1     **IN THE UNITED STATES DISTRICT COURT**

2     **IN AND FOR THE DISTRICT OF DELAWARE**

3           - - -

4 IDENIX PHARMACEUTICALS, INC., UNIVERSITA : CIVIL ACTION
  DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL :
5 DE LA RECHERCHE SCIENTIFIQUE and    :
  L'UNIVERSITE MONTPELLIER II,      :
6                  :
       Plaintiffs,      :
7 v                  :
                  :
8 GILEAD SCIENCES, INC. and GILEAD    :
  PHARMASSET LLC,          :
9                  :
       Defendants.     : NO. 13-1987-LPS
10 ----------------------------------------
  IDENIX PHARMACEUTICALS, INC., UNIVERSITA : CIVIL ACTION
11 DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL :
  DE LA RECHERCHE SCIENTIFIQUE and    :
12 L'UNIVERSITE MONTPELLIER II,      :
                  :
13      Plaintiffs,      :
  v                  :
14                  :
  GILEAD PHARMASSET LLC,       :
15                  :
       Defendant.      : NO. 14-109-LPS
16 ----------------------------------------
  IDENIX PHARMACEUTICALS, INC.,      : CIVIL ACTION
17                  :
       Plaintiff,      :
18 v                  :
                  :
19 GILEAD SCIENCES, INC.        :
                  :
20       Defendant.      : NO. 14-846-LPS
                - - -
21

          Wilmington, Delaware
22        Monday, December 5, 2016
          *Jury Trial - Volume A*
23

           - - -
24

  BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
25           - - -

1  **APPEARANCES:**

2

3         **ASHBY & GEDDES, P.A.**
       **BY:  JOHN G. DAY, ESQ.**

4             **and**

5         **McCARTER & ENGLISH**
       **BY:  MICHAEL P. KELLY, ESQ.**

6             **and**

7

8         **JONES DAY**
       **BY:  CALVIN P. GRIFFITH, ESQ.,**
           **RYAN B. McCRUM, ESQ.,**

9             **MICHAEL S. WEINSTEIN, ESQ., and**
           **BRADLEY W. HARRISON, ESQ.**

10             **(Cleveland, Ohio)**

11             **and**

12         **JONES DAY**
       **BY:  JENNIFER L. SWIZE, ESQ.**

13             **(Washington, District of Columbia)**

14             **and**

15         **JONES DAY**
       **BY:  STEPHANIE E. PARKER, ESQ., and**

16             **JESIKA W. FRENCH, ESQ.**
           **(Atlanta, Georgia)**

17             **and**

18

19         **JONES DAY**
       **BY:  JOHN D. KINTON, ESQ., and**
           **ANTHONY M. INSOGNA, ESQ.**

20             **(San Diego, California)**

21             **and**

22         **JONES DAY**
       **BY:  JOHN M. MICHALIK, ESQ., and**

23             **LISA L. FURBY, ESQ.**
           **(Chicago, Illinois)**

24             **Counsel for Plaintiffs**

25

1    APPEARANCES:   (Continued)

2

3                    FISH & RICHARDSON, P.C.
                     BY:  MARTINA TYREUS HUFNAL, ESQ.,
                          DOUGLAS E. McCANN, ESQ.,
4                         JOSEPH B. WARDEN, ESQ.,
                          SANTOSH COUTINHO, ESQ.,
5                         ROBERT OAKES, ESQ., and
                          KELLY ALLENSPACH DEL DOTTO, ESQ.
6
                          and
7
                     FISH & RICHARDSON, P.C.
8                    BY:  FRANK SCHERKENBACH, ESQ., and
                          JENNY SHMUEL, ESQ.
9                         (Boston, Massachusetts)

10                        and

11                   FISH & RICHARDSON, P.C.
                     BY:  JUANITA BROOKS, ESQ.,
12                        W. CHAD SHEAR, ESQ.,
                          CRAIG COUNTRYMAN, ESQ., and
13                        JONATHAN E. SINGER, ESQ.
                          (San Diego, California)
14
                          and
15
                     FISH & RICHARDSON, P.C.
16                   BY:  MICHAEL R. HEADLEY, ESQ.,
                          JOHN M. FARRELL, ESQ., and
17                        DALIA KOTHARI, ESQ.
                          (Redwood City, California)
18
                          and
19
                     FISH & RICHARDSON, P.C.
20                   BY:  TASHA FRANCIS, ESQ.
                          (Minneapolis, Minnesota)
21
                               Counsel for Defendants
22

23

24   Kevin Maurer                         Brian P. Gaffigan
     Official Court Reporter              Official Court Reporter
25

                              - oOo -

                        P R O C E E D I N G S

                    (REPORTER'S NOTE:  The following trial was held
08:18:09  in open court, beginning at 8:34 a.m.)

08:18:09          THE COURT:  Good morning, everyone.

08:34:15          (The attorneys respond, "Good morning, Your
08:34:16  Honor.")

08:34:16          THE COURT:  Just this first morning of trial,
08:34:19  let me start by having you put your appearances on the
08:34:21  record, please.

08:34:22          MS. PARKER:  Good morning, Your Honor.
08:34:22  Stephanie Parker from Jones Day for the plaintiffs.

08:34:26          MR. GRIFFITH:  Calvin Griffith from Jones Day
08:34:29  on behalf of the plaintiffs.

08:34:30          MR. DAY:  Good morning, Your Honor.  John Day
08:34:32  from Ashby & Geddes on behalf of the plaintiffs.

08:34:36          MR. KELLY:  Michael Kelly from McCarter &
08:34:39  English, Your Honor.

08:34:40          MS. SWIZE:  Jennifer Swize from Jones Day on
08:34:43  behalf of plaintiffs.

08:34:43          MR. McCRUM:  Ryan McCrum from Jones Day on
08:34:46  behalf of plaintiffs.

08:34:48          MR. KINTON:  Jonathan Kinton from Jones Day on
08:34:51  behalf of plaintiffs.

08:34:52          MR. HARRISON:  Bradley Harrison from Jones Day

08:34:54 1    on behalf of the plaintiffs, Your Honor.

08:34:55 2              MR. INSOGNA:  Anthony Insogna on behalf of the

08:34:57 3    plaintiffs, Your Honor.

08:34:57 4              THE COURT:  Is that everybody, Ms. Parker?

08:35:01 5              MS. PARKER:  Your Honor, may I introduce?  These

08:35:02 6    are not lawyers.

08:35:03 7              THE COURT:  Yes, please.

08:35:04 8              MS. PARKER:  May I introduce, this is Dr.

08:35:06 9    Davis who is our jury consultant who will be helping me

08:35:09 10   today.  This also Dr. David Standring who is our client

08:35:12 11   representative.

08:35:15 12             MR. STANDRING:  Good morning.

08:35:15 13             THE COURT:  Good morning.  Welcome to all of you.

08:35:18 14             All right.  The other side.

08:35:18 15             MS. HUFNAL:  Good morning, Your Honor.  Martina

08:35:18 16   Hufnal from Fish & Richardson for Gilead.

08:35:22 17             Frank Scherkenbach.

08:35:22 18             MR. SCHERKENBACH:  Good morning.

08:35:23 19             MS. HUFNAL:  Michael Headley.

08:35:24 20             MR. HEADLEY:  Good morning.

08:35:24 21             MS. HUFNAL:  Chad Shear.

08:35:26 22             MR. SHEAR:  Good morning.

08:35:27 23             THE COURT:  Good morning.

08:35:29 24             MS. HUFNAL:  Joseph Warden.

08:35:30 25             Craig Countryman.

08:35:32 1     And in the back, Your Honor, we have from

08:35:35 2  Gilead, Andrea Hutchinson.

08:35:37 3     THE COURT:  Good morning.

08:35:37 4     MS. HUFNAL:  Lorie Ann Morgan, and Brett

08:35:42 5  Pletcher.

08:35:42 6     THE COURT:  Good morning to all of you.

08:35:43 7     So, of course, we are here for trial.  The jury

08:35:46 8  pool should be able to us at 9:30, so I have a few things I

08:35:51 9  wanted to say before we turn the clock on.  Then I'll turn

08:35:55 10  to both side to raise any issues that they want to.

08:35:58 11     First, as I'm sure you have seen, we have

08:36:00 12  adopted the voir dire that we'll be using.  We docketed

08:36:04 13  the preliminary instructions.  We got a memorandum order

08:36:06 14  out yesterday dealing with the issues that you all raise on

08:36:10 15  Saturday.

08:36:10 16     I'm aware of I believe four letters that came

08:36:12 17  in some time yesterday with further issues that you want

08:36:16 18  resolved.  And if we have time this morning, if you want to

08:36:20 19  raise those as part of what we do this morning, we can do

08:36:23 20  that.

08:36:24 21     Just a few miscellaneous things.

08:36:27 22     The jury notebooks have those been prepared, do

08:36:30 23  they have the sample patent in them that is mentioned in the

08:36:34 24  FJC video, Mr. Day?

08:36:35 25     MR. DAY:  Good morning, Your Honor.  They are

prepared.  They do not have the sample patent in them.
They have the patent from this case and the preliminary
instructions also in them and some blank paper.

        THE COURT:  I would ask, if you have access to
it, that you get a copy of the sample patent in there
because it can be confusing for the jury when it is
referenced in the video.

        MR. DAY:  Okay.  Thank you, Your Honor.

        THE COURT:  Thank you.

        The filings this weekend, it was unclear which
action you are filing things in.  My understanding was
this trial is really an 846, 14-846 trial, and presumably
everything should be filed in that action but it is unclear
that is what you were doing.  I'm happy to proceed however
you want but I need to know which case to be monitoring
essentially.

        Mr. Headley.

        MR. HEADLEY:  Yes, that is fine, Your Honor.  I
believe the plaintiffs have started filing that way, but we
hadn't reached agreement with the Court's guidance on that
so I appreciate you flagging that for us.  We will follow
that procedure for the course of trial.  Of course, if
something else changes or there needs to be something in
another case, we'll do that but that will streamline things
going forward.

08:37:44 1        THE COURT:  Let's make sure everything related

08:37:46 2   to the trial is filed at least in the 14-846.  If you want

08:37:50 3   to file it in other actions, that is fine, too, but I will

08:37:53 4   train myself to know to look in the 846 action for what is

08:37:57 5   going on in this case.  Understood?

08:37:59 6        MR. HEADLEY:  Likewise.  Thank you.

08:38:00 7        THE COURT:  Understood on the plaintiffs' side

08:38:01 8   also?

08:38:01 9        MR. DAY:  Yes, Your Honor.

08:38:02 10        THE COURT:  Okay.  Now, further, I expect by the

08:38:05 11   end of the day today, we will have an e-mail address to give

08:38:09 12   you all that we will want you to send a copy of whatever you

08:38:14 13   filed outside of the normal business hours.  Send a copy to

08:38:20 14   that e-mail address so we're able to know pretty much in

08:38:22 15   real-time something has been filed.  I don't know what that

08:38:25 16   e-mail address is yet, but by the end of the day we will let

08:38:28 17   you know that.

08:38:29 18        One last thing.  At the end of the preliminary

08:38:32 19   instructions, we have a glossary, and there is one term

08:38:37 20   there that I want to try my best to pronounce correctly for

08:38:40 21   the jury.  So I will take your guidance from anyone.  It's,

08:38:47 22   I'm not going to tell you what I think it is, but page 14,

08:38:51 23   this last term, chemical formula essentially, how do you

08:38:55 24   want me to pronounce that to the jury.

08:38:58 25        MR. GRIFFITH:  Your Honor, should I take a crack

08:39:01 1   at it?

08:39:01 2          THE COURT:  Sure.

08:39:01 3          MR. GRIFFITH:  Beta-D-2'-methyl ribofuranosyl

08:39:11 4   nucleoside.  Ribofuranosyl.

08:39:13 5          THE COURT:  Is that agreeable to Gilead?

08:39:16 6          MR. SCHERKENBACH:  It is, Your Honor.

08:39:16 7          THE COURT:  I will do my best to say that

08:39:19 8   correctly.

08:39:19 9          That is all I had.  I will direct Mr. Looby to

08:39:23 10   turn the clock on now, and we will turn to the plaintiffs

08:39:25 11   for any issues they want to raise this morning.

08:39:52 12          MR. GRIFFITH:  Good morning, Your Honor.

08:39:54 13          THE COURT:  Good morning.

08:39:55 14          MR. GRIFFITH:  I have two groups of things to

08:39:58 15   discuss.  One is the demonstrative slides, and we have some

08:40:04 16   objections to their slides that they're planning on using;

08:40:07 17   and the second thing is some designations that were made to

08:40:16 18   the Schinazi declaration.  These came in yesterday, so after

08:40:19 19   the previous declarations had been submitted.

08:40:22 20          THE COURT:  That is the Schinazi deposition?

08:40:24 21          MR. GRIFFITH:  Yes, Your Honor.  So there are

08:40:27 22   objections we had to that and then we have counterdesignations.

08:40:31 23   They have some objections to our counterdesignation.

08:40:33 24          THE COURT:  Let's deal with the issues related

08:40:35 25   to the demonstratives and the openings statements first.

08:40:38 1         MR. GRIFFITH:  Okay.  Your Honor, if I may hand

08:40:53 2  up to the bench some of the slides I'm going to talk about

08:40:57 3  this morning, and they're grouped according to objections.

08:41:00 4         THE COURT:  Do you have two sets of them?  If

08:41:02 5  you don't have two, we'll take one.

08:41:03 6         MR. GRIFFITH:  I have one.  I'm sorry.

08:41:07 7         (Documents passed forward.)

08:41:16 8         MR. GRIFFITH:  Your Honor, the first two

08:41:18 9  groups deal with similar issues, and that is that they're

08:41:25 10  argumentive in the titles for the first group and they are

08:41:30 11  statements of law.  And the second group is a checklist,

08:41:36 12  but it is also statements of law.

08:41:40 13         And what I would say about these, Your Honor,

08:41:43 14  is these are quotes from the patent video as opposed to the

08:41:50 15  Court's jury instructions or preliminary jury instructions,

08:41:53 16  and so it doesn't -- these should be treated as jury

08:42:00 17  instructions.  That said, Your Honor, we have a series of,

08:42:06 18  not a lot but a few slides in our own presentation that are

08:42:11 19  simple quotes from Your Honor's preliminary jury

08:42:15 20  instructions and our titles just say jury instructions, and

08:42:21 21  things like clear and convincing standard.

08:42:23 22         THE COURT:  They're from the preliminary

08:42:25 23  instructions.

08:42:25 24         MR. GRIFFITH:  They are, Your Honor.  Yes.  And

08:42:28 25  so what I would say on these is ours are, one, based on the

08:42:35 1  jury instructions that don't have argumentive titles.

08:42:38 2          That said, I did offer to the other side that we

08:42:43 3  could dispense with their objections to our rather bland

08:42:50 4  slides that have a quote from the jury instructions on them,

08:42:54 5  we would not persist in these ones, even though, Your Honor,

08:42:57 6  I don't think they should be referring to the quotes from

08:43:02 7  the PTO video as if that is a jury instruction or the law.

08:43:06 8  The law is what the Court gives to the jury.  And on top of

08:43:10 9  it, there are these argumentive titles.

08:43:12 10          THE COURT:  All right.  So your principal

08:43:16 11  request is that I do not allow them to use any of the first

08:43:18 12  set which appear to be slides with the photo of Judge Fogel

08:43:21 13  and some excerpts that are emphasized from what I'm sure are

08:43:25 14  quotes from the video.

08:43:26 15          MR. GRIFFITH:  Correct, Your Honor.

08:43:27 16          THE COURT:  But if that they would agree to

08:43:30 17  whatever quotes or slides you have from the preliminary

08:43:33 18  jury instructions, then you would withdraw this objection?

08:43:36 19          MR. GRIFFITH:  We would, Your Honor.

08:43:37 20          THE COURT:  Okay.  Let's go on to the next

08:43:41 21  category.

08:43:42 22          MR. GRIFFITH:  The next category is, the third

08:43:44 23  categories is a series of slides, 121, PDX-121, 150 to 154,

08:43:51 24  and 156.

08:43:54 25          THE COURT:  And just, sorry, that second

08:43:56 1    category with the checkboxes, same offer?

08:43:58 2           MR. GRIFFITH:  I apologize, Your Honor.  The

08:44:01 3    second category is grouped in with the first, so I had first

08:44:06 4    two categories the rules of validity with the checkboxes is

08:44:10 5    the second category.  It is also the issue of law and

08:44:15 6    argumentive issue.

08:44:16 7           THE COURT:  But you would withdraw your

08:44:18 8    objection to those as well?

08:44:19 9           MR. GRIFFITH:  Yes, we would.

08:44:20 10          THE COURT:  Okay.  So then the third category,

08:44:23 11   this is for the record, Your Honor, it's slide 121, 150 to

08:44:28 12   154, and 156.

08:44:32 13          These slides deal with the alleged failures of

08:44:38 14   Dr. Griffon and others to not make 2'-methyl (up), 2'-fluoro

08:44:45 15   (down), we filed a motion in limine on this.  That motion

08:44:48 16   was denied.  We don't waive that objection, and so I just

08:44:51 17   want to put on the record that that is still an objection

08:44:53 18   that we will make if, and when, this evidence is sought to

08:44:58 19   be brought in.

08:44:59 20          But I also understand, Your Honor's ruling on

08:45:02 21   the MIL.  So the objection is based on 402 and 403 and all

08:45:06 22   the reasons we had stated in our motion in limine.

08:45:13 23          Your Honor, the fourth group is, it's three

08:45:21 24   slides, it should only be two.  They withdrew.  I apologize

08:45:24 25   to the other side.  They withdrew.  We did have some

discussions worked out a couple of things.  They withdrew DDX-106.

But 144 and 145 deal with an issue about the Schinazi depo designations.  And I think it might be more appropriate, our objections to those are the same as they are to the depo designations.  It's these designations were made untimely.  But they're also, they're hearsay.  They are based on leading questions, they should not come into evidence.  The lack of personal knowledge is also present.

And so all those objections that we lodged with respect to the Schinazi testimony, I think that that will probably ought to be more fleshed out with that second motion or second set of objections.  And then,

Finally, Your Honor, we have a group of slides. It's DDX-102, 113, 114, and 131.  And there are two additional but we're going to withdraw our objections on 148 and 163 due to some changes they made to those slides, so that it's 102, 113, 114 and 131.

The objections there, Your Honor, are argumentative in the titles.  And the thing I would point out on these as well is they have objected to some of our slides that talk about Gilead's, they refer to Gilead's products using our breakthrough invention.  And on these slides, they're referring to Gilead's inventions, Harvoni and Sovaldi.

08:47:16 1        I would say on these, it is a little it's sauce

08:47:20 2  for the goose, sauce for the gander.  It would seem those

08:47:24 3  cut both ways.

08:47:25 4            THE COURT:  Okay.

08:47:27 5            MR. GRIFFITH:  Then, Your Honor, should I move

08:47:29 6  on to the depo designations?

08:47:30 7            THE COURT:  No, you have given me quite a lot to

08:47:33 8  start with.  I'd like to start with Gilead on these

08:47:35 9  objections.

08:48:37 10            MR. SCHERKENBACH:  Good morning, Your Honor.

08:48:44 11            THE COURT:  Good morning.

08:48:45 12            MR. SCHERKENBACH:  I will try to do them in

08:48:47 13  order.  I wrote as fast as I could.

08:48:54 14            I will try to go in the order they did.

08:48:57 15            The quotes from the patent video, as I am sure

08:49:01 16  you recall, that's typically done.  I have done it many

08:49:06 17  times in trials here.  The jury will have heard that.  It's

08:49:09 18  simply being used to frame the issues that they have to

08:49:12 19  decide.  No one is arguing they are a jury instruction.  It

08:49:14 20  is clearly not.  It is clearly just the person they saw in

08:49:18 21  the video.

08:49:18 22            It is in the nature of, there is this thing

08:49:21 23  called the written description requirement, there is this

08:49:24 24  thing called the enablement requirement, and those are the

08:49:27 25  issues you have to decide in the case.

08:49:30 1          This trade that they mentioned is, the reason we

08:49:33 2     didn't accept the trade is they actually have on their

08:49:37 3     slides things that are neither in the patent video nor in

08:49:42 4     your preliminary jury instructions.  We actually didn't

08:49:46 5     object to anything in their slides that wasn't preliminary

08:49:49 6     jury instruction or wasn't part of it.  And I can hand these

08:49:57 7     up.  It may kill two birds with one stone.  They actually

08:50:01 8     have an instruction on clear and convincing evidence that

08:50:03 9     does not appear.  You have given it to the jury, and you are

08:50:07 10    not going to, as I understand it, until final instructions.

08:50:10 11    They have a slide saying patents are presumed valid.  There

08:50:14 12    is nothing on presumption of validity either in the patent

08:50:17 13    video or the preliminary instructions.

08:50:19 14          So if both sides stick to what the jury will

08:50:23 15    actually be told here, the trade is fine.

08:50:26 16          THE COURT:  Was there nothing proposed on clear

08:50:29 17    and convincing or presumption in the preliminary

08:50:31 18    instructions?

08:50:32 19          MR. SCHERKENBACH:  There is -- in the

08:50:34 20    preliminary instructions, I don't believe so.  There is a

08:50:37 21    statement in the patent video, where Judge Fogel says clear

08:50:42 22    and convincing evidence means that it has to be highly

08:50:47 23    probable that the fact has been proven.  So there is a

08:50:49 24    one-liner in there.

08:50:51 25          Their statement about clear and convincing is

08:50:54 1  actually different than that.  I think what they have done

08:50:57 2  is take it from some jury instruction somewhere.

08:50:59 3           THE COURT:  I have what I believe are the

08:51:02 4  preliminary instructions.  It looks like on page 6 I am

08:51:06 5  saying, Gilead contends the patent is invalid.  The party

08:51:09 6  challenging has the burden of clear and convincing and clear

08:51:12 7  and convincing is, you know, an abiding conviction.  I am

08:51:17 8  sort of paraphrasing.

08:51:19 9           Is it your view that what Idenix proposes to do

08:51:22 10 is not actually consistent or doesn't quote what we have at

08:51:26 11 page 6?

08:51:27 12          MR. SCHERKENBACH:  One moment, Your Honor, let

08:51:30 13 me find that.

08:51:31 14          THE COURT:  Sure.

08:51:35 15          MR. SCHERKENBACH:  That is my information.

08:51:51 16          That one is accurate.  The presumption of

08:51:58 17 validity, I guess, is the one where we got a disconnect.  So

08:52:03 18 they have a slide -- I can hand it up -- about patents are

08:52:06 19 presumed valid.  It was in the nature of that.

08:52:10 20          If everyone is going to just refer to what the

08:52:14 21 jury has heard and been told, the trade is fine.  They have

08:52:17 22 just one slide that goes beyond that, their Slide 51, where

08:52:21 23 they say patents are presumed valid when issued.  I don't

08:52:25 24 believe that is in the preliminaries or in that --

08:52:33 25          THE COURT:  When it comes to that the final

08:52:36 1    instructions, do you have a position as to whether you are

08:52:38 2    going to object to telling the jury there is a presumption

08:52:42 3    of validity?

08:52:43 4         MR. SCHERKENBACH:  I actually don't have a

08:52:45 5    position yet.

08:52:47 6         I want to look at what we have done in patent

08:52:50 7    cases.  He we had a lot of discussions about whether the

08:52:52 8    jury should hear both about the assumption and that it's the

08:52:56 9    clear and convincing evidence standard and they should not

08:52:58 10   be doing double counting.

08:53:01 11        I don't want to take a position on that at the

08:53:03 12   moment.

08:53:05 13        That's the issue of, I guess, the trade, if I

08:53:10 14   can call it that.  I think we are down to one slide.  If

08:53:14 15   everyone is going to abide to the same set rules and only

08:53:17 16   refer to the what the jury hears, that is okay with us, what

08:53:21 17   the jury will actually hear.

08:53:23 18        The second category, I believe, rises or falls

08:53:27 19   with that.  That was my understanding.

08:53:28 20        THE COURT:  That was the plaintiffs' view.

08:53:32 21        MR. SCHERKENBACH:  Then that brings us to the

08:53:35 22   third category regarding the, basically Idenix's failures to

08:53:39 23   synthesize 2-methylfluoro.  This is the group of Slides 121,

08:53:45 24   150 to 154, 156.  I believe they just wanted to note for the

08:53:50 25   record that they are not waiving their objection to the

underlying evidence by use in openings, and then we to have a problem.

Actually, both sides have taken that position, using evidence in opening statement subject later to its actual admission.

Your Honor you recall this topic in particular, they filed a motion in limine, which you denied. We think it's fair game for us to refer to that in opening. I believe they are just preserving their position on that.

As to the fourth group, which are Slides 144 to 145, this is actually sort of the same issue. This pertains to Dr. Schinazi communicating to Idenix the Pharmasset invention and then Idenix changing its patent. This also was the subject of a motion in limine they brought, which you also denied and determined the evidence was relevant and admissible.

So apart from their timeliness argument, which we can take up separately in the context of the depo designations, I believe this has been resolved and it's fair game.

Then we have the last group, 5, their Group 5, 101, Slides 102, 113, 114, 131, they have a problem just with the titles on their slides. If I understand -- this is a slight modification from where we got to last night. If we don't object to their slides, that is the breakthrough

08:55:28 1    ones, and there is three or four of them, they are okay with

08:55:32 2    our titles, that is actually fine with us.  That was not an

08:55:36 3    offer that I understood to be made last night.

08:55:38 4                THE COURT:  Mr. Griffith, are we talking about

08:55:40 5    the same slides, the breakthrough ones?

08:55:42 6                MR. GRIFFITH:  Yes.

08:55:44 7                THE COURT:  Is he accepting the offer you have

08:55:45 8    made?

08:55:46 9                MR. GRIFFITH:  So the series of slides, number

08:55:51 10   one, the number refers to our invention, Sovaldi and Harvoni

08:55:58 11   used the breakthrough invention.  I can get them, Your

08:56:03 12   Honor.

08:56:05 13               THE COURT:  Why don't you two confer.  If the

08:56:09 14   offer that was made has been accepted, that's easy for me.

08:56:11 15   If not, then I may need to hear more.

08:56:19 16                    (Counsel confer.)

08:56:26 17               MR. GRIFFITH:  Slide 10.

08:56:29 18               THE COURT:  You can talk to one another.

08:56:31 19                    (Counsel confer.)

08:56:54 20               THE COURT:  Sorry, did you resolve that?

08:56:57 21               MR. SCHERKENBACH:  I believe we did.

08:56:58 22               MR. GRIFFITH:  We did.

08:56:59 23               THE COURT:  Mr. Griffith, that takes care of

08:57:00 24   that last set of objections?

08:57:02 25               MR. GRIFFITH:  It does, Your Honor.

08:57:04 1          THE COURT:  You can come back on what he has

08:57:06 2    left.

08:57:07 3          Thank you, Mr. Scherkenbach.  Whatever you think

08:57:17 4    may still be in dispute, if you want to have the last word

08:57:20 5    you may do so.

08:57:23 6          MR. GRIFFITH:  The only thing, the one video

08:57:25 7    that says patents are presumed valid, we did not attribute

08:57:28 8    that to a jury instruction.  I have never been in a patent

08:57:31 9    case where a jury wasn't told the patents were presumed

08:57:36 10    valued where validity is at stake.  It seems fairly

08:57:40 11    innocuous.

08:57:41 12          Again, I would go back to what I proposed as a

08:57:43 13    way to get by this for both parties and not have to argue

08:57:47 14    it.  It is true their slides, the ones I noted, the first

08:57:51 15    two groups, do have quotes from the video.  But then they

08:57:54 16    have above it their own statement.  It's a statement of

08:57:58 17    their spin on the law.  I don't agree with it.  It's

08:58:01 18    incomplete.  It's not the way I believe it should be

08:58:06 19    phrased.

08:58:06 20          And then that second group of slides, 117, 119,

08:58:11 21    I think it's 155 and 159, same thing, they are not quotes

08:58:17 22    from the video.

08:58:18 23          If the rule is it's got to come out of the jury

08:58:22 24    instructions word by word, then sauce for the goose - sauce

08:58:25 25    for the gander.  Again, to me this is not a big deal.  If

they can get past the patent is presumed valid, we would withdraw our objections on this second group of slides.

THE COURT: Okay. Thank you.

So with respect to the first and second set, which is the slides with Judge Fogel and the excerpts from the video as well as the checked boxes, I am overruling the objections, meaning I am going to allow Gilead to use all of these slides. But I am also going to allow Idenix to have its one slide, which I understand is in dispute, the one about the presumption of validity with respect to the patent.

I think, first of all, this is being fair to both sides, and second of all, is essentially telling the jury things that they will either have already heard in the video or the preliminary instructions from me. They are almost certainly going hear from me in the final instructions on the presumption of validity.

While I have not made a final decision as to whether I will literally say the words presumed valid in the final instructions, that is only because I haven't received the final version of what the parties' positions are.

I don't believe I have had a patent trial with a validity issue in which I haven't told the jury that patents are presumed valid. I will defer a final decision on that. If I don't end up instructing them on that, I don't think it

09:00:11 1    will be highly prejudicial to anyone because I will make

09:00:13 2    clear at the time of the final instructions that these are

09:00:16 3    the final instructions and you must follow these, whatever

09:00:19 4    they are.

09:00:20 5         I do want Gilead to be on notice that it would

09:00:23 6    be objectionable to overemphasis Judge Fogel's role as a

09:00:29 7    judge or to suggest in any way that what they are being

09:00:32 8    shown are the binding instructions that they will have to as

09:00:37 9    a matter of law follow, because that is not the case. And

09:00:39 10    that will become very clear to the jury at the appropriate

09:00:42 11    time.

09:00:43 12         That takes care of the first set and the second

09:00:46 13    set of objections.

09:00:48 14         With respect to the third, which is the slides,

09:00:50 15    the first one begins with Dr. Griffon, those objections of

09:00:54 16    Idenix's are overruled, consistent with the Court's ruling

09:00:58 17    on the motion in limine.

09:01:00 18         With respect to Dr. Schinazi, I am deferring

09:01:03 19    ruling for a moment.

09:01:04 20         We will come I think probably next or soon,

09:01:07 21    hopefully, to the issues related to the depositions. I am

09:01:11 22    going to hear that argument before I make a decision on the

09:01:13 23    slides.

09:01:14 24         In terms of the last set, I think you agreed on

09:01:18 25    those, so there is nothing for me to decide there.

09:01:22  1                    Other than Dr. Schinazi, does that take care of

09:01:24  2     the objections you have raised?

09:01:25  3                    MR. GRIFFITH:  Yes, Your Honor.

09:01:26  4                    THE COURT:  Did you have anything else that goes

09:01:27  5     to their opening?

09:01:31  6                    MR. GRIFFITH:  No, I do not, Your Honor, other

09:01:34  7     than the Schinazi deposition thing.

09:01:35  8                    THE COURT:  I do want to come back to that.

09:01:38  9                    Let me see.  Are there issues that defendants

09:01:40 10     wants to raise about the defendants' opening?

09:01:43 11                    MR. SCHERKENBACH:  We do.

09:01:44 12                    THE COURT:  I am happy to hear them, please.

09:01:49 13                    MR. SCHERKENBACH:  I think there are three.  We

09:01:54 14     can do them by category, Your Honor, if I could hand up a

09:01:58 15     couple of sets of the relevant slides.

09:02:01 16                    THE COURT:  You can.

09:02:02 17                    MR. SCHERKENBACH:  They are clipped together.

09:02:15 18                    It looks worse than it is, Your Honor.  I think

09:02:18 19     we can talk about one or two as an example, because there is

09:02:21 20     a category.

09:02:22 21                    The first category on the top, you will see

09:02:25 22     there is the slide that says "internal e-mail to Dr.

09:02:30 23     Schinazi" and there is a handwritten No. 6 on it.  So this

09:02:34 24     is representative of a number of their slides where, rather

09:02:38 25     than show the actual evidence, you know, in other words,

show the document, they have taken excerpts out of the document and essentially turned them into an argument.

You can see on the slides, there is ellipse here where they leave out the words they don't like. They pick and choose from different parts of the document, which I think is inappropriate. If you look at the document, it really isn't even appropriate for closing and certainly not for opening.

If you look at the next set with the 27 at the bottom, this is another thing they have done on some slides where they have actually cut out pieces of a document and rearranged the order in which they actually appear in the document. For example, in the top in this one, the top box and the bottom box are out of order than the way they appear in the document. There is a bunch of text in between. They are entitled to put on the evidence and preview the actual document and zoom in on what they want to zoom in on and make their objections, okay. But there is a very different thing that are either lawyer arguments or bullets without showing it or previewing it, and that's what I think is objectionable. In my view, it misrepresents the content of the document.

These are sort of two examples. So the issue, should they have to show the underlying evidence before they zoom in on what they want to focus on.

09:03:08  1          THE COURT:  So, hold on.

09:03:09  2          MR. SCHERKENBACH:  Yes.

09:03:10  3          THE COURT:  You would be comfortable, or not

09:03:12  4  comfortable but you don't have an objection if they first

09:03:15  5  throw up the first document and then go to these slides?

09:03:19  6          MR. SCHERKENBACH:  Well, if they actually show

09:03:23  7  in the document where the language comes from, that would be

09:03:27  8  okay.  Right?

09:03:30  9          So I mean I don't think, for example, with

09:03:32 10  respect to 27, I don't think that one is fair in its current

09:03:35 11  form regardless of whether they first show the document and

09:03:38 12  say now let me show you the document rearranged.  I think

09:03:41 13  they should put the document up and show the jury the

09:03:43 14  language they like.  Here it is in one spot and here it is

09:03:46 15  in the other spot.  That is all.  Show me the evidence.  So

09:03:50 16  that is one category.

09:03:54 17          The second issue is, relates to a single slide

09:03:58 18  with the number 50 handwritten at the bottom.

09:04:01 19          THE COURT:  Okay.

09:04:01 20          MR. SCHERKENBACH:  It says, Profit Margin.  The

09:04:04 21  problem with this one is you see there is no source

09:04:08 22  indicated because there is no source for this proposition.

09:04:14 23          There is their argument --

09:04:16 24          MR. GRIFFITH:  Your Honor, we have withdrawn

09:04:19 25  that slide.

09:04:20  1          MR. SCHERKENBACH:  All right.  Excellent.

09:04:28  2          Then actually the last issue, Your Honor, I'm

09:04:30  3   embarrassed to have to raise it.  The reason we have hand-

09:04:33  4   written numbers on these slides is they were produced to us

09:04:36  5   without any numbers and in a shuffled order.

09:04:40  6          We got 73 slides last night from the Jones Day

09:04:47  7   folks, and the concluding slide is No. 33.  It's just, it

09:04:53  8   was just a jumbled mess with no numbers on the slides.

09:04:57  9          I don't know why anyone would do that.  We asked

09:05:00 10   them why they did it.  No one had an explanation for us.  I

09:05:04 11   think they should have to present their slides in the order

09:05:08 12   in which they produced them to us.  And they should not now

09:05:11 13   be allowed to rearrange them in their preferred order

09:05:15 14   because, of course, that could affect the way in which we

09:05:18 15   would have objected to the content of the slides and needless

09:05:25 16   to say, this should not occur going forward with witnesses

09:05:28 17   or otherwise.  I don't understand where that is coming from.

09:05:32 18          THE COURT:  Okay.  Thank you.  We'll hear from

09:05:35 19   Idenix.

09:05:41 20          MR. GRIFFITH:  Your Honor, let me clarify one

09:05:54 21   point about the 98 and 99 percent slide.

09:06:01 22          We don't intend to use that as a slide.  It is

09:06:05 23   from one of their witnesses.  And I anticipate that that

09:06:12 24   profit margin will be mentioned in opening statement.  So I

09:06:15 25   just wanted to clarify that.  We don't have that as a slide.

09:06:18 1         THE COURT: Which witness provides the basis?

09:06:22 2         MR. GRIFFITH: James Meyers, and he testified to

09:06:24 3 that profit margin.

09:06:25 4         On the e-mails, these are all quotes from the

09:06:30 5 e-mails and it is a fair portrayal of the quotes. We could

09:06:33 6 have done it by putting the document up like they did and

09:06:38 7 highlighting different parts, and so they focus the jury's

09:06:42 8 intention on just the things they highlighted and in many of

09:06:46 9 their exhibits pulling pages from other pages and putting

09:06:51 10 them on the same slide.

09:06:53 11         So this notion of pulling quotes from different

09:06:57 12 portions of a document is something they did throughout

09:07:00 13 their slides. And I don't think they gave it fair portrayal

09:07:08 14 of our patent or any number of documents in which they do

09:07:11 15 that.

09:07:12 16         That said, I didn't see fit to quibble over, you

09:07:22 17 know, I don't like the fact that you pulled a quote from

09:07:24 18 column 33 of the patent in the second page of the letter

09:07:27 19 and juxtaposed it against something else. It just seemed

09:07:34 20 somewhat pointless, and it seemed like busy work for us to

09:07:38 21 go and have to put the actual document on or blow up of a

09:07:42 22 portion of it and highlight the portions that we're actually

09:07:47 23 quoting. The quotes were the quotes.

09:07:49 24         I understand that they want to put their own

09:07:53 25 spin on these e-mails and things. But these e-mails, by the

way, are all e-mails that have been, are going to come in
with the Schinazi deposition, and the depositions have been
ruled upon, so it's just a matter of time until that
deposition comes into evidence, is played before the jury
and all these exhibits income in.

They're all accurate quotes.  There is no
dispute about that.  They just don't like the ones that we
picked basically.  And if we did it by highlighting as
opposed to by reprinting on the page, it's the same thing.
It's a distinction without a difference.

THE COURT:  What about the contention that it is
argumentive?

MR. GRIFFITH:  These are all, they're not, the
titles are not argumentive and these are all direct quotes
from the documents.  And just as in their slides, they go to
portions of the patent, pick this example and that example
and juxtaposed those, these are the relevant quotes that we
think are the most relevant.

Now, there is nothing inaccurate about any of
these quotes.  They don't challenge that.  They're all
accurate quotes.  They just don't like the ones that we have
highlighted.

As I said, if we had done it with the yellow
highlighter, it would be the exact same thing.  They did
that routinely throughout basically all of their exhibits,

highlighting this, highlighting that, grabbing a portion of a page from the second page of the letter, putting them together.

The fact of the matter is it is efficient to do it that way, and so there is an economy in that, but there is nothing inaccurate or argumentive about our selection of quotes. It is what we believe the jury should look out for.

THE COURT: All right. What about the way you produced these?

MR. GRIFFITH: Your Honor, there was no bad intent in that. We were putting these slides together and they have been evolving as we have gone. We did not have a particular order when we were working on them and putting these things into place and so we gave them what we had. That was our working set, too. And so there was no intent to obfuscate or otherwise with that.

And we worked through all of the objections easily enough. There wasn't objections to a majority of the slides anyway. It was just, I don't think it is the cause of any confusion. It certainly didn't cause them any difficulty in understanding what the basis is, slide by slide.

THE COURT: What is the status of your slide deck now for the opening? Do you have it in any kind of order.

09:10:41 1          MR. GRIFFITH:  Yes, we do.  And last night, we

09:10:43 2     continued to work on that, and there were slides that we

09:10:47 3     pulled and we reach some agreement on some slides as well,

09:10:52 4     as Your Honor understands, you try to cull down from what

09:10:56 5     you have.

09:10:57 6          THE COURT:  Subject to whatever rulings I make

09:11:00 7     before the opening, have you provided them a copy of the

09:11:03 8     slides in the order that you intend to present them?

09:11:05 9          MR. GRIFFITH:  I don't know.  We would be more

09:11:07 10    than happy to do that.  And we would be happy to do that

09:11:11 11    immediately, and get that accomplished forthwith.

09:11:16 12         THE COURT:  All right.  Is there anything else?

09:11:18 13         MR. GRIFFITH:  Nothing else, Your Honor.

09:11:18 14         THE COURT:  All right.  Mr. Scherkenbach.

09:11:20 15         MR. GRIFFITH:  We do have them, Your Honor.

09:11:25 16         THE COURT:  It appears you are holding something

09:11:27 17    in your hand that might in fact be those.

09:11:29 18         MR. SCHERKENBACH:  That proves my point, right?

09:11:31 19    We don't have them.

09:11:33 20          It's incredible to me that at this level of

09:11:36 21    practice we're doing this.  We don't have a set with

09:11:40 22    numbers.  We don't have a set in the order clearly in the

09:11:42 23    order they're going to use them.  I can hand up their set.

09:11:45 24    It is a jumbled mess.  And they should be required to

09:11:50 25    present it in the order they provided it to us.  The jury is

coming in here in 18 minutes. It doesn't help me to get a new set of their slides in the order they're actually going to present them. I don't think that is appropriate and there is no excuse for it.

Just continuing in reverse order. On this document issue, again, Your Honor, if I can direct you to, you know, slide 6 as an example, they say, well, the e-mails will all come in.

That is right. They should show the e-mail. They should show the document. They shouldn't show pieces excerpted out. I mean for them to say these are accurate quotes, you can see on their face it is not an accurate quote.

Again, I'm looking, using slide 6 as an example. They just take out the words they don't like and they can do that in their opening if the document is on the screen and the jury can see, oh, well, you are missing, you are skipping that phrase and that word and you cut off that sentence in the middle, and I am fine with that and they're not fine with that, which is why we're having this fight.

We don't do that in our slides or anything like it. We show the actual evidence and then comment on the evidence. So that is Category 2.

On profit margin, they represented to you that Mr. Meyers is going to say what is on that slide. He is

not.  And that is why there is no cite to a source on that slide.

If they think he said it, they should put his testimony on a slide and say, look, he said it.

THE COURT:  Well, now they're not doing a slide, and so I don't know, you know, you didn't have to disclose each sentence you are going to say to one another.  We'll just have to deal with that if we need to deal with it.

MR. SCHERKENBACH:  I understand that.  I'm not saying -- but at some level, it's subjective, and I get it.  But somebody can't say the most outrageous thing in the world and just because it is not on a slide it's okay.

THE COURT:  No, but if you have to object, you will have to object.

MR. SCHERKENBACH:  I think those are my responses.

THE COURT:  Okay.  Thank you.  So these are Gilead's objections to Idenix's slides for Idenix's opening.

First is the objections to these slides that are excerpting certain exhibits that are going to come into evidence.

I'm going to grant in part and deny in part Gilead's objection.  It's granted to the extent that if Idenix wants to use these slides, it needs to first show the full document to the jury.  I think that is appropriate

09:14:37 1    context that the jury should have in light of the concerns

09:14:40 2    that Gilead has raised.

09:14:44 3            Once that is done, if Idenix prefers to then

09:14:50 4    remove that document from the jury's view and move Otto

09:14:53 5    its slides, I'm going to allow Idenix to do that.  I think

09:14:59 6    that that is a fair balance in terms of the parties'

09:15:03 7    interests and the jury's interest in understanding the

09:15:06 8    record and understanding the parties' positions and

09:15:10 9    understanding what an opening statement is as opposed to

09:15:13 10    any other portion of the trial.

09:15:15 11            While I understand Gilead is apparently going to

09:15:22 12    in its own presentation keep full exhibits up and highlight,

09:15:27 13    and that is perfectly appropriate, I'm not persuaded that I

09:15:30 14    should require Idenix to do it exactly that way.  I think

09:15:35 15    what I have come up with is fair under all of the

09:15:40 16    circumstances.

09:15:40 17            In terms of the second objection, which to me is

09:15:44 18    the slides being out of order because I consider the 98 to

09:15:49 19    99 percent issue having been withdrawn for the moment, I'm

09:15:55 20    overruling the objection.  I'm not going to require Idenix

09:15:57 21    to present its slides in the order that it provided them to

09:16:03 22    Gilead.

09:16:03 23            But I do want to say I have not heard a valid

09:16:07 24    excuse, and it may well, in fact, as Mr. Scherkenbach says,

09:16:12 25    be inexcusable what Idenix has done.  I just think the

remedy that has been asked for is too extreme and would be unhelpful to the jury and would not get this trial off to the start that it should be off to.

That said, it's hard to understand how with a team this large and this experienced and with the stakes here that you would produce what appears without objection or without disagreement to be a jumbled mess that does not reflect what you intend it to do and intend to do at trial told. So, again, that is hard to understand. I take the representation it wasn't done in bad faith and I believe that something like that will not happen again during this trial. If it does, then the consequences will have to be more substantial.

I also take note of the fact that even on my best estimate, we're not likely to get to Gilead's opening statement until well into the afternoon and the slide deck as the plaintiffs intends to use them has now been handed to the defendants or will be. I saw it there and I know it will be imminently in the hands of Gilead's team, and I believe that they can overcome the prejudice of not having received those slides in a timely manner.

So are there any other issues besides Dr. Schinazi that go to the opening statement?

MR. SCHERKENBACH: Yes. I'm sorry. There is one other thing. Sequestration during opening.

09:17:44 1          As I understand it, Idenix has taken the

09:17:50 2 position that no one should be able to listen to opening --

09:17:54 3 any fact witness should not be able to listen to the

09:17:57 4 openings.

09:17:59 5          I don't understand that.  That has not been my

09:18:03 6 experience.  It is not what the cases say.  We actually

09:18:08 7 cited to them, when we discussed this, a Third Circuit case,

09:18:12 8 *U.S. v Brown*, 546 F2d 36.

09:18:18 9          Where the Third Circuit says, basically, and

09:18:22 10 they have invoked Federal Rule of Evidence 615, the usual

09:18:26 11 sequestration rule to say fact witnesses shouldn't be able

09:18:29 12 to hear opening.  And the Third Circuit in *Brown* says, well,

09:18:34 13 no, that is wrong.  Rule 615 doesn't apply to that.

09:18:37 14          And so consistent with the Court's practice, I

09:18:44 15 would hope that the openings are open and the sequestration

09:18:46 16 applies to testimony.

09:18:47 17               THE COURT:  Let me hear Idenix's position.

09:18:50 18               MR. McCRUM:  Thank you, Your Honor.

09:18:54 19               THE COURT:  Good morning.

09:18:54 20               MR. McCRUM:  Good morning.  Ryan McCrum.

09:18:57 21          The leading authority is the *Brown* case, Mr.

09:18:59 22 Scherkenbach is right, but what the Court there said was

09:19:02 23 that this decision is at the discretion of the Court to

09:19:06 24 decide.  And it actually did recognize that there is a

09:19:13 25 danger of having improper suggestions to witnesses during

opening statements.

Now, the Third Circuit did rule that there was not an abuse of discretion there but it did recognize the potential dangers. And here, I think we have exactly the type of dangers that the Court was talking about.

Both sides have submitted, exchanged over 70 demonstratives. It is apparent that the openings are going to be relatively long. They're going to go through all of the evidence. Everybody in this courtroom is going to hear that.

So if we have the witnesses for each side, fact and expert, Your Honor, hearing all of the evidence in the level of detail that we have seen, we think it does present the very dangers that we're alluding to and mentioned in the brown case.

There is precedent for this. There is a case *Hazle v. Crofoot* from the Eastern District of California that did exactly this. It sequestered all expert and fact witnesses during the opening statements.

Rule 615 doesn't explicitly apply here but I think the spirit of it does, Your Honor, because the purpose of Rule 615 is to sequester witnesses so they don't hear the testimony.

Well, there is a lot of slides that have been proposed that put the testimony of witnesses on the screen

09:20:45 1    and everyone in the courtroom will hear that.

09:20:47 2              So I think that the spirit of Rule 615 at least

09:20:51 3    applies here to make this proper to sequester the witnesses,

09:20:54 4    Your Honor.

09:20:55 5              So with that, that is all I had.

09:20:57 6              THE COURT:  Your position is to sequester fact

09:20:59 7    and expert witnesses?

09:21:01 8              MR. McCRUM:  Just during opening statements for

09:21:03 9    experts.  I think we have reached agreement that when the

09:21:06 10   testimony comes in the trial that the experts can be present.

09:21:12 11             THE COURT:  So everybody, all witnesses will be

09:21:14 12   excluded from openings is your position?

09:21:16 13             MR. McCRUM:  Yes.

09:21:17 14             THE COURT:  But then experts would be allowed

09:21:19 15   in during trial, during the evidentiary portion of trial.

09:21:21 16             MR. McCRUM:  That is correct, Your Honor.  And I

09:21:23 17   think there is a distinction because depending on when these

09:21:27 18   experts come up, it could be earlier in the case.  They

09:21:30 19   will not have heard the extent of the evidence that they

09:21:34 20   will hear in openings.

09:21:35 21             THE COURT:  Okay.  Thank you.

09:21:37 22             MR. McCRUM:  Thank you.

09:21:38 23             THE COURT:  Mr. Scherkenbach, any response?

09:21:40 24             MR. SCHERKENBACH:  Excluding even experts?

09:21:46 25   There is no precedent for that.  They cited no case.  There

is no case we're aware of.  The *Hazle* case they cite I can

give Your Honor if Your Honor wants the cite, 2010 WL

2509355.  It's an Eastern District of California case.  That

case cites *Brown* and says, right, this Third Circuit case,

and says Rule 615 doesn't apply to openings but the Court

always retains discretion and you need facts to do something

different, and the facts in that case are entirely different

and just don't apply here, and they haven't suggested otherwise.

THE COURT:  All right.  I'm not going to keep

the fact or expert witnesses out of the opening statements.

I'm assuming for the moment that I have discretion to do

what Idenix is asking me to do but I don't see a basis to do

that here.

I'm not aware of cases in which expert witnesses

have been excluded from openings.  So that would be at least

close to unprecedented in my experience.  And on the fact

witnesses, I'm simply going to trust that the trial processes

that have been tried and true over centuries probably are

going to keep this trial on track towards whatever the truth

and reality are.  So cross-examination and the presentation of

both sides competing evidence I have confidence will do what

it usually does, and I don't think that fact witnesses who

have probably been exposed to each side's spin at some level

already, and certainly could have been had they wanted to,

that they are going to materially change their stories under

09:23:39 1 risk of perjury simply because of seeing an extensive perhaps

09:23:46 2 opening statement.

09:23:46 3          So I will allow fact and expert witnesses to be

09:23:51 4 in the courtroom for the openings.

09:25:00 5          MR. SCHERKENBACH:  No, Your Honor.

09:25:01 6          THE COURT:  Mr. Griffith, it's still just

09:25:04 7 Schinazi.  Right?

09:25:07 8          MR. GRIFFITH:  Yes, Your Honor.

09:25:08 9          THE COURT:  Let's try in the few minutes we have

09:25:10 10 before the jury gets up here just to talk about the extent

09:25:12 11 to which you are disputing about how the new Schinazi

09:25:16 12 designations impacts what I should do about the slides.

09:25:22 13          MR. GRIFFITH:  Your Honor, the issue -- the

09:25:25 14 primary issue with the Schinazi designations, these were

09:25:31 15 extra ones that came in after we had already gone through

09:25:35 16 everything, submitted the letter to the Court, and it was

09:25:37 17 actually shortly before but it was before Your Honor's

09:25:41 18 ruling came out on all the designations we had.  They are in

09:25:46 19 our view untimely for that reason.

09:25:48 20          We had already packaged everything up and

09:25:50 21 submitted it.  And then this was something extra that came

09:25:53 22 in.

09:25:56 23          What the, substantively, if you will, or on the

09:26:01 24 evidentiary rules, the issue is that with this witness, in a

09:26:07 25 deposition, he is a consultant, he has a consulting

09:26:13 1    agreement with Gilead or Gilead's counsel in connection with

09:26:16 2    these legal matters, and he has given an affidavit that he

09:26:21 3    had signed a number of years ago, 2008, I believe.  And a

09:26:29 4    paragraph was read to him, then he was asked, Is that true?

09:26:33 5    And he would say, Yes.

09:26:36 6         There were a series of questions that were

09:26:39 7    asked, objections, not to all of the questions, but they

09:26:44 8    were moving fast and objections to some of the questions

09:26:46 9    were made as leading.  And they are all just completely

09:26:51 10   leading questions.  Especially putting the answer in front

09:26:54 11   of the witness and saying, Do you adopt that, basically.

09:26:59 12        So that is the problem with this.  The affidavit

09:27:02 13   is, of course, hearsay.  It is an out-of-court statement and

09:27:06 14   his adoption of it in a deposition doesn't make it

09:27:09 15   non-hearsay nor does it make his testimony about it

09:27:12 16   non-hearsay.

09:27:15 17        Support for that would be Kimberly Clark

09:27:18 18   versus -- just a moment, Your Honor.  First Quality, 2014

09:27:27 19   WL12480496.

09:27:31 20        THE COURT:  Is it your understanding they are

09:27:32 21   seeking go admit the evidence?

09:27:34 22        MR. GRIFFITH:  I believe they are seeking to

09:27:37 23   admit his testimony.  But his testimony is hearsay because

09:27:43 24   it is simply adopting the declaration, which is clearly

09:27:49 25   hearsay, or is an affidavit.  There are also leading

questions.  While not all of the questions were objected to as leading, it was a series of questions.  And in context, objections to the leading nature of the questioning was made.  And there was never any attempt made to change the style of questioning in that regard.

The testimony also includes speculation.  He was asked, When did Idenix first conceive of 2'-methy-2'-fluoro. He said, As far as I know it wasn't before this.

That's -- by adding as far as I know doesn't establish that he has knowledge, fact knowledge of --

THE COURT:  Weren't there many speculation objections that Gilead made to similar statements of Dr. Schinazi that we overruled?

MR. GRIFFITH:  So those were admissions that he made in his capacity as an officer of the company.

THE COURT:  I am not talking about whose favor they are in.  But he said things like "As far as I know," or, you know, "I think so."

Didn't I just overrule a whole bunch of speculative objections from them?

MR. GRIFFITH:  Yes.  There were some speculation objections they made to some of Dr. Schinazi's admissions made as a CEO.  But his admissions as an officer of the company have a different impact on that -- speculation is not a proper objection to an admission that is made on

09:29:29 1    behalf of the company.

09:29:34 2            But there is a further issue with this.  The

09:29:37 3    primary purpose of this testimony is to talk about a

09:29:42 4    confidential conversation he had with Sherry Knowles,

09:29:48 5    Pharmasset's lawyer, in May of 2003, or that he says he had

09:29:53 6    with her, and that he said was in confidence, and as

09:29:57 7    Pharmasset's lawyer.

09:30:00 8            So what we have here is a selective waiver of

09:30:04 9    the attorney-client privilege.

09:30:08 10           THE COURT:  We are getting very close to 9:30.

09:30:10 11   This started with your objection to two of their slides.

09:30:14 12   How many of these objections go to just those two slides?

09:30:18 13           MR. GRIFFITH:  All of them go to those two

09:30:21 14   slides.

09:30:21 15           THE COURT:  So the privilege and the Ms. Knowles

09:30:23 16   is implicated here?

09:30:25 17           MR. GRIFFITH:  Yes.  So on Slide, I believe it

09:30:29 18   was are 145 --

09:30:32 19           THE COURT:  144.

09:30:33 20           MR. GRIFFITH:  That is the privilege and Ms.

09:30:35 21   Knowles.  And 145 is speculation and lack of foundation,

09:30:42 22   lack of personal knowledge.

09:30:43 23           THE COURT:  Let me hear from the defendant.

09:30:47 24           MR. SCHERKENBACH:  Your Honor, you resolved this

09:30:49 25   issue.  They brought a Motion in Limine No. 3 on the very

question of whether we could use the evidence of Dr.
Schinazi communicating to Sherry Knowles this exact
information.  It was briefed, it was argued, you denied
their motion in limine.  And that should be the end of the
matter.

Most of what you heard this morning from Mr.
Griffith is a bunch of new arguments as to why the mill -- I
guess you should reconsider or it shouldn't have been
denied.

The case he is citing, the privilege waiver, he
never made these arguments before.  If he thought they were
good, he should have made them in their motion in limine.
We could have responded to them.  You could have considered
them.

It isn't fair to try to shut down our use of
this evidence that there was a specific motion in limine on
with sort of a Hail Mary, if you will.

So I really think the only question as framed in
the letter for you is the question of when this testimony
can be played.

They say we didn't timely disclose it.  We
disagree.  There is no prejudice to them.  There is no
question that they can play it and should play it, we think,
at the same time as they play the rest of Dr. Schinazi's
testimony.

09:32:04 1        Why should the jury be confused and hear some of

09:32:07 2   it in their case and then the rest our responsive piece

09:32:11 3   essentially in our case?

09:32:13 4        But there is no question, but for the

09:32:15 5   substantive admissibility, we could play this testimony in

09:32:18 6   our case.  There won't be any timeliness issue.  The jury

09:32:21 7   should hear it all at once.  You have decided, with all due

09:32:25 8   respect already, it is fair game.  They just don't like it.

09:32:29 9        THE COURT:  If your designations would be timely

09:32:31 10  if I made you play them during your case-in-chief, what

09:32:34 11  would be your position?

09:32:35 12       MR. SCHERKENBACH:  My position is there is no

09:32:37 13  dispute they would be timely then.  I think they are timely

09:32:40 14  anyway.  It's a situation where they were disclosed.  Some

09:32:45 15  of them got dropped up for a couple of days through an

09:32:48 16  administrative error.  We caught it.  They had these for a

09:32:53 17  month.

09:32:54 18       THE COURT:  Thank you.

09:32:54 19       Mr. Griffith, briefly.

09:33:01 20       MR. GRIFFITH:  Your Honor, the motion in limine

09:33:03 21  went to -- it didn't rule that the evidence is admissible.

09:33:06 22  It denied our motion in limine to exclude that subject

09:33:09 23  matter as a whole from whatever source in this case.  That

09:33:16 24  doesn't mean that because the MIL was denied that they don't

09:33:24 25  have to satisfy the Rules of Evidence in using proper

questioning, in laying foundations, establishing personal knowledge and so forth. There was no ruling that this evidence satisfies that.

I do think that this privilege issue is significant. This woman is on over 500 entries on their privilege log. I didn't hear any statement from them that this wasn't a privileged conversation.

Again, we have selective use of privileged communications without -- they have had -- I think the log was 32,000 entries long. And there were over 500 entries just for Ms. Knowles. And there are entries on this very day, around this very time, many entries around this very time that this alleged conversation took place to which there is no witness at all.

THE COURT: Why would the privilege objection not have more appropriately been raised earlier?

MR. GRIFFITH: Your Honor, as I said, we were addressing the entire topic as opposed to specific questions. And so, you know, we addressed it on a 402/403 basis, which we felt should have kept it out, and Your Honor disagreed. I understand that.

That is not a waiver of our other objections. It is improper, under 611, 602, and hearsay, 801. It is improper in so many respects, these questions that they want to play.

09:35:14  1          THE COURT:  What about the timeliness argument

09:35:17  2  and the suggestion that you guys knew for some time that

09:35:20  3  these were part of their designations?

09:35:24  4          MR. GRIFFITH:  Both sides designated large

09:35:28  5  quantities of deposition testimony.  And the agreement was

09:35:33  6  objections don't have to be even raised until we actually

09:35:37  7  start swapping for the trial, because there was so much it

09:35:42  8  was going to be unworkable to do.

09:34:42  9          We don't, this happens in all cases we're using

09:34:47 10  a fraction, a small fraction of what everyone designated.

09:34:50 11          THE COURT:  Is there any reason to doubt their

09:34:51 12  representation that it was essentially a clerical error that

09:34:55 13  for a few days, these particular designations fell off their

09:34:59 14  list?

09:34:59 15          MR. GRIFFITH:  Mr. Scherkenbach represented

09:35:00 16  that.  And I take him at his word on it, Your Honor.  So I

09:35:05 17  don't know why, honestly, why they didn't come in in the

09:35:08 18  first instance.

09:35:10 19          But the larger problems here are evidentiary

09:35:17 20  objections with them, although the timing one is not

09:35:20 21  insignificant.

09:35:21 22          THE COURT:  All right.  Thank you very much.

09:35:25 23          So for now, my comments are limited to the

09:35:31 24  slide.  That is what is imminent.  Gilead needs to know

09:35:35 25  whether or not it can use its slide.

And the answer is Gilead can use its slide but let me tell you, to the extent I can, my ruling on the objections; and it's a little bit incomplete, so Gilead needs to factor that in as it decides whether it wants to use this slide.

In terms of the timeliness objection and objection to the designations of the deposition, I'm over-ruling the timeliness objection. I accept the representation from Gilead, and as we have already seen, on both sides, things have not moved perfectly as you all have gotten close to trial and I don't see any undue prejudice to the plaintiffs from the time with which they got final confirmation that these designations were indeed part of what defendants intend to play at trial.

Further, I'm not hearing that there would be a timeliness objection to playing these designations during the case-in-chief of the defendant, but I think it will be easier for the jury and consistent with what I expect will be the practice throughout the trial, that we play all of a particular witness's designations at once in the order that that testimony was given.

So the timeliness objection is overruled, as is the hearsay objection.

I do not agree that even assuming the affidavit itself would be hearsay, and I don't understand the defendants

09:37:05 1  to be seeking to move into evidence the affidavit, even if it

09:37:09 2  would be, that is not the evidence that is being offered.

09:37:12 3  What is being offered is a witness's testimony about the

09:37:16 4  affidavit and while the substance may not be different, the

09:37:20 5  evidentiary analysis is different.  And,

09:37:23 6  Similarly, I'm overruling the objections that some

09:37:26 7  of the questions were leading.  I think these are, this is an

09:37:34 8  appropriate way to ask one about whether they adopt statements

09:37:38 9  in an affidavit, and I don't think that is a basis in the

09:37:44 10  context here to exclude the testimony.  I also think the

09:37:49 11  testimony is going to be necessary and helpful for telling the

09:37:53 12  complete story consistent with the ruling that I made on the

09:37:57 13  motion in limine.

09:37:59 14  This is, in Gilead's view, part of the story

09:38:02 15  that goes to a key issue in the case.  And I think it is

09:38:05 16  appropriate to admit the evidence for that reason as well.

09:38:08 17  All that said, I'm not in a position to give

09:38:11 18  you a final decision on the privilege issue.  That issue has

09:38:15 19  only come up in a letter that I believe was filed late last

09:38:19 20  night.  I don't recall hearing it in connection with the

09:38:23 21  motion in limine.  We don't have much time today to argue

09:38:25 22  about the privilege implications.

09:38:28 23  So my ruling is without prejudice to, if

09:38:35 24  plaintiff continues to have a privilege objection, find me a

09:38:40 25  way to get me authorities and give me to get up to speed to

make a ruling.  So it may well be that ultimately I'm
persuaded there is a privilege issue, I don't know that I
will be or won't be, but this is as far as I think I'm going
to be able to get before we bring the jury in and have the
openings.

So with that, if, under the circumstances,
Gilead wants to use a slide, they are free to do so.

Is there anything else that is pressing relating
to jury selection or to openings before we bring the jury
pool up from plaintiffs?

MR. PARKER:  Yes, Your Honor.  If I may just
fairly quickly.

Some of the jurors have never submitted
questionnaires or we never received them so we just wanted
to flag that for Your Honor's attention.  We brought some
extra ones that have not been filled out, if that is how
Your Honor wants to handle it or question them, but I just
wanted to make sure Your Honor is aware of that.

Do you think we'll have a break at lunch before
openings?  I have a couple fairly logistical issues about
opening I can save until then.

THE COURT:  We'll have a break before we start
openings, so you will have a chance to raise those issues.

MS. PARKER:  I just have logically about the
screen.

09:39:50 1            THE COURT:  Right.  Just raise those before we

09:39:51 2  get to openings.

09:39:53 3            MR. DAY:  I have a list of the five jurors who

09:39:55 4  didn't return questionnaires with blanks.  Can I hand them

09:39:59 5  up?

09:40:00 6            THE COURT:  You can.  Are defendants aware of

09:40:01 7  that list?

09:40:01 8            MR. SCHERKENBACH:  I think there is agreement on

09:40:04 9  it for the list.

09:40:04 10            THE COURT:  All right.  You can pass that up.

09:40:06 11            MR. DAY:  Thank you, Your Honor.

09:40:09 12           (Documents passed forward.)

09:40:27 13            THE COURT:  All right.  Is there anything

09:40:28 14  further from plaintiffs?

09:40:30 15            MR. GRIFFITH:  Your Honor, just a question, two

09:40:32 16  questions, on the privilege issue.  Should we submit a bench

09:40:35 17  brief to the Court?

09:40:36 18            THE COURT:  For now, I'll going to leave it up

09:40:38 19  to you.  The reality is I'm pretty busy between now and

09:40:42 20  openings.  It may be, I take it we're not intending to play

09:40:45 21  Dr. Schinazi until tomorrow, so if that is the case, and you

09:40:49 22  want to renew your objection, I'll try my best to get to it

09:40:52 23  tonight, whatever it is you submit to me.

09:40:54 24            MR. GRIFFITH:  Thank you, Your Honor.

09:40:55 25            THE COURT:  Okay.

09:40:55 1          MR. SCHERKENBACH:  Whatever they do submit, just

09:40:57 2 so it is clear, we'd like to respond because they haven't

09:40:59 3 raised these issues before.

09:41:00 4          THE COURT:  Certainly.

09:41:02 5          MR. SCHERKENBACH:  At this point.

09:41:03 6          THE COURT:  You will have that opportunity.

09:41:04 7          MR. SCHERKENBACH:  Thank you.

09:41:05 8          MR. GRIFFITH:  The other question.  Your Honor,

09:41:06 9 will we have an opportunity to enter any objections we may

09:41:09 10 have to preliminary instructions before they're given to the

09:41:11 11 jury, just for the record?

09:41:14 12          THE COURT:  Yes.  And maybe in just a moment.

09:41:17 13 But let me come back to you.

09:41:18 14          Mr. Scherkenbach, is there anything else related

09:41:21 15 to openings or jury selection from your side?

09:41:23 16          MR. SCHERKENBACH:  No, Your Honor.

09:41:23 17          THE COURT:  All right.  If you want to put your

09:41:25 18 objections to preliminary instructions, you can do that now.

09:41:37 19          Good morning.

09:41:40 20          MS. SWIZE:  Thank you, Your Honor.  Jennifer

09:41:41 21 Swize.  I will be brief.  We understand Your Honor's ruling.

09:41:44 22 But for the record, I'll just cite five objections.

09:41:46 23          First, the omission of our requested

09:41:48 24 instructions referring to Gilead's infringement are

09:41:50 25 Instructions 2, 5, and 8.

09:41:53  1          Second, the restriction on references to

09:41:55  2    infringement at trial.

09:41:56  3          Third, the adopted Instruction No. 7 to the

09:41:59  4    extent that it requires the jury to assume infringement.

09:42:02  5          Fourth, the adopted Instruction No. 5 that omits

09:42:06  6    willfulness as an issue under the burden of proof.

09:42:09  7          We have set forth our reasons in our November

09:42:12  8    30th letter the Court has read and believe our proposals are

09:42:16  9    consistent with Gilead's concession and with the issue in

09:42:18 10    the case.

09:42:18 11          Finally, for preservation purposes, we object to

09:42:21 12    the omission of our Instructions 7 and 12 on the glossary

09:42:25 13    and the patent wrapper that we proposed.

09:42:27 14          Thank you, Your Honor.

09:42:27 15          THE COURT:  Okay.  Thank you.

09:42:29 16          Is there anything that defendant wants to say

09:42:30 17    either in response or with respect to their own objections?

09:43:33 18          MR. SCHERKENBACH:  No, Your Honor, excepting I

09:43:36 19    don't feel we need to restate the instructions we offered

09:43:42 20    which were refused.  As I understand your usual practice, if

09:43:44 21    we offered something and it was refused then that objection

09:43:47 22    is preserved for the record.  So I don't feel a need to

09:43:50 23    restate it.

09:43:50 24          THE COURT:  For my purposes, the objections are

09:43:53 25    all preserved.  But I am just me.

I adhere to the preliminary instructions that I already entered, those are what I intended to give.

We are going to take a break. I understand a significant number of our juror pool is missing. We will figure out if we can how many of the five didn't fill out the questionnaire?

THE COURT: Bear with me.

(Court consults with Chief Deputy Looby.)

THE COURT: I am advised by Mr. Looby that only one of the five people who did not fill out the form is actually here.

I have not encountered this before. Given that it's only one person, any suggestions as to how we deal with that, from plaintiffs?

MS. PARKER: Your Honor, if we are going to take a break anyhow maybe this juror can fill it out while we are taking our break.

THE COURT: What is the defendants' view?

MR. SCHERKENBACH: I think that would be fine, or we can ask the questions earlier as part of the voir dire process.

THE COURT: Why don't we just plan to call that one person back if he or she doesn't come back to us. And we will, you know, we can have some more extensive questioning of that person if need be.

I don't know which juror that is.  Mr. Looby

may.  If he does, I will have him inform you of that while I

take a short break.  Any objection to that approach?

MS. PARKER:  No, Your Honor, thank you.

MR. SCHERKENBACH:  No, Your Honor.  Thank you.

THE COURT:  We will take a short recess.

(Brief recess taken.  Jury pool enters courtroom.)

*     *     *

(Proceedings reconvened after recess.)

THE COURT:  Good morning, everyone.

(The jurors respond, "Good morning.")

THE COURT:  Welcome, everyone, especially the

members of our jury pool.  I am Judge Stark and I am the

judicial officer from this court that has been selected to

preside over a civil trial, a civil jury trial.  I'll have

more to tell you about that trial in just a moment.  But

first I do want to thank you all for being here.  As you

probably know, serving on a jury is an important civic

responsibility that all of us as citizens of the United

States share, and it is very important that you are willing

to perform this service and all of us are very grateful for

that.

Before I have an oath administered to you and we

begin the process in full, I wanted to introduce to you a

few of the people that are helping me with this trial.

First is Mr. Neil Looby who is my deputy clerk and Ms. Elizabeth Ghione, who is also my deputy clerk. They will both be helping me throughout the day.

And I have a law clerk with me, Mr. Farris Martini.

I also have a court reporter, Mr. Brian Gaffigan, who may not be able to wave to you since he is taking down everything that is being said.

This process may take much of the day. I ask for your patience. There is a lot of steps to it which I will explain to you in just a moment.

But with that, let me ask Mr. Looby to please administer an oath to the jury pool.

(Prospective jurors placed under oath.)

THE COURT: Thank you, all.

So I'm going to read to you a document entitled "Voir Dire" which I think will explain to you what we're doing here this morning.

It begins: Good morning, ladies and gentlemen. I am Judge Stark, and I will be presiding over the trial for which a jury is about to be drawn.

This case is a patent case. The parties are Idenix pharmaceuticals LLC and Universitas Degli Studi di Cagliari on the other side -- whom together I may collectively refer to as "Idenix" -- and Gilead Sciences

Inc. on the other side -- whom I may refer to as "Gilead."

The trial is expected to last approximately ten days, meaning we expect to be completed no later than next Friday, December 16th. I will go over the specific schedule in a few moments. Our trial days will run from approximately 9:00 a.m. to 4:30 p.m., although on some days we will meet for less than a full day.

In light of this brief summary, I will ask you certain question, the purpose of which is to: (1), enable the Court to determine whether or not any prospective juror should be excused for cause; and, (2), enable counsel for the parties to exercise their individual judgment with respect to peremptory challenges, that is, challenges for which no reason need be given by counsel.

As I read these questions to you, please try to keep in mind whether you answer "yes" to any of them. There is no need for you to raise your hand or stand or respond in any way at this time to my questions.

Instead, when I have completed asking all of the questions, I will move to my juryroom, along with the attorneys and the court reporter. The juryroom is located right behind where I am sitting. Then, for any of you who have answered "yes" to any of my question, members of my staff will bring you individually to the juryroom so you can speak to me and the attorneys about any affirmative

responses that you had.  Don't worry if you can't remember the specific question or question number to which you answered "yes."

Also, you may recall having filled out a jury questionnaire.  The lawyers or I may have some questions for you about the answers you gave on that questionnaire.  If that is the case, we will call you back to the juryroom at the appropriate time.

Now, I will turn to the questions for you:

Question 1.  As I noted, the parties to this case are Idenix Pharmaceuticals LLC and Universitas Degli Studi di Cagliari on the one side -- whom together I may collectively refer to as "Idenix" -- and Gilead Sciences, Inc. on the other side -- whom I may refer to as "Gilead."

Are you familiar with either Idenix or Gilead?"

Question 2.  Are you familiar with this case or have you heard or read anything about it?

Question 3.  Counsel will now introduce themselves and their clients and list the names of their potential witnesses.  After they do so, I will ask you whether you or any members of your immediate family or anyone close to you know of or have any current or former relationship with any of the attorneys, their law firms, their clients, or the witnesses.

First, from Idenix.

10:03:22  1            MS. PARKER:  Would Your Honor like me to do it

10:03:24  2     standing here or move up to the podium?

10:03:27  3            THE COURT:  Why don't you move to the podium and

10:03:28  4     move the microphone so you can see folks and they can all

10:03:32  5     hear us.

10:03:32  6            MS. PARKER:  Thank you.

10:03:33  7            Can everybody hear me?  Good morning.

10:03:36  8            THE JURORS:  Good morning.

10:03:38  9            MS. PARKER:  My name is Stefanie Parker.  And I

10:03:40 10     am one of the lawyers of the Idenix and the university, so

10:03:44 11     I'm going to read my list.

10:03:46 12            Again my name is Stephanie Parker.  This is

10:03:48 13     Calvin Griffith, Ryan McCrum, John Kintron, Brad Harrison,

10:03:58 14     Anthony Insogna, Jennifer Swize, Jesika French, John Day,

10:04:06 15     Michael Kelly, Dr. David Davis, Carrie Mason, Will Ferrell,

10:04:15 16     Dr. David Standring, Raymond Arner, Samira Benzaria-Prad,

10:04:24 17     Andrew Carter, Andrea Corcoran, Rafael DeFrancesco, Joseph

10:04:32 18     Duffy, Jill Gosselin, Paoli LaColla, Robert Langer, Chris

10:04:42 19     Meier, James Meyers, Adel Moussa, David Olsen, Michael Otto,

10:04:54 20     Krzysztof Pankiewicz, Schaefer Price, Ronald Renaud, Raymond

10:05:03 21     Schinazi, Jean-Pierre Sommadossi, and Lieven Stuyver.

10:05:09 22            Thank you.

10:05:10 23            Thank you, Your Honor.

10:05:12 24            THE COURT:  Thank you.  Now we'll hear from

10:05:13 25     Gilead.

10:05:15 1      MR. SCHERKENBACH:  Thank you, Your Honor.

10:05:17 2      Good morning, ladies and gentlemen.  My name is

10:05:19 3  Frank Scherkenbach.  And I am the lead lawyer for Gilead.

10:05:24 4      I let me introduce some members of my team and a

10:05:28 5  few additional witnesses on our side.

10:05:30 6      With me will be Juanita Brooks, Craig

10:05:35 7  Countryman, Santosh Coutinho, John Farrell, Kelly Del Dotto,

10:05:44 8  Tasha Francis, Michael Headley, Martina Hufnal, Dalia

10:05:54 9  Kothari, Doug McCann, Chad Shear, Jenny Shmuel, John Singer,

10:06:07 10  Joseph Warden.  And then for some additional witnesses, Mr.

10:06:10 11  Phil Baran, John McHutchinson, James Meyers, Michael Otto,

10:06:20 12  John Putnam, Suguna Rachakonda, John Secrist, Christoph

10:06:29 13  Seeger, and Michael Sofia.

10:06:33 14      THE COURT:  Thank you.

10:06:35 15      So, ladies and gentlemen of the jury pool,

10:06:38 16  Question 4 to you then is:  Do you or any member of your

10:06:41 17  immediate family or anyone close to you know of or have any

10:06:45 18  current or former relationship with any of the attorneys,

10:06:49 19  their law firms, their clients, or the witnesses?

10:06:55 20      And then finally, Question 5:  This case is

10:07:02 21  expected to take a total of 10 days to try.  We expect to

10:07:05 22  be done by the end of the day on Friday, December 16th.  We

10:07:09 23  will usually begin at 9:00 a.m. and end by 4:30 p.m.  Some

10:07:14 24  days -- including at least two days next week, Tuesday,

10:07:18 25  December 13th, and Wednesday, December 14th, we will end by

3:15 p.m.  Each day we will take a morning break and an afternoon break.  We will also take a lunch break and on all trial days after today the Court will provide you lunch.

The question then is does this schedule present any special problem for you?

So those are the voir dire questions.  And I indicated I and the lawyers will now move into my juryroom.  I ask the members of the jury pool to wait here until members of my staff come to find you and bring you back one by one, if you have anything to speak to us about.

We'll be in a recess.

(Brief recess taken.)

*     *     *

(Proceedings reconvened after recess in the juryroom.)

THE COURT:  All right.  Have a seat, please.

Just a few preliminary words.

First off, as some of you know, the court reporters are instructed to take down everything that is said when I'm in here.  So I hope that doesn't deter you to be friendly with one another, but he is going to try and take it down for the record.

Second, Mr. Looby has the list for us of who has not shown up and also the number of the one juror I believe who did not complete the questionnaire.

           THE DEPUTY CLERK: The one juror that didn't completely the questionnaire is 57, Spence. The other four are not here.

           THE COURT: So I think if Juror 57 doesn't show up on her own, we'll make sure to call her back when we're done with all of the rest of the folks.

           THE DEPUTY CLERK: So these people are not here today: No. 4, No. 5, No. 10, 14, 15, 18, 21, 23, 29, 30, 32, 33, 44, 51, 52, 53, and 59.

           THE COURT: Are there any questions before we start bringing the jurors back? Questions from Idenix.

           MS. PARKER: Yes, Your Honor. I want to make sure I got that right. The last one, 51, 52, 53, and 59.

           THE DEPUTY CLERK: 51, 52, 53, and 59.

           THE COURT: Is there anything else?

           MS. PARKER: No.

           THE COURT: Questions?

           MR. SCHERKENBACH: No, Your Honor.

           THE COURT: All right. Bring the folks back.

           MS. PARKER: Can we ask the followup questions on the questionnaires?

           THE COURT: I'll start, and then I will give each side a brief chance for follow-up.

           MS. PARKER: May we ask follow-up from the questionnaire?

10:13:58  1          THE COURT:  Let's start out doing what you want

10:13:59  2  to do, and if it is a problem, they or I will let you know.

10:14:03  3          MS. PARKER:  Thank you, Your Honor.

10:14:46  4          (Juror entered juryroom.)

10:14:47  5          THE COURT:  Good morning.

10:14:48  6          A JUROR:  Good morning.

10:14:48  7          THE COURT:  Please have a seat.

10:14:50  8          Tell us what your juror number is.

10:14:52  9          A JUROR:  One.

10:14:52 10          THE COURT:  No. 1, Pamela Adams.

10:14:55 11          A JUROR:  Yes.

10:14:55 12          THE COURT:  If you recall, what did you either

10:14:58 13  answer "yes" to in the courtroom or what did you want to

10:15:00 14  talk to us about?

10:15:02 15          A JUROR:  I also put on the questionnaire that

10:15:05 16  was sent, I am familiar with Gilead and my daughter works

10:15:10 17  for QPS, LLC, and Gilead is one of their largest clients.

10:15:19 18  So I didn't, you know.

10:15:21 19          THE COURT:  Right.  And we'll talk a little bit

10:15:24 20  more about that in a moment.  Were there other things you

10:15:26 21  wanted to tell us?

10:15:28 22          A JUROR:  Not really.  I mean the hardship I

10:15:31 23  have is I dog sit, and I have people's dogs that I am taking

10:15:42 24  care of, and to try to figure out what to do with them for

10:15:46 25  two weeks is going to be an issue.

THE COURT: Okay. But the dog sitting you think you can overcome?

A JUROR: I'll try. My husband is out of the country. I mean I'd have to kennel them or something at my expense, but ...

THE COURT: Okay. Were there other issues?

A JUROR: No.

THE COURT: Let's talk about what you know about Gilead. Has your daughter talked to you about them based on her work?

A JUROR: No, not really. I don't -- I know they're a pharmaceutical company and that they happen to be probably one of their largest clients.

THE COURT: Right. Do you have an opinion of them, positive or negative?

A JUROR: No.

THE COURT: Has your daughter expressed an opinion about them to you?

A JUROR: No.

THE COURT: Do you think you could be fair to Gilead and to a party that is on the other side of the trial?

A JUROR: Yes. I just wanted people to be aware that I do, you know, know who they are, and because of her. But she doesn't discuss her work so I know really nothing

about it.  I just know, she was with me when I was filling

out the questionnaire, and, oh, it's pharmacy stuff,

something about the name.  Oh, Gilead.  That is probably my

largest client.  I'm just like okay.  I really don't know.

I mean I have investments in pharmaceuticals but that is not

one that I am sure, you know, that I can name that I have an

investment into.

        THE COURT:  You may have an investment in them?

        A JUROR:  I don't think I do.  I mean my husband

takes care of that, so I don't -- the name doesn't sound

familiar to me and our investment situation.

        THE COURT:  Okay.  Let me see if the lawyers

have any questions for you.

        MS. PARKER:  May I?

        Good morning.

        A JUROR:  Hi.

        MS. PARKER:  Given your daughter's business,

would you have any concern that if you were a juror and you

awarded damages to Idenix, so that means Gilead would have

to pay damages, would that adversely affect your daughter's

business?

        A JUROR:  Probably not.  I guess it would depend

on the damages.  I mean how would it affect the company?  If

they were so bad that the company, you know, went broke or

whatever, it would definitely affect my daughter's business

10:18:29 1  because she has her job and says that is her biggest

10:18:33 2  customer or biggest client.

10:18:36 3         MS. PARKER:  And because of that, would you have

10:18:39 4  any, I want to say, funny feeling about having to decide

10:18:44 5  whether or not to award damages that Gilead would have to

10:18:47 6  pay?

10:18:48 7         A JUROR:  No, no.  It's just the luck of the

10:18:49 8  draw, and that's life.

10:18:53 9         MS. PARKER:  Would you be concerned about your

10:18:54 10  daughter's business as you are sitting as a juror and

10:18:58 11  evaluating damages?

10:18:59 12         A JUROR:  No.

10:19:00 13         MS. PARKER:  Or the amount of damages?

10:19:01 14         A JUROR:  No.

10:19:04 15         MS. PARKER:  Okay.

10:19:04 16         THE COURT:  Questions?

10:19:06 17         MR. SCHERKENBACH:  Good morning.

10:19:07 18         A JUROR:  Hi.

10:19:08 19         MR. SCHERKENBACH:  Can you give us a sense of

10:19:09 20  what your daughter business is?  What she does?

10:19:12 21         A JUROR:  She compiles research from a lot of

10:19:18 22  the laboratory, you know, the researchers that do laboratory

10:19:22 23  work and stuff.  They compile, they send her stuff that

10:19:26 24  they have written up, and she has to put it all together in

10:19:31 25  written form.

10:19:32   1           MR. SCHERKENBACH: I see. And I noticed on your

10:19:35   2   form, you checked the box for Gilead that you are aware of.

10:19:39   3           A JUROR: Right.

10:19:42   4           MR. SCHERKENBACH: You also checked the box for

10:19:44   5   Merck. Is that another company that your daughter works

10:19:46   6   with?

10:19:46   7           A JUROR: All those companies, the ones that I

10:19:48   8   checked, are ones that are clients of the business place

10:19:51   9   that my daughter works for. I just know she mentioned that

10:19:54 10   Gilead is probably their largest client that they have. So

10:19:59 11   other than that, I don't know about the others, what

10:20:02 12   percentage or anything.

10:20:03 13           MR. SCHERKENBACH: Okay. Did she mention Merck

10:20:05 14   as one of her clients as well?

10:20:09 15           A JUROR: Yes, after she said something about

10:20:11 16   Gilead. I said, well, do you know any of these other

10:20:15 17   places? And she said, yes, one of these are our clients and

10:20:18 18   one of these are our clients and whatever. But she is

10:20:21 19   not -- you know, she didn't go into any detail because that

10:20:25 20   is confidential, what she does, when she works with those

10:20:29 21   companies.

10:20:30 22           MR. SCHERKENBACH: Sure.

10:20:30 23           A JUROR: We didn't discuss it. I'm just aware

10:20:33 24   they are a client. Other than that, I know absolutely

10:20:36 25   nothing about it.

MR. SCHERKENBACH:  And then you mentioned you have some investments in pharmaceutical companies.

A JUROR:  Yes.

MR. SCHERKENBACH:  Do you know if Merck is a stock that you own?

A JUROR:  I don't think so.  But my husband takes care of that, so I honestly don't know.  I don't recall him ever mentioning any of those companies at all.

MR. SCHERKENBACH:  Okay.

THE COURT:  Okay.

MS. PARKER:  May I ask a followup based up on that?

THE COURT:  Just briefly, yes.

MS. PARKER:  Does your daughter have contact with anyone at Gilead as part of her job?

A JUROR:  I don't believe so.

MS. PARKER:  You mentioned some reports.

A JUROR:  Yes, she did, from the people that worked at the place she works at.  They're researchers and the scientists or whatever they are, that they send out whatever research they're working on.  They send information to her and she has to compile it and proofread it and all that.

MS. PARKER:  I think I understand.

A JUROR:  I don't think she deals with Gilead

1   herself at all.

2           THE COURT: Okay.

3           MS. PARKER: Thank you.

4           THE COURT: Thank you very much. You can go

5   back into the courtroom.

6           (Juror left juryroom.)

7           THE COURT: So once they step out, I'll see if

8   either party has a motion for cause. Does Idenix have a

9   motion to strike for cause?

10           MS. PARKER: Yes, we do because of the

11   relationship her daughter has with the defendant here, the

12   way she just explained it.

13           THE COURT: All right. What is Gilead's

14   position?

15           MR. SCHERKENBACH: She has a relationship with

16   Merck, too. It's not as significant but they're both

17   clients. The only hesitation that I heard from the witness

18   was if the damages award was so large as to bankrupt Gilead

19   or something to that effect. I don't think anyone in this

20   case couldn't make that statement, and so I think I'd oppose

21   the motion.

22           THE COURT: All right. I'm going to deny the

23   motion for cause. I asked the juror whether she could be

24   fair and impartial. I believed her, that she believes that

25   she can be. I think she can be. It's a somewhat attenuated

10:22:45 1   relationship, and she clearly doesn't have any detail about

10:22:48 2   what her daughter does with Gilead or with Merck or what,

10:22:53 3   if anything, her daughter thinks about any of them. And I

10:22:58 4   don't think she is going to have a moment in this trial

10:23:02 5   where the evidence would give her a basis to think that

10:23:07 6   Gilead could be going out of business as a result of the

10:23:10 7   decision she is being asked to make. So I'll deny the

10:23:13 8   motion.

10:23:17 9           (Juror enters courtroom.)

10:23:20 10           THE COURT: Good morning.

10:23:21 11           A JUROR: Good morning.

10:23:21 12           THE COURT: Have a seat, please.

10:23:22 13           Do you know what juror number you are?

10:23:25 14           A JUROR: 24.

10:23:26 15           THE COURT: 24.

10:23:27 16           Leona Johnson?

10:23:30 17           A JUROR: Yes.

10:23:30 18           THE COURT: Do you recall what you answered

10:23:32 19   "yes" to in there or anything else you want to talk to us

10:23:35 20   about?

10:23:36 21           A JUROR: As far as the time frame, my husband

10:23:38 22   is getting surgery next week on his shoulder so I have to

10:23:42 23   take him.

10:23:44 24           I have documentation, if you need it.

10:23:46 25           THE COURT: I believe you.

10:23:48  1                    A JUROR:   Okay.

10:23:49  2                    THE COURT:   So which day next week?   Do you

10:23:52  3   know?

10:23:52  4                    A JUROR:   On the 16th.

10:23:53  5                    THE COURT:   On Friday?

10:23:55  6                    A JUROR:   (Nodding yes.)   Friday morning.

10:23:57  7                    THE COURT:   And he needs you to be the one to

10:23:59  8   take him?

10:24:00  9                    A JUROR:   Yes.   It is on his shoulder so I have

10:24:02 10   to take him.

10:24:02 11                    THE COURT:   And I am sorry to have to ask you

10:24:05 12   this.   Would there be anyone else that might be able to take

10:24:08 13   him if we needed you Friday morning?

10:24:10 14                    THE WITNESS:   (Shaking head no.)

10:24:12 15                    THE COURT:   Just for the record, you are saying

10:24:13 16   no; correct?

10:24:14 17                    A JUROR:   No, I have to take him.

10:24:15 18                    THE COURT:   Okay.   Are there any other issues?

10:24:18 19                    A JUROR:   I'm also a sleep tech, so I work at

10:24:20 20   night, so it will be hard for me to come during the day and

10:24:24 21   then to go to work at night.

10:24:26 22                    THE COURT:   What is your normal schedule at

10:24:28 23   night?

10:24:28 24                    A JUROR:   7:00 at night to 7:00 in the morning.

10:24:31 25                    THE COURT:   When do you usually sleep?

10:24:33 1                A JUROR:  During the day.

10:24:34 2                THE COURT:  All right.  Is there anything else?

10:24:37 3                A JUROR:  I go to the bathroom a lot, so I don't

10:24:38 4 know if the breaks would be enough for me, and I'm scheduled

10:24:43 5 to get a MRI for issues with migraines I'm having

10:24:47 6 constantly.

10:24:48 7                THE COURT:  I'm sorry to hear that.

10:24:50 8                A JUROR:  Thank you.

10:24:51 9                THE COURT:  Is that scheduled in the next two

10:24:53 10 weeks?

10:24:53 11               A JUROR:  No, it is not.

10:24:54 12               THE COURT:  All right.  Thank you.

10:24:55 13          Are there any questions from the plaintiffs?

10:24:56 14               MS. PARKER:  No, Your Honor.

10:24:57 15               THE COURT:  Are there any questions from the

10:24:58 16 defendants?

10:24:58 17               MR. SCHERKENBACH:  No, Your Honor.

10:24:59 18               THE COURT:  All right.  You can go back into the

10:25:01 19 courtroom.  Thank you.

10:25:02 20            (Juror left juryroom.)

10:25:09 21              THE COURT:  Given her collection of issues, I

10:25:13 22 think I should strike her.  Is there any objection from

10:25:15 23 Idenix?

10:25:15 24               MS. PARKER:  No, Your Honor.

10:25:16 25               THE COURT:  And from Gilead?

10:25:17 1                MR. SCHERKENBACH:  No, Your Honor.

10:25:18 2                THE COURT:  All right.  We'll strike Juror 24.

10:25:28 3                (Juror enters juryroom.)

10:48:36 4                MS. PARKER:  No, Your Honor.

10:48:36 5                (Juror enters juryroom.)

10:48:36 6                THE COURT:  Good morning.  What is your juror

10:48:36 7 number?

10:48:36 8                A JUROR:  48.

10:48:36 9                THE COURT:  Mark Pierce.

10:48:36 10                A JUROR:  Yes.

10:48:36 11                THE COURT:  What did you want to talk to us

10:48:36 12 about?

10:48:36 13                A JUROR:  My only concern is with the length of

10:48:36 14 the trial.  I am scheduled for a personal vacation next

10:48:36 15 week.

10:48:36 16                THE COURT:  Have you made some payments?

10:48:36 17                A JUROR:  Hotel and flight.  And we are going to

10:48:36 18 Vegas.

10:48:36 19                THE COURT:  What day next week?

10:48:36 20                A JUROR:  I leave Sunday and am back on

10:48:36 21 Wednesday.

10:48:36 22                THE COURT:  You are leaving this coming Sunday?

10:48:36 23                A JUROR:  Yes.

10:48:36 24                THE COURT:  If this trial went into next week it

10:48:36 25 would mean missing that?

10:48:36 1          A JUROR:  Yes.

10:48:36 2          THE COURT:  Any other issues?

10:48:36 3          A JUROR:  That's it.

10:48:36 4          THE COURT:  Any questions?

10:48:36 5          MS. PARKER:  No, Your Honor.

10:48:36 6          THE COURT:  Any questions.

10:48:37 7          MR. SCHERKENBACH:  No, Your Honor.

10:48:37 8          (Juror leaves juryroom.)

10:48:37 9          THE COURT:  Usually a prepaid vacation gets you

10:48:37 10  out.  Any objection to me striking him?

10:48:37 11          MS. PARKER:  No, Your Honor.

10:48:37 12          MR. SCHERKENBACH:  No objection, Your Honor.

10:48:37 13          THE COURT:  I will strike 48 then.

10:48:37 14          (Juror enters juryroom.)

10:48:37 15          THE COURT:  Good morning.  What is your juror

10:48:37 16  number, please, if you know?  Or you can tell me your name.

10:48:37 17          A JUROR:  Gracey.

10:48:37 18          THE COURT:  We have you as No. 16.

10:48:37 19          What did you answer yes to?

10:48:37 20          A JUROR:  No. 5.

10:48:37 21          THE COURT:  The schedule.

10:48:37 22          A JUROR:  Yes.  I work with pulmonary people at

10:48:37 23  Christiana.  And I see them on a regular basis.  So I am the

10:48:37 24  only respiratory therapist with the pulmonary rehab program.

10:48:37 25          So I guess I could reschedule everybody, but --

10:48:37  1          THE COURT:  You have appointments scheduled for

10:48:37  2   the next two weeks?

10:48:37  3          A JUROR:  And all through till the first year,

10:48:37  4   yes, sir.  People with oxygen, pre and post-lung transplant

10:48:37  5   patients, ventilator patients, trach patients.

10:48:37  6          THE COURT:  Is there anybody else that could

10:48:37  7   take over?

10:48:37  8          A JUROR:  I am the only therapist that works in

10:48:37  9   pulmonary.  We just reschedule them until I can get to them.

10:48:37 10   The ones that come three times a week, I wouldn't be there

10:48:37 11   for them.

10:48:37 12          THE COURT:  Without giving us too much detail

10:48:37 13   about what you actually do with them, would it threaten

10:48:37 14   their health if you had to reschedule them for two weeks

10:48:37 15   down the road?

10:48:37 16          A JUROR:  It would delay their progress, I

10:48:37 17   guess.

10:48:37 18          THE COURT:  There is not somewhere else in

10:48:37 19   Christiana Care that they could go to?

10:48:37 20          A JUROR:  No.  There is no other pulmonary

10:48:37 21   rehab.

10:48:37 22          THE COURT:  All right.  Let me see if others

10:48:37 23   have questions for you.

10:48:37 24          MS. PARKER:  No, thank you.

10:48:37 25          THE COURT:  Mr. Scherkenbach.

10:48:37 1           MR. SCHERKENBACH:  No questions.

10:48:37 2           THE COURT:  Okay, you can go back in the

10:48:37 3  courtroom.

10:48:37 4           A JUROR:  I will do my duty.  Whatever you need.

10:48:37 5           (Juror leaves juryroom.)

10:48:37 6           THE COURT:  Any motion from plaintiff?

10:48:37 7           MS. PARKER:  No, Your Honor.

10:48:37 8           THE COURT:  Any motion?

10:48:37 9           MR. SCHERKENBACH:  No motion, Your Honor.  It is

10:48:37 10  a hardship issue.  I wouldn't object to her being released

10:48:37 11  for hardship.

10:48:37 12           MS. PARKER:  Same here.

10:48:37 13           THE COURT:  I am going to defer on her.  We will

10:48:37 14  come back to her.  Let me let's see how many people we have.

10:48:37 15           (Juror enters juryroom.)

10:48:37 16           THE COURT:  Good morning.  Have a seat there and

10:48:37 17  tell us your juror number, if you know it?

10:48:37 18           A JUROR:  In here?

10:48:37 19           THE COURT:  One or two-digit number.

10:48:37 20           A JUROR:  Three.

10:48:37 21           THE COURT:  Are you Ralph Allen?

10:48:37 22           A JUROR:  Yes.

10:48:37 23           THE COURT:  What did you want to talk to us

10:48:37 24  about?

10:48:37 25           A JUROR:  My wife is having major surgery on

Monday, the 12th. And I am going to be with her.

THE COURT: If you were not able to be there, is there someone else that could take her?

A JUROR: No. It's at Christiana Hospital.

THE COURT: Is it the kind of thing where if you were missing Monday you could be back Tuesday or is she going to need you after the surgery?

A JUROR: She is going to need me after the surgery.

THE COURT: Anything else you want to tell us?

A JUROR: No.

I think I recognize one of the lawyers on the left side. I don't know him.

THE COURT: You might recognize him but you don't know him?

A JUROR: Yes.

THE COURT: Anything else?

A JUROR: No.

THE COURT: Questions?

MS. PARKER: No, thank you.

THE COURT: Questions.

MR. SCHERKENBACH: No questions. Thank you.

THE COURT: You can go back in the courtroom. Thank you.

(Juror leaves juryroom.)

10:48:37 1        THE COURT:  Any objections to striking No. 3 for

10:48:37 2  hardship?

10:48:37 3        MS. PARKER:  No, Your Honor.

10:48:37 4        MR. SCHERKENBACH:  No, Your Honor.

10:48:37 5        THE COURT:  We will strike No. 3 then.

10:48:37 6        (Juror enters juryroom.)

10:48:37 7        THE COURT:  Good morning.

10:48:37 8        A JUROR:  Good morning.

10:48:37 9        THE COURT:  Can you tell us your juror number,

10:48:37 10  if you know it?

10:48:37 11        A JUROR:  17:  17.

10:48:37 12        THE COURT:  You are Joanne Hayman?

10:48:37 13        A JUROR:  Yes.

10:48:37 14        THE COURT:  What did you answer yes to or what

10:48:37 15  did you want to talk to us about?

10:48:37 16        A JUROR:  I believe it was Question No. 5 that

10:48:37 17  asked about, would the length of the trial impede.  I am

10:48:37 18  waiting for biopsy results.  I do have a lot of doctor

10:48:37 19  appointments scheduled for the month of December.  That

10:48:37 20  would begin to impact a little bit.

10:48:37 21        THE COURT:  Okay.  So are there other issues or

10:48:37 22  just that related to the trial schedule?

10:48:37 23        A JUROR:  That's the most pressing thing for me.

10:48:37 24  I mean, when I don't work, I don't get paid.  But the most

10:48:37 25  important thing is the medical aspect of it right now.

THE COURT: All right. So you do have appointments that are currently scheduled over the next two weeks. Is that right?

A JUROR: That's correct.

THE COURT: If you are on this jury you would have to reschedule those. Right?

A JUROR: I would.

THE COURT: That would pose some hardship to you?

A JUROR: Yes, sir.

THE COURT: In the meantime you may get some results from the test that may change when you need to go see somebody?

A JUROR: Exactly. Yes.

THE COURT: Any questions?

MS. PARKER: No, thank you.

THE COURT: Any questions?

MR. SCHERKENBACH: You mentioned if you don't work you don't get paid. Would that be an issue over the next two weeks as well?

A JUROR: It would be. I am responsible for other people's time. I have got a lot of things going on here. But the most pressing for me, I could get around the work aspect, but the medical aspect. I don't want to have to worry about rescheduling specialists.

THE COURT:  You can go back in the courtroom.
Thank you.

(Juror leaves juryroom.)

THE COURT:  I think I better strike 17 for
hardship.  Any objection?

MS. PARKER:  No, Your Honor.

MR. SCHERKENBACH:  No objection, Your Honor.

THE COURT:  17 is stricken.

(Juror enters juryroom.)

THE COURT:  Good morning.

A JUROR:  Hello.

THE COURT:  Tell us your juror number?

A JUROR:  The long one?

THE COURT:  Just one or two digit.

A JUROR:  20.

THE COURT:  Kathy Holmes.

A JUROR:  Yes.

THE COURT:  What did you answer yes to?

A JUROR:  My issue is, I am a stay-at-home mom
to two-years-old twins.  I think I could work it out for a
week.  But I don't know that I could work it out for two
weeks.  My husband took off today.  But we are military, so
we don't have a lot of family here.  I think I could do it
for a little while.  I am afraid to be able to do it every
single day.  I could try if I need to.

THE COURT:  You are down in Dover at the base?

A JUROR:  Yes.

THE COURT:  Other than that, are there other issues?

A JUROR:  No.  Everything else is okay.

THE COURT:  You have been able to arrange coverage for this week if need be?

A JUROR:  I think so.  I am not a hundred percent.  But I think I could do it.

THE COURT:  But next week --

A JUROR:  I haven't even attempted.  I just have a couple of friends that could keep them that don't work.  A lot of the other ones work during the day.  Again, my husband could take off some, but I don't know for two weeks.

THE COURT:  Thank you.

Any questions?

MS. PARKER:  Could you check about next week and let us know?  Is that something that you could do?

A JUROR:  I could try to contact them now.  Do you want me to do that?

THE COURT:  Hold on a second.

A JUROR:  If I needed to, if I had 30 minutes or so, I could try to figure it out if I needed to, definitely.

MS. PARKER:  Thank you.  Nothing else.

THE COURT:  Any questions?

MR. SCHERKENBACH:  No, Your Honor.

THE COURT:  You can go back in.

(Juror leaves juryroom.)

THE COURT:  What's your view on what we should do?

MS. PARKER:  She didn't say she is not available next week.  She just said she didn't know.  So I think it's premature to strike her for hardship.

THE COURT:  And no motion for cause.  Correct?

MS. PARKER:  Correct.

THE COURT:  Gilead.

MR. SCHERKENBACH:  I would say the same.  No motion for cause.  Maybe suggest deferring on her and see how many people we end up with.

THE COURT:  I think these are both good suggestions.  I am not striking her for cause, of course.  I will defer and possibly ask her to see if she can give us more information, but I don't think I need to do that just yet.  So we will defer on 20.

(Juror enters juryroom.)

THE COURT:  Good morning.

A JUROR:  Hi.

THE COURT:  Tell us, if you know, your juror number?

A JUROR:  49.

THE COURT: Jennifer Poppiti, okay.

What did you want to talk with us about?

A JUROR: I have two concerns. One of them, I am a kindergarten teacher. Leaving 24 kindergartners for two weeks is hard.

The second, my questionnaire I filled out, I do have a health concern. Am I supposed to say what it is or how detailed can I go?

THE COURT: You can start with being pretty general about it.

A JUROR: I have Crohn's disease. It is hard for me to sit for a long period of time and not have access to a rest room. Even now -- that is my concern. I could access a rest room if I needed to. It comes on pretty quickly if it does.

THE COURT: Thank you for sharing it with us. First off, most importantly, when you go back out there, there is one out in the hallway behind the courtroom.

(Addressing Deputy Clerk Looby) Make sure the CSOs know that folks can go to the rest room if they need to.

So you are not trapped in there.

Now, in terms of if you are on the jury, you have probably heard the schedule, we would be in the courtroom between 9 and 4:30, but we would take a break

10:48:38 1    every morning for at least 15 minutes, every afternoon for

10:48:38 2    at least 15 minutes, lunch for a half-hour.  But any other

10:48:38 3    time that anyone needs a break, you raise your hand and

10:48:38 4    stand up or something.

10:48:38 5            A JUROR:  I wouldn't want to try to feel bad

10:48:38 6    interrupting the process.

10:48:38 7            THE COURT:  That is the question to you.  If you

10:48:38 8    are on this jury, will you be able to -- we don't want you

10:48:38 9    to suffer.

10:48:38 10            A JUROR:  I would be able to raise my hand,

10:48:38 11    absolutely, yes.

10:48:38 12            THE COURT:  With that, does that take care of

10:48:38 13    that?

10:48:38 14            A JUROR:  It does, yes.

10:48:38 15            THE COURT:  And you are in the juryroom.  So you

10:48:38 16    have some sense of where that is relative to the courtroom.

10:48:38 17    There is two restrooms in this room.

10:48:38 18            A JUROR:  Okay.  Perfect.

10:48:38 19            THE COURT:  Let's talk about you being a

10:48:38 20    kindergarten teacher.  Thank you for teaching kindergarten.

10:48:38 21            A JUROR:  Thank you for saying that.

10:48:38 22            THE COURT:  If you are not there, and I could

10:48:38 23    understand why you would want to be there, of course, they

10:48:38 24    would get a substitute?

10:48:38 25            A JUROR:  They would.  There is one there today

10:48:38 1 obviously because I am not there. It's just difficult,

10:48:38 2 writing out lesson plans, preparing things for the children,

10:48:38 3 I guess it's more I feel for them because I am not there and

10:48:38 4 disrupting their routine is very difficult for them.

10:48:38 5     THE COURT:  And it would probably lead right

10:48:38 6 into the holidays?

10:48:38 7     A JUROR:  It does.  From the parent conferences

10:48:38 8 right now, we are working into the holidays.  It is what it

10:48:38 9 is.  Everybody has a child, so...

10:48:38 10     THE COURT:  Let me see if the lawyers have

10:48:38 11 questions.

10:48:38 12     MS. PARKER:  I do not, thank you.

10:48:38 13     MR. SCHERKENBACH:  I do have one followup.  I

10:48:38 14 think in your questionnaire you might have indicated that

10:48:38 15 Merck is a stock your parents own in a mutual fund?

10:48:38 16     A JUROR:  Yes.

10:48:38 17     MR. SCHERKENBACH:  Do you have any sense of how

10:48:38 18 much?

10:48:38 19     A JUROR:  No.  Because my dad worked for DuPont.

10:48:38 20     MR. SCHERKENBACH:  Okay.  Thank you.

10:48:38 21     THE COURT:  Okay.  You can go back in the

10:48:38 22 courtroom.

10:48:38 23     (Juror leaves room.)

10:48:38 24     THE COURT:  Any motion or issue for No. 49?

10:48:38 25     MS. PARKER:  No, Your Honor.

10:48:38 1           THE COURT:  Any motion or issue?

10:48:38 2           MR. SCHERKENBACH:  I think I would make an

10:48:38 3 application as for a combination of sort of hardship and

10:48:38 4 cause.  She clearly wants to try to do the right thing.  But

10:48:38 5 between the medical issue and the kindergarten issue, and

10:48:38 6 not wanting to be away from her kids.  Also, I mean, she can

10:48:38 7 say her parents own Merck.  Yes, I know they own Merck.

10:48:38 8 There is going to be a lot of talk about Merck in this

10:48:38 9 trial.  I am taking all those things together, and I have a

10:48:38 10 concern.

10:48:38 11           THE COURT:  Do you want to respond?

10:48:38 12           MS. PARKER:  Yes.  If I may.

10:48:38 13           So the juror did not ask to be excused for

10:48:38 14 hardship.  She just asked about the bathroom situation.  You

10:48:38 15 followed up and asked if that would accommodate her issue

10:48:38 16 and she said yes.

10:48:38 17           She didn't ask about being excused for hardship

10:48:38 18 because of it, her teaching at the kindergarten.

10:48:38 19           Also, I think she is ready, willing and able to

10:48:38 20 serve, now that Your Honor has talked to her.  And what I

10:48:38 21 understood about her parents is no different than the

10:48:38 22 daughter working with the first juror that we talked to,

10:48:38 23 this is Ms. Adams.  We are getting way from just the

10:48:38 24 immediate family.  Goose-gander.  I would oppose a cause

10:48:38 25 challenge for that.

10:48:38  1          THE COURT:  Anything else?

10:48:38  2          MR. SCHERKENBACH:  I think holding stock in

10:48:38  3   essentially a party, and I think the Court is aware, Merck

10:48:38  4   owns Idenix so Merck is effectively a party here, that is

10:48:38  5   very different than the earlier juror we are talking about,

10:48:38  6   which is why I made an application here and not for the

10:48:38  7   earlier one.  That is the additional point.

10:48:38  8          THE COURT:  I don't have a completed form.  I

10:48:38  9   understood that her parents own it through mutual funds.

10:48:38 10          MR. SCHERKENBACH:  That's what she wrote down.

10:48:38 11          MS. PARKER:  May I show it?

10:48:38 12          THE COURT:  That's okay.

10:48:38 13          I am going to deny the motion.  I do think the

10:48:38 14   bathroom situation and the kindergarten, they are both

10:48:38 15   unfortunate.  No one wants to take her away from the

10:48:39 16   classroom and the trial may require more breaks than all of

10:48:39 17   us might otherwise need.

10:48:39 18          But we can handle both of those things.

10:48:39 19          In terms of the parents owning stock of

10:48:39 20   essentially a party through a mutual fund, that just strikes

10:48:39 21   me as too attenuated to create cause.

10:48:39 22          So I will deny the motion.

10:48:39 23          Bring in the next one.

10:48:39 24          (Juror enters juryroom.)

10:48:39 25          THE COURT:  Good morning.

| | | |
|---|---|---|
| 10:48:39 | 1 | A JUROR: Hi, Your Honor. |
| 10:48:39 | 2 | THE COURT: Have a seat, please. |
| 10:48:39 | 3 | Do you know your juror number? |
| 10:48:39 | 4 | A JUROR: Yes, it's 25. |
| 10:48:39 | 5 | THE COURT: Basil Krikelis? |
| 10:48:39 | 6 | A JUROR: Yes. |
| 10:48:39 | 7 | THE COURT: What did you want to talk to us |
| 10:48:39 | 8 | about? |
| 10:48:39 | 9 | A JUROR: My partner, Mike Kelly, is counsel |
| 10:48:39 | 10 | here. |
| 10:48:39 | 11 | THE COURT: You recognize him? |
| 10:48:39 | 12 | A JUROR: Yes, I recognize Mike. |
| 10:48:39 | 13 | MR. KELLY: But I didn't give him a good bonus, |
| 10:48:39 | 14 | so he can be impartial, Your Honor. |
| 10:48:39 | 15 | THE COURT: All right. Anything else? |
| 10:48:39 | 16 | A JUROR: I mean, unless you want more. Do you |
| 10:48:39 | 17 | need any more? |
| 10:48:39 | 18 | THE COURT: I don't think so. |
| 10:48:39 | 19 | You work in the same office? |
| 10:48:39 | 20 | A JUROR: Correct. Honestly, I just found |
| 10:48:39 | 21 | out -- I think you entered an appearance pretty -- |
| 10:48:39 | 22 | MR. KELLY: Two weeks ago. |
| 10:48:39 | 23 | A JUROR: I didn't really know it. But I know |
| 10:48:39 | 24 | that, for example, Merck's a pretty big client of the firm. |
| 10:48:39 | 25 | And I know Dan Silver and Mike, they are working on a lot of |

10:48:39 1  the stuff.

10:48:39 2          THE COURT:  A partner at the firm?

10:48:39 3          A JUROR:  Yes.

10:48:39 4          THE COURT:  I don't think we need to talk about

10:48:39 5  anything else.  But thank you very much.

10:48:39 6          A JUROR:  Good luck.  It would have been fun.  I

10:48:39 7  am a patent attorney.

10:48:39 8          MR. KELLY:  Say something nice about me.

10:48:39 9          A JUROR:  If Will Ferrell does testify --

10:48:39 10         THE COURT:  I imagine Mr. Ferrell will let you

10:48:39 11 know.

10:48:39 12         A JUROR:  I still have to go back in the

10:48:39 13 courtroom?

10:48:39 14         THE COURT:  Yes.

10:48:39 15         A JUROR:  Good luck, guys.  Have fun.

10:48:39 16         (Juror leaves juryroom.)

10:48:39 17         THE COURT:  For the record, I take it there is

10:48:39 18 no objection to striking him for cause.

10:48:39 19         MS. PARKER:  Correct.

10:48:39 20         MR. SCHERKENBACH:  No objection.  But I feel

10:48:39 21 compelled to add a little fuel to the fire.  My

10:48:39 22 understanding, McCarter & English is his firm.  Is that

10:48:39 23 right?

10:48:39 24         MR. KELLY:  Yes.

10:48:39 25         MR. SCHERKENBACH:  My understanding is they

10:48:39 1    represent Gilead in a pending case as well.  At least that's

10:48:39 2    what my client seems to think.  I expect that will be raised

10:48:39 3    for the Court.  There is no question to me he should be

10:48:39 4    excused for cause.

10:48:39 5                    THE COURT:  I am certainly striking 25 for

10:48:39 6    cause.  I don't know anything about any conflicts.  If

10:48:39 7    somebody has an issue, we will raise it and do our best.

10:48:39 8                    Let's bring in the next juror.

10:48:39 9                    (Juror enters juryroom.)

10:48:39 10                   THE COURT:  Good morning.

10:48:39 11                   A JUROR:  Good morning.

10:48:39 12                   THE COURT:  Have a seat.

10:48:39 13                   A JUROR:  Whoa.

10:48:39 14                   THE COURT:  Do you know your juror number?

10:48:39 15                   A JUROR:  34.

10:48:39 16                   THE COURT:  So you are Carole Marshall?

10:48:39 17                   A JUROR:  Yes.

10:48:39 18                   THE COURT:  What did you want to talk to us

10:48:39 19    about?

10:48:39 20                   A JUROR:  I am 72 years old.  I didn't realize

10:48:39 21    that I would be here for ten days.  I do have some health

10:48:39 22    issues.  I mean, I have a bad back.  I had a broken leg.

10:48:39 23                   I just thought ten days, I was willing for a

10:48:39 24    couple of days, but ten is really a stretch for me.

10:48:39 25                   THE COURT:  All right.  The stretch, first, in

terms of your health, you would be uncomfortable sitting

there, I take it?

A JUROR:  For that long, yes.

THE COURT:  Now, if we have frequent breaks, let

you stand up, stretch, walk around?

A JUROR:  You want me to stay.

THE COURT:  Well, I want to make sure I

understand what you are saying.

Is it something that you could deal with or

would it be setting you off to be in some real physical

discomfort?

A JUROR:  I could probably deal with it.  But I

am 72.

THE COURT:  I heard that.

Are there other things about your schedule or

work that would make it a hardship for you to be here with

us for two weeks?

A JUROR:  Yes.  I am not retired.  I do work in

real estate for my son.  And this is a busy time for him.

THE COURT:  Other issues you want to tell us

about?

A JUROR:  No.  I think that was a strong one, my

age and my health.  I really did want to serve.  I did.  But

I didn't think it would be ten days.

THE COURT:  Let me see if others in the room

10:48:39 1    have questions for you.  Any questions?

10:48:39 2              MS. PARKER:  Would you be willing to serve for

10:48:39 3    the whole ten-day period?

10:48:39 4              A JUROR:  Would I?  That's what I am objecting

10:48:39 5    to, the length of time.

10:48:39 6              THE COURT:  You don't want to be on this jury

10:48:39 7    now that you know it's ten days?

10:48:39 8              A JUROR:  Correct.  That's really what it is.

10:48:39 9              MS. PARKER:  No other questions.  Thank you.

10:48:39 10             THE COURT:  Any questions?

10:48:39 11             MR. SCHERKENBACH:  No, Your Honor.

10:48:39 12             THE COURT:  All right.

10:48:39 13             A JUROR:  I really respect the jury process,

10:48:39 14    too.

10:48:39 15             THE COURT:  Thank you.

10:48:39 16             (Juror leaves juryroom.)

10:48:39 17             THE COURT:  Any objection to No. 34?

10:48:39 18             MS. PARKER:  I think that's not enough for

10:48:39 19    hardship.

10:48:39 20             THE COURT:  So no motion.

10:48:39 21             MS. PARKER:  No motion.

10:48:39 22             MR. SCHERKENBACH:  I would make a motion.  I

10:48:39 23    think it's pretty clear she is going to be upset if she has

10:48:39 24    to be here.  She does not want to be here.  She thinks she

10:48:39 25    should be excused -- it's not like she is making up the

10:48:39 1 reasons.  So we have an unhappy juror on our hands.

10:48:39 2       THE COURT:  I am going to strike No. 34,

10:48:39 3 obviously, reluctantly.  Believe it or not, it's pretty rare

10:48:39 4 that I have someone look me in the eye in response to my

10:48:39 5 question and make it very clear they really don't want to be

10:48:39 6 here and want to get out and think they have a good enough

10:48:39 7 reason to get out.

10:48:39 8       I think it's best that I let her go.

10:48:39 9       So 34 is stricken.

10:46:17 10       (Juror enters juryroom.)

10:46:59 11       THE COURT:  Good morning.

10:47:01 12       A JUROR:  Good morning.

10:47:01 13       THE COURT:  Join us and have a seat, please.

10:47:04 14       A JUROR:  Holy hell.  I feel like I'm coming

10:47:08 15 into a board meeting or something.

10:47:10 16       THE COURT:  Can tell us what your juror number

10:47:13 17 is please?

10:47:14 18       A JUROR:  47.

10:47:16 19       THE COURT:  So hopefully that means you are

10:47:18 20 Charles Pettit.

10:47:20 21       A JUROR:  Yes.

10:47:20 22       THE COURT:  What did you want to tell us?

10:47:22 23       A JUROR:  So it cost me a lot of money to drive

10:47:26 24 back and forth up here; and also I'm in the process of

10:47:28 25 redoing my security clearance for the military.  So it's

like I have a lot of paperwork and computer work and stuff
like that that I still have to do, on top of my job and
everything else, and this is just kind of adding to the
collection of headache.

          THE COURT:  Right.

          A JUROR:  More or less than anything.

          THE COURT:  Let's break these things down.  You
live downstate; right?

          A JUROR:  Yes.

          THE COURT:  About how long did it take you to
get here?

          A JUROR:  Almost two hours to get here this
morning.

          THE COURT:  So if we could put you up in a
Wilmington hotel in Wilmington, would that help?

          A JUROR:  Not really because I still have to go
home and finish all my security clearance, so ..

          THE COURT:  Is that not something you could
bring with you up here?

          A JUROR:  No, it's not stuff I'm going to bring
up here.

          THE COURT:  Do you give --

          A JUROR:  Mag card readers and stuff like that,
and stuff with the military.  I'm not leaving that at the
hotel.  I'd rather leave it at my house or the armory.

10:48:21 1    THE COURT:  If you had to do that work just over

10:48:23 2 the weekend and then presumably after the trial was over,

10:48:26 3 how much would that be a problem for you?

10:48:28 4    A JUROR:  To do what?

10:48:29 5    THE COURT:  If you couldn't do any of that work,

10:48:30 6 let's say you stayed in a hotel up here all the rest of the

10:48:34 7 week.

10:48:34 8    A JUROR:  If I don't have my security, all the

10:48:36 9 paperwork and everything for my security clearance finished

10:48:39 10 in the next two days, I lose my security clearance and I

10:48:42 11 lose my job in the military.

10:48:43 12    THE COURT:  In the next two days?

10:48:46 13    A JUROR:  Yes.  I have two days to finish all

10:48:48 14 the paperwork.  And I'm doing ten years worth of financial

10:48:52 15 history, background history, criminal background, drugs,

10:48:55 16 like everything.  I have to do ten years worth.

10:48:58 17    THE COURT:  So if you're not on this trial, when

10:49:03 18 were you planning to get that work done in the next two

10:49:05 19 days?

10:49:06 20    A JUROR:  I'm trying to get the rest of it done

10:49:08 21 tonight and tomorrow.  It's got to get done.

10:49:10 22    THE COURT:  During the day tomorrow.

10:49:11 23    A JUROR:  Well, it will be when I get off work

10:49:13 24 because I'm trying to like balance work and it at the same

10:49:16 25 time, and it's not very fun.

10:49:17 1          THE COURT:  I'm sure.  It sounds very

10:49:19 2   challenging.  What time would you normally get off work

10:49:22 3   tomorrow?

10:49:24 4          A JUROR:  I work ten hours.  So I go in at 5:30

10:49:27 5   in the morning, I get back at 3:30 and 4:00.  And I am

10:49:31 6   working right down the road from my house so I can literally

10:49:34 7   hop to home.

10:49:34 8          THE COURT:  Okay.  Other issues or is that all?

10:49:37 9          A JUROR:  No.

10:49:37 10          THE COURT:  All right.  Let me see if other

10:49:40 11   folks have questions for you.

10:49:43 12          Are there any questions?

10:49:43 13          MS. PARKER:  Good morning.

10:49:43 14          A JUROR:  Good morning.

10:49:45 15          MS. PARKER:  Just a couple.  On your

10:49:46 16   questionnaire, there was health issues.  You mentioned that

10:49:50 17   you had ADHD, and I'm going to read it.  It says I have a

10:49:54 18   hard time sitting anywhere for long periods of time.  Will

10:49:57 19   that be an issue for you during the trial?

10:49:59 20          A JUROR:  I get very twitchy.  As you can see,

10:50:01 21   I'm constantly moving my hand, chair, legs, stuff like that.

10:50:04 22   So it kind of annoys people more than anything.  It's not a

10:50:09 23   problem to me because I'm used to it.  I'm 28 years old.  I

10:50:13 24   lived my whole life like this, so I know how it is.  Just

10:50:16 25   other people get annoyed with it.

10:50:18  1          MS. PARKER:  Then I want to follow-up on Judge

10:50:20  2     Stark's questions.  I don't want to put words in your mouth

10:50:23  3     by any means, but what I'm hearing is you really don't want

10:50:25  4     to serve in this particular case because of your

10:50:27  5     circumstances; is that fair?

10:50:29  6          A JUROR:  Kind of.  And it is also with, it's

10:50:34  7     just the collection of things right now.  It's just a lot on

10:50:38  8     my plate all at once.

10:50:40  9          MS. PARKER:  That's all I have.  Thank you.

10:50:42 10          THE COURT:  Are there any questions?

10:50:42 11          MR. SCHERKENBACH:  No questions, Your Honor.

10:50:43 12          THE COURT:  All right.  You can go back into the

10:50:45 13     courtroom.  Thank you very much.

10:50:46 14          A JUROR:  Yes, sir.

10:50:47 15          (Juror left juryroom.)

10:50:47 16          THE COURT:  Any motion from Idenix?

10:50:55 17          MS. PARKER:  Yes, Your Honor.  I think that he

10:50:56 18     is in the same situation as our last juror that Your Honor

10:51:01 19     struck, hardship.  He just doesn't want to be here.  He went

10:51:06 20     on and on about his scheduling issues and the job and

10:51:10 21     he says he is going to lose his job if he doesn't get this

10:51:13 22     done in two days.  So, yes, I would move to strike him for

10:51:17 23     hardship and for cause, both for the same reason.

10:51:19 24          THE COURT:  What is your position?

10:51:20 25          MR. SCHERKENBACH:  I actually have no objection

10:51:21 1    to the motion.  I think the combination of the two hour

10:51:24 2    one-way drive and the fact that he seems convinced he is

10:51:28 3    going to lose his job if he can't finish what he needs to

10:51:32 4    finish is sufficient.

10:51:32 5              THE COURT:  All right.  Then we'll grant the

10:51:35 6    unopposed motion to strike.  So No. 47 is stricken.

10:51:44 7              (Juror entered juryroom.)

10:51:46 8              THE COURT:  Good morning.

10:51:47 9              A JUROR:  Good morning.

10:51:49 10             THE COURT:  Could you tell us your number,

10:51:53 11   please?

10:51:53 12             A JUROR:  35.

10:51:53 13             THE COURT:  Derek Martin.

10:51:55 14             A JUROR:  Yes.

10:51:55 15             THE COURT:  What did you want to tell us?

10:51:57 16             A JUROR:  I actually have a family trip I paid

10:52:00 17   for and supposed to be leaving Thursday.

10:52:02 18             THE COURT:  This Thursday?

10:52:03 19             A JUROR:  Yes, correct.  I'll be back on

10:52:05 20   Tuesday.

10:52:06 21             THE COURT:  And if you weren't on that trip, you

10:52:07 22   would lose the money you paid toward it?

10:52:09 23             A JUROR:  Yes.  And obviously I wouldn't be able

10:52:11 24   to see my family either.

10:52:13 25             THE COURT:  Are you going to visit?

10:52:14  1          A JUROR:  Yes, visit family.  Christmas is right

10:52:17  2  around the corner.

10:52:18  3          THE COURT:  Okay.  Is there anything else?

10:52:19  4          A JUROR:  No, sir.

10:52:19  5          THE COURT:  All right.  Are there any questions?

10:52:22  6          MS. PARKER:  No, Your Honor.  Thank you.

10:52:23  7          THE COURT:  Are there any questions?

10:52:26  8          MR. SCHERKENBACH:  No, Your Honor.  Thank you.

10:52:27  9          THE COURT:  Thank you.  You can go back into the

10:52:30 10  courtroom.

10:52:31 11          A JUROR:  Thank you.

10:52:32 12          (Juror left juryroom.)

10:52:35 13          THE COURT:  Is there any objection to me

10:52:36 14  striking No. 35?

10:52:37 15          MS. PARKER:  No, Your Honor.

10:52:37 16          MR. SCHERKENBACH:  No objection.

10:52:38 17          THE COURT:  All right.  35 is stricken.

10:52:41 18          (Juror enters juryroom.)

10:52:47 19          THE COURT:  Good morning.

10:52:47 20          A JUROR:  Good morning.

10:52:48 21          THE COURT:  Have a seat, please, and tell us

10:52:49 22  your juror number.

10:52:51 23          A JUROR:  39.

10:52:52 24          THE COURT:  Robert Miller.

10:52:53 25          A JUROR:  Yes.

THE COURT: Okay. What did you want to tell us?

A JUROR: Well, I answered "yes" to the last question, I believe.

THE COURT: The schedule.

A JUROR: I know there is a lot of people in here about that, but I am a little nervous. Forgive me.

THE COURT: Take your time.

A JUROR: I am not good at speaking, but one reason or a reason of excuse for me. I had sent a letter in or my pastor sent a letter in from my church because of my religious beliefs.

First of all, I do appreciate the court system in the United States of America, and I appreciate definitely all that you do as a judge and everyone else that is involved. And I was just thinking, because of where I stand as a Christian, a follower of Christ, that to participate in something like this would jeopardize my faith in Christ, but although I do see my duty as a Christian to pray for you all in this process, I see that as my calling, and so if you see fit to excuse me from any potential place in the jury, I would very much appreciate it. And like I said, I definitely would lift you all in prayer and just can't think of anything else to say but that is pretty much all.

THE COURT: Okay. Thank you for that. You also did mention your schedule.

10:54:31 1          Would your schedule pose a hardship in addition

10:54:34 2 to what you already stated?

10:54:36 3          A JUROR:  No, it probably wouldn't, although my

10:54:38 4 kids do have chicken pox right now.

10:54:41 5          THE COURT:  Sorry.

10:54:42 6          A JUROR:  So that is kind of an ongoing thing.

10:54:46 7 My youngest has got it right now, my other two have it, and

10:54:48 8 my wife is doing a lot in caring for them.  Plus I have, am

10:54:53 9 busy at work, but I know that is a lot of people's excuse.

10:54:57 10 But, yes, it would be nice to not have the time or, you

10:55:03 11 know, to come up here.  I live in Dover, so it's quite a

10:55:06 12 drive for me, you know, from there.

10:55:09 13          But, yeah, I do appreciate, like I said,

10:55:11 14 everything that the Court does and what it stands for and

10:55:17 15 everything.

10:55:17 16          THE COURT:  Thank you.  Let me see if anyone has

10:55:20 17 questions for you.

10:55:21 18          Are there any questions?

10:55:22 19          MS. PARKER:  If I may.

10:55:23 20          I believe you mentioned that your pastor sent a

10:55:25 21 letter in, is that right?

10:55:26 22          A JUROR:  Um-hmm.

10:55:28 23          MS. PARKER:  Is it because that you are saying

10:55:30 24 serving on the jury would be contrary to your religious

10:55:33 25 beliefs?

10:55:34  1          A JUROR:  Yes.

10:55:34  2          MS. PARKER:  Okay.  Thank you.  That's all I

10:55:36  3   have.

10:55:36  4          THE COURT:  Are there any questions?

10:55:37  5          MR. SCHERKENBACH:  Just one follow-up on your

10:55:40  6   questionnaire.

10:55:41  7          There is this question about do you believe it's

10:55:43  8   wrong for companies to get patents on medicine?  You said

10:55:46  9   yes.  Can you just tell us a little bit more about that?  Is

10:55:49 10   that something that concerns you?

10:55:52 11          A JUROR:  The only thing I would think of that,

10:55:54 12   I mean I really don't know too much about it, but I just, I

10:56:00 13   just know that if there is a patent on something, it tends,

10:56:05 14   it may tend to increase the price on a product, but that may

10:56:09 15   not be true.  I may not know what I'm talking about either.

10:56:12 16          But you have brand names, and so just shopping,

10:56:15 17   for instance, at a local drugstore, whatever, there is

10:56:19 18   off-brands that you can get that are a lot cheaper, and I

10:56:22 19   often wonder why a off-brand name is cheaper.  I mean you

10:56:28 20   look at the labels and most times they will have the same

10:56:31 21   ingredient, but I just don't see the purpose of a patent on

10:56:35 22   a drug where that would be the case.  I mean, but maybe, I

10:56:41 23   mean all drugs, maybe some are better than others.  I would

10:56:47 24   think if they all had the same ingredient and they are

10:56:49 25   capable of doing care for a patient or whatever that it

| | | |
|---|---|---|
| 10:56:52 | 1 | would be, you know, the price would be the same across the |
| 10:56:56 | 2 | board.  But I mean that probably has nothing to do with why |
| 10:57:00 | 3 | or whatever. |
| 10:57:01 | 4 | THE COURT:  All right.  Thank you. |
| 10:57:02 | 5 | A JUROR:  Just one reason. |
| 10:57:04 | 6 | THE COURT:  Thank you. |
| 10:57:04 | 7 | MR. SCHERKENBACH:  Thank you. |
| 10:57:05 | 8 | THE COURT:  Okay.  You can go back into the |
| 10:57:06 | 9 | courtroom. |
| 10:57:07 | 10 | A JUROR:  Thank you. |
| 10:57:08 | 11 | THE COURT:  Thank you. |
| 10:57:09 | 12 | (Juror left juryroom.) |
| 10:57:12 | 13 | THE COURT:  Any objection to me striking the 39 |
| 10:57:15 | 14 | based on his religious beliefs? |
| 10:57:18 | 15 | MS. PARKER:  No, Your Honor. |
| 10:57:19 | 16 | MR. SCHERKENBACH:  No, Your Honor. |
| 10:57:20 | 17 | THE COURT:  We'll strike No. 39. |
| 10:57:21 | 18 | (Juror entered juryroom.) |
| 10:57:28 | 19 | THE COURT:  Good morning.  Have a seat. |
| 10:57:31 | 20 | Can you tell us your juror number? |
| 10:57:35 | 21 | A JUROR:  50. |
| 10:57:36 | 22 | THE COURT:  Shelly Redden. |
| 10:57:37 | 23 | A JUROR:  Correct. |
| 10:57:37 | 24 | THE COURT:  What did you want to tell us about? |
| 10:57:39 | 25 | A JUROR:  A couple situations, and both related |

10:57:42 1    to work.

10:57:43 2            I am an hourly employee at a charter school.  If

10:57:48 3    I don't report, I do not get paid.  That puts a financial

10:57:51 4    burden on me at this point, with the holidays coming and

10:57:55 5    everything.

10:57:55 6            Also, because I work for a charter school, we

10:57:59 7    have limited number of employees and resources.  I work in

10:58:03 8    the office.  We have four people normally.  One's mother

10:58:09 9    passed away and the other has stage four colon cancer and

10:58:13 10   she will not be in.  Another one had emergency surgery on

10:58:17 11   Friday.  So that leaves I understand two people in a charter

10:58:22 12   school office and, like I said, payroll, accounts payable,

10:58:27 13   accounts receivable.  We wear a lot of hats.

10:58:31 14           THE COURT:  All right.  So if you were here over

10:58:35 15   the next two weeks, I imagine some part of your mind would

10:58:39 16   be back at the charter school --

10:58:41 17           A JUROR:  Yes.

10:58:42 18           THE COURT:  -- wondering what is going on.

10:58:43 19           A JUROR:  Um-hmm.

10:58:44 20           THE COURT:  Do you think nonetheless if you were

10:58:46 21   here, you would be able to focus sufficient attention on

10:58:49 22   what was being presented and try your best?

10:58:51 23           A JUROR:  Honestly, yes.

10:58:52 24           THE COURT:  Okay.  And in terms of, you would

10:58:59 25   have no benefits, you would not get paid at all over the

next two weeks for your work.

A JUROR:  I am semi, I get a pension so this is -- I am semiretired.  I work approximately 25 hours a week.

THE COURT:  So that would be a hardship to lose that portion?

A JUROR:  Yes, this being the holidays.

THE COURT:  Okay.  Is there anything else you want to tell us?

A JUROR:  No, I think that is it.

THE COURT:  Are there any questions?

MS. PARKER:  I do.

Good morning.

A JUROR:  Hi.

MS. PARKER:  I just want to understand what your situation a little bit better.

So you told us about this financial burden that you have.  Despite that, would you be able to serve if you were selected?

A JUROR:  Yes.

MS. PARKER:  That's all I have.

THE COURT:  Okay.  Are there any questions?

MR. SCHERKENBACH:  No.  Thank you.

MS. PARKER:  Thank you.

THE COURT:  You can go back into the courtroom.  Thank you.

10:59:47 1                    A JUROR:  Thank you.

10:59:49 2                    (Juror left juryroom.)

10:59:51 3               THE COURT:  Any motion for No. 50?

10:59:53 4               MS. PARKER:  Not from me.  Thank you.

10:59:55 5               MR. SCHERKENBACH:  I think she should be excused

10:59:57 6     for hardship.  She won't get paid for two weeks and needs

11:00:01 7     the money.  People can't really cover for her, it seems.

11:00:06 8     It's sort of a bad situation, but she really, I can kind of

11:00:13 9     feel the hardship coming from her, personally.

11:00:17 10              MS. BROOKS:  Also, Your Honor, apparently we

11:00:19 11    didn't get a questionnaire from her, so we don't know if

11:00:21 12    there were questions.

11:00:23 13              MS. PARKER:  There is a questionnaire.

11:00:28 14              MS. MASON:  Her's is one that came in late.

11:00:29 15              MS. PARKER:  I'm happy for you all to look at

11:00:33 16    mine.

11:00:33 17              THE COURT:  Yes.  Why don't you provide one for

11:00:35 18    a moment.

11:00:37 19              (Document handed to Mr. Scherkenbach.)

11:00:37 20              MR. SCHERKENBACH:  Thank you very much.

11:00:43 21              MS. PARKER:  Sure.

11:01:01 22              MR. SCHERKENBACH:  Thank you.

11:01:02 23              (Document reviewed and given back.)

11:01:02 24              THE COURT:  Nothing further in light of what you

11:01:04 25    have seen there?

11:01:04 1          MR. SCHERKENBACH:  No.

11:01:05 2          THE COURT:  Do you want to respond to the

11:01:06 3 argument?

11:01:07 4          MS. PARKER:  Your Honor, perhaps put her in the

11:01:09 5 deferred category.  She said she is willing to serve.

11:01:12 6          THE COURT:  All right.  I will add her to our

11:01:15 7 defer category for now.

11:01:17 8          Before we bring the next one in, No. 39 who I

11:01:21 9 struck, I realize that I was maybe a little short in what I

11:01:25 10 said and the transcript might not accurately reflect what

11:01:28 11 happened here.

11:01:29 12          So I struck him not because of his religious

11:01:32 13 beliefs but it was clear to all of us in the room he felt

11:01:36 14 because of his religious faith, it would be inconsistent

11:01:38 15 with that faith to sit in judgment and be on a jury trial,

11:01:41 16 so I just want that to be clear.

11:01:43 17          You can bring in the next one.

11:01:45 18          (Juror enters juryroom.)

11:01:48 19          THE COURT:  How are you.

11:02:01 20          A JUROR:  Good.

11:27:08 21          THE COURT:  What is your juror number?  Or what

11:27:08 22 is your name?

11:27:08 23          A JUROR:  My name is Melissa Longo.

11:27:08 24          THE COURT:  Then I think you are Juror 31.

11:27:08 25          A JUROR:  Yes.

11:27:08 1                THE COURT:  What did you want to talk to us

11:27:08 2  about?

11:27:08 3                A JUROR:  I am a teacher in the inner city.  Ten

11:27:08 4  days is a hardship on my school.  We can't get subs.  My

11:27:08 5  principle wrote this note.  She should know.

11:27:08 6                THE COURT:  I am looking at the letter.

11:27:08 7                Tell me, what grade or subject?

11:27:08 8                A JUROR:  First grade, a dual language.  It is

11:27:08 9  in the city.  When I am out it is really hard because they

11:27:08 10  don't have anybody to fill my spot.

11:27:08 11                THE COURT:  If they can't get someone of similar

11:27:08 12  qualifications, is that the problem?

11:27:08 13                A JUROR:  Correct.

11:27:08 14                THE COURT:  So what would happen -- they would

11:27:08 15  find some substitute but work just wouldn't get done.  Is

11:27:08 16  that right?

11:27:08 17                A JUROR:  Right.  It won't be as -- the quality

11:27:08 18  that would give the kids wouldn't be as good.

11:27:08 19                THE COURT:  Notwithstanding all that very valid

11:27:08 20  concern, if you were here for the next two weeks, would you

11:27:08 21  be able to focus on what's going on in the courtroom and

11:27:08 22  give the parties a fair trial?  Or would you be too

11:27:08 23  concerned about your students and what was happening back at

11:27:08 24  school?

11:27:08 25                A JUROR:  I would be worried because I have to

provide work for them, like, every day. So that would be

hard for me, too, because I won't be able to get there

before school is done. I would have to go after court, do

my lesson plans for the next day because I don't know

whether they are getting done every day. For me, that would

be hard.

THE COURT: Okay. Anything else you wanted to

tell us?

A JUROR: No.

THE COURT: I am going to provide the lawyers a

chance to look at the questionnaire and see if they want to

ask any questions?

MS. PARKER: No, Your Honor.

MR. SCHERKENBACH: I do have -- on your

questionnaire you indicated your husband has ordered from

Merck, ordered like supplies or products or something. Is

that for use in his business?

A JUROR: He is a dentist. Yes.

MR. SCHERKENBACH: Do you know if Merck is

somebody he buys from currently?

A JUROR: I don't know if he is currently. I

worked in his office for a short amount of time. So I would

like sign for stuff that came in that was for Merck, for

someone from Merck.

This was like 11 years ago.

11:27:08 1    MR. SCHERKENBACH:  Okay.  You also I think said

11:27:08 2  something about people getting patents on medicines was a

11:27:08 3  concern you had.

11:27:08 4    A JUROR:  My cousin does that.  He makes

11:27:08 5  chemicals and medicines and stuff and gets patents for them.

11:27:08 6    MR. SCHERKENBACH:  I understand.  Thank you.

11:27:08 7    THE COURT:  Anything else?

11:27:08 8    MR. SCHERKENBACH:  No.

11:27:08 9    THE COURT:  You can go back in the courtroom.

11:27:08 10  You can hold onto the letter.  Thank you very much.

11:27:08 11    A JUROR:  Thank you.

11:27:08 12    (Juror leaves juryroom.)

11:27:08 13    THE COURT:  Motion?

11:27:08 14    MS. PARKER:  No, Your Honor.  It sort of sounded

11:27:08 15  like what she said about her hardship was similar to what

11:27:08 16  Ms. Gracey said about her respiratory situation and Your

11:27:08 17  Honor deferred her.  So I would request that she be

11:27:08 18  deferred.

11:27:08 19    THE COURT:  What's Gilead's position?

11:27:08 20    MR. SCHERKENBACH:  We make a motion both for

11:27:08 21  hardship and for cause.

11:27:08 22    I am a little concerned about her answer to my

11:27:08 23  question about Question 16, because of what she said on her

11:27:08 24  questionnaire, "Because I think it's unfair to charge the

11:27:08 25  highest possible price for a medicine that someone might

need to live," which is very different than what she said in
answer to my question. She tied it back to her having a
relative who has some patents.

So I am concerned there is some real issue there
that she doesn't want to talk about.

THE COURT: Is 16 the question do you believe
it's wrong for companies to get patents on this?

MR. SCHERKENBACH: Yes.

THE COURT: Any response?

MS. PARKER: She didn't say the magic language,
that she couldn't serve as a fair juror here. I don't think
that is sufficient for a cause challenge. So just going
back, what she said was most of the respiratory therapist.
I would suggest we defer the matter.

THE COURT: I don't think I have specifically
asked her if she could be fair. I don't want to bring her
back.

I am going to grant the motion and strike No. 31
for the combination of reasons that have been argued by
Gilead.

31 is stricken.

(Juror enters juryroom.)

THE COURT: Good morning.

A JUROR: Good morning.

THE COURT: Could you tell us your juror number,

11:27:08 1  please?

11:27:08 2           A JUROR:  8.

11:27:08 3           THE COURT:  William Bryant?

11:27:08 4           A JUROR:  Yes.

11:27:08 5           THE COURT:  What did you answer yes to or want

11:27:08 6  to talk to us about?

11:27:08 7           A JUROR:  I take medicine daily manufactured by

11:27:08 8  Gilead and receive about 3,500 to $4,000 in grant money from

11:27:08 9  them each year to take that medicine.  I would like to

11:27:08 10  continue taking the medicine.

11:27:08 11          THE COURT:  Let's talk about that.  I am sorry

11:27:08 12  to have to ask you sort of personal questions.  Can you tell

11:27:08 13  us a little bit about that medicine and what if any feelings

11:27:08 14  you have about Gilead?

11:27:08 15          A JUROR:  It is Truvada HIV prevention.  I am a

11:27:08 16  big supporter, and I take it, and I like the company for

11:27:09 17  giving me money to take it.

11:27:09 18          THE COURT:  So as you heard, there is a Gilead

11:27:09 19  party to this case.  Right?

11:27:09 20          A JUROR:  Yes.

11:27:09 21          THE COURT:  If you are on this jury, you will be

11:27:09 22  instructed to be fair and impartial to Gilead and the party

11:27:09 23  on the other side, Idenix.  Do you understand that?

11:27:09 24          A JUROR:  Yes.

11:27:09 25          THE COURT:  Do you think you would be able to be

1   fair and impartial?

2           A JUROR:  Yes.  But I mean, I take a pill every

3   morning that says Gilead on it.

4           THE COURT:  Would Gilead start out a little bit

5   ahead in your mind of this trial because of your familiarity

6   with them?

7           A JUROR:  I would say so.

8           THE COURT:  Would you be concerned that if the

9   verdict were in favor of Idenix that maybe your access to

10  the medicine or the money you are paid would potentially be

11  at risk?

12          A JUROR:  Possibly.  I mean, it seems that way.

13  But I don't know what the patent is in regards to.

14          THE COURT:  Okay.  Other issues you want to tell

15  us about?

16          A JUROR:  That's it.

17          THE COURT:  Any questions?

18          MS. PARKER:  You mentioned in your questionnaire

19  you had some commitments about rehearsals?

20          A JUROR:  Just evening rehearsals.  If it is

21  past 4:30, it's fine.

22          THE COURT:  Any questions?

23          MR. SCHERKENBACH:  No, Your Honor.

24          THE COURT:  You can go back in the courtroom.

25  Thank you.

11:27:09 1                    (Juror leaves juryroom.)

11:27:09 2          THE COURT:  Motion?

11:27:09 3          MS. PARKER:  Move to strike him for cause based

11:27:09 4  on his personal experience with Gilead and his answer about

11:27:09 5  starting out perhaps a little bit ahead.

11:27:09 6          THE COURT:  Any objection to that?

11:27:09 7          MR. SCHERKENBACH:  No.

11:27:09 8          THE COURT:  No. 8 is stricken.

11:27:09 9                    (Juror enters juryroom.)

11:27:09 10         THE COURT:  Good morning.

11:27:09 11         A JUROR:  Good morning.

11:27:09 12         THE COURT:  Have a seat, please.

11:27:09 13         Do you know your juror number?

11:27:09 14         A JUROR:  Yes.

11:27:09 15         THE COURT:  It's a one or two-digit number?

11:27:09 16         A JUROR:  It's 12.

11:27:09 17         THE COURT:  Omar Crews-Moore.

11:27:09 18         A JUROR:  Yes.

11:27:09 19         THE COURT:  What did you want to talk to us

11:27:09 20  about?

11:27:09 21         A JUROR:  I want to know, do I still have to

11:27:09 22  come in?  I am in college.

11:27:09 23         THE COURT:  You are a student now?

11:27:09 24         A JUROR:  Yes.  Full-time student.

11:27:09 25         THE COURT:  Where are you enrolled right now?

11:27:09 1                A JUROR:  I am at Del Tech, Stanton.

11:27:09 2                THE COURT:  Over this week and next week, when

11:27:09 3 would you be in class if you weren't at this trial?

11:27:09 4                A JUROR:  You said where I would be in class?

11:27:09 5                THE COURT:  Not where, but when.  Were you

11:27:09 6 scheduled to be in classes this week?

11:27:09 7                A JUROR:  Yes.

11:27:09 8                THE COURT:  It starts at 2:30?

11:27:09 9                A JUROR:  Yes.

11:27:09 10               THE COURT:  Every day this week?

11:27:09 11               A JUROR:  Every day.

11:27:09 12               THE COURT:  What about next week?

11:27:09 13               A JUROR:  Yes.

11:27:09 14               THE COURT:  Same thing, every day at 2:30?

11:27:09 15               A JUROR:  Yes.

11:27:09 16               THE COURT:  If you missed those classes, are

11:27:09 17 there tests or something coming up that might be more

11:27:09 18 difficult?

11:27:09 19               A JUROR:  I am not sure of that, because the

11:27:09 20 semester hasn't ended yet.

11:27:09 21               THE COURT:  The semester has not ended yet?

11:27:09 22               A JUROR:  No.

11:27:09 23               THE COURT:  Do you know when it ends?

11:27:09 24               A JUROR:  No, I am not sure.

11:27:09 25               THE COURT:  So if we don't have you on this

11:27:09 1    jury, you are going to probably be in class every day this

11:27:09 2    week and next week starting at 2:30?

11:27:09 3                    A JUROR:  Yes.

11:27:09 4                    THE COURT:  Do you have other concerns?

11:27:09 5                    A JUROR:  No.

11:27:09 6                    THE COURT:  Let's see if the lawyers have any

11:27:09 7    questions for you.

11:27:09 8                    MS. PARKER:  No, Your Honor.

11:27:09 9                    MR. SCHERKENBACH:  No questions.  Thanks.

11:27:09 10                   THE COURT:  You can go back in the courtroom.

11:27:09 11   Thank you.

11:27:09 12                   (Juror leaves juryroom.)

11:27:09 13                   THE COURT:  Any motion?

11:27:09 14                   MS. PARKER:  He has a hardship, I believe.

11:27:09 15                   MR. SCHERKENBACH:  I agree.

11:27:09 16                   THE COURT:  All right.  I agree, too.  So No. 12

11:27:09 17   is stricken for hardship.

11:27:09 18                   (Juror enters juryroom.)

11:27:09 19                   THE COURT:  Good morning.

11:27:09 20                   A JUROR:  Good morning.

11:27:09 21                   THE COURT:  Could you tell us your number,

11:27:09 22   please?

11:27:09 23                   A JUROR:  46.

11:27:09 24                   THE COURT:  Bradley Okin?

11:27:09 25                   A JUROR:  Yes.

11:27:09 1          THE COURT:  What did you want to tell us?

11:27:09 2          A JUROR:  I live 111 miles away.  I left at 5:30

11:27:09 3  today.  I don't know if I could drive five hours a day for

11:27:09 4  ten days and be attentive enough in the jury box.

11:27:09 5          THE COURT:  If we put you up in a hotel up here,

11:27:09 6  would that help?

11:27:09 7          A JUROR:  The second part, my wife broke her

11:27:09 8  ankle last month, she has a couple doctor's appointments.

11:27:09 9          THE COURT:  And you are currently scheduled to

11:27:09 10 take her to those appointments?

11:27:09 11         A JUROR:  Right now, yes.

11:27:09 12         THE COURT:  Those appointments are over the next

11:27:09 13 two weeks, I take it?

11:27:09 14         A JUROR:  Yes.

11:27:09 15         THE COURT:  And if you were up here is there

11:27:09 16 anyone else that could take her?

11:27:09 17         A JUROR:  Probably she could get a neighbor.

11:27:09 18         THE COURT:  So --

11:27:09 19         A JUROR:  My worry is the drive.

11:27:09 20         THE COURT:  Just for a moment putting your

11:27:09 21 wife's situation aside, if we offered you a hotel up here

11:27:09 22 and eliminated the drive, would that alleviate at least that

11:27:09 23 concern or would it not?

11:27:09 24         A JUROR:  I am sure it would.

11:27:09 25         THE COURT:  Are there other issues?

11:27:09 1          A JUROR:  No.

11:27:09 2          THE COURT:  Okay.  I want to see if the lawyers

11:27:09 3  have questions for you.

11:27:09 4          MS. PARKER:  Good morning.

11:27:09 5          A JUROR:  Good morning.

11:27:09 6          THE COURT:  If you had to make this drive would

11:27:09 7  it be more difficult for you to sit and listen to the

11:27:09 8  evidence in the case because you have had to drive that

11:27:09 9  distance both ways?

11:27:09 10         A JUROR:  Yes.  By the third or fourth day I am

11:27:09 11  sure that in the afternoon I would have a hard time

11:27:09 12  focusing.

11:27:09 13         MS. PARKER:  Thanks.  That's all.

11:27:09 14         THE COURT:  Any questions.

11:27:09 15         MR. SCHERKENBACH:  Based on your questionnaire,

11:27:09 16  you indicated you have a Bachelor of science.  What field is

11:27:09 17  it in?

11:27:09 18         A JUROR:  It's in mathematics.

11:27:09 19         MR. SCHERKENBACH:  It looks like you took

11:27:09 20  biology and chemistry courses in college, too?

11:27:09 21         A JUROR:  Yes.

11:27:09 22         MR. SCHERKENBACH:  That wasn't a major focus?

11:27:10 23         A JUROR:  No.

11:27:10 24         MR. SCHERKENBACH:  No.

11:27:10 25         THE COURT:  Just about your wife, sorry to have

1  to ask you personal questions, if someone could take her to

2  her appointment, if she okay during the day on her own?

3          A JUROR:  Yes.  She has the boot on and she can

4  hobble around.

5          THE COURT:  How many appointments do you think

6  she has over the next two weeks?

7          A JUROR:  One this week and one next week, plus

8  physical therapy.  But they could pick her up.

9          THE COURT:  Anything else?

10          A JUROR:  No.

11          THE COURT:  You can go back in the courtroom.

12  Thank you.

13          A JUROR:  Thank you.

14          (Juror leaves juryroom.)

15          THE COURT:  Any motion?

16          MS. PARKER:  I would move to strike for

17  hardship.

18          THE COURT:  All right.  What's Gilead's

19  position?

20          MR. SCHERKENBACH:  I oppose.  It is a long

21  drive.  But that seems to be the major issue.  I thought I

22  heard him say that a hotel would accommodate the major

23  problem.  Obviously, someone would have to take his wife to

24  her doctor appointments.  But it sounds like that was

25  do-able, also.

11:27:10 1          THE COURT:  Any response?

11:27:10 2          MS. PARKER:  There is a discussion about staying

11:27:10 3   in hotels.  Is that the entire jury would be sequestered and

11:27:10 4   stay in a hotel?

11:27:10 5          THE COURT:  There is no sequestering.  But we do

11:27:10 6   have the means to put them in a hotel room.

11:27:10 7          MS. PARKER:  All of them?  That's what I am

11:27:10 8   trying to figure out.

11:27:10 9          THE COURT:  It's just whoever needs it.  Most

11:27:10 10  people don't live 111 miles away.

11:27:10 11         MS. PARKER:  I would continue to make that same

11:27:10 12  motion.  But I have nothing else to add to what I said

11:27:10 13  previously.

11:27:10 14         THE COURT:  I am going to deny the motion.  I

11:27:10 15  think, under the circumstances, we certainly would offer him

11:27:10 16  a hotel room.  It would be up to him if he wanted to do the

11:27:10 17  five-hour drive or stay in the hotel.  While certainly no

11:27:10 18  one wants to have a spouse with a broken ankle, I think it

11:27:10 19  sounds as if she can get along and get to those

11:27:10 20  appointments, if need be.

11:27:10 21             (Juror enters juryroom.)

11:27:10 22         THE COURT:  Good morning.

11:27:10 23         A JUROR:  Good morning.

11:27:10 24         THE COURT:  Could you tell us your juror number,

11:27:10 25  please?

A JUROR: 27.

THE COURT: Charles Livingston?

A JUROR: Yes.

THE COURT: What did you want to tell us?

A JUROR: Judge, I just don't feel -- I can't even take off one week much less two weeks from my job. It would be very devastating to me.

THE COURT: You work at the Air Force Base?

A JUROR: Yes.

THE COURT: Just to help us understand a little bit better why it would be devastating, you wouldn't get paid?

A JUROR: No, no. Absolutely. It's just, my job on a daily basis is just, it's overwhelming, just on a daily basis. If I take one day, a couple days off just to go back and visit my mom in Pennsylvania, I come back, I got twice as much work. I take one day off, it's two days work when I come back. I know that sounds hard to believe. But it's true.

THE COURT: Tell us a little bit about what kind of work you do?

A JUROR: I manage construction contracts, manage and inspect construction contracts. And I could give you a laundry list of things -- I wish I had been more prepared, the kind of things I do. I process badges, access

badges for contractors, digging permits, materials, metals.
It's just overwhelming.

THE COURT: When you are not there or weren't
there --

A JUROR: It's going to pile up.

THE COURT: If we need you for jury service for
two weeks, is there not someone else they could put in that
spot?

A JUROR: There is not. We are already down to
the bare bones. There is three guys -- as a matter of fact,
I am basically filling in for a project manager who just
left and went to another base. There is nobody that came in
and took his place.

People don't realize. They think, government
workers, you sit back. That's not the case.

Some jobs are not, you know, they are not. But
mine is.

THE COURT: Notwithstanding all of that, if you
found yourself here for the next two weeks having to listen
to the evidence and make a decision, would you be able to do
that or would you not be able to do what we would ask you to
do?

A JUROR: I can just tell you, I wouldn't be
happy to be here. That's for sure.

THE COURT: Okay. Let me see if others have

11:27:10  1    questions for you.  Any questions?

11:27:10  2              MS. PARKER:  Just one followup.  Good morning.

11:27:10  3              So if you are selected as a juror, will you be

11:27:10  4    paid or not?

11:27:10  5              A JUROR:  Oh, yes.  Money, that's not an object.

11:27:10  6              MS. PARKER:  That's all I have to ask.  Thank

11:27:10  7    you.

11:27:10  8              THE COURT:  Any questions?

11:27:10  9              MR. SCHERKENBACH:  No, Your Honor.

11:27:10 10              A JUROR:  My contractors depend on me.  They are

11:27:10 11    already pressuring me.  The pressure that I have on a daily

11:27:10 12    basis is just -- if I sit down, you give me a little bit of

11:27:10 13    a of time I will make you a list of what I do.

11:27:10 14              THE COURT:  Thank you very much.  You can go

11:27:10 15    back in the courtroom.

11:27:10 16              (Juror leaves juryroom.)

11:27:10 17              THE COURT:  Any motions?

11:27:10 18              MS. PARKER:  No, Your Honor.

11:27:10 19              THE COURT:  Any motion?

11:27:10 20              MR. SCHERKENBACH:  Yes.  For hardship.  I mean,

11:27:10 21    for the reasons he explained to us, he is very sort of

11:27:10 22    upset, borderline angry, I think, about the possibility that

11:27:10 23    he might have to serve.  I would be worried about the impact

11:27:10 24    he would have on other jurors if he did serve, actually.  "I

11:27:10 25    wouldn't be happy to be here, that's for sure."

11:27:10 1          THE COURT:  Any response?

11:27:10 2          MS. PARKER:  Being happy to be here is not the

11:27:10 3 test, the legal standard.

11:27:10 4          We would oppose the motion.

11:27:10 5          THE COURT:  All right.  I am going to grant the

11:27:10 6 motion.  It's not the legal standard.  But he was pretty

11:27:10 7 strong about it.  I definitely got the sense that he is

11:27:11 8 particularly unhappy to be here.

11:27:11 9          I believe him that his work is going to

11:27:11 10 essentially double for every day he is here.  That is going

11:27:11 11 to weigh on him.

11:27:11 12          I will strike 27.

11:27:11 13          (Juror enters courtroom.)

11:27:11 14          THE COURT:  Good morning.

11:27:11 15          A JUROR:  Good morning.

11:27:11 16          THE COURT:  Can you tell us your juror number,

11:27:11 17 please?

11:27:11 18          A JUROR:  No. 2.

11:27:11 19          THE COURT:  Jeffrey Allen?

11:27:11 20          A JUROR:  Yes.

11:27:11 21          THE COURT:  What did you want to tell us?

11:27:11 22          A JUROR:  I just want to say that it would

11:27:11 23 probably be a hardship for me.  I am currently in the, work

11:27:11 24 for a financial institution.  And we are going through the

11:27:11 25 Department of Labor changes for financial institutions.  I

11:27:11 1    am the subject matter expert on that.

11:27:11 2           So two weeks away from that, we are in the

11:27:11 3    process of going through all of our requirements and things

11:27:11 4    that the company needs to get set up.  That has a strict

11:27:11 5    deadline of April of 2017.

11:27:11 6           So that would be my hardship.

11:27:11 7           Being away, there is no one to replace me at

11:27:11 8    this point in time for that.

11:27:11 9           THE COURT:  You still would get paid yourself.

11:27:11 10    Correct?

11:27:11 11           A JUROR:  I will still get paid, yes.

11:27:11 12           THE COURT:  Give us a sense, that sounds like a

11:27:11 13    long time frame, April, I am sure it doesn't seem that way

11:27:11 14    when you are doing the work, what you would you be doing

11:27:11 15    over the next two weeks towards that project if you weren't

11:27:11 16    here?

11:27:11 17           A JUROR:  Right now we are going through the

11:27:11 18    company requirements and trying to define what functional

11:27:11 19    changes we have to make for the systems, what indicators,

11:27:11 20    and so on and so forth.  We need to set up for all of our

11:27:11 21    client base in order for them to be slotted into whether

11:27:11 22    they are a DOL client or not.  There is a lot of system

11:27:11 23    changes.

11:27:11 24           I am actually in charge of all the testing of

11:27:11 25    that.  Not only do I have to sit in on the requirement

gathering and all those meetings, I actually have to create

all those. Right now we are in the gathering process. So

defining what we have -- we have to figure out what we have

to change and what we have to test and things like that.

THE COURT: If you are not there for the next

two weeks, what do you think will happen to that project?

A JUROR: Probably get delayed somehow.

THE COURT: You heard the schedule. Is it

helpful that you would be done here at 4:30 and some days at

more like 3:15?

A JUROR: Not really. I work in Philly. That's

not going to help me. I can't go to Philly in the evenings,

so...

THE COURT: Any other concerns?

A JUROR: That was the only one I had.

THE COURT: Let me see if the lawyers have

questions for you.

MS. PARKER: Good morning. Given what you have

just described for us, if you were selected to serve and you

went back to work, would your workload be heavier when you

get back?

A JUROR: Sure. All the things I don't get done

in the next two weeks I would have on my plate once I get

back.

MS. PARKER: One other question. You answered

in your questionnaire on question 23 when asked did you have

any health issue that might make it difficult to pay

attention at the trial, you mentioned attention deficit

disorder?

A JUROR: Yeah. I have a hard time -- I

probably couldn't tell you any of your names. I know you

all announced your names. Although I do know Judge Stark's.

MR. SCHERKENBACH: That's a good one to

remember.

A JUROR: That's a good one. You remember the

big one.

I will say, I will say limited, for about half

an hour, 45 minutes, I am good listening. Once it gets into

a lot of that over and over detail, then I kind of lose

focus a little bit.

I just figured I would put it on there as

something that, you know, it happens. You know, my wife

says I forget everything.

MS. PARKER: That's all I have.

THE COURT: Any questions?

MR. SCHERKENBACH: I don't have any questions,

actually. Thanks.

THE COURT: You heard our schedule. We often go

an hour and a half, two hours without a break if nobody

needs one. We can take a break more often if a juror or

11:27:11 1    witness or somebody needs one.

11:27:11 2             If you found after 45 minutes or so you were

11:27:11 3    starting to lose focus and needed a break, I require people

11:27:11 4    basically just to indicate that somehow, stand up, wave

11:27:11 5    their hands, something like that, would you feel comfortable

11:27:11 6    doing that if you were on this jury?

11:27:11 7             A JUROR:  I would think so, yes.

11:27:11 8             THE COURT:  Anything else?

11:27:11 9             A JUROR:  No.

11:27:11 10            THE COURT:  You can go back in the courtroom.

11:27:11 11            (Juror left juryroom.)

11:24:31 12            THE COURT:  Any motion from Idenix?

11:24:40 13            MS. PARKER:  Yes, Your Honor.  I would move to

11:24:41 14   strike him for hardship and cause.  He said pretty much the

11:24:46 15   same thing that the prior juror, who was No. 47, said.

11:24:51 16            The work won't get done if he is not there.

11:24:55 17   When he gets back he will have increased workload, plus he

11:24:59 18   raised ADHD issues.  I think he sounds just like Mr. Pettit,

11:25:04 19   I believe it was, who was No. 47.

11:25:06 20            THE COURT:  All right.  What is Gilead's

11:25:07 21   position?

11:25:08 22            MR. SCHERKENBACH:  I would oppose.  I don't

11:25:10 23   think he is at all like the prior juror for reasons the

11:25:15 24   record will reflect.  His deadline is way out there and he

11:25:18 25   is defining requirements and gathering information and so

forth. It didn't sound to me like something that rises to the level of a hardship.

THE COURT: What about the ADHD?

MR. SCHERKENBACH: Well, he did say that he can pay attention for blocks of time, and if he feels he can't, he can raise his hand. I guess it didn't sound that severe.

We had some other people who had it and I think Mr. Pettit said, yeah, I have it but I have learned to deal with it and it's not that big a deal. So I don't think it's a big issue.

THE COURT: All right. Is there anything else?

MS. PARKER: Nothing to add.

THE COURT: All right. I'm going to deny the motion. I don't see this person as similar to the other one. The other one told me his work would double for every day he was out. I understood this individual to say the work won't get done and he will have to deal with it when he gets back but April seems like a long time away for me.

And I gave him a chance to explain why that was sort of a misunderstanding on my part and I was not convinced that it was; and the ADHD, if he needs frequent breaks, I'm confident he will let us know that.

Next person.

(Juror entered juryroom.)

THE COURT: Good morning.

11:26:38 1     A JUROR:  Good morning.

11:26:39 2     THE COURT:  Can you tell us your juror number,

11:26:41 3 please?

11:26:42 4     A JUROR:  28.

11:26:44 5     THE COURT:  Gail Lo-gu-llo (phonetic).

11:26:48 6     A JUROR:  Lo-gul-lo (phonetic), but you are

11:26:50 7 close enough.

11:26:50 8     THE COURT:  Sorry about that.

11:26:52 9     A JUROR:  No, no problem.

11:26:52 10     THE COURT:  What did you want to tell us?

11:26:54 11     A JUROR:  I work for a small residential

11:26:56 12 construction company.  I'm a construction manager.  I have

11:26:59 13 two jobs.  We just tore out the bathroom in a house in North

11:27:02 14 Shores in Rehoboth.  And I have the Rehoboth/Lewes area and

11:27:06 15 the other project -- no, I have the Rehoboth area, he has

11:27:10 16 the Lewes area.

11:27:11 17     And we just had another project manager was

11:27:14 18 fired last month.  So we all kind of got, inherited his

11:27:18 19 jobs.  And I live in Lewes and I have to have this bathroom

11:27:22 20 done by next Friday because they're coming back for the

11:27:26 21 holidays.  And if it was two or three days, I would be glad

11:27:32 22 to do it, but ten days would be a hardship for my company.

11:27:34 23     THE COURT:  All right.  So forget that I don't

11:27:39 24 know exactly what a project manager does on a bathroom

11:27:42 25 project.  If you are not available from let's just say 8:30

11:27:47 1    to 4:30, the next two weeks, how will that negatively impact

11:27:50 2    the project?

11:27:51 3            A JUROR:  Well, my boss would have to cover for

11:27:54 4    me.  Someone else would have to cover for me, and we only

11:27:57 5    have like eight employees, and three of them are partners,

11:28:00 6    so there are two silent partners, so there are actually five

11:28:04 7    active employees.

11:28:05 8            THE COURT:  Do you have any understanding as to

11:28:06 9    how that would adversely affect what your boss does?  Could

11:28:10 10   he or she not step in and do this?

11:28:12 11           A JUROR:  He more or less is in the business.

11:28:14 12   He goes out and finds new business.

11:28:16 13           And I have asked to be excused twice this year.

11:28:19 14   The third time, I got the summons.  I said to him I have to

11:28:23 15   do this.  They won't leave me alone.  And he says, well,

11:28:26 16   November and December are pretty good months.  That is why I

11:28:31 17   put November and December.  And it was unfortunate that the

11:28:32 18   one project manager was let go last month, and we're really

11:28:36 19   tight staffed.  And for me, it is 90 miles to drive up here

11:28:41 20   today.

11:28:41 21           THE COURT:  Well, if we could put you in a hotel

11:28:44 22   up here, would that take care of that concern?

11:28:47 23           A JUROR:  It would.

11:28:48 24           THE COURT:  So would you be getting paid if you

11:28:52 25   are not at work?

11:28:53 1                    A JUROR:  I am.

11:28:54 2                    THE COURT:  Okay.

11:28:54 3                    A JUROR:  I'm salaried.

11:28:55 4                    THE COURT:  So it is really your concern about

11:28:57 5        the project, in particular, the bathroom getting done?

11:29:01 6                    A JUROR:  Oh, yes.  Yes.

11:29:02 7                    THE COURT:  Do you think it wouldn't get done if

11:29:05 8        you weren't there?

11:29:06 9                    A JUROR:  Well, the homeowner specifically asked

11:29:10 10       for me because we're ripping out a bathroom because another

11:29:12 11       contractor didn't do it to his expectations.

11:29:15 12                   THE COURT:  All right.  So if you were here the

11:29:20 13       next two weeks and staying in a hotel, do you think you

11:29:25 14       would be able to focus enough attention on what was going

11:29:28 15       on in the courtroom to give everybody a fair and impartial

11:29:31 16       trial?

11:29:31 17                   A JUROR:  Yes.  I would try.

11:29:33 18                   THE COURT:  Do you have other concerns that you

11:29:35 19       wanted to share?

11:29:36 20                   A JUROR:  No.

11:29:37 21                   THE COURT:  All right.

11:29:38 22                   A JUROR:  Being away from my job.

11:29:39 23                   THE COURT:  Let's me see if the others have

11:29:41 24       questions for you.

11:29:42 25                   MS. PARKER:  No, thank you.

11:29:42 1        MR. SCHERKENBACH:  I do have one question based

11:29:44 2    on your questionnaire.

11:29:46 3            A JUROR:  Sure.

11:29:47 4        MR. SCHERKENBACH:  I think it is related to your

11:29:48 5    business.  You said you have done many construction jobs for

11:29:51 6    Merck.

11:29:51 7            A JUROR:  Yes.  In Millsboro, I did a bathroom

11:29:57 8    for them.  That was last year.

11:29:58 9        We did a polebarn to keep their production

11:30:01 10   equipment in.  It was a big polebarn, 60 x 60.

11:30:05 11       And I just completed like 10 colony houses where

11:30:08 12   they take the chickens and they get them one day from

11:30:12 13   Mountainaire, and they do what they have to do and then they

11:30:15 14   have to get the chickens.  I call it Bye-Bye Birdie Day.  So

11:30:20 15   we had to renovate those.  They hose them down and they have

11:30:27 16   to decompose whatever they do.

11:30:29 17           MR. SCHERKENBACH:  And this is for a division of

11:30:30 18   Merck?

11:30:31 19           A JUROR:  Yes, Merck Animal Health.  They have

11:30:33 20   three facilities.  One in Gumboro and two in Millsboro,

11:30:38 21   Delaware.

11:30:38 22           MR. SCHERKENBACH:  Okay.  Thank you.  If you

11:30:40 23   heard that Merck is a party to this case, would your work

11:30:45 24   with Merck impact how you would see the evidence here?

11:30:48 25           A JUROR:  No, I just did construction jobs.  I

11:30:51 1  wasn't in their production area.  Well, I was.  Two years

11:30:54 2  ago, I was in the production area.  I had to let the

11:30:58 3  contractors go.

11:30:59 4            THE COURT:  Did you have something else?

11:31:01 5            MS. PARKER:  No.  Thank you.

11:31:02 6            THE COURT:  Thank you.

11:31:04 7            A JUROR:  Thank you.  Have a good day.

11:31:07 8            (Juror left juryroom.)

11:31:08 9            THE COURT:  Any motion from Idenix?

11:31:10 10           MS. PARKER:  No, Your Honor.

11:31:10 11           THE COURT:  From Gilead?

11:31:11 12           MR. SCHERKENBACH:  No, Your Honor.

11:31:12 13           THE COURT:  Okay.

11:31:17 14           (Juror entered juryroom.)

11:31:38 15           THE COURT:  Thank you.  Have a seat, please.

11:31:40 16  Good morning.

11:31:41 17           A JUROR:  Good morning.

11:31:41 18           THE COURT:  Do you know what your juror number

11:31:43 19  is?  And if not, just tell me your last name please.

11:31:46 20           A JUROR:  Meisinger.  Do you want the whole ...

11:31:49 21           THE COURT:  No, that's plenty.  Looks like we

11:31:51 22  have you as No. 38, Shirley Meisinger.

11:31:54 23           A JUROR:  Right.

11:31:55 24           THE COURT:  What did you want to tell us?

11:31:57 25           A JUROR:  Wow.  I live all the way in Smyrna.

11:32:02 1  I'm not joking.  It is like really super-scary to come all

11:32:07 2  the way here.

11:32:07 3              THE COURT:  To drive this long?

11:32:08 4              A JUROR:  The drive is long.  The traffic is

11:32:12 5  crazy.  The people are crazy.  This car almost swerved over

11:32:15 6  and hit me this morning on my way here.  It is dangerous.

11:32:18 7              THE COURT:  If we were able to put you in a

11:32:20 8  hotel, would that make it easier for you?

11:32:23 9              A JUROR:  I have pets, and I'm the only person

11:32:26 10  at home.

11:32:26 11              THE COURT:  That can take care of the pets?

11:32:27 12              A JUROR:  Yes.

11:32:28 13              THE COURT:  Do you have anyone that could come

11:32:30 14  and take care of those pets?

11:32:32 15              A JUROR:  No, my boyfriend passed away.  We were

11:32:34 16  kind of lonely people and I don't have anybody.

11:32:36 17              THE COURT:  Okay.  So the drive is a concern.

11:32:42 18  Other concerns?

11:32:44 19              A JUROR:  Other than that, I like to be at work.

11:32:46 20              THE COURT:  You would like to be at work.  What

11:32:49 21  do you do?

11:32:49 22              A JUROR:  I'm a custodian and right now our

11:32:52 23  chief is out.  So I'm doing the chief's job, and I'm getting

11:32:56 24  paid only if I'm there.  If I'm not there, I don't get that

11:33:02 25  pay.

11:33:02 1          THE COURT:  Do you get paid at all if you are

11:33:04 2   not at work?

11:33:05 3          A JUROR:  Yes.

11:33:05 4          THE COURT:  But not the extra pay?

11:33:06 5          A JUROR:  Not the extra pay.  You have to

11:33:08 6   physically be there.

11:33:09 7          THE COURT:  Any other concerns you wanted to

11:33:14 8   raise with us?

11:33:16 9          A JUROR:  The animals are sick.  They have to

11:33:21 10  have medicine.

11:33:21 11         THE COURT:  Your animals?

11:33:22 12         A JUROR:  Yes.

11:33:23 13         THE COURT:  Sorry about that.  Let me see if the

11:33:24 14  others have any questions.  Do you have any questions?

11:33:27 15         MS. PARKER:  I do.  Good morning.

11:33:28 16         A JUROR:  Good morning.

11:33:29 17         MS. PARKER:  If it were a hotel that allowed

11:33:31 18  animals, could your pets come up here with you?

11:33:34 19         A JUROR:  I have three of them.

11:33:35 20         THE COURT:  What kind of animals are they?

11:33:39 21         A JUROR:  I have a cockapoo and two cats.

11:33:42 22         MS. PARKER:  That's all I have.

11:33:43 23         THE COURT:  Okay.  Are there any questions?

11:33:45 24         MR. SCHERKENBACH:  One question based on your

11:33:48 25  questionnaire.  There was a question about suing or having

11:33:51 1    been sued for patent infringement of anyone you know.  Does

11:33:56 2    that ring any bells?  You checked both yes and no.

11:33:59 3             A JUROR:  I meant no.

11:34:00 4             MR. SCHERKENBACH:  Okay.  Okay.

11:34:01 5             A JUROR:  No, I'm sorry about that.

11:34:03 6             MR. SCHERKENBACH:  No, that is the only question

11:34:05 7    I have.

11:34:06 8             THE COURT:  All right.  You can go back into the

11:34:08 9    courtroom.  Thank you very much.

11:34:09 10            (Juror left juryroom.)

11:34:12 11            THE COURT:  Any motion from Idenix?

11:34:15 12            MS. PARKER:  No, Your Honor.

11:34:15 13            THE COURT:  And Gilead?

11:34:17 14            MR. SCHERKENBACH:  Yes, for hardship I think.  I

11:34:22 15    mean the hotel I guess option doesn't work for her, and she

11:34:26 16    is far away, and no one can take care of her pets, and she

11:34:30 17    doesn't get paid for some of her work if she doesn't work.

11:34:33 18    It seems like a hardship.

11:34:35 19            THE COURT:  Do you want to respond?

11:34:36 20            MS. PARKER:  Sure, I'm happy to.  I think what

11:34:39 21    she said about being paid is she would get paid kind of

11:34:41 22    whatever her base is.  She just wouldn't get that extra

11:34:45 23    amount.  But she said the extra amount is only temporary

11:34:48 24    because she is getting it because the person holds that

11:34:52 25    position, the chief is out, and that is how she explained it

on her questionnaire.  I just don't think that is significant.

And her just not wanting to drive is just not enough to be a hardship.  Otherwise, we wouldn't have anybody from out of town.

THE COURT:  Any response?

MR. SCHERKENBACH:  I guess the only thing I would add is this is on her questionnaire.  She didn't say it here but she says in 26, I'm very upset about going to Wilmington.  It's too far away.

So I mean it seems to really stress her out frankly.  That is all.

THE COURT:  Yes.  Her concerns with being in Wilmington did seem to extend beyond just the drive, the traffic and the crazy people, I think she said, but I'm going to defer ruling on her.  So I'm deferring on 38.

(Juror entered juryroom.)

THE COURT:  Good morning.  Have a seat.

A JUROR:  Good morning.

THE COURT:  Can you tell us your juror number? Do you know it?

A JUROR:  I think it is 57, I believe.

THE COURT:  Let me double check that.  Are you --

A JUROR:  Amber Spence.

THE COURT:  -- Amber Spence?

11:36:02  1           A JUROR:  Yes, I am.  As you heard from outside

11:36:05  2  there, I'm a big Cowboys fan.

11:36:06  3           THE COURT:  I did not hear that.  We're going to

11:36:09  4  raise our concerns.  We'll let that one go.

11:36:12  5           A JUROR:  Gotcha.

11:36:13  6           THE COURT:  So did you answer "yes" to any of

11:36:15  7  the questions I asked?

11:36:17  8           A JUROR:  It was the hardship.  I am a single

11:36:20  9  parent of a nine-year-old little boy named Dominic, and he

11:36:23 10  gets to have at school at 3:30.  It is just me and him.

11:36:26 11  There is nobody else in the picture.  So it would, there

11:36:29 12  would be nobody there to watch him, and he is nine.  So I

11:36:32 13  don't want to be back here for another reason.  Do you know

11:36:36 14  what I mean?

11:36:37 15           THE COURT:  Understood.  So if you were here

11:36:43 16  nonetheless, just playing that out, is there no one else

11:36:47 17  that could get him from school and meet him at the bus?

11:36:51 18           A JUROR:  No, just me and him.  His dad's family

11:36:54 19  has nothing to do with him.

11:36:55 20           THE COURT:  Okay.  Other things that you wanted

11:36:57 21  to raise with us or just that?

11:36:59 22           A JUROR:  And I just don't have a vehicle right

11:37:01 23  now.  I borrowed a vehicle to get here.

11:37:03 24           I'm just down on my luck.  Things will get

11:37:05 25  better, though.  I have hope.

THE COURT: All right. I think that we had sent a questionnaire to you. Did you get that?

A JUROR: I don't know if I got it. It did come with something that I filled out. I think I put it in here. Like both of them. Oop. This is what I got here today.

THE COURT: That is not it.

A JUROR: Oh, that's not it.

THE COURT: All right. You don't recall receiving and filling out a questionnaire.

A JUROR: No, I know I went online to fill something out to make sure when I got the paperwork because we have the neighbors that just moved in, they keep getting my mail but they never keep giving me my mail. So I keep going over there, but nobody understands what I'm saying here because they don't speak the same language as me, so then I have to like try to (indicating using non-verbal language), right?, to the grandpa, which they're lovely people, though. They give me great food.

THE COURT: All right. I'm just showing you the questionnaire I had in mind.

A JUROR: Okay.

THE COURT: You don't recognize that?

A JUROR: No.

THE COURT: All right. Let me see if anyone has other questions for you.

MS. PARKER: Could we go over the questionnaire questions?

THE COURT: If you would like. I guess you have your own copy.

MS. PARKER: I just have a few questions to ask on you.

A JUROR: Okay.

MS. PARKER: Where do you work?

A JUROR: I actually just left Toys R' Us. I was a customer service rep there. But my mom, she is going blind and I have Dominic, so I had some money saved, until my grandma can move up here so I can get a night job. I can sleep when I'm dead.

MS. PARKER: Who takes care of your son when you are not able to?

A JUROR: Nobody. There is just me. My mom, she is working two jobs, and she is losing her sight, so ...

MS. PARKER: There is no daycare?

A JUROR: No, he doesn't go to daycare or anything like that. No, he is home with me.

MS. PARKER: And I believe that is all I have. Thank you.

THE COURT: Okay. Thank you.

Are there any questions?

MR. SCHERKENBACH: How far do you drive to come

here?

11:38:58  A JUROR:  I live in New Castle by the Delaware
Memorial Bridge, so it's not too far.

11:39:03  MR. SCHERKENBACH:  Okay.  I don't have any
further questions.

11:39:05  THE COURT:  All right.  You can go back to the
courtroom.

11:39:08  A JUROR:  Thank you.  Oop.

11:39:10  THE COURT:  You got everything?

11:39:11  A JUROR:  Yes.  Thank you.

11:39:12  (Juror left juryroom.)

11:39:12  THE COURT:  Any motion?

11:39:15  MS. PARKER:  No, Your Honor.

11:39:17  THE COURT:  No.

11:39:17  Any motion?

11:39:20  MR. SCHERKENBACH:  Yes, for hardship.  I don't
know what is going to happen with the nine year old if she
serves, it seemed pretty clear to me.  Plus she has to
borrow a car and doesn't know if she can continue to borrow
a car to get here.  I know it is not far but she has to get
here.  She is unemployed.  It sounds like a hardship.

11:39:39  THE COURT:  Do you oppose that?

11:39:40  MS. PARKER:  I do.

11:39:42  THE COURT:  Why?

11:39:45  MS. PARKER:  I would maybe defer to Mr. Kelly on

this. I don't know exactly what the rule is on hardship with children, but what I'm familiar with is over the age of six, so because of that, I don't see her child as being a hardship situation, but if that not the situation?

MR. KELLY: It is not a black-and-white rule. It is up the to the Judge's discretion.

THE COURT: I'm not familiar with that rule. I'm sure they have that rule somewhere. But I think it is a hardship, and primarily for the child. So I'm going to grant the motion to strike 57.

I believe we have only three more left; is that right?

THE DEPUTY CLERK: Maybe two.

THE COURT: Maybe two.

(Juror entered juryroom.)

THE COURT: Good morning.

A JUROR: Holy cow. That is a lot of people here.

THE COURT: Yes, we have got a full crowd for you.

A JUROR: I can see that.

THE COURT: Do you know your juror number?

A JUROR: 13.

THE COURT: 13.

A JUROR: Yes. I don't know who gave me that

number.  I'd like to change that in.  That is not a very

lucky number.

            THE COURT:  We can switch that for you.  And you

are Daniel Donovan?

            A JUROR:  That is correct.

            THE COURT:  What did you want to tell us?

            A JUROR:  I just wanted to say that I work for

the electric company, and my division is quite shorthanded.

I have been working a lot of overtime and it wouldn't be

good for us to go another guy down.  We have several people

out on medical problems.

            THE COURT:  All right.  Do you have other issues?

We'll talk more about that one, but any other concerns?

            A JUROR:  No, that is the main concern.

            THE COURT:  Okay.

            A JUROR:  I don't know anybody here or anything

about the trial.

            THE COURT:  If you weren't with us on this

trial, what would be your work hours over the next two

weeks, roughly speaking?

            A JUROR:  I'm working the entire week this week.

The next week, I have several days the next week.

            THE COURT:  So you normally work days?

            A JUROR:  I'm on rotating shift work.

            THE COURT:  Okay.

11:41:41 1         A JUROR: So day or night, I work 6:00 to 6:00.

11:41:45 2         THE COURT: It could 6:00 a.m. to 6:00 p.m. or

11:41:47 3 it could be the opposite?

11:41:49 4         A JUROR: Correct.

11:41:49 5         THE COURT: And you mentioned overtime. Is that

11:41:52 6 in addition to the 6:00 to 6:00?

11:41:54 7         A JUROR: Well, it's factored in. Like this

11:41:57 8 week, my regular schedule, if I wasn't working overtime,

11:42:00 9 would be Monday through Thursday, day work.

11:42:02 10         THE COURT: Okay. You might get an extra day

11:42:05 11 because of the trial?

11:42:05 12         A JUROR: I'm already scheduled Friday,

11:42:07 13 Saturday, Sunday into next week.

11:42:10 14         THE COURT: Okay. Now, if you are not able to

11:42:13 15 do that work because we have you here, does the work just

11:42:16 16 not get done, they bring in other people?

11:42:18 17         A JUROR: No, they have to bring in other people.

11:42:20 18         THE COURT: Okay.

11:42:21 19         A JUROR: But we're thin.

11:42:23 20         THE COURT: And what about your income? Do you

11:42:26 21 only get paid when you show up or would you be paid if you

11:42:30 22 were here with us?

11:42:30 23         A JUROR: I'm getting paid for today. I'll be

11:42:33 24 paid this week, but anything that goes over -- things even

11:42:36 25 that is factored into my schedule that are overtime, I won't

11:42:40 1   be making that money.

11:42:41 2           THE COURT:  Right.  And what about next week for

11:42:43 3   the non-overtime?

11:42:45 4           A JUROR:  Everything next week is overtime for me.

11:42:48 5           THE COURT:  I see.  Because you are scheduled to

11:42:50 6   be out some of those days, are you saying?

11:42:51 7           A JUROR:  Well, it's kind of a crazy schedule,

11:42:54 8   but I'm scheduled Monday through Thursday this week, and

11:42:57 9   next week, we see actually have a seven day break in the

11:43:01 10  middle of our schedule.

11:43:02 11          THE COURT:  All right.  Let me see if the others

11:43:04 12  have questions for you.

11:43:06 13          Are there any questions?

11:43:07 14          MS. PARKER:  No.  Thank you, Your Honor.

11:43:07 15          THE COURT:  Are there any questions?

11:43:08 16          MR. SCHERKENBACH:  I have a couple based on

11:43:10 17  your questionnaire.  You said your wife works for a drug

11:43:13 18  distributor?

11:43:15 19          A JUROR:  Yeah.

11:43:16 20          MR. SCHERKENBACH:  What is that about?

11:43:19 21          A JUROR:  Oh, God.  I can't remember the name of

11:43:22 22  the company now.  She hasn't been there probably 10 years,

11:43:25 23  13 years because she left when my younger daughter was born.

11:43:28 24          MR. SCHERKENBACH:  Okay.

11:43:29 25          A JUROR:  They were wholesalers.  They were

11:43:31 1  from the pharmaceuticals.  She dealt in contracts with the

11:43:35 2  pharmaceutical companies and they distributed through like

11:43:38 3  Happy Harry's and stuff.  They were like the middleman.

11:43:40 4          MR. SCHERKENBACH:  Do you know if she dealt with

11:43:43 5  either Merck or Gilead?

11:43:44 6          A JUROR:  Yes, I know Merck.

11:43:47 7          MR. SCHERKENBACH:  She did deal with Merck.

11:43:49 8          A JUROR:  Yes, and I'll be honest.  I didn't

11:43:51 9  know.  I cared about what she was bringing home.  What was

11:43:54 10 written on the contract didn't mean anything to me.

11:43:56 11         MR. SCHERKENBACH:  Okay.

11:43:56 12         A JUROR:  Nor did I ever see it or have anything

11:43:59 13 to do with it.

11:44:00 14         MR. SCHERKENBACH:  Just one other question.

11:44:02 15 There was a sort of a catchall "any other reason you thought

11:44:05 16 you couldn't be completely fair and impartial," and you

11:44:07 17 wrote "I hate big companies."

11:44:10 18         A JUROR:  I worked for a big company.  I will

11:44:12 19 tell you, I'll be honest.  I don't know how to put it.  I

11:44:16 20 have seen a lot of things, not the most ethical things some

11:44:19 21 days, you know.  And I guess that is a rough statement to

11:44:22 22 say, but ...

11:44:23 23         MR. SCHERKENBACH:  Well --

11:44:23 24         A JUROR:  Even though I have been fortunate to

11:44:26 25 have a good job, I have seen some of the decisionmaking

11:44:29 1  hasn't been too great.

11:44:31 2        MR. SCHERKENBACH:  Well, great.  That's all I

11:44:32 3  have.

11:44:32 4        THE COURT:  If you were on this jury and learned

11:44:35 5  this was a dispute between two big companies, do you think

11:44:38 6  that sentiment would affect how you see things?

11:44:41 7        A JUROR:  If they were both big companies, I

11:44:43 8  guess they would be even then, wouldn't they?

11:44:46 9        THE COURT:  I'm asking you.

11:44:48 10        A JUROR:  Yeah.

11:44:49 11        THE COURT:  Is there anything else?

11:44:50 12        A JUROR:  I like to think it would be the

11:44:52 13  merits, but I'll be honest.  I'm trying to get off the jury.

11:44:55 14        THE COURT:  All right.  Is there anything else?

11:44:58 15        A JUROR:  I'm being straight up.

11:44:59 16        THE COURT:  Okay.

11:45:00 17        A JUROR:  You know.

11:45:02 18        THE COURT:  Is there anything else?

11:45:03 19        A JUROR:  No, that's all.

11:45:04 20        THE COURT:  All right.  You can step out.

11:45:06 21        A JUROR:  Thanks.  Have a good day.

11:45:08 22        (Juror left juryroom.)

11:45:10 23        THE COURT:  Is there any motion from Idenix?

11:45:14 24        MS. PARKER:  No, Your Honor.

11:45:15 25        THE COURT:  From Gilead?

11:45:17 1       MR. SCHERKENBACH: Yes. I mean for cause on

11:45:19 2 hardship. I mean he, as I understood it, on the hardship

11:45:24 3 piece, he works nights on a rotating basis. I don't know

11:45:29 4 how that would work and allow him to serve. He won't get

11:45:32 5 paid next week at all, which he is currently scheduled to be

11:45:36 6 paid.

11:45:38 7       Hates big companies. I mean I don't, I don't

11:45:41 8 see why either wants somebody like that on the jury. I mean

11:45:45 9 he was pretty emphatic that he wants to get off and he

11:45:48 10 doesn't want to serve. So, yes.

11:45:49 11       THE COURT: All right. Is there any response?

11:45:52 12       MS. PARKER: Sure. I think he told Your Honor,

11:45:56 13 I think very truthfully, all he was trying to do is to get

11:45:59 14 off the jury. Okay? So I think you can take what he said

11:46:03 15 with that grain of salt. He is not -- his situation is not

11:46:10 16 so extreme that it fits in the same situations where Your

11:46:14 17 Honor has excused jurors for cause. It's just, he is just

11:46:18 18 not that far along in what he said, so I would oppose it.

11:46:22 19       THE COURT: Is there anything else?

11:46:24 20       MS. BROOKS: Your Honor, can I add one thing?

11:46:26 21       THE COURT: Sure.

11:46:27 22       MS. BROOKS: In response here in chambers, he

11:46:30 23 said he hates big companies because he thinks they're not

11:46:33 24 ethical. The fact there is two big companies on each side

11:46:36 25 he said would make us even, but what he doesn't know are

11:46:40 1  the allegations, which is, from our perspective, this is a

11:46:43 2  patent case. From Idenix's perspective, based on her

11:46:46 3  opening statement, they're going to say that we stole from

11:46:49 4  them, misappropriated their stuff and put it to wrong use,

11:46:54 5  wrongful use, and are refusing to pay for it.

11:46:58 6  I think if anyone will be seriously prejudiced

11:47:00 7  by what we have to assume is his truthful statement that he

11:47:03 8  could not be completely fair and impartial because he hates

11:47:07 9  big companies added to what he said in chambers that

11:47:10 10  translates to him being unethical, I think we stand very far

11:47:15 11  behind in that response.

11:47:17 12  THE COURT: Is there any response?

11:47:19 13  MS. PARKER: No, Your Honor.

11:47:19 14  THE COURT: I'm very concerned about I hate big

11:47:21 15  companies and statements written on a form, so I'm striking

11:47:24 16  him for cause as a result of that. I'm concerned he

11:47:27 17  wouldn't be able to put that aside, and for all I know, he

11:47:31 18  would be trying to determine which of the two companies is

11:47:33 19  bigger and holding it against them. I don't know, but I'm

11:47:36 20  not going to take that chance, so I'm striking Juror No. 13.

11:47:41 21  (Juror entered juryroom.)

12:12:19 22  THE COURT: Good morning.

12:12:19 23  A JUROR: Good morning.

12:12:19 24  THE COURT: Could you tell us your juror number?

12:12:19 25  Or your last name is fine.

12:12:19 1          A JUROR:  My last name is Smith, Tamar.

12:12:19 2          THE COURT:  Tamar Smith, 56, is what we have in

12:12:19 3 our records.

12:12:19 4          A JUROR:  That number, yes.  I am sorry.  I

12:12:19 5 thought you meant the serial number.

12:12:19 6          THE COURT:  No.  But thank you.

12:12:19 7          What did you want to tell us?

12:12:19 8          A JUROR:  Well, the only thing that, you know, I

12:12:19 9 think it sounds really interesting.  But I had some surgery

12:12:19 10 on my back not too long ago.  I thought, I would really like

12:12:19 11 to hear the case for a week.  I could sit for a week.  But I

12:12:20 12 am not sure if I can make it, you know, for two weeks.  I

12:12:20 13 have to get up and just stretch every once in a while.

12:12:20 14          Then I got anxious about it.  So I was sitting

12:12:20 15 out there and I thought, I will come in and tell you that.

12:12:20 16          THE COURT:  Okay.  I appreciate it.

12:12:20 17          A JUROR:  That's really all there is.

12:12:20 18          THE COURT:  So assume that it may take all of

12:12:20 19 two weeks.  Our normal schedule would be to be here from

12:12:20 20 about 9 to 4:30, if we take scheduled breaks in the morning

12:12:20 21 and afternoon and for lunch.  But I also allow additional

12:12:20 22 breaks if a juror or witness or anybody who needs it.  It's

12:12:20 23 just that if it is a break other than the scheduled one you,

12:12:20 24 obviously -- I don't know you need it unless you indicate by

12:12:20 25 raising your hand or standing.

12:12:20 1    A JUROR:  Oh, I didn't know that.  Okay.

12:12:20 2    THE COURT:  Would you feel comfortable doing

12:12:20 3 that?

12:12:20 4    A JUROR:  Possibly, yes.  I have anxiety, okay.

12:12:20 5 I have lost my first spouse and my son.

12:12:20 6    THE COURT:  I am sorry.

12:12:20 7    A JUROR:  So it's difficult for me.  That's all.

12:12:20 8 So hence, the anxiety.

12:12:20 9    THE COURT:  So I wouldn't want to have --

12:12:20 10    A JUROR:  But I don't want to mess up anything

12:12:20 11 with you guys and start to roam, because I did another case

12:12:20 12 but it was only federal level in Baltimore, but it was only

12:12:20 13 like three days.  I thought I would make you aware of my

12:12:20 14 needs.

12:12:20 15    THE COURT:  I want to be sure, do you feel

12:12:20 16 comfortable that you would make me aware of your needs for a

12:12:20 17 break?

12:12:20 18    A JUROR:  I would try.  I would try to do that.

12:12:20 19    THE COURT:  Okay.  Other concerns?

12:12:20 20    A JUROR:  No.  That was all.

12:12:20 21    THE COURT:  Let me see if others have questions

12:12:20 22 for you.  Any questions?

12:12:20 23    MS. PARKER:  If your situation were accommodated

12:12:20 24 by Judge Stark, would you be willing to serve?

12:12:20 25    A JUROR:  Yes, probably, yes.

MS. PARKER:  Thank you.

THE COURT:  Any questions?

MR. SCHERKENBACH:  One question.  From your questionnaire here about companies having patents on medicines, you said it's okay except prescription prices are too high when no generic is available.  Can you tell us a little bit about that, what your feelings are?

A JUROR:  I don't know if that really had to do with the patents.  I thought that when patents have had their length of time, their shelf life, their copyright life, whatever, you know, that they should be filled by generics and are affordable by people who need them, you know.  But also, many times companies will, because it's still under patent, and being produced by a singular person or company, are that, you know, those are sometimes exceedingly high.

So I guess I go by what I hear in the news, too, that if you can go to Canada or you can go to England or where the social medicine is, the prices are so low, why should people be paying, I don't know, $1500 for a little pill.

MR. SCHERKENBACH:  Okay.  Thank you.

A JUROR:  Does that answer you?

MR. SCHERKENBACH:  It does, thank you.

THE COURT:  Any further questions ?

12:12:20 1      MS. PARKER:  No.  Thank you.

12:12:20 2      THE COURT:  You can step how out.  Thank you.

12:12:20 3      A JUROR:  Thank you.

12:12:20 4      (Juror leaves juryroom.)

12:12:20 5      THE COURT:  Any motion?

12:12:20 6      MS. PARKER:  No, Your Honor.

12:12:20 7      THE COURT:  Gilead.

12:12:20 8      MR. SCHERKENBACH:  No, Your Honor.  But we will

12:12:20 9  have to have a further discussion about pricing evidence, I

12:12:20 10 guess, if she gets on the jury.  Obviously, she is very

12:12:20 11 concerned about that.

12:12:20 12     THE COURT:  But you are not moving to strike

12:12:20 13 her.

12:12:20 14     MR. SCHERKENBACH:  I am not moving to strike.

12:12:20 15     THE COURT:  Is that everybody?

12:12:20 16     MS. PARKER:  If I may, you said this would be an

12:12:20 17 opportunity for us to ask Your Honor if we could bring in

12:12:20 18 the one that answered based on the questionnaire.

12:12:20 19     THE COURT:  Give me a moment.  Let me make sure

12:12:20 20 no one else is in line first.

12:12:20 21     DEPUTY CLERK LOOBY:  Do you want me to go out

12:12:20 22 and check --

12:12:20 23     THE COURT:  Yes.

12:12:20 24     MR. KELLY:  Your Honor, counsel raised an issue

12:12:20 25 about the conflict.  Just to put on the record, because of

12:12:20 1    the charges made, obviously, I couldn't have entered my

12:12:20 2    appearance if my firm was representing Gilead.  While Your

12:12:20 3    Honor wasn't looking, I e-mailed our general counsel.  We do

12:12:20 4    not represent Gilead.  That is the response to the 12th-

12:12:20 5    hour allegation.

12:12:20 6              MR. SCHERKENBACH:  I apologize.  I am just

12:12:20 7    reporting what my client told me.

12:12:20 8              DEPUTY CLERK LOOBY:  That's it.

12:12:20 9              THE COURT:  Both positions are on the record

12:12:20 10   now.  If you all ask me to do something --

12:12:20 11             MR. KELLY:  We have represented them in the

12:12:20 12   past, but not at the present.

12:12:20 13             DEPUTY CLERK LOOBY:  That's it.

12:12:20 14             THE COURT:  Nobody else.

12:12:20 15             DEPUTY CLERK LOOBY:  Nobody else.

12:12:20 16             THE COURT:  You believe there are some others

12:12:20 17   that you might like to call back.

12:12:20 18             MS. PARKER:  Just three, if I may.

12:12:20 19             THE COURT:  Tell us by juror number.

12:12:20 20             MS. PARKER:  37.  43.  And 60.

12:12:20 21             THE COURT:  Any objection to us calling those

12:12:20 22   folks back from Gilead?

12:12:20 23             MR. SCHERKENBACH:  No.  But if I could I would

12:12:20 24   like to add one to the list -- did you say 26?  26 is a

12:12:20 25   person we would like to have back.

THE COURT: Any objection to 26 coming back?

MS. PARKER: No, thank you.

THE COURT: So you will need -- did you get those four numbers? Grab those.

DEPUTY CLERK LOOBY: Yes.

THE COURT: The last four, what we will do, I know we owe you rulings on the deferrals, and we will give you a chance to take a little break.

MR. SCHERKENBACH: We might not need deferrals from looking at this.

THE COURT: We will see. I am still deferring.

(Juror enters juryroom.)

THE COURT: Hi, good morning. Would you mind having a seat there, please.

Do you remember the one or two-digit juror number we gave you?

A JUROR: I have it here.

THE COURT: Why don't you tell me your last name?

A JUROR: Winfred Mbwiri.

THE COURT: I believe you are Juror No. 37 on our list.

A JUROR: Yes.

THE COURT: We had some questions for you.

Counsel.

MS. PARKER:  Good morning.  How are you?

A JUROR:  I am pretty good, thank you.

MS. PARKER:  May I show her the questionnaire for a minute?

THE COURT:  Sure.

MS. PARKER:  Remember you filled out a questionnaire here?

A JUROR:  Yes.

MS. PARKER:  I wanted to ask about your questions here.  It says, "Do you have any strong feelings about patents?"  You said yes.  You answered, "To give patent company a monopoly for something."

What did you mean by that?

A JUROR:  Let me see that, too, because I am not able to recall it.

(Document handed to juror.)

A JUROR:  I meant if a company, I mean, if they develop some medication, what I meant is that it all involves a lot of money, it's very expensive.  Like research, to make -- to do testing and all that, to make sure it's the right medication.

So after I was being through, is it the right medication to treat a certain disease, and if it is -- it is not good for other people to be given a right to start straight away developing the same medication, but they

should give the other company to make -- to continue and get
some profit before you bring it on the market for all of the
other companies to develop it, to do it.

That is why I say, it is better for the mother
company to have a monopoly for some years.

MS. PARKER:  If I may, if I could show you, I
also want to ask you, here, this question says, "Have you
ever had a negative experience with or anyone close to you
ever had a negative experience with any of the following
entities or products?"

You listed -- no, I have the wrong one.

Here it is.  11a.

"Have you received any training, experience, or
specialized knowledge in any of the following?"  And you
checked "pharmaceutical products, medicinal chemistry,
neurology, Hepatitis C virus and" -- you didn't check that
one -- "through Hepatitis C virus."

Do you see that?

A JUROR:  Yes.

THE COURT:  What is your experience with those
areas?

A JUROR:  When I say medicinal chemistry, it's
like, medical chemistry is like, the chemistry we learn in
school.  And also, the chemistry, like, when blood is
tested, what we see, this level of potassium or that level

12:12:20 1   of this in blood, calcium level.  All these levels.  The

12:12:20 2   normal, the normal things in blood.

12:12:20 3          MS. PARKER:  Can you tell us a little bit more

12:12:20 4   about that training that you had?

12:12:20 5          A JUROR:  I am a nurse by profession.  And being

12:12:20 6   a nurse, we are supposed to learn the normal things, the

12:12:20 7   normal things in the body, or something which happens, we

12:12:20 8   regard this as normal.

12:12:20 9          MS. PARKER:  Have you ever taken care of

12:12:20 10  patients who had Hepatitis C?

12:12:20 11         A JUROR:  No.  In my country, in Ghana, it's a

12:12:20 12  little B, hepatitis B.  I did, a long time ago.

12:12:20 13         MS. PARKER:  As a nurse, have you ever worked

12:12:20 14  with a drug called Sovaldi a drug called Harvoni?

12:12:20 15         A JUROR:  Alcohol?  What did you say?

12:12:20 16         MS. PARKER:  As a nurse in your work, have you

12:12:20 17  ever treated patients, worked with patients, who were taking

12:12:20 18  a drug called Sovaldi or a drug called Harvoni?

12:12:20 19         A JUROR:  I need to say no there.

12:12:20 20         THE COURT:  Are those names on the

12:12:20 21  questionnaire?

12:12:20 22         MS. PARKER:  Not in the context that I asked it.

12:12:20 23         A JUROR:  I said no there?

12:12:20 24         THE COURT:  Question 16 or 15?

12:12:20 25         MS. PARKER:  15 has herself or anyone close to

her.  I was asking about patients.

THE COURT:  I understand that.

MS. PARKER:  That is probably what you were talking about right there, where it asks about you or anyone close to you.

A JUROR:  Yes.  Maybe what is -- it refers to what?  I never did it.

THE COURT:  Have you heard of either of those medications?

A JUROR:  No, even when I went to college, I never heard of it.

MS. PARKER:  What is your husband's job?

A JUROR:  He is a teacher, a school teacher

MS. PARKER:  What does he teach?

A JUROR:  He teaches, he did in our home country, he was teaching math and physics.

But when we came here, he went as a substitute teacher to teach math.  Now, when he worked in Italy, he was teaching -- now he is teaching math and special education.

MS. PARKER:  Have you ever worked as a nurse in the United States?

A JUROR:  Yes.  I worked for a few months.  I am still looking for a job.  I haven't obtained a job.

MS. PARKER:  Thank you.  I have no further questions.  Thank you, ma'am.

THE COURT: Questions?

MR. SCHERKENBACH: One followup. You said you are trained as a nurse. Was your training in Kenya and the U.S. or only in one place?

A JUROR: I trained in Kenya as an associate, but when I went to Wilmington, I learned better.

MR. SCHERKENBACH: A Bachelor's degree in nursing from Wilmington University?

A JUROR: Yes.

MR. SCHERKENBACH: When was that roughly, how long ago?

A JUROR: I completed in 2010.

MR. SCHERKENBACH: You said you worked for a few months?

A JUROR: I was looking for a job, but I haven't been able to get one.

MR. SCHERKENBACH: Thank you.

MS. PARKER: Thank you.

THE COURT: Thank you very much. You can go back in the courtroom.

(Juror leaves juryroom.)

THE COURT: Any motion from Idenix?

MS. PARKER: No, Your Honor.

THE COURT: Gilead.

MR. SCHERKENBACH: No, Your Honor.

THE COURT:  All right.

(Juror enters juryroom.)

THE COURT:  Good afternoon.  Have a seat,
please.

Could you tell us what your juror number is?

A JUROR:  60.

THE COURT:  Susan Wise.  We called you back here
because we have some questions for you.  I am going to turn
to counsel.

MS. PARKER:  Good morning.  I just want to
follow up on some questions on the questionnaire that you
filled out, ma'am.

There was a question here, 25 on the form, it
asked, "Is there any reason why you feel like you could not
serve as a completely fair and impartial juror in the case?"
You answered yes.

It says, "If yes, please explain."  It says, "If
Merck is highly involved and they have difficulty."

Could you please tell us about that?

A JUROR:  That is in relation to a question that
I had answered earlier.  I just -- I don't know if Merck is
involved in this.  But I just have a very negative opinion
of Ken Frazier.  I know of him through being a board member
at Penn State.  And I am a Penn State alumnus, and have
followed a lot of things that have gone on in the last few

12:12:20  1    years.  And I have a very low opinion of him.

12:12:20  2              I am concerned that that would interfere with my

12:12:20  3    judgment.

12:12:20  4              MS. PARKER:  Because of that, do you think that

12:12:20  5    Merck would start out a little bit behind in your mind?

12:12:20  6              A JUROR:  Yes.  It comes up and it's like red,

12:12:20  7    red, red.

12:12:20  8              MS. PARKER:  I have no further questions.

12:12:20  9              THE COURT:  Any questions?

12:12:20 10              MR. SCHERKENBACH:  No, Your Honor.

12:12:20 11              THE COURT:  Okay.  Thank you very much.

12:12:20 12              (Juror leaves juryroom.)

12:12:20 13              THE COURT:  Any motions?

12:12:20 14              MS. PARKER:  Yes.  We move to strike her for

12:12:20 15    cause.

12:12:20 16              THE COURT:  Any objection?

12:12:20 17              MR. SCHERKENBACH:  No.

12:12:20 18              THE COURT:  We will strike 43 for cause -- 60, I

12:12:20 19    am sorry.

12:12:20 20              (Juror enters juryroom.)

12:12:20 21              THE COURT:  Good afternoon.

12:12:20 22              A JUROR:  Good afternoon.

12:12:20 23              THE COURT:  Tell us your juror number, please?

12:12:20 24              A JUROR:  No. 43.

12:12:20 25              THE COURT:  Rita Murphy?

12:12:20  1              A JUROR:  Yes.

12:12:20  2              THE COURT:  We called you because we have some

12:12:20  3  questions about the form that you filled out.

12:12:20  4              MS. PARKER:  Hi, how are you?

12:12:20  5              A JUROR:  I am good.  How are you?

12:12:20  6              MS. PARKER:  Remember you filled out the

12:12:20  7  questionnaire?  If I may show you, this is just a copy of

12:12:20  8  it.  One of the questions here, No. 19, asked if you had a

12:12:20  9  negative experience with or if anyone close to you has had a

12:12:20 10  negative experience with any of the following entities'

12:12:20 11  products.  It lists some here.  You checked yes by Merck.

12:12:20 12  Do you see that there?

12:12:20 13              A JUROR:  Right.

12:12:20 14              THE COURT:  Then you wrote it in, "If you answer

12:12:20 15  yes, please explain," you wrote your ex-husband was laid off

12:12:20 16  from Merck.

12:12:20 17              Can you tell us about that, please?

12:12:20 18              A JUROR:  It was a division over in New Jersey,

12:12:20 19  a Merck division.  He was laid off -- give me a second,

12:12:20 20  because it's been a while, probably 25 years ago.  I just

12:12:20 21  remember, we had a really hard time getting health insurance

12:12:20 22  at that time.

12:12:20 23              MS. PARKER:  Were you married to him at the time

12:12:20 24  he was laid off?

12:12:20 25              A JUROR:  Yes.  Actually, we were newly married.

12:12:20  1          MS. PARKER:  Because of that, what you described

12:12:20  2   as a negative experience with Merck, in your mind would

12:12:20  3   Merck start out, even if it's just a little bit, behind in

12:12:20  4   the case?

12:12:20  5          A JUROR:  Probably.  I think once you go through

12:12:20  6   an experience like that, it definitely would, you know,

12:12:20  7   leave a negative.

12:12:20  8          MS. PARKER:  Thank you.

12:12:20  9          That's all I have, Your Honor.

12:12:20 10          THE COURT:  Any questions?

12:12:20 11          MR. SCHERKENBACH:  I have actually two

12:12:20 12   questions.

12:12:20 13          Can you just tell, what do you do in your

12:12:20 14   current job?

12:12:20 15          A JUROR:  I am an accountant for an independent

12:12:20 16   school, Delaware Valley Friends School.

12:12:20 17          MR. SCHERKENBACH:  Are you the only accountant

12:12:20 18   for them?

12:12:20 19          A JUROR:  I am.

12:12:20 20          MR. SCHERKENBACH:  If you were instructed by the

12:12:20 21   Court not to let any potential bias affect your view of the

12:12:20 22   case or consideration of the evidence, would you be able to

12:12:20 23   follow that instruction, if you were asked to serve?

12:12:20 24          A JUROR:  Say the question again?

12:12:20 25          MR. SCHERKENBACH:  You made some comments about

12:12:20 1    Merck?

12:12:20 2                    A JUROR:  Right.

12:12:20 3                    MR. SCHERKENBACH:  My question is, if you were

12:12:20 4    instructed that you needed to come in with an open mind and

12:12:20 5    be fair to both sides and whatever, could you do that?

12:12:20 6                    A JUROR:  I could.  I could.

12:12:20 7                    MR. SCHERKENBACH:  Okay.

12:12:20 8                    A JUROR:  Yes.

12:12:20 9                    MR. SCHERKENBACH:  Nothing further.

12:12:20 10                   THE COURT:  Anything further?

12:12:20 11                   MS. PARKER:  Yes.  Just trying to understand

12:12:20 12   better about the situation.  You described it as a negative

12:12:20 13   experience.  I believe I heard you say Merck would start out

12:12:20 14   a little bit behind in the case?

12:12:20 15                   A JUROR:  Yes.

12:12:20 16                   MS. PARKER:  Given that, could you put that out

12:12:20 17   of your mind?  Could you forget about that altogether and

12:12:20 18   listen to the evidence, or would that always be something in

12:12:20 19   the back of your mind that, a reminder to you about what

12:12:20 20   happened?

12:12:20 21                   A JUROR:  It would definitely be there.

12:12:20 22                   MS. PARKER:  Thank you.

12:12:20 23                   That is all I have, Your Honor.

12:12:20 24                   THE COURT:  You can go back in the courtroom.

12:12:24 25                   (Juror left juryroom.)

12:10:48 1          THE COURT:  Motion?

12:10:51 2          MS. PARKER:  Move to strike her for cause.

12:10:54 3          THE COURT:  Because she couldn't put it out of

12:10:57 4 her mind?

12:10:57 5          MS. PARKER:  And because Merck would start out

12:11:00 6 behind.

12:11:00 7          THE COURT:  All right.  What is Gilead's

12:11:02 8 position?

12:11:02 9          MR. SCHERKENBACH:  I oppose.  I mean it's

12:11:04 10 25 years ago, and obviously it wasn't a good experience at

12:11:07 11 the time.  She says she could follow your instruction.  So

12:11:11 12 ...

12:11:11 13          THE COURT:  Any response?

12:11:12 14          MS. PARKER:  After she said she would follow the

12:11:16 15 instruction, she said she could not put it out of her mind.

12:11:22 16          THE COURT:  I'm going to deny the motion.  She

12:11:25 17 is going to start out with Merck a tiny bit behind, and she

12:11:29 18 is not going to forget Merck was involved in a difficult

12:11:32 19 time in her life, but she said she could be fair and

12:11:35 20 impartial, and I believe she could be fair and impartial.  I

12:11:38 21 think that is a long time ago, and I think she will be able

12:11:41 22 to put it in its proper context, which is that it has no

12:11:44 23 relevance to the issues she will be asked to decide.

12:11:47 24          I think we have one more?

12:11:49 25          THE DEPUTY CLERK:  Yes.

12:11:50 1                    (Juror enters juryroom.)

12:11:56 2                    THE COURT:  Welcome.  Have a seat, please.

12:11:58 3                    A JUROR:  Thank you.

12:11:58 4                    THE COURT:  Are you juror 26?

12:12:00 5                    A JUROR:  I am.

12:12:00 6                    THE COURT:  Suzanne Linderman?

12:12:02 7                    A JUROR:  Yes.

12:12:02 8                    THE COURT:  We have some questions based on your

12:12:05 9       responses to the questionnaire that you might remember

12:12:08 10      having filled out.

12:12:09 11                   A JUROR:  Okay.

12:12:09 12                   THE COURT:  I will let counsel ask questions.

12:12:11 13      Do you want to start?

12:12:12 14                   MR. SCHERKENBACH:  Good morning.

12:12:14 15                   A JUROR:  Good morning.

12:12:15 16                   MR. SCHERKENBACH:  You have a lot of experience

12:12:19 17      with DuPont, it looks like, from your questionnaire.

12:12:22 18                   A JUROR:  Um-hmm.

12:12:23 19                   MR. SCHERKENBACH:  My question was mostly about

12:12:25 20      patents and whether you had any involvement in DuPont

12:12:31 21      getting patents or DuPont either asserting patents or being

12:12:34 22      sued for patent infringement.  Do you have any connection to

12:12:36 23      any of that?

12:12:38 24                   A JUROR:  Not directly.  I was responsible for

12:12:41 25      the business unit, medical x-ray, diagnostic imaging, and

12:12:44 1   both our film and electronics products, and our solanum

12:12:50 2   array products had patents granted.  Most of those

12:12:54 3   applications had been made and patents issued before I took

12:12:57 4   on that role --

12:12:59 5          MR. SCHERKENBACH:  Okay.

12:13:00 6          A JUROR:  -- with that business.

12:13:01 7          MR. SCHERKENBACH:  And what was your role with

12:13:02 8   the business?

12:13:02 9          A JUROR:  I was the business director at DuPont

12:13:05 10   and I became president of the Sterling business division

12:13:08 11   when DuPont spun the company off, spun the business off as a

12:13:12 12   standalone.

12:13:13 13          MR. SCHERKENBACH:  Were any of the patents that

12:13:14 14   you were aware of or the business that owned the patents,

12:13:16 15   were they involved in patent litigation in any way while you

12:13:18 16   were there?

12:13:19 17          A JUROR:  No.

12:13:23 18          MR. SCHERKENBACH:  Also, it looks like you have

12:13:26 19   some college or university training in chemistry.

12:13:29 20          A JUROR:  I simply took chemistry courses in

12:13:32 21   college.

12:13:32 22          MR. SCHERKENBACH:  Didn't we all.

12:13:34 23          A JUROR:  You don't want to know what my grade

12:13:36 24   was.

12:13:36 25          MR. SCHERKENBACH:  Okay.  And then just one

12:13:40  1    other question.  Is there anything else you feel the Court

12:13:44  2    should know?

12:13:44  3            You say you currently serve on the Preliminary

12:13:46  4    Investigatory Committee of the Delaware Court on the

12:13:49  5    Judiciary.

12:13:51  6            A JUROR:  I initially checked no to that box and

12:13:53  7    I thought, well, it's court related so I thought I would put

12:13:56  8    it down.

12:13:57  9            MR. SCHERKENBACH:  What is your role there?

12:13:59  10            A JUROR:  In the Delaware state courts, we have

12:14:02  11    Strine is the Chief Justice, and there is a committee on the

12:14:05  12    judiciary that deals with charges levied against judges for

12:14:09  13    improper behavior in court cases, and there is a preliminary

12:14:13  14    investigatory committee that is assigned the role of the

12:14:17  15    initial investigation of charges.  There are always at

12:14:21  16    least two attorneys and at least one layperson on those

12:14:25  17    subcommittees, so I have been involved in some charges and

12:14:30  18    completed the investigation.

12:14:32  19            MR. SCHERKENBACH:  For how long roughly have you

12:14:33  20    been on that committee?

12:14:35  21            A JUROR:  I think my assignment started about

12:14:37  22    two years ago.

12:14:38  23            MR. SCHERKENBACH:  And are you serving on it

12:14:39  24    currently?

12:14:40  25            A JUROR:  Yes.  Yes.

12:14:41 1                    MR. SCHERKENBACH:  Great.  That's all.

12:14:42 2                    THE COURT:  Are there any questions?

12:14:44 3                    MS. PARKER:  Good morning.

12:14:44 4                    A JUROR:  Good morning.

12:14:45 5                    MS. PARKER:  So you mentioned DuPont might have

12:14:48 6     been sued?

12:14:50 7                    A JUROR:  There were so many business units, I

12:14:53 8     have no idea.

12:14:53 9                    MS. PARKER:  I'll just show you.

12:14:55 10                    A JUROR:  About patents?

12:14:56 11                    MS. PARKER:  Yes.  I will just show you what you

12:14:56 12     wrote there.

12:14:57 13                    A JUROR:  Sure.

12:14:58 14                    MS. PARKER:  Right?

12:14:59 15                    A JUROR:  (Nodding yes.)

12:15:00 16                    MS. PARKER:  So my question is does the fact

12:15:02 17     that DuPont is sued make you feel more sympathetic to

12:15:06 18     defendants who also are sued?

12:15:10 19                    A JUROR:  I wouldn't say it has any impact

12:15:12 20     because if suits were brought, I don't know how they would

12:15:16 21     have been resolved, so ...

12:15:18 22                    MS. PARKER:  Okay.

12:15:18 23                    A JUROR:  I don't know.

12:15:19 24                    MS. PARKER:  Thank you.

12:15:20 25                    Thank you, Your Honor.

12:15:20 1                THE COURT:  All right.  You can step back into

12:15:22 2     the courtroom.  Thank you very much.

12:15:23 3                A JUROR:  Sure.

12:15:25 4                (Juror left juryroom.)

12:15:28 5                THE COURT:  Is there any motion from Idenix?

12:15:30 6                MS. PARKER:  No, Your Honor.

12:15:31 7                THE COURT:  Is there any motion?

12:15:32 8                MR. SCHERKENBACH:  No, Your Honor.

12:15:33 9                THE COURT:  Okay.  We believe that is everyone,

12:15:35 10    right?

12:15:36 11               THE DEPUTY CLERK:  Yes, we do.

12:15:37 12               THE COURT:  So would you tell us again who is

12:15:41 13    still in.

12:15:42 14               THE DEPUTY CLERK:  Sure, I believe there are 27.

12:15:48 15               THE COURT:  27 you believe are in.

12:15:48 16               THE DEPUTY CLERK:  So it would be 1, and 2, 6,

12:15:50 17    and 7, 9, 11, 16, 19 and 20, 22, 26, 28, 36, 37, and 38, 40,

12:16:17 18    41 and 42, and 43, 45, and 46, 49, 50, 54, 55, 56, and 58.

12:16:32 19               THE COURT:  And is 60 out?

12:16:36 20               THE DEPUTY CLERK:  60 is out.

12:16:37 21               THE COURT:  Rights.  Okay.  So there was, I

12:16:40 22    don't know, I assume that was about 27 people that were

12:16:42 23    system in.  There are four that I had, I believe four that I

12:16:46 24    had deferred on.

12:16:47 25               THE DEPUTY CLERK:  Yes.

12:16:48  1                    MR. KELLY:  Yes, Your Honor.

12:16:50  2                    THE COURT:  16, 20, 50, and I don't know.

12:16:55  3                    THE DEPUTY CLERK:  38.

12:16:57  4                    MR. KELLY:  38.

12:16:57  5                    THE COURT:  38, thank you.  What would be your

12:17:00  6    position from Idenix's perspective for deferrals?

12:17:04  7                    MS. PARKER:  I'm sorry.  What was the last one?

12:17:06  8                    THE COURT:  38 was the last one.

12:17:08  9                    MS. PARKER:  Oh, 38 was the last one.

12:17:11 10                    The first one is No. 16.  That was Ms. Gracey.

12:17:17 11    You will remember she is the pulmonary therapist.

12:17:19 12                    THE COURT:  Right.  I guess first I want to know

12:17:21 13    do you have a position whether I should handle them globally,

12:17:24 14    and if not, we'll talk about them each individually.

12:17:28 15                    MS. PARKER:  It would be fine with us to excuse

12:17:30 16    them all given the number of other non-deferred jurors

12:17:35 17    available.

12:17:35 18                    THE COURT:  Okay.  What is Gilead's position?

12:17:37 19                    MR. SCHERKENBACH:  We agree.

12:17:38 20                    THE COURT:  You agree?  Okay.  Well, then I

12:17:40 21    think that is probably the most appropriate outcome.  So we

12:17:43 22    will strike the four that we deferred which I believe are

12:17:47 23    16, 20, 50, and 38.

12:17:53 24                    And that should leave us you believe 23?

12:17:56 25                    THE DEPUTY CLERK:  Correct.

THE COURT:  All right.  Are there any questions before we take a break and then complete jury selection?

MS. PARKER:  Yes, Your Honor.  May I?  I read the local rules and talked to Mr. Kelly and talked to Mr. Day.  So I tried to find out everything, but if I might just ask to make sure I got this straight?

THE COURT:  Sure.

MS. PARKER:  So when we go back in there, you are going to put 14 in the box; is that right?  Is that how we will start?

THE COURT:  Mr. Looby, why don't you explain what is going to happen next.

THE DEPUTY CLERK:  Yes.  We'll call out 14 names.

MS. PARKER:  Not in this order, or they go in this order?

THE DEPUTY CLERK:  Which order do you mean?

THE COURT:  We'll draw them randomly out of the 20 plus that are remaining.

MS. PARKER:  Okay.

THE DEPUTY CLERK:  And then all 14 names will be on the clipboard.  Go to the plaintiff first for the first strike, and then you go back and forth until each side is has done three.  Bring the clipboard back to the Judge.  I think he asks whether or not there is an objection to the

striking process.  If there is not, I read off the six

names.  They go to the back, reseat them one through eight,

and that's it.

MS. PARKER:  I just have one question.

I think I can do this, but let me just ask to

make sure.  So when we're going back and forth with the

clipboard, I can back strike.  It's not like we have to go

down in number, right?  So I can go back.

THE COURT:  Yes, you can do them in whatever

order you want.

MS. PARKER:  Thank you.

THE COURT:  Okay.  Are there any questions?

MR. SCHERKENBACH:  No, Your Honor.

THE COURT:  All right.  So there are a couple

restrooms here, if anyone needs it.  I do want to try to get

this done in time to let our non-jurors go at close at what

is close to lunchtime.  But as soon as you are ready, we

will return to the courtroom and then we'll continue.

MS. PARKER:  After we're done with that, if we

can talk for about three minutes?

THE COURT:  Once we're down to eight, I will

excuse the jury for lunch.  We can talk and then you will

get a chance for lunch as well.

MS. PARKER:  Thank you.

(Brief recess taken.)

```
12:19:52  1              *     *     *

12:33:04  2              (Proceedings reconvened after recess.)

12:33:04  3              THE COURT:  All right.  Ladies and gentlemen of

12:33:06  4    the jury pool, thank you for your patience.  We are now

12:33:09  5    ready to begin the final step in the jury selection process.

12:33:12  6    What is going to happen next is that Mr. Looby is going to

12:33:15  7    randomly draw 14 juror numbers.

12:33:19  8              If you hear your jury number called, please look

12:33:25  9    to Mr. Looby who will tell you where to sit in the jury box

12:33:30 10    to my right.  After the jury is seated, we'll move into what

12:33:33 11    are called peremptory strikes.  That will allow each side

12:33:36 12    to strike three of the 14 people from the jury box.  That

12:33:40 13    process happens silently by the exchange of a clipboard, so

12:33:43 14    please be quiet while counsel are going through that process.

12:33:47 15              Once we finish the peremptory strikes, we'll be

12:33:51 16    down to our eight jurors, and the rest of you will be

12:33:54 17    excused.

12:33:54 18              So we'll begin that process now.  Mr. Looby.

12:34:02 19              THE DEPUTY CLERK:  Juror No. 55, please come

12:34:10 20    forward.  First seat in the first row.

12:34:39 21              Juror No. 28, second seat in the first row,

12:34:52 22    please.

12:35:16 23              Juror No. 54.

12:35:29 24              A JUROR:  54?

12:35:32 25              THE DEPUTY CLERK:  54.
```

12:36:00  1                    Juror No. 36.

12:36:29  2                    Juror No. 2.

12:37:01  3                    Juror No. 42.

12:37:33  4                    Juror No. 56.

12:38:19  5                    Juror No. 40, first seat in the second row,

12:38:29  6        please.

12:39:03  7                    Juror No. 22.

12:40:28  8                    Juror No. 6.

12:40:58  9                    Juror No. 37.

12:41:41 10                    Juror No. 9.

12:42:10 11                    Juror No. 19.

12:42:55 12                    Juror No. 43.

12:43:14 13                    THE COURT:  We will begin the silent peremptory

12:43:19 14        strike process now.

12:43:22 15                    (Pause as counsel exercise peremptory

12:43:27 16        challenges.)

12:53:38 17                    THE COURT:  Any objections to the striking

12:53:40 18        process from plaintiffs?

12:53:41 19                    MS. PARKER:  No, Your Honor.  Thank you.

12:53:43 20                    THE COURT:  From defendants?

12:53:45 21                    MR. SCHERKENBACH:  No, Your Honor.

12:53:47 22                    DEPUTY CLERK LOOBY:  Would the following jurors

12:53:50 23        return to the back of the courtroom:

12:53:52 24                    Juror No. 55.  Juror No. 36.  Juror No. 2.

12:54:14 25        Juror No. 6.  Juror No. 9.  Juror No. 43.

12:54:58 1           THE COURT:  All right.  Ladies and gentlemen in

12:54:59 2 the jury box, I will have more to say to you in just a

12:55:02 3 moment.  But for those of you who are not in the jury box,

12:55:06 4 you have not been selected for our jury.  Thank you very

12:55:09 5 much for your time and your willingness to serve.  You are

12:55:12 6 all free to go at this point.

12:55:13 7           Those of you in the box, Mr. Looby is going to

12:55:16 8 distribute some things to you.  We will talk for a brief

12:55:19 9 moment, then we will take a break.

12:55:25 10          (Remainder of juror panel excused.)

12:55:34 11          THE COURT:  So we have another oath for you all

12:55:36 12 to take.

12:55:38 13          (At this point the jury was sworn and/or

12:55:45 14 affirmed.)

12:55:59 15          THE COURT:  Everyone can have a seat for a

12:56:06 16 moment.

12:56:07 17          Ladies and gentlemen of the jury, that completes

12:56:10 18 the jury selection process.  You are our jurors for this

12:56:14 19 trial.

12:56:14 20          Let me tell you what is going to happen next.

12:56:17 21          In a moment I am going to let you go for lunch.

12:56:20 22 Every day after today we will be able to provide lunch to

12:56:24 23 you.  I will talk about that a little bit this afternoon but

12:56:28 24 today you are on your own to find lunch.  I will give you

12:56:31 25 about an hour.

12:56:32 1         If you could please be back here a little before

12:56:34 2  2:00 so we can get started with our afternoon session.  That

12:56:38 3  will involve me giving you some instructions about the trial

12:56:41 4  and then we have a video to play, which will also give some

12:56:46 5  instructions about the case.  Then we will hear opening

12:56:49 6  statements by the parties.

12:56:50 7         We will be done by 4:30 today and we will be

12:56:53 8  done no later than 4:30 every other day that we meet.

12:56:57 9         A few words that I will repeat later.

12:57:01 10         You have been given these juror stickers.  We

12:57:03 11  may have something more permanent to give you now that we

12:57:07 12  know who you are as a juror.  But it is important that you

12:57:10 13  do have something identifying you as jurors, because those

12:57:14 14  of us involved in the case need to know who the jurors are

12:57:16 15  so we know not to talk to you.

12:57:18 16         So please make sure you have that with you.

12:57:21 17         You may have noticed in the courtroom the

12:57:23 18  temperature right now is very cold.  It may be warm later.

12:57:27 19  I apologize for that.  We try to adjust it to make it

12:57:32 20  comfortable.  If you are particularly uncomfortable, please

12:57:35 21  let me or my assistants know.  The best strategy, as you

12:57:39 22  seem to have figured out, is to have layers.  So wear

12:57:43 23  whatever you need to stay warm, and then if it gets warmer

12:57:46 24  feel free to take it off.

12:57:48 25         Finally, you are not to talk about the case

12:57:52 1  amongst yourselves or with anyone else.  I know you don't

12:57:55 2  really know much about the case yet.  But it is important

12:57:58 3  that you not talk even to one another about the case until

12:58:02 4  we get to deliberations at the end of the trial, and I will

12:58:05 5  talk about that more with you when you get back from your

12:58:08 6  lunch break.

12:58:09 7       So with that, I will have Mr. Looby show you to

12:58:12 8  the juryroom, and then you will be excused to go for lunch

12:58:15 9  and we will see you in about an hour.  Thank you.

12:58:28 10      (Jury leaves courtroom at 12:58 p.m.)

12:58:44 11      THE COURT:  You may all be seated.  Let's just

12:58:46 12 talk briefly here.  I believe plaintiffs had some issues

12:58:50 13 they wanted to raise.

12:58:51 14      MS. PARKER:  Thank you, Your Honor.

12:58:52 15      I just want to talk about the logistics.  If I

12:58:55 16 could just step away so I can demonstrate what my question

12:58:58 17 is.

12:58:59 18      THE COURT:  Sure.

12:58:59 19      MS. PARKER:  Obviously, the jury is going to be

12:59:01 20 right here and the screen is way over here.

12:59:04 21      I don't want to have to keep doing this

12:59:07 22 (indicating).  Here is what I would suggest.  Mr.

12:59:11 23 Scherkenbach certainly is welcome to use this as well.

12:59:13 24      We have a little music stand.  It is all it is.

12:59:16 25 We bought it at the music store.  If it would be all right

12:59:19 1    for me to put it maybe about right here. That way the

12:59:22 2    jurors are not blocked at all. Instead of me looking

12:59:26 3    directly at Your Honor, I can address my remarks over here.

12:59:31 4         THE COURT: I am not going to let you get that

12:59:34 5    close to the jury. I don't mind the music stand. Would it

12:59:37 6    not accomplish the same end just to turn the podium toward

12:59:40 7    the jury box?

12:59:41 8         MS. PARKER: That is what we tried to do to

12:59:44 9    begin with. But it is locked down because of the Elmo and

12:59:47 10   such. That is the issue.

12:59:50 11        I am happy to put it right here. I just want to

12:59:52 12   be able --

12:59:53 13        THE COURT: As long as it is very close to the

12:59:55 14   podium, then that is fine. I don't want you to encroach on

12:59:59 15   the jurors' space.

01:00:00 16        MS. PARKER: Two other very brief issues that

01:00:03 17   aren't directly related to the opening. Just looking at the

01:00:06 18   timing, if we start back at 2, with Your Honor's preliminary

01:00:09 19   instructions, video, I am happy to tell you what my opening

01:00:15 20   is, mine is a little over an hour -- and I don't know if you

01:00:19 21   know exactly how much you are your opening is as well. I am

01:00:23 22   trying to find out whether we need a witness here today

01:00:26 23   because I don't think I do.

01:00:27 24        THE COURT: Mr. Scherkenbach, about how long

01:00:29 25   would your estimate be ?

01:00:31 1                    MR. SCHERKENBACH:  Probably 75 minutes or so.

01:00:33 2                    THE COURT:  I don't think you need a witness.

01:00:36 3        It sounds to me we will get to 4:30 with the openings.

01:00:39 4                    MS. PARKER:  Just wanted to confirm that.

01:00:41 5                    Finally, just to put on the record, we mentioned

01:00:44 6        this at the pretrial conference.  We had agreed to, in

01:00:48 7        effect, kind of a gag order that neither one of the parties

01:00:51 8        would make any comments about the case.  Gilead wanted to

01:00:54 9        confirm that with their client.  They have now confirmed

01:00:56 10       that.  I want to put that on the record.

01:00:58 11                   THE COURT:  Do you want to confirm that for us

01:01:00 12       on the record?

01:01:01 13                   MR. SCHERKENBACH:  It's agreed.

01:01:02 14                   MS. PARKER:  That's all I have.  Thank you, Your

01:01:05 15       Honor.

01:01:05 16                   THE COURT:  Mr. Scherkenbach, any issues from

01:01:06 17       your side?

01:01:07 18                   MR. SCHERKENBACH:  I don't believe so, Your

01:01:08 19       Honor.

01:01:08 20                   THE COURT:  I think with those estimates from

01:01:10 21       the openings it is possible that we may be -- we may not

01:01:15 22       have 75 full minutes by the time we get to the beginning of

01:01:20 23       the defendant's opening, because I will have to give the

01:01:24 24       jury I would think probably at least one short break between

01:01:27 25       2:00 and 4:30.  I don't know if you have any thoughts about

01:01:31 1  that, Mr. Scherkenbach.

01:01:34 2          MR. SCHERKENBACH:  Yes.  It's not ideal.

01:01:43 3  Obviously, I guess, I can start and finish in the morning.

01:01:47 4  I guess I don't want to have a scenario where we stop for

01:01:51 5  the day after plaintiffs' opening and there is radio

01:01:55 6  silence.

01:01:55 7          THE COURT:  What you mean is, you could get as

01:02:00 8  far as you could get and finish up in the morning if that is

01:02:03 9  what happens.

01:02:03 10          Any thoughts about that?

01:02:04 11          MS. PARKER:  I would object to that, just

01:02:06 12  because that is giving an overnight advantage, so to speak,

01:02:10 13  after they hear mine.

01:02:11 14          THE COURT:  If it comes to it, what would you

01:02:14 15  propose then?

01:02:15 16          MS. PARKER:  It would save some time if I don't

01:02:18 17  have to go through those exhibits that I now have to put up

01:02:20 18  on the page.

01:02:21 19          THE COURT:  I am not going to revisit my

01:02:23 20  decisions.

01:02:23 21          MS. PARKER:  If it is all right if I could put

01:02:25 22  it up, if this would work, so I need to show it, so I will

01:02:30 23  say, here is the document, and I put it up, then I go

01:02:34 24  immediately to the part that I want to show, that would save

01:02:37 25  some time.

01:02:38　1　　　　　THE COURT:  That sounds consistent with what I

01:02:40　2　ordered.

01:02:40　3　　　　　MS. PARKER:  I think so.  I think that will

01:02:43　4　help, I believe.

01:01:43　5　　　　　THE COURT:  Okay.  Well, I'm not going to make a

01:01:46　6　decision about what we'll do when we get to 4:30 in advance

01:01:49　7　of knowing whether it is an issue, but it looks like it may

01:01:52　8　be an issue, so we'll see where we are.

01:01:55　9　　　　　Is there anything further from plaintiffs before

01:01:57　10　we take a break for lunch?

01:01:58　11　　　　　MS. PARKER:  No.  Thank you, Your Honor.

01:01:59　12　　　　　THE COURT:  From defendants?

01:02:00　13　　　　　MR. SCHERKENBACH:  No, Your Honor.

01:02:01　14　　　　　THE COURT:  I think any of the outstanding

01:02:03　15　deposition related issues, we can talk about at 4:30.  I

01:02:06　16　don't think they're coming up before then.

01:02:08　17　　　　　So, all right, we will take a recess.

01:22:29　18　　　　　(Lunch recess taken.)

01:22:29　19　　　　　*　　　*　　　*

02:08:26　20　　　　　AFTERNOON SESSION, 2:07 p.m.

02:08:26　21　　　　　THE COURT:  I know you have the jury notebooks.

02:08:29　22　Do they have the preliminary instructions in them?

02:08:32　23　　　　　MR. DAY:  They do, Your Honor.

02:08:34　24　　　　　THE COURT:  Any issues before we bring the jury

02:08:36　25　in?  From plaintiff?

02:08:37 1        MS. PARKER:  No, thank you, Your Honor.

02:08:39 2        THE COURT:  Defendant?

02:08:40 3        MR. SCHERKENBACH:  No, Your Honor.

02:08:41 4        THE COURT:  While Mr. Looby is getting the jury,

02:08:45 5 Mr. Day, if you want to bring the notebooks up, that would

02:08:49 6 be great.

02:08:52 7        MR. DAY:  Thank you, Your Honor.

02:08:54 8        (Jury enters courtroom at 2:09 p.m.)

02:11:39 9        THE COURT:  Welcome back, ladies and gentlemen

02:11:41 10 of the jury.

02:11:42 11        Mr. Looby, before you sit, if you would

02:11:45 12 distribute the binders to the jury.

02:11:48 13        Ladies and gentlemen, these are your jury

02:11:50 14 notebooks.  I will tell you a little bit more about them in

02:11:54 15 a moment.

02:12:01 16        Among the materials you will find in the jury

02:12:04 17 notebooks is something called preliminary jury instructions.

02:12:13 18        I am now going read to you those preliminary

02:12:15 19 jury instructions.  If you wish you can follow along in your

02:12:19 20 copy.  You will have your notebook with you throughout the

02:12:23 21 trial.

02:12:23 22        I am at page 1 of the preliminary jury

02:12:26 23 instructions.  It says, 1.  Introduction.

02:12:29 24        Members of the jury.  Now that you have been

02:12:32 25 sworn in, I have the following preliminary instructions for

02:12:36 1    guidance on your role as jurors in this case.  These

02:12:40 2    instructions are intended to introduce you to the case and

02:12:42 3    the law that you will apply to the evidence that you will

02:12:46 4    hear.  I will give you more detailed instructions on the law

02:12:50 5    at the end of the trial.

02:12:53 6          Also, because this is a patent trial, which will

02:12:57 7    deal with subject matter that is not within the every-day

02:13:00 8    experience of most of us, I will additionally give you some

02:13:03 9    preliminary instructions regarding patents to assist you in

02:13:06 10   discharging your duty as jurors.

02:13:14 11          Does everybody have the preliminary instructions

02:13:16 12   in their binder?

02:13:18 13          Okay.

02:13:23 14          I am now on page 2, the section on The Parties.

02:13:27 15          This is a case about patents.  The plaintiffs in

02:13:30 16   this case are Idenix Pharmaceuticals LLC and Universita

02:13:39 17   Degla Studi di Cagliari.  I will refer to the plaintiffs

02:13:41 18   collectively as Idenix.

02:13:43 19          The defendant in this case is Gilead Sciences,

02:13:46 20   Inc., which I will refer to as Gilead.

02:13:50 21          There is one patent at issue in this case,

02:13:53 22   United States Patent No. 7,608,597, the '597 patent.

02:14:01 23   Because these numbers are so long, patents are usually

02:14:03 24   referred to by their last three digits.  You may hear the

02:14:07 25   lawyers and witnesses in the case refer to Idenix's patent

as the '597 patent.  A copy of the '597 patent has been given to you along with these preliminary instructions.  So I think you will find elsewhere in your notebook a copy of the '597 patent.

3.  Duties of the Jury.

It will be your duty to find what the facts are from the evidence as presented at the trial.  You and you alone will be the judges of the facts.  You will have to apply those facts to the law as I will instruct you at the close of the evidence.  You must follow that law whether you agree with it or not.

In addition to instructing you about the law, at the close of the evidence I will provide you with instructions as to what the claims of the patents mean.  Again, of course, you are bound by your oath as jurors to follow these and all the instructions that I give you, even if you personally disagree with them.

All the instructions are important, and you should consider them together as a whole.

You are the judges of the facts.  I will decide which rules of law apply to this case.  Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

Also, do not let anything I say or do during the

course of the trial influence you.  Nothing I say or do is intended to indicate or should be taken by you as indicating what your verdict should be.

        4.  Evidence.

        The evidence from which you will find the facts will consist of the testimony of witnesses and the documents and other things admitted into evidence.  The evidence may also include certain facts agreed to by the parties or that I may instruct you to find.

        Certain things are not evidence, and must not be considered by you.  1.  Statements, arguments, and questions by lawyers are not evidence.  2.  Objections to questions are not evidence.  Lawyers have an obligation to their clients to make an objection when they believe testimony or exhibits being offered are not admissible under the Rules of Evidence.  You should not be influenced by a lawyer's objection or by my ruling on the objection.  If I sustain or uphold the objection and find the matter is not admissible, you should ignore the question or document.  If I overrule an objection and allow the matter in evidence, you should treat the testimony or document like any evidence.

        If I instruct you during the trial that some item of evidence is admitted for a limited purpose, you must follow that instruction and consider that evidence for that purpose only.  If this occurs during the course of the

trial, I will try to clarify this for you at that time.

3.  During trial you will be shown charts and animations to help illustrate the testimony of the witnesses.  These illustrative exhibits called demonstrative exhibits are not admitted into evidence and should not be considered as evidence.

4.  Anything you see or hear outside the courtroom is not evidence and must be disregarded.  You are to decide this case solely on the evidence presented here in the courtroom.

There are two kinds of evidence:  direct and circumstantial.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

As a general rule, the law makes no distinction between these two types of evidence, but simply requires that you find facts from all the evidence in the case, whether direct or circumstantial, or a combination of the two.

In judging the facts, it will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness' testimony to accept or reject.

5.  Burden of Proof.

In any legal action, facts must be proven by a required standard of evidence known as the burden of proof. In a patent case such as this, there are two different burdens of proof that are used. The first is called preponderance of the evidence. The second is called clear and convincing evidence.

Idenix contends that it is entitled to damages related to the '597 patent. A party claiming patent damages has the burden of proving those damages by a preponderance of the evidence. A preponderance of the evidence is evidence that, when considered in light of all of the facts, leads you to believe that what the party claims is more likely true than not. To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting Idenix's claims must make the scales tip somewhat toward its side.

Gilead contends that the '597 patent is invalid. A party challenging the validity of a patent has the burden of proving that the patent is invalid by clear and convincing evidence. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.

Some of you may have heard the phrase proof beyond a reasonable doubt. That burden of proof applies only in criminal cases and has nothing to do with a civil

case like this one.  You should therefore not consider it in this case.

        6.  Patent Video.

        At this time we are going to show a 17-minute video as an introduction to the patent system.  It contains background information to help you understand what patents are, why they are needed, the role of the Patent Office, and why disputes over patents arise.  This was prepared by the government, not by the parties.  Please understand that this video was prepared by the government to be shown to jurors in every patent case in every federal court across the country.

        Therefore, the video addresses issues that are not necessarily going to be presented as issues for you to decide in this case.

        I will instruct you when the video is completed as to the issues you will need to decide in this case.

        Is the video ready to be played?  Somebody has it ready?  Okay.  Can we turn some of the lights down, Mr. Looby.

        Ladies and gentlemen, during the video you will hear reference to a sample patent.  There should be a copy of that sample patent in your binder if you want to look at it.

        (Patent video played as follows.)

03:54:57  1          JUDGE FOGEL:  Hello.  I'm Jeremy Fogel.  I've

03:55:00  2   been a United States District Judge since 1998, and I'm now

03:55:04  3   the Director of the Federal Judicial Center.

03:55:07  4          As you probably know by now, this is a patent

03:55:09  5   case, so you may be wondering, how can I sit in judgment on

03:55:13  6   a case like this when I'm not entirely sure what a patent

03:55:16  7   is?  We hope to answer that concern with this brief video,

03:55:20  8   which will give you some of the background needed to do your

03:55:23  9   job.

03:55:24 10          This case will involve some special issues that

03:55:27 11   the Judge and lawyers will explain to you, but all patent

03:55:30 12   cases involve some basics that you will learn about.

03:55:33 13          This video will discuss what patents are, why we

03:55:37 14   have them, how people get them, and why there are disputes

03:55:40 15   that require us to call in a jury like you.  We'll also show

03:55:44 16   you what patents look like.

03:55:46 17          The United States Constitution gives Congress

03:55:49 18   the power to pass laws relating to patents.  Article 1,

03:55:55 19   Section 8, Clause 8 allows Congress to promote the progress

03:55:59 20   of science and useful arts by securing for limited times to

03:56:03 21   authors and inventors the exclusive right to their

03:56:06 22   respective writings and discoveries.

03:56:08 23          A patent, then, is an official grant by the

03:56:12 24   United States Government that gives its owners certain

03:56:16 25   rights to an invention.  Those include the right to stop

others from making, using, selling, or offering for sale the invention that is claimed in the patent.

A patent lasts for a specific period of time, usually 20 years from the date that the application is filed by the inventor. But because it takes an average of three years for the Patent and Trademark Office to act on the application, the effective life of a patent is closer to 17 years.

A patent represents a bargain made between the government and the inventor. In return for the right to prevent others from using the invention, the inventor must enhance the public knowledge, or what we sometimes call the state of the art, by adding something new and useful to it.

A famous example is Thomas Edison's invention of a light bulb. Harnessing electrical power for illumination transformed society and led to many other important break-throughs. During the lifetime of the patent, its disclosure may inspire new inventions, and after it expires, the invention is free for anyone to use. It is this combination of something new and valuable to the public that justifies granting time-limited patent protection to the inventor.

A patent is in many ways like a deed to a piece of property. It grants the owner the right to keep people off the property or to charge them a fee, like rent, for

using it.  And just as a deed indicates boundaries defining the landowner's property, a patent claim defines the patentee's domain.

The patent system works because the inventor is required to describe the invention in clear and specific terms so that the public knows what the boundaries of the invention are.  Once a patent is issued by the government, it becomes available for public inspection.  And that way, anyone who learns of a patent can read it and understand exactly what the inventor invented and the limits of the patent set forth in the claims.

Now that we understand what a patent is, let's take a closer look at term "invention."  An invention is a new way of solving a problem for a useful new machine, manufacture, or composition of matter.

The patent process begins in the mind of the inventor and, in particular, when the invention is formulated in the mind of the inventor.  Patent lawyers call this "conception."  This is when the idea occurs to the inventor clearly enough that he or she can write it down and explain it to someone.

To qualify for a patent, the invention needs to be new and useful.  Also, it must not be obvious to one of ordinary skill in the field.  If the inventor believes these requirements are met, he or she will prepare an application

for filing with the Patent and Trademark Office, whose headquarters are in Alexandria, Virginia, just outside of Washington, D.C.

The Patent and Trademark Office, often called the PTO, is the agency of the federal government whose job it is to examine patent applications to make sure they were in proper form and comply with the requirements of the law.

The inventor can prepare an application for filing with the PTO, but usually it is drafted by a patent attorney or a patent agent who specializes in what is called prosecuting patent applications. That is, the process by which they are evaluated.

The attorney or agent works with the inventor to be sure the invention is described and claimed in a way that complies with the law and the regulations of the PTO. 98 percent of patent applications are made online using the PTO's electronic filing system, although a few paper applications are still made.

When the PTO receives the inventor's application, it is first checked to see if it is complete and complies with all the PTO's application requirements. It then assigns the submission to a Patent Examiner, a staff person with a background in the field or art the invention falls within to evaluate the application and

decide whether a patent can be granted.

You've been given a sample patent to refer to as you watch this video, so you already have a sense of what a patent looks like, but now let's take a closer look at the three main parts of a patent.

To begin with, there are some basic identifying information on the first page. This material is highlighted in your handout. On the upper right side of the page is the number assigned to the patent by the PTO and on the left side is a title that describes the invention and the names of the inventors and sometimes the company to whom they've assigned the patent. Also on the left is the date when the patent application was filed, and back on the right, the date when the patent was issued.

There also is more detailed information on the first page, including a list of numbers following the caption "Field of Search." These numbers identify previously issued patents the Examiner looked at or searched to make sure the applicant's claimed invention really is something new, not obvious, and thus patentable.

Also listed on the first page is what we call references. That is, previous patents or articles that describe the technology or prior art known at the time the application was filed. It may seem strange to you that we call this pre-existing technology prior art even though it

04:01:53 1    has nothing to do with artists.

04:01:55 2         We use the word "art" in its historical sense

04:01:59 3    to include inventions and other subject matter reasonably

04:02:02 4    related to the claimed invention.  We also refer to the

04:02:05 5    latest technology as state of the art, and we say of someone

04:02:09 6    who can understand and apply the technology that he or she

04:02:12 7    is skilled in the art.

04:02:14 8         The second major part of the patent is what we

04:02:16 9    call the specification or written description.  As is the

04:02:21 10   case in your sample, it is usually the longest part of the

04:02:24 11   patent.  It includes an abstract, which is a brief summary

04:02:28 12   of the invention.  A background section describes the nature

04:02:32 13   of the problem the invention is supposed to solve.  One or

04:02:36 14   more drawings, called figures, that illustrate various

04:02:39 15   aspects of the application, and a detailed description of

04:02:43 16   one or more embodiments of the invention.

04:02:46 17        An embodiment is a specific device or method

04:02:49 18   that uses the invention, such as a particular form of light

04:02:52 19   bulb.

04:02:53 20        The third and most important part of the patent

04:02:56 21   is the claims.  These are the numbered paragraphs that

04:02:59 22   appear at the end.  The claims are what give the public

04:03:03 23   notice of the boundaries of the invention.  They're similar

04:03:07 24   to the description of property you may have seen in a deed,

04:03:11 25   referring to precise measurements taken on the ground.

The Judge will instruct you further on how any technical or ambiguous terms in the patent claims should be understood.

Now that we've discussed the main parts of a patent, let's look at how the PTO processes patent applications, what we referred to earlier as patent prosecution of an application. This process begins when the inventor's application arrives at the PTO. There, it receives a filing date. Under the American Invents Act of 2011, filing dates will determine who is awarded the patent if there are competing valid applications.

In 2012, the PTO received nearly 600,000 patent applications and issued more than 270,000 patents.

After determining that the application is complete, the receiving branch also decides what field of technology an application relates to and assigns it to the appropriate examining group. In order to make that decision, the Patent Examiner usually looks at patents that have been issued previously in the same or closely related fields of art. The Examiner has computer databases that contain information used to accomplish this task.

Another part of the job is to decide if the inventor's description of the invention is complete and clear enough to meet the requirements for a patent, including the requirement that the description enables

someone of ordinary skill in the field to actually make and use it.

However, because the job of examining so many applications is challenging, the law requires the applicant to tell the Examiner whatever he or she knows about the prior art that might be important to the Examiner's decision on whether to allow the patent. We call this the applicant's duty of candor.

One way the applicant can satisfy this duty is by bringing pertinent prior art to the attention of the Examiner, either in the original application, or in other submissions called Information Disclosure Statements. In this way, the decisions of the Examiner are based on both the information provided by the applicant and on the information the Examiner finds during his or her prior art search.

Sometimes the Examiner concludes that the application meets all the requirements we've discussed and allows the patent to issue at this first stage, but more frequently the Examiner will reject the application as deficient in some respect. This decision will be communicated by the Examiner in what is called an Office Action, which is a preliminary notice to the applicant of what the Examiner finds insufficient or unpatentable. For example, the Examiner may reject certain claims as being

unpatentable because a journal article written and published by another person prior to the effective filing date of the patent application disclosed what the applicant was currently claiming. At that point, the applicant prepares a written response, either agreeing or disagreeing with the Examiner.

An applicant who agrees with the Examiner can suggest amendments to the application, designed on overcome the Examiner's rejection. Alternatively, an applicant who disagrees with the Examiner's Office Action can explain the reasons for the disagreement.

This exchange of Office Actions and responses goes on until the Examiner issues a Final Office Action, which may reject or allow some or all of the applicant's claims. The overall process is referred to as the prosecution history of the application.

The written incoming and outgoing correspondence between the PTO Examiner and the applicant is also called the file wrapper. In the past, these file wrappers were all in paper form as were the submitted applications. Now they are most often electronic and may occasionally be paper as well.

Most patent applications filed on or after November 29th, 2000 are published by the PTO 18 months after the inventor has filed his or her application so that the

public may inspect it.

Once a final PTO Office Action has occurred and one or more claims have been allowed, the applicant is required to pay an issuance fee and the patent is printed. Then, on the date shown on the upper right-hand corner, the first page of the patent, it is issued by the PTO and the inventor receives all the rights of the patent. That date is highlighted on your sample.

Once a patent has issued, the inventor or the person or company the inventor has assigned a patent to can enforce the patent against anyone who uses the invention without permission. We call such unlawful use infringement, but the PTO and its Examiners have no jurisdiction over questions relating to infringement of patents. If there is a dispute about infringement, it is brought to the Court to decide.

Sometimes in a court case you are also asked to decide about validity. That is whether the patent should have been allowed at all by the PTO. A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or nonobvious in light of the prior art or whether other requirements of patentability have been met. In other words, a defense to an infringement lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked

to consider such things when the patent has already been reviewed by a Government Examiner.  There are several reasons for this.

First, there may be facts or arguments that the Examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant.  In addition, there is of course the possibility that mistakes were made or important information overlooked.  Examiners have a lot of work to do and no process is perfect.

Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it is important that we provide a chance for someone who is accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity, it is your job to decide the facts of the case.  The Judge will instruct you about the law, which may include the meaning of certain words or phrases contained in the patent.

So it is your primary duty as jurors to resolve any factual disputes and in some cases, such as infringement and validity, to apply the law to those facts.  To prove infringement, the patentholder must persuade you by what is called a preponderance of the evidence relating to the facts of the case that the patent has been infringed.

04:09:55 1    To prove invalidity, the alleged infringer must

04:09:58 2  persuade you by what is called clear and convincing evidence

04:10:01 3  that the patent is invalid.

04:10:04 4    The Judge in your case will explain these and

04:10:07 5  other terms and provide additional specific instructions at

04:10:10 6  the appropriate time.

04:10:12 7    Good luck with your task, and thank you for your

04:10:16 8  service.

04:10:16 9    (End of video.)

02:36:08 10   THE COURT:  If you will turn the lights back up.

02:36:13 11   All right.  Ladies and gentlemen, I'll now read

02:36:15 12  the remainder of the preliminary instructions.  And I'm at

02:36:19 13  page 8.  And there, it's section 7, entitled Summary of the

02:36:24 14  Patent Issues.

02:36:25 15   In this case, you must decide things according

02:36:28 16  to the instructions I will give you at the end of the trial.

02:36:35 17  Those instructions will repeat this summary and will provide

02:36:38 18  more detail.

02:36:40 19   Infringement of the '597 patent is not an issue

02:36:46 20  you are deciding in this case and Idenix is not required to

02:36:49 21  prove infringement at this trial.  Instead, you are to

02:36:52 22  assume that Gilead infringes the '597 patent.  Here are the

02:36:58 23  issues you must decide:

02:36:59 24   1.  Whether Idenix has proven its entitlement to

02:37:03 25  any damages.

02:37:03 1          2.   What measure of damages has Idenix proven it

02:37:08 2  is entitled to.

02:37:09 3          3.   Whether Idenix has proven that the assumed

02:37:13 4  infringement of any valid claim of the '597 patent was

02:37:17 5  willful.

02:37:18 6          4.   Whether Gilead has proven by clear and

02:37:21 7  convincing evidence that one or more of the asserted claims

02:37:25 8  of the '597 patent is invalid.

02:37:29 9          Section 8, Conduct of the Jury.

02:37:32 10         Now a few words about your conduct as jurors.

02:37:35 11         First, I instruct you that during the trial you

02:37:37 12 are not to discuss the case with anyone or permit anyone to

02:37:41 13 discuss it with you.  Until you retire to the juryroom at

02:37:45 14 the end of the case to deliberate on your verdict you simply

02:37:49 15 are not to talk about this case.  If any lawyer, party, or

02:37:52 16 witness does not speak to you when you pass in the hall,

02:37:55 17 ride the elevator or the like, remember, it is because they

02:37:59 18 are not supposed to talk with you, nor you with them.  In

02:38:04 19 this way, any unwarranted or unnecessary suspicion about

02:38:07 20 your fairness can be avoided.  If anyone should try to talk

02:38:10 21 to you about it, bring the case to the court's attention

02:38:13 22 appropriately.

02:38:14 23         Second, do not read or listen to anything

02:38:18 24 touching on this case in any way.

02:38:20 25         Third, do not try to do any research or make any

02:38:24 1     investigation about the case on your own.

02:38:29 2              Let me elaborate.  During the course of the

02:38:31 3     trial, you must not conduct any independent research about

02:38:33 4     the case, the matters in the case, and the individuals or

02:38:37 5     entities involved in the case.  In other words, you should

02:38:40 6     not consult dictionaries or reference materials, search the

02:38:44 7     Internet, websites, blogs, or any other electronic means.

02:38:49 8     Also, should there happen to be a newspaper article or radio

02:38:53 9     or television report relating to this case, do not read the

02:38:56 10    article or watch or listen to the report.  It is important

02:38:59 11    that you decide this case based solely on the evidence

02:39:02 12    presented in the courtroom.  Please do not try to find out

02:39:06 13    information from any other sources.

02:39:08 14             I know that many of you use cell phones,

02:39:11 15    BlackBerries, iPhones the Internet and other tools of

02:39:14 16    technology.  You also must not talk to anyone about this

02:39:17 17    case or use these tools to communicate electronically with

02:39:21 18    anyone about the case.  This includes your family and friends.

02:39:26 19    You may not communicate with anyone about the case on your

02:39:29 20    cellphone, through e-mail, your BlackBerry or iPhone, text

02:39:33 21    messaging or Twitter, through any blog or website, through any

02:39:37 22    Internet chatroom or by way of any other social networking

02:39:41 23    websites, including Facebook, MySpace, LinkedIn, and YouTube.

02:39:45 24             Finally, do not form any opinion until all the

02:39:50 25    evidence is in.  Keep an open mind until you start your

02:39:53 1    deliberations at the end of the case.

02:39:56 2         During the trial, you may, but are not required,

02:39:58 3    to take notes regarding testimony.  For example, exhibit

02:40:03 4    numbers, impressions of witnesses or other things related

02:40:06 5    to the proceedings.  The parties have provided you with

02:40:09 6    notebooks for this purpose.  These notebooks include a copy

02:40:14 7    of the '597 patent and will include photographs of the

02:40:17 8    witnesses to assist you.

02:40:19 9         A word of caution is in order.  There is

02:40:22 10   generally I think a tendency to attach undue importance to

02:40:26 11   matters to what one has written down.  Some testimony which

02:40:30 12   is considered unimportant at the time presented and thus

02:40:32 13   not written down takes on greater importance in the trial

02:40:36 14   in light of all the evidence presented.  Therefore, you are

02:40:40 15   instructed that your notes are only a tool to aid your own

02:40:44 16   individual memory and you should not compare your notes with

02:40:47 17   other jurors in determining the content of any testimony or

02:40:51 18   in evaluating the importance of any evidence.  Your notes

02:40:55 19   are not evidence and are by no means a complete outline of

02:40:58 20   the proceedings or a list of the highlights of the trial.

02:41:02 21   Also, keep in mind that you will not have a transcript of

02:41:06 22   the testimony to review.  So above all, your memory will be

02:41:09 23   your greatest asset when it comes time to deliberate and

02:41:14 24   render a decision in this case.

02:41:15 25        You must leave these notebooks, including any

02:41:18 1    handwritten notes that you take, in the jury deliberation

02:41:21 2    room which is secured at the end of the day.  And remember

02:41:25 3    that they are for your own personal use.

02:41:28 4           I will give you detailed instructions on the law

02:41:30 5    at the end of the day and those instructions will control

02:41:33 6    your deliberations and decision.

02:41:35 7           9.  Course of the Trial.

02:41:39 8           The case will now begin.  First, Idenix may make

02:41:42 9    an opening statement outlining its case.  Then Gilead may

02:41:45 10   make an opening statement outlining its case.  Open

02:41:49 11   statements are not evidence; their only purpose is to help

02:41:53 12   you understand what the evidence will be.

02:41:55 13          Next, the parties will present their evidence.

02:41:58 14   Idenix will first introduce its evidence that it believes

02:42:01 15   supports its claims of willful infringement and for

02:42:04 16   damages.  When Idenix is finished, Gilead will then have

02:42:07 17   the opportunity to offer evidence to defend against Idenix's

02:42:12 18   claims and to introduce evidence that it believes supports

02:42:16 19   its claim that the '597 patent is valid.

02:42:20 20          When Gilead is finished, Idenix will have the

02:42:23 21   opportunity to introduce evidence to defend against Gilead's

02:42:27 22   claims and offer rebuttal evidence related to its own claims.

02:42:32 23   Gilead will then have the opportunity to offer rebuttal

02:42:37 24   evidence related to its claim.

02:42:38 25          After all the evidence is in, the lawyers will

offer closing arguments. The closing arguments are not evidence. Their purpose is to summarize and interpret the evidence for you and to tie the evidence to their story.

I will give you instructions on the law and describe for you the matters you must resolve. You will then retire to the juryroom to deliberate on are verdict.

Section 10. Trial Schedule.

Though you may have heard me say this during the jury selection process, I want to again outline the schedule I expect to maintain during the course of this trial.

This case is expected to take ten business days to try, between now and December 16th, which is a week from Friday.

We will normally begin the day at 9:00 a.m. We will go until around 12:30 p.m., and, after about a half hour break for lunch, continue until 4:30 p.m. There will be a 15 minute break in the morning and another 15 minute break in the afternoon. The most significant exception to this schedule may occur when the case is submitted to you for your deliberations. At that point, you will be permitted to deliberate as late as you wish.

Next week, due to other commits I have to other cases, we will finish earlier than 4:30 on at least Tuesday and Wednesday. Specifically on December 13 and Wednesday, December 14th, we will conclude our trial date at 3:15 p.m.

Finally, please understand this is a timed trial. This means I have allocated each party a maximum number of hours in which to present all portions of its case. This allows me to assure you that we expect to be completed with this case by next Friday, December 16th. Of course, you can help me keep on schedule by being here promptly each morning and being ready to proceed at the end of each break.

Just one more word about breaks. As you may have heard me discuss during jury selection, these are the scheduled breaks that I have mentioned. If at any time anybody needs an additional break, you just need to raise your hand or stand up or get me or my assistant's attention, and we will do that just as soon as we can. Okay?

All right. Finally, in the instructions, Section 11. Glossary of Claim Terms.

It is the Court's duty under the law to define what the patent claims mean. I have made my determinations, and I will now instruct you on the meaning of claims that you will hear the parties address in their presentations.

So the claim term "method for the treatment of a hepatitis C virus infection" has the construction, "plain and ordinary meaning."

The claim term "administering" has the construction "making available."

The claim term "effective amount" has the construction, "an amount of the claimed ribofuranosyl nucleoside that is effective to treat HCV."

The claim term "nucleoside" has the construction "a compound comprising a base linked to a sugar."

And the claim term, "Beta-D-2'-methyl-ribofuranosyl nucleoside" has the construction, "a Beta-D nucleoside that includes a five member sugar ring with a methyl group in the 2' up position and nonhydrogen substituents at the 2' down and 3' down positions."

So that completes the preliminary instructions.

We will now turn to Idenix for its opening statement.

MS. PARKER: May it please the Court and counsel and Mr. Myers, good afternoon.

Ladies and gentlemen, the evidence in this case is going to come down to three simple truths that you are going to hear about at trial.

The first is that Gilead, Gilead is the defendant, they are over here, Gilead wrongfully took our patented invention and they used it without paying us. You just heard Judge Stark, when he gave you those preliminary instructions that are in your notebook, tell you that you are to assume that Gilead, again, the defendant over here,

infringes on our patent.  And you also heard Judge Stark

tell you in those same preliminary instructions that Idenix,

that's us, that we are not required to prove infringement.

What we are going to prove in this case is what

Gilead did was willful.  We are going to present evidence on

that during the trial.

Ladies and gentlemen, this is a story of

betrayal.  This is a story of their scientist getting

confidential information from us and using it for their own

profits.  And this betrayal that you are going to hear about

during the trial is what led them to develop these two drugs

that are at issue in this case.

The second simple truth that you are going to

hear about is that our invention, our work, is the bedrock

basis of these two drugs that they sell.  We were there

first.  Our invention is what led to the development of

those two drugs.

Now, you are going to hear at trial that these

are remarkable drugs that treat Hepatitis C.  Hepatitis C is

a very dangerous illness.  It can cause liver problems.  It

can cause death.  And these two drugs treat Hepatitis C.

In fact, you are going to hear that there are

over 150 million people around the world who have Hepatitis

C.

And then the third simple truth that you are

going to hear about during this trial is that it is wrong for Gilead to profit over the sales of these two drugs without paying us our fair and reasonable share. You are going to hear that their sales of these two drugs since they went on the market about three years ago, their sales of these two drugs are about 25 billion dollars. You are going to hear that these two drugs are what are called blockbuster drugs. What that means is they are highly profitable drugs for Gilead.

The evidence at this trial is going to reveal that their profit margin on these two drugs is between 98 and 99 percent. And what that means is that for every $1,000 of sales, they are making a profit of over $980. Those two drugs are still on the market. They are still being sold today.

The evidence is going to show that Gilead knew what they were doing, they did it willfully. They did it intentionally. And then they tried to cover it up. Including, the evidence will show, deleting data and going back and changing their official company documents to cover up what they did.

Now, this is not a criminal trial. But the evidence is going to show that what happened here is kind of similar to theft. They took our invention, and they used it without our permission.

Ladies and gentlemen, all of this that I am telling you is going to come into evidence not from me, this is not what I am saying, this is not what our people are saying, all of this evidence is going to come from you from their own documents.  It's going to come to you in their own words.

During this litigation, we had an opportunity to get their internal company documents on this issue.  They had to turn them over to us in this litigation.  So we are going to prove our case with their own words and their own documents.

Let me give you just one example of what I am talking about.

So when they would have meetings of their chemistry department, the scientists would sit around the table and they would have their meeting.  And they would have somebody who would take minutes, take notes, of their meeting, would type them up, that would be their official minutes of the meeting of their chemistry department.

Well, their minutes talked about us.  They use our name, Idenix.  Their meeting minutes showed they were talking about working on our compounds, our sugar.  Let me give you one example.  Here is the whole document you are going to see at trial.  You are going to have all of this.  Let me pull out the part I want to show you.

02:53:17 1      Here are meeting minutes from the chemistry

02:53:19 2  department.  And you will see right there, it talks about

02:53:22 3  Idenix, over and over.  But then, they decided they wanted

02:53:30 4  to cover that up.  They wanted to rewrite history.

02:53:35 5      So you will see another one of their internal

02:53:39 6  company documents that we got in this litigation.  And this

02:53:43 7  is a memo, this is the entire memo, let me pull out the part

02:53:48 8  we want to show, this is an internal e-mail where the head

02:53:51 9  of the company writes to his assistant.  He says, "Ann.

02:53:56 10  Avoid using the word Idenix sugar."  He says instead call it

02:54:02 11  by the chemical name.  Then he signs it with his initials.

02:54:07 12      What happens?  There is another document.  They

02:54:12 13  take those original meeting minutes that I showed you just a

02:54:17 14  minute ago, and they change them.

02:54:20 15      Let's put those up.

02:54:24 16      But is the exact same document that they took

02:54:27 17  out the reference to us, and they put in the chemical name

02:54:32 18  instead.

02:54:33 19      Let's go back and forth and show that on the

02:54:36 20  screen so you can see.

02:54:38 21      That's the original.  Here is how they changed

02:54:41 22  it.

02:54:45 23      Now, we were able to obtain these confidential

02:54:49 24  documents through this litigation.  Gilead is required to

02:54:54 25  turn them over to us.  This is what the evidence is going to

02:54:58 1  show.  This is why at the end of the case I am going to come

02:55:01 2  back to you, I am going to respectfully ask that you return

02:55:04 3  a verdict in favor of Idenix and to award damages to us for

02:55:08 4  what they have done.

02:55:11 5          Now, let me just stop after that brief overview.

02:55:15 6  I want to introduce myself again and the name of my client.

02:55:19 7          We met during jury selection.  But let me tell

02:55:22 8  you my name again.  It's Stephanie Parker.  And I am so

02:55:26 9  proud to be here representing Idenix and the university.

02:55:29 10  Let's put that up, if we can.  These are the two plaintiffs:

02:55:33 11  Idenix and then the university in Italy.  Just like Judge

02:55:37 12  Stark did, I am going to call them together Idenix.  So when

02:55:41 13  I say Idenix, that is what I am referring to.

02:55:43 14          On behalf of Idenix, on behalf of our entire

02:55:46 15  trial team, I want to thank you for your service as jurors.

02:55:50 16  We appreciate the sacrifices that you are making to be here,

02:55:56 17  particularly as we are getting into this holiday season.

02:55:58 18  Thank you very much for that.  You have a very important

02:56:00 19  task to do here.

02:56:02 20          This is our opportunity to come to court and to

02:56:07 21  recover what they took from us wrongfully.

02:56:10 22          Now, I am going to spend my time with you this

02:56:13 23  afternoon talking to you about what the evidence will be

02:56:15 24  about the story of this patent, and the wrongdoing by the

02:56:21 25  other side.

02:56:22 1         So this is a patent case. As you heard on the

02:56:25 2 video, a patent is property. A patent is property the same

02:56:28 3 way that real estate is property or an automobile is

02:56:31 4 property. When somebody else uses your property, that's

02:56:35 5 wrong.

02:56:37 6         Idenix, that's us, we do not have to prove that

02:56:41 7 Gilead uses our patent. You are to assume that they

02:56:45 8 infringe our patent.

02:56:48 9         The issue for you is to decide whether what they

02:56:51 10 did was willful.

02:56:54 11         Since this is a patent lawsuit, let's start with

02:56:56 12 the patent. I am going to show it to you right now. This

02:56:58 13 is the actual patent. This is it. This is the red ribbon

02:57:02 14 on here. You see the gold seal. This is the patent at

02:57:05 15 issue in the case. You are going to have that. You will

02:57:08 16 see that during the trial. Let's put it up on the screen so

02:57:11 17 all of you can see it here.

02:57:14 18         The first page of the patent gives the basic

02:57:17 19 information about the case. Here, it names the two

02:57:23 20 inventors. So we could put that up. That is Dr. Sommadossi

02:57:27 21 and Dr. La Colla. Here are some photographs of the two of

02:57:32 22 them. These two scientists discovered that Hepatitis C

02:57:37 23 could be treated using a special class of compounds. You

02:57:41 24 are going to hear about that at trial.

02:57:45 25         They worked really hard to come up with this

idea.  Basically, what their invention does is it kills the Hepatitis C virus in the body and it kills the virus by preventing the virus from replicating itself.  That's the invention.

Before our invention, Hepatitis C treatment just didn't work that well and it had a lot of really horrible side effects.

Looking again at this patent, you will see the number for it is '597.  That's what Judge Stark referred to. You will hear during the trial talk about the '597 patent, and that's what this is.

So Idenix first filed the patent application with the United States Government, with the Patent Office, back in 2000.  At the time they filed it, it's confidential. It's not public yet.  And the Patent Office, just like they showed in the video, reviewed the application, they completed this rigorous review, and then they found that our patent application met the requirements.  So they issued the patent.  That's when it became an official patent.

Looking, again, on the screen, the title of the patent is called Methods and Compositions For Treating Hepatitis C Virus.

Our invention covers a way to treat Hepatitis C. It tells you how a certain class of compounds can be used to treat Hepatitis C.

Here is exactly what Idenix invented.  If we could put that up.

The critical part of it is what's shown in green.  And it's called 2'-methyl (up).  You are going to hear about that at trial.  That is the class of drugs that's involved in this case.  And that is what is taken by patients to treat Hepatitis C.

That green H3C, that's what 2'methyl (up) means.

Why are we here?  What is the evidence going to be about this patent and what happened?

Well, there is going to be a lot of evidence that you are going to hear at trial.  So what I am going to do is walk through it with you, so you will know what to expect, kind of give you a roadmap of what's coming.

Let's go back to these two inventors.  Again, this is Dr. Sommadossi.  Dr. Sommadossi is the person who started Idenix Pharmaceuticals.  He is one of the two inventors on the patent.  He is the one who started the company.

Now, back when he started the company, just like most pharmaceutical companies, he had something called a scientific advisory board, which is a group of scientists that helped him with the research ideas and with the company.  He asked several scientists to be on that scientific advisory board.  One of the scientists that he

invited to serve was his best friend, someone who is also a scientist. His name was Dr. Raymond Schinazi. Here is a photo of him.

These two gentlemen are key to the story about what happened here. Both of them are going to testify in this trial.

Now, Dr. Sommadossi and Dr. Schinazi were friends. There is no question about that at all.

Dr. Schinazi has his own company. Dr. Schinazi has his own company called Pharmasset. And Pharmasset was later sold to Gilead. And that's why Gilead is the defendant in this case.

Pharmasset was bought by Gilead for 11 billion dollars. And Dr. Schinazi, himself, received about 400 million dollars when he sold his company to Gilead.

Now, because of Dr. Schinazi's role in our company, in Idenix -- remember I said he was on the scientific advisory board -- well, that's not all he did. He was involved with founding the company. He was a paid consultant. Because of all of that, he had confidentiality agreements. Here is a letter that you are going to see at trial, where he acknowledges that he was an insider, and he was privileged to a large amount of confidential information.

In addition to his role, like I mentioned, on

03:02:55 1  the advise re board, he was also this paid consultant.  And

03:02:58 2  as a paid consultant, he also had a written agreement with

03:03:02 3  Idenix.  Let's put that up.  You are going to see this at

03:03:07 4  trial as well.

03:03:08 5      This confidentiality consulting agreement also

03:03:13 6  provided that he was receiving confidential information.

03:03:16 7  And he was required to keep it private.

03:03:19 8      In fact, if we could look at what's up there,

03:03:22 9  this is really important, Dr. Schinazi agrees that he is

03:03:26 10 getting confidential information from Idenix, and he agrees

03:03:31 11 that he cannot use it for any purpose other than for Idenix.

03:03:39 12      Dr. Sommadossi, who started Idenix, trusted his

03:03:43 13 best friend.  He trusted Dr. Schinazi.  Trust is important,

03:03:51 14 particularly in the pharmaceutical industry, where all these

03:03:54 15 profits are out there.  There is a lot of money at stake.

03:03:59 16      So in 2000, after Idenix submits its patent

03:04:05 17 application, but before it's public, so it's still

03:04:09 18 confidential, highly inside information, Idenix, Dr.

03:04:16 19 Sommadossi, the inventor, who is on the patent, Dr.

03:04:20 20 Sommadossi tells his best friend about his invention.

03:04:25 21      He tells him that information because he has a

03:04:27 22 confidentiality agreement with him and he is helping him

03:04:30 23 with his company.  So Dr. Schinazi tells this information to

03:04:35 24 Dr. Schinazi.

03:04:38 25      But Dr. Schinazi did not honor his commitments.

Dr. Schinazi betrayed the trust from Dr. Sommadossi and Idenix.

That brings us to why we are here today.

Dr. Schinazi gets this confidential information from Dr. Sommadossi at Idenix, and he turns around and he gives it to his own company for his own benefit.

Here is what you are going to hear at trial.

You are going to hear evidence at trial that Dr. Schinazi violated his confidentiality agreements, he betrayed the trust of Dr. Sommadossi. And he did it for his and his company's own financial benefit. You are going to hear at trial that this is going to come from Dr. Schinazi himself. You are going to hear Dr. Schinazi himself admit this.

Now, as part of this litigation, before we came to court, we were allowed to take depositions, what's called a deposition, of certain individuals. It's kind of like where you are here in Court. There is a court reporter who writes everything down. And there are lawyers present. And the witness is under oath, just like if the witness were up there on the witness stand.

In this deposition, Dr. Schinazi admits that Dr. Sommadossi gave him confidential information. And he also admits that he turned around, and he gave that information to the scientists at his own company.

He shared that confidential information with
scientists at his own company.

Here is what you will hear Dr. Schinazi say
under oath.

He admits that he had confidential information.
He admits that it was about this 2'-methyl (up) compound
that is the subject of these two drugs that are used to
treat Hepatitis C.

And then he admits that he gave that
confidential information to another scientist at his company
by the name of Dr. Watanabe.

Now, Dr. Watanabe is not a low-level employee.
Dr. Watanabe is the vice president at his company.  He is
the Vice President of Research and Development.

So Dr. Schinazi gets this confidential
information from his best friend at Idenix and he goes and
he takes it to the head of his own company's research and
development department.

And Dr. Schinazi tells his own scientists, his
vice president, he tells them keep this a secret because
this is inside confidential information.

You are also going to hear Dr. Schinazi admit
in his deposition that he did not know that this class of
compounds with this 2'-methyl up, he did not know that
this class of compounds could be used to treat hepatitis C

until Dr. Sommadossi told him about it.  He admitted he

didn't know it.  He found out about that information from

Dr. Sommadossi.  That is the invention that this case is

about.

So what happened next?

Well, so Dr. Sommadossi at Idenix gives the

confidential information to Dr. Schinazi, his best friend.

Dr. Schinazi in turn gives it to the vice president at his

company, Dr. Watanabe.

And what do they do?  Well, there is a document

that lays it all out.  This is one of those internal company

documents that we were able to obtain because of this

litigation.  So let's look at that.

You will see that he admits that he told the

vice president at Pharmasset, Dr. Watanabe, about this

confidential information.

And you are going hear that Dr. Watanabe in turn

tells another chemist there about that confidential

breakthrough invention.  And that scientist uses it.  He

acts on it, he uses it, and he makes the compound based on

the confidential information that the best friend got.

That chemist was named Dr. Hassan.  And remember

that name because that is a name that you are going to hear

Gilead claim Dr. Hassan came up with this idea all on his own.

Later on, another vice president at Pharmasset

also found out about this confidential information that is

from Idenix about this invention.  You are going to hear --

that his name is Dr. Stuyver.  You are going to hear that

Dr. Stuyver found out about it, and then he writes a memo.

He writes a memo to his boss, Dr. Schinazi again, telling

him about it.

This is a really important document so watch for

this one at trial.  This is an e-mail that this vice

president writes to the boss, again, the head of the

company, the one that is the best friend that has the

confidentiality agreement.  He finds out about it, and what

does he say to him?

You will see in this document that Idenix was

called Novirio.  That was the first name of the company, it

was Novirio, and then it became Idenix.  So he is going to

talk about Novirio in this document.

What is the vice president going to say?  He is

going to say:  I got a cold shower when I found out about

it.  That means he needed to calm down when he found out

about this confidential information from Idenix.

He said:  Nothing is left of our work.

He said:  We need to take a license for Novirio,

which is Idenix.

Now, license means that the person who owns the

patent allows someone else to use it, but they paid them for

it.  Pharmasset here never got a license from Idenix and they never paid us for using our information and our invention.

He also says:  I consider all of my work at this moment redundant.

This is one of those internal company documents that we obtained with discovery in this case.

And then he says, again, writing to Dr. Schinazi, the head of the company:  What is your opinion about the chemists work involving compounds that may eventually belong to Idenix?

So we asked him:  What is your opinion?

Well, we have Dr. Schinazi's response.  We have the e-mail he wrote back.  What does Dr. Schinazi say?

He writes back and he does not dispute that they are using the Idenix's work.  He doesn't write back and say, oh, no, you're wrong.  We're not working on Idenix.

He doesn't do that.  Instead, look at what he says.  He says:  Lieven -- that is Dr. Stuyver.  That is the vice president.  He says:  Relax, I have already worked out a plan.

Sleep well.  Be happy.

Dr. Stuyver, the vice president, writes back to him.  Dr. Stuyver writes back to him and he says:  I am sorry, but I am not relaxed, I did not sleep well, and I am not happy.

He said the moment of truth, the moment of truth is coming closer. And that is when that patent is going to be published and become public.

Today, this trial is that moment of truth.

He knew that the work he was doing and the work that Pharmasset was doing was worthless because he knew that they were copying the work that had been first done, the invention that was first found by Idenix, Dr. Sommadossi. He knew that.

And he knew that it was soon going to become public information, and the patent was published and became public.

Idenix got there first, and these documents prove that.

But that is not all. So the Idenix patent was published. It became public information and that happened in November of 2001.

Now, it still is owned by Idenix, but up until that time, the patent application was confidential with the Patent Office.

But then it publishes, and so the whole world can see that we have a patent, we have an application for a patent that everyone knows about.

So what else do we have?

Well, from the same period of time, way back,

03:13:41 1    this is before there is any lawsuit, we know that Pharmasset

03:13:46 2    publicly admitted to this invention by Idenix and by Dr.

03:13:52 3    Sommadossi and Dr. La Colla.

03:13:56 4             How do we know that?

03:13:58 5             Well, Pharmasset is doing its own research,

03:14:01 6    different types of research, and they go to the Federal

03:14:04 7    Government, and they ask the Federal Government for grant

03:14:07 8    money for their own research.

03:14:09 9             Now, when you go to the Federal Government and

03:14:11 10   you ask for grant money, you have to fill out applications.

03:14:14 11   And it is the Federal Government, so those applications have

03:14:18 12   to be filled out under penalty of perjury.  They're filled

03:14:22 13   out under oath.  You can go to jail if you put information

03:14:25 14   in there that is incorrect.

03:14:26 15            Pharmasset filled out applications to our

03:14:32 16   Federal Government trying to get grant money for their own

03:14:35 17   work.  What do they say in those grant applications?

03:14:40 18            You will see it right there.  They talk about

03:14:43 19   the recent discovery of a class of compounds with potent

03:14:50 20   anti-HCV, that is hepatitis C, activity.

03:14:54 21            And according to Pharmasset's admission, right

03:14:58 22   there, Pharmasset admits that that invention is made by

03:15:05 23   Dr. Sommadossi and Dr. La Colla in that Idenix patent.

03:15:11 24            And you will see they have a footnote there,

03:15:14 25   footnote 9.  That is where they cite to Dr. Sommadossi and

Dr. La Colla.

So when it meant getting money for themselves to do research, Pharmasset was all too happy to admit that this invention came from Dr. Sommadossi and Dr. La Colla, but when it comes time for us to pay us for using our work, they refused to do so.

Now, it's not just Pharmasset back there who is acknowledging publicly that this invention came from Idenix, Dr. Sommadossi and Dr. La Colla.

You are going to see at trial other articles written by other scientists that also recognize this invention by us.

Here is just one example. Here is an article from 2002; and you will see the title there is called Approaching a New Era For Hepatitis C Virus Therapy.

It talks about this novel -- that is the word it used -- this novel discovery. And it cites Dr. Sommadossi and Dr. La Colla. You see that right there on the screen.

But Pharmasset is still intentionally deliberately using the Idenix compounds. They are still talking about using the Idenix compounds in these internal meeting minutes like I showed you a few minutes ago.

So let me give you another example of what you are going to see at trial. Here is another set of these meeting minutes.

These meeting minutes have an overview about the work that they are doing at Pharmasset. And you will see that Dr. Watanabe -- remember, he is that first scientist that got the confidential information? The confidential information came from Idenix from Dr. Sommadossi to Dr. Schinazi. And Dr. Schinazi turned around and gave it to his own company, and the first person he gave it to was Dr. Watanabe.

Dr. Watanabe is talking about the overview of the work that they are doing at Pharmasset. And you will see that this focus over and over is on Idenix. It is on the Idenix compounds. It is on the Idenix sugars.

They're calling it that in their own official company documents, describing the work that they are doing.

And then you will see, at the bottom of this document, there is a reference to Jeremy. That is Jeremy Clark. And it says: Jeremy is working on a derivative of the Idenix compound.

Jeremy Clark is not working out there independent, nothing to do with Idenix. He is working on the Idenix compound. It says it right there in their official meeting minutes that we were able to get because of this lawsuit.

Now, let me stop for a minute and talk about Jeremy Clark and talk about his work. Now, Jeremy Clark did

make a compound. And they called it, Pharmasset called it

6130. You are going to hear about that at trial, but it

used the Idenix invention. It uses 2'-methyl up as a way to

treat hepatitis C, just like it showed on that document.

So let's go back and look again at what Dr.

Schinazi admitted under oath in his deposition in this case.

So he is talking about this information that he

provided to his own scientists and how it was important to

his own company when they were doing the work that they

worked on with hepatitis C.

You are going to see Dr. Schinazi admits that

he told Dr. Watanabe about the Idenix invention, this

2'-methyl up. And he also admits they had no knowledge,

they had no knowledge of it at that time. He only found

out about it because Dr. Sommadossi told him in confidence,

and he in turn went around and told the scientists at his

own company.

Jeremy Clark's work was based on this Idenix

breakthrough invention. And we know that. We know that

because they have admitted it.

Watch for this at trial. The chief scientific

officer at Pharmasset was deposed, and he testified under

oath, just like if he was on the witness stand here in the

courtroom. This is what he says.

He says, Jeremy Clark walked into his office.

So Jeremy Clark walked into his boss's office to tell him
about the work he was doing and to tell him about the
Compound 6130 he had been working on.

And what did he do?  What did he take in with
him.  What did he do when he went into his boss's office?
He took the application for this patent from Idenix.  He
took it in there to his boss and said, this is what I'm
working on.  That becomes Compound 6130.

Then remember that cold shower guy, Dr. Stuyver,
the one that said I found out about this and had to take a
cold shower?  Well, what do we know about him?  We have his
confidential laboratory notebooks.  We have his confidential
company documents.

And what do they show?

Well, on the right-hand side, there, circled in
red, that is the Idenix lead compound.  That is that lead
2'-methyl up compound.  And then Dr. Stuyver draws an arrow.
He draws an arrow.

And then what you see on the left there, that on
the left is the 6130 that their scientist worked on.  You
see it right there.  And the 6130 is what led to these two
drugs that are being sold and the subject of this lawsuit.

You can see it right there on the screen.  They
admit way back, before there is any lawsuit, in their
official company records, they are using our information,

right there with that arrow, to come up with their work.

But they are still using the word Idenix internally to describe what they are doing.

Here is another set of meeting minutes. This is from February. This other set of meeting minutes also says what they are working on is Idenix sugar.

But then Dr. Schinazi starting getting nervous. He knows what his company is doing. He knows he violated his confidential agreements. He knows what they are doing is wrong. What does he do?

Well, here is another internal company document.

He is writing, Dr. Schinazi is writing to Dr. Otto, his chief scientific officer. What does he say? He says, I am not sure we should show the Idenix compound. I would prefer if you deleted any data on that compound. He says, You have inside information. And it's signed by him, RFS, Raymond F. Schinazi, right there.

But that doesn't stop them from doing the work. They just start covering it up. Remember those meeting minutes that I went over at the very beginning. Let me go over those again and tell you about those in more detail now that you have this background.

So they are at another meeting of the chemistry department. And you see these meeting minutes that were taken, typed up as the official company record what they

were doing.  It says "Idenix" all over it.  But Dr. Schinazi has gotten nervous.  He doesn't want them to use the word Idenix anymore.

So he takes action.  And he writes an e-mail that he never thought he would see in this courtroom.  Dr. Schinazi e-mails his assistant Ann, and he says, "Avoid using Idenix sugar."

He said, instead call it by the chemical name. And so they doctored the minutes.  They revised the minutes. And here is the revised version that I showed you earlier. You can see right there what they did.

So Pharmasset had been working using the Idenix compound, and here he is rewriting history to cover that up. What started as a betrayal of his best friend has now turned into a coverup.  That is wrong, and that is why we are here.

Why would anybody do that?  Greed.  They knew that there was this potential for these enormous profits in the pharmaceutical industry for these drugs.  And that's what happened here.

So, ladies and gentlemen, at trial you are going to see this mountain of evidence in their own words showing that they wrongfully took and used our invention.

Now that you know about that background, I want to circle back and tell you a little bit more about the invention and the patent.

03:26:34 1    That brings us to the second important issue

03:26:37 2 that you are going to hear evidence about at trial.  That is

03:26:40 3 that Idenix's invention was groundbreaking.  Here are the

03:26:45 4 two inventors again.  There is Dr. Sommadossi and Dr.

03:26:51 5 LaColla.  Their invention was a way to treat Hepatitis C.

03:26:55 6    So what is Hepatitis C?  Well, it's a virus.

03:26:59 7 It's a virus that attacks your liver.  People can get that

03:27:04 8 virus from blood transfusions and syringes or tattoos.

03:27:12 9 Hepatitis C affects over 150 million people worldwide.

03:27:16 10    When it attacks your liver, it can cause

03:27:19 11 cirrhosis of the liver, it can cause liver cancer, and it

03:27:22 12 can cause death.  It is very serious.

03:27:25 13    This virus that causes Hepatitis C was first

03:27:30 14 identified in 1989.  So let's put that on the timeline

03:27:36 15 first.  Nine years later is when the company Idenix was

03:27:39 16 formed.

03:27:41 17    Dr. Sommadossi, who formed the company, and his

03:27:46 18 colleague in Italy, Dr. LaColla, were working together to

03:27:50 19 try to find a way to treat Hepatitis C.

03:27:53 20    And in early 2000, Dr. Sommadossi came up with

03:27:58 21 this extraordinary idea that a certain class of drugs that

03:28:01 22 had been used to treat cancer was also effective against

03:28:06 23 Hepatitis C.  That is the invention.  Dr. Sommadossi had

03:28:12 24 worked previously in cancer research.  He worked at the

03:28:15 25 National Cancer Institute, part of our federal government.

And he knew that there was this certain class of drugs that was active, meaning effective, against certain cancers.

That's when the light bulb went off for him. That's when he discovered that the Hepatitis C virus enzyme had a similar structure to the enzyme in these certain cancers. So he said, if this class of drugs is effective against this enzyme in these certain cancers, then it's also effective against the similar enzyme in Hepatitis C.

Nobody ever thought about that before. That was the breakthrough moment. That was the light bulb. That was the flash of genius here in this case. That was a new use of these compounds that had been used previously to treat cancer.

Yet Gilead will tell you that Dr. Sommadossi does not deserve this patent.

So Dr. Sommadossi and his colleague in Italy, Dr. LaColla, they start doing testing. They start analyzing compounds. And they confirmed, they confirmed that this compound with the 2'-methyl (up) worked.

The compound was called MD1. You are going to see these pages from Dr. LaColla's lab notebook. The date is there.

By the way, he is in Italy, so this is a European date. So it's March of 2000. And he confirmed in his laboratory notebook that this 2'-methyl (up), MD-1, was

active against Yellow Fever.  Yellow Fever is a virus from the same family of viruses as Hepatitis C.  So that indicated that this compound was effective against this family of viruses that included Hepatitis C.

That was the 2'-methyl (up).  That is the key to the whole thing.

Now, after they confirmed this in this laboratory notebook, they filed for patent application.  The patent application was filed in May of that year, May 23rd.  Remember that day, May 23rd.  That's why we have it up there with the yellow around it.  That's the date the patent application was first filed, to cover this invention.

For the next year or so, they continued to work on the invention.  And a year later they filed what's called a non-provisional patent application.  And then the patent actually published, meaning it became public, later on that year.  Shortly after that, Idenix became the first company that treated Hepatitis C in animals.  The Idenix compound, subject to this patent, successfully treated the human Hepatitis C in chimpanzees.

By the way, let me stop right here and just say, you will hear at trial that all pharmaceutical companies are required to do this animal testing before they can test in humans.

So after they had the successful animal testing,

03:31:43 1 Idenix is the first company that went to human clinical

03:31:48 2 trials to treat Hepatitis C using this special class of

03:31:53 3 compounds that included 2'-methyl (up). And then from 2003

03:31:58 4 forward, Idenix has continued to develop these compounds and

03:32:01 5 to enter them into clinical trials.

03:32:04 6         Now, this is important. You can have other

03:32:08 7 variations, but you have to have this 2'-methyl (up) to

03:32:14 8 treat Hepatitis C. That is the key. Whatever the variation

03:32:18 9 may be, it's got to have this invention. It's got to have

03:32:21 10 this 2'-methyl (up) in it. Otherwise, it's useless. It's

03:32:25 11 got to have that in there to be effective in treating

03:32:28 12 Hepatitis C.

03:32:31 13         That is the end of our timeline.

03:32:34 14         Now, these compounds that Idenix and others had

03:32:39 15 been working on, some of them never got out of the clinical

03:32:43 16 trials and into the market. But this case is about the

03:32:47 17 success of these two drugs that Gilead makes using this

03:32:54 18 invention with the 2'-methyl (up).

03:32:57 19         It's not about who gets to the market first.

03:32:59 20 It's about willful infringement. And the Gilead products

03:33:07 21 use the Idenix invention in two of their products that you

03:33:11 22 are going to hear about. Here they are. This is Sovaldi

03:33:14 23 and Harvoni. Those are the two drugs that they sold using

03:33:19 24 our invention. Sovaldi is the commercial name of something

03:33:23 25 called sofosbuvir and Harvoni is that compound plus one

other compound added to it.

Both of them used this patented invention because both of them contain 2'-methyl (up) to treat Hepatitis C.

Here is a drawing of this sofosbuvir. You will see right there that that is the 2'-methyl (up), right there, you can see it highlighted on the screen.

Remember, as Judge Stark instructed you in these preliminary instructions, infringement of the '597 patent is not an issue you are deciding in this case. And Idenix is not required to prove infringement at this trial. You are to assume that Gilead infringes this '597 patent, as you heard Judge Stark tell you.

When I finish my time talking to you, Gilead will have an opportunity to stand up and they will talk to you as well.

They are likely going to spend a lot of time talking to you about the success of these two products and everything that they did to improve them and to get them on the market.

But listen carefully about when their work began, because you will see that all of their work comes after the active compound, this 2'-methyl (up), after it was developed using our work. We were there in the beginning. We were first, our patent was first.

03:35:04 1          Gilead's story starts years later.

03:35:08 2          Before there was Sovaldi, before there was

03:35:11 3  Harvoni, before there was sofosbuvir, before there was this

03:35:14 4  Jeremy Clark, before there was anybody at Pharmasset or

03:35:18 5  anybody at Gilead doing this work, there was Dr. Sommadossi

03:35:22 6  and Professor LaColla working away, coming up with this

03:35:27 7  invention.

03:35:28 8          Our work, our patent application, came first.

03:35:32 9  They stood on our shoulders to develop these two drugs.

03:35:37 10          Now, we congratulate them for the work they have

03:35:41 11  done to make those drugs better for patients.  They took a

03:35:46 12  great invention and they made it better.  But the key in

03:35:50 13  this case is they took our invention.  And that is why we

03:35:54 14  are here.

03:35:55 15          You are going to hear, I believe, when you hear

03:35:58 16  from their lawyers, that they made certain improvements,

03:36:03 17  such as adding something called fluorine down and adding

03:36:06 18  something called prodrug.  And you can see that on there.

03:36:10 19  That's fine.  But that's irrelevant to this lawsuit.  Adding

03:36:14 20  elements on does not avoid infringement.  The key is, they

03:36:18 21  are still using our invention.

03:36:22 22          Those drugs would be meaningless without the

03:36:25 23  part that came from us.

03:36:27 24          So Gilead is caught with their hand in the

03:36:31 25  cookie jar.  I don't know exactly what they are going to say

when they stand up and talk to you. But I expect that they are going to try to avoid responsibility by claiming that this patent is not valid.

As you listen to them, though, please keep a few things in mind. Judge Stark gave you the preliminary instructions already. They have the burden of proof to prove that our patent is invalid. They have to prove it to you.

They have to prove it to you by something called clear and convincing evidence.

That is the very highest burden in any civil case. What it means, you heard from Judge Stark, evidence that produces an abiding conviction that the truth is highly probable. That's what they have to prove to you.

Second, keep in mind that the law presumes that patents are valid. All that that you saw on the video from the U.S. Patent Office, when you go through that process and the federal government issues a patent to you, it is presumed to be valid, unless and until they come in here and they bring this clear and convincing evidence to persuade you otherwise.

You watch that video about that rigorous process, that rigorous process applied to this patent as well.

You may hear from them that their drugs got FDA

03:38:04 1  approval first.  That's correct.  We don't dispute that.

03:38:08 2  But who gets FDA approval first is irrelevant.  It doesn't

03:38:15 3  matter who gets their product to the market first, because

03:38:18 4  there is no dispute, Gilead did.  Otherwise, we wouldn't

03:38:21 5  have a trial.

03:38:24 6  They may tell you, well, we have our own patent

03:38:27 7  from these two drugs.  That's true.  We don't dispute that.

03:38:30 8  It's kind of like cellphones you have with a product, a

03:38:33 9  product can have more than one patent on it.  The key,

03:38:36 10  though, is those two drugs, despite whatever else they have

03:38:40 11  done with them, they still use our invention that's covered

03:38:44 12  by this patent.

03:38:45 13  Now, some of you may remember, when we were

03:38:49 14  asking questions with Judge Stark in the juryroom and then

03:38:52 15  the questionnaire that you filled out, it asked about Merck.

03:38:56 16  So what is that going to be about?  I want to tell you so it

03:39:00 17  doesn't sound confusing during the trial.

03:39:02 18  Well, all during this whole period of time when

03:39:05 19  this betrayal happened, Idenix was a separate independent

03:39:09 20  company.  Back from 1999 when it was formed all the way

03:39:13 21  through the 2000s, actually until a couple of years ago,

03:39:17 22  Idenix was an independent company.  So Idenix is the proper

03:39:20 23  plaintiff.  Idenix is the correct one in this lawsuit.

03:39:23 24  But Merck purchased Idenix a couple of years

03:39:28 25  ago.  So you may hear about that at trial.  And Gilead may

03:39:32  1    try to argue that Merck was there before Idenix.  They are

03:39:39  2    just trying to rewrite history again.

03:39:41  3         You are going hear from the scientist at Merck

03:39:46  4    who was head of the whole Hepatitis C research program.  You

03:39:49  5    are going to hear him say, no, Idenix was first, they were

03:39:52  6    first, we were not.  And if anybody would know about that,

03:39:59  7    it would be him, because he was head of the whole Hepatitis

03:40:01  8    C research program at Merck.

03:40:03  9         Finally, when you are listening to Gilead come

03:40:06 10    up with all these excuses about why they think the patent is

03:40:11 11    invalid, keep this in mind.  Keep in mind what they were

03:40:16 12    thinking, what they were saying, what they were doing, back

03:40:19 13    before there was a lawsuit.

03:40:22 14         Back before there was a lawsuit, remember the

03:40:24 15    evidence in their own words, about Dr. Schinazi saying, he

03:40:29 16    didn't know anything about how this class of compounds could

03:40:32 17    be used to treat Hepatitis C.  He didn't know anything about

03:40:35 18    it until he found out about it from his best friend.  And

03:40:39 19    remember how Dr. Schinazi was so taken by this invention

03:40:42 20    that he violated his confidentiality agreements and gave

03:40:46 21    that information to scientists at his own company.  And

03:40:49 22    remember how that scientist reacted and wrote that e-mail to

03:40:52 23    him saying I had to take a cold shower.

03:40:56 24         Remember, he said nothing is left of our work.

03:40:58 25    He said, we need to take a license now from Idenix.  He

03:41:02 1   said, I consider all my efforts redundant.  Then he says, so

03:41:07 2   what are we going to do?  And Dr. Schinazi replies back and

03:41:11 3   says, "Sleep well.  Relax.  Be happy."

03:41:16 4       The scientist responded by saying the moment of

03:41:19 5   truth is coming closer.

03:41:21 6       Remember those grant applications they filled

03:41:24 7   out under oath, under penalty of perjury --

03:41:28 8       MR. SCHERKENBACH:  Your Honor, I am sorry to do

03:41:29 9   this.  But we are into pure argument now.  I object.

03:41:33 10      THE COURT:  Objection sustained.  Move on.

03:41:36 11      MS. PARKER:  Remember Jeremy Clark taking this

03:41:40 12  application for this patent, when he went in to explain the

03:41:44 13  work that he was doing.

03:41:48 14      With that background, I want to now talk to you

03:41:50 15  about the third issue, the other set of evidence that you

03:41:55 16  are going to hear in this case.  That has to do with

03:42:00 17  damages.  Gilead owes Idenix for using its groundbreaking

03:42:06 18  invention.

03:42:07 19      We are here because it's fundamentally unfair

03:42:10 20  for one company to use another company's product, to use

03:42:14 21  their patent.  We were in first.

03:42:17 22      What do you do?  You come to court and you file

03:42:19 23  a lawsuit like we have.  And awarding damages for taking

03:42:24 24  somebody else's property is part of our American judicial

03:42:28 25  system.  You are going to hear at trial that it is a bedrock

American value.  It is part of who we are as a nation.

And any damages in this case go to Idenix and to the university in Italy.

So how are you going to determine the right amount of damages in this case?  What is the evidence going to be about that?

Well, you are going to hear evidence about what is called a reasonable royalty.  And what that means is we're going to present evidence, we're going to ask you to award a percentage, a percentage of their total sales to us.

Now, Sovaldi and Harvoni are blockbuster drugs, they're wonderful treatments for hepatitis C, and you are going to hear that Gilead put a lot of work into developing them and getting them to the market.

We don't disagree with that.  But our patent, our work was there first.  It was there in the beginning, and because of that, we're not going to ask, we're not going to put on evidence for a 100 percent royalty rate.  We're not asking for 100 percent of their sales.  Instead, we're going to put on evidence about what is fair and what is reasonable.

And you are going to hear that in the evidence that in situations like this, where companies get a license from another company, what is a reasonable percentage is 10 percent.  That is all.

03:42:55 1         Now, you are going to hear evidence that in

03:42:57 2 similar situations, that percentage can go up as high as

03:43:01 3 18 percent.  And after you hear all the evidence in the

03:43:03 4 case, you may think 18 percent is right.  But we're going

03:43:06 5 to present evidence, and we're going to ask for only

03:43:08 6 10 percent.

03:43:10 7         So let's put up -- so if you think of it in

03:43:14 8 terms of a pie, remember, we were there in the beginning.

03:43:18 9 They did their work based on ours.  We were there first.

03:43:23 10 10 percent, the evidence will show that 10 percent is

03:43:25 11 reasonable, it's fair, and it will make things right.

03:43:29 12         But 10 percent of what, okay?

03:43:32 13         The 10 percent is a royalty, what is called a

03:43:35 14 royalty based on their sales.  None of those sales would

03:43:39 15 have happened if it had not been for our invention.  We were

03:43:43 16 the bedrock basis for those two drugs.

03:43:46 17         Now, Gilead has made a lot of money on these

03:43:50 18 two drugs.  In fact, the evidence will be that they made a

03:43:55 19 staggering amount of money.  But all of this traces back

03:43:58 20 to Dr. Schinazi violating the trust, violating the

03:44:02 21 confidentiality agreements from his best friend, taking this

03:44:06 22 information from Idenix into his own company and developing

03:44:12 23 the drugs based on that.

03:44:15 24         So if you go back to the pie chart, you will see

03:44:18 25 that the total sales that this percentage is based on is

03:44:23  1  $25.4 billion.  That is how much they have made just in the

03:44:29  2  United States since these two drugs have been sold.

03:44:32  3          So once you know the percentage, once you know

03:44:34  4  the evidence about the percentage, and once you know the

03:44:37  5  evidence about the base, all you have to do is do the math.

03:44:41  6  When you do the math, 10 percent is $2.54 billion.

03:44:48  7          Now, that is a lot of money, but 10 percent

03:44:51  8  is only a small piece of the pie of their sales.  And,

03:44:56  9  remember, you are going to hear evidence that their profit

03:44:59 10  margin is 98 to 99 percent.

03:45:04 11          So, ladies and gentlemen, after you hear all the

03:45:06 12  evidence, this case is going to come down to these three

03:45:10 13  simple truths.

03:45:11 14          Gilead wrongfully took our patented invention

03:45:15 15  and they used it without paying us.

03:45:18 16          Our invention is the bedrock basis of these two

03:45:22 17  drugs that Gilead sells that are used to treat hepatitis

03:45:26 18  consider.  And it is wrong for Gilead to profit from the

03:45:29 19  sale of these two drugs without paying us our fair and

03:45:32 20  reasonable share.

03:45:35 21          So at the end of the case, I'm going to come

03:45:37 22  back to you I'm going to respectfully ask you to fully

03:45:41 23  compensate Idenix for what Gilead has done.

03:45:44 24          Now, let me give you a little roadmap about what

03:45:47 25  is coming next in the trial.  So after I finish, the lawyer

for Gilead will have an opportunity to speak to you just like I did.  And when that finishes, we'll get to put on our case.  We'll get to call on our witnesses.

So our first witness is Dr. Sommadossi. Remember him?  He is the inventor, okay?

Dr. Sommadossi is going to come to the Court, he is going to take the witness stand, and he is going to testify and he is going to tell you about his invention.  He is going to tell you about this patented breakthrough.

And then the second witness is going to be the other inventor, Dr. La Colla.

Now, Dr. LaColla is going to testify by videotaped deposition.  He is in Italy and he speaks Italian, so there is a translator on the videotape so you will be able to understand what he is saying.  He will be our second witness.  So we'll put up the two inventors first.

And then our third witness is going to be Dr. Schinazi.  Now, I can't force him to be here so we're going to have to play that videotape deposition of him under oath that I told you about.  And you will get to see Dr. Schinazi testifying under oath all these things that I have been going over with you this afternoon.

Watch his demeanor on that videotape because that is part of the evidence.

03:47:10  1          MR. SCHERKENBACH:  Your Honor, I object to the

03:47:11  2   argument.

03:47:11  3          THE COURT:  Sustained.  Move on.

03:47:14  4          MS. PARKER:  I'd like to leave you with one

03:47:16  5   final thought this afternoon.  Remember that Pharmasset

03:47:21  6   scientist wrote the memo that said the moment of truth is

03:47:24  7   here?  We ask you when you listen to the evidence, use your

03:47:28  8   common sense and do what is fair and return a verdict in

03:47:32  9   favor of Idenix.

03:47:33 10          Ladies and gentlemen, I want to thank you so

03:47:37 11   much for your attention this afternoon.  I very much

03:47:40 12   appreciate it and we look forward to presenting our case to

03:47:42 13   you.  Thank you very much.

03:47:43 14          Your Honor, thank you.

03:47:44 15          THE COURT:  Thank you.  We'll give you, ladies

03:47:46 16   and gentlemen of the jury, a short break.  At this point

03:47:48 17   during your break, no talking about the case.  We're going

03:47:52 18   to try to keep it to about five to ten minutes tops so we

03:47:56 19   can get you back here shortly.

03:47:57 20          But with that, we'll give you a short break.

03:48:00 21          (Jury left courtroom.)

03:48:27 22          THE COURT:  You can have a seat, if you wish.

03:48:29 23          Mr. Scherkenbach, I assume it's still your

03:48:32 24   desire to get started on your opening?

03:48:34 25          MR. SCHERKENBACH:  Yes.

03:48:35 1     THE COURT:  Okay.

03:48:35 2     MR. SCHERKENBACH:  Yes.  I'll try to get to it a

03:48:38 3 sensible breaking point and finish up the morning.

03:48:41 4     THE COURT:  All right.  Do plaintiffs have

03:48:42 5 anything they want to say about that?

03:48:44 6     MS. PARKER:  I don't know any other way we can

03:48:47 7 do it.

03:48:47 8     THE COURT:  All right.  Well, we'll take a

03:48:48 9 recess.  I will tell the jury that we will finish at 4:30

03:48:52 10 and so do look as best as you can for a breaking point

03:48:56 11 around there.  Otherwise, I'll have to stop you.

03:48:58 12     MR. SCHERKENBACH:  Will do.

03:48:58 13     THE COURT:  All right.  We'll take a recess.

03:49:21 14     (Brief recess taken.)

03:49:21 15     *     *     *

03:58:08 16     (Proceedings reconvened after recess.)

03:58:08 17     THE COURT:  Bring the jury back.

03:58:49 18     (Jury returned.)

03:59:14 19     THE COURT:  All right.  Ladies and gentlemen,

03:59:15 20 welcome back.  We are ready to proceed.  We'll hear opening

03:59:19 21 statements from Gilead.

03:59:22 22     As I told you, we're going to finish at 4:30

03:59:25 23 today, and we will finish at 4:30 today.  I don't expect

03:59:28 24 Gilead will be done with its opening by then, but we will,

03:59:32 25 rest assuredly, be stopping at that point.

03:59:35 1        Mr. Scherkenbach.

03:59:35 2        MR. SCHERKENBACH:  Thank you, Your Honor.

03:59:38 3        Ladies and gentlemen, good afternoon.  My name

03:59:40 4  is Frank Scherkenbach.  And together with my colleagues,

03:59:45 5  Juanita Brooks, Martina Hufnal and some other people you

03:59:49 6  will be hearing from throughout the course of the trial, we

03:59:51 7  could not be more proud to represent a company than Gilead

03:59:56 8  Sciences, the company that actually cured hepatitis C.

04:00:01 9        You were just told a story, and it may have

04:00:07 10 sounded like a pretty good story by counsel for Idenix.  But

04:00:11 11 you need to keep in mind there are two sides to every story.

04:00:15 12 Just as you know from your own personal experience, there is

04:00:18 13 more than one side to a story.  There is more than one side

04:00:22 14 to this story.  And your job in this case is to figure out

04:00:27 15 whether any of the story you were just told is true and

04:00:32 16 whether it actually means Idenix is entitled to $2

04:00:37 17 and-a-half billion that they're asking for.

04:00:41 18       What lawyers say in opening statement is not

04:00:43 19 evidence.  It's argument.  You need to look at the actual

04:00:48 20 evidence, and we're going to show you the actual evidence

04:00:52 21 and we're going to ask you, as Judge Stark told you in the

04:00:55 22 preliminary instructions, to wait until you see and hear all

04:00:59 23 the evidence before you actually make your mind up.

04:01:04 24       Keep an open mind until you hear all the

04:01:06 25 evidence.  And when you do, we believe you are going to

04:01:11 1  conclude that Gilead took nothing from Idenix.  That these

04:01:19 2  lifesaving drugs that are on the market today developed by

04:01:21 3  Gilead, sold by Gilead, are not the result of taking

04:01:25 4  anything from Idenix.

04:01:29 5          Now, listening to counsel's opening -- can I

04:01:34 6  have the Elmo, please? -- it occurred to me that there are

04:01:40 7  two words that can sum up a lot of the differences between

04:01:46 8  us in this case.  Two words.

04:01:53 9          (Mr. Scherkenbach writes on Elmo in capital

04:01:53 10 letters:  "NOT ONCE.")

04:01:58 11         MR. SCHERKENBACH:  Not once.

04:02:00 12         What do I mean by that, not once?

04:02:06 13         Not once did the scientists who actually

04:02:10 14 developed these medicines take anything from Idenix.

04:02:13 15         And I don't expect you to take my word for that,

04:02:15 16 just as I expect that you won't take counsel's word for the

04:02:18 17 arguments that she made.

04:02:20 18         We're going to bring you the scientists.  You

04:02:24 19 can listen to their testimony directly.  You can make up

04:02:27 20 your own mind.

04:02:29 21         We're going to present you with the actual

04:02:31 22 witnesses who did the work, and they can be asked the

04:02:35 23 questions:  Did you do something wrong?  Did you take

04:02:38 24 something you shouldn't have taken?  What is it that you

04:02:41 25 actually did?  How did we get the cure to hepatitis C?  And

04:02:45 1    did it actually begin with Idenix?

04:02:49 2              Who are you going hear from?  You are going to

04:02:52 3    hear from Dr. Suguna Rachakonda.  Dr. Rachakonda, can you

04:02:57 4    stand up?

04:02:57 5              (Dr. Rachakonda stands up.)

04:02:58 6              MR. SCHERKENBACH:  She is here.  She just sat

04:02:59 7    through that and heard her and her colleagues basically

04:03:02 8    accused of stealing.  And she is going to have something to

04:03:05 9    say about that.

04:03:07 10             Suguna was part of the Pharmasset team that

04:03:12 11   developed the critical compound that led to the cure to

04:03:16 12   hepatitis C, this 2'-methyl fluoro compound called PSI 6130.

04:03:24 13             Not an Idenix compound, as you will see and the

04:03:27 14   evidence will show, it was a Pharmasset compound.

04:03:31 15             We're going to bring you Jeremy Clark by video

04:03:37 16   who is the person who actually first conceived of and made

04:03:44 17   this critical nucleoside compound that led to the cure for

04:03:47 18   hepatitis C.

04:03:48 19             Now, counsel mentioned that you are going to be

04:03:53 20   seeing other patents in this case.  You are going to be

04:03:55 21   seeing other patents, lots of patents, because as you are

04:03:59 22   going to see, Idenix is far from the only company in this

04:04:04 23   space that has been recognized for its work.  Okay?

04:04:08 24             Jeremy Clark, I'm holding here the '572 patent.

04:04:11 25   This is DX-7, one of his patents on the compound that he

04:04:16 1    developed.  All right?

04:04:20 2            And you are going to hear -- so that is No. 2.

04:04:24 3    You are going to hear from Dr. Mike Otto.  Dr. Mike Otto

04:04:29 4    couldn't be here live today but he will be here live during

04:04:32 5    the trial to take the stand and to answer any questions, any

04:04:37 6    questions Idenix wants to ask him about taking and misusing

04:04:41 7    something.

04:04:45 8            Wait for it.  Listen to his answers.  Make up

04:04:49 9    your own mind.

04:04:49 10            Dr. Otto supervised the effort at Pharmasset to

04:04:53 11    come up with this critical compound, this PSI 6130 compound.

04:05:00 12    And you are going to hear him say he wanted to be absolutely

04:05:04 13    sure that it was not something Idenix was already working

04:05:08 14    on, and it was not something any other company was working

04:05:12 15    on.  That is going to be his testimony.

04:05:15 16            Now, don't take my word for it.  And you may not

04:05:17 17    believe him.  But he is going to take the stand and say

04:05:21 18    that, and you need to make up your own mind.  And,

04:05:25 19            Finally, on the issue of the core invention.

04:05:29 20    How do we get from what Pharmasset did with this compound

04:05:32 21    that they came up with to the cure?  That is where

04:05:37 22    Dr. Michael Sofia comes in.

04:05:38 23            Dr. Sofia I believe is here.

04:05:41 24            (Dr. Sofia stands up.)

04:05:44 25            MR. SCHERKENBACH:  Dr. Sofia took this compound

04:05:47 1  that Pharmasset created in the lab and that had tremendous

04:05:54 2  promise in the lab and that they thought would lead to a

04:05:57 3  cure in hepatitis C and he actually made it a cure, and he

04:06:00 4  is going to testify live.  And he is going to take that

04:06:05 5  stand and he is going to invite Idenix to ask him all the

04:06:10 6  questions they want about whether he took something, about

04:06:16 7  whether he misused something.

04:06:19 8      And as you will see, and I will show you a bit

04:06:23 9  later in my presentation, in the scientific community, that

04:06:30 10  is the man who is credited with curing hepatitis C.  And he

04:06:38 11  has the awards to prove it and the recognition to prove it.

04:06:42 12      It is not Idenix.  It is not Dr. Sommadossi at

04:06:46 13  Idenix, it is Dr. Michael Sofia.

04:06:54 14      We need to go back to the Elmo, please.

04:06:54 15      (Elmo settings adjusted.)

04:06:58 16      MR. SCHERKENBACH:  Thank you.

04:06:58 17      So what else not once?  What else will you not

04:07:04 18  once hear?

04:07:07 19      Well, in the many years between the time Idenix

04:07:11 20  first knew about the ingredient in these drugs, it's called

04:07:19 21  sofosbuvir.  It's a mouthful.  It has taken me awhile to

04:07:22 22  figure out how to say it.  We'll show you the spelling and

04:07:26 23  we'll all be able to hopefully say it for you.  It's been

04:07:30 24  years since Idenix knew all about that drug.

04:07:34 25      And as you will hear and the evidence will show,

04:07:37 1   this case was filed in 2013 and not once in all that time

04:07:45 2   did Idenix ever suggest that these products were its

04:07:52 3   invention.  Not once.

04:07:57 4          Not once in all that time, and, in fact, going

04:07:59 5   all the way back to the year 2000, the evidence will show,

04:08:03 6   when allegedly Dr. Schinazi misappropriated information from

04:08:09 7   Dr. Sommadossi, did these wrong things with the information,

04:08:15 8   that was 2000-2001 time frame, 15 years ago, the evidence

04:08:22 9   will show not once in the intervening 15 years, until this

04:08:28 10  lawsuit was filed, did Idenix ever say anyone had ever done

04:08:33 11  anything wrong.

04:08:35 12         You were shown agreements with confidentiality

04:08:38 13  clauses.  Not once was there ever a charge made of any

04:08:43 14  breach of confidentiality, any misuse of confidential

04:08:47 15  information.

04:08:49 16         Now, you might have thought, listening to the

04:08:59 17  opening for Idenix, that this case is about who got to

04:09:03 18  market first.  Right?

04:09:08 19         Counsel was careful to say, well, we acknowledge

04:09:11 20  Gilead got to market first.  Actually, you are going to hear

04:09:17 21  the evidence, and it is going to be undisputed, Idenix never

04:09:21 22  got a drug to market.  Not once since they allegedly came up

04:09:27 23  with their ground breaking invention have they brought to

04:09:30 24  market a drug that cures anybody.

04:09:34 25         And, in fact, you are going to hear that what

they thought they invented, which is very different than what Pharmasset and Gilead admitted, ended up being shut down by the FDA.

And, finally, not once. This is a patent case. Not the most exciting case probably ever, but it is a patent case and, fundamentally, as you will see, the issues you are going to be asked to decide are about Idenix's patent and what is in their patent and what is not in their patent. Okay? And you were shown by counsel the cover, and that's it.

I'm going to walk through with you the parts of the patent, the inside of the patent. What is actually in here, what is actually not in here.

And in particular, does this patent actually disclose what Idenix says the invention is? Does it disclose the compound that Gilead uses in its drugs?

One other thing on "not once," and then I will move on.

Idenix, the evidence will show, tried, tried, to make the key compound that is in Gilead's drugs. They tried, for years. And they could not do it, couldn't make it, for a period of over three years. I will show you the evidence on this. And not once could they make it, until they saw Jeremy Clark's patent. When Jeremy Clark's patent published, you will see, Idenix was able finally to read it

and to learn for the first time how to make the compound that actually led to the cure.

Now, I mentioned, we are going to bring the witnesses. We really do hope that you wait for their testimony and listen to their testimony and make your own judgments.

Counsel put up a lot of documents. Another thing that you have to be aware of in these cases is the difference between evidence and argument. What do the documents actually show versus what they are represented to you to show.

I wanted to put up a couple of examples that were used in Idenix's opening. There we go. This is from their Slide 38. You were shown what looks like a couple of sentences from this Exhibit PX-677. It turns out, if you look at the actual document -- and you will have these in evidence. Once these are admitted into evidence, you will have them. You can look at them.

Just as an example, you were shown this first portion here, for the record here are the facts. Kyo Watanabe was told by me in confidence about the 2'-methyl derivatives, period.

That's what's on the slide.

The actual document, the yellow, the yellow is what's on the slide. The green is the rest of the story.

04:15:24 1         The slide, the part there for the record, here

04:15:27 2  are the facts.

04:15:29 3         "Kyo Watanabe was told by me in confidence about

04:15:32 4  the 2'-methyl derivatives in order for him not to waste his

04:15:36 5  time making them because of a patent conflict with Idenix."

04:15:39 6         This is something you will hear and see a lot of

04:15:42 7  evidence on, that absolutely Pharmasset knew that Schinazi

04:15:49 8  knew what Idenix was working on, absolutely, and just as

04:15:54 9  absolutely, the evidence will show, did something else.

04:16:01 10         So you have to be very careful about slides and

04:16:11 11  things put up on the screen, as opposed to the actual

04:16:17 12  evidence and the actual documents.

04:16:20 13         Now, there are a lot of examples of this.  We

04:16:27 14  are going to have the witnesses throughout the trial

04:16:31 15  actually show you the documents and actually address the

04:16:35 16  documents.  I just want to do one more.

04:16:38 17         Here is a slide that was used, Slide 41, from

04:16:44 18  Exhibit 470.  And it looks like, again, quotes, are those

04:17:00 19  quotes from a document?

04:17:03 20         Well, a lot of missing information there.

04:17:09 21  Right?  You got to ask yourself, why would that be?

04:17:15 22         Well, on this one, let's look at the actual

04:17:21 23  document in a few respects.  Again, the yellow is what's on

04:17:29 24  their slide.  And the green is the rest of the story.  The

04:17:34 25  "cold shower," remember the "cold shower" statement.

"In Sherry's office" -- you are going to hear about, this is a reference to Sherry Knowles, who was a patent lawyer involved in many of the events that are going to be relevant here -- "when she disclosed in general terms (no details) the basics of the Novirio patent."

No details, general terms, Idenix was filing a patent.

Now -- I say one more. Never believe a lawyer when he says one more. I do have one more I want to show you.

This comes from PX-470. This is their Slide 42. "Lieven, relax. I have already worked out a plan today.

"Sleep well. Be happy."

Then counsel showed you a followup to this before Dr. Stuyver said, well, I don't think I am going to be sleeping very well. Sounds very sinister.

What does the actual document say? This is PX-470. Again, yellow is what's on the slide. Green is the rest of the story. Now, this one, they picked out this little piece and put it on the slide. The rest of the story is, Dr. Schinazi saying, "JPS" -- that's Dr. Sommadossi. The evidence will show he often goes by his initials, JPS.

"JPS and Sherry" -- this is Ms. Knowles, the patent lawyer -- "have agreed to the terms in general. Please worry more about the science. Your efforts are not

wasted."

One of the other things you are going to hear a lot about in this case, you are going to see, and Dr. Sommadossi is going to talk about it on the stand, both of these companies knew what the other was doing. They were, as counsel pointed out, absolutely true.

The evidence will show, Dr. Sommadossi and Dr. Schinazi were close friends. They were scientific collaborators. They co-founded one another's companies. They sat on one another's boards. And they knew exactly what one another were working on. And they had a plan, and they had an agreement. And again, as the evidence will show, until this lawsuit got filed, nobody ever said there was anything wrong with that.

All right. Now, can we go to the slides.

So you are going to hear quite a bit about Hepatitis C. What is it? How bad is it? How do you get it? How do you treat it? How difficult was it to come up with a cure for Hepatitis C?

Again, we are going to bring you the witnesses who are going to talk about that firsthand, because they cured it. And it is one in particular, you will hear, was a tremendous advance over the prior treatment, which really didn't work very well at all. Most people actually couldn't tolerate the prior treatment with injections and massive

numbers of pills every day, over a long period of time, often as long as a year.  It made you feel horrible.  People stopped the treatment.  They would rather live with Hepatitis C than endure the treatment that used to exist, until Gilead came along.

Today, you take a pill once a day for three months, and you are cured.  The virus, it actually cures you of the virus.  It's not a treatment.  It's not a vaccine to prevent you from getting it.  It's not a treatment to help you live with it.  It's a cure.

Now, Gilead, I don't know whether any of you would have heard of Gilead before you came here today.  It is a leading antiviral company based in California, actually, initially, the evidence will show, the leading company in the HIV space.  They have a number of treatments on the market for HIV, and have for many years, and are very well known in that space.

And they branched out into Hepatitis C.  They did some of their own research in Hepatitis C.  You will hear about that.  But they also recognized that there were other companies that had some really good drugs, too.

And so they acquired Pharmasset.  They looked around, the evidence is going to show, this is undisputed, they went out and they looked for a company that had the best, the most promising drug.  And they looked at Idenix,

04:23:44  1   who had a different drug, and they looked at Pharmasset, and

04:23:47  2   they looked at some other companies.  And they bought

04:23:50  3   Pharmasset.  They chose not to buy Idenix.  They bought

04:23:55  4   Pharmasset.

04:23:56  5           And then they invested a lot of money to get

04:24:01  6   these to market.

04:24:02  7           Now, there were a lot of big numbers thrown

04:24:04  8   around here and there are some big numbers involved, no

04:24:07  9   question about it.  Hepatitis C affects over 170 million

04:24:12 10   people worldwide.  It is an enormous problem worldwide.

04:24:18 11   There are an enormous number of people who need these drugs.

04:24:22 12   And it is a testament, you will hear, to the success of

04:24:28 13   Gilead's efforts that these drugs have been so incredibly

04:24:32 14   successful.

04:24:32 15           So there are some big numbers.

04:24:34 16           But there is also big numbers involved, as you

04:24:37 17   will hear, in the investment required to bring these drugs

04:24:40 18   to market.  It costs billions of dollars to bring these

04:24:44 19   drugs to market.

04:24:45 20           Gilead is going to be represented throughout

04:24:47 21   this trial by Jim Meyers.

04:24:49 22           Mr. Meyers, can you stand up, please?

04:24:50 23           Mr. Meyers is the executive vice president of

04:24:52 24   worldwide commercial operations for Gilead.

04:24:56 25           Thank you, Mr. Meyers.

He is going to testify in this case toward the end of our case. He will tell you about Gilead, and talk about some of the investments that Gilead made and how it was, actually, that these drugs got to market from a commercial perspective.

Now, let me leave you with this timeline, and we will conclude here on time.

I am going to show you tomorrow what led to the cure, what actually did, who did what when, what information did they have, what information did they actually use, the scientists who actually did the work.

This is a little summary. And you are going to see, I already mentioned, most of these folks, but not all, Dr. Rachakonda, you are also going hear from a person named Dr. Hassan. He won't be here in person. But you will either see him by video or hear his deposition testimony. He is actually a professor in Egypt. They will explain to you why and how did they first start working on nucleosides with the with a 2'-methyl (up)? Why was that? Where did it come from? Did it come from Idenix or not?

They will explain to you where the fluorine down comes from. And you will hear -- I think counsel said during her opening, that's just, these made a few changes. You are going to hear that that change was enormously important for actually curing the disease.

You are going to hear from Jeremy Clark about how he actually, with knowledge of what his colleagues were doing and other insights he had, why and how he put the pieces together to come up with this critical compound, that ultimately led to the cure, in the hands of Dr. Sofia and his colleagues. And Dr. Sofia took this promising compound in the lab and made it actually work in a patient, in a human. It turns out, as you will hear, especially from Dr. Sofia that is an extremely, extremely difficult thing to do.

And finally, Dr. McHutchison -- I believe he is here.

Dr. McHutchison, would you stand up, please.

Dr. McHutchison is the person at Gilead who headed the effort when Gilead was looking around at what was the best technology in the field to acquire, looking at Idenix, looking at Pharmasset, looking at other companies. And he will talk about that. What information was out there? What information was known? What was Idenix doing? What were their compounds like? Did they have an invention? Did they have a good drug or not?

So I think with that , Your Honor, I will, with your permission, end for the day.

THE COURT: That is fine. Thank you. We will pick up there tomorrow morning.

Ladies and gentlemen, before we let you go for

04:28:30  1    the evening, just a few words.  Tomorrow we will start at

04:28:34  2    9:00 a.m.  As I had indicated, we are able to order lunch

04:28:40  3    for you and provide you lunch.  In order to do that I need

04:28:43  4    to ask you to get here a few minutes before 9.  We will have

04:28:47  5    some menus waiting for you and you can tell us what your

04:28:49  6    order is and we can take care of having what you want when

04:28:52  7    we get to your lunch break.

04:28:54  8         As you also heard me say, and will hear me say

04:28:58  9    repeatedly, while you are away from us, please don't talk to

04:29:01 10    anybody about the case.  Do not do any research or try to

04:29:04 11    find out anything about the case.

04:29:07 12         And tomorrow we are going to finish at 4:30,

04:29:11 13    just as we are finishing today at 4:30.

04:29:14 14         That is all I have for you.

04:29:16 15         Have a good evening, and we will look for you

04:29:19 16    tomorrow morning.

04:29:22 17              (Jury leaves courtroom at 4:29 p.m.)

04:29:45 18              THE COURT:  You cab all have a seat.

04:29:48 19         There were some of the deposition disputes at

04:29:54 20    least on which one side wanted to present argument.  Is that

04:29:57 21    still the position?  I think it was Gilead wanted argument.

04:30:00 22    Is that still the case?

04:30:04 23              MR. SCHERKENBACH:  It is, Your Honor.  May I

04:30:07 24    have a moment to orient myself?

04:30:09 25              THE COURT:  Sure.

04:30:10 1          MR. SCHERKENBACH:  We also have one issue for

04:30:12 2   Dr. Sommadossi, who almost certainly will go on tomorrow.

04:30:17 3          THE COURT:  That is fine.

04:29:29 4          MR. SCHERKENBACH:  So on Dr. Schinazi, we talked

04:29:38 5   about, and just with reference to the letter Your Honor has,

04:29:41 6   I think the December 4th letter, yesterday, I believe we

04:29:47 7   dealt with Issue No. 1 and Issue No. 2 more or less this

04:29:55 8   morning.  I mean that is the same substantive issue, whether

04:30:01 9   the designations were untimely and so on and so forth for

04:30:06 10  the evidence about Pharmasset communicating things to

04:30:10 11  Idenix.  So I think that one has been taken care of.

04:30:13 12         It's Issue 3 is the one that is still I think to

04:30:16 13  come.  And this has to do with the portion -- Your Honor may

04:30:24 14  remember even back at the pretrial conference the parties

04:30:26 15  flagged this one -- whether Idenix can use some either

04:30:32 16  reference to the civil tax fraud matter with respect to

04:30:40 17  Dr. Schinazi and/or the documents relating to the civil tax

04:30:44 18  fraud matter.

04:30:44 19         It's our position that they cannot for the

04:30:49 20  reasons explained in the letter.  I just wanted to elaborate

04:30:53 21  on that for a moment, if I can.

04:30:56 22         And Your Honor actually has an opinion on this

04:30:58 23  that is related to this; I should say that you wrote as

04:31:02 24  well.

04:31:03 25         It turns on the interpretation of Federal Rule

04:31:07 1    of Evidence 608(b).  And I think it is relatively clear

04:31:13 2    the rules of the road are this:  A witness can be asked

04:31:17 3    about allegedly prior instances of untruthfulness on

04:31:23 4    cross-examination when testifying live.  That is what the

04:31:29 5    rule allows, that is how the cases interpret the rule, but

04:31:33 6    then whatever the answer is it is.

04:31:36 7            And evidence, extrinsic evidence of allegedly

04:31:39 8    unspecific untruthful acts cannot be introduced.  It is a

04:31:45 9    balancing.  That policy has been struck in the rules.  The

04:31:49 10   courts had talked about that.

04:31:53 11           And so in this case, they are not able to do

04:31:59 12   that obviously with Dr. Schinazi.

04:32:01 13           I wanted to say a word about -- because they

04:32:03 14   cited some cases have been cited to Your Honor.  The *Carter*

04:32:11 15   case.  They cite the *Carter* case in their portion of the

04:32:14 16   papers here.  That is completely consistent with that

04:32:19 17   general rule because in the *Carter* case, the witness was

04:32:23 18   testifying live in court and the issue was what they could

04:32:27 19   be asked on cross-examination.  So I don't think that helps

04:32:34 20   them.

04:32:34 21           And I wanted to make one other observation in

04:32:37 22   response to their cite to *Carter* and that is cross-examination

04:32:43 23   within the meaning of Rule 608 has been interpreted to mean in

04:32:48 24   court testimony.  Okay?

04:32:52 25           Because some people have tried to argue before,

well, what about cross in some prior deposition somewhere?

Is that within the scope of the rule?  And the answer is no,

and you can give you a citation on that.  There is a case,

just one moment here.  It is the *Balsam* case, *US v Balsam*.

It is a First Circuit case, but it is sort of I

think one of the leading cases.  It is 203 F.3d 72, and

particular at footnote 18, and they cite some other

authorities in that footnote for that proposition.

THE COURT:  So that issue 3 with respect to

Dr. Schinazi?

MR. SCHERKENBACH:  Yes.

THE COURT:  Do you want or does your side want

to present argument with respect to any of the other three

witnesses whose depositions are at issue?  Because I think

at least one may be raised similar issues.

MR. SCHERKENBACH:  I don't -- can I confer for

one moment?

THE COURT:  Absolutely.

(Counsel confer.)

MR. HEADLEY:  Your Honor, while they are

conferring, I can confirm that the Sommadossi objections

have been resolved for the record with opposing counsel.

There had been objections to the use of PX-181, PX-729,

and four of the slides we received from Idenix that were

originally numbers 3, 8, 13, and 20 that had referenced

04:34:24 1   those documents.  Those have all been withdrawn and will not

04:34:27 2   be used with Dr. Sommadossi.

04:34:29 3           THE COURT:  Can you confirm that?

04:34:30 4           MR. GRIFFITH:  That's correct, Your Honor.

04:34:31 5           THE COURT:  Now, Sommadossi is not one of the

04:34:33 6   witnesses for whom I have four pending letters with

04:34:36 7   objections; correct?

04:34:37 8           MR. HEADLEY:  Correct.  I just wanted to clear

04:34:41 9   it up, since we raise so many names for Your Honor, while my

04:34:42 10  colleagues were conferring briefly, about the letters we

04:34:45 11  have.

04:34:45 12          THE COURT:  I won't worry about Sommadossi then.

04:34:47 13  Thank you for that.

04:34:48 14          MR. HEADLEY:  Thank you.

04:34:49 15          MR. SCHERKENBACH:  Your Honor, for Mr. Price,

04:34:52 16  there is one issue we would like to address live, and

04:34:54 17  Mr. Warden will do that.

04:34:56 18          THE COURT:  Mr. Warden, am I correct it is

04:34:58 19  somewhat related to the what I heard from Mr. Scherkenbach?

04:35:00 20          MR. WARDEN:  I think there are several ways it

04:35:03 21  is related both factually and legally.

04:35:04 22          THE COURT:  Let me hear that and we will turn to

04:35:07 23  Idenix to respond.

04:35:08 24          MR. WARDEN:  The primary issue with respect to

04:35:10 25  Mr. Price -- excuse me, Your Honor -- is that the Idenix has

designated testimony related to a memo that Mr. Price wrote when he was the CEO of Pharmasset specifying some reasons why he was recommending that the Board ask Mr. Schinazi to resign from the Board of Directors.

And just to start with the exhibit itself before I get into the deposition testimony.

The exhibit is inadmissible for much of the same reasons that Mr. Scherkenbach just said. It is not permissible under Rule 608(b) for Idenix to introduce extrinsic evidence in the form of this memo to try to attack Mr. Schinazi's character for truthfulness or untruthfulness, which is our understanding of the purpose of their designations of his testimony.

Similarly, the related deposition testimony is not permissible under Rule 608(b) both because as Mr. Scherkenbach noted, the cases say 608(b) applies when there is live cross-examination, it doesn't come into effect with there are depositions, but also because the specific provision of 608(b) that they're trying to invoke is 608(b)(2) which basically says Mr. Price can be asked on cross-examination about specific instances of conduct related to Dr. Schinazi's character only if he first testified about Dr. Schinazi's character.

And Gilead is not going to put any testimony in about Dr. Schinazi's character, for example, for

truthfulness.

Gilead is not opening the door here. It is Idenix who is designating this testimony, and they don't get to open the door for themselves by designating testimony about his character for untruthfulness and then using that to say now we get to delve into specific instances of conduct.

One other related issue is they have designated testimony as well about the civil tax fraud. We think the testimony they have designated is particularly problematic because it refers to it as a conviction for tax fraud. It suggests it was a criminal matter which it wasn't. It was a judgment of civil tax fraud, and so it is a particular prejudice I think because of that language.

Your Honor, there is also one piece of testimony that has nothing to do with this Schinazi stuff. I can address that now or later. And there are also some counterdesignations related Schinazi that we put that they have objected to and they put in. I don't know if you want to address that now or later.

THE COURT: Let's hold off on those. But a question.

So is there a distinction under the rule between evidence that goes to one's reputation as opposed to specific instances of arguably untruthfulness?

MR. WARDEN: I think there is, Your Honor. But the evidence that Idenix is seeking to introduce is specific instances of conduct. This memo that they're trying to introduce is filled with nothing but specific instances of conduct.

THE COURT: Well, I think it refers to him as untrustworthy. Somebody refers to him as greedy. Are those not reputational issues as opposed to specific instances?

MR. WARDEN: Those are reputational issues and I respond in two ways.

First, if they were only seeking to introduce testimony about the reputation without the memo, we might have a different calculus. As we understand it, that is not what they're doing.

But, second, if they're going to try and introduce his reputation for truthfulness -- so let me give a specific example. They designate testimony, for example, that Roche considered him to be untrustworthy. And they have objected to our designations for the reasons why Roche considered hmm to be untrustworthy.

We would have much less problem with the testimony about Roche considering him to be untrustworthy coming in if we were allowed to also designate the testimony where Mr. Price explains why he thought it was untrustworthy. We actually think this is an issue under

Rule 106, the rule of completeness. It really has to come in, in fairness.

So I will say if the only thing we were talking about was just the reputation testimony, if we were able to complete that testimony and the exhibit doesn't come in, I think we might be able to work something out with them. But the specific instances of conduct either from the exhibit or the testimony of, for example, the civil tax fraud shouldn't come in.

THE COURT: You may want to pass this one to Mr. Scherkenbach. It's up to you, but he suggested there is a case that I was part of that maybe has something to say relevant to this.

MR. WARDEN: I will pass that to Mr. Scherkenbach.

THE COURT: All right. And he can remind all of us what that was.

MR. SCHERKENBACH: Your Honor, I am not going to be able to put my hands right on the case. I believe it's Norman. I will find it, we'll find it while the other side is speaking.

But you addressed Rule 608. And I believe in the case, you said it's okay to ask about specific instances on cross because in that case, the witness testified live.

THE COURT: Okay.

04:40:42 1          MR. SCHERKENBACH:  That was my only point.  So

04:40:44 2  we did generally address the issue.  I do have copies of the

04:40:47 3  *Balsam* case.  I don't know if Your Honor wants them.

04:40:49 4          THE COURT:  Sure.  You can pass them up.  Do you

04:40:52 5  have one for the other side?

04:40:54 6          MR. SCHERKENBACH:  I do.

04:40:54 7          THE COURT:  Then we'll hear from Idenix on the

04:40:57 8  issues that we put on the table.

04:41:08 9          Good afternoon.

04:41:09 10         MR. McCRUM:  Good afternoon, Your Honor.  Ryan

04:41:13 11 McCrum.  I actually do have a couple cases that I may refer

04:41:16 12 to.  May I approach?

04:41:18 13             THE COURT:  You may.

04:41:19 14         MR. McCRUM:  I have copies for the other side as

04:41:21 15 well.

04:41:22 16         (Documents passed forward.)

04:41:40 17         THE COURT:  All right.  Go ahead.

04:41:42 18         MR. McCRUM:  I actually have two sets.

04:41:43 19         THE COURT:  Sure.  We'll take a second one.

04:41:52 20         MR. McCRUM:  Your Honor, there is really no

04:41:53 21 dispute now that Gilead has opened the door clearly to try

04:41:57 22 to get Dr. Schinazi's input, Dr. Schinazi's credibility

04:42:04 23 squarely at issue in this case.

04:42:06 24         They have taken this story that was originally

04:42:09 25 applied solely to our '600 patent and they're now trying to

map that on to the patent at issue here.

The evidence that they have to support that begins and ends with the testimony of Dr. Schinazi. There is no documents that support the statements. There is no, there is no other witness that is going to come in here and corroborate it.

So it is really important because this testimony that he gives, if the jury were to believe it without us having the ability to attack his credibility, it is vitally important we be able to do that because he is the sole person sponsoring it.

Now, the rule that are applicable here is Rule 608(b)(1) and it says the Court may, on cross-examination, allow specific instances of conduct to be inquired into if they're probative of the character for truthfulness of the evidence.

There is no question here that the conduct that we're talking about, the tax fraud, is in fact probative of truthfulness.

And that is the first case that I provided to you, Your Honor. It's up at the top. It's the *U.S. v Sullivan* case, 803 F2d 87, and it's at page 91. The Court found failure to disclose income on tax forms is probative of truthfulness.

Dr. Schinazi was being cross-examined, Your

04:43:40 1    Honor.  That is the whole role.  We deposed him as an
04:43:45 2    adverse witness for five to six hours.  They had the
04:43:49 3    opportunity and, in fact, took advantage of the opportunity
04:43:52 4    to ask questions on redirect.
04:43:55 5            He is an unavailable witness.  He is not within
04:44:01 6    the jurisdiction of the Court.  He was testifying under
04:44:03 7    oath at that deposition, Your Honor, just like he would be
04:44:06 8    testifying here.
04:44:07 9            That seems to be really their only hook here,
04:44:10 10   because otherwise Rule 608(b)(1) clearly and plainly applies.
04:44:18 11           The other thing that they brought up was
04:44:25 12   extrinsic evidence.
04:44:27 13           Here, the Order from the Court in Georgia where
04:44:33 14   he was found to have committed tax fraud, there should be no
04:44:37 15   ban on that either, Your Honor.
04:44:38 16           And that was the case, that was the *Carter* case
04:44:40 17   that with cited, and that is the second case in the stack
04:44:42 18   that I gave to you.
04:44:44 19           And there, the Third Circuit said there is no
04:44:47 20   need to invoke in such a case the ban on extrinsic evidence
04:44:52 21   when you adopt and admit that the specific act happened.
04:44:57 22           And that is exactly what happened here, Your
04:44:58 23   Honor.
04:44:59 24           Dr. Schinazi was asked:  It's true that you were
04:45:02 25   found to have committed civil tax fraud?

04:45:04 1    And he responded:  Correct.

04:45:07 2    So *Carter* recognizes that the concerns of

04:45:10 3 extrinsic evidence are not implicated here under these

04:45:15 4 circumstances.

04:45:15 5    A few other factors that are relevant.  Again, I

04:45:22 6 had mentioned one.  The importance of this testimony of the

04:45:27 7 specific act.

04:45:27 8    Again, he is the only one coming in telling this

04:45:31 9 story.  And we should be provided the means to attack his

04:45:36 10 credibility under the rules.  And 608(b) allows us to do

04:45:43 11 that.

04:45:43 12    So that is all I had on Dr. Schinazi.

04:45:49 13    THE COURT:  Do you cite in your letter or do you

04:45:51 14 have cases that apply the rule and treat as cross-examination

04:45:57 15 deposition testimony when it is a hostile or adverse witness?

04:46:03 16    MR. McCRUM:  So we do have law on that issue,

04:46:04 17 Your Honor.  Quite candidly, I did not think that was going

04:46:07 18 to be such a dispute given that he was cross-examined under

04:46:10 19 oath and he is unavailable.  So I requested that we get the

04:46:14 20 case, and like Gilead is doing now, and I'm hopeful I will

04:46:17 21 have it in hand by the time we're done here today.

04:46:20 22    THE COURT:  Okay.  And did you have anything to

04:46:22 23 say about the memo, but maybe that was the other witness?

04:47:28 24    MR. McCRUM:  That was Mr. Price.  Yes.  That

04:47:31 25 memorandum, it's a business record.  He wrote the memo, Your

04:47:38 1    Honor.  There is no hearsay issues with it.

04:47:41 2          So if the testimony comes in, and he is clearly

04:47:46 3    talking about and testifying about the character and

04:47:48 4    reputation of Dr. Schinazi, he said that he had a reputation

04:47:54 5    for not being trustworthy.  That is exactly what Rule 608(a)

04:48:00 6    is intended to cover.

04:48:03 7          608(b) also applies because he also talks about

04:48:07 8    specific acts of misconduct.  He also talked about the tax

04:48:10 9    fraud.  He also talked about instances where Dr. Schinazi

04:48:15 10   was signing contracts on behalf of multiple companies for

04:48:20 11   his own financial gain.

04:48:23 12         Those are additional multiple specific acts of

04:48:26 13   misconduct.

04:48:27 14         So under Rule 608(a) and (b), the Price

04:48:31 15   testimony, we believe, should come in, Your Honor.

04:48:34 16         THE COURT:  Are statements regarding a

04:48:36 17   reputation for greed or untrustworthiness, isn't that the

04:48:41 18   same thing as reputation for untruthfulness.

04:48:43 19         MR. McCRUM:  We believe it is, Your Honor.  I

04:48:47 20   think when you look at the case law and some of the cases

04:48:49 21   that I have cited, when they are talking about

04:48:51 22   untrustworthiness, they are using things like those types of

04:48:55 23   statements.  I mean, they are clearly a reflection, and here

04:48:59 24   in particular, in the context, he was motivated by greed for

04:49:03 25   his own financial gain.  So he was going out doing these

04:49:06 1    unethical things, signing contracts on behalf of multiple

04:49:12 2    companies, and the tax fraud clearly is something that

04:49:16 3    reflects untruthfulness.

04:49:19 4            THE COURT:  And what about the contention that

04:49:22 5    there is other testimony that they have designated about,

04:49:28 6    for instance, why Roche didn't trust him and that you object

04:49:31 7    to that?  Is that correct?

04:49:33 8            MR. McCRUM:  We have objected to that, Your

04:49:36 9    Honor.  But quite candidly, I think here, we can reach

04:49:39 10   agreement that if ours comes in we can probably resolve the

04:49:44 11   objections that we had to their counters.

04:49:45 12           THE COURT:  All right.  Thank you.

04:49:49 13           Any response to any of that from Gilead?

04:49:51 14           MR. SCHERKENBACH:  I would like to respond

04:49:53 15   briefly on the case law, reading as fast as I can.  I think

04:49:58 16   all the new cases that counsel handed up are completely

04:50:02 17   consistent with the law as I represented it to you.  The

04:50:05 18   Sullivan case --

04:50:07 19           THE COURT:  Hold on one second.

04:50:09 20           (Pause.)

04:50:10 21           THE COURT:  Go ahead.

04:50:12 22           MR. SCHERKENBACH:  The Sullivan case, the Bailey

04:50:15 23   case, the Edelman case, every one of them involved a witness

04:50:18 24   testifying live at trial on the stand and being

04:50:21 25   cross-examined live.

04:50:22 1          THE COURT:  They say that they have cited to you

04:50:24 2     cases and they are going to get them for us applying the

04:50:29 3     rule to depositions.  You have not seen that?

04:50:32 4          MR. SCHERKENBACH:  I have not seen that.  I

04:50:36 5     mean, I guess we could be proved wrong.  I cited Balsam,

04:50:43 6     First Circuit case, citing another First Circuit case, and

04:50:47 7     it says, this is a quote, "Extrinsic evidence" -- this is in

04:50:50 8     the context of the exact rule we are talking about --

04:50:54 9     "Extrinsic evidence includes any evidence other than trial

04:50:56 10    testimony."

04:50:58 11         I don't know if some other circuit has decided

04:51:02 12    otherwise.  We are not aware of it.  We looked.  We will

04:51:05 13    look at the case.  I don't know what it is.

04:51:08 14         I think perhaps Mr. Warden would like to address

04:51:08 15    you.

04:51:32 16         MR. WARDEN:  Your Honor, a couple of brief

04:51:33 17    points.  First with respect to the memo itself, Mr. McCrum

04:51:36 18    made the statement that it's not hearsay.  I would say that

04:51:42 19    is wrong and that it doesn't matter.  It's wrong in the

04:51:44 20    sense that the objected-to statements are not Mr. Price's

04:51:50 21    out-of-court statements so that Mr. Price is repeated things

04:51:53 22    he heard from Roche.  Repeated things he learned from a

04:51:55 23    Google search.  It is the out-of-court statements from Roche

04:51:59 24    and Google that Mr. Price is repeating that would be

04:52:02 25    hearsay.

04:52:03  1          But in any event, even if it weren't hearsay,

04:52:05  2     the point still stands that Rule 608(b) only allows the

04:52:09  3     matters to be inquired into on cross-examination.  It

04:52:12  4     doesn't let extrinsic evidence like this memo come in.

04:52:15  5          Even if the cross-examination, the deposition

04:52:19  6     testimony could be cross-examination, the memo is not

04:52:21  7     cross-examination.  So Rule 608 doesn't let that memo come

04:52:25  8     in.

04:52:29  9          With respect to whether a reputation for greed

04:52:32 10     is a reputation for untrustworthiness, our contention is

04:52:35 11     that it is not.  But even if it were, the particular

04:52:38 12     testimony from Mr. Price about the tax fraud conviction

04:52:42 13     would still be so prejudicial because it implies a criminal

04:52:45 14     conviction that under Rule 403 we would say it shouldn't

04:52:49 15     come in because the danger of unfair prejudice outweighs any

04:52:52 16     minimal relevance.

04:52:55 17          Finally, with respect to a compromise, I think

04:52:57 18     it is possible we could reach some agreement.  Gilead would

04:53:01 19     be willing for Idenix's designated testimony to come in

04:53:05 20     other than the statements about the tax fraud so long as our

04:53:10 21     designation comes in.

04:53:11 22          Again, there is still an objection to the memo

04:53:14 23     itself.  But the testimony other than the tax fraud we would

04:53:18 24     agree to come if our testimony also comes in.

04:53:21 25          THE COURT:  I am going give you all time to meet

04:53:24  1    and confer after we are done and see if you can narrow these

04:53:27  2    objections or even work them out.

04:53:31  3            There has also been suggestions that you may all

04:53:34  4    have case law that is relevant and you want me to consider.

04:53:37  5            Provided that we break in the near future, I

04:53:40  6    will ask that you submit a joint letter by 7 tonight that

04:53:44  7    just gives me those case citations and lets me know if I

04:53:48  8    still need to resolve all of the Price and Schinazi

04:53:51  9    objections or if some or all have been resolved.

04:53:56 10            MR. WARDEN:  One question about Mr. Price.  Can

04:53:58 11    I address that now?

04:53:59 12            THE COURT:  Yes.

04:54:01 13            MR. WARDEN:  They designated testimony regarding

04:54:03 14    the amount of money that Mr. Price made as a result of the

04:54:05 15    acquisition of Pharmasset.  It is argued that that money,

04:54:09 16    which was in the past, his testimony today can have no

04:54:13 17    impact on that.  They haven't designated testimony about

04:54:16 18    current financial interest in Gilead --

04:54:18 19            THE COURT:  Isn't it pertinent to understanding

04:54:20 20    his credibility and just his position within this whole

04:54:25 21    story?  The jury has already heard some very large numbers.

04:54:30 22            MR. WARDEN:  I don't think so, Your Honor.  They

04:54:32 23    will understand he was the CEO.  They will understand he had

04:54:35 24    a position with Pharmasset.  The amount of money he made we

04:54:37 25    don't believe is relevant to his credibility, to bias, and

04:54:40 1  it's very personal, Your Honor.

04:54:42 2          The minimal relevance it might have is not worth

04:54:46 3  revealing that kind of confidential personal information

04:54:49 4  about a third party -- he is not employed by anybody here --

04:54:53 5  about a third party in open court.

04:54:56 6          THE COURT:  All right.  Thank you.

04:54:58 7          Can somebody from Idenix respond to that

04:55:02 8  objection?

04:55:05 9          MR. McCRUM:  Your Honor, just a couple of

04:55:07 10 points.

04:55:07 11         First, I think this issue has already been

04:55:09 12 resolved through the objection to Dr. Schinazi and the

04:55:13 13 amount of money that he made, which was one of the

04:55:16 14 objections they lodged with respect to his deposition

04:55:19 15 testimony.  That was overruled.  There really doesn't seem

04:55:23 16 to be any distinction between Dr. Schinazi and Mr. Price

04:55:28 17 that would justify any different ruling.

04:55:32 18         I think the reasons that you provided in your

04:55:35 19 order, Your Honor, are equally applicable here.  They do, in

04:55:38 20 fact, go to bias, credibility, you worked somewhere and got

04:55:44 21 300 million dollars, I think you might have some reason to

04:55:48 22 want to sue.

04:55:48 23         THE COURT:  I think it's 300 million.  You may

04:55:51 24 have said "billion."

04:55:53 25         MR. McCRUM:  Did I?  I heard a lot of billions

04:55:55 1    today.  I apologize.  Yes, three hundred million.

04:55:58 2         I think it's as simple as that from our

04:56:01 3    position, Your Honor.

04:56:01 4         THE COURT:  Thank you.

04:56:02 5         Mr. Warden, anything further on that?

04:56:04 6         MR. WARDEN:  Just very briefly, Your Honor.

04:56:07 7         There is a meaningful distinction between Mr.

04:56:09 8    Dr. Schinazi and Mr. Price.  Dr. Schinazi is a witness in

04:56:12 9    this case who is going to be providing substantive testimony

04:56:15 10   and about whom the parties have a disagreement about his

04:56:19 11   bias, about his credibility.  That is simply not true for

04:56:21 12   Mr. Price.  He is at most going to be providing character

04:56:26 13   testimony about a third party.  Nobody is questioning Mr.

04:56:29 14   Price's veracity.  They are actually sponsoring the

04:56:31 15   testimony from Mr. Price.

04:56:33 16        So there is no reason to bring in anything, even

04:56:36 17   if it were relevant to his credibility or bias.

04:56:39 18        THE COURT:  Is there anyplace in the deposition

04:56:41 19   where he just more generally says, yes, I made some money

04:56:44 20   out of that transaction?

04:56:45 21        MR. WARDEN:  I don't know, Your Honor.  We could

04:56:48 22   look, but I don't know.

04:56:51 23        THE COURT:  Again, if you make any progress on

04:56:53 24   anything regarding Mr. Price, put that in the letter at 7:00.

04:57:01 25        There were two other letters that had deposition

04:57:05 1    objections, one was Mr. Otto, I believe there was a fourth

04:57:09 2    one, but I have lost track of who that would be.

04:57:12 3            MR. SCHERKENBACH:  The other gentlemen is Dr.

04:57:14 4    Stuyver.  I believe we do want to raise an issue with

04:57:16 5    respect to him.  Thank you.

04:57:17 6            THE COURT:  Does that mean you don't want to

04:57:19 7    with respect to Mr. Otto?

04:57:20 8            MR. SCHERKENBACH:  There is one issue there as

04:57:27 9    well.

04:57:27 10            THE COURT:  We will hear one or both of those at

04:57:27 11   this point.

04:57:35 12            MS. HUFNAL:  Your Honor, they are related.  The

04:57:37 13   first issue for Dr. Stuyver, and this was in our submission

04:57:42 14   last night, I would just direct the Court's attention to the

04:57:46 15   objections that we had regarding designations around page

04:57:50 16   129 through 130.  That's No. 4 of the issues in our joint

04:57:55 17   letter from last night.

04:57:57 18            Your Honor, we attached the transcript as

04:58:00 19   Exhibit A.  The testimony relates to Dr. Stuyver's

04:58:09 20   speculation about what transpired between Dr. Hassan and Dr.

04:58:15 21   Schinazi.  And as we have heard, that is an issue that the

04:58:19 22   jury is obviously going to hear a lot about.  Dr. Stuyver

04:58:22 23   has no knowledge about what happened.

04:58:26 24            As you read through his testimony, it is all

04:58:29 25   speculation.  And the prejudicial value of allowing this

04:58:36 1    highly outweighs any probative value.  Specifically, Idenix

04:58:39 2    has designated lines 129 through 130, where Dr. Stuyver --

04:58:47 3             THE COURT:  Pages 129 to 130?

04:58:50 4             MS. HUFNAL:  Yes, Your Honor.  Where Dr. Stuyver

04:58:52 5    is saying the 2'-methyl hydroxy nucleoside must have come

04:58:57 6    from Dr. Schinazi, what he was working on, with no basis for

04:59:03 7    that.  We have counter-designated, and they have objected to

04:59:06 8    that, when we have presented him with the facts that it

04:59:09 9    could have come from somebody else, namely, Dr. Hassan did

04:59:14 10    it independently, and in which Dr. Stuyver begins waffling

04:59:17 11    on maybe, maybe it didn't, maybe Dr. Hassan did it himself.

04:59:22 12    Really, when it comes down to it, Dr. Stuyver doesn't know

04:59:25 13    anything about this issue.  So all of it should be kept out.

04:57:37 14             MS. HUFNAL:  And the other critical page and

04:58:30 15    line that should, in our view be kept out is page 218.

04:58:36 16             And the question is:  So it's possible, if not

04:58:38 17    likely, that Dr. Schinazi told Dr. Hassan to make the

04:58:42 18    2'-methyl up, is that right?

04:58:44 19             So it's possible.  It's possible that he may

04:58:47 20    have told him to make the compound.

04:58:49 21             This is all, it's just very prejudicial, and it

04:58:54 22    has no basis.  Dr. Stuyver has no basis to know.

04:58:59 23             So that is the Dr. Stuyver issue.

04:59:03 24             And Dr. Otto, similar issue in our submission

04:59:05 25    from last night.  This relates to the testimony that begins

around page 188. And Dr. Otto, he is a 30(b)(6) witness, but he is being asked about his awareness of Dr. Schinazi's prior testimony. And we submit that that is irrelevant. It doesn't matter that he was a 30(b)(6) witness. Knowledge of Dr. Schinazi's prior testimony should not be admitted in.

And just as one example, Your Honor, it's on page 187 of the transcript.

The question is: Are you aware that he testified in arbitration that he did have confidential information?

Dr. Otto says: I don't recall that.

So whether or not Dr. Otto was aware of previous testimony from previous proceedings is highly prejudicial and irrelevant.

THE COURT: Is he answering or shouldn't we assume he is answering on behalf of the company for which he has been designated as a 30(b)(6)? And, if so, why isn't that relevant?

MS. HUFNAL: Whether or not they know of Dr. Schinazi's previous testimony, I don't see how that is relevant. Yes, he was testifying on behalf of the company as to Gilead's position on what conversations happened and the facts that Gilead knows, but whether or not he knows about prior testimony, sure, he could still answer on behalf of the company but that is irrelevant to this case.

05:00:34 1          THE COURT:  Doesn't it make it more probative

05:00:35 2     that those conversations or whatever it is Schinazi

05:00:38 3     testified about previously actually happened?

05:00:41 4          MS. HUFNAL:  Whether or not Dr. Otto knows that

05:00:43 5     Dr. Schinazi previously testified doesn't go at all to

05:00:48 6     whether or not the conversations actually happened.

05:00:50 7          THE COURT:  Again, he not answering I think as

05:00:52 8     Dr. Otto.  He is answering as I guess Pharmasset, correct?

05:00:56 9          MS. HUFNAL:  Correct.

05:00:57 10          THE COURT:  So whether Pharmasset knows that

05:00:59 11     Dr. Schinazi testified I did X, that is not probative of

05:01:04 12     whether Dr. Schinazi did X?

05:01:07 13          MS. HUFNAL:  No, I don't think it is, Your

05:01:09 14     Honor.

05:01:09 15          THE COURT:  Okay.  Is there anything else?

05:01:13 16          MS. HUFNAL:  No.

05:01:13 17          THE COURT:  All right.  Any response?

05:01:18 18          MR. KINTON:  Your Honor, John Kinton on behalf

05:01:21 19     of Idenix.  I'm going to take the issues in reverse order.

05:01:24 20          With respect to Dr. Otto, he was designated as a

05:01:27 21     30(b)(6) witness testifying on behalf of Gilead, and he was

05:01:32 22     testifying regard Gilead's knowledge of when they knew about

05:01:36 23     Idenix's confidential information.

05:01:38 24          That was the subject of Mr. Schinazi's

05:01:41 25     testimony.  And counsel, we heard a lot about cutting things

off.

The answer was -- the question was:  Does Gilead
have any information different than Dr. Schinazi's
testimony?

No, he would be the person to know.  Gilead
would not know that other than what he was saying.

So that is Gilead's knowledge as a 30(b)(6)
witness.  I think it's perfectly relevant and perfectly
admissible in this particular situation.

With respect to Dr. Stuyver.  The testimony
there, we're perfectly fine with admitting.  We're waiving
our objections to their counterdesignations.

If anything, the information, first of all, the
jury has already heard the particular issue here and so
there is not going to be any additional prejudice.  We can
live with their counterdesignations regarding whether or not
it's speculation, and to that extent it would go to weight,
not relevant.

THE COURT:  Okay.  Thank you.  Ms. Hufnal, is
there anything else you want to add?

MS. HUFNAL:  No, Your Honor.  Just that the
point I was just made, Dr. Otto was testifying on behalf of
Gilead as to what Gilead, the knowledge that Gilead has
about the actual conversations that took place, not about
whether or not they had knowledge about previous testimony

05:03:01 1    about Dr. Schinazi.  So while he is a 30(b)(6) of what

05:03:04 2    Gilead knows what happened, whether or not he knows about

05:03:07 3    testimony that Dr. Schinazi gave to the point is not

05:03:11 4    irrelevant.

05:03:11 5              THE COURT:  Okay.  Thank you.  Well, we are

05:03:14 6    going to be done soon.  So let me add there was a

05:03:22 7    representation that perhaps objections to

05:03:24 8    counterdesignations may be withdrawn.

05:03:26 9              So let me just add Otto and Stuyver to the

05:03:30 10   letter at 7:00 o'clock.  Tell me where we are and which

05:03:34 11   objections to designations or counterdesignations that are

05:03:37 12   listed in the earlier letters are still ripe for me to

05:03:40 13   resolve and then we will work on resolving them.

05:03:42 14             Are there any other issues since we're sort of

05:03:45 15   on defendants' time?  Any other issues defendants want to

05:03:48 16   raise before we break for the evening?

05:03:51 17             MR. SCHERKENBACH:  Not to my knowledge, Your

05:03:52 18   Honor.

05:03:52 19             THE COURT:  All right.  Anything from plaintiffs

05:03:54 20   at this point?

05:03:55 21             MR. GRIFFITH:  Your Honor, we, this morning, we

05:03:57 22   talked about that privilege issue.

05:04:00 23             THE COURT:  Right.

05:04:00 24             MR. GRIFFITH:  We prepared a draft for our side.

05:04:03 25   We could have that over to them in 15 minutes, I would

05:04:06 1   think.  And so that can go in tonight as well.

05:04:09 2               THE COURT:  Okay.  That relates to Dr. Schinazi;

05:04:15 3   right?

05:04:15 4               MR. GRIFFITH:  Yes, it does.

05:04:16 5               THE COURT:  So that issue comes up some time

05:04:18 6   tomorrow?

05:04:18 7               MR. GRIFFITH:  It does, and perhaps in their

05:04:19 8   opening.

05:04:20 9               THE COURT:  Right.  Okay.

05:04:23 10              MR. GRIFFITH:  So does I think maybe the Stuyver

05:04:25 11  issue.

05:04:26 12              Oh, the depositions will probably be played

05:04:28 13  tomorrow I think given the timing that we're on.

05:04:31 14              THE COURT:  Right.

05:04:32 15              MR. GRIFFITH:  So ...

05:04:33 16              THE COURT:  Well, I'm not going to give you a

05:04:35 17  deadline.  Obviously, the later I get both sides' letters

05:04:40 18  about privilege, the less likely I'll have an answer for you

05:04:42 19  first thing in the morning, but I understand we'll need to

05:04:46 20  resolve them one way or another I take it before we play

05:04:49 21  Dr. Schinazi's deposition.  So we'll just see where we are,

05:04:54 22  when we get there.

05:04:56 23              But do, as soon as possible, get whatever you

05:05:01 24  have to defendants.  And to the extent you can meet and

05:05:05 25  confer briefly in case this can be resolved, please do, and

05:05:09 1    then get your letters to me.  I want to hear from both sides

05:05:12 2    certainly at whatever time you can tonight and we'll take it

05:05:16 3    from there.

05:05:16 4            Is there anything else from plaintiffs?

05:05:19 5            MS. PARKER:  No, Your Honor.  Thank you.

05:05:21 6            THE COURT:  I just want to note for the record

05:05:22 7    because it wouldn't be clear from the transcript, but during

05:05:25 8    plaintiffs' opening, counsel did comply with my order by

05:05:30 9    showing the exhibit at least briefly before going right to

05:05:36 10   her slides.  And I just wanted to make that clear on the

05:05:39 11   record.

05:05:41 12           We will be in recess.  We'll see you at 8:30

05:05:42 13   tomorrow morning.

05:05:56 14           (Proceedings adjourn at 5:05 p.m.)

05:06:18 15

05:06:18 16       I hereby certify the foregoing is a true and accurate
          transcript from my stenographic notes in the proceeding.

17

18                          /s/ Brian P. Gaffigan
                            Official Court Reporter
19                            U.S. District Court

20

21

22

23

24

25