1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                    - - -

4   IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
    DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
5   DE LA RECHERCHE SCIENTIFIQUE and          :
    L'UNIVERSITE MONTPELLIER II,              :
6                                             :
             Plaintiffs,                      :
7   v                                         :
                                              :
8   GILEAD SCIENCES, INC. and GILEAD          :
    PHARMASSET LLC,                           :
9                                             :
             Defendants.                      :  NO. 13-1987-LPS
10  ------------------------------------------
    IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
11  DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
    DE LA RECHERCHE SCIENTIFIQUE and          :
12  L'UNIVERSITE MONTPELLIER II,              :
                                              :
13           Plaintiffs,                      :
    v                                         :
14                                            :
    GILEAD PHARMASSET LLC,                    :
15                                            :
             Defendant.                       :  NO. 14-109-LPS
16  ------------------------------------------
    IDENIX PHARMACEUTICALS, INC.,             :  CIVIL ACTION
17                                            :
             Plaintiff,                       :
18  v                                         :
                                              :
19  GILEAD SCIENCES, INC.                     :
                                              :
20           Defendant.                       :  NO. 14-846-LPS
                             - - -

21
                    Wilmington, Delaware
22                Tuesday, December 6, 2016
                   *Jury Trial - Volume B*
23
                             - - -
24
    BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
25
                             - - -

1    APPEARANCES:

2
                 ASHBY & GEDDES, P.A.
3                BY:  JOHN G. DAY, ESQ.

4                     and

5                McCARTER & ENGLISH
                 BY:  MICHAEL P. KELLY, ESQ.
6
                     and
7
                 JONES DAY
8                BY:  CALVIN P. GRIFFITH, ESQ.,
                     RYAN B. McCRUM, ESQ.,
9                    MICHAEL S. WEINSTEIN, ESQ., and
                     BRADLEY W. HARRISON, ESQ.
10                   (Cleveland, Ohio)

11                   and

12               JONES DAY
                 BY:  JENNIFER L. SWIZE, ESQ.
13                   (Washington, District of Columbia)

14                   and

15               JONES DAY
                 BY:  STEPHANIE E. PARKER, ESQ., and
16                   JESIKA W. FRENCH, ESQ.
                     (Atlanta, Georgia)
17
                     and
18
                 JONES DAY
19               BY:  JOHN D. KINTON, ESQ., and
                     ANTHONY M. INSOGNA, ESQ.
20                   (San Diego, California)

21                   and

22               JONES DAY
                 BY:  JOHN M. MICHALIK, ESQ., and
23                   LISA L. FURBY, ESQ.
                     (Chicago, Illinois)
24
                         Counsel for Plaintiffs
25

1  APPEARANCES:  (Continued)

2

3          FISH & RICHARDSON, P.C.
           BY:  MARTINA TYREUS HUFNAL, ESQ.,
4                DOUGLAS E. McCANN, ESQ.,
                JOSEPH B. WARDEN, ESQ.,
5                SANTOSH COUTINHO, ESQ.,
                ROBERT OAKES, ESQ., and
6                KELLY ALLENSPACH DEL DOTTO, ESQ.

7                and

8          FISH & RICHARDSON, P.C.
           BY:  FRANK SCHERKENBACH, ESQ., and
9                JENNY SHMUEL, ESQ.
                (Boston, Massachusetts)

10               and

11         FISH & RICHARDSON, P.C.
           BY:  JUANITA BROOKS, ESQ.,
12               W. CHAD SHEAR, ESQ.,
                CRAIG COUNTRYMAN, ESQ., and
13               JONATHAN E. SINGER, ESQ.
                (San Diego, California)

14               and

15         FISH & RICHARDSON, P.C.
           BY:  MICHAEL R. HEADLEY, ESQ.,
16               JOHN M. FARRELL, ESQ., and
17               DALIA KOTHARI, ESQ.
                (Redwood City, California)

18               and

19         FISH & RICHARDSON, P.C.
           BY:  TASHA FRANCIS, ESQ.
20               (Minneapolis, Minnesota)

21                    Counsel for Defendants

22

23

24  Valerie Gunning              Brian P. Gaffigan
    Official Court Reporter      Official Court Reporter
25

1                         - oOo -

2                   P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following jury trial was

4       held in open court, beginning at 8:42 a.m.)

08:44:23  5              THE COURT:  Good morning, everyone.

08:44:24  6              (The attorneys respond, "Good morning, Your

08:44:25  7       Honor.")

08:44:25  8              THE COURT:  So I'm going to begin by giving you

08:44:28  9       rulings.  And we'll start the clock and we'll split this

08:44:33 10       time that it takes me to articulate the rulings equal

08:44:37 11       between both sides because they deal with issues relating to

08:44:41 12       deposition designations and counterdesignations, and there

08:44:44 13       is objections on both sides, and there is the privilege

08:44:47 14       issue.  So it's fair to split this between both sides.

08:44:51 15              Specifically, I'm dealing with issues relating

08:44:54 16       to four witnesses that are the subject of at least seven

08:44:58 17       letters, four from Sunday, two related to privilege from

08:45:04 18       last night and one from yesterday updating us to what still

08:45:07 19       was ripe for the Court's ruling.

08:45:09 20              So let me go witness by witness.  First witness,

08:45:12 21       Dr. Stuyver.  Gilead's objection at Issue No. 1 has been

08:45:19 22       withdrawn.  Gilead's objection at Issue Nos. 2 and 3 are

08:45:24 23       overruled.

08:45:26 24              The testimony here establishes that the witness

08:45:29 25       authored parts of the grant application.  The testimony and

08:45:34 1   exhibit are relevant to Pharmasset's work and its

08:45:36 2   recognition of Idenix's work.  The probative value of this

08:45:41 3   evidence is not substantially outweighed by prejudice or

08:45:44 4   risk of unfair prejudice to Gilead and the potential for

08:45:49 5   juror confusion.

08:45:50 6         Next, Gilead's objections at Issues 4 and 5 are

08:45:53 7   also overruled, pretty much for the reasons given in the

08:45:58 8   letter by Idenix.  There are adequate indications of the

08:46:02 9   witness's personal knowledge.  The testimony is relevant to

08:46:05 10   Pharmasset's development of its compound.  And both parties

08:46:09 11   have put their competing versions of that story, that is,

08:46:14 12   how Pharmasset developed its compound at the center of this

08:46:17 13   case.  And even if one were to say that the probative of

08:46:21 14   value of that evidence is minimal, it is not substantially

08:46:25 15   outweighed by the risk of unfair prejudice to Gilead.

08:46:29 16         Idenix's objections to Gilead's

08:46:31 17   counterdesignations were withdrawn by last night's letter,

08:46:35 18   as the plaintiff indicated during argument yesterday it

08:46:38 19   would be.

08:46:38 20         So that takes care of Dr. Stuyver.

08:46:41 21         The next witness is Dr. Otto.  Gilead's

08:46:45 22   objection at Issue No. 1 to the admission of PX-498B is

08:46:51 23   overruled.

08:46:53 24         This evidence is probative at least to refute

08:46:56 25   Gilead's claim that Idenix performed irrelevant testing.

08:47:01 1   And the 403 balance does not favor exclusion.  The risk of

08:47:06 2   jury confusion is not so substantial as to substantially

08:47:09 3   outweigh the probative value of the evidence, nor is the

08:47:14 4   risk of wasted time substantially outweighing that probative

08:47:19 5   value.  It should not take very long to make clear that this

08:47:22 6   is a different patent application.

08:47:25 7           Gilead's objections to the designations listed

08:47:28 8   at Nos. 1 through 4 are all overruled.

08:47:34 9           The Court understands that PX-2116 has been

08:47:37 10  withdrawn, leaving just the objections to the testimony, and

08:47:41 11  those objections are to testimony that the Court believes is

08:47:44 12  probative of Pharmasset's knowledge of Idenix's work on

08:47:49 13  2'-methyl compounds, an issue on which Otto was designated

08:47:54 14  as a 30(b)(6) witness.

08:47:56 15          The testimony is also probative of the fact that

08:47:59 16  Gilead has no knowledge contrary to Schinazi's knowledge and

08:48:04 17  in that way is probative of what Schinazi and Pharmasset did.

08:48:09 18          It's also probative of helping complete the

08:48:11 19  Schinazi story, a story that both sides have made relevant.

08:48:16 20          And Rule 403 does not favor exclusion.  The

08:48:20 21  risks of unfair prejudice is minimal and clearly does not

08:48:25 22  substantially outweigh the probative value.

08:48:29 23          That takes us to witness Peter Schaefer Price.

08:48:33 24          The Court's understanding is there is only one

08:48:35 25  objection left for its decision.  As the letter yesterday

08:48:39 1 says, Gilead is only pressing Issue 1.  That means that

08:48:43 2 issues 2 through 8 have been withdrawn and the Court further

08:48:47 3 understands from the letter and the discussion yesterday

08:48:49 4 that Idenix has withdrawn its objections to Gilead's

08:48:52 5 counterdesignations.

08:48:54 6 Gilead's objection at Issue No. 1 is overruled.

08:48:58 7 The enormous amount of money that Price earned

08:49:00 8 from his association with the company may be pertinent to

08:49:04 9 the jury's assessment of his credibility.  A reasonable

08:49:08 10 juror could conclude that one will be biased toward a

08:49:11 11 company from which you have made hundreds of millions of

08:49:14 12 dollars.

08:49:15 13 Further, a simple Internet search -- and I'll

08:49:19 14 put on the record we did a simple Internet search -- reveals

08:49:23 15 public reports about Mr. Price owning a certain percentage

08:49:26 16 of stock at the time of the transaction and estimating how

08:49:29 17 much he stood is to make from the deal, and those numbers

08:49:32 18 are fairly close or at least in the ballpark of what his

08:49:35 19 testimony here is going to be.

08:49:36 20 So that takes care of Witness Price.

08:49:39 21 Finally, Dr. Schinazi.

08:49:44 22 Idenix's objections to Gilead's

08:49:47 23 counterdesignations, Issue Nos. 1 and 2, those objections

08:49:52 24 from Idenix are overruled.  Largely, this issue was decided

08:49:56 25 yesterday in connection with the dispute over the opening

08:50:00 1   statement slides that Gilead has been permitted to use.  And

08:50:05 2   today's decision is for the same reasons as articulated

08:50:08 3   yesterday.

08:50:09 4        Gilead's designations were not untimely under

08:50:11 5   the circumstances.  The testimony is not hearsay.  The

08:50:16 6   questioning was not improperly leading, and the 403 balance

08:50:20 7   does not favor exclusion.  The risk of confusion and unfair

08:50:25 8   prejudice does not substantially outweigh the significant

08:50:28 9   probative value of this testimony.

08:50:31 10        Now, the portion of the objection at Issue No. 1

08:50:35 11  that I did not reach yesterday and which was the subject of

08:50:38 12  letter briefing last night is the privilege issue, but the

08:50:42 13  Court has decided that the privilege issue does not alter

08:50:44 14  the outcome here.

08:50:47 15        To the extent that Idenix is objecting to

08:50:52 16  counterdesignations based on privilege or an improper use of

08:50:55 17  privilege, that objection is overruled.

08:50:57 18        Fundamentally, that objection provides no

08:51:01 19  meritorious basis for preventing Gilead from using the

08:51:05 20  designated deposition testimony.  As an initial matter, and

08:51:09 21  this is dispositive, under the circumstances Idenix has

08:51:12 22  raised its objection related to privilege far too late.  It

08:51:16 23  only coming to the Court's attention on the first day of the

08:51:18 24  trial.

08:51:19 25        It should have been raised during discovery or

08:51:24 1    no later than soon after the Schinazi deposition or no later

08:51:28 2    than soon after Idenix receipt of Gilead's privilege log,

08:51:33 3    yet there was never any challenge to the assertions of

08:51:36 4    privilege that was brought before the Court.

08:51:38 5         No motion to compel was ever brought to the

08:51:40 6    Court or arguably even later than that.  It should have been

08:51:46 7    included in the motion in limine in which Idenix asked the

08:51:50 8    Court to consider the admissibility of this whole area of

08:51:54 9    testimony and evidence, yet it was not brought to the

08:51:58 10   Court's attention at that time or arguably even later than

08:52:03 11   that.  There may have been a window in the weeks between

08:52:05 12   the Court's ruling on the motion in limine and the start

08:52:08 13   of trial, but, again, it was not brought to the Court's

08:52:12 14   attention until the first day of the trial.  And that leaves

08:52:15 15   the Court with really almost no possibility of really

08:52:19 16   effectively and fairly doing something about this or the

08:52:25 17   Court persuaded it should do something about it.

08:52:28 18        So the objections are overruled on timeliness,

08:52:31 19   but I will also say from the record and it is a limited

08:52:33 20   record, I know you only have a little bit of time last night

08:52:37 21   to write letters and I only had a little bit of time to

08:52:40 22   review them.

08:52:41 23        It is not clear to me there is any privilege

08:52:44 24   here.  It appears that the discussion between Dr. Schinazi

08:52:47 25   and Ms. Knowles was a casual conversation outside the

08:52:52 1    context of any attorney-client relationship.  And further,

08:52:56 2    it doesn't really look like there was any selective or

08:53:00 3    intentional waiver.

08:53:01 4              So for all those reasons, the objection is

08:53:04 5    overruled.

08:53:05 6              That leaves just Issue No. 3 relating to

08:53:10 7    Dr. Schinazi, which is Gilead's objection to Idenix's

08:53:14 8    counter-counterdesignation, if I've got that right.  It is

08:53:19 9    Gilead's objection and that objection is overruled.

08:53:22 10             In the disputed testimony, counsel for Idenix is

08:53:25 11   using a 2000 order or judgment from the Northern District of

08:53:29 12   Georgia to examine Dr. Schinazi about his prior commission

08:53:33 13   of civil tax fraud.

08:53:35 14             Federal Rule of Evidence 608(b) provides that

08:53:39 15   specific instances of a witness's conduct may be used in

08:53:43 16   order to attack or support the witness's character for

08:53:46 17   truthfulness but the rule limits such practice to

08:53:49 18   cross-examination.

08:53:51 19             Gilead argues that Dr. Schinazi's deposition

08:53:54 20   testimony is not cross-examination under this rule and

08:53:59 21   cannot be designated for the purpose of attacking his

08:54:02 22   correct.  The Court is unpersuaded by this argument.  The

08:54:05 23   Court views what happened here as essentially

08:54:08 24   cross-examination.

08:54:08 25             Federal Rule of Civil Procedure 32 provides that

all or part of a deposition may be used against a party to
the extent it would be admissible under the Federal Rules of
Evidence if the deponent were present and testifying.

An advisory committee note to the 1970 amendment
to that rule states that the Rules of Evidence are to be
applied to depositions offered at trial as though the
deponent were then present and testifying at trial.

Federal Rule of Evidence 30 provides that
deposition examination and cross-examination of a deponent
proceed as they would at trial.

And Federal Rule of Evidence 806 provides that
when a hearsay statement, here, the other deposition
testimony of Dr. Schinazi, has been admitted in evidence,
the declarant's credibility may be attacked by any evidence
that would be admissible for those purposes if the declarant
had testified as a witness.  In the Court's view, when you
put all that together, Idenix's examination at deposition of
Dr. Schinazi, an adverse witness, qualifies as
cross-examination under Rule 608(b).

Gilead cites no authority to the contrary that
is really on point.  For example, the First Circuit *Balsam*
case is distinguishable.  It does not deal with sworn
deposition testimony but deals with jailhouse
tape-recordings.

Further, the Court does not believe that the

questioning using the Northern District of Georgia order makes this an impermissible use of extrinsic evidence to prove a specific instance of misconduct. Dr. Schinazi conceded to the order. There is no doubt about its authenticity. There is no doubt that the Court found what the order says the Court found.

The order is clearly probative of Dr. Schinazi's credibility, and both sides have put his credibility at the center of this case.

Further, the Court's ruling is consistent with the Third Circuit's decision in *Carter v Hewitt* which explains in part the rule exists to avoid mini-trials on wholly collateral matters which tend to distract and confuse the jury. I see no significant risk of that occurring for my decision here today.

Similarly, the Third Circuit notes the great majority of decisions finding violations of 608(b) find so in the intrinsic evidence that is challenged from a witness other than the one whose credibility is under attack. Plainly, that is not our situation here today.

And the Third Circuit went on to say: "When, however, the extrinsic evidence is obtained from and through examination of the very witness whose credibility is under attack, the rules core concerns are not implicated." And I think that does fit our situation here today.

08:56:58 1　　　　　So for all these reasons, the challenged

08:57:02 2　testimony will be allowed in and again the Court overrules

08:57:06 3　Gilead's objection.

08:57:07 4　　　　　Just one other thing I have to say.  It is not

08:57:10 5　substantive, but we advised you both sides of an e-mail

08:57:15 6　address, the chambers e-mail address.  For whatever reason,

08:57:19 7　only one out of three letters filed last night came to that

08:57:23 8　e-mail address, so please make sure if we're going to be hit

08:57:25 9　with letters after court and on weekends, et cetera, that

08:57:28 10　you send them to that address and docket as we talked about

08:57:32 11　yesterday.  Everything at least in the 14-846 action.

08:57:37 12　　　　　All right.  That is all I had to say on that.

08:57:39 13　　　　　We'll turn now to plaintiffs to see if they have

08:57:42 14　any issues for today.

08:57:43 15　　　　　MR. GRIFFITH:  Just a couple, Your Honor.

08:57:44 16　　　　　THE COURT:  Okay.

08:57:47 17　　　　　MR. GRIFFITH:  First, Your Honor, understanding

08:57:53 18　the Court's rulings, we would ask at some point in time,

08:58:00 19　during an appropriate point in time, for a curative

08:58:03 20　instruction with respect to the conversation, alleged

08:58:06 21　conversation between Dr. Schinazi and Ms. Knowles.  If it

08:58:10 22　is not privileged as they asserted in their letter, then

08:58:13 23　it wasn't confidential and the declaration saying it was

08:58:16 24　confidential communication is a false declaration.

08:35:44 25　　　　　THE COURT:  If you propose something, I mean,

obviously, you have to meet and confer with the other side, and if you can't get agreement and you propose something, I will deal with it when you raise it.

MR. GRIFFITH: Understood. Thank you.

Then, Your Honor, I wanted to note that for our first witness, Dr. Sommadossi, he is represented by Tony Figg, his own attorney, and I discussed this with Mr. Scherkenbach yesterday morning. We do not intend to get into his present business affairs in our direct examination, and my understanding from Mr. Scherkenbach is that if we don't do that, then they won't do it either. The only reason I mention that is if that were to happen and if some confidentiality issue were to arise, it's possible that Mr. Figg would have to stand up and object or say something, and I didn't want Your Honor to be caught by surprise if that circumstance happened.

THE COURT: I would have been, so I appreciate the heads-up.

Did you have any, other than just standing up, do you have now any suggestion as to how you might protect your client's interest?

MR. FIGG: I don't, Your Honor. I think the issue is pretty much as was described. Obviously, both sides have said they do not intend to ask about any of Dr. Sommadossi current affairs, his research and development or

patenting or anything that his current company is doing, but they reserve the right because they don't know what he's going to say. So should that come up, I might object on grounds of relevance or privilege or ask that the courtroom be closed.

THE COURT: If you see the need to do anything like that, make sure you stand and get counsel or my attention somehow.

MR. FIGG: Yes. I will.

THE COURT: Okay.

MR. FIGG: Thank you, Your Honor.

THE COURT: Thank you.

Just for the record, can defendants confirm that that is your intent as well?

MR. SCHERKENBACH: It is intention to stay away from that, again, presuming they do so on direct. Again, all I said was I don't know what the witness will say.

THE COURT: Okay. All right. Thank you for flagging that issue.

MR. GRIFFITH: And then Ms. Parker has a couple of items.

THE COURT: Okay.

MS. PARKER: Good morning, Your Honor.

THE COURT: Good morning.

MS. PARKER: I just want to check with the Court

to see the Court's preference on handling exhibits today.
So the first three witnesses, the first one is Dr.
Sommadossi live. All of his exhibits that I'm going to use
have been agreed to, so they are going to come in without
objection, and I've already given a list to the Court.

And then the next two witnesses are both by
deposition, so we know what those exhibits will be. Those
are all by agreement with the exception of one. Your Honor
has just ruled on that one, so all of those are set as well.
I've also given that list up. So I'm happy to do however
Your Honor wants to handle it, but maybe I can just read the
list into the record or whatever.

THE COURT: It's fine.

Mr. Scherkenbach?

MR. SCHERKENBACH: There's a distinction between
the two, I think. As to the live witness, Dr. Sommadossi,
we don't object to the exhibits, but only the ones that are
actually used with the witness should be admitted. So I
just ask that they admit them as they go, or they can use
them all as they go, and then the ones that actually are
used, move in, that's fine. For the depositions, that's a
different issue because we know what has been designated and
they all are coming in.

THE COURT: All right. So that is all correct
what Mr. Scherkenbach just said, but it still gives you some

09:02:11 1    flexibility.

09:02:11 2            So you do have to, with the live witness, you

09:02:14 3    have to at least show the document to the witness if you're

09:02:17 4    going to offer it into evidence.

09:02:23 5            MS. PARKER:  Okay.

09:02:24 6            THE COURT:  So I think that means you either

09:02:25 7    want to offer them as you go through or all at once at the

09:02:28 8    end is fine, but it would be it would raise an issue, if you

09:02:33 9    offer them all at once at the beginning in case, you might

09:02:37 10   by oversight not use one with the witness.

09:02:39 11           MS. PARKER:  Well, just to save the jury's time,

09:02:42 12   I'm happy to wait until one of the breaks and I will read it

09:02:44 13   into the record.

09:02:45 14           THE COURT:  I will have you do it in front of

09:02:47 15   the jury.

09:02:47 16           MS. PARKER:  Okay.

09:02:48 17           THE COURT:  But you can do it at the end of the

09:02:50 18   testimony is fine or do it as you go through.  However many

09:02:56 19   times you say it, I'm going to turn to the defendant and

09:02:58 20   say, is there an objection, or make sure that there is no

09:03:01 21   objection, even though we all know there's no objection.

09:03:04 22           MS. PARKER:  Okay.  All right.  Thank you, Your

09:03:06 23   Honor.

09:03:06 24           THE COURT:  And it is different with the

09:03:08 25   deponent.  It is a deposition.  If you want to do that at

09:03:12 1    the beginning, that's fine as well.

09:03:14 2              MS. PARKER:  Okay.  And we can do that outside

09:03:16 3    the presence of the jury?

09:03:17 4              THE COURT:  No.  Do it in front of the jury.

09:03:19 5              MS. PARKER:  Also?

09:03:19 6              THE COURT:  Yes.

09:03:20 7              MS. PARKER:  Okay.

09:03:21 8              THE COURT:  All right?

09:03:21 9              MS. PARKER:  Thank you.

09:03:22 10             THE COURT:  Any other issues from plaintiff?

09:03:24 11             MS. PARKER:  Yes.  One.

09:03:26 12             THE COURT:  Okay.

09:03:26 13             MR. DAY:  Just a housekeeping matter, Your

09:03:28 14   Honor, with respect to the juror notebooks.  The parties

09:03:31 15   have agreed to provide the witness pictures that you asked

09:03:34 16   on a rolling basis as we expect the witnesses to appear.

09:03:37 17             THE COURT:  Okay.

09:03:38 18             MR. DAY:  I've got one more that may happen

09:03:40 19   today that I would like to hand up if that's okay.

09:03:42 20             THE COURT:  Okay.  So we'll ask Mr. Looby to get

09:03:46 21   the jury copies of this additional photo.

09:03:50 22             MR. DAY:  Thank you, Your Honor.

09:03:52 23             THE COURT:  All right.  We'll follow that

09:03:53 24   procedure every day.  That's fine.  That's it for

09:03:55 25   plaintiffs' issues letters from the defendant?

09:03:57 1    MR. SCHERKENBACH:  Two, Your Honor.  One is just

09:03:59 2    a clarification to make sure we understand your ruling on

09:04:02 3    the last issue for Dr. Schinazi, the testimony and his

09:04:05 4    deposition about his civil tax fraud.

09:04:09 5         We understand your ruling on the testimony.  The

09:04:12 6    part of the objection was also the actual finding of the

09:04:16 7    Court itself, this exhibit PX-739.  And we don't understand

09:04:23 8    the Court to have said that the underlying ruling is

09:04:26 9    admissible.  That would be extrinsic evidence as opposed to

09:04:29 10   the witness' testimony on cross-examination, which is what

09:04:32 11   the rule addresses.  So there's, in our view, a very

09:04:36 12   important distinction between the two, and I don't know if

09:04:39 13   the Court meant to address the exhibit as well.

09:04:41 14        THE COURT:  Well, I was relying on the letter,

09:04:43 15   which didn't flag PX-739 as being a

09:04:48 16   counter-counter-designation, but maybe I lost that.

09:04:51 17        MR. SCHERKENBACH:  It's in a parenthetical.

09:04:54 18        THE COURT:  That's a reference that you object

09:04:55 19   to it, but it wasn't clear to me that it is with a being

09:04:57 20   offered.

09:04:58 21        MR. SCHERKENBACH:  Okay.

09:04:59 22        THE COURT:  I'm happy to hear from Mr. McCrum,

09:05:02 23   but I'm not sure -- I see where we are.

09:05:05 24        MR. SCHERKENBACH:  I think it's in the

09:05:06 25   deposition.

09:05:06 1      THE COURT:  I understand it's referenced in the

09:05:08 2  deposition and I understand you objected to it.

09:05:10 3      MR. SCHERKENBACH:  Okay.

09:05:11 4      THE COURT:  Should I have understood you wanted

09:05:12 5  it in?

09:05:13 6      MR. McCRUM:  Your Honor, yes, we did want that

09:05:15 7  in.  I actually understood your Honor's decision to include

09:05:19 8  the underlying decision.  If I was mistaken about that, then

09:05:22 9  I'm happy to comment on it, but I think the two cases that

09:05:25 10 were submitted yesterday on the record, and I think they

09:05:29 11 noted in their letter to you, one was the Noble, the Norman

09:05:34 12 case.

09:05:34 13     The case before you, Your Honor, actually

09:05:38 14 addressed this exact issue as to whether a prior decision

09:05:42 15 could come in with this type of testimony, and that decision

09:05:47 16 in the footnote and the ruling that you issued, Your Honor,

09:05:51 17 that decision came in because it was deemed the most

09:05:57 18 reliable type of evidence and satisfied all the reliability

09:06:01 19 factors, and I'm happy to get that case, Your Honor.

09:06:04 20     THE COURT:  I think I understand that part of

09:06:07 21 it.  My problem is, and admittedly, you've thrown a lot at

09:06:13 22 us, but, you know, when I looked at the letter, it doesn't

09:06:17 23 say anything about PX-739 other than the defendant objecting

09:06:23 24 to its admission whereas other letters, you know, say, you

09:06:28 25 know, they list deposition testimony and then an exhibit.

So, for instance, the Dr. Stuyver letter, you know, for many every objection, it lists deposition testimony and then an exhibit. So I didn't understand there to be a dispute about this. Can you help me on that?

MR. McCRUM: Well, I think, Your Honor, that this has been briefed multiple times. I thought that we did, in fact, reference the exhibit and now we're out of papers on this. I will have to look at the paper. I know we've had a couple of them, but I'm happy to do that, Your Honor.

THE COURT: All right. No. That's not necessary right now, but thank you.

Mr. Scherkenbach, what do you want to say about that?

MR. SCHERKENBACH: I guess two things. One is just a practical suggestion. They can play or read Dr. Schinazi's testimony consistent with your ruling because all the testimony does is refer to the challenged exhibit, and you've ruled on that. The issue is whether the exhibit itself comes in, and to the extent you want to further reflect on that, if you are going to give them another bite at the apple, I guess you can do that.

I think the analysis is very different for the actual extrinsic evidence coming in as opposed to being asked questions about the acts on cross-examination, which

is what -- which was briefed and is what you decided.  And in our view, it should come out the other way.  But I don't think it will hold up today with their testimony.

THE COURT:  Right.  Either way, the exhibit is going to flash on the screen or at least be read in connection with playing of the deposition, but when it's offered into evidence, whether I let it in, it's the remaining issue.

MR. SCHERKENBACH:  Well, just to be clear, so I mean --

THE COURT:  I already ruled on already, but that's what we're arguing about.  Right?

MR. SCHERKENBACH:  Right.  But we would ask that they can show the testimony on the screen if they want.  I don't know if they are doing video or reading of this, where the witness talks about the exhibit, but I don't believe the exhibit should be shown until you've actually decided whether the exhibit itself is admitted.

THE COURT:  All right.  Well, Schinazi, if I understand correctly, is the third witness today.  Right?  Is that correct?

MS. PARKER:  That's correct, Your Honor.

THE COURT:  Well, I will get you a decision before that.

MR. SCHERKENBACH:  One really quick procedural

09:08:53 1    issue, because I didn't want the Court to be surprised,

09:08:56 2    relating to the cross-examinations generally.

09:08:59 3                     Counsel had agreed and put into the pretrial

09:09:02 4    order that impeachment material could be shown to the jury

09:09:05 5    at the time of impeachment, which is somewhat different than

09:09:09 6    the way we've done it in some cases in front of Your Honor,

09:09:12 7    and I just didn't want you to be -- it was in the Pretrial

09:09:15 8    Order, but there was a lot in the Pretrial Order.  This was

09:09:18 9    specifically in there and I believe you "so ordered" the

09:09:21 10   pretrial order, but I wanted to alert you of that.

09:09:24 11                    THE COURT:  I did so order it.  I vaguely

09:09:25 12   remember seeing that.  We may have discussed it.  I can't

09:09:28 13   remember.  But that's what you all have agreed to?

09:09:30 14                    MR. SCHERKENBACH:  Yes.

09:09:30 15                    THE COURT:  Right?

09:09:31 16                    MR. SCHERKENBACH:  Yes.  It's on page 15 of the

09:09:33 17   pretrial order.

09:09:33 18                    THE COURT:  Okay.  Thank you.

09:09:35 19                    Anything else before we look to see if the jury

09:09:37 20   is ready?

09:09:38 21                    MS. PARKER:  Not from us, Your Honor.  Thank

09:09:39 22   you.

09:09:39 23                    THE COURT:  All right.  We'll take a recess and

09:09:40 24   see if the jury is here.

09:09:50 25                    (Short recess taken.)

09:26:42 1                         - - -

09:26:42 2               THE COURT:  The jurors are all now here, so

09:26:45 3     we'll bring them in.

09:27:03 4               (The jury entered the courtroom.)

09:28:14 5               THE COURT:  Good morning, ladies and gentlemen

09:28:15 6     of the jury.  Welcome back.  I hope you had a good evening.

09:28:18 7               Just a reminder to do your best to try to all

09:28:21 8     get here on time so that we can start on time and keep

09:28:24 9     things moving on the schedule that I've given you.  With

09:28:27 10    that, we are ready to continue.  We'll hear the remainder of

09:28:32 11    Gilead's opening statement.

09:28:33 12              Mr. Scherkenbach?

09:28:34 13              MR. SCHERKENBACH:  Thank you, Your Honor.  Good

09:28:37 14    morning, ladies and gentlemen.  Welcome back.  Thank you for

09:28:39 15    coming back.

09:28:40 16              I'm going to pick up right where I left off.  We

09:28:43 17    had just gotten to the point where I showed you an overview

09:28:49 18    slide describing the development or some of the evidence

09:28:51 19    relating to the development of what led to the cure to

09:28:54 20    hepatitis C.  Okay?  And I want to go through with you now

09:28:59 21    some of the key witnesses you're going to hear from and some

09:29:02 22    of the evidence each of them is going to talk about to

09:29:04 23    describe how Gilead developed what became Sovaldi.  All

09:29:08 24    right.

09:29:08 25              And the story starts actually back in very early

09:29:12 1    of 2001, I introduced you earlier to Dr. Rachakonda and I

09:29:20 2    mentioned the name of Dr. Hassan, and they are going to talk

09:29:23 3    about work in early 2001, March and May, where Dr. Hassan in

09:29:29 4    particular, he came to Pharmasset in about the 2000 time

09:29:34 5    frame, and at his prior job he had been making these

09:29:38 6    2'-methyl OH nucleosides.  The thing that Idenix claims to

09:29:44 7    have invented, he had been making them and using them for

09:29:46 8    other purposes at his prior job, and you'll hear about that

09:29:49 9    from him in his deposition.

09:29:50 10           And so when he first came to Pharmasset in very

09:29:54 11   early 2001, March of 2001 and was put on the hepatitis C

09:29:57 12   team, he thought, hey, I should try these methyl OH

09:30:02 13   nucleosides, which were known to have antiviral properties

09:30:05 14   and see what happens for hepatitis C.  And so he did that,

09:30:09 15   and, in fact, you're going to see evidence that in March he

09:30:12 16   made specifically a 2'-methyl adenosine compound.  It hasn't

09:30:16 17   really been explained to you what that is or what that

09:30:19 18   means.  The witnesses will, and I'm going to show you a

09:30:22 19   blowup of sort of a nucleoside.

09:30:25 20           But adenosine is the base part, which is the

09:30:28 21   upper right part of the structure, and the 2'-methyl

09:30:31 22   nucleoside part is that ring right there in the center.  So

09:30:34 23   you're going to hear the witnesses talk a lot about both

09:30:36 24   that center ring called the sugar ring, and then the base

09:30:40 25   part is the part that's sort of stuck on there on the upper

09:30:43 1    right side.  Anyway, so he had been using these compounds

09:30:46 2    before he came to Pharmasset.  Came to Pharmasset, said,

09:30:51 3    let's try it for HCV.  And they did.  They made the compound

09:30:54 4    and they tested it a couple months later.  This is in May of

09:30:58 5    2001.  Okay?  And they found that it was active actually

09:31:02 6    against hepatitis C.

09:31:05 7            At this time, Pharmasset already had what's

09:31:08 8    called the replicon assay, the hepatitis C replicon assay,

09:31:13 9    which was sort of the gold standard to really figure out

09:31:15 10   if something worked for HCV.  They said, yes, the thing

09:31:18 11   worked, but actually, it turns out that it looks like it's

09:31:21 12   toxic.

09:31:22 13           So Pharmasset recognized pretty early on that

09:31:24 14   these 2'-methyl OH compounds, which were the ones that

09:31:28 15   Idenix was working on, too, were active against HCV but

09:31:34 16   toxic.

09:31:35 17           Now, sort of separately at Pharmasset, there was

09:31:39 18   also work going on on fluorine down compounds.  Again, we're

09:31:43 19   going to blow these up subsequently, but there's an "F" down

09:31:46 20   there.  So a nucleoside with a flourine down at what's

09:31:50 21   called the 2' position.

09:31:37 22           And it turned out that those also were effective

09:31:42 23   against HCV but also toxic.  So you had various people doing

09:31:49 24   research on various molecules and finding things that worked

09:31:53 25   in the sense that they would kill hepatitis C but wouldn't

really work in a patient because they were toxic, okay?

And here is the blow-up; right?

I'm going to come back to this label Merck compound because one of the issues that is important in this case that you are going to hear about is who actually first made and reported these 2'-methyl OH compound for antiviral activity, and it turns out it's Merck.

And you are going to hear, and it is not going to be disputed, and you are going to see evidence in the papers that showed that Merck made these actually back in the 1960s. They're very old compounds, which is why, as you will hear from the witnesses, people knew about these compound and they were using them for various things.

They were well known, both with adenosine as a base. So remember that upper right part, there is an adenosine base and a cytidine base.

And both of those had been made and tried by Pharmasset before any Idenix patent application accomplished or became public, okay? November 2001, you are going to hear. You are going to hear they filed their first patent application in May of 2000 and that became public in November of 2001. And that is not disputed. There is a sort of a rule in the Patent Office that a certain amount of time after you file for a patent, it gets published, and then people can see it. Okay?

09:33:26 1          Now, Jeremy Clark is the person at Pharmasset

09:33:30 2     who had the idea to put these two things together.  All

09:33:34 3     right?  And you are going to hear from him by video.  Okay?

09:33:38 4     You are going to see him tell his own story how did he come

09:33:41 5     up with this key compound which they called internally

09:33:46 6     Jeremy C's compound or PSI-6130 where he came along and he

09:33:53 7     recognized.  He knew that there were 2'-methyl up compound

09:33:57 8     that were active but they were toxic.  He knew 2'-fluoro

09:34:03 9     down was active but toxic.

09:34:06 10          His idea was let's put them together.  Let's

09:34:08 11     create a nucleoside that has a methyl up at 2' and a fluoro

09:34:13 12     down at 2'.

09:34:14 13          And you might think and a lot of his colleagues

09:34:16 14     thought and the evidence will show, well, why would you want

09:34:19 15     to take toxic plus toxic?  Wouldn't that be more toxic?  Why

09:34:24 16     would you want to do that?  But he did.  He did.

09:34:26 17          And he actually had to persuade his colleagues

09:34:29 18     that that was even a good thing to try because a lot of them

09:34:32 19     thought it wasn't.  And you will hear testimony about their

09:34:35 20     skepticism.  A, they didn't think it would, that it would

09:34:39 21     work.  Why would you want to do it?  And, B, could you even

09:34:43 22     make it?

09:34:44 23          And, in fact, you will see there is this saying

09:34:46 24     that Jeremy liked to use.  He said -- I don't know if we can

09:34:50 25     blow that up but -- what slide are we on, 108?  There we go.

That is better:

That which some call impossible is simply what they've not seen.

So this is actually in a document from May of 2003 that Dr. Clark -- not Dr. Clark, Mr. Clark created reflecting the fact that his colleagues were really skeptical about this. You know, really, you are going to take two toxic things and put them together and that is going to cure or lead to the cure for hepatitis C.

That brings me to another issue that was talked about by Idenix in their opening, and it's going to get a lot of air time in the trial. And that is the idea that in Pharmasset's documents, they refer to the "Idenix compound." And they do. It's all over the place. Okay? The Idenix compound or the Idenix sugar.

And you will hear from Dr. Rachakonda why that was. It's a label. Right? Idenix was working with methyl OH nucleosides. Did Pharmasset know that? Yes, Pharmasset knew that. This is a 2003 document. Remember, their Idenix's patent application had published in November 2001 showed the methyl OH compound. Sure, they were working on those.

So you will see Idenix or, excuse me, Pharmasset refer to that as the "Eden" compound.

Okay. But you will also see -- and this is, by

09:36:18 1   the way, this is Dr. Rachakonda's handwritten notebook in

09:36:23 2   January of 2003.

09:36:24 3   And on the same page, she labels Jeremy Clark's

09:36:31 4   compound, JC is Jeremy Clark, methyl up, fluoro down.  Okay?

09:36:35 5   And then she has actually got another one, Hassan.  That is

09:36:39 6   Dr. Hassan who made all the methyl compound nucleosides

09:36:43 7   before he came to Pharmasset, and he has another one with a

09:36:47 8   methyl up and an NH 2 down.  Hassan's compound.  So you are

09:36:52 9   going to see that in the documents that the scientist would

09:36:55 10  use these labels to recovery to different compounds,

09:36:57 11  including Idenix's compound.

09:36:59 12  Now, you are also going to see -- so just as --

09:37:04 13  let me just go back for a minute.  So just as Pharmasset

09:37:07 14  labeled the different compounds with the names of the

09:37:10 15  companies or people who were working on them, okay?  So did

09:37:15 16  Idenix.

