08:24:17  1              IN THE UNITED STATES DISTRICT COURT

        2              IN AND FOR THE DISTRICT OF DELAWARE

        3                        - - -

        4  IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
           DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
        5  DE LA RECHERCHE SCIENTIFIQUE and          :
           L'UNIVERSITE MONTPELLIER II,              :
        6                                            :
                         Plaintiffs,                 :
        7  v                                         :
                                                     :
        8  GILEAD SCIENCES, INC. and GILEAD          :
           PHARMASSET LLC,                           :
        9                                            :
                         Defendants.                 :  NO. 13-1987-LPS
       10  ------------------------------------------
           IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
       11  DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
           DE LA RECHERCHE SCIENTIFIQUE and          :
       12  L'UNIVERSITE MONTPELLIER II,              :
                                                     :
       13                   Plaintiffs,              :
           v                                         :
       14                                            :
           GILEAD PHARMASSET LLC,                    :
       15                                            :
                         Defendant.                  :  NO. 14-109-LPS
       16  ------------------------------------------
           IDENIX PHARMACEUTICALS, INC.,             :  CIVIL ACTION
       17                                            :
                             Plaintiff,              :
       18  v                                         :
                                                     :
       19  GILEAD SCIENCES, INC.                     :
                                                     :
       20                   Defendant.               :  NO. 14-846-LPS
                                            - - -
       21
                              Wilmington, Delaware
       22                 Wednesday, December 7, 2016
                            *Jury Trial - Volume C*
       23
                                    - - -
       24
           BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
       25
                                    - - -

1    APPEARANCES:

2

                ASHBY & GEDDES, P.A.
3               BY:  JOHN G. DAY, ESQ.

4                   and

5               McCARTER & ENGLISH
                BY:  MICHAEL P. KELLY, ESQ.
6
                    and
7
                JONES DAY
8               BY:  CALVIN P. GRIFFITH, ESQ.,
                    RYAN B. McCRUM, ESQ.,
9                   MICHAEL S. WEINSTEIN, ESQ., and
                    BRADLEY W. HARRISON, ESQ.
10                  (Cleveland, Ohio)

11                  and

12              JONES DAY
                BY:  JENNIFER L. SWIZE, ESQ.
13                  (Washington, District of Columbia)

14                  and

15              JONES DAY
                BY:  STEPHANIE E. PARKER, ESQ., and
16                  JESIKA W. FRENCH, ESQ.
                    (Atlanta, Georgia)
17
                    and
18
                JONES DAY
19              BY:  JOHN D. KINTON, ESQ., and
                    ANTHONY M. INSOGNA, ESQ.
20                  (San Diego, California)

21                  and

22              JONES DAY
                BY:  JOHN M. MICHALIK, ESQ., and
23                  LISA L. FURBY, ESQ.
                    (Chicago, Illinois)
24
                        Counsel for Plaintiffs
25

```
1    APPEARANCES:   (Continued)

2
             FISH & RICHARDSON, P.C.
3            BY:  MARTINA TYREUS HUFNAL, ESQ.,
                  DOUGLAS E. McCANN, ESQ.,
4                 JOSEPH B. WARDEN, ESQ.,
                  SANTOSH COUTINHO, ESQ.,
5                 ROBERT OAKES, ESQ., and
                  KELLY ALLENSPACH DEL DOTTO, ESQ.
6
                  and
7
             FISH & RICHARDSON, P.C.
8            BY:  FRANK SCHERKENBACH, ESQ., and
                  JENNY SHMUEL, ESQ.
9                 (Boston, Massachusetts)

10                and

11           FISH & RICHARDSON, P.C.
             BY:  JUANITA BROOKS, ESQ.,
12                W. CHAD SHEAR, ESQ.,
                  CRAIG COUNTRYMAN, ESQ., and
13                JONATHAN E. SINGER, ESQ.
                  (San Diego, California)
14
                  and
15
             FISH & RICHARDSON, P.C.
16           BY:  MICHAEL R. HEADLEY, ESQ.,
                  JOHN M. FARRELL, ESQ., and
17                DALIA KOTHARI, ESQ.
                  (Redwood City, California)
18
                  and
19
             FISH & RICHARDSON, P.C.
20           BY:  TASHA FRANCIS, ESQ.
                  (Minneapolis, Minnesota)
21
                       Counsel for Defendants
22

23

24    Kevin Maurer                    Brian P. Gaffigan
      Official Court Reporter         Official Court Reporter
08:24:17 25
08:24:17
```

                              - oOo -

                        P R O C E E D I N G S

                    (REPORTER'S NOTE:  The following hearing was

held in open court, beginning at 8:33 a.m.)

                    THE COURT:  Good morning.

                    (The attorneys respond, "Good morning, Your

Honor.")

                    THE COURT:  Are there any issues from plaintiffs

this morning?

                    MS. PARKER:  Just a couple things very briefly.

                    THE COURT:  Can you come to the podium?

                    MS. PARKER:  Good morning.

                    THE COURT:  Good morning.

                    MS. PARKER:  So we have four depositions that

we're starting with today.  And we have already provided up

the exhibits, so that is all ready to go.  Then I think

Mr. Day has additional pages for the notebooks at the

appropriate time.

                    MR. DAY:  I have already given them to

Mr. Looby.

                    THE COURT:  Okay.  Then we will take care of

getting them to the jurors.

                    MS. PARKER:  We do have something else.

                    THE COURT:  All right.

                    Mr. Griffith, good morning.

08:34:34 1          MR. GRIFFITH:   Good morning.

08:34:35 2          Briefly, we have issues regarding certain

08:34:38 3     exhibits for two live witnesses that they have identified

08:34:41 4     for their case-in-chief.   One is Dr. Rachakonda and the

08:34:47 5     second one is Dr. Otto.

08:34:49 6          For Dr. Rachakonda, there are a series of

08:34:53 7     exhibits, DX-42, 44, 46, 59, 97, 139, 142, and 2830, that

08:35:03 8     are meeting minutes, copies of meeting minutes and they are

08:35:08 9     hearsay and hearsay within hearsay.

08:35:10 10         They have told us that they believe the hearsay

08:35:13 11    exception applies to them.   I believe they're going to

08:35:16 12    assert the business record exception.   And our position is

08:35:19 13    they can do that but they have to establish that, so absent

08:35:24 14    establishing that, we have a hearsay objection to those.

08:35:27 15         So those are with Dr. Rachakonda that are

08:35:30 16    listed.

08:35:30 17         The second issue is they intend to use a series

08:35:36 18    of our opening statements slides with Dr. Rachakonda or have

08:35:44 19    listed them as potential exhibits.   We object to those under

08:35:48 20    602 and 701.   They're not evidence.   They were not prepared

08:35:54 21    by the witness, so they're not like demonstratives that

08:35:59 22    witnesses prepared to help illustrate their testimony and

08:36:02 23    that sort of thing.

08:36:04 24         And there were several that, for example,

08:36:06 25    illustrate molecules and refer to the pioneering invention

of Idenix, and we're concerned that questions about them would elicit expert testimony for which we received no expert report.  So on that basis, we would object to those.

So those are our objections on Dr. Rachakonda exhibits.

On Dr. Otto, it is much more narrow.  There is one, a paragraph of all of the company employees.  And that is irrelevant to any of the issues in this case, and it can only be prejudicial.  It doesn't serve to elucidate on any of the issues that are before the Court.  So that is a 402, 403 objection.  And then,

Finally, there is Defendants' Exhibit 900 which we object to on hearsay grounds.  That is not a meeting minute.  It appears to be a document authored by Jeremy Clark, and so, on its face, Dr. Otto is not listed as a recipient, so on that one, it's a hearsay objection; and again I suppose if they can establish some exception to that, then they can get it in, but they have to establish that with the witness.  That is our position.

THE COURT:  Okay.  Thank you.  We'll hear from Gilead.

MS. BROOKS:  Thank you, Your Honor.

THE COURT:  Good morning.

MS. BROOKS:  Good morning.  Juanita Brooks for Gilead, Your Honor.

08:37:43 1        I'm just going to be addressing the objections

08:37:44 2   to the Dr. Rachakonda exhibits.

08:37:46 3        As for the chemistry meeting minutes, we will

08:37:49 4   establish that those minutes were prepared either by

08:37:54 5   Dr. Rachakonda or prepared by another one of the chemists

08:37:59 6   and witnessed by Dr. Rachakonda.  They were made at or near

08:38:03 7   the time of the actual event or meeting that is being

08:38:06 8   discussed.  They were kept in the normal course of regularly

08:38:10 9   conducted business activity.  They were a record of a

08:38:14 10  regular practice of that activity, meaning the chemistry

08:38:20 11  meeting minutes that they used to have.

08:38:21 12       And as far as there being hearsay, I think

08:38:24 13  within the hearsay, there are statements within the meeting

08:38:27 14  minutes where it might say, for example, Jeremy Clark is

08:38:31 15  thinking of making a 2'-methyl up with a 2' fluoro down.  We

08:38:40 16  are offering it for his state of mind that on such-and-such

08:38:43 17  a date, he made such a statement.

08:38:45 18       There are similar statements from Dr. Hassan,

08:38:48 19  from Dr. Rachakonda that are contained in the minutes, and

08:38:53 20  we're simply offering them for the operative facts that on

08:38:55 21  such-and-such a day, they said that they were either

08:38:58 22  thinking about or were actually synthesizing certain molecules.

08:39:03 23       THE COURT:  So it's the business records

08:39:06 24  exception and then state of mind exception?

08:39:08 25       MS. BROOKS:  Correct, Your Honor.

08:39:09 1       As for using the demonstratives with

08:39:13 2 Dr. Rachakonda, the plaintiffs used in evidence, I only

08:39:15 3 intend to use demonstratives of which the content of which

08:39:20 4 she would have personal knowledge and ask her whether, based

08:39:24 5 on her personal knowledge, the characterizations that are

08:39:28 6 contained in those demonstratives were accurate or not.  And

08:39:31 7 that is my purpose for using them.  And I disclosed all the

08:39:35 8 ones that I intend to use with her to plaintiffs.

08:39:38 9       THE COURT:  Are they in the nature of chemical

08:39:41 10 formulas or some of the images we saw of what some of these

08:39:46 11 structures look like?

08:39:48 12       MS. BROOKS:  There is one I believe that

08:39:49 13 contains the chemical formula that was characterized on this

08:39:54 14 slide as Idenix's ground breaking invention or something

08:39:58 15 like that.  I don't intend to elicit from Dr. Rachakonda

08:40:01 16 whether she believes it was ground breaking or even whether

08:40:05 17 she believes that it was Idenix's.

08:40:08 18       What I did want to do is have her discuss from

08:40:12 19 her scientific background what is on the molecule.  Just

08:40:18 20 what is the 1', what is at 2', what is 3'.  She is an Ph.D.

08:40:24 21 organic chemist that has two years of post-doctoral.  But

08:40:27 22 she will not be offering any expert opinions, Your Honor.

08:40:30 23       THE COURT:  Okay.

08:40:30 24       MS. BROOKS:  Thank you.

08:40:31 25       THE COURT:  Is someone else addressing Dr. Otto?

08:40:35 1          MR. McCANN:  Good morning.

08:40:35 2          THE COURT:  Good morning.

08:40:37 3          MR. McCANN:  Doug McCann from Fish & Richardson

08:40:40 4    on behalf of Gilead.

08:40:40 5          So the issue for Dr. Otto, first a photo of the

08:40:42 6    Pharmasset team in 2000-2001, I think Your Honor may recall

08:40:45 7    from the opening statements.

08:40:46 8          And I don't understand there to be an objection

08:40:48 9    to its use as a demonstrative.  I know that Ms. Brooks has

08:40:52 10   disclosed it for Dr. Rachakonda.  It was in the opening.

08:40:56 11         I really don't think that is an issue for the

08:40:57 12   jury seeing it.  It is just a question of its admissibility.

08:41:01 13         First, I think in terms of personal knowledge,

08:41:02 14   Dr. Otto is the chief scientific officer.  He is in the

08:41:05 15   picture.  Those are all the people that worked for him.

08:41:07 16   That is not an issue.

08:41:08 17         As far as 402 relevance, given these are the

08:41:11 18   people who will accused of theft, and we are describing them

08:41:14 19   as a small company of nucleoside chemists and virologists

08:41:18 20   who are trying to invent something and cure a horrible

08:41:21 21   disease, we are painting that picture in words and I would

08:41:24 22   also like to introduce that photograph for that same

08:41:27 23   purpose.  I don't really see the 403 issue.

08:41:29 24         So that is the photograph.

08:41:32 25         The other is the presentation at a meeting.  So,

08:41:35 1    Ms. Brooks, this is DX-900.  Ms. Brooks was just giving you

08:41:41 2    some context about Pharmasset's meetings.  They would have

08:41:45 3    routine chemistry meetings and the chemist would present

08:41:48 4    their ideas and minutes would be taken.

08:41:49 5            This is one of the presentations at the meeting.

08:41:52 6    Dr. At Otto was present personally and can testify at these

08:41:57 7    kind of meetings, presentations like this were made by the

08:42:01 8    scientists.  Slides were prepared at the time.  Records were

08:42:05 9    kept, the usual business records exception, facts can be

08:42:08 10   established.  Most of it is just pictures, not even

08:42:11 11   statements.

08:42:12 12           There is only really two I guess what you would

08:42:16 13   call declarations on the first page of DX-900.  And that is

08:42:20 14   the Jerm.C. is a highly potent compound and, second, it

08:42:25 15   says:  That which some call impossible is simply what

08:42:29 16   they've not seen.

08:42:29 17           To the extent this is hearsay within hearsay

08:42:32 18   within this business record, we would say, first, it gets to

08:42:34 19   the state of mind.  That is 803(6), and that means it would

08:42:38 20   come in for the truth.  Because what is happening is

08:42:41 21   Mr. Clark said he was going to attempt to make 6130.  The

08:42:44 22   chemists were very skeptical he could succeed.

08:42:48 23           This is the sort of meeting where he tells them

08:42:50 24   I did it.  And what he says is first, hey, I got it.  It is

08:42:53 25   a highly effective compound.  And the second is he says this

08:42:56 1   statement:  That which some call impossible is simply what

08:42:59 2   they've not seen.  He is simply telling the chemists, aha, I

08:43:03 3   told you so.

08:43:03 4          So that would make it 803(6).  And even if Your

08:43:07 5   Honor wasn't prepared to accept that, it can still come in

08:43:10 6   as not for the truth but the effect on the listener because

08:43:13 7   he is telling him, I'm right, you're wrong.

08:43:17 8          Thank you.

08:43:17 9          THE COURT:  Thank you.

08:43:18 10         Mr. Griffith, is there any response?

08:43:24 11         MR. GRIFFITH:  Your Honor, on the slides, and

08:43:30 12  so, for example, on that --

08:43:33 13         THE COURT:  These are Dr. Rachakonda.

08:43:35 14         MR. GRIFFITH:  Yes, Dr. Rachakonda.  It says

08:43:37 15  Idenix is a pioneering invention.  It does have an

08:43:40 16  illustration of a molecule.  This is the 2'-methyl, 2' OH

08:43:47 17  molecule in this case.  There are others that have

08:43:50 18  sofosbuvir on them.  They have plenty of other documents

08:43:53 19  that have those molecules on them, that have illustrations

08:43:57 20  of those molecules.

08:43:58 21         To use our slides as an excuse to put the

08:44:01 22  molecule up is thin ruled.  That is not why these are being

08:44:06 23  used.  The illustrations of the molecule have been available

08:44:09 24  for many, many other documents.  So it is going to work

08:44:12 25  mischief to I think use documents of this nature with

witnesses.

Where does it stop?  Do we get to put transcript testimony in front of them and say do you agree with that?  Do you disagree with that?  I think it will lead to bad places.

On the photograph, Your Honor, Dr. Schinazi interestingly is not in the picture.  None of those people are being sued here.

So the case is against Gilead, and the accusations extend back to the predecessor company, Pharmasset.  And this photo is a photo of selected people from the company at some point in time.

There are pictures of the people who are testifying in this case that are in the witness notebooks.  So the jurors have pictures of those people who are testifying.  And these are people, they don't even know who they are or what they have to do with this case.  It is not relevant.  It doesn't advance the ball on whether there is willful infringement or on what the damages should be or on any of the validity issues.

Finally, on the last document, the state of mind, they are introducing that, really, to prove the truth of what he said, that this is a great thing, and not to show state of mind.  Plus, they have got plenty of testimony from Mr. Carter and others talking about what they thought about

the invention at the time of this document.  It is hardly

necessary or appropriate to do that.

It is coming in to argue the truth of the

assertion of the statement.

THE COURT:  All right.  Thank you.

I will go through these one by one briefly.  But

all of the objections are overruled.

First, with respect to Dr. Rachakonda, candidly,

the argument that the meeting minutes are hearsay, well,

when I say it's overruled, it's subject to making the record

that Ms. Brooks has outlined and represented that she will

make.  Provided that she does make that record, it sounds

like the foundation will be set for the business records

exception as well as the state of mind exception.

Therefore, those will be admitted.

With respect to the use of the slides, I simply

think it is fair game for either side to use slides that are

presented by the other side with the witness.  I am sure

there is some outer limit to that.  But if plaintiffs think

that something is being abused or that expert opinion, for

instance, is being elicited, that is a separate objection,

and make it as the questioning comes up.  But there is

nothing in my view per se wrong with using a slide that was

presented in open court during the opening statement by

plaintiffs if defendants think it will be helpful to their

08:48:25  1    presentation with their witnesses.

08:48:30  2            With respect to Dr. Otto, the photo, I don't see

08:48:35  3    any 403 concern.  It may have only minimal relevance.  But

08:48:40  4    it certainly has some relevance.  I am told this is the

08:48:43  5    Pharmasset team at a particular time and that Dr. Otto is

08:48:46  6    one of the people in the picture.  I think that's relevant,

08:48:52  7    given the allegations that are in this case, and I am sure

08:48:56  8    the jury will find it helpful.  I don't really see any 403

08:49:01  9    risk of unfair prejudice or confusion or anything in that

08:49:04 10    regard.

08:49:06 11            With respect to DX-900, again, based on Mr.

08:49:10 12    McCann's representation, it sounds as if the business

08:49:14 13    records exception will be established as well as the state

08:49:17 14    of mind exception.  So assuming that that foundation is

08:49:21 15    laid, the document will be admitted.

08:49:26 16            As a general matter, with respect to these

08:49:29 17    business record documents, it sounds as if there is clearly

08:49:35 18    sufficient indicia of reliability, that these are documents

08:49:39 19    that the company created near the time by people who had

08:49:44 20    knowledge, and that the company relied on them to operate

08:49:46 21    its business.

08:49:48 22            So at a general level they seem to be

08:49:51 23    sufficiently reliable.  And all of them, I think, will be

08:49:56 24    quite helpful to the jury in understanding the story and

08:49:59 25    evaluating both sides' competing versions of this story.

08:50:04 1          So all of these objections are overruled.

08:50:07 2          Any other issues from Idenix this morning?

08:50:09 3          MS. PARKER:  No, Your Honor.

08:50:11 4          THE COURT:  Any Gilead issues?

08:50:12 5          MR. McCANN:  One question for clarification.  We

08:50:17 6  certainly don't want to do something that is not consistent

08:50:19 7  with what the Court expects.

08:50:21 8          With the use of the demonstratives in the

08:50:24 9  witness presentation, I understand what you just said a

08:50:27 10  moment ago, Your Honor.  There were also in the opening

08:50:30 11  statement, or it was at times argument, there were

08:50:33 12  characterizations of how certain events took place, Jeremy

08:50:37 13  Clark walked into your office, Dr. Otto, and behaved in a

08:50:39 14  certain way --

08:50:40 15          THE COURT:  Are you referring to things that

08:50:42 16  plaintiff said in their opening?

08:50:43 17          MR. McCANN:  Yes.  So the question is, you know,

08:50:46 18  I think the witness is going to say, it happened differently

08:50:49 19  than that.  And what is the best way for the jury to

08:50:53 20  understand the context of the questions?

08:50:55 21          What I was thinking, just excerpt the specific

08:50:58 22  language from the transcript of the opening statement and

08:51:01 23  say, this is how the meeting was portrayed.  Is that what

08:51:07 24  happened?  It can be in the question.

08:51:09 25          But I think in terms of accuracy, using the

08:51:11  1    actual words on the Elmo, for example, would be the most

08:51:14  2    helpful example.  But I don't want to do something you don't

08:51:17  3    approve.

08:51:17  4              THE COURT:  Does Idenix want to speak to that?

08:51:23  5              MR. GRIFFITH:  Your Honor, we would object.  It

08:51:27  6    is going to be the very mischief that I mentioned a moment

08:51:30  7    ago.  But I think that we are going down the road where both

08:51:35  8    sides can bring transcript on the screen and ask witnesses

08:51:38  9    about this.  I think that that could be confusing for the

08:51:42 10    jury, and it could be -- there is no -- nothing is

08:51:49 11    preventing either side from asking witnesses, is it true

08:51:52 12    that X happened or how did this happen.

08:51:54 13              THE COURT:  I hear the word mischief.  What is

08:51:57 14    the mischief you are concerned with?

08:51:59 15              MR. GRIFFITH:  We are going to put a page of

08:52:01 16    transcript up on the screen --

08:52:03 17              THE COURT:  You all said it.  Right?

08:52:06 18              MR. GRIFFITH:  Yes.

08:52:06 19              THE COURT:  They are not going to make up, Here

08:52:08 20    is what the plaintiff said in opening.  They are going to

08:52:12 21    show a transcript and accurately remind the jury of what was

08:52:16 22    said.

08:52:16 23              I am trying to understand what the mischief is.

08:52:20 24              MR. GRIFFITH:  Well, as long as it is sauce for

08:52:23 25    the goose and sauce for the gander, we are fine with it.  So

08:52:28 1    we can both do that.

08:52:29 2             THE COURT:  Mr. McCann, I assume your side is

08:52:32 3    not going to object if the plaintiff does the same thing.

08:52:36 4             MR. McCANN:  Sauce for the goose, sauce for the

08:52:38 5    gander, Your Honor.

08:52:38 6             THE COURT:  We will follow that rule.  Mr.

08:52:41 7    McCann, if you decide to use transcript, that is fine.  Just

08:52:45 8    understand, you are either the goose or the gander in this

08:52:48 9    and the other is in the room.

08:52:50 10            Any other issues from the defendants?

08:52:54 11            MR. WARDEN:  Your Honor, on behalf of Gilead.

08:52:57 12            We have got three issues that relate to the

08:52:59 13   testimony of Mr. Carter, Idenix's damages expert, who is

08:53:03 14   going to be going up today.

08:53:06 15            The first two are related in that during the

08:53:09 16   pretrial conference, this Court indicated that there were

08:53:13 17   certain topics on which if either side was going to

08:53:17 18   introduce evidence or touch, we needed to seek leave from

08:53:21 19   the Court first.  We are here to do that on two topics.

08:53:24 20            First, Your Honor, with Mr. Carter, with the

08:53:26 21   Court's leave, we intend to cross-examine him on the fact

08:53:30 22   that his expert report was written with respect to three

08:53:35 23   patents and that he offered an opinion with respect to three

08:53:39 24   patents that the appropriate damages was ten percent or a

08:53:43 25   total of 2.54 billion.

08:53:47 1          Now only one of those patents is at issue in

08:53:50 2    this case.  We think it's relevant for the jury to hear that

08:53:53 3    he is still offering the same opinion, that Gilead should

08:53:58 4    pay the same price for one patent as he opined that they

08:54:02 5    should pay for three patents.

08:54:03 6          THE COURT:  What would you propose to tell the

08:54:04 7    jury, in the questioning about how we got from three patents

08:54:08 8    to one patent?

08:54:10 9          MR. WARDEN:  Our proposal is only to question

08:54:12 10   him on the fact that there were three patents at issue in

08:54:15 11   this case, and there is now one patent at issue in this

08:54:19 12   case, and to give the jury no other information about why

08:54:23 13   they are not in the case, not to say that Idenix dropped

08:54:26 14   them, excuse, me in this trial.

08:54:29 15          I think Mr. Scherkenbach corrects me, we will

08:54:31 16   say there is only one patent at issue in this trial, not "in

08:54:36 17   this case."

08:54:36 18          THE COURT:  There were three in this case.

08:54:37 19   There is one in this trial.

08:54:40 20          Is that effectively what you want to say?

08:54:42 21          MR. WARDEN:  I think that's right, Your Honor.

08:54:44 22          THE COURT:  And then the point is that his

08:54:48 23   report didn't change substantively?

08:54:51 24          MR. WARDEN:  Correct, Your Honor.  One thing I

08:54:54 25   will point out, this is actually a line of cross-examination

08:54:56  1    that we believe would have been appropriate even if there

08:54:58  2    were the three patents in the case, because Mr. Carter has a

08:55:01  3    statement in his expert report that he says, quote, "Note

08:55:05  4    that my royalty rate opinion is the same whether one claim

08:55:09  5    from one of the patents in suit or multiple claims from

08:55:11  6    multiple patents in suit are found to be valid and infringed

08:55:15  7    by Gilead."

08:55:17  8          We think the jury should hear that.  His opinion

08:55:20  9    is that Gilead should pay the same price for one patent as

08:55:23 10    for three patents.  And the jury can judge for themselves

08:55:26 11    whether they think that's credible.

08:55:27 12          THE COURT:  Okay.  That is one thing.

08:55:29 13          MR. WARDEN:  The second issue, Your Honor, is we

08:55:32 14    intend to elicit, or cross-examine Mr. Carter on some what

08:55:38 15    we view as incompatibilities between the expert opinion he

08:55:41 16    has offered in this case and the expert opinion he has

08:55:44 17    offered in the Merck case, particularly as it pertains to

08:55:49 18    the entire market value rule.

08:55:50 19          The Court may recall, this was the subject of

08:55:54 20    Gilead's Daubert motion with respect to Mr. Carter.  And

08:55:57 21    although the Court overruled our -- denied our Daubert

08:56:01 22    motion at the time, the Court said, and I will quote from

08:56:05 23    the July hearing, "Of course, the jury need not agree with

08:56:09 24    any of this," "this" referring to Mr. Carter's analysis,

08:56:13 25    "Gilead can challenge it."

08:56:16 1         That's what we intend to do, is challenge him on

08:56:18 2 the incompatibilities between the two expert reports.  And

08:56:21 3 if it would be helpful to the Court, I have actually just

08:56:25 4 prepared highlighted excerpts, two expert reports that show

08:56:29 5 what it is we intend to cross-examine Mr. Carter on.  May I

08:56:32 6 hand those up?

08:56:32 7         THE COURT:  Yes, as long as you provide copies

08:56:36 8 for plaintiffs.

08:56:37 9         MR. WARDEN:  I have got one for them and one for

08:56:40 10 you.

08:56:41 11         THE COURT:  Whether in this document or

08:56:43 12 otherwise, tell me what it is that you would propose the

08:56:47 13 jury hear about this other report.

08:56:50 14         MR. WARDEN:  Yes, Your Honor.

08:56:51 15         We recognize that both the Court and the parties

08:56:53 16 have wanted to avoid getting into the results of any other

08:56:56 17 trial.  And to avoid that, what we would provide is not even

08:57:01 18 to mention the fact that this was a case on behalf of Merck.

08:57:05 19 We would be willing to simply question Mr. Carter on the

08:57:08 20 fact that he offered an opinion in other another case on

08:57:11 21 behalf of a different party with respect to different

08:57:14 22 patents, and that specifically, if you look at the

08:57:18 23 highlighted sections in the two reports -- excerpts of the

08:57:22 24 two reports -- you will see that his entire market value

08:57:25 25 analysis is literally a cut-and-paste job, other than

changing the name of certain parties and certain experts on which he is relying.

       This was an issue that he was cross-examined on at the Merck trial, over the objection of Merck. Judge Freeman allowed us to cross-examine him on it. They have known this is coming. We let them know last night as well that we would be asking leave of this Court.

       THE COURT: The point you would be trying to establish is that his analysis is the same for entire market value kind of whatever case it is, whoever party it is, whatever patent.

       MR. WARDEN: The point we are making is he has attributed the entire market value of sofosbuvir in one case to the Merck patents and in the other case to the Idenix patents. And that is consistent.

       THE COURT: You would have the jury know that it was specifically an opinion related to sofosbuvir?

       MR. WARDEN: To sofosbuvir. We would note that it was the Merck case, but it was related to sofosbuvir. Essentially, what we intend to elicit from him, the information in the highlighted portion we handed up. We would not ask him about the amount of damages that he asked for in that case. Simply what his opinion was as in the highlighted portions.

       THE COURT: There was a third category?

08:58:42 1          MR. WARDEN:  The third is two exhibits that they

08:58:45 2  have disclosed for Mr. Carter that we have objections to.

08:58:48 3  Do you want me to address those now?

08:58:50 4          THE COURT:  Exhibits they want to use?

08:58:53 5          MR. WARDEN:  Yes.

08:58:53 6          THE COURT:  Please do that.

08:58:57 7          MR. WARDEN:  These two exhibits are related.

08:58:59 8  They both have to do with a negotiation that didn't result

08:59:02 9  in any license, that both of the experts in this case have

08:59:06 10  considered, and that both of the experts have expressly

08:59:10 11  concluded is not comparable to the hypothetical license.  In

08:59:15 12  our view, that is dispositive of whether Mr. Carter should

08:59:17 13  be allowed to tell the jury about it.  But since he is

08:59:20 14  seeking to -- let me give the Court a little more context.

08:59:24 15          This was a negotiation between Gilead and Idenix

08:59:26 16  back in 2010, in which Gilead was exploring taking a license

08:59:31 17  from Idenix not to a bare patent license, but to an advanced

08:59:37 18  clinical stage compound that Idenix had been developing.

08:59:41 19  And Gilead explored whether it would want to take a license

08:59:44 20  to commercialize that compound.

08:59:47 21          Now, with that license, there would of course

08:59:50 22  come the patent rights that were necessary to commercialize

08:59:52 23  the compound, though what Gilead was looking to explore was

08:59:56 24  the commercialization of the compound.

09:00:00 25          It is not comparable because it is not a patent

license. It is also not comparable because it was a
negotiation that never resulted in anything.

As I stated, Mr. Carter in his expert report
expressly states that he does not believe that it's
comparable to the hypothetical negotiation.

I will also note that at his deposition he
reaffirmed that position. He was asked specifically at his
deposition --

THE COURT: I will take your word for it. We
are starting to run out of time. Your expert said something
similar, I consider it but it is not comparable.

MR. WARDEN: Yes, Your Honor.

THE COURT: That's all the issues, right?

MR. WARDEN: That's all the issues.

THE COURT: All right. Let me hear from Idenix,
please.

Good morning.

MR. HARRISON: Good morning, Your Honor. Brad
Harrison on behalf of Idenix.

As it relates to the other patent issue, as
defense counsel pointed out, Mr. Carter's report is crystal
clear. His opinion is the same whether it is one patent or
three patents or the various claims.

That has been a known opinion the entire case.
There has been no challenge to that opinion. There was no

*Daubert* motion.  There is nothing like that.  This is no the a new matter.

The parties agreed, Your Honor will remember, at the pretrial that we would not discuss other lawsuits.  Not the outcomes, not the rulings, not even the mere existence of the lawsuits.

In the transcript, you will recall, it was Mr. Scherkenbach was asked the point directly:  You're not going to say, hey, they dropped the '054 patent?

No, no, no.  That is actually not it.  By the same token, infringement should be treated in a parallel fashion.

In this case, we're not allowed to say that they concede infringement.  We're not allowed to said it was part of the case, and it no longer is.  That is clear with Your Honor's ruling.

The defendants wanted the other patents to be treated the same way.  The Court's ruling at the pretrial was specifically that this would only come in if somebody opened the door.

There has been no door opening.  They have known we're going to call Mr. Carter since before the pretrial.  They have known in this case since the expert reports were filed.

On that basis, there is no grounds to introduce

09:01:19 1   Mr. Carter's opinions regarding the other patents. It's

09:01:24 2   particularly confusing here because the '054 patent was

09:01:27 3   dropped to streamline the process and the '600 patent is yet

09:01:31 4   to be determined.

09:01:32 5           The risk of jury confusion here is enormous.

09:01:36 6   They are going to be speculating about what else is going

09:01:38 7   on out in the world? What is going on with these other

09:01:40 8   patents? What is going on with these other cases?

09:01:45 9           THE COURT: So are you objecting to them

09:01:48 10  establishing the point that your expert's opinion doesn't

09:01:54 11  change depending on how many patents or how many claims are

09:01:57 12  at issue?

09:02:00 13          MR. HARRISON: It's that it was three and now it

09:02:01 14  is one.

09:02:02 15          THE COURT: Meaning you don't object to them

09:02:05 16  exploring the point that I just asked about?

09:02:06 17          MR. HARRISON: If they were to ask, if they were

09:02:08 18  to ask would your opinion be the same whether they would be

09:02:12 19  multiple patents or a single patent, if it was limited to

09:02:14 20  that and he gave the answer that he will give in his expert

09:02:17 21  report, I anticipate, I think I would be fine with that and

09:02:19 22  we have no objection. It's the '054, the '600, the three

09:02:23 23  patents and now this one and any discussion of that issue.

09:02:25 24          THE COURT: So if I understand correctly, the

09:02:28 25  only thing beyond that that they want to do is to say:

09:02:32 1        At the time you wrote your report and gave your

09:02:35 2 opinion, there were three patents at issue and now there is

09:02:40 3 one in this trial.  Isn't that right?

09:02:44 4        Yes.

09:02:44 5        And that doesn't change your opinion?

09:02:47 6        Right.

09:02:48 7        You object to that.

09:02:50 8        MR. HARRISON:  Certainly, I object to that.

09:02:51 9 Because that introduces what happened to the other patents

09:02:53 10 issue.  That is what is going to leave the jury speculating.

09:02:56 11 That is what we have done in the litigation, just like they

09:02:59 12 have done with the infringement claim has changed certain

09:03:01 13 aspects of the case.  We are not allowed to talk about their

09:03:05 14 infringement concession.  Sauce for the goose is sauce for

09:03:09 15 the gander.  They shouldn't be allowed to talk about the

09:03:12 16 disappearance of the patents.

09:03:14 17        THE COURT:  But what you are allowed to say and

09:03:15 18 have said is they're to assume infringement.  You don't have

09:03:20 19 to prove infringement.  I think, of course, that that was

09:03:24 20 the right balance.  You seem materially at greater risk here

09:03:31 21 that the jury is going to suddenly start speculating about

09:03:34 22 what else is going on than what they theoretically would

09:03:38 23 already be doing based on that instruction I have given them?

09:03:40 24        MR. HARRISON:  Well, it is a different issue.

09:03:42 25 Here, because of the presence of other patents, the jury

will be speculating as to what happened to the other two

patents?  What is going on with those patents?  We're

inviting them to look into issues that are wholly irrelevant

to any aspect in this case in this trial.

THE COURT:  All right.  Do you want to, do you

have anything more to say about that one?

MR. HARRISON:  That one I think I'm complete.

THE COURT:  Okay.

MR. HARRISON:  The Merck opinion is the biggest

problem I think we have.  This is incredibly inflammatory.

The parties went out of their way at the

pretrial to point out that there should be nothing about

these other cases.  No mention of the rulings, no mention of

the intermediate rulings.  Not even the fact that these

lawsuits took place.

At the pretrial, Your Honor held specifically

that there will be no reference to the fact of prior

litigation involving either of these parties.

They cannot possibly introduce Mr. Carter's

opinion regarding the Merck patent or the royalty

infringement.  They have to say it is sofosbuvir.  The jury

has heard -- even if they're not told it was Merck, that is

the first logical assumption.  That is immediately where the

jury is going to speculate.

They will start thinking about what is that

other case?  What were they talking about?  Who else is sued

for sofosbuvir?  Issues that are wholly irrelevant to this

case.

Again, Your Honor's only exception to the ruling

was if the door was opened.  We're not opening the door by

calling Mr. Carter.  He has been a known witness since prior

to the joint pretrial.  His opinions are distinct.

And I think where this really goes, and the real

harm in this, is that they're trying to suggest that he is

doing two different things.  They're goings to leave an

implication it is a 20 percent total amount, Mr. Carter

keeps citing to everyone.

The only way to diffuse that is to actually

explain to the jury that there is no other royalty, there is

no other patent, because Gilead hasn't paid anything on it.

Because of the outcome of the lawsuit and what went on there.

That is the exact situation we have been trying

to avoid.

THE COURT:  All right.  But is it true that your

expert opined that the Merck patents are a basis for the

application of the Entire Market Value Rule?

MR. HARRISON:  When he says the Merck patents,

if I'm not mistaken, were that the consumers use the product

as covered by the Merck patent.  He has a similar opinion in

this case that the features of sofosbuvir are covered by the

09:06:17 1    Idenix patent.

09:06:20 2         THE COURT:  Are you contending that that is not --

09:06:21 3    put aside the issues we're arguing about, but that that is not

09:06:24 4    fair grounds for cross-examination?  That an expert walks into

09:06:28 5    one court and says the Entire Market Value Rule is

09:06:32 6    attributable to patent A and walks into another courtroom and

09:06:35 7    says the entire market is attributable to opinion B.

09:06:39 8         MR. HARRISON:  In Mr. Carter's opinion, he uses

09:06:41 9    a comparable license rule.  This was brought up in the

09:06:43 10   *Daubert* hearing.  Your Honor has already ruled on that

09:06:46 11   Mr. Carter's opinions are reliable used in an appropriate

09:06:49 12   methodology.  He used comparable licenses.  He says that is

09:06:52 13   what I do and that is the appropriate way to do it.

09:06:54 14        To the extent that somebody thinks I have to

09:06:56 15   apply the Entire Market Value Rule, here is how it would

09:07:00 16   apply, here is how it is apportioned, and that is how it

09:07:03 17   goes.

09:07:03 18        What they want to do is say, hey, when you talk

09:07:06 19   about the sofosbuvir, you say the same thing about Merck as

09:07:08 20   you do at Idenix, and that introduces the problem with the

09:07:12 21   Merck litigation.

09:07:13 22        THE COURT:  It might introduce that problem, but

09:07:15 23   I'm just trying to establish are you disputing that that is

09:07:18 24   a proper ground for cross-examination?

09:07:21 25        MR. HARRISON:  It is not, Your Honor.  Because

01 it is a contrary hypothetical at this point.  It is a

02 different alternative universe in the sense of the Idenix

03 patent, because there is a --

04          THE COURT:  Are you not going to elicit

05 testimony about the Entire Market Value Rule?

06          MR. HARRISON:  I don't believe it is our -- no,

07 we will not elicit.  We will not say the Entire Market Value

08 Rule applies.  We will say here is the basis I did.  Here

09 are the comparable agreements.  Here is what I think

10 applies.  Here are the *Georgia-Pacific* factors, and that is

11 what leads to my opinion.

12          THE COURT:  All right.  What about these

13 exhibits?

14          MR. HARRISON:  The exhibits, the

15 characterization is correct.  There are comparable

16 agreements in this case.  Mr. Carter will talk about those.

17 These are not being offered as comparable agreements, but

18 the fundamental dispute in this case between the experts is

19 royalty rate as a percentage.  Their expert says a single

20 lump sum based on a post-acquisition by Merck.

21          Gilead's approach to licensing prior to the

22 hypothetical negotiation is relevant.  It involves the

23 patents in this suit.

24          THE COURT:  So these exhibits show that Gilead

25 sometimes at least resolves issues or engages in licensing

09:08:39  1    discussions with a royalty rate?

09:08:42  2              MR. HARRISON:  That is exactly right.  In fact,

09:08:44  3    the header of the chart that was described says an analysis

09:08:47  4    of comparable licenses, and then the other document actually

09:08:50  5    looks at rate, royalty rates that were offered to Idenix in

09:08:54  6    the situation that was described.  On that basis, they're

09:08:56  7    relevant to Gilead's approach to licensing, they should come

09:09:00  8    in.  There is no prejudice to it the other way.

09:09:01  9              THE COURT:  Okay.  Thank you.

09:09:02 10              Mr. Warden.

09:09:03 11              MR. WARDEN:  I'll try and be very fast, Your

09:09:11 12    Honor.

09:09:11 13              On the other patent issue, we're not going to be

09:09:15 14    saying, as Mr. Carson suggested, that they drop the '054

09:09:19 15    patent.  We're just going to say it is not at issue in this

09:09:22 16    trial.  Just as the Court has instructed the jury

09:09:26 17    infringement is not at issue in this trial.  It is a very

09:09:29 18    similar approach to what the Court has done with

09:09:32 19    infringement.

09:09:32 20              On the Merck opinion, again, we're not going to

09:09:37 21    reference Merck as a party.  We're also not going to mention

09:09:40 22    the royalty percent.  We're not going to say it is 10

09:09:44 23    percent here and 10 percent there.  The issue we have is

09:09:46 24    with the royalty base.  Under the Entire Market Value Rule,

09:09:50 25    if he is going to use 100 percent of sales as the royalty

base, he needs to satisfy the Entire Market Value Rule. He is using 100 percent of the sales as a base there, he is using 100 percent of the sales here.

And they say he is not going to testify about the Entire Market Value Rule. It doesn't really matter, Your Honor. He is going to testify that 100 percent of the net sales of sofosbuvir is his royalty base, and he needs to satisfy the Entire Market Value Rule if that is his royalty base.

THE COURT: What about the concern that the jury has already heard enough that once we talk about the base being sofosbuvir, they're going to know that this other case must have involved these parties and/or Merck?

MR. WARDEN: Even if some jurors might wonder if this involved these parties and/or Merck, we're not going to be describing the results, we're not going to say he asked for $2 billion from Merck, we're not going to say what happened with the patents at trial or the subsequent opinion from the Court. It is merely going to be saying he offered an opinion in one case that is incompatible with the opinion in this case.

(Counsel confer.)

MR. WARDEN: Yes. Your Honor, the point is Mr. Scherkenbach has pointed out there are other parties that Gilead has engaged in litigation with, for instance, Abbe.

The jury does not have to assume it is Merck, and it wouldn't necessarily be Merck.

And the importance of this issue, Your Honor, far outweighs any prejudicial effect. This really is a completely incompatible opinion that he has offered.

Lastly, on the other patents, what I heard Mr. Harrison say they want to use it as a comparable on the structure when their expert has acknowledged it is not a comparable license. And the case law is explicit that you cannot use a license as part of the damages analysis if it is not a comparable license.

THE COURT: Has he specifically said that the structure of it is not comparable, i.e., the running royalty versus lump sum?

MR. WARDEN: He has not said specifically the structure. He merely said it was not a comparable license, reaffirmed that at his deposition, at which point he knew that Dr. Putnam had offered an opinion it should be a lump sum and not a running royalty, and he still reaffirmed his opinion that it was not comparable.

Lastly, Your Honor, Mr. Harrison said there is no prejudice. There is great prejudice here. This is a negotiation between Gilead and Idenix about a compound. It never resulted in anything. But if the jury hears it, there is danger that the jury going to think what Gilead was

asking for is a license to the Idenix patents to

commercialize sofosbuvir.

THE COURT:  If I understood correctly, all they

want to do is make the point that sometimes Gilead at least

contemplates entering into deals where there is a running

royalty as opposed to a lump sum.  Is there a way to

possibly redact this license, these two license agreements

to just tell the jury about that and not the other?

MR. WARDEN:  So I can say, Your Honor, I think

we would be willing to agree that on one of the two

exhibits, there is -- so there is two exhibits.  One is the

term sheet Gilead sent to Idenix.  I don't think there any

way to meaningfully get into that, but the other one is sort

of a spreadsheet where Gilead is looking at royalty rates in

lots of different deals.  And if they want to use that to

say Gilead sometimes looks at the royalty rates and/or

licenses, that would be less prejudicial.

I would say it is still not relevant because

what Gilead is looking at is royalty rates for licenses to

compound, not to patents, but it would certainly be less

prejudicial.

THE COURT:  All right.  Thank you.

Mr. Harrison, if you would just speak to that

redaction possibility, and then we'll take a break.

MR. HARRISON:  Your Honor, I, the redaction

09:13:42 1   possibility isn't going to work because it is both Gilead

09:13:47 2   approaches licensing with looking at comparable rates and

09:13:50 3   they approached the patent in this suit by looking at

09:13:52 4   royalty rates of significant -- of a high percentage.  So

09:13:57 5   that when they look at it, their mental state, it is not

09:14:00 6   what is a comparable agreement.  When they approached

09:14:03 7   Idenix, it reflected that there was value to the patents in

09:14:06 8   this suit, a position they wholly disagree with today.

09:14:09 9       To the extent that he wants to be cross-examined

09:14:12 10  that that patent, that licensing proposal also involved a

09:14:16 11  compound and not just a patent, that is in this case, that

09:14:19 12  is fair cross-examination.  But it doesn't mean that the

09:14:22 13  evidence should be excluded and that is what they're asking

09:14:24 14  to do through the redactions.

09:14:26 15       THE COURT:  All right.  Thank you.

09:14:28 16       Bear with me a moment.

09:14:30 17       (Court and deputy clerk confer.)

09:14:35 18       THE COURT:  I'm told we have seven out of eight

09:14:37 19  jurors.  My understanding is we're playing the Schinazi

09:14:42 20  deposition and then maybe three others before we get to

09:14:45 21  Mr. Carter; is that correct?

09:14:46 22       MS. PARKER:  Yes, Your Honor.

09:14:47 23       THE COURT:  All right.  Well, I will certainly

09:14:48 24  have more to say about Mr. Carter before we get to him.  All

09:14:52 25  right.  We'll be in a short recess.  Hopefully short.

09:15:12  1          (Brief recess taken.)

09:15:12  2          *    *    *

09:22:11  3          (Proceedings reconvened after recess.)

09:22:11  4          THE COURT:  Have a seat.  I don't have the clock

09:22:13  5   on.  I wanted to advise you of something with respect to the

09:22:16  6   jury and get your thoughts.

09:22:19  7          So all the jurors are here now.  The late juror

09:22:23  8   today is the same juror who was late significantly yesterday

09:22:27  9   who I believe was also late after the first lunch break.  It

09:22:30 10   is Juror No. 7.  You may recall I think she told us she is a

09:22:34 11   nurse.  We definitely spoke with her during jury selection.

09:22:42 12          When Mr. Looby has been back and forth with

09:22:45 13   lunch orders, he got a strong sense that the jurors are

09:22:49 14   unhappy with her and concerned that this trial may take

09:22:55 15   longer and go beyond next Friday as a result of her being

09:22:59 16   regularly late.  And I'm concerned that if I bring them all

09:23:06 17   in and essentially admonish all of them to do better to get

09:23:10 18   here on time, that the jury as a whole may react negatively

09:23:16 19   to that because they all view it as one person's problem.

09:23:20 20          So I'm thinking of speaking directly to this one

09:23:23 21   juror to make sure she understands she needs to be here on

09:23:27 22   time and make sure there isn't some problem I'm unaware of

09:23:33 23   because I don't want to start a half hour late everyday.

09:23:36 24   That will cause problems.  But I wanted to get the parties

09:23:40 25   views on this.  And if you need time to think or confer on

09:23:43 1   it, that's fine, provided it is a short amount of time.

09:23:45 2   But Mr. Scherkenbach, any thoughts?

09:23:47 3   MR. SCHERKENBACH:  I think that is exactly the

09:23:48 4   appropriate thing to do would be to speak with her

09:23:50 5   privately, see if there is some issue, you know, you are not

09:23:55 6   aware of.  I don't think it is fair to beat the rest of the

09:23:58 7   jurors up in open court.

09:23:59 8   THE COURT:  All right.  Ms. Parker.

09:24:01 9   MS. PARKER:  Your Honor, I agree with that but I

09:24:02 10  would also mention I didn't see it myself but several people

09:24:05 11  told me she was texting using her phone.

09:24:08 12  THE COURT:  In the courtroom?

09:24:09 13  MS. PARKER:  Sitting up there during the

09:24:12 14  witness, while the witnesses were on the stand yesterday.

09:24:16 15  So if I see it myself, I will raise my hand or something but

09:24:20 16  I understand that that was ...

09:24:24 17  THE COURT:  I'm not aware of that.  I'm not sure

09:24:27 18  I would be able to see it from here, but okay.  Thank you.

09:24:29 19  Well, I think under the circumstances, I will

09:24:31 20  bring this one juror back to meet with me privately.  I will

09:24:35 21  have a court reporter there to take things down but for the

09:24:39 22  moment I don't intend to share that discussion with you but

09:24:42 23  it will be, it will be on the record in case I need to share

09:24:45 24  that with you.  All right.  We'll take a short recess.

09:33:49 25  (Brief recess taken.  Following portion ordered

sealed by the Court, bound separately.)

         \*    \*    \*

        (Proceedings reconvened after recess.)

        THE COURT:  Have a seat.  I did speak in chambers with the juror.  She essentially said she has had trouble with traffic and parking to a greater degree than she anticipated.  She apologized, and she has committed to me that she will be leaving home earlier and will get here on time in the future.

        With that, I am going to trust that this problem will not recur.  I will bring the jury in in a moment.

        I think I will allude to this because they know we pulled the one juror out, and I think I will just reiterate to them that we all are going to be doing our best to be here on time, that the trial is moving according, roughly, to the pace we anticipated.  And also, with respect to the devices, while we do let them have their devices in the courtroom, we are going to remind them they need to be off.  So Mr. Looby will be reminding them of that, and I will as well.

        For now, my discussion with the juror is sealed. I don't think there is any need for you all to see it at this point.

        Any other thoughts or questions about that?

        MS. PARKER:  No, Your Honor.  Thank you.

09:41:37 1          MR. SCHERKENBACH:  No, Your Honor.

09:41:38 2          THE COURT:  Let's bring the jury in, please.

09:41:41 3          (Jury enters courtroom at 9:40 a.m.)

09:43:17 4          THE COURT:  Good morning, ladies and gentlemen

09:43:20 5    of the jury.  Welcome back.  Nice to see you all.

09:43:24 6          Just a few words before we get started with the

09:43:27 7    evidence today.

09:43:28 8          I have spoken to one juror, who has been late.

09:43:32 9    That juror, like all of us, is committed to being here on

09:43:36 10   time going forward.  So I appreciate the efforts of those of

09:43:43 11   you who have been here on time.  It is important that we

09:43:45 12   keep those efforts up.  We are all going to be committed to

09:43:49 13   doing that going forward.

09:43:50 14         To the extent you are concerned about whether we

09:43:53 15   are proceeding at the pace that we thought we would, the

09:43:56 16   answer is generally we are.  There are all sorts of stops

09:44:01 17   and starts and things about my schedule, for instance, that

09:44:06 18   can interrupt us as we go forward.  I assure you, that is

09:44:09 19   all factored in.  My estimate as to when this case will end

09:44:13 20   remains as it was on Monday morning when we began.

09:44:18 21         Then, finally, I have asked Mr. Looby to remind

09:44:21 22   you all, but I wanted to do it as well, that while we let

09:44:24 23   you have your devices and your personal items in the

09:44:27 24   courtroom -- by devices I mean cellphones and that sort of

09:44:29 25   this thing -- they need to be turned off when we are in

09:44:33 1    here, so there aren't interruptions or distractions for

09:44:38 2    anyone.

09:44:39 3              So please take care to do that when we are in

09:44:44 4    here.

09:44:44 5              If anyone thinks they need a break, you know,

09:44:47 6    outside of when I am already planning to give you a break,

09:44:51 7    you know, perhaps we need to check something or whatever,

09:44:54 8    just let me know, so we can send you back to the jury room

09:44:57 9    to do those things.

09:44:59 10             With that, we will get started.  We turn to

09:45:02 11   Idenix.  Good morning.

09:45:04 12             MS. PARKER:  Good morning, thank you, Your

09:45:06 13   Honor.

09:45:06 14             Our next witness will be Dr. Raymond Schinazi,

09:45:10 15   who is the founder and the former chairman of Pharmasset.

09:45:15 16   We are going to present his testimony through deposition.

09:45:18 17   It starts with just really less than a five-minute reading.

09:45:23 18   Then we go to the videotape deposition.  The dates of the

09:45:26 19   reading, that's July 8 of 2010.  Then the videotape

09:45:30 20   deposition was earlier this year, on January 29.

09:45:34 21             Before we get started, if I may read the exhibit

09:45:37 22   numbers that we are going to move to admit during the

09:45:40 23   deposition.

09:45:40 24             THE COURT:  You may.

09:45:42 25             MS. PARKER:  These are all plaintiff numbers:

| | |
|---|---|
| 09:45:44 1 | **470. 636. 677. 678. 718. 720. 755. 782. 785. 789.** |
| 09:45:58 2 | **832. 851. 879. 880. 929. 1280. And 1482.** |
| 09:46:06 3 | **We move to admit those. Thank you.** |
| 09:46:09 4 | **MR. WARDEN: That's correct, Your Honor.** |
| 09:46:10 5 | **THE COURT: Those are all admitted. We are** |
| 09:46:12 6 | **going to be beginning with the reading portion.** |
| 09:46:16 7 | **(Above-referenced exhibits received in** |
| 09:46:16 8 | **evidence.)** |
| 09:46:16 9 | **MS. PARKER: Yes, Your Honor. That's less than** |
| 09:46:20 10 | **five minutes, I am told.** |
| 09:46:27 11 | **THE COURT: Good morning.** |
| 09:46:29 12 | **MR. McCRUM: Good morning.** |
| 09:46:30 13 | **Are you going to be the witness?** |
| 09:46:32 14 | **MR. McCRUM: Yes, Your Honor.** |
| 09:46:33 15 | **THE COURT: For the record, tell the ladies and** |
| 09:46:36 16 | **gentlemen of the jury who you are and who you are pretending** |
| 09:46:38 17 | **to be.** |
| 09:46:39 18 | **MR. KINTON: My name is John Kinton. I** |
| 09:46:43 19 | **represent Idenix. And I am pretending to be the attorney** |
| 09:46:46 20 | **representing Dr. Schinazi during the deposition.** |
| 09:46:48 21 | **MR. McCRUM: Good morning. I am Ryan McCrum. I** |
| 09:46:53 22 | **represent plaintiffs but I will be playing the role of Dr.** |
| 09:46:57 23 | **Schinazi.** |
| 09:46:57 24 | **THE COURT: You may proceed.** |
| 09:46:57 25 | **(Deposition designations of Raymond Schinazi** |

09:46:58  1    placed in record.)

09:46:58  2                "Question:  Do you agree that Jeremy Clark first

09:47:02  3    conceived of the 6130?

09:47:04  4                "Answer:  I know that he was the first person on

09:47:05  5    the planet to make that compound, but I'm not aware of

09:47:09  6    whether -- I don't know the answer to your question.  He

09:47:12  7    actually synthesized that compound and made it in the lab.

09:47:14  8                "Question:  And sitting here today, you don't

09:47:18  9    know of anyone who instructed Jeremy Clark to synthesize

09:47:21 10    that compound?

09:47:26 11                MR. HEADLEY:  Your Honor, sidebar?

09:47:26 12                THE COURT:  Okay.

09:47:28 13                (The following took place at sidebar.)

09:48:42 14                THE COURT:  All right.  What is the position?

09:48:42 15                MR. HEADLEY:  I think they are reading from the

09:48:42 16    wrong transcript.  I have no idea where this comes from.

09:48:42 17                THE COURT:  You two should confer.

09:48:42 18                (Pause.)

09:48:42 19                MR. HEADLEY:  My apologies.

09:48:42 20                THE COURT:  For the record, you are okay?

09:48:42 21                MR. HEADLEY:  No problem.

09:48:42 22                THE COURT:  You can pick it up from there.

09:48:42 23                (End of sidebar conference.)

09:48:43 24                THE COURT:  We are ready to go.  Go ahead.

09:48:45 25                (Deposition further read as follows.)

09:48:45 1        "Question:  Sitting here today, you don't know

09:48:48 2    of anyone who instructed Jeremy Clark to synthesize that

09:48:52 3    compound?

09:48:52 4        "Answer:  The specific compound not -- not --

09:48:55 5    not -- no.  But that specific compound, no.  But in general,

09:48:59 6    yes, there were -- Dr. Pankiewicz, Dr. Otto was involved.

09:49:02 7    The whole group was involved in meetings where we discussed

09:49:05 8    2'-fluoro nucleoside as a target.

09:49:08 9        "Question:  And you didn't design 6130, did you?

09:49:13 10        "Answer:  I did not design it, no.

09:49:14 11        "Question:  And I guess, just getting right down

09:49:18 12    to it, though, Dr. Schinazi, sitting here today, can you

09:49:21 13    testify under oath that you are the one who told Jeremy

09:49:27 14    Clark to synthesize a compound with a fluorine and a methyl

09:49:30 15    at the 2' position?

09:49:33 16        "Answer:  No.

09:49:34 17        "Question:  Is there any information not

09:49:37 18    contained in Emory's patents that you pointed Pharmasset to

09:49:43 19    that led to the development of 6130?

09:49:46 20        "Answer:  The Emory patent clearly focused on

09:49:51 21    2'-fluoro nucleosides, 2'-fluoro nucleosides, not

09:49:54 22    3'-fluoro nucleosides, not 4'-fluoro nucleosides.  2'-fluoro

09:50:00 23    nucleosides.  Even though it was not Emory's -- it was not

09:50:02 24    Emory's technology, I pointed them to that, and the idea

09:50:08 25    flew -- through that the idea, the conception came of

09:50:11 1    putting these two groups together in the 2' position.

09:50:35 2            "Question:  So it was at your suggestion to Dr.

09:50:38 3    Watanabe, to put a methyl --

09:50:42 4            "Answer:  I mean, I did -- I did not

09:50:43 5    specifically say to him this.  I vaguely remember telling

09:50:46 6    him that I -- that the -- as I mentioned before, that

09:50:50 7    2'-methyl nucleosides could be important the same way

09:50:54 8    2'-fluoro nucleosides could be important for the treatment

09:50:58 9    of Hepatitis C and it would be useful to make 2'-methyl

09:51:01 10   derivatives.  But I also urged him to hold off the

09:51:04 11   development of 2'-methyl nucleosides until the information

09:51:07 12   became public from Pharmasset -- I am sorry, Idenix, not

09:51:12 13   Pharmasset, from Idenix.

09:51:14 14           "Question:  So you had confidential information

09:51:15 15   from Idenix that they were developing compounds?

09:51:18 16           "Answer:  Yes.

09:51:19 17           "Question:  At the 2'-methyl?

09:51:22 18           "Answer:  Yes.

09:51:22 19           "Question:  That you shared with Dr. Watanabe?

09:51:25 20           "Answer:  I shared that with Dr. Watanabe and I

09:51:26 21   told him to keep it secret until the patent -- I was also

09:51:29 22   trying to get his mind to try to understand why these compounds

09:51:33 23   were effective against -- against Hepatitis C because at the

09:51:37 24   time I didn't quite understand how a simple 2'-methyl on a

09:51:42 25   cytosine molecule could be effective against Hepatitis C.

09:51:44  1   But I also forbade Pharmasset from developing 2'-methyl

09:51:49  2   nucleosides until it became public knowledge."

09:51:54  3          THE COURT:  Thank you.  So the rest of it is by

09:51:57  4   video.  Right?

09:51:58  5          MS. PARKER:  Yes, Your Honor.

09:51:59  6          THE COURT:  About how long?

09:52:01  7          MS. PARKER:  About an hour and 40 minutes.

09:52:03  8          THE COURT:  Okay.  So we will get started on it.

09:52:09  9   If I don't see any other indication from the jury, we may

09:52:12 10   play the whole thing before our break.  But if we need to

09:52:16 11   take a break, of course, we will.

09:52:18 12          Mr. Looby, do you want to dim the lights.

09:52:22 13          "The Videographer:  Would the court reporter

09:52:33 14   please swear the witness.

09:52:36 15          (witness sworn.)

09:52:43 16          "Question:  Good morning, Dr. Schinazi.  Would

09:52:46 17   you please state your full name for the record?

09:52:48 18          "Answer:  Raymond Felix Schinazi.

09:52:50 19          "Question:  Do you have any other agreement with

09:52:52 20   Gilead or its lawyers by which they have agreed to pay you

09:52:56 21   for any time spent on the litigation for which you're here

09:52:59 22   today?

09:53:00 23          "Answer:  I believe I do have some agreement

09:53:02 24   that pays me, yes, correct.

09:53:07 25          "Question:  And who is that agreement with?  Is

09:53:09 1   it with Gilead or is it with counsel for Gilead?

09:53:12 2          "Answer:  I think it's with counsel.  My lawyer

09:53:14 3   can confirm that.  He's the one that negotiated it.

09:53:17 4          "Question:  Okay.  And your -- Gilead is

09:53:21 5   obligated to pay you an hourly rate for your time --

09:53:25 6          "Answer:  Right.

09:53:25 7          "Question:  -- in connection with this

09:53:28 8   litigation, is that right?

09:53:29 9          "Answer:  I think the money -- for this -- for

09:53:32 10  this litigation, this particular day, today?

09:53:34 11         "Question:  Any time spent by you in

09:53:36 12  connection --

09:53:38 13         "Answer:  I'm not being paid for today.

09:53:39 14         "Question:  Okay.  How about any other time that

09:53:42 15  you've spent in connection with this litigation?

09:53:45 16         "Answer:  They're supposed to pay me.  I never

09:53:47 17  asked them for my reimbursement.

09:53:49 18         "Question:  And how much are they supposed to

09:53:51 19  pay you?

09:53:52 20         "Answer:  $800 an hour.

09:53:57 21         "Question:  Exhibit 1 is a deposition that you

09:54:00 22  gave on July 8th, 2010.

09:54:03 23         "All right.  I'm going also to hand you a

09:54:06 24  document that I've marked as Schinazi Exhibit 2.  This is a

09:54:10 25  deposition transcript dated, I believe, December 20th, 2013.

09:54:14 1    "Did you understand at the time that you gave

09:54:17 2    those depositions that you were giving your testimony under

09:54:19 3    oath, right?

09:54:20 4           "Answer:  That's right.

09:54:21 5           "Question:  And you understood you were legally

09:54:23 6    obligated to tell the truth?

09:54:25 7           "Answer:  I do.

09:54:25 8           "Question:  And to the best of your abilities,

09:54:27 9    you did tell the truth, right?

09:54:30 10          "Answer:  Yes.

09:54:30 11          "Question:  Are you aware of any testimony in --

09:54:33 12   you provided in Schinazi Exhibits 1 and 2 that you would

09:54:36 13   like to correct today?

09:54:38 14          "Answer:  These are very long documents.  There

09:54:40 15   may be a few typographical errors.  There may be some other

09:54:43 16   statements that were not -- misinterpreted.  But in general,

09:54:45 17   it is correct, as I stated before.

09:54:47 18          "Question:  All right.  And then in the late

09:54:49 19   1990s, you formed a company known as Pharmasset, right?

09:54:54 20          "Answer:  Late nineties --

09:54:55 21          "Question:  Late --

09:54:58 22          "Answer:  -- that's correct, 1998.

09:55:01 23          "Mr. McCrum:  I'm going to mark as Schinazi

09:55:03 24   Exhibit 6 a document bearing Bates numbers RFS 125 to 126.

09:55:16 25          "Question:  Okay, this exhibit includes e-mails

09:55:28 1   that were either authored by or sent to you on February 2nd,

09:55:33 2   2005.  So let's go ahead and start with the first one, which

09:55:38 3   is dated February 2nd, 2005, and it's addressed from -- from

09:55:43 4   you to a Michael Otto.  Do you see that?

09:55:46 5           "Answer:  Yes.

09:55:46 6           "Question:  And you did write this e-mail to Dr.

09:55:50 7   Michael Otto, correct?

09:55:52 8           "Answer:  I'm trying to see where I -- the top

09:55:54 9   part, yes.  It looks like me, but I don't recall this

09:55:58 10  document specifically.

09:55:59 11          "Question:  Okay.  Well, you have no reason to

09:56:02 12  doubt that you did, in fact, send this e-mail on or about

09:56:06 13  February 2nd, 2005, correct?

09:56:10 14          "Answer:  That's about -- probably correct.

09:56:12 15          "Question:  Okay.  Then in the last e-mail that

09:56:15 16  you sent to Dr. Otto, you write, 'Mike:  My pleasure.  Just

09:56:20 17  make sure these Roche people do not scoop my group.  We are

09:56:23 18  drafting a paper.  It's so easy to build on someone else's

09:56:28 19  knowledge.  Cheers.  RFS.'

09:56:32 20          "What did you mean when you said 'It's so easy

09:56:36 21  to build on someone else's knowledge'?

09:56:40 22          "Answer:  I don't recall what I meant at that

09:56:42 23  time.

09:56:42 24          "Question:  Does it have any meaning to you

09:56:44 25  today?

09:56:46 1          "**Answer:  Well, people have the habit of**

09:56:48 2  **scooping things from one -- it's common knowledge it's being**

09:56:52 3  **scooped from one person to the other.  So there's -- there**

09:56:55 4  **are -- there's information, confidential information,**

09:57:00 5  **nonconfidential information, and there is -- people can use**

09:57:03 6  **this information for their benefit sometimes.  Not my**

09:57:06 7  **benefit, necessarily, or the benefit of my university.**

09:57:09 8          "**Question:  Understood.  So I want to talk**

09:57:11 9  **about -- we talked about Pharmasset, the company that you --**

09:57:15 10  **well, let me ask you this:  Pharmasset was a company that**

09:57:23 11  **you at least co-founded, correct?**

09:57:26 12          "**Answer:  That's correct.**

09:57:26 13          "**Question:  Okay.  And that company was founded**

09:57:28 14  **in 1998?**

09:57:30 15          "**Answer:  Correct.**

09:57:30 16          "**Question:  And you were the -- you were the**

09:57:34 17  **principal founder, right?**

09:57:36 18          "**Answer:  I guess I was the chairman and the**

09:57:37 19  **only employee when I founded -- not employee, but at least I**

09:57:45 20  **was chairman.  I was the guy who founded the company.  I**

09:57:50 21  **wasn't -- I never worked for the company.**

09:57:52 22          "**Question:  Okay.  And you were -- you were**

09:57:54 23  **chairman of the board.  Do you recall for how long, roughly,**

09:57:57 24  **you were chairman of the board of Pharmasset?**

09:58:00 25          "**Answer:  I believe it was from '98 to 2004 or**

09:58:03 1   '5.  I can't remember exactly.

09:58:05 2           "Question:  Okay.  And after you were chairman

09:58:07 3   of the board, you remained on the board for some period of

09:58:10 4   time; is that your recollection?

09:58:12 5           "Answer:  Very short period of time.

09:58:14 6           "Question:  Okay.  So prior to 2005, did you

09:58:17 7   hold any other positions at Pharmasset?

09:58:19 8           "Answer:  Executive director.

09:58:20 9           "Question:  Executive director.  And what does

09:58:23 10  that mean?  What is an executive director at Pharmasset?

09:58:26 11          "Answer:  I sign the checks.

09:58:27 12          "Question:  You sign the checks.  Anything else?

09:58:30 13          "Answer:  That's it.  I was -- I was helping

09:58:32 14  with the chemistry as well.

09:58:33 15          "Question:  Okay.  So you do agree that in 1998

09:58:36 16  and 1999, Pharmasset did not have the tools to do serious

09:58:40 17  research on HCV?

09:58:42 18          "Answer:  If it's 1998, absolutely correct.

09:58:45 19  1999, we were beginning to gear up.

09:58:47 20          "Question:  Okay.  When did you get the tools to

09:58:50 21  do research on HCV?

09:58:56 22          "Answer:  When we obtained the realtime PCR --

09:59:00 23  realtime PCR machine.  We bought a realtime PCR machine and

09:59:05 24  we hired Dr. Lieven Stuyver.

09:59:08 25          "Question:  Okay.  When was that?

09:59:10 1            "Answer:  I don't remember exactly.  I think it

09:59:12 2     was 1998-2000 period.  1999, sorry, 1999-2000 period.

09:59:19 3            "Question:  Okay.  It wasn't until about

09:59:22 4     2000-2001 time frame that Pharmasset started focusing on

09:59:25 5     research related to Hepatitis-C; is that correct?

09:59:28 6            "Answer:  That is correct.

09:59:28 7            "Question:  Okay.  Let's go get back to the time

09:59:31 8     frame we're talking about.  The 2000 time frame, you were

09:59:34 9     familiar with a company known as Novirio, right?

09:59:38 10           "Answer:  Yes.

09:59:39 11           "Question:  Okay.  And that company was later

09:59:41 12    named Idenix?

09:59:42 13           "Answer:  That's correct.

09:59:42 14           "Question:  And so for ease of reference today,

09:59:46 15    Dr. Schinazi, I'm going to refer to Idenix and Novirio

09:59:49 16    simply as Idenix unless a document is referring to it as

09:59:52 17    Novirio, okay?

09:59:54 18           "Answer:  That's correct.  And may I make a

09:59:56 19    statement, too, because my lawyer didn't make it at the

09:59:59 20    beginning?  When I say 'We,', I don't -- I mean me myself

10:00:05 21    and not somebody else.

10:00:06 22           "Question:  Okay.  Okay, so your -- Idenix was

10:00:10 23    formed around the same time as Pharmasset, right?

10:00:13 24           "Answer:  The same month.

10:00:14 25           "Question:  The same --

10:00:16   1         "Answer: But earlier, a few days earlier, a few

10:00:19   2   days earlier.

10:00:20   3         "Question: Do you recall what month?

10:00:21   4         "Answer: May.

10:00:22   5         "Question: May. Okay. And you were one of the

10:00:24   6   co-founders of that company, right?

10:00:29   7         "Answer: Yes.

10:00:30   8         "Question: And a Dr. Jean-Pierre Sommadossi was

10:00:32   9   the principal founder of that company, do you agree?

10:00:35 10         "Answer: Yes.

10:00:36 11         "Question: Can you describe your relationship

10:00:37 12   with Dr. Sommadossi in the 2000-2001 time frame?

10:00:42 13         "Answer: Very good friend.

10:00:42 14         "What did you think --

10:00:47 15         MR. REEVES: Point of clarification -- excuse

10:00:49 16   me -- we were talking about the formation in '98, and then

10:00:53 17   you moved away from '98 to '01.

10:00:56 18         Mr. McCrum: Fair point.

10:00:58 19         "Question: Well, let me ask, what -- describe

10:01:01 20   your relationship from the 1998 to the 2000 time frame.

10:01:05 21         "Answer: Yeah. Dr. Sommadossi worked at the

10:01:07 22   University of Alabama. He was a professor there, I believe,

10:01:09 23   and we collaborated scientifically. We were also very close

10:01:13 24   friends.

10:01:13 25         "Question: I want to mark another exhibit. I'm

10:01:19 1   going to mark as Schinazi Exhibit 8 a document bearing Bates

10:01:24 2   numbers IDXDE00592779 through 2780.

10:01:39 3           "Dr. Schinazi, this is an e-mail from you to Dr.

10:01:42 4   Sommadossi and Andrea Corcoran attaching a draft letter.  Do

10:01:46 5   you agree that you sent this e-mail on or about August 15th,

10:01:50 6   2003?

10:01:51 7           "Answer:  Frankly, I don't recall.  I don't

10:01:53 8   recall anything about this particular e-mail.  You're

10:01:55 9   talking about Exhibit 8?

10:01:57 10          "Question:  Right.

10:01:58 11          "Answer:  Exhibit 8.  There's two pieces of

10:02:00 12  paper, so -- is there two?  I got two.

10:02:07 13          "Question:  There is.  So for the record,

10:02:12 14  there's an e-mail and then there's an attachment to the

10:02:15 15  e-mail.  That attachment is named 'Schinazi letter

10:02:25 16  08083.doc.'  So the second page is the attachment to this

10:02:28 17  letter, Dr. Schinazi?

10:02:28 18          "Answer:  Yeah, I don't know who composed the

10:02:31 19  letter, whether it was me or Andrea.  I'm not a lawyer.  She

10:02:36 20  was a lawyer for Idenix.  They may have sent me a draft.

10:02:39 21          "Question:  Okay.  Well, let's --

10:02:42 22          "Answer:  But I don't know -- I don't even know

10:02:44 23  what this letter is for.

10:02:46 24          "Question:  Okay.  So let's talk about it for a

10:02:48 25  moment.  You have no reason to doubt that you sent this

e-mail with the attachment, correct?

"Answer:  It looks like my e-mail.  It has my
e-mail -- my Pharmasset e-mail address.

"Question:  Okay.

"Answer:  And it's dated August 15, 2003.

"Question:  Okay.  In the e-mail you write,
'Dear JP:  As discussed today, please find attached a draft
letter.  Please feel free to edit it with Andrea as you see
fit.  It would be better if Andrea signs it since you are my
best friend and that could be perceived as a conflict.
Again, thanks.  RFS.'

"Answer:  Yeah.

"Question:  All right.  Did I read that
correctly?

"Answer:  That is correct.

"Question:  Okay.  And let's look at the draft
letter that's attached.  You agree, Dr. Schinazi, that based
on this e-mail, you wrote this letter, right?

"Answer:  I don't know.  I have to see -- I have
to read it.

"Question:  Okay.

"Answer:  I don't know if I wrote this letter.
It doesn't look like my style, and usually I do
justification on my letters, so I don't think it's me.
Maybe somebody sent it to me first and it was then sent to

10:03:57 1    Dr. Sommadossi.  Maybe Andrea sent it to me initially.  I

10:04:01 2    have no idea.

10:04:03 3            "Question:  So putting that aside, though, you

10:04:05 4    agree you sent this letter?

10:04:07 5            "Answer:  I don't know.  If it was attached to

10:04:09 6    the file, then probably I did.

10:04:11 7            "Question:  Okay.  And if you're going to attach

10:04:13 8    a letter and send it to Dr. Sommadossi and Andrea Corcoran,

10:04:17 9    a letter of this nature, you're going to review it, right?

10:04:21 10           "Answer:  I presume, yes.

10:04:21 11           "Question:  Okay.  And if there's anything

10:04:24 12   that's not truthful and accurate, you're going to note that,

10:04:27 13   correct?

10:04:28 14           "Answer:  It depends.  It's still a draft.

10:04:30 15           "Question:  So drafts -- is it your practice to

10:04:33 16   include statements that are inaccurate and --

10:04:37 17           "Answer:  Someone else may have written this.  I

10:04:39 18   don't know.

10:04:39 19           "Question:  Okay, but you would have reviewed

10:04:42 20   it?

10:04:43 21           "Answer:  Probably, but probably read it

10:04:44 22   quickly.

10:04:45 23           "Question:  Okay.  So let's look at the letter

10:04:47 24   that's attached.  I want to talk about the last sentence in

10:04:50 25   the first paragraph, and that reads, 'As a founder,

shareholder and insider, you are privileged to a large

amount of confidential information about our company from

the early days of its creation.'

"Did I read that correctly?

"Answer:  Yes, that's correct.

"Question:  Okay.  And, in fact, you were a

founder, a shareholder, and insider of Novirio at the time;

isn't that true?

"Answer:  Yes.

"Question:  And you were privileged to their

confidential information, correct?

"Answer:  They were shareholders in my company

and I was shareholder of their company.

"Question:  Okay.  So maybe both of you were

privileged to each other's confidential information; is that

correct?

"Answer:  That's correct.

"Question:  Okay.  I want to refer to the first

two sentences of the second paragraph, it says, 'When the

company was started, the venture investors wanted to make

sure that Dr. Sommadossi, the current CEO, and you had

confidentiality consulting agreements.  Although you agreed

to maintain strict confidentiality, you never agreed to sign

a consultant agreement since the draft we provided was too

restrictive and because you were in the process of founding

Pharmasset Inc.'

"Did you believe at some point in time around

this time frame that you did not enter into a consulting

agreement with Idenix in the late 1990s?

"Answer:  I don't recall.  Remember, I'm an

Emory employee, so Emory has to review everything.

"Question:  Okay.  You agree that this draft

letter represents that you did not, in fact, sign such a

consulting agreement?

"Answer:  I probably did not.

"Question:  That's what this letter says, right?

"Answer:  I probably did not without Emory's

permission.

"Question:  Okay.  Go back to the first page of

this.  It says, 'PS - please destroy this e-mail after you

get it.'

"Answer:  Yes.

"Question:  Yes.  Why were you asking that this

e-mail be destroyed?

"Answer:  I don't know, but I can speculate.

"Question:  What is your speculation, for

whatever it's worth?

"Answer:  I'm saying that -- you know, that he's

my best friend, that it could b e perceived as a conflict.

I didn't wany anybody to know that it cold be a conflict or

1  that -- I probably sent a draft letter there also, who

2  drafted it and so on.

3              "Mr. McCrum:  All right, I'm going to mark as

4  Schinazi Exhibit 9 a document bearing Bates numbers IDXDE005 --

5              "The Witness:  Okay.  IDXDE00565027 to 5029.

6              (Exhibit 9 marked for identification.)

7              "Question (By Mr. McCrum):  Okay, this is --

8  this document includes e-mail correspondence involving --

9              "Answer:  Yeah.

10             "Question:  -- you, Dr. Sommadossi, and Andrea

11  Corcoran, along with the executed letter that you wanted to

12  see.

13             "Answer:  Uh-huh.

14             "Question:  Yeah, of the letter.  You see that

15  there's a sentence that is at least similar to the previous

16  one.  It says, 'As a founder and principal shareholder,

17  you have had access to a large amount of confidential

18  information about our company from the early days of its

19  creation.'  So did I read that correctly?

20             "Answer:  Yeah.  She's ...

21             "Question:  And this is the signed version that

22  you were looking for, correct?

23             "Answer:  Correct.  As you can see, it's not my

24  style of typing, as I said before.

25             "Question:  Sure.  It's signed by Andrea

1    Corcoran.

2              "Answer:  And I would not say 'Very truly

3    yours.'  Find me one letter where I say 'Very truly yours.'

10:05:17 4              "Question:  Okay.  I don't dispute --

10:05:17 5              "Answer:  I don't -- I don't do -- I usually use

10:05:19 6    'sincerely yours.'  I'm very consistent with my letters.

10:05:29 7              "Question:  I've noticed that from the several

10:05:32 8    documents of yours --

10:05:34 9              "Answer:  Thank you.

10:05:35 10             "Question:  -- that I reviewed, Dr. Schinazi.

10:05:38 11   I'm not suggesting you signed this document either way.

10:05:42 12             "Answer:  No.

10:05:43 13             "Question:  What I, what I am --

10:05:46 14             "Answer:  No.

10:05:47 15             "Question:  -- suggesting is that you reviewed

10:05:49 16   it, though, before it was signed, correct?

10:05:55 17             "Answer:  Possibly.

10:05:57 18             "Question:  Okay.  And if there was anything in

10:05:59 19   that document that was to be signed and executed that you

10:06:02 20   felt was untruthful, you would have corrected that, right?

10:06:06 21             "Answer:  I don't know.

10:06:07 22             "Question:  No?

10:06:10 23             "Answer:  I probably wouldn't.  It depends.  I

10:06:12 24   did not sign the document, so how can you accuse me of

10:06:16 25   signing documents.  It's not me.  I didn't draft the

10:06:20 1  document.  I told you I don't recall drafting the document.

10:06:24 2          "Question:  I understand that you don't recall,

10:06:26 3  but it's possible that you did?

10:06:28 4          "Answer:  It's very unlikely, actually, based on

10:06:32 5  the style --

10:06:33 6          "Question:  Okay.

10:06:35 7          "Answer:  -- because I would never say, 'very

10:06:38 8  truly yours.'

10:06:41 9          "Question:  Dr. Schinazi, the purpose of this

10:06:43 10 letter was so that you could pass it on to Emory, correct?

10:06:49 11         "Answer:  I don't recall.

10:06:49 12         "Question:  Okay.  Well, assuming that it was to

10:06:52 13 be passed on to Emory, you would have wanted it to be

10:06:56 14 accurate, correct?  If you were going to be passing this

10:06:59 15 letter on to Emory, you agree you would have wanted it to be

10:07:07 16 accurate, correct?

10:07:08 17         "Answer:  The company has fiduciary duties.  I

10:07:15 18 think it was publicly traded at the time, so they have to be

10:07:19 19 accurate.

10:07:19 20         "Question:  Pharmasset has to be accurate?

10:07:21 21         "Answer:  No.  We're talking about Idenix.

10:07:24 22         "Question:  Okay.  They do -- they do have to be

10:07:27 23 accurate, correct?

10:07:29 24         "Answer:  Thank you.

10:07:29 25         "Question:  I agree, and --

"Answer:  So they -- the lawyer signed it on behalf of Idenix.

"Question:  And the lawyer is a Senior VP Legal of Idenix?

"Answer:  I presume it's -- she believes in what she signed.

"Question:  Okay.  And if you were, in fact, using this to send to Emory and you had an opportunity to review it before it went out, you would have wanted it to be accurate, correct?

"Answer:  Of course, if it says something derogatory or says something that's very inaccurate, very, very inaccurate, I would have objected to it and I would have told her to send a correction, but the final -- the final decision is hers.

"Question:  As you sit here today, do you have any reason to believe that any of the information in this letter is inaccurate?

"Answer:  I don't know.  I need to read it carefully.

"Question:  Okay.  It's only -- I thought you did.  It's only a page.

"Answer:  Well, I know, but you have been interrupting me all the time, so --

"Question:  Okay.

10:08:41 1        "Answer:  -- with questions.

10:08:43 2        "Question:  Go ahead and -- go ahead and read

10:08:46 3    it, Dr. Schinazi.

10:08:55 4        "Answer:  Well, I didn't -- I didn't take this

10:08:58 5    letter and send it to my attorney to review to see what's

10:09:02 6    accurate, what's not accurate at the time.  So I don't know

10:09:05 7    what was absolutely accurate or not.  I do believe the last

10:09:09 8    paragraph is definitely accurate.  'I also want' -- it says,

10:09:21 9    'I also want to state that you're not currently serving as a

10:09:24 10   member of any scientific advisory or other board of Idenix.'

10:09:31 11       "I guess it was something to do with some stuff

10:09:33 12   that was put on the Internet that was incorrect.  So I

10:09:36 13   probably requested for it to be taken out, but I don't know

10:09:40 14   about the other points.  When she talks about a large excess

10:09:46 15   of confidential information, I'm not sure how large it is

10:09:49 16   and what time period you're talking about, and I don't

10:09:54 17   recall these details of agreement between Pharmasset and

10:09:57 18   Novirio, but -- and license with TherapX.  I don't remember

10:10:07 19   the exact details on that.  It's such an old -- old stuff,

10:10:11 20   so I can't remember it.  And it talks about an affiliate of

10:10:16 21   Novartis, Idenix.  I don't know if Idenix was an affiliate

10:10:20 22   of Novartis.  I don't know what the definition of

10:10:24 23   'affiliate' is in this particular case, so there are issues

10:10:27 24   related to that.

10:10:29 25       "Again, I'm not a lawyer, but I see some things

10:10:32   1    that I don't understand --

10:10:35   2          "Question:  Okay.

10:10:36   3          "Answer:  -- even today.

10:10:41   4          "Question:  I'm asking you:  Do you deny the

10:10:43   5    statement, 'as a founder and principal shareholder, you have

10:10:49   6    had access to a large amount of confidential information

10:10:52   7    about our company from the early days of its creation' --

10:10:58   8          "Answer:  Yeah, it depends what formative stage

10:11:01   9    of the company means.  Probably the first year of the

10:11:04 10    company.

10:11:04 11          "Question:  So this was dated --

10:11:07 12          "Answer:  Remember, I had already resigned as --

10:11:10 13    by 2003, I had already resigned, I believe, as advisor.

10:11:15 14          "Question:  Okay.  Well --

10:11:22 15          "Answer:  So I don't know what period they're

10:11:23 16    talking about specifically.

10:11:25 17          "Question:  Okay.  Well, let's --

10:11:27 18          "Answer:  If it's early stage, yes, I agree.

10:11:31 19          "Mr. McCrum:  All right, great.  So I would like

10:11:33 20    to mark as Schinazi Exhibit 10 a document entitled

10:11:38 21    'consulting agreement' bearing Bates numbers IDXDE00379711

10:11:46 22    to 720."

10:11:49 23          (Exhibit 10 marked for identification.)

10:11:54 24          Mr. Reeves:  Thank you.

10:11:58 25          "Question:  Dr. Schinazi, this is a true and

correct copy of the consulting agreement that you entered

into with Novirio on June 12th, 1998; correct?

   "Answer:  It looks like it.

   "Question:  Okay.  You have no reason to doubt

that it is, correct?

   "Answer:  That looks correct.

   "Question:  Okay.  Can you -- yeah, can you turn

to the third-to-last page of the document, please, page 8 of

the actual consulting agreement?

   "Answer:  Yes.

   "Question:  That's your signature that appears

there, right?

   "Answer:  Looks like mine.

   "Question:  All right.  Let's go back to the

first page of this document.  You can go ahead and read --

well, let me go ahead and read this.  Paragraph 2,

'services,' says, 'consultant.'  Here, you understand

'consultant' to be you, correct?

   "Answer:  Yes.

   "Question:  Okay.  'Consultant shall provide

consulting, advisory, and other services in the business,

including, without limitations, (A) performing the functions

described on Exhibit A hereto; (B), assisting the company in

the preparation and filing of patent applications; (C),

assisting with the development and research of products and

10:13:28  1    potential products for business.'

10:13:30  2                "Did I read that correctly?

10:13:32  3                "Answer:  That's correct.

10:13:33  4                "Question:  Can you go to page 3 of this

10:13:35  5    agreement for me, please?  And I want to talk about

10:13:39  6    paragraph 6.

10:13:42  7                "Okay.  You can take a moment to read that if

10:13:47  8    you'd like.  I have a few questions for you.

10:13:57  9                "You agree that pursuant to paragraph 6, you had

10:13:59 10    a duty to maintain Idenix's confidential information,

10:14:02 11    correct?

10:14:03 12                "Answer:  Correct, except that it says,

10:14:05 13    'confidential information shall not include information that

10:14:08 14    may be demonstrated by consultant to have been known by the

10:14:12 15    consultant prior to the date hereof or which is otherwise

10:14:18 16    disclosed by the consultant by a third party.'  I believe at

10:14:23 17    that time period, I probably gave more information to them

10:14:25 18    than they gave to me.

10:14:26 19                "Question:  Okay.  Okay.  So I'm just going to

10:14:30 20    read this -- a portion of this.  The first paragraph says --

10:14:34 21    after the number 6 says, 'Confidentiality.  During the

10:14:39 22    course of his engagements with the company, consultant

10:14:42 23    may have access to, learn of, or participate in the

10:14:45 24    development of the company's confidential information or

10:14:48 25    confidential information entrusted to the company or other

10:14:51 1   persons, corporations, or firms.'

10:14:53 2               "Did I read that correctly?

10:14:56 3               "Answer:  I believe you can read.

10:14:58 4               "Question:  All right.  So further down, about

10:15:02 5   two-thirds, it says, 'Consultant agrees to hold such

10:15:05 6   information as strictly confidential and not to disclose any

10:15:08 7   such confidential information to any person, corporation, or

10:15:11 8   firm other than the company."

10:15:12 9               "Do you see that?

10:15:16 10              "Answer:  Correct, but the most important part

10:15:18 11  is the one coming afterwards.

10:15:20 12              "Question:  Okay.  Correct.  So the next

10:15:21 13  sentence says, 'Consultant agree' -- 'further agrees not to

10:15:28 14  make use of such confidential information except on the

10:15:32 15  company's behalf whether or not such information is produced

10:15:36 16  by its own efforts.'

10:15:38 17              "Did I read that correctly?

10:15:40 18              "Answer:  Yes.

10:15:40 19              "Question:  Okay.  So you agree that pursuant to

10:15:43 20  this paragraph, you had a duty not to use Idenix's

10:15:45 21  confidential information except on Idenix's behalf, correct?

10:15:49 22              "Answer:  Except -- I don't agree, except if I

10:15:51 23  already knew the information, then I didn't have to worry

10:15:54 24  about it.

10:15:54 25              "Question:  But if you didn't already know the

10:15:56 1    information and you received it from Idenix, you agree that

10:15:59 2    you were only to use that on Idenix's behalf; correct?

10:16:02 3                    "Answer:  That's correct.

10:16:02 4                    "Question:  Okay.  And you agree that Idenix had

10:16:05 5    determined that certain 2'-methyl nucleosides had activity

10:16:09 6    against HCV, right?

10:16:11 7                    "Answer:  What time period?

10:16:13 8                    "Question:  Any time period.  I mean they -- you

10:16:14 9    agree that they had -- they had determined that 2'-methyl

10:16:18 10   nucleosides had activity against HCV?

10:16:21 11                   "Answer:  I'm not sure it was HCV, sir.  I think

10:16:24 12   it was BVDV.

10:16:26 13                   "Question:  You're drawing a distinction between

10:16:28 14   the two?

10:16:28 15                   "Answer:  Absolutely.

10:16:29 16                   "Question:  Okay.  Do you agree that Idenix had

10:16:31 17   determined that certain 2'-methyl nucleosides had activity

10:16:35 18   against HCV?

10:16:37 19                   "Answer:  Do you agree what?

10:16:41 20                   "Question:  That Idenix had determined that

10:16:42 21   certain 2'-methyl nucleosides had activity against HCV.

10:16:47 22                   "Answer:  At some point, I did.

10:16:48 23                   "Question:  You obtained confidential

10:16:50 24   information from Idenix regarding its development of

10:16:52 25   compounds having a methyl group at the 2' position for the

10:16:58 1    treatment of HCV, correct?

10:17:00 2              "Answer:  No.

10:17:01 3              "Question:  Okay.  Well, let's go to your

10:17:03 4    deposition testimony.

10:17:05 5              "Answer:  Until much later.  I was -- let me

10:17:08 6    finish the time period.  I received -- when the patent

10:17:11 7    issued, yes, I did receive the full information.

10:17:13 8              "Question:  Okay.  So I want you to go to your

10:17:15 9    deposition, which is marked as Schinazi Exhibit 1.

10:17:20 10             "Answer:  Okay.

10:17:21 11             "Question:  Okay.  And I want you to go to page

10:17:23 12   339 starting at --

10:17:28 13             "Okay.  Are you there?  We're going to -- we're

10:17:32 14   going to -- I'm going to refer you to line 18 and I'm going

10:17:36 15   to read this to you, Dr. Schinazi.

10:17:40 16             'Question:  So you had confidential information

10:17:45 17   from Idenix that they were developing compounds?

10:17:49 18             'Answer:  Yes.

10:17:49 19             'Question:  At the 2'-methyl?

10:17:53 20             'Answer:  Yes.

10:17:53 21             'Question:  That you shared with Dr. Watanabe?

10:17:58 22             'Answer:  I shared that with Dr. Watanabe and I

10:18:01 23   told him to keep it secret until the patent -- I was also

10:18:04 24   trying to get his mind to try to understand why these

10:18:10 25   compound were effective against -- against hepatitis C,

10:18:17 1  because at the time I didn't quite understand how a simple

10:18:20 2  2'-methyl on a cytosine molecule could be effective against

10:18:25 3  hepatitis C."

10:18:26 4  "Were you asked those questions and did you give

10:18:28 5  those answers under oath, Dr. Schinazi?

10:18:31 6  "Answer:  That is correct.

10:18:31 7  "Question:  You told Dr. Watanabe -- well, first

10:18:36 8  of all, who is Dr. Watanabe?

10:18:39 9  "Answer:  Well, he's no longer with us,

10:18:41 10  unfortunately.  He died last year, but he was a great

10:18:44 11  chemist, somebody I respected highly.  I had hired him at --

10:18:48 12  I had hired him at Pharmasset.  I believe he was working for

10:18:52 13  a company called Codon Pharmaceutical in Washington area and

10:18:58 14  I hired him.  But before that, he worked at Sloan Kettering

10:19:01 15  for many years with Dr. Jack Fox and others.  He was one of

10:19:05 16  the walking encyclopedia on nucleosides.

10:19:09 17  "Question:  You told Dr. Watanabe in secret

10:19:12 18  about Idenix's 2'-methyl nucleosides for treating HCV before

10:19:19 19  those compounds became public, correct?

10:19:21 20  "Answer:  That's correct.  But it doesn't

10:19:23 21  specifically say what the 2' -- it could be 2'-methyl up or

10:19:29 22  2'-methyl down.  It could be 2'-methyl -- where exactly, it

10:19:34 23  doesn't specify.

10:19:35 24  "Question:  Okay.  Are you disputing -- okay.

10:19:37 25  Let me ask you this:  Did you -- did you tell Dr. Watanabe

10:19:37 1    --

10:19:44 2                    "Answer:  Watanabe (pronunciation).

10:19:44 3                    "Question:  Watanabe about -- that Idenix had

10:19:47 4    developed a 2'-methyl up nucleoside?

10:19:50 5                    "Answer:  I don't recall him -- telling that.  I

10:19:53 6    told him 2'-methyl.  That's what I told him.

10:19:55 7                    "Question:  Okay.  And as you sit here today,

10:19:57 8    you don't know whether that was methyl up or methyl down,

10:20:01 9    correct?

10:20:01 10                   "Answer:  Correct.

10:20:02 11                   "Question:  As it turns out, Idenix was

10:20:03 12   developing 2'-methyl up nucleosides in the 2000 to 2003 time

10:20:10 13   frame, correct?

10:20:11 14                   "Answer:  Correct.

10:20:12 15                   "Question:  At the time you told Dr. Watanabe

10:20:14 16   about the 2'-methyl nucleosides in confidence, Pharmasset had

10:20:18 17   no knowledge that the 2'-methyl nucleosides were important

10:20:20 18   for treating HCV, correct?

10:20:24 19                   "Answer:  I don't know what knowledge they had.

10:20:26 20                   "Question:  Okay.  Well, let's look at what you

10:20:28 21   said in your deposition, Dr. Schinazi.  Can you look at page

10:20:31 22   338, starting at line 10.

10:20:33 23                   "Answer:  Uh-huh.

10:20:35 24                   "Question:  Okay.  Dr. Schinazi, you were asked

10:20:37 25   at 338, line 14 -- I'm sorry, line 10:  'And the information

10:20:42 1   and the knowledge that you provided to Pharmasset that was

10:20:45 2   -- that led to or was useful in the development of 6130.'

10:20:49 3            "Do you see that?

10:20:51 4            "Answer:  Yes.

10:20:51 5            "Question:  Okay.  And then at line 14 of page

10:20:54 6   30 -- 338, you answered under oath, 'Well, I provided

10:20:59 7   basically two important pieces of information to -- first

10:21:01 8   the Emory patent that we talked about, the idea of the 2'

10:21:06 9   fluoro, and I also told them -- told them about the -- told

10:21:10 10   one person specifically, Dr. Watanabe, that 2'-methyl

10:21:14 11   nucleosides were important, and they had no knowledge at the

10:21:14 12   time.

10:21:18 13            "Answer:  Well, when I say 'they', it means

10:21:23 14   'he.'

10:21:23 15           (Video picture freezes.)

10:21:23 16           THE COURT:  Do you know what the problem is?

10:21:29 17           VIDEO SPECIALIST:  I'll start over.

10:21:31 18           THE COURT:  Bear with us, ladies and gentlemen,

10:21:34 19   I'm sure we'll get it running again.

10:23:08 20           (Pause.)

10:23:08 21           THE COURT:  Do you have any estimate how long

10:23:12 22   this will take to get resolved?

10:23:17 23           MR. HARRISON:  It may take a minute or two.

10:23:19 24           THE COURT:  Okay.

10:23:21 25           MR. HARRISON:  Meaning a minute or two yet.

| | | |
|---|---|---|
| 10:23:24 | 1 | THE COURT:  Okay.  If you want to stand up and |
| 10:23:28 | 2 | stretch or do whatever, you are welcome to. |
| 10:23:47 | 3 | (Pause.) |
| 10:24:11 | 4 | THE COURT:  Are you ready? |
| 10:24:13 | 5 | MR. HARRISON:  Yes, Your Honor. |
| 10:24:13 | 6 | THE COURT:  We'll pick it up where we left off. |
| 10:24:13 | 7 | (Video resumes.) |
| 11:40:16 | 8 | "Answer:  Well, when I say 'they,' it means |
| 11:40:23 | 9 | 'he.'  But I thought there may be some other people at -- I |
| 11:40:27 | 10 | didn't question every single person at Pharmasset to ask |
| 11:40:30 | 11 | whether they knew about the possibility that 2'-methyl could |
| 11:40:34 | 12 | be -- could have activity against HCV. |
| 11:40:38 | 13 | "Question:  Okay.  So your testimony is that |
| 11:40:40 | 14 | your reference to 'they' here -- |
| 11:40:44 | 15 | "Answer:  Meaning Dr. Watanabe. |
| 11:40:45 | 16 | "Question:  Watanabe.  And you provided that |
| 11:40:48 | 17 | answer under oath, correct? |
| 11:40:50 | 18 | "Answer:  That's correct. |
| 10:24:33 | 19 | "Question:  You agree that you pointed |
| 10:24:35 | 20 | Pharmasset to the fact that 2'-methyl nucleosides were |
| 10:24:38 | 21 | important, is that right? |
| 10:24:43 | 22 | "Answer:  Only Dr. Watanabe -- |
| 10:24:43 | 23 | "Question:  Only -- |
| 10:24:43 | 24 | "Answer:  -- at that time period. |
| 10:24:44 | 25 | "Question:  And this was before Idenix's |

10:24:47 1  development work on these 2'-methyl compounds had become

10:24:50 2  publicly available, right?

10:24:55 3          "Answer:  That is correct.

10:24:56 4          "Question:  And you told Dr. Watanabe that

10:25:02 5  2'-methyl nucleosides were important for treating HCV, right?

10:25:07 6          "Answer:  I just wanted to figure out what I --

10:25:10 7  I don't recall what I said specifically, but I did tell hem

10:25:13 8  to look into it to see why 2'-methyl are active,

10:25:17 9  scientifically.  It was a scientific question to him

10:25:17 10 because, as I mentioned before, he is a walking

10:25:17 11 encyclopedia --

10:25:24 12         "Question:  And you wanted --

10:25:24 13         "Answer:  -- on nucleosides.

10:25:24 14         "Question:  You wanted him to try to understand

10:25:26 15 why those compounds were effective against --

10:25:28 16         "Answer:  Yes, and even -- yes, and even to this

10:25:31 17 day, we're not clear why.

10:25:33 18         "Question:  But just -- we've got to make sure

10:25:36 19 we're not talking over each other.  You wanted him to

10:25:38 20 understand why those compounds were effective against HCV,

10:25:41 21 correct?

10:25:42 22         "Answer:  Or viruses in general.

10:25:43 23         "Question:  And that's why you provided him that

10:25:45 24 information?

10:25:45 25         "Answer:  Yes, more a scientific question.

10:25:47 1    "Question:  At the time you told Dr. Watanabe

10:25:49 2    about Idenix's confidential work on 2' methyl nucleosides,

10:26:06 3    you did not understand how a simple 2'-methyl nucleoside

10:26:11 4    could be effective against HCV, correct?

10:27:08 5          "Answer:  That is correct.

10:27:08 6          "Question:  And you didn't believe anybody else

10:27:10 7    at Pharmasset understood that, either.  Right?

10:27:14 8          "Answer:  I don't know.

10:27:15 9          "Question:  At the time that you told Dr.

10:27:18 10   Watanabe about Idenix's 2'-methyl nucleosides, you told him

10:27:23 11   it would be useful to make 2'-methyl derivatives, correct?

10:27:27 12         "Answer:  No, I did not say that.  Did I say

10:27:29 13   that specifically?  I don't think so.  I never asked him to

10:27:32 14   make any.

10:27:33 15         "Question:  You never asked him --

10:27:35 16         "Answer:  In fact, I forbade him to make any.

10:27:39 17         "Question:  Lines 8 through 10 say, 'But I also

10:27:43 18   forbade Pharmasset from developing 2'-methyl nucleosides

10:27:46 19   until it became public knowledge.'

10:27:50 20         "Answer:  Correct.

10:27:52 21         "Question:  And just to be clear, Idenix

10:27:55 22   2'-methyl nucleosides were not public knowledge at the time

10:27:58 23   you told Dr. Watanabe?

10:28:00 24         "Answer:  Correct, but they had -- I believe

10:28:02 25   they had filed a patent.

10:28:03  1          "Question:  Okay.

10:28:04  2          "Answer:  So they were covered.

10:28:05  3          "Question:  Right, but a patent had not

10:28:08  4   published yet?

10:28:09  5          "Answer:  Yeah, but it was covered.

10:28:11  6          "Question:  It was covered but not published?

10:28:14  7          "Answer:  Correct.

10:28:17  8          "Mr. McCrum:  Let's -- I'm going to mark as

10:28:20  9   Schinazi Exhibit 11 a document bearing Bates numbers

10:28:26 10   GILEAD04007742 to '43.

10:28:31 11          "Okay.  This exhibit is a series of e-mails

10:28:38 12   between you and Michael Otto from January of 2003, correct?

10:28:42 13          "Answer:  It looks like it's correct.  It's

10:28:44 14   related to 2'-methyl NHC.  NHC stood for N-hydroxy-cytidine.

10:28:53 15          "Question:  So I want to start with the first

10:28:55 16   e-mail from Michael Otto to you that's beginning at -- in

10:28:58 17   the second paragraph of that.  So we're looking at -- kind

10:29:01 18   of halfway down the page, Dr. Schinazi, do you see where it

10:29:04 19   says, 'Ray, I didn't want to criticize'?

10:29:08 20          "Answer:  Uh-huh.

10:29:08 21          "Question:  Okay.  So he writes to you, 'Here

10:29:11 22   are the facts' -- I'm at the second paragraph, by the way.

10:29:16 23   'Here are the facts.  Hassan was working on 2'-methyl

10:29:20 24   compounds back in 2001.  He had started to synthesize

10:29:24 25   2'-methyl-NHC in March of that year.  Through Kyo's reports,

10:29:30 1  you learned of these efforts and demanded that all work on

10:29:33 2  2'-methyl compounds be stopped immediately.  In hindsight,

10:29:37 3  this was so that Pharmasset would stay clear of Novirio's

10:29:42 4  efforts of which you were aware.  Pharmasset scientists were

10:29:44 5  not aware of the potential conflict at the time.  Much later

10:29:49 6  when we learned of the 2'-methyl compounds, Hassan was

10:29:54 7  instructed by me to make the 2'-methyl C as a positive

10:29:57 8  control.'

10:29:59 9          "Did I read that correctly?

10:30:01 10         "Answer:  Yes.

10:30:01 11         "Question:  Okay.  And who is Dr. Hassan?

10:30:03 12         "Answer:  He's a chemist I hired from SRI in

10:30:06 13 Alabama --

10:30:07 14         "Question:  And you --

10:30:09 15         "Answer:  Birmingham, Alabama.

10:30:10 16         "Question:  And you learned that Dr. Hassan was

10:30:13 17 working on 2'-methyl derivatives back in 2001, correct?

10:30:18 18         "Answer:  I was not aware --

10:30:20 19         "Question:  The question is:  You learned in

10:30:21 20 2001 that Dr. Hassan was working on 2'-methyl derivatives;

10:30:26 21 is that true?

10:30:29 22         "Answer:  First of all, this document, the

10:30:32 23 date's 2003.  I believe this Idenix patent was out at the

10:30:35 24 time.  So everybody knew that 2'-methyl C was the active --

10:30:40 25 supposed to be the active compound.  Secondly, I did not

10:30:42  1   know that Dr. Hassan had experience on 2'-methyl

10:30:46  2   nucleosides, if that's what your question is.

10:30:49  3          "Question:  Okay.  So you opined about 2003 --

10:31:00  4   the e-mail says, 'Hassan was working on 2'-methyl compounds

10:31:03  5   back in 2001.'

10:31:05  6          "Do you know if that's correct?

10:31:07  7          "Answer:  I have no idea.  It's the first --

10:31:09  8   probably the first time I had learned that Hassan was

10:31:11  9   working in 2001 on this.

10:31:13 10          "Question:  Okay.  Let's look at your response,

10:31:16 11   okay?  It says, 'Mike, for the record, here are the facts.

10:31:22 12   Kyo Watanabe was told by me in confidence about the

10:31:23 13   2'-methyl derivatives in order for him not to waste his time

10:31:27 14   making them because of a patent conflict with Idenix.  Kyo

10:31:31 15   was, at the time, in charge of the chemistry effort.  At

10:31:34 16   that time, he was intrigued by my disclosure.  And to the

10:31:39 17   best of my knowledge, Hassan was making CH2OH

10:31:45 18   derivative.  A few weeks later, despite my warnings and

10:31:49 19   strictly confidential disclosure to him, he must have told

10:31:53 20   Hassan, who made the active compound.  When I challenged

10:31:56 21   Kyo, he indicated that the 2'-methyl derivatives were

10:32:00 22   intermediates to making 2'CH2OH derivatives for the HIV/HBV

10:32:08 23   projects.  Nevertheless, I felt this argument was a

10:32:10 24   violation of trust by any standard.  I put a stop to this

10:32:14 25   unfair situation immediately.'

10:32:16 1    "Did I read that correctly?

10:32:18 2    "Answer:  Yes.

10:32:18 3    "Question:  Okay.  So let's just go through

10:32:20 4 this.  You told Dr. Watanabe about -- in confidence about

10:32:24 5 Idenix's 2'methyl derivatives, right?

10:32:26 6    "Answer:  Yes.  I already testified to that.

10:32:35 7    "Question:  Okay.  And at the time, you believe,

10:32:38 8 to the best of your knowledge, that Dr. Watanabe told Hassan

10:32:42 9 to make the active compound?

10:32:43 10    "Answer:  Which active compound?

10:32:47 11    "Question:  A 2'-methyl compound?

10:32:49 12    "Answer:  I'm speculating.  I don't know.  I'm

10:32:51 13 saying -- if you read carefully, it says, 'When I challenged

10:32:56 14 Kyo, he indicated that the methyl derivatives were

10:32:59 15 intermediates.'  So he's making intermediates.  He wasn't

10:33:04 16 really trying to make the methyl compound.  He was trying to

10:33:07 17 make the methyl-hydroxy compound, which is very different,

10:33:10 18 as you probably know if you have a chemistry background.  I

10:33:14 19 don't know if you're a chemist by training.  But it also

10:33:17 20 states 'To the best of my knowledge.'  At that time, he was

10:33:23 21 intrigued by my disclosure.  'To the best of my knowledge --

10:33:29 22 to the best of my knowledge, Hassan was making CH2OH

10:33:32 23 derivative.'  He wasn't making methyl derivative, but

10:33:37 24 unfortunately he had to go through the methyl group to get

10:33:39 25 to that.

10:33:40 1          "Question:  Okay.  At the end of this e-mail,

10:33:42 2    Dr. Schinazi, you say, 'I put a stop to this unfair

10:33:46 3    situation' --

10:33:47 4          "Answer:  Yes.

10:33:47 5          "Question:  -- 'immediately,' correct?

10:33:49 6          "Answer:  Correct.

10:33:50 7          "Question:  What were you putting a stop to?

10:33:52 8          "Answer:  Him making methyl derivatives.

10:33:54 9          "Question:  So you knew he was making them?

10:33:56 10         "Answer:  Well, obviously, because after -- this

10:33:59 11   was what it says here, it says Dr. Kyo Watanabe was told me

10:34:03 12   in confidence about the -- and it does say Kyo, at the time,

10:34:07 13   he basically wanted to change the chemistry, so I stopped

10:34:10 14   it.  What's wrong with that?

10:34:11 15         "Question:  I'm just -- I wanted --

10:34:14 16         "Answer:  I thought it was a violation.

10:34:18 17         "Question:  I thought you were disputing that

10:34:20 18   you had knowledge that Dr. Hassan was making these compounds

10:34:24 19   at the time, but --

10:34:26 20         "Answer:  Yeah, but you're putting things in --

10:34:28 21   I didn't know when I talked to Kyo that Dr. Hassan was

10:34:31 22   making anything.  It's after the fact.  Now we're dealing

10:34:34 23   2003.  We're looking at -- from 2003 back to whatever time

10:34:39 24   Hassan made that compound.

10:34:41 25         "Question:  Okay.  Do you believe that telling

10:34:42  1    Dr. Watanabe about Idenix 2'methyl compounds was a violation

10:34:45  2    of any confidentiality obligations you owed to Idenix?

10:34:49  3             "Answer:  Not really because I told him this is

10:34:51  4    very confidential, it's strict confidence.  I also forbade

10:34:55  5    him to take advantage of this information and I forbade

10:34:58  6    anybody at Pharmasset to work on it.

10:35:00  7             "Question:  Okay, but you believe he violated

10:35:02  8    that trust, right?

10:35:03  9             "Answer:  I don't know if he violated it.

10:35:04 10             "Question:  But you said you believed he did in

10:35:08 11    this e-mail, correct?

10:35:09 12             "Answer:  You have to -- you have to read the --

10:35:11 13    it's -- obviously I wasn't happy about it, but I don't know

10:35:14 14    if -- I don't know who told what.  From what I can gather,

10:35:19 15    that Hassan was making already 2'-methyl.  According to Dr.

10:35:22 16    Otto, he was making compounds in 2001 containing 2'-methyl,

10:35:26 17    and I also believe he had knowledge how to make these

10:35:29 18    compounds.  He didn't know about the Idenix patent, I can

10:35:31 19    tell you that.  Hassan did not know.  I did not talk -- I

10:35:34 20    didn't disclose to Dr. Hassan anything.

10:35:36 21             "Question:  Okay.  Why did you put a stop, as

10:35:38 22    you say, to the unfair situation of Dr. Hassan making

10:35:42 23    2'-methyl compounds?

10:35:46 24             "Answer:  Because somebody must -- I didn't want

10:35:49 25    anybody at Pharmasset to work on 2'-methyl nucleosides

10:35:52 1  because they -- this -- these particular compounds belonged

10:35:55 2  to Idenix.

10:35:56 3          "Question:  And you felt if making them, that

10:35:58 4  would have been wrong?

10:35:59 5          "Answer:  Well, you know, it would have been

10:36:01 6  wrong if they made them intentionally, yes.

10:36:04 7          "Question:  At the end of your e-mail, at the

10:36:06 8  top, you say, 'Now Idenix's patent is public, this research

10:36:10 9  area is fair play.  We can work on related compounds.'

10:36:15 10         "Do you see that?

10:36:15 11         "Answer:  Yes.

10:36:16 12         "Question:  Okay.  What related compounds were

10:36:18 13 you referring to?

10:36:19 14         "Answer:  I don't know specifically.  Obviously

10:36:20 15 related to -- work on nucleosides, so we can make -- we can

10:36:25 16 make any -- if we want to make methyl compounds, we can

10:36:28 17 certainly make methyl compounds.

10:36:30 18         "Question:  The patent conflict that was

10:36:31 19 referred to in Schinazi Exhibit 11, that -- is it true that

10:36:36 20 that involved Idenix's 2'-methyl patent application?

10:36:41 21         "Answer:  I'm referring to the e-mail from Dr.

10:36:44 22 Otto.  And actually Dr. Schinazi says it in the very -- in

10:36:44 23 the second sentence, he says, 'Kyo Watanabe was told by me

10:36:44 24 in confidence about the 2'-methyl derivatives in order for

10:36:44 25 him not to waste his time making them because of a patent

10:36:53 1    conflict with Idenix.'

10:36:53 2         "What was the patent conflict with Idenix that

10:37:12 3    you were referring to, Dr. Schinazi?

10:37:13 4         "Answer:  Well, obviously Idenix had 2'-methyl

10:37:15 5    covered in their patent, so I was basically telling him not

10:37:18 6    to work on 2'-methyl nucleosides because what's the point,

10:37:22 7    we would be competing with them.

10:37:28 8         "Mr. McCrum:  Let's see.  I'm going to mark

10:37:30 9    another exhibit, Dr. Schinazi.  I'm marking as Schinazi

10:37:33 10   Exhibit 19 a document bearing Bates Nos. GILEAD04070485

10:37:42 11   through 88.

10:37:44 12        "Question:  You agree this exhibit is an e-mail

10:37:47 13   chain involving you and Lieven Stuyver dated October -- in

10:37:52 14   the October 2001 time frame?

10:37:55 15        "Answer:  That's correct.

10:37:55 16        "Question:  Okay.  I want you to refer to the

10:38:03 17   e-mail sent by Dr. Stuyver to you beginning on the second

10:38:07 18   page of this exhibit.  You see where I'm referring to, the

10:38:10 19   one that starts 'Dear Raymond'?

10:38:14 20        "Answer:  Okay, which page?

10:38:16 21        "Question:  This is the second page.

10:38:19 22        "Answer:  'Dear Raymond, I got a cold shower...'

10:38:23 23        "Question:  Yes.  I'm actually going to read a

10:38:26 24   portion of this e-mail to you.  Dr. Stuyver writes, 'Dear

10:38:29 25   Raymond:  I got a cold shower in Sherry's office when she

10:38:32 1   disclosed in general terms (no details) the basics of the

10:38:36 2   Novirio patent.  For me this means that almost NOTHING' --

10:38:41 3   'NOTHING' is in all caps -- 'is left of our inventions and

10:38:44 4   list of compounds.  Novirio's patent will be published in

10:38:47 5   two months' time.  They will have all the priority dates.'

10:38:52 6          "Did I read that correctly?

10:38:54 7          "Answer:  Sounds like it.

10:38:55 8          "Question:  Okay.  Prior to this e-mail, were

10:38:57 9   you aware that Ms. Knowles had disclosed the basics of the

10:38:59 10   Novirio patent to Dr. Stuyver?

10:39:02 11          "Answer:  No, I didn't know he even had a

10:39:03 12   meeting with her.

10:39:04 13          "Question:  Okay.  You understand the reference

10:39:06 14   to Sherry here to be Sherry Knowles?

10:39:11 15          "Answer:  That's correct.

10:39:11 16          "Question:  And you had no -- your recollection

10:39:14 17   is you have no memory of that meeting taking place?

10:39:18 18          "Answer:  No.

10:39:19 19          "Question:  Dr. Stuyver references that

10:39:21 20   Novirio's patent will be published in two months' time,

10:39:24 21   correct?

10:39:25 22          "Answer:  Yeah.  I don't know how he knows that,

10:39:27 23   but I guess she must have told him.

10:39:29 24          "Question:  And if you go back to 15 --

10:39:35 25          "Answer:  15?

10:39:37 1          "Question:  Yeah, it's the big one.  It's the

10:39:39 2     PCT --

10:39:41 3          "Answer:  Yeah, what about it?

10:39:43 4          "Question:  -- publication.  This is an

10:39:46 5     application that was filed by Novirio, right?

10:39:49 6          "Answer:  Yes.

10:39:50 7          "Question:  And you see at the top, it says,

10:39:53 8     'International Publication Date' --

10:39:57 9          "Answer:  Yes.

10:39:57 10         "Question:  -- 'November 29th, 2001.'

10:40:01 11         "Do you see that?

10:40:02 12         "Answer:  Correct.

10:40:02 13         "Question:  And that was about two months after

10:40:04 14    Dr. Stuyver sent this e-mail to you about getting the cold

10:40:08 15    shower from Sherry, right?

10:40:09 16         "Answer:  It's about one -- it's about one and a

10:40:16 17    half months.

10:40:16 18         "Question:  One and a half months.  Okay, fair

10:40:19 19    enough, one and a half months.  So about halfway down the

10:40:22 20    page, continuing with Dr. Stuyver's e-mail here, he says,

10:40:26 21    you see where it says, 'The way I see it now'?  Do you see

10:40:31 22    where I'm referring to?

10:40:34 23         "'The way I see it now, either we need to take a

10:40:39 24    license for Novirio; in this case we will not have matter.

10:40:51 25    'In this case, we will not have matter of composition nor

10:40:54 1    use patents.'

10:40:56 2              "Do you see that?

10:40:57 3              "Answer:  I see that.

10:40:57 4              "Question:  And did -- well, moving down a

10:41:00 5    little further, he says, starting -- it says, 'Also, why

10:41:08 6    would Novirio give PSL a license?'

10:41:12 7              "Do you see where I'm referring to?  It's a

10:41:15 8    little more than halfway down.

10:41:18 9              "Answer:  Yes.

10:41:18 10             "Question:  It says, 'Also, why would Novirio

10:41:22 11   give PSI a license?  They're in the same business and are

10:41:25 12   our competition.  Either we fight them; in this case, Sherry

10:41:29 13   is not the person to deal with it because of conflict of

10:41:32 14   interest.'

10:41:33 15             "Do you see that?

10:41:33 16             "Answer:  Uh-huh.

10:41:34 17             "Question:  Okay.  Let's turn to the next page,

10:41:36 18   which is Page 3, Dr. Schinazi.  And three lines down, Dr.

10:41:40 19   Stuyver writes, 'I consider all efforts at this moment

10:41:44 20   redundant.  Besides that, what is your opinion about the

10:41:48 21   chemists' work designing compounds that eventually might

10:41:51 22   belong to Novirio?'

10:41:54 23             "Did I read that correctly?

10:41:56 24             "Answer:  Yes.

10:41:56 25             "Question:  Dr. Stuyver, at that point in time,

10:41:59 1  you agree, felt that the Pharmasset work that was being done

10:42:03 2  might eventually belong to Idenix?

10:42:05 3         "Answer:  I disagree with that because, frankly,

10:42:08 4  he was not a patent attorney, number one; number two, he

10:42:13 5  didn't know anything about chemistry.  He was just a

10:42:15 6  biologist testing drugs.  He didn't know anything else.

10:42:18 7         "Question:  During the 2001 time frame that

10:42:23 8  we've been discussing, you agree that Pharmasset was not

10:42:26 9  working on nucleosides for treating HCV that had methyl at

10:42:33 10 the 2' position?

10:42:34 11        "Answer:  As far as I know, yes, and as I

10:42:36 12 instructed them, yes.

10:42:38 13        "Question:  Yes, they were not working on them?

10:42:41 14        "Answer:  They were not working on them, to the

10:42:43 15 best of my knowledge at the time.

10:42:43 16        "Question:  And the reason -- one of the reasons

10:42:47 17 for that is because it was not a primary objective of

10:42:49 18 Pharmasset to work on those compounds in 2001, right?

10:42:54 19        "Answer:  We had our own derivatives that we

10:42:56 20 were working on, own compounds that we had discovered.

10:42:59 21        "Question:  Okay.  And the work that you were

10:43:01 22 doing, it was not a primary objective of Pharmasset to be

10:43:04 23 working on 2'-methyl compounds, right?

10:43:08 24        "Answer:  At that time, correct.

10:43:09 25        "Mr. McCrum:  I am going to mark Schinazi

10:43:12  1   Exhibit 21 U.S. Patent number 7,307,065 entitled '2'-fluoro

10:43:21  2   nucleosides.'

10:43:28  3           "Question:  And this patent discloses the idea

10:43:32  4   of putting fluorine at the 2' position of a nucleoside for

10:43:36  5   treating various viral infections.  Right?

10:43:38  6           "Answer:  That's correct.

10:43:39  7           "Question:  You are familiar with a Pharmasset

10:43:41  8   compound referred to as PSI-6130?

10:43:45  9           "Answer:  Yes, I am.

10:43:46 10           "Question:  And that compound had a methyl at

10:43:49 11   the 2'-(up) position and the fluorine at the 2'-(down)

10:43:54 12   position, correct?

10:43:55 13           "Answer:  With a cytosine base, yes.

10:43:58 14           "Question:  Okay.  I want to talk about what

10:44:00 15   you -- what information you provided specifically to

10:44:03 16   Pharmasset with respect to that development.  The first

10:44:06 17   thing that you provided was the idea of putting fluorine at

10:44:09 18   the 2' position as disclosed in the Emory patents, right?

10:44:18 19           "Answer:  That's not correct.

10:44:19 20           "Question:  Okay.  Well, let's go back to

10:44:22 21   Exhibit 1, which is your July 8th, 2010 deposition, and I

10:44:26 22   want to look at Page 338.  Okay.  Starting at Line 10, Dr.

10:44:31 23   Schinazi.  Let me know when you're there.

10:44:34 24           "Answer:  Line 10 on 238, yes, sir.

10:44:36 25           "Question:  338.

10:44:38  1            "Answer:  338.  338.  Okay.  What about it?

10:44:42  2            "Question:  Okay.

10:44:43  3            "Answer:  Line 10?

10:44:44  4            "Question:  Line 10, right.  I'm going to 338.

10:44:59  5            "Answer:  338.  'And the information and

10:45:00  6    knowledge' --

10:45:02  7            "Question:  I'm just going to read this to you.

10:45:04  8    You were asked the following question and gave the following

10:45:06  9    answer.

10:45:06 10            "Answer:  Yeah.

10:45:07 11            "Question:  'Question:  And the information and

10:45:09 12    knowledge that you provided to Pharmasset that was -- that

10:45:12 13    led to or was useful in the development of 6130?

10:45:16 14            "Answer:  Well, I provided basically two

10:45:17 15    important pieces of information to -- first the Emory patent

10:45:21 16    that we talked about, the idea of 2'-fluoro, and I also told

10:45:25 17    them -- told them about the -- told one person specifically,

10:45:30 18    Dr. Watanabe, that 2'-methyl nucleosides were important.

10:45:33 19    And they had no knowledge at that time.  Even though it was

10:45:37 20    not Emory's -- it was not Emory's technology, I pointed them

10:45:41 21    to that, and the idea flew -- through that idea, the

10:45:45 22    conception of putting these two groups together in the 2'

10:45:48 23    position.'

10:45:50 24            "Were you asked that question and did you give

10:45:52 25    that answer under oath, Dr. Schinazi?

10:45:55  1    "Answer:  I did, but you should remember that

10:45:57  2    Kyo Watanabe was a world-class expert on fluoro -- 2'-fluoro

10:46:01  3    nucleosides prior to me even discussing with him.

10:46:04  4    "Question:  But you were asked that question and

10:46:06  5    gave that answer under oath, correct?

10:46:11  6    "Answer:  That is correct, but I'm trying to

10:46:15  7    tell you what I told them is true, but also Dr. Watanabe was

10:46:18  8    a world class expert on 2'-fluoro nucleosides, so was Dr.

10:46:21  9    Pankiewicz, who had written a review on 2'-fluoro

10:46:24 10    nucleosides prior to this patent.

10:46:25 11    "Question:  The second thing that you

10:46:26 12    contributed to the development of PSI-6130 was -- that

10:46:30 13    putting methyl at the 2' position was important, correct?

10:46:33 14    "Answer:  I didn't say that specifically, but I

10:46:34 15    say the importance -- I provided -- it says, 'Well, I

10:46:39 16    provided basically two important pieces of information to --

10:46:41 17    first the Emory patent, and I also told them -- told one

10:46:46 18    person, just one person, not them.  When you said 'We,' that

10:46:51 19    means everybody at Pharmasset.  That's not true.  Only Dr.

10:46:56 20    Watanabe under secrecy.

10:46:57 21    "Question:  Okay.  So you told Dr. Watanabe that

10:46:59 22    2'-methyl nucleosides were important, right?

10:47:02 23    "Answer:  Under secrecy, yes.

10:47:03 24    "Question:  Okay.  And you obtained that

10:47:05 25    information, 2'-methyl and its importance from Idenix,

10:47:12 1    right?

10:47:14 2              "Answer:  Yes.

10:47:15 3              "Question:  There was an individual at

10:47:20 4    Pharmasset by the name of Jeremy Clark, correct?

10:47:25 5              "Answer:  That's correct.

10:47:25 6              "Question:  And you believe that Jeremy Clark

10:47:27 7    was the first person to make a 2'-methyl-2'-fluoro

10:47:33 8    nucleosides.  Right?

10:47:34 9              "Answer:  I found that -- about that when he

10:47:37 10   described his work at the group meeting and also later on

10:47:40 11   looking at his notebooks.  He was the first person to

10:47:43 12   actually make the compound.

10:47:44 13             "Question:  Before Mr. Clark made that compound,

10:47:47 14   there were group meetings at Pharmasset where the group

10:47:50 15   talked about 2'-methyl compounds because of Idenix's work

10:47:54 16   on those compounds.

10:46:30 17             "Answer:  You have to show me the note

10:46:33 18   specifically, but I don't -- I'm sure we talked about

10:46:37 19   many things, not just the 2'-methyl, but every single

10:46:42 20   possibility.  We talked about so many compounds that it's

10:46:45 21   hard for me to remember specifically what was discussed.

10:46:48 22   There were many ideas.  It doesn't mean that they were

10:46:51 23   implemented.

10:46:53 24             "Question:  So let's look at page 58 of your

10:46:56 25   deposition from 2010.

10:46:57 1          "Answer:  Block 58, you're --

10:47:01 2          "Question:  Page 58, yeah.

10:47:04 3          "Answer:  Okay.  Okay.

10:47:06 4          "Question:  And at line 2 through line 17, you

10:47:10 5   were asked the following question and gave the following

10:47:12 6   answer:  'And the notion of putting a methyl group and a

10:47:40 7   flourine group at the 2' position of the sugar ring was not

10:47:45 8   something you advised Jeremy Clark on before he synthesized

10:47:49 9   6130, correct?

10:47:50 10          "Answer:  Not directly, but to the whole group

10:47:52 11  we talked about 2'-methyl nucleosides and we had group

10:47:57 12  meetings, as you are aware, and we talked with 2' methyl

10:48:01 13  because of Idenix and we talked about the fluoro because of

10:48:04 14  Emory and the idea was to bring the two together, as a --

10:48:08 15  and normally it doesn't work.  Normally, when you do a

10:48:12 16  methyl and a fluorine or whatever, you take one idea from

10:48:14 17  the other, sometimes it does, sometimes it doesn't.  You

10:48:17 18  have to actually make the compound and test it."

10:48:19 19          "Were you asked that question and did you give

10:48:22 20  that answer under oath, Dr. Schinazi?

10:48:22 21          "Answer:  Yes, I did.

10:48:23 22          "Question:  Okay.

10:48:24 23          "Answer:  And I don't remember the exact title,

10:48:26 24  what I meant for the whole group, but certainly that sound

10:48:30 25  like me and it is correct.

| | | |
|---|---|---|
| 10:48:33 | 1 | "Mr. McCrum: I'm marking as Schinazi Exhibit 23 |
| 10:48:36 | 2 | a document bearing Bates numbers IDXDE00564958 to 999. It's |
| 10:48:43 | 3 | a presentation entitled, 'Antiviral Drug Development.' |
| 10:48:48 | 4 | (Exhibit 23 marked for identification.) |
| 10:48:53 | 5 | "Question: Dr. Schinazi, your name appears on |
| 10:48:55 | 6 | the cover of this presentation, correct? |
| 10:48:56 | 7 | "Answer: That's right. |
| 10:48:57 | 8 | "Question: And it's dated June 20th, 2003, |
| 10:49:00 | 9 | correct? |
| 10:49:01 | 10 | "Answer: Correct. |
| 10:49:02 | 11 | "Question: Okay. So this slide reads, |
| 10:49:05 | 12 | 'Hepatitis C Drug Candidates First-in-Class (Idenix |
| 10:49:09 | 13 | Pharma.)' |
| 10:49:10 | 14 | "Answer: That's correct. |
| 10:49:13 | 15 | "Question: And what does 'first-in-class' mean |
| 10:49:15 | 16 | in the pharmaceutical industry? |
| 10:49:16 | 17 | "Answer: It means -- 'first-in-class' meaning |
| 10:49:21 | 18 | the first time somebody finds a compound that's active |
| 10:49:26 | 19 | against hepatitis C in that particular class." |
| 10:49:28 | 20 | "Question: And Idenix was the first company to |
| 10:49:32 | 21 | do that, correct? |
| 10:49:33 | 22 | "Answer: As far as I knew, yes. |
| 10:49:34 | 23 | "Question: The second bullet point reads, |
| 10:49:40 | 24 | 'First clinical drug candidate (NM283 a prodrug of NM107) |
| 10:49:49 | 25 | discovered from a potent, selective class of compounds.' |

10:49:52  1              "Do you see that?

10:49:53  2              "Answer:  Yes.

10:49:54  3              "Question:  And then underneath that, it says

10:49:56  4      'highly potent in cell-based assays and predictive animal

10:49:59  5      model.'  Right?

10:50:02  6              "Answer:  Yes.

10:50:02  7              "Question:  Idenix had developed NM283, right?

10:50:05  8              "Answer:  Correct.

10:50:06  9              "Question:  And that was the compound that is

10:50:07 10      being referred to as first-in-class?

10:50:09 11              "Answer:  Yes.

10:50:09 12              "Question:  And that compound was a prodrug of

10:50:11 13      another compound know-as NM107, right?

10:50:15 14              "Answer:  That's correct.

10:50:15 15              "Question:  Just to be clear, NM283 was the

10:50:18 16      first nucleoside for treating HCV that was put into the

10:50:25 17      clinic, right?

10:50:28 18              "Answer:  I don't know what Merck and other

10:50:29 19      companies did because they also had compounds, so they could

10:50:32 20      have put their compounds and never disclosed.  So I don't

10:50:35 21      know if we were the only -- if Idenix were the first one.

10:50:40 22      There could have been other companies that put -- rib, as

10:50:45 23      you know, ribavirin, is a nucleoside, but it's not exactly a

10:50:50 24      specific antiviral agent.  So they were actually approved

10:50:53 25      for HCV.  So that's actually a nucleoside.  If you really

10:50:58 1  want to go for first-in-class, riba may be the first one,

10:51:02 2  the very first one.  This could be the most -- more

10:51:05 3  selective compound.

10:51:06 4          "Question:  NM283 had a methyl group at the 2'

10:51:10 5  up position, right?

10:51:11 6          "Answer:  That's correct.

10:51:11 7          "Question:  Okay.

10:51:12 8          "Answer:  And may I point out this was in 2003,

10:51:16 9  well after disclosure.  I believe these slides actually were

10:51:19 10 provided to me by Idenix for this meeting.

10:51:21 11         "Question:  I want to -- okay.  So in both

10:51:25 12 compounds, NM107 and 6130, they have a methyl at the 2' up

10:51:32 13 position, right?

10:51:33 14         "Answer:  Correct.

10:51:33 15         "Question:  And they both have cytosine as the

10:51:37 16 base, right?

10:51:38 17         "Answer:  Correct.

10:51:38 18         "Question:  And they both have OH at the 3' and

10:51:41 19 5' positions, right?

10:51:42 20         "Answer:  Correct.

10:51:43 21         "Question:  So the only difference between these

10:51:45 22 two compounds is that NM107 has OH at the 2' down position

10:51:51 23 and 6130 has fluorine at the 2' down position?

10:51:55 24         "Answer:  Sir, if you didn't have a methyl

10:51:58 25 group, you'd probably be a woman.  So it's all a simple

10:52:04  1   modification, and nucleosides can change things completely.

10:52:07  2   So that's a major difference when you have a fluoro versus a

10:52:11  3   no fluoro or have a methyl and no methyl.

10:52:14  4          "Question:  So putting this document aside, the

10:52:16  5   only difference between NM107 and 6130 is that NM107 has an

10:52:21  6   OH at the 2' down and 6130 has a fluoro at the 2' down,

10:52:26  7   correct?

10:52:28  8          "Answer:  Correct.

10:52:28  9          "Question:  Let me mark as Exhibit 25 a document

10:52:31 10   bearing Bates numbers GILEAD05101283 through GILEAD05101301.

10:52:43 11          (Exhibit 25 marked for identification.)

10:52:47 12          "Question:  Dr. Schinazi, this document is the

10:52:49 13   final copy of the October 28th annual chemistry retreat,

10:52:53 14   Stone Mountain Park, held October 4th, 2003, correct?

10:52:58 15          "Answer:  Yes.

10:52:58 16          "Question:  Under the first paragraph, you see

10:53:01 17   there is a heading, 'Dr. Schinazi's Presentation'?

10:53:06 18          "Answer:  Yes.

10:53:07 19          "Question:  Okay.  I'm going to refer to the

10:53:09 20   seventh bullet from the bottom of the page.  So if you count

10:53:13 21   seven up, it reads, 'PSI-6130 similar in profile to Idenix

10:53:22 22   and less potent than A analog analog, the selectivity is

10:53:28 23   better than A analog which is more toxic' --

10:53:33 24          "Answer:  Where are you talking about?  Are you

10:53:34 25   talking about the first page?

10:53:36 1          "Do you have something wrong?  This is the

10:53:39 2    seventh.  Am I missing something?

10:53:40 3          Ah, from the bottom.  Okay.  Go ahead.

10:53:43 4          "Question:  See where I'm at?  It reads

10:53:52 5    'PSI-6130 similar in profile to Idenix and less potent than

10:53:54 6    A analog" --

10:53:57 7          "Answer:  Yes, that's correct.

10:53:59 8          "Question:  -- 'analog, the selectivity is

10:54:03 9    better than A analog, which is more toxic.'

10:54:07 10          "Did I read that correctly?

10:54:09 11          "Answer:  That is correct.

10:54:09 12          "Question:  Okay.  Then if you -- the bullet

10:54:12 13    point above the one that we just discussed reads, '2'-methyl

10:54:17 14    sugars show that they are hepatitis C inhibitors.  S282T

10:54:23 15    mutation occurs and demonstrates that there is a true

10:54:26 16    antiviral effect."

10:54:28 17          "Did I read that correctly?

10:54:29 18          "Answer:  Yeah.

10:54:30 19          "Question:  And these bullet points appear under

10:54:32 20    the heading, 'Dr. Schinazi's Presentation,' correct?

10:54:37 21          "Answer:  Yes.

10:54:37 22          "Question:  I'm going to mark as Schinazi

10:54:40 23    Exhibit 26 a document bearing Bates numbers GILEAD00219610

10:54:48 24    to 612.

10:54:50 25          (Exhibit 26 marked for identification .)

10:54:52 1        "Question:  Dr. Schinazi, this exhibit reflects

10:54:54 2  the chemistry meetings for a meeting that took place at

10:54:57 3  Pharmasset on January 17th, 2003, right?

10:55:00 4        "Answer:  Looks like it.  I haven't seen it in

10:55:02 5  years.

10:55:02 6        "Question:  And you're listed as an attendee,

10:55:06 7  correct?

10:55:06 8        "Answer:  It looks like it.

10:55:07 9        "Question:  And first page, you see where

10:55:09 10  there's a series of bullet points under the name Dr. Kyoichi

10:55:14 11  Watanabe?

10:55:15 12        "Answer:  Yes.

10:55:15 13        "Question:  Okay.  So I'm going to read a couple

10:55:18 14  of these into the record.  In particular, the second, third,

10:55:21 15  and fourth bullet read, 'Discussed biological data of

10:55:27 16  PSI-1487, PSI-5583, and Idenix compounds.  Based on the new

10:55:33 17  leads from Idenix, Merck, and Roche, the future focus is to:

10:55:40 18  Make 2' modified and 4' modified sugars with structural

10:55:46 19  similarity to lead sugars; make 2' modified and 4' modified

10:55:51 20  nucleosides with natural bases.

10:55:53 21        "Did I read that -- those correctly?"

10:55:56 22        "Answer:  Correct.

10:55:56 23        "There is a typo.  Nucleoside is misspelled.

10:55:59 24        "Question:  Okay.  And the Idenix nucleosides, I

10:56:02 25  think we established that you're referring to, had a methyl

10:56:05 1  at the 2' up position; right?

10:56:07 2          "Answer:  Yeah.  We -- you know, instead of

10:56:10 3  saying the chemical name, we just called Idenix.  It could

10:56:14 4  be called the Merck or the Roche or whatever.  It's just a

10:56:18 5  convenient way of describing the compound.

10:56:20 6          "Question:  And people at Idenix -- or at

10:56:22 7  Pharmasset knew what you were referring to when you said the

10:56:25 8  Idenix or the Merck compounds, right?

10:56:27 9          "Answer:  By 2003, I think they understood

10:56:30 10  that.

10:56:30 11          "Question:  Okay.  Okay.  And the Merck -- the

10:56:32 12  Merck compounds referred to here, those also had a methyl at

10:56:37 13  the 2' up position, correct?

10:56:38 14          "Answer:  Some of them did.

10:56:39 15          "Question:  And according to this document, the

10:56:40 16  future focus of Pharmasset was to make 2' modified and 4'

10:56:46 17  modified sugars and nucleosides based on the new leads of

10:56:49 18  Idenix and Merck, right?

10:56:51 19          "Answer:  Idenix, Merck, and Roche, because 4'

10:56:54 20  were actually made by Roche.

10:56:57 21          "Question:  I'm going to mark as Schinazi

10:56:59 22  Exhibit 29 a document bearing Bates number GILEAD03277630.

10:57:07 23          (Exhibit 29 marked for identification.)

10:57:10 24          "Question:  All right.  Dr. Schinazi, you agree

10:57:12 25  that this document reflects the chemistry meeting minutes

10:57:15 1   for Pharmasset held on February 21, 2003, correct?

10:57:19 2             "Answer:  Based on what I see in front of me,

10:57:21 3   yes.

10:57:21 4             "Question:  Okay.  On the first page, do you see

10:57:24 5   the reference is to Dr. Rachakonda?

10:57:33 6             "Answer:  Yes.

10:57:33 7             "Question:  And it says, "Discussed the

10:57:36 8   synthesis of the Idenix sugar and will have four sugars with

10:57:40 9   the synthetic route used."

10:57:43 10            "Do you see that?

10:57:45 11            "Answer:  Correct.

10:57:46 12            "Question:  What is your understanding of what

10:57:47 13  is meant by the "Idenix sugar" here?

10:57:52 14            "Answer:  I've seen something in the previous --

10:57:54 15  I mean, I'm just speculating.  I've seen something that

10:57:59 16  Dr. Rabi was making, large quantities.  So I presume that's

10:58:03 17  the same compound he's talking about -- that she's talking

10:58:06 18  about.

10:58:07 19            "Question:  I'm going to mark as Schinazi

10:58:09 20  Exhibit 30, a document bearing Bates numbers GILEAD00714800

10:58:14 21  through 801.

10:58:15 22            (Exhibit 30 marked for identification.)

10:58:18 23            "Question:  Dr. Schinazi, this document reflects

10:58:20 24  the chemistry meeting minutes for Pharmasset that was held

10:58:23 25  on April 4th, 2003, correct?

10:58:26 1      "Answer:  Yes.

10:58:26 2          "Question:  The first -- I want you to look

10:58:29 3  under the -- under Dr. Rachakonda's name, not the bullets,

10:58:33 4  but the paragraph.  It reads, 'Chemists suggested an

10:58:38 5  alternative route to making the Idenix sugar.  Chemists also

10:58:43 6  raised a question about the rationale for making these

10:58:45 7  sugars and nucleosides thereafter.  They said that most of

10:58:49 8  the possible nucleosides from the Idenix sugar derivatives

10:58:53 9  are already have been synthesized by Idenix and possibly did

10:58:57 10 not show good results.  Mike replied saying that we are

10:59:01 11 trying to cash on the loopholes in the patents from other

10:59:05 12 companies.'

10:59:06 13         "Did I read that correctly?

10:59:09 14         "Answer:  Yes.

10:59:10 15         "Question:  Okay.  So as of April 4th, 2003, you

10:59:13 16 agree that Pharmasset was still doing work related to this

10:59:24 17 Idenix sugar?

10:59:26 18         "Answer:  I was not present at that meeting, so

10:59:28 19 I don't know what they were doing.  But I guess, based on

10:59:31 20 the piece of paper you showed me, that they are talking

10:59:33 21 about Idenix sugar.  But actually, as you know, this

10:59:37 22 compound, the sugar was made by other people, other Idenix.

10:59:40 23 My -- the scientists at Pharmasset probably use the word,

10:59:44 24 "Idenix sugar" as saying -- you know, to try to define

10:59:49 25 complex molecule with a lot of chirality, so they just used

10:59:54 1    the word "Idenix sugar," I presume.

10:59:57 2          "Question:  I'm going to mark as Schinazi

10:59:59 3    Exhibit 31 a document entitled GILEAD04 -- I'm sorry, a

11:00:03 4    document having Bates numbers GILEAD04545011 to 012.

11:00:10 5          (Exhibit 31 marked for identification.)

11:00:13 6          "Question:  Dr. Schinazi, this document is the

11:00:15 7    chemistry meeting minutes for Pharmasset for the chemistry

11:00:20 8    meeting held on May 2nd, 2003, right?

11:00:23 9          "Answer:  Yes.

11:00:23 10          "Question:  Under the name 'Abdalla Hassan,' you

11:00:28 11    see your name there as the third bullet?

11:00:31 12          "Answer:  Yes.

11:00:32 13          "Question:  The bullet under your name reads,

11:00:35 14    "Suggested making Idenix compound for compound #9."

11:00:40 15          "Did I read that --

11:00:42 16          "Answer:  Making -- yeah, I see under 'Abdalla

11:00:46 17    Hassan,' yes.

11:00:49 18          "Question:  Okay.  Do you see under Laurent

11:00:55 19    Hollecker's -- do you see the reference to Laurent Hollecker

11:00:56 20    there?

11:00:57 21          "Answer:  Yes.

11:00:58 22          "Question:  And who is Laurent Hollecker?

11:00:59 23          "Answer:  He is an organic chemist we hired from

11:01:02 24    France.

11:01:04 25          "Question:  Okay.  The second bullet under his

11:01:06 1    name reads -- you see the name, 'Mike:  Laurent, Jeremy, and

11:01:14 2    Christian came together to make the Idenix compound in 10 days.'

11:01:19 3              "Do you see that?

11:01:20 4              "Answer:  Yes.

11:01:20 5              "Question:  Did you think that was an easy

11:01:22 6    compound to make?

11:01:24 7              "Answer:  Nothing is easy initially.  But once

11:01:26 8    you know how to make it, it's easy, and there are many ways

11:01:31 9    of making the compound.  And it wasn't -- these compounds

11:01:34 10   were made previously by others, not just Idenix, as you well

11:01:38 11   know.

11:01:39 12             "Question:  The Idenix compound referred to here

11:01:41 13   again, that has methyl at the 2' up position, right?

11:01:46 14             "Answer:  I presume that's what they meant.

11:01:48 15             "Question:  I'm going to mark as Schinazi

11:01:50 16   Exhibit 32 a document bearing Bates number Gilead04435409.

11:01:56 17             (Exhibit 32 marked for identification.)

11:02:00 18             "Question:  This document is an e-mail from you

11:02:02 19   to Ann Hobbs dated May 8th, 2003, correct?

11:02:08 20             "Answer:  Interesting.  Yes.

11:02:09 21             "Question:  And there's actually two e-mails

11:02:12 22   here.  The bottom e-mail from Ann Hobbs to you says,

11:02:17 23   'Dr. Schinazi:  Attached are the meeting minutes from

11:02:20 24   Friday's meeting for your review.'

11:02:23 25             "Answer:  Yes.

11:02:25 1          "Question:  Did I read that correctly?

11:02:32 2          "And in response, you state, 'Ann:  Looks good.

11:02:38 3  AVOID" -- and 'avoid' is in all caps -- "using the word

11:02:45 4  "Idenix sugar.  Call it throughout as 2'-methyl-ribose."

11:02:50 5          "Do you see that?

11:02:51 6          "Answer:  Yes.

11:02:51 7          "Question:  Okay.  Why did you want to avoid

11:02:53 8  using the word "Idenix sugar"?

11:02:56 9          "Answer:  I don't know, but probably it annoyed

11:02:58 10  me that they kept using the word "Idenix sugar" when it

11:03:05 11  wasn't really Idenix sugar.  It was -- other people had made

11:03:10 12  that compound well before Idenix.

11:03:11 13          "Question:  Did it make you uncomfortable that

11:03:14 14  you had all these repeated references to a competitor's

11:03:17 15  compound in your meeting minutes, Dr. Schinazi?

11:03:19 16          "Answer:  Well, I just didn't think it was

11:03:22 17  appropriate to have the name of another company mentioned in

11:03:26 18  our 20 minutes unnecessarily.  And he kept calling it this.

11:03:30 19  I don't know why.  It's not even Idenix sugar, as I said.

11:03:34 20  It's incorrect.  It's not Idenix sugar.  It was not made

11:03:37 21  first by Idenix, just in case you didn't know.  If you want

11:03:41 22  to know, I can tell you who made it first.

11:03:43 23          "Question:  So you said instead of the Idenix

11:03:45 24  sugar, call it throughout as 2'-methyl ribose, right?

11:03:50 25          "Answer:  Yeah, but she didn't listen to me.  It

11:03:52 1    doesn't look as though she listened to me.

11:03:54 2                "Question:  Well, let's --

11:03:56 3                "Answer:  Because that's probably a draft.

11:03:58 4                "Question:  Let's mark --

11:04:00 5                "Answer:  Unless this is another one.  Maybe she

11:04:02 6    did.  I don't know.  We'll find out.

11:04:05 7                "Question:  I'm going mark as Schinazi

11:04:08 8    Exhibit 33 GILEAD04522825.

11:04:12 9                (Exhibit 33 marked for identification.)

11:04:16 10               "Answer:  How interesting.  Hey, well done.

11:04:18 11               "Question:  This is an e-mail dated May 9th,

11:04:21 12   2003, one day after your instruction to Ms. Hobbs to avoid

11:04:24 13   using the word 'Idenix sugar.'  You agree this e-mail from

11:04:30 14   Ann Hobbs was sent to you on May 9th, 2003, Dr. Schinazi?

11:04:34 15               "Answer:  Looks like it.  She's listening to me.

11:04:38 16               "Question:  And she's attaching meeting minutes

11:04:41 17   from Friday's meeting, correct?

11:04:44 18               "Answer:  Correct.

11:04:48 19               "Question:  And you agree that these meeting

11:04:50 20   minutes now, a day later, have removed all references to an

11:04:54 21   Idenix compound or sugar, correct?

11:04:57 22               "Answer:  Let's see if she did it right.  I

11:05:00 23   don't remember.  Let me just see if she has the word

11:05:03 24   'Idenix' anywhere.  It looks like it.

11:05:08 25               "Question:  So, for example, if you go back to

Schinazi Exhibit 31, okay, under 'Abdalla Hassan' --

           "Answer:  Yeah.

           "Question:  -- there's your name as the third

bullet.  Underneath your name, it said, 'suggested making

Idenix compound from compound #9.'  That's what it says in

Exhibit 31, right?

           "Answer:  That's correct.

           "Question:  And then in Exhibit 33, that same

line now says, 'Suggested making 2' C methyl-cytidine from

compound #9,' right?

           "Answer:  Correct.

           "Question:  So it appears that she did, in fact,

follow your instruction, right?

           "Answer:  She didn't always, but I'm glad she

did.

           "Question:  Dr. Schinazi, I have marked as

Schinazi Exhibit 34 a document bearing Bates number

GILEAD04007740.

           And, Dr. Schinazi, this is e-mail correspondence

between you, Michael Otto, Lieven Stuyver, Alan Roemer, Abel

De La Rosa, taking place around February 24th and 25th,

2003; correct?

           "Answer:  Let me just read it quickly and I will

let you know.

           "Yes.

11:06:37  1              "Question:  Okay.  And I want to talk about the

11:06:39  2      first e-mail at the bottom of the page.

11:06:43  3              "Answer:  Yes.

11:06:43  4              "Question:  That's an e-mail from you to

11:06:45  5      Dr. Stuyver and Alan Roemer, correct?

11:06:51  6              "Answer:  The e-mail is addressed to Michael

11:06:53  7      Otto.

11:06:54  8              "Question:  At the bottom of the first page?

11:06:56  9              "Answer:  Oh, at the bottom, yeah.  At the

11:06:58 10      bottom, yes.  It seems like a lot of people are copied.

11:07:03 11              "Question:  Yes, copying Abel De La Rosa and

11:07:06 12      Michael Otto, correct?

11:07:08 13              "Answer:  Yes.

11:07:08 14              "Question:  Okay.  So you write to Dr. Stuyver,

11:07:10 15      you say: 'Lieven:  Pretty nice.  A bit long, but I'm sure

11:07:16 16      they will be very impressed with the approach.  I'm not sure

11:07:20 17      we would show the -- I'm not sure we should show the Idenix

11:07:24 18      compound.  I would prefer if you deleted any data on this

11:07:28 19      compound or add the slides on the Idenix molecule at the

11:07:30 20      very end as a reserve.'

11:07:33 21              "Do you see that?

11:07:34 22              "Answer:  Yes.

11:07:35 23              "Question:  So why did you want to delete the

11:07:37 24      data on the Idenix compound?

11:07:39 25              "Answer:  First of all, I don't remember what

1    the context was.  We were preparing a preparation maybe for

2    investors or somebody, and there's no point in mentioning other

3    companies, I presume.  I don't know what was the context of

4    this, was it a slide presentation, a manuscript or something

5    else.  I don't recall.

6          "Question:  And by 'inside information,' you're

7    referring to Idenix inside information, correct?

8          "Answer:  Absolutely not.  It could be inside

9    information related to our own information, 'inside' meaning

10   the company's information.

11         "Question:  Okay.  So your testimony is that

12   when you say, 'let's do things the right way; you have

13   inside information,' your testimony is that could be

14   referring to Pharmasset's inside information?"

15         "Answer:  It looks like it based on what I've

16   read, but I don't recall exactly what was the context of

17   this, but it could -- I would have said -- I would have said

18   you have -- if I want to say Idenix, I would have said

19   Idenix.  I wouldn't be ashamed to say it, as you have seen

20   me mention Idenix's name everywhere.  But I did say inside

21   information in this particular case, which means -- 'inside'

22   meaning probably inside the company.  We were about to

23   disclose something outside, so why do we want to disclose

24   our own information that's inside information for us.

25         "Question:  So the first e-mail you say -- you

11:09:04 1    suggest deleting any data on this compound or add the slides

11:09:07 2    on the Idenix molecules at the very end, right?

11:09:10 3                    "Answer:  Yes.

11:09:10 4                    "Question:  And then Michael Otto responds and

11:09:12 5    says, 'regarding the Idenix compound.'

11:09:14 6                    "Do you see that?

11:09:16 7                    "Answer:  Yeah.

11:09:16 8                    "Question:  And then he says, 'I don't think

11:09:18 9    there's any problem including it as a control,' right?

11:09:22 10                   "Answer:  Yes.

11:09:22 11                   "Question:  And you say, 'not right.  The C

11:09:25 12   compound was NOT disclosed in the review.  A patent has a

11:09:28 13   thousand compounds.  Let's do things the right way or else

11:09:31 14   there will be problems.  You have inside information.'

11:09:35 15   Correct?

11:09:36 16                   "Answer:  Yeah.  He knows something that nobody

11:09:38 17   else knows.  He knows, not me.

11:09:40 18                   "Question:  What did you mean when you said, 'a

11:09:42 19   patent has a thousand compounds?'

11:09:47 20                   "Answer:  Well, most patents have a thousand

11:09:49 21   compounds that could be listed, can be listed.  Very few --

11:09:52 22   very few patents are very narrow and one compound is

11:09:56 23   mentioned.  There are literally thousands of compounds

11:09:59 24   mentioned.

11:09:59 25                   "Question:  You're aware that people made

11:10:04 1    prodrugs of PSI-6130?

11:10:08 2             "Answer:  At what time period?

11:10:10 3             "Question:  At any time period.  They were made,

11:10:12 4    right?

11:10:12 5             "Answer:  Of 6130.

11:10:14 6             "Question:  Yeah.

11:10:15 7             "Answer:  I actually had a dislike for prodrugs

11:10:17 8    in general, but I presume they were made.  Sovaldi happens

11:10:21 9    to be a prodrug.

11:10:22 10             "Question:  And that's a prodrug of

11:10:25 11    2'-methyl-2'-fluoro nucleoside, right?

11:10:27 12             "Answer:  That's correct.  U analog.

11:10:28 13             "Question:  And what type of prodrug is that?

11:10:31 14             "Answer:  It's what we call a McGuigan prodrug.

11:10:34 15             "Question:  A McGuigan prodrug.  And what do you

11:10:38 16    mean a 'McGuigan prodrug'?

11:10:42 17             "Answer:  It's a phosphate.  It's a masked

11:10:45 18    phosphate drug.

11:10:46 19             "Question:  Okay.

11:10:48 20             "Answer:  So nucleoside is a phosphate masked so

11:10:50 21    it can penetrate into the cells.

11:10:52 22             "Question:  Okay.  And when this McGuigan -- is

11:10:56 23    it Dr. McGuigan?

11:10:59 24             "Answer:  Yes.

11:10:59 25             "Question:  And he developed these phosphate

11:11:00  1  prodrugs?

11:11:01  2          "Answer:  I presume he did with his students or

11:11:03  3  his post-docs, I don't know, somewhere in the Welsh country

11:11:07  4  side, Welsh, Cardiff University.  I think he's from Cardiff

11:11:11  5  University in the U.K.

11:11:13  6          "Question:  And what time frame, ballpark?

11:11:32  7          "Answer:  Years ago.  It's ancient.  In the

11:11:35  8  '70s, maybe.

11:11:35  9          "Question:  Okay.

11:11:37 10          "Answer:  Nothing new about this.

11:11:38 11          "Question:  Let me just ask you:  The novelty of

11:11:46 12  this compound, PSI-7851, is not the prodrug, but rather the

11:11:59 13  2'-fluoro-2'-methyl derivative, correct?

11:12:01 14          "Answer:  It's a -- it's definitely 2'-fluoro

11:12:10 15  -2'-methyl nucleosides and the ribo sugar, and it's a

11:12:17 16  uridine analog, and it has a phosphate moiety and some other

11:12:23 17  derivatives attached to the phosphorus, including a phenyl

11:12:35 18  group, but I can't tell whether it's McGuigan or not.

11:12:50 19          "Question:  All right.  Can you please pull

11:12:52 20  out -- can you please pull out Exhibit 1.

11:12:55 21          "Answer:  Okay.

11:12:56 22          "Question:  Page 68, please, and we're looking

11:12:59 23  for Lines 2 through 25.

11:13:02 24          "Answer:  Okay.

11:13:02 25          "Question:  Okay.  Actually, it starts at Line

11:13:06 1    3.   You were asked the following questions and gave the

11:13:09 2    following answers under oath.

11:13:12 3            "'Turning to the next page of the exhibit,

11:13:15 4    chemical structure of PSI-7851, do you recognize that

11:13:22 5    chemical structure?

11:13:25 6            "'Answer:  Yes.

11:13:28 7            "'Question:  "Okay.  Do you know who was

11:13:31 8    involved in the conception and design of the 7851'?

11:13:37 9            "'Answer:  This is what is known as a McGuigan

11:13:39 10   type -- McGuigan type of prodrug.

11:13:43 11           "'Question:  Okay.

11:13:44 12           "'Answer:  And very well -- fairly well known in

11:13:47 13   the field of nucleotide chemistry.  And this compound -- the

11:13:50 14   novelty is not the prodrug.  The novelty is the

11:13:53 15   2'fluoro-2'-methyl derivative.  And, obviously, Pharmasset

11:14:00 16   people came up with the 2'fluoro-2'-methyl.  I'm not aware

11:14:04 17   of who actually made this compound or synthesized that

11:14:07 18   compound, if it was even synthesized.  I don't know.  I

11:14:11 19   don't recall.  But it's fairly well known in chemistry.'

11:14:15 20           "Were you asked those questions and did you give

11:14:17 21   those answers under oath, Dr. Schinazi?

11:14:19 22           "Answer:  I did and I did specifically mention

11:14:20 23   the McGuigan type, not McGuigan itself, but McGuigan

11:14:27 24   type --

11:14:27 25           "Question:  Okay.

11:14:29 1          "Answer: -- of prodrug. Are we finished with

11:14:32 2  this?

11:14:32 3          "Question: Dr. Schinazi, do you know an

11:14:34 4  individual by the name of Michael Sofia?

11:14:35 5          "Answer: Yes, I know him.

11:14:36 6          "Question: And he was a consultant for

11:14:38 7  Pharmasset at the time that you were chairman of the board?

11:14:41 8          "Answer: I believe he was -- we -- I think

11:14:43 9  Pharmasset hired him. I don't remember whether I was still

11:14:45 10  chairman of the board, but I was involved with Pharmasset

11:14:48 11  still at the time.

11:14:49 12          "Question: Okay. And you believe that prior to

11:14:51 13  working with Pharmasset, Dr. Sofia would have easily found

11:14:54 14  out how to make prodrugs of nucleosides, right?

11:14:57 15          "Answer: If he wanted to, I presume he could

11:14:58 16  have.

11:15:04 17          "Question: From time to time, Pharmasset would

11:15:06 18  submit grant proposals in an effort to obtain funding,

11:15:10 19  right?

11:15:11 20          "Answer: Yes.

11:15:11 21          "Question: Okay. And when doing so, you agree

11:15:13 22  that Pharmasset would do its best to ensure that those grant

11:15:17 23  proposals were truthful and accurate?

11:15:19 24          "Answer: I can't guarantee it, but I presume

11:15:21 25  they were truthful and accurate.

11:15:23 1           "Question:  That was -- that was your intent,

11:15:25 2 right?

11:15:26 3           "Answer:  Yeah.  Why would we say anything

11:15:28 4 different?

11:15:29 5           "Question:  You're not going to intentionally

11:15:32 6 misrepresent something to the U.S. government --

11:15:34 7           "Answer:  Absolutely not.

11:15:35 8           "Question:  -- in asking them for money, right?

11:15:38 9           "Answer:  Absolutely not.

11:15:39 10           "Question:  Okay.  Was it your practice to

11:15:41 11 review Pharmasset's grant proposals?

11:15:43 12           "Answer:  Occasionally.  I didn't always do it.

11:15:45 13 There were things they were doing on their own.

11:15:50 14           "Question:  Okay, but you were asked to do so

11:15:52 15 from time to time, right?

11:15:54 16           "Answer:  Yes.

11:15:54 17           "Question:  And if it was particularly a grant

11:15:56 18 proposal for the benefit of Pharmasset, would you typically

11:15:58 19 look at those as the chairman of the board?

11:16:01 20           "Answer:  I was involved not as a chairman, but

11:16:04 21 as fellow scientist, yes, helping them."

11:16:08 22           THE COURT:  Ms. Parker, I think that is a good

11:16:11 23 stopping point.  I want to give the jury a little bit of a

11:16:14 24 break.

11:16:15 25           Ladies and gentlemen of the jury, no talking

11:16:17 1  about the case during the break.  We will get you back here

11:16:20 2  in about 15 minutes.

11:16:32 3            (Jury leaves courtroom at 11:15 a.m.)

11:16:38 4            THE COURT:  We will be in recess.

11:16:41 5            (Recess taken.)

11:32:58 6            THE COURT:  Let's bring the jury back in.

11:33:00 7            MS. PARKER:  To let you know, it's another 20 or

11:33:03 8  25 minutes.  I do apologize about that little glitch.

11:33:06 9            THE COURT:  Right.  Hopefully, it won't happen

11:33:08 10  again.

11:34:03 11            (Jury enters courtroom at 11:33 a.m.)

11:34:15 12            THE COURT:  Welcome back.

11:34:17 13            If we can turn some of those lights down, Mr.

11:34:20 14  Looby.  I believe we have 20 other 25 minutes more of Dr.

11:34:24 15  Schinazi.  We will pick up where we left off.

11:34:27 16            "Question:  Let me mark as Schinazi Exhibit 36 a

11:34:40 17  document bearing Bates numbers 04 -- GILEAD04435044 to

11:34:51 18  GILEAD04435056.  And I'm also going to mark as Schinazi

11:35:05 19  Exhibit 37 a document bearing Bates Nos. IDX -- a document

11:35:14 20  bearing Bates Nos. IDXDE00618454 to 18488.

11:35:27 21            "So, Dr. Schinazi, the first document is an

11:35:32 22  e-mail that was sent from Dr. Pankiewicz to you, Dr. Otto

11:35:38 23  and Dr. Watanabe on November 15th, 2002.  Correct?

11:35:44 24            "Answer:  I'm sorry?

11:35:45 25            "Question:  The first document, the first Page

11:35:48  1    of Exhibit 36?

11:35:51  2    "Answer:  November 15, 2002.

11:35:58  3    "Question:  The subject of the e-mail is SBIR.

11:36:01  4    And the file for the attachment is named hcvgrant.doc.  Do

11:36:05  5    you see that?

11:36:07  6    "Answer:  Hcvgrant.doc, yes correct.

11:36:12  7    "Question:  The text of the e-mail says, 'Dear

11:36:14  8    Dr. Schinazi and Mike:  Attached please find HCV grant

11:36:19  9    proposal designed and prepared by Kyo.  I did some editorial

11:36:24 10    work and now I am asking for your comments and suggestions.

11:36:28 11    Regards, Kris.'

11:36:29 12    "Do you see that?  Did I read that correctly?

11:36:32 13    "Answer:  That's correct.

11:36:32 14    "Question:  And then attached is what appears to

11:36:36 15    be a grant proposal that you were asked to review.  Correct?

11:36:41 16    "Answer:  Yes.

11:36:41 17    "Question:  Now, I'm going to ask that you refer

11:36:52 18    to Schinazi Exhibit 37?

11:37:03 19    "Answer:  Yes, I am looking at it.

11:37:04 20    "Question:  This is a Notice of Grant Award

11:37:06 21    issued by the National Institutes of Health to Pharmasset.

11:37:09 22    Right?

11:37:11 23    "Answer:  Correct.

11:37:11 24    "Question:  And if you look at the middle of the

11:37:13 25    page, the first page, the first sentence under Dear Business

11:37:19 1   Official reads, 'The National Institutes of Health hereby

11:37:22 2   awards a grant in the amount of $175,000 (see Award

11:37:31 3   Calculation in Section I) to Pharmasset, Inc.'

11:37:36 4        "Did I read that correctly?

11:37:37 5        "Answer: Well, it's correct but it's actually

11:37:39 6   dated 2003, the budget period 2003. The draft was 2002. So

11:37:47 7   it's possible, it's probably the same -- probably the same

11:37:51 8   grant.

11:37:51 9        "Question: Can you look at the first

11:37:52 10   sentence -- I am looking at Paragraph -- I'm sorry, Schinazi

11:37:58 11   Exhibit 7. Thank you. I want you to look at the first

11:38:06 12   sentence of the second paragraph of the research plan in the

11:38:09 13   actual grant award.

11:38:11 14        That reads, 'During the course of our search for

11:38:15 15   nucleosides, it may inhibit replication of bovine viral

11:38:20 16   diarrhea virus, BVDV, used as an HCV surrogate, we discovered a

11:38:30 17   potent inhibitory activity of nucleoside derivatives

11:38:34 18   containing the bicyclo, and there is a 4.2.1, nonane ring

11:38:41 19   system about, Bio-constant 1.'

11:38:45 20        Did I read that correctly?

11:38:46 21        "Answer: Yes.

11:38:48 22        "Question: And the 'we' here is referring to

11:38:51 23   individuals at Pharmasset. Correct?

11:38:54 24        "Answer: It probably does, but I'll accept

11:38:57 25   that.

11:38:58 1        "Question:  Can you please turn to Page 20 of

11:39:03 2    this grant award?

11:39:07 3            "Answer:  What do you mean by 20?

11:39:08 4            "Question:  It's at the bottom of the page.  The

11:39:12 5    page number is IDXDE00618479.

11:39:18 6            "I want you to refer to the paragraph at the

11:39:22 7    bottom of the page, starting with Compounds of Class.

11:39:26 8            Do you see that?

11:39:34 9            "Answer:  Yes.

11:39:34 10           "Question:  I'm going to read a few sentences

11:39:36 11   here.  It says Compounds of Class 1, (13 through 17 Figure

11:39:42 12   1) will be modified at the sugar moiety in order to

11:39:44 13   establish the structural necessity in the sugar for the

11:39:48 14   activity.  The rationale for the presence of 2'-beta-(up)

11:39:55 15   methyl is because recent patents, Footnotes 34 and 35,

11:40:00 16   reveal that certain nucleosides with 2'-dehydro-2'-methyl-D-

11:40:10 17   ribofuranose show a potent anti-HCV activity.

11:40:14 18           "Did I read that correctly?

11:40:16 19           "Answer:  Correct.

11:40:17 20           "Question:  So let's look at what is being

11:40:20 21   relied on in Footnotes 34 and 35 for that statement.  Those

11:40:31 22   footnotes appear toward the end of the document.  The

11:40:42 23   second-to-last page.  Are you there?

11:40:46 24           "The Witness:  I was reading that before.

11:40:47 25           "Question:  You are quick.  35 refers to a Dr.

11:40:50 1  Sommadossi.  Correct?

11:40:50 2            "The Witness:  Correct.

11:40:51 3            "Question:  And also refers to a -- the P.

11:40:55 4  La Colla, correct?

11:40:56 5            "Answer:  Yes.

11:40:56 6            "Question:  And then there is a reference to a

11:40:59 7  patent number there, correct?

11:41:01 8            "Answer:  Yes.

11:41:01 9            "Question:  And did you understand Sommadossi to

11:41:03 10 refer to Dr. Sommadossi from Idenix, right?

11:41:08 11           "Answer:  Absolutely.

11:41:08 12           "Question:  Dr. Schinazi, first of all,

11:41:14 13 Pharmasset, the company that you were the principal founder

11:41:18 14 of, was ultimately sold to Gilead, correct?

11:41:22 15           "Answer:  Yes.

11:41:23 16           "Question:  And I don't recall exactly how much

11:41:26 17 that was for.  Was it 12 billion dollars?

11:41:30 18           "Answer: .4, another .4 billion dollars.

11:41:32 19           "Question:  Another .4 billion dollars.  And how

11:41:36 20 much money did you personally make on that sale?

11:41:39 21           "Answer:  Well I had trusts, trusts for my

11:41:41 22 daughter, my grandchildren.  And I also had a divorce that

11:41:49 23 was almost completed and a settlement with my ex.

11:41:50 24           "So between us, all the family and everything,

11:41:55 25 there was approximately maybe 400 million dollars, of

11:42:00 1    course, before taxes and before the divorce.

11:42:03 2              "Question:  So that's approximately 400 million,

11:42:06 3    you said?

11:42:08 4              "Answer:  Minus at least 50-plus, 60 million

11:42:10 5    dollars, plus the taxes, just on, I don't know, my ex

11:42:15 6    probably took half that money.  So, my -- I was left with

11:42:19 7    maybe 200 million or something like that, which was quite

11:42:23 8    nice.

11:42:23 9              "Question:  Do you currently own stock in

11:42:26 10   Gilead?

11:42:26 11             "Answer:  Yes, I do.

11:42:27 12             "Question:  And approximately how many shares do

11:42:30 13   you own?

11:42:31 14             "Answer:  I don't recall.

11:42:32 15             "Question:  Do you have an idea of the

11:42:35 16   approximate value of the shares that you own in Gilead?

11:42:38 17             "Answer:  I don't know.  Ask my bankers.

11:42:43 18             "Question:  Dr. Schinazi, I am going to mark as

11:42:47 19   Schinazi Exhibit 56 an order from the Northern District of

11:42:54 20   Georgia, Atlanta Division, dated March 12, 2003?

11:43:14 21             "Answer:  Yes, sir.

11:43:14 22             "Question:  You agree, this order relates to the

11:43:17 23   case captioned Raymond F. Schinazi and Carol Lynn Schinazi

11:43:22 24   versus United States of America, Civil Action

11:43:26 25   1:00-CV-768-ODE.  Correct?

11:43:33 1                  "Answer:  Yes.

11:43:33 2                  "Question:  And you have seen this before,

11:43:35 3      correct?

11:43:36 4                  "Answer:  Yes.

11:43:36 5                  "Question:  And it's true you were found to have

11:43:41 6      committed civil tax fraud in connection with filing your

11:43:44 7      federal tax return.  Correct?

11:43:46 8                  "Answer:  That's what it says in there, does it

11:43:48 9      say that in there?  Civil tax fraud, specifically?

11:43:51 10                 "Question:  Yes.

11:43:53 11                 "Answer:  Yes.

11:43:53 12                 "Question:  It does.

11:43:55 13                 "Answer:  Okay.  If that's the case, okay,

11:43:58 14     that's correct.

11:43:58 15                 "Question:  But you recall after there were

11:44:01 16     actually meetings you had with the IRS.  Correct?

11:44:04 17                 "Answer:  Well, there are meetings with IRS all

11:44:07 18     the time.  Even last year.  So what's the problem?

11:44:11 19                 "Question:  Did someone -- did the IRS contact

11:44:13 20     you to question a tax filing last year?

11:44:15 21                 "Answer:  Yes.

11:44:16 22                 "Question:  They did?

11:44:18 23                 "Answer:  Yes, and they found nothing.

11:44:20 24                 "Question:  How many times does the IRS question

11:44:21 25     you about your tax files, Dr. Schinazi?

11:44:24 1          "Answer:  I don't know.  But quite a few times.

11:44:26 2          "Question:  Let's turn to Page 11 of this order?

11:44:32 3          "Answer:  Page 11?

11:44:34 4          "Question:  Yes.  It is a summary of the

11:44:40 5    findings.  And it reads in the first sentence, 'The Court

11:44:47 6    finds by clear and convincing evidence that when Dr.

11:44:50 7    Schinazi filed his 1993 tax return in April 1994 he intended

11:44:54 8    to defraud the government.'

11:44:56 9          "Did I read that correctly?

11:44:57 10         "Answer:  That's what you are reading.

11:44:58 11         "Question:  Dr. Schinazi, I am going to hand you

11:45:00 12   what I'm marking as Exhibit 58.  It is a document entitled

11:45:09 13   Affidavit of Raymond Schinazi, in an action between

11:45:18 14   Pharmasset and King & Spalding, Production Numbers

11:45:22 15   GILEAD03722188 through 22191.

11:45:42 16         "And if you could just read to yourself, please,

11:45:45 17   Dr. Schinazi, this, just to refresh your recollection?

11:45:50 18         "Answer:  Yes, let me read it.

11:45:53 19         "Question:  Please do.

11:45:54 20         "Answer:  I will check this.

11:45:56 21         "Question:  It was signed 18 of June, 2008?

11:48:03 22         "Answer:  Yes.

11:48:04 23         "Question:  Okay.  First of all, let me just

11:48:08 24   verify, if you look at the last page, is it your belief that

11:48:12 25   you signed this affidavit on or about June 18th of 2008?

11:48:18 1          "Answer:  Correct.

11:48:20 2          "Question:  And at the time you signed this

11:48:22 3   affidavit, did you believe that the information contained in

11:48:24 4   it was true and correct?

11:48:27 5          "Answer:  Yes.

11:48:27 6          "Question:  And you believe, as you sit here

11:48:29 7   today the information in this affidavit remains true and

11:48:32 8   correct?

11:48:32 9          "Answer:  Yes.

11:48:33 10          "Question:  I want to ask you just a few matters

11:48:38 11   of this in particular.  And I want to read that into the

11:48:41 12   record.  You say, quote, 'On May 30, 2003, Pharmasset filed

11:48:48 13   provisional patent application No.  60/474,368, with the

11:48:54 14   United States Patent and Trademark Office, without the

11:48:57 15   assistance of an outside attorney.  The application was

11:49:01 16   directed to compounds of the type of (2' R)-2',

11:49:13 17   2-deoxy-2'-fluoro-2'-C-methyl nucleosides.

11:49:27 18          "Do you see are where I am reading?

11:49:29 19          "Answer:  Yes.

11:49:29 20          "Question:  Does that compound describe there a

11:49:32 21   2'-methyl-2'fluoro nucleoside?

11:49:36 22          "Answer:  Yes, it is.

11:49:37 23          "Question:  Does PSI-6130 fall in that class of

11:49:42 24   compounds, as you understand it?

11:49:43 25          "Answer:  Yes.

11:49:43  1          "Question:  In the next paragraph, 15, you say,

11:49:45  2    quote -- sorry, withdrawn.

11:49:53  3          "To the best of your knowledge, the information

11:49:55  4    contained in Paragraph 14 is true, is that right?

11:49:55  5          "Answer:  Yes.

11:49:59  6          "Question:  Paragraph 15, 'In late May of 2003,

11:50:03  7    I attended a social function at Ms.  Knowles' home.  While I

11:50:10  8    was there, I discussed with Ms. Knowles Pharmasset's plan to

11:50:13  9    file a provisional patent application.  I mentioned to Ms.

11:50:16 10    Knowles in confidence as Pharmasset's attorney the key

11:50:20 11    chemical feature of the compounds that Pharmasset had

11:50:23 12    discovered and sought to patent in the application, namely,

11:50:27 13    the particular 2'-fluoro-2'-C-methyl nucleoside analogues.  I

11:50:35 14    asked her not to tell anyone about this major novel discovery.'

11:50:39 15          "Do you see that?

11:50:40 16          "Answer:  Yes.

11:50:40 17          "Question:  Is that true?

11:50:42 18          "Answer:  Yes.

11:50:47 19          "Question:  Skip down to Paragraph 18:  Quote,

11:50:51 20    'I have also reviewed the Idenix international patent

11:50:53 21    application PCT/IB2003/003246, a copy of which is attached

11:51:04 22    here as Exhibit C, which was filed on June 27, 2003.'

11:51:11 23          "Do you see that?

11:51:12 24          "Answer:  Yes.

11:51:13 25          "Question:  Now I'm going to go on to Paragraph

19.   'In particular, I have reviewed Claim 9 of that

particular application.  It is my opinion that the subgenus

of compounds of Claim 9 is not disclosed anywhere else in

that patent application.  Furthermore, it is my opinion that

the appearance in Idenix's patent application referred to in

Paragraph 18 of the unique chemical modification or

substitutions encompassed by these compounds is based upon

the disclosure I have made to Ms. Knowles described in

Paragraph 15 concerning Pharmasset's 2'-fluoro-2'-C-methyl

nucleoside analogues.'

            "Do you see that?

            "Answer:  Yes.

            "Question:  Is that true?

            "Answer:  Yes.

            "Question:  And then -- and you also describe in

Paragraph 15 a late May of 2003 social function at Sherry

Knowles's home.  Do you see that?

            "Answer:  Yes.

            "Question:  Are you saying that you believe Ms.

Knowles stole the idea of 2'-methyl'-2-fluoro from

Pharmasset and put it into Idenix's patent application?

            "Answer:  I don't know what went through Ms.

Knowles's information, but I can certainly speculate.

            "Question:  And is it your speculation that she

did?

11:52:36  1          "Answer:  Not well.  I think probably she

11:52:41  2   reported this information to the people at Idenix and Idenix

11:52:44  3   probably put pressure on her to file a patent application.

11:52:47  4   I don't recall.

11:52:48  5          "Question:  Let me go to your exhibit, your

11:52:51  6   deposition transcript from December 2013?

11:52:53  7          "Answer:  Okay.

11:52:53  8          "Question:  So I would like to direct your

11:52:56  9   attention to Page 157 and Line 23 at Page 158.  I'm going to

11:53:01 10   read a question and an answer.

11:53:05 11          "Okay.  And on Page a 157, Line 23, it says:

11:53:12 12   'So I go back to my question.  Did you ever form a belief

11:53:15 13   that Idenix had stolen from Pharmasset the idea of using

11:53:19 14   2'methyl-(up), 2' fluoro (down) for nucleosides for treating

11:53:27 15   HCV?

11:53:28 16          "Answer:  I must say the -- stolen is a bit

11:53:32 17   strong language, but I did inform at some stage after filing

11:53:36 18   the patent application -- I verbally informed Idenix's

11:53:41 19   general counsel -- Andrea Corcoran, that Pharmasset had

11:53:45 20   filed a patent on 2'fluoro-2'-methyl nucleosides.'

11:53:50 21          "Do you see that?

11:53:51 22          "Answer:  Yes.

11:53:52 23          "Question:  Did you -- were you not asked that

11:53:54 24   question and did you not give that answer at your

11:53:58 25   deposition?

11:53:59  1          "Answer:  That is correct.

11:53:59  2          "Question:  And you understood that you were

11:54:01  3  under oath, correct?

11:54:03  4          "Answer:  Yes, I understand.

11:54:05  5          "Question:  And why didn't you mention anything

11:54:07  6  about Sherry Knowles there?

11:54:08  7          "Answer:  You never asked about Sherry Knowles.

11:54:12  8          "Question:  I asked about Idenix getting the

11:54:14  9  idea of 2'-methyl 2'-fluoro from Pharmasset, and you never

11:54:23 10  mentioned this idea that Ms. Knowles was somehow a conduit

11:54:27 11  for transmitting that information?

11:54:28 12          "Answer:  Not necessarily.  I mean, I had --

11:54:32 13          "Question:  Her name --

11:54:33 14          "Answer:  I had a direct line to Andrea Corcoran

11:54:36 15  for me to go to -- to tell her what I told and what I didn't

11:54:40 16  to Sherry Knowles.

11:54:41 17          "Question:  You didn't need to go to what you

11:54:43 18  said about Sherry Knowles?

11:54:44 19          "Answer:  I didn't have to tell her anything

11:54:46 20  about Sherry Knowles.  I basically informed Andrea Corcoran

11:54:49 21  that Pharmasset had filed 2'-fluoro-2'-methyl nucleosides.

11:54:53 22          "Question:  But why didn't you mention to me in

11:54:55 23  response to this question that 'Hey, I think Sherry Knowles

11:55:00 24  might have given that idea to Idenix?

11:55:02 25          "Answer:  You didn't ask.  You were more

11:55:04 1    interested in finding out how I informed her.

11:55:07 2              "Question:  The question --

11:55:08 3              "Answer:  Based on -- based on what you have

11:55:10 4    here.  You're saying, how you did inform her?

11:55:14 5              "By phone.

11:55:16 6              "When did you inform her?

11:55:18 7              "After we filed this particular patent.

11:55:22 8              "Soon after.

11:55:23 9              "Soon after.  Because I wanted to make sure that

11:55:26 10   Idenix aren't trespassing on Pharmasset's technologies.

11:55:30 11             "You didn't ask the question.  Why should I

11:55:32 12   answer -- why should I say anything?

11:55:34 13             "Question:  Right.  So you say in here you

11:55:36 14   implied that Ms. Knowles breached a confidentiality

11:55:39 15   obligation.  My question is:  Are you aware that she was

11:55:42 16   ever found by a judge or an arbitration panel to have

11:55:45 17   breached a confidentiality obligation as you imply in your

11:55:50 18   declaration?

11:55:50 19             "Answer:  To the best of my knowledge, I don't

11:55:52 20   know."

11:54:43 21             MS. PARKER:  That concludes her testimony.  That

11:54:45 22   testimony.

11:54:46 23             THE COURT:  Okay.  All right.

11:54:46 24             MS. PARKER:  Thank you.

11:54:47 25             THE COURT:  You may call your next witness.

11:54:53 1          MR. KINTON:  Thank you, Your Honor.  Idenix's
11:54:56 2     next witness is Dr. Lieven Stuyver.  Dr. Stuyver was the
11:55:00 3     former head of biology at Pharmasset.  Dr. Stuyver lives in
11:55:04 4     Belgium, so he will be testifying by deposition videotape
11:55:09 5     deposition on February 29th, 2016.
11:55:12 6          The video will last about 48 minutes.  Before we
11:55:15 7     begin, I'd like to move in the exhibits.
11:55:17 8          THE COURT:  Okay.
11:55:18 9          MR. KINTON:  These are Plaintiffs' Exhibit 394,
11:55:20 10    Plaintiffs' Exhibit 491B, and Plaintiffs' Exhibit 647.
11:55:28 11         MR. HEADLEY:  That's fine, Your Honor.
11:55:28 12         THE COURT:  All right.  Those are all admitted.
11:55:28 13         (Above-referenced exhibits admitted in evidence.)
11:55:28 14         MR. COUTINHO:  Good morning, Your Honor.
11:55:38 15         THE COURT:  Good morning.
11:55:39 16         MR. McCANN:  Santosh Coutinho on behalf of
11:55:41 17    Gilead.
11:55:41 18         There are three exhibits that are discussed in
11:55:44 19    our counterdesignations of Dr. Stuyver's testimony.  Those
11:55:48 20    will go into evidence.  Those are DX-712, DX-2444, and
11:55:56 21    DX-2222.
11:55:56 22         THE COURT:  Is there any objection?
11:55:59 23         MR. KINTON:  No objection, Your Honor.  I left
11:56:02 24    it off the list.
11:56:03 25         THE COURT:  And those ones are admitted.

11:56:03 1          (Above-referenced exhibits admitted in evidence.)

11:56:05 2          THE COURT:  Yes, you may pass those up, if you

11:56:07 3   wish.

11:56:14 4          MR. KINTON:  The last exhibit, plaintiff's

11:56:16 5   exhibit is Plaintiff's Exhibit 764, move to admit that.

11:56:20 6          MR. HEADLEY:  That's correct in our record.

11:56:22 7          THE COURT:  That is admitted as well.

11:56:22 8          (PTX-764 was admitted into evidence.)

11:56:22 9          THE COURT:  We can start the deposition, if you

11:56:22 10  are ready.

11:56:22 11          (Deposition designations of Lieven Stuyver

11:56:35 12  placed into the record.)

11:56:35 13          "Question:  Good morning, Dr. Stuyver.  Thank

11:56:37 14  you for appearing today; I appreciate that.

11:56:37 15          "Before we begin, state your name and address

11:56:45 16  for the record.

11:56:48 17          "Answer:  My name is Lieven Stuyver, and my

11:56:48 18  address is Holestraat 8 in Herzele, Belgium.

11:56:56 19          "Question:  Did you get a bachelor's degree?

11:56:58 20          "Answer:  Also, yes.

11:56:59 21          "Question:  When did you get your bachelor's

11:57:00 22  degree?

11:57:01 23          "Answer:  The bachelor's was 1993.

11:57:04 24          "Question:  Okay.  And then you got a master's

11:57:09 25  in biochemistry from University of Ghent in '85?

11:57:10 1          "Answer:  In '85, yes.

11:57:12 2          "Question:  And you got your Ph.D. in 1992 in

11:57:15 3  hemogenetics from Antwerp?

11:57:18 4          "Answer:  That is correct.  Yes.

11:57:20 5          "Question:  And then you joined Pharmasset in

11:57:22 6  October of 1999, is that right?

11:57:27 7          "Answer:  Correct.

11:57:27 8          "Question:  How did you come to be employed at

11:57:29 9  Pharmasset?

11:57:30 10         "Answer:  I met Schinazi in 1998 in a meeting

11:57:34 11 and we were discussing antivirals for hepatitis C.  At that

11:57:39 12 moment the meeting where I met him on was on HIV, but I -- I

11:57:46 13 was working also on hepatitis C and since there was nothing

11:57:49 14 out there, besides interferon and ribavirin, so I discussed

11:57:55 15 with him on nucleosides for hepatitis C, and that's how I

11:57:59 16 became involved with it.  But that was a year before I

11:58:02 17 joined it.

11:58:08 18         "Question:  What were you -- generally, what

11:58:10 19 were you hired to do at Pharmasset when you first joined?

11:58:13 20         "Answer:  Well, the main -- the main objective

11:58:15 21 was to find a nucleoside for hepatitis C virus.

11:58:20 22         "Question:  So what were your responsibilities

11:58:22 23 with respect to that?

11:58:23 24         "Answer:  Well, I was responsible for everything

11:58:25 25 which was biology side.

11:58:27 1      "Question:  Okay.  And for the folks who haven't

11:58:30 2    been in this case for a long time, can you describe what --

11:58:35 3    what that involved?

11:58:36 4      "Answer:  Well, in 1999, there were no --

11:58:40 5    hepatitis C was not -- you couldn't culture it and so you

11:58:44 6    need to find surrogate models for working on hepatitis C.

11:58:49 7    So everything that I had to do was set up systems in which

11:58:54 8    we could screen the nucleoside compounds into surrogate --

11:59:00 9    surrogate models that were developed there at Pharmasset.

11:59:04 10      "Question:  Okay.  And what were some of the

11:59:06 11   surrogate models that you used?

11:59:08 12      "Answer:  One of the surrogate models was the

11:59:10 13   bovine viral diarrhea virus assay.

11:59:15 14      The Court Reporter:  I'm sorry.  Can you repeat

11:59:17 15   that?

11:59:17 16      The Witness:  Bovine viral diarrhea virus.

11:59:20 17      "And that was one surrogate model.  The other

11:59:24 18   one is a -- an assay that is an enzyme assay for the

11:59:30 19   hepatitis C polymerase.  And the idea -- the -- the

11:59:35 20   underlying idea here is that if you would screen in that

11:59:38 21   surrogate model and you have a hit, you could confirm it in

11:59:44 22   the enzyme assay.

11:59:46 23      "Question:  Okay.

11:59:47 24      "Answer:  So that was the major understanding in

11:59:49 25   1999.

11:59:50 1    "Question:  Okay.  And how long did Pharmasset

11:59:54 2 use the BVDV and HCV polymerase assays to screen for

12:00:01 3 anti-HCV activity?

12:00:07 4    "Answer:  As far as I remember, the use of the

12:00:10 5 BVDV assay and the polymerase assay was from the day we had

12:00:15 6 it up to when I left, it was there and we used it regularly.

12:00:19 7 But later onwards, I think by the end of 2000, we also -- or

12:00:24 8 maybe earlier, maybe in over the summer, we also got access

12:00:38 9 to the replicon system from Charlie Rice.  And that system

12:00:42 10 was then implemented in the lab and then the main screening

12:00:44 11 was always done in the replicon system.

12:00:47 12    "Question:  Okay.  And how long did it take to

12:00:49 13 set up the replicon system from when you first got access to

12:00:52 14 it?

12:00:53 15    "Answer:  Quite some time; it was not so easy.

12:00:56 16    "Question:  'Quite some time', give me a sense

12:01:00 17 in days, weeks, months, years?

12:01:03 18    "Answer:  Well, it's not only keeping the cells

12:01:05 19 in culture but it's also designing and the technology on how

12:01:08 20 you're going to look for the -- the viral RNA that is there.

12:01:13 21 You need to quantify the viral RNA and then you need to

12:01:17 22 establish technologies in which you can see the changes in

12:01:20 23 the vir -- in the viral quantity.  So getting access to the

12:01:24 24 cells is one -- one part of it.  Then developing a culture

12:01:27 25 system where you can do the testing is another thing.

12:01:30 1    Altogether I think it took a few months, several months.

12:01:34 2              "Question:  Okay.  When you first started at

12:01:37 3    Pharmasset, who did you report to?

12:01:39 4              "Answer:  Ray Schinazi.

12:01:40 5              "Question:  Okay.  And what was his role at the

12:01:42 6    company when you joined?

12:01:44 7              "Answer:  Well, he was Chairman of the Board,

12:01:46 8    but in reality he also acted as the CEO.

12:01:50 9              "Question:  So he -- he ran the company?

12:01:52 10             "Answer:  He ran the company, yes.

12:01:55 11             "Question:  Okay.  Did that -- or did his role

12:01:58 12   change over time while you were there?

12:02:00 13             "Answer:  Well, he was -- in the beginning, he

12:02:04 14   was very much -- it was a small organization, it had five,

12:02:08 15   six people at the chemist side and then maybe one or two in

12:02:12 16   general management, and then in biology one or two.  So it

12:02:16 17   was a small organization.  But later onwards, when there

12:02:20 18   were more chemists hired, and also in the biology group, it

12:02:25 19   became a full -- a full team.  I remember that there were

12:02:29 20   expectations for Ray Schinazi to act as the real CEO.

12:02:34 21             "Question:  Okay.

12:02:36 22             "Answer:  But he never took up that real -- that

12:02:39 23   role as a CEO because he stayed at -- at the Emory side.

12:02:45 24   So, in a way, at the top, I would say that there was a kind

12:02:48 25   of unclarity on who was running the company.  Well, it was

12:02:53 1    Ray Schinazi who was running it, but without being real CEO.

12:02:59 2             "Question:  Okay.  Do you recall reviewing any

12:03:02 3    of the Idenix's patent applications related to compounds for

12:03:05 4    treating hepatitis C?

12:03:14 5             "Answer:  Published applications you mean?

12:03:16 6             "Question:  Yes.

12:03:17 7             "Answer:  Yes, sure.  Absolutely.

12:03:21 8             "Question:  Okay.  Which applications -- do you

12:03:28 9    call -- recall generally which applications you reviewed?

12:03:31 10            "Answer:  I guess all the ones that became

12:03:33 11   available --

12:03:34 12            "Question:  Okay.

12:03:36 13            "Answer:  -- in the public domain.

12:03:38 14            "Question:  Okay.  Do you recall learning about

12:03:40 15   any patent applications before they became published?

12:03:43 16   Idenix patent applications?

12:03:45 17            "Answer:  No.

12:03:45 18            "Question:  I'm going to hand you what was

12:03:47 19   previously marked as Rachakonda Exhibit 24.  It's a document

12:03:51 20   bearing Bates range GILEAD01713121 through GILEAD01713416.

12:04:03 21   It's a WIPO publication WO 01/90121.

12:04:11 22            "Dr. Stuyver, I'd like you to look through

12:04:15 23   Rachakonda Exhibit 24 just for the purpose of determining

12:04:18 24   whether you recognize it or not and let me know when you

12:04:22 25   have had a chance to do that.

12:04:25  1        "Answer:  So, this looks like one of the

12:04:29  2   Novirio/Idenix patent applications.

12:04:38  3        "Question:  Okay.

12:04:39  4        "Answer:  And priority date of May 2000, yes.

12:04:47  5        "Question:  Okay.  And do you recall taking a

12:04:53  6   look through this, reviewing this patent application before?

12:04:57  7        "Answer:  I have definitely seen those

12:04:59  8   applications, yeah.

12:05:02  9        "Question:  Okay.  Do you recall about when you

12:05:12 10   first saw this patent application?

12:05:15 11        "Answer:  This must be when it is published.  So

12:05:18 12   if the filing date is May 2000, that is going to be

12:05:21 13   available by the end of 2001.

12:05:24 14        "Question:  I'm going to hand you what was

12:05:27 15   previously marked as Exhibit No. 19 to Dr. Schinazi's

12:05:31 16   deposition.  It's a document bearing Bates range

12:05:39 17   GILEAD04070485 through 0488.  It appears to be an e-mail

12:05:45 18   chain with the most recent e-mail dated October 15th, 2001

12:05:50 19   between Raymond Schinazi and Lieven J. Stuyver, Ph.D.  The

12:06:03 20   subject line is, 'RE:  Patent.'

12:06:03 21        "Do you recognize--

12:06:04 22        "Answer:  Yes.  Absolutely.

12:06:28 23        "Question:  And that e-mail, and it starts:

12:06:33 24   "Dear Raymond,

12:06:34 25        "I got a cold shower in Sherry's office when she

12:06:39 1   disclosed in general terms (no details) the basics of the

12:06:45 2   Novirio patent. For me, this means almost NOTHING ..." --

12:06:52 3   and 'nothing' is in all caps -- "... is left of our

12:07:01 4   inventions and list of compounds. Novirio's patent will be

12:07:05 5   published in two months time. They will have all priority

12:07:15 6   dates."

12:07:18 7              "Do you see that?

12:07:19 8              "Answer: Yes.

12:07:22 9              "Question: Do you understand the reference to

12:07:24 10  'Sherry' in that as to Sherry Knowles?

12:07:34 11             "Answer: That's Sherry Knowles, yes.

12:07:19 12             "Question: And who is she?

12:07:37 13             "Answer: Sherry Knowles was the lawyer, the

12:07:40 14  patent lawyer that was taking care of all the Pharmasset

12:07:44 15  patents in those days, but in the same time also the patent

12:07:48 16  lawyer for the sister company.

12:07:50 17             "Question: Idenix?

12:07:51 18             "Answer: Which is Idenix, which has always been

12:07:53 19  a very difficult situation for us to understand how -- how

12:07:58 20  they were dealing with it.

12:08:00 21             "Question: Okay.

12:08:01 22             "Answer: But I also understand now that when I

12:08:04 23  was saying that I have seen this only after it was

12:08:08 24  published, that this is evidence that I must have seen it

12:08:13 25  earlier.

12:08:13  1          "Question:  Or at least she'd disclosed --

12:08:17  2          "Answer:  Before it was published.

12:08:18  3          "Question:  Okay.  It says here that she had

12:08:21  4  disclosed the basics of the Novirio patent to you.  Do you

12:08:26  5  recall what those basics were?

12:08:29  6          "Answer:  I don't remember exactly at that day

12:08:31  7  what it is, but I can now understand at that moment I must

12:08:36  8  have seen it because in our first application, which we

12:08:40  9  filed in October 2000, at that moment the methyl group was

12:08:45 10  not included there, so Sherry was able to manage it that

12:08:49 11  when we did the filing of our 2000 patent and the

12:08:53 12  application in October 2000 that that methyl group was not

12:08:57 13  included, and now she's shown me most likely that the

12:09:01 14  application here contains the 2'-methyl and that -- that is

12:09:05 15  the active compound.  And so then all the other compounds

12:09:09 16  that we had found most likely were also covered in this

12:09:12 17  application.  That's what I understand now.

12:09:15 18          "Question:  Okay.  And when you say 'This

12:09:19 19  application,' you're referring to --

12:09:23 20          "Answer:  To the Idenix one, yeah.

12:09:24 21          "Question:  In your e-mail in Schinazi Exhibit

12:09:28 22  19 you -- you mention that the Novirio patent will be

12:09:40 23  published in two months' time.  And is it your understanding

12:09:45 24  that that's referring to the Novirio patent application

12:09:48 25  that -- the '121 application --

12:09:51 1          "Answer:  Yes.

12:09:52 2          "Question:  -- that was published.

12:09:54 3          "Okay.  Now, you said -- said in your e-mail you

12:09:58 4     got 'a cold shower.'  What did you mean by that?

12:10:06 5          "Answer:  I don't exactly recall what it is the

12:10:09 6     cold shower, but most likely I went in there with a whole

12:10:13 7     lot of interesting stuff to tell her that, 'Look, this is

12:10:18 8     the -- the -- the new things that we found in our screening,

12:10:22 9     we should go and -- and start filing maybe,' something like

12:10:28 10    that, and then she most likely told me, 'Well, I can't file

12:10:34 11    for you on this type of compound because it's already in --

12:10:38 12    in the -- the Idenix's filings.'

12:10:43 13         "Question:  Was it your impression that the

12:10:45 14    Pharmasset work up to October 2001, developing compounds,

12:10:50 15    might eventually belong to Idenix at that time?

12:10:52 16         "Answer:  The way that -- if I read this now,

12:10:55 17    the way that I see that is that throughout all of our

12:10:59 18    screenings everything that -- that we discovered must have

12:11:03 19    been part of -- of what was covered already in Idenix's

12:11:07 20    applications, yes.

12:11:08 21         "Question:  Okay.  When you say 'We discovered,'

12:11:13 22    you mean Pharmasset?

12:11:15 23         "Answer:  We at Pharmasset , yes.

12:11:16 24         "Question:  You respond to him just above that

12:11:19 25    and -- and in your response it says:  'The moment of truth

12:11:24 1    is coming closer...' -- and in parentheses: '...[October

12:11:37 2    18], with full impact available at the moment the patent of

12:11:41 3    Novirio is published.'

12:11:50 4              "Do you see that?

12:11:52 5              "Answer:  Yes.

12:11:52 6              "Question:  What did you mean by 'The moment of

12:11:55 7    truth'?

12:11:55 8              "Answer:  Well then it's going to be in the

12:11:58 9    public domain and then we will know -- so, the way that I

12:12:02 10   understand all of this is that I have been at Sherry

12:12:07 11   Knowles's office.  I received there my cold shower and I

12:12:11 12   have most likely seen some of it but not everything, and

12:12:14 13   then for me what is the moment of truth?  The moment of

12:12:16 14   truth is the publication of this document, then I'm going to

12:12:20 15   be able to study it in full detail.

12:12:22 16             "Question:  Okay.  Is it possible you were

12:12:24 17   referring to the -- October 18th date as the date that

12:12:27 18   Pharmasset was filing a PCT application?

12:12:30 19             "Answer:  Did we file an application on October

12:12:32 20   18th?  I don't remember.  We filed in -- in 2000 and we

12:12:37 21   filed in 2002.

12:12:39 22             "Question:  Stuyver Exhibit 3 is a document

12:12:42 23   bearing Bates range GILEAD01822954 through 1 -- 1823183.

12:12:55 24   It's an international patent publication No. WO 02/32920.

12:13:07 25   The inventors are Lieven Stuyver and Kyoichi Watanabe.  And

12:13:12 1  the title is 'Modified Nucleosides For Treatment of Viral

12:13:17 2  Infections in Abnormal Cellular Proliferation.'  So Dr.

12:13:25 3  Stuyver, I'd like you to look through Stuyver Exhibit 3 for

12:13:29 4  the purpose of determining whether you recognize it or not

12:13:32 5  and let me know when you've had a chance to do that.

12:13:36 6          "Answer:  Yes, I recognize it.

12:13:37 7          "Question:  Okay.

12:13:39 8          "Answer:  And I also see the filing date is

12:13:41 9  October 18, 2001.

12:13:44 10         "Question: Okay.

12:13:45 11         "Answer:  Okay.

12:13:49 12         "Question:  Okay.  And you will see the priority

12:13:53 13 date for one of the provisionals is October 18th, 2000.

12:13:53 14         "Answer:  Yes.

12:13:55 15         "Question:  -- do you see that?

12:13:55 16         "Answer:  Okay.

12:13:57 17         "Question:  So is it possible that you're

12:14:01 18 referring to this PCT filing as - as what was happening on

12:14:01 19 October 18th in your e-mail in October of 2001 to Dr. Schinazi?

12:14:12 20         "Answer:  I don't know.

12:14:13 21         "Question:  Who -- who is Kyo Wat -- Kyo

12:14:16 22 Watanabe?

12:14:16 23         "Answer:  Kyo Watanabe was the VP chemistry in

12:14:20 24 Pharmasset.  He was heading all the chemistry efforts.

12:14:25 25         "Question:  And that was -- he was the head when

657

12:14:27  1   you joined?

12:14:28  2            "Answer:  Yes.

12:14:28  3            "Question:  Okay.  And he came from Memorial

12:14:31  4   Sloan-Kettering?

12:14:32  5            "Answer:  Correct.

12:14:33  6            "Question:  Okay.  And he brought a compound

12:14:35  7   library with him when he came to Pharmasset; is that right?

12:14:38  8            "Answer:  That is correct.

12:14:39  9            "Question:  Were there nucleoside compounds in

12:14:41 10   that library?

12:14:42 11            "Answer:  My understanding is his whole library

12:14:45 12   was nucleoside compounds.  Some of them final product, some

12:14:49 13   of them in-between steps not purified, but all of it must be

12:14:54 14   nucleoside chemistry.

12:14:55 15            "Question:  Okay.  And was one of the compounds

12:14:57 16   in that library 2'-fluoro-down cytosine?

12:15:03 17            "Answer:  Yes, that's correct.

12:15:04 18            "Question:  Okay.  And at Pharmasset you tested

12:15:06 19   that compound for antiviral activity; is that right?

12:15:11 20            "Answer:  That is correct.

12:15:11 21            "Question:  And it came back as a hit for

12:15:14 22   anti-HCV activity, right?

12:15:17 23            "Answer:  That is correct.

12:15:18 24            "Question:  Okay.  The reference to

12:15:22 25   2'-F-cytidine, is that -- that's also FdC, another way of

12:15:27  1    saying it?

12:15:29  2               "Answer:  FdC, yeah.

12:15:30  3               "Question:  And was -- do you recall if there

12:15:32  4    was a PSI number associated with that?

12:15:34  5               "Answer:  0262.

12:15:35  6               "Question:  Okay.  And none of the nucleosides

12:15:37  7    in Dr. Watanabe's library had a 2'methyl-(up);  is that

12:15:40  8    right?

12:15:41  9               "Answer:  That is correct.

12:15:41 10               "Question:  Okay.  Okay, did you have something

12:15:44 11    to add here?

12:15:45 12               "Answer:  Well, the question asked me if I know

12:15:47 13    the complete content of Dr. Watanabe's library.  The answer

12:15:51 14    is, no, I don't know.  The only thing that I know is that

12:15:54 15    Dr. Watanabe never submitted any of those compounds to us

12:15:57 16    for testing.

12:16:02 17               "Mr. Kinton:  Okay.  I'm going to have the court

12:16:05 18    reporter mark as Stuyver Exhibit 15 a document entitled

12:16:08 19    'Grant Application bearing Bates range GILEAD05079233

12:16:15 20    through 05079287.

12:16:19 21               "And this grant application is titled '2' and or

12:16:24 22    4'C modified nucleosides as anti-HCV agents.'

12:16:30 23               "Do you see that?

12:16:31 24               "Answer:  Yes, I see that.

12:16:32 25               "Question:  Are you familiar with this grant

12:16:34  1    application?

12:16:35  2         "Answer:  But this is not the grant application

12:16:38  3    of the -- the grant that I wrote.  I think this is another

12:16:41  4    one, right.

12:16:48  5         "Question:  Okay.  And were you involved at all

12:16:51  6    in -- in writing this draft app -- draft application?

12:16:54  7         "Answer:  Well, maybe not in the chemistry, but

12:16:56  8    I see there is activity, there's the screening in here and

12:16:59  9    the biology work, the research done most likely on activity,

12:17:02 10    that is all -- that is all material that has been written by

12:17:06 11    me.

12:17:08 12         "Mr. Kinton:  So I'm going to have the court

12:17:12 13    reporter mark as Stuyver Exhibit 15 -- 16, sorry, a document

12:17:16 14    bearing Bates range GILEAD05075840 through 5873.  It's

12:17:25 15    entitled 'Grant Application.'  And the title of the project

12:17:30 16    is 'Novel Class of Compounds For Treatment of HCV

12:17:36 17    Infections.'

12:17:38 18         "Dr. Stuyver, do you recognize Stuyver Exhibit

12:17:40 19    16?

12:17:41 20         "Answer:  Yes, it's another grant application.

12:17:43 21         "Question:  And you're listed as a role on the

12:17:46 22    project of bio-evaluation on the second page; is that right?

12:17:50 23         "Answer:  Yes.

12:17:50 24         "Question:  Were you involved at all in drafting

12:17:51 25    this particular grant application?

12:17:53 1      "Answer:  Well, my role is going to be limited

12:17:55 2  in this one to what is on Page -- and down at the bottom

12:18:00 3  here GILEAD05075868, which is Page 27 and Page 28, yeah.  So

12:18:11 4  there is a description of the biology part and that is the

12:18:14 5  description or text that is going to be introduced by me.

12:18:17 6      "Question:  Is it fair to say that the purpose

12:18:19 7  of looking at other companies' patents was to find compounds

12:18:23 8  that you thought weren't explicitly disclosed but might have

12:18:26 9  activity?

12:18:34 10     "Answer:  But it's every single time.  If -- if

12:18:37 11 you are in this business, you see there are so many

12:18:39 12 applications that are filed by everyone dealing or working

12:18:43 13 in this, and then you have your hit, and then with that hit

12:18:48 14 you would go and look into the filings of the competition

12:18:51 15 and try to find if there is anything that if you would take

12:18:55 16 your hit maybe it's covered, or if you would introduce a

12:18:58 17 modification to that hit, is it free to go?  Is it free from

12:19:02 18 published IP applications?  And that is standard.  That is

12:19:05 19 not only at Pharmasset that that is done.  That's throughout

12:19:09 20 my whole career that that is the way you look at patents.

12:19:14 21     "Question:  Okay.  I'm going to have the court

12:19:16 22 reporter mark as Stuyver Exhibit 17 a document bearing Bates

12:19:22 23 range GILEAD00188843 through 00189081, appears to be a lab

12:19:32 24 notebook of Lieven Stuyver from February 12th, 2001 through

12:19:37 25 August 27th, 2003, Volume 4.

12:19:43  1        "Question:  Dr. Stuyver, I'd like you to go over

12:19:46  2   Exhibit 17 for the purpose of determining whether you

12:19:49  3   recognize it or not, and let me know when you've had a

12:19:53  4   chance to do that.

12:19:55  5        "Answer:  Yes.  I recognize it as one of my lab

12:19:58  6   notebooks.

12:19:58  7        "Question:  Yeah.  So I'd like you to turn to

12:20:01  8   Page 140 of your lab notebook, which appears on Gilead

12:20:06  9   188996.  Do you have that --

12:20:08 10        "Answer:  Yes.

12:20:08 11        "Question:  -- in front of you?

12:20:10 12        "Answer:  Yes, I have.

12:20:11 13        "Question:  So at Line 5 it says, 'PSI-6130 is a

12:20:19 14   modification of the PSI-5817 analog and from PSI-0262.'

12:20:33 15        "Do you see that?

12:20:34 16        "Answer:  Yes.

12:20:34 17        "Question:  And there's a figure below that

12:20:37 18   shows PSI-6130 that's circled?

12:20:41 19        "Answer:  Yes.

12:20:41 20        "Question:  And it -- it's got a structure

12:20:44 21   labeled PSI-0262 which is FdC; is that right?

12:20:50 22        "Answer:  Yes.

12:20:50 23        "Question:  And then the other structure is

12:21:00 24   labeled PSI-5817, that's 2'-methyl (up) cytosine, right?

12:21:02 25        "Answer:  Correct.

12:21:02  1        "Question:  And that's what was referred to as

12:21:05  2   the Idenix compound within Pharmasset?

12:21:07  3        "Answer:  Yes.

12:21:07  4        "Question:  Okay.

12:21:22  5        "Answer:  Yes.

12:21:23  6        "Question:  And it's got two arrows, an arrow

12:21:37  7   from PSI-0262 and PSI 5817 going to PSI-6130.  Do you see

12:21:45  8   that?

12:21:47  9        "Answer:  Yes.

12:21:48 10        "Question:  And between the arrows it says

12:21:53 11   Combined Active Motifs.  Do you see that?

12:21:54 12        "Answer:  Yes.

12:21:54 13        "Question:  What did you mean by combined active

12:21:57 14   motifs?

12:22:00 15        "Answer:  Well, the fluoro (down) in one

12:22:02 16   molecule was an active compound.  The methyl (up) in the

12:22:05 17   other is an active compound.  If you combine those two then

12:22:09 18   you come up with PSI-6130.

12:22:11 19        "Question:  And did you -- by doing that, did

12:22:17 20   you expect there was a chance that it would have activity?

12:22:21 21        "Answer:  It is part of the structure-activity

12:22:23 22   relationship.  It could be active; it could be inactive; it

12:22:26 23   could be an antimetabolite.

12:20:49 24        "Question:  And when you say "it could be an

12:20:53 25   antimetabolite," what do you mean by that?

12:20:59  1      "Answer:  We know that the fluoro -- fluoro up

12:21:04  2  fluoro down -- that is gemcitabine.  Now, that is a very

12:21:20  3  toxic compound.  So just by taking a look to this structure,

12:21:25  4  you need to put yourself in two -- in 2002, 2003.  Just by

12:21:31  5  -- and knowing on the antimetabolite activity and research

12:21:37  6  that I have done.  Just by looking to that structure, I

12:21:45  7  couldn't say that this is going to be an anti- hepatitis C

12:21:49  8  compound.  Yes, later onwards, years later, all -- everyone

12:21:55  9  can -- can come up with that type of -- of -- of rationale

12:22:01 10  and you hope at a certain moment that it's going to be a

12:22:04 11  hit, but for the same it's -- it's an antimetabolite, it's

12:22:08 12  extremely toxic.  Or for the HuH7 cells that we are using,

12:22:17 13  it's not phosphorylated, because the enzymes for phosphor --

12:22:23 14  phosphorylation are not there, and then it turns out to be

12:22:27 15  an inactive compound.  So, in 2002, 2003, you don't know any

12:22:33 16  of this, you're in the blind.

12:22:35 17      "Question:  Okay.  So your knowledge, was

12:22:37 18  Mr. Clark the person who first synthesized PSI-6130 at

12:22:43 19  Pharmasset?

12:22:44 20      "Answer:  Yes, that is correct.

12:22:45 21      "Question:  So, Dr. Stuyver, in your Lab

12:22:48 22  Notebook No. 4, you had identified PSI-6130 as a combination

12:22:54 23  of the motif from the Idenix methyl up compound and FdC; is

12:23:03 24  that right?

12:23:04 25      "Answer:  Correct, yes.

12:23:04 1     "Question:  And that was an idea that you had at

12:23:07 2     Pharmasset, correct?

12:23:08 3          "Answer:  Correct.

12:23:08 4          "Question:  So you understand that you assigned

12:23:12 5     to Pharmasset any rights you had in any invention you may

12:23:16 6     have made while you were there, correct?

12:23:18 7          "Answer:  Yes.

12:23:18 8          "Question:  So you understand that even if you

12:23:21 9     were an inventor of PSI-6130, Pharmasset would own the

12:23:26 10    rights to that invention, correct?

12:23:28 11         "Answer:  That is correct.

12:23:43 12         "Question:  I take it you agree that PSI-6130 is

12:23:47 13    an invention?

12:23:48 14         "Answer:  I hope so.

12:23:49 15         "Question:  And you agree that it's Pharmasset's

12:23:52 16    invention, right?

12:23:53 17         "Answer:  Absolutely.

12:23:54 18         "Question:  It's certainly not, in your view,

12:23:56 19    Idenix's invention, right?

12:23:59 20         "Answer:  6130 is for me the consequence of my

12:24:02 21    work, of studying the literature, of finding in the lab

12:24:07 22    compounds and you bring the pieces together and out of that

12:24:10 23    you distill 6130.  That's independent of what happened at

12:24:16 24    Idenix at that moment.  In 2002, I was not aware of what

12:24:20 25    was going on at Idenix in the lab or in their patent port --

12:24:26 1    portfolios.

12:24:27 2              "Question:  Mr. Kinton had you look at a couple

12:24:31 3    of patent applications during your testimony this morning.

12:24:36 4    Do you recall that?  One was a Novirio patent application

12:24:39 5    that published November 29th, 2001.  Do you recall that?

12:24:46 6              "Answer:  (Nodding head.)

12:24:47 7              "Question:  You understand that that patent

12:24:49 8    application doesn't disclose PSI-6130, right?

12:24:53 9              "Answer:  That is correct.

12:24:56 10             "Question:  Do you remember a Dr. Abdullah

12:24:59 11   Hassan at Pharmasset?

12:25:01 12             "Answer:  Yes.

12:25:02 13             "Question:  Who is he?

12:25:03 14             "Answer:  He was a guy from Egypt.

12:25:05 15             "Question:  A chemist?

12:25:08 16             "Answer:  A chemist, yes.

12:25:08 17             "Question:  And he worked under Dr. Watanabe?

12:25:10 18             "Answer:  Yes.

12:25:10 19             "Question:  He synthesized compounds?

12:25:15 20             "Answer:  Yes.

12:25:17 21             "Question:  I take it you aren't aware that

12:25:19 22   Dr. Hassan had made 2'-methyl-2'-hydroxyl nucleosides at

12:25:32 23   Pharmasset by March 2001?

12:25:34 24             "Answer:  Is that so?

12:25:35 25             "Question:  It is true.  If it's true -- let me

12:25:40  1    make this clear.  If it's true that Dr. Hassan synthesized

12:25:44  2    2'-methyl-up-2 -- 2'-hydroxyl down nucleosides by March 2001

12:25:52  3    at Pharmasset, would that change your previous testimony in

12:25:56  4    any way?

12:25:58  5              "Answer:  Well, if that is the case, then my

12:26:01  6    recollection is wrong, eh?

12:26:04  7              "Question:  And it's possible --

12:26:07  8              "Answer:  Obviously.  That is possible, yes.

12:26:08  9              "Question:  Let me ask it this way.  If

12:26:10 10    Dr. Hassan made 2'-methyl-2'-hydroxyl nucleosides by

12:26:16 11    March 2001, are you still of the view that Pharmasset -- let

12:26:21 12    me strike that and start over.

12:26:26 13              You previously testified that for the simple

12:26:31 14    reason of where other -- where else could it come from,

12:26:35 15    Dr. Schinazi learned about the structure of

12:26:45 16    2'-methyl-2'-hydroxyl compounds from Idenix.  Does that

12:26:47 17    sound familiar?

12:26:51 18              "Answer:  (Nodding head.)

12:26:52 19              "Question:  Okay.  That isn't necessarily true

12:26:54 20    if Dr. Hassan had made 2'-methyl-2'-hydroxyl compounds

12:26:59 21    before Dr.  Schinazi knew anything about what Idenix was

12:27:01 22    doing, correct?

12:27:03 23              "Answer:  But -- so -- so this is interesting.

12:27:06 24    If Hassan was able to synthesize it in spring 2001, in

12:27:12 25    spring 2001, and we filed our patent in -- in -- in 2000.

12:27:24 1    The question remains where did Hassan, out of the blue, get

12:27:29 2    the directions to synthesize this compound?  The only way

12:27:33 3    that -- who -- who had that type of structure?  It was not

12:27:41 4    in the public domain.

12:27:43 5            "Question:  Is that your understanding that

12:27:46 6    2'-methyl-2'-hydroxyl nucleosides were not in the public

12:27:51 7    domain?

12:27:51 8            "Answer:  No, they are in the public domain

12:27:53 9    there but for -- for -- as candidates for hepatitis C.

12:27:58 10           "Question:  Isn't it possible that Pharmasset

12:28:00 11   independently came up with that idea?

12:28:02 12           "Answer:  I don't remember that.  If --

12:28:04 13           "Question:  Isn't it--

12:28:07 14           "Answer:  -- if that would be the case.  I don't

12:28:09 15   remember that because to me the history is -- is -- the

12:28:13 16   events, the series of events in my recollections are

12:28:16 17   different.

12:28:16 18           "Question:  Right.  And your testimony has been

12:28:19 19   based on that recollection which does --

12:28:23 20           "Answer:  Yes.

12:28:24 21           "Question:  -- not include a memory of

12:28:26 22   Pharmasset synthesizing 2'-methyl-up-2'-hydroxyl compounds

12:28:35 23   as of March 2001, correct?

12:28:37 24           "Answer:  That is possible.

12:28:38 25           "Question:  So it is possible Pharmasset

12:28:40 1     independently came up with the idea to make

12:28:45 2     2'-methyl-2'-hydroxyl compounds to treat HCV, right?

12:28:51 3          "Answer:  It's an interesting story, yes.  I

12:28:54 4     don't know where -- where that would come up but if that is

12:28:56 5     the case, then that is very interesting.

12:28:58 6          "Question:  And it is possible, right?  That

12:29:03 7     Pharmasset independently came up about that idea?

12:29:12 8          "Answer:  That is possible then, yes.

12:29:14 9          "Question:  Just to finish up with this e-mail,

12:29:17 10     Schinazi Exhibit 19.  On the first page, Dr. Kinton asked

12:29:20 11     you about a line in your e-mail in the middle of the page

12:29:23 12     where you said:

12:29:25 13          "The moment of truth is coming closer (October

12:29:29 14     18), with full impact available at the moment the patent of

12:29:32 15     Novirio is published."

12:29:34 16          "Do you remember him asking you about that?

12:29:37 17          "Answer:  (Witness nodded head.)

12:29:38 18          "Question:  And then he showed you a Pharmasset

12:29:40 19     patent application.

12:29:41 20          "Answer:  Okay.  So now this starts making more

12:29:43 21     sense for me.

12:29:44 22          "Question:  How so?

12:29:45 23          "Answer:  Because if we had independently

12:29:46 24     detected or synthesized the 2'-methyl up ribo, and maybe I

12:29:52 25     discovered here that Sherry Knowles that that was in their

12:29:56 1    patent portfolio from Idenix, then this world is collapsing.

12:30:01 2           "Question:  What do you mean?

12:30:02 3           "Answer:  Well, then -- then, if it came up

12:30:05 4    independently at Pharmasset, then it belongs to -- and it

12:30:08 5    was filed already in the Idenix application in 2000, then,

12:30:16 6    then that makes more sense now for me, yes.

12:30:19 7           "Question:  Can you tell me a little more?  When

12:30:22 8    you say the world is collapsing, what do you mean by that?

12:30:25 9    How did this make you feel?

12:30:27 10          "Answer:  So, suppose that the whole -- the 2' --

12:30:31 11    the 2'-methyl up hydroxyl down, that that was independently

12:30:37 12    conceived at Pharmasset, and we worked through the summer with

12:30:40 13    this compound as our positive control, then I must have lived

12:30:44 14    at that time with the idea that this is a com -- a compound

12:30:51 15    that belongs to us.  But then I go to Sherry Knowles, and

12:30:54 16    there the cold shower is that, "Yeah, you can work on it but

12:31:05 17    it's not yours."  And then I'm asking myself, "What am I doing

12:31:10 18    here?"  And then I write an e-mail to Schinazi.

12:31:16 19          "Question:  If you could please grab what has

12:31:18 20    previously been marked Exhibit 9 in your stack.  And this is

12:31:27 21    your notebook, Volume 2; is that right?

12:31:30 22          "Answer:  Yes.

12:31:30 23          "Question:  You certainly recognize this

12:31:32 24    document from your time at Pharmasset?

12:31:34 25          "Answer:  (The witness nodded.)

12:31:37 1        "Question:  Did you keep this notebook as part

12:31:39 2   of your job duties at Pharmasset?

12:31:41 3        "Answer:  Yes.

12:31:42 4        "Question:  And it -- in it, you recorded work

12:31:45 5   you performed for Pharmasset between March 30th, 2000 and

12:31:50 6   December 3rd, 2001, correct?

12:31:53 7        "Answer:  Yes.  That's what it says, yes.

12:31:55 8        "Question:  And you try to record the work in

12:31:57 9   your notebook at or around the time you actually performed

12:32:01 10  it, right?

12:32:02 11       "Answer:  Correct.

12:32:02 12       "Question:  And you try to be accurate in your

12:32:05 13  recordings?

12:32:06 14       "Answer:  Yes.

12:32:06 15       "Question:  Fair enough.  If you could please

12:32:08 16  turn to page 99 of the notebook.  It's the page ending in

12:32:13 17  Bates number 586.

12:32:17 18       "Answer:  Page 99?

12:32:19 19       "Question:  Yes.  Is this your handwriting on

12:32:21 20  this page?

12:32:22 21       "Answer:  Yes.

12:32:22 22       "Question:  Okay.  At the top it says:  'New

12:32:26 23  screening of PSI compounds in HCV replicon?'

12:32:35 24       "Answer:  Yes.

12:32:38 25       "Question:  And just below that it says:  'All

compounds tested @ 100 [micromolar].'  Is that right?

"Answer:  Correct.

"Question:  You signed and dated this page on
February 27th, 2001?

"Answer:  Yes.

"Question:  Am I correct that one of the first
tasks you undertook when you came to Pharmasset was to
develop an HCV replicon assay?

"Answer:  No, that is not correct.  Not to
develop it, eh.  Well, what do you mean by developing?

"Question:  Why don't you tell me.

"Answer:  So the -- the replicon system is a
system that was invented by Ralf Bartenschlager in Germany,
and then nobody could reproduce that system.  They had a
meeting somewhere in, I guess in '99, with the key leaders
in the field of hepatitis C, and they discussed the
protocol.  And then it was repeated in Charlie lab -- in
Charlie Rice, in his lab in -- I think that in that, in
those days, it was still in, in St. Louis.  And then
through, through the discussions, Charlie Rice had his own
company there.  The name escapes me now.  He had his own
company that was taking care of that portfolio, including
the replicon system.  And so Schinazi, I asked Schinazi to,
-- to go and negotiate and get access to that system.  And
then later onwards, we, somewhere in 2000, we, we must have,

12:34:20 1    have access to those cells.

12:34:22 2            So the replicon system was in the scientific

12:34:26 3    community developed already.  It has not been converted into

12:34:30 4    a screening tool for antiviral compounds.

12:34:32 5            "Question:  So that's my question:  What did --

12:34:39 6    what was your role in converting that into a screening

12:34:43 7    assay?

12:34:45 8            "Answer:  Everything you can imagine about this.

12:34:47 9            "Question:  And was that easy?

12:34:49 10           "Answer:  That was not easy.

12:34:50 11           "Question:  So can you walk me through the steps

12:34:52 12   you took, and the general time frame you were working on it?

12:35:01 13           "Answer:  So, first of all, you need to

12:35:02 14   understand the dynamic -- the dynamics of that replicon.

12:35:08 15   The replicon, that is the self-replicating RNA molecule that

12:35:13 16   is intracellular and that is produced and it's also decayed.

12:35:19 17   And here we have a continuously system of producing it and

12:35:22 18   then it is disappearing again.

12:35:24 19           "If you set up -- you need to understand, if you

12:35:27 20   set up an antiviral assay and you set it up in a bad way,

12:35:31 21   then your results, you think you're going to have a hit but

12:35:35 22   actually you have nothing.  So you need to, you need to set

12:35:39 23   those assays very meticulously to make sure that if you see

12:35:44 24   something you can trust it.

12:35:45 25           "And in one of the papers that I published, I

1   have explained in all the details what you need to do to

2   make sure that you have the right assay.  And that is if you

3   take your cells, for example, three, four, five days into

4   culture and they start -- the cells start touching each

5   other, then you see a decay in the intracellular RNA pool,

6   and that could be misinterpreted as an antiviral activity,

7   if you would add a non-active compound on top of it.

8          "And so figure that out, that is not something

9   that, that happens overnight; it's not like, okay, you take

10  the protocol from Charlie Rice, you put it there on your own

11  culture and you say 'okay, now we're ready to screen.'

12  That's not the way it worked.  I had to understand, first of

13  all, everything that was going on with those cells.

14         "Now, the second thing is how do you measure?

15  What is the readout on that viral RNA that is in there in

16  those cells?  How do you measure that in a standardized way,

17  reproducible from one experiment to the other, from one

18  operator to the other?  Right?

19         "So that is a whole lot of standardization,

20  procedures that need to be put in place, understanding the

21  biology and also understanding the, the human errors that

22  can be introduced.  You need to have the, the proper

23  equipment.  So I tell you this is hard work, eh?

24         "Question:  And that was your work?

25         "Answer:  And that was my work, yes.

12:37:18 1          "Question:  So once you had the HCV replicon

12:37:21 2    assay at Pharmasset, you no longer used the BVDV assay to

12:37:25 3    test for anti-HCV activity?

12:37:28 4          "Answer:  For screening, you mean?

12:37:30 5          "Question:  Right.

12:37:30 6          "Answer:  That is correct.

12:37:31 7          "Question:  Now, back to our discussion with

12:37:34 8    respect to your notebook where we were talking about

12:37:36 9    screening compounds in a replicon assay at a concentration

12:37:40 10   of 100 micromolar.  Was that a standard you developed as

12:37:44 11   part of your set up of the replicon assay?

12:37:49 12         "Answer:  It's -- it's very practical.  If you

12:37:52 13   have a few thousand compounds to screen, then you need to

12:37:57 14   take a selection on what is the most relevant concentration

12:38:01 15   to start with.  And so depending on the amount of compound

12:38:10 16   that is available, and the original stock, you could make a

12:38:15 17   decision to go to 100 micromolar.  But I have seen people

12:38:19 18   doing 10 micromolar as a start screening, or 50 micromolar,

12:38:23 19   or 20 micromolar, whatever.  Thinking there is a whole lot

12:38:29 20   to say for nucleosides to start screening with one -- 100

12:38:33 21   micromolar.  In other compounds, not nucleosides, I think

12:38:36 22   they start in, in, in maybe at the, in the nanomolar range.

12:38:42 23   But here we started with that one.  But having said that,

12:38:45 24   this is the gold standard for starting it.  I wouldn't say

12:38:49 25   that -- for example, I can imagine that for certain

12:38:52 1   compounds, we, we skipped the screening and went immediately

12:38:56 2   to the, do a, a dose response curve.

12:39:00 3            "Question:  Okay.  Now, if we turn to the next

12:39:02 4   page, so page 144 of your notebook, ending in Bates number

12:39:06 5   of 31.  It looks like this is a table of data from your

12:39:12 6   replicon assay; correct?

12:39:15 7            "Answer:  Correct.

12:39:15 8            "Question:  Okay.  If we focus on the top half,

12:39:17 9   please.  If you look around line 5 and a little above, there

12:39:29 10  are four data entries for a compound PSI-5557.  Do you see

12:39:34 11  that?

12:39:35 12           "Answer:  Yes.

12:40:20 13           "Question:  And it looks to me like that

12:40:36 14  compound was screened, and again we are talking about

12:40:39 15  with -- without the antibiotics, so just the compound, it

12:40:44 16  was screened at a hundred micromolar?

12:40:47 17           "Answer:  Correct.

12:40:47 18           "Question:  And it was also screened at 30

12:40:47 19  micromolar?

12:40:59 20           "Answer:  Although --

12:41:00 21           "Question:  All right.

12:41:01 22           "Answer:  -- No. 4 --

12:41:03 23           "Question:  Okay.

12:41:03 24           "Answer:  5557 is toxic at 100...but active at

12:41:08 25  33 micromolar.  Yes.  You see 15 years later I still come up

12:41:12 1    with the same conclusion.

12:41:13 2              "Question:  You still come up with the same

12:41:17 3    conclusion, thank you.

12:41:18 4              "And you wrote that conclusion on Page 146 of

12:41:21 5    your notebook or around May 1st, 2001, correct?  That's your

12:41:27 6    signature on this page?

12:41:29 7              "Answer:  Yes.

12:41:30 8              "Question:  Dr. Stuyver, before the break we

12:41:32 9    were talking about your notebook page dated May 1st, 2001.

12:41:36 10   Do you recall that?

12:41:36 11             "Answer:  Yes.

12:41:36 12             "Question:  Okay.  And as part of that

12:41:39 13   experiment, represented on Page 146 of your notebook, you

12:41:42 14   had tested PSI 5557 in the replicon assay, correct?

12:41:47 15             "Answer:  Correct.

12:41:48 16             "Question:  And from that screening you

12:41:49 17   concluded that PSI-5557 is toxic at a hundred micromolar but

12:41:55 18   active at 33 micromolar.  Correct?

12:42:00 19             "Answer:  Correct.

12:42:01 20             "Question:  Okay.  Is it your understanding that

12:42:03 21   PSI-5557 is a nucleoside with methyl in the 2' (up)

12:42:08 22   position, hydroxyl in the 2' down position and an adenine

12:42:13 23   base?

12:42:14 24             "Answer:  Yes.

12:42:14 25             "Question:  Dr. Stuyver, the court reporter has

12:42:16  1    handed to you what's been marked as Exhibit 24, a document

12:42:20  2    bearing Bates No. GILEAD02384575 through 938.  Do you

12:42:27  3    recognize this document?

12:42:28  4              "Answer:  Another lab notebook from Phil

12:42:33  5    Tharnish.

12:42:33  6              "Question:  And, again, it's your understanding

12:42:34  7    that Mr. Tharnish kept this notebook as part of his job

12:42:38  8    duties as Pharmasset?

12:42:39  9              "Answer:  Yes.

12:42:39 10              "Question:  Could you turn to the page -- well,

12:42:42 11    turn to Page 136 of the notebook, ending in 865.  This page

12:42:48 12    is dated May 15th, 2003, correct?

12:42:52 13              "Answer:  Yes.

12:43:11 14              "Question:  And it's subsequently co-signed and

12:43:13 15    witnessed by you?

12:43:14 16              "Answer:  Correct.

12:43:15 17              "Question:  In the top plate, if you look at

12:43:17 18    wells F1 through F8, am I correct that 6130 was plated for

12:43:21 19    screening in the replicon assay?

12:43:24 20              "Answer:  Correct.

12:43:24 21              "Question:  And then if you could please turn to

12:43:27 22    Page 138 of the notebook.  Am I correct that the results

12:43:31 23    from that HCV replicon assay are shown here?

12:43:35 24              "Answer:  Yes.

12:43:35 25              "Question:  And if you look down at around Line

12:43:38 1    8, you see PSI-6130?

12:43:44 2              "Answer:  Correct.

12:43:44 3              "Question:  And it was screened at a

12:43:47 4    concentration of 100 micromolar, correct?

12:43:50 5              "Answer:  100.

12:43:50 6              "Question:  And also at 33 micromolar?

12:44:03 7              "Answer:  100.  33, 10 and 3.

12:44:06 8              "Question:  Okay, so it was screened at four

12:44:08 9    different concentrations, correct?

12:44:10 10             "Answer:  Correct.

12:44:10 11             "Question:  And it was -- this screening was --

12:44:13 12   or the results from this screening were reported by Mr.

12:44:16 13   Tharnish on May 19th, 2003, correct?

12:44:19 14             "Answer:  Correct.

12:44:20 15             "Question:  And then if we turn to Page 140, it

12:44:22 16   looks like Mr. Tharnish wrote some conclusions.

12:44:27 17             "Answer:  Correct.

12:44:28 18             "Question:  The conclusion of 6 reads:  'PSI

12:44:33 19   6130 looks to be a very active compound with an EC90 ([

12:44:41 20   micromolar]) of approximately 2.5.  This needs to be

12:44:47 21   confirmed.'

12:44:49 22             "Answer:  Correct.

12:44:50 23             "Question:  Okay.  And you were told that Dr.

12:44:52 24   Hassan made a 2'methyl (up) compound in March of 2001; is

12:44:57 25   that right?

12:44:57 1          "Answer:  That is what I learned today.

12:45:00 2          "Question:  Okay.  In 2001, Dr. Schinazi had

12:45:02 3   complete control of Pharmasset's chemistry; is that right?

12:45:06 4          "Answer:  Yes, well, Kyo Watanabe was heading

12:45:08 5   the chemistry activities but in my view Schinazi was

12:45:12 6   controlling what is going to be made and Kyo was

12:45:15 7   instrumental to make sure it's gonna be made -- he had a

12:45:19 8   wealth of knowledge on the chemistry, on the synthesis, on

12:45:22 9   the -- and so on.  But what -- the what, that is done by

12:45:27 10  Schinazi.

12:45:27 11          "Question:  So Dr. Schinazi directed what was to

12:45:30 12  be made at Pharmasset?

12:45:31 13          "Answer:  Yeah.

12:45:31 14          "Question:  And are you aware that in 2000 and

12:45:35 15  2001 Dr. Schinazi was in regular communication with Idenix?

12:45:40 16          "Answer:  I think he had communication with

12:45:42 17  Jean-Pierre Sommadossi all the time.

12:45:49 18          "Question:  So it's possible, if not likely,

12:45:52 19  that Dr. Schinazi told Hassan to make the 2'-methyl (up)

12:45:58 20  nucleoside.  Is that right?

12:46:00 21          "Answer:  So I -- it's possible that Dr.

12:46:03 22  Schinazi told Hassan to make that compound.  It's likely,

12:46:06 23  yes."

12:46:11 24          THE COURT:  Does that conclude the testimony?

12:46:13 25          MS. PARKER:  Yes, Your Honor.  Thank you.

12:46:14  1        THE COURT:  We are going to give the ladies and

12:46:17  2   gentlemen of the jury their lunch break.  During the break,

12:46:18  3   no talking about the case.  Your lunch is here, I

12:46:22  4   understand.  We will give you about a half-hour, and then we

12:46:25  5   will get you back.  Thank you.

12:46:27  6        (Jury leaves courtroom at 12:45 p.m.)

12:46:52  7        THE COURT:  I have divided what I am doing with

12:46:55  8   respect to the issues about the witness and Dr. Carter

12:47:00  9   argued this morning.  I am just going to tell you the

12:47:02 10   outcome.  I will give you the reasoning at the end of the

12:47:05 11   lunch break.

12:47:05 12        But there were two issues on which Gilead sought

12:47:08 13   leave to cross-examine Mr. Carter.  I am going to grant that

12:47:13 14   leave for Gilead to do so.

12:47:16 15        Then there were two Gilead objections to the use

12:47:19 16   of two exhibits that Idenix wants to use in its examination

12:47:24 17   of Mr. Carter.  I am going to overrule those objections and

12:47:28 18   permit those exhibits to be used.

12:47:30 19        I will have more to say about that after the

12:47:32 20   lunch break.  But let's take a break.

12:47:35 21        (Luncheon recess taken.)

01:27:37 22        THE COURT:  Have a seat.  I did want to put on

01:27:40 23   the record my reasoning for the rulings relating to Gilead's

01:27:43 24   issues regarding the plaintiffs' expert, damages expert,

01:27:46 25   Andrew Carter.  The decision was given before the lunch

01:27:51 1    break.  Here is a little bit more about that.

01:27:55 2            First, the issue, as I understand it initially,

01:27:57 3    is that Gilead seeks leave to cross the expert on his

01:28:00 4    opinion that the proper amount of damages owed to Idenix is

01:28:03 5    the same regardless of whether the analysis involves one,

01:28:07 6    two, or three patents, regardless of the number of claims,

01:28:11 7    and also seeks leave to cross the expert on the fact that he

01:28:17 8    attributed the same sales base to the Merck patents in other

01:28:21 9    litigation.

01:28:23 10           In defendant's view, the leave that they are

01:28:26 11   seeking is to be able to tell the jury that earlier, at the

01:28:33 12   time of Carter's report, there were three patents at issue

01:28:42 13   in the this case, and now at trial there is only one patent

01:28:45 14   at issue before the jury, and also, defendant believes they

01:28:49 15   need to tell the jury or to follow that the jury will learn

01:28:52 16   that there has been some other litigation between some

01:28:55 17   parties relating to sofosbuvir.

01:28:58 18           And the Court is going to grant leave for

01:29:00 19   defendant to do both of those, subject to the

01:29:03 20   representations the defendant has made about what limited

01:29:06 21   information they are going to tell the jury, or that will

01:29:10 22   come out in the course of the questioning, and the answers.

01:29:17 23           So this is not meant to be an open door to going

01:29:20 24   into detail about, for instance, how this case became a

01:29:26 25   one-patent case for the moment as opposed to a three-patent

case, nor is it meant to be an open door to go into all of the other litigation of the parties who are related to these parties have had or what the outcome of those litigations have been. It is the bare minimum to allow the type of questioning that defendant has sought leave to do.

I believe this is consistent with the pretrial conference, at which we really talked about seeking leave from the Court to do this. I don't believe that -- and I have re-read the transcript -- I certainly used the phrase "open the door," if either side thinks the door has been opened.

I did not mean by that that there had to be some sort of surprise to the parties by some development at trial that could not have been anticipated.

Obviously, then as now, I know a whole lot less about the case than all of you do. What I was trying to convey by "open the door" was do you think you have a good-faith and persuasive basis to explain to me in light of what I now understand about the case that the 403 balance favors allowing you to do this.

And since I wasn't able to make those decisions in the absence of what I understood at the time of the pretrial conference, I said , as you all had agreed, you would have to first seek leave. That is exactly what the defendants have done. Now that I understand better what

01:31:03 1   they are trying to do and how it fits into the entirety of

01:31:05 2   the case, I think it is appropriate.

01:31:08 3            I do specifically find that the evidence, or the

01:31:13 4   questioning that the defendants seek to get into is

01:31:17 5   probative, in fact, fairly strongly probative, as the jury

01:31:26 6   may be less likely to accept Carter's opinion as to the

01:31:31 7   value of the one patent in suit if the jury learns that the

01:31:34 8   expert had the same value opinion when he was valuing three

01:31:37 9   patents.

01:31:40 10            That could suggest to the jury that one patent

01:31:42 11  is less valuable than Carter is now opining.

01:31:46 12            Similarly, the jury could also find that

01:31:54 13  Carter's opinion as to the value of the patent in front of

01:31:58 14  them is less, that it's less valuable than he is saying if

01:32:03 15  they learn that the same revenue base that he is attributing

01:32:09 16  as value related to this patent is revenue base that he has

01:32:15 17  attributed as value to other patents in another lawsuit.

01:32:19 18            So I consider that to be very strongly probative

01:32:21 19  evidence, and the jury could credit it.  I think the jury

01:32:27 20  should hear it.

01:32:29 21            There is, on the other hand, certainly

01:32:30 22  significant risk of jury confusion and unfair prejudice.  As

01:32:36 23  I have already said, this case isn't going to become all

01:32:40 24  about the other litigation or the other patents or how we

01:32:43 25  got here.  But I think what defendants have proposed and

01:32:48 1    what I am allowing carefully balances the interests and

01:32:54 2    ultimately, while there is significant risk of prejudice, it

01:32:59 3    does not substantially outweigh the strong probative value

01:33:03 4    of what the defendants are seeking to do.

01:33:07 5         I think the balance that I am drawing and the

01:33:09 6    lines that we are drawing are consistent with how we handled

01:33:12 7    the issue of what the jury would be told with respect to

01:33:14 8    infringement.

01:33:15 9         So that's the first two issues.

01:33:18 10         The objection, Gilead's objections to the two

01:33:21 11   exhibits that the plaintiff wishes to use with witness

01:33:25 12   Carter, as I had indicated, those objections are overruled.

01:33:28 13   The plaintiff can use those exhibits.  The plaintiff seeks

01:33:31 14   to use what I understand to be unexecuted agreements in an

01:33:36 15   effort to support Carter's opinion that the structure of the

01:33:40 16   damages here should be in the form of a royalty and not a

01:33:43 17   lump-sum payment.

01:33:45 18         These documents are probative of that point, as

01:33:48 19   they show that Gilead at least sometimes considers entering

01:33:53 20   into agreements that have as their structure royalties.

01:33:59 21         So that is probative.

01:34:02 22         There is a risk of unfair prejudice or jury

01:34:05 23   confusion, given the nature of what technology is at issue

01:34:10 24   in those agreements, and given that those agreements have to

01:34:13 25   do with evidently not just patent rights but other rights as

01:34:17 1   well.  But, again, that risk, while significant, does not

01:34:22 2   substantially outweigh the probative value.

01:34:29 3         The fact that both experts found that these

01:34:32 4   exhibits are not comparable overall for damages purposes

01:34:35 5   does not alter the Court's conclusion, as they are being

01:34:38 6   offered for the compatibility only as to the structure, that

01:34:45 7   is a royalty payment as opposed to a lump-sum payment.  On

01:34:49 8   that point I am told that the expert has not expressed an

01:34:52 9   opinion that the agreements are not comparable or otherwise

01:34:54 10  not relevant.

01:34:55 11        So again, the 403 balance does not favor

01:34:59 12  preventing the plaintiff from doing what it wishes to do.

01:35:04 13        That is my ruling on those issues.

01:35:05 14        Anything else before we bring the jury back,

01:35:08 15  from plaintiffs?

01:35:10 16        MR. HARRISON:  Based on what Your Honor just

01:35:14 17  ruled, I want to make sure we are clear.  Mr. Carter, for

01:35:17 18  the term sheet, the Gilead offered term sheet, with the

01:35:20 19  various royalty rates that they offered, I believe this

01:35:23 20  before reflects that Gilead placed value in their minds on

01:35:27 21  the patents at issue without saying that that is a

01:35:29 22  comparable rate but does reflect Gilead's view of licensing

01:35:36 23  the compounds and he could be crossed on the distinctions

01:35:39 24  between those aspects.

01:35:41 25        I want to know before we were to ask those

01:35:43 1  questions whether Your Honor contemplated that was

01:35:45 2  appropriate or not.

01:35:50 3          THE COURT:  I had focused on the argument that

01:35:54 4  you wanted to -- that that it was probative of whether

01:35:59 5  Gilead would ever enter into a royalty as opposed to a

01:36:03 6  lump-sum structure, and that you can clearly ask questions

01:36:06 7  about.  You are secondarily asking to be able to also show

01:36:12 8  that Gilead has placed value on the particular patent at

01:36:19 9  issue in this case?

01:36:21 10

01:36:21 11         MR. HARRISON:  When looking at it, the term

01:36:23 12 sheet is for MD-184.  So there was a term sheet offered.

01:36:29 13 There were royalty rates that were involved.  Those royalty

01:36:32 14 rates reflect that Gilead does put value on what's going on.

01:36:36 15 There is no breakdown as between the compound or the patent

01:36:38 16 rights.

01:36:40 17         That's why I don't want to go out of bounds.  We

01:36:43 18 wanted to make sure if we are limited to this to talk about

01:36:46 19 the structure they offered afterward it was a rate-based

01:36:48 20 structure, we could stop it at that.  I don't want to run

01:36:53 21 afoul of the Court's ruling.

01:36:56 22         THE COURT:  Thank you for clarifying that.  The

01:36:58 23 line I meant to draw was as between structure and anything

01:37:03 24 else.  So you can use it to get into questions about the

01:37:08 25 royalty versus lump sum.  But the balance, it does flip to

the defendant's favor if you start drawing any other --
Gilead has placed value on this technology or our patent or
a particular compound, since I think it is undisputed that
that is not the sole subject of these agreements and these
negotiations.  Understood?

        MR. HARRISON:  Understood.  That's why I wanted
to check.

        THE COURT:  I appreciate that very much.

        Did you have more to say about that?

        MR. WARDEN:  Your Honor, as I understand it,
that would preclude Idenix from asking questions about what
the particular number was, that the percentage that we are
talking about, other than just they were talking about a
running royalty versus a lump sum.  Is that correct?

        THE COURT:  That sounds right as a general
matter.  But if in order to orient everyone he has to say do
you see the column that has the numbers 8 percent, 12
percent, whatever, what are those, there may have to be some
sort of orienting like that.

        And I don't have the document in front of me.

        MR. WARDEN:  To be clear, they wouldn't be
allowed to then link that up to the '597 patent, for
instance.

        THE COURT:  To the extent -- yeah, they can't
argue or suggest with the witness this shows that Gilead

01:38:31 1    thinks any of these numbers, these percentage rates, reflect

01:38:35 2    value of the '597, that's correct.

01:38:39 3                    MR. WARDEN:  Okay.  Very good.

01:38:41 4                    THE COURT:  Any further clarification needed on

01:38:43 5    any of that?

01:38:44 6                    MR. HARRISON:  No, Your Honor.  I believe what

01:38:46 7    we will do is show the chart and show that is the rate

01:38:50 8    percentages and not lump sum and avoid Your Honor's --

01:38:54 9                    THE COURT:  Thank you.

01:38:55 10                   Anything else plaintiffs have before I bring the

01:38:57 11   jury in?

01:38:58 12                   MS. PARKER:  No.  Thank you, Your Honor.

01:38:59 13                   THE COURT:  Defendants.

01:39:00 14                   MR. SCHERKENBACH:  No, Your Honor.

01:39:01 15                   THE COURT:  I think the jury is ready.  Let's

01:39:04 16   bring them in.

01:39:04 17                       (Lunch recess taken.)

01:39:04 18                       *     *     *

01:39:13 19                       (Proceedings reconvened after recess.)

01:39:13 20                   THE COURT:  Welcome back.  I hope you had a nice

01:39:17 21   lunch.

01:39:17 22                   We are ready to proceed.  You may call your next

01:39:18 23   witness.

01:39:19 24                   MR. GRIFFITH:  Good afternoon, Your Honor.

01:39:21 25                   THE COURT:  Good afternoon.

01:39:22 1          MR. GRIFFITH:  Idenix's next witness is

01:39:24 2   Dr. Michael Otto who was the chief scientific officer of

01:39:29 3   Pharmasset.  Dr. Otto will be testifying by videotape

01:39:33 4   deposition as the corporate representative of Gilead under

01:39:38 5   Rule 30(b)(6).  Although he will be testifying later live in

01:39:41 6   this case, Dr. Otto will be testifying by videotape

01:39:46 7   deposition in his capacity as Gilead's corporate designee.

01:39:52 8          The deposition was taken on August 28th, 2015

01:39:58 9   and will last about 34 minutes.

01:40:00 10          THE COURT:  All right.  We'll turn the lights

01:40:02 11   down and we'll play it.

01:40:03 12          MR. GRIFFITH:  One more thing, Your Honor.  We

01:40:04 13   will move to have admitted into evidence the following

01:40:11 14   exhibits:  Plaintiffs' Exhibit 399, 471, 498B, 609A, and

01:40:22 15   1524.

01:40:23 16          THE COURT:  All right.  Are there any

01:40:24 17   objections?

01:40:25 18          MR. HEADLEY:  That's consistent, Your Honor.

01:40:28 19   Thank you.

01:40:28 20          THE COURT:  Okay.  Those are all admitted.

01:40:28 21          (Above-referenced exhibits admitted in evidence.)

01:40:30 22          THE COURT:  You may proceed when you are ready.

01:40:30 23          (Deposition designations of Michael Otto placed

01:40:51 24   in the record.)

01:40:51 25          "Question:  Would you state your name for the

01:40:53 1 record?

01:40:53 2          "Answer:  My name is Michael John Otto.

01:40:55 3          "Question:  And then we get to 1999 when you

01:40:58 4 joined Pharmasset.

01:40:59 5          "What was your position when you were hired at

01:41:01 6 Pharmasset?

01:41:02 7          "Answer:  I was hired as the chief scientific

01:41:04 8 officer.

01:41:04 9          "Question:  What was your role at the company as

01:41:06 10 chief scientific officer?

01:41:07 11          "Answer:  I was charged with establishing the

01:41:10 12 antiviral discovery program that he wanted to set up.  He

01:41:14 13 had already hired some scientists but none of them had

01:41:17 14 industrial drug discovery experience.  And so that's one of

01:41:21 15 the reasons I was hired.  So part of my responsibility was

01:41:23 16 overseeing chemistry and overseeing biology and helping to

01:41:28 17 coordinate those efforts into drug discovery of antivirals

01:41:32 18 based on nucleosides.

01:41:34 19          "The other part of my responsibility was to take

01:41:36 20 a compound that had been licensed from Emory university

01:41:45 21 called Racivir and to get -- for HIV, and to get that into

01:41:53 22 the clinic, file an IND, which I did, and begin clinical

01:41:59 23 trials, which I did.

01:42:01 24          "Question:  Did your responsibilities change

01:42:03 25 over time subsequent to your initial hiring?

01:42:05 1        "Answer:  No.  Basically, they remained the

01:42:10 2  same.  You know, focus might have changed as to what --

01:42:13 3  which -- the progress of a project, you know.  So emphasis

01:42:19 4  might change slightly but the overall responsibility

01:42:22 5  remained the same.  Chemistry and biology reported to me and

01:42:27 6  clinical development was under my responsibility.

01:42:30 7        "Question:  What was Dr. Schinazi's role other

01:42:35 8  than as, other than a founder in Pharmasset between 1999 and

01:42:40 9  2004?

01:42:41 10        "Answer:  Well, he was named executive director.

01:42:45 11  So that gave him an operational responsibilities if you were

01:42:51 12  -- if you will.  He wasn't an employee of the company.  But,

01:42:55 13  as I said, I worked closely with him.  He was there very

01:42:58 14  often.  He wasn't there every single day, but he was there

01:43:01 15  very often to see how things were going, you know.  Since he

01:43:05 16  founded the company, it was his baby, if you will.  So he

01:43:11 17  took a very close look at the financials, that kind of

01:43:14 18  thing.

01:43:14 19        "Question:  Was he involved at all in the

01:43:16 20  scientific direction of the company?

01:43:19 21        "Answer:  Well, as a scientist, he would from

01:43:21 22  time to time attend meetings and offer suggestions but he

01:43:24 23  didn't direct any of the science.

01:43:26 24        "Question:  Who did?

01:43:27 25        "Answer:  Well, I -- for all intents and

01:43:35 1    purposes, I did, but I did allow the head of chemistry and

01:43:40 2    head of biology to really take a lot of the responsibility

01:43:43 3    for the day-to-day operations.

01:43:44 4              "Question:  Who at Pharmasset first had the idea

01:43:47 5    to make PSI-6130?

01:43:50 6              "Answer:  That would have been Jeremy Clark.

01:43:52 7              "Question:  I'm going to call it 6130 for

01:43:55 8    convenience.

01:43:55 9              "Answer:  I understand.

01:43:56 10             "Question:  You under that is 2'-methyl up, 2'

01:44:00 11   fluoro down cytosine?

01:44:04 12             "Answer:  Correct.

01:44:04 13             "Question:  We will call it 6130 for everyone's

01:44:07 14   convenience.

01:44:07 15             "Answer:  That makes it easier, yes.

01:44:09 16             "Question:  You said 6130 was Mr. Clark's idea?

01:44:15 17             "Answer:  Yes.

01:44:15 18             "Question:  How do you know that?

01:44:19 19             "Answer:  He is the one that proposed the

01:44:21 20   structure to make it.  No one else did.  So it was his idea.

01:44:26 21             "Question:  Tell me about that proposal.  How

01:44:30 22   were you made aware of it?

01:44:34 23             "Answer:  He came to my office and suggested

01:44:39 24   that we make -- that he make some compounds, one of which

01:44:45 25   was what turned out to be 6130.

01:44:48 1          "Question:  What was the context in which he

01:44:50 2    came to you with the idea for these compounds?

01:44:54 3          "Answer:  Well, I think the best way to describe

01:44:56 4    it is, Jeremy was one of these people who is very curious,

01:45:05 5    reads a lot, is really looking at the literature all the

01:45:08 6    time.  From my perspective, he had a lot of enthusiasm.

01:45:13 7          Some time in fall of 2002, in one of the

01:45:16 8    meetings I was having with the chemists, which was not

01:45:21 9    unusual for us to get together and talk about things, I

01:45:24 10   emphasized the importance of finding, you know, new

01:45:29 11   inventions, new areas to work in, and part of my discussion

01:45:33 12   with them was make sure that you are looking at all the

01:45:39 13   literature that's available, including patent applications,

01:45:43 14   published papers.  And I referred to it as the look for the

01:45:46 15   holes.  So look for areas that you don't believe are being

01:45:50 16   worked on by others that we might work on and still be able

01:45:54 17   to get an invention, if you will.

01:45:57 18          And some time after that, some time in November,

01:46:01 19   Jeremy came to me, as part of that whole process of him

01:46:07 20   looking at it and me asking them to make sure they were

01:46:10 21   looking at it and made his proposal to me to make 6130.

01:46:14 22          "Question:  Okay.  Go ahead.  Tell me about the

01:46:18 23   compound that he told you -- brought to you.

01:46:20 24          "Answer:  So they were all compounds that had

01:46:22 25   methyl and fluorine at the 2' position.  He felt they

01:46:26 1   weren't being worked on by anybody else.  They were

01:46:29 2   cytosine, adenosine, guanine and uradine.  So there was

01:46:34 3   four.

01:46:34 4        "In addition to that, there were some other

01:46:36 5   structures that I don't recall what they were, but to me,

01:46:39 6   they -- I don't recall what they were.

01:46:41 7        "Question:  So when Mr. Clark told you about his

01:46:43 8   idea for 6130, did you think he would be able to make it?

01:46:47 9        "Answer:  I actually -- he said he could but I

01:46:53 10   had no idea.

01:46:53 11        "Question:  But he told you he could make it?

01:46:55 12        "Answer:  I asked him.  I said do you think you

01:46:57 13   can make this?  And he said yeah.

01:46:59 14        "Question:  How about antiviral activity?  Did

01:47:03 15   he express a belief that 6130 would be active against HCV

01:47:07 16   when he brought the idea to you?

01:47:10 17        "Answer:  I think he was motivated mostly by the

01:47:12 18   fact that it was a novel compound that no one had made and

01:47:16 19   that this was an opportunity for him to make something that

01:47:19 20   no one else had been able to do or had done.  I don't think

01:47:23 21   he was working in a vacuum.  I think he was hoping that it

01:47:29 22   would have activity.  At that particular point in time, he

01:47:32 23   -- I am sure he didn't know and I didn't know.

01:47:35 24        "Question:  In what context was the idea to

01:47:38 25   make 6130 presented to the larger Pharmasset -- group of

01:47:43 1 Pharmasset scientists?

01:47:44 2    "Answer: Well, I know that he presented it to

01:47:47 3 the chemistry group at large. I mean, the entire chemistry

01:47:51 4 group. Presented his idea and a route for synthesizing it.

01:47:56 5     "Question: When was that?

01:47:57 6     "Answer: That was in January of 2002.

01:47:59 7     "Question: Was it presented to --

01:48:02 8     "Answer: Sorry. 2003, yeah.

01:48:04 9     "Question: When it was presented to the

01:48:06 10 chemistry team, did any of the chemists express doubt as to

01:48:10 11 whether Mr. Clark could make 6130?

01:48:12 12     "Answer: It's my understanding that they did.

01:48:18 13 I wasn't present at that particular meeting. But,

01:48:20 14 afterwards, I heard that the reaction ranged from neutral

01:48:25 15 skepticism to outright you can actually never make that,

01:48:31 16 that will never work.

01:48:32 17     "Question: Who reported that to you, the

01:48:35 18 chemists' response to you?

01:48:37 19     "Answer: Probably many of the chemists, and

01:48:39 20 that would be in hallway conversations, I think. There was

01:48:44 21 discussion about it, generally, you know, a small group. We

01:48:48 22 talked a lot.

01:48:48 23     "Question: Who -- who had the reaction outright

01:48:51 24 you can never make that?

01:48:53 25     "Answer: Well, I think there was more than one

01:48:56 1  chemist who thought that.  I believe Krys Pankiewicz was

01:49:07 2  fairly pretty vocal at not being able -- that he wouldn't be

01:49:12 3  able to do it, and there may have been others.  There were a

01:49:15 4  couple of people, I think.  Hassan never thought it was a

01:49:19 5  good idea, but I am not sure he said he couldn't make it.

01:49:23 6          "Question:  Did Dr. Hassan say why he didn't

01:49:27 7  think it was a good idea?

01:49:28 8          "Answer:  I believe he said he thought it would

01:49:30 9  be toxic based on, you know, his observations of the

01:49:34 10 structure.

01:49:34 11         "Question:  When Mr. Clark came to you with his

01:49:37 12 idea for 6130, in conducting the literature search you told

01:49:41 13 him to conduct, did he present you with any literature that

01:49:46 14 guided him to 6130?

01:49:48 15         "Answer:  Well, he didn't say what necessarily

01:49:50 16 guided him to that idea.  But he did bring with him to my

01:49:53 17 office copies or portions of copies of a Merck application

01:49:57 18 and a Novirio application.

01:50:06 19         "Question:  Do you recall which Merck

01:50:08 20 application or which Novirio application he came --

01:50:12 21         "Answer:  I believe it was the first published

01:50:15 22 application from Novirio, and I don't know which Merck

01:50:18 23 application it was.  The Novirio application was against --

01:50:24 24 was compounds for flavivirus that mentioned the methyl OH,

01:50:32 25 and it was a similar -- it was a similar kind of application

01:50:36 1   from Merck. Precisely which ones, I don't remember.

01:50:40 2           "Question: I am going to hand you what's

01:50:42 3   previously been marked as Rachakonda Exhibit 17.

01:50:46 4           "Answer: Okay.

01:50:47 5           (Rachakonda Exhibit 17 was marked at deposition.)

01:50:59 6           "Question: Rachakonda Exhibit 17 is Bates

01:51:02 7   numbered GILEAD00004707 through GILEAD00004934.

01:51:13 8           "Dr. Otto, have you seen Rachakonda Exhibit 17

01:51:17 9   before?

01:51:18 10           "Answer: I have certainly seen a copy of

01:51:21 11   Dr. Clark's -- I am sorry, Mr. Clark's notebook which is

01:51:26 12   what this appears to be.

01:51:27 13           "Question: I am going to ask you to turn to

01:51:30 14   page -- it is numbered page 25 on the top right. It is also

01:51:35 15   Bates numbered on the bottom right, Gilead 00004733. Let me

01:51:42 16   know when you are there.

01:51:45 17           "Answer: I have got page 25, yes.

01:51:47 18           "Question: You are familiar with page 25?

01:51:49 19           "Answer: I am.

01:51:58 20           "Question: Does page 25 then depict one of

01:52:00 21   the ideas Mr. Clark brought to you after conducting his

01:52:04 22   literature search?

01:52:05 23           "Answer: Yes, it does.

01:52:06 24           "Question: Which one do you recall it

01:52:09 25   depicting?

01:52:09 1          "Answer:  Well, it's clear that between -- it

01:52:12 2    is clear between lines, say, 10 and 13 or so, there is a

01:52:16 3    structure that has a number 3 next to it and that's "B=cyt,"

01:52:29 4    that's 6130.

01:52:31 5          "Question:  At the bottom of the notebook page,

01:52:35 6    there is a date; is that correct?

01:52:36 7          "Answer:  Yes.  There is --

01:52:40 8          "Question:  There are several dates, I should

01:52:42 9    say.

01:52:43 10          "Answer:  Yeah, there is more than one date,

01:52:45 11    yes.

01:52:46 12          "Question:  There is Jeremy Clark's signature at

01:52:49 13    the bottom; is that right?

01:52:50 14          "Answer:  Yes.

01:52:50 15          "Question:  And the date that Mr. Clark dated,

01:52:53 16    at least, is that December 6th, 2002?

01:52:57 17          "Answer:  I believe that's correct.

01:52:58 18          "Question:  Are you aware of any documentation

01:53:02 19    at Pharmasset prior to this December 6th, 2002 notebook

01:53:10 20    entry that documents Mr. Clark's idea for 6130?

01:53:13 21          "Answer:  I am not aware of any.

01:53:14 22          "Question:  And I believe we covered this

01:53:16 23    already, but to the right of number 3 is 6130, around line

01:53:21 24    12; correct?

01:53:22 25          "Answer:  That is correct.

01:53:23 1  "Question: The 1' position has a B connected;

01:53:27 2  is that correct?

01:53:27 3  "Answer: Okay. Yes.

01:53:29 4  "Question: Do you know what B stands for?

01:53:34 5  "Answer: Yeah, because B is described right

01:53:36 6  next to it.

01:53:37 7  "Question: Well, generally speaking, what could

01:53:39 8  B stand for?

01:53:40 9  "Answer: In this context, B usually refers to

01:53:43 10  base.

01:53:43 11  "Question: Any specific base?

01:53:44 12  "Answer: No.

01:53:45 13  "Question: Would it be -- how would you

01:53:47 14  understand what B refers to?

01:53:49 15  "Answer: A base.

01:53:50 16  "Question: A natural base?

01:53:51 17  "Answer: Yes, that's how I initially read it.

01:53:54 18  Yeah, for sure.

01:53:56 19  "Question: And in this case, as you suggested,

01:53:58 20  it says, 'B=cyt. for HCV, just to the right.'

01:54:06 21  "Do you see that?

01:54:07 22  "Answer: I do see that.

01:54:08 23  "Question: What your interpretation of what

01:54:10 24  that means?

01:54:11 25  "Answer: As we discussed, that would make it

01:54:13 1    **6130.**

01:54:14 2    **"Question:  In the case that the B attached to**

01:54:17 3    **the 1' position is cytosine?**

01:54:20 4    **"Answer:  Yes.**

01:54:20 5    **"Question:  Okay.  And what is the 'for HCV?'**

01:54:25 6    **How do you interpret that?**

01:54:26 7    **"Answer:  That the target for -- the reason for**

01:54:28 8    **making it would be to test it against HCV.**

01:54:31 9    **"Question:  Is that consistent with what's**

01:54:33 10   **written at the top right-hand side of the notebook page just**

01:54:37 11   **in line -- what I will say is line 1 or 2, 'candidate**

01:54:42 12   **compounds as anti-HCV?'**

01:54:45 13   **"Answer:  That would be consistent.**

01:54:55 14   **"Question:  So, in November, Mr. Clark presents**

01:54:57 15   **you with this idea and in December, ends up in his notebook,**

01:55:00 16   **and at some point later it was discussed at chemistry team**

01:55:03 17   **meetings; is that right?**

01:55:05 18   **"Answer:  That's when he presented his schematic**

01:55:08 19   **-- his synthesis, yes.**

01:55:09 20   **"Question:  And you had mentioned earlier that**

01:55:10 21   **there was a meeting in which some of the chemists expressed**

01:55:14 22   **some doubt, on a varying scale, as to whether Mr. Clark**

01:55:17 23   **could make the compound; correct?**

01:55:18 24   **"Answer:  Um-hmm.**

01:55:19 25   **"Question:  Where on the timeline does that**

01:55:21 1    meeting fall between December and, say, February -- December

01:55:24 2    2002 and February 2003?

01:55:26 3              "Answer:  I believe it occurred at the time when

01:55:28 4    he first presented his scheme which would have been in

01:55:30 5    January of 2003.

01:55:32 6              "Question:  So the idea for the compound is out

01:55:35 7    there, now you have to make it.  Who is the first one to

01:55:37 8    synthesize PSI-6130?

01:55:41 9              "Answer:  Jeremy.

01:55:42 10             "Question:  When did he begin his synthetic work

01:55:43 11   on 6130?

01:55:45 12             "Answer:  Some time after our meeting.  I can't

01:55:47 13   -- I don't know when exactly he started working on it.  He

01:55:49 14   was there during December, so he liked, he was very

01:55:53 15   enthusiastic about the idea.  My guess is he probably

01:55:57 16   started shortly after our meeting.

01:56:00 17             "Question:  I have handed you a document that

01:56:02 18   I've marked as Otto Exhibit 10.

01:56:05 19             "Answer:  Yes.

01:56:05 20             "Question:  It is titled at the bottom of the

01:56:12 21   first page, 'Plaintiffs' Notice of Rule 30(B)(6) Deposition

01:56:17 22   of Defendants Gilead Sciences Inc. and Gilead Pharmasset

01:56:22 23   LLC.'

01:56:23 24             "Do you see that?

01:56:24 25             "Answer:  I do.

01:56:25 1               "Question:  Have you seen Otto Exhibit 10

01:56:27 2  before?

01:56:27 3               "Answer:  I have.

01:56:28 4               "Question:  Do you understand that you have

01:56:30 5  been designated on certain of the topics listed in Otto

01:56:34 6  Exhibit 10?

01:56:35 7               "Answer:  Yes.

01:56:42 8               "Question:  If we turn to page 5.  You see

01:56:47 9  topic 3?

01:56:49 10               "Answer:  Yes.

01:56:49 11               "Question:  Topic 3 reads, 'research,

01:56:52 12  development, and testing of 2'-methyl compounds between

01:56:57 13  January 1, 2000 and January 1, 2006?'

01:57:03 14               "Answer:  Yes.

01:57:03 15               "Question:  Do you understand that, subject to

01:57:05 16  your counsel's objections, that you have been designated to

01:57:09 17  testify on topic 3 today on behalf of the defendants?

01:57:12 18               "Answer:  Yes.

01:57:12 19               "Question:  Can we turn to page 10, topics 38 to

01:57:15 20  43.  Do you understand you have been designated by the

01:57:19 21  defendants to testify on their behalf with respect to topics

01:57:23 22  38 to 43 subject to the -- their objections?

01:57:26 23               "Answer:  Yes.

01:57:27 24               "Question:  When did Pharmasset first become

01:57:29 25  aware of Idenix's work on 2'-methyl compounds?

01:57:34  1        "Answer:  Shortly after their provisional

01:57:36  2  application was published.

01:57:44  3        "Question:  Do you recall when that was?

01:57:48  4        "Answer:  Late in 2001, I believe.

01:57:50  5        "Question:  Had Pharmasset done any work on

01:57:53  6  synthesizing 2'-methyl compounds prior to late 2001?

01:57:58  7        "Answer:  Yes.

01:57:59  8        "Question:  Why was Pharmasset doing work on

01:58:01  9  synthesizing 2' -- strike that.

01:58:04 10        "What was the impetus for Pharmasset to begin

01:58:08 11  work on synthesis of 2'-methyl compounds?

01:59:37 12        "Answer:  As part of our discovery process,

01:59:39 13  especially in those early years of 2000 and 2001, we were

01:59:43 14  testing as many different 'sites -- as many different types

01:59:47 15  of nucleosides as we could get our hands on.  In the

01:59:50 16  literature as well as -- well, in the literature, there are

01:59:54 17  a lot of nucleosides that had been published on and you can

01:59:58 18  actually buy them.

01:59:59 19        So one of the compounds that we purchased very

02:00:02 20  early on was a 2'-methyl compound that we bought from Sigma,

02:00:08 21  Sigma-Aldrich, and put that into the test.  And it had some

02:00:14 22  interesting results.  We got interesting results.  It had

02:00:17 23  some little bit of activity.  Significant amount of

02:00:20 24  toxicity, but because there was some little bit of activity,

02:00:25 25  we decided at that point to make some related analogs of

02:00:28 1    that, if you will, compounds that contain methyl as well as

02:00:32 2    other things at that position.

02:00:33 3            That occurred throughout 2001 along with other

02:00:37 4    compounds that we had purchased making, testing and

02:00:40 5    potentially making analogs of those.

02:00:42 6            "Question:  Whether through purchase or through

02:00:44 7    your own synthesis, when did Pharmasset first have a

02:01:56 8    2'-methyl compound in its lab?

02:01:59 9            "Answer:  Sometime in 2001.  But I am not sure

02:02:03 10   exact date.

02:02:03 11           "Question:  Was anyone at Pharmasset aware of

02:02:06 12   Novirio's work on 2'-methyl compounds prior to November 2001?

02:02:11 13           "Answer:  No.  It was the first time that we

02:02:13 14   were aware of what Novirio was working on.

02:02:16 15           "Question:  The first time you were aware of

02:02:18 16   being the publication of PCT applications?

02:02:21 17           "Answer:  Yes, that's correct.

02:02:22 18           "Question:  I am going to hand you what has

02:02:30 19   previously been marked as Rachakonda Exhibit 10.

02:02:34 20           "Answer:  Yes.

02:02:34 21           (Rachakonda Exhibit 10 was marked at deposition.)

02:02:43 22           "Question:  Bates numbered GILEAD00830340

02:02:48 23   through GILEAD00830573.

02:02:54 24           "Dr. Otto, do you recognize this document?

02:03:00 25           "Answer:  Yes, I do.

02:03:00 1                "Question:  What is it?

02:03:01 2                "Answer:  It's a photocopy of volume of a

02:03:03 3        notebook that belonged to a Dr. Hassan.

02:03:06 4                "Question:  I will ask you to turn to page 2 of

02:03:08 5        the notebook which is Bates numbered GILEAD00830343?

02:03:15 6                "Answer:  Okay.  I have it.

02:03:16 7                "Question:  Is this page in Rachakonda

02:03:19 8        Exhibit 10 the first synthesis of Pharmasset of a 2'-methyl

02:03:55 9        down 2' OH up nucleoside or protected nucleoside?

01:59:45 10               "Answer:  To the best of my knowledge, it is the

02:00:17 11       first one that was synthesized at Pharmasset.

02:00:20 12               "Question:  And on the opposite stereochemistry,

02:00:24 13       I will ask you to jump ahead to Page 4, two pages ahead,

02:00:29 14       GILEAD00830345.  Is this Pharmasset's first synthesis of a

02:00:36 15       methyl (up) OH (down) protected sugar?

02:00:39 16               "Answer:  To the best of my knowledge, it is.

02:00:41 17               "Question:  And then I am going to ask you to

02:00:44 18       next flip ahead to Page 11, which is GILEAD00830352, and it

02:00:51 19       is dated March 5, 2001, at the bottom, right; is that

02:00:59 20       correct?

02:00:59 21               "Answer:  On Page 11, yes.

02:01:01 22               "Question:  Is this the first completed

02:01:03 23       synthesis of a methyl (up) O-H (down) nucleoside at

02:01:07 24       Pharmasset?

02:01:10 25               "Answer:  I believe so.

02:01:10  1          "Question:  And Dr. Hassan was first to make the

02:01:13  2   methyl OH sugars in nucleosides at Pharmasset?

02:01:16  3          "Answer:  Yes, he was.

02:01:17  4          "Question:  Was anyone else at Pharmasset

02:01:19  5   working on 2'-methyl-2'-hydroxy sugars or nucleosides at

02:01:25  6   Pharmasset in 2001?

02:01:26  7          "Answer:  I don't think so.

02:01:27  8          "Question:  Just Dr. Hassan?

02:01:29  9          "Answer:  I think so.

02:01:30 10          "Question:  Under whose direction was Dr. Hassan

02:01:32 11   working on these compounds?

02:01:35 12          "Answer:  He reported to Kyo Watanabe, yes.

02:01:40 13          "Question:  Was Kyo aware the compounds that Dr.

02:01:50 14   Hassan was making, these compounds being 2'-methyl

02:03:15 15   2'-hydroxy sugars or nucleosides?

02:03:17 16          "Answer:  Was he aware of what Hassan was doing,

02:03:20 17   the answer is yes.

02:03:21 18          "Question:  Was Dr. Schinazi aware that Dr.

02:03:24 19   Hassan was working on 2'-methyl 2'-hydroxy sugars and

02:03:29 20   nucleosides in 2001?

02:03:31 21          "Answer:  I don't believe so.

02:03:31 22          "Question:  Were you aware that Dr. Hassan was

02:03:34 23   working on 2'-methyl-2-hydroxy sugars or nucleosides in

02:03:40 24   2001?

02:03:40 25          "Answer:  I was aware of it when I was told that

02:03:43 1    he had the compound that we were looking at on Page 11.

02:03:46 2              "Question:  When were you told that he had the

02:03:49 3    compound on Page 11?

02:03:50 4              "Answer:  Shortly after he had it.

02:03:52 5              "Question:  What were you told about it?

02:03:55 6              "Answer:  Well, that he had made it.  That's

02:03:57 7    part of our -- that's my seeing what the chemists were

02:04:01 8    doing.  I was told that he had made this particular

02:04:04 9    compound.

02:04:04 10             "Question:  Did Pharmasset test, in any assays,

02:04:08 11   the compound that Dr. Hassan made on Page 11 of his

02:04:11 12   notebook?

02:04:11 13             "Answer:  Yes, I believe it went into all of our

02:04:15 14   assays as all of the new compounds would.

02:04:18 15             "Question:  Did Dr. Hassan then proceed to make

02:04:21 16   additional 2'-methyl 2'-hydroxy sugars or nucleosides at

02:04:26 17   Pharmasset throughout 2001?

02:04:29 18             "Answer:  I believe so, because in the pages

02:04:31 19   prior to this, we saw that he was making a cytidine; a

02:04:36 20   similar compound with cytidine in it.  So, yes, he was

02:04:40 21   working on others.

02:04:54 22             "Question:  These others that he made, were they

02:04:57 23   also tested in the assays you had available?

02:04:59 24             "Answer:  They were not.

02:05:00 25             "Question:  Why not?

02:05:02 1                   "Answer:  We were told to stop working in that

02:05:04 2    area.

02:05:05 3                   "Question:  By whom?

02:05:07 4                   "Answer:  Dr. Schinazi.

02:05:08 5                   "Question:  Did Dr. Schinazi explain why he

02:05:12 6    wanted you to stop working in that area?

02:05:15 7                   "Answer:  No, he did not.

02:05:16 8                   "Question:  He just gave an instruction, stop?

02:05:20 9                   "Answer:  Yes.

02:05:20 10                   "Question:  That was it?

02:05:21 11                   "Answer:  Yes.

02:05:22 12                   "Question:  To whom did he give that

02:05:24 13    instruction?

02:05:24 14                   "Answer:  To me and to Kyo and to whomever, yes.

02:05:27 15                   "Question:  Then what did you do upon being

02:05:30 16    instructed by Dr. Schinazi to stop working on these

02:05:33 17    compounds?

02:05:34 18                   "Answer:  We stopped.

02:05:35 19                   "Question:  What did Dr. Watanabe do in response

02:05:37 20    to being told by Dr. Schinazi to stop working on these

02:05:40 21    compounds?

02:05:41 22                   "Answer:  He stopped.  Everybody stopped.

02:05:44 23                   "Question:  Did Dr. Hassan also stop?

02:05:46 24                   "Answer:  Yes.

02:05:46 25                   "Question:  When did other chemists at

02:05:48 1   Pharmasset begin synthesizing 2'-methyl-2'-OH sugars or

02:05:54 2   nucleosides?

02:05:55 3        "Answer:  I don't know because we really didn't

02:05:56 4   do any work in that area after Hassan and after we had

02:06:06 5   tested the -- we had eventually tested the cytidine

02:06:11 6   compound.  We really had very little interest in them

02:06:14 7   because there was toxicity associated with them.  The

02:06:19 8   activity wasn't that impressive.

02:06:21 9        We continued to have the compound as positive

02:06:24 10   control, and it was something that worked in the assay.  But

02:06:27 11   we had no efforts in making methyl OH compounds.  We just

02:06:31 12   weren't interested in doing that.

02:06:33 13        "Question:  Did you have a specific name for

02:06:35 14   the -- any of the compounds that were methyl OH compounds

02:06:39 15   that you used as positive controls?

02:06:41 16        "Answer:  Mm-hmm.  Yes, we did.

02:06:43 17        "Question:  What were they?

02:06:44 18        "Answer:  So for the -- for the ease of

02:06:46 19   referring to the compounds, the adenosine compound was

02:06:50 20   referred to as the Merck compound and the cytidine compound

02:06:53 21   was referred to as the Idenix compound.

02:06:55 22        "Question:  Dr. Otto, I have handed you Otto

02:06:59 23   Exhibit 11, which is GILHEAD04007742.  Have you seen this

02:07:04 24   document before?

02:07:06 25        "Answer:  I have.

02:07:06  1          "Question:  It's an e-mail exchange dated

02:07:09  2   Wednesday, January 15, 2003, correct?

02:07:12  3          "Answer:  Yes, it is an e-mail exchange between

02:07:15  4   myself and Dr. Schinazi in January of 2003.

02:07:21  5          "Question:  Did you write this e-mail, the

02:07:24  6   second e-mail in the chain dated January 15th, 2003 at 8:21

02:07:35  7   a.m.?

02:07:39  8          "Answer:  I have no reason to believe that I

02:07:49  9   didn't.

02:07:49 10          "Question:  And do you have any reason to

02:07:52 11   believe you did not receive the response dated Wednesday,

02:07:55 12   January 18th 2:04 p.m.?

02:08:00 13          "Answer:  No, I have no reason to believe that I

02:08:02 14   didn't receive this.

02:08:03 15          "Question:  If you look at the e-mail you sent

02:08:05 16   in this first e-mail chain, the lower e-mail in the chain?

02:08:10 17          "Answer:  Yes.

02:08:11 18          "Question:  You wrote, 'Hassan was working on

02:08:16 19   2'Me-NHC back in 2001.'  Correct?

02:08:26 20          "Answer:  Mm-hmm.  Yes.  I thought I said yes.

02:08:31 21          "Question:  You wrote that, 'Through Kyo's

02:08:35 22   reports you learned of these efforts and demanded that all

02:08:38 23   work on 2'Me compounds be stopped immediately.'

02:08:44 24          "Correct?

02:08:45 25          "Answer:  That's what I wrote.

02:08:47 1        "Question:  And it was -- and you wrote that,

02:08:52 2  'In hindsight this was so that Pharmasset would stay clear

02:08:56 3  of Novirio's efforts,' which you were -- 'of which you were

02:09:02 4  aware.'  Correct?

02:09:05 5        "Answer:  That's what I wrote.

02:09:06 6        "Question:  And Dr. Schinazi responded, 'For the

02:09:09 7  record, here are the facts.  Kyo Watanabe was told by me in

02:09:15 8  confidence about the 2'Me derivatives in order for him not

02:09:21 9  to waste his time making them because of a patent conflict

02:09:25 10  with Idenix.'

02:09:29 11        "Is that correct?

02:09:30 12        "Answer:  That's what he wrote.

02:09:31 13        "Question:  What is Pharmasset's -- what is

02:09:33 14  Gilead's best information about when that conversation took

02:09:37 15  place?

02:09:51 16        "Answer:  The only time I know of us, us being

02:09:55 17  Pharmasset, told -- not to be told not to be working in the

02:10:03 18  area of 2'-methyl-2'-hydroxy was when we stopped.

02:10:08 19        "Question:  What is Gilead's best information

02:10:10 20  about what Dr. Schinazi told Kyo Watanabe in confidence

02:10:13 21  about 2'-methyl derivatives?

02:10:15 22        "Answer:  The only information that Gilead

02:10:18 23  had -- Gilead has is this e-mail.  This e-mail does not

02:10:22 24  stipulate when or where that conversation took place.  So

02:10:25 25  as, as a company, we do not know when or where that

02:10:29 1  conversation took place.

02:10:30 2          "Question:  Does Gilead have a position on

02:10:32 3  whether Schinazi did in fact tell Dr. Watanabe to hold off

02:10:36 4  on making 2'-methyl-2'hydroxy nucleotides or sugars --

02:10:42 5          "Answer:  The company has no knowledge of him

02:10:45 6  telling Kyo differently than what he told the rest of the

02:10:48 7  company.

02:10:48 8          "Question:  And I believe you said, and correct

02:10:51 9  me if I am wrong, that you don't recall when that

02:10:54 10 instruction was given by Dr Schinazi to you and Dr. Watanabe

02:10:57 11 in 2001; is that right?

02:10:59 12         "Answer:  It was clearly after he became aware

02:11:02 13 of the results from adenosine compound.

02:11:05 14         "Question:  So it was sometime after March of

02:11:07 15 2001 when Dr. Hassan had made the compound but before --

02:11:12 16         "Answer:  Yes.  Yes, it would be after that

02:11:14 17 time.

02:11:14 18         "Question:  Dr. Schinazi indicated a patent

02:11:16 19 conflict with Idenix over 2'-methyl compounds in his e-mail

02:11:20 20 to you?

02:11:32 21         "Answer:  He did refer to one, yes.

02:11:34 22         "Question:  Do you know what specific patents he

02:11:37 23 was referencing?

02:11:38 24         "Answer:  No, I do not.

02:11:40 25         "Question:  Does Gilead know what specific

02:11:42 1   patents he was referencing?

02:11:44 2         "Answer:  Gilead's understanding is it refers to

02:11:46 3   the patent applications that were published from Novirio in

02:11:50 4   2001.

02:11:51 5         "Question:  Is Gilead's best information that

02:11:53 6   the Novirio patents Dr. Schinazi was referencing in his

02:11:57 7   e-mail to you on January 15, 2003 were the Otto Exhibit 1

02:12:01 8   and Rachakonda Exhibit 24?

02:12:04 9         "Answer:  That's our belief.

02:12:05 10         "Question:  Dr. Otto, I have handed you Otto

02:12:08 11   Exhibit 12, which is GILEAD04091590.  Do you recognize that

02:12:15 12   document?

02:12:17 13         "Answer:  I recognize that that's an e-mail

02:12:20 14   string between Raymond and myself but other than that, I

02:12:25 15   don't recognize it.

02:12:25 16         "Question:  Do you have any doubt that you

02:12:28 17   wrote the e-mail at the bottom of Page -- well, the only

02:12:31 18   page of Otto Exhibit 12 dated October 12, 2001, 2:04 p.m.?

02:12:37 19         "Answer:  No, I -- I am pretty sure I wrote

02:12:39 20   that.

02:12:40 21         "Question:  And I am assuming that the 'Dear

02:12:45 22   Raymond' is an e-mail to Dr. Schinazi?

02:12:50 23         "Answer:  Um-hmm.

02:12:50 24         "Question:  And in the second line of the e-mail

02:12:52 25   you wrote him, you wrote, 'Obviously the patent

02:12:57 1     complications with Novirio will need to be addressed.'

02:13:03 2              "Do you see that?

02:13:04 3              "Answer:  I see that.

02:13:05 4              "Question:  Did you write that statement?

02:13:11 5              "Answer:  I did.

02:13:11 6              "Question:  Did you write it in October of 2001?

02:13:15 7              "Answer:  Apparently, I did.

02:13:16 8              "Question:  What patent complications with

02:13:19 9     Novirio were you describing in this e-mail to Dr. Schinazi?

02:13:23 10              "Answer:  I don't recall.

02:13:24 11              "Question:  This e-mail was drafted and sent --

02:13:26 12     strike that.  This e-mail was sent prior to the publication

02:13:29 13     of the two Novirio patents we discussed this morning; is

02:13:33 14     that correct?

02:13:33 15              "Answer:  Yes, it seems that way.

02:13:35 16              "Question:  Does this refresh your recollection

02:13:38 17     at all regarding whether or not you knew of any information

02:13:41 18     contained in the two Novirio patent applications we

02:13:44 19     discussed this morning before they were public?

02:13:46 20              "Answer:  No.  My knowledge of these two patent

02:13:48 21     applications that we talked about is when they were

02:13:51 22     published.  That's all I know about them.  And I don't know

02:13:54 23     what patent this e-mail is referring to.  It clearly cannot

02:13:57 24     be these because these were obviously published later than

02:14:00 25     that.

02:14:00  1       "Question:  Are you aware of any others that it

02:14:03  2  could have been?

02:14:04  3       "Answer:  I can't remember any others.

02:14:05  4       "Question:  Are you aware that Dr. Schinazi --

02:14:14  5       "Answer:  Am I aware that he testified?

02:14:17  6       "Question: Yes.

02:14:18  7       "Answer:  Yes, I am.

02:14:19  8       "Question:  Did you review his testimony in

02:14:21  9  preparation for your deposition today?

10        "Answer:  No, I did not.

11        "Question:  Are you aware that he testified

12  confidential information of Idenix prior to November of

13  2001, that he shared it with Dr. Watanabe?

14        "Answer:  I don't recall that.  But if it's in

15  the transcript, I would --

16        "Question: Does --

17        "Answer:  -- accept that.

18        "Question:  Sorry, I didn't mean to interrupt

19  you.

20        "Does Gilead have any different information than

21  Dr. Schinazi's testimony?

22        "Answer:  No.  He would be the person to know

23  that.  Gilead would not know that other than what he was

24  saying.

25        "Question:  I am going to hand you the next

1    exhibit which I have marked as Otto Exhibit 13.

2              "That document is Bates labeled IDXDE00001215

3    through '00001299.  Do you have that document in front of

4    you?

5              "Answer:  I do.

6              "Question:  Have you seen this document before?

7              "Answer:  I don't recall seeing it, no.

8              "Question:  Do you see at the top it is

9    identified as U.S. patent number 7,608,597?

10              "Answer:  Yes.

11              "Question:  And it indicates date of patent,

12    October 27, 2009?

13              "Answer:  Yes.

14              "Question:  When did Pharmasset or Gilead --

15    when did Pharmasset become aware of this patent?

16              "Answer:  I believe when it was issued."

02:16:05 17              (Designations end.)

02:16:05 18              MS. PARKER:  Your Honor, may we approach on a

02:16:10 19    matter before we start the next deposition?

02:16:12 20              THE COURT:  Ladies and gentlemen of the jury,

02:18:26 21    bear with us.

02:18:26 22              (The following took place at sidebar.)

02:18:26 23              MS. PARKER:  Your Honor, Juror No. 7 has been

02:18:26 24    asleep pretty much since lunch.  You may not be able to see

02:18:26 25    it.  I wanted to bring to the Court's attention that she is

not getting the evidence.  I know you are going to reaffirm this, but we would move to strike her.  I know there is case law in this.

THE COURT:  Is No. 7 the one that I spoke with this morning?

MS. PARKER:  Yes, Your Honor.

THE COURT:  Mr. Scherkenbach.

MR. SCHERKENBACH:  I didn't notice it right at the moment.  But I will say some of the others jurors have occasionally nodded off.  It is very hard to sit through hours and hours of deposition plays.  It's their choice to have done it.  I think it would be extreme to take that step at this point in the trial.

THE COURT:  Anything else?

MS. PARKER:  No, Your Honor.

THE COURT:  I have noticed several of the jurors dozing at times.  It is particularly hard to sit through the video depositions.  I am not at this time ready to strike anybody on that basis.  But it is something I am noticing, I will keep my eye on it.  If any side thinks that they have a basis to ask for relief, I don't mean by the decision right now to mean that there may not come a time when it has to be done.  If there is authority, I would like to see it.

I do know from personal experience, Mr. Scherkenbach and I encountered it in another trial in this

02:18:26 1  courtroom.  But I don't know what authority is out there.

02:18:26 2           MS. PARKER:  Thank you.

02:18:26 3           THE COURT:  Do we have one more deposition?

02:18:26 4           MS. PARKER:  This is a really short one.  Ten

02:18:26 5  minutes.  Then we will call a live witness.

02:18:26 6           (End of sidebar conference.)

02:18:32 7           THE COURT:  You may call your next witness.

02:18:39 8           MR. KINTON:  Your Honor, Idenix's next witness

02:18:41 9  is Mr. James Meyers.  I understand that Mr. Meyers is

02:18:44 10 currently Gilead's executive vice president worldwide

02:18:48 11 commercial operations.  Mr. Meyers was designated by Gilead

02:18:52 12 to testify as its corporate representative under Rule

02:18:56 13 30(b)(6).  And although he may be called live later in the

02:19:00 14 case, he will be testifying by videotape deposition in his

02:19:03 15 capacity as Gilead's corporate designee.

02:19:06 16          The deposition was taken on November 11, 2015.

02:19:10 17 And the video will last about ten minutes.

02:19:13 18          THE COURT:  Any exhibits?

02:19:15 19          MR. KINTON:  Yes.  Before we begin, I would like

02:19:18 20 to move in Plaintiffs' Exhibits 1722 and 2132.

02:19:26 21          MR. WARDEN:  No objection, Your Honor.

02:19:28 22          THE COURT:  Those are admitted.  You may play

02:19:30 23 the video.

02:19:30 24          (Deposition clips of James Meyers played as

02:19:31 25 follows.)

02:19:31 1          "Question:  Good morning, Mr. Meyers.

02:19:32 2          "Answer:  Good morning.

02:19:33 3          "Question:  Can you state your name and spell it

02:19:35 4   for the record?

02:19:37 5          "Answer:  Yes.  James Meyers, J-a-m-e-s, Meyers,

02:19:41 6   M-e-y-e-r-s.

02:19:47 7          "Question:  Okay.  You understand that you've

02:19:50 8   been designated to testify for certain topics pursuant to

02:19:52 9   what is called a 30(b)(6) deposition on behalf of Gilead?

02:19:55 10         "Answer:  Yes.

02:19:55 11         "Question:  And what is Meyers Exhibit 3?

02:19:58 12         "Answer:  It is a look at both units and net

02:20:00 13  revenue units sold, and net revenue for both Harvoni and

02:20:06 14  Sovaldi for 2013, 2014 and the first three-quarters of 2015,

02:20:12 15  each thing broken out on a quarterly and an annual basis.

02:20:15 16         "Question:  Okay.  And is this worldwide or

02:20:19 17  U.S.?

02:20:19 18         "Answer:  U.S.

02:20:20 19         "Question:  So on the second page -- what

02:20:23 20  appears on the second page?

02:20:25 21         "Answer:  This would be the same information

02:20:26 22  just literally broken out monthly.  It's aggregated on the

02:20:30 23  previous page to quarterly.

02:20:32 24         "Question:  And you used the term 'net revenue.'

02:20:37 25  What do you mean by net revenue?

02:20:39 1       "Answer:  That would be the amount that we

02:20:41 2  actually book as revenue, and it would be gross revenue

02:20:44 3  minus any costs of distribution, costs of -- there's

02:20:47 4  government mandated discounts.  There is discretionary

02:20:51 5  discounts.  So it would be net of all of that.

02:20:54 6       "Question:  Do you know if Gilead has ever

02:20:56 7  looked at the profit margins for HCV therapeutic -- on the

02:21:02 8  therapeutic level for HCV products?

02:21:04 9       "Answer:  Yes.

02:21:05 10      "Question:  And have they?

02:21:20 11      "Answer:  Yes.

02:21:20 12      "Question:  And how is that done?

02:21:23 13      "Answer:  So we did this once.  It was for a --

02:21:27 14 I believe it was for a board meeting in a year after the

02:21:30 15 acquisition of Pharmasset in November 2012, and it was very

02:21:35 16 specific to the moment.  This was a huge acquisition.  It

02:21:38 17 was a third of our market cap.  And our board understandably

02:21:41 18 wanted to get some understanding, a pro forma type

02:21:45 19 understanding of what this acquisition, the costs and the

02:21:48 20 potential revenue might mean to Gilead, what it might mean

02:21:51 21 over time.  So we did our best to construct -- our finance

02:21:55 22 team did our best to construct something we never do, which

02:21:58 23 is a therapeutic area P&L.  It was actually very difficult

02:22:03 24 to do because we had to use just basic assumptions for G&A

02:22:09 25 for the reasons I mentioned earlier.  We didn't know how

02:22:12 1    much time they were spending in HCV versus any other

02:22:16 2    therapeutic area, but we used some placeholder assumptions

02:22:21 3    and did it very specific to that event.  That's -- that's

02:22:26 4    not anything I've seen done ever since.  It's not anything

02:22:29 5    we were tracked versus or held to.  It was kind of a

02:22:34 6    one-time exercise based on a -- really an historic for

02:22:39 7    Gilead acquisition.

02:22:49 8           "Question:  Okay.  And what is the size of the

02:22:52 9    market for Gilead's HCV products containing sofosbuvir?

02:22:57 10          "Answer:  When you say 'size,' revenue,

02:23:02 11   patients?

02:23:03 12          "Question:  Let's start with revenue.

02:23:05 13          "Answer:  So Gilead's revenue, and it's on

02:23:08 14   Exhibit 3, but for 2014 was 10.5 billion for the HCV

02:23:16 15   franchise, which accounted for both Sovaldi and Harvoni.

02:23:21 16   And it's roughly 10 billion so far in the first three

02:23:25 17   quarters of 2015.

02:23:26 18          "Question:  Do you know what the manufacturing

02:23:28 19   costs were for Sovaldi in 2014?

02:23:31 20          "Answer:  For 2015 I know.

02:23:34 21          "Question:  You don't know for 2014?

02:23:38 22          "Answer:  I would assume they'd be similar.  But

02:23:40 23   I don't know specifically.

02:23:47 24          "Question:  And how -- what are the

02:23:49 25   manufacturing costs for Sovaldi in 2015?

02:23:52 1          "Answer:  Roughly $125 a bottle.

02:23:56 2          "Question:  And so a bottle, that would be the

02:23:58 3  units that are shown in Meyers Exhibit 3?

02:24:00 4          "Answer:  Yes.

02:24:00 5          "Question:  Okay.  So is it fair to assume that

02:24:05 6  that's the manufacturing cost for Sovaldi since its launch?

02:24:09 7  Is that a fair estimate?

02:24:12 8          "Answer:  That's a fair estimate.

02:24:13 9          "Question:  Okay.  What about for Harvoni?  Do

02:24:16 10 you know what the costs -- manufacturing costs are for

02:24:21 11 Harvoni?

02:24:21 12         "Answer:  Yes.

02:24:22 13         "Question:  And what are they?

02:24:25 14         "Answer:  $156 a bottle.

02:24:28 15         "Question:  And is that cost the same for all of

02:24:33 16 the Americas or just for North America?

02:24:35 17         "Answer:  That's just speaking for North

02:24:37 18 America.  My sense is it would be similar, but there are

02:24:39 19 different things that might go into that in other countries.

02:24:42 20 But I think it's a fair representation.  So --

02:24:46 21         "Question:  Go ahead.

02:24:48 22         "Answer:  A fair representation just for the

02:24:49 23 cost of manufacturing.

02:24:50 24         "Question:  At the time Gilead acquired

02:24:57 25 Pharmasset, who were the companies that Gilead considered to

02:25:00 1   be competitors in the HCV space?

02:23:59 2            "Answer:  At the time we acquired Pharmasset,

02:24:02 3   everybody in and around HCV would have been our competitor

02:24:06 4   because we were all kind of in the same boat.  You know, we

02:24:10 5   were looking for something.  That would have included Merck,

02:24:15 6   AbbVie, Vertex, Johnson & Johnson, Achillion, Idenix.  A lot

02:24:22 7   of companies were looking at HCV.

02:24:36 8            "Question:  So up until the clinical testing of

02:24:39 9   the Idenix compound was stopped, did Gilead consider Idenix

02:24:45 10  a competitor in the HCV space?

02:24:47 11           "Answer:  Yes.  Not yet a commercial competitor,

02:24:50 12  but certainly a competitor from a -- from a drug development

02:24:54 13  standpoint.

02:24:56 14           "Question:  Okay.  And does Gilead still

02:24:59 15  consider Idenix to be a competitor in the HCV space?

02:25:03 16           "Answer:  Well, since the acquisition, we

02:25:04 17  consider Merck certainly to be -- even before the

02:25:07 18  acquisition, we considered Merck to be a competitor.

02:25:10 19           "Question:  Up until the acquisition of Idenix

02:25:13 20  by Merck, did Gilead consider Idenix to be a competitor in

02:25:17 21  the HCV space?

02:25:19 22           "Answer:  Yep.

02:25:19 23           "Question:  And what is Meyers Exhibit 4?

02:25:22 24           "Answer:  This was the aforementioned

02:25:24 25  presentation from our President and COO, John Milligan, to

02:25:29 1     **the Board of Directors in November 2012, and it was a**

02:25:34 2     **forward-looking forecast.**

02:25:35 3             **"Question:  And this is the presentation that**

02:25:37 4     **showed the profitability based on the, at the therapeutic**

02:25:42 5     **level?**

02:25:42 6             **"Answer:  Correct.**

02:25:43 7             **"Question:  If you look on the next page, slide**

02:25:46 8     **11, it says -- it's titled, 'Gross Margin Trends Base Case.'**

02:25:56 9             **"Do you see that?**

02:25:57 10             **"Answer:  Yes.**

02:25:58 11             **"Question:  Do you have an understanding as to**

02:25:59 12     **what's depicted on this slide?**

02:26:02 13             **"Answer:  Yes.**

02:26:02 14             **"Question:  And what's depicted on this slide?**

02:26:05 15             **"Answer:  It's the gross margin with or without**

02:26:07 16     **our HCV franchise.**

02:26:09 17             **"Question:  And there's a bullet that says, 'Key**

02:26:12 18     **assumptions driving gross margin trends.'  And it says:**

02:26:31 19     **'7977 gross margin assumed to be at 98.7%.'**

02:26:36 20             **"Do you see that?**

02:26:38 21             **"Answer:  Yes.**

02:26:38 22             **"Question:  And do you understand that 7977**

02:26:40 23     **refers to sofosbuvir?**

02:26:42 24             **"Answer:  I do.**

02:26:43 25             **"Question:  And do you know if the gross -- what**

the gross margin is for sofosbuvir-containing products, or

what it was in 2014?

    "Answer:  I don't specifically know, but I have

no reason to think that this number would be largely off

since it's a measure of gross revenue or total revenue minus

cost of goods, and that would have been largely established

at that point.

    "Question:  And that was -- the cost of goods

was the amount per bottle that you have testified to

earlier?

    "Answer:  For 2015, yes.

    (Deposition designations end.)

    THE COURT:  Is that it?

    MS. PARKER:  Yes, Your Honor.  For that

deposition.

    THE COURT:  You may call your next witness.

    MS. PARKER:  Thank you, Your Honor.  Our next

witness is Andrew Carter; and he is our damages expert.

    THE COURT:  Okay.  Mr. Carter may come up and

we'll turn the lights back up.

    MS. PARKER:  Your Honor, may I approach?

    THE COURT:  You may.

    (Binders passed forward.)

    ... ANDREW CARTER, having been first duly sworn,

was examined and testified as follows ...

02:28:45 1    THE COURT:  Good afternoon.  Welcome,

02:28:46 2    Mr. Carter.

02:28:47 3    THE WITNESS:  Thank you, Your Honor.

02:28:48 4    THE COURT:  Ms. Parker, you may proceed.

02:28:51 5    MS. PARKER:  Thank you, Your Honor.

02:29:05 6    DIRECT EXAMINATION

02:29:05 7    BY MS. PARKER:

02:28:52 8    Q.    Good afternoon.

02:28:53 9    A.    Hello.

02:28:54 10   Q.    Mr. Carter, would you please give your name to the

02:28:56 11   jury and just introduce yourself briefly to them?

02:28:59 12   Sorry.  After you get some water.

02:29:02 13   A.    Sorry.

02:29:02 14   Q.    No, that's fine.

02:29:10 15   (Witness pours some water.)

02:29:10 16   BY THE WITNESS:

02:29:14 17   A.    All right.  Good afternoon.  My name is Andrew

02:29:18 18   Carter.

02:29:18 19   Q.    And if you could just tell us, top line, what are you

02:29:22 20   here to talk about this afternoon?

02:29:24 21   A.    I'm here today to discuss the issue of damages and a

02:29:29 22   royalty to be paid.

02:29:31 23   Q.    Now, before we get into your opinions, I'd like to

02:29:35 24   have you tell the jury about your qualifications, your work,

02:29:38 25   and your educational background.  Did you bring a slide with

02:29:42 1  you that we can show the jury to summarize all of that?

02:29:46 2  A.    Yes, I did.

02:29:46 3         MS. PARKER:  Okay.  If we could pull up

02:29:48 4  Demonstrative No. 1.

02:29:48 5  BY MS. PARKER:

02:29:51 6  Q.    Can you see on the screen there?

02:29:53 7  A.    I can see it up there.  The screen here doesn't, it's

02:29:56 8  not working.

02:29:57 9  Q.    All right.  So I'm going to start with your

02:30:04 10 education.  If you can tell the jury a little bit about your

02:30:06 11 educational background?

02:30:08 12 A.    Certainly.  I started life as an engineer.  I have a

02:30:12 13 bachelor's degree in chemical engineering.  I also have a

02:30:15 14 master's in business and MBA from the University of Chicago.

02:30:19 15 Q.    Did you ever work as a chemical engineer?

02:30:22 16 A.    Yes, for about five years.

02:30:24 17 Q.    And in the next bullet that is up on the screen talks

02:30:28 18 about your professional certifications.  Can you tell us a

02:30:32 19 little bit about that?

02:30:32 20 A.    Yes.  The two mentioned up on the screen are CLP and

02:30:36 21 CPA.  I think a lot of people have heard what a CPA is.

02:30:40 22 Certified Public Accountant.

02:30:42 23        CLP is a Certified Licensing Professional.  It's

02:30:46 24 a designation given to people by the largest licensing

02:30:51 25 organization in the world with certain specialized skills in

02:30:56 1    the licensing area.

02:30:57 2    Q.    And then the next bullet is Ocean Tomo.  What is

02:31:01 3    that?

02:31:01 4    A.    Ocean Tomo was the company that I cofounded about

02:31:05 5    13 years ago.  We're a group of professionals that look at

02:31:10 6    intellectual property, much of it being patents like we're

02:31:13 7    talking about today, from a business perspective.  We help

02:31:16 8    people figure out how much their patents are worth, and

02:31:21 9    people want to know this for various reasons.  If they want

02:31:24 10   to, companies want to buy patents or sell patents, for

02:31:29 11   example, they'll come to us for assistance in that area.

02:31:31 12   Q.    Can you give us just a brief idea about the types of

02:31:38 13   intellectual property or patents that you have worked on in

02:31:40 14   the past?

02:31:41 15   A.    It's really been all types, from things like we're

02:31:46 16   talking about in this case, which are pharmaceuticals, to

02:31:50 17   everything under the sun:  cellphones, transmitting devices,

02:31:54 18   automobiles, medical devices.  It's really all types.

02:31:59 19   Q.    So I'm just going to move on down the screen.

02:32:01 20        The next bullet is, valuation expert.  Can you

02:32:05 21   tell us about your expert as a valuation expert?

02:32:07 22   A.    Yes.  For the period before I was running Ocean Tomo,

02:32:14 23   I was in another company that did some of the same things

02:32:17 24   that we do at Ocean Tomo, which a lot of it is looking at

02:32:20 25   patents and how much they're worth under various scenarios.

02:32:23 1    So I did a lot of valuation work, valuing patents for sale

02:32:27 2    or license or in courtrooms.

02:32:29 3    Q.    All right.  And then the next bullet is, teaching

02:32:32 4    experience.  Do you have teaching experience?

02:32:34 5    A.    Yes.  I was a professor for several years, an adjunct

02:32:39 6    professor teaching a master's level course in intellectual

02:32:41 7    property management, essentially telling students how to

02:32:46 8    obtain value for their intellectual property, be it patents

02:32:50 9    or other things.

02:32:53 10   Q.    Finally, on the screen it says, prior cases.  What

02:32:55 11   does that mean?

02:32:56 12   A.    That means I worked on a number of other patent

02:32:59 13   litigations, looking at the value of patents in courtrooms

02:33:03 14   like today.

02:33:04 15          MS. PARKER:  Your Honor, at this time I would

02:33:05 16   like to offer Mr. Carter as an expert on patent damages and

02:33:10 17   the assessment of reasonable royalties.

02:33:16 18          MR. WARDEN:  No objection.

02:33:16 19          THE COURT:  He is so recognized.

02:33:19 20   BY MS. PARKER:

02:33:19 21   Q.    Mr. Carter, are you being compensated for your work

02:33:22 22   on this case?

02:33:22 23   A.    Yes, I charge my standard hourly fee.

02:33:27 24   Q.    Is your compensation in any way dependent on the

02:33:30 25   outcome of the case?

02:33:30 1   A.      No, I charge by the hour.  Just like a lawyer I

02:33:34 2   charge by the hour.

02:33:39 3   Q.      Now that we have gotten all that out of the way,

02:33:41 4   let's move to your opinions.  All right?

02:33:43 5           Now, did you bring a demonstrative that shows

02:33:46 6   your top line opinions in the case?

02:33:47 7   A.      Yes, ma'am.

02:33:49 8           MS. PARKER:  If we can pull up Demonstrative No.

02:33:51 9   2.

02:33:51 10  BY MS. PARKER:

02:33:53 11  Q.      All right.  Now, what does this slide show?

02:33:56 12  A.      So this slide shows, it's a pie chart and it shows a

02:34:01 13  breakout of percentages.

02:34:03 14          In my opinion, there should be a royalty

02:34:06 15  assessed in this case of 10 percent of Gilead's sales.

02:34:11 16  That is the little green 10 percent sliver.  That leaves

02:34:15 17  the other 90 percent for Gilead.  My opinion is that a

02:34:18 18  reasonable royalty here would be 10 percent of sales.

02:34:21 19  Q.      Now, I want to follow-up on one of the words you just

02:34:24 20  said.  You said "reasonable royalty."  Is that your term or

02:34:29 21  where did you get that from?

02:34:30 22  A.      That is a term that comes from the actual statute on

02:34:33 23  patent damages.

02:34:34 24  Q.      And did you bring a demonstrative to show that to the

02:34:38 25  jury?

02:34:38 1    A.      Yes.

02:34:40 2            MS. PARKER:  If we could pull up Demonstrative

02:34:42 3    No. 3.

02:34:42 4    BY MS. PARKER:

02:34:45 5    Q.      And what is shown there?

02:34:46 6    A.      And so this is the statute related to patent damages.

02:34:51 7    And I won't read through the whole thing, but the portion in

02:34:56 8    red talks about awarding an amount that is in no event less

02:35:00 9    than a reasonable royalty.

02:35:02 10           So that is the floor in terms of damages.  We

02:35:06 11   want to try to find what a reasonable royalty would be for

02:35:09 12   Gilead's use, assumed use of Idenix's patent.

02:35:14 13   Q.      So let me ask you about that word "royalty."  What do

02:35:17 14   you mean by royalty?

02:35:20 15   A.      A royalty is a payment or a license fee for using

02:35:23 16   something, like musicians when they sell records.  When the

02:35:30 17   record sells, the musician gets a fee or a payment every

02:35:34 18   time the record sells.  It is a license fee or royalty.

02:35:37 19   Q.      So what does reasonable royalty mean in the context

02:35:39 20   of this case?

02:35:40 21   A.      A reasonable royalty in the context of this case

02:35:44 22   means an amount that the parties Gilead and Idenix would

02:35:50 23   have agreed to for a license fee under a certain structure.

02:35:54 24   We'll talk about that more, probably.

02:35:55 25   Q.      Okay.  Well, as you're making this evaluation, is

02:36:00 1  there some type of framework that you use to come up with

02:36:05 2  your opinion, or you tell me?

02:36:09 3  A.    Yes.  Typically, the way that you figure out this

02:36:12 4  license fee or royalty is by looking at something called a

02:36:15 5  hypothetical negotiation.  And this, I know there is a slide

02:36:19 6  I have.

02:36:20 7          MS. PARKER:  All right.  Let's go ahead and pull

02:36:22 8  that up.  It's Demonstrative No. 4.

02:36:22 9  BY MS. PARKER:

02:36:25 10  Q.    Is this the one you were talking about?

02:36:27 11  A.    Yes, ma'am.

02:36:27 12  Q.    What does that show?

02:36:28 13  A.    So this shows the construct of what we want to find.

02:36:32 14  We want to assume that hypothetically Gilead and Idenix sat

02:36:40 15  down at a bargaining table and they negotiated for the

02:36:43 16  rights to use Idenix's patent.  And as part of that

02:36:48 17  negotiation they have to come up with a fee.  How much would

02:36:51 18  Gilead pay?  What did they agree on?

02:36:53 19          And so that is the construct we need to use here

02:36:56 20  is, hypothetically, what would these two parties, if they

02:36:59 21  had sat down, what would they have agreed on for a fee?

02:37:03 22  Q.    And when is it in time?  When is it that this

02:37:08 23  hypothetical negotiation takes place?

02:37:10 24  A.    This negotiation would take place in the period just

02:37:15 25  before infringement began, the assumed infringement would

02:37:19 1    begin.

02:37:20 2                In this particular case, that would be December

02:37:22 3    of 2013.  It would be shortly before the sales of Sovaldi

02:37:26 4    would start.  That is when we would assume the parties would

02:37:29 5    sit down at this table and try to come up with an agreement

02:37:32 6    for a licensing rate.

02:37:33 7    Q.    Now, as part of this negotiation framework that you

02:37:38 8    have been telling the jury about, are there any assumptions

02:37:41 9    that you have to make on your part?

02:37:44 10   A.    Yes, there are.  There are two or three important

02:37:48 11   assumptions we need to make.

02:37:50 12   Q.    Did you bring a slide to demonstrate that to the

02:37:52 13   jury?

02:37:52 14   A.    Yes, ma'am.

02:37:53 15               MS. PARKER:  If we could pull up No. 5.

02:37:53 16   BY MS. PARKER:

02:37:56 17   Q.    Okay.  I'm just going to ask if you are able to go

02:37:59 18   through those and explain what you mean by them.

02:38:01 19   A.    Certainly.  The first assumption is that we must

02:38:04 20   assume that Idenix's patent is valid.  Now, obviously we

02:38:10 21   have been here so far this week, and this will go on for

02:38:14 22   several days where there are going to be arguments over

02:38:16 23   whether is Idenix's patent valid or not.

02:38:20 24               In the hypothetical negotiation, we need to

02:38:23 25   assume that is the patent is valid and that both parties

02:38:28 1    agree and no one understands the patent is valid.  So there

02:38:31 2    is no dispute there.  Idenix has a valid patent.

02:38:33 3    Q.    Move on down.

02:38:38 4    A.    The second item is that both parties understand and

02:38:41 5    agree that Gilead's products of Sovaldi and Harvoni would

02:38:49 6    infringe the patent that Idenix has.  In other words, both

02:38:51 7    parties know and agree that Gilead needs to have this patent

02:38:55 8    in order to lawfully sell its product.  There is no dispute

02:38:58 9    with that.  They would agree.  Just like validity, they

02:39:02 10   would agree.

02:39:04 11   Q.    Is there anything else up there?

02:39:06 12   A.    And then the third item is we need to, it sort of

02:39:10 13   tells us we need to come up with an answer.  We have to

02:39:12 14   decide what the parties would agree on at the end of the

02:39:15 15   day.  We can't give up.  We have to come to an answer at

02:39:18 16   some point.

02:39:19 17   Q.    So now that you talked about this framework that you

02:39:23 18   follow to come up with your opinion, I want to switch gears

02:39:27 19   and ask you what you reviewed, what materials you reviewed

02:39:32 20   to fit within that framework.  Did you bring a slide to show

02:39:36 21   the jury what all you did in this case?

02:39:38 22   A.    Yes, ma'am.

02:39:38 23   Q.    Okay.  And that is Demonstrative No. 6.  Could you go

02:39:49 24   over that with the jury, please?

02:39:51 25   A.    Certainly.  So I looked at a number of documents in

735

Carter - direct

this case, financial records and internal business records and analyses from the parties in this case.

I also reviewed depositions as part of my effort. I interviewed some of the people involved in the case, expert witnesses as well as other witnesses.

And I looked at a number of actual real world license agreements that had been signed that were produced in this matter.

Q.    Okay. Is there anything else on there you want to go over with the jury?

A.    I think I pretty much covers it.

Q.    All right. I'm going to let you get some more water. Sorry.

(Pause while witness refills his cup.)

BY MS. PARKER:

Q.    So you mentioned some of these licenses that you looked at. Why did you look at those?

A.    So the reason that I looked at the license agreements is because let's remember what we are trying to figure out. We're trying to figure out the rate of a license that the parties would have signed if they had sat down and negotiated; if Idenix and Gilead had actually worked their differences out, what would they have come to for a license fee. So the best indication of what that license fee would be in this hypothetical negotiation are actual real license

02:41:13 1    agreements negotiated by the parties or by similar people in

02:41:18 2    the industry.

02:41:19 3    Q.    Now, is there any like everyday example that we would

02:41:23 4    be familiar with that would be similar to what you are

02:41:27 5    describing here with the licenses?

02:41:28 6    A.    Well, it's like anything.  We're trying to look for

02:41:34 7    examples of something like if you want to rent an apartment

02:41:38 8    and you want to figure out what is a fair amount of rent to

02:41:41 9    pay, you might look at what the apartments are renting for

02:41:44 10   in the area to see if what you are paying is a fair amount.

02:41:48 11   So something like that, looking for other things that are

02:41:50 12   comparable.

02:41:51 13   Q.    Did you see any evidence in this case that Idenix or

02:41:56 14   Gilead would have looked at comparable licenses to try to

02:42:00 15   determine what would be the appropriate rate?

02:42:06 16   A.    Yes.  Idenix, I mean they looked at comparable rates

02:42:10 17   based on percentages of sales when they are trying to come

02:42:13 18   up with royalty rates they should pay in the real world.

02:42:16 19   That is how they do it.

02:42:19 20   Q.    Why is that significant to you?

02:42:21 21   A.    Because again we want to find out what the parties

02:42:23 22   might do with the hypothetical negotiation, how they might

02:42:26 23   approach the problem of finding a license fee.

02:42:28 24   Q.    What about Gilead?  What did you find out, if

02:42:33 25   anything, about Gilead's approach to licensing?

02:42:36 1  A.    Gilead appears to look at things the same way.  There
02:42:42 2  was a time when Gilead was looking at licensing some
02:42:49 3  intellectual property and a particular HCV drug from Idenix.
02:42:55 4  As Gilead was coming up with what it should offer, it looked
02:42:59 5  at other license agreements in the industry to help it
02:43:02 6  figure out what the going rate was.
02:43:04 7  Q.    I'm going to ask you, if you will, if you will look
02:43:07 8  in that notebook I put in front of you up there.  If you
02:43:10 9  look at Tab 1.  If you can tell us what is in Tab 1?
02:43:22 10 A.    So this is a spreadsheet that Gilead made when they
02:43:33 11 were looking at this very question of how much to pay Idenix
02:43:37 12 a few years ago when they were looking at licensing an HCV
02:43:42 13 drug from Idenix.
02:43:42 14        MS. PARKER:  Your Honor, that is Plaintiffs'
02:43:44 15 Exhibit 1536.  I'd like to move that into evidence at this
02:43:47 16 time.
02:43:47 17        MR. WARDEN:  No objection.
02:43:48 18        THE COURT:  All right.  It is admitted.
02:43:48 19        (PTX-1536 was admitted into evidence.)
02:43:50 20        THE COURT:  And I think before we talk further
02:43:52 21 about it, we'll give the jury their afternoon break.  No
02:43:55 22 talking about the case during your break, and we'll get you
02:43:57 23 back here in a little bit.
02:44:00 24        (Jury left courtroom.)
02:44:24 25        THE COURT:  We will be in recess.

02:44:56 1          (Brief recess taken.)

02:44:56 2          *    *    *

03:06:27 3          (Proceedings reconvened after recess.)

03:06:27 4          THE COURT:  We will bring the jury back in.

03:07:22 5          (Jury enters courtroom at 3:07 p.m.)

03:07:38 6          THE COURT:  Welcome back.  We will proceed.

03:07:43 7  BY MS. PARKER:

03:07:44 8  Q.    Mr. Carter, before the break, we had just started

03:07:48 9  talking about comparable transactions.  And I was just about

03:07:52 10 to pull up a document.  So I am going to pick up back where

03:07:55 11 we were.  If we could display Plaintiffs' Exhibit 1536,

03:08:00 12 please.  It's such small print.  Let's look at the top

03:08:05 13 first.

03:08:06 14          What does that say, the title of this, it's

03:08:13 15 looking at a certain HCV program, Hepatitis C program.  It's

03:08:18 16 looking at various comparable transactions that occurred in

03:08:22 17 the marketplace.  Again, this is a document that Gilead put

03:08:26 18 together.

03:08:28 19 Q.    If we could go back to the document and pull up the

03:08:32 20 right-hand side of these columns, I am going to ask you,

03:08:35 21 what does that show?

03:08:37 22          "Answer:  So each one of those numbers relates

03:08:39 23 to a particular licensing deal that was done in the HCV

03:08:45 24 space.  And what it's showing is there is percentages, it is

03:08:50 25 showing the percentage royalty rates in the different deals

03:08:53 1    that Gilead looked at when it was approaching in negotiation

03:08:57 2    with Idenix.

03:09:01 3    Q.    What does this tell you, if anything, about Gilead's

03:09:04 4    approach to structuring these licensing agreements?

03:09:07 5    A.    Yes.   This is an indication that Gilead looked at the

03:09:12 6    going rate in the market for a license fee, when

03:09:17 7    specifically when it was contemplating offering money or

03:09:21 8    offering a license term to Idenix for a Hepatitis C drug

03:09:27 9    that Idenix had.   This is a real-world example of what

03:09:31 10   Gilead did.

03:09:31 11   Q.    Did Gilead and Idenix ever exchange proposals?

03:09:36 12   A.    Yes.

03:09:37 13   Q.    If you could look at Tab 2 in your notebook there in

03:09:41 14   front of you, I believe that's Plaintiffs' Exhibit 1544,

03:09:53 15   what's that?

03:09:57 16   A.    So this is a -- one of the proposals -- there are

03:10:03 17   drafts and then actual proposals -- that Gilead exchanged

03:10:08 18   with Idenix to try to figure out how much Gilead should pay

03:10:12 19   for one of Idenix's Hepatitis C drugs and related patents.

03:10:16 20   Q.    And what was the date?

03:10:19 21   A.    The date on this is March of 2010.

03:10:22 22   Q.    So going back to this hypothetical negotiation, the

03:10:26 23   framework that you told the jury about when you first

03:10:29 24   started speaking about them, does this document come before

03:10:35 25   or after the hypothetical negotiation?

03:10:38 1   A.      This is before the hypothetical negotiation.  So this

03:10:41 2   would be one of the things that the negotiators would have

03:10:45 3   at the bargaining table.  They would understand this type of

03:10:48 4   information was available to them.

03:10:51 5              MS. PARKER:  Your Honor, I would like to move

03:10:53 6   for the admission of Plaintiffs' Exhibit 1544.

03:10:58 7              MR. WARDEN:  No objection.

03:10:59 8              THE COURT:  It's admitted.

03:11:00 9              (Plaintiffs' Exhibit No. 1544 received in

03:11:01 10  evidence.)

03:11:01 11  BY MS. PARKER:

03:11:01 12  Q.      Was the Gilead proposal to Idenix a running royalty?

03:11:06 13  A.      Yes, ma'am, it was.

03:11:07 14  Q.      What is a running royalty?

03:11:10 15  A.      A running royalty is an amount of -- it's a royalty

03:11:14 16  rate that you apply to sales, so if you -- like ten percent

03:11:19 17  as an example, five percent, 15 percent are all examples.

03:11:23 18  So if sales go up, if more is sold, then more money is paid.

03:11:27 19  If sales are lower, then less money is paid.  But it's some

03:11:31 20  type of rate, a percentage, that is applied to sales.

03:11:34 21  Q.      Now, I want to go back to something else --

03:11:38 22             MR. WARDEN:  Objection, Your Honor.  Can we have

03:11:39 23  a sidebar?

03:11:40 24             MS. PARKER:  Your Honor, we don't need one.

03:13:21 25  BY MS. PARKER:

03:13:21  1   Q.    Before the break, one of the things you said was you

03:13:21  2   would look to other companies for what you considered

03:13:21  3   comparable licenses?

03:13:21  4   A.    Yes.

03:13:21  5   Q.    Did you find any comparable licenses here?

03:13:21  6   A.    Yes, in this particular case I found two license

03:13:21  7   agreements that were I believe comparable to what the

03:13:21  8   hypothetical negotiators would have to come up with.

03:13:21  9   Q.    Can you identify them fist, then I will ask you about

03:13:21 10   them?

03:13:21 11   A.    One is an agreement between Pharmasset-Roche and one

03:13:21 12   is an agreement between Roche and Merck.

03:13:21 13   Q.    I am going ask you about the Pharmasset-Roche one.  I

03:13:21 14   believe if you look at Tab 3 in your notebook, if you could

03:13:21 15   just look there and identify that document for us?

03:13:21 16   A.    Yes.  This is the agreement between Pharmasset and

03:13:21 17   Roche.

03:13:21 18            MS. PARKER:  And, Your Honor, that is

03:13:21 19   Plaintiffs' Exhibit 1132.  We would move to admit that at

03:13:21 20   this time?

03:13:21 21            MR. WARDEN:  No objection.

03:13:21 22            THE COURT:  It's admitted.

03:13:21 23            (Plaintiffs' Exhibit No. 1132 received in

03:13:21 24   evidence.)

03:13:21 25   BY MS. PARKER:

03:13:21  1   Q.      Let's pull up Page 1 on the screen.  Why is it that

03:13:23  2   you considered this agreement between you and Roche to be a

03:13:26  3   comparable license?

03:13:27  4   A.      I considered it to be comparable because first of all

03:13:30  5   it was for the 6130 drug and the related patents around it.

03:13:34  6   That is the Jeremy Clark drug we keep hearing about.

03:13:39  7           The second reason was because we are talking

03:13:42  8   about Pharmasset licensing Roche, so Pharmasset, again, a

03:13:48  9   smaller development company, similar to Idenix, is licensing

03:13:52 10   Roche, a large drug company, that would be doing all the

03:13:55 11   work and selling the product, similar to what Gilead would

03:13:59 12   be doing.

03:13:59 13   Q.      I want to go to Page 234 in this document and ask you

03:14:04 14   about it.  What are the royalty rates that are in the

03:14:11 15   document that you -- the agreement that you are relying on

03:14:16 16   as a comparable license?

03:14:18 17   A.      There are a number of rates in this agreement.  The

03:14:22 18   particular callout you have up on the screen shows royalty

03:14:26 19   rates of 12 percent and 18 percent.  What the screen shows

03:14:39 20   is a royalty rate of 12 percent for up to 3500 million a

03:14:43 21   year and 18 percent for between 500 and $750 million a year.

03:14:49 22   They were the rates contemplated.

03:14:52 23   Q.      Let's go to the next page of that document.

03:15:07 24           What is shown there?

03:15:08 25   A.      Here are some more royalty rates.  These are shown,

03:15:11 1    royalty rates that would apply at lower amounts of sales

03:15:14 2    some years down the line.  So you can generally see here,

03:15:18 3    that as the level of sales goes up, the royalty rate

03:15:21 4    increases as well.

03:15:22 5    Q.    So I want to go back now to that part that popped up.

03:15:26 6    So the prior page down at the bottom, tell us what this

03:15:32 7    means?

03:15:35 8    A.    Yes.  What this is saying is that the royalty rate

03:15:38 9    would be 18 percent for sales of a billion dollars in any

03:15:43 10    given year.

03:15:45 11    Q.    In this license agreement that you have identified as

03:15:48 12    one that is a comparable license agreement, what is the

03:15:52 13    range of the rates that are provided for in this agreement?

03:15:56 14    A.    The range spans from ten percent to 18 percent.

03:16:01 15    Q.    You said that you -- you identified two that were

03:16:04 16    comparables, we just talked about one of them.  I am going

03:16:07 17    to switch now and talk about the other one.  The other one

03:16:09 18    is between Merck and Roche.  Is that right?

03:16:12 19    A.    Yes.

03:16:13 20    Q.    If you could look at Tab 4 of your notebook there,

03:16:16 21    please, sir, of that document before the jury?

03:16:26 22    A.    Yes.  This is the agreement between Merck and Roche

03:16:31 23    for a Hepatitis C medication.

03:16:35 24        MS. PARKER:  Your Honor, I would like to move to

03:16:37 25    admit Plaintiffs' Exhibit 1606 at this time.

03:16:41 1      MR. WARDEN:  No objection.

03:16:42 2      THE COURT:  It's admitted.

03:16:43 3      (Plaintiffs' Exhibit No. 1606 received in

03:16:43 4  evidence.)

03:16:43 5  BY MS. PARKER:

03:16:44 6  Q.     Why did you consider this agreement to be comparable?

03:16:47 7  A.     So this agreement, it is for a patent, this agreement

03:16:54 8  is for a patent related to Hepatitis C medication that Merck

03:17:01 9  has.  And Merck is licensing Roche.  And Roche needs to take

03:17:08 10  that patent and then, in effect, do all the rest of the

03:17:12 11  work, so it's similar to, again, this hypothetical

03:17:16 12  negotiation with Idenix and Gilead where Gilead has a --

03:17:21 13  Idenix has a patent and Gilead will be doing the work.

03:17:25 14  Q.     So, I am going to ask you, if you will, tell us what

03:17:31 15  the date is that's shown up there?

03:17:33 16  A.     The date is May of 2011.

03:17:35 17  Q.     So is that date -- how does that date relate to the

03:17:41 18  hypothetical negotiation where the jury saw on the screen

03:17:44 19  the two chairs around the table?

03:17:46 20  A.     This was also in time before the hypothetical

03:17:52 21  negotiation.  So this is information that the negotiators

03:17:55 22  could have available to them.

03:17:57 23  Q.     Let's go to Page 5, please.  I want to ask you, what

03:18:03 24  are the royalty rates in this comparable license?

03:18:08 25  A.     So as you can see on the screen, there is a range of

03:18:11 1   rates, depending on various conditions.  And those rates

03:18:14 2   range from 9 percent of sales or product sales to 12 percent

03:18:18 3   of product sales.

03:18:20 4   Q.    Did you prepare a demonstrative to explain to the

03:18:23 5   jury why this license agreement is comparable?

03:18:27 6   A.    Yes, ma'am.

03:18:27 7   Q.    And if we could pull up Demonstrative No. 7.  What is

03:18:33 8   shown up there?

03:18:35 9   A.    So what I tried to look at here was who was going to

03:18:41 10  be doing what in this agreement.  And so on the left-hand

03:18:49 11  side, on the left-hand side, we look at what Merck is

03:18:52 12  bringing to the table, because we want to figure out how big

03:18:56 13  a piece of the pie Merck should get.

03:18:58 14        In this Merck-Roche license, Merck is providing

03:19:01 15  a patent license to a patent that Roche needs in order to

03:19:07 16  sell its HCV medication.

03:19:10 17        The right-hand side is what Roche needs to do as

03:19:12 18  part of this, as you can see, the list for Roche is

03:19:15 19  significantly longer.  Roche needs to have the compound, the

03:19:19 20  thing that actually cures you.  Roche needs to have the

03:19:23 21  prodrug.  I know we have heard prodrug a little bit, Roche

03:19:29 22  needs to have the prodrug along with the compound.  They

03:19:33 23  need to do all the testing, all the FDA work.  They need to

03:19:36 24  manufacture the product.  They need to market it.  They need

03:19:39 25  to sell it.

03:19:40 1          So Roche has to do literally everything, except

03:19:44 2  Merck is providing its patent.  And the license agreement

03:19:46 3  was based on that allocation of who was going to do what.

03:19:50 4  Q.    Now, I want to ask you how you used this analysis,

03:19:56 5  which you have up on the screen, to apply to the case that

03:19:59 6  we have here in the courtroom.

03:20:01 7          Did you prepare a demonstrative that relates to

03:20:04 8  this case?

03:20:05 9  A.    Yes, ma'am.

03:20:05 10 Q.    If we could pull up Demonstrative No. 8.  If you

03:20:12 11 could go over that with the jury, please?

03:20:15 12 A.    Yes.  This demonstrative looks like the last one.

03:20:18 13 That's because the situation is very similar.  In the

03:20:22 14 hypothetical negotiation, Idenix would be bringing its

03:20:24 15 patent to the table, and Gilead would be bringing everything

03:20:28 16 else.  Gilead has to provide the drug that cures you, the

03:20:32 17 prodrug that gets the curative drug in the body, all the

03:20:37 18 testing, all the marketing, the manufacturing, promotion,

03:20:42 19 sales, and the like.  So it's an analogous situation to what

03:20:47 20 Merck and Roche went through in their negotiation in the

03:20:50 21 real world.

03:20:51 22 Q.    Did you prepare a summary of all these different

03:20:55 23 royalty rates you have been telling the jury about?

03:20:57 24 A.    Yes.

03:20:57 25 Q.    If we could pull up Demonstrative No. 9.

03:21:01 1        What is shown there?

03:21:04 2    A.    This is just a simple summary of the two license

03:21:07 3    agreements we have been discussing.  The Merck-Roche

03:21:10 4    agreement, with the nine to 12 percent rates, and the

03:21:13 5    Pharmasset-Roche agreement, with the ten to 18 percent

03:21:17 6    royalty rates.

03:21:17 7    Q.    Based on your review of these comparable agreements,

03:21:22 8    and everything else you did in the case, what is your

03:21:25 9    opinion on what would be a fair and reasonable royalty rate

03:21:31 10   in this case to compensate Idenix for Gilead's infringement?

03:21:35 11   A.    As I said at the beginning, the analysis suggests

03:21:38 12   that ten percent would be a fair and reasonable rate.

03:21:40 13   Q.    Can we go to the next demonstrative, which is No. 10?

03:21:47 14        What is shown there?

03:21:48 15   A.    It's the picture of what I just described in words, I

03:21:51 16   guess.  It's a ten-percent royalty rate for Idenix, and that

03:21:56 17   means, of course, Merck keeps the other 90 percent.

03:21:59 18   Q.    After you come up with the percentage, what do you do

03:22:03 19   next?

03:22:04 20   A.    At this point, we need to find out what the sales are

03:22:08 21   of Sovaldi and Harvoni so we can multiply the percentage

03:22:11 22   times the sales.

03:22:12 23   Q.    If you could look at your notebook at Tab 6, please.

03:22:23 24   If you could just identify what document you are looking at

03:22:26 25   there?

03:22:27 1    A.    So this is a document that Gilead prepared to come up

03:22:35 2    with their sales of Sovaldi and Harvoni.

03:22:40 3         MS. PARKER:  Your Honor, I would like to move

03:22:41 4    for admission of Plaintiffs' Exhibit 2251.

03:22:45 5         MR. WARDEN:  No objection.

03:22:46 6         THE COURT:  It's admitted.

03:22:47 7         (Plaintiffs' Exhibit No. 2251 received in

03:22:47 8    evidence.)

03:22:47 9    BY MS. PARKER:

03:22:48 10   Q.    If we could pull up the second page from that up on

03:22:52 11   the screen.

03:22:54 12        I am going to ask you, if you will, to go

03:22:56 13   through this with the jury and explain what's up there on

03:22:59 14   the screen?

03:23:00 15   A.    Certainly.  So this document, this is only a portion

03:23:04 16   of the whole thing, but this shows the number of bottles

03:23:10 17   sold of the different components as well as the revenue that

03:23:13 18   Gilead received for Sovaldi and Harvoni.  If you look all

03:23:17 19   the way over on the right-hand side, the second number down

03:23:20 20   is 12,755,000,000, that's the sales of Sovaldi through

03:23:32 21   August of this year, through the third quarter of 2016.

03:23:39 22   Then the last number at the bottom right-hand is

03:23:42 23   15,741,000,000.  That's the U.S. sales of Harvoni through

03:23:49 24   quarter 3 of 2016.

03:23:51 25   Q.    I have a question.  So just looking at the screen,

03:23:54 1 those numbers look like 12,755.  It looks like 15,741.  Can

03:24:04 2 you explain to us what that really means?

03:24:06 3 A.     Those are in millions.  If you look on the left-hand

03:24:11 4 side, for example, the bottom, yellow box on the bottom

03:24:16 5 left, it says net revenues, dollar sign M, that is to let us

03:24:20 6 know that the numbers on this page are in millions.

03:24:23 7 Somebody can write it shorthand so you don't have a whole

03:24:26 8 lot of big numbers on the page.

03:24:28 9 Q.     Is that something that is typical in accounting?

03:24:31 10 A.     Typical in a lot of professions if you don't want to

03:24:35 11 have a lot of pages full of numbers, yes.

03:24:37 12 Q.     Have you prepared a demonstrative that summarizes

03:24:40 13 Gilead's total United States sales of Sovaldi and Harvoni

03:24:45 14 through August of this year?

03:24:46 15 A.     Yes, ma'am.

03:24:46 16 Q.     If we could pull up Demonstrative No. 11, please.

03:24:52 17        If you could go over that with the jury, please?

03:24:54 18 A.     Yes.  So this is the rounded figures for the sales of

03:25:00 19 Sovaldi and Harvoni through August of this year.  Those

03:25:04 20 numbers that you can see from the page we saw before on the

03:25:07 21 right-hand side and added together equals

03:25:11 22 28,496,000,000 dollars.

03:25:13 23 Q.     Once you came up with the total sales number shown

03:25:18 24 there on the screen, what did you do next?

03:25:20 25 A.     Then I multiplied this number by the percent royalty

03:25:23  1  rate I found earlier.

03:25:24  2  Q.      Did you bring a demonstrative to explain that to the

03:25:27  3  jury?

03:25:27  4  A.      Yes.

03:25:28  5  Q.      If we could pull up No. 12.

03:25:35  6          What is shown here?

03:25:36  7  A.      Before I took the ten percent and multiplied by the

03:25:41  8  238 billion, I made a couple of deductions.  The first

03:25:44  9  deduction, the five percent, that is something typical in

03:25:47 10  the Hepatitis C area.  That companies when they license each

03:25:50 11  other, they agree to knock a little bit off the top to

03:25:53 12  handle things like returns and the like so they don't have

03:25:56 13  to deal with accountants crawling over their books all the

03:25:59 14  time.

03:26:00 15          The second number is a reduction I made in the

03:26:03 16  price and revenues of Harvoni because Harvoni is actually

03:26:06 17  two active ingredients.  It's sofosbuvir, which is Sovaldi,

03:26:11 18  and it's ledipasvir, which is another active ingredient that

03:26:16 19  Gilead created.

03:26:16 20          So this case is about sofosbuvir or Sovaldi.  So

03:26:22 21  I took out the ledipasvir compound.  So 11 percent of

03:26:25 22  Harvoni is applied here, I took that out.  We were just

03:26:30 23  assessing the royalty on sofosbuvir or Sovaldi.

03:26:34 24  Q.      Just to be really clear, that top number, the 28.5

03:26:38 25  billion, is that the same number on the prior slide when we

03:26:43  1   added it all up?

03:26:45  2   A.    Yes.

03:26:45  3   Q.    So now you have taken a couple of reductions for

03:26:47  4   various reasons.  Right?

03:26:49  5   A.    Yes.

03:26:53  6   Q.    What word are you using to describe the 235.4 billion

03:26:58  7   number at the bottom?

03:27:00  8   A.    The royalty base or that is the number that the ten

03:27:02  9   percent should be applied to.

03:27:03 10   Q.    Let's go back four demonstrative slides using the

03:27:07 11   pie.  If we could pull up Demonstrative No. 13.  So if you

03:27:12 12   could just tell the jury what's shown here?

03:27:15 13   A.    The entire pie is 25.4 billion dollars after making

03:27:19 14   those adjustments I described.

03:27:21 15   Q.    So now that you have the percentage, and you have got

03:27:25 16   the base, what do you do next?

03:27:28 17   A.    I multiply them together to find the royalty in

03:27:32 18   dollar terms that should apply.

03:26:28 19         MS. PARKER:  If we could pull up Demonstrative

03:26:30 20   No. 14.

03:26:30 21   BY MS. PARKER:

03:26:33 22   Q.    If you could tell the jury what is shown there,

03:26:35 23   please?

03:26:35 24   A.    So, here, remember how before I said that document

03:26:39 25   was in shorthand, so it would be full of numbers?  Well,

1    here, this is the actual, we pull the full numbers out of

2    the document.

3           At $25.4 billion written long form is that

4    entire $25,409,234,029.

5           I multiply that by the 10 percent to come up

6    with a total royalty of $2,540,923,403.

7    Q.    Is there anything on that chart other than just the

8    math?

9    A.    No, it's just 10 percent times the number of the

10   amount of sales.

11          MS. PARKER:  Okay.  Let's go back to the pie

12   chart, and that is Demonstrative 15 now.

13   BY MS. PARKER:

14   Q.    What is shown here?

15   A.    So this shows the 10 percent of $2.54 billion in the

16   little green slice, and that is the part that would go to

17   Idenix in a royalty.  And then the rest, the $22.86 billion

18   would stay with Gilead.  This is for U.S. sales only.

19   Q.    All right.  Thank you.  Now, I need to switch gears

20   and ask you about something called the *Georgia-Pacific*

21   factors.

22          Can you tell the jury what that is?

23   A.    Yes.  Many years ago, there was a case called the

24   *Georgia-Pacific* case; and in that case, there were a number

25   of factors that the Court laid out and suggested that some

03:28:08 1   of those factors can be useful in determining a royalty.  So

03:28:13 2   I looked at those factors here.

03:28:14 3   Q.    Did you prepare a summary of those factors to show to

03:28:18 4   the jury?

03:28:19 5   A.    Yes, ma'am.

03:28:20 6         MS. PARKER:  If we could pull up No. 16.  I

03:28:22 7   think we're up to 16.  Yes.

03:28:22 8   BY MS. PARKER:

03:28:24 9   Q.    What is shown there?

03:28:25 10  A.    So what is shown there are the *Georgia-Pacific*

03:28:28 11  factors.  Don't panic, we're not going to read through every

03:28:32 12  one of these factors.  We're going to talk about them in

03:28:35 13  easy to digest chunks, but this is a shorthand version of

03:28:39 14  the actual factors.

03:28:40 15  Q.    I am just going to ask you about some of them, but I

03:28:43 16  do want to ask, first, did you actually evaluate every one

03:28:47 17  of those factors?

03:28:48 18  A.    Yes.

03:28:48 19  Q.    So I understand that you group some of them together

03:28:53 20  so I'm going to try to ask you about them in a few groups.

03:28:56 21  All right?

03:28:58 22        Let's start with the first group which is No. 1,

03:29:00 23  No. 2, and No. 12.

03:29:04 24        If we could pull up Demonstrative 17.  There.

03:29:07 25  Okay.

03:29:09  1          So tell us about those factors and what it means

03:29:11  2   in this case?

03:29:11  3   A.      So these three factors, they really all get to the

03:29:15  4   same concept, and that concept is look at the going rates

03:29:20  5   in the market.  It's telling us we should look at other

03:29:23  6   licensing rates, other licenses, other royalties to try to

03:29:27  7   come up with our answer here.  And that is what the

03:29:33  8   *Georgia-Pacific* factors tell us.  That is exactly what I did

03:29:35  9   is I looked under license rates that were available under

03:29:39 10   this case.

03:29:40 11   Q.      Is there anything else under these factors or can I

03:29:43 12   move to the next one?

03:29:43 13   A.      You can move to the next.

03:29:49 14          MS. PARKER:  Okay.  So let's go to No. 13.  If

03:29:50 15   we pull up No. 13, which is a demonstrative, here it is, No.

03:29:53 16   18.

03:29:53 17   BY MS. PARKER:

03:29:54 18   Q.      What is shown there?  And how does that impact your

03:29:56 19   analysis in this case?

03:29:57 20   A.      So *Georgia-Pacific* Analysis No. 13, this is reminding

03:30:00 21   us that if the defendant, if Gilead, the one who is going

03:30:06 22   to be using the patent, that they have done things to

03:30:11 23   contribute to the product that we need to make sure that we

03:30:14 24   somehow account for those.  So this is reminding us to do

03:30:16 25   that.  And I've done that because as we talk about with

03:30:19 1  the comparable license agreements, we were looking at the

03:30:22 2  portion that would be fair to pay given that Gilead would

03:30:27 3  have to do a lot of work and Idenix would be contributing

03:30:31 4  its patent.

03:30:32 5  Q.    Okay.  So I want to go up now to No. 8 and ask you

03:30:35 6  about that one.

03:30:37 7          If we could pull up Demonstrative 19.  Yes.

03:30:41 8          What is this factor?  And how does that apply to

03:30:44 9  this case?

03:30:45 10 A.    So this factor says, hey, we should look at the

03:30:48 11 profits that were made by the product because if the product

03:30:52 12 made a lot of money, if the profit margin was high, it tends

03:30:57 13 to lead to higher royalty rates.  So I looked at the profit

03:30:59 14 margin of the product.

03:30:59 15 Q.    And I want to ask you to go back to your binder, to

03:31:02 16 the notebook, and this is Tab 9.

03:31:07 17         MS. PARKER:  Your Honor, this has already been

03:31:08 18 admitted.  It's Plaintiffs' Exhibit 1722.

03:31:11 19         THE COURT:  Okay.

03:31:11 20 BY MS. PARKER:

03:31:12 21 Q.    What is shown there with respect to this

03:31:14 22 *Georgia-Pacific* factor?

03:31:16 23 A.    So this is a financial forecast that Gilead prepared.

03:31:20 24 You saw the last witness who was on videotape talk about

03:31:24 25 this document.

03:31:25 1          MS. PARKER:  And if we could pull up page 11

03:31:28 2   from that document and put it on the screen.

03:31:28 3   BY MS. PARKER:

03:31:30 4   Q.     And the jury saw this page from the last, that little

03:31:36 5   short videotape.  I want to ask you about it.  So what is

03:31:39 6   shown in highlighted in yellow there?

03:31:41 7   A.     So highlighted in yellow is, well, it says:  Gross

03:31:46 8   margin assumed to be at 98.7 percent for the 7977 product.

03:31:52 9   That is Sovaldi or sofosbuvir.  And this is what Gilead at

03:31:57 10  the time was projecting for their gross profit margin.  By

03:32:01 11  any measure, that is a very high margin.

03:32:04 12  Q.     What does gross margin mean?

03:32:06 13  A.     That's gross profit.  It is profit at the gross

03:32:10 14  margin level.  And that is how, when Gilead prepared their

03:32:13 15  analysis looking at this drug, this is what they prepared to

03:32:16 16  look at, profitability.

03:32:17 17  Q.     Let me just ask you some, just a math number.  Okay?

03:32:21 18  Just so we can explain to the jury what the 98.7 means.

03:32:25 19          So let me just ask you to assume just

03:32:28 20  hypothetically there is $1,000 in sales.  Let's say that

03:32:32 21  that is the number.  If you use a 98.7 gross margin, what

03:32:37 22  does that mean in terms of the profits?

03:32:39 23  A.     That means that the gross profits would be $987.

03:32:46 24  Q.     Now, does this information that is here on the screen

03:32:50 25  have any impact on your analysis in this case?

03:32:53 1   A.      It does from the perspective of I recognize that

03:32:58 2   information.  *Georgia-Pacific* says we should be mindful of

03:33:00 3   it, and I took that into account, yes.

03:33:02 4   Q.      So I'm going to go back to the *Georgia-Pacific* list,

03:33:05 5   and I've got just really two others to ask you about.

03:33:09 6           So if we could pull up Demonstrative 20.

03:33:11 7           All right.  So this is No. 9 and No. 10.  I want

03:33:15 8   to ask you about those together.

03:33:16 9           What are those factors?  And how did you use

03:33:20 10  them in this case?

03:33:23 11  A.      So 9 and 10 talk about the advancement of the

03:33:26 12  patented property over what they call the old modes.  In

03:33:29 13  other words, advances of the patented property over what

03:33:34 14  used to be, and I don't think there is any disagreement that

03:33:37 15  sofosbuvir is a wonderful drug.

03:33:39 16          Something else the people often talk about when

03:33:42 17  looking at these factors is the question of alternatives.

03:33:44 18  In other words, could Gilead have easily gotten around

03:33:50 19  Idenix's patent?  Do they have a lot of other ways to do

03:33:53 20  what they wanted to do?

03:33:55 21          And Gilead hasn't put for the any alternatives

03:33:57 22  at all in this matter.  They're not working on anything to

03:34:00 23  get around the patent.  They need to have the patent.

03:34:03 24  Q.      All right.  Thank you.  Now, I really just have one

03:34:06 25  more question.  I want to go back to the pie.

03:34:09 1          MS. PARKER:  If we can pull up Demonstrative 21.

03:34:09 2     BY MS. PARKER:

03:34:12 3     Q.     And I want to ask you if you will tell the jury, what

03:34:14 4     is your final conclusion about a reasonable royalty that

03:34:19 5     Gilead would pay to Idenix for the use of the Idenix patent?

03:34:24 6     A.     Well, my final opinion is that at the end of the

03:34:29 7     hypothetical negotiation, the parties would agree that

03:34:31 8     10 percent is a reasonable figure, given the information

03:34:35 9     available, and in dollar terms, that would be $2.54 billion

03:34:40 10    in terms of a royalty through August of 2016.

03:34:43 11             MS. PARKER:  Thank you, Your Honor.

03:34:44 12             Your Honor, I have no further questions.

03:34:46 13             THE COURT:  Thank you.

03:34:46 14             Cross-examination.

03:34:47 15             MR. WARDEN:  Yes, Your Honor.

03:34:57 16             Your Honor may I approach the witness?

03:35:03 17             THE COURT:  You may.

03:35:18 18             MR. WARDEN:  We have two binders, Your Honor.

03:35:39 19             (Binders passed forward.)

03:35:41 20                     CROSS-EXAMINATION

03:35:41 21    BY MR. WARDEN:

03:36:00 22    Q.     Good afternoon, Mr. Carter.

03:36:02 23    A.     Good afternoon, sir.

03:36:03 24    Q.     As part of your analysis, you're assuming that the

03:36:09 25    '597 patent is valid?

03:36:10 1    A.    Yes, sir.

03:36:11 2    Q.    You understand that Gilead disputes the validity of

03:36:15 3    the '597 patent?

03:36:16 4    A.    Yes, sir.

03:36:17 5    Q.    And you understand as well the jury has not yet heard

03:36:20 6    from Gilead's witnesses that relate to the issue of validity?

03:36:24 7    A.    Correct.    It's an assumption that I made, that it's a

03:36:29 8    necessary assumption for damages.    You have to assume

03:36:33 9    validity.    Otherwise, there is no damage.    That is why you

03:36:35 10   always assume validity to come up with the damages figure.

03:36:37 11   Q.    And you understand that the jury doesn't have to

03:36:39 12   assume validity?

03:36:41 13         MS. PARKER:    Objection, Your Honor.    We're

03:36:42 14   getting into a legal issue at this point.

03:36:44 15         THE COURT:    Overruled.

03:36:44 16   BY THE WITNESS:

03:36:46 17   A.    So in order to -- the jury doesn't have to assume

03:36:49 18   validity for validity's purpose, but for damages purposes

03:36:53 19   you have to assume validity.    If there is no validity, there

03:36:56 20   is no damages.    But if there is validity, there is damages.

03:36:59 21   Q.    As you said, if the jury agrees with Gilead that

03:37:03 22   these patents are invalid, there are no damages?

03:37:07 23   A.    My understanding is that the patent is not valid,

03:37:11 24   then there is no damage.    That is why you assume validity to

03:37:15 25   come up with a damages figure.

03:37:16 1    Q.    And if the jury agrees with Gilead that the patents

03:37:18 2    are invalid, they don't need to consider the analysis that

03:37:21 3    you have just testified about?

03:37:23 4    A.    My analysis is a damages analysis.  That is true.

03:37:26 5    Q.    Let's talk about your analysis.  I want to start

03:37:32 6    where you left off with your discussion of the *Georgia-Pacific*

03:37:35 7    factors.  Specifically, your discussion of factors 9 and 10.

03:37:42 8          Mr. Sayres, would you show Mr. Carter Demonstrative

03:37:48 9    Slide No. 20.

03:37:50 10         Now, I want to start with the first part of

03:37:53 11   factors 9 and 10, the utility and advantages of the patented

03:37:57 12   property over old modes or devices.

03:38:02 13        You were here yesterday when Dr. Sommadossi

03:38:05 14   testified?

03:38:05 15   A.    Yes.

03:38:07 16   Q.    And you saw the timeline slide that Mr. Sommadossi

03:38:12 17   had used as part of his testimony?

03:38:14 18   A.    It was up there.  I couldn't see it well at all.  In

03:38:18 19   fact, I kind of couldn't see it at all.  It was very tiny.

03:38:21 20   Q.    Let's look.

03:38:23 21        Mr. Sayres, could you put up Mr. Sommadossi's

03:38:27 22   Slide No. 23.

03:38:39 23        You understand Idenix began working in the HCV

03:38:44 24   field in late 1999?

03:38:48 25   A.    I can accept that.

03:38:49 1  Q.    And the Idenix patent application, the provisional

03:38:53 2  patent application was filed in May of 2000?

03:38:56 3  A.    I believe that is what it says, yes.

03:39:00 4  Q.    More than 15 years ago?

03:39:03 5  A.    That is correct, I believe.  Yes.

03:39:06 6  Q.    And Idenix has continued working on HCV treatments

03:39:13 7  since that time?

03:39:14 8          MS. PARKER:  Objection as to relevance and

03:39:15 9  beyond the scope.

03:39:17 10          MR. WARDEN:  Your Honor, the relevance is to the

03:39:19 11 value of the patents, and what the patents have allowed over

03:39:22 12 the old modes and devices.

03:39:24 13          THE COURT:  Ms. Parker.

03:39:27 14          MS. PARKER:  Same objection.

03:39:28 15          THE COURT:  It's overruled.  You may continue.

03:39:28 16 BY MR. WARDEN:

03:39:31 17 Q.    Idenix has continued working on HCV in the 15 years

03:39:36 18 since?

03:39:36 19 A.    I believe so.

03:39:37 20 Q.    And in those 15 years, Idenix has not developed any

03:39:40 21 treatment for HCV that has been approved by the FDA to cure

03:39:44 22 patients?

03:39:45 23 A.    I believe that is true, yes.

03:39:47 24 Q.    Now, Idenix has developed some compounds that fall

03:39:52 25 within the scope of its claims?

03:39:55 1    A.        Yes, I understand that is true.

03:39:57 2    Q.        But none of those compounds ever advanced to the

03:40:00 3    stage of an approved treatment.

03:40:02 4    A.        Yes.  Yes, sir.  That's true.

03:40:04 5    Q.        For example, you heard Mr. Sommadossi testify

03:40:06 6    yesterday about NM283.

03:40:12 7    A.        Was there -- I don't remember the number.  Was it

03:40:15 8    known by another number?

03:40:16 9    Q.        Let's be more general.  You heard Mr. Sommadossi

03:40:19 10   testify about some compounds that Idenix had in development.

03:40:24 11   A.        Yes.

03:40:24 12   Q.        And you heard from Mr. Sommadossi that the FDA put a

03:40:29 13   hold on one of those compounds?

03:40:32 14   A.        Well, what I recall him saying is that the FDA put a

03:40:36 15   hold -- I know the FDA put a hold on some compounds, whether

03:40:39 16   it was that compound or related ones, then they put a hold

03:40:42 17   on their own compound.  I just know some compounds were held

03:40:46 18   at some point for some reason.

03:40:47 19   Q.        And you understand that Idenix discontinued

03:40:50 20   development of those compounds?

03:40:51 21   A.        Yes.  At some point that occurred, yes.

03:40:58 22   Q.        I want to shift focus for a second and now talk about

03:41:01 23   Gilead.  Gilead launched sofosbuvir under the brand name of

03:41:06 24   Sovaldi in December of 2013; is that right?

03:41:13 25   A.        Yes, that's true.

03:41:14 1    Q.    That was 13 years after Idenix filed its patent

03:41:19 2    application?

03:41:20 3    A.    I don't remember the exact date, but it was several

03:41:26 4    years after, yes.

03:41:27 5    Q.    And at that time, years later, sofosbuvir was

03:41:32 6    considered a game changer?

03:41:35 7    A.    Yes, Sovaldi was considered a wonderful breakthrough.

03:41:39 8    That's true.

03:41:39 9    Q.    It was highly anticipated?

03:41:41 10   A.    Yes.

03:41:42 11   Q.    At that time, a senior official at the FDA called the

03:41:47 12   launch of Sovaldi a significant shift in the treatment

03:41:52 13   paradigm for treatments with chronic hepatitis C?

03:41:55 14         MS. PARKER:  Your Honor, objection.  I do think

03:41:57 15   this is going beyond.

03:41:58 16         MR. WARDEN:  Your Honor, this is straight out of

03:41:59 17   Mr. Carter's report.

03:42:00 18         THE COURT:  All right.  I'll see counsel at

03:42:01 19   sidebar.  Feel free to stand up and stretch if you would

03:46:57 20   like.

03:46:57 21         THE WITNESS:  Your Honor, can I stand, too?

03:46:57 22         THE COURT:  Yes, if you'd like.

03:46:57 23         (Sidebar conference held.)

03:46:57 24         THE COURT:  All right.  So the objection is this

03:46:57 25   is beyond the scope of your direct.

03:46:57 1        MS. PARKER:  It is beyond the scope.  Yes, it

03:46:57 2   is beyond the scope.  And I don't see how it is relevant.  I

03:46:58 3   mean it's fine for him to ask the questions, and I

03:46:58 4   understand Your Honor's ruling before.  I'm not arguing

03:46:58 5   against that but I think we're going one step too far here.

03:46:58 6        THE COURT:  Okay.

03:46:58 7        MR. WARDEN:  Your Honor, all the information

03:46:58 8   we're asking about is in Mr. Carter's report.  It is

03:46:58 9   relevant to what he testified about, *Georgia-Pacific* factors

03:46:59 10  8 and 9, which is the advantages of the patent over old

03:46:59 11  modes.  The fact that Sovaldi was universally recognized as

03:46:59 12  a game changer as a breakthrough even 13 years after the

03:46:59 13  patent suggests what Sovaldi, the value that was coming from

03:46:59 14  Sovaldi wasn't related to the patents.  That that is not

03:46:59 15  what made it valuable.  Mr. Carter relies on all of this in

03:46:59 16  his expert report.  I'm simply going through information

03:46:59 17  that he has said he relied on in forming his opinion.

03:46:59 18       THE COURT:  Is it your view that it's relevant

03:46:59 19  simply by virtue at least of the fact that it's in his

03:47:00 20  report and he considered it?

03:47:00 21       MR. WARDEN:  Not only because he considered it.

03:47:00 22  That is part of why it is relevant, but it is relevant

03:47:00 23  because it goes to show what is the value of sofosbuvir as

03:47:00 24  compared to what the patents actually taught and whether the

03:47:00 25  patents are what generated that value.  That is what we're

03:47:01 1    here to find out is whether the patents are responsible or

03:47:01 2    how much of the value of sofosbuvir the patents are

03:47:01 3    responsible for.

03:47:01 4            THE COURT:  So if you would first address if

03:47:01 5    your expert put it in his report, isn't it true then that he

03:47:01 6    thinks it is relevant to his analysis?

03:47:01 7            MS. PARKER:  Your Honor, I'll withdraw my

03:47:01 8    objection.

03:47:01 9            THE COURT:  Was that a yes?

03:47:01 10           MS. PARKER:  Yes.  I withdraw any objections to

03:47:01 11   what is actually in his report, but when he is mixing it up

03:47:01 12   with him sitting in the courtroom, what he may or may not

03:47:01 13   have seen in the courtroom, I just think we're going, we're

03:47:01 14   going one step beyond.  But if there is something in his

03:47:02 15   report, I don't have an objection as to that.  But when it's

03:47:02 16   combined with here in the courtroom, this, that, and the

03:47:02 17   other, I think we have gone one step beyond.

03:47:02 18           THE COURT:  All right.  Do you want to respond?

03:47:02 19           MR. WARDEN:  Your Honor, if there is testimony

03:47:02 20   in the courtroom that contradicts or rebuts something

03:47:02 21   Mr. Carter had said, that is fair cross-examination whether

03:47:02 22   or not he put it in his report.

03:47:02 23           So, for example, if he has testified, as he has,

03:47:02 24   that the Idenix patents are responsible for a significant

03:47:02 25   amount of value of sofosbuvir, we're entitled to cross-examine

03:47:02 1  him on the point the Idenix patents have not generated any

03:47:02 2  commercial or monetary success for Idenix which suggests there

03:47:03 3  is not a lot of monetary value in those patents.

03:47:03 4          THE COURT:  Do you disagree with the idea that

03:47:03 5  if your expert is sitting in the trial and he hears

03:47:03 6  something and it is arguably inconsistent with his analysis

03:47:03 7  that it is fair to cross him on that?

03:47:03 8          MS. PARKER:  That is fair, if there is something

03:47:03 9  that is inconsistent with what he is saying.  This is going,

03:47:04 10 that is not our situation here.

03:47:04 11         THE COURT:  All right.  Well, at this point,

03:47:04 12 let's go back to where we are.  Is there anything that is

03:47:04 13 going on right now that you are objecting to that you need

03:47:04 14 me to rule on?

03:47:04 15         MS. PARKER:  No, Your Honor.  But we have, now

03:47:04 16 that we're up here, we have a totally different issue.  I'm

03:47:04 17 sorry.

03:47:04 18         THE COURT:  Let me make it clear.  Of course,

03:47:04 19 you can all object any time you want to a particular

03:47:04 20 question but it seems to me at least for this witness, in

03:47:04 21 his report, it's relevant and fair cross-examination.  It is

03:47:04 22 something he heard while he was here earlier in the trial

03:47:05 23 and that if it is inconsistent, then it is fair game for

03:47:05 24 cross-examination.

03:47:05 25         All right.  So what is the other issue?

03:47:05 1               **MS. PARKER:** Juror No. 7 is texting again, and

03:47:05 2  Mr. Day is our witness.

03:47:05 3               **MR. DAY:** As soon as you went to sidebar, she

03:47:05 4  picked up her purse and she has the phone on the top of her

03:47:06 5  purse.

03:47:06 6               **THE COURT:** It's the same juror that was

03:47:06 7  mentioned earlier?

03:47:06 8               **MR. DAY:** Yes.

03:47:06 9               **THE COURT:** Okay. Well, thank you for telling

03:47:06 10  me that.

03:47:06 11               I will have to think about what to do about

03:47:06 12  that. I'm pretty sure that we instructed them they were to

03:47:06 13  have their phones off in the courtroom.

03:47:06 14               **MS. PARKER:** You did.

03:47:06 15               **THE COURT:** We may not have precisely said

03:47:07 16  during sidebars you can't turn it back on, so maybe I have

03:47:07 17  to tell them that.

03:47:07 18               Are you asking me to do anything at this point?

03:47:07 19               **MS. PARKER:** I think we're good. Thank you.

03:47:07 20               **THE COURT:** All right. Anything?

03:47:07 21               **MR. WARDEN:** No, Your Honor.

03:47:07 22               **THE COURT:** All right. Thank you.

03:47:07 23               (Sidebar conference ends.)

03:48:16 24               **THE COURT:** We are ready to proceed.

03:48:19 25  BY MR. WARDEN:

03:48:19  1    Q.      Mr. Carter, let's continue where we left off.  At the

03:48:23  2    time of the sofosbuvir launch, a senior official at the FDA

03:48:26  3    call the launch of Sovaldi a significant shift in the

03:48:30  4    treatment paradigm for some patients with chronic wrong

03:48:34  5    Hepatitis C.

03:48:35  6    A.      Okay, yes.

03:48:37  7    Q.      Sovaldi was the first all oral interferon-free

03:48:42  8    treatment for Hepatitis C?

03:48:47  9    A.      Well, sofosbuvir was the first interferon-free

03:48:51 10    treatment.

03:48:52 11    Q.      And sofosbuvir was first approved under the brand

03:48:55 12    name Sovaldi?

03:48:57 13    A.      Sofosbuvir was first approved under the brand name

03:49:00 14    Sovaldi.  Depending on the genotype -- yes, I don't think

03:49:03 15    anyone is disputing that Sovaldi is a wonderful drug.

03:49:06 16    Q.      Interferon-free treatment was a big deal?

03:49:10 17    A.      Yes, for those patients for that specific type of

03:49:14 18    HCV, yes, it was a wonderful drug.

03:49:16 19    Q.      Because most untreated HCV patients remained

03:49:20 20    untreated due to the severe side effects of the interferon?

03:49:23 21    A.      Yes, true.

03:49:24 22    Q.      Interferon was part of the standard of care for

03:49:27 23    treating Hepatitis C before Sovaldi launched?

03:49:30 24    A.      I believe that's true, yes.

03:49:31 25    Q.      Let's talk about that preexisting standard of care

03:49:34 1   from before Sovaldi launched.

03:49:36 2               Under the preexisting standard of care, patients

03:49:39 3   had to take three different drugs.  Is that right?

03:49:45 4   A.      Three, I think so, it depends on the cocktail you

03:49:49 5   were looking at.  Yes, I think three was common.

03:49:52 6   Q.      One was a protease inhibitor?

03:49:55 7   A.      Yes.

03:49:56 8   Q.      Such as Merck's Victrelis product?

03:49:58 9   A.      Yes.

03:49:58 10  Q.      One was daily doses of ribavirin?

03:50:02 11  A.      Yes.

03:50:02 12  Q.      And patients also had to have multiple injections of

03:50:06 13  interferon every week?

03:50:07 14  A.      Yes.

03:50:08 15  Q.      That treatment would last from 24 to 48 weeks?

03:50:19 16  A.      Again, it depends on the type.  But yes.

03:50:21 17  Q.      It could last almost a year?

03:50:24 18  A.      I don't remember the total length.  But, yes, it

03:50:27 19  could last quite a while.

03:50:28 20  Q.      During that time the patients would suffer from

03:50:31 21  significant side effects?

03:50:32 22  A.      Yes, true.

03:50:33 23  Q.      The side effects from interferon and ribavirin

03:50:37 24  include constant flu-like symptoms?

03:50:40 25  A.      Yes, that could happen.

03:50:41 1    Q.    Nausea and diarrhea?

03:50:44 2    A.    Yes.

03:50:44 3    Q.    Abdominal pain?

03:50:46 4    A.    Yes, that's true.

03:50:47 5    Q.    Seizures?

03:50:51 6    A.    I don't remember seizures specifically.  But I will

03:50:53 7    take your word for it.  I know there was a long list of

03:50:56 8    potential side effects, that's true.

03:50:57 9    Q.    And some patients couldn't undergo treatment with

03:51:01 10   interferon at all?

03:51:03 11   A.    I believe that's true, yes.

03:51:04 12   Q.    For example, pregnant women?

03:51:09 13   A.    I don't remember all the specifics.  But I know there

03:51:11 14   were patients that couldn't take interferon.  That is

03:51:14 15   definitely true.

03:51:15 16   Q.    For those patients who could undergo the treatment,

03:51:18 17   after going through the up to 48 weeks with those side

03:51:23 18   effects, there was no guarantee they would be cured?

03:51:26 19   A.    True.

03:51:26 20   Q.    For example, the cure rates for patients treated with

03:51:31 21   Merck's Victrelis product were between 63 and 66 percent?

03:51:36 22   A.    I will take your word for the percentages.  I don't

03:51:40 23   have them memorized.  It was not as good as Sovaldi, that's

03:51:43 24   true.

03:51:43 25   Q.    With Sovaldi, things changed?

03:51:46 1    A.      Yes.

03:51:47 2    Q.      Treatment time drops to as little as 12 weeks?

03:51:51 3    A.      Yes, I agree.

03:51:54 4    Q.      Cure rates jump to as high as 97 percent?

03:51:58 5    A.      Depending upon the type of HCV, yes.

03:52:01 6    Q.      Many patients didn't even need interferon anymore?

03:52:07 7    A.      Depending on what Sovaldi was mixed with, yes, that

03:52:10 8    was true.

03:52:10 9    Q.      Leading to less severe side effects?

03:52:12 10   A.      Yes, true.

03:52:15 11   Q.      Now, as you have alluded to, with Sovaldi, some

03:52:18 12   patients still needed ribavirin and/or interferon?

03:52:22 13   A.      Yes.

03:52:22 14   Q.      But ten months after Sovaldi launched, Gilead

03:52:27 15   launched Harvoni?

03:52:30 16   A.      Yes, that's true.

03:52:31 17   Q.      Harvoni became the first therapy to not require

03:52:36 18   administration with either ribavirin or interferon?

03:52:42 19   A.      From Gilead, yes, true, yes.

03:52:46 20   Q.      Leading to far less significant side effects?

03:52:52 21   A.      Yes.

03:52:52 22   Q.      Now, Harvoni, you talked about on your direct

03:52:57 23   examination, is a combination of two drugs?

03:53:00 24   A.      Yes, ledipasvir and sofosbuvir.

03:53:03 25   Q.      And then combined into a single pill?

03:53:07 1    A.    That's true.

03:53:07 2    Q.    Patients treated with Harvoni could take just that

03:53:11 3    one pill once a day?

03:53:14 4    A.    Yes.

03:53:14 5    Q.    For as little as eight weeks?

03:53:17 6    A.    Yes.

03:53:17 7    Q.    And more than 90 percent of them would be cured?

03:53:22 8    A.    Yes.

03:53:22 9    Q.    Mr. Carter, I would now like to discuss your opinion

03:53:38 10   on what Gilead would have agreed to pay to Idenix as a

03:53:42 11   reasonable royalty.

03:53:46 12          You testified in your direct examination about

03:53:48 13   the Pharmasset-Roche agreement?

03:53:51 14   A.    Yes.

03:53:52 15   Q.    You said that was comparable to the hypothetical

03:53:55 16   license?

03:53:56 17   A.    Yes.

03:53:57 18   Q.    You agree that in order for you to rely on a royalty

03:54:01 19   rate in another license as part of your analysis, that other

03:54:05 20   license has to be comparable to the hypothetical license?

03:54:09 21   A.    It has to have some compatibility, yes.

03:54:10 22   Q.    It has to be economically and technologically

03:54:14 23   comparable?

03:54:17 24   A.    Yes.  You can consider it, if it's comparable, yes,

03:54:21 25   you can.

03:54:21  1    Q.      And if it is not economically and technologically

03:54:25  2    comparable, you can't consider it?

03:54:27  3    A.      You can -- you look at the license for compatibility

03:54:30  4    and you take the information from it, recognizing that no

03:54:33  5    license is perfect, and you use that as part of your

03:54:37  6    analysis.

03:54:38  7    Q.      And if you conclude that a license is not

03:54:40  8    technologically or economically comparable, you can't use

03:54:44  9    it?

03:54:44 10    A.      That's true.

03:54:44 11    Q.      Let's compare the Pharmasset-Roche license to the

03:54:50 12    hypothetical license.  Turn in your binder to PX-1132?

03:54:59 13            THE COURT:  One of the two binders.

03:55:02 14    BY MR. WARDEN:

03:55:02 15    Q.      The smaller of the two binders that I just gave you

03:55:06 16    will have that exhibit.

03:55:07 17    A.      Okay.

03:55:09 18            MR. WARDEN:  Your Honor, PX-1132 is already in

03:55:12 19    evidence.

03:55:13 20    BY MR. WARDEN:

03:55:13 21    Q.      Can you put up PX-1132 on the screen.

03:55:24 22            PX-1132 is the Pharmasset-Roche agreement you

03:55:28 23    testified about during your direct examination?

03:55:30 24    A.      Yes.

03:55:30 25    Q.      PX-1132 is not just a patent license, is it?

03:55:38 1    A.      PX-1132, it's a license agreement that has more than

03:55:42 2    just patent rights in it.  That's true.

03:55:44 3    Q.      In fact, if we look at the top of PX-1132, it's not

03:55:48 4    even described as a patent license, is it?

03:55:50 5    A.      It's described as a collaboration agreement.

03:55:52 6    Q.      A collaboration agreement.  Let's look at what was

03:55:55 7    agreed to in that collaboration agreement.

03:56:00 8            Turn to Page 9 of PX-1132.  If you look towards

03:56:11 9    the bottom of Page 9, there is a provision that says Grants;

03:56:18 10   Option.

03:56:19 11           Do you see that?

03:56:19 12   A.      Yes.

03:56:20 13   Q.      And this section specifies what Pharmasset is

03:56:24 14   licensing to Roche.  Correct?

03:56:25 15   A.      Yes.

03:56:25 16   Q.      And the provision states that Pharmasset is giving

03:56:28 17   Roche a license with respect to primary compound?

03:56:32 18   A.      Yes.

03:56:33 19   Q.      You understand that the primary compound refers to

03:56:35 20   PSI-6130?

03:56:38 21   A.      Right.

03:56:38 22   Q.      And we have heard about 6130 during this trial,

03:56:42 23   haven't we?

03:56:42 24   A.      Yes, we have.  The Jeremy Clark compound.

03:56:45 25   Q.      The Jeremy Clark compound.  You understand that

03:56:48 1 PSI-6130 was developed by Pharmasset, Mr. Jeremy Clark?

03:56:53 2 A.    Yes, that's true.  They are licensing it.  That's

03:56:55 3 what's going on.

03:56:56 4 Q.    It was considered a very promising compound?

03:56:58 5 A.    Yes.

03:56:58 6 Q.    Section 2.1 states that with respect to the primary

03:57:07 7 compound, with respect to PSI-6130, Pharmasset is granting

03:57:12 8 Roche a license to a couple of things.

03:57:17 9 A.    Yes.

03:57:17 10 Q.    One of those things is Pharmasset's patent rights?

03:57:20 11 A.    Yes.

03:57:20 12 Q.    And the other is Pharmasset's know-how?

03:57:24 13 A.    Yes.

03:57:26 14 Q.    Let's look and see what know-how means in this

03:57:30 15 agreement.  Would you turn back to Page 5.  You see the top

03:57:39 16 of Page 5 there is a definition of know-how?

03:57:43 17 A.    Yes.

03:57:43 18 Q.    It lists -- has a list of things that are considered

03:57:48 19 know-how.

03:57:52 20 A.    Yes, I agree.

03:57:52 21 Q.    That includes data.  Is that right?

03:57:59 22 A.    Yes.

03:57:59 23 Q.    It includes knowledge and information?

03:58:04 24 A.    Yes, that's what it says.

03:58:05 25 Q.    It includes materials and samples?

03:58:10 1  A.      Yes.

03:58:11 2  Q.      Pharmasset is giving Roche the physical compound?

03:58:16 3  A.      As part of this agreement, depending on how it's

03:58:20 4  defined, right, that's right what the document is saying,

03:58:22 5  yes.

03:58:22 6  Q.      It considers several types of data, chemical and

03:58:26 7  manufacturing, toxicological, pharmacological, preclinical,

03:58:30 8  testing data?

03:58:31 9  A.      Yes.

03:58:32 10  Q.      It includes assays, platforms, formulations,

03:58:37 11  specifications, quality control?

03:58:39 12  A.      Yes.

03:58:40 13  Q.      These are all things that Pharmasset is giving to

03:58:44 14  Roche separate from any patent rights?

03:58:46 15  A.      That's true, yes.

03:58:47 16  Q.      Let's compare that to the hypothetical license.  The

03:58:55 17  hypothetical license would be a license between Gilead and

03:58:59 18  Idenix?

03:59:01 19  A.      That's correct.

03:59:01 20  Q.      It would be what is called a bare patent license?

03:59:06 21  A.      Yes.

03:59:07 22  Q.      Meaning the only thing Gilead would be getting from

03:59:10 23  Idenix is the patent rights?

03:59:12 24  A.      That's true, yes.

03:59:13 25  Q.      Gilead would not be getting data?

03:59:17 1    A.     That's true.

03:59:18 2    Q.     Gilead would not be getting knowledge and

03:59:22 3  information?

03:59:22 4    A.     That's true, yes.

03:59:23 5    Q.     Gilead would not be getting materials and samples?

03:59:27 6    A.     Yes, true.

03:59:28 7    Q.     Idenix would not be providing Gilead with the

03:59:31 8  actual -- any actual physical compound?

03:59:35 9    A.     That's true, yes.

03:59:36 10    Q.     Gilead wouldn't be getting any compound at all from

03:59:39 11  Idenix?

03:59:41 12    A.     Physically in a vial, that's true, yes.

03:59:44 13    Q.     Gilead had developed its own compound?

03:59:48 14    A.     Yes.

03:59:48 15    Q.     Gilead would not be getting any of this data from

03:59:53 16  Idenix?

03:59:54 17    A.     Yes, I agree.

03:59:55 18    Q.     It would not be getting assays, platforms,

03:59:58 19  formulations, specifications, or quality control?

04:00:02 20    A.     Yes, I agree.

04:00:03 21    Q.     The only thing Gilead gets in the hypothetical

04:00:06 22  license is the patent rights?

04:00:07 23    A.     Yes, I agree.

04:00:08 24    Q.     Two more questions about the Pharmasset-Roche

04:00:13 25  agreement.  Roche was never actually able to develop

04:00:16 1    PSI-6130 into a commercial drug.  Correct?

04:00:21 2    A.    It's true that the drug in the end never made it to

04:00:24 3    market, that's true.

04:00:25 4    Q.    So the total royalties that Roche ever actually paid

04:00:29 5    under this license was zero dollars?

04:00:32 6    A.    That is not true, no.

04:00:33 7    Q.    The total royalties that Roche ever paid under this

04:00:36 8    license for sales of a commercial product was zero dollars?

04:00:40 9    A.    For sales, that's true.  There were other royalties

04:00:43 10   paid.  This license had Pharmasset paying over a hundred

04:00:47 11   million dollars of additional money.  And some portion of

04:00:50 12   that was paid because no sales were paid.  Ultimately no

04:00:55 13   sales-related royalties were paid, that's true.

04:00:58 14   Q.    No royalties were paid at the 12 to 18 percent

04:01:02 15   royalty rate that you testified about in your direct

04:01:05 16   examination?

04:01:05 17   A.    The parties expected to pay that if the drug got to

04:01:07 18   market.  It never did, so no royalties were paid.)

04:01:13 19   Q.    Let's move on to the discussion of the Merck-Roche

04:01:16 20   license, the other license we talked about in your direct

04:01:18 21   examination.

04:01:19 22         You also testified that in your opinion the

04:01:22 23   Merck-Roche license is comparable to the hypothetical

04:01:25 24   license?

04:01:25 25   A.    Yes, sir.

04:01:26 1   Q.      Let's again compare the Merck-Roche license to the

04:01:31 2   hypothetical license.  The hypothetical license would be a

04:01:36 3   license to a single patent?

04:01:39 4   A.      That's true.

04:01:40 5   Q.      Idenix's '597 patent?

04:01:42 6   A.      That's true.

04:01:43 7   Q.      By contrast, the Merck-Roche license included a

04:01:47 8   license to a whole portfolio of patents?

04:01:51 9   A.      Well, actually, the Merck-Roche license, when it was

04:01:54 10  signed, had one U.S. patent, that had just I think two

04:02:00 11  claims.  It was one patent with two claims.  Then there were

04:02:02 12  some patent applications that were still in the Patent

04:02:04 13  Office, plus some foreign patents, which is why I

04:02:07 14  wouldn't -- there was that chart for Merck-Roche.  Remember,

04:02:10 15  there were sort of different royalty rates for U.S. or not

04:02:14 16  U.S.  But at the time the license was signed, it was just

04:02:16 17  one patent.

04:02:17 18  Q.      The Merck-Roche license included licenses to a

04:02:20 19  portfolio of worldwide patents and patent applications?

04:02:26 20  A.      Worldwide, true.  In the U.S., it was just the one

04:02:29 21  U.S. patent.

04:02:30 22  Q.      There were three patents or patent applications from

04:02:32 23  the U.S. in the Merck-Roche license?

04:02:36 24  A.      There were -- there were two other patent

04:02:39 25  applications.  There were patents that were in the Patent

04:02:43 1   Office, they were not patents yet.  That's true.

04:02:45 2   Q.    If those patents issued, they would be included in

04:02:49 3   the license that Roche was taking from Merck?

04:02:52 4   A.    If they issued, then they would have been.  If they

04:02:55 5   didn't issue, then they wouldn't have.  At the time, it was

04:02:59 6   a "maybe."

04:02:59 7   Q.    Let's look at the parties to the license, the

04:03:04 8   Merck-Roche license, as compared to the hypothetical

04:03:06 9   license.

04:03:11 10          Actually, one of the slides you prepared, can we

04:03:15 11  get Slide No. 16.  We are looking at Factor 5, the

04:03:22 12  commercial relationship between the licensor (Idenix) and

04:03:26 13  licensee (Gilead).  This is not one of the factors you

04:03:31 14  testified about on your direct examination.  Right?

04:03:32 15  A.    Right, I did not mention this factor.

04:03:34 16  Q.    What you have on your slide there is not the full

04:03:36 17  text of *Georgia-Pacific* Factor No. 5, is it?

04:03:40 18  A.    Correct.  That's a shorthand.

04:03:41 19  Q.    The full sentence is, The commercial relationship

04:03:44 20  between the licensor and licensee such as whether they are

04:03:49 21  competitors in the same territory in the same line of

04:03:52 22  business, or whether they are inventor and promoter.

04:03:56 23  A.    Correct.

04:03:56 24  Q.    At the time of the Merck-Roche license, Merck and

04:04:01 25  Roche were competitors in the same territory in the same

04:04:04   1    line?

04:04:07   2    A.    Well, we have to be careful.  They were competitors,

04:04:09   3    it's true.  But they were also looking to work together.  So

04:04:14   4    in the broader sense they were competitors, in relation to

04:04:18   5    just the particular drug they were more like collaborators.

04:04:21   6    Q.    They had competing products in the market for

04:04:25   7    treating Hepatitis C?

04:04:27   8    A.    Again, hold on.  In that license, Roche had their --

04:04:35   9    in that license, that was an HCV license where Roche was

04:04:39  10    also selling Pegylated Interferon.  Merck had a product they

04:04:44  11    wanted to sell with Roche's Pegylated interferon.  That is

04:04:49  12    why I say you got to be careful because in the big picture

04:04:51  13    they were competitors.  But related to the situation, they

04:04:55  14    were acting more like collaborators.

04:04:57  15    Q.    They had competing products in the market for

04:05:01  16    treating Hepatitis C?

04:05:03  17    A.    I just explained it.  There was the HCV product that

04:05:08  18    Roche was coming out with and Merck had a product that they

04:05:12  19    wanted to use with Roche's Pegylated Interferon, which was

04:05:16  20    the biggest selling product in the market at the time.  So

04:05:19  21    that's why I say, they were competitors globally, but they

04:05:23  22    were working together here.  It was more a collaboration

04:05:28  23    issue here.

04:05:29  24    Q.    Let's get more specific.  Merck and Roche were two

04:05:33  25    companies selling competing Pegylated Interferon products?

04:05:38 1    A.      I believe Merck had a Pegylated Interferon product.

04:05:40 2    But again, Roche was the interferon leader that Merck had a

04:05:43 3    product that was going to be sold with interferon and they

04:05:46 4    wanted the benefit of -- Merck wanted the benefit of Roche's

04:05:50 5    market leading position.

04:05:51 6    Q.      And Merck, as you said, had its own peculiar

04:05:56 7    interferon brand of Pegasus?

04:05:58 8    A.      I don't remember the name.

04:06:00 9    Q.      Roche sold the Pegasus brand of Pegylated Interferon?

04:06:06 10   A.      Be Merck itself had its own plan, and Merck wanted to

04:06:10 11   sell a product with PEG interferon at the time.

04:06:14 12   Q.      Merck also and Roche were also selling competing

04:06:18 13   brands of rivotril?

04:06:20 14   A.      I believe that's true, yes.

04:06:21 15   Q.      Merck sold the rivotril brand?

04:06:23 16   A.      I don't remember, but yes.

04:06:24 17   Q.      And Merck sold the Pegasys brand?

04:06:28 18   A.      Yes, that's true.

04:06:28 19   Q.      As we discussed, ribavirin and interferon were two of

04:06:32 20   the three parts of the standard of care for treating

04:06:34 21   Hepatitis C at the time?

04:06:35 22   A.      Yes.

04:06:35 23   Q.      Merck and Roche were competing for sales of two of

04:06:38 24   the three products that were used for the standard of care

04:06:41 25   of treating Hepatitis C at the time?

04:06:44 1    A.      As I said, in the big picture, they are competing,

04:06:48 2    but in the specific instance there was also, Merck wanted to

04:06:52 3    collaborate, they wanted to piggy-back back on Roche's

04:06:56 4    interferon sales.

04:06:56 5    Q.      Let's talk now about the parties to the hypothetical

04:07:02 6    negotiation.

04:07:03 7            Those parties would be Gilead and Idenix?

04:07:06 8    A.      Yes.

04:07:06 9    Q.      At the time of the hypothetical license, Gilead and

04:07:12 10   Idenix did not have any products competing in the HCV

04:07:16 11   market?

04:07:17 12   A.      At the time, neither of them had a product in the HCV

04:07:21 13   market.  But they expected -- I mean, you just heard the

04:07:24 14   testimony of the Gilead person talking about they looked at

04:07:29 15   Idenix as a competitor.  They didn't have a product then.

04:07:32 16   But looking forward, there was expectations of competition.

04:07:37 17   Q.      You heard the testimony of Mr. Meyers a moment ago?

04:07:40 18   A.      Yes.

04:07:40 19   Q.      He stated that Gilead considered Idenix a competitor

04:07:44 20   from a drug development standpoint but not from a commercial

04:07:49 21   standpoint?

04:07:50 22   A.      Right.  They were competitors from that perspective,

04:07:53 23   but they weren't competitors from the perspective of selling

04:07:56 24   right then because they both didn't have a product on the

04:07:58 25   market.  That was a future consideration.

04:08:00 1    Q.    At the time of the hypothetical negotiation, Gilead

04:08:02 2    was launching Sovaldi imminently?

04:08:06 3    A.    Yes.

04:08:06 4    Q.    At the time of the hypothetical negotiation, Idenix

04:08:09 5    was years from having a product on the market?

04:08:13 6    A.    There was some number of years, yes, true.

04:08:15 7    Q.    To this day, Idenix doesn't have a product on the

04:08:18 8    market?

04:08:19 9    A.    That's true, yes.

04:08:20 10   Q.    All right.  I want to talk about the products

04:08:29 11   licensed in the hypothetical negotiation as compared to

04:08:33 12   those licensed in the Merck-Roche license.  To do this, I

04:08:36 13   want to use the slides you prepared.  Can we get Carter

04:08:40 14   Slide No. 7.

04:08:45 15         So in this slide you had talked about some

04:08:47 16   things that Roche did, and then on the next slide, if we can

04:08:52 17   get it, have compared that to some of the things that Gilead

04:08:57 18   did.  Right?

04:08:58 19   A.    These are the things Gilead did and the other slide

04:09:02 20   are the things that Roche did or was expected to do under

04:09:04 21   the license, yes.

04:09:05 22   Q.    Let's talk about the first column here.  On your

04:09:09 23   direct examination you talked about both sides having to

04:09:12 24   have a compound for treating HCV?

04:09:15 25   A.    Yes.

04:09:16 1    Q.    And you had said that this is -- they need to have

04:09:19 2    the thing that would cure patients?

04:09:22 3    A.    Yes.

04:08:18 4    Q.    Roche's product RD728 has never been approved to cure

04:08:25 5    any patients?

04:08:27 6    A.    I think it has come out, the Roche product, there was

04:08:31 7    high hopes for it but eventually the Roche drug it didn't

04:08:35 8    make it.  They tried, it didn't work.

04:08:37 9    Q.    By contrast, sofosbuvir was considered a paradigm

04:08:42 10   shift in the treatment of HCV?

04:08:45 11   A.    Yes, sofosbuvir worked.  Yes, Gilead's drug worked.

04:08:48 12   Q.    A game changer?

04:08:50 13   A.    Yes.

04:08:50 14   Q.    It has been curing patients?

04:08:52 15          MS. PARKER:  Objection to cumulative.

04:08:54 16          THE COURT:  Overruled.

04:08:58 17   BY THE WITNESS:

04:08:58 18   A.    What was the question?

04:08:59 19   Q.    It has been curing patients?

04:09:00 20   A.    Yes.

04:09:01 21   Q.    Let's move on to a couple of the others.  Go through

04:09:06 22   clinical trials and seek and obtain FDA approval.

04:09:09 23          At the time of the hypothetical or, excuse me,

04:09:12 24   at the time of the Merck/Roche negotiations in 2011, these

04:09:18 25   aren't things that Roche had completed?

04:09:20  1    A.      True.   These were, this was on their to do list.   It

04:09:24  2    was what they were expected to do.   They hadn't done it.

04:09:28  3    Well, I take it back.   They had actually gone through Phase

04:09:31  4    I and I think even part of Phase II trials.   The drug hadn't

04:09:35  5    been through the trials yet because eventually it didn't

04:09:38  6    make it, but they were in testing at the time.

04:09:39  7    Q.      And my question was these are things that Roche had

04:09:42  8    not yet completed?

04:09:43  9    A.      True, they had not completed it.   Yes.

04:09:45 10    Q.      And there was no guarantee that Roche would ever

04:09:48 11    complete it?

04:09:48 12    A.      That's true.

04:09:48 13    Q.      And, in fact, Roche never completed these steps?

04:09:53 14    A.      It's true the drug never made it to market.

04:09:55 15    Q.      Roche's drug never obtained FDA approval?

04:09:59 16    A.      As I said, it never made it to market.   That's true.

04:10:01 17    Q.      At the hypothetical negotiation, these are tasks that

04:10:05 18    Gilead would have already completed?

04:10:08 19    A.      No.   At the hypothetical negotiation, this would have

04:10:11 20    been completed for Sovaldi.   For Harvoni, which is more than

04:10:17 21    half the sales, Harvoni wasn't FDA approved yet.   That was

04:10:22 22    still almost a year away.

04:10:24 23            But in a way, that is neither here nor there

04:10:27 24    because the important thing is Roche expected to do these

04:10:29 25    things.   They signed the license agreement and they decided

04:10:32 1  who was going to do what.  In the end, the Roche product

04:10:35 2  didn't work.

04:10:36 3  Q.    Mr. Carter, let me make my question more simple.

04:10:39 4        At the time of the hypothetical negotiation,

04:10:42 5  Gilead had already obtained FDA approval for Sovaldi?

04:10:45 6  A.    For Sovaldi, not Harvoni, that's true.

04:10:47 7  Q.    At the time of the 2011 Merck/Roche negotiations,

04:10:52 8  there was no guarantee that Roche would ever sell the

04:10:55 9  product?

04:10:56 10 A.    Well, that's true.  They did the licensing before

04:11:00 11 their product was through trials.

04:11:02 12 Q.    And they never did sell the product?

04:11:04 13 A.    That's true.

04:11:04 14 Q.    At the time of the hypothetical negotiation, Gilead

04:11:08 15 and Idenix knew that Gilead would begin selling Sovaldi

04:11:14 16 imminent?

04:11:15 17 A.    Sovaldi yes, Harvoni no.  But Sovaldi they knew was

04:11:18 18 going to market, yes.

04:11:19 19 Q.    And their expectations was that it would be highly

04:11:21 20 successful?

04:11:22 21 A.    Yes, that's true.

04:11:23 22 Q.    Now, you testified on your direct -- Mr. Sayres, you

04:11:50 23 can take the slide down.

04:11:51 24        You testified in your direct examination that

04:11:53 25 you believe that the appropriate compensation for a

04:11:58 1  hypothetical license to the '597 patent is $2.54 billion.

04:12:04 2  A.    Well, I testified that it's 10 percent is the right

04:12:07 3  royalty rate.  Then, mathematically, it work out to

04:12:11 4  $2.5 billion.

04:12:13 5  Q.    And that is for a license to the '597, a hypothetical

04:12:16 6  license to the '597 patent?

04:12:18 7  A.    Yes.

04:12:18 8  Q.    Just to that one patent as we discussed.

04:12:21 9  A.    Yes.

04:12:21 10  Q.    When Idenix retained you in this case, there were

04:12:26 11  three patents at issue.

04:12:30 12  A.    Yes, that's true.

04:12:31 13  Q.    And Idenix retained you to identify the appropriate

04:12:34 14  compensation with respect to three patents.

04:12:40 15  A.    Well, they technically retained me to find the

04:12:43 16  appropriate damages in the case is what they found, is what

04:12:45 17  they asked me to do.

04:12:46 18  Q.    And with respect to three patents?

04:12:48 19  A.    At the time, there were three patents at issue.

04:12:52 20  That's true.

04:12:52 21  Q.    And you were specifically retained to identify the

04:12:56 22  appropriate compensation for each of those three patents.

04:13:00 23  A.    No, I wasn't asked to find the compensation on a

04:13:03 24  patent-by-patent basis.  I was asked to find the appropriate

04:13:06 25  damages, and as you know, as I state in my report, that is

04:13:12 1  what I have done.

04:13:13 2  Q.      Mr. Carter, as you just alluded to, you prepared an

04:13:17 3  expert report that summarizes the opinion you have in this

04:13:21 4  case; correct?

04:13:21 5  A.      Yes, sir.

04:13:23 6  Q.      And in that expert report, you accurately reported

04:13:26 7  your opinion?

04:13:26 8  A.      Yes.

04:13:26 9  Q.      You signed that expert report?

04:13:28 10 A.      Yes, sir.

04:13:28 11 Q.      Mr. Carter, I want you to look in the bigger of the

04:13:36 12 two binders that I gave you.  In the second tab, that's the

04:13:47 13 expert report that you prepared in this case.  Is that

04:14:00 14 correct?

04:14:00 15 A.      Yes.

04:14:00 16 Q.      Mr. Carter, I'm going to direct your attention to

04:14:03 17 page 1 under the paragraph summary of assignment.

04:14:07 18         Mr. Sayres, can you put that up on the screen?

04:14:16 19         and specifically, beginning right here

04:14:19 20 (indicating).  Do you see where I'm pointing?  Oops.

04:14:27 21 A.      Yes.

04:14:27 22 Q.      You write:  I was asked to analyze certain

04:14:32 23 accounting, financial, marketing, and other business data in

04:14:35 24 order to identify the compensation that would be appropriate

04:14:38 25 for Idenix to receive in the event that U.S. Patent No.

04:14:44 1    6,914,054, the "'054 patent," U.S. Patent No. 7,608,597, the

04:14:55 2    "'597 patent," and U.S. Patent No. 7,608,600, the "'600

04:14:59 3    patent," collectively, the patents-in-suit, are held valid

04:15:02 4    and infringed by Gilead Sciences, Inc.

04:15:05 5            Correct?

04:15:06 6    A.    Yes.

04:15:12 7    Q.    Mr. Carter, when you initially formed your opinion in

04:15:15 8    this case, all three patents were still at issue?

04:15:17 9    A.    Yes, that's true.

04:15:18 10   Q.    Two of those patents are not at issue at this trial?

04:15:23 11   A.    That's true.

04:15:24 12   Q.    You have told the jury that it's still your opinion

04:15:28 13   that the appropriate damages in this case is $2.54 billion?

04:15:34 14   A.    That's true, yes.

04:15:35 15   Q.    And, Mr. Carter, in your opinion, Gilead should pay

04:15:38 16   the same for a license to just the '597 patent as they would

04:15:43 17   pay for a license to all three patents?

04:15:45 18   A.    Well, yes, that's true, which is the very nature of

04:15:49 19   licensing.  If you recall, he was cross-examining me on the

04:15:54 20   Merck/Roche license and saying, oh, the royalty would be the

04:15:58 21   same if it was the one patent or if those two other patent

04:16:02 22   applications issued.  That's true.  The license rate doesn't

04:16:04 23   go up or down if the number of patents changes.

04:16:08 24           In the Pharmasset/Roche license, for example,

04:16:11 25   that is a license for the patents that Pharmasset has, and

04:16:14 1    the royalty rate doesn't change as patents, different

04:16:19 2    patents come off patent.  Those license agreements are very

04:16:21 3    consistent with what we see in the other agreements in this

04:16:25 4    case, which is the agreement is in force at a certain rate,

04:16:28 5    and that rate is unchanging with the number of patents, and

04:16:31 6    it stays that way until the last of the patents expires.

04:16:34 7    Q.     Mr. Carter, we're on the clock.  The jury is on the

04:16:38 8    clock.  I would ask you simply to respond to the questions I

04:16:41 9    ask.  Your counsel --

04:16:41 10          MS. PARKER:  Objection, argumentive.

04:16:44 11          THE COURT:  Overruled.

04:16:44 12   BY MR. WARDEN:

04:16:57 13   Q.     Mr. Carter, I want to put up Slide No. 13 from your

04:17:02 14   demonstrative?

04:17:02 15          Mr. Sayres, can you put that up?

04:17:05 16          Mr. Carter, you testified that you used as your

04:17:13 17   royalty base this $25.4 billion?

04:17:17 18   A.     Yes.

04:17:18 19   Q.     You described this as the whole pie.

04:17:21 20   A.     Consistent with the license agreements in this

04:17:23 21   matter, yes.

04:17:23 22   Q.     And when you say the whole pie, you mean that this is

04:17:28 23   100 percent of the sales revenue for sofosbuvir after you

04:17:31 24   have made the 5 percent adjustment that you said is

04:17:35 25   customary in the industry?

04:17:36 1    A.      That is not true, no.

04:17:37 2    Q.      Excuse me.  Mr. Carter, 100 percent of the sales

04:17:41 3    revenue for sofosbuvir, not for Sovaldi and Harvoni, for

04:17:45 4    sofosbuvir.  Is that correct?

04:17:46 5    A.      Consistent with the license agreements, yes.  This

04:17:49 6    is the sales of Sovaldi and then the Sovaldi portion of

04:17:55 7    Harvoni.

04:17:56 8    Q.      Mr. Carter, you are familiar with the concept or the

04:18:00 9    legal rule called the Entire Market Value Rule?

04:18:03 10   A.      I am familiar with that rule, yes.

04:18:05 11   Q.      And you considered the Entire Market Value Rule as

04:18:08 12   part of your opinion in this case?

04:18:09 13   A.      No.  What I did was I used comparable license

04:18:14 14   agreements to come up with my opinion, and then as you know,

04:18:18 15   in my report, I also mention there is this other concept,

04:18:22 16   sort of a different pathway that uses the Entire Market

04:18:27 17   Rule.  And I made some comments about that other pathway,

04:18:30 18   that I took the path of looking at comparable license

04:18:34 19   agreements to come up with my answer.

04:18:36 20   Q.      Mr. Carter, let's have you turn again to Tab 2 in the

04:18:40 21   bigger binder of your expert report.  I'm going to direct

04:18:47 22   your attention to page 29.

04:18:54 23           Mr. Sayres, can you put up page 29 of

04:18:59 24   Mr. Carter's -- yes, that's the one.

04:18:59 25   BY MR. WARDEN:

04:19:06  1   Q.      Mr. Carter, this is your expert report?

04:19:10  2   A.      Yes.

04:19:10  3   Q.      You write here, Entire Market Value Rule?

04:19:14  4   A.      Yes.  This is the, this is the section where I

04:19:18  5   mention the Entire Market Value Rule, yes.

04:19:20  6   Q.      And your understanding is under the Entire Market

04:19:23  7   Value Rule, if you want to use the whole pie, as you

04:19:25  8   described it, you have to establish that the patents are the

04:19:29  9   basis for customer demand for the product?

04:19:32 10   A.      If you go down that, if you go down that Entire

04:19:37 11   Market Value Rule pathway, then the courts tend to say --

04:19:43 12   and forgive me, Your Honor, I'm just answering his question.

04:19:46 13   The courts tend to say you want to look at the basis for

04:19:50 14   customer demand but the courts also say then look at being

04:19:53 15   at the smallest saleable practicing unit.  But that is a

04:19:57 16   whole different path.

04:19:58 17   Q.      As part of your analysis, you had conversations with

04:20:02 18   some scientific experts retained on behalf of Idenix?

04:20:06 19   A.      That's true.

04:20:06 20   Q.      You spoke to a Dr. Meier and a Dr. Glenn?

04:20:09 21   A.      Yes.

04:20:09 22   Q.      And based on those conversations, you attributed the

04:20:12 23   therapeutic value of sofosbuvir to the active metabolites of

04:20:17 24   sofosbuvir that are covered by Idenix's patents?

04:20:20 25   A.      As I understand it, the metabolites cure you and the

04:20:27 1    patent in this case covers the metabolite and becomes the

04:20:32 2    use of the metabolite.

04:20:33 3    Q.    And because you attributed the therapeutic benefit of

04:20:36 4    sofosbuvir to the active metabolites in Idenix's patents,

04:20:40 5    you concluded that it was appropriate to calculate a running

04:20:43 6    royalty on the whole pie?

04:20:47 7    A.    Let's be careful.  What I did was I looked at the

04:20:51 8    comparable license agreements, looked at how people did in

04:20:54 9    the industry, and I came up with my royalty rate based on

04:20:58 10   those agreements.

04:20:58 11              I also comment that the active metabolite as I

04:21:04 12   understand it is what cures you and the patent in this case

04:21:08 13   covers the active metabolite.

04:21:11 14   Q.    Let's go back to your report.  You state:  As the

04:21:15 15   patent in suit covers the active metabolite that is

04:21:18 16   responsible for the therapeutic benefit of sofosbuvir for

04:21:21 17   treating HCV infection and methods of treatment that provide

04:21:24 18   such metabolites, it is appropriate to calculate a running

04:21:28 19   royalty on the adjusted U.S. net sales of Sovaldi and

04:21:31 20   Harvoni, as calculated above.  Right?

04:21:35 21   A.    I'm saying if you deciding to go down -- if you do an

04:21:38 22   Entire Market Value Rule type of analysis, if you do that,

04:21:41 23   then from what I understand, the metabolites are covered by

04:21:46 24   the patent-in-suit.

04:21:46 25   Q.    This isn't the first time that you offered an opinion

04:21:50 1    regarding the appropriate reasonable royalty for a

04:21:54 2    hypothetical license to a patent covering sofosbuvir?

04:21:58 3    A.        That's true.

04:21:58 4    Q.        You offered an opinion in another case involving some

04:22:03 5    different patents assigned to a different company; correct?

04:22:08 6    A.        Yes, that's true.

04:22:09 7    Q.        And in that opinion, you spoke with some different

04:22:13 8    scientific experts who are retained on behalf of that other

04:22:17 9    company?

04:22:17 10   A.        Yes, that's true.

04:22:18 11   Q.        Based on your conversations with those other experts,

04:22:23 12   you attributed the therapeutic benefit of sofosbuvir to the

04:22:27 13   active metabolites that are covered by those other patents?

04:22:31 14   A.        Yes, that's true.  You can have the whole patent on

04:22:35 15   the same metabolite.  You can have multiple patents on the

04:22:39 16   same thing that cures you, and the experts in that other

04:22:42 17   matter, the technical experts, they told me that the active

04:22:48 18   metabolites are covered by the patents in that matter.  Just

04:22:50 19   like Dr. Meier, for example, in this case told me that the

04:22:54 20   active metabolite here is covered by the patent here.  That

04:22:57 21   is why there are two cases, because there are two sets of

04:23:00 22   competing patents.

04:23:02 23   Q.        And as a result, in that other case, you concluded

04:23:04 24   that it was appropriate to calculate a royalty based on the

04:23:09 25   whole pie in that other case?

04:23:11 1   A.       Well, yes.  Yes, that is exactly how you need to do

04:23:15 2   it.  Because, again, look at how licensing is done in the

04:23:17 3   industry.  They calculate royalties based on the sales of

04:23:22 4   the entire product, just like Merck/Roche sells the whole

04:23:25 5   product, Pharmasset/Roche sells the whole product.  It's the

04:23:29 6   same thing.  They calculate royalties based on the sales of

04:23:32 7   the product.  That is how it is done.

04:23:34 8          MR. WARDEN:  Your Honor, may I confer with my

04:23:36 9   counsel for just a moment?

04:23:38 10          THE COURT:  You may.

04:23:39 11          (Counsel confer.)

04:23:39 12  BY MR. WARDEN:

04:24:15 13  Q.       Mr. Carter, let's move on from licenses and talk

04:24:20 14  about what was happening in the real world at the time of

04:24:23 15  the hypothetical negotiation.  The hypothetical negotiation

04:24:30 16  would have taken place in December of 2013.

04:24:35 17  A.       Yes, that's true.

04:24:35 18  Q.       Right before Sovaldi launches?

04:24:39 19  A.       Yes, that's true.

04:24:40 20  Q.       Several months after the hypothetical negotiation, in

04:24:46 21  August of 2014, Idenix was bought by Merck?

04:24:50 22  A.       Yes, that's true.

04:24:51 23  Q.       As of August of 2014, Idenix became part of Merck?

04:24:57 24  A.       Yes, Merck purchased Idenix.

04:25:01 25  Q.       Ultimately, they purchased Idenix for a price of

04:25:05 1    $3.9 billion?

04:25:07 2    A.    Yes, that's true.  It was $3.85 billion.

04:25:12 3    Q.    Approximately $3.9 billion?

04:25:15 4    A.    The CPA got the better of me.  I'm sorry.  $3.85,

04:25:17 5    $3.9, Whatever.

04:25:17 6    Q.    And, again, that acquisition happened eight months

04:25:21 7    after the hypothetical negotiation?

04:25:23 8    A.    Right.  That is something the negotiators would not

04:25:27 9    have known about.  That's true.

04:25:29 10   Q.    Mr. Carter, turn in your binder to DX-2461.

04:25:44 11   A.    Yes, I see it.

04:25:45 12   Q.    You have seen DX-2461 before?

04:25:49 13   A.    Yes.

04:25:50 14   Q.    You understand that this is an Idenix acquisition

04:25:55 15   valuation memo prepared by Merck in conjunction with that

04:25:58 16   acquisition?

04:25:58 17   A.    Yes, it was a memo that was prepared as part of that

04:26:07 18   acquisition that occurred in 2014.

04:26:09 19   Q.    And this sort of memo is sometimes called a purchase

04:26:11 20   price allocation?

04:26:13 21   A.    Yes.

04:26:13 22   Q.    Or a PPA?

04:26:15 23   A.    Yes.  That is an accounting document, yes.

04:26:17 24   Q.    So if I use the term "purchase price allocation" or

04:26:20 25   "PPA," you will understand I'm talking about this document?

04:26:24 1    A.    Yes, sir.

04:26:24 2    Q.    Now, you didn't consider this PPA before forming your

04:26:34 3    initial opinion in this matter, did you?

04:26:37 4    A.    As you know, I had multiple reports in this case.

04:26:39 5    When I wrote my first report, I didn't have this in front of

04:26:42 6    me, much like the hypothetical negotiators wouldn't have had

04:26:46 7    it in front of them.  Then in subsequent reports, I was able

04:26:49 8    to find this memo and considered it.

04:26:50 9    Q.    You said you were able to find the memo?

04:26:53 10   A.    It was provided to me, all the documents come in from

04:26:56 11   the parties, so it was provided to me and I talked about it

04:27:00 12   in my subsequent reports.

04:27:02 13   Q.    In fact, the reason you talked about it in your

04:27:05 14   subsequent reports is because Gilead's damages expert,

04:27:09 15   Dr. Putnam had discussed it in his expert report?

04:27:13 16   A.    I mean he did, yes.

04:27:14 17   Q.    And that is the reason you first considered it?

04:27:18 18   A.    Yes, because this type of document wouldn't be

04:27:20 19   relevant to the hypothetical negotiation because the

04:27:24 20   transaction didn't take place.  The negotiators wouldn't

04:27:27 21   know that was going to come later in time.

04:27:29 22   Q.    But as you said, you did later consider and rely on

04:27:32 23   this document?

04:27:32 24   A.    Yes, sir.

04:27:35 25        MR. WARDEN:  Your Honor, I'd like to move the

04:27:37 1    admission of DX-2461.

04:27:39 2                    MS. PARKER:  No objection.

04:27:40 3                    THE COURT:  No objection?

04:27:42 4                    MS. PARKER:  No objection.

04:27:42 5                    THE COURT:  Okay.  It's admitted.

04:27:44 6                    (DX-2461 was admitted into evidence.)

04:27:44 7                    MR. WARDEN:  Mr. Sayres, can you please put

04:27:47 8    DX-2461 up on the screen.

04:27:47 9    BY MR. WARDEN:

04:27:55 10   Q.      I want to orient the jury to the document.  As you

04:27:57 11   testified, this is the Idenix acquisition valuation memo.

04:28:03 12   A.      Well, it's the purchase price allocation is what it

04:28:05 13   is.

04:28:05 14   Q.      Excuse me.  It is the purchase price allocation.  The

04:28:08 15   subject is the Idenix acquisition valuation memo?

04:28:11 16   A.      Right.

04:28:12 17   Q.      And this was prepared in October of 2014?

04:28:16 18   A.      Yes.

04:28:16 19   Q.      So this was actually prepared after the acquisition?

04:28:19 20   A.      Yes.

04:28:20 21   Q.      After Idenix had become part of Merck?

04:28:24 22   A.      Yes.  That is how it is done, yes.

04:28:26 23   Q.      And in the first paragraph here, it is an executive

04:28:33 24   summary.

04:28:34 25   A.      Yes.

04:28:34 1   Q.    And it states, as we talked about, with the total

04:28:38 2   consideration for the acquisition was approximately

04:28:41 3   $3.87 billion. Correct?

04:28:43 4   A.    Yes.

04:28:44 5   Q.    I guess we were both wrong. I said $3.9, you said

04:28:47 6   $3.85, somewhere in the middle.

04:29:56 7   A.    I think there was a slight change that occurred

04:29:58 8   afterward. But whatever. We will call it $3.89 and be

04:30:03 9   friends.

04:30:03 10   Q.    Let's move down. Here in the middle of the first

04:30:07 11   page, there is a summary of some of the things that were

04:30:11 12   being valued as part of the Idenix acquisition?

04:30:14 13   A.    Yes.

04:30:14 14   Q.    This is a summary explanation of how Merck valued the

04:30:19 15   different components of Idenix that it was getting as part

04:30:22 16   of this acquisition?

04:30:23 17   A.    Well, based on what they were -- based on what they

04:30:26 18   were looking to buy when they bought the company, yes.

04:30:28 19   Q.    And this was, as you said, done after Idenix was part

04:30:35 20   of the company, when they prepared this valuation?

04:30:37 21   A.    Yes, that's true.

04:30:38 22   Q.    Let's jump forward a few pages, Page 7. Page 7

04:31:05 23   provides a more detailed summary of some of these assets

04:31:10 24   that were being valued as part of this acquisition.

04:31:12 25   Correct?

04:31:13 1  A.       Yes.

04:31:13 2  Q.       In the first column it lists the asset that's being

04:31:16 3  considered?

04:31:18 4  A.       Yes.

04:31:18 5  Q.       And in the last column it provides the value for that

04:31:22 6  asset?

04:31:23 7  A.       Yes.

04:31:24 8  Q.       And could we actually zoom out just a little bit so

04:31:28 9  we can see, we are missing the bottom line of that table.

04:31:35 10  The total value is 3.74 billion dollars for the assets that

04:31:43 11  are being considered?

04:31:43 12  A.       Yes.

04:31:44 13  Q.       In the middle it provides some comments about those

04:31:48 14  different assets?

04:31:49 15  A.       Yes, sir, I agree.

04:31:50 16  Q.       I want to direct you here to the second line IPR&D.

04:31:54 17  The single biggest component of the of this

04:31:58 18  3.74-billion-dollar value is the 3.17 billion dollars

04:32:03 19  attributed to IPR&D?

04:32:06 20  A.       That's true.  The reason Merck bought Idenix is they

04:32:10 21  wanted to get this compound and the patents and intellectual

04:32:13 22  property related to this particular compound.  That was the

04:32:16 23  reason for the deal.  That was the deal driver.  That was

04:32:20 24  what they paid the money for.

04:32:22 25                THE COURT:  Mr. Warden, we are going to have to

04:32:25 1    stop there for today.  That is the end of our time with the

04:32:28 2    jury today.

04:32:30 3              Ladies and gentlemen of the jury, we are going

04:32:31 4    let you go for the evening.  Of course, no talking about the

04:32:35 5    case.  No researching or reading anything about the case

04:32:39 6    while you are gone.

04:32:40 7              Please do your best to be here let's say at 8:45

04:32:44 8    tomorrow morning so there is time to order lunch and get

04:32:47 9    started at 9:00.  We expect a full day tomorrow.

04:32:51 10             Thank you very much for your attention.  Have a

04:32:53 11   good evening.

04:32:55 12             (Jury leaves courtroom at 4:31 p.m.)

04:33:18 13             THE COURT:  Anything plaintiffs need to discuss?

04:33:22 14             MS. PARKER:  No, Your Honor.  Thank you.

04:33:24 15             THE COURT:  Defendants?

04:33:24 16             MR. SCHERKENBACH:  I don't believe so, Your Honor.

04:33:26 17             THE COURT:  Have a good evening.  We will be in

04:33:28 18   recess.

04:33:30 19             (Court adjourned at 4:32 p.m.)

20

21             I hereby certify the foregoing is a true and accurate
          transcript from my stenographic notes in the proceeding.

22

23                       /s/ Brian P. Gaffigan
                         Official Court Reporter
24                         U.S. District Court

25