09:37:16 17  This is an Idenix document from 2009 written

09:37:21 18  actually by Dr. Standring who is here actually as Idenix's

09:37:26 19  corporate representative and may testify.

09:37:28 20  And he says, in 2009, when describing a compound

09:37:34 21  called NB66.  Now, there is a lot of labels.  I apologize.

09:37:38 22  You don't have to remember all of them, but NB66 is for

09:37:43 23  Novirio Boston.  That is a 2'-methyl fluoro compound.  Okay?

09:37:50 24  Because Idenix later actually made a 2'-methyl fluoro

09:37:55 25  compound.  They started with methyl OH and ultimately they

09:38:00 1  realized they should try methyl fluoro.  And when they did,

09:38:04 2  they made it and they labeled it NB66.  We're going to talk

09:38:07 3  about how they were able to make it.

09:38:09 4          And what does Dr. Standring say about that

09:38:12 5  compound?  This is the Pharmasset drug.

09:38:17 6          He agreed that is the Pharmasset drug both in

09:38:21 7  the text and down below:  Pharmasset.  Not Idenix's,

09:38:26 8  Pharmasset's.

09:38:26 9          And ultimately, as we know, so internally at

09:38:33 10  Pharmasset, it was clear from the labeling whose compound

09:38:36 11  was whose.

09:38:38 12          Internally, at Idenix, it was clear who everyone

09:38:42 13  thought was responsible for the various compound.

09:38:44 14          And then we get to sort of the real world.  And

09:38:47 15  you are going to hear -- I already mentioned Mr. Clark.  You

09:38:51 16  are going to hear from Dr. Sofia.

09:38:52 17          Who did the scientific community think should be

09:38:55 18  credited with this sofosbuvir, this compound that ended up

09:39:02 19  curing HCV?  It is Dr. Sofia.

09:39:05 20          Now, I'm not going to go through all these

09:39:07 21  awards.  He is fairly modest and probably won't even want to

09:39:10 22  talk about them himself, but he has every award there is to

09:39:13 23  get for this cure.  Okay?

09:39:18 24          No one suggests, at least in the scientific

09:39:21 25  community, that when sofosbuvir came out, sofosbuvir was

09:39:25  1    successful, cured HCV.  You are not going to hear any

09:39:29  2    evidence that people said, oh, Idenix, great job.

09:39:34  3              So let's get to the specific issues you are

09:39:37  4    going to be asked to decide in the case.

09:39:39  5              And really, one of the most important ones comes

09:39:44  6    down to did Idenix invent, back in 2000 or 2001, did they

09:39:53  7    invent sofosbuvir?  Because they're now saying their patent

09:39:58  8    covers sofosbuvir, and you are to assume for purposes of

09:40:00  9    this trial that it does.  All right?

09:40:03 10              The question is, did they have it, ever, and, if

09:40:09 11    so, when?

09:40:10 12              And there are two, I put two dates up here

09:40:13 13    because there are two different patent applications, and you

09:40:16 14    are going to hear testimony about both of them.  Their first

09:40:20 15    one was in May of 2000, the second one was in May of 2001.

09:40:24 16    It turns out there is a third one later we're going to talk

09:40:27 17    about.

09:40:27 18              So one of the issues you are going to decide is

09:40:29 19    you are going to look at those patent applications and say,

09:40:33 20    well, did they actually describe in this compound that they

09:40:39 21    later claimed?  Is it there or not?

09:40:44 22              This is just to frame sort of the test for you.

09:40:48 23    There isn't going to be -- this is not, you know, instructing

09:40:51 24    you on the law here.  Judge Stark will do that.  But

09:40:54 25    conceptually, it's okay to later claim something if you

already had it described in your patent. And so the issue is, did they already have it described in their patent?

And you heard about this a little bit in the patent video. Again, this is not a jury instruction but just a framing issue for you. There are going to be two requirements that we're going to refer to that a patent specification has to have.

So, you know, these patents have to meet various rules in order to be valid. Okay? One of them is what is called a written description requirement. And so the patent itself has to adequately describe what the inventor claims.

And the second thing is this enablement requirement. So you have to first describe what it is in enough detail and then you have to enable people to make and use it. Can it actually be done?

Now, there is a third issue in the case. And we're going to talk about those two and I'm going to show you the evidence on those two.

There is also a third requirement, really sort of 3(A) and 3(B). Also, what you claim has to actually be new and not obvious. So you might describe it perfectly well. You might enable it perfectly well, but if somebody else did it sooner you are out of luck. You can't get a patent, or if you got a patent it is not valid.

And that is actually another issue in the case.

Why is that?

I mentioned the evidence will show that in Gilead's view, Merck actually was the first company to make these 2'-methyl OH compounds, the things that Idenix really thought they invented.

And they were first actually to test them for HCV. Not methyl fluoro but methyl OH.

So let's look at the -- oh, sorry. One other thing before I show you some of the key evidence.

I wanted to mention two of our other witnesses. There is going to be a lot of evidence on these topics. There is going to be a lot of scientific evidence, and both sides have scientific evidence who they're going to call to the stand to help explain to you what the concepts are and how the evidence sort of fits into these concepts.

You are going to hear on our side from Dr. Jack Secrist, Dr. Christoph Seeger, and they will talk.

Dr. Secrist is the chemistry expert, okay? Dr. Seeger is the virology expert.

So Dr. Secrist is sort of the structure of the compounded, the synthesis of the compound. And Dr. Seeger tests the biological activity of the compound witness.

You will hear them. Those are sort of the two pieces you really need to have to understand whether you have a compound that is going to be effective for treating

HCV.  You have to be able to synthesize it.  You have to be able to test it and see what it will do.

All right.  So let's talk about written description and enablement together, the first two rules, if you will, for having a valid patent.

Now, I mentioned there were, there was a third patent application, and so there is a May 2000, there is a May 2001.  Neither of those actually issued as the patent at issue in this case.

The patent in this case issued from an application filed in June of 2003.  June of 2003.

And you will hear evidence and see, that is the first time that Idenix sought any claims that would, versions of any claims that would actually cover sofosbuvir, that would actually cover a nucleoside with a 2'-methyl up, fluoro down.  So 2003 is the first time they tried to get those claims, and we're going to talk about the facts relating to that.

It's also going to be, well, you are going to see evidence that as of the time they filed -- go back -- as of the time they filed the application that issued as the patent in suit in 2003, they didn't know how to make a 2'-methyl fluoro.  They hadn't made one, didn't know how to make one, so I wanted to show you.  And there is going to be evidence on that.

Here is Dr. Griffon who is an Idenix chemist, and he, he and his colleagues tried for years to make a 2'-methyl fluoro nucleoside and couldn't, until, you will see, until they actually saw how Pharmasset did it and they were able to do it.

So here he is saying:  Even in June of 2004, all the strategies that were attempted to introduce a methyl group at the 2' up and a fluorine atom at the 2' down position failed.

Yes, that is my conclusion.

So even a year after they filed the patent at issue in this case, they couldn't even make a methyl fluoro.

Now, I'm going to run through the timeline of how it is then that Idenix could actually get the patent they're asserting in this case, if they couldn't actually make a methyl fluoro.  How did that happen?

And this, you going to hear a lot of evidence on this timeline actually later this morning from Dr. Sommadossi because they're not disputed.

In March of 2000, Idenix first tests a methyl OH.  Again, it's methyl OH for Idenix, methyl OH, methyl OH, methyl OH in yellow fever, and there is going to be discussion about that.  What does yellow fever got to do with this case?

You are going to hear that the scientists, if

you didn't have a hepatitis C assay, you could use something else, maybe. And maybe it would be predictive and maybe it wouldn't. So Idenix at the time really only had yellow fever, and so their first test was to see if methyl OH would be effective against yellow fever in March of 2000. And that is sort of the first point on the map there.

And they're going to show you notebooks that show that they tested a compound called MD1 in yellow fever in March. This is March 7th. The Europeans write the month and the day backward, March 7th.

And this is a methyl OH adenosine. Okay?

So it's sorts of an interesting issue in the case. When Dr. Hassan first joined Pharmasset, I showed you from his prior company the very first compound he tried for hepatitis C was 2'-methyl OH adenosine. He knew about it from Merck.

When Idenix first decided to look at compounds for treating hepatitis C, though they first tested it against yellow fever, 2'-methyl adenosine, that is exactly same compound, the Merck compound.

Okay. The next event is they file the first patent application. So they tested one compound in yellow fever and they filed the patent. That is not going to be disputed. And when you look at that patent, and you are going to be shown the context of that patent, there is no

disclosure of 2'-methyl fluoro anywhere. They hadn't actually thought of it yet. That is going to be undisputed. They hadn't actually thought to try 2'-methyl fluoro.

And there is no antiviral data in the May 2000 patent at all. They didn't even put their yellow fever test, this one yellow fever test they had is not even in the May 2000 patent. I don't know if anyone knows why that is, but it is not in there.

And that actually matters because as you are going to be -- as you are going to learn later in the case, in determining whether they satisfied this rule for describing things adequately, this written description rule, all that matters is what is in the patent. Right? The written description has to be in the patent. You can't say, well, I did a bunch of other stuff that I left out. It has to be in the patent.

Okay. What happens next? And there is their patent.

Oh. And so I'm not going to spend a lot of time on this because the witnesses are. You will see in these patents many, many formulas that Idenix claims to have invented nucleosides described by all these formulas, and it is actually undisputed that the number of compounds -- so in the May 2000, there is 14 compounds -- 14 formulas. Excuse me.

09:50:00 1    There will be a quiz on this later so take this

09:50:03 2 down.

09:50:04 3    So here is the 14 compounds.  And it's actually

09:50:08 4 going to be undisputed that each of them covers millions or

09:50:13 5 billions of possibilities, because you will see the way

09:50:17 6 chemists claim these things, and I know you can't see it

09:50:20 7 from here.  We'll blow some up.  At each of these locations,

09:50:25 8 they tend to put in variables like R, 2' down can be R.

09:50:29 9 Here is one, an R variable.  Then when you look at the

09:50:33 10 description of the patent, it says R can be this many

09:50:35 11 things, just this huge list of things.  And so the formulas

09:50:40 12 in this May 2000 provisional cover billions of compounds.

09:50:44 13    Only half of them allow even allow a methyl at

09:50:51 14 2' up.  So one of the things have to assess is Idenix

09:50:54 15 here in this case is telling you, and they told you in

09:50:57 16 opening that their invention is all about methyl up at 2'.

09:51:01 17 That is it.  That is the holy grail.  That was the "aha"

09:51:05 18 moment.  That was the breakthrough.  It is all about methyl

09:51:08 19 up.  And you are going to have to decide what to make of

09:51:11 20 that when you look at their patents is that really what they

09:51:13 21 thought at the time they'll filed, and so you can see things

09:51:16 22 like only half of the formulas in the provisional even allow

09:51:19 23 methyl at 2' up.  Half of them don't.  You can't have a

09:51:23 24 methyl.  Okay?

09:51:26 25    This is the slide I should have gotten to, 128,

09:51:29 1 where you will see, and this is an example.  Here is formula
09:51:33 2 14 where it is described in terms of, so that is basically
09:51:40 3 the sugar ring.  So when you see the pentagon like that,
09:51:44 4 that is the sugar ring in the middle of the nucleoside,
09:51:47 5 okay?
09:51:27 6           And then the base is stuck on here at the upper
09:52:04 7 right, and the base can be a whole bunch of different
09:52:06 8 things, too.  And then they tend to put -- let's just walk
09:52:10 9 around this.  And the witnesses will explain.
09:52:13 10           So this first, as you go to the right, the first
09:52:16 11 apex, that's called the 1' position.  The next one is the 2'
09:52:21 12 position, which everyone is going to spend a whole lot of
09:52:24 13 time talking about.  Three prime, 4', 5'.  And you'll see
09:52:28 14 sometimes those labels 1', 2', 3'.  Okay.  And at each
09:52:34 15 position in many of these formulas is a variable, and then
09:52:37 16 the variable can be many different groups of things.  All
09:52:43 17 right.
09:52:44 18           And in this case, the claim at issue, which
09:52:53 19 you'll see later, it wasn't shown to you by Idenix yet,
09:52:59 20 requires treating hepatitis C by administering what's called
09:53:03 21 an effective amount of a 2'-methyl ribofuranosyl nucleoside.
09:53:12 22 The witnesses are going to explain to you what that means.
09:53:15 23 Basically it's a 2' nucleoside with methyl up.
09:53:20 24 Ribofuranosyl is something that has been separately
09:53:24 25 construed.  It may be explained to you.  It has to be an

09:53:28 1    effective amount.

09:53:29 2          One of the issues for you to decide is did

09:53:31 3    Idenix describe in its patents how to figure out which of

09:53:34 4    these variations of their various formulas would actually be

09:53:39 5    effective in treating hepatitis C, right, because it is one

09:53:44 6    thing to disclose billions of compounds and it's another to

09:53:47 7    actually know what works.

09:53:50 8          And, you know, we're going to point to some

09:53:58 9    areas in the patent that we're going to invite you to look

09:54:00 10   at.  I'm sure Idenix will, too, as to sort of where is it in

09:54:04 11   the patent that Idenix actually says how you know whether

09:54:08 12   something is effective for HCV, how do you know which of

09:54:12 13   these formulas, which of these compounds to actually pick.

09:54:16 14         And you're going to have to decide, here's, you

09:54:20 15   know -- this is one sentence that they are going to rely on

09:54:23 16   that they say answers that question, and you're going to

09:54:27 17   have to decide whether that's sufficient.  Compounds can

09:54:32 18   exhibit anti-HCV activity by inhibiting HCV polymerase, by

09:54:39 19   inhibiting other enzymes needed in the replication cycle, or

09:54:42 20   by other known methods.  So does that tell you which

09:54:46 21   compound that works?

09:54:49 22         Okay.  This is just a summary.  So it would be

09:54:54 23   our contention that, you know, you've got billions of

09:54:57 24   compounds.  There really isn't anything in the May 2000

09:55:00 25   application that tells you which one would be effective,

which ones would be effective.  There's certainly no methyl

fluoro in sight.  I don't think they are going to be able to

point you to anything in there that shows you methyl fluoro.

And there's no data.  There's no anti-viral data at all.

That's undisputed.  So that's May 2000.

Let's go on to May 2001, the second one in the

chain, a year later.  And they did some work between May

2000 and May 2001, and they are going to talk about some of

the work they did, no doubt.  And, in fact, they added a

little bit of disclosure in May of 2001, so that the patent,

the content of the patent application in May 2001 has a few

things added to it, but it's going to be undisputed, the

evidence will show that there still is no antiviral data in

the May 2001, and there's still no 2'-methyl fluoro in

sight.  All right?  That's all I'm going to say about it for

now.

Oh, they did add a couple formulas.  Sorry.

That's the one other thing.  So remember the May 2000 had

14.  The May 2001 has 18.  But the four they added, so we

went from 14 to 18, the four still don't show any disclosure

of fluorine down at the 2' location.  It's not there.

These 18, we'll look at them, you know, again,

again, only -- I think there's only the seven, so one, two,

three, four, five, six, seven.  Only seven allow methyl at

2' up.  The other 11 don't even allow it.  Can't even have a

methyl.

And only two of the 18 actually specify that you have a methyl at the 2' up. And, of course, none of these -- in particular, the two that specify methyl, these are O, O plus something, O plus something, so you can't even have a fluorine down. It's not even allowed in the two formulas that require methyl up.

And so here again, this is a similar example to the one I showed from May 2000. There's May 2001, where, you know, here's formula 17 as an example where you see that similar structure. Right? The pentagon sugar with the base tacked on at the upper right. You've got the apexes here and all these Rs. And these Rs can be this enormous number of classes of things, of groups. Okay? Each group has many members in it and, you know, you total it all up and you've got billions of possibilities.

And the question still remains: What works? What's effective to treat HCV, and did Idenix say in its patent what's actually effective?

All right. Now, after May of 2001 they do some more work, absolutely. Idenix is continuing to work on their methyl OH compounds. You're going to hear about a number of these compounds. And NM283, for example, that's one of their first leads, 2'-methyl OH. But what became of these things? What happened? How far did they get? Did

09:58:28 1  they work?  Were they effective?  And you're going to hear

09:58:31 2  that none of them as I mentioned I think yesterday, none of

09:58:35 3  Idenix's compounds ever made it out of clinic.  While they

09:58:40 4  were -- they were active against HCV, some of them, they

09:58:46 5  actually could kill HCV, they turned out to be toxic.

09:58:51 6          And so the FDA here directly put some of the

09:58:54 7  compounds on hold or put on hold related compounds that

09:58:58 8  other companies were working on.  There's lots of companies

09:59:02 9  that were working on methyl OH.  Merck was.  Bristol-Myers

09:59:06 10  Squibb was.  Schering-Plough was.  And you'll hear this.

09:59:09 11  Lots of people were all about methyl OH, including Idenix.

09:59:13 12  None of those compounds made it out of clinic and to

09:59:18 13  treating actual patients because they all turned out to be

09:59:22 14  toxic.

09:59:24 15          And this slide is from DX-338.  You'll see,

09:59:33 16  because there was a suggestion again that Idenix says, well,

09:59:37 17  methyl up is the answer.  It's all about that.  It turns out

09:59:41 18  in Idenix's own testing, and, again, I don't expect you to,

09:59:46 19  you know, know all of these.  Even at the end of the case,

09:59:49 20  we won't talk about all of them.  But they tested, I don't

09:59:52 21  know, between 2 and 300 methyl OH compounds.  Idenix

09:59:58 22  internally tested that many with methyl up, OH down and 2'.

10:00:05 23  The vast majority of the methyl OH compounds they tested,

10:00:09 24  the evidence will show, were not active at all against

10:00:12 25  hepatitis C.  Some were.  Some were active.  They turned out

10:00:16 1    to be toxic.  But the vast majority weren't active.

10:00:22 2            All right.  Next event in the timeline.  Now

10:00:24 3    we're going to hop up above the timeline and we're going to

10:00:27 4    talk about what's going on outside Idenix.  Pharmasset --

10:00:32 5    and I didn't fill in the part to the left here because I

10:00:34 6    already told you about it.  Dr. Hassan's work, Dr.

10:00:39 7    Rachakonda's work, Mr. Clark coming up with 2' methyl fluoro

10:00:42 8    and making it and testing it and finding that it actually

10:00:45 9    worked against HCV in vitro.  Not in a patient, but in the

10:00:51 10   lab, and it was not toxic.  They were very excited.

10:00:55 11           They filed their patent, May of 2003 Pharmasset

10:00:59 12   files its patent.  Okay.  And it has -- it's all about

10:01:02 13   methyl fluoro, as you will see.  It has groups of compounds

10:01:07 14   that all have methyl fluoro and identifies a bunch of

10:01:11 15   specific variations of nucleosides that all have methyl

10:01:14 16   fluoro at 2'.  It has a detailed synthesis.  It tells you

10:01:18 17   exactly how to make it in the patent.  And it provides

10:01:24 18   antiviral data.  All right?  And all of the things you would

10:01:28 19   think would be in the patent:  The structure, how you make

10:01:33 20   it, whether it works, it's all there.

10:01:35 21           So who is Pharmasset?  We talked a little bit

10:01:39 22   about it, but more about Gilead yesterday.  They were sort

10:01:44 23   of the Idenix of Georgia.  Right?  A little company of

10:01:49 24   talented scientists working on nucleosides, different

10:01:54 25   nucleosides.  They ended up folk focusing on 2' methyl

10:01:59 1  fluoro in Tucker, Georgia, which is sort of near Atlanta.  I

10:02:03 2  highlighted a couple of so-called characters here.  There's

10:02:06 3  Mike Otto in the white shirt.  Dr. Otto, you're going to

10:02:09 4  hear from him later in the case.  This is Dr. Rachakonda.

10:02:12 5  She looks just like that today.  Hasn't aged today.  And

10:02:15 6  this is a vintage picture I think from '98 from the family.

10:02:19 7  And then Dr. Clark joined a little bit after this photo in

10:02:23 8  2001, and then Dr. Sofia joined a little bit later than

10:02:28 9  that.  Okay?

10:02:29 10         And there's their patent.  So they filed in

10:02:33 11  2003.  Their patent issued.  And there's a number of

10:02:37 12  patents.  You know, I'm using one as an example, but you'll

10:02:39 13  hear and see that there's a number of patents with Dr.

10:02:43 14  Clark -- Mr. Clark, excuse me, is the inventor that issued

10:02:46 15  covering 2'-methyl fluoro nucleoside going, claiming back to

10:02:51 16  this May 2000 application, saying, hey, that's when we first

10:02:56 17  had it, and citing Idenix's work, citing Idenix's patents

10:03:01 18  and patent applications.  And actually in this case even the

10:03:04 19  Idenix, one of the early Idenix compounds, NM283, which was

10:03:09 20  an actual methyl OH compound, which was in clinic at the

10:03:13 21  time.  And so Pharmasset put that information in front of

10:03:15 22  the Patent Office and said, you know, hey, we're different.

10:03:17 23  We're methyl fluoro and got the patent.

10:03:21 24         Now, next, I'm just going to go back to the

10:03:24 25  timeline here for a second.  So May 2003, Pharmasset files

its patent.  It turns out there will be evidence -- I'm

flipping forward.  Here's Dr. Schinazi.  You heard all kinds

of things about Dr. Schinazi yesterday from Idenix in their

opening.  Okay?

And Dr. Schinazi testified that he told Sherry

Knowles, who is a patent attorney that was shared by Idenix

and Pharmasset, she did work for both.  Okay?  And Dr.

Schinazi told Dr. Knowles, or, excuse me, Sherry Knowles

about 2' fluoro methyl nucleosides and said, hey, these

things are great.  We've been working on it.  We've made it.

We've tested it.  It's really interesting.  It really looks

like it's going to be great for HCV.  And this is in May of

2003.  It was after they filed their patent application, Dr.

Schinazi tells this to Sherry Knowles.

And the next event on the timeline is -- I think

I should go back.  Dr. Schinazi was also asked, so are you

saying as far as you know, Idenix, you know, hadn't done a

methyl fluoro 2' methyl fluoro before you told this to

Sherry Knowles?  He said, yes, as far as I know, they

hadn't.

Okay.  The next event on the timeline is the

next month, June of 2003, and I mentioned this one already.

I want to come back to it.

In June of 2003, Idenix files the patent

that actually issues.  Files the patent application that

actually issues as the patent that's asserted in the case, the '597 patent, so the one that's really at issue here. All right?

Now, they can't change, and they didn't change the actual disclosure, the description. They didn't change the formulas from the 2001 app. The 2003, they kept all that in, which, as I said, as the evidence will show, has nothing about methyl fluoro. But what they did do is for the first time they added claims that were broad enough to cover 2'-methyl fluoro nucleosides. And they said to the Patent Office, well, we invented that back in May of 2000.

So though they filed in June of 2003, they said, hey, we get the benefit of this May 2000 date. And that's a critical issue that you have to decide. Is that right? Do they get that May 2000 date for a claim that covers a 2'-methyl fluoro compound?

Their patent issued in 2009. Okay. And the Pharmasset application -- we're just going to go in parallel here to get to the end of the story. The Pharmasset application publishes in January of 2005. Remember I mentioned before, just like their early applications published, they publish about 18 months later after they are filed. Same thing for Pharmasset. May of 2003, the application publishes in January of 2005. And so the world knows at that point all about Pharmasset's 2'-methyl fluoro

10:07:03 1   invention, what it is, how you make it, what does the

10:07:07 2   hepatitis C antiviral testing look like?  It's all laid out.

10:07:12 3   Okay.

10:07:12 4       Now, the evidence is going to show that

10:07:15 5   until Pharmasset's patent application published, Idenix

10:07:22 6   couldn't -- they had tried to make a methyl fluoro,

10:07:26 7   2'-methyl fluoro, and they couldn't.  But when they saw the

10:07:30 8   patent application published -- this is January 19th of

10:07:35 9   2005, so this is like six days after, it's not going to be

10:07:40 10   disputed, but the Pharmasset application publishes I think

10:07:43 11   January 13th of 2005, and basically immediately it's

10:07:47 12   circulated inside Pharmasset.  And they are very interested

10:07:53 13   in it, and it's totally fine for them to read it.  We don't

10:07:56 14   have a problem with that.  People can read one another's

10:07:59 15   patents and patent applications.

10:08:02 16       But what's interesting, or maybe you'll find

10:08:04 17   interesting, this is Dr. Stewart.  Dr. Stewart is one of the

10:08:08 18   people after Dr. Griffon at Idenix who kept trying to make a

10:08:13 19   2'-methyl fluoro.  Dr. Griffon couldn't do it.  Dr. Stewart,

10:08:17 20   you try.  And here he is saying, just a quick note to let

10:08:21 21   you know, let you and Adel know what we're up to at the

10:08:28 22   moment after getting the patent yesterday.  The patent is

10:08:31 23   the Pharmasset patent.

10:08:34 24       I've gathered all the materials for carrying out

10:08:35 25   the first two steps of the synthesis, scaled up the

10:08:39 1  fluorination reaction using their conditions, and I won't

10:08:41 2  bore you with the conditions, but they're very technical,

10:08:44 3  how you actually make this compound.  So they're ordering

10:08:48 4  the materials to try to do it in their own lab.

10:08:52 5       And they actually subsequently generated a

10:08:55 6  report.  Here's January 28th, so it's a couple weeks later,

10:08:59 7  saying that, you know, investigation of the Pharmasset

10:09:02 8  patent route, following the publication of the patent, it

10:09:06 9  was decided that their route from cytidine should be

10:09:10 10 followed to make the required fluorinated nucleoside.

10:09:14 11      Ms. Wang, who worked with Dr. Stewart, here's

10:09:21 12 her notebook page.  And this is very hard to read.  I will

10:09:25 13 read it on my copy to you.  Maybe we can blow that up.  I

10:09:30 14 don't know.  The top part.  It's in her handwriting, so it's

10:09:33 15 a little bit difficult to see.

10:09:36 16      Objective.  Objective:  To synthesize the title

10:09:40 17 compound, and that's a methyl up and a fluoro down at 2'.

10:09:46 18 Okay.  That bottom right-hand corner on the sugar.  Follow

10:09:49 19 Pharmasset patent.  And they did it, and they were able to

10:09:59 20 make it once they saw the Pharmasset patent.

10:10:02 21      Here's Dr. Griffon again.  He was still part of

10:10:06 22 the effort.  And later in 2005, did you -- you did

10:10:09 23 successfully synthesize a 2'-methyl up, 2' fluoro down

10:10:15 24 nucleoside using information from a published Pharmasset

10:10:17 25 patent application?

10:10:18 1          Yes.  It was either a patent or maybe a

10:10:20 2   publication, a paper, but in any case, it was from

10:10:23 3   Pharmasset.

10:10:24 4          So they were able to do it in 2005.  Now,

10:10:30 5   remember, their patent, the actual application for the

10:10:37 6   patent in this case was filed in 2003, and they claim they

10:10:41 7   invented it in 2000, or 2001.  Okay.

10:10:47 8          So this is just to summarize, you know, did they

10:10:51 9   follow the rules?  Okay.  Did they follow the rules you are

10:10:55 10  supposed to follow?  So in 2000 they've got a patent

10:10:58 11  specification, a description that has information in it.

10:11:03 12  There was something there.  A lot of stuff about methyl OH.

10:11:07 13  Okay.

10:11:08 14          And they can -- certainly, they can draft

10:11:15 15  different kinds of claims based on that specification that

10:11:19 16  cover material they actually disclosed.  No problem.  And

10:11:25 17  they did that in 2001.  Now, they also actually expanded

10:11:29 18  their specification in 2001.  Remember I mentioned they

10:11:33 19  added some information?  That may be an important issue in

10:11:37 20  the case.  We'll see how much they rely on the 2001

10:11:40 21  information.  But in any case, they can claim what they

10:11:44 22  actually disclosed, no problem.

10:11:49 23          But then Pharmasset comes along with this

10:11:51 24  2'-methyl fluoro compound not shown in Idenix's 2000 or 2001

10:11:59 25  specifications, and then claims it -- for the first time in

10:12:05 1  2003, Idenix comes along and gets a claim, or seeks a claim

10:12:11 2  that covers methyl fluoro.

10:12:15 3          And so the issue, the key issue for enablement

10:12:18 4  and written description is, can they do that?  Can they go

10:12:22 5  beyond what they actually disclosed and taught and cover

10:12:25 6  this other compound?

10:12:07 7          All right.  So we have one more rule.  That is

10:12:16 8  the first two rules.  There is one other rule to cover and

10:12:20 9  we'll go much more quickly.  I appreciate your patience.

10:12:22 10          Merck.  Okay?  I mentioned Merck.  We talked

10:12:26 11  about how Merck had these compounds since the 60s.

10:12:31 12          The other rule is even as to methyl OH, for HCV,

10:12:39 13  for treating HCV, did Idenix do that first or not?  Because

10:12:45 14  you can't get a patent on something that somebody else

10:12:49 15  already did.

10:12:50 16          And our contention is going to be that they

10:12:52 17  didn't, that Merck did it.  And the Patent Office didn't

10:12:55 18  know about Merck's work because it was internal, it was not

10:12:58 19  something that was published.  The Patent Office couldn't

10:13:01 20  know about it.  And so you folks are going to be the first

10:13:04 21  people to actually assess whether Merck or Idenix first came

10:13:09 22  up with the idea and actually made compounds, 2'-methyl OH

10:13:15 23  compound for treating HCV.

10:13:18 24          This just makes the point that patent

10:13:21 25  prosecution is private.  Until the application publishes,

nobody can know what is going on between an applicant and the Patent Office. It's a confidential process. And so Merck couldn't know, for example, that Idenix was seeking a patent of 2'-methyl OH to treat HCV. There is no way Merck could know that and say, hey, wait a minute. We did it. Right?

So Merck on the timeline; remember, Idenix is down below, Pharmasset is in green. Merck is over here in blue because their work started the earliest of all: '98.

And so what are the key events there?

I should say their work for HCV started in '98. Actually, you are going to hear some testimony it was '97. Whoops. Wrong way.

But the compound, as I mentioned, and this is not going to be disputed, the actual compound, 2'-methyl R can be CH3. That is methyl. This is an a Merck paper from 1966. See? These compounds were well known.

Methyl OH adenosine. This is the compound that Idenix -- let's see if I can do my math -- 34 years later, tested in yellow fever and filed the patent that launched this lawsuit.

Merck was interested in HCV even before Idenix was. You will hear testimony, and actually you are going to see a live witness, Dr. Olsen. They had a very large collaboration with a company called Isis Pharmaceuticals to

really figure out a cure to HCV.  And they had lots of people on the job.

And in '98, this is September 11th, 1998, they tested a bunch of compounds, one of which you are going to hear reference to an L-765 compound, 2'-methyl OH adenosine. 2'-C-methyl adenosine.  And they found that it was active against BVDV.

Now, this is, remember, Idenix started with yellow fever and then eventually they did testing against another virus called BVDV.  These were both used by Idenix as surrogates for HCV.  They didn't test directly against HCV and the witnesses are going to explain to you why that was.

Merck initially use BVDV as a surrogate also, but the evidence will show years before Idenix.  So in 1998, here they are, finding that a methyl OH is active against BVDV.

It's exactly the same compound, I already showed this to you, that Idenix tested later.  It is the same compound two years later.

And later, in 2000, Merck retested same compound.  So what happened between '98 and 2000?  The replicon assay.  You are going to hear this is a big deal in the field.  In '99, some researchers figured out how you could actually test these compounds directly against the HCV

virus.

HCV is a very, as the witnesses will say, is a very tricky virus.  It is very hard to nail it down, even to figure out how to treat it, where to attack it to treat it. Can you actually even test against it?  And it was a big watershed event in '99 where people figured out how to do that.

Merck licensed that technology so they could test against actual HCV.  And so in 2000, then, as part of this same program, Merck tested tons of additional compounds, including methyl OH compounds like methyl OH adenosine and found out that, yes, in fact, it is active against HCV, and they became very excited about it in 2000.

Now, there is going to be a dispute between us and Idenix about when exactly in 2000, who did what.  I'm not going to go through all that now.

But one thing that will not be disputed is so Merck's 2000 work was actually testing these compounds against hepatitis C.  The first time Idenix actually tested its compound against hepatitis C was 2005.  Okay?

So the work that Idenix is going to rely on to try to beat Merck, to try to get behind Merck is actually yellow fever testing, that yellow fever testing, when Merck was testing against HCV.  All right?  And that is going to be an issue, an important issue in the case that we're going

to talk more about.

Merck got a bunch of patents.  Not surprisingly.
One of them is this '499 patent.  There is two or three
others you may hear about during the course of the case.  So
they got their patents.

And I wanted to say in terms of, because you
were shown this document.

And we're very near the end here.  Thanks
your patience.

This is, you are going to see, you saw it in
their opening.  You may not remember but I'm quite sure you
are going to see it again.  It's a 2003 grant application by
Pharmasset trying to get government funding for further
research on hepatitis C.  Okay?

And it was suggested to you by Idenix that,
well, see here, look, this is Pharmasset crediting Idenix
with the idea of 2'-methyl compounds for HCV.

And it's correct that in this grant, Pharmasset
cited to three sources, 9, 10, and 11.  Okay?

One was Idenix's to an application that has no
HCV data but does show methyl OH compound for sure.

But you are also going to see that No. 10 was to
Merck.  It was because Merck published on their work, too.
Pharmasset was aware of that and credited Merck with
actually providing data.  And if you look at the Merck

paper, you will see, this will be in evidence, it actually contains replicon anti-HCV activity for 2'-methyl OH.

So this is another example of one of those documents. I gave you some examples yesterday where you really have to look at the whole thing and not just the pieces of the document.

And so it will be Gilead's contention at the end of the day that as between Idenix and Merck for 2'-methyl OH, Merck was first.

Merck made these compounds first in the 60s. They actually tested them for antiviral activity first in the 60s.

They tested them for potential hepatitis C applications first in 1998.

They did, Merck was first to use HCV specific assays in 2000.

And, actually, Merck filed its patent application in January of 2001, which is before the Idenix 2001 patent application.

All right. So there you have it. And so we'll be asking at the end of the case for a verdict that the Idenix patent is not valid for the reasons that I walked you through, these three reasons, any one of which is sufficient. You don't have to have all three. We think we have all three. But for any one of them, their patent is

10:21:30 1   not valid and you should find in favor of Gilead.

10:21:35 2          That's it.  Thank you.  I appreciate your

10:21:37 3   patience.

10:21:38 4          THE COURT:  All right.  Thank you very much.

10:21:39 5   That completes the opening statements.

10:21:40 6          I believe before calling the first witness, I

10:21:46 7   was going to read the uncontested facts to the parties.  Do

10:21:50 8   either of you happen to have a copy handy of that?

10:21:56 9          Just bear with us for a moment, ladies and

10:21:58 10  gentlemen.

10:22:26 11         MR. HEADLEY:  Permission to approach, Your

10:22:28 12  Honor.

10:22:28 13         THE COURT:  Yes, please.

10:22:32 14         (Documents passed forward.)

10:22:37 15         MR. HEADLEY:  Just a reminder, Your Honor, there

10:22:39 16  is one on the back of the page.

10:22:40 17         THE COURT:  Thank you.

10:22:42 18         Okay.  Ladies and gentlemen, before -- well, to

10:22:45 19  begin the evidentiary portion of the trial, I'm going to

10:22:47 20  read you something called the joint statement of uncontested

10:22:52 21  facts.  It's a very short document, seven statements.

10:22:56 22         1.  Idenix Pharmaceuticals LLC, ("Idenix") is a

10:23:02 23  limited liability company.

10:23:05 24         2.  Universitas Degli Studi di Cagliari ("U.

10:23:12 25  Cagliari") is an Italian university located in Cagliari,

Italy.

       3. Gilead Sciences Inc. ("Gilead Sciences") is a Delaware corporation with its principal place of business in Foster City, California.

       4. Idenix and U. Cagliari filed a lawsuit on December 1st, 2013 alleging Gilead infringes U.S. Patent No. 7,609,597.

       5. The '597 patent, titled Methods and Compositions For Treating Hepatitis C Virus, issued on October 27th, 2009.

       6. The named inventors on the '597 patent are Jean-Pierre Sommadossi and Paolo La Colla. And,

       7. Use of Sovaldi and Harvoni in accordance with their respective labels results in the use of the method defined by the asserted claims of the '597 patent under this Court's claim construction.

       That completes the uncontested facts. We'll now turn to Idenix to call its first witness.

       MS. PARKER: Thank you, Your Honor. We would like to call Dr. Jean-Pierre Sommadossi.

       THE COURT: Okay.

       ... JEAN-PIERRE SOMMADOSSI, having been first duly sworn, was examined and sworn as follows ...

       THE COURT: Welcome, Mr. Sommadossi.

       THE WITNESS: Thank you.

10:25:40 1          THE COURT:  Good morning.

10:25:42 2          MS. PARKER:  May I approach?

10:25:43 3          THE COURT:  Yes.

10:25:44 4          MS. PARKER:  I have two copies.

10:25:47 5          THE COURT:  Thank you.

10:25:50 6          (Documents passed forward.)

10:25:52 7          MS. PARKER:  Your Honor, may I approach the

10:25:53 8   witness?

10:25:54 9          THE COURT:  You may.

10:26:20 10                    DIRECT EXAMINATION

10:26:20 11  BY MS. PARKER:

10:26:21 12  Q.     Good morning, Dr. Sommadossi.  Are you ready?

10:26:26 13  A.     Good morning.  I am.

10:26:27 14  Q.     Would you please introduce yourself to the jury.

10:26:30 15  A.     I'm Jean-Pierre Sommadossi.  I live in Boston.  And I

10:26:35 16  am married.  I have a 27-year-old daughter who is a lawyer,

10:26:41 17  just graduated from American law.

10:26:45 18  Q.     What are you hear to talk about today?

10:26:45 19  A.     I'm here to talk about invention almost 20 years ago

10:26:51 20  on the 2'-methyl ribonucleoside for the treatment of HCV --

10:26:59 21  -- of hepatitis C.  I'm sorry.

10:27:03 22  Q.     Have you ever testified in court before?

10:27:05 23  A.     No, this is my first one.

10:27:07 24  Q.     Now, you told us you are from Boston.  Is that where

10:27:10 25  you are from originally?

10:27:11 1    A.        No, with my accent you know.  I am originally from

10:27:15 2    France.  I was born in Italy actually.  I was born in

10:27:20 3    Torino.  My father was a dentist.  And I moved to France,

10:27:28 4    being with my grandparents when my parents divorce when I

10:27:34 5    was four years old.  I was raised by my grandparents, and

10:27:38 6    went to the University in Marseille.  And then I went to the

10:27:43 7    United States the first time in 1981, so 35 years ago, and

10:27:50 8    still I have the same accent as 35 years ago.

10:27:54 9    Q.        I want to go back and break some of that down.

10:27:58 10   A.        Sure.

10:27:58 11   Q.        First of all, can you tell us how is it that you

10:28:01 12   first got interested in science?

10:28:02 13   A.        Sure.  Well, as I mention, my father was a dentist

10:28:07 14   and so I thought that I was going to be a dentist as well.

10:28:15 15   In the early '70s, in 1973 exactly, when I enter the first

10:28:21 16   year medical school, dental school and pharmacy school in

10:28:25 17   France were equivalent or the same.  It was like a common

10:28:30 18   year.  And during that year, I graduated, I could go in any

10:28:39 19   of the three branches, and I really liked pharmacology.  I

10:28:43 20   really liked chemistry.  And so I decided to go in pharmacy

10:28:51 21   school instead of dental school.  And then I spent a summer

10:28:56 22   with my dad and helping him, and I had to say that it was

10:29:00 23   not always pleasant.  So I decided that I was going to go

10:29:05 24   in pharmacy school.

10:29:07 25            And I stayed there for six years when I receive

a Pharm.D degree at the University of Marseille, School of

Pharmacy.

Q.    And tell us about all of your degrees that you have,

if you will, please, sir.

A.    Sure.  So I have a Pharm.D degree, as I indicated.

And I have something in France that is called a Doctorat

D'etat Es Sciences Pharmaceutiques.  So Doctorat D'etat is

higher than the Ph.D. level.  That means you do not need

additional work or demonstrate the ability to be a full

professor in France.

So I received that degree in 1984, which is an

advanced Ph.D. in Pharmacology.

Q.    Now, did you do any type of fellowship as part of

your education or your training?

A.    Sure.  I was fortunate to be the first fellow to come

under a U.S./France cancer program.  When Valery Giscard

d'Estaing and Gerald Ford met in the middle of the Atlantic,

one thing they did was to sign an agreement for cancer

research.

I was the first fellow to come to the National

Cancer Institute in Bethesda as a faculty fellow, so paid by

the faculty, and spend about six months at the NIH.  And

because it was very crowded, even extremely crowded today,

my mentor, who was the head of DCT, which is Division of

Cancer Treatment, suggested that I go to another cancer

10:31:16 1    center where there was some great research going on.  And

10:31:21 2    that is why I went to the Medical Clinic of Virginia, Cancer

10:31:26 3    Center in Richmond, which I think today is called VCU.

10:31:45 4    Q.    And what did you do after that?

10:31:47 5    A.    What I did after that, so I stayed there until 1983.

10:31:57 6    We did some really major replications at the time in the

10:32:02 7    cancer field and actually already a nucleoside at the time

10:32:09 8    in the early eighties.

10:32:10 9              And because of that U.S. cancer program, I

10:32:17 10   had to abide to a two-year residence in France before I

10:32:24 11   could apply for any for any U.S. Visa.  And so for two years

10:32:30 12   I was continuing my research on both sides of the ocean,

10:32:35 13   going between the U.S. and France, and I decided to come

10:32:43 14   permanently to the U.S., resign from my position of a

10:32:48 15   tenured scientist, the equivalent of the French NIH on

10:32:57 16   February 28th, 1981, and became an assistant professor at

10:33:04 17   the University of Alabama at Birmingham School of Medicine

10:33:08 18   on March 1, 1985.

10:33:09 19   Q.    And tell us about your work and your positions at the

10:33:13 20   University of Alabama.

10:33:16 21   A.    Sure.  So I stayed about 15 years at the University

10:33:25 22   of Alabama, Birmingham, School of Medicine.

10:33:27 23              At the time, so I end up there, my mentor,

10:33:40 24   Dr. Robert Diazio today, he's the director of the Cancer

10:33:43 25   Center at Mayo Clinic, had the offer to lead the department

10:33:54 1 of pharmacology and also being an associate director, the

10:33:59 2 comprehensive cancer center at UAB, there was about 15

10:34:05 3 comprehensive cancer centers in the U.S. and those are

10:34:08 4 really the major centers for research and treatment of

10:34:13 5 cancer.

10:34:14 6 And so he called me at the end of '84 and said,

10:34:23 7 hey, you know, I decided to take that position. Would you

10:34:28 8 like to join me and be my first faculty to develop the

10:34:37 9 department of pharmacology and in the same time, the

10:34:42 10 division of clinical pharmacology as well, which I accepted,

10:34:47 11 so I was an assistant professor. That means I could be

10:34:55 12 promoted as a tenured professor, first tenured associate

10:34:58 13 professor in 1989, and then I became a full professor in

10:35:06 14 1992, tenured.

10:35:09 15 So when I was at UAB, I started from scratch,

10:35:21 16 from zero, writing grants. This is the life of an academic

10:35:27 17 person. Many grants, many publications. Today I think I

10:35:32 18 have about 200 peer-reviewed publications at the time when I

10:35:38 19 was an academic.

10:35:41 20 I developed a graduate program in pharmacology

10:35:49 21 at UAB. I became the associate director of the Liver Center

10:35:55 22 and the Comprehensive Cancer Center and the AIDS Center as

10:36:00 23 well, and I was fortunate to be at the very early stage of

10:36:11 24 research and development of HIV therapeutics, both from an

10:36:17 25 academic standpoint and working with biotech and the NIH and

10:36:29  1    big pharma.

10:36:30  2              This was a time, and I'm talking about '85, '86,

10:36:38  3    when HIV became really more recognized as a major issue, was

10:36:45  4    a high priority at the National Cancer Institute.  And I was

10:36:51  5    fortunate to be part of the first major grants in drug

10:36:57  6    discovery, which combined academia, big pharma for the first

10:37:07  7    time.  It was like a major project, and academic.

10:37:16  8              I was actually on the first study section on HIV

10:37:21  9    therapeutics in 1989 and I was 33 years old, I think, if I

10:37:29 10    recall, so definitely the youngest one on the panel.

10:37:35 11              And during these years, I probably did a lot,

10:37:40 12    90 percent of nucleosides, which have been developed for the

10:37:48 13    treatment of HIV AIDS either through grants from the NIH, as

10:37:56 14    an academic professor, to corporations, biotech and big

10:38:04 15    pharma, as an expert and a consultant either of biotech and

10:38:11 16    big pharma as well as conducting the first part of the team

10:38:20 17    that did the first triple combination, we call it cocktail

10:38:25 18    for HIV therapeutics.  And this is part of a group, a large

10:38:32 19    group international of investigators and the NIH as well.

10:38:39 20    Q.    I want to ask you a couple followup questions about

10:38:43 21    that.  You mentioned you were a tenured professor.  Can you

10:38:45 22    tell the jury, can you tell us, what does that mean?

10:38:47 23    A.    Tenured professor?

10:38:49 24    Q.    Yes.

10:38:49 25    A.    It means when I was at UAB, a tenured professor and

10:38:54 1    still today, you can have a job for life.  That means that

10:39:00 2    you are paid and regardless if you receive grants or no

10:39:10 3    grants, you still need to publish.  You need to teach.

10:39:15 4                So I was teaching to medical students, to

10:39:20 5    dental students, to nursing school students, to medical,

10:39:30 6    medical, dental, nursing and graduate program, and

10:39:37 7    basically, I can just get a paycheck at the end of every

10:39:42 8    month until I'm 70 years old.

10:39:46 9    Q.    Okay.  Now, you mentioned the word pharmacology.  So

10:39:50 10   I want to ask you about that.  What is pharmacology?

10:39:53 11   A.    So pharmacology, it's a great science.  It's an

10:39:59 12   applied science.  Actually, everything that happens when you

10:40:08 13   take medicine, so you take a pill and you take an injection,

10:40:13 14   a vaccine, anything that's inhaled, as medicine, you take as

10:40:23 15   a pill, Tylenol, anything, and then study what happened to

10:40:28 16   that drug.  So the drug is absorbed either in the intestine

10:40:35 17   or in the mucosa and then, so that's called absorption.  And

10:40:42 18   then --

10:40:44 19   Q.    May I jump in?

10:40:45 20   A.    Yes.

10:40:46 21   Q.    I'm sorry.  I'm sorry to jump in and interrupt, but

10:40:49 22   did you bring a demonstrative with you that goes over these

10:40:51 23   points?  Maybe we can show that to the jury as you're

10:40:54 24   talking.

10:40:55 25   A.    I'm sorry?

Sommadossi - direct

10:40:56 1    Q.    Did you bring a demonstrative with you, a chart with

10:40:58 2    you on these issues about absorption that we could show the

10:41:01 3    jury?

10:41:01 4    A.    No.

10:41:03 5    Q.    And can we pull that up, the demonstrative you

10:41:05 6    prepared.

10:41:06 7          MS. PARKER:   If we could pull up demonstrative

10:41:08 8    number 1.

10:41:10 9          THE WITNESS:   Okay.

10:41:10 10   BY MS. PARKER:

10:41:12 11   Q.    Do you remember that?

10:41:12 12   A.    How does it work?  I'm sorry.

10:41:14 13   Q.    Can you see it on your screen?

10:41:17 14   A.    Yes.

10:41:18 15   Q.    Okay.

10:41:18 16   A.    All right.  So now it is because it was not before.

10:41:22 17   Q.    Okay.

10:41:23 18   A.    So absorption I mentioned.  So it's when the drug

10:41:28 19   basically goes through the joint mucosa of the intestine and

10:41:35 20   then after it's distributed in your body and then it's

10:41:41 21   metabolized.  And metabolized means that the drug is

10:41:45 22   converted in maybe another product or two products or ten

10:41:53 23   products, and some may be active, may be important for the

10:41:59 24   treatment, and some may be toxic.

10:42:03 25          And the metabolism can occur -- the major organ

10:42:08 1  where your metabolism is is the liver, because you have the

10:42:13 2  predominant enzyme that's going to really chop those

10:42:17 3  therapeutics, those medicines, those drugs.

10:42:21 4  And then excreted.  Well, it can be excreted in

10:42:27 5  urine, in any body fluids.  That's what is excretion.  So --

10:42:34 6  and it can be excreted the way you took it or in the

10:42:38 7  different form.

10:42:38 8  So pharmacology, that's what we study and it's a

10:42:45 9  key science for obviously development of new therapeutics

10:42:52 10  and for their approval, the marketing by FDA.

10:42:58 11  Q.    Dr. Sommadossi, are you a pharmacologist?

10:43:01 12  A.    I am a pharmacologist.  I have been a professor of

10:43:04 13  pharmacology for 17 years.

10:43:06 14  Q.    Now, going back to the University of Alabama, at some

10:43:10 15  point did you leave there?

10:43:12 16  A.    I'm sorry?

10:43:13 17  Q.    Now, going back to your time at the University of

10:43:17 18  Alabama --

10:43:17 19  A.    Yes.

10:43:18 20  Q.    All right.  At some point, did you leave the

10:43:20 21  University of Alabama?

10:43:21 22  A.    Yes.  So in 1998, I got into one of those situations,

10:43:28 23  maybe a midlife crisis, but, said, okay.  You know, here I

10:43:36 24  am 40, 42 years old.  I had accomplished I think in academia

10:43:45 25  what could have been accomplished.  I was the head of the

10:43:50 1  graduate program.  I had acquired about 23 Ph.D. students.

10:44:01 2  I had a group of about 30 scientists.

10:44:05 3       I was bringing in excess of $5 million a

10:44:08 4  year in NIH grants.  The university alumni, because I pay my

10:44:17 5  own salary for 15 years over the 17 years I was there

10:44:21 6  through my grants, and when you pay grants, the university,

10:44:26 7  there is what we call an overhead, and therefore they

10:44:31 8  appreciate academics that bring very significant grants.

10:44:36 9       So I was, either I was going to continue and

10:44:43 10  become a chairman of the department and then a dean, but

10:44:47 11  really what I always loved is drug discovery and

10:44:56 12  development, studied pharmacology, as I indicated:  How they

10:45:03 13  work, could they be toxic?  And I have pretty good

10:45:09 14  expertise, and I was basically traveling extensively, being

10:45:14 15  on the board and being a consultant of pharmaceutical

10:45:17 16  companies and biotech.

10:45:20 17       But when you consult when you're an expert, you

10:45:24 18  see only a part of the drug development.  You see the first

10:45:32 19  stage, which is going from the discovery to the early, what

10:45:37 20  we call in vitro study, to see how the drug interacts.

10:45:47 21       And then after that, you go into animals.  Then

10:45:51 22  you have to get very rigorous studies to be able to go in

10:45:57 23  man for testing the drug, and then after it's all complex,

10:46:05 24  clinical development, which is very well defined by the FDA

10:46:11 25  to get potential approval.

10:46:14 1    And so really what I was interested in was to go

10:46:19 2    from A to Z, and there are very few individuals that have

10:46:25 3    been able to go A to Z, and very few biotechs have been able

10:46:29 4    to go from A to Z.

10:46:31 5    And so the same way when I came to the United

10:46:39 6    States, I started to go around with my briefcase and take a

10:46:47 7    sabbatical in 1999 -- in 1999, so I -- in 1988, in 1998,

10:47:01 8    first I founded a biotech company, which was called Novirio,

10:47:08 9    and then became Idenix.

10:47:10 10   Q.    Could we pull up demonstrative number 2 at this

10:47:13 11   point, please.

10:47:15 12   A.    And I co-founded as well Pharmasset.  That's in 1998.

10:47:20 13   And so just to found companies is one thing, but

10:47:30 14   then you have to raise the money, and only the founders can

10:47:34 15   do that.

10:47:36 16   Q.    Now --

10:47:37 17   A.    And so I was basically having, like, two jobs, three

10:47:43 18   jobs, even consulting with companies.  And that's why I

10:47:49 19   decided to take a sabbatical, because I was fortunate that

10:47:57 20   in '98 I had raised $12 million from a premier venture

10:48:05 21   capital firm, and the chairman of the advisory board of that

10:48:15 22   venture capital firm was a very well-known Nobel Prize

10:48:23 23   winner, former president of Cal Tech, former president of

10:48:30 24   the White Institute.  And I had worked with him.  And he's

10:48:37 25   the person that says, yes, definitely, we should invest in

10:48:43 1    that company.

10:48:44 2    Q.    How --

10:48:45 3    A.    And so that's when I took a sabbatical and started

10:48:52 4    really to put in ideas in the development of those

10:48:56 5    therapeutics.

10:48:57 6    Q.    How did you come up with the name Novirio?

10:49:01 7    A.    Novirio?  Well, Novartis.

10:49:03 8    Q.    Okay.

10:49:04 9    A.    So basically, we -- our job is to regulate

10:49:13 10   pharmacists, and so I came with Novartis.

10:49:15 11             THE COURT:  Dr. Sommadossi, just wait until

10:49:17 12   counsel has finished her question so we can get a clean

10:49:20 13   transcript of your answer.

10:49:21 14             Go ahead.

10:49:22 15   BY MR. PARKER:

10:49:22 16   Q.    And then Idenix, how did you come up with the name

10:49:24 17   Idenix?

10:49:25 18   A.    I came up -- so it's a nice infectious disease, and

10:49:32 19   we have to change the name in early 2000 due to the fact

10:49:39 20   that one pharmaceutical company argued that we had infringed

10:49:44 21   a trademark.  And so we were a very small company and just,

10:49:51 22   we agreed to sell for $100,000 so we can change all the

10:49:56 23   letterhead and that's fine, and that's how we changed the

10:49:59 24   name.

10:50:00 25   Q.    Now, when was your company formed?  What year?

10:50:04 1    A.      The company was formed in May 1998.

10:50:11 2    Q.      All right.  So to start with, how many employees did

10:50:14 3    you have?

10:50:15 4    A.      One.

10:50:16 5    Q.      All right.  Who was the principal founder of your

10:50:20 6    company?

10:50:21 7    A.      I was the principal founder.

10:50:23 8    Q.      Okay.  Were there others who helped you found the

10:50:27 9    company?

10:50:27 10   A.      Yes.  There were, other founders were Dr. Raymond

10:50:35 11   Schinazi, Dr. Jean-Louis Imbach, and Dr. Gilles Gosselin.

10:50:41 12   Q.      Now, back at the beginning, were there certain

10:50:44 13   diseases that your company was focused on in terms of the

10:50:47 14   research?

10:50:48 15   A.      Yes.  When we founded the company, the priority was

10:50:57 16   on HIV, and we were in the process to license a technology

10:51:07 17   or drugs for a company called Pharmasset, and also in

10:51:14 18   hepatitis B as we had licensed technologies, patents from

10:51:21 19   the university of -- the founder and the co-founders.  And

10:51:27 20   so '98, early '99, we were focused on HIV, AIDS, and

10:51:36 21   hepatitis B treatment.

10:51:37 22   Q.      And at some point did you become focused on hepatitis

10:51:41 23   C?

10:51:42 24   A.      Yes.

10:51:43 25   Q.      Can you tell us about that briefly, please?

10:51:45 1    A.    Sure.  So this is in late 1999, I was reading a lot

10:52:01 2    of publications, scientific publications and the key

10:52:05 3    scientific journals, and I just got a publication that was

10:52:15 4    just issued in late '99 on a 3D structure.  When you have an

10:52:26 5    enzyme that has been identified, first purified, identified,

10:52:33 6    purified and got like a crystal of the enzyme, you have

10:52:41 7    tools, which are called X-ray crystallography, that will

10:52:46 8    give you the exact structure and the three dimensions of

10:52:51 9    that enzyme.

10:52:39 10           And, basically, this is what you need in general

10:52:44 11   to have a better idea of the type of drugs that you need to

10:52:49 12   design to be able to bind to the enzyme and offer the

10:53:01 13   pharmacological effect.

10:53:02 14   Q.    All right.  Now, before we talk in a little more

10:53:05 15   detail about the hepatitis C work, let me just stop and ask

10:53:09 16   you, do you work at Idenix today?

10:53:12 17   A.    Today?

10:53:12 18   Q.    Today.

10:53:14 19   A.    No.

10:53:15 20   Q.    And are you being paid to come here and testify in

10:53:18 21   this lawsuit?

10:53:19 22   A.    No.

10:53:20 23   Q.    All right.  So let me go back to hepatitis C, and I

10:53:25 24   want to ask you first if you could please just explain in a

10:53:29 25   fairly top line way to all of us what is the hepatitis C

10:53:35 1  virus?  What is hepatitis C?

10:53:37 2  A.    Sure.  May I have the slide that illustrate?

10:53:43 3  Q.    Yes.  This is Demonstrative No. 3.

10:53:48 4  A.    It's a pretty complex structure, as you can see.  It

10:53:59 5  has an envelope.  What is important to know, here, when we

10:54:02 6  talk about viruses, you have RNA or DNA viruses.  So as you

10:54:09 7  know, those are the two nuclear classes that are critical

10:54:18 8  for the life of human beings but also viruses, bacteria.

10:54:21 9  And so viruses are either RNA viruses or DNA viruses and you

10:54:30 10 have some single stranded RNA and double stranded RNA.

10:54:38 11 Hepatitis C is a single stranded RNA.

10:54:42 12         We have key enzymes in the normal cells in the

10:54:46 13 body that are critical for the cell division for normal

10:54:54 14 cells or for the replication when your virus has been to

10:55:02 15 replicate and multiply in many viruses, and the HCV

10:55:10 16 polymerase is one of those critical enzymes that been used

10:55:14 17 by the virus to replicate, to multiply.

10:55:20 18 Q.    How big is this?  What we're looking at this on the

10:55:23 19 screen, how big is that in reality in your body?

10:55:27 20 A.    You cannot see without, without an electron

10:55:32 21 microscope.  So it is angstroms we are talking about.

10:55:36 22 Extremely small.

10:55:37 23 Q.    Now, you talked about RNA.  If we could bring up

10:55:42 24 Demonstrative No. 4.  And I will ask, if you will please

10:55:45 25 tell us what this shows?

10:55:47 1    A.      So basically this is the RNA strand.  And what you

10:55:58 2    have is four different what we call nucleosides.  So you can

10:56:06 3    see they are building blocks.  So RNA or DNA is the building

10:56:15 4    blocks of nucleotides, that are in the body that are linked

10:56:28 5    to each other; and for the RNA, you have a UAGC.  So it is

10:56:38 6    always a connection to a group that you have between each

10:56:51 7    nucleoside.  And you can see that it's CGAU.  And if it was

10:56:58 8    a DNA strand, it would be a T instead of a U.

10:57:03 9            So those are basically, what you have is like

10:57:06 10   you will see like a soup.  It is a soup in the cell of those

10:57:14 11   individual endogenous nucleotide which was the polymerase.

10:57:22 12   Polymerase is basically adding one nucleotide at a time.

10:57:26 13   And that is our basically RNA and DNA elongates and either

10:57:35 14   for a virus replicate or for a cell continue to be involved

10:57:39 15   in expanding, divide, and then become the tissues, for

10:57:47 16   example.

10:57:47 17   Q.      Let's pull up the next slide.  And this is

10:57:50 18   Demonstrative No. 5.  So, Dr. Sommadossi, if you can tell

10:57:54 19   us, how is it that the virus that gets in your body, how is

10:57:59 20   it that it spreads and causes problems?

10:58:02 21   A.      Sure.  So being affected by hepatitis C, it is a

10:58:21 22   virus that affects your blood.  So you must have a blood to

10:58:24 23   blood, in contrast to hepatitis B or HIV which can be also

10:58:33 24   transmitted sexually, for example.  Hepatitis C, very low

10:58:38 25   rate, three or four percent.  So the majority, it is a blood

10:58:43  1    to blood.

10:58:43  2         So it's like you see here, IV drug abusers and

10:58:51  3    then the virus, that is enough of one copy of the virus.

10:58:57  4    One copy of the virus is sufficient.  Actually, the virus,

10:59:02  5    hepatitis C virus, just put it, take an example, can stay

10:59:07  6    three weeks still alive.  So if you are someone that is

10:59:15  7    using a needle and then discard the needle, someone is going

10:59:19  8    to use two weeks later, three weeks later and inject

10:59:25  9    himself, he will be very likely infected.

10:59:28  10        And then after, the copy goes to the liver.  So

10:59:35  11   the copy of the hepatitis C virus goes to the liver, and

10:59:42  12   then it is going to divide and multiply, but the reason we

10:59:50  13   call the silent killer is because for up to 20 years, you

10:59:59  14   may not even know that you are infected with the hepatitis

11:00:06  15   C.

11:00:06  16        Actually, today, it's known we think that about

11:00:23  17   one-third use of the individuals of the baby boomers, so

11:00:27  18   born between 1945 and 1965, are probably carrying the

11:00:33  19   hepatitis C virus and without even knowing it.

11:00:37  20        So when you are doing normal blood chemistry,

11:00:41  21   you go for a check up, this is not screened.  It's not

11:00:48  22   automatic screen for hepatitis C.  And the only reason that

11:00:55  23   you are going to screen for hepatitis C is you have some

11:00:59  24   enzyme, liver enzyme which are called transaminators.  And

11:01:06  25   those transaminators, when the disease become really, it's

11:01:13 1    really affecting the liver itself, the physiology of the

11:01:20 2    liver, so you start to become sick, the transaminators are

11:01:27 3    increased.

11:01:27 4            Those enzymes are increased.  And that is where

11:01:35 5    you can detect that there was something wrong, because you

11:01:39 6    have elevated transaminators.  There are only two reasons

11:01:45 7    for elevated transaminators:  alcohol or hepatitis B or

11:01:50 8    hepatitis C.  And that is where your doctors say, hey, we

11:01:53 9    should test for hepatitis B, hepatitis C.

11:01:56 10           At the same time, what is important to note is

11:01:59 11   that it doesn't mean that someone has hepatitis C, that it

11:02:03 12   was an IV drug abuser at any time of his life, because the

11:02:11 13   virus was discovered in 1989.  There was no screening of the

11:02:21 14   blood banks available until 1992.  It means that about, we

11:02:30 15   know that about 25 percent of the surgeries in the '80s were

11:02:38 16   infected with contaminated blood from hepatitis C.  And the

11:02:43 17   reason is because we didn't know the structure of hepatitis

11:02:48 18   C and we didn't know how to screen it.

11:03:00 19           Therefore, 90 percent plus of individuals

11:03:04 20   infected with hepatitis C is because they got a blood

11:03:07 21   transfusion for a reason or another, surgery or for any

11:03:13 22   other reason.  Very likely, that is where they acquire

11:03:17 23   hepatitis C.

11:03:18 24           THE COURT:  Ms. Parker, I think this is a good

11:03:20 25   point to stop and give the jury their morning break.

11:03:22 1    Ladies and gentlemen of the jury, while we let

11:03:24 2 you go back to the juryroom for about 15 minutes, no talking

11:03:28 3 about the case, and we'll get you back here in a little bit.

11:03:55 4    (Jury left courtroom.)

11:03:55 5    THE COURT:  All right.  We will be in recess.

11:04:35 6    (Brief recess taken.)

11:04:35 7    *    *    *

11:04:35 8    (Proceedings reconvened after recess.)

11:19:45 9    THE COURT:  Bring the jury back in.

11:19:48 10    (Jury returned.)

11:21:35 11    THE COURT:  We are ready to proceed.

11:21:37 12    Ms. Parker.

11:21:41 13    MS. PARKER:  Thank you, Your Honor.

11:21:44 14 BY MS. PARKER:

11:21:44 15 Q.    All right.  Now, Dr. Sommadossi, before the break, we

11:21:47 16 had been talking about hepatitis C and how it affects the

11:21:51 17 body, and I'm going to change gears now.  And now I'm going

11:21:54 18 to ask you some questions about your invention with respect

11:21:58 19 to hepatitis C?

11:21:59 20    If we could pull up Demonstrative No. 6, and I

11:22:03 21 want to just go through these points with you so that you

11:22:07 22 can tell us about your work.

11:22:10 23 A.    Sure.

11:22:10 24 Q.    So let me start in the beginning.  How did you come

11:22:13 25 up with your invention with respect to hepatitis C?

11:22:20 1  A.       So as I mentioned before the break, in late '99, I

11:22:28 2  was reading the publication on this 3D structure of the

11:22:35 3  hepatitis C polymerase.

11:22:39 4            This is the first time that the critical enzyme

11:22:42 5  was reported with a very good evaluation of that active

11:22:52 6  site, as I was talking about.  So that we have some ideas

11:22:57 7  about the type of drugs that could interact and bind to that

11:23:04 8  active site to inhibit the replication of the virus, so to

11:23:10 9  multiply.

11:23:11 10           And when I learned of replication, as I

11:23:17 11 mentioned, I was engaged for many years in cancer research,

11:23:21 12 in the same type of drugs, it was called nucleosides.  And I

11:23:26 13 recall that there is an enzyme called ribonucleotide

11:23:33 14 reductase which is essential for the division, for the cell

11:23:45 15 division in the formation of those building blocks, those

11:23:49 16 nucleotide building blocks.

11:23:51 17           And I thought, huh, something on the active site

11:23:58 18 is very closely similar to the active site for the enzyme.

11:24:06 19 So I knew there were some ribonucleoside reductase

11:24:12 20 inhibitors that had been reported many years ago.

11:24:15 21           And so that is when, we are now in late '99,

11:24:20 22 early 2000, that I call my collaborators and cofounders,

11:24:30 23 first the chemist, Dr. Jean-Louis, and Dr. Imbach, and

11:24:42 24 Gilles Gosselin think we have some ideas about potential

11:24:45 25 compounds that could inhibit hepatitis C.  And those are

11:24:51  1    nucleosides which are ribonucleotide reductase inhibitors.

11:24:59  2    Do you have some on the shelf?

11:24:59  3            And they say no, we don't.

11:25:01  4            And then I called to talk Dr. or Professor La

11:25:09  5    Colla.  Also, we had signed an agreement in 1999 between

11:25:14  6    Novirio and the University of Cagliari to screen our

11:25:19  7    compounds against several viruses, HIV, hepatitis B, herpes,

11:25:31  8    really a broad screening in this lab.

11:25:34  9            So I asked, I called Dr. La Colla and I say,

11:25:39 10    hey -- because I knew he was doing also some cancer research

11:25:45 11    as well.  I said, by chance, do you have some inhibitors,

11:25:48 12    those nucleoside inhibitors reductase?

11:25:54 13            He said let me check.  I'll call you back.  And

11:26:01 14    next day or a couple days later, he says absolutely, I do.

11:26:04 15    I do have a couple of those inhibitors, those nucleosides.

11:26:09 16    And so that is how we start to discuss.  Do you want me to

11:26:15 17    go further now?

11:26:16 18    Q.      Well, maybe let's stop right here and give the jury a

11:26:19 19    little bit more information about some of these terms that

11:26:21 20    you are using.

11:26:22 21    A.      Sure.

11:26:23 22    Q.      So let's pull up Demonstrative No. 7.  And if you

11:26:26 23    could just tell the jury very top line, what is shown here?

11:26:31 24    A.      Okay.  So what you have on the left is a nucleoside.

11:26:39 25    It's a natural endogenous nucleoside.  The reason we are

11:26:46 1 calling it ribonucleoside is that you have -- it doesn't

11:26:52 2 work.  I try.  (Indicating laser pointer didn't work.)

11:26:56 3        Anyway, so you have two of those hydroxy.  Does

11:27:02 4 not work.  In the 3' position and 2' position, we see there

11:27:09 5 is basically five K structure, so in black on the left.

11:27:16 6 That is called a sugar moiety.

11:27:19 7        So you have a base, in blue, and then you

11:27:22 8 have the sugar in black.  And natural ribonucleoside, this

11:27:30 9 is a C, as I mention before, the building block.  You have

11:27:34 10 CGAU.

11:27:36 11        The reason that we are going to talk only about

11:27:40 12 ribonucleoside is because hepatitis C is an RNA virus.  So

11:27:49 13 that is why we're going to use those ribonucleosides to try

11:27:53 14 to inhibit an RNA virus.  If it was a DNA virus, it would be

11:27:58 15 other, there would be deoxynucleoside.  They would not be

11:28:05 16 ribonucleosides.

11:28:06 17        So here with ribonucleoside, you must have two

11:28:13 18 moieties, chemical moieties.  You can see those two hydroxy

11:28:18 19 OH, OH.  And that is a ribonucleoside in that 2' position

11:28:25 20 and 2' position.

11:28:41 21        So you must have either OH, OH or another

11:28:46 22 moiety, but you cannot have an H, because if you have an H,

11:28:50 23 then after that would be deoxynucleoside, and that will

11:28:57 24 affect DNA viruses, but not RNA viruses, to the best of my

11:29:02 25 knowledge.

11:29:03  1        So then after what you see on the right side is

11:29:06  2    a modification for one we call a CH3.  This stands for a

11:29:18  3    methyl.  It's a methyl substitution, CH3.  It's a carbon and

11:29:25  4    three hydrogen.

11:29:26  5        And so these are the type of basically compounds

11:29:32  6    as an example with a C, which you can have any base.  So you

11:29:36  7    can have the A, the G, the U, and these compounds, those

11:29:45  8    modified ribonucleosides are the compounds that were

11:29:51  9    synthesized in the sixties by big pharma Merck as in

11:30:00 10    medicals of ribonucleotide reductase as potential anticancer

11:30:06 11    drugs.  And these are the type of compounds that I thought

11:30:13 12    that could be effective against hepatitis C because the

11:30:19 13    active sites of the HCV polymerase is very closely similar

11:30:26 14    to the active site of the ribonucleotide.

11:30:35 15        And so this is the type of compound that I asked

11:30:38 16    Professor La Colla if he added or not.  And this, do you

11:30:43 17    want me to continue or stop here?

11:30:45 18    Q.    Let's go to the next slide, which is demonstrative

11:30:48 19    eight.

11:30:48 20    A.    Okay.

11:30:48 21    Q.    What's shown there?

11:30:50 22    A.    So this is basically showing the mechanism of action.

11:30:55 23    So as I have indicated, what you have is the strand.  You

11:31:01 24    have the strand, so from 5' to C prime.  And you see it's

11:31:08 25    the building blocks, C, G, A, U.

11:31:13 1    And so what these drugs do, they have two

11:31:18 2 mechanisms, is one, the 2'-methyl ribonucleoside of any

11:31:29 3 modified nucleoside either in the 2' position, in the 3'

11:31:41 4 position, they bind to the enzyme, and then they act like a

11:31:46 5 chain termination.  That means that you cannot -- another

11:31:51 6 enzyme, I'm sorry, another nucleotide that is going to link

11:32:01 7 to the strand and continue the elongation.

11:32:08 8    So you stop -- it's like you have a monkey -- a

11:32:13 9 money wrench here.  You basically, you cannot go further in

11:32:19 10 terms of dividing the cells.  It's like you stop it.  Your

11:32:21 11 drug is taking the place of an endogenous one, so the enzyme

11:32:27 12 recognized as -- it's like a fraudulent.

11:32:31 13    You recognize if it's the good one that you want

11:32:35 14 to be able to modify, but actually, it's a fake, and you

11:32:40 15 will stop.  So the drug is like a fake endogenous nucleoside

11:32:47 16 that will stop the elongation and therefore stop the

11:32:49 17 division, the multiplication of the virus.

11:32:54 18 Q.    Now, back at this period of time that we're talking

11:32:57 19 about in late 1999 and then early 2000, were there any

11:33:04 20 modified ribonucleosides that were known to inhibit this

11:33:10 21 replication for hepatitis C that you've been telling us

11:33:14 22 about?

11:33:14 23 A.    Not to my knowledge.

11:33:15 24 Q.    All right.  Let's go back to the timeline.  It's

11:33:19 25 demonstrative number 9.  Okay.

So let's move up the next bullet point there.
It says February of 2000.  Tell us what happened then.

A.     So basically that's what we discussed with Professor
Le Colla of the idea.

Now, how do we test and how do we confirm that
these compounds could be effective against HCV replication?
At the time we did not have any assay available in academics
or that we knew that -- where we could test those compounds
in an in vitro system.  One we call in vitro system is cells
which are infected by the virus or by something that looks
like the virus or replicates like the virus.

And so Professor La Colla was a biologist, said,
you know, I think that the best way to do this is to look at
the Yellow Fever virus.  Why the Yellow Fever virus?
Because the Yellow Fever is an RNA virus as well.  And we
know that actually the RNA viruses regarding the polymerase
of this RNA polymerase, which is the enzyme that put all
those building blocks together and creates this chain, which
is essential of nucleic acid for multiplication.  They are
pretty well conserved, those RNA polymerases.

He said, I think that's what we should do, and
also the bovine virus is an RNA polymerase as well that he
thought could be also highly relevant.

And what do we have to remember?  That this is
not the first time that scientists like us use surrogate

11:35:46 1    viruses.  Just to tell you, if I may, as a parenthesis, the

11:35:52 2    first HIV drug which was tested in the human being, which

11:35:58 3    actually has been used in many individuals, is still used

11:36:06 4    today, is called Zidovudine, or AZT.  It was the very first

11:36:13 5    drug approved for HIV.  It is also a nucleoside analog

11:36:20 6    interacting with a polymerase, and that drug was discovered

11:36:28 7    because at the time there was not an available HIV in vitro

11:36:38 8    assay.  It was a surrogate virus.  It was a murine.  It was

11:36:43 9    a mouse virus called MULV.  So murine is a retrovirus and

11:36:49 10   it's a murine retrovirus.  Nothing to do with the HIV.

11:36:53 11           So this is not unique to us that we are using

11:36:59 12   surrogate viruses when we do not have the availability of

11:37:03 13   those assays.  And it's interesting that actually, the

11:37:09 14   discovery by Burroughs-Wellcome using the MULV stands in a

11:37:20 15   court of law for the discovery of AZT many years ago.

11:37:23 16   Q.     Now, I want to focus your attention on this period of

11:37:27 17   time here, in February of 2000.  Okay?

11:37:31 18   A.     Mm-hmm.

11:37:32 19   Q.     Now, in February of 2000, were you on the Board of

11:37:36 20   Directors of your company?

11:37:37 21   A.     In 2000?  Yes.  I've been actually the chairman of

11:37:42 22   the board since the founding of the company in May 1998.

11:37:46 23   Q.     Okay.  And that period of time in February of 2000,

11:37:50 24   your company is called Novirio; right?

11:37:53 25   A.     I believe so.

Sommadossi - direct

11:37:53 1  Q.      Okay.  Now, in your role, did you receive management

11:37:58 2  reports that were sent to board members?

11:38:01 3  A.      Probably since I was the chairman of the board.

11:38:05 4  Q.      Okay.  I'm going to ask you, if you will, to look at

11:38:08 5  tab number 4 in the notebook up there by you, right there.

11:38:12 6  Tab 4, please, sir.

11:38:16 7  A.      Okay.

11:38:16 8  Q.      And I want to ask you if you recognize that as a

11:38:22 9  management report that you received.

11:38:25 10  A.      Well, I would have to read, but since it was

11:38:29 11  addressed to Novirio board by the CEO, Mr. Lucidi, sure.

11:38:36 12  Q.      Okay.  And what is the date on there, please, sir?

11:38:39 13  A.      It's January 2000.  I'm sorry.  The date, February

11:38:43 14  22, 2000.

11:38:44 15          MS. PARKER:  Your Honor, I would like to move

11:38:47 16  the admission of Plaintiffs' Exhibit 279.

11:38:50 17          MR. SCHERKENBACH:  No objection.

11:38:50 18          THE COURT:  It's admitted.

11:38:52 19          (PX-279 was admitted into evidence.)

11:38:54 20          MS. PARKER:  Could we pull that up on the screen

11:38:56 21  then?  And I want to enlarge the first page of the document

11:38:58 22  down at the bottom.

11:39:04 23  BY MS. PARKER:

11:39:05 24  Q.      Okay.  So what's being reported from the CEO of your

11:39:08 25  company to you and the other board members?

11:39:10 1    A.      So saying here that the standardization of the BVDV

11:39:16 2    testing in Yellow Fever model has been completed.  Screening

11:39:19 3    of compounds has been initiated in Cagliari under the

11:39:28 4    direction of Dr. La Colla.

11:39:31 5    Q.      Okay.  Let's pull up demonstrative number 10.  Do you

11:39:37 6    recognize this gentleman?

11:39:38 7    A.      Sure.

11:39:39 8    Q.      Okay.

11:39:40 9    A.      I've known him for 35 years.

11:39:43 10   Q.      Could you please tell the jury?

11:39:44 11   A.      Dr. La Colla.

11:39:45 12           THE COURT:  Hold on, Doctor.  Wait for the

11:39:47 13   question to be answered.

11:39:48 14   BY MS. PARKER:

11:39:49 15   Q.      If you could tell the jury who this is?

11:39:51 16   A.      Professor La Colla.  He was a professor and a

11:39:55 17   virologist.

11:39:57 18   Q.      How did you first meet him?

11:39:59 19   A.      I met him as a scientist in 1985 going to the same

11:40:06 20   scientific meetings.

11:40:07 21   Q.      Okay.  All right.  Let's go back to that management

11:40:09 22   report we were talking about before we put up the

11:40:14 23   photograph.  Let's pull that back up.

11:40:19 24           Okay.  Tell us about the reference there to the

11:40:23 25   Yellow Fever and the BVDV.  What does that mean?

11:40:28 1    A.    BVDV?

11:40:30 2    Q.    Yes.  Right up there.

11:40:32 3    A.    Bovine viral diarrhea virus.

11:40:37 4    Q.    And what is that about?  Why is that mentioned in

11:40:39 5    this document?

11:40:39 6    A.    I'm sorry?

11:40:41 7    Q.    Why is that mentioned in this report to the board?

11:40:43 8    A.    Because this is one of the testings that Professor

11:40:49 9    La Colla had suggested, as I have indicated, as a surrogate

11:40:53 10   virus with the Yellow Fever virus as well.

11:40:58 11   Q.    All right.  If we could show demonstrative number 11.

11:41:11 12   What's shown here?

11:41:12 13   A.    So this is basically a classification of Flaviridae

11:41:23 14   and there are three major classes of Flaviviridae:

11:41:29 15   Hepevirus, Flavivirus and Pestivirus.  You can see that

11:41:35 16   they're all Flaviridae, and that's why they have a very

11:41:38 17   close -- they are very close and similar RNA polymerases.

11:41:42 18   Q.    All right.  I'm going to ask you, please, sir, if you

11:41:45 19   will look at the next tab in your notebook, which is tab

11:41:47 20   number 5.  If you could turn to that, please.  And I just

11:41:55 21   want to ask you if that's another memo that was prepared for

11:41:58 22   the Board of Directors at your company?

11:42:00 23   A.    Yes.  April 12th, 2000.

11:42:04 24   Q.    Okay.

11:42:05 25         MS. PARKER:  Your Honor, I would like to move

11:42:07 1    the admission of Plaintiffs' Exhibit 296.

11:42:09 2              MR. SCHERKENBACH:  No objection.

11:42:10 3              THE COURT:  It's admitted.

11:42:11 4              (PT-296 was admitted into evidence.)

11:42:11 5              MS. PARKER:  Okay.  Let's pull up the first page

11:42:14 6    of that document.

11:42:14 7    BY MS. PARKER:

11:42:20 8    Q.    Dr. Sommadossi, what is being reported as shown up

11:42:24 9    here on the screen?

11:42:25 10   A.    So the surrogate virus assays have been finalized and

11:42:31 11   are being used to screen a broad class of compounds, and

11:42:39 12   activities to identify HCV polymerase and multiple in vitro

11:42:45 13   screening assays are in progress.

11:42:46 14   Q.    And --

11:42:47 15   A.    So this is when Professor La Colla started to screen

11:42:50 16   those 2'-methyl ribonucleosides.

11:42:55 17   Q.    This is a report to the board of directors at your

11:42:58 18   company?

11:42:58 19   A.    Yes.

11:42:59 20   Q.    All right.  Let's go back to the timeline,

11:43:01 21   demonstrative 12.

11:43:02 22              Okay.  So we were talking about February and I

11:43:06 23   wanted to move now to March of 2000.  Okay?

11:43:10 24   A.    Okay.

11:43:10 25   Q.    Now, tell us what happens in March of 2000.

11:43:16 1   A.      Well, in March of 2000, Professor La Colla called me

11:43:24 2   back with the data, indicating that --

11:43:29 3                   MR. SCHERKENBACH:  Objection.

11:43:30 4                   THE COURT:  Hold on a second.

11:43:31 5                   MR. SCHERKENBACH:  Sorry.  Hearsay.  I think

11:43:33 6   this is being offered for the truth.

11:43:35 7                   THE COURT:  All right.  Ms. Parker, can we make

11:43:36 8   sure we're not calling for hearsay in response from the

11:43:40 9   witness?

11:43:41 10                   MS. PARKER:  Yes.  Thank you, Your Honor.

11:43:42 11  BY MS. PARKER:

11:43:43 12  Q.      Dr. Sommadossi, if you could just tell us what was

11:43:47 13  happening at the March 2000 time period?  What was going on

11:43:50 14  in terms of the testing without necessarily saying what

11:43:52 15  someone said to you.

11:43:53 16  A.      Well, Professor La Colla was testing the 2'-methyl

11:44:07 17  and other nucleosides, individuals of ribonucleoside in

11:44:15 18  those assays on Yellow Fever and BVDV, and he reported to me

11:44:27 19  the activity of those compounds in the Yellow Fever assay.

11:44:32 20  Q.      Okay.  Is that something good or something bad, or

11:44:35 21  what does that mean?

11:44:36 22  A.      It was great.  It was fantastic.  We were really

11:44:41 23  excited because this was the very first time that we knew

11:44:48 24  that there was really a potential new class of compounds

11:44:54 25  that were demonstrated to be active in these RNA viruses and

11:45:02 1 therefore against HCV virus as well.

11:45:08 2 Q.    By the way, when you say HCV, what does that stand

11:45:12 3 for?

11:45:12 4 A.    Hepatitis C.

11:45:15 5 Q.    Okay.  Let's pull up demonstrative 13.  What's shown

11:45:17 6 there?

11:45:18 7 A.    So this is, again, a 2'-methyl ribonucleoside.

11:45:30 8 Instead of the C base that you heard before, this is an A

11:45:35 9 base.  It's a natural base.  And this is, to the best of my

11:45:41 10 recollection, is the compound MD1 that Professor La Colla

11:45:47 11 tested in the Yellow Fever assay.

11:45:51 12 Q.    After analyzing those test results, what conclusions

11:45:57 13 did you draw?

11:45:58 14 A.    Conclusion that this drug, this 2'-methyl

11:46:04 15 ribonucleoside, would definitely be active against HCV

11:46:10 16 polymerase and hepatitis C virus.

11:46:12 17 Q.    Let's go back to the timeline again.  This is

11:46:15 18 demonstrative 14.  And I want to ask you:  What happened

11:46:21 19 next on the timeline?

11:46:22 20 A.    Well, what happened next is when we saw those

11:46:28 21 results, we called -- I called our patent, outside patent

11:46:33 22 lawyer, and asked to draft a patent application, call it

11:46:41 23 provisional patent application.  And Professor La Colla and

11:46:48 24 I basically shared our, what we discovered, and basically a

11:46:59 25 provisional patent application was filed on May 27th, 2000.

11:47:06 1 Q.      I'm going to ask you, if you will, if you will look

11:47:09 2 back at that binder there in front of you to tab 6.  Tab 6,

11:47:15 3 please, sir.  It's actually I think the second page there.

11:47:19 4 And I'm just going to ask you if you can identify that

11:47:22 5 document.

11:47:22 6 A.      Yes.

11:47:23 7 Q.      What is it?

11:47:25 8 A.      This is the provisional application that was filed on

11:47:32 9 May 23rd, 2000.

11:47:33 10          MS. PARKER:  Your Honor, I move the admission of

11:47:36 11 Plaintiffs' Exhibit 311.

11:47:37 12          MR. SCHERKENBACH:  No objection.

11:47:38 13          THE COURT:  It's admitted.

11:47:39 14          (PX-311 was admitted into evidence.)

11:47:41 15 BY MR. PARKER:

11:47:41 16 Q.      All right.  Let's pull up the second page there on

11:47:44 17 the screen.  Okay.

11:47:44 18          So what is the title of the application that you

11:47:48 19 filed?

11:47:49 20 A.      "Methods and Compositions For Treating Hepatitis C

11:47:53 21 virus."

11:47:54 22 Q.      Was this an important event for you?

11:47:58 23 A.      Well, this was a very important event for the

11:48:03 24 company, for Novirio, for the shareholders, and obviously

11:48:08 25 myself as a scientist.

11:48:10 1   Q.    All right.  So let's go back to the timeline again

11:48:13 2   and this is demonstrative 15.

11:48:19 3           All right.  So after you file this provisional

11:48:27 4   patent application that we just talked about, what happened

11:48:29 5   next?

11:48:29 6   A.    Well, what happened next is that we went in very high

11:48:37 7   gear in the chemistry.  We asked, if I recall, Professor La

11:48:46 8   Colla, a few milligrams, very small amounts, and so we

11:48:50 9   wanted to synthesize more of that compound that you have

11:48:56 10  seen, and also all of the other analogs.

11:48:37 11          So when we are talking about those 2'-methyl

11:48:52 12  nucleoside, and you are seeing that you have full potential

11:48:57 13  basis.  So it's very well known in that field that any of

11:49:02 14  those bases could be a potential drug as well.  So here

11:49:07 15  you see the A but have to synthesize the C, we have to

11:49:13 16  synthesize the G, and we have to synthesize the U.

11:49:17 17          And then from there, we started to do some in

11:49:22 18  vitro studies, to demonstrate the mechanism of action, which

11:49:32 19  is standard for nucleoside analog in general, which mean all

11:49:37 20  those nucleosides have to be activated in the cell.

11:49:41 21          So when you see the structure on the screen,

11:49:46 22  this is a chemical structure of the drug.  But that drug,

11:49:52 23  when it is in the body, and that is what we call metabolism

11:49:56 24  in the liver, which you have hepatitis C replication, this

11:50:02 25  drug, these type of drugs have to be activated.  So the drug

11:50:06 1    itself is not going to be effective.  It has to be activated

11:50:12 2    in what we call active metabolite.  As I say before,

11:50:16 3    different product.

11:50:17 4            So some can be good, some can be bad.  And all

11:50:21 5    this, the mechanism of action of this nucleoside analog is

11:50:27 6    so this active metabolite, which is called a triphosphate

11:50:32 7    because it has three phosphate groups, and this is how they

11:50:38 8    bind to this enzyme, to this DNA polymerase.

11:50:42 9            And then as you have seen, stop, terminate chain

11:50:48 10   elongation because it is like monkey wrench.

11:50:51 11           So what we wanted to obviously know is if all

11:50:57 12   design analogs synthesize and start in vitro studies on the

11:51:02 13   mechanism of action of these drugs.

11:51:04 14   Q.    Let me ask you just big picture, just overall.  What

11:51:07 15   did this additional testing show you about the results that

11:51:12 16   Dr. La Colla had obtained to begin with?  Were they

11:51:16 17   consistent?  Did they confirm it or were they different or

11:51:18 18   what?

11:51:19 19   A.    Well, yes.  This work demonstrate to us that every

11:51:28 20   single 2'-methyl nucleoside was active in the surrogate

11:51:35 21   assay.  This is, when we show that you have all basis, is

11:51:43 22   the same sugar, that is what you have is a class.  So what

11:51:49 23   we have discovered is not one compound but it is a class

11:51:54 24   which is active against hepatitis C, and that class is

11:51:59 25   2'-methyl ribonucleoside.  Any 2'-methyl ribonucleoside

11:52:08 1    would be active against hepatitis C virus.

11:52:12 2    Q.      Let me pull up Demonstrative No. 16.  I want to ask

11:52:16 3    you about that.

11:52:16 4             Let's just stop with that top item up there.

11:52:19 5    Can you please explain to us what that means, synthesized

11:52:23 6    more of 2' methyl up ribonucleosides?

11:52:30 7    A.      Yes.  This is what I just indicated.  I sure you know

11:52:34 8    well.  It's AUCG.

11:52:37 9             So what you want is to synthesize those compounds.

11:52:42 10   Always the same sugar or moiety, 2'-methyl ribonucleoside with

11:52:50 11   different base.  And so we synthesize those compounds, we

11:52:58 12   continue to test and we demonstrate that they were all active

11:53:03 13   and some were even more active than others.

11:53:07 14            And then when we are talking about toxicity, so

11:53:16 15   I can consider myself an expert on toxicity of nucleosides

11:53:21 16   in general because actually the assays that I set up when I

11:53:28 17   was at UAB and publish in several top notch journals are

11:53:36 18   still required today by the FDA to have those nucleosides

11:53:44 19   tested before a first in map.

11:53:51 20            So when we're talking about nucleoside, the

11:53:53 21   potential major toxicity is affecting bone marrow system

11:53:59 22   cells.  So that mean cells that are important enough as red

11:54:09 23   cells and white cells in your blood, which are made in the

11:54:15 24   bone marrow.  And those nucleoside toxicity, they can affect

11:54:19 25   that because they are rapidly dividing cells.

11:54:23 1     And then another test is, we know that those

11:54:29 2  nucleosides can affect an organelle which is called

11:54:37 3  mitochondria.  So when you have a cell, you have the

11:54:40 4  envelope and then the cytoplasm, and then you have the

11:54:44 5  nuclei, and you have also an important organelle which is

11:54:49 6  called mitochondria which is essential to produce the energy

11:54:53 7  of the cell.  And those nucleosides in general can affect

11:54:59 8  those mitochondria, resulting potentially in liver toxicity

11:55:05 9  and cardiac toxicity.

11:55:07 10     So when you test new nucleosides, those are

11:55:13 11  assays that you want to do up front, very rapidly, to see

11:55:18 12  if your compounds, your drugs are going to be selected.  And

11:55:23 13  these are assays that I developed myself in my lab and that

11:55:28 14  are still required by the FDA today.

11:55:32 15  Q.     You mentioned when you were giving your answer there,

11:55:35 16  you said UAB.  Can you just tell us?

11:55:37 17  A.     University of Alabama at Birmingham.

11:55:40 18  Q.     Okay.  Thank you.  Let's pull up the next

11:55:43 19  demonstrative, No. 17.  And if you could just tell us what

11:55:48 20  is shown there?

11:55:49 21  A.     Yes.  These are the basic four compounds that I have

11:55:53 22  indicated that we synthesize.

11:55:57 23     So the NM80 is the same compound as MD1.

11:56:03 24     And then after we have 106 was with a U, in the

11:56:09 25  blue.

11:56:10  1          107 is with a C, in the blue.

11:56:12  2          And then 108 is with a G.

11:56:15  3          So we have the four bases of being synthesized,

11:56:21  4  tested, and demonstrated to be active.

11:56:23  5  Q.    And what is common among all of those that are shown

11:56:28  6  on the screen?

11:56:29  7  A.    They have all 2'-methyl, and they are all 2'-methyl

11:56:34  8  ribonucleosides.

11:56:36  9  Q.    What color is that?

11:56:37 10  A.    It is in green.  It is in green.

11:56:39 11          THE COURT:  Doctor, please wait until counsel

11:56:41 12  finishes her question.

11:56:42 13  BY MS. PARKER:

11:56:42 14  Q.    Let's go back to that list of the work that you were

11:56:45 15  doing.  And I want to move down to the second item there.

11:56:48 16  It says continued to test 2'-methyl up ribonucleosides in

11:56:55 17  surrogate assays.

11:56:55 18          So are you still on the board at Novirio, at

11:57:00 19  your company in July and August of that year, in 2000?

11:57:03 20  A.    I am.  I am the chairman of the board still in August

11:57:08 21  of 2000, yes.

11:57:09 22  Q.    I'm going to ask you, if you will, to look in the

11:57:12 23  notebook there in front of you at Tab No. 9.  And if you

11:57:19 24  could just identify, that is a document that you wrote to

11:57:23 25  your board; correct?

11:57:24  1    A.      Correct.

11:57:25  2    Q.      And it is dated August 22nd of 2000; is that right?

11:57:29  3    A.      Correct.

11:57:30  4            MS. PARKER:  Your Honor, I would like to move

11:57:32  5    the admission of Plaintiffs' Exhibit 333.

11:57:35  6            MR. SCHERKENBACH:  No objection.

11:57:35  7            THE COURT:  It is admitted.

11:57:36  8            (PTX-333 was admitted into evidence.)

11:57:39  9            MS. PARKER:  If we could pull up the first page

11:57:41 10    there.

11:57:41 11    BY MS. PARKER:

11:57:43 12    Q.      So what are you telling your board there?

11:57:46 13    A.      So that we are doing what we call structure activity

11:57:55 14    relationship, which means that we synthesize always the

11:58:03 15    2'-methyl ribonucleoside.  That does not change.  But we

11:58:08 16    change some modifications either in the sugar moiety or in

11:58:15 17    the base.  And we tried to basically double up the, discover

11:58:23 18    the best compound that we feel that will be developed.

11:58:30 19            And then testing of molecules in surrogate

11:58:36 20    assays in progress.

11:58:38 21            And then we wanted to start to evaluate our

11:58:44 22    compounds in the SKID-HU model.

11:58:54 23            It's basically a mice model that has been

11:58:57 24    humanized and infected with hepatitis C.  And you can see

11:59:03 25    that we were looking at the time how we could go further and

11:59:13  1   look for animal, for relevant animal model of HCV

11:59:19  2   replication.

11:59:20  3   Q.    Now, at this point in time, as shown in your memo

11:59:24  4   that you wrote to your board, did you draw any conclusions

11:59:28  5   from the testing that is described there?

11:59:31  6   A.    Conclusion is we are doing great, is that we identify

11:59:38  7   a very important class of compounds against hepatitis C, and

11:59:46  8   we are the first ones that did it.

11:59:49  9         MS. PARKER:  Let's pull up Demonstrative 19 now.

11:59:49 10   BY MS. PARKER:

11:59:53 11   Q.    Now, you talked about this a little earlier but I

11:59:55 12   want you to, if you will, to tell the jury what is shown up

11:59:58 13   there.

11:59:59 14   A.    I think we have seen already is the 2'-methyl.

12:00:08 15             So riboU, with the blue is the U.

12:00:12 16             And then 2'-methyl riboC.  And,

12:00:18 17             2'-methyl riboG.

12:00:21 18         So these are basically three 2'-methyl

12:00:29 19   ribonucleosides and all of them have been shown to be

12:00:32 20   active.

12:00:32 21   Q.    Is this testing continued to be done by Dr. La Colla

12:00:37 22   at his laboratory in Italy?

12:00:39 23   A.    It continues, Dr. La Colla at the same time we have

12:00:45 24   started to develop up the assays in Boston as well.

12:00:50 25   Q.    Okay.  Let's go back.  We can pull up No. 20 again.

12:00:55  1   I think we're down to the third point.

12:00:58  2         Continued to test for toxicity of 2'-methyl up

12:01:03  3   ribonucleosides.

12:01:05  4         So what does that mean?

12:01:07  5   A.    Continued to test for toxicity?  That is what I

12:01:11  6   have indicated, evaluate against bone marrow system cells,

12:01:17  7   so white blood cells, red blood cells, mitochondria for

12:01:24  8   potential liver toxicity or cardiac toxicity.  These are the

12:01:30  9   key toxicity assays for nucleosides in general.

12:01:34 10   Q.    I'm going to ask you, if you will, to look in the

12:01:37 11   binder there in front of you at Tab No. 12 now, please, sir.

12:01:43 12   A.    Okay.

12:01:43 13   Q.    Okay.  And is that a memo you wrote to your board?

12:01:50 14   A.    Yes.

12:01:50 15   Q.    May 31st of 2001?

12:01:56 16   A.    Correct.

12:01:57 17         MS. PARKER:  Your Honor, I'd like to move the

12:01:58 18   admission of Plaintiffs' Exhibit 434.

12:02:01 19         MR. SCHERKENBACH:  No objection.

12:02:01 20         THE COURT:  It's admitted.

12:02:03 21         (PTX-434 was admitted into evidence.)

12:02:04 22         MS. PARKER:  All right.  I want to pull up that

12:02:06 23   section there about hepatitis C.

12:02:06 24   BY MS. PARKER:

12:02:10 25   Q.    Okay.  Would you please explain just in a very top

12:02:13 1  line fashion to us what does that mean in that first bullet

12:02:16 2  point?

12:02:16 3  A.     All bullet points?

12:02:20 4  Q.     The first one.

12:02:21 5  A.     Oh, the first one?  The first one is basically we

12:02:24 6  confirm the antiviral activity of the four leads.

12:02:28 7          So you have see the structures of the four

12:02:33 8  2'-methyl ribonucleoside with a A, with a C, with a U, and

12:02:40 9  with a G.

12:02:41 10 Q.     And what is that second bullet point?  What does that

12:02:44 11 mean?

12:02:45 12 A.     Okay.  The second bullet point is, as I have

12:02:51 13 indicated, those nucleoside analogs have to be activated to

12:02:59 14 the active metabolite inside the cell, and they are called

12:03:04 15 triphosphate.  So we demonstrate that the mechanism of

12:03:09 16 action is what you anticipate for a nucleoside, which is

12:03:14 17 formation of triphosphate, which is going to interact with

12:03:18 18 the polymerase; in this case, the HCV polymerase.

12:03:24 19         As I indicated, there was no mitochondrial

12:03:28 20 toxicity, or no bone marrow toxicity.

12:03:31 21 Q.     I want to move down to the next bullet point there.

12:03:33 22 What do you mean by that?

12:03:35 23 A.     So then after, you want to make sure that those type

12:03:40 24 of drugs are going to be absorbed, so that we call

12:03:46 25 bioavailable.  So that means they are going to be absorbed

12:03:49 1    either by the GI or by the intestine and get in the blood

12:03:57 2    and then the liver, at the liver site.

12:04:01 3            So as we know, in general, known human primates,

12:04:13 4    monkeys are the closest to humans.  That is why we always

12:04:17 5    like to test in this case, in the simian world, it's the

12:04:30 6    type of monkey you use in experimentation, just to make sure

12:04:33 7    the drug is absorbed.

12:04:34 8            And, again, when you talk about

12:04:38 9    pharmacokinetics, it is another form of pharmacology.  So it

12:04:43 10   is absorbed.  Where does it go?  It is changed to what?  And

12:04:51 11   how it is excreted.  So that is what it means.

12:04:54 12   Q.    I'm going to move now to the next bullet point that

12:04:57 13   talks about the 40 analogs.

12:04:59 14   A.    Um-hmm.

12:04:59 15   Q.    What do you mean there?

12:05:01 16   A.    Well, we synthesize 40 analogs.  I have to see.  I

12:05:06 17   don't remember exactly which one have been synthesized.

12:05:08 18   Q.    And the fifth bullet point where you wrote chemistry

12:05:11 19   is initiated to the 100 gram scale.  What is that referring

12:05:14 20   to?

12:05:15 21   A.    Well, it means that the reason we have to go to --

12:05:22 22   so first term of chemistry, when we start to look at the

12:05:30 23   discovery level, we're not going to synthesize more than

12:05:34 24   10 milligram, so very small scale.

12:05:36 25           But then after when you need to go and do more

1    testing especially in animals, mice, rat, monkeys, you need

2    to scale up.  And usually the time you have to use a

3    different chemist and when you go from 100 gram to 1 kilo

4    and then 10 kilos, very likely you will again change your

5    chemistry.  And basically what you synthesize is different

6    steps.  And the reason we wanted to go to 100 gram is that

7    the ultimate experiment that we wanted to do was to test our

8    drug in HCV infected chimpanzees.

9            And Dr. Standring, who was at, was the head of

10   biology at Idenix was asked, had a very close relationship

11   with the head of the primate center in San Antonio, Dr.

12   Robert Lanford.  Dr. Lanford is world renowned scientist on

13   hepatitis C.  And Dr. Lanford was one of the few who had

14   infected chimpanzee with the human hepatitis C.  So it was

15   not a chimpanzee, it was a human hepatitis C, and obviously

16   we wanted to test our drug, if our drug would be affected

17   directly in a in vivo situation; before it go to man, that

18   it go to this chimpanzee.

19           The important aspect we need to recognize, as

20   you know, this chimpanzee are extremely well infected.  You

21   cannot give to this chimpanzee compounds that have not been

22   studied in termed of toxicity.  This is essentially where

23   you try to test in chimpanzees like going to man.  So there

24   are some very well defined toxicity studies that needed to

25   be done in rats, and monkeys before and demonstrate to a

12:08:27 1    board committee that these compounds are not going to affect

12:08:33 2    negatively these chimpanzee.

12:08:36 3          And so it took us about a year to do all these

12:08:41 4    studies required to be able to have these drugs tested in

12:08:49 5    chimpanzee and actually, today, this would not even be

12:08:52 6    possible because this chimpanzee have been retired, and we

12:09:02 7    were basically the first one, to my knowledge, to be able to

12:09:04 8    do that, and obviously that was the ultimate demonstration

12:09:09 9    that we have been right all the way.  That we have

12:09:13 10   discovered a new class of drugs against hepatitis C.

12:09:31 11   Q.    And I want you, if you will, to just describe briefly

12:09:34 12   for the jury what it meant, what your work meant from 1999,

12:09:40 13   when you first came up with this idea, all the way up to

12:09:44 14   where we are right now in the timeline, which is May of

12:09:47 15   2001.  If you will, just tell the jury a little bit about

12:09:52 16   the significance of that work.

12:09:53 17   A.    Well, the significance of that work is that we

12:10:01 18   rapidly raised as much money as we could, had a very high

12:10:09 19   priority in developing these drugs.

12:10:16 20          Now, let's not forget, we are a very small

12:10:20 21   company.  When we say high priority, we are not a Gilead, a

12:10:24 22   Merck, a Schering-Plough, a big pharma.  So at the time, if

12:10:32 23   I recall, it may have been 40 people, might have been 20

12:10:38 24   people in the lab.  So we are talking about small teams

12:10:41 25   working day and night.  And basically in the same time we

12:10:51 1    were engaged in the development of other drugs in HIV and

12:10:58 2    hepatitis B, so this was not the only program ongoing at the

12:11:04 3    time.  And so it was pretty busy.

12:11:10 4    Q.    All right.  Let's go back to the timeline.  This is

12:11:13 5    demonstrative 21.  So this brings us up to May of 2001 and

12:11:19 6    it says there that the non-provisional patent application

12:11:22 7    was filed.  Tell us about that, if you will.

12:11:24 8    A.    Well, this is when we converted the provisional, and

12:11:32 9    if I recall, we added a lot of data that were generated

12:11:38 10   during that year.

12:11:40 11   Q.    Okay.  If you could look in your notebook in tab 24,

12:11:45 12   please.

12:11:46 13   A.    24?

12:11:47 14   Q.    Yes, sir.

12:11:48 15   A.    Sure.

12:11:52 16   Q.    Is that the non-provisional patent application you're

12:11:55 17   talking about?

12:11:56 18   A.    Yes, correct.

12:11:58 19   Q.    Okay.

12:11:59 20           MS. PARKER:  Your Honor, I would like to move

12:12:00 21   the admission of Plaintiffs' Exhibit 1813A, like "apple."

12:12:05 22           MR. SCHERKENBACH:  No objection.

12:12:06 23           THE COURT:  It's admitted.

12:12:08 24           (PX-1813A was admitted into evidence.)

12:12:15 25   BY MS. PARKER:

12:12:15 1    Q.    Let's pull up the cover page so we can all see that.

12:12:18 2    This is demonstrative 22.

12:12:20 3            Now, could you tell us again the named inventor

12:12:24 4    there?

12:12:25 5    A.    It's myself.

12:12:28 6    Q.    Okay.  All right.  And the title of the invention, if

12:12:32 7    you will tell us that again?

12:12:33 8    A.    "Methods and Compositions For Treating Hepatitis C

12:12:38 9    Virus."

12:12:38 10   Q.    Now, did you actually receive at some point a patent

12:12:45 11   from the United States Federal Government, from the Patent

12:12:49 12   Office?

12:12:49 13   A.    I probably did.

12:12:52 14   Q.    Yes.  I'm just going to hold it up for you.  This is

12:13:01 15   Exhibit 1525.  This is the official copy.  We have a copy

12:13:08 16   for evidence.  I would like to move this into admission.

12:13:12 17           THE COURT:  Any objection?

12:13:14 18           MR. SCHERKENBACH:  No objection.  This is the

12:13:19 19   '597 you're moving in now.  Right?

12:13:21 20           THE COURT:  I presume.

12:13:22 21           MS. PARKER:  Yes.

12:13:23 22           THE COURT:  Okay.  It's admitted.

12:13:24 23           (Exhibit 1525 was admitted into evidence.)

12:13:25 24           MS. PARKER:  If we could pull up the cover sheet

12:13:27 25   on the page so we could see it, the next page.

BY MS. PARKER:

Q.     So I want to ask you again if you will identify the title and the inventors in the patent.

A.     Sure.  So it's methods and compositions for treating hepatitis C virus and was Professor La Colla and myself as inventors.

Q.     Okay.  And it has a date of the patent up on the right-hand side.  If you can tell us what that is, right there (indicating).

A.     October 27th, 2009.

Q.     All right.  I want to change gears and ask you some other questions now.

        If you can please tell us, what is NM283?

A.     NM283 is another 2' methyl ribonucleoside.  I think I should have a slide.

Q.     Let's pull up Demonstrative 23, please.  All right. Is that it?

A.     That's it.

Q.     Okay.

A.     So NM stands for Novirio 283.  It's a two-point methyl ribonucleoside.  It is a C as a base.  And you see that there is a modification in the 3' position.  It was a prodrug.  And that prodrug, which is a valine amino acid. Actually, it's a natural amino acid.  And that prodrug has been used by -- with another drug before.  And this is to

12:15:31 1   increase the absorption.

12:15:33 2                So when you see that the drug is absorbed,

12:15:38 3   but it may not be absorbed -- when we say good absorption,

12:15:44 4   40, 50 percent.  If you have an absorption of 10,

12:15:48 5   20 percent, you say, let's see what we can do to improve

12:15:53 6   that.

12:15:53 7                And so this is one -- there were others, but

12:15:59 8   this is what in this case we used the value to increase the

12:16:03 9   absorption of the drug.

12:16:04 10  Q.     All right.  Now, you used the word prodrug, I

12:16:07 11  believe.  Can you just tell us in a very top line way, what

12:16:13 12  is a prodrug?

12:16:14 13  A.     So a prodrug, the reason it's pro is that when it is

12:16:20 14  absorbed, it's going to release the drug.  So that's why we

12:16:24 15  call it a prodrug.

12:16:26 16  Q.     All right.  Let's go back to the timeline, and this

12:16:29 17  is demonstrative 24, the next one.

12:16:32 18                And what is shown there, it says 2002, first to

12:16:37 19  treat animals with hepatitis C.  Tell us about that.

12:16:41 20  A.     Yes.  We were very excited because this is after a

12:16:51 21  lot of work, and we had to -- if I recall, every time we

12:17:00 22  were submitting to the committee, we had more questions from

12:17:05 23  the committee at the center, and this is how stringent it

12:17:15 24  was.

12:17:16 25                And so when you evaluate whether the drug works

12:17:20  1    or not is, as I indicated here, a broad box.  What you have,

12:17:31  2    obviously, it multiplies in the liver, but it is present in

12:17:37  3    the blood.  So that is -- it's called that you can measure.

12:17:45  4    You have techniques where you can measure the quantity

12:17:50  5    amounts that you have in the drug and it's called a viral

12:17:53  6    load.

12:17:54  7           And so if the drug is effective, you should

12:17:57  8    see a decrease of the amount of virus in the blood.  And

12:18:03  9    this is the first time to our knowledge that we could

12:18:10 10    demonstrate that the drug was effective in decreasing the

12:18:16 11    viral load in chimpanzees infected with human hepatitis C

12:18:22 12    virus.  And obviously, that is -- that was really a key in

12:18:32 13    the story of Novirio and Idenix, and this was the prelude to

12:18:42 14    a large landmark deal that we did with a big pharma called

12:18:49 15    Novartis, because this was really extremely exciting for the

12:18:55 16    field.

12:18:56 17    Q.     All right.  Let's go to the next point then on the

12:19:00 18    timeline.  This is demonstrative 25.  Okay.  And it says,

12:19:05 19    December 2002, first two clinical trials in humans.

12:19:10 20           What happened next?  What does that mean?

12:19:13 21    A.     Well, after, we were also with the NM283 and with

12:19:27 22    this 2' methyl ribonucleoside, we were the first company to

12:19:36 23    our knowledge to test a drug for hepatitis C in the human

12:19:45 24    being.  So prior to that, we had to finalize all the studies

12:19:54 25    required by the FDA, and you file a dossier, which is called

Sommadossi - direct

12:20:01 1  IND for investigational new drug to the FDA.  The FDA has

12:20:07 2  30 days to decide if they'll let you go or not, or if they

12:20:15 3  don't, they will ask you what they require for it.

12:20:20 4          If I recall, we were successful at the first

12:20:25 5  trial, and I think obviously the data in chimpanzees were

12:20:31 6  very important and we could demonstrate as well that the

12:20:33 7  drug was safe to go for testing in humans.

12:20:39 8  Q.      I'm going to ask you, if you will, to look at tab 17

12:20:43 9  of the binder that's in front of you, please.

12:20:51 10 A.      Yes.

12:20:51 11 Q.      Back at this period of time that we were talking

12:20:54 12 about, so this was December of 2002, did Idenix prepare

12:20:59 13 monthly reports about the research and development?

12:21:02 14 A.      Yes.

12:21:02 15 Q.      And was that part of the regular course of business

12:21:05 16 of Idenix?

12:21:06 17 A.      Yes.

12:21:08 18          MS. PARKER:  Your Honor, I would like to move

12:21:10 19 the admission of Plaintiffs' Exhibit 646.

12:21:13 20          MR. SCHERKENBACH:  No objection.

12:21:14 21          THE COURT:  It's admitted.

12:21:15 22          (PX-646 was admitted into evidence.)

12:21:16 23          MS. PARKER:  Okay.  If we could pull that up on

12:21:18 24 the screen.

12:21:18 25 BY MS. PARKER:

12:21:19 1  Q.      And I apologize.  This is the best copy that we have.

12:21:22 2  But if you could tell the jury what does that say and what

12:21:25 3  does it mean?

12:21:26 4  A.      Well, it says NM283 IND, as I mentioned, filed,

12:21:36 5  November, allowed December.  So 30 days.  No objection from

12:21:41 6  the FDA.  And we could go.

12:21:44 7  Q.      All right.  Why do you have that in all caps and why

12:21:47 8  do you have the exclamation points?

12:21:49 9  A.      It's a big deal.

12:21:50 10  Q.      Okay.  Why is it a big deal?

12:21:53 11  A.      Well, it's a big deal when you have the first drug

12:21:57 12  eventually for hepatitis C.  It's a big deal for the

12:22:01 13  millions of people infected.  You have 170 million

12:22:05 14  individual infected in the world with hepatitis C.  You have

12:22:09 15  about four million in the United States, and still today

12:22:15 16  probably more than 50 percent are still not diagnosed.  So

12:22:19 17  it's really at the time in 2002 and still today, it's

12:22:29 18  well-known, the major accomplishments that have been done in

12:22:34 19  the last 15 years with a cure for hepatitis C.

12:22:38 20  Q.      Now, this particular compound, this NM283, how long

12:22:44 21  was it in clinical trials?

12:22:45 22  A.      I will have to go back in details, but I think

12:22:54 23  probably around four years.  Four or five years.

12:22:57 24  Q.      Did it ever get approved by the FDA?

12:23:01 25  A.      We never submitted a package that we call NDA for new

12:23:11 1   drug application.

12:23:12 2   Q.     Okay.  Why not?

12:23:13 3   A.     We decided, we were going into -- so I have to

12:23:21 4   explain here that the clinical development in this is

12:23:26 5   obviously defined by the FDA.

12:23:30 6          So first you have a Phase 1, called Phase

12:23:36 7   1, and you start in normal volunteers, and you test the

12:23:45 8   pharmacology of the drug with basically ADME and the

12:23:52 9   safety.

12:23:54 10         Then after when this is completed, the FDA

12:24:00 11  allows you to go, what we call a Phase 2B, where we are

12:24:05 12  going to test for a few days short-term and different

12:24:13 13  doses in no more than 30 to 40 individuals infected with

12:24:23 14  hepatitis C.

12:24:24 15         If you pass this stage safely and that the drug

12:24:31 16  shows activity, so now you know it's the same as the

12:24:38 17  chimpanzee.  You measure the amount of virus that are in the

12:24:42 18  blood.  It's called viral load.  And you see if you have a

12:24:47 19  decrease of that viral load.  That means that the drug

12:24:51 20  works.

12:24:52 21         So that's what we call Phase 1B.  Then you move

12:24:56 22  into Phase 2.  Phase 2 is where you are going to now have

12:25:03 23  the drug tested with one or two doses at the most, because

12:25:08 24  you are going to start to dose into very large number of

12:25:14 25  patients.  We are talking about hundreds of patients.  And

12:25:20 1   that at the time, it was a one-year treatment, so it was

12:25:28 2   very long.  And at the time again, so it was a combination,

12:25:37 3   but you could not use that drug only in monotherapy.  You

12:25:42 4   will add that drug to what we called standard of care.  At

12:25:49 5   the time, the standard of care was a combination of

12:25:55 6   interferon and a drug called interferon and another drug

12:26:02 7   called robafen.  And so for Phase 2, we did that, and we did

12:26:10 8   several.  We did hundreds of patients.  And for one year in

12:26:19 9   combination with interferon and robafen, and then you had to

12:26:23 10  wait six months to demonstrate if your treatment was leading

12:26:31 11  to a cure.  That means the cure means that you cannot detect

12:26:37 12  the virus in the blood.

12:26:39 13          So it's not just a decrease of the viral amount

12:26:45 14  in the blood, but you cannot detect with sensitive assays

12:26:52 15  called BCR that are measured basically even single copies of

12:27:00 16  the drug.  And if you do not detect after six months, you

12:27:03 17  have a cure.

12:27:04 18          So when we decided that we will -- so we

12:27:10 19  completed those Phase 2 and we had to make a business

12:27:17 20  decision in Phase 2.  Initiate Phase 3.

12:27:22 21          So the Phase 3 is the last phase that you need

12:27:26 22  to do.  Those are thousands of patients now.  You go from

12:27:32 23  tens to hundreds to thousands.  And what we decided was that

12:27:39 24  it will be difficult from a commercial standpoint.  The

12:27:45 25  effect was there.  It was active.  We had cures in those

12:27:51  1   patients that were treated for a year, but there was some

12:27:55  2   limitation of GI toxicity, and most importantly, we were

12:28:02  3   not, we believed, sufficient potency, so sufficient in a

12:28:09  4   patient of the replication.  And what we had over the other

12:28:12  5   time was the son and the daughter of NM283, which actually

12:28:19  6   today are the ones that are being used in the clinic and

12:28:26  7   approved.

12:28:27  8           So from NM283, we were at a decision, at the

12:28:36  9   beginning of the Phase 3.  Are we going to basically go and

12:28:38 10   spend a hundred million dollars, because it's a hundred

12:28:41 11   million dollars with thousands of patients being evaluated,

12:28:45 12   or we are going to take the new generation, which at the

12:28:50 13   time was called 184, IDX184, which the pro type.  So it was

12:28:57 14   already another type of prodrug, and we were again the first

12:29:01 15   ones to go with the new generation of 2'-methyl

12:29:07 16   ribonucleoside in basically in the clinics some time after.

12:29:13 17           So that's why we decided that commercially

12:29:16 18   speaking and from a business standpoint, it was a decision

12:29:20 19   between Novartis and I that we will go and develop now the

12:29:26 20   new generation on prototypes.

12:29:27 21   Q.      So let me just make sure I understand this.  So this

12:29:30 22   particular compound, this NM283, okay, that was not actually

12:29:36 23   approved by the FDA; is that correct?

12:29:38 24   A.      Well, we never submitted --

12:29:41 25   Q.      Right.

12:29:42 1    A.      -- the NDA application.

12:29:43 2    Q.      Was it a failure?

12:29:45 3    A.      Well, for us it was not, because we had demonstrated

12:29:50 4    that 2'-methyl ribonucleoside did work.  We demonstrated

12:29:57 5    that it cured some patients and it was not sufficiently

12:30:02 6    potent to go and spend hundreds of millions of dollars.  And

12:30:10 7    we had the sons of it that were ready to go, and basically,

12:30:12 8    that was the business decision we did, we took.

12:30:02 9    Q.      So these other compounds, I think you said were the

12:30:05 10   sons and the daughters?

12:30:06 11   A.      Um-hmm.

12:30:07 12   Q.      Did you put these sons and daughters into clinical

12:30:12 13   trials?

12:30:13 14   A.      Yes.

12:30:13 15   Q.      What do they all have in common?  Why do you call

12:30:15 16   them sons and daughters?

12:30:17 17   A.      Because they have all 2'-methyl ribonucleosides and

12:30:22 18   still today, every single compound that has been in the

12:30:28 19   clinic for the treatment, for being evaluated in the clinic

12:30:35 20   for hepatitis C or approved for hepatitis C has a 2'-methyl

12:30:42 21   substitution and is a 2'-methyl ribonucleoside.

12:30:46 22           MS. PARKER:  Just a couple more questions and

12:30:49 23   then we'll have lunch break.

12:30:51 24           THE COURT:  Okay.

12:30:51 25   BY MS. PARKER:

Sommadossi - direct

12:30:53  1    Q.      Dr. Sommadossi, did other companies place 2'-methyl

12:31:02  2    up compounds into clinical trials?

12:31:04  3    A.      Yes.

12:31:04  4    Q.      Did that become before or after your invention became

12:31:07  5    public?

12:31:08  6    A.      After.

12:31:08  7            MS. PARKER:  Your Honor, I'm going to go into a

12:31:10  8    new area.  This might be a good time for the lunch break.

12:31:12  9            THE COURT:  I think it might be.  The lunch is

12:31:15  10   here for the jury.  So during the break, no talking about

12:31:17  11   the case.  I'll give you about a half hour, and then we'll

12:31:19  12   get started again for the afternoon.

12:31:44  13            (Jury left courtroom.)

12:31:55  14            THE COURT:  All right.

12:31:56  15            MS. PARKER:  May I?  I just wanted to make sure

12:32:03  16   this was okay.  Obviously, we won't have any substantive

12:32:06  17   discussions with Dr. Sommadossi, but could be arrange for

12:32:10  18   him to go somewhere to have lunch?  Could we talk to him

12:32:13  19   about that?

12:32:13  20            THE COURT:  Yes, you can talk to him about

12:32:15  21   eating lunch.  And I hope he can eat lunch and we'll start

12:32:18  22   back in about a half hour.

12:32:19  23            MS. PARKER:  Thank you, Your Honor.

12:32:20  24            THE WITNESS:  Thank you.

12:32:27  25            (Lunch recess taken.)

| | | |
|---|---|---|
| 12:32:27 | 1 | *    *    * |
| 01:15:10 | 2 | AFTERNOON SESSION, 1:07 P.M. |
| 01:15:10 | 3 | THE COURT:  All right.  I understand the jury is |
| 01:15:12 | 4 | done with their lunch, so we'll bring them in. |
| 01:15:23 | 5 | (Jury returned.) |
| 01:16:19 | 6 | THE COURT:  Ladies and gentlemen, I hope you had |
| 01:16:21 | 7 | a pleasant lunch break. |
| 01:16:22 | 8 | Doctor, you may have a seat. |
| 01:16:24 | 9 | We are ready to continue.  Ms. Parker. |
| 01:16:28 | 10 | MS. PARKER:  Thank you, Your Honor. |
| 01:16:28 | 11 | BY MS. PARKER: |
| 01:16:34 | 12 | Q.    Dr. Sommadossi, I want to change gears altogether. |
| 01:16:37 | 13 | A.    Okay. |
| 01:16:37 | 14 | Q.    I'm going to ask up now about some questions about |
| 01:16:41 | 15 | Dr. Raymond Schinazi.  Can you tell us what was |
| 01:16:46 | 16 | Dr. Schinazi's role at your company? |
| 01:16:50 | 17 | A.    Dr. Schinazi was a co-founder of Idenix and initially |
| 01:16:59 | 18 | at the beginning was on the scientific advisory board. |
| 01:17:04 | 19 | That's it. |
| 01:17:05 | 20 | Q.    Did he ever serve as a paid consultant for your |
| 01:17:08 | 21 | company? |
| 01:17:09 | 22 | A.    As a paid consultant, yes. |
| 01:17:11 | 23 | Q.    What period of time was he involved with your |
| 01:17:13 | 24 | company? |
| 01:17:13 | 25 | A.    I'm sorry.  He had a consultant agreement as a paid |

01:17:21  1    consultant between May 1998 and May 2002.  Four years.

01:17:32  2    Q.    Now, as a member of the scientific advisory board and

01:17:37  3    as a paid consultant, did Dr. Schinazi have access to

01:17:42  4    confidential information, inside information at your

01:17:45  5    company?

01:17:45  6    A.    He had access to some confidential information and

01:17:53  7    actually he, as part of the agreement, he was under the CDA,

01:18:01  8    so confidential disclosure agreement that anything that he

01:18:05  9    had heard from any executive or myself or anything at our

01:18:12 10    scientific advisory board should be confidential.

01:18:15 11    Q.    I'm going to ask you, if you will, to please look at

01:18:19 12    that notebook, the binder again, and this time tab 19.

01:18:29 13          And have you seen that document before?

01:18:34 14    A.    It's 15 years, so ...

01:18:38 15    Q.    Well, it is addressed to you; right?

01:18:41 16    A.    Okay.

01:18:41 17    Q.    And the date is August 15th of 2003?

01:18:45 18    A.    Correct.

01:18:46 19    Q.    Do you see that?

01:18:47 20    A.    Yes.

01:18:47 21    Q.    And that is an e-mail from Dr. Schinazi; correct?

01:18:51 22    A.    Correct.

01:18:54 23          MS. PARKER:  Your Honor, I move the admission of

01:18:56 24    Plaintiffs' Exhibit 878.

01:18:59 25          MR. SCHERKENBACH:  No objection.

01:19:00 1        THE COURT:  It is admitted.

01:19:01 2             (PTX-878 was admitted into evidence.)

01:19:01 3        MS. PARKER:  If we could put that up on the

01:19:03 4   screen.

01:19:03 5   BY MS. PARKER:

01:19:05 6   Q.    First of all, it says, it's from Raymond Schinazi.

01:19:09 7   Do you see that at the top?

01:19:11 8   A.    Yes.

01:19:11 9   Q.    Okay.  And then the date there, Friday, August 15th,

01:19:17 10  2003.  Do you see that?

01:19:18 11  A.    Yes.

01:19:19 12  Q.    And then it's addressed to, that is you,

01:19:23 13  Dr. Sommadossi.  And then it says, Andrea Corcoran.  Who is

01:19:28 14  she?

01:19:28 15  A.    Andrea Corcoran was the general counsel of Idenix.

01:19:34 16  Q.    And I'm just going to read the e-mail.

01:19:36 17        It says:  "Dear JP,"

01:19:38 18        That is you, Jean-Pierre?

01:19:39 19  A.    Yes, everybody call me JP.

01:19:44 20  Q.    "Dear JP,

01:19:45 21        "As discussed today, please find attached a

01:19:48 22  draft letter.  Please feel free to edit with Andrea as you

01:19:53 23  see fit.  It would be better if Andrea signs it since you

01:19:56 24  are my best friend and that could be perceived as a

01:19:59 25  conflict."

01:19:59  1          "Again, thanks, RFS."

01:20:02  2          That is Raymond F. Schinazi; right?

01:20:04  3     A.     Correct.

01:20:04  4     Q.     And then it says:  "PS, please destroy this e-mail

01:20:08  5     after you get it."

01:20:09  6          So at that period of time, did Dr. Schinazi

01:20:13  7     consider you his best friend?

01:20:14  8     A.     I think so.

01:20:15  9     Q.     Okay.  Let's pull up the letter that is attached to

01:20:20 10     this e-mail now.  I want to pull up the highlighted part in

01:20:26 11     particular.

01:20:27 12          And it specifically says there:  "As a founder,

01:20:31 13     shareholder, and insider, you are privileged to a large

01:20:35 14     amount of confidential information about our company from

01:20:37 15     the early days of it its creation."

01:20:41 16          Now; is that correct?  Was Dr. Schinazi

01:20:46 17     privileged?  Did he have the privilege of seeing a large

01:20:50 18     amount of confidential information at your company at

01:20:54 19     Idenix?

01:20:55 20     A.     Yes.

01:20:55 21     Q.     And did he have confidentiality obligations to your

01:21:00 22     company?

01:21:02 23     A.     Yes, between May 1998 and May 2002.

01:21:09 24     Q.     I'm going to ask you if you will to turn to Tab No. 1

01:21:13 25     in the binder there and ask you if you can identify that as

Sommadossi - direct

01:21:16 1    the consulting agreement that you had with Dr. Schinazi.

01:21:34 2    A.    Yes.

01:21:36 3              MS. PARKER:  Your Honor, I'd like to move the

01:21:37 4    admission of Plaintiffs' Exhibit 204.

01:21:39 5              MR. SCHERKENBACH:  No objection.

01:21:40 6              THE COURT:  It's admitted.

01:21:41 7              (PTX-204 was admitted into evidence.)

01:21:41 8              MS. PARKER:  If we could pull up page 3 on the

01:21:44 9    screen.

01:21:44 10   BY MS. PARKER:

01:21:52 11   Q.    All right.  So Paragraph No. 6 there.  It says:

01:21:56 12   "During the course of his engagement with the company,

01:21:59 13   consultant" -- now, that is Dr. Schinazi, right?

01:22:03 14   A.    Yes.

01:22:03 15   Q.    -- "consultant may have access to, learn of, or

01:22:07 16   participate in the development of the company's confidential

01:22:10 17   information or confidential information entrusted to the

01:22:14 18   company by other persons, corporations, or firms."

01:22:16 19              Did Dr. Schinazi have access to confidential

01:22:21 20   information in his capacity as a paid consultant covered by

01:22:26 21   this agreement?

01:22:27 22   A.    Yes.

01:22:27 23   Q.    And then, if we could move on down on that page.

01:22:34 24              It says, "consultant" -- and again that is

01:22:38 25   Dr. Schinazi, right?

01:22:40 1    A.     **(Nodding yes.)**

01:22:40 2    Q.     **"Consultant agrees to hold such information as**

01:22:43 3   **strictly confidential and not disclose any such confidential**

01:22:46 4   **information to any person, corporation or firm (other than**

01:22:50 5   **the company)."**

01:22:52 6         **And that is Idenix, right?**

01:22:54 7    A.     **Correct.**

01:22:54 8    Q.     **"Consultant." Again, Dr. Schinazi, right?**

01:22:57 9    A.     **Correct.**

01:22:58 10    Q.     **"Consultant further agrees not to make use of such**

01:23:02 11   **confidential information except on the company's behalf**

01:23:05 12   **whether or not such information is produced by his own**

01:23:09 13   **efforts."**

01:23:10 14         **Now, what was your understanding of these**

01:23:15 15   **provisions that we just went over when it comes to**

01:23:18 16   **Dr. Schinazi and the information that he was able to obtain**

01:23:22 17   **by being a paid consultant?**

01:23:24 18         **MR. SCHERKENBACH: Objection. That calls for a**

01:23:25 19   **legal conclusion.**

01:23:27 20         **THE COURT: Ms. Parker.**

01:23:28 21         **MS. PARKER: I just asked for his understanding**

01:23:30 22   **of it.**

01:23:30 23         **THE COURT: Mr. Scherkenbach.**

01:23:32 24         **MR. SCHERKENBACH: That is a legal agreement.**

01:23:34 25   **She is asking him his understanding of a legal agreement.**

01:23:36 1    THE COURT:  I'll overrule the objection.  He can

01:23:39 2  give us his understanding.

01:23:39 3  BY THE WITNESS:

01:23:41 4  A.    My understanding is that information that I was

01:23:47 5  giving to Dr. Schinazi and the Idenix executives were giving

01:23:56 6  information to Dr. Schinazi and these were strictly

01:23:58 7  confidential.

01:23:59 8  Q.    Pursuant to this consulting agreement that your

01:24:03 9  company had with Dr. Schinazi, did you personally share

01:24:08 10  confidential inside information with Dr. Schinazi in that

01:24:13 11  capacity?

01:24:13 12  A.    Yes.

01:24:14 13  Q.    Was the information that you provided to Dr. Schinazi

01:24:22 14  confidential at the time that you provided it to him?

01:24:26 15  A.    Yes.

01:24:27 16  Q.    And what exactly did you tell Dr. Schinazi about this

01:24:35 17  confidential information as it relates to your invention

01:24:38 18  about hepatitis C?

01:24:40 19    MR. SCHERKENBACH:  Objection, Your Honor.  It

01:24:41 20  calls for hearsay.

01:24:42 21    THE COURT:  His own words as to what he told

01:24:46 22  him?

01:24:47 23    MR. SCHERKENBACH:  Yes.

01:24:47 24    THE COURT:  All right.  Ms. Parker.

01:24:48 25    MS. PARKER:  I'll ask for the response then

01:24:50 1   which is I believe an admission by a party opponent.

01:24:50 2   BY MS. PARKER:

01:24:54 3   Q.    I'm not going to ask you about what you said to

01:24:56 4   Dr. Schinazi.  All right?  I want to ask about what

01:25:00 5   Dr. Schinazi said to you.  Okay?

01:25:03 6           What did Dr. Schinazi say to you about any

01:25:07 7   confidential information that he received from you with

01:25:11 8   respect to your invention about hepatitis C?

01:25:14 9           MR. SCHERKENBACH:  I have the same objection,

01:25:16 10  Your Honor.

01:25:16 11          THE COURT:  Hearsay objection?

01:25:17 12          MR. SCHERKENBACH:  Yes.

01:25:17 13          THE COURT:  All right.  Ms. Parker.

01:25:19 14          MS. PARKER:  Admission by a party opponent.

01:25:22 15          MR. SCHERKENBACH:  Foundation for that I don't

01:25:24 16  believe has been laid.

01:25:25 17          THE COURT:  All right.  I'll sustain the

01:25:27 18  objection.  You will have to lay the foundation.

01:25:27 19  BY MS. PARKER:

01:25:32 20  Q.    At the time that Dr. Schinazi -- well, let me start

01:25:37 21  by saying this.  Did Dr. Schinazi at some point make -- I'm

01:25:41 22  not going to ask you what it is yet, but did Dr. Schinazi

01:25:44 23  make statements to you about the confidential information

01:25:50 24  that he received as a paid consultant and with respect to

01:26:00 25  your invention relating to hepatitis C?

01:26:06 1          I think you can answer that.

01:26:09 2                THE WITNESS:  Should I, Your Honor?

01:26:10 3                THE COURT:  You can answer that, yes.

01:26:10 4    BY THE WITNESS:

01:26:13 5    A.    Okay.  So Dr. Schinazi indicated, I forgot the

01:26:24 6    timing, probably 2001, early 2002, that he confirmed the

01:26:33 7    activity, the 2'-methyl ribonucleoside that he synthesized,

01:26:44 8    either in his lab or somewhere else, following the

01:26:50 9    indication that I had told him that this 2'-methyl

01:27:00 10   ribonucleoside would have been active against hepatitis C

01:27:05 11   and that 2'-methyl was the essential modification to have

01:27:10 12   activity against hepatitis virus.

01:27:14 13   Q.    At the time he said that to you, did Dr. Schinazi

01:27:17 14   have a role in the company called Pharmasset?

01:27:21 15   A.    I think so.

01:27:23 16   Q.    Okay.  And what was his role with this company called

01:27:28 17   Pharmasset?

01:27:28 18   A.    I think he was the major founder and chairman of the

01:27:34 19   board.

01:27:34 20   Q.    Thank you.

01:27:37 21               MS. PARKER:  Your Honor, I have no further

01:27:38 22   questions.  Thank you.

01:27:39 23               THE COURT:  Okay.  Cross-examination.

01:27:45 24               MR. SCHERKENBACH:  Yes, Your Honor.  Thank you.

01:27:46 25   May we approach with some binders?

01:27:49 1          THE COURT:  Yes.

01:28:03 2              (Documents passed forward.)

01:28:06 3          MR. SCHERKENBACH:  Your Honor, may I approach

01:28:08 4   the witness?

01:28:08 5          THE COURT:  Yes.

01:28:13 6          MR. SCHERKENBACH:  Thank you.

01:28:16 7              (Binders passed forward.)

01:28:41 8                  CROSS-EXAMINATION

01:28:41 9   BY MR. SCHERKENBACH:

01:29:06 10  Q.     Okay.  Good afternoon, Dr. Sommadossi.

01:29:18 11  A.     Good afternoon.

01:29:19 12  Q.     We met before?

01:29:19 13  A.     Yes.

01:29:20 14  Q.     I took your deposition in the case?

01:29:21 15  A.     Correct.

01:29:22 16  Q.     It is nice to see you again.

01:29:23 17  A.     Good to see you.

01:29:25 18  Q.     I want to start I think where you started, talking a

01:29:29 19  little bit about how you came up with your invention.  Okay?

01:29:32 20  A.     Okay.

01:29:32 21  Q.     And you talked about that obviously on direct

01:29:37 22  examination today; right?

01:29:38 23  A.     Yes.

01:29:39 24  Q.     And you and I also talked about that in your

01:29:43 25  deposition in this case; right?

01:29:44 1    A.    Yes.

01:29:44 2    Q.    Okay.  And you showed the jury I think sort of the

01:29:49 3    cover of the '597 patent during your direct exam.  Do you

01:29:52 4    recall that?

01:29:53 5    A.    Yes.

01:29:53 6    Q.    Do you recall the '597 patent is the patent that is

01:29:57 7    being asserted in this trial; right?

01:30:00 8    A.    I believe so, yes.

01:30:01 9    Q.    You believe so.  Okay.  You didn't show the jury any

01:30:05 10   of the contents of the '597 patent; right?  We didn't look

01:30:09 11   inside; right?

01:30:10 12   A.    No.

01:30:11 13   Q.    Okay.  And when I asked you in your deposition about

01:30:14 14   the '597 patent, you said you hadn't read it since you left

01:30:18 15   Idenix in 2010; right?

01:30:21 16   A.    Correct.

01:30:21 17   Q.    And, in fact, you had no recollection at that point

01:30:25 18   of having read the '597 patent since it issued in 2009;

01:30:31 19   true?

01:30:31 20   A.    Correct.

01:30:31 21   Q.    Okay.  Now, you recall also we talked in your

01:30:38 22   deposition about a document called an interrogatory response

01:30:42 23   in which Idenix described your conception of the invention.

01:30:47 24   Do you remember that?

01:30:49 25   A.    If you say so, okay.

01:30:51  1    Q.    Well --

01:30:52  2    A.    I have to say yes.

01:30:53  3    Q.    No, you don't have to say yes.

01:30:55  4    A.    That's fine.

01:30:55  5    Q.    Only if it is true.

01:30:57  6          You have two binders there.  Let me explain what

01:31:00  7    they are.  One has two great big exhibits that are the file

01:31:03  8    histories of the patents, and the other has a bunch of

01:31:05  9    additional exhibits that are smaller tabs.

01:31:07 10    A.    So should I take the first one?

01:31:11 11          MR. SCHERKENBACH:  May I approach him?

01:31:12 12          THE COURT:  You may.

01:31:12 13          MR. SCHERKENBACH:  Thank you.

01:31:20 14          THE WITNESS:  Okay.

01:31:20 15          THE COURT:  And, Doctor, feel free to use the

01:31:22 16    your counter to your left as you have with the other binder,

01:31:25 17    if you need to.

01:31:27 18          THE WITNESS:  Okay.  Thank you.

01:31:30 19    BY MR. SCHERKENBACH:

01:31:30 20    Q.    If you could find, Dr. Sommadossi, DX-548.  They

01:31:37 21    should be in numerical order so there is DX-and the number

01:31:41 22    548?

01:31:42 23    A.    So DX?

01:31:43 24    Q.    DX-548.

01:31:47 25    A.    Okay.

01:31:47 1    Q.      Okay.  Do you see that document?

01:31:54 2    A.      Yes.

01:31:54 3    Q.      And this is titled Plaintiffs' First Supplemental

01:31:58 4    Responses to Interrogatories Nos. 1 through 4.  Right?  On

01:32:04 5    the cover there?

01:32:05 6    A.      Yes.

01:32:05 7    Q.      And just to remind you, we were discussing in your

01:32:11 8    deposition on page 10, there is a description of some of the

01:32:16 9    work you and Dr. La Colla did related to coming up with the

01:32:20 10   invention of the '597 patent.  Do you see that on page 10?

01:32:24 11   A.      Okay.

01:32:26 12           MR. SCHERKENBACH:  Your Honor, we would move the

01:32:28 13   admission of DX-548.

01:32:31 14   BY THE WITNESS:

01:32:31 15   A.      Yes.

01:32:31 16           THE COURT:  No.

01:32:32 17           MR. SCHERKENBACH:  Please hold on.

01:32:34 18           THE COURT:  That's for us.  Please hold on a

01:32:35 19   second, doctor.

01:32:36 20           Is there any objection?

01:32:36 21           MS. PARKER:  Yes, Your Honor.  Improper

01:32:38 22   impeachment.

01:32:39 23           MR. SCHERKENBACH:  I'm not impeaching him.

01:32:40 24           THE COURT:  You object to its admission?

01:32:42 25           MS. PARKER:  Yes, Your Honor.

01:32:42  1          THE COURT:  On the basis of improper

01:32:44  2   impeachment?

01:32:45  3          MS. PARKER:  Yes, Your Honor.  It is not

01:32:46  4   substantive evidence to be admitted.

01:33:02  5          MR. SCHERKENBACH:  Well, it's an interrogatory

01:33:04  6   response, so it's a party admission, so I think it comes

01:33:07  7   in.

01:33:07  8          THE COURT:  Is it not a party admission?

01:33:08  9          MS. PARKER:  It is, but I don't think it's

01:33:11 10   appropriately used with this witness as impeachment.

01:33:14 11          THE COURT:  All right.  Well, right now it just

01:33:16 12   has been offered into evidence.  I'm going to admit it into

01:33:18 13   evidence.  If you have an objection to how he's using it,

01:33:20 14   you'll have to state the objection.

01:33:21 15          MR. SCHERKENBACH:  Okay.

01:33:23 16          THE COURT:  So the document -- I'm sorry.  What

01:33:25 17   was the exhibit number again?

01:33:26 18          MR. SCHERKENBACH:  It's DX-548.

01:33:27 19          THE COURT:  Okay.  548 is admitted.

01:33:29 20          MR. SCHERKENBACH:  I'm sorry.  Thank you.

01:33:31 21          (DX-548 was admitted into evidence.)

01:33:31 22   BY MR. SCHERKENBACH:

01:33:31 23   Q.    And, Dr. Sommadossi, we may have to refer to this for

01:33:36 24   reference, but I will, for the most part, ask the questions

01:33:40 25   with respect to your testimony today.  Okay?

01:33:42  1    A.      Sure.

01:33:43  2    Q.      So just so you know, you have it up there.

01:33:45  3                    THE COURT:  Ms. Parker?

01:33:46  4                    MS. PARKER:  If he is going to proceed in this

01:33:48  5    matter, I do have an objection it's improper impeachment,

01:33:51  6    because these --

01:33:51  7                    THE COURT:  Let me see you at sidebar.

01:38:27  8                    (Sidebar conference held out of the hearing of

01:38:27  9    the jury as follows.

01:38:27 10                    THE COURT:  So we actually have to talk loud

01:38:27 11    over here, because with the white noise, they can't here

01:38:27 12    anything.

01:38:27 13                    What's the objection?

01:38:27 14                    MS. PARKER:  The objection is it's improper

01:38:27 15    impeachment because these are not the witness'

01:38:27 16    interrogatories.  He's trying to use interrogatories from

01:38:27 17    the company recently against the witness who left there

01:38:27 18    before the interrogatories were ever answered.  And so if he

01:38:27 19    wrote authority, these were his own interrogatories,

01:38:27 20    absolutely, he could use them for impeachment.  This is not

01:38:27 21    impeachment by this witness.

01:38:27 22                    MR. McCRUM:  He left the company in 2010.

01:38:27 23                    THE COURT:  All right.  Mr. Scherkenbach?

01:38:27 24                    MR. SCHERKENBACH:  First of all, I'm not

01:38:27 25    impeaching right now.  I just moved the document into

01:38:27 1  evidence.

01:38:27 2         Second of all, he was examined at length on this

01:38:27 3  document in his deposition and adopted essentially all of

01:38:27 4  it.

01:38:27 5         And, third, even if he hadn't, I'm entitled to

01:38:27 6  show if there are material inconsistencies between his story

01:38:27 7  and his company's story as to what the invention conception

01:38:27 8  was and the invention.

01:38:27 9         THE COURT:  All right.  Isn't that correct?  I

01:38:27 10  mean, the company has a certain story to tell and maybe the

01:38:27 11  witness who would know something about it has something to

01:38:27 12  tell.  Why isn't it pertinent to put all of that in front of

01:38:27 13  a jury?

01:38:27 14         MR. GRIFFITH:  Not using the interrogatories.

01:38:27 15  Okay?  He can ask whatever questions that he would like to

01:38:27 16  in terms of, well, what is your position, what was your

01:38:27 17  company's position.  He can't use the interrogatories as

01:38:27 18  part of that story because interrogatories are not telling

01:38:27 19  the story.

01:38:27 20         This --

01:38:27 21         THE COURT:  I'm sorry.  On what authority are

01:38:27 22  you saying you can only impeach with something tied to this

01:38:27 23  witness?

01:38:27 24         MS. PARKER:  Because the impeachment has to

01:38:27 25  be -- well, the way I understand he's using it, he'll say,

01:38:28 1    hey, here's some interrogatories from this company and he's

01:38:28 2    using that to impeach a witness, and I don't understand any

01:38:28 3    other way he could be using it here.

01:38:28 4            MR. GRIFFITH:  He didn't sign the

01:38:28 5    interrogatories, Your Honor.  I mean, it's not his prior

01:38:28 6    statements, so it is fine to ask about the invention story,

01:38:28 7    whatever he wants to testify about.

01:38:28 8            The fact that it was asked about in a deposition

01:38:28 9    doesn't make it proper or admissible.  You can ask about it

01:38:28 10   in a deposition broader than in court.

01:38:28 11           THE COURT:  The document is in evidence now.  Do

01:38:28 12   you have any response?

01:38:28 13           MR. SCHERKENBACH:  Whether it's impeachment or

01:38:28 14   not, I should be entitled to use this document, ask him

01:38:28 15   whether or not his version of events squares with the

01:38:28 16   version of events in the document provided by the company

01:38:28 17   and maybe it does and maybe it doesn't.  The jury should be

01:38:28 18   entitled to hear that.

01:38:28 19           THE COURT:  Anything else?

01:38:28 20           MS. PARKER:  Nothing else, Your Honor.

01:38:28 21           THE COURT:  All right.  I'm overruling the

01:38:28 22   objection.  I don't think it's improper questioning.

01:38:28 23   Whether it's improper impeachment or it's even impeachment,

01:38:28 24   I suppose we can debate.

01:38:28 25           I'm going to allow questioning with the admitted

01:38:28 1    document, which happened to be interrogatories.  I'll allow

01:38:28 2    that question.

01:38:28 3                MS. PARKER:  I'm not arguing.  May I ask a

01:38:28 4    follow-up question?

01:38:28 5                THE COURT:  Sure.

01:38:28 6                MS. PARKER:  So what exactly is Your Honor

01:38:29 7    allowing him to do?

01:38:29 8                THE COURT:  I'm sorry to say, he's going to be

01:38:29 9    allowed to question with this document.  He can refer to

01:38:29 10   that document.  If there's something you think is

01:38:29 11   objectionable that he does arguably inconsistently with what

01:38:29 12   I've just ordered, rise for an objection.

01:38:29 13               MS. PARKER:  Rule of completeness or anything

01:38:29 14   like that?  I can object?

01:38:29 15               THE COURT:  I'm not taking away any of your

01:38:29 16   objections.

01:38:29 17               MS. PARKER:  I guess -- maybe I can be more

01:38:29 18   articulate about what I'm trying to ask.  So you're using

01:38:29 19   this document not as interrogatories but as the document, so

01:38:29 20   to speak, so if there's some other part or whatever?

01:38:29 21               THE COURT:  I don't see why I -- I'm not sure

01:38:29 22   what the relevance of that question is.  If you have an

01:38:29 23   objection, you'll have to rise.

01:38:29 24               MS. PARKER:  Okay.

01:38:29 25                    (End of sidebar conference.)

01:38:29 1      THE COURT:  Ladies and gentlemen, that was

01:38:29 2 called a sidebar or a bench conference, but those may happen

01:38:29 3 throughout the trial.  You should feel comfortable to chat

01:38:29 4 quietly while we're over there or even stand up and walk

01:38:31 5 around the jury box if you would like to.

01:38:33 6      I'm sorry.  Do we need a break?  No.  We're

01:38:35 7 good.  Okay.  All right.  Then we will continue.

01:38:37 8      MR. SCHERKENBACH:  Thank you, Your Honor.

01:38:39 9 BY MR. SCHERKENBACH:

01:38:41 10 Q.    Dr. Sommadossi, maybe you had a chance while we were

01:38:44 11 chatting over there.  Do you generally recall that you and I

01:38:47 12 discussed the substance of this interrogatory response in

01:38:50 13 your deposition?

01:38:50 14 A.    Yes.

01:38:51 15 Q.    Okay.  Fine.  Now, you said on direct that Professor

01:38:58 16 La Colla tested a compound known as MD1 for antiviral

01:39:02 17 activity before Idenix filed its patent application in May

01:39:09 18 of 2000; right?

01:39:11 19 A.    Yes.

01:39:12 20 Q.    Okay.  And MD1, you showed a structure.  That is a

01:39:17 21 2'-methyl up OH down nucleoside; right?

01:39:20 22 A.    It's a 2'-methyl ribonucleoside.

01:39:24 23 Q.    And to answer my question, that means, among other

01:39:27 24 things, it has a methyl up at 2' and an OH down at 2'; is

01:39:31 25 that right?

01:39:31  1    A.      Correct.

01:39:32  2    Q.      Okay.  And that particular flavor of nucleoside MD1,

01:39:37  3    that has an adenine base; is that right?

01:39:40  4    A.      Correct.

01:39:41  5    Q.      Okay.  And that compound, MD1, is the only nucleoside

01:39:51  6    Dr. La Colla tested before Idenix filed its May 2000 patent

01:39:56  7    application; true?

01:39:57  8    A.      No.

01:39:59  9    Q.      Let me put up your slide 22, I think, your timeline

01:40:06 10    slide.

01:40:11 11            Do you recognize this?  This is the 2001

01:40:13 12    version of your timeline slide that you used on your direct

01:40:18 13    exam.

01:40:18 14    A.      Yes.

01:40:19 15    Q.      There's an entry for March 2000 for Idenix confirms

01:40:23 16    MD1 is active in Yellow Fever assay; is that right?

01:40:26 17    A.      Yes.

01:40:26 18    Q.      Okay.  And then the next event shown on your timeline

01:40:29 19    is May 23, 2000, filing of the provisional patent

01:40:33 20    application; is that right?

01:40:34 21    A.      Correct.

01:40:35 22    Q.      Okay.  So you didn't testify about any additional

01:40:39 23    testing Dr. La Colla did of MD1 between March of 2000 and

01:40:45 24    May of 2000.  Fair?

01:40:46 25    A.      Can you repeat the question?

01:40:48  1    Q.    You didn't testify on your direct about any testing

01:40:52  2    that Dr. La Colla did on MD1, additional testing on MD1

01:40:58  3    between March of 2000 and May 23rd, 2000; right?

01:41:03  4            MS. PARKER:  Objection as to relevance as to

01:41:04  5    what he testified based on what I may or may not have

01:41:07  6    asked.

01:41:08  7            THE COURT:  Mr. Scherkenbach?

01:41:09  8            MR. SCHERKENBACH:  I don't know what that means.

01:41:13  9    I will stand by my question.

01:41:14 10            THE COURT:  Okay.

01:41:16 11            THE WITNESS:  Well --

01:41:17 12            THE COURT:  Hold on, Doctor.  I have to rule on

01:41:19 13    the objection before you answer.

01:41:20 14            I'm overruling the objection.  It's a fair

01:41:22 15    question and you can answer.

01:41:23 16            THE WITNESS:  I didn't ever question actually.

01:41:27 17    It's in the document, black and white, what you gave me,

01:41:32 18    that Professor La Colla had two compounds, MD1 and ADM3, one

01:41:41 19    being a 2'-methyl ribonucleoside and the other compound

01:41:45 20    being a 1' ribonucleoside.  1' methyl ribonucleoside.

01:41:52 21    BY MR. SCHERKENBACH:

01:41:53 22    Q.    So let me repeat my question, which was:  The only

01:41:56 23    2'-methyl OH nucleoside that Dr. La Colla tested before

01:42:04 24    Idenix filed the May 23rd, 2000 provisional, was MD1; is

01:42:10 25    that right?

01:42:10 1    A.      Yes.

01:42:10 2    Q.      Okay.

01:42:11 3    A.      Only one, yes.

01:42:12 4    Q.      Only one?

01:42:13 5    A.      2'-methyl.  Yes, only one.

01:42:15 6    Q.      All right.  And this testing, this testing, the one

01:42:25 7    compound, the 20012'-methyl compound in Yellow Fever, it was

01:42:29 8    in Yellow Fever; is that right?

01:42:31 9    A.      Yes.

01:42:32 10   Q.      Okay.  That testing does not appear in the May 2000

01:42:36 11   patent application; is that right?

01:42:38 12   A.      Yes.

01:42:39 13   Q.      Meaning it does not appear in the application; is

01:42:43 14   that correct?

01:42:43 15   A.      In the provisional application?

01:42:46 16   Q.      Correct.

01:42:47 17   A.      I think it is not.

01:42:51 18   Q.      All right.  Thank you.

01:42:52 19           And, in fact, if we look at the cover of the May

01:42:58 20   23, 2000 provisional, we're not going to see Dr. La Colla

01:43:02 21   listed as an inventor on that provisional application.

01:43:06 22   True?

01:43:06 23   A.      I don't recall.

01:43:09 24           MR. SCHERKENBACH:  Can we bring up PX-311, just

01:43:12 25   the cover, and just zoom in on the top part here.

01:43:19 1   BY MR. SCHERKENBACH:

01:43:20 2   Q.   Dr. Sommadossi, this is the exhibit that you talked

01:43:22 3   about?

01:43:23 4   A.   Mm-hmm.

01:43:24 5   Q.   And you see under, at the top here, inventor, your

01:43:28 6   name is listed; is that right?

01:43:29 7   A.   Yes.

01:43:30 8   Q.   Okay.  Thank you.

01:43:31 9       And there aren't any other inventors other than

01:43:35 10   yourself listed on this May 2000 provisional application;

01:43:39 11   right?

01:43:39 12   A.   Correct.

01:43:40 13   Q.   Okay.  Dr. La Colla isn't there?

01:43:42 14   A.   Correct.

01:43:42 15   Q.   All right.  Now, this compound --

01:43:47 16       MR. SCHERKENBACH:  We can take that down.

01:43:48 17   BY MR. SCHERKENBACH:

01:43:48 18   Q.   This compound MD1 that Dr. La Colla first tested, he

01:43:53 19   did not himself synthesize that compound as far as you know;

01:43:57 20   is that right?

01:43:57 21   A.   Correct.

01:43:59 22   Q.   He instead got it from a Professor Grifantini, who

01:44:06 23   was at another university; right?

01:44:10 24   A.   Yes.

01:44:11 25   Q.   Okay.  And as I understand it, you don't know

01:44:16 1    Professor Grifantini; right?

01:44:18 2    A.    Never met Professor Grifantini.

01:44:20 3    Q.    All right.  Never met him and you never spoke to him

01:44:22 4    either; right?

01:44:23 5    A.    I never spoke to him.

01:44:24 6    Q.    All right.  And he's not named as an inventor on --

01:44:28 7    actually, on any Idenix patent as far as you know; is that

01:44:30 8    right?

01:44:31 9    A.    Correct.

01:44:31 10    Q.    Okay.  Now, this compound MD1 is the 2'-methyl up OH

01:44:41 11    down adenosine, that compound has been known since the

01:44:44 12    1960's; right?

01:44:45 13    A.    Correct.

01:44:46 14    Q.    And I believe you mentioned on direct that Merck had

01:44:50 15    synthesized it in the sixties; is that correct?

01:44:53 16    A.    Correct.

01:44:53 17    Q.    All right.  So after filing the May 2000 provisional,

01:45:05 18    Idenix did some further testing on 2'-methyl

01:45:10 19    ribonucleosides; is that right?

01:45:11 20    A.    Yes.

01:45:11 21    Q.    You talked about that on direct.  True?

01:45:13 22    A.    True.

01:45:14 23    Q.    And, in fact, after filing the May 2000 provisional,

01:45:21 24    Idenix synthesized some additional 2'-methyl ribonucleosides

01:45:27 25    in addition to MD1; right?

01:45:29  1   A.      Yes.

01:45:30  2   Q.      Okay.  And I believe you talked about this on direct,

01:45:35  3   but you made different nucleosides with methyl up at 2' but

01:45:40  4   different bases.  Right?

01:45:42  5   A.      Yes.

01:45:43  6   Q.      All right.  Let's look at your slide, I think it's

01:45:45  7   18.  And here are three of the other 2'-methyl up OH down

01:45:57  8   nucleosides that Idenix made after filing the provisional in

01:46:02  9   May of 2000; is that right?

01:46:03 10   A.      Correct.

01:46:04 11   Q.      All right.  Now, one of these, the one in the middle,

01:46:10 12   NM107, that has cytosine as the base; is that right?

01:46:16 13   A.      Yes.

01:46:16 14   Q.      So you would call that, I think, 2'-methyl cytidine

01:46:24 15   nucleoside; is that right?  I'm just seeing if we agree on

01:46:32 16   the terminology.  I'm not --

01:46:34 17   A.      Well, I'm thinking.

01:46:35 18   Q.      Okay.

01:46:35 19   A.      Cytosine.  I think it's cytosine.  No.  Cytidine.

01:46:41 20   Q.      I have the same problem.

01:46:42 21   A.      Cytidine, yes.  Cytosine is the base.  All right.

01:46:46 22   Q.      That's my point.  Maybe you should tell the jury.

01:46:49 23   There's a terminology difference between, referring to just

01:46:52 24   the base --

01:46:53 25   A.      That's right.

01:46:54 1    Q.    Okay.  Versus the nucleoside that has the base?

01:46:57 2    A.    Exactly.

01:46:58 3    Q.    All right.

01:46:59 4    A.    Exactly.

01:46:59 5    Q.    So do we agree that this NM107 is fairly referred to

01:47:04 6    as a 2'-methyl cytidine nucleoside?

01:47:07 7    A.    Yes.

01:47:07 8    Q.    All right.  That compound was also known since the

01:47:12 9    1960's; is that right?

01:47:14 10   A.    Correct.

01:47:15 11   Q.    And that's another compound that Merck had first

01:47:21 12   reported in the sixties; right?

01:47:23 13   A.    Correct.

01:47:24 14   Q.    Okay.  Can you find in your binder, please, DX-866,

01:47:32 15   DX-866.

01:47:42 16   A.    Okay.

01:47:42 17   Q.    That is a form 10-K for Idenix for the year ended

01:47:52 18   December 31, 2007; is that correct?

01:47:55 19   A.    Correct.

01:47:55 20   Q.    You were the CEO at the time; is that right?

01:47:58 21   A.    Correct.

01:47:58 22   Q.    And, in fact, you actually signed this 10-K at least

01:48:04 23   electronically; right?

01:48:05 24   A.    I'm sure I did.

01:48:06 25   Q.    You can, if you want to verify, it's on page 108.

01:48:13  1    A.      I'm sure I did.

01:48:15  2    Q.      Fair enough.

01:48:15  3            MR. SCHERKENBACH:  Your Honor, we'd move the

01:48:17  4    admission of DX-866.

01:48:18  5            MS. PARKER:  No objection.

01:48:19  6            THE COURT:  It's admitted.

01:48:20  7            (DX-866 was admitted into evidence.)

01:48:21  8            MR. SCHERKENBACH:  Thank you.

01:48:21  9    BY MR. SCHERKENBACH:

01:48:24 10    Q.      So let's look at that just to orient ourselves.  Can

01:48:26 11    we put up page -- well, it's .199 in the document, and just

01:48:36 12    blow up this part, the signature part here (indicating).

01:48:39 13    BY MR. SCHERKENBACH:

01:48:40 14    Q.      Do you see your electronic signature there, Dr.

01:48:43 15    Sommadossi?

01:48:43 16    A.      I don't see it, but it's there.

01:48:45 17    Q.      Well, your name?

01:48:46 18    A.      Okay.

01:48:48 19    Q.      All right.

01:48:48 20    A.      That's fine.

01:48:49 21    Q.      Okay.  Fine.  You don't dispute that?

01:48:51 22    A.      No, I don't dispute it.

01:48:52 23    Q.      All right.  And obviously, you know, these

01:48:56 24    submissions to the SEC have to be true and accurate; right?

01:49:00 25    A.      I agree.

01:49:00  1  Q.    And at the time you signed this, you thought that

01:49:03  2  this document was true and accurate; is that right?

01:49:05  3  A.    I agree.

01:49:06  4  Q.    Okay.  I want to turn to the page that's .82.  And

01:49:20  5  can you scroll down just on that page?  Right.

01:49:28  6          The bottom paragraph here, let's try to blow

01:49:30  7  that up, please.  Sorry.  Make it as big as you can.

01:49:47  8          Can you see that, Dr. Sommadossi, on the screen?

01:49:49  9  A.    I can see it, but may I have the page?

01:49:52 10  Q.    I believe it's actually page 42 of the 10-K is what

01:49:57 11  we're blowing up here.  This paragraph is at the bottom.

01:50:04 12  A.    It's not page 42.

01:50:06 13  Q.    All right.  Bear with me a minute.

01:50:11 14          MR. SCHERKENBACH:  Your Honor, may I --

01:50:12 15          THE COURT:  You may approach.

01:50:13 16          MR. SCHERKENBACH:  Thank you.

01:50:27 17          (Pause.)

01:50:42 18          THE WITNESS:  Okay.

01:50:43 19  BY MR. SCHERKENBACH:

01:50:43 20  Q.    Okay.  All right.  So whether it's easier for you to

01:50:51 21  look on your paper copy or on the screen, this paragraph is

01:50:56 22  talking about your compound NM107; is that correct?

01:51:00 23  A.    Yes.

01:51:01 24  Q.    And it says here beginning in the third line, NM107

01:51:09 25  was a known compound at the time that the patent application

01:51:14 1    covering the use of this active form to treat HCV infection

01:51:19 2    were filed.  Right?

01:51:20 3    A.    I have to read it, the whole paragraph, if you don't

01:51:27 4    mind.

01:51:27 5    Q.    Well, you can read it to yourself.

01:51:29 6    A.    I will read it to myself.

01:51:31 7    Q.    Okay.

01:51:32 8    A.    Okay.

01:51:32 9          (Pause while witness reviewed exhibit.)

01:51:46 10         THE WITNESS:  Okay.

01:51:46 11   BY MR. SCHERKENBACH:

01:51:47 12   Q.    All right.  And so obviously, you will agree that

01:51:53 13   Idenix is saying in this 10-K that this compound, NM107, was

01:51:58 14   a known compound; right?

01:51:59 15   A.    A known compound from Idenix.

01:52:06 16   Q.    Well, the compound itself had been synthesized by

01:52:12 17   Merck in the 1960's; right?

01:52:13 18   A.    I'm sorry, but I have to disagree with that statement

01:52:17 19   related to that paragraph.  Can we read the entire

01:52:21 20   paragraph?

01:52:22 21   Q.    Well --

01:52:23 22   A.    And then the meaning of a known compound?

01:52:26 23   Q.    I'm asking just about the compound itself.

01:52:29 24   A.    I'm just telling you that this is out of context, so

01:52:33 25   if you allow me, okay, I can explain what is the known

01:52:38 1    compound when Merck here has nothing to do about it.

01:52:41 2    Q.    Dr. Sommadossi, let's try the last sentence and see

01:52:48 3    if that that helps us.  Okay?

01:52:51 4    A.    Mm-hmm.

01:52:51 5    Q.    We cannot, however, obtain patent protection on the

01:52:55 6    compound NM107.

01:52:57 7          Do you see that?

01:52:58 8    A.    Okay.  I see that.

01:52:59 9    Q.    That was a true statement at the time Idenix made it;

01:53:02 10   right?

01:53:03 11   A.    Again, this must have been the general counsel that

01:53:07 12   has written that sentence and this is the first time that I

01:53:12 13   see since 2007, so it's possible.

01:53:18 14   Q.    Well, more than possible.  It is true, isn't it?

01:53:27 15   A.    To --

01:53:29 16         MS. PARKER:  Objection, Your Honor, to the --

01:53:30 17   I'm not sure what the questioning is.  It's unclear.

01:53:33 18         THE COURT:  All right.  Restate the question,

01:53:35 19   please.

01:53:22 20   BY MR. SCHERKENBACH:

01:53:22 21   Q.    Is the statement in Idenix's 10-K submission to the

01:53:26 22   SEC, "we cannot, however, obtain patent protection on the

01:53:30 23   compound NM107," is that a true statement at the time it was

01:53:35 24   made in 2007?

01:53:37 25         MS. PARKER:  Objection on legal grounds.

01:53:40 1          THE COURT:  Overruled.

01:53:45 2          You can answer.

01:53:46 3          THE WITNESS:  I'm sorry?

01:53:48 4          THE COURT:  You can answer the question.

01:53:48 5  BY THE WITNESS:

01:53:50 6  A.    Well, I think we offered patent protection on the

01:53:54 7  component NM107.  I don't know why it was written we cannot

01:54:00 8  obtain patent protection on NM107.

01:54:04 9  Q.    So you are saying you think you have a patent on the

01:54:07 10  compound NM107?

01:54:12 11  A.    NM107 being 2'-methyl ribonucleoside or 2'-methyl

01:54:21 12  cytidine.  I believe we have a patent on that compound, yes.

01:54:24 13  Q.    Okay.  We'll move on.  I want to turn to some of the

01:54:31 14  assays you talked about on direct.  And, in particular,

01:54:39 15  let's talk first about the testing done prior to the filing

01:54:42 16  of the May 2000 provisional.

01:54:48 17          MR. SCHERKENBACH:  Can I have slide 22 up again,

01:54:50 18  please?

01:54:51 19  BY MR. SCHERKENBACH:

01:54:51 20  Q.    So the testing on the 2'-methyl compound done before

01:54:59 21  the filing of the provisional application, that was yellow

01:55:02 22  fever assay; right?

01:55:04 23  A.    Correct.

01:55:04 24  Q.    Okay.  Yellow fever virus is a different virus than

01:55:13 25  hepatitis C virus; correct?

01:55:15  1    A.      Correct.

01:55:15  2    Q.      But you said on direct I believe that Idenix used

01:55:18  3    yellow fever virus as a surrogate for HCV; right?

01:55:26  4    A.      Correct.

01:55:26  5    Q.      In fact, Idenix believed the yellow fever virus assay

01:55:31  6    was a predictive test for anti-HCV activity; right?

01:55:38  7    A.      I did not say that Idenix thought that it was a

01:55:43  8    surrogate assay for HCV.  This, at the time, was Professor

01:55:51  9    La Colla, a microbiologist, thought that in the absence of

01:56:00 10    HCV assay where you could test the compound, the yellow

01:56:05 11    fever virus was the closest virus, and that is why we called

01:56:08 12    it a surrogate virus.  And it is after that conclusion that

01:56:15 13    Professor La Colla tested MD1 in a yellow fever virus assay.

01:56:24 14    Q.      Let me try my question again, please.

01:56:28 15            Idenix believed the yellow fever virus assay was

01:56:34 16    used as a predictive test for anti-HCV activity; true?

01:56:42 17    A.      Idenix representing who?

01:56:46 18            MR. SCHERKENBACH:  Can we show, Mr. Sayres,

01:56:50 19    DX-548 at page 11?

01:56:58 20    BY MR. SCHERKENBACH:

01:56:59 21    Q.      This is the interrogatory response that I mentioned

01:57:02 22    before.  And right about the middle that paragraph.  Can you

01:57:09 23    see where I'm pointing?

01:57:11 24            The yellow fever virus assay was used for as a

01:57:16 25    predictive test for anti-HCV activity.

01:57:18 1  A.     Um-hmm.

01:57:19 2  Q.     So this is a response provided in response by Idenix

01:57:22 3  in this case.  You understand that.

01:57:22 4  A.     I agree with that.

01:57:23 5  Q.     You agree with that?

01:57:24 6  A.     I agree with this statement.

01:57:26 7  Q.     And that statement means that if a compound was

01:57:31 8  effective against yellow fever virus, Idenix predicted it

01:57:35 9  would also be effective against hepatitis C; true?

01:57:40 10  A.     True.

01:57:41 11  Q.     And, in fact, I believe you said on direct that based

01:57:45 12  on the yellow fever results, you knew the compound would

01:57:49 13  definitely be active against HCV; right?

01:57:56 14  A.     I say should be active against HCV.

01:58:04 15  Q.     You don't recall saying on direct it definitely would

01:58:07 16  be.  Now it should be?

01:58:09 17  A.     Okay.

01:58:09 18  Q.     Well, I'm not trying to put words in your mouth.

01:58:11 19  A.     That's all right.

01:58:12 20  Q.     Which is it?  Is it would definitely be predictive?

01:58:16 21  A.     At a very high likelihood, that these compounds would

01:58:21 22  be effective against HCV.

01:58:23 23  Q.     That is yellow fever.  BVDV is another assay you

01:58:30 24  talked about on direct; right?

01:58:31 25  A.     Yes, I did.

01:58:31 1    Q.    Okay.  And that is another virus that is different

01:58:35 2    than HCV; true?

01:58:38 3    A.    Correct.

01:58:39 4              MR. SCHERKENBACH:  Can we show Dr. Sommadossi

01:58:47 5    slide 11, please.

01:58:47 6    BY MR. SCHERKENBACH:

01:58:49 7    Q.    Do you recall showing this to the jury?

01:58:51 8    A.    Yes.

01:58:51 9    Q.    And I believe you were observing that there is a

01:58:56 10   broader family of Flaviviridae that has three different

01:59:02 11   subgenuses of virus.  Is that fair?

01:59:04 12   A.    Fair.

01:59:09 13   Q.    And BVDV falls in one genus, yellow fever in another,

01:59:14 14   and hepatitis C in another?

01:59:17 15   A.    Correct.

01:59:17 16   Q.    And Idenix likewise believed that activity against

01:59:21 17   BVDV was also predictive of activity against hepatitis C;

01:59:26 18   true?

01:59:27 19   A.    In combination with yellow fever, we thought that

01:59:31 20   that would reenforce our yellow fever data.

01:59:37 21   Q.    Now, in fact, you have said under oath previously

01:59:45 22   that yellow fever virus assay results cannot be used to

01:59:50 23   predict activity against HCV; isn't that right?

01:59:56 24   A.    I don't recall that statement.

01:59:57 25   Q.    And, in fact, you have said under oath before that

02:00:00  1    BVDV assay results cannot be used to predict activity

02:00:03  2    against HCV?

02:00:05  3    A.      I don't recall that statement.

02:00:07  4    Q.      Okay.  Turn in your binder to tab DX-330.

02:00:13  5            MS. PARKER:  Your Honor, objection.  Improper

02:00:16  6    impeachment when the witness said he dent recall.

02:00:20  7            THE COURT:  Well, right now, the only question

02:00:22  8    is turn to the exhibit in the binder, so let's see where

02:00:25  9    this goes.

02:00:28 10            Which exhibit was it?

02:00:32 11            MR. SCHERKENBACH:  DX-330.

02:00:31 12    BY MR. SCHERKENBACH:

02:00:32 13    Q.      Have you found that one, Dr. Sommadossi?

02:00:34 14    A.      330?

02:00:35 15    Q.      330.

02:00:39 16    A.      Yes.

02:00:39 17    Q.      Do you recognize that as a declaration you filed

02:00:42 18    under oath in the Patent Office?

02:00:44 19    A.      Correct.

02:00:44 20    Q.      That actually has, to be clear, has attached to it a

02:00:49 21    version of your CV as well; right?

02:00:57 22    A.      Yes.

02:00:57 23    Q.      Okay.  And do you recall that we talked about this

02:01:00 24    document in your deposition?

02:01:02 25    A.      I don't recall, but ...

02:01:09 1    Q.    Okay.  Well, we'll see if we can refresh your

02:01:13 2    recollection, first of all.  Turn to page 4 of the document.

02:01:19 3    A.    Um-hmm.

02:01:20 4    Q.    That is your signature on the declaration there;

02:01:22 5    right?

02:01:23 6    A.    It is.

02:01:23 7    Q.    It is dated April 2nd, 1998; right?

02:01:28 8    A.    Correct.

02:01:28 9    Q.    And while we're at it, on that page, paragraph 17,

02:01:34 10   you declare that all statements in this declaration are

02:01:38 11   true?

02:01:39 12   A.    It is.

02:01:40 13   Q.    And that all statements made -- excuse me.  And you

02:01:43 14   understand that willful false statements could be punishable

02:01:47 15   by fine, imprisonment and so forth; right?

02:01:50 16   A.    Correct.

02:01:50 17   Q.    So you obviously were telling the truth in this

02:01:53 18   declaration; right?

02:01:54 19   A.    Yes.

02:01:54 20   Q.    Now, let me direct you to paragraph 10.  And just

02:01:58 21   read that one to yourself, please.

02:02:01 22   A.    Yes.

02:02:01 23   Q.    That is on page 3, do you see?

02:02:06 24   A.    What page?

02:02:07 25   Q.    Page 3, paragraph 10 at the top.

02:02:10  1   A.      Okay.

02:02:10  2   Q.      Just read it to yourself.  Then I'm going to ask you

02:02:13  3   a question.

02:02:14  4   A.      That's fine.

02:02:15  5   Q.      You would agree, Dr. Sommadossi, wouldn't you, that

02:02:18  6   viruses differ widely, for example, in enzymes used in

02:02:22  7   replication, in surface proteins, in DNA, in lifecycle and

02:02:28  8   in host cell selection?  You agree with that; right?

02:02:34  9   A.      Yes.

02:02:34 10   Q.      And you would also agree, further, all viruses use

02:02:39 11   host cell enzymes during replication which can differ among

02:02:44 12   types of mammals.  Each virus is unique; right?

02:02:49 13   A.      Okay.

02:02:49 14   Q.      Okay.  That is true; right?

02:02:53 15   A.      Yes, to a large extent it is.

02:02:55 16   Q.      All right.  Now, turn the page and look at paragraph

02:02:59 17   15.  Again, just read that one to yourself.

02:03:02 18   A.      Okay.

02:03:02 19   Q.      You also agree and stated under oath, isn't it true,

02:03:07 20   that it is accepted in the field of antiviral therapy, that

02:03:15 21   observation of activity against one virus or even two

02:03:19 22   viruses is an insufficient basis on which to reasonably

02:03:23 23   predict broad spectrum antiviral activity or even activity

02:03:29 24   against related viruses.  You said that in your declaration;

02:03:35 25   right?

02:03:35 1    A.      I said that in my declaration.

02:03:38 2    Q.      And that is true?

02:03:39 3    A.      Well, there is examples that actually differ from

02:03:52 4    that statement.  And I mention this morning the discovery of

02:04:02 5    HIV for, of AZT for HIV reductase using a surrogate virus

02:04:09 6    and with a murine virus.

02:04:11 7          So one of my statement I believe is in part true

02:04:17 8    and we are talking about broad spectrum antiviral activity.

02:04:22 9          The second part, again, it is extremely

02:04:31 10    difficult to assume and to expand to all viruses when we

02:04:40 11    were talking in this specific patent about HIV and hepatitis

02:04:51 12    B.

02:04:51 13          There was no discussion in this application

02:04:54 14    about RNA viruses, about hepatitis C, about yellow fever,

02:05:03 15    and bovine diarrhea virus.  So in contrast to what you infer

02:05:10 16    before, when I said that MD1 was not active against those

02:05:17 17    viruses, this document actually is related to a drug called

02:05:30 18    FDC, and a patent that is related to FDC, and that is only

02:05:35 19    relevant to HIV and hepatitis B.

02:05:41 20    Q.      I'll try one more time.

02:05:43 21    A.      That's fine.

02:05:44 22    Q.      Is it true that it is accepted in the field of

02:05:47 23    antiviral therapy that observation of activity against one

02:05:52 24    virus or even two viruses is an insufficient basis on which

02:05:56 25    to reasonably predict broad spectrum antiviral activity or

02:06:02 1    even activity against related viruses?  Is it true or is it

02:06:09 2    not true?

02:06:11 3    A.    It is not true, based on what I told you related to

02:06:16 4    MULV and HIV.  And this is, when we do not have available

02:06:27 5    viruses in screening, it is standard in the field to use

02:06:34 6    surrogate viruses to evaluate whether those compounds would

02:06:39 7    be active or not on some other viruses.

02:06:45 8            MR. SCHERKENBACH:  Your Honor, at this point I

02:06:46 9    move to admit DX-330 under Rule 801(d)(1)(A) as prior

02:06:55 10   inconsistent statement.

02:06:58 11           THE COURT:  Okay.

02:07:00 12           MR. SCHERKENBACH:  I admit it into evidence.

02:07:01 13           THE COURT:  Is there any objection?

02:07:03 14           MS. PARKER:  It is not inconsistent.  I do

02:07:05 15   object.

02:07:05 16           THE COURT:  All right.  Well, let me see counsel

02:07:09 17   at sidebar.

02:07:10 18           Bear with us, ladies and gentlemen.

02:07:11 19           (Sidebar conference held.)

02:15:06 20           THE COURT:  Do you disagree that it is a prior

02:15:06 21   inconsistent statement it is admissible?

02:15:06 22           MS. PARKER:  I don't disagree with that.  I

02:15:06 23   disagree it is inconsistent.

02:15:06 24           THE COURT:  How can a document that you just now

02:15:06 25   said is not true not be inconsistent?

02:15:06  1          MR. GRIFFITH:  His testimony -- I'm sorry.  I

02:15:06  2   apologize.

02:15:06  3          THE COURT:  I'll hear from either of you.

02:15:06  4   That's fine.

02:15:06  5          MR. GRIFFITH:  The testimony, it was jumbled

02:15:06  6   time frames here.  His declaration was filed in 1998.  So it

02:15:06  7   was dealing with HIV and whether or not predictive of a fact

02:15:06  8   applies to a broad spectrum so not just for an RNA virus but

02:15:06  9   another virus, to a DNA virus.  This is what he was trying

02:15:07 10   to explain.

02:15:07 11          THE COURT:  I think I understand all of that,

02:15:07 12   but I have a witness who first said everything on the

02:15:07 13   document is true.  He also said in the document everything

02:15:07 14   in there is true.  And then he later said, well, it's only

02:15:07 15   partially true.  Now he says it is not true.  And isn't

02:15:07 16   there an inconsistency somewhere there?

02:15:07 17          MS. PARKER:  But each one of those questions

02:15:07 18   were in context.

02:15:07 19          THE COURT:  You have to speak up.

02:15:07 20          MS. PARKER:  Sorry.  It has been asked, he has

02:15:07 21   been asked questions in different context and he made that

02:15:07 22   clear I think in his answer, what he said this morning.  He

02:15:08 23   put it in the context of the testimony he gave this morning,

02:15:08 24   which is different than the context, the date and everything

02:15:08 25   else and the HIV context in which he made the statements

02:15:08 1    subject to this document.  I think he, I think he is the one

02:15:08 2    who is responding that there was a different context to what

02:15:09 3    is true in one context and what is not true in a different

02:15:09 4    context.  It is not inconsistent.

02:15:09 5            MR. GRIFFITH:  This is not addressing BVDV or

02:15:09 6    yellow fever, and so what we're saying is here he is.

02:15:09 7            I'm sorry.  It's a different page.

02:15:09 8            MR. SCHERKENBACH:  It's paragraph 15.

02:15:09 9            MR. GRIFFITH:  It is accepted in the field of

02:15:09 10   antiviral therapy that observation of activity against one

02:15:09 11   virus, or even two viruses, is an insufficient basis on

02:15:09 12   which to reasonably predict broad spectrum antiviral

02:15:09 13   activity.

02:15:09 14           So we're talking about here across wide spectrum

02:15:09 15   viruses as opposed to what he said, as opposed to his, in

02:15:10 16   particular, virus assay, surrogate for another one.  Yes, it

02:15:10 17   is BVDV and yellow fever.  But this is talking about something

02:15:10 18   different in terms of predictability.  It is a broad spectrum.

02:15:10 19   Why doesn't he ask what he means by broad spectrum?

02:15:10 20           THE COURT:  All right.

02:15:10 21           MR. GRIFFITH:  They're talking across each

02:15:10 22   other.

02:15:10 23           THE COURT:  All right.

02:15:10 24           MR. SCHERKENBACH:  May I respond, please?

02:15:10 25           THE COURT:  Yes.

02:15:10 1        MR. SCHERKENBACH:  Thank you.

02:15:10 2        They're arguing the weight of the evidence, not

02:15:10 3 whether the evidence should be admissible under the rule.

02:15:10 4 This is a textbook prior inconsistent statement.  I gave

02:15:10 5 him multiple chances to agree with it.  First he explained

02:15:11 6 it, then he said he only agreed in part and then he flat

02:15:11 7 out said it is not true.

02:15:11 8        I don't know how you get more inconsistent than

02:15:11 9 that.  He has already put his explanation on the record

02:15:11 10 twice, even though it wasn't responsive to my question but

02:15:11 11 it is in the record and they can argue that.  The jury

02:15:11 12 should be entitled to see our side of the story and his

02:15:11 13 prior testimony on the subject for his declaration, and let

02:15:11 14 the jury decide.

02:15:11 15        THE COURT:  Any response?

02:15:11 16        MS. PARKER:  I have a procedural objection as

02:15:11 17 well.

02:15:11 18        THE COURT:  Well, first, can you respond?  Do

02:15:11 19 you have any response to that before I rule on the

02:15:12 20 objection?

02:15:12 21        MS. PARKER:  Anything else?

02:15:12 22        MR. GRIFFITH:  I don't agree.  I think that with

02:15:12 23 his explanations, I don't think that they had a meeting of

02:15:12 24 the minds on that question.  I think that with his

02:15:12 25 explanation, I think to me he was reasonably clear as to

what he was trying to convey in terms of the assays, how
broadly he would state it.

THE COURT: All right. I'm overruling the
objection and I am admitting the document. You will have to
move it again when we go back so Mr. Looby can hear it. It
may or may not be a textbook case of a prior inconsistent
statement but it certainly is sufficiently inconsistent that
a reasonable jury could find it to be inconsistent and
therefore I think it is admissible under the rule.

What matters is not what any of us standing here
at sidebar think as to whether it is inconsistent or not,
whether in the full context there might be an explanation, I
think you will have a chance on redirect to try to go into
it as well if you want, but the issue is whether a
reasonable jury can find it to be inconsistent, and I heard
the witness say something he said previously under oath is
not true. And I think a jury could find that to be a prior
inconsistent statement.

You had some other objection?

MS. PARKER: Your Honor. I'm not going to argue
with your ruling on admissibility, but I do want to ask a
question about admitting a document in our case. We all
agreed in the pretrial, and I'm not in any way going back to
that, that the opposing side does not have to provide a list
of material, so we did not. That's fine. But I did not

02:15:14 1   understand that by not providing it to us, they can use it

02:15:14 2   with the witness, that they would move to admit documents in

02:15:15 3   our case without submitting it until we had an opportunity

02:15:15 4   to take a look at them so we could argue the admissibility

02:15:15 5   of them.

02:15:15 6          THE COURT:  Are you arguing anything that has

02:15:15 7   been done here is inconsistent with the pretrial order?

02:15:15 8          MS. PARKER:  It is not inconsistent, no.  No,

02:15:15 9   Your Honor, I'm not.  It is not inconsistent.  It is not

02:15:15 10  covered, or not for me, as someone in your court, that it

02:15:15 11  would actually be admitted in our case.  If that is Your

02:15:15 12  Honor's practice, that is fine.  Let me know that and we'll

02:15:15 13  do that with the other side.  I had understood that because

02:15:16 14  we didn't have to exchange the cross list, it would be used

02:15:16 15  with the witness, but anything that we wanted to admit they

02:15:16 16  would have to admit in their case.

02:15:16 17         THE COURT:  There is nothing in the pretrial

02:15:16 18  order I believe inconsistent with it.  There is nothing in

02:15:16 19  any other rule or authority that I understand is

02:15:16 20  inconsistent with it.  If you all want to propose some limit

02:15:16 21  to the pretrial order, that's fine.  Otherwise, we'll

02:15:16 22  proceed as we have been, and, of course, it will be fair for

02:15:16 23  you to do the same when it is their case.

02:15:16 24         MS. PARKER:  I understand.

02:15:16 25         THE COURT:  Is there anything?

02:15:16  1     MR. SCHERKENBACH:  Just one comment.  I believe,

02:15:16  2  though I won't represent at the moment, I believe that this

02:15:16  3  is specifically covered in the pretrial order.  And that it

02:15:17  4  actually says that a document can be moved into evidence on

02:15:17  5  cross if the foundation for the document is laid.  We'll

02:15:17  6  look for that and provide it to the Court, but I believe it

02:15:17  7  is explicitly allowed.

02:15:17  8     THE COURT:  I don't recall at this point.

02:15:17  9     MS. PARKER:  Maybe we missed it, but that just

02:15:17 10  wasn't what we understood.

02:15:17 11     THE COURT:  Is there anything else while we're

02:15:17 12  here?  No?

02:15:17 13     All right.  Please move the document in again.

02:15:17 14     MR. SCHERKENBACH:  Will do, Your Honor.

02:15:17 15     THE COURT:  Okay.

02:15:17 16     (Sidebar conference ends.)

02:15:17 17     THE COURT:  Thank you again for your patience.

02:15:20 18     Mr. Scherkenbach?

02:15:21 19     MR. SCHERKENBACH:  Your Honor, yes.  For the

02:15:22 20  reasons discussed, Gilead moves again the admission of

02:15:27 21  Exhibit DX-330.

02:15:30 22     THE COURT:  330 is admitted.

02:15:32 23     (DX-330 was admitted into evidence.)

02:15:32 24     MR. SCHERKENBACH:  Thank you.

02:15:39 25  BY MR. SCHERKENBACH:

02:15:39  1    Q.      Now, this exhibit, Dr. Sommadossi, this declaration

02:15:45  2    which you signed in 1998, it was submitted to the Patent

02:15:49  3    Office in connection with a different proceeding back in

02:15:56  4    1998; is that right?

02:15:57  5    A.      I'm sorry?  Your question is what?

02:15:59  6    Q.      This declaration that we've been looking at here,

02:16:03  7    DX-330 --

02:16:05  8    A.      Yes?

02:16:06  9    Q.      -- you executed that declaration and it was submitted

02:16:09 10    to the Patent Office, but not in connection with any of the

02:16:14 11    patents in this case; right?

02:16:16 12    A.      Absolutely.  Yes.

02:16:18 13    Q.      Right.  Okay.  And so when Idenix submitted the

02:16:28 14    May 2000 patent application to the Patent Office, this

02:16:32 15    declaration was not submitted to the Patent Office at that

02:16:36 16    time; is that true?

02:16:37 17    A.      True.

02:16:37 18    Q.      And when Idenix submitted its May 2001 patent

02:16:41 19    application, this declaration was not submitted to the

02:16:45 20    Patent Office at that time?

02:16:47 21    A.      True.

02:16:47 22    Q.      And when Idenix submitted the June 2003 patent

02:16:52 23    application that actually issued as the '597 patent, this

02:16:55 24    declaration of yours, which is marked as DX-330, was not

02:16:59 25    submitted at that time either; is that right?

02:17:01 1   A.      True.

02:17:02 2   Q.      All right.  So as far as you know, the examiner who

02:17:11 3   ultimately allowed the '597 patent had no knowledge of the

02:17:16 4   statements you made in your 1998 declaration that we marked

02:17:20 5   as DX-330?

02:17:21 6           MS. PARKER:  Objection.  Calls for speculation,

02:17:24 7   lack of foundation.

02:17:25 8   BY MR. SCHERKENBACH:

02:17:26 9   Q.      If you know.

02:17:26 10  A.      I don't know.

02:17:27 11  Q.      Okay.  All right.  Now, I want to look at the patent

02:17:34 12  applications that led to the '597 in a little more detail.

02:17:37 13          MR. SCHERKENBACH:  Can we have the cover of the

02:17:40 14  '597 patent?

02:17:43 15          And let's just blow up the filing date and then

02:17:49 16  the related application information below.  There we go.

02:17:52 17  BY MR. SCHERKENBACH:

02:17:52 18  Q.      We've all heard this a number of times, so hopefully,

02:17:55 19  we can go through it quickly.  But the '597 patent issued

02:18:01 20  from a patent application filed June 20th, 2003?  Is that

02:18:06 21  your understanding?

02:18:07 22  A.      Okay.  Yes.

02:18:07 23  Q.      All right.  And that application was a continuation

02:18:14 24  of an application filed on May 23, 2001; is that right?

02:18:17 25  A.      Right.

02:18:18  1    Q.    And, in fact, I think you referred to the May 23,

02:18:21  2    2001 application on your direct?

02:18:22  3    A.    Yes.

02:18:23  4    Q.    Okay.  And then if we keep going backward, there's

02:18:26  5    one more, which is the May 23rd provisional application; is

02:18:29  6    that right?

02:18:29  7    A.    Correct.

02:18:30  8    Q.    So there's sort of three in a row; correct?

02:18:32  9    A.    Correct.

02:18:33 10    Q.    All right.  And just so we're clear, and I believe

02:18:35 11    you said this on direct, in going from the 2000 application

02:18:39 12    provisional to the 2001, Idenix did add some information

02:18:43 13    to the application.  That's your understanding; is that

02:18:46 14    right?

02:18:46 15    A.    Yes.

02:18:46 16    Q.    All right.  But in going from the 2001 application to

02:18:50 17    the 2003, the content of the application wasn't changed;

02:18:55 18    right?

02:18:55 19    A.    Well, I will have to read.

02:18:57 20    Q.    Okay.

02:18:59 21    A.    The patent application.

02:19:00 22    Q.    We won't do that right now.

02:19:02 23    A.    Okay.

02:19:04 24    Q.    All right.  So PX-311, can we have that back again,

02:19:10 25    the cover of PX-311?  This is the provisional application.

02:19:14 1  We looked at this once and we talked about who the inventors

02:19:17 2  were; right?

02:19:18 3  A.     Right.

02:19:18 4  Q.     Now, let me just scroll down to the bottom here.

02:19:22 5  This application was filed by Sherry Knowles; right?

02:19:26 6  A.     Yes.

02:19:26 7  Q.     And I believe you told the jury who she was; is that

02:19:29 8  right?

02:19:29 9  A.     She was an outside patent counsel for Idenix.

02:19:33 10  Q.     Right.  And she was also -- she also did in patent

02:19:37 11  filings for Pharmasset, too; is that right?

02:19:40 12  A.     I believe so.

02:19:41 13  Q.     Okay.  Now, you didn't talk about the actual content

02:19:55 14  of the May 23, 2000 application on your direct; right?  You

02:19:59 15  didn't show the jury the actual content?

02:20:02 16  A.     I don't think so.

02:20:02 17  Q.     Okay.  But you recall, or know that there isn't any

02:20:08 18  disclosure in there of a 2'-methyl fluoro down nucleoside;

02:20:14 19  is that right?

02:20:14 20  A.     Not to the best of my recollection.

02:20:17 21  Q.     Okay.  And the same is true of the May 2001

02:20:20 22  application; right?  No disclosure of 2'-methyl up fluoro

02:20:27 23  down?

02:20:27 24  A.     I believe it's correct.

02:20:29 25  Q.     And so then it's also true of the '597 patent.  If

02:20:34  1   you look at the '597 patent, there's no disclosure of a 2'

02:20:38  2   up fluoro down methyl nucleoside?

02:20:41  3   A.     Correct.

02:20:42  4   Q.     All right.  Bear with me one moment, please.  I will

02:20:56  5   speed up.

02:21:01  6          Do you recall filing what's called an oath?

02:21:06  7   When you file a patent application as an inventor, you sign

02:21:09  8   something called an oath?  You're familiar with that?

02:21:12  9   A.     I don't remember, but I'm not a patent lawyer, so...

02:21:16 10   Q.     Okay.

02:21:16 11   A.     I usually sign what my patent lawyer asks me to sign.

02:21:19 12   Q.     Okay.  Can you find DX-177 in your binder, please?

02:21:26 13   177.  And let me just, to orient you here on the cover, you

02:21:41 14   see it says, declaration and power of attorney there?

02:21:44 15   A.     Yes.

02:21:45 16   Q.     And then, in re application of, and then it has your

02:21:50 17   name and Professor La Colla's name?

02:21:53 18   A.     Yes.

02:21:54 19   Q.     And then again just to orient you, if you turn to, I

02:21:57 20   think it's the third page of the document, do you see you

02:22:00 21   signed it and it's dated June 21st, 2001?

02:22:03 22   A.     Yes.

02:22:04 23   Q.     Okay.

02:22:04 24          MR. SCHERKENBACH:  Your Honor, we'd move the

02:22:05 25   admission of DX-177.

02:22:08  1        MS. PARKER:  No objection.

02:22:09  2        THE COURT:  It's admitted.

02:22:10  3        MR. SCHERKENBACH:  Thank you.

02:22:11  4        (DX-177 was admitted into evidence.)

02:22:12  5  BY MR. SCHERKENBACH:

02:22:27  6  Q.    Do you have any recollection of signing this

02:22:31  7  declaration in the context of either the -- of what became

02:22:35  8  the '597 patent?  Do you recall at all?

02:22:38  9  A.    I got this document from my patent lawyer and I

02:22:42 10  signed it.

02:22:42 11  Q.    Okay.  Okay.  All right.  Let's move on.

02:22:57 12        MR. SCHERKENBACH:  Can I go back to the cover of

02:22:59 13  the '597 patent?

02:23:04 14  BY MR. SCHERKENBACH:

02:23:06 15  Q.    So we talked about this being three applications in

02:23:09 16  the -- in sort of the chain; right?

02:23:11 17  A.    Okay.

02:23:12 18  Q.    Okay.  And the latest one, the June 2003, that

02:23:16 19  actually issued as the '597 patent; right?

02:23:19 20  A.    Okay.

02:23:19 21  Q.    Okay.  You're aware that the middle one here, the May

02:23:23 22  2001, that issued as a different patent; right?

02:23:27 23  A.    Again, if you say so, okay?

02:23:33 24  Q.    Well, let's blow it up.  I don't want you to just

02:23:35 25  take my word for it.  Okay?

02:23:37 1   A.      Mm-hmm.

02:23:37 2   Q.      It actually says on the cover of the '597, it issued

02:23:41 3   as Patent No. 6,914,054; right?

02:23:45 4   A.      Correct.

02:23:45 5   Q.      Okay.  And that patent is not at issue in this trial;

02:23:49 6   right?

02:23:50 7   A.      I don't know.  I'm not a lawyer.  I'm a witness.

02:23:53 8   Q.      Okay.  So you don't know one way or the other?

02:23:56 9   A.      I don't know one way or another.  I'm a witness.  I'm

02:23:58 10   here to say what I know.

02:24:00 11   Q.      Okay.  It was your practice at least back at the

02:24:19 12   time, was it, to review submissions your lawyer made to the

02:24:23 13   Patent Office on your behalf before they actually got

02:24:26 14   submitted?  Did you review things at the time?

02:24:28 15           MS. PARKER:  Objection to the form of the

02:24:30 16   question of back at the time, because we're talking about

02:24:32 17   different applications.

02:24:33 18           THE COURT:  All right.  I will sustain that.

02:24:35 19   Restate the question.

02:24:36 20           MR. SCHERKENBACH:  All right.

02:24:37 21   BY MR. SCHERKENBACH:

02:24:37 22   Q.      Let me ask for a specific example.  So the other

02:24:41 23   binder I gave you, not the one you have right there?

02:24:44 24   A.      Yes.

02:24:45 25   Q.      There's a document in there, DX-10, kind of a thick

02:24:51 1  document.  Can you find that one?

02:24:53 2  A.     I'm going to try.

02:24:54 3  Q.     Thank you.

02:25:01 4  A.     Okay.

02:25:02 5  Q.     So, and the cover -- just for now, just look at the

02:25:16 6  cover.  Do you see there's a date there?  It says,

02:25:19 7  6/20/2003; right?

02:25:24 8  A.     Yes, correct.

02:25:24 9  Q.     Okay.  And have you ever seen the prosecution history

02:25:35 10 of your '597 patent?

02:25:37 11 A.     No.

02:25:38 12 Q.     No?  Do you know what a prosecution history of a

02:25:41 13 patent is?

02:25:42 14 A.     Not in detail.

02:25:49 15 Q.     Okay.  Do you recall during the process of getting --

02:25:54 16 trying to get your '597 patent reviewing anything at all,

02:25:58 17 any of the correspondence back and forth with the Patent

02:26:01 18 Office?

02:26:01 19 A.     No.

02:26:02 20 Q.     And did you have any occasion at all to review the

02:26:07 21 prosecution history of the '597 patent before coming here

02:26:10 22 today?

02:26:10 23 A.     No.

02:26:11 24 Q.     Okay.  I think we can go on to -- oh, I'm sorry.  So

02:26:36 25 the next topic.

02:26:37 1          I want to talk just a little bit about some

02:26:43 2     of the clinical activity.  You talked a little bit about on

02:26:47 3     your direct NM283, for example, and to what extent it was in

02:26:53 4     the clinic.

02:26:53 5          Do you recall that?

02:26:54 6     A.     Sure.

02:26:55 7     Q.     Okay.

02:26:55 8     A.     So I don't need this binder anymore?

02:26:58 9     Q.     I think you can put that one back to the side, yes.

02:27:01 10    A.     Okay.  Thank you.

02:27:02 11    Q.     Okay.  So NM283, you talked about that compound

02:27:08 12    during your direct exam; right?

02:27:10 13    A.     Yes.

02:27:12 14    Q.     Okay.  In fact, let's just reorient the jury.

02:27:15 15           MR. SCHERKENBACH:  Can we have slide 13 back

02:27:17 16    up there, Mr. Sayres?  I think it's 13.  Yes.  No.  That's

02:27:23 17    MD1.  Hold on.

02:27:46 18           We have slide confusion.  I apologize.

02:27:58 19           (Pause.)

02:28:12 20    BY MR. SCHERKENBACH:

02:28:12 21    Q.     Okay.  23 I guess it is.  23.  I'm 0 for 2.  It's

02:28:29 22    either the one before or after.

02:28:38 23           You know what, why don't you give me -- there we

02:28:42 24    have it.  All right.  21.

02:28:44 25           THE WITNESS:  You got it.

02:28:46  1          MR. SCHERKENBACH:  We're good.  Third time is a

02:28:47  2    charm.  Okay.

02:28:48  3    BY MR. SCHERKENBACH:

02:28:48  4    Q.     So you talked a little bit about this compound on

02:28:50  5    direct; right?

02:28:51  6    A.     Correct.

02:28:51  7    Q.     All right.  Fine.  That compound though, it went to

02:28:56  8    clinic.  It never came to the market; right?

02:28:58  9    A.     Correct.

02:28:58 10    Q.     And you explained your view on direct as to why that

02:29:01 11    was; right?

02:29:02 12    A.     Correct.

02:29:03 13    Q.     But you didn't tell the jury that the FDA actually

02:29:07 14    put that compound on hold, did you?

02:29:10 15    A.     I was not asked.

02:29:15 16    Q.     All right.  The FDA put your compound on hold; is

02:29:18 17    that right?

02:29:19 18    A.     Many drugs are put on hold and getting approved.

02:29:24 19    This is not unique to this compound and unique and it

02:29:27 20    doesn't mean -- actually, a significant number of drugs that

02:29:36 21    are on the market got clinical hold during the development.

02:29:40 22    Nothing unique.

02:29:41 23    Q.     Let me go back to the 10-K document that we already

02:29:46 24    looked at.

02:29:47 25    A.     Sure.

02:29:48  1      MR. SCHERKENBACH:  Can we turn the page, 006, in

02:29:51  2  that document.

02:29:54  3          THE COURT:  What was the exhibit number again?

02:29:56  4          MR. SCHERKENBACH:  It's DX-866, Your Honor.

02:29:58  5          THE COURT:  Thank you.

02:30:06  6          THE WITNESS:  There's too many documents here.

02:30:09  7  What should I look at?

02:30:10  8  BY MR. SCHERKENBACH:

02:30:10  9  Q.     I think on this one, Dr. Sommadossi, if I can just

02:30:13 10  ask you to look at the screen?

02:30:15 11  A.     Okay.

02:30:15 12  Q.     Because the numbering of this one is a little bit

02:30:18 13  challenging.

02:30:18 14  A.     Okay.

02:30:19 15          MR. SCHERKENBACH:  Just give me one moment,

02:30:21 16  please.  I need the page ending in 006, please.  I'm going

02:30:29 17  to have to zoom in.  The type is really small.

02:30:35 18          THE COURT:  006 at the bottom?

02:30:43 19          MR. SCHERKENBACH:  Yes.  It's this section HCV.

02:30:49 20  Can we blow that up even bigger, Mr. Sayres?

02:30:51 21          THE COURT:  Doctor, you do have a hard copy.

02:30:53 22          THE WITNESS:  I'm fine.  I'm fine.  Thank you,

02:30:55 23  Your Honor.

02:30:57 24  BY MR. SCHERKENBACH:

02:31:00 25  Q.     Can you see that on the screen?

02:31:02 1   A.      Yes.

02:31:02 2   Q.      You're the most important person who has to be able

02:31:05 3   to see it.

02:31:06 4   A.      I see it.

02:31:07 5   Q.      All right.  And so this is in that same submission to

02:31:11 6   the SEC that we talked about before?

02:31:13 7   A.      Mm-hmm.

02:31:14 8   Q.      Okay?

02:31:14 9   A.      Mm-hmm.  Mm-hmm.

02:31:16 10  Q.      And it says, in July 2007, we announced that the U.S.

02:31:19 11  Food and Drug Administration, or FDA, had placed on clinical

02:31:23 12  hold in the United States our development program of, how do

02:31:29 13  you pronounce that?  This word, valopicitabine?

02:31:36 14  A.      Valopicitabine.

02:31:36 15  Q.      That's why I never get it right.  Or NM283.

02:31:41 16  A.      Correct.

02:31:41 17  Q.      For the treatments of HCV based on the overall

02:31:44 18  risk/benefit profile observed in clinical testing.

02:31:47 19  A.      Mm-hmm.

02:31:48 20  Q.      We subsequently discontinued the development of the

02:31:52 21  drug.

02:31:52 22  A.      Yes.

02:31:53 23  Q.      Okay.  So it wasn't purely a business decision by

02:31:59 24  Idenix not to pursue this drug?

02:32:02 25  A.      I think you are changing my words, because I told the

02:32:07 1   jury that the risk/benefit ratio was not good enough to be

02:32:15 2   competitive, and therefore we made a decision, because we

02:32:19 3   had the new generation coming up with the son and the

02:32:24 4   daughter before to embark into a Phase 3 and spending

02:32:29 5   hundreds of millions of dollars, and at the same time to

02:32:32 6   remove clinical hold would imply to do additional clinical

02:32:37 7   evaluation.

02:32:38 8            So you can check that when you have a drug in

02:32:42 9   clinical hold, it does not mean that the drug is that

02:32:47 10  according to the FDA.  All right?

02:32:49 11           So you can do additional testing.  The FDA

02:32:55 12  required to do some ordered studies to remove the clinical

02:32:59 13  hold and to continue new evaluation.  It was a business

02:33:03 14  decision that to take the clinical hold off to do additional

02:33:09 15  studies, and in the same time that we are starting more

02:33:18 16  potent drug, that it was a waste, and this was a business

02:33:22 17  decision between the CEO of Novartis Pharma, Thomas Everly,

02:33:28 18  and myself and the board.

02:33:29 19  Q.       Okay.  We can agree the FDA placed NM283 on clinical

02:33:34 20  hold; is that right?

02:33:35 21  A.       I agree.

02:33:36 22  Q.       And the clinical hold the FDA placed on NM283 was due

02:33:41 23  to the overall risk/benefit profile of that drug observed in

02:33:45 24  clinical testing.  True?

02:33:47 25  A.       That's exactly what I said.

02:33:49  1    Q.      Okay.

02:33:50  2    A.      True.

02:33:50  3    Q.      And that hold was never lifted by the FDA; is that

02:33:54  4    true?

02:33:54  5    A.      It was never lifted because we did not continue.  We

02:33:59  6    discontinued the development of the drug.

02:34:01  7    Q.      Right.  Because you discontinued the development of

02:34:04  8    the drug, it never came to market; is that right?

02:34:05  9    A.      That's correct.

02:34:06 10    Q.      All right.  Now, you've talked a couple times about

02:34:09 11    the sons and daughters of NM283?

02:34:12 12    A.      Correct.

02:34:12 13    Q.      All right.  Some of those were IDX102 and IDX184; is

02:34:19 14    that right?

02:34:19 15    A.      Some of them, correct.

02:34:20 16    Q.      Okay.  They never came to market either; right?

02:34:23 17    A.      184 did not come to market, correct.

02:34:25 18    Q.      All right.

02:34:26 19    A.      And then there was some -- other sons that are still

02:34:31 20    in clinical trials.

02:34:32 21    Q.      Okay.  Well, Dr. Sommadossi, Idenix has never brought

02:34:38 22    to market a 2'-methyl nucleoside for the treatment of HCV;

02:34:44 23    right?

02:34:44 24    A.      As of today, but that doesn't mean that you would

02:34:51 25    not -- it would be true in two years or three years since

02:34:54 1    actually Idenix/Merck has a drug with the 2'-methyl up as a

02:35:00 2    ribonucleoside in Phase 3 clinical trials.

02:35:04 3    Q.    Okay.  I didn't ask about --

02:35:06 4    A.    I'm just telling you.  All right?

02:35:08 5    Q.    Even considering what Merck --

02:35:11 6    A.    That's okay.

02:35:12 7           THE COURT:  Doctor, wait for the question to be

02:35:14 8    asked.

02:35:15 9    BY MR. SCHERKENBACH:

02:35:16 10    Q.    Even considering what Merck is doing right this

02:35:18 11    minute, okay, neither Merck nor Idenix has ever brought to

02:35:23 12    market a 2'-methyl ribonucleoside for the treatment of HCV;

02:35:29 13    right?

02:35:30 14    A.    Correct.

02:35:33 15    Q.    Okay.  And, in fact, I think you mentioned this, but

02:35:36 16    IDX184, that was placed on clinical hold by the FDA too;

02:35:40 17    right?

02:35:41 18    A.    This is -- I think you extrapolate what is going on

02:35:48 19    in that clinical development of 2'-methyl ribonucleoside.

02:35:53 20    Q.    Can you answer my question?  Was Idenix 184 placed on

02:35:58 21    clinical hold?

02:35:59 22    A.    It was put on clinical hold based on the data of

02:36:03 23    another drug that was very toxic, which was developed by

02:36:11 24    BMS, and based on the BMS data, the FDA put a clinical hold

02:36:17 25    on all drugs in the same class, including IDX184.

02:36:23  1   Q.      And that class of drugs was 2'-methyl up nucleosides;

02:36:29  2   right?

02:36:29  3   A.      2'-methyl up purine nucleosides.

02:36:34  4   Q.      So the -- by the way, BMS I think you said,

02:36:40  5   Bristol-Myers Squibb; right?

02:36:41  6   A.      That's correct.

02:36:42  7   Q.      Their drug that was really toxic, that was a

02:36:45  8   2'-methyl ribonucleoside; is that correct?

02:36:47  9   A.      Correct.

02:36:48 10   Q.      All right.  Let's go on to Dr. Schinazi and what you

02:36:52 11   had to say about Dr. Schinazi.

02:36:57 12           He was a co-founder of your company, Idenix, in

02:37:01 13   1998.  True?

02:37:02 14   A.      True.

02:37:03 15   Q.      And the reason he was a co-founder of Idenix was that

02:37:08 16   Idenix had licensed some technology which was owned by Dr.

02:37:13 17   Schinazi; right?

02:37:13 18   A.      Correct.

02:37:14 19   Q.      In addition to co-founding Idenix with you, Dr.

02:37:19 20   Schinazi was a consultant for Idenix.  You talked about

02:37:22 21   that; is that right?

02:37:23 22   A.      Right.

02:37:24 23   Q.      Okay.  And Dr. Schinazi was a significant shareholder

02:37:29 24   in Idenix; true?

02:37:31 25   A.      True.

02:37:31 1   Q.      In fact, at the time of the founding of Idenix, Dr.

02:37:36 2   Schinazi was the second largest shareholder in Idenix among

02:37:41 3   the founding group; right?

02:37:44 4   A.      Correct.

02:37:44 5   Q.      Second only to you?

02:37:45 6   A.      Correct.

02:37:46 7   Q.      Okay.  Dr. Schinazi was on Idenix's scientific

02:37:50 8   advisory board for a while?

02:37:51 9   A.      Correct.

02:37:52 10  Q.      Now, just as Dr. Schinazi co-founded your company,

02:37:58 11  you co-founded his company Pharmasset; right?

02:38:01 12  A.      Correct.

02:38:02 13  Q.      And that also happened in 1998; right?

02:38:06 14  A.      Correct.

02:38:07 15  Q.      And, in fact, Pharmasset and Idenix were founded at

02:38:13 16  the same time; right?

02:38:14 17  A.      Same month.

02:38:15 18  Q.      Same month.  For a time you were on the scientific

02:38:19 19  advisory board of Pharmasset?

02:38:21 20  A.      Correct.

02:38:22 21  Q.      And like Dr. Schinazi, you had a consulting agreement

02:38:26 22  with Pharmasset, too; right?

02:38:29 23  A.      Correct.

02:38:29 24  Q.      All right.  You were also a shareholder of

02:38:33 25  Pharmasset; right?

02:38:33 1    A.      Yes.

02:38:34 2    Q.      Okay.  So you and Dr. Schinazi were founders and

02:38:38 3    shareholders in one another's companies?

02:38:40 4    A.      Correct.

02:38:41 5    Q.      All right.  In fact, Idenix itself, at the time it

02:38:46 6    was Novirio, but Idenix itself was a shareholder in

02:38:50 7    Pharmasset; right?

02:38:53 8    A.      Correct.

02:38:53 9    Q.      Idenix bought a million shares of Pharmasset; right?

02:38:57 10   A.      May I give the details?  Idenix did not buy a million

02:39:05 11   shares of Pharmasset.

02:39:06 12   Q.      At one point Idenix owned a million shares of

02:39:09 13   Pharmasset?

02:39:10 14   A.      Okay.  As part of the licensing of the technology,

02:39:16 15   Idenix gave $1 million, paid $1 million as an up-front

02:39:24 16   payment to Pharmasset to license a drug for HIV AIDS.  And

02:39:19 17   at the same time, Idenix received 1 million shares of

02:39:23 18   Pharmasset as part of the transaction.

02:39:25 19   Q.      Okay.

02:39:27 20   A.      So we did not buy.

02:39:28 21   Q.      No, that's fair.  That's fair.  But at the end of the

02:39:33 22   transaction, Idenix ended up owning 1 million shares?

02:39:37 23   A.      Correct.

02:39:37 24   Q.      Okay?

02:39:39 25   A.      Correct.

02:39:39 1  Q.      And because Idenix owned a million shares of

02:39:41 2  Pharmasset, Idenix actually had a seat on the board of

02:39:45 3  Pharmasset?

02:39:46 4  A.      Correct.

02:39:46 5  Q.      And you were the person from Idenix who occupied that

02:39:50 6  seat?

02:39:50 7  A.      Correct.

02:39:51 8  Q.      Okay.  Now, apart from these relationships between

02:39:58 9  these companies, Pharmasset and Idenix, you and Dr. Schinazi

02:40:03 10 collaborated scientifically as well; right?

02:40:07 11 A.      Until 2000, yes.

02:40:08 12 Q.      Okay.

02:40:09 13 A.      Until I was at the University as an academic person.

02:40:14 14 Yes.

02:40:14 15 Q.      Well, for example, you and Dr. Schinazi are actually

02:40:17 16 named as co-inventors on a number of patents; true?

02:40:22 17 A.      True.

02:40:23 18 Q.      You and Dr. Schinazi are named as coauthors on a fair

02:40:28 19 number of papers; true?

02:40:31 20 A.      Absolutely.

02:40:31 21 Q.      You and Dr. Schinazi are named as coauthors or

02:40:35 22 presenters on quite a number of abstracts as well; right?

02:40:39 23 A.      Absolutely.

02:40:40 24 Q.      Okay.  And abstract is probably not super clear to

02:40:44 25 everybody.  Can you tell the jury what an abstract is, a

02:40:47 1    scientific abstract?

02:40:48 2    A.    An abstract is a summary, within one page, that you

02:40:59 3    use at scientific meetings, and these abstracts are reviewed

02:41:02 4    by a committee and they accept or not the presentation at

02:41:09 5    those scientific meetings.

02:41:10 6    Q.    Okay.  And so in addition to all that, you and

02:41:16 7    Dr. Schinazi were very close friends for years; right?

02:41:19 8    A.    Yes.

02:41:19 9    Q.    But you had a falling out?

02:41:22 10   A.    Correct.

02:41:23 11   Q.    Over a personal matter?

02:41:25 12   A.    Correct.

02:41:26 13   Q.    And, in fact, it was so personal you didn't want to

02:41:30 14   talk about it in your deposition; right?

02:41:31 15   A.    Correct.

02:41:32 16   Q.    So we didn't.

02:41:34 17   A.    Correct.

02:41:34 18   Q.    But it didn't have anything to do with 2'-methyl

02:41:40 19   ribonucleosides; right?

02:41:42 20   A.    Correct.

02:41:42 21   Q.    And the relationship ended in April of 2008; right?

02:41:50 22   A.    Absolutely.

02:41:51 23   Q.    And so it was about ten years after the two of you

02:41:56 24   had cofounded one another's companies; right?

02:41:58 25   A.    Correct.

02:41:59  1    Q.      And you haven't spoken to him since?

02:42:02  2    A.      I did not.

02:42:05  3            THE COURT:  Mr. Scherkenbach, do you know about

02:42:10  4    how much more you will have?

02:42:10  5            MR. SCHERKENBACH:  I'm actually reasonably

02:42:13  6    close.  Maybe ten minutes or so.  We can take a break.

02:42:15  7            THE COURT:  I think it's a good time to take a

02:42:17  8    break.  Ladies and gentlemen of the jury, we're going to

02:42:19  9    give you about 15 minutes during the break, and we'll get

02:42:22 10    you back.

02:42:34 11            (Jury left courtroom.)

02:42:47 12            THE COURT:  You can have a seat if you want.

02:42:50 13            I'm going to briefly give a ruling on the one

02:42:54 14    outstanding issues in case we get to Dr. Schinazi's

02:42:56 15    deposition this afternoon.

02:42:57 16            The remaining issue was -- well, this morning,

02:43:02 17    of course, we overruled Gilead's objections to certain

02:43:05 18    counter-counterdesignations by Idenix of deposition

02:43:11 19    testimony regarding or of Dr. Schinazi.  The remaining issue

02:43:14 20    which was brought up as the parties sought clarification of

02:43:19 21    the Court's ruling is about whether the Court would also

02:43:22 22    allow plaintiffs to admit PX-739, the order of the U.S.

02:43:27 23    District Court in Georgia into evidence.

02:43:29 24            Having considered that question further, I am

02:43:32 25    sustaining the objection, and we're not going to allow that

02:43:36 1    document to come into evidence.

02:43:38 2            As outlined earlier, Rule 608(b) allows attacks

02:43:43 3    on a witness's ability only under certain circumstances and

02:43:46 4    that rule explicitly precludes the use of extrinsic evidence

02:43:50 5    for that purpose.  This document is extrinsic evidence and

02:43:57 6    therefore I believe it would be impermissible under the rule.

02:44:03 7            I would just take the opportunity to urge the

02:44:05 8    parties once again, I know everybody is doing a lot of

02:44:07 9    things, there is a lot of moving pieces, but it would have

02:44:10 10   been easier on everyone had it been clear that the

02:44:13 11   plaintiffs wanted that document admitted in the letter we

02:44:17 12   looked at last night.

02:44:18 13           We'll take a short recess.

02:44:30 14           (Brief recess taken.)

02:44:30 15           *      *      *

03:06:00 16           (Proceedings reconvened after recess.)

03:06:00 17           THE COURT:  We have one juror, Juror No. 4 who

03:06:04 18   for health reasons would be more comfortable sitting in the

03:06:07 19   back row instead of the front row, so we told her she could,

03:06:11 20   if she wants to, move to seat five in the back row.  So if

03:06:14 21   she does move or come back in and sit there, that's why.

03:06:18 22           All right.  Let's bring the jury in.

03:06:54 23           (Jury returned.)

03:07:46 24           THE COURT:  All right.  Welcome, ladies and

03:07:49 25   gentlemen.  I anticipate this will be our last session for

03:07:51 1    the afternoon.  I don't anticipate taking another break, but

03:07:54 2    as always, if anybody needs a break, just let me know by

03:07:59 3    getting my attention, one way or another.

03:08:00 4             Mr. Scherkenbach.

03:08:01 5             MR. SCHERKENBACH:  Thank you, Your Honor.

03:08:05 6             Welcome back.

03:08:05 7    BY MR. SCHERKENBACH:

03:08:06 8    Q.    We're just about done, Dr. Sommadossi.  The last

03:08:09 9    topic I wanted to talk about was the confidentiality

03:08:12 10   agreement.  You talked about on direct.  Do you recall that?

03:08:16 11   A.    Sure.

03:08:16 12   Q.    Okay.  Before I get quite to that one, there were

03:08:22 13   agreements between the companies, Idenix on the one hand and

03:08:27 14   Pharmasset on the other, that had confidentiality agreements

03:08:29 15   in them, too; right?, between Novirio and Pharmasset.  Do

03:08:40 16   you recall that?

03:08:40 17   A.    I know about one agreement which is a waiver.  Is

03:08:43 18   this the document you are talking about?

03:08:44 19   Q.    No, it is a different one.

03:08:46 20   A.    Okay.

03:08:46 21   Q.    Let me just direct you to it to refresh your

03:08:49 22   recollection.

03:08:50 23   A.    Okay.

03:08:50 24   Q.    DX-134 in the binder you have there.  134.  This is

03:09:04 25   titled Amendment Agreement in 1998 Between Pharmasset and

03:09:10 1  Novirio.  Do you see that?

03:09:14 2  A.     Yes.

03:09:15 3  Q.     And this actually is a document we talked about

03:09:17 4  during your deposition.  I don't know if you recall.  Do you

03:09:18 5  recall?

03:09:19 6  A.     I do not recall.

03:09:19 7  Q.     In any event, you don't have any reason to dispute it

03:09:23 8  is an actual agreement between Pharmasset and Novirio?

03:09:27 9  A.     Yes.

03:09:28 10          MR. SCHERKENBACH:  Your Honor, I move the

03:09:29 11  admission of DX-134.

03:09:31 12          MS. PARKER:  No objection.

03:09:31 13          THE COURT:  It is admitted.

03:09:31 14          (DX-134 was admitted into evidence.)

03:09:31 15  BY MR. SCHERKENBACH:

03:09:33 16  Q.     Maybe to refresh you a little bit more,

03:09:38 17  Dr. Sommadossi, on page 3 of the document, there is a

03:09:40 18  section 6.  And this is actually an amendment to a

03:09:44 19  pre-existing license between the companies.  Do you recall

03:09:47 20  that?

03:09:48 21  A.     Um-hmm.

03:09:49 22  Q.     Okay.  And so section 6 of this agreement refers to

03:09:53 23  section 9.1 of the license agreement.  Do you see that, up

03:09:58 24  at the top?

03:09:58 25  A.     Yes.

03:09:59 1  Q.     And basically this is a substitute confidentiality

03:10:03 2  provision.  You can read as much as of it as you like, but

03:10:07 3  it pertains to confidential information between the parties.

03:10:09 4  Do you see that?

03:10:10 5  A.     Yes.

03:10:10 6  Q.     Okay.  And to the best of your knowledge, you don't

03:10:20 7  recall any instance where Idenix alleged to Pharmasset that

03:10:26 8  Pharmasset -- where a Pharmasset employee had violated this

03:10:31 9  confidentiality provision; right?

03:10:34 10 A.     Correct.

03:10:34 11 Q.     Okay.  Now let's turn to the confidentiality

03:10:38 12 agreement you talked about which is PX-204.

03:10:45 13        This is the consulting agreement between

03:10:48 14 Dr. Schinazi and Idenix.  Do you remember talking about this

03:10:51 15 on direct?

03:10:52 16 A.     Yes.

03:10:52 17 Q.     And you, I think you showed paragraph 6 of this

03:10:58 18 agreement has a confidentiality clause, too; right?

03:11:02 19 A.     Yes.

03:11:03 20 Q.     Okay.  And, in particular, I want to direct your

03:11:06 21 attention to the same language I think you talked about on

03:11:08 22 direct, which is right in the middle here:  "Consultant

03:11:15 23 agrees to hold such information as strictly confidential and

03:11:20 24 not disclose any such confidential information to any

03:11:23 25 person, corporation or firm (other than the company)."

1             Do you see that?

2  A.    Yes.

3  Q.    Okay.  You are not aware of anyone at Idenix or

4  employed by Idenix accusing Dr. Schinazi of violating this

5  agreement; right?

6  A.    I accuse Dr. Schinazi to violate this agreement.

7  Q.    You accused him.

8  A.    I indicated to you on the deposition that

9  Dr. Schinazi, to the best of my knowledge, breached this.

10 Q.    And you are referring in your deposition?

11 A.    Yes.

12 Q.    All right.  Let me rephrase my question.  Prior to

13 this lawsuit being filed, you are not aware of anyone at

14 Idenix or anyone employed at Idenix accusing Dr. Schinazi of

15 breaching this confidential agreement; true?

16 A.    True.

17 Q.    Idenix has never sued Dr. Schinazi for breach of

18 contract; right?

19 A.    True.

20 Q.    Idenix has never sued Dr. Schinazi for

21 misappropriation of trade secret or confidential

22 information; right?

23 A.    Correct.

24         MR. SCHERKENBACH:  That's all I have, Your

25 Honor.

03:12:34  1          THE COURT:  Redirect.

03:12:41  2          MS. PARKER:  Thank you, Your Honor.

03:12:42  3                      REDIRECT EXAMINATION

03:12:42  4  BY MS. PARKER:

03:12:43  5  Q.     Dr. Sommadossi, I only have a few more questions for

03:12:45  6  you; all right?

03:12:48  7          Now, in addition to being friends with

03:12:52  8  Dr. Schinazi, were you in competition with him?  Were your

03:12:55  9  companies in competition?

03:12:57 10  A.     All the scientists are in competition; right?  So we

03:13:03 11  can say, we can say that we founded two companies at the

03:13:12 12  same time initially targeting different therapeutic

03:13:16 13  indications, so different targets, different drugs.  And

03:13:21 14  then three years later, yes, we were, four years later, yes,

03:13:28 15  we were in competition.

03:13:29 16  Q.     Is that why you required Dr. Schinazi to sign a

03:13:34 17  confidentiality agreement?

03:13:35 18  A.     In 1998?  No, this is standard agreement actually and

03:13:45 19  it is the investors that request it.  That all the founders,

03:13:49 20  so the four founders sign confidentiality agreement as part

03:13:53 21  of their consulting agreement.

03:13:56 22  Q.     Thank you.  Now, I want to switch gears and ask you

03:13:58 23  some follow-up questions about another topic that you were

03:14:02 24  questioned about.  You were asked some questions about a

03:14:04 25  declaration, and it is Gilead Defendants' Exhibit 330.  I'm

03:14:11  1    going to pull that back up and I'm going to ask you some

03:14:15  2    follow-up questions.  We're going to put it on the screen

03:14:17  3    for you.

03:14:18  4    A.    Yes.

03:14:18  5    Q.    If we could go to page 2, paragraph 8.  Page 2.

03:14:31  6          All right.  I'm just going to read this for you.

03:14:33  7          It says claim 1 of the '820 patent covers the

03:14:37  8    use of FTC to treat all viral diseases in all mammals.

03:14:45  9    Claim 2 of the '820 patent covers the use of FTC at least

03:14:51 10    95 percent free of -- am I saying this right? -- positive

03:14:56 11    FTC to treat all viral diseases in all mammals.

03:15:00 12          So with that background, now, I want to go to

03:15:03 13    page 4 of this document.

03:15:05 14          MR. SCHERKENBACH:  Well, is there a question?

03:15:08 15          THE COURT:  Yes.  Is there a question?

03:15:09 16          MR. SCHERKENBACH:  That's the background.  I

03:15:10 17    want to show him both sections.

03:15:11 18          THE COURT:  At least ask him a question about

03:15:13 19    what he read.

03:15:13 20    BY MS. PARKER:

03:15:15 21    Q.    Did I read that correctly?

03:15:16 22    A.    That's correct.

03:15:17 23    Q.    Now, page 4, paragraph 15.

03:15:22 24          Okay.  And this says:  "It is accepted in the

03:15:26 25    field of antiviral therapy that observation of activity

03:15:30 1  against one virus, or even two viruses, is an insufficient

03:15:35 2  basis on which to reasonably predict broad spectrum

03:15:39 3  antiviral activity, or even activity against related

03:15:42 4  viruses."

03:15:43 5          Did I read that one correctly?

03:15:46 6  A.    You read it correctly.

03:15:47 7  Q.    Okay.  What did you mean by "broad spectrum" in that

03:15:51 8  paragraph?

03:15:52 9  A.    Yes.  This is a key is that we are including both DNA

03:16:01 10 and RNA viruses.  And so -- and retro viruses.  Those are

03:16:08 11 the three major classes.

03:16:11 12         And so as I indicated this morning, if we have

03:16:18 13 the DNA virus, there will be totally different structure on

03:16:22 14 these compounds.  As it is an RNA virus, it is a totally

03:16:29 15 different structure.

03:16:30 16         So it isn't a context of the claim that it

03:16:36 17 was, that claim indicated that FTC, which is a drug

03:16:45 18 commercialized by Gilead today, was treating all viral

03:16:50 19 diseases in all mammals.  And this, to the best of my

03:16:55 20 knowledge, I have not seen yet today, after 35 years, a drug

03:17:02 21 that is active against both RNA virus and DNA virus.  So you

03:17:09 22 can have some broad spectrum antivirals; but as specific

03:17:17 23 drugs, potent drugs, we are not yet, and this is a common

03:17:23 24 knowledge.

03:17:23 25         So in my declaration, that is, again, did I

03:17:28 1  write this?  No.  It is the patent lawyer who wrote this,

03:17:33 2  and I should have read more carefully.  I agree on that.

03:17:37 3  But it is accepted in the field of antiviral therapy that

03:17:41 4  observation of activity against one virus or even two

03:17:44 5  viruses is an insufficient basis on which to reasonably

03:17:48 6  predict broad spectrum antiviral activity.

03:17:51 7        That the sentence should have stopped there.

03:17:54 8  Because it is a contest about FTC being treating all

03:17:59 9  antiviral diseases in all mammals.  If we had activity

03:18:05 10  against related viruses, actually when they are related

03:18:09 11  viruses, there is definitely possibility that there is

03:18:12 12  activity as well.  That is why, when we testing, for

03:18:16 13  example, RNA viruses such as West Nile virus, such as Zeka

03:18:24 14  today, such as yellow fever, most likely, not all the time

03:18:28 15  but very often there is going to be crossreactivity.  Those

03:18:35 16  drugs are going to basically work on those related viruses.

03:18:41 17  And that is the mistake in that sentence.

03:18:44 18  Q.    Well, let's pull out the date that you signed.  If we

03:18:48 19  could pull that up down on that same page.

03:18:51 20        Okay.  It looks like that you signed this April

03:18:55 21  2nd of 1998?

03:18:57 22  A.    Correct.

03:18:57 23  Q.    All right.  As of April 2nd, 1998, were you aware of

03:19:03 24  any particular viral assay that could be used for all

03:19:08 25  viruses?

03:19:10 1   A.      No.

03:19:10 2   Q.      Okay.  By 2000, I want to move forward.  By 2000, did

03:19:15 3   you believe that this BVDV assay was predictive for activity

03:19:20 4   against hepatitis C?

03:19:23 5   A.      Yes.

03:19:24 6   Q.      Now, when you saw that yellow fever data that came in

03:19:30 7   from Dr. La Colla in his laboratory, did you believe that

03:19:33 8   you had conceived of a method to treat HCV, hepatitis C?

03:19:41 9   A.      I believe I did.

03:19:42 10  Q.      And was this compound MD1 active against BVDV?

03:19:47 11  A.      It was, to the best of my knowledge.

03:19:50 12          MS. PARKER:  Okay.  So if we could pull the

03:19:52 13  declaration back up, please.

03:19:52 14  BY MS. PARKER:

03:19:56 15  Q.      So at the time you signed your declaration in 1998,

03:20:01 16  was your declaration true or not?

03:20:05 17  A.      It was not true when we include the last few words.

03:20:15 18  Q.      Okay.  Is there anything else -- is there anything

03:20:29 19  else that you would like to say to explain that, or is

03:20:31 20  that --

03:20:32 21  A.      No.  I think that, as I have indicated this morning

03:20:37 22  to the jury and to the audience and to Your Honor, we knew

03:20:45 23  in 1998, because actually, Sovaldi has been discovered in

03:20:51 24  the early eighties with a surrogate virus, and actually a

03:20:58 25  murine virus and not the HIV virus.

03:21:01 1          So a misstatement.  I should have I should

03:21:04 2  have read maybe better.  And as you indicated, my view was

03:21:07 3  related to broad spectrum anti-viral activity with the

03:21:12 4  statement of the FTC was treating, was used to treat all

03:21:18 5  viral diseases in all mammals, and that's, to my knowledge,

03:21:24 6  that's not possible.

03:21:27 7  Q.     All right.  Thank you.

03:21:28 8          Now, I want to switch and ask you about another

03:21:30 9  document that you were just questioned about.  And so if we

03:21:33 10  could pull up -- this is that 10-K document.  It's Exhibit,

03:21:38 11  Defendants'4 Exhibit 866, so if we could pull that up,

03:21:42 12  please.

03:21:43 13  A.     Which --

03:21:44 14  Q.     All right?

03:21:45 15  A.     Which --

03:21:46 16  Q.     You can just look on the screen?

03:21:47 17  A.     That's okay.

03:21:48 18  Q.     First of all, let me ask you:  Are you a lawyer?

03:21:50 19  A.     I am not.

03:21:51 20  Q.     Okay.  All right.  Now, if we could go to page 82.  I

03:22:06 21  want to read that.  You were asked a question about the last

03:22:10 22  sentence there:  We cannot, however, obtain patent

03:22:14 23  protection on the compound NM107.

03:22:17 24          Okay.  I want to ask you about the sentence

03:22:19 25  that's right above there.

03:22:21 1   A.      Mm-hmm.

03:22:21 2   Q.      It says, we have been granted U.S. patents claiming

03:22:26 3   methods of treatment using NM1Q07, each directed to treating

03:22:30 4   HCV infection, specifically to treating flavivirus and

03:22:36 5   pestivirus infection.

03:22:39 6           Okay.  So you were asked about whether you were

03:22:46 7   able to get a compound patent on NM107.

03:22:53 8           Do you recall that?

03:22:54 9   A.      Yes.

03:22:55 10  Q.      Okay.  Let me ask you:  Prior to your invention, had

03:22:59 11  anyone patented the method of using 2'-methyl up modified

03:23:05 12  ribonucleosides to treat hepatitis C?

03:23:08 13  A.      No.

03:23:08 14          MR. SCHERKENBACH:  Objection.  Objection.

03:23:10 15          THE COURT:  Hold on.

03:23:10 16          MR. SCHERKENBACH:  It calls for speculation and

03:23:12 17  a legal conclusion.

03:23:13 18          MS. PARKER:  Well, overruled.  You can answer to

03:23:15 19  the extent you know.

03:23:16 20          THE WITNESS:  Well, for the jury, there is two

03:23:21 21  type of patents.  There is what we call a use patent or what

03:23:32 22  we call a composition of matter patent.

03:23:38 23          So the first time when a compound is patented,

03:23:45 24  it's called a composition of matter.  And that composition

03:23:51 25  of matter -- and, again, I'm not a patent lawyer, but from

03:23:58 1    what I understand, if anyone will find a use for the

03:24:06 2    compound which is still a composition of matter, that

03:24:16 3    individual company will have to take a license because there

03:24:20 4    is a composition of matter.  That means that the compound

03:24:23 5    itself is protected by a patent.

03:24:28 6              Now, this is valid for 20 years.  If after

03:24:37 7    20 years you find --

03:24:38 8              MR. SCHERKENBACH:  Your Honor, we're being

03:24:39 9    instructed on the law now?

03:24:41 10             THE COURT:  Yes.  Let me interrupt you there,

03:24:42 11   Doctor.

03:24:43 12             Ms. Parker, could you ask the question that you

03:24:45 13   asked once again, please?

03:24:46 14             MS. PARKER:  Okay.

03:24:46 15   BY MS. PARKER:

03:24:47 16   Q.    So if we look at -- let's just pull up your patent.

03:24:52 17   If we could pull up Plaintiffs' Exhibit --

03:24:53 18   A.    So I can answer quickly.

03:24:55 19             THE COURT:  Hold on.  There's no question

03:24:57 20   pending.

03:24:57 21   BY MS. PARKER:

03:24:58 22   Q.    I'm going to follow up in the context of your patent.

03:25:01 23   Okay?  If we could pull up Plaintiffs' Exhibit 1525.

03:25:04 24   A.    Sure.

03:25:10 25   Q.    And is this your patent here?

03:25:12 1    A.      Yes.

03:25:13 2    Q.      If we could pull that up.  We talked about this

03:25:16 3    before and you were asked some questions about it:  Methods

03:25:18 4    and compositions for treating hepatitis C. Virus.

03:25:21 5            Okay.  Is your patent a method patent or a

03:25:24 6    compound patent?

03:25:25 7    A.      It's a method patent.

03:25:26 8    Q.      And what's the difference between the two?

03:25:28 9            MR. SCHERKENBACH:  Same objection.

03:25:29 10           THE COURT:  Ms. Parker?

03:25:33 11           MS. PARKER:  May I rephrase?

03:25:35 12           THE COURT:  Yes.

03:25:35 13   BY MS. PARKER:

03:25:36 14   Q.      Based on your knowledge as the inventor --

03:25:38 15   A.      Mm-hmm.

03:25:39 16   Q.      -- what is the difference between a compound patent

03:25:41 17   and a method patent?

03:25:42 18           MR. SCHERKENBACH:  Same objection.  I'm sorry.

03:25:43 19           THE COURT:  I'm going to overrule it.  I will

03:25:45 20   allow a brief answer, but not a long answer.

03:25:48 21           THE WITNESS:  Okay.  Thank you, Your Honor.

03:25:49 22           So it's very simple.  I apologize.  Composition

03:25:54 23   matter, the compound is the first time that it's being

03:25:59 24   synthesized and reported to be used for something.  Merck

03:26:02 25   synthesizes compound 1964 composition of matter for cancer.

03:26:10 1    We found in 2000, May 2000, a use patent.  I

03:26:16 2 mean that we discovered that these same compounds could be

03:26:23 3 useful against hepatitis C.  This is a use patent.  And you

03:26:30 4 have many drugs that today are approved by the FDA as a use

03:26:34 5 patent.  You do not need a composition of matter patent.

03:26:37 6 BY MS. PARKER:

03:26:38 7 Q.    Now, despite all of those issues that you were asked

03:26:41 8 about on cross-examination, did the U.S. Patent Office

03:26:45 9 review your application and issue a patent to cover the

03:26:50 10 methods that you have been describing to us?

03:26:52 11 A.    Yes.

03:26:53 12    MS. PARKER:  Your Honor, I have no further

03:26:55 13 questions.  Thank you.

03:26:55 14    Thank you, Dr. Sommadossi.

03:26:58 15    THE WITNESS:  Okay.

03:26:58 16    THE COURT:  Thank you, Dr. Sommadossi.  You may

03:26:59 17 step down.

03:27:00 18    THE WITNESS:  Thank you, Your Honor.

03:27:01 19    THE COURT:  Thank you very much.

03:27:02 20    (Witness excused.)

03:27:07 21    THE COURT:  Plaintiffs may call their next

03:27:09 22 witness.

03:27:09 23    MS. PARKER:  Thank you, Your Honor.  Our next

03:27:13 24 witness is the other inventor.  It's Dr. Paolo La Colla from

03:27:17 25 the Italian University.  He's going to testify by videotaped

03:27:22 1    deposition, and I will just tell Your Honor, it lasts about

03:27:30 2    50 minutes.  It was taken on November 7th of 2015.

03:27:33 3            And I would like to move at this time for

03:27:34 4    admission of the exhibits that were used in the deposition.

03:27:38 5    Plaintiffs' Exhibit 0181 and Plaintiffs' Exhibit 0240B.

03:27:44 6            THE COURT:  Okay.  Any objection to those?

03:27:46 7            MR. HEADLEY:  No objection to those, Your Honor.

03:27:49 8    Their counter-designations include one of our exhibits.

03:27:52 9    That's DX-364.

03:27:53 10           THE COURT:  Any objection?

03:27:57 11           MS. PARKER:  Can I see what it is?  No

03:28:00 12   objection.

03:28:00 13           THE COURT:  All right.  All three or however

03:28:02 14   many exhibits it was the two of you listed are admitted.

03:28:02 15           (Above-referenced exhibits admitted in evidence.)

03:28:06 16           Do you have copies of the transcripts, the

03:28:07 17   portions that are going to be played?

03:28:09 18           While you pass that up, ladies and gentlemen of

03:28:11 19   the jury, you may have already gathered, but a deposition is

03:28:18 20   testimony that is given at a deposition by a witness under

03:28:22 21   oath prior to at trial, and so both sides are going to be

03:28:25 22   presenting to you certain testimony of witnesses who are not

03:28:28 23   going to be testifying live, but they've previously been

03:28:30 24   under oath and given this testimony.

03:28:33 25           And if I understand it correctly, what we're

03:28:36 1   going to watch right now lasts a little bit under an hour,

03:28:39 2   so I intend to play it all the way through, but if anybody

03:28:41 3   needs a break during it, just wave or get our attention.

03:28:49 4           Mr. Headley?

03:28:50 5           MR. HEADLEY:  I don't think plaintiffs included

03:28:51 6   our exhibit in the binder.  Permission to approach?

03:28:54 7           THE COURT:  Yes.

03:28:55 8           Can we turn some of the lights down?

03:29:08 9           All right.  We can play it when we're ready.

03:29:11 10         (The videotaped deposition of Dr. Paola La Colla

03:29:11 11   was played as follows.)

03:29:12 12         "Question:  Good morning, Dr. La Colla.

03:29:15 13         "Answer:  Good morning.

03:29:16 14         "Question:  Could you please state your full

03:29:18 15   name for the record?

03:29:19 16         "Answer:  Yes.  Paolo La Colla, P-a-o-l-o

03:29:26 17   L-a C-o-l-l-a.

03:29:28 18         "Question:  Dr. La Colla, could you please give

03:29:35 19   me a high-level overview of your educational background?

03:29:41 20         "Answer:  Yes.  I went to the classical lyceum,

03:29:45 21   could be called 'liceo classico.'  There isn't an exact

03:29:54 22   correspondence in English.  I took a degree in pharmacy in

03:29:58 23   1968.  I spent two years as a post-doctorate researcher at

03:30:03 24   the -- (in English) Roche Institute of Molecular Biology in

03:30:09 25   New Jersey (through the interpreter) at the Roche Institute

03:30:13  1    of molecular biology (in English) in New Jersey.

03:30:19  2         "(Through the interpreter):  I then started to

03:30:22  3    work as an assistant at the University of Cagliari in the

03:30:27  4    microbiology institute, until I became associate professor,

03:30:32  5    and a few years later, regular -- I would say a professor on

03:30:35  6    a regular assignment, full-time professor for microbiology

03:30:39  7    and biology.

03:30:40  8         "I had the opportunity of becoming the director

03:30:42  9    of the faculty of science and biomedical sciences, and from

03:30:46 10    November 1st last year -- (in English) or maybe two years

03:30:49 11    ago -- (through the interpreter) I've been retiring.  I'm

03:30:53 12    retired.

03:30:54 13         "I think what is important to say regarding this

03:30:57 14    case is that since 1999, from 1999 to 2010, I have been the

03:31:02 15    director of the co-operative laboratory in Cagliari, which

03:31:13 16    is a laboratory that works between Idenix and the University

03:31:17 17    of Cagliari.

03:33:11 18         "Question:  Thank you.  If I could back up in

03:33:16 19    time just a little bit.  Your degree in pharmacy from 1968,

03:33:20 20    that from the classical lyceum -- where was that from?

03:33:26 21         "Answer:  At the university.  I got my degree at

03:33:28 22    the university.

03:33:29 23         "Question:  And do you have what's equivalent to

03:33:31 24    a Ph.D. in the United States?

03:33:34 25         "Answer:  Not really, because back then the

03:33:36 1  Ph.D. was not actually an existing or practiced institution,

03:33:40 2  but it is now, of course.

03:33:41 3          "Question:  You obtained one degree in 1963?

03:33:47 4          "Answer:  Not really.  What we call a degree is

03:33:49 5  obtained after five years of study, university studies.

03:33:52 6          "Question:  And that's the degree, then, you

03:33:54 7  received in 1968?

03:33:56 8          "Answer:  (In English).  Right.  (Through the

03:34:00 9  interpreter) correct.

03:34:01 10         "Question:  Okay.  Your first work with

03:34:04 11 Professor Grifantini was in relation to this HIV project?

03:34:29 12         "Answer:  My only work with him.

03:34:30 13         "Ms. Hufnal:  I'm going to mark as La Colla

03:34:35 14 Exhibit 4 a document with production number IDXDE00403314

03:34:43 15 through 3316.

03:34:44 16         "(La Colla Exhibit 4 marked for identification.)

03:34:53 17         "By Ms. Hufnal:

03:34:54 18         "Question:  Dr. La Colla, have you seen what's

03:34:56 19 been marked as Exhibit 4 before?

03:34:58 20         "Answer:  Yes, of course.

03:34:59 21         "Question:  So let me start with the part of

03:35:09 22 Exhibit 4 that has production numbers 3314 and 3315.  These

03:35:14 23 pages are both dated July 12, 1999, correct?

03:35:14 24         "Answer:  Yes.

03:35:19 25         "Question:  Does this appear to be a cover

03:35:20 1    letter sending two compounds to you?

03:35:20 2             "Answer:  Yes.

03:35:23 3             "Question:  And the two compounds are MD1 and

03:35:27 4    ADM3?

03:35:27 5             "Answer:  Yes.

03:35:30 6             "Question:  So MD1 and ADM3 were known to have

03:35:33 7    anti-cancer activity as of 1999 and you were testing to see

03:35:38 8    if there was any anti-HIV activity?

03:35:38 9             "Answer:  Yes.

03:35:42 10            "Question:  Did Professor Grifantini, to the

03:35:44 11   best of your knowledge, already have data on cytotoxicity

03:35:48 12   for MD1 and ADM3?

03:37:22 13            "The Witness:  It is possible that he -- surely,

03:37:27 14   actually.  Surely he had some data from the literature.

03:37:31 15            "By Ms. Hufnal:

03:37:31 16            "Question:  As it related to the anti-cancer

03:38:00 17   activity?

03:38:00 18            "Answer:  Yes.

03:38:02 19            "Question:  So when you received MD1 and ADM3,

03:38:06 20   you did both cytotoxicity testing and biological -- or

03:38:11 21   anti-HIV testing?

03:38:11 22            "Answer:  Yes.

03:38:15 23            "Question:  What were the results of the

03:38:16 24   anti-HIV testing that your lab did on MD1 and ADM3?

03:38:21 25            "Answer:  Yes.  We can see it from the numbers

03:38:24  1    that are noted at the side of the two structures, which are

03:38:27  2    CC50 and EC50.  One can infer from these notes that two

03:38:52  3    different assays were carried out and that the results for

03:38:58  4    cytotoxicity were 6 and 7 in one case -- sorry, 6 and 9 in

03:39:02  5    one case, and 7 and 7.2 in the other case.

03:39:21  6            "Question:  I'm sorry.  Can I just stop you one

03:39:25  7    second.  You're looking right now on the page ending 314 of

03:39:31  8    Exhibit 4 and at the handwritten notes under 'CC50'?  Those

03:39:40  9    are the numbers you're looking at?

03:39:43 10            "Answer:  Yes.

03:39:44 11            "Question:  Okay.  Thank you.  Go ahead.

03:39:47 12            "Answer:  So, cytotoxicity was around 10

03:39:54 13    micromolar and none of the assays demonstrated an anti-HIV

03:40:07 14    activity at lesser concentrations of the cytotoxicity.

03:40:15 15            "Question:  So was it your conclusion that these

03:40:18 16    compounds, MD1 and ADM3, were not useful for anti-HIV?

03:40:27 17            "Answer:  Correct.

03:40:34 18            "Question:  Before that, so when you finished

03:40:38 19    your testing on ADM3 and MD1 in this summer '99 time period,

03:40:44 20    did you do anything further with those compounds?

03:40:49 21            "Answer:  (In English.)  No, no, no.  The answer

03:40:55 22    was given.  The project was closed.

03:41:33 23            MS. HUFNAL:  I'm going to mark as La Colla

03:41:43 24    Exhibit 5 a document with production number IDXDE00414271

03:41:50 25    through 414561.

03:41:55 1        **(La Colla Exhibit 5 marked for identification.)**

03:42:06 2        **"Question:  Dr. La Colla, have you seen before**

03:42:10 3 **or do you recognize the document that's been marked as La**

03:42:14 4 **Colla Exhibit 5?**

03:42:17 5        **"Answer:  Yes.**

03:42:18 6        **"Question:  What is La Colla Exhibit 5?**

03:42:36 7        **"Answer:  This is the register for the**

03:42:38 8 **researcher Silvia Doratiotto who carried out the first**

03:42:48 9 **assays on the antiviral activity of MD -- MD1 and ADM3.**

03:42:55 10        **"Question:  Okay.  If I could just ask**

03:42:58 11 **generally, in your lab, was it your practice, or did you**

03:43:02 12 **commonly review the lab notebooks of the scientists working**

03:43:06 13 **in your lab?**

03:43:07 14        **"Answer:  We would use the notebooks to discuss**

03:43:10 15 **on the results.**

03:43:12 16        **"Question:  So you would, from time to time,**

03:43:14 17 **look at the lab notebooks of the scientists in your lab to**

03:43:18 18 **look at the results and talk about the results that they**

03:43:21 19 **achieved?**

03:43:24 20        **"Answer:  Regularly.  At every experiment.**

03:43:26 21        **"Question:  Okay.  In this 2000 time period,**

03:43:30 22 **how many individuals did you have in your lab who kept lab**

03:43:33 23 **notebooks?**

03:43:35 24        **"Answer:  As I said before, ten, twelve,**

03:43:38 25 **roughly.  Just to give you a rough idea.**

03:43:41 1          "Question:  If you look at Exhibit 5, on page

03:43:44 2     417, do you see some handwriting there that says,

03:43:54 3     "ADM3/MD1/RBV"?

03:43:57 4          "Answer:  I think this is my handwriting.

03:44:00 5          "Question:  Okay.  The ADM3 and the MD1, those

03:44:05 6     refer to the compounds that you received from Professor

03:44:12 7     Grifantini?

03:44:16 8          "Answer:  Yes.

03:44:17 9          "Question:  What does RBV stand for?

03:44:25 10         "Answer:  Ribavirin.

03:44:48 11         "Question:  Is that an 'SU' that follows the

03:44:55 12    'RBV'?

03:45:01 13         "Answer:  RBV is ribavirin.  R-i-b --

03:45:12 14         "Question:  There's, I believe, an 'SU' that

03:45:18 15    follows 'RBV.'

03:45:24 16         The Interpreter:  Oh, right.

03:45:29 17         The Witness:  Okay.  It means on yellow fever

03:45:33 18    virus.

03:46:45 19         "Question:  And so YFV stands for yellow fever

03:46:50 20    virus?

03:46:52 21         "Answer:  Yes.

03:46:53 22         "Question:  And the date here, is that March 7,

03:46:57 23    2000 or is that July 3, 2000?

03:47:03 24         "Answer:  It's written the Italian way for

03:47:07 25    dates, so ...

03:47:09 1          "Question:  So that would be March 7, 2000?

03:47:13 2          "Answer:  Yes.  It is also visible from the

03:47:16 3  dates that are listed on the following page, on the dates

03:47:19 4  that are marked on the following page.

03:47:21 5          "Question:  Okay.  Does this correspond with the

03:47:23 6  time frame that you were talking about earlier when you

03:47:26 7  circled back to ADM3 and MD1 to assess their activity

03:47:31 8  against other viruses?

03:47:33 9          "Answer:  Yes.

03:47:38 10         "Question:  So, as depicted on this page 419 of

03:47:45 11 Exhibit 5, is Silvia running an experiment that you directed

03:47:50 12 her to run?

03:47:51 13         "Answer:  Yes.

03:47:51 14         "Question:  Which assays did Silvia run, as

03:47:57 15 shown on the page ending in 419?

03:48:02 16         "Answer:  Yes.  As the title says, it was an

03:48:05 17 experiment on the anti-yellow fever activity of the

03:48:12 18 compounds which were sent by Professor Grifantini and

03:48:23 19 Manfredini.

03:48:25 20         "Question:  Would you consider or did you

03:48:27 21 conclude that MD1 had activity against yellow fever virus?

03:48:31 22         "Answer:  This result was indicative of some

03:48:41 23 activity.

03:48:42 24         "Question:  Why did you choose or why did you

03:48:45 25 ask Silvia to run these compounds on the yellow fever assay

03:48:50  1    specifically?

03:49:30  2            "Answer:  Because the virus was easily obtained

03:49:41  3    from the vials that are sold in the pharmacy for

03:49:45  4    vaccination, and because the yellow fever is part of the

03:49:51  5    flaviviridae family which was indicated in the prediction as

03:50:00  6    potentially -- as something that could be potentially

03:50:02  7    inhibited.

03:50:03  8            "Question:  Why did you choose the yellow fever

03:50:10  9    virus as the assay to run against the library of compounds?

03:50:14 10            "Answer:  I believe I already answered the

03:50:16 11    question but I can answer again.  Because the yellow fever

03:50:20 12    virus could be the member of a family of virus that could be

03:50:25 13    used as the target for the inhibitors of the compounds of

03:50:29 14    MD1 and ADM3 which were included in the predictions that we

03:50:34 15    were just mentioning earlier.

03:50:36 16            "Question:  In early 2000, did you consider

03:50:39 17    yellow fever to be a surrogate for anti-HCV activity?

03:50:49 18            "Answer:  (In English.)  A surrogate for

03:50:53 19    anti-HCV activity?

03:50:56 20            "Question:  Or predictive.

03:50:57 21            "Answer:  (In English.)  Predictive, yes.  Yes.

03:51:04 22            "Question:  So, in early 2000, activity in the

03:51:06 23    yellow fever assay, to you, would be predictive of activity

03:51:11 24    against HCV?

03:51:16 25            "Answer:  For me, the yellow fever was one of

03:51:19 1  the different assays.

03:51:21 2          The Check Interpreter:  'Many.'  'Many.'  Not

03:51:30 3  'different,' 'many.'

03:51:33 4          The Witness:  ... tests used to predict anti-HCV

03:51:38 5  activity.

03:51:39 6          "Question:  The assay or the work that you were

03:51:44 7  doing on ADM3 and MD1, was that in conjunction with Novirio?

03:51:52 8          "Answer:  Yes.  Because the lab had already

03:51:54 9  started, when we decided that MDR (sic) was of interest, I

03:52:01 10 called on the telephone Sommadossi.  We discussed about the

03:52:04 11 results.

03:52:05 12         "Question:  Sorry.  If I can just clarify.  You

03:52:10 13 said 'MDR.'  Do you mean MD1?

03:52:16 14         "Answer:  (In English.)  MD1.

03:52:20 15         "Question:  Okay.

03:52:21 16         The Interpreter:  Sorry.  MD1, yes.

03:52:27 17         The Witness:  And we decided to add, as a

03:52:31 18 target of the Cagliari joint lab, also the research on the

03:52:36 19 anti-hepatitis C compounds.

03:52:39 20         "Question:  You mentioned that you called

03:52:41 21 Sommadossi on the telephone and discussed the results on

03:52:44 22 MD1.  Did I get that right?

03:52:48 23         "Answer:  Yes.

03:52:48 24         "Question:  What results did you discuss with

03:52:51 25 Dr. Sommadossi on MD1?

03:52:53 1      "Answer:  Those obtained up to then, which

03:52:55 2  indicated that the prediction could be valid.

03:52:58 3      "Question:  When you say, 'up to then,' what

03:53:01 4  time period?  Do you recall when this telephone call was

03:53:04 5  with Dr. Sommadossi?

03:53:07 6      "Answer:  I don't remember exactly if I called

03:53:08 7  immediately after the first assay or after other assays.

03:53:12 8      "Question:  And just so I can orient myself,

03:53:15 9  when you say 'the first assay,' are you referring to the

03:53:20 10 yellow fever assay that we looked at, the data from the

03:53:25 11 yellow fever assay that we looked at in Exhibit 5?

03:53:29 12     "Answer:  Yes.

03:53:30 13     "Question:  And you don't recall if you spoke to

03:53:32 14 him before or after you received the results from the

03:53:42 15 coxsackie assay?

03:53:45 16     "Answer:  There is one, two weeks' time, two

03:53:49 17 weeks interval, so obviously it wasn't months in terms of

03:53:52 18 the difference in time.

03:53:55 19     "Question:  If we can turn to the page ending in

03:53:57 20 503, is that your handwriting on page 503?

03:54:03 21     "Answer:  (In English.)  Yes again.  Yes.

03:54:15 22     "Question:  Okay.  And there's a reference here

03:54:17 23 to BVDV.  Do you see that?

03:54:19 24     "Answer:  Yes.

03:54:19 25     "Question:  And the date here is June -- is that

03:54:22 1 **17 or 27?**

03:54:25 2         **"Answer:  (In English.)  17.**

03:54:27 3         **"Question:  June 17, 2000?**

03:54:28 4         **"Answer:  Yes.**

03:54:29 5         **"Question:  So, do you understand this to be the**

03:54:31 6 **beginning of the description of your assays, BVDV assays,**

03:54:35 7 **for ADM3 and MD1?**

03:54:40 8         **"Answer:  (In English.)  If I look at the**

03:54:43 9 **previous page, ending 502, I can see that in this page there**

03:54:47 10 **is also -- that there are also results against BVDV.**

03:54:52 11         **"Question:  Okay.  So let's look at 502.  The**

03:54:57 12 **EC50 values listed on page 502, those are EC values in the**

03:55:02 13 **BVDV assay?**

03:55:04 14         **"Answer:  (In English.)  Yes, it appears.**

03:55:08 15         **(Through the interpreter.)  Yes, it seems so.**

03:55:12 16         **"Question:  The date on page 502 is June 17,**

03:55:16 17 **2000 as well; correct?**

03:55:19 18         **"Answer:  (The answer was not translated.)**

03:55:23 19         **The Check Interpreter.  'Yes.'  He said, 'yes.'**

03:55:33 20         **"Question:  Why were you running MD3 and -- MD1**

03:55:41 21 **and ADM3 in the BVDV assay?**

03:55:45 22         **"Answer:  (In English.)  Because, according to**

03:55:48 23 **the prediction, BVDV, which is a member of pestiviruses, was**

03:55:54 24 **a potential predictive assay for HCV.**

03:56:08 25         **"Question:  In May of 2000, is that when you**

03:56:10 1   first got the BVDV assay?

03:56:14 2        "Answer:  (In English.)  To my recollection,

03:56:16 3   yes, approximately.  And this is why we used the yellow

03:56:19 4   fever in the experiment.  We ran to the pharmacy, we bought

03:56:24 5   the vial, we prepare the virus.  In the case of BVDV, we

03:56:29 6   had to get the virus from another lab.

03:56:32 7        "Question:  So at least flipping through the

03:56:34 8   notebook to the page 460 where you start describing the BVDV

03:56:39 9   assay, the first results that you see are still the page

03:56:43 10   that we were looking at on -- ending in 502?

03:56:49 11        "Answer:  (In English.)  So could you repeat,

03:56:53 12   please, which page you are looking?

03:56:56 13        "Question:  I am looking at page 502 which is

03:56:58 14   the page that -- the data that we were looking at.

03:57:05 15        "Answer:  (In English.)  502, just the starting

03:57:08 16   page, the page from which we started looking back?

03:57:13 17        "Question:  Correct.

03:57:14 18        "Answer:  (In English.)  Okay.  So we can

03:57:17 19   conclude that that was the first assay done on ADM3 and MD1

03:57:22 20   in the BVDV assay.

03:57:25 21        "Question:  As shown on page 502 of Exhibit 5?

03:57:29 22   Was that a "yes?"  Sorry.

03:57:32 23        "Answer:  Yes.

03:57:32 24        "Question:  Okay.  So, in your lab, you had

03:57:35 25   all of these NM compounds and you were working through the

03:57:39 1    library, testing them in the assay in chronological order?

03:57:44 2           "Answer:  While I was waiting to receive from

03:57:46 3    Novirio the 2' compounds.

03:57:50 4           "Question:  So had you requested 2'-methyl

03:57:55 5    compounds from Novirio?

03:58:05 6           "Answer:  Once Sommadossi agreed that the tests

03:58:07 7    -- that the project was valid, the chemists from Montpellier

03:58:12 8    started to synthesize compound for which we thought that the

03:58:15 9    target could be the 2'-methyl.

03:58:19 10           "Question:  So you requested Dr. Sommadossi's

03:58:21 11    chemists to synthesize 2'-methyl compounds for you to run in

03:58:28 12    the assay?

03:58:29 13           "Answer:  What I can say is that I explained the

03:58:31 14    results obtained on MD1 and -- MD and ADM.  I pointed out

03:58:37 15    what was the hypothesis which could lead to predict also the

03:58:41 16    anti-HCV activity.  They saw the structures, and we then

03:58:46 17    agreed -- they agreed we could start working together on the

03:58:49 18    project.

03:58:50 19           "Question:  With all those agreements to start

03:59:46 20    working together on the project, you mentioned 2'-methyl

03:59:51 21    compounds were what you were interested in, I believe?

03:59:55 22           "Answer:  Yes.

04:00:29 23           "Question:  Okay.  When you say '2-methyl,' do

04:00:33 24    you contemplate that would have a hydroxy group at the 2'

04:00:38 25    position as well?

04:00:39 1          "The Witness:  Not necessarily.  Provided that

04:00:41 2  in the 2' position there is no hydrogen.

04:00:44 3          "Question:  Looking at the data for the Yellow

04:00:47 4  Fever for NM80, would that data suggest to you that NM80 is

04:00:51 5  active against Yellow Fever?

04:00:51 6          "Answer:  Yes.

04:00:55 7          "Question:  So if we go to the next page, which

04:00:56 8  is page ending in 529, this is dated September 12, 2000.  Do

04:01:01 9  you see that?

04:01:01 10         "Answer:  Yes.

04:01:16 11         "Question:  And there's another reference to

04:01:18 12  NM80 in this table on page 529?

04:01:21 13         "Answer:  (The answer was not translated.)

04:01:23 14         "Question:  And there is data reported for the

04:01:27 15  Yellow Fever and BVDV; is that correct?

04:01:27 16         "Answer:  Yes.

04:01:32 17         "Question:  Do those data, for both the BVDV

04:01:35 18  assay and the Yellow Fever virus, suggest to you that NM80

04:01:38 19  is active against BVDV and Yellow Fever?

04:01:38 20         "Answer:  Yes.

04:01:43 21         "Question:  Do you know what the -- or whether

04:01:46 22  there's a structural difference between MD1 and NM80?

04:01:52 23         "Answer:  No, there is no structural difference

04:01:54 24  because it is very probable that both in Grifantini's lab

04:01:59 25  and Gosselin's lab they proceed to assess the structure of

04:02:03 1   the compound.

04:02:05 2           "Question:  Okay.  So if we can turn to the page

04:02:08 3   ending in 532 of Exhibit 5, this is a lab notebook page

04:02:12 4   dated November 22, 2000.  Do you see that?

04:02:12 5           "Answer:  Yes.

04:02:16 6           "Question:  And this table reports data in

04:02:18 7   Yellow Fever and BVDV for NM80 and MD1.  Do you see that?

04:02:18 8           "Answer:  Yes.

04:02:28 9           "Question:  Okay.  So could you turn to the page

04:02:29 10   ending in 545 of Exhibit 5?  This is a page dated November

04:02:34 11   3, 2000; is that right?

04:02:34 12           "Answer:  Yes.

04:02:37 13           "Question:  Does this appear to be your testing

04:02:38 14   of a series of NM compounds, 103 to 108?

04:02:38 15           "Answer:  Yes.

04:02:45 16           "Question:  And do you recall if these were

04:02:46 17   compounds that you already had in your lab?

04:02:58 18           The Witness:  No.  They arrived after the NM80.

04:03:01 19           "Question:  So were NM103 through 108

04:03:05 20   synthesized as a result of the data from NM80?

04:03:09 21           "Answer:  Yes, for 106, 107, 108, for which I

04:03:13 22   recall the structure.

04:03:15 23           "Question:  Okay.  Did you suggest the

04:03:16 24   structures of 106, 107, 108 to somebody at Novirio?

04:03:26 25           "Answer:  There was no need to suggest anything.

04:03:28 1    Any chemist or biologist that works on this, when they see a

04:03:33 2    nucleoside like -- (in English) like NM80, which has a base,

04:03:46 3    adenine, immediately he goes to synthesize the other bases

04:03:54 4    that are used to make ribonucleic acids which are uracil,

04:04:09 5    cytosine, and guanosine.  So it is rather obvious.

04:04:20 6        "Question:  If we look at the page ending in 545

04:04:22 7    of Exhibit 5, and we were talking specifically about NM106,

04:04:27 8    107 and 108.

04:04:30 9        "Answer:  Yes.

04:04:31 10        "Question:  If you look at the data for the

04:04:33 11    Yellow Fever and BVDV assays, do you or would you conclude

04:04:37 12    that NM106 is active in both of those assays?

04:04:37 13        "Answer:  Yes.

04:04:43 14        "Question:  Would you conclude that NM107 is

04:04:45 15    active in both the Yellow Fever and the BVDV assay?

04:04:49 16        "Answer:  It is very potent.  It is very potent

04:04:52 17    against BVDV but in this assay it doesn't prove very potent

04:05:01 18    on the Yellow Fever.  This doesn't mean that it is

04:05:05 19    non-active.

04:05:06 20        "Question:  Why not?

04:05:08 21        "Answer:  (In English) Again, because my

04:05:10 22    experience teaches, not only with these compounds but also

04:05:14 23    with so many different compounds, that sometimes the assay

04:05:27 24    conditions had not so reproduce --

04:05:38 25        'The Interpreter:  Reproducible?

04:05:42 1      The Witness:  (In English) No reproducibly the

04:05:46 2  same, absolutely the same, absolutely optimal, so you can

04:05:50 3  have a variation in potency and selectivity.  What we

04:05:56 4  consider a true result comes from looking -- from looking at

04:05:59 5  different experiments made in different times.

04:06:01 6      "Question:  So for NM108, would you consider

04:06:05 7  that compound active in Yellow Fever -- or against Yellow

04:06:09 8  Fever and BVDV?

04:06:09 9      "Answer:  Yes.

04:06:12 10      "Question:  Dr. La Colla, if you look at

04:06:14 11  Exhibit 6, you'll see that's an e-mail from Dr. Gosselin to

04:06:19 12  yourself, dated May 4, 2001?

04:06:19 13      "Answer:  Yes.

04:06:22 14      "Question:  And attached to the e-mail is a

04:06:24 15  document titled 'biological results of NM, NA... compounds'

04:06:38 16      "Answer:  Yes.

04:06:39 17      "Question:  Do you recognize this document

04:06:40 18  that's attached to the e-mail in Exhibit 6?

04:06:40 19      "Answer:  Yes.

04:06:45 20      "Question:  Were you familiar with this type of

04:06:47 21  document Dr. Gosselin maintained?

04:06:47 22      "Answer:  Yes.

04:06:50 23      "Question:  Did you, at any time after December

04:06:53 24  of 2001, do any biological testing on a nucleoside with a

04:06:57 25  methyl up at the 2' position and a fluorine down at the 2'

04:07:02 1    position?

04:07:06 2            "Answer:  (In English) No, I didn't.

04:07:08 3            "Question:  Did anyone in your university lab?

04:07:12 4            "Answer:  (In English) No.

04:07:20 5            (End of videotaped deposition.)

04:18:22 6            THE COURT:  That completes that witness.

04:18:23 7    Correct?

04:18:24 8            MS. PARKER:  Yes.  That completes that

04:18:25 9    deposition.

04:18:26 10           THE COURT:  Your next witness is going to be?

04:18:28 11           MS. PARKER:  Another deposition, and this is Dr.

04:18:31 12   Schinazi, which --

04:18:33 13           THE COURT:  About how long altogether will it

04:18:35 14   be?

04:18:36 15           MS. PARKER:  An hour and 30 minutes.

04:18:42 16           THE COURT:  Okay.  All right.

04:18:47 17           Mr. Headley?

04:18:48 18           MR. HEADLEY:  Your Honor, there are a couple of

04:18:50 19   housekeeping things related to the Schinazi designations.

04:18:53 20   There's some video and some being read and all of that.

04:18:58 21           With the Court's permission, we'd like to take

04:19:01 22   them up with the Court to resolve them.  I think three short

04:19:05 23   issues.

04:19:05 24           THE COURT:  I think all things considered, I

04:19:07 25   probably ought to let the jury go home for the evening a

04:19:09 1   little bit early, so that will conclude our day.  Tomorrow

04:19:15 2   we'll begin I guess with the Schinazi deposition tomorrow

04:19:18 3   morning.

04:19:18 4        While you're away from us, of course, no

04:19:21 5   researching or talking about the case.  Tomorrow will be

04:19:24 6   another day similar to today.  We would want to start at

04:19:27 7   9:00 o'clock, so if you can try to be here in time to

04:19:30 8   order lunch and start at 9:00, and we're going to 4:30

04:19:34 9   tomorrow.

04:19:34 10        So I wish you all a nice evening.  We'll see you

04:19:37 11   in the evening.

04:19:37 12        (The jury was excused for the evening recess.)

04:19:53 13        THE COURT:  Whose issues are these?

04:19:55 14        MR. HEADLEY:  We have some brief issues.  I

04:19:58 15   think we can probably resolve one of them on each side if I

04:20:01 16   could just have a minute to confer with counsel.

04:20:03 17        THE COURT:  Sure.  Go right ahead.

04:20:05 18        MR. HEADLEY:  And then I think there is one

04:20:09 19   other.

04:20:10 20        (Counsel confer.)

04:20:52 21        MR. HEADLEY:  One of three is down, Your Honor.

04:20:53 22        THE COURT:  All right.  We're down to two.

04:21:04 23        MR. HEADLEY:

04:21:05 24        (Counsel confer.)

04:21:06 25        MR. HEADLEY:  Two of three are down.

04:21:09  1          THE COURT:  Okay.

04:21:09  2          MR. HEADLEY:  We have one last thing of

04:21:12  3   designations from Dr. Schinazi.

04:21:14  4          Last night, during our meet and confer, we made

04:21:19  5   some cuts, we made some progress to streamline the hour

04:21:23  6   and-a-half of Dr. Schinazi's designation which we thought

04:21:27  7   everybody would be happy about.

04:21:28  8          After midnight, we received what were referred

04:21:30  9   to as counter-counterdesignations from Idenix in response to

04:21:36 10   our cuts and they were not adding what we cut, which is a

04:21:41 11   normal thing and is actually provided for in the pretrial

04:21:44 12   order.  Instead of adopting our cuts or something, Idenix

04:21:51 13   proposed a new addition of several pages from what has

04:21:56 14   referred to as the Emory arbitration that we have been

04:22:00 15   talking about.

04:22:01 16          They have withdrawn the effort to move the Emory

04:22:05 17   arbitration exhibit in designation -- let me start that over

04:22:10 18   again.

04:22:11 19          They have withdrawn their efforts to move the

04:22:13 20   transcript from the Emory arbitration into evidence but now

04:22:17 21   they want to add testimony from that arbitration that was

04:22:19 22   not previously designated or counterdesignated or counter-

04:22:25 23   counterdesignated in response to some cuts we made.

04:22:27 24          We would object to this, Your Honor.  In

04:22:30 25   particular, the testimony is literally repeated verbatim in

04:22:38 1     the 2016 deposition. Counsel for Idenix asked Dr. Schinazi

04:22:41 2     this year about the earlier deposition and literally read

04:22:47 3     the questions and answers into the record more than once

04:22:53 4     actually.

04:22:54 5             THE COURT: So all of what they now propose to

04:22:56 6     add is already, those same words already appear as questions

04:23:01 7     and answers in what previously had been designated?

04:23:05 8             MR. HEADLEY: There is one stretch in the middle

04:23:06 9     that that is not true for, Your Honor. But I can provide

04:23:11 10     the citations for a quick comparison.

04:23:13 11             I would say, for example, at 116 of the new

04:23:19 12     deposition, 2016 deposition, line 15 through 117, 18, Mr.

04:23:26 13     McCrum asked the questions from the Emory arbitration at

04:23:30 14     pages 338, 10 through 339, 3, verbatim.

04:23:40 15             And then he also asked the same subset of that

04:23:46 16     same question again during the 2016 deposition, repeating

04:23:51 17     lines 338, 10 through 21, reading them into the record. And

04:23:56 18     Your Honor overruled the objection to that part, so that is

04:24:00 19     obviously coming in.

04:24:00 20             And there was a third stretch in the two pages

04:24:03 21     they want to read in. There is nothing, that it is

04:24:07 22     prejudicial and that it is going to waste a lot of time, but

04:24:09 23     this doesn't need to be heard over and over and over again.

04:24:13 24             So we would object to their effort to front-load

04:24:16 25     this after midnight counter-counterdesignation that we have

04:24:21 1    never seen before as a separate document.

04:24:23 2              THE COURT:  So in your view, it is untimely as

04:24:25 3    well as redundant, I guess.

04:24:26 4              MR. HEADLEY:  Correct, Your Honor.  And, again,

04:24:28 5    we all pressed our objections with the 2016 transcript.

04:24:31 6    That is fine.  We have a very few designations coming out

04:24:35 7    the grand mire application.  That, again, the objections

04:24:38 8    were overruled.  They don't relate to this.  So we would say

04:24:42 9    the new short stretch should not be reiterated for a third

04:24:47 10   time in front of the jury.

04:24:47 11             THE COURT:  Okay.  Let me hear from plaintiffs.

04:24:51 12             MR. McCRUM:  Good afternoon, Your Honor.

04:24:53 13             THE COURT:  Good afternoon.

04:24:53 14             MR. McCRUM:  Just a couple of points on that.

04:25:00 15   My e-mail that I sent out after midnight last night was

04:25:04 16   referenced a couple times, but what you didn't hear was it

04:25:06 17   was responsive to an e-mail that we got at 11:30 last night.

04:25:11 18   And the e-mail we got at 11:30 for the very first time

04:25:15 19   eliminated a bunch of deposition designations, a number of

04:25:19 20   which were part of our original designations from this

04:25:24 21   transcript.

04:25:25 22             So when they designated the transcript first,

04:25:30 23   and we could counter, we weren't going to counter-counter

04:25:34 24   with something that they had already designated, but it was

04:25:38 25   something that was in our original designations.

04:25:41 1          So my point is had they not designated that

04:25:45 2  initially, we would have counter -- if they wouldn't have

04:25:49 3  countered, we would have counter-countered with it.

04:25:52 4          THE COURT:  But my understanding is what you

04:25:54 5  are trying to add back now or put in now is not stuff that

04:26:00 6  was -- is stuff that was never in.  Is that wrong?

04:26:04 7          MR. McCRUM:  That is not true.

04:26:05 8          THE COURT:  That is inaccurate?

04:26:08 9          MR. McCRUM:  We had designated at least most, all

04:26:12 10 but maybe one question, Your Honor.  But all of the answers we

04:26:14 11 had originally included in our original designations in this

04:26:19 12 case that were over a month ago.

04:26:22 13         THE COURT:  Let me ask you this.  What would be

04:26:24 14 inadequate about just putting back in some or all of what

04:26:28 15 they took out at 11:30 last night as opposed to having this

04:26:33 16 other stuff, whether it is new or not?

04:26:36 17         MR. McCRUM:  Your Honor, that would be fine.

04:26:37 18 Because all that we counter-countered was what they had

04:26:41 19 taken out.

04:26:42 20         THE COURT:  All right.  Hold on.  Do you object

04:26:44 21 to that?

04:26:44 22         MR. HEADLEY:  No, Your Honor.  We object.  That

04:26:47 23 is not right.  I offered to let them have our

04:26:49 24 counter-counters last night.  I wrote an e-mail this morning

04:26:51 25 and said if you want to take back what we have given up,

04:26:54 1    that is not a problem.  It is the new stuff that has shown

04:26:56 2    up for the first time.

04:26:57 3                THE COURT:  So, wait.  Would there be an

04:26:59 4    agreement if they just simply want to add back some or all

04:27:03 5    of what you took out at approximately 11:30 last night?

04:27:07 6                MR. HEADLEY:  Sure.

04:27:07 7                THE COURT:  You're okay with that?

04:27:08 8                MR. HEADLEY:  That's a standard practice.

04:27:08 9    That's fine.

04:27:11 10               THE COURT:  Are you okay with that?

04:27:13 11               MR. McCRUM:  Yes, that's fine.

04:27:13 12               THE COURT:  Then it sounds like we resolved that.

04:27:15 13               MR. McCRUM:  Thank you, Your Honor.

04:27:16 14               THE COURT:  All right.  Thank you.  Are there

04:27:17 15   any other issues from plaintiffs?

04:27:34 16               MS. PARKER:  I am reminded that I believe we

04:27:37 17   made this request already.

04:27:39 18               THE COURT:  Can you come to the podium?  I want

04:27:41 19   to make sure I hear you.

04:27:43 20               MS. PARKER:  Jury instructions were due today,

04:27:44 21   and we have had some e-mails back and forth.  If we could

04:27:48 22   have a one day extension?  So we'd like to make the request,

04:27:52 23   and I believe it is coming from everybody.

04:27:54 24               THE COURT:  You believe it is a joint request?

04:27:55 25               MR. SCHERKENBACH:  It is, Your Honor.  I think

04:27:56 1    you originally said at the pretrial conference how about

04:28:00 2    Tuesday night?  If you really want, we can try.

04:28:02 3            THE COURT:  No, I'm happy to not deal with them

04:28:04 4    tonight.  That's fine.

04:28:05 5            MR. SCHERKENBACH:  So are we.

04:28:07 6            THE COURT:  Yes, tomorrow night is fine.

04:28:09 7            Is there anything else from plaintiffs?  No?

04:28:13 8            MS. PARKER:  No.  Thank you, Your Honor.

04:28:15 9            THE COURT:  From defendants?

04:28:15 10           MR. SCHERKENBACH:  We don't have anything

04:28:16 11   further.

04:28:16 12           THE COURT:  Does anybody anticipate sending us

04:28:19 13   anything else tonight?  I know you can't always be sure, but

04:28:22 14   at the moment, do you anticipate that?

04:28:27 15           MS. PARKER:  It doesn't appear.

04:28:28 16           THE COURT:  It doesn't appear that way at the

04:28:30 17   moment.  How about on the other side of the courtroom?

04:28:32 18           MR. SCHERKENBACH:  I think that is right because

04:28:33 19   the rest of the witnesses that they're calling by depo, I

04:28:37 20   believe you resolved.

04:28:40 21           Well, that is not true.  We have put letters in

04:28:43 22   but we can argue them in the morning, so I don't think we're

04:28:45 23   anticipating submitting anything further.

04:28:47 24           THE COURT:  And I haven't looked but I don't

04:28:50 25   think anything has been submitted today.

04:28:52  1           MR. SCHERKENBACH:  Actually, no.  I'm sorry.

04:28:54  2  I'm sorry.  I'm looking at the wrong date.  So no further

04:28:57  3  submissions.

04:28:58  4           THE COURT:  Okay.  Let's hope that it stays that

04:29:00  5  way for tonight at least.

04:29:02  6           With respect to the depositions, the one we

04:29:04  7  played and ones we play in the future, we need you to tell

04:29:07  8  us the percentage breakdown because we have the clock

04:29:11  9  running the whole time and then we just apply your

04:29:13 10  percentages to how long that all took.

04:29:16 11           All right.  Have a good evening.  We'll see you

04:29:18 12  all at 8:30 tomorrow morning.

        13           (Proceedings adjourn at 4:29 p.m.)

        14

        15      I hereby certify the foregoing is a true and accurate
             transcript from my stenographic notes in the proceeding.
        16

        17                    /s/ Brian P. Gaffigan
                            Official Court Reporter
        18                   U.S. District Court

        19

        20

        21

        22

        23

        24

        25