1    IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE DISTRICT OF DELAWARE

3    - - -

4    IDENIX PHARMACEUTICALS, INC., UNIVERSITA    :   CIVIL ACTION
     DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL    :
5    DE LA RECHERCHE SCIENTIFIQUE and            :
     L'UNIVERSITE MONTPELLIER II,                :
6                                                :
              Plaintiffs,                        :
7    v                                           :
                                                 :
8    GILEAD SCIENCES, INC. and GILEAD            :
     PHARMASSET LLC,                             :
9                                                :
              Defendants.                        :   NO. 13-1987-LPS
10   -----------------------------------------
     IDENIX PHARMACEUTICALS, INC., UNIVERSITA    :   CIVIL ACTION
11   DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL    :
     DE LA RECHERCHE SCIENTIFIQUE and            :
12   L'UNIVERSITE MONTPELLIER II,                :
                                                 :
13            Plaintiffs,                        :
     v                                           :
14                                               :
     GILEAD PHARMASSET LLC,                      :
15                                               :
              Defendant.                         :   NO. 14-109-LPS
16   -----------------------------------------
     IDENIX PHARMACEUTICALS, INC.,               :   CIVIL ACTION
17                                               :
              Plaintiff,                         :
18   v                                           :
                                                 :
19   GILEAD SCIENCES, INC.                       :
                                                 :
20            Defendant.                         :   NO. 14-846-LPS
                                        - - -
21
                        Wilmington, Delaware
22                      Friday, December 9, 2016
                        *Jury Trial - Volume E*
23
                                - - -
24
     BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
25
                                - - -

1   **APPEARANCES:**

2
            **ASHBY & GEDDES, P.A.**
3           **BY:  JOHN G. DAY, ESQ.**

4                  **and**

5           **McCARTER & ENGLISH**
            **BY:  MICHAEL P. KELLY, ESQ.**
6
                  **and**
7
            **JONES DAY**
8           **BY:  CALVIN P. GRIFFITH, ESQ.,**
                 **RYAN B. McCRUM, ESQ.,**
9                **MICHAEL S. WEINSTEIN, ESQ., and**
                 **BRADLEY W. HARRISON, ESQ.**
10               **(Cleveland, Ohio)**

11                **and**

12          **JONES DAY**
            **BY:  JENNIFER L. SWIZE, ESQ.**
13               **(Washington, District of Columbia)**

14                **and**

15          **JONES DAY**
            **BY:  STEPHANIE E. PARKER, ESQ., and**
16               **JESIKA W. FRENCH, ESQ.**
                 **(Atlanta, Georgia)**
17
                  **and**
18
            **JONES DAY**
19          **BY:  JOHN D. KINTON, ESQ., and**
                 **ANTHONY M. INSOGNA, ESQ.**
20               **(San Diego, California)**

21                **and**

22          **JONES DAY**
            **BY:  JOHN M. MICHALIK, ESQ., and**
23               **LISA L. FURBY, ESQ.**
                 **(Chicago, Illinois)**
24
                      **Counsel for Plaintiffs**
25

```
1   APPEARANCES:   (Continued)

2
                   FISH & RICHARDSON, P.C.
3                  BY:  MARTINA TYREUS HUFNAL, ESQ.,
                        DOUGLAS E. McCANN, ESQ.,
4                       JOSEPH B. WARDEN, ESQ.,
                        SANTOSH COUTINHO, ESQ.,
5                       ROBERT OAKES, ESQ., and
                        KELLY ALLENSPACH DEL DOTTO, ESQ.
6
                        and
7
                   FISH & RICHARDSON, P.C.
8                  BY:  FRANK SCHERKENBACH, ESQ., and
                        JENNY SHMUEL, ESQ.
9                       (Boston, Massachusetts)

10                      and

11                 FISH & RICHARDSON, P.C.
                   BY:  JUANITA BROOKS, ESQ.,
12                      W. CHAD SHEAR, ESQ.,
                        CRAIG COUNTRYMAN, ESQ., and
13                      JONATHAN E. SINGER, ESQ.
                        (San Diego, California)
14
                        and
15
                   FISH & RICHARDSON, P.C.
16                 BY:  MICHAEL R. HEADLEY, ESQ.,
                        JOHN M. FARRELL, ESQ., and
17                      DALIA KOTHARI, ESQ.
                        (Redwood City, California)
18
                        and
19
                   FISH & RICHARDSON, P.C.
20                 BY:  TASHA FRANCIS, ESQ.
                        (Minneapolis, Minnesota)
21
                            Counsel for Defendants
22

23

24   Kevin Maurer                    Brian P. Gaffigan
     Official Court Reporter         Official Court Reporter
25
```

- oOo -

**P R O C E E D I N G S**

(REPORTER'S NOTE:  The following hearing was held in open court, beginning at 8:32 a.m.)

THE COURT:  Good morning.

Just two quick things to update you all before seeing if you have any issues.

Well, first, I think Mr. Looby has probably discussed with you we need to have those deposition breakdowns by percentage and we really ideally need them by 7:00 p.m. the night after you play them so we can keep track of exactly what the allocation is of the time for both sides.  I think last night it came in very, very late, so you can get that to us by 7:00 p.m., or if you think you are going to have a problem doing that, please let us know that by 7:00 p.m.

The other thing is we have a late juror this morning.  It's Juror No. 5.  He is encountering some vehicle problems and he has a long drive.  So he has been very diligent to this point keeping in touch with us.  He first called about 6:30 this morning.  At that point his, estimate was he wouldn't be here until 10:30.  He called an hour later and thought he might be back by 10:00.  We're still waiting for a further update.  I have no further information than that.

08:33:18 1          But if we do hear back from him, we'll let you

08:33:21 2   know, but I do expect there will be some delay in getting

08:33:24 3   started this morning.

08:33:25 4          Are there any issues from plaintiffs this

08:33:27 5   morning?

08:33:30 6          MS. PARKER:  Yes, Your Honor.

08:33:31 7          THE COURT:  Okay.

08:33:35 8          Good morning.

08:33:35 9          MR. GRIFFITH:  Good morning, Your Honor.

08:33:37 10         First, we have some scheduling issues with

08:33:44 11  witnesses that I believe we worked out with the other side

08:33:47 12  and I think it is all going to be fine, just in terms of

08:33:52 13  timing and estimating when they're going to close and how

08:33:54 14  that is all going to work.  So at this point, I don't think

08:33:59 15  there is anything to discuss or go into there.  I think

08:34:02 16  that is going to work out.

08:34:03 17         We have a couple of objections that we want to

08:34:07 18  argue this morning.  Mr. McCrum is going to argue those on

08:34:11 19  our behalf.

08:34:12 20         THE COURT:  Well, before we move on, Mr.

08:34:14 21  Scherkenbach, did you have anything to say about the

08:34:15 22  scheduling issues?  Do you think there is anything I need

08:34:17 23  to be aware of or deal with?

08:34:20 24         MR. SCHERKENBACH:  Actually, in light of the

08:34:22 25  fact that we may not start until 10:00, the answer is

08:34:25 1    probably no.  We had worked out an arrangement that would

08:34:29 2    have allowed a witness to be called out of order because

08:34:33 3    of witness scheduling issue.  We thought we might have to

08:34:36 4    start Dr. Seeger today but not finish him because Dr.

08:34:41 5    Olsen on their side is related to Dr. Seeger's testimony.

08:34:45 6    Dr. Olsen can't testify until Monday.  It sounds like that

08:34:49 7    won't happen now.

08:34:50 8         We did want to alert the Court the plan was to

08:34:52 9    put on Dr. Seeger, get as far as we can get, and then put

08:34:56 10   Dr. Olsen on and call Dr. Seeger back, and this was all

08:35:00 11   worked out.  I guess it's probably going to be moot.

08:35:04 12        I think the issue counsel refers to is relating

08:35:07 13   to Mr. Renaud?  Is that it?

08:35:10 14        MR. GRIFFITH:  I have two witnesses that need to

08:35:12 15   finish by Tuesday and Mr. Renaud is one of them.  We've got

08:35:16 16   him going out of turn, as Mr. Scherkenbach mentioned.

08:35:20 17        MR. SCHERKENBACH:  Right.  It's agreed.  They

08:35:22 18   have two folks they need to get on and off by Tuesday at

08:35:25 19   noon, and we agreed to allow that.

08:35:27 20        THE COURT:  All right.  Well, then we'll make

08:35:29 21   sure that that happens.  And the details, we'll just have to

08:35:34 22   wait and see until we get started today at least.

08:35:38 23        MR. GRIFFITH:  All right.

08:35:38 24        THE COURT:  All right.  Let's move on to the

08:35:40 25   plaintiffs' objections.

08:35:43 1          Good morning.

08:35:46 2          MR. McCRUM:  Good morning, Your Honor.  We filed

08:35:47 3     a paper this morning.  I don't know if, Your Honor, you had

08:35:51 4     a chance to look at it.  And it relates to the deposition of

08:35:55 5     third party that they're trying to read in today.  I don't

08:35:58 6     expect it will be this morning.  If you would like to hear

08:36:02 7     argument on that, I'm happy to give you.

08:36:04 8          THE COURT:  It's really up to you.  I have not

08:36:06 9     seen it.  The last I saw was an issue responding about the

08:36:10 10    authority on striking the juror.

08:36:12 11         MR. McCRUM:  Okay.

08:36:12 12         THE COURT:  I didn't see anything since then.

08:36:14 13         MR. McCRUM:  I'll be brief with about it, Your

08:36:16 14    Honor.  The issue relates to a witness by the name of Dan

08:36:21 15    Cook.  He is a third party.  He has never worked for Merck.

08:36:23 16    He has never worked for Idenix.  He has never worked Gilead.

08:36:28 17    His deposition was taken in the California action, and it

08:36:30 18    was taken on April 16th, 2015.

08:36:36 19         The deposition is hearsay.  Nobody disputes

08:36:42 20    that.  And there is no exception that applies to that, Your

08:36:44 21    Honor.  Rule 804(b)(1) does allow for the admission of

08:36:48 22    deposition testimony if it's offered against a party who

08:36:52 23    had an opportunity and similar motive to develop it.

08:36:56 24         We didn't attend the deposition.  Idenix didn't

08:37:01 25    attend it.  Counsel for Idenix didn't attend it.  We weren't

08:37:04 1    even notified of the deposition, Your Honor.

08:37:07 2            So we didn't have an opportunity.  We certainly

08:37:10 3    didn't have similar motives to develop that testimony.  The

08:37:18 4    testimony that they intend to introduce is a snippet about

08:37:22 5    Merck's work and when they worked on 2'-methyl nucleosides.

08:37:28 6            Our contention -- I'm sorry.  Our position,

08:37:33 7    Idenix's position is contrary to what they elicited during

08:37:36 8    that deposition, so neither of the two prongs of the test

08:37:39 9    are satisfied either, opportunity or motive, Your Honor.

08:37:45 10           The other thing I want to note that I think is

08:37:47 11   important is at the time of this deposition, this Merck

08:37:51 12   defense wasn't even in the case, as you are well aware of

08:37:56 13   the timing of when that into this case, Your Honor.  So even

08:37:59 14   if we had been given notice, even if we did attend, we would

08:38:03 15   have had really no reason at that point to elicit the

08:38:08 16   testimony.

08:38:10 17           The other thing I want to note, the patents in

08:38:14 18   California are obviously different than the patents that are

08:38:16 19   at issue here.  There is case law that says that if that is

08:38:21 20   the case, there is not similar motive.  I'm happy to give

08:38:24 21   you the case cite.  That is the *Amaranth Inc. v Genesis*

08:38:29 22   case.  That is 2014 WL 7012391.  It's a Central District of

08:38:36 23   California case from 2014.  And there, the Court found no

08:38:40 24   similar motive when the patents at issue were different.

08:38:44 25           The only other possibly relevant rule is Rule

08:38:50  1    31.  That requires that deposition testimony cannot be used

08:38:56  2    against another party where the other party was not present

08:38:58  3    or representative and given reasonable notice of the

08:39:02  4    deposition.

08:39:03  5            None of these requirements are met for the

08:39:05  6    reasons that are articulated, Your Honor.

08:39:08  7            In their paper, they pointed out to a joint

08:39:12  8    stipulation that we entered into in this case where you

08:39:15  9    cross-designate documents and testimony to be produced in

08:39:21 10    both cases.  And they pointed out that they designated

08:39:26 11    this testimony.

08:39:27 12            Two things about that, Your Honor.  One, that

08:39:31 13    doesn't mean it is admissible, and the stipulation expressly

08:39:33 14    provides for that.  The last paragraph says it does not

08:39:37 15    prejudice any party from objecting to the admissibility of

08:39:41 16    the designated evidence and we're certainly reserving our

08:39:44 17    right in doing that today.

08:39:47 18            The second point of that stipulation was not

08:39:50 19    entered into and executed until after this deposition.  And

08:39:55 20    with regard to depositions, Your Honor, really the purpose

08:40:00 21    of this stipulation was, look, if there is a deposition,

08:40:05 22    because of the potential overlapping people that had been

08:40:09 23    involved in these cases, where it made sense to just have

08:40:13 24    that person appear once for both cases, that we could

08:40:18 25    designate.  We would do it then and then it would be

08:40:21 1   applicable both cases.

08:40:24 2           Mr. Cook is not a deposition that Idenix had any

08:40:29 3   interest in being involved in.  So that is our position,

08:40:33 4   Your Honor.  Nothing further.

08:40:34 5           THE COURT:  All right.  I'll ask you a couple

08:40:36 6   questions.

08:40:37 7           MR. McCRUM:  Sure.

08:40:38 8           THE COURT:  I have not seen or looked at the

08:40:39 9   testimony.

08:40:40 10          MR. McCRUM:  I understand.

08:40:40 11          THE COURT:  Why would Merck and Idenix, given

08:40:44 12  their relationship, not have the same -- why wouldn't their

08:40:47 13  motive and opportunity, which I would imagine is undisputed,

08:40:52 14  apply to Idenix as well?

08:40:54 15          MR. McCRUM:  Well, our position throughout

08:40:56 16  this case has been pretty clear, Your Honor.  That

08:40:59 17  Idenix and Merck, while it does have the appearance of a

08:41:03 18  parent/subsidiary relationship, they are different entities.

08:41:06 19  And I think there is case law that recognizes the parent and

08:41:11 20  the sub doesn't necessarily mean those two entities have the

08:41:14 21  same interest.  As the evidence is unfolding here, I think

08:41:17 22  that has become somewhat clear there are certain things on

08:41:21 23  which we would take a position that may or may not be

08:41:25 24  inconsistent with some of the evidence they're trying to

08:41:28 25  introduce from Merck.

08:41:29 1              THE COURT:  And in the discovery period that we

08:41:32 2  had between when I allowed this defense to go forward and

08:41:37 3  trial, was there any particular attention on Mr. or Ms. Cook

08:41:43 4  and this deposition or did it not get any individual

08:41:48 5  attention on its own?

08:41:51 6               MR. McCRUM:  I'm not aware of it, Your Honor.

08:41:55 7  I'm happy to look.  And when you say "attention?"

08:41:58 8               THE COURT:  I mean, for instance, there wasn't a

08:42:00 9  request as part of the new discovery to take his or her

08:42:04 10  deposition and then everyone agreed, well, it has already

08:42:07 11  been taken or something to that effect.

08:42:09 12              MR. McCRUM:  No, we certainly didn't ask for his

08:42:11 13  deposition.  They didn't either, Your Honor.

08:42:12 14              THE COURT:  All right.  Thank you.  Does Gilead

08:42:15 15  want to address this?

08:43:29 16              MR. SCHERKENBACH:  We didn't know they were

08:43:30 17  going to raise this, but I will do the best I can.

08:43:34 18              First of all, as to hearsay and there being no

08:43:37 19  exception, the witness is unavailable.  He is a third party

08:43:39 20  that is not under Gilead's control.  So the hearsay, there

08:43:43 21  is a hearsay exception.

08:43:47 22              On this adequate opportunity and motive and

08:43:50 23  representation, Merck is Idenix, Idenix is Merck.  Merck's

08:43:55 24  counsel has participated and sat in on almost all the

08:43:59 25  depositions.  They participated in, obviously, that

08:44:02 1  deposition in full of Mr. Cook.

08:44:05 2  One of the things also I would point out just in

08:44:08 3  terms of the time leaps of the objection, if they thought

08:44:11 4  that the stipulation, which I am going to come to because I

08:44:15 5  think that disposes of everything, if the stipulation

08:44:17 6  permitting use of depositions from the Merck case in this

08:44:20 7  case somehow didn't apply to certain depositions, including

08:44:23 8  this one, they should have objected earlier and we could

08:44:27 9  have taken Mr. Cook's deposition in this case.

08:44:29 10  The whole point of the stipulation -- and I am

08:44:31 11  sorry, I don't have a copy to hand up, but maybe we will get

08:44:35 12  one and let the Court take a look at it -- the entire

08:44:39 13  purpose of the stipulation was so that the depositions could

08:44:42 14  be used in the case so that they did not have to be redone.

08:44:47 15  I believe the clause that counsel is talking

08:44:49 16  about in the stipulation is sort of the saving clause, it

08:44:53 17  goes to the substance.  In other words, procedurally, the

08:44:56 18  depositions are treated as though they can be used in both

08:44:59 19  cases.  That doesn't mean you waive your right to object to

08:45:02 20  specific testimony as irrelevant or prejudicial or whatever.

08:45:06 21  That is all that clause did.

08:45:08 22  As to the retroactivity, again , the stipulation

08:45:10 23  was entered at a certain point in time.  That's true.  Some

08:45:14 24  depositions had already happened, some had not.  But it

08:45:17 25  applied to all of them.  It didn't say, oh, it only applies

08:45:22 1  going forward.  It applied to all the depositions.

08:45:25 2            That is really the substance of the response.

08:45:27 3            Again, the whole point of the stip was that so

08:45:31 4  we would be able to use the deposition.

08:45:32 5            THE COURT:  Thank you.

08:45:33 6            Mr. McCrum, did you want to reply?

08:45:36 7            MR. McCRUM:  Just briefly.

08:45:38 8            We tracked down the answer to your question the

08:45:42 9  best we could, Your Honor.  Our sources indicate that the

08:45:45 10 first time that this testimony was cited in an expert report

08:45:49 11 was in their expert reports in late October.  At that time

08:45:54 12 the supplemental discovery had closed.  We didn't have an

08:46:00 13 opportunity to take any discovery at that point.  It wasn't

08:46:05 14 in the reports during the initial round of fact discovery,

08:46:08 15 so we wouldn't have had any reason to take discovery on

08:46:12 16 that, Your Honor.

08:46:13 17            THE COURT:  All right.  Thank you.

08:46:15 18            Mr. Scherkenbach, anything else you want to add?

08:46:19 19 Also, if I understand it correctly, we are finishing at

08:46:22 20 least with Dr. Sofia before we get to the reading in of the

08:46:24 21 deposition?

08:46:25 22            MR. SCHERKENBACH:  We are.  It's not the first

08:46:27 23 thing up.  It's actually one of the later depositions.  It

08:46:29 24 will be today, but it may even be after lunchtime.

08:46:33 25            THE COURT:  Anything else you wanted to add?

08:46:35 1    MR. SCHERKENBACH:  Only I don't have a paper

08:46:37 2 copy of the stipulation.  If the Court actually wants to see

08:46:40 3 that, we can provide that.

08:46:41 4    THE COURT:  Is it in our docket somewhere?

08:46:44 5    MR. WARDEN:  It is, Your Honor.  I don't know

08:46:46 6 the docket number but I do know it was entered into right at

08:46:49 7 the end of October.  It might have actually been October

08:46:52 8 31st, if not, a couple days earlier in 2015.

08:46:56 9    THE COURT:  If we can't find it from that

08:46:59 10 information, we will ask for more help.

08:47:01 11    Were there other issues from plaintiffs?

08:47:03 12    MS. PARKER:  I believe that's all for us, thank

08:47:06 13 you, Your Honor.

08:47:06 14    THE COURT:  Any issues from defendants?

08:47:09 15    MR. WARDEN:  Good morning, Your Honor.

08:47:13 16    We have two issues which really are closely

08:47:15 17 related and I think will be resolved together.

08:47:18 18    At the pretrial conference, the Court had

08:47:20 19 requested that if we were going to need to seal the

08:47:23 20 courtroom for any witness, that we let the Court know in

08:47:26 21 advance.  This afternoon we will be calling as a witness Jim

08:47:29 22 Meyers, our corporate rep, on some issues related to -- some

08:47:34 23 commercial issues.  It is possible that we will need to seal

08:47:36 24 the courtroom.  But that's going to depend on whether Idenix

08:47:39 25 is permitted to question Mr. Meyers about issues related to

08:47:44 1    pricing of the accused products.

08:47:46 2            This was an issue that we had filed a motion in

08:47:49 3    limine on.  The Court had denied it, but really to defer to

08:47:53 4    hear the evidence, hear whether Gilead opened the door into

08:47:57 5    that kind of evidence by presenting evidence of praise, and

08:48:00 6    the Court indicated that it would then conduct the Rule

08:48:04 7    402/403 balance in determining whether it should come in.

08:48:07 8    In so doing, the Court had required Idenix to notify Gilead

08:48:12 9    and the Court before it sought to introduce that evidence.

08:48:16 10           Idenix before today hadn't done so.  But sort of

08:48:19 11   in an abundance of caution, so we would know if we need to

08:48:22 12   seal the courtroom, we approached them this morning and

08:48:25 13   asked if they did intend to introduce in evidence.  We have

08:48:28 14   been informed that they very well may because they believe

08:48:30 15   that Gilead has opened the door by introducing evidence or

08:48:35 16   statements during opening statement about how great Sovaldi

08:48:40 17   is.  We certainly don't feel evidence about how great

08:48:44 18   Sovaldi is has in any way opened the door as to issues

08:48:48 19   relating to pricing or commercial success or criticism of

08:48:52 20   pricing.

08:48:53 21           It is really an undisputed issue that Idenix has

08:48:58 22   raised.  Though it's great, really it is what the expert

08:49:02 23   relies on for his damages issues.  At no time does Idenix

08:49:05 24   need to respond now to praise of a scientific breakthrough

08:49:09 25   with counterbalancing evidence.  They have done that in

08:49:12 1  spades.  They called the scientists who worked toward that

08:49:17 2  invention "thieves" essentially.  They have been able to put

08:49:19 3  in the opposite side of that story.  It has nothing at all

08:49:23 4  to do with pricing.

08:49:24 5          And the pricing evidence has the danger of being

08:49:28 6  extremely prejudicial.  As we noted, this includes

08:49:32 7  statements from the Massachusetts Attorney General calling

08:49:34 8  the briefing strategy unethical, saying it might do massive

08:49:39 9  public harm, that it might cause the taxpayers millions of

08:49:45 10 dollars.

08:49:46 11         It is not going to help this case.  It might

08:49:48 12 inflame emotions.

08:49:50 13         THE COURT:  If they ask for leave, which they

08:49:52 14 haven't asked me yet, and if they do, then it is granted,

08:49:56 15 then you request to seal the courtroom during discussion of

08:49:59 16 Gilead's pricing strategy, I guess, is that right?

08:50:02 17         MR. WARDEN:  Yes, we would certainly ask to seal

08:50:06 18 the courtroom at that point.

08:50:07 19         THE COURT:  I know we are several contingencies

08:50:10 20 out.  But responding to, let's say there was cross on what

08:50:17 21 the Attorney General said and the ultimate finding there.

08:50:20 22 Are you asking that all that be under seal as well?

08:50:24 23         MR. WARDEN:  Your Honor, we would, because in

08:50:26 24 order to explain what happened with the interactions with

08:50:29 25 the Attorney General, we would need to get into some

08:50:32 1    confidential information of Gilead's.

08:50:36 2          Just as another point, Your Honor, at the

08:50:40 3    pretrial conference, we had stated that evidence of the

08:50:45 4    actual price might be relevant to damages issues.  At that

08:50:49 5    time we weren't asking evidence on the price to be excluded.

08:50:53 6    I would note at this point, Your Honor, their damages

08:50:56 7    expert, Mr. Carter, has testified it was his opinion to

08:50:59 8    which price has been relevant.  He didn't mention the price

08:51:02 9    of sofosbuvir or Harvoni in his opinion.  I think that makes

08:51:06 10    it pretty clear that Mr. Carter doesn't believe that price

08:51:09 11    was relevant to his analysis or that the jury needed to hear

08:51:12 12    the price to consider his analysis.

08:51:13 13          And there is no reason at this point that Idenix

08:51:16 14    should be able to question Mr. Meyers even on the issue of

08:51:19 15    price.

08:51:20 16          The only reason to do that would be to try and

08:51:22 17    make Gilead look bad or look greedy.  The prejudicial effect

08:51:28 18    of that would substantially outweigh any probative value

08:51:31 19    given that Mr. Carter didn't rely on price in his testimony.

08:51:35 20          THE COURT:  Okay.  Thank you.  Who is going to

08:51:37 21    address this for plaintiff?

08:51:40 22          MS. PARKER:  Good morning.

08:51:42 23          Your Honor, Ms. Swize is here.  If we need to

08:51:46 24    get into the substance right now, the argument, she argued

08:51:48 25    it in the pretrial conference.  But I think that's

08:51:51  1    premature.

08:51:52  2              What we said this morning, what our position is,

08:51:54  3    we need to wait and see what Mr. Meyers says.  We are not

08:51:58  4    going to be able to address whether that opens the door

08:52:00  5    until we hear whatever it may be.  I think that's what Your

08:52:04  6    Honor said in the pretrial in terms of not making an

08:52:07  7    advisory opinion, otherwise, Your Honor would have ruled

08:52:10  8    back then.

08:52:11  9              I think we are in a holding position on that

08:52:13 10    issue until we see whether the door is open enough for us to

08:52:17 11    feel like it is something we want to raise.  We certainly

08:52:19 12    understand that before we say anything in front of the jury

08:52:22 13    we need to approach the Court.

08:52:23 14              THE COURT:  Well, the implication of that is

08:52:25 15    that you agree the door has not been opened to this point.

08:52:29 16              MS. PARKER:  Our position is that there is some

08:52:31 17    evidence out there which may be cumulative with what Mr.

08:52:35 18    Meyers says that may open the door.  But where we are right

08:52:38 19    now, we don't believe it has opened the door.  Otherwise, we

08:52:41 20    would have raised it with Your Honor.

08:52:42 21              THE COURT:  It is true that we have heard

08:52:45 22    nothing about even the price of the defendants' product from

08:52:48 23    your expert.  Correct?

08:52:51 24              MS. PARKER:  That's not correct, Your Honor.

08:52:53 25              THE COURT:  Well, remind me, what is in the

08:52:56 1   record about that?  I am happy to hear from anyone.

08:53:01 2        MR. WARDEN:  Your Honor will recall that Mr.

08:53:04 3   Carter went through the *Georgia-Pacific* factors.  He talked

08:53:05 4   about how pricing of products affects royalty rates and that

08:53:09 5   the higher the profit margin the higher the pricing of a

08:53:12 6   product, that tends to push the royalty rates higher.  It

08:53:15 7   was something he addressed.

08:53:16 8        He showed the pricing projections for Sovaldi

08:53:19 9   and Harvoni -- the sofosbuvir franchise.  He said that would

08:53:23 10  tend to push rates up.  He said it point-blank in his

08:53:27 11  testimony.  So it did come in.

08:53:28 12       THE COURT:  Did he give us actual numbers as to

08:53:31 13  what it cost for Sovaldi?

08:53:33 14       MR. WARDEN:  He put up the projection part, the

08:53:36 15  98-percent projected profit margin, and said that shows --

08:53:42 16       THE COURT:  I remember the profit margin.  I

08:53:44 17  don't remember if there was a dollar figure per pill or per

08:53:47 18  monthly set of pills, for instance.

08:53:49 19       MR. WARDEN:  That is what he talks about when he

08:53:51 20  talks about the -- when you are talking at the low market

08:53:54 21  and the pricing certainly goes into that -- he did not break

08:53:57 22  it down to the per bottle.  But he does use, as he said, the

08:54:01 23  smallest salable unit.  So he does talk about the pricing.

08:54:05 24  He does talk about how it influences the reasonable royalty,

08:54:08 25  he did in his opinion.  That is also an explanation of where

08:54:11 1  the royalty base is coming from.  So it certainly was part

08:54:14 2  of his testimony.

08:54:15 3        THE COURT:  Okay.  Anything from the plaintiffs

08:54:18 4  on this yet?

08:54:20 5        MS. PARKER:  No, Your Honor.  Unless Your Honor

08:54:22 6  does want us to actually argue it right now.

08:54:25 7        THE COURT:  Your proposal is that we wait and

08:54:28 8  see what the direct is of Mr. Meyers, and then, if you seek

08:54:36 9  leave -- if you are going to seek leave to question him

08:54:39 10  about this, that would be the time and we would have to have

08:54:42 11  a discussion outside the presence of the jury.

08:54:44 12        MS. PARKER:  Yes, Your Honor, because we

08:54:46 13  can't -- we can't argue what we haven't heard.

08:54:49 14        THE COURT:  Right.  Anything more from

08:54:51 15  plaintiffs on any of this?

08:54:54 16        MS. PARKER:  Can I just confer?

08:54:56 17        THE COURT:  Of course.

08:55:01 18        MS. PARKER:  Yes, Your Honor.  I understand that

08:55:05 19  Mr. McHutchison may come before Mr. Meyers.  If that is the

08:55:10 20  case, then Mr. McHutchison himself may open the door.  So it

08:55:16 21  may be an issue that's raised before Mr. Meyers.

08:55:21 22        THE COURT:  And remind me who Mr. McHutchison is

08:55:25 23  or what his role is.

08:55:27 24        MS. PARKER:  Mr. McCrum is going to handle that

08:55:29 25  witness.

08:55:29 1          THE COURT:  Mr. McCrum.

08:55:34 2          MR. McCRUM:  I don't actually know his official

08:55:37 3  title, but he is a very senior ranking executive at Gilead

08:55:42 4  who has been kind of the, for lack of a better word, the

08:55:45 5  company mouthpiece in the various litigations around the

08:55:49 6  world.

08:55:50 7          He has talked extensively about Gilead as a

08:55:53 8  whole as a company and what they have done in this industry.

08:55:58 9  I should say to counsel for Gilead, if I misstated anything

08:56:01 10 about his role, they can correct me if I am wrong.

08:56:03 11         THE COURT:  Your position is, it's possible

08:56:06 12 McHutchison's testimony may open the door but you would let

08:56:09 13 us know before you begin your cross-examination.

08:56:14 14         MR. McCRUM:  Absolutely, Your Honor.  If it is

08:56:18 15 consistent with the testimony that he has provided in past

08:56:21 16 cases, we don't think there is any question that it will

08:56:23 17 open the door.

08:56:27 18         THE COURT:  Mr. Warden.

08:56:31 19         MR. WARDEN:  Just two issues, Your Honor.

08:56:33 20 First, with respect to Mr. Carter, Mr. Carter talked about

08:56:35 21 profit margins.  Mr. Carter never put the price of either

08:56:39 22 Sovaldi or Harvoni up there.  If he thought the actual price

08:56:43 23 was relevant, he would have talked about the actual price.

08:56:46 24 We are not objecting to them asking questions about profit

08:56:48 25 margins.  That's not what this is about.  It's about the

08:56:51 1    price, criticism of the pricing, patient access issues.

08:56:55 2    None of that was talked about with Mr. Carter.

08:56:58 3          With respect to what Idenix believes will open

08:57:01 4    the door, what we were told this morning is a little

08:57:03 5    different from what we have now heard in argument.  We were

08:57:06 6    told that they believed praise about how great Sovaldi is

08:57:10 7    has opened the door.  If their position is praise about

08:57:13 8    Sovaldi doesn't open the door, that's great.  But I want to

08:57:15 9    make sure we have an understanding of whether they think

08:57:17 10   that's the kind of evidence that opens the door.  We don't

08:57:20 11   think so, for the reasons I have already articulated.

08:57:24 12         The last point I would make, Your Honor, is they

08:57:26 13   have indicated they think the door might open up with Mr.

08:57:29 14   McHutchison.

08:57:30 15         We are not going to be eliciting testimony on

08:57:33 16   his direct that would open the door.  And we want to make

08:57:36 17   sure that there is a clear understanding that they are not

08:57:38 18   allowed to try and open the door themselves on his

08:57:42 19   cross-examination by eliciting testimony with the intent of

08:57:46 20   getting into issues about praise for Gilead that would then

08:57:50 21   allow them to argue that they have opened the door.

08:57:53 22         THE COURT:  First off, do you object to their

08:57:58 23   proposal that we wait and see what Mr. McHutchison and/or

08:58:02 24   Mr. Meyers say before I make this decision?

08:58:07 25         MR. WARDEN:  No, no.  I think that is a fine

08:58:09 1    proposal, Your Honor.  We want to make sure we are sort of

08:58:12 2    clear about the rules of the road before the questioning

08:58:15 3    starts.

08:58:16 4              THE COURT:  Second of all, if I heard Mr. McCrum

08:58:18 5    correctly, he says he believes almost to a certainty that

08:58:22 6    you will open the door if Mr. McHutchison's testimony is

08:58:25 7    anything like it was in the other case.

08:58:28 8              Do you have an understanding as to what he

08:58:29 9    means?

08:58:30 10             MR. WARDEN:  I don't, Your Honor.

08:58:32 11             THE COURT:  Okay.  Thank you.  Let me get Mr.

08:58:35 12   McCrum back and clue us in to why you have that high level

08:58:39 13   of confidence that you view the door as having been opened.

08:57:34 14             MR. McCRUM:  Well, Your Honor, in the past

08:57:37 15   cases, Dr. McHutchison has also been the first witness for

08:57:42 16   Gilead to introduce the company and inevitably has talked

08:57:46 17   about Gilead as a whole and how they have done wonderful

08:57:50 18   things inside the HCV arena and outside the HCV arena and

08:57:57 19   just kind of put them on the pedestal, at least in my view,

08:58:01 20   and I think it is fairly clear from that testimony.

08:58:03 21             I'll take their word for it if they're not going

08:58:05 22   to provide that same type of testimony, but we won't know

08:58:09 23   it, of course, until we see it.

08:58:10 24             THE COURT:  All right.  Thank you.

08:58:11 25             Is there anything else, Mr. Warden?

08:58:13 1          MR. WARDEN:  Just one thing, Your Honor.  I

08:58:15 2     think it might be useful for everybody, certainly it would

08:58:18 3     make sense for the Court to defer on a ruling, but it might

08:58:20 4     be useful for everybody to get some guidance from the Court

08:58:23 5     about what might open that door so that we know what is and

08:58:27 6     is not going to be okay with Dr. McHutchison so we don't

08:58:34 7     inadvertently open the door, so to speak.

08:58:36 8          Our view has been that evidence about praise for

08:58:38 9     the science, about praise for sofosbuvir about what

08:58:40 10    sofosbuvir can do does not open the door into evidence about

08:58:43 11    criticism of pricing.

08:58:44 12         It would be a different issue if we got into

08:58:47 13    what the Court expressed concern about at the pretrial

08:58:50 14    confidence, evidence about Gilead's altruism.  If we get

08:58:54 15    into evidence that Gilead has been helping disadvantaged

08:58:57 16    countries, providing medical care, they're providing

08:58:59 17    discounts for poor people, that might get into opening the

08:59:02 18    door.  But it's our view that just scientific evidence

08:59:06 19    shouldn't.

08:59:07 20         But if the Court can -- I guess we would like to

08:59:10 21    know if the Court has a view on that so we know what we can

08:59:13 22    and can't do.

08:59:14 23         THE COURT:  All right.  Well, at this point I

08:59:16 24    don't have anything to add beyond what I said at the

08:59:18 25    pretrial conference.  The plaintiffs will need to seek leave

08:59:25 1  before getting into this line of questioning with any Gilead

08:59:31 2  witness, but it seems most pertinent to the two that we

08:59:34 3  talked about.

08:59:37 4          And it's most likely that if I allow some of the

08:59:43 5  questioning that I will be open to closing the courtroom for

08:59:49 6  that portion of the testimony, certainly given adequate

08:59:51 7  notice of your request to do that.  But this point, I think

08:59:55 8  I just need to take these issues under advisement and see

08:59:58 9  how it plays out.

08:59:59 10         MR. WARDEN:  Yes, Your Honor.

09:00:00 11         THE COURT:  The good news is I have been handed

09:00:02 12  a note that indicates the late juror has arrived in

09:00:05 13  Wilmington and is in process of parking and heading over to

09:00:08 14  the courthouse.  So we may be able to start sooner than we

09:00:12 15  had feared.

09:00:13 16         But let's take a recess.  We'll double check on

09:00:16 17  that and we'll get started as soon as we can.

09:01:06 18         (Brief recess taken.)

09:01:06 19         *      *      *

09:14:16 20         (Proceedings reconvened after recess.)

09:14:16 21         THE COURT:  The jurors are all here.  We will

09:14:19 22  bring them in in just a moment.  I have now seen the letter

09:14:22 23  with the plaintiffs' objection to the testimony of Dr. Cook.

09:14:26 24  I think, was it Mr. McCrum that addressed that?

09:14:29 25         MR. McCRUM:  Yes, Your Honor.

09:14:30  1          THE COURT:  It's a half hour ago in my mind.

09:14:33  2          The question is really procedurally as to why we

09:14:36  3    just got this letter apparently this morning?  And isn't it

09:14:39  4    too late and shouldn't I deem these objections waived?

09:14:42  5          MR. McCRUM:  Yes, Your Honor.  Apologies for

09:14:45  6    that, number one.  I think that the procedure that the

09:14:48  7    parties had been following given the number of deposition

09:14:51  8    designations that Gilead has provided to us, unfortunately

09:14:56  9    both parties had been submitting papers as late as the

09:15:00 10    morning of, including Gilead's letter that was just

09:15:03 11    submitted yesterday.

09:15:05 12          We've been exchanging and meeting and conferring

09:15:08 13    on objections well into the hours of the mornings, including

09:15:13 14    on this one, Your Honor.  I'm happy to confer with the other

09:15:18 15    side and make sure that we don't do this to Your Honor and

09:15:21 16    the Court again, but this has become, because of the volume,

09:15:25 17    the pure volume of designations that have been put at issue,

09:15:29 18    the way things have unfolded to date.

09:15:32 19          THE COURT:  Mr. Scherkenbach, was it who that

09:15:34 20    argued this this morning?

09:15:36 21          MR. SCHERKENBACH:  Yes.

09:15:36 22          THE COURT:  I don't recall you raising the

09:15:38 23    argument of waiver.  It just occurred to me as I was reading

09:15:41 24    this letter.  What is your view?

09:15:43 25          MR. SCHERKENBACH:  Well, my view is I agree

```
09:15:47  1    there has to be some reasonable flexibility.  I'm not saying
09:15:51  2    if you are a minute late, it should be waived.  I will just
09:15:54  3    point out, though, this issue has nothing to do with the
09:15:57  4    substance of the testimony.  It is a you can't use the
09:16:01  5    deposition, period, full stop, because it was taken in the
09:16:03  6    other case.
09:16:04  7             I think it should have been raised.  I made this
09:16:06  8    remark initially.  I didn't use the word waiver.  It should
09:16:09  9    have been raised a long time ago.
09:16:11 10             That said, I think the Court can and should
09:16:13 11    deny it on the merits.  I have had a chance to look at the
09:16:16 12    stipulation.  I don't know whether Your Honor has.
09:16:18 13    Actually, Merck itself was a party to the stipulation, Isis
09:16:23 14    was a party to it.  All the parties negotiated this thing
09:16:27 15    and agreed to it, and it clearly applies.
09:16:30 16             THE COURT:  Do you have a docket reference?
09:16:32 17             MR. SCHERKENBACH:  I do.  It's Document No. 201,
09:16:38 18    filed October 28th, 2015.  And I think Your Honor so ordered
09:16:44 19    it on October 30th, 2015.
09:16:47 20             THE COURT:  Okay.  Thank you.
09:16:48 21             Is there anything else, Mr. McCrum?
09:16:49 22             MR. McCRUM:  Just very briefly, Your Honor.
09:16:52 23             I will just reiterate -- and we actually have
09:16:55 24    extra copies, if you would like me to hand it up.
09:16:58 25             THE COURT:  Of the stipulation?
```

09:16:59   1                  MR. McCRUM:  Yes.

09:17:00   2                  THE COURT:  Sure.  In a moment, after you are

09:17:01   3 done.

09:17:01   4                  MR. McCRUM:  Paragraph 9 expressly says the

09:17:03   5 designation of documents.  It doesn't waive any objection to

09:17:05   6 the admissibility of that.  And obviously that is what we're

09:17:09   7 here arguing about today, Your Honor.

09:17:10   8                  THE COURT:  All right.  Well, we'll bring the

09:17:12   9 jury in.  If you could pass up the stipulation when they're

09:17:16 10 coming.  But as this point, Mr. Looby, I'll ask you to go

09:17:20 11 get the jury.

09:17:37 12                  (Documents passed forward.)

09:18:48 13                  (Jury returned.)

09:18:48 14                  THE COURT:  Good morning, ladies and gentlemen.

09:18:49 15 Welcome.  Happy Friday.

09:18:53 16            I know we had, one juror had some vehicle

09:18:55 17 problems.  I appreciate him keeping us informed about that

09:19:00 18 and getting here, and we're very grateful that he is able

09:19:06 19 to be here, and that the rest of you are here as well.  So

09:19:09 20 we are ready to begin.

09:19:10 21            We'll turn back to defendants, and you can call

09:19:13 22 your witness back.

09:19:14 23                  MR. SHEAR:  Thank you, Your Honor.

09:19:16 24            If Dr. Sofosbuvir could retake the stand.

09:19:19 25                  THE COURT:  Yes.

09:19:20 1        Good morning, Dr. Sofia.  Welcome back.  I

09:19:32 2   remind you that you remain under oath, of course.

09:19:35 3        THE WITNESS:  Yes.

04:10:15 4        ... MICHAEL JOSEPH SOFIA, having been previously

04:10:25 5   Sworn as a witness, was examined and testified as follows ...

09:19:36 6        THE COURT:  You may continue with your

09:19:37 7   examination.

09:19:38 8        MR. SHEAR:  Thank you, Your Honor.  May it

09:19:38 9   please the Court.

09:19:38 10        DIRECT EXAMINATION (Continued)

09:19:38 11   BY MR. SHEAR:

09:19:40 12   Q.    Good morning, Dr. Sofia.

09:19:42 13   A.    Good morning.

09:19:43 14   Q.    Yesterday, we had a brief chance to talk about

09:19:47 15   sofosbuvir and your invention of it.  One thing that we sort

09:19:51 16   of jumped past was you as a person and who you are.  Could

09:19:56 17   you tell the jury a little bit about where you grew up?

09:20:00 18   A.    Sure.  I grew up in Northeast Baltimore City in a row

09:20:04 19   home within the city there.  I grew up in a family where my

09:20:11 20   father was a barber with an Eighth Grade education.  My

09:20:14 21   mother was a payroll clerk and attended the public high

09:20:20 22   school in the city, a magnet public high school in the city.

09:20:25 23   Q.    Were you and your siblings the first to go to

09:20:28 24   college?

09:20:28 25   A.    Yes, we were in my family.

09:20:30 1    Q.    Obviously from your earlier testimony, we see that

09:20:33 2    you went into science.  What drew you to science?

09:20:35 3    A.    I was interested in science very early on in my life.

09:20:40 4    Actually, probably as a result of reading books from the

09:20:44 5    Baltimore Public City Library and then ultimately, you know,

09:20:48 6    going to this math science magnet high school in Baltimore

09:20:53 7    where I had a really great teacher, biochemistry teacher, in

09:20:58 8    fact, who kind of inspired me to sort of continue to sort of

09:21:02 9    pursue my interest in the science field.

09:21:03 10   Q.    Where did you go to undergraduate?

09:21:06 11   A.    I was fortunate enough to get a scholarship to go to

09:21:10 12   Cornell University in Upstate New York.

09:21:12 13   Q.    What did you study?

09:21:13 14   A.    I was a chemistry major at Cornell.

09:21:17 15   Q.    I called you Dr. Sofia.  Is that because you have a

09:21:24 16   Ph.D.?

09:21:25 17   A.    Yes, I do.  I have a Ph.D. from the University of

09:21:27 18   Illinois.

09:21:28 19   Q.    What is your Ph.D. in?

09:21:30 20   A.    It is in organic chemistry.

09:21:32 21   Q.    Why did you choose the University of Illinois?

09:21:34 22   A.    Well, the University of Illinois was one of the top

09:21:36 23   five chemistry schools in the country, and there was a

09:21:39 24   professor there who was actually doing work that I was very

09:21:42 25   interested in.  I have always been interested in that sort

09:21:44 1   of interface with chemistry and biology and using molecules

09:21:49 2   to impact biological processes, and he was one of the few

09:21:52 3   young professors doing that kind of work.

09:21:54 4   Q.    Dr. Sofia, at a high level, could you describe for

09:22:01 5   the jury what your Ph.D. thesis was in?

09:22:03 6   A.    Yes.  So it was involved in the design of molecules

09:22:08 7   that would inhibit certain enzymes, these are proteins in

09:22:12 8   the body, to impact the biological system there.  And it

09:22:16 9   would actually design them in a very rational way.

09:22:20 10  Q.    Where did you go when you finished your Ph.D?

09:22:23 11  A.    I then ultimately did postgraduate work at Columbia

09:22:27 12  University.

09:22:27 13  Q.    Who did you study with?

09:22:28 14  A.    I studied with a professor there, one of the sort of

09:22:33 15  preeminent scientists or chemists in the field of organic

09:22:37 16  chemistry.  Organic synthesis.

09:22:39 17  Q.    Why did you study with -- and I'm sorry, what was the

09:22:42 18  individual's name?

09:22:42 19  A.    His name is was Gilbert Stork.

09:22:44 20  Q.    Why did you study with Professor Stork?  Why did you

09:22:46 21  choose to study with Professor Stork?

09:22:46 22  A.    So I, I wanted to really continue to hone and gain

09:22:51 23  more experience in how to build molecules, complex molecules

09:22:54 24  that would be sort of the foundation of what I wanted to

09:22:58 25  continue to pursue in my professional career and, you know,

09:23:03 1  using these complex molecules in impacting biology.

09:23:07 2  Q.    Once you were finished with your education, did you

09:23:10 3  go into the industry?

09:23:13 4  A.    Yes, I did.  I started my career in the

09:23:16 5  pharmaceutical industry.

09:23:17 6  Q.    How long were you in the pharmaceutical industry?

09:23:19 7  A.    So I have been in the pharmaceutical industry for now

09:23:22 8  30 years.

09:23:22 9  Q.    What do are you presently doing?

09:23:25 10  A.    I am currently the co-founder and chief scientific

09:23:29 11  officer of a biotech company in Pennsylvania called Arbutus

09:23:34 12  Biopharma, focused in trying to find a cure for hepatitis B

09:23:38 13  virus.

09:23:38 14  Q.    Why hepatitis B?

09:23:40 15  A.    Well, hepatitis B, like hepatitis C, is a disease

09:23:44 16  of the liver.  It is a disease that actually impacts more

09:23:49 17  patients than does hepatitis C.  So hepatitis C actually

09:23:53 18  impacts about 400 million individuals worldwide, and it

09:23:57 19  ultimately leads to liver cancer.  And with all the

09:24:00 20  experience and knowledge I have in the area of developing

09:24:04 21  designing antivirals and viral hepatitis, this was an area I

09:24:09 22  wanted to sort of focus my effort in and see if I could

09:24:12 23  contribute in finding the cure for that disease as well.

09:24:14 24  Q.    Dr. Sofia, are you a paid consultant for Gilead?

09:24:19 25  A.    Yes, I am.

09:24:20  1    Q.     I'd like to transition and focus on one time period

09:24:24  2    in your professional career.  And I want to focus on the

09:24:28  3    time you spent at Pharmasset.  How long were you at

09:24:30  4    Pharmasset?

09:24:31  5    A.     I was at Pharmasset for about seven and-a-half years.

09:24:35  6    Q.     When did you join?

09:24:36  7    A.     I joined in 2005.  August of 2005.

09:24:40  8    Q.     In August of 2005, when you joined Pharmasset, how

09:24:44  9    many people were working there?

09:24:45 10    A.     Somewhere around 12, 12 individuals were actually at

09:24:50 11    the company.

09:24:50 12    Q.     At that point in time, was Pharmasset working in the

09:24:54 13    HCV space?

09:24:55 14    A.     Yes, they had a very early program in hepatitis C

09:24:59 15    virus that I inherited as part of my research efforts.

09:25:03 16    Q.     What compound were they focused on?

09:25:05 17    A.     At the time, they were focused on a compound called

09:25:09 18    PSI-6130.  It was a nucleoside analog.

09:25:14 19             MR. SHEAR:  Mr. Sayres, if we could have

09:25:17 20    DDX-304.

09:25:17 21    BY MR. SHEAR:

09:25:17 22    Q.     And, Dr. Sofia, if you could explain to the jury what

09:25:20 23    this is at a high level?

09:25:22 24    A.     Sure.

09:25:24 25             This is a nucleoside.  This is PSI-6130.  It is

09:25:29 1    a cytidine base up here.  And it has a 2'-methyl up and a

09:25:39 2    2'-fluoro down, 3'-hydroxyl down and this group here, a

09:25:42 3    hydroxy methylene which is called at the 4' position here.

09:25:45 4    Q.    And, Dr. Sofia, over the last several days, the jury

09:25:49 5    has heard quite a bit about PSI-6130.  Has PSI-6130 ever

09:25:54 6    made it to market?

09:25:55 7    A.    No, it did not.

09:25:56 8    Q.    Why not?

09:25:57 9    A.    Well, there are a couple problems with this

09:25:59 10   particular molecule that did not allow it to ultimately

09:26:04 11   become a drug.

09:26:04 12          One of them was poor absorption.  So we talked

09:26:08 13   about absorption before, that, you know, a drug must get

09:26:11 14   into the body at a high concentration to make it effective.

09:26:14 15   In this particular case, it really, it didn't get into the

09:26:17 16   body very well, so it wasn't, a lot wasn't getting in.  You

09:26:22 17   had to get a really large amount of the drug.  That was kind

09:26:24 18   of impractical in many ways.  And,

09:26:27 19          Secondly, the other problem was it turns out

09:26:29 20   that this molecule, the body chewed this molecule up, and it

09:26:34 21   chewed it up to something that was completely inactive, so

09:26:37 22   you are producing a lot of inactive material.  And it chewed

09:26:40 23   it up on what is known as the base.  It really converted

09:26:44 24   this to something else that we really didn't want.  And it

09:26:47 25   was, it was completely undesirable.

09:26:50 1 Q.    This "undesirable," what is the technical term for

09:26:54 2 what you just --

09:26:55 3 A.    Well, it would convert this base to a uridine or a

09:27:01 4 Uracel, and this becomes a uridine nucleoside, and that

09:27:05 5 uridine nucleoside, which was known as PSI-6206 was

09:27:11 6 completely inactive against the HCV virus.

09:27:14 7 Q.    I think that PSI-6206 might be a new number for

09:27:19 8 everyone in the courtroom.

09:27:20 9        Mr. Sayres, can we have DDX-305?

09:27:27 10       And, Dr. Sofia, what is the nucleoside on the

09:27:31 11 right?

09:27:31 12 A.    So the nucleoside on the right is PSI-6206.  And

09:27:36 13 what you can see here is that a very simple atom change, so

09:27:39 14 this is what is known as a nitrogen, it can convert into

09:27:43 15 an oxygen, and that simple change ultimately produces an

09:27:47 16 inactive molecule and the molecule that is not active

09:27:50 17 against the HCV virus.

09:27:52 18 Q.    Now, that one change from the nitrogen to the oxygen

09:27:55 19 rendered PSI-6206 inactive?

09:28:00 20 A.    That is correct.

09:28:02 21 Q.    When you were at Pharmasset, did you attempt to

09:28:05 22 address these issues that you just described with PSI-6130?

09:28:09 23 A.    Yes, we did.  We ultimately tried to solve that

09:28:12 24 problem by making a prodrug of 6130.

09:28:16 25 Q.    And did that work?

09:28:18 1    A.    It worked to some extent.  It helped to some extent

09:28:26 2    to solve the absorption problem, so we can get a little bit

09:28:30 3    more into the body, but it did not really solve this

09:28:32 4    problem, this conversion, this metabolic conversion of 6130

09:28:36 5    to 6206, producing this inactive agent.

09:28:39 6    Q.    So at this point in time, while you are at

09:28:43 7    Pharmasset, I think you just testified you were working on a

09:28:45 8    prodrug of 6130, what did you do next?

09:28:49 9    A.    Well, what we actually did was completely redesigned

09:28:54 10   the molecule.  Okay?  Essentially rethink the approach we

09:28:59 11   were going to take, realizing that 6130 was not going to be

09:29:03 12   the solution that we wanted and ultimately said, okay, we

09:29:08 13   had to step back and rethink how we were going to solve this

09:29:11 14   problem of trying to find a cure for hepatitis C.

09:29:16 15   Q.    So I'd like to focus -- well, let me back up.

09:29:24 16         What nucleoside did you focus on in the

09:29:28 17   redesigning of the molecule that you just mentioned?

09:29:30 18   A.    Well, actually surprisingly, we focused on this

09:29:34 19   inactive material.  And that came out as a result of a

09:29:37 20   pretty extensive biochemical investigation on actually how

09:29:44 21   6130, the active material, was actually being handled by

09:29:48 22   the body.  It was a study that had previously never been

09:29:51 23   done before, and we had some expertise within the company

09:29:55 24   that allowed us to really, really tease out all the

09:29:59 25   different issues there.

09:30:00 1    Q.    Dr. Sofia, in the binder in front of you, you should

09:30:04 2    have DX-2749 that we're going through yesterday.  It was put

09:30:11 3    into evidence yesterday.

09:30:12 4          And, Mr. Sayres, if we could have DX-2749.  And

09:30:17 5    if you can turn to page 20.  And, Dr. Sofia, if you can turn

09:30:21 6    to page 20 as well.

09:30:25 7          Dr. Sofia, the title of this slide is Leveraging

09:30:29 8    the Uridine Metabolite.  First, let me ask you what is the

09:30:33 9    uridine metabolite we're talking about?

09:30:35 10   A.    The uridine metabolite is the molecule, PSI-6206,

09:30:40 11   this enactive metabolite of this molecule 6130.

09:31:46 12   Q.    And I am sorry if I didn't mention this before.  This

09:31:55 13   is a slide from your 2009 presentation, is that correct?

09:32:00 14   A.    That is correct.

09:32:00 15   Q.    Dr. Sofia, could you explain the purpose of this

09:32:04 16   slide from your presentation from 2009?

09:32:07 17   A.    Sure.  So this actually encompasses quite a lot of

09:32:12 18   investigative work on the part of the scientists at

09:32:14 19   Pharmasset.

09:32:15 20         What it actually shows is the detailed

09:32:18 21   information on what happens to PSI-6130 when it gets into

09:32:24 22   the body and what the body does with it.

09:32:29 23         I know it's complicated.  I will try to take you

09:32:30 24   through it.  But what's showing here is, this PSI-6130 is

09:32:35 25   actually not the active form of the drug that acts against

09:32:39 1  the virus.  The body itself must convert it first to what is

09:32:44 2  known as the monophosphate, but this little group on it then

09:32:48 3  puts a second one on and then a third one on.

09:32:51 4          What you end up forming is what is known as

09:32:53 5  PSI-6130 triphosphate.  So it has three phosphate groups

09:32:59 6  attached to this 5' position.  It turns out it's this form

09:33:04 7  of PSI-6130 that actually acts upon the virus itself, the

09:33:09 8  enzyme and the virus.

09:33:10 9  Q.      So, Dr. Sofia, let me interrupt you for a moment.

09:33:16 10 Which form, just to make sure we are all on the same page,

09:33:19 11 which form is necessary to inhibit the virus?

09:33:24 12 A.      It is this triphosphate.  It inhibits the enzyme that

09:33:28 13 the virus has that this molecule acts against.

09:33:30 14 Q.      Why are you calling it triphosphate?

09:33:32 15 A.      Well, as I mentioned, it has three of what they call

09:33:36 16 these phosphate groups.  You can see this P with the O's

09:33:39 17 attached to it.  So there is three of them.  So they are

09:33:41 18 attached to that.  That is what the enzyme recognizes.

09:33:44 19 Q.      Is the triphosphate of the uridine, PSI-6206 on the

09:33:52 20 bottom there, is that active against the virus?

09:33:55 21 A.      Yes, it turns out to be active.  And surprisingly so.

09:34:00 22 Q.      Could you give that compound to a patient?

09:34:03 23 A.      No, you can't.

09:34:04 24 Q.      Why?

09:34:05 25 A.      Well, it turns out that this particular molecule, as

09:34:08 1    a triphosphate, has two major problems.  It is highly

09:34:14 2    charged.  It goes back to this whole concept of, you know,

09:34:19 3    how molecules get into the body, get across the biological

09:34:24 4    barriers.  The biological barriers are usually very

09:34:27 5    lipid-like.  These are very polar.  They don't really

09:34:30 6    associate.  It's like oil and water.  So it can't really get

09:34:34 7    into this membrane and ultimately get across.

09:34:37 8         So this particular form, these triphosphates,

09:34:42 9    are highly charged and can't associate with these barriers

09:34:45 10   and never gets in.

09:34:47 11        Secondly, it turns out to be chemically

09:34:52 12   unstable.  You make it, it can't stay around very long, so

09:34:58 13   you can never really make a drug out of it.

09:35:00 14        Thirdly, the body will chew it up really

09:35:02 15   quickly.  So if you give it to somebody by the mouth, it

09:35:05 16   will get chewed up pretty quickly before it ever gets the

09:35:09 17   cell at all.

09:35:10 18        It really is not a form or chemical that you can

09:35:15 19   actually give as a drug.

09:35:16 20   Q.   Dr. Sofia, I heard you list, when you were talking

09:35:20 21   about the 6206 phosphate, I heard you say there was an

09:35:26 22   absorption issue, a chemical stability issue and the fact

09:35:30 23   that it gets chewed up.  Did you try to address those

09:35:33 24   problems?

09:35:34 25   A.   Well, yes.  So as I mentioned, we had done a

09:35:37 1    significant amount of investigation and delineated this

09:35:41 2    whole pathway of what happens to this.

09:35:44 3         What we found out is, as I mentioned, that 6130

09:35:47 4    gets converted to this 6206 (inactive), but it's inactive

09:35:53 5    because, in fact, the body can't convert this to this first

09:35:59 6    intermediate in the step of generating the triphosphate.  It

09:36:03 7    can't convert it to this monophosphate.  For some reason,

09:36:07 8    this particular molecule is just not accepted by mechanisms

09:36:11 9    in the body that convert it.

09:36:14 10        So the real question was, how do we actually

09:36:16 11   deliver this, because we think that if we can deliver this,

09:36:19 12   then it will actually go to the diphosphate and ultimately

09:36:22 13   the triphosphate, and then inhibit the HCV virus.

09:36:31 14        What was really interesting about this, and the

09:36:33 15   reason why we were very interested in this, and this was a

09:36:36 16   key finding, a key finding that we had, was that in fact not

09:36:40 17   only was this triphosphate active against the virus but it

09:36:43 18   actually lasted for a really long time in the liver, in the

09:36:46 19   liver cell.  It could last here 38 hours.

09:36:50 20        What that told us is we could develop really

09:36:53 21   high concentrations, like a lot of it in the cell , meaning

09:36:56 22   that it had a higher potential for inhibiting the virus.

09:37:00 23   And also, it would last a long time.  So you only have to

09:37:04 24   give, if you could get it there and make it, you can have a

09:37:07 25   drug that can -- you can give maybe just once a day, versus

09:37:12 1    a lot of these other drugs that you were giving multiple

09:37:14 2    times a day.

09:37:15 3            So it had a lot of advantages.  If we could just

09:37:17 4    get this in the cell, then we could actually maybe achieve

09:37:21 5    this concept of getting a drug that we could give once a

09:37:26 6    day, and that would be very potent.

09:37:29 7            But it really required us to first get this

09:37:32 8    delivered into the cell some way.

09:37:35 9    Q.    Dr. Sofia, so the record is clear, you are saying

09:37:38 10   "this" and using the laser pointer, that won't make it into

09:37:43 11   the record itself.  When you say "this," specifically what

09:37:45 12   you were you pointing to?

09:37:46 13   A.    PSI-6206 monophosphate.  We had to deliver the

09:37:50 14   monophosphate into the cell in order for it ultimately to be

09:37:54 15   taken by the body, converted to the diphosphate and

09:37:57 16   ultimately then to the triphosphate.

09:37:59 17   Q.    Ultimately, how were you able to deliver PSI-6206

09:38:05 18   monophosphate the cell?

09:38:06 19   A.    What we ultimately used was a prodrug.

09:38:09 20   Q.    In looking for a prodrug of PSI-6206 monophosphate,

09:38:18 21   how many different prodrugs were there to choose from?

09:38:21 22   A.    If you look in the literature, there are probably ten

09:38:25 23   or more different classes of these different things that you

09:38:28 24   could put on here to possibly solve the problem.

09:38:32 25   Q.    And in those ten classes that you considered, how

09:38:36  1    many options are within each class?

09:38:38  2    A.      Well, there could be hundreds of options because each

09:38:41  3    of those classes you could put different -- you can vary

09:38:44  4    them in a number of different ways to get the optimal form

09:38:48  5    of it that you wanted.

09:38:49  6    Q.      And ultimately, what class did you select?

09:38:51  7    A.      We ultimately selected this class called a

09:38:55  8    phosphoramidite.

09:38:57  9    Q.      Why did you choose that class?

09:38:59 10    A.      Well, as we were thinking about the problem we wanted

09:39:03 11    to solve, not only the fact that we wanted to get this

09:39:06 12    monophosphate into the cell, but we actually had this

09:39:11 13    aspirational idea of trying to target the liver.  We talked

09:39:15 14    about liver target before.  If we can target the liver, we

09:39:18 15    can get all the drug into the liver, the person doesn't get

09:39:21 16    exposed in the rest of the body.  It adds a level of safety

09:39:26 17    that we wanted, a level of getting a lot of drug into the

09:39:29 18    liver, where the virus is, replicating at a very high rate.

09:39:33 19            What we believed was that the phosphoramidite,

09:39:36 20    when we looked at it, that, in fact, you know, we could

09:39:40 21    leverage this thing as we talked about before, first pass

09:39:44 22    metabolism, we said this for the phosphoramidite prodrug

09:39:47 23    concept had the structure that we felt that the liver could

09:39:53 24    actually act upon it specifically, cleave it off and unmask

09:39:57 25    it, ultimately delivering this molecule into the liver cell.

09:40:02  1    Q.    Were there any drawbacks associated with the

09:40:06  2    phosphoramidite class?

09:40:08  3    A.    Sure.  There were quite a lot of drawbacks.

09:40:10  4    Q.    What were a few of the drawbacks?

09:40:14  5    A.    No one had ever really demonstrated that you could

09:40:18  6    deliver a phosphoramidite prodrug into a human effectively

09:40:22  7    and get an effective therapeutic out of it.  So that was

09:40:27  8    never demonstrated.

09:40:28  9          No one actually ever delivered a phosphate of a

09:40:32 10    nucleoside into a human as a drug.  This would have been the

09:40:35 11    first time anyone ever actually demonstrated that you could

09:40:38 12    do that.

09:40:39 13          You know, there was also the problem of, you

09:40:43 14    know, could, in fact, that construct be safe.  You know, you

09:40:47 15    are building a new molecule now, a completely new molecule

09:40:50 16    that was never given before.  Is that going to be safe and

09:40:53 17    effective against the virus?

09:40:58 18    Q.    Dr. Sofia, despite these concerns, did you ultimately

09:41:01 19    move forward with the phosphoramidite?

09:41:03 20    A.    Yes, we did.  In fact.  We ultimately moved forward

09:41:08 21    even though there were many, many people and a lot of what

09:41:11 22    we call experts that we consulted about this strategy who

09:41:14 23    said it wasn't going to work.

09:41:15 24    Q.    Why did you move forward?

09:41:17 25    A.    Well, we moved forward because I believed very

09:41:21 1  strongly in this whole concept of liver first pass

09:41:24 2  metabolism and that the construct that we were developing,

09:41:27 3  this phosphoramidite prodrug of this uridine nucleoside,

09:41:32 4  well had a chance of getting to the liver, leveraging the

09:41:38 5  liver mechanisms, the liver machinery, to ultimately deliver

09:41:41 6  this monophosphate.  Others didn't believe it was really

09:41:44 7  possible.

09:41:45 8  Q.     How many different phosphoramidite prodrugs did you

09:41:49 9  make and test before you ultimately arrived at

09:41:54 10 phosphoramidite?

09:41:54 11 A.     We ultimately made over 140 different variants.

09:41:57 12 Q.     How long did that effort take?

09:41:58 13 A.     Approximately a year and a half to complete that.

09:42:00 14 Q.     Were you awarded any patents for your invention?

09:42:03 15 A.     Yes.  I was awarded six U.S. patents for that patent.

09:42:10 16 Q.     If we could have DDX-306.

09:42:13 17        Dr. Sofia, in your binder, there should be an

09:42:18 18 exhibit labeled DX-2721.

09:42:28 19 A.     I see.

09:42:28 20 Q.     Do you recognize that document?

09:42:31 21 A.     Yes.  This is the U.S. patent that I was co-inventor

09:42:37 22 on.

09:42:38 23        MR. SHEAR:  Your Honor, we would move DX-2721

09:42:41 24 into evidence.

09:42:43 25        MR. KINTON:  No objection, Your Honor.

09:42:45 1          THE COURT:  It's admitted.

09:42:45 2          (DX-2721 received in evidence.)

09:42:46 3  BY MR. SHEAR:

09:42:48 4  Q.     If we could have the front page of DX-2721.

09:42:52 5          If we could look at the named inventors, are you

09:42:55 6  the Michael Joseph Sofia listed there?

09:42:58 7  A.     Yes, I am.

09:42:58 8  Q.     If we could focus down, a few inches down, there is

09:43:04 9  a, it says Filed, March 21st, 2008.  Do you see that?

09:43:09 10 A.     Yes, I do.

09:43:10 11 Q.     I should have asked right at the beginning, is this

09:43:12 12 one of the patents that covers sofosbuvir?

09:43:15 13 A.     Yes, it does.

09:43:17 14 Q.     Prior to March 21, 2008, how many compounds had you

09:43:22 15 made and tested?

09:43:23 16 A.     In this particular area, probably anywhere between 25

09:43:28 17 and a hundred compounds.

09:43:30 18 Q.     Has anyone put your patent into practice?

09:43:33 19 A.     Yes.  You know, this ultimately led to the drugs

09:43:39 20 Sovaldi and Harvoni, incorporated this what ultimately

09:43:44 21 became sofosbuvir for the cure of Hepatitis C.

09:43:47 22 Q.     Would you characterize your invention as a success?

09:43:51 23 A.     Sure.  I mean, it has changed the lives of, you know,

09:43:57 24 hundreds of thousands, if not millions of individuals

09:44:01 25 worldwide, who are now cured of the disease.

09:44:03 1   Q.      Dr. Sofia, let's change gears for a second and move

09:44:07 2   away from your patent.  We are in the home stretch.

09:44:12 3           Could we have DDX-307.

09:44:16 4           Mr. Sofia, could you explain to the jury what

09:44:20 5   DDX-307 is?

09:44:23 6   A.      Yes.  This is a slide showing that number of awards

09:44:26 7   that I received for the discovery of a cure of for Hepatitis

09:44:31 8   C.

09:44:31 9   Q.      Are these awards for sofosbuvir?

09:44:34 10  A.      Yes, they are.

09:44:35 11  Q.      Of the awards that were up there, is there any one

09:44:40 12  that you are more proud of than the others?

09:44:42 13  A.      I am proud of all of them.  I think they all

09:44:45 14  represent not only the accomplishment that I made, but the

09:44:50 15  accomplishments of the team that I was part of at

09:44:54 16  Pharmasset.

09:44:54 17          But, you know, I certainly would have to

09:44:57 18  highlight the last, the 2016 Lasker-Debakey Clinical Medical

09:45:05 19  Research Award that was awarded in September of this year.

09:45:08 20  Q.      Why do you highlight that one?

09:45:11 21  A.      Well, it is the most preeminent award in biomedical

09:45:15 22  research given in the United States.  It is awarded by the

09:45:22 23  Lasker Foundation, and the Lasker Foundation has a jury of

09:45:25 24  approximately 25 of the most preeminent scientists and

09:45:29 25  scholars in the United States, who spend months reading the

09:45:34 1    literature, understanding the contributions to a particular

09:45:38 2    field.  It's composed of a number of Nobel Laureates,

09:45:42 3    presidents of prominent universities, former head of the

09:45:48 4    National Institutes of Health and the National Cancer

09:45:52 5    Institute.

09:45:53 6              So they spend a lot of time.

09:45:57 7              Just to get the recognition of that group of

09:45:59 8    individuals for this accomplishment is certainly a highlight

09:46:03 9    of my career.

09:46:04 10   Q.    Could we have DDX-308.  Dr. Sofia, who is the

09:46:14 11   gentleman on the far right?

09:46:15 12   A.    That's me.

09:46:16 13   Q.    And can you explain to the jury what this picture is,

09:46:20 14   who is in this picture?

09:46:22 15   A.    Sure.  This was a picture taken at the 2016 Lasker

09:46:27 16   Award ceremony in New York City on September 23rd.  And in

09:46:33 17   this picture, to the far left is Ralf Bartenschlager, in the

09:46:40 18   center is Charlie Rice.  They are the co-winners with me of

09:46:44 19   the 2016 Lasker-Debakey Clinical Medical Research Award.

09:46:49 20             The other two individuals are Jim Wilson and his

09:46:53 21   wife Fran, who were my invitees, one of my ten allowed

09:46:58 22   invitees at the award ceremony.

09:47:02 23   Q.    Let me interject for a moment.  Are Drs.

09:47:06 24   Bartenschlager and Rice, did they work on sofosbuvir

09:47:08 25   specifically?

09:47:09 1    A.      No, they didn't.  They are academic scientists who

09:47:14 2    developed a particular assay, a way to screen drugs,

09:47:19 3    potential drugs for Hepatitis C.  And they were

09:47:21 4    instrumental, ultimately, in helping everyone ultimately

09:47:25 5    come up with a cure.

09:47:26 6    Q.      Then you mentioned Jim Wilson and Fran Wilson as one

09:47:32 7    of your, two of your ten invitees.

09:47:34 8            Why did you invite them?

09:47:36 9    A.      Well, it turns out that I got to know Jim a couple

09:47:41 10   years ago.  Jim is an individual who was an HCV sufferer.

09:47:47 11   He had HCV for decades.

09:47:51 12           He had two rounds of interferon therapy that

09:47:54 13   were unsuccessful, had a liver transplant that ultimately

09:47:58 14   was unsuccessful.  Meaning he had recurrent Hepatitis C,

09:48:02 15   which is not uncommon with people with Hepatitis C, to get

09:48:05 16   recurrent disease.

09:48:07 17           Jim was cured by sofosbuvir regimens.  And I

09:48:15 18   felt it pretty appropriate to have him representing those

09:48:19 19   millions of people who suffered from HCV to be at this award

09:48:26 20   ceremony.  I invited him, and he graciously accepted.

09:48:29 21           MR. SHEAR:  Thank you, Dr. Sofia.

09:48:30 22           Your Honor, we pass the witness.

09:48:32 23           THE COURT:  Cross-examination.

09:48:54 24           MR KINTON:  Your Honor, may I approach?

09:48:56 25           THE COURT:  You may.

**CROSS-EXAMINATION**

**BY MR. KINTON:**

Q.      Good morning Dr. Sofia.

A.      Good morning.

Q.      We met a little while ago.  My name is John Kinton, in case you don't remember.

I have a few questions of followup.

You never were employed by Novirio, were you?

A.      No, I was not.

Q.      And you were never employed by Idenix?

A.      No, I was not.

Q.      So you have no personal knowledge about what Idenix was doing in the 1999, 2000, 2001 time frame to identify Hepatitis C treatment?

A.      No personal knowledge other than what I read in the literature.

Q.      And so you are not an inventor on any Idenix's patents, are you?

A.      No, I am not.

Q.      You joined Pharmasset in August of 2005?

A.      That's correct.

Q.      You were not with Pharmasset when PSI-6130 was first made?

A.      That is correct.

Q.      You understand that Mr. Clark worked on PSI-6130?

09:50:12 1    A.    Yes, I do.

09:50:13 2    Q.    And Mr. Clark left Pharmasset by the time you joined?

09:50:17 3    A.    Yes, he did.

09:50:18 4    Q.    And you never even met him?

09:50:21 5    A.    No, I never met him.

09:50:23 6    Q.    Dr. Schinazi was also gone when you joined

09:50:27 7  Pharmasset, wasn't he?

09:50:28 8    A.    That is correct.

09:50:28 9    Q.    And Dr. Stuyver wasn't at Pharmasset when you joined

09:50:31 10  the company?

09:50:31 11    A.    That is correct.  He was not.

09:50:32 12    Q.    Dr. Watanabe wasn't at Pharmasset when you joined the

09:50:35 13  company, was he?

09:50:36 14    A.    That is correct, he was not.

09:50:37 15    Q.    So many of the people at Pharmasset who would have

09:50:40 16  been involved in chemistry meetings between 2000 and 2004

09:50:44 17  were gone when you got there, is that right?

09:50:50 18    A.    No, that's not correct.  Many of the scientists who

09:50:54 19  reported to me at Pharmasset were chemists, and they were

09:50:58 20  part of those meetings.  So there were a number of them that

09:51:01 21  were there.

09:51:02 22    Q.    You talked to the -- but certainly none of the top

09:51:06 23  executives, including Dr. Schinazi, Dr. Stuyver, and Dr.

09:51:13 24  Watanabe weren't there when you joined.  Right?

09:51:15 25    A.    Well, Dr. Otto was.  He was my boss.  So he was a top

09:51:19  1    executive who was still at Pharmasset and had been there

09:51:21  2    during my whole tenure.

09:51:23  3    Q.    You talked to the jury on direct examination about

09:51:26  4    your patents, your work covering sofosbuvir?

09:51:32  5    A.    That's correct.

09:51:32  6    Q.    You understand there can be multiple patents covering

09:51:34  7    the same product?

09:51:35  8    A.    That's correct.

09:51:35  9    Q.    And you have, in fact, six patents covering

09:51:40 10    sofosbuvir.  Correct?

09:51:41 11    A.    That's correct.

09:51:41 12    Q.    You are aware that there are patents that can cover

09:51:44 13    the compound and then different patents that can cover the

09:51:48 14    methods of use?

09:51:49 15    A.    That's correct.

09:50:45 16    Q.    Let's look at DX-2721.  And it's in either binder.

09:50:54 17    It's the one that counsel used as well in the white binder.

09:51:08 18          Actually, it may not be in the white binder.

09:51:13 19    It's in the one that your counsel provided.

09:51:19 20    A.    Okay.

09:51:20 21    Q.    So this is one of your patents on sofosbuvir?

09:51:22 22    A.    That is correct.

09:51:22 23    Q.    And column 4, on page 9 of the patent.  It shows a

09:51:31 24    summary of the invention.  Do you see that?

09:51:43 25    A.    Yes, I do.

09:51:44  1    Q.      So it's a generic scope invention?

09:51:46  2    A.      That is correct.

09:51:47  3    Q.      And the formula has several R groups, an X group, a Y

09:51:53  4    group, and a base?

09:51:53  5    A.      That is correct.

09:51:55  6    Q.      With a bunch of options for each of those?

09:51:58  7    A.      That is correct.

09:51:58  8    Q.      And the options start with the "wherein" below the

09:52:02  9    formula?

09:52:07 10    A.      Yes.

09:52:08 11    Q.      And they continue on to the next page?

09:52:16 12    A.      That is correct.

09:52:17 13    Q.      And they continue on to the next page up to right

09:52:21 14    before the word "definitions?"

09:52:25 15    A.      That is correct.

09:52:25 16    Q.      There are billions of compounds described in this

09:52:29 17    patent, aren't there?

09:52:32 18    A.      I don't know off the top of my head how many but

09:52:35 19    there are a number.

09:52:37 20    Q.      There is a very, very large number, wouldn't you

09:52:39 21    agree?

09:52:39 22    A.      There is large number.  Yes, there is a large number.

09:52:42 23    Q.      You testified on direct that you tested 140

09:52:44 24    compounds?

09:52:44 25    A.      Yes, 140 ultimately to get to what we were looking

09:52:49  1   for.

09:52:49  2   Q.      So you hadn't made all the compounds in the patent?

09:52:52  3   A.      No, we made a lot of representative compounds though.

09:52:54  4   Q.      And you hadn't tested all of the compounds in the

09:52:57  5   patent either, had you?

09:52:59  6   A.      We tested all the compounds that were exemplified in

09:53:02  7   the patent.

09:53:02  8   Q.      But not all the compounds in the generic scope?

09:53:06  9   A.      Not all the compounds in the generic scope.

09:53:08 10   Q.      But you though you had identified a class that you

09:53:11 11   thought would be useful?

09:53:13 12   A.      Yes, we did.

09:53:14 13   Q.      And a member of that class is sofosbuvir, right?

09:53:17 14   A.      That is correct.

09:53:18 15   Q.      And it has a 2'-methyl up?

09:53:21 16   A.      It has a 2'-methyl, 2'-fluoro substitution.

09:53:25 17   Q.      Which is, one of the substitutions is a 2'-methyl up.

09:53:29 18   Would you agree with that?

09:53:30 19   A.      It has a 2'-methyl, and a 2'-fluoro, yes.

09:53:32 20   Q.      And which orientation is the 2'-methyl?

09:53:35 21   A.      The 2'-methyl is in the beta which is in the upper

09:53:39 22   orientation.  2'-fluoro is down.

09:53:43 23   Q.      You understand that the jurors have been instructed

09:53:45 24   that the use of Sovaldi and Harvoni in accordance with their

09:53:48 25   respective labels results in the use of the method defined

09:53:50 1  by the asserted claims of the '597 patent under this Court's

09:53:54 2  claim construction?  Are you aware of that?

09:53:57 3  A.      Could you repeat that, please?

09:53:58 4  Q.      Sure.  Are you aware that the jurors have been

09:54:01 5  instructed that the use of Sovaldi and Harvoni in accordance

09:54:05 6  with their respective labels results in the use of the

09:54:08 7  method defined by the asserted claims of the '597 patent

09:54:12 8  under the Court's claim construction?

09:54:16 9  A.      I believe that is correct.

09:54:17 10 Q.      And you're aware they've been instructed to assume

09:54:22 11 the use of Sovaldi and Harvoni infringe the '597 patent;

09:54:22 12 correct?

09:54:26 13 A.      Yes, they have been instructed that.  That's correct.

09:54:33 14         MR. KINTON:  Can we have PX-1569 up on the

09:54:36 15 screen?  Actually, don't put it on the screen yet.  Sorry.

09:54:36 16 BY MR. KINTON:

09:54:39 17 Q.      I'd like you to look the a PX-1569 in your white

09:54:44 18 binder which I believe is going to be Tab 1.

09:54:57 19         Do you have that in front of you?

09:54:59 20 A.      Yes, I do.

09:55:00 21 Q.      And this is a book chapter you authored in 2011?

09:55:06 22 A.      Yes, it appears to be that.

09:55:08 23 Q.      And you recognize it?

09:55:10 24 A.      Yes, I do.

09:55:13 25         MR. KINTON:  Plaintiffs would like to move in

09:55:15 1   Plaintiffs' Exhibit 1569.

09:55:18 2                    MR. SHEAR:  No objection, Your Honor.

09:55:19 3                    THE COURT:  It's admitted.

09:55:19 4            (PX-1569 was admitted into evidence.)

09:55:19 5   BY MR. KINTON:

09:55:21 6   Q.      You wrote this article in 2001 when you -- or 2011

09:55:27 7   when you were at Pharmasset; right?

09:55:29 8   A.      Yes, it was published in 2011.

09:55:31 9   Q.      And that was before the lawsuit was filed?

09:55:34 10  A.      I believe that is true.

09:55:36 11                   MR. KINTON:  Okay.  Can we go to page 241 of the

09:55:42 12  article.

09:55:46 13                   Can we take that popup down.  There we go.

09:55:46 14  BY MR. KINTON:

09:55:54 15  Q.      Under the heading 11.2.1, there is a paragraph with

09:55:58 16  the heading is Rationale and Medicinal Chemistry for

09:56:02 17  PSI-6130.  Do you see that?

09:56:04 18  A.      Yes, I do.

09:56:05 19  Q.      Okay.  And in that paragraph, you wrote:  However, it

09:56:08 20  was known that attaching a methyl group at the 2'-beta

09:56:14 21  position of a ribonucleoside as demonstrated by NM107

09:56:18 22  produced an active inhibitor of a related RNA virus, the

09:56:23 23  bovine virus diarrhea virus (BVDV) which was used as a

09:56:31 24  surrogate for HCV.

09:56:33 25                   Did I read that correctly?

09:56:34 1    A.      That is correct.

09:56:34 2    Q.      When you made that statement, you said this was

09:56:37 3    demonstrated by NM107?

09:56:41 4    A.      Yes, that is correct.

09:56:41 5    Q.      And NM107 is Idenix's compound?

09:56:44 6    A.      It is a 2'-methyl, 2' hydroxy compound that Idenix

09:56:50 7    was developing, yes.

09:56:50 8    Q.      And the statement you wrote in that book chapter

09:56:52 9    contains a footnote No. 10?

09:56:54 10   A.      That is correct.

09:56:55 11   Q.      And if we look at the footnote 10 on page 263.

09:57:13 12   A.      I see it.

09:57:13 13   Q.      You see there is a reference to a paper by Pierre,

09:57:17 14   and some of the authors are Standring and J.P. Sommadossi?

09:57:21 15   A.      Yes, I do see that.

09:57:22 16   Q.      And that is Dr. Standring sitting right there?

09:57:25 17   A.      That is.

09:57:25 18   Q.      And you understand Dr. Standring worked at Idenix?

09:57:28 19   A.      Yes, I do.

09:57:29 20   Q.      And you understand he is an inventor on the '597

09:57:31 21   patent in this case?

09:57:31 22   A.      Yes, I do.

09:57:32 23   Q.      Let's go back to page 241, please.

09:57:39 24           Later in that same paragraph, you write:  "With

09:57:42 25   this limited information in hand, the 2'-deoxy, 2'-fluoro,

09:57:48 1   2'-C-methyl-cytidine nuc, PSI-6130 was prepare and evaluated

09:57:55 2   as an inhibitor of HCV" --

09:57:57 3           That is hepatitis C, right?

09:58:00 4   A.    Yes, that is true.

09:58:01 5   Q.    (Continuing):  -- "using the subgenomic HCV replicon

09:58:05 6   assay."  Do you see that?

09:58:06 7   A.    Yes, I do.

09:58:07 8   Q.    And you agree part of the information in hand

09:58:11 9   included knowledge that attaching a methyl group to the 2'

09:58:15 10   beta position of a ribonucleoside produced an active

09:58:19 11   inhibitor of a related RNA virus?

09:58:21 12   A.    Yeah, but there was no information about whether it

09:58:25 13   would work against HCV or whether 2'-methyl or 2'-fluoro was

09:58:30 14   going to be effective.

09:58:31 15   Q.    You agree with what you wrote in the article?

09:58:34 16   A.    Yes.  That is, you have got to take it in context

09:58:36 17   though with what the rest of the article says.

09:58:38 18   Q.    And you cite to Idenix for the source of that piece

09:58:42 19   of knowledge in the article?

09:58:44 20   A.    Excuse me?

09:58:46 21   Q.    And you cite to Idenix in this paragraph in the

09:58:50 22   article?  Idenix's work?

09:58:52 23   A.    Well, that original statement up top where I describe

09:58:55 24   what they had done in their work, I referenced that, yes.

09:58:59 25   This one, Reference 11, is to the work that Clark and

09:59:03 1   Pharmasset had done.

09:59:04 2   Q.    I'd like you to turn to the next tab in your book,

09:59:08 3   which is Plaintiffs' Exhibit 3000.  And this is a chapter

09:59:14 4   you wrote titled Discovery and Development of PSI-6130,

09:59:23 5   RG7128 in a book called Antiviral Drugs From Basic Discovery

09:59:27 6   Through Clinical Trials; is that right?  It should be the

09:59:35 7   next tab.

09:59:37 8   A.    No, that doesn't say that here.

09:59:52 9         THE COURT:  Do you want to approach?

09:59:56 10        MR. KINTON:  May I have a moment, Your Honor?

09:59:58 11        THE COURT:  Sure.

09:59:59 12        (Counsel confer.)

10:00:04 13        MR. KINTON:  It should be behind Tab 2 in your

10:00:07 14  notebook.

10:00:09 15  A.    It says "Discovery and Development of PSI-6130."  Is

10:00:09 16  that?

10:00:13 17  Q.    Yes.

10:00:14 18  A.    "/RG7128."

10:00:16 19  Q.    Yes.

10:00:17 20  A.    That doesn't say clinical trials.

10:00:18 21  Q.    If you look at the publication down at the bottom, it

10:00:22 22  is antiviral drugs.

10:00:23 23  A.    It was in that text, yes.

10:00:24 24  Q.    In that text, okay.

10:00:25 25  A.    Yes.

10:00:25 1   Q.     Do you recognize that article?

10:00:27 2   A.     Yes, I do.

10:00:28 3   Q.     And you wrote that with Dr. Furman and Dr. Otto?

10:00:31 4   A.     Yes, I did.

10:00:32 5   Q.     And all of you were employees at Pharmasset at the

10:00:34 6 time?

10:00:34 7   A.     Yes, we were.

10:00:36 8         MR. KINTON:  Plaintiffs move Exhibit 3000 into

10:00:38 9 evidence.

10:00:39 10         MR. SHEAR:  No objection, Your Honor.

10:00:39 11         THE COURT:  It's admitted.

10:00:39 12         (PTX-3000 was admitted into evidence.)

10:00:39 13 BY MR. KINTON:

10:00:43 14   Q.     So, again, you wrote this article before the lawsuit

10:00:45 15 was filed in 2013?

10:00:46 16   A.     Yes, it was published in 2011.

10:00:50 17   Q.     And you wrote:  "Nevertheless" -- let's go to page

10:00:55 18 306.

10:01:00 19         And there is a paragraph at the top of it where

10:01:03 20 you wrote:  "Nevertheless, in recent years, specific

10:01:07 21 nucleoside analog inhibitors of HCV have been identified,

10:01:11 22 and two general classes of nucleosides have progressed to

10:01:15 23 the clinical stage of development.  These classes include

10:01:18 24 the 2'-C-methyl chemotype represented by NM107, PSI-6130,

10:01:26 25 MK0608, and PSI-7851."

10:01:29  1        Did I read that correctly?

10:01:31  2   A.    That is correct.

10:01:31  3   Q.    And NM107 is an Idenix compound?

10:01:36  4   A.    That is correct.

10:01:36  5   Q.    And PSI-6130 and PSI-7851 are Pharmasset compounds?

10:01:42  6   A.    That is correct.

10:01:43  7   Q.    And PSI-7851 is a metabolite of sofosbuvir; right?

10:01:51  8   A.    Excuse me?

10:01:52  9   Q.    PSI-7851, that is a metabolite of sofosbuvir?

10:01:56 10   A.    No, it is not.

10:01:57 11   Q.    It is not.  MK608 is a Merck compound, right?

10:02:03 12   A.    It is a Merck 2'-methyl, 2'-hydroxyl nucleoside, yes.

10:02:07 13   Q.    And those four compounds, they all have a 2'-methyl

10:02:10 14   up?

10:02:10 15   A.    Well, they have different things at 2', including

10:02:16 16   2'-methyl hydroxyl, 2'-methyl fluoro.

10:02:16 17   Q.    But they all have 2' methyl up and that is what makes

10:02:20 18   them part of the 2'-methyl chemotype class; right?

10:02:24 19   A.    Well, again, you take, you take it out of context

10:02:26 20   because when you read the rest of the paper, it describes

10:02:30 21   how really differentiated they are.

10:02:32 22   Q.    You wrote that?

10:02:34 23   A.    I did write that, yes.

10:02:36 24   Q.    In 2001 -- or 2011?

10:02:37 25   A.    That is correct.

10:02:38 1    Q.      After Gilead acquired Pharmasset, you were employed

10:02:44 2    by Gilead until June of 2012, right?

10:02:47 3    A.      That is correct, yes.

10:02:49 4    Q.      And then you were a research advisor for Gilead from

10:02:52 5    June 2012 to December 2012?

10:02:54 6    A.      That is correct.

10:02:55 7    Q.      From the terms of the settlement agreement you

10:03:01 8    negotiated with Pharmasset in 2006, you have an obligation

10:03:04 9    to support any defense of any IP you are associated during

10:03:07 10   your Pharmasset days; is that right?

10:03:08 11   A.      That is correct, yes.

10:03:09 12   Q.      And that led you to being involved in certain legal

10:03:11 13   proceedings, including this case?

10:03:13 14   A.      That is correct.

10:03:13 15   Q.      And you mentioned that you are being compensated.

10:03:19 16   You have an agreement with Gilead?

10:03:21 17   A.      That is correct.  I have a consulting agreement with

10:03:23 18   Gilead.

10:03:23 19   Q.      And for your work, you are being compensated at $700

10:03:27 20   an hour?

10:03:27 21   A.      No, I'm not.

10:03:28 22   Q.      What are you being compensated at?

10:03:29 23   A.      As a consultant now, because of my work not only

10:03:33 24   includes supporting this trial, I also do a lot of speaking

10:03:37 25   engagements outside, talking about the discovery of

10:03:40 1    sofosbuvir and providing that sort of communications, so my

10:03:44 2    consulting agreement now is about $15,000 a month when I'm

10:03:49 3    working.

10:03:49 4    Q.    And so you worked at Pharmasset when -- so does that

10:03:58 5    include -- when you say "when you are working," does that

10:04:00 6    include testifying here today?

10:04:02 7    A.    That is correct.

10:04:02 8    Q.    It included sitting through opening statements?

10:04:05 9    A.    That is correct, yes.

10:04:06 10    Q.    As a result of the acquisition by Gilead, you made a

10:04:12 11    fairly significant amount of money; is that right?

10:04:13 12    A.    I made some money.

10:04:14 13    Q.    And how many how much did you make?

10:04:17 14    A.    Look, I'm incredibly grateful for what I made. I'm

10:04:21 15    currently blessed by that, the money that I was able to make

10:04:26 16    at that. And, you know, that is very, I've been very

10:04:34 17    fortunate.

10:04:35 18    Q.    So how much did you make?

10:04:37 19    A.    Like I said, I've been really blessed. Look, I grew

10:04:43 20    up, my parents almost lost their home because they couldn't

10:04:46 21    make payments. I'm very blessed that now I'm in a position

10:04:50 22    that I don't have to worry about that with me and my

10:04:53 23    children. This is a private matter. I really don't feel

10:04:56 24    that I need to share that personal, personal information

10:04:59 25    that only me and my wife know.

10:05:01 1          MR. KINTON:  Your Honor, could he testify?

10:05:04 2          THE COURT:  I'm sorry.

10:05:05 3          MR. KINTON:  I would like him to answer the

10:05:07 4  question.

10:05:07 5          MR. SHEAR:  We object.  It is a private matter.

10:05:09 6  It is not public information.

10:05:10 7          THE COURT:  All right.  The objection is

10:05:11 8  overruled.  Doctor, you are going to have to answer the

10:05:14 9  question.

10:05:16 10         THE WITNESS:  Could you repeat the question?

10:05:17 11 BY MR. KINTON:

10:05:18 12 Q.     Yes.  How much did you make by the acquisition of

10:05:23 13 Pharmasset by Gilead?

10:05:24 14 A.     I made $5 million.

10:05:31 15         MR. KINTON:  Thank you.  I have no further

10:05:32 16 questions.

10:05:36 17         THE COURT:  Redirect.

10:05:37 18         MR. SHEAR:  Yes, Your Honor.

10:05:39 19                  REDIRECT EXAMINATION

10:05:39 20 BY MR. SHEAR:

10:05:40 21 Q.     Dr. Sofia, let's start where that just ended.  You

10:05:43 22 looked uncomfortable answering the question.

10:05:45 23 A.     I was very uncomfortable.

10:05:47 24 Q.     Can you explain to the jury why you were

10:05:49 25 uncomfortable?

10:05:50 1        MR. KINTON:  Objection, relevance.

10:05:52 2        THE COURT:  Overruled.

10:05:52 3   BY THE WITNESS:

10:05:55 4   A.    It's a private matter.  I don't share my personal

10:05:58 5   information with people.  There are many people in this

10:06:00 6   juryroom today who I now had to share some very personal

10:06:04 7   information with that only my wife and I know.  And I

10:06:09 8   frankly find it pretty offensive that I had to do that.

10:06:13 9   Q.    Dr. Sofia, thank you.  Let's turn back to some

10:06:18 10  science.  I think that's why we're here.

10:06:21 11        Counsel showed you PX-1569, and if we could have

10:06:27 12  that up on the screen.

10:06:28 13        And, Dr. Sofia, this is a paper that you wrote

10:06:31 14  that counsel took you through on cross-examination.  And

10:06:34 15  counsel highlighted one specific passage of this paper with

10:06:38 16  you.

10:06:39 17        And if we could have PX-1569.0004.

10:06:47 18        And counsel highlighted you to this sentence:

10:06:53 19  However, it was known that attaching a methyl group to the

10:06:56 20  2'-beta position of a ribonucleoside as demonstrated by

10:07:00 21  NM107, produced an active inhibitor of a related RNA virus.

10:07:05 22  It goes on to talk about BVDV.

10:07:07 23        First, what is NM107?

10:07:11 24  A.    NM107 is the 2'-methyl, 2' hydroxy cytidine

10:07:19 25  nucleoside.

Sofia - redirect

10:08:21 1   Q.      And, if you could scroll down on the page -- go back

10:08:31 2   up.  NM107, there is a number there.  If we go back down, is

10:08:37 3   this NM107 right here?  My laser pointer just died on me.

10:08:42 4   A.      The structure above, the No. 1 is NM107, that's

10:08:46 5   correct.

10:08:46 6   Q.      What's at the 2' (down) position?

10:08:49 7   A.      It's a hydroxyl group.

10:08:51 8   Q.      What structure is to the right of that compound?

10:08:53 9   A.      That is a known nucleoside.

10:08:57 10  Q.      I am sorry, I meant straight below.  I am sorry.

10:09:01 11  A.      That molecule is PSI-6130.

10:09:05 12  Q.      Okay.  If we could go back up.

10:09:09 13          Dr. Sofia, you were directed specifically to

10:09:13 14  Footnote No. 10 when you were asked about this.  Do you

10:09:16 15  recall that?

10:09:17 16  A.      That's correct.

10:09:17 17  Q.      And if we could actually look at Footnote 10, Mr.

10:09:20 18  Sayres, it's on Page PX-15690026.

10:09:33 19          Now, Dr. Sofia, the document that you have cited

10:09:38 20  here at Footnote 10, that is not a patent, is it?

10:09:41 21  A.      No.  That is a publication in a peer-reviewed

10:09:44 22  research journal.

10:09:45 23  Q.      And when was that publication made?

10:09:47 24  A.      That publication was made in 2006.

10:09:50 25  Q.      So it's not the patent that's at issue in this case.

10:09:56 1    Is that right?

10:09:57 2    A.      That is correct.

10:09:57 3    Q.      If we could go back, Mr. Sayres, to PX -- we are

10:10:01 4    going to stay in this document.  Counsel showed you that one

10:10:06 5    limited sentence.  I want to show you some of the rest of

10:10:09 6    it.

10:10:10 7              Mr. Sayres, if we could go to PX-15690005, and,

10:10:21 8    Dr. Sofia, if we could look at this -- the last sentence of

10:10:26 9    this first paragraph here, "So, it was surprising when a

10:10:32 10   cytidine nucleoside analog (PSI-6130) that combined a

10:10:36 11   2'-Beta-methyl group and a 2'-Alpha-fluoro group exhibited

10:10:42 12   exceptional potency, selectivity and lack of both

10:10:46 13   cytotoxicity and mitochondrial toxicity."

10:10:49 14             Dr. Sofia, could you explain to the jury what

10:10:52 15   you meant by that sentence?

10:10:53 16   A.      Sure.  You know, it was known that a 2'-methyl group

10:10:56 17   on a nucleoside, without anything in the other 2' position,

10:11:02 18   was extremely cytotoxic.  And it also is known that a

10:11:09 19   2'-methyl-2'hydroxy group also produced molecules that

10:11:14 20   ultimately were shown to be toxic even when they were taken

10:11:17 21   into the clinic.  And, in fact, no 2'-methyl-2'hydroxy has

10:11:24 22   ever been taken all the way through the clinic and marketed

10:11:27 23   as a product because of the toxicity associated with them.

10:11:32 24             What we found out here was, in fact, very

10:11:35 25   uniquely, a 2'-methyl with a fluorine in that Alpha position

was exceptionally potent and selective, meaning it only hit

the HCV virus.

In fact, you know, that is very different from a

2'methyl-2'hydroxy, which had that number of other viruses

and wasn't very selective. Then from the cytotoxicity

standpoint, you know, when you compare 2'methyl-2'fluoro to

2'methyl-2'-fluoro to 2'methyl-2'hydroxy, there is no

comparison with regard to the safety profile. The 2'-methyl

with the fluorine (down) that we made at Pharmasset, you

know, was exceptionally clean, as demonstrated by the fact

that Sovaldi, sofosbuvir, is on the market with no side

effects whatsoever associated with it.

Comparably, with 2'-methyl with a hydroxy

(down), biochemical studies have shown that, in fact, this

molecule gets incorporated into human genetic material,

causing problems. And that's probably why this molecule

with the 2'-methyl-hydroxy has never been to the market.

Q.    Dr. Sofia, thank you.

Let's take a look at the other document that you

were shown, PX-3000?

Now, Dr. Sofia, during your cross-examination,

you were shown this document and I believe you were shown

one specific limited portion. If we could have the second

page of the exhibit.

Dr. Sofia, you were shown, and it is going to be

10:13:44 1    hard to read, right here, "Nevertheless, in recent years

10:13:48 2    specific nucleoside analog inhibitors of HCV have been

10:13:52 3    identified and two general classes of two nucleosides have

10:13:55 4    progressed to the clinical stage of development.  These

10:13:57 5    classes include 2'-C-methyl nucleotide represented by NM107,

10:14:02 6    PSI-6130, MK608, and PSI-6120."

10:14:08 7              Do you recall that?

10:14:09 8    A.    Yes, I do.

10:14:09 9    Q.    Dr. Sofia, let's actually look at the parts of the

10:14:14 10   paper counsel didn't show you.  If we could have the next

10:14:18 11   page.  Dr. Sofia, on the right-hand side, and it's small, I

10:14:21 12   am going to try to read it to you, if you could potentially

10:14:24 13   blow up this portion, so, Dr. Sofia, it says, "A comparison

10:14:34 14   with the 2'-methyl-C ribose nucleosides NM107 and MK601."

10:14:41 15             Let's stop right there.  Those two compounds,

10:14:44 16   what are they?

10:14:45 17   A.    NM107 is the Idenix compound.  2'-methyl-hydroxy with

10:14:50 18   a cytidine base.  And MK0608 is a 2'-methyl-hydroxy again

10:14:56 19   with a, what is known as a purine base or adenosine-type

10:15:03 20   base.

10:15:03 21   Q.    Who made MK608?

10:15:06 22   A.    Merck made that compound.

10:15:07 23   Q.    For both of those compounds, what is at the 2' (down)

10:15:07 24   position?

10:15:11 25   A.    A hydroxyl group.

10:15:12 1    Q.    Let's continue with the sentence:  "A comparison of

10:15:15 2    those two compounds shows that PSI-6130 is about fivefold

10:15:19 3    more potent than its direct 2'-hydroxyl analog NM107 and

10:15:25 4    equipotent to the adenosine derivative.  Equally striking is

10:15:29 5    that PSI-6130 has a more favorable cytotoxicity profile than

10:15:33 6    either of the 2'-C-methyl derivatives."

10:15:37 7          Can you explain to the jury what you meant when

10:15:38 8    you wrote that?

10:15:39 9    A.    Yes.  This just highlighted the fact that the

10:15:41 10   2'-methyl-fluoro substitution is really quite unique and

10:15:46 11   stands out, in a field by itself, relative to the

10:15:50 12   2'-methyl-hydroxy group.  So you had two molecules up there

10:15:56 13   that have 2'-methyl with a hydroxy (down), different bases,

10:16:00 14   but the 2'-methyl-hydroxy, and they demonstrated various

10:16:06 15   cytotoxicity profiles that were inferior to the

10:16:09 16   2'-methyl-fluoro substitution.

10:16:12 17         So again, demonstrating that this whole class of

10:16:15 18   2'-methyl-fluoro is really quite unique from a 2'-methyl-

10:16:19 19   hydroxy in the NM107 and MC0608 compounds.

10:16:24 20   Q.    Dr. Sofia, this explanation that you just gave behind

10:16:28 21   what you have written here, this isn't the first time you

10:16:30 22   have ever said it, is it?

10:16:32 23   A.    No, it's not.

10:16:33 24   Q.    In fact, Dr. Sofia, do you still have the binder that

10:16:37 25   I gave you with the exhibits?  If you could open up DX-2749.

10:16:41  1   It is the black binder.

10:16:44  2              Your presentation from 2009.

10:16:52  3              MR. KINTON:  Objection, relevance.

10:16:56  4              THE COURT:  Response?

10:16:57  5              MR. SHEAR:  They cross-examined him on these

10:16:59  6   multiple classes of nucleosides and implied some special

10:17:03  7   credit was given.

10:17:04  8              THE COURT:  Any response?

10:17:05  9              MR. KINTON:  Still bolstering.  He has already

10:17:08 10   responded to my cross-examination.  He is still on redirect,

10:17:11 11   not my cross.

10:17:11 12              THE COURT:  Overruled.  It's proper redirect.

10:17:15 13   BY MR. SHEAR:

10:17:15 14   Q.    Dr. Sofia, in Exhibit DX-2749, if you could turn to

10:17:21 15   Page 46 of the presentation.  Dr. Sofia, the first bullet

10:17:26 16   point, could you explain what you meant by that first bullet

10:17:30 17   point of this presentation that you gave in 2009?

10:17:33 18   A.    Yes.  The first point says,

10:17:39 19   "2'methyl-fluoro-2'C-methyl nucleosides are a unique class

10:17:41 20   of highly selective and potent antiviral agents targeting

10:17:44 21   HCV."

10:17:45 22              What I meant here is that they really stand out

10:17:47 23   in a group of their own, because of their potency, viral

10:17:52 24   selectivity, safety, you know, even chemical --

10:17:59 25   three-dimensional chemical structure.  They are completely

10:18:01 1  unique relative to any other nucleoside 2'-methyl-hydroxy or

10:18:06 2  otherwise.

10:18:08 3  Q.    Dr. Sofia, the structure of sofosbuvir has been known

10:18:18 4  since 2009, right?

10:18:20 5  A.    That is correct.

10:18:20 6  Q.    Has anyone from Idenix ever approached you, to your

10:18:23 7  knowledge, claiming that they had invented sofosbuvir?

10:18:27 8  A.    No.

10:18:28 9        MR. KINTON:  Beyond the scope of my cross.

10:18:31 10       THE COURT:  Do you want to respond?

10:18:33 11       MR. SHEAR:  I think it was well within the first

10:18:35 12  five minutes of the questions he asked regarding multiple

10:18:41 13  patents covering multiple products.

10:18:43 14       MR. KINTON:  Whether or not Idenix, somebody

10:18:46 15  from Idenix talked to him is beyond the scope of my cross.

10:18:49 16       THE COURT:  Overruled.  You can ask the

10:18:51 17  question.

10:18:51 18  BY MR. SHEAR:

10:18:53 19  Q.    Do you remember the question?

10:18:54 20  A.    No.  Could you repeat it?

10:18:55 21  Q.    Sure.  The structure of sofosbuvir has been known

10:18:59 22  since 2009, right?

10:19:01 23  A.    That is correct, yes.

10:19:02 24  Q.    Since 2009, has anyone from Idenix ever approached

10:19:05 25  you and claimed that they invented sofosbuvir?

10:19:11 1    A.    No, no one has.

10:19:12 2    Q.    One -- when I say one last question, which to a

10:19:17 3    lawyer means three last questions, but one last question.

10:19:20 4    Counsel asked you on cross if Dr. Schinazi was part of the

10:19:24 5    company when you joined.  Do you recall that?

10:19:26 6    A.    That is correct, yes.

10:19:27 7    Q.    And I believe you said he wasn't part of the company?

10:19:29 8    A.    That is correct, he was not.

10:19:31 9    Q.    If Dr. Schinazi had been part of the company when you

10:19:34 10   joined, would you have joined Pharmasset?

10:19:37 11   A.    No, I would not.

10:19:39 12              MR. KINTON:   Speculation, objection.

10:19:41 13              THE COURT:   Overruled.

10:19:43 14   BY MR. SHEAR:

10:19:44 15   Q.    I am sorry?

10:19:46 16   A.    No, I would not have joined Pharmasset if Dr.

10:19:49 17   Schinazi was part of the company.

10:19:49 18   Q.    Why not?

10:19:50 19   A.    Dr. Schinazi had a reputation that preceded him of an

10:19:57 20   individual that was not trustworthy.  And so I would never

10:20:02 21   have worked for someone of that caliber.

10:18:59 22              MR. SHEAR:   No further questions, Your Honor.

10:19:00 23              THE COURT:   All right.  Thank you very much.  I

10:19:03 24   think it is a good time for the jury to have a break.  No

10:19:05 25   talking about the case, and we'll get you back in just a

little bit.

10:19:27 2                    (Jury left courtroom.)

10:19:31 3                    THE COURT:  Thank you, Dr. Sofia.

10:19:33 4                    We will be in recess.

10:42:11 5                    (Brief recess taken.)

10:42:11 6                    *     *     *

10:42:28 7                    (Proceedings reconvened after recess.)

10:42:28 8                    THE COURT:  We'll bring the jury in.

10:43:44 9                    (Jury returned.)

10:43:44 10                   THE COURT:  All right.  We're ready to proceed,

10:43:45 11   Mr. Scherkenbach?

10:43:46 12                   MR. SCHERKENBACH:  We are, Your Honor.  Thank

10:43:47 13   you.

10:43:48 14                   Good morning, ladies and gentlemen.  We're going

10:43:50 15   to do some deposition readings now before our next live

10:43:54 16   witness.  To do that, Your Honor, may I hand up the binders

10:43:57 17   for you and your clerk?

10:43:59 18                   THE COURT:  You may, yes.

10:44:18 19                   MR. SCHERKENBACH:  Ladies and gentlemen, we're

10:44:20 20   going to do this by reading.  So the first witness is

10:44:23 21   Dr. Richard Storer who was the head of chemistry at Idenix

10:44:28 22   beginning in 2001.  And this is from his November 10, 2015

10:44:34 23   deposition.

10:44:35 24                   Mr. Craig Countryman will be doing all the

10:44:38 25   readings as the attorney.  The witness will be played by

10:44:41 1    Santosh Coutinho.  This one is only about seven minutes

10:44:45 2    long.

10:44:46 3              THE COURT:  Thank you.

10:44:55 4              MR. COUNTRYMAN:  And, Your Honor, before I begin

10:44:56 5    the reading, I would just like to move some of the exhibits.

10:44:59 6    I'll list them in the order in which they appear in the

10:45:01 7    transcript.

10:45:01 8              THE COURT:  Okay.

10:45:02 9              MR. COUNTRYMAN:  DX-235, DX-296, DX-305, DX-399,

10:45:13 10   and DX-374.  We move those into evidence.

10:45:16 11             THE COURT:  Any objections?  Any objection to

10:45:20 12   those exhibits, Mr. McCrum?

10:45:22 13             MR. McCRUM:  I'm sorry.

10:45:23 14             THE COURT:  Any objection?

10:45:23 15             MR. McCRUM:  No objection.

10:45:24 16             THE COURT:  Those are all admitted.

10:45:26 17             MR. COUNTRYMAN:  Thank you.

10:45:26 18             (Above-referenced exhibits admitted in evidence.)

10:45:26 19             THE COURT:  All right.  You may proceed.

10:45:29 20             "Question:  When you joined Idenix, there was

10:45:31 21   already a goal or an understanding that nucleosides that had

10:45:35 22   a methyl at the 2' position and then potentially other

10:45:40 23   things at the 2' position could be used to treat HCV?

10:45:44 24             "Answer:  Some other things.

10:45:45 25             "Question:  Some other things?

10:45:46 1          "Answer:  Yes.

10:45:46 2          "Question:  What do you mean by that?

10:45:48 3          "Answer:  Well, compounds where the group down

10:45:51 4    at the 2 position, we expected those which would mimic

10:45:55 5    hydroxy in some way, shape or form, would be active against

10:45:58 6    HCV.

10:45:59 7          "Question:  Okay.

10:46:00 8          "Answer:  We didn't believe that a compound

10:46:01 9    lacking -- you know, with a hydrogen down in that position

10:46:04 10   would be active, for example.

10:46:06 11         "Question:  And this was the focus of the

10:46:07 12   company when you joined?

10:46:09 13         "Answer:  Yes.

10:46:09 14         "Question:  So, was it your idea to try to put a

10:46:13 15   fluorine at the 2' down position of a nucleoside?

10:46:20 16         "Answer:  Yes.

10:46:20 17         "Question:  Dr. Storer, I've handed you what's

10:46:24 18   been marked DX-235, and it's a document, it looks like a

10:46:28 19   memo with a 'to' and a 'from,' and the 'from' is yourself.

10:46:32 20         "Do you see that?

10:46:33 21         "Answer:  Yes.

10:46:34 22         "Question:  And the title is called 'Novirio

10:46:43 23   Chemistry Discussion Meeting.'

10:46:44 24         "Do you see that?

10:46:45 25         "Answer:  Yes.

10:46:45 1          "Question:  Do you recall seeing this document

10:46:47 2     before?

10:46:48 3               "Answer:  Yes.

10:46:48 4               "Question:  Is this a document that you created?

10:46:50 5               "Answer:  Yes.

10:46:50 6               "Question:  If you look at the next page, which

10:46:52 7     has a production number ending in 194, and if you look at

10:46:56 8     the 2' hydroxy section, we see a similar paragraph to the

10:47:00 9     one that we looked at in Storer Exhibit 4, with the title

10:47:04 10    '2'-hydroxy.'

10:47:05 11              "Do you see that?

10:47:07 12              "Answer:  Yes.

10:47:08 13              "Question:  There is also an addition of some

10:47:11 14    parenthetical language after the reference to 'fluorine.'

10:47:15 15    It says, 'although often toxic.'

10:47:18 16              "Do you see that?

10:47:20 17              "Answer:  Yes.

10:47:20 18              "Question:  So that was your belief at the time

10:47:22 19    in 2001, that fluorine would be the best replacement but

10:47:27 20    it's also sometimes toxic.  Is that fair?

10:47:29 21              "Answer:  Yes.

10:47:30 22              "Question:  Is that still your belief today?

10:47:32 23              "Answer:  Yes.

10:47:35 24              "Question:  So I would like to talk about why,

10:47:37 25    in 2001, you thought that the hydroxy -- or fluorine would

10:47:41 1  be the best replacement for the hydroxy.  Could you explain

10:47:45 2  that to me?

10:47:46 3          "Answer:  Fluorine is a small electronegative

10:47:49 4  atom so it doesn't introduce of a large steric demand that

10:47:52 5  would cause problems and, at the same time, it's

10:47:55 6  electronegativity means it's considered a good replacement

10:48:01 7  for a hydroxy.

10:48:01 8          "Question:  Okay.  So the addition of the

10:48:03 9  parenthetical, 'although often toxic,' you believe that was

10:48:07 10 based on your own opinion at the time?

10:48:09 11         "Answer:  Yeah.  I mean my view, now a fairer

10:48:12 12 description of that, but we know that sometimes it's toxic.

10:48:16 13 I think since then -- even more work has been done since

10:48:21 14 this time on fluorine, so the examples where you see

10:48:24 15 improvements in potency without due toxicity has grown since

10:48:27 16 that time.

10:48:29 17         "But at the time I wrote this, my view was that

10:48:32 18 fluorine was the best potential replacement for hydroxy,

10:48:35 19 and this really is just, you know, a warning that, you

10:48:38 20 know, we need to look at an early stage, because often in a

10:48:42 21 biological assay you can get confusion between activity seen

10:48:46 22 as a result of activity and activity seen as a result of

10:48:50 23 toxicity.  So you need to be careful.  That's all I'm saying

10:48:54 24 there.

10:48:55 25         "Question:  Do you recall if that point was

10:48:57 1    discussed, and specifically the idea of replacing the

10:49:00 2    hydroxy with a fluorine, at the Maui meeting?

10:49:04 3              "Answer:  I believe so.

10:49:04 4              "Question:  Do you recall getting any push-back

10:49:06 5    at the meeting about replacing the hydroxy with fluorine?

10:49:16 6              "Answer:  Not that I recall.

10:49:16 7              "Question:  Dr. Storer, do you see DX-296 is an

10:49:20 8    e-mail from yourself to Dr. Gosselin and Dr. Moussa dated

10:49:24 9    February 13, 2003.  Subject 'Paul Coe?'

10:49:28 10             "Answer:  Yes.

10:49:28 11             "Question:  Who is Paul Coe?

10:49:31 12             "Answer:  Paul Coe was a reader at the

10:49:33 13   University of Birmingham.

10:49:34 14             "Question:  Do you recall reaching out to Dr.

10:49:36 15   Coe in the February 2003 time frame?

10:49:38 16             "Answer:  Yes.

10:49:38 17             "Question:  Why?

10:49:40 18             "Answer:  Dr. Coe was an expert on fluorination,

10:49:42 19   and I contacted him to ask him some questions about bringing

10:49:46 20   his advice to bear on fluorinated compounds that were of

10:49:49 21   interest to us.

10:49:50 22             "Question:  If you look at the attachment to

10:49:52 23   your e-mail, the second page of DX-296, is this a copy of

10:50:00 24   the letter that you sent to Dr. Coe in February of 2003?

10:50:02 25             "Answer:  Yes.

10:50:03 1      "Question:  You state, at the last sentence of

10:50:05 2  the first paragraph:

10:50:06 3      "'We are OK with the nucleoside chemistry, it's

10:50:10 4  the fluorine chemistry we are struggling with and where your

10:50:14 5  help will be valuable.'

10:50:16 6      "Do you see that?

10:50:17 7      "Answer:  Yes.

10:50:20 8      "Question:  Okay.  And part of what you were

10:50:21 9  looking for his help with on, though, was fluorination of

10:50:27 10 nucleosides; correct?

10:50:28 11     "Answer:  Yes.  Yes.

10:50:29 12     "Question:  Then if you flip the page to the

10:50:31 13 last page of the exhibit, that ended in numbered page 500.

10:50:34 14 Do you see the number 9, target 9?

10:50:37 15     "Answer:  Yes.

10:50:38 16     "Question:  In the top left.  That is the

10:50:40 17 nucleoside we've been talking about, the methyl up, fluorine

10:50:45 18 down, correct?

10:50:46 19     "Answer:  Correct.

10:50:47 20     "Question:  Dr. Storer, what has been handed to

10:50:50 21 you is an e-mail -- what's been handed to you as DX-305 is

10:50:55 22 an e-mail from yourself to Dr. Gosselin, dated March 17,

10:51:01 23 2004.  Do you see that?

10:51:02 24     "Answer:  Yes.

10:51:02 25     "Question:  And the subject line says:  'RE:  In

10:51:08  1    **Vivo Data on NM108.  Reply.'  Do you see that?**

10:51:13  2           **"Answer:  Yes.**

10:51:13  3           **"Question:  And NM108 was one of the**

10:51:13  4    **2'methyl-up-hydroxy-down nucleosides that Idenix had as a**

10:51:21  5    **lead compound?**

10:51:21  6           **"Answer:  That's what I recall.**

10:51:22  7           **"Question:  Okay.  If you look at the second**

10:51:25  8    **paragraph of the top e-mail.**

10:51:26  9           **"Answer:  Um-hmm.**

10:51:27 10           **"Question:  It says 'JP.'  Is that Dr.**

10:51:29 11    **Sommadossi?**

10:51:30 12           **"Answer:  Yes.**

10:51:30 13           **"Question:  'JP is still keen that we try and**

10:51:35 14    **make the 2'-fluoro, 2'-methyl analog which he heard from**

10:51:46 15    **Schinazi was good ...'**

10:51:48 16           **"Do you see that?**

10:51:49 17           **"Answer:  Yes.**

10:51:49 18           **"Question:  Do you recall knowing that**

10:51:51 19    **Dr. Schinazi had biological data on a 2'-methyl, 2'-fluoro**

10:51:58 20    **nucleoside?**

10:51:59 21           **"Answer:  That clearly is the case from what's**

10:52:01 22    **written there, and I would have heard it from Jean-Pierre.**

10:52:04 23           **"Question:  Please look at DX-399.  And do you**

10:52:07 24    **recognize this document?**

10:52:08 25           **"Answer:  It looks like a photocopy of the front**

10:52:11 1   cover of one of my books.

10:52:12 2           "Question:  And your name is listed on the front

10:52:13 3   page of DX-399?

10:52:15 4           "Answer:  It is.

10:52:16 5           "Question:  I'm just going to direct you to a

10:52:18 6   specific page, and it is the page ending in production

10:52:21 7   number 2992.

10:52:23 8           "At the very bottom of that page, there is a

10:52:26 9   comment.

10:52:27 10          "First, let me ask, does the handwriting on this

10:52:30 11  page appear to be yours?

10:52:32 12          "Answer:  Yes.

10:52:35 13          "Question:  Okay.  So at the very bottom of the

10:52:36 14  page, there is a comment that says, I believe, 'Pharmasset

10:52:41 15  drug looks good, no tox, potent, et cetera.'

10:52:45 16          "Do you see that?

10:52:46 17          "Answer:  Yes.

10:52:46 18          "Question:  Did I read that correctly?

10:52:48 19          "Answer:  Yes.

10:52:48 20          "Question:  So sometime between the period of

10:52:51 21  August 13 -- I'm sorry, August 15, you said, 2003 and

10:52:56 22  October 9th, 2003, did you know about a drug that Pharmasset

10:53:00 23  had in development?

10:53:02 24          "Answer:  It appears so.

10:53:03 25          "Question:  Do you know what that drug that was?

10:53:06 1          "Answer:  It would have been the 2'-methyl,

10:53:11 2     2'-fluoro.

10:53:11 3          "Question:  Do you recall having any discussions

10:53:11 4     with anyone at Pharmasset about a drug they had in

10:53:11 5     development?

10:53:14 6          "Answer:  I certainly never had any discussion

10:53:17 7     with anybody in Pharmasset.

10:53:18 8          "Question:  So what's been marked as DX-374 is

10:53:22 9     an e-mail from you to Dr. Stewart and Dr. Gosselin, dated

10:53:25 10    January 18th, 2005.  Do you see that?

10:53:45 11         "Answer:  Yes.

10:53:48 12         "Question:  And it's forwarding -- the subject

10:53:51 13    line says:  [Forward]:  Pharmasset published PCT:  Do you

10:53:59 14    see that?"

10:54:00 15         "Answer:  Yes.

10:54:00 16         "Question:  And then there's some redactions on

10:54:02 17    the e-mail, but attached to the e-mail is a United States

10:54:05 18    patent application publication.  Do you see that?

10:54:05 19         "Answer:  Yes.

10:54:47 20         "Question:  Do you recall becoming aware of it?

10:54:50 21         "Answer:  I certainly recall becoming aware of it.

10:54:54 22         "Question:  Why?

10:54:55 23         "Answer:  It was clearly a document of interest

10:54:57 24    to us.

10:54:58 25         "Question:  Because it reported on

10:55:04 1  2'-methyl-2'-fluoro nucleoside?

10:55:11 2          "Answer:  Sure.

10:55:11 3          "Question:  Mm-hmm.  What were your thoughts

10:55:13 4  when you saw the patent application of DX-374?

10:55:17 5          "Answer:  As far as I was concerned, this was

10:55:19 6  our compound, so I didn't think it was a major issue.

10:55:22 7          "Question:  And you thought it was your compound

10:55:24 8  why?

10:55:24 9          "Answer:  Based on our earlier filing of a

10:55:26 10 patent in this area."

10:55:29 11         MR. COUNTRYMAN:  That concludes the designations

10:55:33 12 for Dr. Storer.

10:55:36 13         MR. GRIFFITH:  We have one issue with the

10:55:37 14 read-in, if I may speak just for a second, we may be able to

10:55:42 15 find a way to correct it.

10:55:44 16         THE COURT:  Go ahead.

10:56:01 17         MR. COUNTRYMAN:  I understand there was one

10:56:02 18 question and answer where there had been an errata to the

10:56:05 19 deposition that had been corrected, statement on the

10:56:10 20 transcript.  I will read that question and answer again, if

10:56:12 21 that is okay.

10:56:13 22         MR. GRIFFITH:  That would be fine.  I don't

10:56:15 23 think Mr. Coutinho will know what the correction was.  It

10:56:18 24 had been corrected by errata sheet.

10:56:20 25         THE COURT:  Mr. Countryman can read into the

10:56:22 1    record what the plaintiff wants added.

10:56:25 2            MR. GRIFFITH:  It was at the beginning of the

10:56:27 3    questioning.

10:56:27 4            THE COURT:  Go ahead, please.

10:56:29 5            MR. COUNTRYMAN:  "Question:  When you joined

10:56:30 6    Idenix there was already a goal or an understanding that

10:56:33 7    nucleosides that had a methyl at the 2' position and then

10:56:36 8    potentially other things at the 2' position could be used to

10:56:40 9    treat HCV?"

10:56:43 10           THE COURT:  That's the question.  Mr. Coutinho,

10:56:45 11   do you have the answer?

10:56:48 12           MR. COUNTRYMAN:  I will read it.

10:56:50 13           "Answer:  Some other things.

10:56:51 14           "Question:  Some other things?

10:56:54 15           "Answer:  Yes.

10:56:55 16           "Question:  What do you mean by that?

10:56:58 17           "Answer:  Well, compounds were the group down at

10:57:02 18   the 2' position, we expected those would mimic hydroxyl in

10:57:07 19   some way, shape or form would be active against HCV."

10:57:12 20           THE COURT:  Thank you.  That now completes that

10:57:14 21   testimony.  Correct?

10:57:16 22           MR. COUNTRYMAN:  Yes.

10:57:18 23           THE COURT:  Thank you.

10:57:19 24           MR. SCHERKENBACH:  Ladies and gentlemen, the

10:57:27 25   next witness is Dr. Jean-Francois Griffon.  He was an Idenix

10:57:33 1    scientist who was working on synthesis or making

10:57:36 2    2'-methyl-fluoro nucleosides at Idenix.  We are going read

10:57:40 3    from his June 23rd, 2016 deposition.  Mr. Countryman will

10:57:45 4    read the questions and the witness will be played by my

10:57:48 5    colleague, Ms. Shmuel.

10:57:49 6              MR. COUNTRYMAN:  I will list the exhibits to

10:58:05 7    move in:  DX-189, DX-2178, DX-194, DX-1129, DX-1128, DX-272,

10:58:21 8    DX-354, DX-2182, DX-2183, DX-268, DX-2184, DX-202, DX-1171,

10:58:41 9    DX-2186.

10:58:44 10             We would move all of these in evidence.

10:58:47 11             MR. GRIFFITH:  No objection.

10:58:48 12             THE COURT:  Those are all admitted.

10:58:51 13             (Above-referenced exhibits received in evidence.)

10:58:52 14             "Question:  When you were studying for your

10:58:53 15   Bachelor of Science degree, which you received in 1991, did

10:58:57 16   you do any work related to nucleosides?

10:59:00 17             "Answer:  I think I had some classes and lessons

10:59:02 18   on nucleosides.

10:59:02 19             "Question:  Did you have any classes from

10:59:05 20   Professor Imbach or Dr. Gosselin?

10:59:07 21             "Answer:  I think I did from both professors.

10:59:10 22             "Question:  In studying for your Master's

10:59:12 23   degree, which I understand you received in 1992, did you do

10:59:16 24   work related to nucleosides?

10:59:18 25             "Answer:  It seems to me that I did have classes

10:59:21 1     on the biochemistry of nucleosides.

10:59:24 2              "Question:  So the subject matter of your

10:59:27 3     Master's thesis was nucleosides?

10:59:28 4              "Answer:  Yes.

10:59:28 5              "Question:  Let me ask you now about your Ph.D.

10:59:32 6     studies?

10:59:33 7              "Answer:  Yes.

10:59:33 8              "Question:  Is it correct that your thesis

10:59:35 9     involved the introduction of fluorine or other atoms at the

10:59:38 10    2' and 3' positions in nucleosides?

10:59:42 11             "Answer:  Correct.

10:59:48 12             "Question:  And is it correct that, during your

10:59:50 13    Ph.D. work, you prepared multiple 2' and 3'fluoro

10:59:54 14    substituted nucleosides as part of your work?

10:59:56 15             "Answer:  I did -- I did a certain number, yes.

10:59:59 16             "Question:  Now, after you finished your Ph.D.,

11:00:02 17    you went to the Southern Research Institute to do a

11:00:06 18    postdoctoral fellowship, is that correct?

11:00:07 19             "Answer:  Yes, it is exactly.

11:00:08 20             "Question:  And was Dr. Secrist, in your

11:00:11 21    opinion, an expert on nucleosides?

11:00:13 22             "Answer:  Yes.

11:00:14 23             "Question:  Is it correct that, after your

11:00:16 24    postdoctoral work at Southern Research Institute, you joined

11:00:21 25    Idenix's nucleoside analogues group?

11:00:23  1          "Answer:  It is true.

11:00:24  2          "Question:  And you are currently employed by

11:00:31  3   Idenix today, true?

11:00:32  4          "Answer:  Yes.

11:00:33  5          "Question:  Now, in addition to lab notebooks,

11:00:35  6   is it correct you summarized your work in monthly progress

11:00:39  7   reports?

11:00:40  8          "Answer:  Correct.

11:00:40  9          "Question:  And was that true specifically in

11:00:42 10   the 2002 through 2004 time frame?

11:00:44 11          "Answer:  Yes.

11:00:45 12          "Question:  And is it also correct that your

11:00:46 13   progress reports were distributed, to some extent, inside

11:00:49 14   the company, including to Drs. Storer, Gosselin and

11:00:53 15   Professor Imbach?

11:00:54 16          "Answer:  Correct.

11:00:55 17          "Question:  You are being handed what we have

11:00:57 18   marked as DX-189, a document titled Summary of Chemistry

11:01:01 19   Montpelier Meeting No. 2 held on Thursday, March 28th, 2002,

11:01:07 20   and it has production numbers IDXDE00120844 through 0848.

11:01:17 21          "Do you recognize DX-189?

11:01:19 22          "Answer:  Yes.

11:01:20 23          "Question:  In the diagram on the first page,

11:01:22 24   there is a structural drawing of a nucleoside, is that

11:01:35 25   correct?

11:01:35 1          "Answer:  Yes.

11:01:36 2          "Question:  And do I correctly understand that

11:01:38 3   what is called the B position is the 2' (down) position of

11:01:42 4   the nucleoside?

11:01:42 5          "Answer:  Correct.

11:01:43 6          "Question:  And at the bottom of the first page

11:01:45 7   there's a reference to various modifications in the B

11:01:47 8   position.

11:01:48 9          "Do you see that?

11:01:49 10          "Answer:  Yes.

11:01:49 11          "Question:  And one of the modifications

11:01:52 12  proposed was to introduce fluorine at the 2' (down)

11:01:55 13  position, is that right?

11:01:57 14          "Answer:  Correct.

11:01:57 15          "Question:  And is it correct that you were

11:01:59 16  assigned to work on certain of these proposed modifications?

11:02:01 17          "Answer:  Correct.

11:02:01 18          "Question:  And, for the record, DX-2178 is a

11:02:06 19  summary of the second scientific meeting with George Fleet

11:02:11 20  held in Montpelier on Thursday, May 23, 2002.  It bears

11:02:17 21  production numbers IDXDE00120876 through 0881.

11:02:22 22          "Answer:  Okay, yes.

11:02:24 23          "Question:  Do you recognize this document?

11:02:26 24          "Answer:  Yes.

11:02:26 25          "Question:  Did you receive it at or about the

11:02:29 1    time it was generated in, say, May or June of 2002?

11:02:32 2                "Answer:  Yes.

11:02:32 3                "Question:  Who was George Fleet?

11:02:35 4                "Answer:  He was, I believe, English, and he was

11:02:38 5    specialized in the chemistry of sugars and nucleosides, but

11:02:41 6    on top of everything, he was specialized in the chemistry of

11:02:44 7    sugars.

11:02:44 8                "Question:  Was he a well-known chemist at the

11:02:46 9    time?

11:02:47 10               "Answer:  Yes.  In his area he was.

11:03:05 11               "Question:  Is it correct that Professor Fleet

11:03:09 12   consulted for Idenix from time to time on issues relating to

11:03:11 13   synthesizing various target nucleosides?

11:03:14 14               "Answer:  Yes.  He was a consultant for Idenix.

11:03:16 15               "Question:  If you turn to the second page of

11:03:18 16   the document, there's a box in the middle of the page titled

11:03:22 17   How to Get This Key Molecule."

11:03:26 18               "Do you see that?

11:03:27 19               "Answer:  Yes.

11:03:28 20               "Question:  And that key molecule is a 2'-methyl

11:03:31 21   up fluoro down nucleoside, right?

11:03:33 22               "Answer:  Yes, correct.

11:03:34 23               "Question:  On how many occasions do you recall

11:03:36 24   personally meeting with Professor Fleet for the purpose of

11:03:38 25   getting his input on synthesis strategies?

11:03:42  1          "Answer:  I think twice.

11:03:42  2          "Question:  Now, after you did your initial

11:03:45  3    literature search, is it correct that you began to attempt

11:03:48  4    various synthetic routes for the target compound 2'-methyl

11:03:51  5    up fluoro down?

11:03:52  6          "Answer:  Yes, it is true.

11:04:00  7          "Question:  You are being handed what we have

11:04:03  8    marked as Griffon Exhibit 12, which is titled Summary of

11:04:07  9    Chemistry Montpelier Meeting No. 5 held on Thursday, October

11:04:11 10    10th, 2002 and it has production numbers IDXDE00121005

11:04:18 11    through 121010.

11:04:22 12          "Answer:  As I have received it.

11:04:22 13          "Question:  Do you recognize this document?

11:04:25 14          "Answer:  Yes.

11:04:25 15          "Question:  Notwithstanding the fact you didn't

11:04:28 16    author this particular set of minutes, do you believe you

11:04:31 17    received these minutes in or around the October 2002 time

11:04:34 18    frame?

11:04:36 19          "Answer:  Yes, I did receive this document.

11:04:38 20          "Question:  And underneath that heading, toward

11:04:40 21    the left-hand side in the middle of the page, there is a

11:04:42 22    representation of a 2'-methyl up fluoro down nucleoside,

11:04:47 23    right?

11:04:47 24          "Answer:  Yes, I can see it.

11:04:49 25          "Question:  Okay, and then just above -- sorry.

11:04:52 1             "And then just above the compound there is a

11:04:55 2  phrase, 'high priority.'

11:04:56 3             "Do you see that?

11:04:57 4             "Answer:  Yes.

11:05:02 5             "Question:  I want to move to a slightly --

11:05:05 6  well, to another document in the January 2003 time period.

11:05:08 7             "You are being handed what has been marked

11:05:10 8  Griffon Exhibit 15.

11:05:13 9             "Answer:  Yes.

11:05:14 10             "Question:  And to be clear, Dr. Griffon, the

11:05:16 11  document that you were just handed as Exhibit 15 is a

11:05:18 12  collection of progress reports for the period January of

11:05:21 13  2003 through December of 2003.  Just so you understand; it's

11:05:25 14  a collection of the reports.

11:05:27 15             "Do you see that?

11:05:28 16             "Answer:  Yes.

11:05:28 17             "Question:  Thank you.

11:05:29 18             "Answer:  Yes, I do.  I do understand.

11:05:30 19             "Question:  And so the record is clear, this

11:05:33 20  document, Exhibit 15, has production numbers IDXDE00132482

11:05:41 21  through 132510.

11:05:41 22             "Answer:  Yes.

11:05:42 23             "Question:  Dr. Griffon, do you recognize the

11:05:44 24  collection of progress reports that we have marked as

11:05:46 25  Exhibit 15?

11:05:47  1                "Answer:  Yes, I recognize it.

11:05:48  2                "Question:  And are these documents you created

11:05:50  3       on or about the dates they bear?

11:05:52  4                "Answer:  Yes.

11:05:52  5                "Question:  I'd like to hand you what we've

11:05:56  6       marked as DX-128.  This is a collection of your progress

11:06:00  7       reports for the year 2002, so beginning in January of 2002

11:06:05  8       running through December of 2002, and it has Production Nos.

11:06:08  9       IDXDE00132457 through 481?

11:06:14 10                "Answer:  Okay.

11:06:14 11                "Question:  Do you recognize DX-128?

11:06:17 12                "Answer:  Yes.

11:06:17 13                "Question:  And is it fair to describe this

11:06:19 14       document as a collection of progress reports that you

11:06:21 15       created in the 2002 time period?

11:06:24 16                "Answer:  Yes, that's correct.

11:06:28 17                "Question:  And would your attempts, beginning

11:06:30 18       in July or August of 2000, to synthesize 2'-methyl up fluoro

11:06:35 19       down nucleosides be described in these -- this collection of

11:06:38 20       progress reports?

11:06:38 21                "Answer:  Yes.

11:06:39 22                "Question:  We're now going to go back to

11:06:41 23       February of 2003, okay?  And your February, 2003 progress

11:06:47 24       report is contained in Exhibit DX-1129 beginning at Page 4.

11:06:52 25                "Do you see that?

11:06:53  1                    "Answer:  Yes.

11:06:54  2                    "Question:  And at the top of Page 4, do you see

11:06:56  3    the heading as 'Synthesis of the 2'-2-fluoro-methyl

11:06:56  4    cytosine'?

11:07:01  5                    "Answer:  Yes.

11:07:02  6                    "Question:  Did you try five different sets of

11:07:04  7    experimental conditions in order to try to synthesize the

11:07:07  8    2'methyl up 2'-fluoro down nucleoside shown at the top of

11:07:13  9    that page?

11:07:15 10                    "Answer:  Yes.

11:07:16 11                    "Question:  And did any of these reactions

11:07:18 12    succeed, as reported here in your progress report?

11:07:22 13                    "Answer:  So my conclusion, which I gave in my

11:07:25 14    report, is that no reaction gave to nucleoside 2, so none of

11:07:33 15    them worked.

11:07:33 16                    "Question:  And then, if you look below the

11:07:35 17    table we were looking at, is that an alternate synthesis

11:07:38 18    scheme that you also tried for synthesizing 2'-methyl up

11:07:42 19    fluoro down nucleoside?

11:07:43 20                    "Answer:  Yes.  It's an alternative method.

11:07:46 21                    "Question:  And again, am I correct that the X,

11:07:48 22    through the line between Compounds 5 and 6A, indicates that

11:07:54 23    it was your conclusion at this time that those reactions

11:07:57 24    were unsuccessful?

11:07:59 25                    "Answer:  Yes, that's correct.

11:08:00  1    "Question:  Dr. Griffon, I am going to hand you

11:08:03  2    your -- one of your laboratory notebooks that may relate to

11:08:06  3    this synthesis we're talking about.

11:08:09  4         "So you've been handed what we have marked as

11:08:12  5    DX-272, which is titled Jean-Francois Griffon Lab Notebook

11:08:18  6    No. 2.  It has production numbers IDXDE001380392 through

11:08:24  7    00138108.

11:08:30  8         "Answer:  Okay.  Oui.

11:08:32  9         "Question:  Do you recognize DX-272?

11:08:35 10         "Answer:  Yes.

11:08:35 11         "Question:  And what is it?

11:08:37 12         "Answer:  My Lab Notebook 2.

11:08:38 13         "Question:  And in the -- at the top of Page 12

11:08:39 14    there are some diagonal lines drawn through two compounds on

11:08:45 15    the right-hand side of the page, including the 2'-methyl up

11:08:48 16    fluoro down target nucleoside.

11:08:51 17         "Do you see that?

11:08:52 18         "Answer:  Yes.

11:08:52 19         "Question:  And what does that notation mean

11:08:57 20    when we see it in your notebook?

11:08:59 21         "Answer:  So I wrote the reaction thinking that

11:09:03 22    what it would obtain would be these compounds.  And then,

11:09:05 23    after making the experiments, I noted that these were not

11:09:08 24    what I obtained, as I had thought beforehand.

11:09:11 25         "Question:  Dr. Griffon, I believe you have been

11:09:12  1  handed an exhibit which we have marked as DX-354.  It is

11:09:18  2  a -- it consists of an e-mail and attached report on a

11:09:21  3  scientific update course with production numbers

11:09:26  4  IDXDE00392613 through 623.

11:09:30  5           "Do you recognize DX-354?

11:09:33  6           "Answer:  Yes.

11:09:33  7           "Question:  And what is it?

11:09:35  8           "Answer:  It's an actual report which Dr. Claire

11:09:38  9  Pierra and myself have written, as we were back from a

11:09:40 10  course called Scientific Update that was given in Great

11:09:43 11  Britain, and that was about fluoration techniques.

11:09:46 12           "Question:  Fluorination techniques?

11:09:48 13           "Answer:  Fluorination techniques.

11:09:54 14           "Question:  Dr. Griffon, you are being handed

11:09:56 15  what we have marked as DX-2182.  This is a letter from Dr.

11:10:01 16  Coe to Dr. Storer, production numbers IDXDE00378904 through

11:10:07 17  919?

11:10:08 18           "Answer:  Yes, I've got it.

11:10:10 19           "Question:  Do you recognize DX-2182?

11:10:13 20           "Answer:  Yes.

11:10:13 21           "Question:  And what is it?

11:10:15 22           "Answer:  This is a report that was communicated

11:10:16 23  by Dick Storer, and it came from Paul Coe, giving routes in

11:10:21 24  order to synthesize the nucleoside 2'-methyl up 2'-fluoro

11:10:25 25  down.

11:10:25 1          "Question:  Did you understand Dr. Coe to

11:10:26 2   provide input on synthesizing among other compounds the

11:10:30 3   2'-methyl up fluoro down nucleosides?

11:10:33 4          "Answer:  Yes, totally.

11:10:35 5          "Question:  And what did you find Dr. Coe's

11:10:37 6   suggestions to be for synthesizing 2'-methyl up fluoro down

11:10:42 7   nucleosides?

11:10:46 8          "Answer:  Well, I have tried some of Dr. Coe's

11:10:50 9   suggestions.

11:10:50 10          "Question:  Did any of them work?

11:10:52 11          "Answer:  Based on Dr. Coe's suggestions, no,

11:10:55 12   none of the experiences I tried gave me or was successful in

11:10:59 13   obtaining a quantity of the 2'-fluoro-2'-methyl.

11:11:03 14          "Question:  Dr. Griffon, we are handing you what

11:11:06 15   we've marked as DX-2183.  It is one of your reports.  This

11:11:11 16   one titled 'Report on the 2'-methyl up 2'-fluoro down

11:11:17 17   Nucleosides Project (September 2002 through May 2003).

11:11:22 18   Production Nos. IDXDE00127072 through '081.

11:11:29 19          "Answer:  I have it.

11:11:30 20          "Question:  Do you recognize DX-2183?

11:11:33 21          "Answer:  Yes.

11:11:34 22          "Question:  Is this a document you created?

11:11:36 23          "Answer:  Yes.

11:11:36 24          "Question:  And is this a report on the overall

11:11:38 25   project as of May 2003?

11:11:40  1          "Answer:  Yes.

11:11:45  2          "Question:  And is it correct that at this time,

11:11:47  3  in or about May of 2003, one of your conclusions was that,

11:11:51  4  'All the strategies that were attempted to introduce the

11:11:54  5  methyl group at the 2' up position and the fluorine atom at

11:11:58  6  the 2' down position starting from different uridine

11:12:03  7  derivatives failed.'

11:12:04  8          "Answer:  Yes, that is correct.

11:12:05  9          "Question:  And did you, in fact, subsequently

11:12:07 10  try a number of sugar strategies for synthesizing a

11:12:11 11  2'-methyl up 2'-fluoro down nucleoside?

11:12:15 12          "Answer:  Yes, that is correct.

11:12:16 13          "Question:  And am I also correct that, in the

11:12:18 14  end, none of those sugar strategies was successful either?

11:12:23 15          "Answer:  So none of the sugar strategies tried

11:12:25 16  enabled the synthesis of nucleosides with 2'-methyl up and

11:12:30 17  2'-fluoro down.

11:12:32 18          "Question:  Dr. Griffin, we're handing you what

11:12:35 19  we have marked as DX-268 -- I'm sorry -- which is titled

11:12:43 20  Summary of Chemistry Montpelier Meeting No. 10, November 5,

11:12:47 21  2003, and it bears production numbers IDXDE00134632

11:12:53 22  through -- through 642.

11:12:57 23          "Answer:  That is correct.  642?

11:12:59 24          "Question:  Yes.  Is the last page of the

11:13:01 25  exhibit, yes.

11:13:02  1          "Do you recognize DX-268?

11:13:09  2          "Answer:  Yes.

11:13:09  3          "Question:  And did you of receive it at or

11:13:11  4  about the time it was created in November of 2003?

11:13:14  5          "Answer:  Yes.

11:13:15  6          "Question:  If you could turn to the second page

11:13:16  7  of the exhibit, please, in about the middle of the page, do

11:13:20  8  you see underneath the heading Modifications in B Position,

11:13:22  9  a drawing of the structure of a 2'-methyl up 2'-fluoro down

11:13:26 10  nucleoside?

11:13:28 11          "Answer:  Oui.

11:13:28 12          "Question:  And next to that structure is the

11:13:30 13  word 'abandoned,' right?

11:13:33 14          "Answer:  That is correct.

11:13:33 15          "Question:  Do you know why work on synthesizing

11:13:36 16  the 2'-methyl up 2'-fluoro down nucleosides was abandoned in

11:13:42 17  November of 2003?

11:13:44 18          "Answer:  No, I do not.  The only thing I know

11:13:46 19  is that, given the conclusions that I had and that I gave, I

11:13:50 20  was asked to discontinue; to stop working on it.

11:13:53 21          "Question:  And -- and who was it that asked you

11:13:56 22  to stop doing work on the 2'-methyl up fluoro down

11:14:01 23  nucleosides project?

11:14:02 24          "Answer:  Dick Sorer and Gilles Gosselin, who

11:14:06 25  were my supervisors at the time.

11:14:07 1          "Question:  You are being handed a document we

11:14:10 2    have marked as DX-2184.  This is a Summary of Chemistry

11:14:15 3    Montpelier Meeting No. 11 held February 3rd, 2004.  It bears

11:14:19 4    production numbers IDXDE00423375 through 396.

11:14:28 5          "Answer:  I have it.

11:14:28 6          "Question:  Do you recognize this document?

11:14:30 7          "Answer:  Yes.

11:14:30 8          "Question:  Did you receive it at or about the

11:14:32 9    time it was created in February of 2004?

11:14:35 10          "Answer:  Yes.

11:14:35 11          "Question:  Turn to Page 2 of the document,

11:14:38 12    please.  And underneath the heading Modifications in the 2'

11:14:43 13    Position, do you see a drawing of the 2'-methyl up

11:14:46 14    2'-fluoro down nucleoside structure?

11:14:49 15          "Answer:  Yes.

11:14:49 16          "Question:  And to the right of that structure

11:14:52 17    is the word 'Reinitiated.'  Correct?

11:14:57 18          "Answer:  Yes.

11:14:58 19          "Question:  Dr. Griffon, perhaps we can start

11:15:00 20    with the French version, which is DX-202.  Do you see that

11:15:05 21    you are copied -- you are one of the addresses, actually, of

11:15:08 22    the e-mail exchange, or some of the e-mails in the chain?

11:15:10 23          "Answer:  Yes.

11:15:10 24          "Question:  Do you have any reason to doubt that

11:15:12 25    you received this e-mail exchange in or around March of

11:15:15 1  2014?

11:15:17 2         "Answer:  No.

11:15:17 3         "Question:  So let me start with the first

11:15:20 4  e-mail in the chain, which is at the bottom of Page 2.  This

11:15:23 5  is an e-mail from Dr. Storer to Dr. Gosselin, right?

11:15:27 6         "Answer:  Yes.

11:15:27 7         "Question:  And one of the things Dr. Storer

11:15:29 8  says is, 'JP is still keen that we try and make the

11:15:34 9  2'F2'Me analog which he heard from Dr. Schinazi was good and

11:15:40 10 was allegedly... made by David Chu?

11:15:45 11        "Answer:  Yes.

11:14:46 12        "Question:  Do you recall hearing, back in this

11:14:49 13 time frame of 2004, that Dr. Schinazi had reported to Dr.

11:14:53 14 Sommadossi, in substance, the 2'-fluoro, 2'-methyl analog

11:15:01 15 was good?

11:15:01 16        "Answer:  Yes.  This e-mail does certify to

11:15:04 17 that, or point to that, but this is something that I did not

11:15:08 18 remember any more.

11:15:09 19        "I just remember it because I see this document

11:15:11 20 to refresh my memory, I remember.

11:15:13 21        "Question:  I'm handing you a document that's

11:15:16 22 been marked as DX-1171.  It is titled Jean-Francois Griffon

11:15:25 23 - Audrey Chappe, Activity Report, September 2003-2004,

11:15:28 24 production numbers IDXDE00135730 through 732.

11:15:38 25        "Answer:  I have got it.

11:15:38 1          "Question:  Do you recognize the document?

11:15:40 2          "Answer:  Yes.

11:15:40 3          "Question:  What is it?

11:15:42 4          "Answer:  It's a -- a good question.  It's a

11:15:45 5   summary of an activity report pertaining to a complete year

11:15:47 6   from September '03 to September '04.

11:15:50 7          "Question:  And did you prepare the report?

11:15:52 8          "Answer:  Yes.

11:15:53 9          "Question:  Let me direct your attention to the

11:15:54 10  second page of the report.

11:15:56 11         "There's a heading C, about the middle of the

11:15:58 12  page, titled 'HCV program:  2'-methyl, up, substituted

11:16:06 13  'down' nucleoside series."

11:16:09 14         "Do you see that?

11:16:24 15         "Answer:  Yes, I see.

11:16:24 16         "Question:  And underneath that heading, there

11:16:27 17  was drawn a structure of a nucleoside that include a

11:16:29 18  2'-methyl up and 2'-fluoro down, correct?

11:16:33 19         "Answer:  Yes.

11:16:34 20         "Question:  And then underneath that you say:

11:16:36 21  Different strategies were attempted in order to synthesize

11:16:39 22  the 2'-methyl 'up', 2'-fluoro 'down' nucleosides:

11:16:43 23  Nucleoside strategy, starting from uridine:  failed.  Sugar

11:16:47 24  strategies, that failed so far.

11:16:48 25         "Do you see that?

11:16:49 1    "Answer:  Yes.

11:16:53 2    "Question:  Dr. Griffon, you are being handed

11:16:53 3 what we've marked as DX-2186.  This was another of your

11:16:53 4 reports regarding the 2'-methyl "up", 2'-fluoro "down"

11:16:57 5 nucleosides project.  It bears the date at the top of

11:17:01 6 September 2002 through June 2004.  The production number is

11:17:04 7 IDXDE00591782 through 788.

11:17:12 8    "Answer:  Yes, I've got it.

11:17:13 9    "Question:  Do you recognize DX-2186?

11:17:16 10    "Answer:  Yes.

11:17:16 11    "Question:  Is it a document that you prepared?

11:17:18 12    "Answer:  Yes.

11:17:18 13    "Question:  And is it correct that it was your

11:17:20 14 conclusion, as of June 2004, that all the strategies that

11:17:27 15 were attempted to introduce a methyl group at the 2' up

11:17:32 16 position and a fluorine atom at the 2' down position failed?

11:17:37 17    "Answer:  Yes, it is my conclusion.  Yes.

11:17:40 18    "Question:  Thank you.

11:17:41 19    "Dr. Griffon, in all of your efforts to

11:17:45 20 synthesize 2'-methyl up, 2'-fluoro down and all the

11:17:51 21 discussions you had with people at Idenix about that, did

11:17:55 22 anyone ever suggest to you that you should look at Idenix's

11:18:01 23 patent or patent application to gain knowledge about how to

11:18:04 24 do the synthesis?

11:18:07 25    "Answer:  No, not that I remember.  I never

11:18:08 1    **supported my experiences, my experiments, from any Idenix**

11:18:12 2    **patent to do this.**

11:18:19 3          **"Question: Do you recall that later in 2005,**

11:18:21 4    **you did successfully synthesize a 2'-methyl up, 2'-fluoro**

11:18:27 5    **down nucleoside using information from a published**

11:18:30 6    **Pharmasset patent application?**

11:18:34 7          **"Answer: Yes. It was either a patent or maybe**

11:18:36 8    **a publication, a paper, but in any case, it was from**

11:18:40 9    **Pharmasset.**

11:18:41 10          **"Question: Let's start with DX-1129,**

11:18:45 11    **Dr. Griffon. And I want to go to the February progress**

11:18:49 12    **report which begins on page 4 of the exhibit.**

11:18:51 13          **"And do you see in the middle of that page,**

11:18:55 14    **there is a synthetic route written out, and it is proposed**

11:18:59 15    **for making a 2'-methyl, 2'-fluoro nucleoside?**

11:19:03 16          **"Answer: Page 4?**

11:19:04 17          **"Question: Page 4.**

11:19:06 18          **"Answer: Okay.**

11:19:06 19          **"Question: Do you recall discussing this route**

11:19:08 20    **earlier today?**

11:19:11 21          **"Answer: (Witness nodded.)**

11:19:12 22          **"Question: And that is a route that involves**

11:19:14 23    **using Deoxy-Fluor as the fluorinating reagent; is that**

11:19:20 24    **right?**

11:19:20 25          **"Answer: Correct.**

11:19:21 1          "Question:  Now -- but do you agree that

11:19:22 2   Deoxy-Fluor is a fluorinating reagent that is similar to

11:19:30 3   DAST?

11:19:30 4          "Answer:  Certainly.

11:19:31 5          "Question:  Now, I want to go back to this

11:19:34 6   synthetic route described on page4 of your February progress

11:19:34 7   report, which is in DX-1129.

11:19:39 8          "Answer:  Oui.

11:19:39 9          "Question:  Did you arrive at that synthetic

11:19:41 10  route on your own?

11:19:42 11         "Answer:  Yes.

11:19:42 12         "Question:  And are you aware today,

11:19:45 13  Dr. Griffon, that that synthetic route that you described

11:19:47 14  there does, in fact, work?

11:19:49 15         "Answer:  Yes, I do.

11:19:50 16         "Question:  And, in that regard, page 11 of your

11:19:53 17  notebook, DX-272 -- withdrawn.

11:19:57 18         "Now, I would like to try -- I'm glad you're

11:20:01 19  opening your notebook, Dr. Griffon, because I want to ask

11:20:04 20  you about your attempt at the synthetic route.

11:20:06 21         "And, again, this synthetic route is a route

11:20:09 22  that today you believe does work; right?

11:20:11 23         "Answer:  Yes.

11:20:15 24         "Question:  Now, I want to go to page 12 of your

11:20:18 25  laboratory notebook.  This is DX-272.  And in the bottom

11:20:22 1  half of this page, you included three TLCs of your reaction

11:20:25 2  mixture; correct?

11:20:27 3              "Answer:  Oui.

11:20:27 4              "Question:  The reaction produced a number of

11:20:29 5  compounds, is that right?

11:20:31 6              "Answer:  Correct.

11:20:31 7              "Question:  And just looking at this TLC, and

11:20:35 8  again I'm referring to the one on the right -- we can see at

11:20:39 9  least six compounds that were produced by this reaction; is

11:20:43 10 that right?

11:20:44 11             "Answer:  Correct.

11:20:44 12             "Question:  Okay.  Now, for analyzing whether

11:20:46 13 the target compound had produced, you used -- what did you

11:20:50 14 use?  NMR?

11:20:52 15             "Answer:  Just the idea, to -- to rough it up.

11:20:55 16 At that time, the idea was to purify compounds per a

11:20:59 17 chromatographic column, and then the use of NMR.

11:21:04 18             "Question:  Okay.  So, once again, you only

11:21:09 19 analyzed using NMR only one of the spots, correct?

11:21:18 20             "Answer:  Correct.

11:21:18 21             "Question:  And is it correct that it's possible

11:21:20 22 that one of the other spots, particularly the one you have

11:21:23 23 circled that is at the top, might, in fact, be the target

11:21:27 24 compound?

11:21:28 25             "Answer:  Yes, it is not impossible.  It is

11:21:30  1    possible, yes.

11:21:31  2                "Question:  And the only way to know for sure

11:21:33  3    would be to analyze using NMR for some other analytical tool

11:21:39  4    like that, correct?

11:21:40  5                "Answer:  Yes.  Correct.

11:21:40  6                "Question:  And the first time you actually

11:21:43  7    concluded that you made a 2'-methyl 'up', fluoro 'down'

11:21:48  8    nucleoside was using the patent, Pharmasset patent

11:21:51  9    conditions, right?

11:21:52 10                "Answer:  It's correct."

11:21:55 11                MR. COUNTRYMAN:  That conclude the designations

11:21:57 12    of Dr. Griffon.

11:21:58 13                THE COURT:  Okay.  Thank you.

11:22:05 14                MR. SCHERKENBACH:  Ladies and gentlemen, we have

11:22:06 15    a few more, and they're all shorter than that one.  We're

11:22:09 16    next going to hear from Dr. Stewart, Alistair Stewart who

11:22:12 17    was a Ph.D. chemist at Idenix also.  He was tried to

11:22:18 18    synthesize 2'-methyl fluoro after Dr. Griffon so in the

11:22:21 19    2004-2005 time frame.  This is about ten minutes long.  And

11:22:25 20    Ms. Tasha Francis will play the witness for this one.

11:22:28 21                THE COURT:  Thank you.

11:22:37 22                MR. COUNTRYMAN:  I have a few exhibits for this

11:22:38 23    one, too, Your Honor.  DX-231, DX-1067, DX-359, DX-230,

11:22:47 24    DX-1057, DX-256, and DX-284.

11:22:53 25                We move all those into evidence.

11:22:55 1          MR. McCRUM:  No objection, Your Honor.

11:22:56 2          THE COURT:  Those are all admitted.

11:22:58 3          MR. COUNTRYMAN:  Thank you.

11:22:58 4          (Above-referenced exhibits admitted in evidence.)

11:22:58 5          "Question:  All right.  And you indicate there

11:23:05 6  that your involvement in the project to synthesize

11:23:08 7  2'-fluoro, 2'-methyl nucleosides began in May of 2004,

11:23:12 8  'although to the best of my recollection I did not start any

11:23:15 9  laboratory work until 30 November 2004.'  Is that true?

11:23:20 10         "Answer:  Yes.

11:23:20 11         "Question:  I'm going to hand you what I have

11:23:22 12 marked as DX-231, an e-mail exchange between you,

11:23:27 13 Dr. Stewart, and Dr. Griffon in March of 2005, so March of

11:23:33 14 2005.  This is production number IDXDE00125582.

11:23:40 15         "Do you have any reason to doubt that you had

11:23:42 16 this e-mail exchange with Dr. Griffon in March of 2005?

11:23:42 17         "Answer:  No.

11:23:46 18         "Question:  On the subject of literature searches,

11:23:48 19 let me show you an e-mail exchange from the November 2004 time

11:23:52 20 frame involving yourself and Dr. Storer and Dr. Moussa and

11:23:56 21 others.  It's production number IDXDE00126120.

11:24:01 22         "Toward the end there, Dr. Storer says to you

11:24:05 23 and Dr. Moussa, quote, 'A lot of things which look simple on

11:24:11 24 paper in related systems have been tried and don't work in

11:24:16 25 this series.  Having to make the tertiary fluoride is very

11:24:20 1  different to having to make a secondary."

11:24:26 2              "Do you see that?

11:24:28 3              "Answer:  Yes.

11:24:28 4              "Question:  Do you disagree with those

11:24:30 5  statements?

11:24:31 6              "Answer:  It requires more context.  I haven't

11:24:33 7  considered exactly which systems he is talking about,

11:24:35 8  related systems.

11:24:36 9              "Question:  So you don't have an opinion, as you

11:24:38 10 sit here today, one way or the other, whether you would

11:24:41 11 agree or disagree with those statements?

11:24:44 12             "Answer:  No, I need more context.

11:24:45 13             "Question:  We have marked as DX-1067 an e-mail

11:24:49 14 exchange dated January 12th, 2005 between yourself and Dick

11:24:54 15 Storer and others, production number IDXDE00126244.

11:25:02 16             "And Dr. Storer says, quote, 'Gilles just told

11:25:07 17 me that someone he interviewed just after Christmas who

11:25:12 18 worked at Pharmasset told him they made the compound from a

11:25:17 19 nucleoside which may be good news for the other approach

11:25:21 20 Alistair discussed.'

11:25:23 21             "Do you see where I am?

11:25:26 22             "Answer:  Yes.

11:25:26 23             "Question:  All right.  The reference there to

11:25:28 24 the compound, that is a reference to a 2'-methyl fluoro

11:25:34 25 nucleoside.  Is that how you understand it?

11:25:37  1          "Answer:  Yes.

11:25:37  2          "Question:  And you say, quote, 'Thanks for that

11:25:41  3    information from Gilles.  Could be very handy and might

11:25:45  4    narrow things down a bit.'  Correct?

11:25:49  5          "Answer:  Yes.

11:25:49  6          "Question:  And then after that sentence, you

11:25:51  7    say, quote, 'I'm going to switch our focus straightaway on

11:25:57  8    to the nucleoside that Jean-Francois provided and see

11:26:02  9    whether we can avoid elimination in a few 50 milligram

11:26:06 10    reactions by varying the fluorinating agent' -- and this a

11:26:10 11    parenthetical with a bunch of terms I won't read -- 'or

11:26:14 12    temperature I used the DAST (r.t. to minus 30 and minus

11:26:19 13    78 degrees C).

11:26:20 14          "Do you see where I'm reading?

11:26:22 15          "Answer:  Yes.

11:26:22 16          "Question:  I'm going to hand you an e-mail

11:26:26 17    which I have marked as DX-359, an e-mail chain dated January

11:26:31 18    18th, 2005, attaching -- with production numbers

11:26:39 19    IDXDE00403509 through 510, with an attachment of a Clark

11:26:42 20    patent application ending in 9737.  The patent application

11:26:47 21    has production numbers IDXDE00420289 through 366.

11:26:54 22          "Is DX-359 -- or, I should say, the e-mail chain

11:26:59 23    that is part of DX-359 the January 18th e-mail that you

11:27:03 24    identified earlier?

11:27:06 25          "Answer:  Yes.  I don't remember everything past

11:27:08 1  "as discussed from Dick Storer."  I don't remember seeing

11:27:12 2  Sommadossi's name but he is definitely references that

11:27:14 3  e-mail from Dick.

11:27:16 4          "Question:  So is it -- talking about your

11:27:19 5  specific experience now:  You would agree that you had a

11:27:23 6  copy of the Pharmasset patent application by January 18th,

11:27:29 7  2005, right?

11:27:30 8          "Answer:  Yes.

11:27:31 9          "Question:  Did you read it?

11:27:32 10         "Answer:  Yes.

11:27:33 11         "Question:  One more document on this issue I

11:27:35 12 want to mark and hand to you DX-230, January 19th, 2005

11:27:42 13 e-mail from you to Dick Storer, production number

11:27:49 14 IDXDE00125532.

11:27:50 15         "Do you have any reason to doubt that you sent

11:27:52 16 this e-mail on or about January 19th, 2005?

11:27:57 17         "Answer:  No.

11:27:57 18         "Question:  And you say to Dr. Storer, quote,

11:28:01 19 'Just a quick note to let you and Adel know what we're up to

11:28:06 20 at the moment after getting the patent yesterday.

11:28:10 21         "Do you see that?

11:28:12 22         "Answer:  Yes.

11:28:12 23         "Question:  The reference to 'the patent' is the

11:28:16 24 reference to the Pharmasset PCT patent application.  Is that

11:28:21 25 right?

11:28:21 1          "Answer:  Yes.

11:28:22 2          "Question:  So what was the reason Idenix was

11:28:26 3   repeating the synthesis shown in the patent?

11:28:29 4          "Answer:  I believe I was trying to replicate

11:28:30 5   the patent to generate the compound for probably 4-6 on

11:28:35 6   example -- on page 29.

11:28:37 7          "Question:  Do you recognize DX-1057?

11:28:42 8          "Answer:  Yes.

11:28:43 9          "Question:  And have I correctly described it as

11:28:45 10  the monthly status report for the process chemistry group

11:28:50 11  from January 28th, 2005?

11:28:53 12         "Answer:  It's my portion of it.

11:28:54 13         "Question:  And there is a heading here that

11:28:55 14  says, 'Investigation of Pharmasset Patent Route.'  Correct?

11:29:00 15         "Answer:  Yes.

11:29:01 16         "Question:  And the first sentence under there

11:29:04 17  says, quote, 'Following the publication of the Pharmasset

11:29:08 18  patent, it was decided that their route from cytidine 10

11:29:13 19  should be followed to make the required fluorinated

11:29:17 20  nucleoside,' close quote.

11:29:19 21         "Do you see that?

11:29:21 22         "Answer:  Yes.

11:29:21 23         "Question:  Do you recognize DX-256?

11:29:27 24         "Answer:  Yes.

11:29:28 25         "Question:  And what is it?

11:29:30 1        "Answer:  I believe it's the combined monthly

11:29:31 2 report for the process group March 31st, 2005.

11:29:35 3        "Question:  And some of this we have seen before

11:29:37 4 so let me just hit the highlights here.

11:29:39 5        "Your first section is called 'Overview of the

11:29:43 6 Investigation of the Synthesis of NB66', right?

11:29:48 7        "Answer:  Yes.

11:29:48 8        "Question:  And this is -- the synthesis you

11:29:51 9 describe here for NB66 is based on the synthesis described

11:29:55 10 in the Pharmasset patent; right?

11:29:56 11        "Answer:  Yes.

11:29:57 12        "Question:  I'm going to hand you what I am

11:29:59 13 marking as DX-284.  This is a document titled 'Idenix

11:30:05 14 Pharmaceutical Process Chemistry Group Development of

11:30:07 15 Fluorination Process,' dated -- May 5th, 2005, production

11:30:12 16 numbers IDXDE00146306 through 311.

11:30:18 17        "Do you recognize DX-284?

11:30:20 18        "Answer:  Yes.

11:30:20 19        "Question:  And this is something you created?

11:30:23 20        "Answer:  Yes.

11:30:23 21        "Question:  So is it correct you attempted to

11:30:26 22 use these 11 different schemes to synthesize a 2'-methyl-fluoro

11:30:35 23 nucleoside in the period November 2004 through April of 2005?

11:30:40 24        "Answer:  Yes.

11:30:40 25        "Question:  The only scheme you tried where you

11:30:43 1   were able to conclude that you had actually synthesized a

11:30:48 2   2'-methyl-fluoro nucleoside was scheme H.  Correct?

11:30:53 3              "Answer:  Yes.

11:30:54 4              "Question:  And that was the scheme that was

11:30:56 5   based on the Pharmasset patent, right?

11:30:59 6              "Answer:  Yes.

11:31:01 7              MR. COUNTRYMAN:  That completes the designations

11:31:02 8   for Dr. Stewart.

11:31:04 9              MR. SCHERKENBACH:  Your Honor, may I confer for

11:31:06 10  one minute about the exhibits?

11:31:07 11             THE COURT:  Sure.

11:31:20 12             (Counsel confer.)

11:31:20 13             MR. COUNTRYMAN:  That's good.

11:31:21 14             THE COURT:  You may call the next witness.

11:31:23 15             MR. SCHERKENBACH:  Okay.  Just two more, and

11:31:25 16  they keep getting shorter.  The next person is Ms. Jingyang

11:31:30 17  Wang.  She is another chemist at Idenix who also worked on

11:31:35 18  trying to synthesize a 2'-methyl-fluoro nucleoside in the

11:31:41 19  2004-2005 time frame.  This one is about nine minutes long

11:31:44 20  Ms. Dalia Kothari will may the role of Ms. Wang.

11:31:44 21             Thank you.

11:31:56 22             MR. COUNTRYMAN:  The exhibits for this one,

11:31:58 23  DX-274, DX-359, DX-371, and DX-210.  We move those into

11:32:06 24  evidence.

11:32:06 25             THE COURT:  Any objection?

11:32:08 1          MR. McCRUM:  No objection.

11:32:09 2          THE COURT:  Thank you.

11:32:09 3              (Above-referenced exhibits admitted in evidence.

11:32:09 4              (Deposition designations of Jingyang Wang placed

11:32:16 5      in record.)

11:32:16 6              "Question:  Page 1.  Do you see a numbered

11:32:20 7      paragraph 3 there?  It says, 'I joined Idenix

11:32:22 8      Pharmaceuticals in 2002 as a process chemist'?

11:32:25 9              "Answer:  Yes.

11:32:25 10             "Question:  'And held the position of research

11:32:27 11     scientist from 2004 until 2007.  I am currently principal

11:32:33 12     research scientist at Idenix at its offices in Cambridge,

11:32:37 13     Massachusetts.'

11:32:37 14             "At the time you executed this declaration in

11:32:40 15     2013, I take it those statements were true?

11:32:42 16             "Answer:  Yes.

11:32:43 17             "Question:  All right.  So let's talk about --

11:32:45 18     and at some point during your time at Idenix, you were asked

11:32:48 19     to help synthesize a 2'-methyl, 2'-fluoro modified

11:32:52 20     nucleoside.  True?

11:32:53 21             "Answer:  Yes.

11:32:54 22             "Question:  Do you recognize DX-274, Ms. Wang?

11:32:59 23             "Answer:  Yes.

11:32:59 24             "Question:  And is it correct that this is a

11:33:01 25     copy of your Notebook 73?

11:33:03  1                "Answer:  Yes.

11:33:03  2                "Question:  And you kept this notebook at Idenix

11:33:06  3     during the time you worked there?

11:33:07  4                "Answer:  Yes.

11:33:08  5                "Question:  All right.  And you say you noted

11:33:10  6     on page 118 that 'a small amount of the desired product,

11:33:15  7     Compound 5 of Scheme C, on Page 115 was observed in my

11:33:20  8     analysis of the reaction."  Do you see that?

11:33:24  9                "Answer:  Yes.

11:33:29 10                "Question:  First of all, the e-mail chain is --

11:33:32 11     again, if you start at the bottom of the first e-mail is

11:33:36 12     January 18th, 2005.  Do you see that?

11:33:39 13                "Answer:  Yes.

11:33:39 14                "Question:  From a person named Sherry Knowles

11:33:42 15     to Dr. Sommadossi and Andrea Corcoran.  Right?

11:33:48 16                "Answer:  Yes.

11:33:48 17                "Question:  And the subject is 'Pharmasset

11:33:50 18     published PCT.'  Correct?

11:33:53 19                "Answer:  Yes.

11:34:23 20                "Question:  And Ms. Knowles says, 'We attach the

11:34:25 21     Pharmasset PCT application.  Please study the experiments

11:34:29 22     and data.'  Do you see that?  In the body of the e-mail?

11:34:32 23                "Answer:  Yes.

11:34:32 24                "Question:  So the last e-mail in the chain

11:34:35 25     we've been looking at on Wang Exhibit 9 is from Alistair

11:34:40 1  Stewart to Dr. Moussa, copying you, also on January 18th,

11:34:44 2  2005, and forwarding the Pharmasset published patent

11:34:47 3  application.  Right?

11:34:48 4            "Answer:  Yes.

11:34:49 5            "Question:  Fair enough.  And then the

11:34:50 6  attachment is the published -- the Pharmasset published

11:34:53 7  patent application naming Jeremy Clark as an inventor,

11:34:57 8  right?

11:34:57 9            "Answer:  Yes.

11:35:13 10           "Question:  Ms. Wang, the cover e-mail from Dr.

11:35:18 11 Stewart to you attaches a portion of a monthly report for

11:35:21 12 January 2005 for the Idenix Process Chemistry Group; is that

11:35:26 13 right?

11:35:27 14           "Answer:  Yes, looks like.  I don't recall this

11:35:30 15 e-mail, but looks like that's what is this attachment.

11:35:35 16           "Question:  And there's a heading there,

11:35:39 17 'Investigation of Pharmasset Patent Route.'

11:35:44 18           "Do you see that?

11:35:46 19           "Answer:  Yes.

11:35:46 20           "Question:  And then underneath that, there's a

11:35:49 21 statement that says, quote, 'Following the publication of

11:35:54 22 the Pharmasset patent, it was decided that their route from

11:35:57 23 cytidine 10 should be followed to make the required

11:36:02 24 fluorinated nucleoside,' close quote.

11:36:07 25           Do you see that?

11:36:11 1                    "Answer:  Yes.

11:36:11 2                    "Question:  You were told to make that compound

11:36:14 3      following the Pharmasset patent approach; right?

11:36:18 4                    "Answer:  Yes.

11:36:19 5                    "Question:  Oh, I see.  So in order to get the

11:36:22 6      required fluorinated nucleoside so you could test it for

11:36:28 7      activity, that's your understanding of why you were told to

11:36:32 8      follow the Pharmasset patent route to get that nucleoside?

11:36:36 9                    "Answer:  Yes.

11:36:44 10                   "Question:  Okay.  So would you agree, then,

11:36:49 11     that March of 2005 is the earliest that you can say you

11:36:54 12     synthesized an unprotected 2'-methyl-2'-fluoro nucleoside?

11:37:02 13                   "Answer:  Unprotected 2'methyl-2'-fluoro

11:37:07 14     nucleoside?

11:37:08 15                   "Question:  Yes.

11:37:09 16                   "Answer:  Yes.

11:37:10 17                   "Question:  And that compound, NB66, has the

11:37:13 18     same structure as compound 4-6 in the Pharmasset patent;

11:37:18 19     right?

11:37:19 20                   "Answer:  4-6, yes.

11:37:20 21                   "Question:  You don't recall.  But in any event,

11:37:22 22     you agree that the first time that compound NB66 was tested

11:37:27 23     for activity was sometime in March of 2005.  Right?

11:37:30 24                   "Answer:  From -- yes, from here, yes.

11:37:33 25                   "Question:  And that -- I think you already said

11:37:35 1    this -- that ended up being successful and you were able to

11:37:38 2    make NB66 following the Pharmasset synthetic route.  True?

11:37:43 3         "Answer:  Yes.

11:37:43 4         "Question:  I have a few questions for you, Ms.

11:37:45 5    Wang.  If you could pull out your notebook, that you were

11:37:48 6    asked about, I think DX-274.  In particular, you recall, I'm

11:38:06 7    sure, being asked about Pages 115 through 118.  I'd ask you

11:38:11 8    to the turn to those real quick.  Are you there?

11:38:13 9         "Answer:  Yes.

11:38:13 10        "Question:  You recall being asked about these

11:38:15 11   pages today?

11:38:19 12        "Answer:  Yes.

11:38:19 13        "Question:  Okay.  And just so the record is

11:38:21 14   clear, what do these pages relate to, generally?

11:38:24 15        "Answer:  These pages are the -- record for the

11:38:27 16   reaction I did for fluorination, protected 2'-methyl down OH

11:38:31 17   up uridine fluorination reaction.

11:38:33 18        "Question:  I'm going to ask that you turn to

11:38:36 19   Page 118.  And do you see where it says 'Conclusion'?

11:38:40 20        "Answer:  Yes.

11:38:41 21        "Question:  Can you read that into the record,

11:38:43 22   so we're clear on what that says?

11:38:46 23        "Answer:  The 'Conclusion ' says, DAST reaction

11:38:52 24   on 1464-JFN in DCM minus 70 to room temperature formed a

11:38:59 25   small amount of the desired fluorinated product, evidenced

11:39:02 1  by LC/MS of the crude.  And the column fraction,

11:39:08 2  JW-073-116-03, together with eliminated byproduct proton NMR

11:39:15 3  of JW-073-116-03, also showed coupling with fluorine on the

11:39:22 4  methyl group.  The reaction also formed anhydro byproduct,'

11:39:25 5  which I draw a structure here, '27 milligrams at 28.7

11:39:30 6  percent yield; and the 2'-hydroxy down epimer of the

11:39:36 7  starting material 10 milligram at ten percent yield.'

11:39:39 8        "Question:  And did you write that conclusion?

11:39:41 9        "Answer:  Yes.

11:39:41 10       "Question:  So as of the date that you wrote

11:39:43 11  that conclusion, did you believe that you had successfully

11:39:46 12  made a 2'-methyl-2'-fluoro compound?

11:39:49 13       "Answer:  Yes.

11:39:50 14       "Question:  He had read the conclusion on Page

11:39:53 15  118?

11:39:54 16       "Answer:  Yes.

11:39:54 17       "Question:  And there is a reference in there to

11:39:57 18  'Formed a small amount of the desired fluorinated product.'

11:40:02 19       "Do you see that?

11:40:03 20       "Answer:  Yes.

11:40:03 21       "Question:  I think you and I talked about this

11:40:05 22  on direct exam.  The reference there to 'Desired fluorinated

11:40:09 23  product,' that's the protected 2'-methyl-fluoro nucleoside;

11:40:15 24  right?

11:40:15 25       "Answer:  Yes."

11:40:16  1          MR. COUNTRYMAN:  That concludes Ms. Wang's

11:40:19  2   designations.

11:40:20  3          THE COURT:  Okay.

11:40:26  4          MR. SCHERKENBACH:  Last one this morning for

11:40:28  5   five minutes is Ms. Michele Tausek.  She was a biologist in

11:40:33  6   Idenix's Hepatitis C group.  And she is going to talk about

11:40:39  7   Idenix's biological testing.

11:40:42  8          I believe Ms. Francis will play the witness.

11:40:58  9          MR. COUNTRYMAN:  A couple of exhibits for this

11:41:00 10   one, Your Honor.  DX-362, DX-363, and DX-388.  We move all

11:41:06 11   those into evidence.

11:41:10 12          MR. KINTON:  No objection, Your Honor.

11:41:12 13          THE COURT:  Those are admitted.

11:41:13 14          (Above-referenced exhibits received in evidence.)

11:41:13 15          "Question:  And you mentioned that that

11:41:14 16   responsibility or that your job was to run assays?

11:41:17 17          "Answer:  Correct.

11:41:18 18          "Question:  I'm going to mark as DX-362 a

11:41:22 19   document -- I'm marking as DX-362 a document with production

11:41:27 20   number IDXDE00410090.

11:41:34 21          "So looking at this document, do you have any

11:41:36 22   sense for the time period that this was created?

11:41:39 23          "Answer:  This would have been my first several

11:41:40 24   months at Novirio.

11:41:41 25          "Question:  So late 2001, early 2002?

11:41:44 1          "Answer:  Yes, yeah.

11:41:45 2          "Question:  The first bullet point says, 'Cell

11:41:49 3  protection assay.'

11:41:51 4          "Do you see that?  That's the CPA?

11:41:53 5          "Answer:  Yes.

11:41:53 6          "Question:  That's the assay that we have been

11:41:55 7  talking about that you worked on?

11:41:57 8          "Answer:  Correct.

11:42:00 9          "Question:  The third bullet says, '37 compounds

11:42:03 10 tested, than 11-2001.'

11:42:07 11         "Do you see that?

11:42:09 12         "Answer:  Yes.

11:42:09 13         "Question:  Does that suggest to you that 37

11:42:12 14 compounds were tested in November of 2001?

11:42:15 15         "Answer:  Yes, it does.

11:42:16 16         "Question:  Does that sound realistic or

11:42:18 17 correct, in terms of the number of compounds you would test

11:42:20 18 in a month?

11:42:22 19         "Answer:  It could be.

11:42:22 20         "Question:  Why do you say it could be?

11:42:25 21         "Answer:  Some months you might have 37; other

11:42:29 22 months you might have two.

11:42:31 23         "Question:  Okay.  In this time period, in late

11:42:34 24 2001, early 2002, what was kind of the maximum amount of

11:42:40 25 compounds that you could test in a month with the assays you

11:42:44 1    had?

11:42:44 2                    "Answer:  I don't remember.

11:42:45 3                    "Question:  Would it have been around 37?  Like

11:42:48 4    are we talking about in the tens?

11:42:51 5                    "Answer:  To the best of my recollection, 37

11:42:53 6    seems like a lot.

11:42:54 7                    "Question:  Stepping back for one second:  You

11:42:57 8    worked in the HCV group, so you were testing for compounds

11:43:01 9    that would show activity against HCV; right?

11:43:05 10                   "Answer:  Yes.

11:43:05 11                   "Question:  Why were you using BVDV, the BVDV

11:43:11 12   virus, in your assays, I guess I should say, in the

11:43:16 13   2001-2003 time period?

11:43:18 14                   "Answer:  Because it's a comparable assay to

11:43:21 15   HCV.  It's a comparable surrogate.

11:43:23 16                   "Question:  So if a compound showed activity

11:43:25 17   against the BVDV virus, it would also show activity against

11:43:30 18   the HCV?

11:43:32 19                   "Answer:  That was my understanding, yes.

11:43:38 20                   "Question:  Did your understanding -- well, I

11:43:40 21   guess, at the time, 2001-2003, how confident were you that

11:43:45 22   it was a good surrogate for activity against HCV?

11:43:49 23                   "Answer:  I believe it was a comparable stand-in

11:43:51 24   for HCV.

11:43:52 25                   "Question:  Has your belief on that changed over

11:43:54 1  the years?

11:43:55 2              "Answer:  No.

11:43:56 3              "Question:  Did you consider the HCV replicon

11:43:59 4  assay to be a better surrogate for activity against HCV than

11:44:02 5  the BVDV CPA?

11:44:06 6              "Answer:  No, I did not.

11:44:06 7              "Question:  You considered them to be comparable

11:44:08 8  surrogates for activity against HCV?

11:44:11 9              "Answer:  Yes.

11:44:11 10             "Question:  So if we look at DX-363, this is a

11:44:14 11 document that you have seen before, or recognize?

11:44:19 12             "Answer:  I don't remember.  I assume I've seen

11:44:22 13 it before, but I don't know.

11:44:23 14             "Question:  Does it look like something that

11:44:26 15 would typically have been created in your group?

11:44:29 16             "Answer:  Yes, yes.

11:44:29 17             "Question:  So let me start with the first page,

11:44:32 18 just to put some numbers on.  The first bullet point says

11:44:35 19 'New compounds tested March through May of 2004.'

11:44:39 20             "Do you see that?

11:44:40 21             "Answer:  Yes.

11:44:40 22             "Question:  So now, for this document, we're in

11:44:42 23 the 2004 time period; correct?

11:44:45 24             "Answer:  Yes.

11:44:45 25             "Question:  And it says the total compounds

11:44:47 1    tested in those three months were 117?

11:44:51 2              "Answer:  Yes.

11:44:51 3              "Question:  And that is total compounds tested

11:44:54 4    of BVDV CPA?

11:44:57 5              "Answer:  Yes.

11:44:57 6              "Question:  So 117 divided by 3 is on the order

11:45:02 7    of 30 to 40 compounds a month?

11:45:05 8              "Answer:  Correct.

11:45:06 9              "Question:  And that's in the same ballpark as,

11:45:09 10   I think, the 37 that we saw earlier?

11:45:11 11             "Answer:  Yes.

11:45:13 12             "Question:  I'll mark as DX-388 a document with

11:45:17 13   production numbers IDXDE00439984 through 440183, titled

11:45:25 14   'Laboratory Notebook,' with the number 76 on the front.

11:45:31 15            "Ms. Tausek, could you just flip through the

11:45:33 16   document sufficient to identify it for me, please?

11:45:35 17            "Answer:  It's another one of my Idenix

11:45:37 18   laboratory notebooks.

11:45:38 19            "Question:  All right.  So let's turn to Page

11:45:41 20   141 of Lab Notebook 76, which is DX-388.  That page has a

11:45:45 21   production number ending in 132.  Are you there?

11:45:49 22            "Answer:  Yes.

11:45:53 23            "Question:  So at the top it is dated March 24,

11:45:55 24   2005.  Do you see that?

11:45:57 25            "Answer:  Yes.

11:45:58 1          "Question:  And you are running a CPA.  Is that

11:46:00 2  the BVDV CPA?

11:46:03 3          "Answer:  Yes.

11:46:03 4          "Question:  One of the compounds you are running

11:46:05 5  is 107-fluoro?

11:46:07 6          "Answer:  Yes.

11:46:08 7          "Question:  And that's what we were talking

11:46:09 8  about, the 107F?

11:46:12 9          "Answer:  Yes.

11:46:12 10          "Question:  Was this the first time you tested

11:46:14 11  107F?

11:46:15 12          "Answer:  I don't know.

11:46:16 13          "Question:  If you would have tested it earlier,

11:46:18 14  would it be in your lab notebook?

11:46:21 15          "Answer:  Yes.

11:46:21 16          "Question:  So there's no reason for you to

11:46:24 17  think that you did some assay or testing on NM107F that's

11:46:28 18  not documented in your lab notebook, is there?

11:46:30 19          "Answer:  No.

11:46:30 20          "Question:  Okay.  Down at the bottom of Page

11:46:34 21  141 there is an annotation that says 'NM107-fluoro' and a

11:46:39 22  lot number.  Do you see that?

11:46:40 23          "Answer:  Yes:

11:46:44 24          "Question:  So you received the compound,

11:46:45 25  NM107-fluoro, that you were testing from Ms. Wang?

11:46:50  1          "Answer:  Yes.

11:46:50  2          "Question:  And it states here that you received

11:46:52  3  it on March 22nd, 2005?

11:46:55  4          "Answer:  Yes.

11:46:55  5          "Question:  So you ran both the BVDV CPA and the

11:47:00  6  HCV replicon at the same time on the same date for the

11:47:04  7  NM107-fluoro sample?

11:47:06  8          "Answer:  Yes.

11:47:06  9          "Question:  Was that consistent with your

11:47:08 10  typical practice?

11:47:08 11          "Answer:  Yes."

11:47:12 12          MR. COUNTRYMAN:  That is the end of Ms. Tausek's

11:47:14 13  examination.

11:47:15 14          THE COURT:  Thank you.

11:47:16 15          Mr. Scherkenbach, what is next?

11:47:18 16          MR. SCHERKENBACH:  We are going to call Dr.

11:47:21 17  McHutchison, who is about 45 minutes or so on direct, he is

11:47:24 18  a live witness.

11:47:26 19          THE COURT:  Lunch is here.  We are going to give

11:47:28 20  the jury an earlier lunch break today than some other days.

11:47:32 21  During your break, of course, no talking about the case.

11:47:35 22  Enjoy your lunch.  And we will get you back here in a bit.

11:47:41 23          (Jury leaves courtroom at 11:48 a.m.)

11:48:02 24          THE COURT:  Have a seat.  For a moment I am

11:48:05 25  going to give you the ruling on plaintiffs' objection to the

11:48:08  1    testimony of Cook, which we argued this morning.

11:48:12  2              The plaintiffs' objection is overruled.  Two

11:48:15  3    grounds for this ruling.

11:48:17  4              First, the Court finds that the objection is

11:48:20  5    waived as untimely.  First off, it's untimely under the

11:48:27  6    pretrial order, which provided, as I am sure you all are

11:48:32  7    aware, that any unresolved objections with respect to

11:48:37  8    deposition designations will be submitted to the Court in a

11:48:39  9    joint submission by 8:30 a.m. the next morning, meaning in

11:48:43 10    context one calendar day before the trial day on which that

11:48:48 11    witness' testimony will be offered.

11:48:50 12              Here, we got the letter sometime this morning,

11:48:53 13    sometime after 7:00 a.m. before for deposition testimony

11:48:59 14    intended to be played today.  So it is untimely.

11:49:02 15              I appreciate that there is a lot you all have to

11:49:04 16    do.  I appreciate that you work late into the night trying

11:49:07 17    to narrow issues for me and resolve them.

11:49:11 18              But it's very difficult with everything else

11:49:14 19    that I have to do to have to deal with issues on the day

11:49:19 20    that they are arising when they could have been anticipated

11:49:23 21    by you all sooner.  So while I am willing to make some

11:49:26 22    reasonable accommodations, getting the letter at, let's say,

11:49:31 23    7:00 a.m. on the very day that it's going to be played is

11:49:35 24    just simply too late.

11:49:38 25              So the objection is overruled on that basis.

11:49:41 1              On the merits, it's also overruled as well.

11:49:46 2  This is a witness who is unavailable, and the Court

11:49:51 3  concludes that Idenix did have motive and opportunity to

11:49:55 4  attend this deposition, and I believe it was April 2015.

11:50:03 5  And that is at least through its relationship with Merck.

11:50:07 6  Merck is of course the parent of Idenix.  And that is

11:50:14 7  adequate under the circumstances to satisfy the

11:50:18 8  requirements.  That's further supplemented in this case by

11:50:21 9  the stipulation that the parties have reached, which further

11:50:25 10  supports that conclusion.

11:50:28 11               So on all of those grounds the objection is

11:50:31 12  overruled.

11:50:31 13               We will take the lunch break.

11:50:34 14               (Luncheon recess taken.)

11:50:34 15               *    *    *

12:35:53 16               Afternoon Session, 12:35 p.m.

12:35:53 17               THE COURT:  Is there an issue?  We will hear

12:35:57 18  from plaintiffs.

12:35:58 19               MS. PARKER:  Thank you, Your Honor.  Just

12:36:00 20  briefly.  I appreciate Your Honor's ruling and discussion

12:36:04 21  with us about the deadlines and all for the depositions.  We

12:36:10 22  are not the only ones who have been staying up working late

12:36:12 23  because we didn't know the full circumstances.  But we found

12:36:15 24  out over lunch, we got their designations late.  We got

12:36:18 25  their designations at 11:40 at night, past the deadline.

1210

So we didn't raise it because we didn't know there was going to be an issue about ours getting in. If it is going to be an issue, they shouldn't be allowed to play theirs today, either, under the deadlines. They have missed it.

We have the e-mail. They faithful us their designations late at 11:40 p.m. on December 7.

Thank you.

THE COURT: Anybody want to react to that.

MR. HEADLEY: Your Honor, we did work, it's the designations and we didn't press a waiver issue. We didn't believe it to be a waiver issue at all. I understand that the Court had two bases for the ruling. We pressed the latter of the two bases. We certainly don't object to the Court reconsidering the waiver part and going back to the issue. That was never our intention. I can say we did work out a number of narrowing disputes throughout the day. We exchanged on Wednesday. As the Court may remember, there is actually no deadline for disclosures anymore. We had one. It got changed and we never solidified what that was going to be so the parties kept rolling them out, sometimes earlier, sometimes what would have been later. But that part of the pretrial order is vacated during the discussion, so we can get matters earlier, ironically, with respect to this situation.

12:37:44 1          All I can say is we met and conferred.  We

12:37:47 2  narrowed the issue.  When we met and conferred on Thursday

12:37:50 3  about this, we were told, we object on hearsay grounds at

12:37:55 4  11:00 p.m. at night.  That was the first we heard of any

12:37:58 5  objection like that.  Before that we didn't hear it and it

12:38:03 6  seemed like a simple straightforward objection where they

12:38:06 7  could have written us back any time in the day saying it is

12:38:09 8  a straight 802 issue.  They didn't do so that.

12:38:12 9          When we were on the phone, they just said,

12:38:1410  that's your problem, it's 802.  When we did the letter

12:38:1911  exchange yesterday, I certainly know we got a letter from

12:38:2512  them at 11:00 at night, it was in the evening.  We got it

12:38:3013  back to you last night.  They waited until this morning to

12:38:3214  file it.

12:38:3315          So we never intended to press the waiver issue

12:38:3616  on that.  I admit, I was surprised at that part of the

12:38:3917  ruling, we apologize.  The letter didn't specify which way

12:38:4318  it was going to be played because we disclosed witnesses

12:38:4519  through the end of our case, basically.

12:38:4920          THE COURT:  Thank you.  I think we have put

12:38:5021  enough time into this issue.  I am not going to change the

12:38:5422  ruling.  It's irrelevant whether I would reconsider it in

12:39:0023  light of what I am told now is additional evidence that was

12:39:0124  not shared with me earlier today.  It wouldn't change the

12:39:0525  outcome, given what I said on the merits.

12:39:08 1          Thank you for updating me.  The ruling stands.

12:39:12 2    We will bring the jury in.

12:39:18 3              (Jury enters courtroom at 12:38 p.m.)

12:41:12 4          THE COURT:  Welcome back, ladies and gentlemen.

12:41:15 5    We are ready to proceed.  Defendants may call their next

12:41:17 6    witness.

12:41:18 7          MR. SCHERKENBACH:  Thank you, Your Honor.

12:41:20 8          Welcome back, ladies and gentlemen.

12:41:21 9          As I mentioned before the break our next witness

12:41:23 10   is Dr. John McHutchison.  Dr. McHutchison is the executive

12:41:27 11   vice president of clinical research at Gilead.  He is going

12:41:30 12   to testify about Gilead's development of nucleosides to treat

12:41:36 13   Hepatitis C based on his experience at both Gilead and Duke.

12:41:40 14         Your Honor, Gilead calls Dr. John McHutchison.

12:41:49 15         ... JOHN McHUTCHISON, having been duly sworn as

12:41:56 16   a witness, was examined and testified as follows ...

12:41:23 17         THE COURT:  Welcome, Dr. McHutchison.

12:41:25 18         THE WITNESS:

12:41:26 19         MR. FARRELL:  Good afternoon.  May it please the

12:41:27 20   Court, John Farrell for Gilead.

12:41:31 21                   DIRECT EXAMINATION

12:41:31 22   BY MR. FARRELL:

12:41:31 23   Q.    Dr. McHutchison, where do you work?

12:41:34 24   A.    At Gilead Sciences.

12:41:35 25   Q.    What is your title there?

12:41:36 1    A.    I'm executive vice president.

12:41:38 2    Q.    How long have you been there?

12:41:39 3    A.    About six and-a-half years.

12:41:42 4    Q.    Before you joined Gilead, did you serve at a member

12:41:46 5    of the Pharmasset Scientific Advisory Board?

12:41:48 6    A.    Yes, I did.

12:41:49 7    Q.    At Gilead, did you lead the strategy and clinical

12:41:55 8    trials that led to the cure for hepatitis C?

12:41:58 9    A.    Yes, I did.

12:41:59 10   Q.    Whose cure is that?

12:42:01 11   A.    It's Gilead's.

12:42:04 12   Q.    You were here for opening statements?

12:42:06 13   A.    Yes, I was.

12:42:08 14          MR. FARRELL:  If we could put Idenix opening

12:42:11 15   slide 81 up, Mr. Sayres.

12:42:11 16   BY MR. FARRELL:

12:42:16 17   Q.    Dr. McHutchison, in Idenix's opening, the jury was

12:42:19 18   shown this slide.  And they were told by Idenix that

12:42:25 19   2'-methyl up is the bedrock basis for the two drugs in this

12:42:30 20   case.  Is that true?

12:42:33 21   A.    No.

12:42:36 22   Q.    Why isn't it true?

12:42:37 23   A.    Well, it's all part of the molecule most important.

12:42:43 24   So rather than one substitution at one part of a sugar, it

12:42:47 25   is the entire molecule that makes the unique compound and

12:42:51 1    the unique drug sofosbuvir in this case.

12:42:53 2            So I, I tend to think of this as like a Rubik's

12:42:58 3    Cube.  It is one of these cubes that has three-dimensional

12:43:03 4    parts to it.  If you change one part, you change multiple

12:43:06 5    other parts as well.  And it is each of those unique

12:43:09 6    characteristics together, not just one individual

12:43:11 7    characteristic that is drawn out here that is important that

12:43:15 8    makes the drug that is unique.

12:43:16 9    Q.    Now, during Idenix's opening, the jury was told, with

12:43:21 10   this slide, No. 81 up, that this is what is taken by

12:43:28 11   patients to treat hepatitis C, this compound.  Is that true?

12:43:34 12   A.    No.

12:43:35 13   Q.    What would happen if a patient took this compound

12:43:38 14   with 2'-methyl hydroxy down?  What would happen to the

12:43:44 15   patient?

12:43:44 16           MR. McCRUM:  Objection, Your Honor.  That calls

12:43:45 17   for speculation, expert testimony.

12:43:49 18           MR. FARRELL:  Your Honor, we can lay the

12:43:50 19   foundation.  If they want me to lay it, we can do that.

12:43:52 20           THE COURT:  Are you withdrawing that question?

12:43:54 21           MR. FARRELL:  No, Your Honor.  I think Dr.

12:43:57 22   McHutchison, what he said already, given he is the head of

12:43:59 23   clinical development and he oversaw that development, he can

12:44:03 24   answer the question now.

12:44:04 25           THE COURT:  You believe you laid an adequate

12:44:06 1  foundation?

12:44:07 2          MR. FARRELL:  For this preliminary question,

12:44:08 3  yes.

12:44:08 4          THE COURT:  What about whether it is expert

12:44:10 5  testimony?

12:44:10 6          MR. FARRELL:  He is an expert.  I can qualify

12:44:12 7  him for that.

12:44:13 8          THE COURT:  Are you offering him as an expert?

12:44:15 9          MR. FARRELL:  I will.  If you want me to wait, I

12:44:17 10 can wait.

12:44:17 11         THE COURT:  Is there an objection to him being

12:44:19 12 qualified as an expert?

12:44:21 13         MR. McCRUM:  I would want to see -- no, he

12:44:23 14 submitted an expert report in this case.

12:44:25 15         THE COURT:  Okay.  Well, then I'm sustaining the

12:44:29 16 objection for now.  We'll see if you can lay the foundation.

12:44:32 17         MR. FARRELL:  Sure.

12:44:32 18 BY MR. FARRELL:

12:44:36 19 Q.      Dr. McHutchison, Dr. Sommadossi told this jury that a

12:44:42 20 certain Idenix 2'-methyl hydroxy down called NM283 was a

12:44:49 21 success in clinic and it was a business decision not to

12:44:53 22 submit that compound to the FDA.

12:44:57 23         First, was NM283 a success in the clinic?

12:45:01 24 A.      No, it was not.

12:45:02 25 Q.      How do you know that?

12:45:04 1    A.    I participated in that clinic, one of those clinical

12:45:07 2    trials.

12:45:09 3    Q.    And because of that, what access did you have to the

12:45:11 4    results of the clinical trial?

12:45:12 5    A.    I had access to all the results of the trial.

12:45:15 6    Q.    What were the results of the clinical trial of NM283,

12:45:21 7    the actual results?

12:45:22 8    A.    So there were two major problems.  The first was the

12:45:26 9    cure rate, which was zero percent.  And then the second was

12:45:32 10   the toxicity.  There was a lot of GI toxicity, nausea,

12:45:38 11   vomiting, diarrhea that led to discontinuation.

12:45:41 12   Q.    So the side effect of toxicity; correct?

12:45:44 13   A.    That's correct.

12:45:44 14   Q.    I'm going to go to that cure rate of zero.  First of

12:45:48 15   all, what do you mean?  What does that mean a cure rate of

12:45:51 16   zero?

12:45:52 17   A.    There are a couple hundred people in the trial; and

12:45:56 18   as I recall, and most of them or a portion of them got NM283

12:46:02 19   plus other drugs, and none of those patients were cured,

12:46:05 20   zero.  So you end up with a zero percent cure rate.

12:46:08 21   Q.    How bad a result is that?

12:46:11 22   A.    That is the lowest cure rate or worst result in the

12:46:16 23   trial I have ever seen in hepatitis C.

12:46:19 24   Q.    Let's go to the part about it being a business

12:46:21 25   decision not to submit it to the FDA for approval.  As part

12:46:25 1  of the work you were doing as a researcher, do you track to

12:46:28 2  what happened to NM283?

12:46:30 3  A.      Yes, I did, sir.

12:46:31 4  Q.      Do you know what happened with NM283?

12:46:34 5  A.      Yes, I do.

12:46:34 6  Q.      How do you know that?

12:46:36 7  A.      It was published on the, you know, electronic media.

12:46:40 8  Q.      So when it comes to whether it was a business

12:46:43 9  decision, what actually happened to NM283?

12:46:46 10 A.      It was put on clinical hold or stopped by the FDA.

12:46:51 11 Q.      And I heard this, did they give a reason why?

12:46:56 12 A.      It was a risk/benefit analysis.

12:47:00 13 Q.      I'll stop you there.  What was the risk here and what

12:47:03 14 was benefit of NM283?

12:47:06 15 A.      So the risk was the side effects, nausea, vomiting,

12:47:12 16 diarrhea, which was significant.  And the benefit was that

12:47:17 17 at least in one trial we're describing, nobody was cured.

12:47:21 18 Q.      So let's go over your expertise in hepatitis C, okay?

12:47:27 19 I'm calling you doctor.  I'm calling you doctor.  You are a

12:47:32 20 medical doctor?

12:47:32 21 A.      Yes, I am.  Yes.

12:47:33 22 Q.      Where did you get your medical degree?

12:47:35 23 A.      In Australia, where I was born.

12:47:37 24 Q.      I was going to guess that.  And upon graduating from

12:47:42 25 medical school, what areas of medicine did you specialize

12:47:46 1  in?

12:47:46 2  A.    Gastroenterology and liver diseases.

12:47:50 3  Q.    Are you board certified in those fields in Australia?

12:47:53 4  A.    Yes, I am.

12:47:54 5  Q.    At a high level, what does it mean to be board

12:47:58 6  certified?

12:47:59 7  A.    It means you are a specialist in those diseases of

12:48:01 8  those organs, really.

12:48:03 9  Q.    Now, in 1988, you came to the United States; correct?

12:48:07 10  A.    I did.

12:48:07 11  Q.    Okay.  And why did you come to the United States in

12:48:10 12  1988?

12:48:11 13  A.    To do a couple of additional years of training in

12:48:16 14  liver disease.

12:48:16 15  Q.    And where were you going to do this additional

12:48:19 16  training from 1988 on?

12:48:21 17  A.    At the University of Southern California in Los

12:48:25 18  Angeles.

12:48:25 19  Q.    And how long were you planning on staying in the

12:48:30 20  United States when you came over?

12:48:31 21  A.    Two years.

12:48:32 22  Q.    So how did that work out?

12:48:38 23  A.    I'm still here.  I'm very happy.

12:48:40 24  Q.    In 1989, what happened that changed that plan?

12:48:44 25  A.    So my boss at USC said, John, I want you to go and

12:48:51 1    talk to this fellow in San Francisco who is called Michael

12:48:56 2    Houghton.  He has discovered this virus called hepatitis C.

12:48:59 3    So I spent a day with Michael Houghton, and we started doing

12:49:02 4    a lot of research on that, and I never went home afterwards.

12:49:05 5    Q.    And for the next 20 years, next 20 years, 1990 to

12:49:13 6    2010, what did you do, big picture?

12:49:15 7    A.    You know, I was a doc, looking after people with

12:49:20 8    liver disease and doing research on liver disease,

12:49:22 9    predominantly hepatitis C and treatments for hepatitis C,

12:49:27 10   et cetera.

12:49:27 11   Q.    What places did you do this research and treating of

12:49:30 12   patients?

12:49:30 13   A.    So I was initially, after USC, at Scripps in San

12:49:36 14   Diego, that is a hospital and a research institute.  Then I

12:49:39 15   was at Duke University; about half the time in both.

12:49:42 16   Q.    You mentioned you were doing research at these places

12:49:45 17   and seeing patients.  Were you also involved in clinical

12:49:48 18   trials?

12:49:48 19   A.    Yes, I did a lot of trials.

12:49:50 20   Q.    And on the folks in clinical trials as well.  How

12:49:56 21   many clinical trials did you do or oversee during your time

12:50:00 22   at Scripps or Duke?

12:50:01 23   A.    I don't know exactly.  At least 100.

12:50:04 24   Q.    And these are clinical trials for potential drugs to

12:50:07 25   treat hepatitis C?

McHutchison - direct

12:50:08 1   A.      Yes.  A lot of them for Hep C, yes.

12:50:11 2   Q.      And who did you do these clinical trials for?

12:50:13 3   A.      So many were sponsored by the pharmaceutical

12:50:18 4   industry.  Some were sponsored by the government, National

12:50:23 5   Institute of Health and other organizations.

12:50:26 6   Q.      By the way, you mentioned you treated patients.  How

12:50:30 7   many patients?  Let's take your time at Duke.  How many

12:50:32 8   patients would you see at Duke and treat them for hepatitis

12:50:37 9   C?

12:50:37 10  A.      We had clinics everyday, and I went on Wednesdays

12:50:41 11  with the other people.  So I think we saw at least, if I

12:50:45 12  remember, about 3,000 hepatitis C patients at least a year.

12:50:49 13  So 20 to 40 a week, I would say, yes.

12:50:53 14  Q.      At a high level, when you say you are also doing

12:50:56 15  research, what do you mean?  What kind of research are you

12:50:58 16  doing?

12:50:59 17  A.      So lots of different types.  We had clinical trials

12:51:03 18  where we had to offer people new therapies to try and treat

12:51:08 19  their hepatitis.  And then we a trials around liver

12:51:13 20  transplantation, trials around the disease itself, et

12:51:17 21  cetera, so we had lots of different things.

12:51:18 22  Q.      Now --

12:51:20 23  A.      Excuse me.

12:51:22 24  Q.      In addition to doing clinical trials, how often did

12:51:26 25  you work with or consult with pharmaceutical companies?

12:51:28 1    A.     Quite a lot.

12:51:29 2    Q.     And like what kind of consulting would that be,

12:51:33 3    separate and apart from the clinical trials you are running

12:51:35 4    for them?

12:51:36 5    A.     Yeah.  We're allowed to consult one day a week at

12:51:39 6    Duke, so that was sort of 20 percent of the time.  And we

12:51:43 7    would advised the companies, because we're experts in the

12:51:47 8    disease, we advised them on how to do the studies and do

12:51:50 9    things properly, run properly, perhaps a better way.

12:51:54 10   Q.     Now, because of the research you were doing and all

12:51:56 11   the clinical trial work you were doing for all these

12:51:59 12   different companies, how aware were you of what companies

12:52:02 13   and people in the field of hepatitis C research were doing

12:52:05 14   and working on?

12:52:07 15   A.     I was very aware of everything that was going on.

12:52:10 16   Q.     And when you say "very aware," how aware were you?

12:52:14 17   Is there anybody else who knew as much?

12:52:18 18   A.     I was one of the two or three people in the world who

12:52:23 19   knew what was running across the board.

12:52:25 20   Q.     Now, you said you served with Pharmasset on their

12:52:28 21   advisory board.  What time did you do that?

12:52:30 22   A.     It was 2000s.  2007 to 2010 probably, I think.

12:52:35 23   Q.     Well, how about Idenix?  Did you ever work with them?

12:52:39 24   A.     Yes, I did.  Yes.

12:52:40 25   Q.     Describe your involvement with Idenix when you were

12:52:42 1    at Duke.

12:52:44 2    A.    So I was involved in some trials, as I said, and did

12:52:48 3    some advisory work for them as well.  Advisory boards, we

12:52:51 4    used to call them.

12:52:52 5    Q.    Now, how long were you at Scripps Research Center in

12:52:57 6    San Diego?

12:52:58 7    A.    So I left in 2001 to go to Duke, I think.

12:53:03 8    Q.    And then how long were you at Duke?

12:53:05 9    A.    2001 to 2010.

12:53:09 10    Q.    Now, I'm going to assume that companies at times came

12:53:13 11    to you and asked if you would join their company?

12:53:15 12    A.    Yes, they did.  Yes.

12:54:23 13    Q.    I want to ask about one company.  Did Idenix ever

12:54:28 14    call you up and ask you to join their company?

12:54:31 15    A.    Yes, they did, yeah.

12:54:33 16    Q.    Tell the jury about that?

12:54:34 17    A.    Dr. Sommadossi, I knew him, I saw him in a meeting.

12:54:39 18    He asked me to come up there.  We had dinner.  I flew up to

12:54:42 19    Boston where the company was, had dinner, spent a day there

12:54:46 20    looking around, interviewing.  I was offered the job as

12:54:49 21    chief medical officer there.

12:54:51 22    Q.    Did you take the job?

12:54:52 23    A.    No, I didn't.

12:54:53 24    Q.    What was it about the timing of the job that caused

12:54:55 25    you to turn it down?

12:54:58 1    A.    I think a number of things, really. I had young kids

12:55:01 2    in North Carolina. I liked academics. I liked the

12:55:08 3    university. So I think it was probably the wrong time,

12:55:11 4    really.

12:55:11 5    Q.    In 2010 you did leave Duke, though, to join Gilead.

12:55:17 6    Why did the timing seem right for you then in 2010?

12:55:21 7    A.    So I -- in the last year we had made a very big

12:55:31 8    scientific discovery, genetic scientific discovery, it

12:55:36 9    explained why some people responded to interferon and others

12:55:39 10   didn't. I had run an awful lot of clinical trials and

12:55:44 11   trials all over the world. I think I was walking around

12:55:47 12   scratching my head, thinking what am I going to do for the

12:55:51 13   next ten years? I don't think I can do anymore in the

12:55:55 14   academic setting.

12:55:57 15          So I think maybe my mind being like that was the

12:56:00 16   reason I decided to go to Gilead.

12:56:02 17   Q.    Now, after you joined Gilead, did you encourage the

12:56:08 18   company to acquire Pharmasset and secure its nucleoside

12:56:12 19   compound 2'-methyl up 2'-fluoro down?

12:56:15 20   A.    Yes, I did.

12:56:17 21   Q.    We are going to talk about that in a little more

12:56:20 22   detail later. What I want to know is after Gilead did

12:56:25 23   acquire that compound, 2'-methyl up 2'-fluoro down, at a

12:56:31 24   high level, in simple terms, what was your role at Gilead in

12:56:36 25   developing that sofosbuvir into Sovaldi and Harvoni?

12:56:42 1    A.      So I was responsible for all of that, to oversee all

12:56:45 2    of the programs that led to the treating package that led to

12:56:49 3    the approval of the drug.  That was my job.

12:56:51 4    Q.      How much have you published in the field of Hepatitis

12:56:56 5    C and Hepatitis C research?

12:56:58 6    A.      I think I have about 350 published papers on liver

12:57:02 7    disease.

12:57:03 8    Q.      Over the years, how many lectures and talks have you

12:57:06 9    been asked to give about Hepatitis C and its treatment?

12:57:10 10   A.      I wouldn't know.  A lot.

12:57:12 11   Q.      How much of your life have you devoted to Hepatitis C

12:57:19 12   treatment and finding a cure?

12:57:22 13   A.      The last 25 years.

12:57:25 14           MR. FARRELL:  Your Honor, in addition to Dr.

12:57:28 15   McHutchison being a fact witness, we offer Dr. McHutchison

12:57:30 16   as an expert in Hepatitis C, drug development and clinical

12:57:34 17   work, including the study and use of nucleosides for the

12:57:38 18   treatment of Hepatitis C.

12:57:40 19           THE COURT:  Okay.

12:57:43 20           MR. McCRUM:  No objection, Your Honor.

12:57:46 21           THE COURT:  He is so recognized.

12:57:49 22   BY MR. FARRELL:

12:57:50 23   Q.      Can we put up the slide again.  Thank you.

12:57:56 24           I am going to go back to that question now.  The

12:57:59 25   jury was told by Idenix in opening that this, what is on

McHutchison - direct

12:58:02 1   this slide, is what patients take to treat HCV.  Is that

12:58:06 2   true?

12:58:06 3   A.    No.

12:58:07 4            THE COURT:  Is there an objection?

12:58:10 5            MR. McCRUM:  I think this is outside the scope

12:58:12 6   of his expert report, Your Honor.

12:58:13 7            THE COURT:  Can I have a copy of the expert

12:58:15 8   report, please?

12:58:18 9            MR. FARRELL:  Sure.  I have to get my copy.  I

12:58:31 10   will give you the paragraph.

12:58:32 11            THE COURT:  Thank you.

12:59:01 12            MR. FARRELL:  Your Honor, it would be in the

12:59:02 13   paragraph talking about the failures --

12:59:06 14            THE COURT:  I need a number.

12:59:10 15            MR. FARRELL:  It is Paragraphs 47, Your Honor,

12:59:18 16   and 52.

12:59:22 17            THE COURT:  Give me a moment.

12:59:27 18      (Pause.)

12:59:37 19            MR. FARRELL:  14 and 54.  I apologize.

01:00:14 20      (Pause.)

01:00:20 21            THE COURT:  Mr. McCrum, have you had a chance to

01:00:22 22   look at those three paragraphs?

01:00:24 23            MR. McCRUM:  Yes, Your Honor.  It's talking --

01:00:27 24            THE COURT:  Hold off.  Do you still have the

01:00:28 25   same objection?

01:00:29  1          MR. McCRUM:  I do.

01:00:30  2          THE COURT:  You can explain it to me.

01:00:31  3          MR. McCRUM:  He is referring to NM, this

01:00:34  4  compound that's not discussed in either of those paragraphs.

01:00:37  5          THE COURT:  What we are looking at is NM.

01:00:40  6          MR. McCRUM:  Yes.

01:00:41  7          THE COURT:  That is not referenced in these

01:00:42  8  paragraphs.

01:00:43  9          MR. McCRUM:  Yes.

01:00:43 10          THE COURT:  Mr. Farrell.

01:00:45 11          MR. FARRELL:  Your Honor, my question was about

01:00:48 12  what would happen if you took a 2'-methyl-hydroxy down like

01:00:52 13  this.  Those paragraphs deal with all of the failures that

01:00:55 14  are involved with 2'-methyl hydroxide.

01:04:39 15          THE COURT:  I will see counsel at sidebar.

01:04:39 16          Bear with us, ladies and gentlemen.

01:04:39 17          (The following took place at sidebar.)

01:04:39 18          THE COURT:  All right.  You can go ahead and

01:04:39 19  explain.  I guess start with, do you agree that one of seven

01:04:39 20  is not specifically referenced in the paragraphs you have

01:04:39 21  identified?

01:04:39 22          MR. FARRELL:  That is -- that's correct.  It's

01:04:39 23  not specifically referenced.  That is not 107, Your Honor.

01:04:40 24  That is an organized composite of what -- we are talking

01:04:40 25  about 2'-methyl OH down.  That is neither 80 or 107.  That

01:04:40 1    is a version of most probably an ND Merck compound.

01:04:40 2         So the problem I am having, Your Honor, is the

01:04:40 3    question is, the question that was asked in opening said

01:04:42 4    this was the class that patients take.  Those paragraphs

01:04:42 5    talk about that class and how they fail and are toxic.

01:04:42 6              THE COURT:  The question is, where does he

01:04:42 7    disclose either in their expert report or deposition that

01:04:42 8    patients do not take that number or even something like

01:04:42 9    that?

01:04:42 10             MR. FARRELL:  Well, when he says in his report

01:04:42 11   that these are toxic, patients don't take toxic drugs,

01:04:43 12   they --

01:04:43 13             THE COURT:  I am sure you are right.  But where

01:04:43 14   does it say that?

01:04:43 15             MR. FARRELL:  In all the paragraphs, there is a

01:04:43 16   history of failures of 2'-methyl --

01:04:43 17             THE COURT:  Does he say patients don't take

01:04:43 18   that?

01:04:43 19             MR. FARRELL:  Well, no, Your Honor, because if

01:04:43 20   it fails in clinic patients don't take it.  That's

01:04:43 21   unapproved.

01:04:43 22             THE COURT:  Why wasn't that disclosed?

01:04:44 23             MR. FARRELL:  Because that is his opinion.  His

01:04:44 24   opinion in his paragraphs are that 2'-methyl up and the

01:04:44 25   paragraph cited at 54 show that only one compound has been

01:04:44 1    approved for compounds to take.  That is what that approved

01:04:44 2    paragraph was.

01:04:44 3            All these other ones have not been approved,

01:04:44 4    they were stopped in this clinic.  The only way a patient

01:04:45 5    can take a drug in this country is if it was approved.

01:04:45 6            MR. McCRUM:  He asked what will happen to a

01:04:45 7    patient if he takes MD80.  You are not going to find that

01:04:45 8    anywhere in here.  That is not one of the opinions he

01:04:45 9    offered.  MD80 is not mentioned, what will happen to

01:04:45 10   somebody who takes MD80 is not mentioned.  It is simply not

01:04:46 11   in the report.

01:04:46 12           THE COURT:  Did you want to reply?

01:04:46 13           MR. FARRELL:  I think this is squarely in the

01:04:46 14   wheelhouse of his opinions.  Does he literally say patients

01:04:46 15   don't take it?  No, I am telling you that.  That's what

01:04:46 16   the --

01:04:46 17           THE COURT:  Does he say what would happen to a

01:04:46 18   patient if they took it?

01:04:46 19           MR. FARRELL:  The litany of all these studies is

01:04:48 20   liver toxicity, liver toxicity, toxicity.

01:04:48 21           THE COURT:  Does he say what would happen to a

01:04:48 22   patient if he took MD80 or 18 or whatever it is?

01:04:48 23           MR. FARRELL:  In our opinion, because the entire

01:04:48 24   class in that slide, which includes, by the way, in all

01:04:48 25   these compounds, look at the numbers, he says toxicity, in

01:04:49 1   the paragraph below he says this is the only one approved

01:04:49 2   for patients to take.

01:04:49 3            THE COURT:  I am going to sustain the objection.

01:04:49 4   This is beyond the scope of what your expert has disclosed.

01:04:49 5            (End of sidebar conference.)

01:04:49 6            THE COURT:  You can proceed.

01:04:49 7   BY MR. FARRELL:

01:04:49 8   Q.       Dr. McHutchison, let's talk about Hepatitis C, what

01:04:49 9   the disease is and how it attacks the body.  Okay?

01:04:52 10  A.       Sure.

01:03:46 11  Q.       The jury has been told it is a blood borne disease.

01:03:51 12  So what does that mean?  How does it get in the body?

01:03:53 13  A.       So it means it is transmitted by the blood.  So if

01:03:57 14  you received a blood transfusion that had hepatitis C in it

01:04:01 15  from many years ago or a tattoo with a bad needle or a

01:04:07 16  shared razor, toothbrush or needles, you could transmit

01:04:12 17  hepatitis C.

01:04:12 18  Q.       And what does the hepatitis C virus, what does it

01:04:14 19  target in the body?

01:04:15 20  A.       So it heads straight towards the cells of the liver.

01:04:19 21  We call them hepatocytes, where it lives within the cells

01:04:22 22  within the liver.

01:04:24 23  Q.       Now, how fast does this virus reproduce or grow?

01:04:27 24  A.       So incredibly fast.  So there is about a trillion

01:04:31 25  viruses, hepatitis C viruses in every patient that is

01:04:35 1  infected.  And they turn over.  We talk about turnover.

01:04:39 2  About half a trillion viruses turn overs, is new, every four

01:04:44 3  to six hours.  So an incredible amount of viral machinery

01:04:48 4  going on.

01:04:48 5  Q.    Now, what does the body try to do to fight back from

01:04:52 6  this virus that is reproducing that fast in the liver?

01:04:56 7  A.    So our immune cells or white blood cells try to kill

01:05:01 8  off the cells within the liver that have the virus in them,

01:05:04 9  so constantly trying to attack those cells that are infected

01:05:09 10  with hepatitis C, so they're causing inflammation.  And, you

01:05:12 11  know, just like if you cut your hand, you get a red swollen

01:05:16 12  area, that is inflammation that keeps going, you get scar

01:05:20 13  tissue laid down.  And that is what happens in hepatitis C

01:05:23 14  patients' livers.  The same thing.  It is a wound.

01:05:26 15  Q.    So as this damage is being taken place in the liver

01:05:29 16  because of the battle that is going on there, as the scar

01:05:32 17  tissue gets worse, what happens to the liver?

01:05:34 18  A.    As the liver gets more and more and more scarred, you

01:05:37 19  end up with these nodules in the liver, and that is what

01:05:40 20  doctors call cirrhosis of the liver.

01:05:43 21  Q.    What is the consequence of getting cirrhosis of the

01:05:46 22  liver?

01:05:46 23  A.    So if the cirrhosis gets worse and worse, then you

01:05:50 24  can develop all of these complications.  You can get

01:05:52 25  yellow eyes and fill up with fluid and all these other

01:05:56 1 complications, and you can end up needing a liver

01:05:59 2 transplant, you can die from the complications, develop

01:06:02 3 liver cancer, and so forth.  So it is very serious.

01:06:05 4 Q.    So in addition to hepatitis C spreading so fast in

01:06:08 5 the liver, how smart a virus is this?

01:06:12 6 A.    It's supersmart.  It's got 13 or 15 ways I think at

01:06:18 7 least of evading the immune system or the white blood cells.

01:06:21 8 And because it is turning over all the time, each mutation

01:06:25 9 in its genetic material or genetic code happens in every

01:06:30 10 person with the disease everyday.  So it is constantly

01:06:34 11 changing.

01:06:34 12 Q.    So it is fast and it is smart.  Is the disease, the

01:06:37 13 virus the same in every person?

01:06:39 14 A.    No, it's not.  There are lots of different strains of

01:06:42 15 the virus.

01:06:43 16 Q.    And how many different strains or genotypes are

01:06:47 17 there?

01:06:47 18 A.    There are seven, so we call them just one through

01:06:49 19 seven.

01:06:50 20 Q.    And how does the fact that this hepatitis C virus has

01:06:54 21 seven different genotypes further complicate trying to treat

01:06:58 22 it?

01:06:58 23 A.    Well, they're different in different parts of the

01:07:01 24 world.  So it might be four in Egypt, five in Africa, one

01:07:05 25 here, and some of the genotypes are easier to treat and some

01:07:08 1    of them are more difficult to treat.

01:07:09 2    Q.    What is the most common genotype type in the United

01:07:14 3    States?

01:07:14 4    A.    Genotype 1 is about two-thirds to three-quarters of

01:07:17 5    all the people.

01:07:18 6    Q.    Which genotype is the hardest to treat?

01:07:21 7    A.    Genotype 1, the one in the U.S.

01:07:23 8    Q.    And what are the genotypes do most of these other

01:07:26 9    people in the U.S. suffer from if it is not genotype 1?

01:07:29 10   A.    So the rest of the patients, the genotype or strain 2

01:07:34 11   or 3 in the U.S.

01:07:36 12   Q.    Now, besides the fast producing, the smartest, and

01:07:41 13   the different strains, we have also been told it is a silent

01:07:45 14   killer.  Can you just explain in simple terms why it is

01:07:48 15   called a silent killer?

01:07:50 16   A.    So people get infected, then, you know, the infection

01:07:56 17   lasts for years after, but you never get rid of it, most of

01:07:59 18   the time.  They don't have any symptoms.  They might have a

01:08:02 19   bit of tiredness or something but nothing specific to the

01:08:05 20   liver.

01:08:05 21         So it's a bit like high blood pressure.  Unless

01:08:09 22   the doctor takes your blood pressure and tests for it or you

01:08:13 23   have a complication, say, a stroke or a heart attack and

01:08:15 24   high blood pressure, people don't know about it.  So that

01:08:18 25   is the case in the U.S.  A lot of people don't know they

01:08:22 1  have it.

01:08:22 2  Q.    Okay.  So now that we have a better idea of the kind

01:08:25 3  of disease hepatitis C is and how difficult to treat, I want

01:08:31 4  to turn to how many people are inflicted with hepatitis C.

01:08:34 5  Okay?

01:08:35 6          Where in the world is hepatitis C?

01:08:38 7  A.    It's all over the world.  All countries.

01:08:40 8  Q.    How many people in the world are infected with

01:08:43 9  hepatitis C?

01:08:43 10 A.    So it's about two percent of the world's population.

01:08:46 11 About 170 million people.

01:08:50 12 Q.    How many people suffer from hepatitis C in the United

01:08:52 13 States?

01:08:52 14 A.    It's about, the estimate is about 3.2 million in the

01:08:56 15 U.S.

01:08:57 16 Q.    And how many new cases of hepatitis C are confirmed

01:09:00 17 each year in the U.S. still?

01:09:02 18 A.    Still now, at least 20,000.  At least 20,000 new

01:09:08 19 cases a year.

01:09:10 20 Q.    You mentioned, for example, there is 3.2 million

01:09:12 21 people in the United States suffering from hepatitis C.  Do

01:09:15 22 they all know they have hepatitis C?

01:09:16 23 A.    No, because of the silent epidemic or killer, then,

01:09:21 24 you know, about half the people in this country don't even

01:09:24 25 know that, they haven't been tested, don't have any

01:09:28 1    symptoms.

01:09:28 2    Q.    Why don't we take a vaccine like a polio vaccine and

01:09:32 3    not get it to begin with?

01:09:33 4    A.    Because it is very smart virus, we have never been

01:09:36 5    able to develop a vaccine.  I doubt we ever will, actually.

01:09:40 6    Q.    Knowing there is no vaccine and the only hope is a

01:09:43 7    cure, let's talk now about how doctors tried to treat

01:09:46 8    hepatitis C before this cure of Sovaldi and Harvoni.  Okay?

01:09:51 9    A.    Yes.

01:09:51 10   Q.    You told us that hepatitis C was discovered as a

01:09:54 11   separate disease in 1989.  Initially, what was the standard

01:09:58 12   of care?  How did you treat these people?

01:10:00 13   A.    So in the 1990s, we used to give people injections of

01:10:05 14   this drug called interferon.  And a little bit later in the

01:10:10 15   '90s, we added these pills called ribavirin to interferon

01:10:15 16   shots and we give those pills and those shots for a year.

01:10:18 17   Q.    And, by the way, we're going to talk about the

01:10:21 18   treatment in a second.  But if that person took that whole

01:10:24 19   treatment for a year, I mean stayed through it the whole

01:10:26 20   wail, you are the doctor, you tell them what are my odds

01:10:29 21   that I will be cured if I do that for an entire year?  What

01:10:33 22   are my odds of being cured?

01:10:35 23   A.    If you took both the pills and the shots for a year

01:10:37 24   and you had the genotype 1, the common strain, it was about

01:10:41 25   40 percent, less than half.

McHutchison - direct

01:10:42 1    Q.    Okay.  So the jury got some insight from Dr.

01:10:47 2    Rachakonda in talking about her mother talking about how

01:10:51 3    tough this treatment is.  I want to ask you about this.  Why

01:10:54 4    is this interferon-based treatment so rotten?

01:10:59 5    A.    So the issue easiest way to describe this is if you

01:11:03 6    get the flu or I get the flu, you feel, you get a fever, you

01:11:08 7    get a terrible headache, these aches and pains and joint

01:11:13 8    pains all over your body.  That is your body making

01:11:16 9    interferon to get rid of that flu virus.

01:11:18 10            So when we're giving shots of interferon to

01:11:22 11   people with hepatitis C, we're just giving them large

01:11:25 12   amounts of the stuff that our body produces naturally.  So

01:11:28 13   they feel like they've got the flu for a year.

01:11:31 14   Q.    How does having the flu, being sick for a year, how

01:11:34 15   did that impact when you saw your patients?  How did that

01:11:38 16   impact their ability to work and live?

01:11:40 17   A.    Well, it's tough.  Not everybody could do it or

01:11:43 18   could they get through it.  So difficulty working, days off

01:11:47 19   work, looking after the family, picking up the kids, and

01:11:49 20   everything.  It was not easy for a lot of people.

01:11:52 21   Q.    That's the flu.  What other side effects did this

01:11:55 22   interferon and ribavirin treatment have?

01:11:58 23   A.    It's a list about this long (indicating).  But the

01:11:59 24   common ones were depression.  About half of the people got,

01:12:05 25   significantly depressed, significantly depressed.  I

01:12:07 1    remember a patient who committed suicide, other docs had

01:12:11 2    that happen as well.  There was rashes, there was hair loss,

01:12:14 3    there was weight loss, there was anemia.  Lots -- nausea,

01:12:20 4    vomiting diarrhea.  Lots and lots of symptoms.

01:12:22 5    Q.    I want to get -- there are some labels there.  I want

01:12:25 6    to see what the real day to day is with that.  When you say

01:12:29 7    nausea, are you talking about throwing up once a day, once a

01:12:32 8    week, once a month?

01:12:33 9    A.    It would vary person by person, but some people, I

01:12:36 10   admitted people for nausea and vomiting, occasionally

01:12:39 11   diarrhea.  So sometimes it was really extreme.  Often, it

01:12:43 12   was debilitating.

01:12:44 13   Q.    We heard about Dr. Rachakonda's mother having to get

01:12:48 14   a blood transfusion.  What is that about when you are taking

01:12:51 15   interferon and ribavirin?

01:12:53 16   A.    So that's the interferon shots and the ribavirin

01:12:57 17   pills cause anemia.  They cause your hemoglobin or your red

01:12:59 18   blood cells to drop and that can make you terribly tired and

01:13:03 19   cause heart and lung problems as well.  So sometimes you

01:13:06 20   would have to decrease the doses to have that come back up

01:13:09 21   or you could give a blood transfusion.  That was done a lot.

01:13:12 22   Q.    So let's talk about the consequences of the fact that

01:13:15 23   this treatment was so harsh.  Okay?  First, were there

01:13:18 24   patients who had hepatitis C that simply couldn't even start

01:13:21 25   the treatment?

McHutchison - direct

01:13:22 1   A.      Yes.  We used to -- there are a lot of people that

01:13:26 2   couldn't.  So if you had heard disease or lung disease,

01:13:29 3   kidney disease, diabetes, depression, you couldn't.  So we

01:13:33 4   used to, I think most estimates, most published work said

01:13:37 5   that at least one-third of people with hepatitis C couldn't

01:13:40 6   take those treatments back then.  At least a third.

01:13:44 7   Q.      So let's talk about the two-thirds that could even

01:13:47 8   try to take the treatment.  How many people, percentage or

01:13:51 9   otherwise, would drop out of the treatment because of the

01:13:57 10  side effects before the year was up?

01:14:00 11  A.      Oh, I think on average, I think we all used to think

01:14:03 12  at least 20 percent would drop out, not finish the course of

01:14:07 13  therapy.

01:15:08 14  Q.      And I want to talk about a third group.  What about

01:15:16 15  people who could take the treatment.  There is nothing

01:15:19 16  stopping them.  But they hear about the treatment and they

01:15:22 17  hear it's only got about a 40-percent chance of success.

01:15:25 18  You are a doctor treating people.  How many people would

01:15:28 19  say, I am just not taking that treatment, I don't care about

01:15:32 20  efficacy?

01:15:33 21  A.      It was hard to estimate.  But a woman in her forties

01:15:36 22  who had young kids and had a job and didn't have cirrhosis,

01:15:41 23  you know, somebody like that often wouldn't take the therapy

01:15:45 24  because it would interfere with their of lives.

01:15:49 25  Q.      If I can't take the treatment, stick with it -- if I

01:15:52 1    can't take it, if I can't keep with it, or I make that

01:15:55 2    calculation that it's not practical for me, what's my fate?

01:16:00 3    A.      So this was the worst part about the clinic, going to

01:16:04 4    see people, so if you couldn't treat somebody, you would say

01:16:10 5    I will see you in six months' time, see you in a year.  So

01:16:16 6    our clinics were full of these people.  You watched them

01:16:19 7    progress over time and develop cirrhosis and some of them

01:16:22 8    come back with liver cancer, et cetera.  That was the worst

01:16:26 9    part of the job.

01:16:26 10   Q.      You mentioned that maybe if I saw somebody and they

01:16:30 11   got a liver transplant, let's suppose I am able to get a

01:16:33 12   liver transplant, does that take care of Hepatitis C now

01:16:37 13   that I have that new liver?

01:16:38 14   A.      Unfortunately, no.  The new liver works, which is

01:16:41 15   good, but the virus comes back in a hundred percent of

01:16:45 16   people with the liver transplant.  And because those people

01:16:48 17   are on rejection medicines, the course after the transplant

01:16:52 18   to the time to develop cirrhosis and all of the

01:16:57 19   complications is accelerated.  Then we had another problem

01:17:01 20   to deal with.

01:17:01 21   Q.      Given the poor standard of care, what did you feel as

01:17:06 22   someone who is in the field doing research and treating

01:17:09 23   thousands of actual patients, what was needed?

01:17:11 24   A.      So we needed a therapy that was simple and short and

01:17:16 25   didn't have interferon and safe and effective, that cured

01:17:20 1    most people.

01:17:21 2    Q.    Sovaldi and Harvoni, did those achieve that result?

01:17:25 3    A.    Yes, they did.

01:17:26 4    Q.    Let's trace the path to that cure.  Let's begin with

01:17:34 5    a thing called direct acting antivirus or DAAs.  As you

01:17:39 6    worked at Scripps and Duke from 1991 to 2010, did you work

01:17:45 7    on trying to improve HCV treatment including DAAs?

01:17:50 8    A.    Yes, a lot of the work I did was that, yes.

01:17:52 9    Q.    In simple terms, what is a DAA?

01:17:55 10   A.    Just what it says, really.  So direct acting

01:17:59 11   antiviral.  So you were trying to directly attack the virus

01:18:03 12   some way so from when the virus would enter the cell and

01:18:10 13   went through its replication and breeding and having babies

01:18:13 14   and it was pushed out of the other side of the cell.  So

01:18:17 15   direct acting antiviral was interfering somewhere in that

01:18:21 16   process in any one of those potential steps.

01:18:23 17   Q.    How does that DAA approach differ from the interferon

01:18:28 18   boosting immune system approach?

01:18:30 19   A.    That was like the blunt hammer, where we were just

01:18:35 20   flooding the body with interferon and hoping that would have

01:18:37 21   more of a nonspecific effect, attack the virus, decrease the

01:18:43 22   virus and kill it.  Direct acting antivirus were more

01:18:47 23   specific for the Hepatitis C virus, where the interferon was

01:18:50 24   a nonspecific blunt approach.

01:18:51 25   Q.    You mentioned there are many possible targets or

01:18:54 1    spots you could try to interfere with the virus.

01:18:57 2    Researchers, did they focus on three particular ones?

01:19:01 3    A.    Yes.   There was most success in developing drugs and

01:19:05 4    therefore most interest in three of these enzymes that the

01:19:10 5    Hepatitis C virus used to breed or have its babies, yes.

01:19:14 6    Q.    And what were those three targets that people were

01:19:16 7    focusing on?  If you can just give me the names.

01:19:19 8    A.    One was called the proteases, Hepatitis C protease

01:19:24 9    enzyme.

01:19:24 10   Q.    That is one?

01:19:25 11   A.    The other one was the Hepatitis C polymerase.

01:19:29 12   Q.    What is the third?

01:19:30 13   A.    The third one is called NS5A, for other reasons.

01:19:34 14   Q.    As part of your work have you written papers on DAAs?

01:19:41 15   A.    Many, yes.

01:19:42 16   Q.    I want to look at one of those papers.  I did not do

01:19:45 17   the traditional binder exchange.

01:19:47 18         With the Court's permission?

01:19:48 19         THE COURT:  You may approach, yes.

01:20:19 20   BY MR. FARRELL:

01:20:19 21   Q.    If you can now turn to the binder I just gave you, in

01:20:19 22   DX-1390?

01:20:19 23   A.    Yes.

01:20:19 24   Q.    What is DX-1390?

01:20:19 25   A.    It's a paper that I wrote with one of my trainees.

01:20:20 1    Q.      In 2009.  Correct?

01:20:23 2    A.      Yes, 2009.

01:20:24 3    Q.      Just the big picture, what was the point of the

01:20:27 4    paper?

01:20:27 5    A.      So this was an article that was talking about the new

01:20:31 6    drugs that were being sort of developed for Hepatitis C.

01:20:35 7            MR. FARRELL:  Move into evidence DX-1390, Your

01:20:39 8    Honor.

01:20:39 9            THE COURT:  Any objection?

01:20:42 10           MR. McCRUM:  No objection, Your Honor.

01:20:43 11           THE COURT:  It's admitted.

01:20:44 12           (DX-1390 received in evidence.)

01:20:45 13   BY MR. FARRELL:

01:20:45 14   Q.      I want to look at Table 1 in that paper, DX-1390.

01:20:49 15   It's on Page 3 -- it's called 0003.

01:20:49 16   A.      Yes.

01:20:12 17           MR. FARRELL:  There we are.  Just blow up the

01:20:15 18   table.  Thank you, Mr. Sayres.

01:20:17 19           I don't want to go through the whole table, line

01:20:19 20   by line.

01:20:21 21   A.      Thank you.

01:20:22 22   Q.      You're welcome.

01:20:24 23           Just big picture, what is Table 1 showing?  What

01:20:29 24   is the kind of information that is in there?

01:20:30 25   A.      So this is looking at those various -- the left-hand

01:20:33  1    column is looking at these different steps that in the viral

01:20:37  2    lifecycle for the DAAs.

01:20:39  3            And then the right-hand column is, this is the

01:20:43  4    phase of the drug development they were in.  So these are

01:20:46  5    all compound on this page, DAAs and various different stages

01:20:50  6    of drug development.

01:20:51  7    Q.    Now, just using Table 1 as a guide, does that table

01:20:54  8    contain the three targets you were talking about, the

01:20:57  9    protease inhibitors:  the NS5A inhibitor, and the NS5B

01:21:03 10    inhibitor?

01:21:03 11    A.    Yes, it does.

01:21:03 12    Q.    Okay.  So I want to just make sure I know what is the

01:21:09 13    NS5B site.  At the bottom, it says NI and NNI.  What does

01:21:14 14    that stand for?

01:21:14 15    A.    That is nucleoside inhibitor.  And non-NNI is

01:21:21 16    nonnucleoside inhibitor.  And these are the polymerase

01:21:26 17    targets.

01:21:26 18    Q.    So if I want to go after the NS3, you can do that

01:21:30 19    with a nuc or a non-nucleotide; correct?

01:21:32 20    A.    That is correct.

01:21:33 21    Q.    All right.  Make sure we keep track.  Sofosbuvir,

01:21:37 22    Dr. Sofia's drug.  What sort of DAA is sofosbuvir?

01:21:42 23    A.    So that is an NI or a nuc.

01:21:44 24    Q.    And it is attacking what target?

01:21:46 25    A.    The polymerase.

01:21:48 1   Q.     The NS5B.

01:21:50 2   A.     The NS5B polymerase.

01:21:53 3   Q.     Now, there are a list of compounds.  And does this

01:21:55 4   table list compounds that attack each of those three sites

01:21:58 5   we have been talking with?

01:21:59 6   A.     Yes, it does.  Yep.

01:22:00 7   Q.     I just want to first focus on the target you called

01:22:03 8   protease inhibitor.  It's just NS, I think the number would

01:22:08 9   be NS3/4A?

01:22:10 10   A.     That is correct, yes.

01:22:11 11   Q.     How many compound are on there?

01:22:12 12   A.     It's not that one.

01:22:13 13   Q.     No, no, we don't have to highlight.  That is okay.

01:22:17 14   A.     The one above it.

01:22:18 15   Q.     Thank you.  That's all right.  That's all right.

01:22:21 16   Just talking.

01:22:22 17          How many of those compounds that targets the

01:22:31 18   NS3/4A?  How many were actually approved by the FDA at some

01:22:34 19   point and prescribed to patients in the real world?

01:22:36 20   A.     So three of the protease inhibitors were approved.

01:22:39 21   Q.     And these are non-nucleosides then; correct?

01:22:42 22   A.     Yes, they're protease inhibitors.

01:22:44 23   Q.     And how did these NS3/4A compounds fair overall with

01:22:50 24   patients?

01:22:51 25   A.     So they're good.  They're a nice step forward.  They

01:22:55 1 worked only for genotype 1.  They increased those cure rates

01:23:02 2 from about 40 percent to 60 to 70 percent for the genotype 1

01:23:07 3 strain of patients.

01:23:08 4 Q. Okay.  That sounds good.  What is bad?

01:23:11 5 A. There are a lot more side effects.  Serious side

01:23:15 6 effects.  Bad skin rashes, some people died from the skin

01:23:19 7 rashes.  A lot of anemia.  People got their liver disease,

01:23:24 8 went over the edge.

01:23:24 9 So they were, they were incrementally good and

01:23:28 10 it was the first DAA approved to be used with interferon

01:23:32 11 and ribavirin.  And that was the other thing.  You still had

01:23:35 12 to give interferon and ribavirin.  So they were a step

01:23:39 13 forward.

01:23:40 14 Q. My question, with these even worse side effects, how

01:23:44 15 was the drop-off rate with these kind of protease inhibitor

01:23:47 16 drugs?

01:23:47 17 A. Much higher, and two of them were eventually

01:23:51 18 withdrawn eventually.

01:24:57 19 Q. Now, let's talk about NS5A inhibitors, that target.

01:25:04 20 Some of those are listed in this table.  Correct?

01:25:06 21 A. There is one listed on the table, yes.

01:25:07 22 Q. Now NS5A inhibitors, these are nucs or non-nucs?

01:25:12 23 A. They are non-nucs, yes.

01:25:14 24 Q. As research progressed and as we are here today, how

01:25:18 25 did the non-nuc NS5A inhibitor perform?  How does that work?

01:25:24 1   A.      So they were a potent class of drugs against

01:25:28 2   Hepatitis C.  And when they were given alone with

01:25:33 3   interferon, ribavirin, like the proteases inhibitors, they

01:25:38 4   were okay.  Their greatest failure is when they were

01:25:40 5   combined with a nuc.

01:25:41 6   Q.      That's what I want to get to.

01:25:44 7          So they were okay, but based on your research

01:25:47 8   and your experience and what you were seeing in the field

01:25:49 9   you wanted to combine that non-nuc NS5A with a nuc NS5B?

01:25:55 10  A.      That's correct.

01:25:56 11  Q.      Why did you just, big picture, want to have a

01:26:00 12  cocktail of drugs to attack this virus?

01:26:02 13  A.      So I always thought, based upon what the field had

01:26:07 14  done in HIV and in the past, the way to cure most people was

01:26:13 15  to combine drugs that worked through different ways, attack

01:26:16 16  the virus in different fashions, at different steps.  And in

01:26:23 17  that way you would prevent the virus from escaping the

01:26:27 18  efficacy of the treatment, and cure most people, and do it

01:26:30 19  in a safe way.  That was the goal.

01:26:32 20  Q.      So let's focus in on the NS5B target and nucs that

01:26:38 21  would attack that target.  Okay.

01:26:42 22          This table contains a list, included in that

01:26:47 23  list are NS5B nucleoside compounds.  Right?

01:26:51 24  A.      Yes, it does.

01:26:52 25  Q.      Could you just -- then we will just highlight these

01:26:55 1  as you call them off.  Could you call out their numbers?

01:27:03 2  You have the actual paper in front of you.  It might be

01:27:07 3  easier?

01:27:08 4  A.     It starts in the middle, R1626.  Underneath it R7128.

01:27:14 5  Underneath that IDX184.  The next NM283.  Then the last,

01:27:20 6  MK0608.

01:27:24 7  Q.     How many of these that are listed here that are

01:27:26 8  highlighted, how many of these NS5B nucleoside inhibitors

01:27:30 9  were ever successfully developed for the treatment of HCV?

01:27:34 10  A.     None of them.

01:27:35 11  Q.     Now, we see NM283.  We have talked about that.  That

01:27:40 12  was the one we talked about at the beginning, the Idenix

01:27:42 13  drug?

01:27:42 14  A.     Yes.

01:27:47 15  Q.     The drug with the zero cure rate?

01:27:49 16  A.     That's correct.

01:27:50 17  Q.     Let's focus on another one.  IDX184 is right there?

01:27:55 18  A.     Correct.

01:27:55 19  Q.     Whose drug is that?

01:27:56 20  A.     Idenix.

01:27:57 21  Q.     What happened with that 2'-methyl up hydroxy down

01:28:03 22  compound, IDX184?

01:28:06 23  A.     So that was studied in humans, and it was initially

01:28:14 24  put on partial hold for liver test increases, then that

01:28:20 25  partial hold was removed.  And then it was put on hold

01:28:28 1   again.

01:28:28 2   Q.      What for?  Why was it put on hold again?  When you

01:28:32 3   say hold, by whom?

01:28:33 4   A.      FDA, sorry.

01:28:34 5   Q.      When the FDA put it on hold again, what was the

01:28:37 6   reason why the FDA said stop?

01:28:40 7   A.      Because the structure of IDX184 was very, very

01:28:43 8   similar to the structure of another drug from another

01:28:45 9   company that had caused severe heart and kidney problems in

01:28:53 10  patients with Hepatitis C and one of those patients had

01:28:55 11  died.  So the FDA said, hey, this is not good, we want to

01:29:00 12  halt all the development, clinical development of these

01:29:03 13  programs.  That's my understanding of what happened.

01:29:05 14  Q.      And by the way, IDX184, that was a drug that at one

01:29:10 15  time Gilead looked at.  Correct?

01:29:14 16  A.      Looked at?  Yes.

01:29:15 17  Q.      That's what I mean.

01:29:16 18  A.      Yes.

01:29:16 19  Q.      We are going to come back to that.  All right?

01:29:19 20  A.      Yes.

01:29:19 21  Q.      So we can take that down.  Thank you very much.

01:29:22 22          That is a 2009 article.  As we move forward from

01:29:26 23  2009 going forward, what is the experience in the field with

01:29:30 24  other attempts with nucleotide inhibitors of the NS5B?

01:29:35 25  A.      So we were excited about the class of the drugs, as

01:29:39 1   docs and researchers, we thought they were really important.

01:29:42 2   So everybody was watching this closely.

01:29:45 3           You know, I think we had lots of faltering after

01:29:48 4   that.  There was lots of toxicity.  We know that was an

01:29:51 5   issue with these types of drugs.

01:29:55 6           I think, generally, we were hopeful, but

01:29:58 7   disappointed.  A lot of them were failing.

01:30:00 8   Q.    Let me ask you this:  Why did you, when you were out

01:30:06 9   doing the research, and looking at all these clinical

01:30:08 10  trials, why did you seek this toxicity as a special issue

01:30:12 11  with nucleoside compounds?  Why are they a special problem

01:30:16 12  with toxicity?

01:30:16 13  A.    Because the way they work is so close to what happens

01:30:27 14  in cells of our body normally.  And I can explain that, if

01:30:30 15  you wish.

01:30:32 16          But, you know, a nuc is a modified nucleic acid,

01:30:36 17  just like our nucleic acids.  So we are trying to get it to

01:30:41 18  block the virus, but not to block our own RNA or DNA.  If

01:30:46 19  you do block your own RNA or DNA, guess what?  That is

01:30:50 20  probably not a good thing and you get side effects or

01:30:53 21  toxicity.  That is why it was so difficult.

01:30:56 22  Q.    So nucleosides are trying to trick the virus by

01:30:58 23  looking at your own RNA.  Right?

01:31:01 24  A.    Looking like a building block for RNA or DNA, yes.

01:31:04 25  Q.    What else might it trick?

01:31:07 1    A.    Well, it would trick your own RNA, DNA, in your

01:31:11 2    cells, in your mitochondria, et cetera.  Different organs.

01:31:15 3    Q.    What does that do to your cell?

01:31:17 4    A.    It's very dangerous to the cells.

01:31:21 5    Q.    The toxicity concern with the nucleosides, how widely

01:31:27 6    recognized was and is this problem in the field?

01:31:29 7    A.    It is very widely recognized.  It happened -- when

01:31:34 8    they were developing drugs for HIV or AIDS, and you see that

01:31:39 9    they have nucs as part of the backbones of those therapies.

01:31:42 10   So it was well known from then, and also Hepatitis B drugs

01:31:49 11   worked the same way.

01:31:50 12   Q.    We are on Hepatitis C.  How widely known was this

01:31:53 13   problem for Hepatitis C?

01:31:54 14   A.    Well, we were seeing this develop in the 2000s.  The

01:31:57 15   same stories.

01:31:58 16   Q.    Let's look at one paper about this topic, if you

01:32:00 17   could turn in your binder to DX-731.

01:32:12 18   A.    Yes.

01:32:12 19   Q.    What is DX-731?

01:32:15 20   A.    So this is a paper written by a scientist at Gilead

01:32:20 21   that I worked with.  It's sort of a summary, it's looking at

01:32:27 22   ways of detecting this toxicity that I have described for

01:32:30 23   nucleoside drugs, how to test for them, to make sure they

01:32:35 24   are not having these what we call off-target effects, effect

01:32:38 25   on normal cell function.

01:32:39 1      MR. FARRELL:  Move DX-731 into evidence, Your

01:32:39 2  Honor.

01:32:45 3      MR. McCRUM:  No objection.

01:32:45 4      THE COURT:  It's admitted.

01:32:46 5      (Exhibit No. DX-731 received in evidence.)

01:32:47 6  BY MR. FARRELL:

01:32:48 7  Q.    DX-731, those are the authors, it says Gilead

01:32:55 8  scientists there.  Correct?

01:32:56 9  A.    Correct.

01:32:57 10 Q.    I want to go to Page DX-2 of DX-731, I mean 0002.

01:33:04 11 And I want to focus on what I call diagrams.  Apparently,

01:33:06 12 they are called structures, those chemical structures there.

01:33:09 13 Do you see that there in that table?

01:33:11 14 A.    Yes, I do.

01:33:12 15 Q.    What are these chemical structures?  What is being

01:33:16 16 shown in this table?  Why are they grouped together here?

01:33:18 17 A.    These are all nucs, NIs.  That's what they are.

01:33:24 18 Q.    Are many of these nucs that have been tested in the

01:33:27 19 clinic or were trying to get to clinic?

01:33:29 20 A.    Yes.  Most of them, except for the bottom line, yes.

01:33:34 21 Q.    And, by the way, this table, just overall, what does

01:33:38 22 it show is happening to almost all of these nucs that are

01:33:43 23 trying to get the NS5B?

01:33:47 24 A.    So the writing underneath the structures gives sort

01:33:51 25 of the status of them.  So you can see, a lot of them were

01:33:54 1  stopped for toxicity, had side effects.

01:33:58 2  Q.    What I want to do is just look at a couple of the

01:34:00 3  structures and see what's on them.  What I want to focus on

01:34:04 4  is, what is up at the 2' up position.  For many of these

01:34:10 5  compounds that were found toxic, what is sitting at the 2'

01:34:14 6  up position?

01:34:17 7  A.    So, I mean, just looking through them, methyl up.

01:34:22 8  Q.    Well, so many of the compounds here that were found

01:34:25 9  to be toxic have 2' up at the methyl position.  Correct?

01:34:30 10 A.    Correct.

01:34:30 11 Q.    Doesn't sofosbuvir have 2'-methyl up at the 2'

01:34:35 12 position?

01:34:35 13 A.    Yes, it does.

01:34:36 14 Q.    And it's not toxic?

01:34:37 15 A.    That's correct.

01:34:38 16 Q.    Okay.  Well, I want you to look at this PSI-9381,

01:34:44 17 which is up in the top.  Now, I want to look at the 2' up

01:34:52 18 and down position here.  What is the 2' up position on this

01:34:56 19 compound?

01:34:57 20 A.    Again, that is methyl.

01:34:58 21 Q.    What is at the 2' down position?

01:35:01 22 A.    That is F for fluorine.

01:35:02 23 Q.    And this compound that has 2'-methyl up, 2'-fluorine

01:35:07 24 down, what was its result?

01:35:09 25 A.    That caused significant liver toxicities.  So we had

01:35:12 1    to stop the program.

01:35:13 2    Q.    But sofosbuvir has 2'-methyl up, 2'-fluorine down.

01:35:18 3    Correct?

01:35:18 4    A.    Correct.

01:35:19 5    Q.    And it's not toxic?

01:35:22 6    A.    No.

01:35:22 7    Q.    By the way, you can take that part down.  Thank you.

01:35:28 8          You did mention that all of these -- I am sorry,

01:35:31 9    are there compounds here that show activity but don't have

01:35:36 10   2'-methyl, don't have methyl in the 2' up position, they are

01:35:42 11   not a 2'-methyl up compound but there is activity?

01:35:45 12   A.    Yes.  There is one I can see.

01:35:49 13   Q.    Which one is it?

01:35:50 14   A.    Middle column on the left, R1626.

01:35:53 15   Q.    What is in the 2' up position on that compound?

01:35:57 16   A.    Not methyl.

01:35:58 17   Q.    But it's active?

01:36:00 18   A.    It's active, yes.  We were excited about this drug.

01:36:02 19   Q.    So you didn't need to have 2'-methyl up to be active?

01:36:06 20   A.    No.

01:36:10 21   Q.    Overall -- let me take that down, you may take the

01:36:18 22   slide down, too.

01:36:20 23         When you see these different types of compounds

01:36:21 24   with different structures, some have methyl up, some have no

01:36:25 25   methyl, some have methyl up fluoro down, all these different

01:36:29 1  structures, and many of them are turning toxic, what does it
01:36:31 2  tell you about the field and this effort?
01:36:34 3  A.      It's unpredictable.
01:36:34 4  Q.      Now, on that slide, without putting it back up, in
01:36:39 5  the upper left corner, there was sofosbuvir.  Do you
01:36:43 6  remember that?
01:36:43 7  A.      Yes.
01:36:43 8  Q.      And there was a word under it that said "Approved."
01:36:46 9  Do you remember that?
01:36:46 10  A.      Yes.
01:36:47 11  Q.      Why was that put in there to say "Approved," by whom?
01:36:52 12  A.      That meant approved for use by doctors, before the
01:36:56 13  FDA.
01:36:56 14  Q.      That word "approved" didn't appear in any of the
01:36:59 15  other compounds?
01:37:00 16  A.      No.
01:37:00 17  Q.      Well, after 27 years of work, after HCV was
01:37:04 18  discovered, up until today, December 9th, 2016, how many
01:37:10 19  nucs have been approved for people to take to treat
01:37:13 20  Hepatitis C?
01:37:15 21  A.      Only one, sofosbuvir.
01:37:20 22  Q.      By the way, in addition to -- I want to be sure, if
01:37:26 23  it talks on toxicity, did nucs trying to get NSP167 to get
01:37:31 24  nucs prosecution that vary, they didn't have direct acting
01:37:34 25  activity?

01:37:34 1   A.      Yes, that is very true.

01:37:36 2   Q.      Just as you are sitting there, as you recall in your

01:37:39 3   research, did any of these compounds that didn't have

01:37:42 4   adequate activity have 2'-methyl up?

01:37:44 5   A.      Yes.

01:37:44 6   Q.      So you could have 2'-methyl up and not have activity

01:37:49 7   or very much?

01:37:49 8   A.      Yes.

01:37:50 9   Q.      What does that tell you about the magic of 2'-methyl

01:37:53 10  by itself, if I see 2'-methyl by itself can I tell whether

01:37:58 11  it is active or inactive?

01:37:59 12  A.      It doesn't tell you.

01:38:02 13  Q.      What does tell you?  What do you need to know?

01:38:06 14  A.      So --

01:38:07 15          MR. McCRUM:  I am going to object, Your Honor.

01:38:09 16  I believe this is also outside the scope of his expert

01:38:11 17  report.

01:38:12 18          THE COURT:  Mr. Farrell, can you tell me where I

01:38:14 19  will find it?

01:38:16 20          MR. FARRELL:  Your Honor, because I am on the

01:38:17 21  clock, I will withdraw the question and move on and come

01:38:19 22  back.

01:38:20 23          THE COURT:  Okay.  That's fine.

01:38:21 24          MR. FARRELL:  Trying to catch up here.

01:38:28 25  Actually, Mr. Scherkenbach told me I have to catch up.

THE COURT: You don't need to tell us that. But thank you.

BY MR. FARRELL:

Q.      Let's focus now on Gilead and acquiring the nuc. Okay?

A.      Okay.

Q.      When you came on to Gilead, what was your goal, what did you see as a key component you needed to get to make an effective treatment, a cocktail of drugs, what did you want as a backbone drug?

A.      We needed to have -- I needed to have a nuc as a backbone done, to be most successful, to cure people and not have interferon, et cetera, that was the goal.

Q.      When you took over this role of spearheading that effort, what did you do to find out historically what Gilead had and what they had looked at?

A.      I had to look at all the drugs that we had in development and I had to find out what we had looked at in the past outside the company as well.  That was my first job.

Q.      As part of that historical effort, did you have people at Gilead send you reports of things they had looked at before you joined?

A.      Yes.

Q.      Why did you need to know that information to do your

01:39:39 1    job?

01:39:40 2    A.    I needed to hit the ground running and do it as

01:39:45 3    efficiently as I could.

01:39:46 4    Q.    What would -- and did they forward this information

01:39:52 5    to you by e-mail often?

01:39:54 6    A.    Sure, yes.

01:39:55 7    Q.    I would like you to look at an e-mail chain, it's

01:39:58 8    DX-2761.  It's in your binder.

01:40:06 9          It's the very last there.  It's probably hiding.

01:40:09 10   A.    Okay, I have it.

01:40:10 11   Q.    DX-2761, this is an e-mail chain from within Gilead

01:40:16 12   that begins, or ends, if you will, with an e-mail from you.

01:40:19 13         Correct?

01:40:20 14   A.    Yes.

01:40:21 15   Q.    What is this e-mail chain, what is it an example of?

01:40:27 16   A.    So this is six weeks after I started with Gilead, and

01:40:32 17   I was sent a summary of a prior evaluation.

01:40:35 18   Q.    That's good enough.

01:40:38 19         MR. FARRELL:  We move DX-2761 into evidence.

01:40:42 20         THE COURT:  Any objection.

01:40:44 21         MR. McCRUM:  No objection.

01:40:44 22         THE COURT:  It's admitted.

01:40:45 23         (DX-2761 was received in evidence.)

01:40:47 24   BY MR. FARRELL:

01:40:48 25   Q.    Now I can ask you some questions.  What is the

01:40:51 1  compound that had been evaluated by Gilead that they are

01:40:54 2  telling you about?  What is described by number?

01:40:57 3  A.    So it's IDX184.

01:41:01 4  Q.    When from the e-mail chain was the evaluation done?

01:41:07 5  A.    I think it was in November 2009.

01:41:13 6  Q.    Now, can we go to the top of your e-mail, you have

01:41:17 7  one line, and you say, "You guys made a very, very wise

01:41:22 8  choice."  Correct?

01:41:24 9  A.    Correct.

01:41:24 10  Q.    Was there a certain kind of information you were

01:41:27 11  looking at in the evaluation -- let me step back.

01:41:30 12        What was the choice Gilead had made before you

01:41:32 13  joined that they are telling you about?  What was the choice

01:41:35 14  they had made?

01:41:36 15  A.    To not pursue further discussions with Idenix.

01:41:42 16  Q.    So what I want to do is find out what it was, what

01:41:47 17  information you were focused on that made you believe that

01:41:51 18  it had been a very, very wise choice to walk away from

01:41:56 19  IDX184.  If you can just point to it in your e-mail, the

01:42:00 20  focus of your information?

01:42:01 21  A.    I think on the prior page or earlier in the e-mail

01:42:04 22  chain, I would look at -- there is a section, "One of the

01:42:10 23  most important negative issues regarding the opportunity,"

01:42:14 24  and then Bullet Point No. 1.

01:42:16 25  Q.    If we could blow up "The most important negative

01:42:19  1    issues" and "Point No. 1," I think the jury was told that

01:42:24  2    IDX184 was a son or daughter of NM283.  I think they have

01:42:29  3    been told it was the first one to go into a chimp or a

01:42:32  4    monkey.  Okay?

01:42:33  5    A.      Okay.

01:42:33  6    Q.      I want to talk about how the monkey did.  All right?

01:42:40  7              If you can pull up Bullet Point No. 1, you may

01:42:44  8    have to translate this for us, it says in four 14-day tox

01:42:48  9    studies in three species, cyno -- what is cyno?

01:42:52 10    A.      Cyno, it's an analogous monkey.

01:42:55 11    Q.      "Monkeys, rats, mice, cardiac toxicity observed."

01:43:00 12              What was that problem that was being seen by

01:43:02 13    Gilead scientists in 2009 that made you say it was a wise

01:43:06 14    choice to walk away?

01:43:07 15    A.      That was one of the reasons.  But they tried the drug

01:43:09 16    for 14 days in three different species of animals, and you

01:43:14 17    see the same problem.

01:43:14 18    Q.      Now, as we go on, it says, "EM not performed, so

01:43:20 19    mitochondrial injury cannot be ruled out (despite their

01:43:25 20    argument that direct mitochondrial toxicity was not observed

01:43:28 21    in an in-vitro assay.)"  What is "EM not performed"?

01:43:35 22    A.      Electron microscope.

01:43:36 23    Q.      What you are saying is because that test wasn't done

01:43:38 24    on the monkeys or animals, you couldn't rule out whether

01:43:41 25    there had actually been mitochondrial injury?

01:43:45 1     A.      That was at that time one of the ways one would like

01:43:47 2     to exclude mitochondrial toxicity, by looking at the

01:43:51 3     mitochondria in the heart.

01:42:44 4     Q.      Okay.  So you couldn't even rule out the heart had

01:42:47 5     been injured?

01:42:47 6     A.      The heart was injured.

01:42:48 7     Q.      Okay.

01:42:49 8     A.      You couldn't tell whether the mitochondrial was

01:42:52 9     injured in the heart?

01:42:53 10    Q.      I want to go to the parenthesis.  It says "despite

01:42:56 11    their argument."  Who is the "their?"

01:42:57 12    A.      Idenix.

01:42:58 13    Q.      So Idenix is saying they don't see this problem,

01:43:00 14    right?

01:43:03 15            An in vitro assay.  What is an in vitro assay?

01:43:08 16            MR. McCRUM:  Your Honor, I'm going to object.

01:43:11 17    What he is asking about is hearsay.  This isn't his e-mail.

01:43:11 18    We didn't object to the exhibit, but now he is asking about

01:43:14 19    what this person was thinking and Idenix was thinking.

01:43:17 20            MR. FARRELL:  No, no.  I'm asking why he thought

01:43:19 21    it was a wise choice.  He is translating what the he thinks.

01:43:24 22    I can rephrase the question.

01:43:24 23            THE COURT:  Well, let's talk about this further

01:43:26 24    in a moment.

01:43:27 25            I'm going to give the jury a break.

01:43:30 1    Ladies and gentlemen, no talking about the case.

01:43:32 2 And we'll see you in a little bit.

01:43:35 3    THE COURT:  Stay here a moment.

01:43:35 4    (Jury left courtroom.)

01:43:36 5    THE COURT:  I don't want you to talk while the

01:43:59 6 jury is leaving.

01:44:00 7    MR. FARRELL:  I apologize.

01:44:01 8    THE COURT:  Have a seat first.

01:44:03 9    Well, Mr. McCrum, is there any objection to the

01:44:07 10 witness being here while I discuss this?

01:44:09 11    MR. McCRUM:  Yes, I would prefer him to leave.

01:44:13 12    THE COURT:  Then you have a few minutes to

01:44:15 13 yourselves.  We'll ask you to step down and step out of the

01:44:18 14 courtroom.

01:44:32 15    (Witness left courtroom.)

01:44:32 16    THE COURT:  All right.  So we're still on the

01:44:34 17 defendants' time.  Mr. Farrell, do you want to address the

01:44:36 18 objection?

01:44:36 19    MR. FARRELL:  Yes, Your Honor.  First of all,

01:44:38 20 it's an exhibit in evidence.  That is the first thing.  And

01:44:40 21 that is because I think I laid a foundation that this is a

01:44:43 22 document that he relied in his business record to get up to

01:44:46 23 speed.  He said I needed to hear what happened historically.

01:44:50 24 So, first of all, it meets that.

01:44:51 25    What we're going through is what, remember, he

01:44:53 1   sent an e-mail that this is a very, very wise choice.  And

01:44:56 2   what I'm saying is -- and I may have to more artfully phrase

01:45:00 3   the question, I agree, Your Honor -- what, how did you

01:45:03 4   translate this and that is, why did you consider this to be

01:45:06 5   a wise choice to walk away?

01:45:08 6              And that is what I am doing.  And I believe it

01:45:11 7   is in evidence.  It is a legitimate business record because

01:45:13 8   he explained that I needed to get this historical

01:45:16 9   information, and now he is explaining why, in September

01:45:20 10  2010, he thought what he meant by that, how he translated

01:45:23 11  that, it was a very wise choice.

01:45:25 12             THE COURT:  All right.  Mr. McCrum.

01:45:30 13             MR. McCRUM:  Your Honor, I think the simplest

01:45:32 14  way to deal with that is to have him ask that question, why

01:45:35 15  do you think it wasn't a wise choice?  But what he is doing

01:45:38 16  now is going down into e-mails written by other people

01:45:42 17  asking him to interpret what they meant and other people

01:45:45 18  might have meant in order to get an answer to a very simple

01:45:49 19  question that he could ask and we could get around all this.

01:45:52 20             THE COURT:  Mr. Farrell, is there any objection

01:45:53 21  to asking that simple question?

01:45:56 22             MR. FARRELL:  Your Honor, I don't -- I

01:45:59 23  apologize.  I don't know what the simple question is.

01:46:00 24             THE COURT:  I thought you told me what you care

01:46:02 25  about is what this witness understood and what he thought.

01:46:06 1          MR. FARRELL:  Right.

01:46:07 2          THE COURT:  So I mean, so why not just ask him

01:46:11 3  that?

01:46:11 4          MR. FARRELL:  Right.  What he -- if you -- I

01:46:15 5  want to make sure I have the Court's guidance.  What I'm

01:46:18 6  going to ask him is then what did you think about this

01:46:22 7  paragraph as to why it was a wise choice to walk away?  He

01:46:26 8  is going to have to translate for us what he said when he --

01:46:29 9  I saw this and this meant what to me, this is what concerned

01:46:32 10  me.  I'm happy to do that in one question.

01:46:34 11          THE COURT:  All right.  Mr. McCrum, do I

01:46:37 12  understand your position correctly, if he simply asks what

01:46:40 13  did you think, why did you think it was a wise choice to

01:46:45 14  walk away, something to that effect?

01:46:47 15          MR. McCRUM:  I don't have an objection to that,

01:46:49 16  Your Honor.  As long as it doesn't lead to this paragraph

01:46:51 17  and this same questioning about somebody else's e-mail and

01:46:55 18  what they meant or others meant about that.

01:46:58 19          THE COURT:  All right.  Well, the objection to

01:46:59 20  the question that was asked is sustained.  You may ask him

01:47:03 21  why did you think it was a wise choice to walk away.

01:47:06 22          MR. FARRELL:  And I will do that, Your Honor.  I

01:47:08 23  will follow directions.  I want to make sure I don't tread

01:47:10 24  on the Court's patience.  He is going to say, and he already

01:47:13 25  said it, the reason why I thought it was a wise choice was

01:47:16 1    because of this paragraph.

01:47:16 2                THE COURT:  Well, we'll see if that's what he

01:47:19 3    says, and we'll see where it goes after that.

01:47:21 4                We will be in recess.

01:47:40 5                (Brief recess taken.)

01:47:40 6                *      *      *

02:08:42 7                (Proceedings reconvened after recess.)

02:08:42 8                THE COURT:  Mr. McCrum.

02:08:43 9                MR. McCRUM:  I do have one minor issue.

02:08:45 10               THE COURT:  Okay.

02:08:45 11               MR. McCRUM:  I talked to local counsel John Day

02:08:48 12   about objections, and there was a couple sustained that were

02:08:50 13   not stated in front of the jury, and I was just asking if we

02:08:54 14   could get the last objection noted on the record in front of

02:08:57 15   the jury so that they know that the objection was sustained?

02:09:00 16   Respectfully, Your Honor.

02:09:01 17               THE COURT:  I don't believe that there had been

02:09:04 18   an answer before the objection was sustained, had there?

02:09:08 19               MR. McCRUM:  I don't believe so.

02:09:10 20               THE COURT:  Okay.

02:09:11 21               MR. FARRELL:  I think it's whether the word

02:09:13 22   "sustained" was said.

02:09:14 23               MR. McCRUM:  Yes.  So sustained wasn't, the

02:09:17 24   objection sustained wasn't noted in front of the jury.

02:09:20 25               THE COURT:  Okay.  Is there an objection to me?

02:09:25  1    MR. FARRELL:  Personally, I don't know if it

02:09:27  2    happened, but they're not supposed to pay attention to

02:09:30  3    whether it's sustained.

02:09:32  4    THE COURT:  Yes, I don't see a need to do that.

02:09:34  5    Thank you.

02:09:34  6    MR. McCRUM:  Thank you, Your Honor.

02:09:35  7    THE COURT:  Bring the jury in.

02:09:45  8    (Jury returned.)

02:11:23  9    THE COURT:  All right.  We're ready to continue.

02:11:25 10    Mr. Farrell.

02:11:26 11    MR. FARRELL:  Thank you, Your Honor.

02:11:26 12    BY MR. FARRELL:

02:11:31 13    Q.    Dr. McHutchison, I forgot one thing.  We were going

02:11:34 14    to talk about the interferon, ribavirin treatment.  So we

02:11:38 15    can talk about that for a second.  We talked about the

02:11:42 16    interferon but I forgot to talk about ribavirin.  What kind

02:11:46 17    of compound is that?

02:11:47 18    A.    So it has the structure of a nuc.

02:11:49 19    Q.    So it's technically called a nucleoside?

02:11:53 20    A.    Not really, no.

02:11:54 21    Q.    No.  And how does it work compared to sofosbuvir?  Do

02:12:00 22    they work the same way?

02:12:01 23    A.    No, it's nonspecific.  We think there are six

02:12:05 24    theories about how it works but nobody actually knows how it

02:12:08 25    works, but it is a very weak polymerase inhibitor and that

02:12:13 1    is not its mechanism.

02:12:15 2    Q.    Okay.  I want to pick up now with a document we had,

02:12:21 3    and we can take it.  Why don't we go back to the first page

02:12:26 4    where it says it is a very, very easy choice.

02:12:29 5         What was the information as you interpreted it

02:12:33 6    that, for you, in September 2010, made you conclude there

02:12:39 7    would have been a very, very wise choice to walk away from

02:12:42 8    IDX184?

02:12:44 9    A.    So, you know, reading this e-mail, understanding what

02:12:49 10   had been done internally in a nuc, I knew what was publicly

02:12:59 11   available about the drug in patients, putting it all

02:13:02 12   together, we have a drug here that in 14 days in animals,

02:13:06 13   three species, we have, if I can paraphrase cardiac, liver,

02:13:13 14   skeletal muscles, and kidney toxicity.  They made a very

02:13:17 15   wise choice.

02:13:18 16   Q.    And that was in November of 2009, you told us.  Like

02:13:25 17   in May of 2010, Gilead had looked at Idenix IDX184 again;

02:13:25 18   correct?

02:13:31 19   A.    Yes.

02:13:31 20   Q.    And you were transitioning from Duke to Gilead.  Did

02:13:34 21   you ask to have that forwarded to you, their evaluation?

02:13:38 22   A.    Yes, I did.

02:13:39 23   Q.    Without going into the details of the evaluation, in

02:13:43 24   the interest of time, what was your comment at looking again

02:13:46 25   at how they evaluated Idenix as to whether IDX184 was a good

02:13:53 1  idea to work with?

02:13:54 2  A.    I can't remember my exact words, but it was the same

02:13:57 3  intent as this.  We shouldn't look further.

02:13:59 4  Q.    Okay.  Now, I want to just ask if I can how it is

02:14:05 5  that Gilead is able to look at like Idenix's compound

02:14:12 6  IDX184.  What is the process for Gilead to be able to have

02:14:20 7  Idenix let you see the drug?

02:14:21 8  A.    So you have to do it under confidentiality.  And

02:14:25 9  usually there is often another what we call a non-binding

02:14:29 10 term sheet.

02:14:30 11 Q.    Can you explain how that works when you say a

02:14:33 12 non-binding term sheet?  What it is and why you do it?

02:14:37 13 A.    So for us to look at Idenix's drug confidentially, or

02:14:42 14 anybody's drug confidentially, you have to show that you are

02:14:45 15 serious about it, and the way companies do that usually is

02:14:50 16 they put together a sheet which is a con -- not a contract

02:14:53 17 but it says, you know, if we like what we look -- if we like

02:14:58 18 what we see, and it looks really good, and then we want to

02:15:02 19 go and collaborate with you and license the drug or buy the

02:15:05 20 company, this is what the financial terms might look like.

02:15:08 21 Q.    And --

02:15:10 22 A.    If we look at, if we like what we see.

02:15:12 23 Q.    And if you like what you see but don't like it so

02:15:16 24 much, are those the minimum terms?  Are those terms of a

02:15:19 25 contract?

A.    No.

Q.    Okay.  What actually would happen then?

A.    Well, a number of things could happen.  What happens is you usually look and then walk away completely.  You don't like what you see.

Secondly, you say okay, well we want to do something, and we think it's interesting, but it's not quite right or there is a risk of toxicity or a risk, in which case you would modify the contract or the terms of the contract so only after it had been more successful and subsequent steps would there be financial, you know, money change hands.

Q.    So let me ask you this.  In order to look at IDX184, did Gilead make an offer to buy Idenix?

A.    No.

Q.    Okay.  Has Gilead ever offered to buy Idenix?

A.    No.

Q.    Now, Gilead did buy Pharmasset to get sofosbuvir; correct?

A.    Correct.

Q.    When Gilead got ahold of sofosbuvir, how far along was Pharmasset in its clinical trials, meaning big picture?

A.    They started one of the big registration trials, Phase III we call them.  And they have done a lot of the earlier trials as well.

02:16:32 1    Q.    And then at high level in summary terms, what exactly

02:16:37 2    did you oversee?  What effort did you oversee clinically to

02:16:40 3    develop sofosbuvir into Sovaldi and Harvoni?

02:16:42 4    A.    So, I oversaw all the clinical development programs

02:16:45 5    for all the registration, studies and everything we had to

02:16:50 6    do to get the drug ready, to be submit the application for

02:16:54 7    approval.

02:16:54 8    Q.    And the application is something called a New Drug

02:16:57 9    Application?

02:16:57 10   A.    NDA, that's correct.

02:16:59 11   Q.    Those are filed electronically?

02:17:00 12   A.    They are.

02:17:03 13   Q.    Suppose my generation actually printed it out on

02:17:07 14   paper and sent it over to the FDA.  What size vehicle would

02:17:10 15   you need to get it from Wilmington to Washington, D.C.?

02:17:13 16   A.    I don't know.  It's about a quarter of a million

02:17:16 17   pages or more, so it would probably be one of those 18

02:17:19 18   wheelers.

02:17:19 19   Q.    And you did file an NDA, and the FDA did approve;

02:17:22 20   correct?

02:17:23 21   A.    That's correct.

02:17:23 22   Q.    And there has been the phrase "breakthrough status."

02:17:29 23   How did the FDA approve Sovaldi and Harvoni so quickly?

02:17:33 24   A.    So on the fast track or the accelerated assessment

02:17:36 25   pathway, if the drug is of great importance, you want to get

02:17:39 1    them approved quicker. The FDA, the government wants to get

02:17:42 2    them approved quicker.

02:17:43 3    Q.    When Sovaldi was approved, what now could a patient

02:17:47 4    with genotype 2 and 3, what could they -- what kind of

02:17:52 5    treatment could they have with Sovaldi?

02:17:53 6    A.    So with Sovaldi and ribavirin, there is no interferon

02:17:57 7    anymore. So for those strains of the virus, interferon had

02:18:00 8    gone away.

02:18:01 9    Q.    And for the genotype 1 people, the most common in the

02:18:04 10    United States, with Sovaldi, how is their treatment now

02:18:07 11    different?

02:18:07 12    A.    So instead of a 48 weeks of interferon, they got

02:18:11 13    only 12 weeks of interferon plus 12 weeks of Sovaldi and

02:18:15 14    ribavirin. We cured 90 percent of those people.

02:18:19 15    Q.    And when Harvoni came out, now for the genotype 1

02:18:22 16    people, in the United States, what is their treatment?

02:18:26 17    Instead of ribavirin and interferon in a year, what is their

02:18:30 18    treatment?

02:18:30 19    A.    So with Harvoni, that is the other regimen, that is

02:18:35 20    one pill once a day for 12 weeks most groups, 24 weeks for

02:18:39 21    some, no interferon. That is for the genotype 1 patients.

02:18:46 22    So there is no interferon for anybody anymore.

02:18:48 23    Q.    What is the cure rate with Harvoni? What are my

02:18:50 24    odds? If I take a pill for 12 weeks of genotype 1, what are

02:18:54 25    my odds of being cured now?

02:18:56 1    A.    Most patients, that is 90, more than 90 percent.  So

02:18:59 2    nine out of ten chance.

02:19:01 3    Q.    How common is a 95 percent cure rate for any disease?

02:19:07 4    A.    It is very uncommon.

02:19:09 5    Q.    Unheard of?

02:19:11 6    A.    It doesn't happen very often.

02:19:15 7          MR. FARRELL:  Appreciate it.  Thank you,

02:19:17 8    Dr. McHutchison.

02:19:17 9          THE COURT:  Thank you.  Cross-examination.

02:19:20 10          MR. McCRUM:  Thank you very much.  If I may have

02:19:23 11    a moment to pass out some binders?

02:19:26 12          THE COURT:  Certainly.

02:19:28 13          (Binders passed forward.)

02:20:05 14                    CROSS-EXAMINATION

02:20:05 15    BY MR. McCRUM:

02:20:06 16    Q.    Good afternoon, Dr. McHutchison.  I don't think we

02:20:09 17    have met.  My name is Ryan McCrum, and I represent Idenix in

02:20:13 18    this case.

02:20:13 19    A.    Good afternoon.

02:20:14 20    Q.    Good afternoon.  You are employed by Gilead, right?

02:20:18 21    A.    Yes, I am.  Yes.

02:20:19 22    Q.    And you are one of the top officials at Gilead?

02:20:24 23    A.    I'm one of the top scientists.  Yes.  I'm not, I'm

02:20:28 24    not an officer of the company.

02:20:30 25    Q.    Who do you report to there?

02:20:33 1    A.       Chief scientific officer.

02:20:35 2    Q.       And who is that?

02:20:36 3    A.       Norbert Bischofberger.

02:20:40 4    Q.       And you are employed by Gilead but you have also been

02:20:44 5    offered as an expert today to testify on behalf of Gilead;

02:20:48 6    is that right?

02:20:48 7    A.       Yes, I have.  Yes.

02:20:49 8    Q.       And you have provided your opinions today as an

02:20:53 9    expert for Gilead, right?

02:20:55 10   A.       Yes.

02:20:57 11   Q.       And a number of those opinions related to Idenix

02:21:00 12   compounds in the clinic; correct?

02:21:02 13   A.       Yes, that's correct.  What I said, yes.

02:21:05 14   Q.       Not in the most positive light; right?

02:21:09 15   A.       My honest opinion.

02:21:12 16   Q.       How much does Gilead pay you a year in annual salary?

02:21:18 17   A.       You want the exact amount?

02:21:19 18   Q.       If you know it.

02:21:23 19   A.       Why?  A lot of money.  I get paid a lot of money.

02:21:26 20   Q.       And how much?

02:21:33 21   A.       I don't know why you need to know the exact amount.

02:21:35 22   Q.       Well, you are an expert here testifying on behalf of

02:21:38 23   Gilead; right?

02:21:40 24   A.       Yes, I am.

02:21:40 25   Q.       Okay.  How much money do you make a year?  How much

02:21:44 1    does Gilead pay you?

02:21:45 2    A.    So I will tell you my wife and I believe we are very

02:21:49 3    fortunate, and we do make a lot of money now, more than I

02:21:53 4    ever did in the university before.  But that is personal and

02:22:00 5    she really wouldn't want me to talk about it, and there are

02:22:03 6    particular reasons why.

02:22:04 7    Q.    Can you answer the question, Dr. McHutchison?

02:22:08 8            MR. FARRELL:  Your Honor, I need to object as to

02:22:10 9    the relevance.

02:22:10 10            THE COURT:  I'll see counsel at sidebar.

02:32:14 11            (Sidebar conference held.)

02:32:14 12            THE COURT:  All right.  Mr. McCrum, do you know

02:32:14 13    the answer to these questions?

02:32:14 14            MR. McCRUM:  I do not know them.  I do not know

02:32:14 15    the precise number.  Actually, I don't even have a ballpark

02:32:14 16    figure, but he is an expert testifying on behalf of Gilead,

02:32:14 17    clearly has a financial interest in the company, and the

02:32:14 18    jury should know that it goes to credibility, it goes to

02:32:14 19    bias.  He has offered opinions in this case disparaging my

02:32:14 20    client's products for over an hour and now we can't bring

02:32:14 21    this to light that he is being paid by Gilead?

02:32:14 22            THE COURT:  Well, you are bringing to light he

02:32:15 23    is being paid by Gilead.

02:32:15 24            MR. McCRUM:  Yes, the extent is significant.

02:32:15 25            THE COURT:  All right.  Mr. Farrell.

02:32:15 1          MR. FARRELL:  Two things.

02:32:15 2          No. 1, to the extent it has any basis, he says

02:32:15 3  we made a lot, we are very fortunate and had a lot of

02:32:15 4  blessings.

02:32:15 5          Second of all, he has a unique circumstance.  He

02:32:15 6  has a unique circumstance that counsel, which I appreciate

02:32:15 7  this in fairness to them, they didn't know.  They have had a

02:32:15 8  series of break-ins and robberies in the neighborhood where

02:32:15 9  he lives.  His wife is terrified.  They had to get extra

02:32:15 10 security to lock the doors.  And I explained to him that we

02:32:15 11 may have to reveal this information; and he said I cannot do

02:32:15 12 this because my wife is terrified that it becomes public

02:32:15 13 knowledge that we, you know, make this money.

02:32:15 14         Now, quite frankly, he has made enough.  He

02:32:15 15 makes much, a very, very lot of money.  I mean they get it.

02:32:15 16 He is a high level executive as a big company.  To the

02:23:42 17 extent they have a relevance objection, I ask given his

02:23:47 18 special circumstance -- that is why he is referring to his

02:23:48 19 wife, Your Honor.  I'm representing to you that is what that

02:23:50 20 special circumstance is he is referring to.  In fairness to

02:23:54 21 him, that is something he revealed to me.

02:32:16 22         THE COURT:  Mr. McCrum.

02:32:16 23         MR. McCRUM:  I think we would be happy to seal

02:32:16 24 the courtroom, if that is that big of a deal, Your Honor.

02:32:16 25 I just don't think, I mean if this is already out in the

02:32:16 1    public they make a substantial amount of money, I don't know

02:32:16 2    how the concern really gets all that much greater by stating

02:32:16 3    the amount.  It is stated on the record he makes a lot of

02:32:16 4    money.

02:32:16 5            MR. FARRELL:  Might I add then the reverse is

02:32:16 6    true.  If, in fact, the effect is the same, then he has got

02:32:16 7    the same relevance.

02:32:16 8            THE COURT:  Do you know whether this witness

02:32:16 9    made money in the transaction by which Gilead --

02:32:16 10           MR. FARRELL:  Yes.  He did not.

02:32:16 11           THE COURT:  He did not.

02:32:16 12           MR. FARRELL:  He did not, no.  Now, in fairness,

02:32:16 13   he was given stock; and, of course, obviously the result of

02:32:16 14   the stock, the stock has gone up in value.  And, again, he

02:32:16 15   is happy.

02:32:16 16           To save you some time here, he is prepared to

02:32:17 17   say look, in the stock went up.  And, again, we're blessed.

02:32:17 18   It is a large increase in money and we are very grateful.

02:32:17 19   Again, the same concept.  But, again, his wife is at home.

02:32:17 20           THE COURT:  I hear you.  All right.  Yes?

02:32:17 21           MS. PARKER:  May I?

02:32:17 22           THE COURT:  You have to speak up.

02:32:17 23           MS. PARKER:  "A lot" varies from person to

02:32:17 24   person.  What may be a lot to me, what may be a lot to the

02:32:17 25   jury may be different amounts.  So the fact that he said it

02:32:17 1    was a lot may mean different things to different people.

02:32:17 2              THE COURT:  Is there any ballpark figure he

02:32:17 3    would be comfortable disclosing?

02:32:17 4              MR. FARRELL:  No, I mean not without this issue.

02:32:17 5    That's the problem.  If he can just say, I mean what I just

02:32:17 6    heard was what is the difference?  He already said it.

02:25:34 7              Again, then we have got the relevance.  That is

02:25:36 8    what I'm saying.  The answer is no.  Judge, I told him the

02:25:40 9    odds are the Judge is going to make you answer.  He said I

02:25:43 10   can't do that.  I'm on the phone with my lawyer and he told

02:25:47 11   me I am going to have to do that, and she said you may not

02:25:48 12   do that.

02:25:49 13             It's not a small event.  These are neighbors

02:25:51 14   being robbed on a regular basis.  I'm not making this up.  I

02:25:55 15   don't really care.

02:32:18 16             THE COURT:  I don't believe you are making it

02:32:18 17   up.  The question is whether it factors into I think a 403

02:32:18 18   balance unless you have some other authority I can rely on.

02:32:18 19             MR. FARRELL:  That I think is a balancing act,

02:26:06 20   especially when I was just told, well, the factor is already

02:26:10 21   out there so I'm going to tell them the money.  They've

02:26:11 22   gotten an adequate fixation on this.  Does any juror

02:26:15 23   actually think that a lot of money is $20,000 when you are

02:26:19 24   a high level executive in a big company?  He says we are

02:26:22 25   blessed to be living this way.  That is my thing.  They have

02:26:25 1    got enough with this unique situation to be done with it.

02:32:18 2                THE COURT:  Mr. McCrum.

02:32:18 3                MR. McCRUM:  Your Honor, I think Ms. Parker's

02:32:18 4    point is very well taken.  When we're talking about "a lot,"

02:32:18 5    it means something different to all kinds of people.  We

02:32:18 6    have no idea what that number is right now.  And if it is

02:32:18 7    a substantial number, it is going to potentially have a

02:32:19 8    significant impact on his credibility, his credibility

02:32:19 9    attacking our client and representing on behalf of Gilead

02:32:19 10   who is paying him we don't know what.

02:32:19 11               THE COURT:  All right.  Give me a moment.

02:32:19 12               (Court and law clerk confer.)

02:32:19 13               THE COURT:  All right.  I'm going to sustain

02:32:19 14   the objection.  I think the balance here is different than

02:32:19 15   with the witnesses that I have addressed before.  This is

02:32:19 16   not a lump sum of money in the millions or hundreds of

02:32:19 17   millions of dollars that was earned as part of a transaction.

02:32:19 18   It is instead salaried, presumably an annual salary.

02:32:19 19               It is enough I think for the jury to be able to

02:32:19 20   assess this witness's credibility by knowing that he is a

02:32:19 21   high level scientist at the company, that he feels blessed,

02:32:19 22   that he has made a lot of money.  You can go over that again

02:32:19 23   with him without asking him to disclose the detailed dollar

02:32:19 24   figures.  We now know he has earned stock options and the

02:32:19 25   stock price I think I have been told has gone up during time

02:32:19 1    he owned them.  You can establish that if you want.

02:32:19 2            But I see a distinction here between the other

02:32:19 3    witnesses for the reasons I have said.  I am concerned about

02:32:20 4    the personal safety issues, but that is really more just a

02:32:20 5    personal concern.  I don't think that, at least I'm not

02:32:20 6    seeing how that fits into the 403 balance and that is not

02:32:20 7    the basis of my decision.  I just think the probative value

02:32:20 8    here is substantially less than with the other witnesses,

02:32:20 9    and that the risk of unfair prejudice substantially

02:32:20 10   outweighs that lesser probative value.

02:32:20 11           Are there any questions about that?

02:32:20 12           MR. McCRUM:  Yes.  I can follow-up on stock, and

02:32:20 13   I can -- he testified in his deposition that over half of

02:32:20 14   his net worth is attributed to his ownership in Gilead stock

02:32:20 15   without getting into numbers.  That is fair game?

02:32:20 16           MR. FARRELL:  Sure.

02:32:20 17           THE COURT:  I think there is no objection.

02:32:20 18           MR. FARRELL:  No, no, no.  It's the number, Your

02:32:20 19   Honor.  We totally don't object.

02:32:20 20           MS. PARKER:  Can he ask if he has shares?

02:32:20 21           MR. FARRELL:  Now we're back.

02:32:20 22           THE COURT:  You want to know if you can ask how

02:32:20 23   many shares?

02:32:20 24           MS. PARKER:  How far.

02:32:20 25           MR. FARRELL:  Your Honor, what he was asked at

02:32:20  1    his depo, we have no objection to 50 percent of his stock

02:32:20  2    value is in Gilead.

02:32:20  3                THE COURT:  50 percent.

02:32:20  4                MR. FARRELL:  50 percent of his worth is in

02:32:20  5    Gilead.  And he is going to say that his stock is a lot, and

02:32:21  6    he made a lot of money, and he is very blessed.  Again, it's

02:32:21  7    the same balancing.

02:32:21  8                THE COURT:  All right.  Let's keep it at that

02:32:21  9    level of generality.  That 50 percent of his net worth

02:32:21 10    sounds like he is not troubled by that.  I'm not troubled by

02:32:21 11    that.  But probably any other details are going to draw an

02:32:21 12    objection that I'm likely to sustain.

02:32:21 13                MR. McCRUM:  Okay.

02:32:21 14                MS. PARKER:  Given that, given Your Honor's

02:30:38 15    ruling, his counsel, Gilead's counsel should not be able to

02:30:44 16    ask the questions in a follow-up like with Dr. Sofia:  Does

02:30:48 17    that make you feel uncomfortable?  Why would you feel

02:30:52 18    uncomfortable?

02:32:21 19                THE COURT:  We'll deal with that when we get

02:32:21 20    there.  If you feel there is something objectionable, I'm

02:32:21 21    confident you will raise an objection.

02:32:21 22                MS. PARKER:  Thank you, Your Honor.

02:32:28 23                (Sidebar conference ends.)

02:33:13 24                THE COURT:  You may continue when you are ready,

02:33:15 25    Mr. McCrum.

02:33:16  1          MR. McCRUM:  Thank you, Your Honor.

02:33:17  2     BY MR. McCRUM:

02:33:17  3     Q.     Dr. McHutchison, picking up where we left off, I

02:33:20  4     think we established, you were acting as an expert for

02:33:23  5     Gilead in this case.  Correct?

02:33:24  6     A.     Yes, I am.

02:33:25  7     Q.     We had also established that you are employed by

02:33:27  8     Gilead.  Correct?

02:33:28  9     A.     That's correct.

02:33:29 10     Q.     And you testified that they pay you a lot of money

02:33:33 11     each year?

02:33:34 12     A.     And we are very grateful.

02:33:35 13     Q.     You are very grateful for that.

02:33:39 14            You also own stock in Gilead.  Correct?

02:33:42 15     A.     I do.

02:33:42 16     Q.     You own a lot of stock in Gilead.  Right?

02:33:45 17     A.     I do.

02:33:47 18     Q.     In fact, over 50 percent of your net worth is

02:33:54 19     attributed to your stock in Gilead right now?

02:33:56 20     A.     That is absolutely correct.

02:33:57 21     Q.     And when you joined and you got that stock, that

02:34:00 22     stock has really gone up substantially.  Correct?

02:34:05 23     A.     What I have remaining of that stock.  A lot of that I

02:34:11 24     had to use as a deposit for a house in San Francisco because

02:34:15 25     I couldn't afford one.

02:34:16  1  Q.      You were never employed by Pharmasset.  Correct?

02:34:23  2  A.      No.  I was an advisor.

02:34:24  3  Q.      So you are not personally -- you weren't personally

02:34:28  4  involved in any of the internal Pharmasset meetings

02:34:31  5  regarding the discovery of PSI-6130.  Right?

02:34:35  6  A.      No, I was not.

02:34:36  7  Q.      And, likewise, you were not personally involved in

02:34:40  8  any internal Pharmasset meetings regarding the discovery of

02:34:44  9  sofosbuvir.  Right?

02:34:45 10  A.      No, I wasn't.

02:34:46 11  Q.      You talked at length today about clinical trials.

02:34:50 12  Correct?

02:34:52 13  A.      I did, yes.

02:34:52 14  Q.      And you understand that the test for validity doesn't

02:34:57 15  rely on whether or not a product has been approved

02:35:00 16  clinically.  Correct?

02:35:02 17  A.      I don't agree with that.

02:35:03 18  Q.      You don't know agree with it.  You understand that

02:35:05 19  you don't need to get FDA approval in order to get a patent.

02:35:09 20  Right?

02:35:10 21  A.      I am not a lawyer.  I am a doctor.

02:35:11 22  Q.      You are not a lawyer.  You don't know that.  Correct?

02:35:15 23  A.      That's correct.

02:35:18 24          MR. McCRUM:  Thank you, Your Honor.  No further

02:35:20 25  questions.

02:35:20  1          THE COURT:  Redirect.

02:35:21  2          MR. FARRELL:  Briefly.

02:35:23  3                    REDIRECT EXAMINATION

02:35:24  4  BY MR. FARRELL:

02:35:24  5  Q.      Dr. McHutchison, the financial blessing that you have

02:35:27  6  received, has it affected your testimony here today?

02:35:30  7  A.      Absolutely not.  I love what I do.  I have had this

02:35:35  8  job -- I have done this for 25 years.  I am very fortunate

02:35:39  9  and grateful now, for the last five years I have been at

02:35:42 10  this company.  But for the first 20 years I was an academic.

02:35:46 11  And I tell everybody I have got a hobby as well as a job.

02:35:49 12          That's the fact.

02:35:51 13          MR. FARRELL:  No more questions, Your Honor.

02:35:53 14          THE COURT:  Thank you.  You may step down,

02:35:56 15  Doctor.

02:35:56 16          (Witness excused.)

02:36:06 17          THE COURT:  Gilead may call its next witness.

02:36:18 18          MR. SCHERKENBACH:  Your Honor, Gilead calls Mr.

02:36:21 19  Jim Meyers.

02:36:23 20          THE COURT:  Okay.

02:36:36 21          ... JIM MEYERS, having been duly sworn as a

02:36:53 22  witness, was examined and testified as follows ...

02:37:04 23          THE COURT:  Good afternoon, Mr. Meyers.  Welcome

02:37:06 24  to this side of the courtroom.

02:37:08 25          Mr. Scherkenbach, you may proceed.

02:37:09 1    MR. SCHERKENBACH:  Thank you, Your Honor.

02:37:11 2                   DIRECT EXAMINATION

02:37:11 3    BY MR. SCHERKENBACH:

02:37:12 4    Q.    Good afternoon, Mr. Meyers.

02:37:13 5    A.    Good afternoon.

02:37:13 6    Q.    Could you introduce yourself to the jurors please?

02:37:15 7    A.    My name is Jim Meyers.  I am the executive vice

02:37:17 8    president of worldwide commercial operations at Gilead.

02:37:20 9    Q.    What are your responsibilities as executive vice

02:37:24 10   president of commercial operations?

02:37:26 11   A.    I am responsible for commercial operations worldwide,

02:37:30 12   which would include sales and marketing, operations, and

02:37:35 13   access to our products.

02:37:37 14   Q.    And that would include Hepatitis C products?

02:37:40 15   A.    Correct.

02:37:40 16   Q.    And so that would include Sovaldi and Harvoni.  Is

02:37:45 17   that correct?

02:37:45 18   A.    Yes.

02:37:45 19   Q.    Okay.  When did you join Gilead?

02:37:48 20   A.    In the first week of January 1996.

02:37:52 21   Q.    And have you been at Gilead since?

02:37:54 22   A.    Yes.

02:37:54 23   Q.    So 20 years?

02:37:56 24   A.    Yes.

02:37:56 25   Q.    Can you -- you told us your current title.  Can you

02:38:03  1    tell us at a high level what sort of jobs you had since you

02:38:05  2    joined Gilead in '96 up to the present?

02:38:08  3    A.     Sure.  When I got there, there was no commercial

02:38:11  4    organization, so I was responsible for creating that from

02:38:15  5    scratch.  And since then, I have been responsible in one way

02:38:19  6    or another for the commercialization and launch of every

02:38:23  7    product ever launched at Gilead in North America.

02:38:26  8    Q.     We want to focus obviously on Gilead's Hepatitis C

02:38:30  9    products.  So let's talk about those.

02:38:32 10           Can you tell me when Gilead's own internal

02:38:36 11    Hepatitis C development efforts began?

02:38:39 12    A.     In the late 1990s.

02:38:41 13    Q.     Again, at a high level, can you describe what those

02:38:44 14    efforts were?

02:38:45 15    A.     Sure.  We invested, well initially, we targeted -- we

02:38:51 16    looked at a number of different targets in the HCV virus.

02:38:55 17    You have heard many of them today.  We spent hundreds of

02:38:58 18    millions of dollars in those efforts.  And like a number of

02:39:03 19    companies during that time, we, frankly, had mixed results.

02:39:08 20    Q.     As of 2010, say, had Gilead's own internal efforts

02:39:12 21    resulted in a commercial drug that was approved to treat HCV

02:39:17 22    patients?

02:39:18 23    A.     No.  We had some promising leads, but no commercial

02:39:21 24    drug.

02:39:21 25    Q.     So did Gilead sort of give up on its own internal

02:39:26 1 efforts?

02:39:26 2 A.     No.

02:39:26 3 Q.     What did you do?

02:39:28 4 A.     We redoubled our efforts.  You saw part of that with

02:39:33 5 what just preceded me.  We went out and hired one of the

02:39:37 6 preeminent experts in the field, in Dr. John McHutchison,

02:39:42 7 who was a world-renowned expert.

02:39:44 8         We also doubled down in our investment, because

02:39:48 9 we were not alone in not having been successful to that

02:39:51 10 point in terms of having a commercialized product, and we

02:39:54 11 knew that there was still a tremendous unmet medical need

02:39:58 12 for patients infected with HCV.

02:40:01 13 Q.     As of the roughly 2010 time frame, can you identify

02:40:04 14 for us one of Gilead's more -- what Gilead thought was one

02:40:08 15 of its more promising internal drug candidates for HCV

02:40:12 16 treatment?

02:40:12 17 A.     Yes.  Particularly in a class called NS5A, which was

02:40:17 18 one of the targets, it's a different class of drug than

02:40:21 19 sofosbuvir, but we had a compound that was known as gs5885,

02:40:28 20 which came to be known as ledipasvir, and we felt strongly

02:40:34 21 that that could be a promising product that could be

02:40:37 22 combined in the future with other compounds, and in fact it

02:40:41 23 ultimately did get combined with sofosbuvir to create

02:40:45 24 Harvoni.

02:40:45 25 Q.     So one of Gilead's own drugs ended up being part of

02:40:50 1  Harvoni that we have heard about in this case?

02:40:52 2  A.    That's correct.

02:40:52 3  Q.    Okay.  Now, did you ever work at Pharmasset?

02:40:59 4  A.    No.

02:40:59 5  Q.    Were you involved personally in the Pharmasset

02:41:03 6  acquisition process?

02:41:05 7  A.    Yes.

02:41:06 8  Q.    What was your role in that process?

02:41:09 9  A.    My role was really the financial analysis and

02:41:13 10  calculations.  Really trying to ascertain what the market

02:41:19 11  would look like if we acquired sofosbuvir and what

02:41:23 12  sofosbuvir would look like within the HCV market in terms of

02:41:28 13  prescriptions, revenue and patients.

02:41:30 14  Q.    We heard sort of how the story ends.  It turned out

02:41:34 15  to be a good acquisition for Gilead.  Right?

02:41:37 16  A.    Yes.

02:41:38 17  Q.    At the time -- actually, let me back up.  What was

02:41:42 18  the date, roughly, or time frame of the acquisition of

02:41:45 19  Pharmasset by Gilead?

02:41:47 20  A.    That was November 2011.

02:41:49 21  Q.    At that time was the decision to acquire Pharmasset

02:41:53 22  an easy one for Gilead to make?

02:41:56 23  A.    No.

02:41:56 24  Q.    Why not?

02:42:00 25  A.    There was significant risk.

02:42:01  1   Q.    What were the risks, as Gilead saw them?

02:42:04  2   A.    Well, I think the first was scientific risk.  I think

02:42:08  3   it's important to realize that, as much promise as

02:42:13  4   sofosbuvir offered, it was only in Phase II at the time --

02:42:17  5   Phase II clinical development at the time we acquired it.

02:42:21  6        In this industry, up to 40 percent of compounds

02:42:26  7   that successfully make it through Phase II actually never

02:42:29  8   successfully make it to Phase III and come to market.

02:42:33  9        So, put another way, there was almost a 50-50

02:42:36 10   chance that what we had just purchased might not have come

02:42:39 11   to market.

02:42:40 12   Q.    What data -- again, high level -- clinical data, did

02:42:43 13   Gilead actually have on sofosbuvir at the time of the

02:42:46 14   acquisition?

02:42:48 15   A.    We had data from a relatively small study in New

02:42:52 16   Zealand on Genotype 2/3 patients.

02:42:56 17   Q.    Was it a concern to only have data on Genotype 2 and

02:43:01 18   3 patients from one small study at this time of the

02:43:04 19   acquisition?

02:43:05 20   A.    Yes.

02:43:05 21   Q.    Why is that?

02:43:05 22   A.    Well with, Genotype 2/3 patients, they are important

02:43:09 23   patients, obviously, but they only represent about 20 to 25

02:43:13 24   percent of patients in the United States.

02:43:16 25   Q.    And the largest genotype in the United States is

02:43:20 1  what?

02:43:20 2  A.     Genotype 1.

02:43:21 3  Q.     You didn't have any data for Genotype 1 for

02:43:25 4  sofosbuvir at the time of the acquisition?

02:43:27 5  A.     Not at all.

02:43:27 6  Q.     So why was Gilead willing to take the risk and spend

02:43:31 7  all this money for Pharmasset?

02:43:33 8  A.     Well, I think it was individuals like Dr. McHutchison

02:43:37 9  sun, the antiviral expertise that we had developed over two

02:43:41 10 decades in HIV and HBV, enabled us to have the conviction

02:43:47 11 that what we saw in a relatively small group of patients was

02:43:50 12 likely, not definitively, but might translate to the larger

02:43:54 13 group of patients, Genotype 1.  And we had the courage of

02:43:58 14 our convictions to make that investment.

02:43:59 15 Q.     You mentioned among the risks at the time in 2011

02:44:04 16 were scientific risks.  Were there other kinds of risks as

02:44:08 17 well?

02:44:09 18 A.     There was significant financial risk.

02:44:11 19 Q.     What do you mean by financial risk?

02:44:13 20 A.     Well, this was a big deal for Gilead.

02:44:17 21        This was easily the biggest acquisition we had

02:44:20 22 ever made.

02:44:22 23        This was a third of our market capitalization.

02:44:24 24 Q.     What does that mean, it was a third of your market

02:44:27 25 capitalization?

02:44:28 1    A.      It was a third of the entire value of the company.

02:44:31 2    Q.      And what was the amount that Gilead invested to

02:44:35 3    actually acquire Pharmasset?

02:44:38 4    A.      11 billion dollars.

02:44:39 5    Q.      And if sofosbuvir had failed in Phase II trials or

02:44:45 6    Phase III trials, what would have happened to your 11

02:44:50 7    billion dollars?

02:44:51 8    A.      We would have lost that, and I am quite sure it would

02:44:55 9    have been considered one of the worst deals in the history

02:44:58 10   of our industry.

02:44:59 11   Q.      How did the market react to Gilead's announcement of

02:45:04 12   the acquisition of Pharmasset?

02:45:06 13   A.      Not well.

02:45:07 14   Q.      What do you mean by that?

02:45:09 15   A.      Well, we -- at that period in Gilead's history we

02:45:14 16   were largely owned by value investors who really preferred a

02:45:18 17   dividend that varied kind of steady, safe growth.  This was

02:45:23 18   not that.  They really fled in droves from the stock.  Our

02:45:27 19   stock price went down significantly.

02:45:30 20           And there was a lot of doubt about what we had

02:45:32 21   done.  People questioned the price.  I think they also

02:45:35 22   questioned whether we had made too big a decision on too

02:45:40 23   little data.

02:45:40 24   Q.      I want to fast-forward to the period right before the

02:45:44 25   launch of Sovaldi in December of 2013.  That is when Sovaldi

Meyers - direct

02:45:49 1    was first launched.  Right?

02:45:51 2    A.    Yes.

02:45:51 3    Q.    Was there still as much risk surrounding sofosbuvir

02:45:56 4    at that time?

02:45:57 5    A.    No.

02:45:58 6    Q.    And why do you say that?

02:46:02 7    A.    Well, at that time we were in receipt of Phase III

02:46:06 8    data, so we really knew the full product profile.  We had

02:46:09 9    already had numerous discussions with the FDA and we were on

02:46:12 10   the home stretch right before approval.

02:46:14 11           So we had significant confidence that we would

02:46:17 12   have an approved drug, and there was already significant

02:46:21 13   anticipation in that time period that this would be a highly

02:46:24 14   successful drug that would cure a lot of patients and

02:46:30 15   generate billions of dollars in revenue.

02:46:32 16   Q.    We have talked about the acquisition date and we

02:46:35 17   fast- forwarded to the launch date.  I want to talk a little

02:46:37 18   bit about the time period in between.  So between 2011 and

02:46:42 19   December of 2013.  What was Gilead's plan for getting

02:46:49 20   sofosbuvir to market in that period?

02:46:52 21   A.    So I think, probably, the two ways I would put it, we

02:46:56 22   wanted to do two things.  We wanted to significantly speed

02:46:59 23   up the process of getting this compound to market.  And

02:47:04 24   secondly, we wanted to significantly expand the number of

02:47:09 25   patients who could potentially benefit from day one based on

02:47:14 1    the label that we got from the FDA.

02:47:16 2    Q.    Let's talk about the first part of the plan, trying

02:47:20 3    to get sofosbuvir to patients as soon as you could.

02:47:23 4          Was Gilead able to accomplish that?

02:47:26 5    A.    We were.

02:47:26 6    Q.    And how was it able to accomplish that?

02:47:30 7    A.    Well, again, we have been in antivirals for a long

02:47:34 8    time.  We don't do everything well, but antivirals is an

02:47:39 9    area that we have been in for 15 years, 15 to 20 years in

02:47:42 10   HIV and HBV.

02:47:44 11         We had significant expertise -- you know,

02:47:47 12   clinical trials are different in every therapeutic area.  We

02:47:51 13   were dealing with the same reviewing division at the FDA.

02:47:54 14   We knew what they needed.  We knew clinical trial sites.

02:48:01 15         We had developed a tremendous expertise in

02:48:04 16   getting nucleotide-based direct acting antivirals to market

02:48:10 17   very quickly.

02:48:10 18   Q.    You mentioned in that answer Gilead had had

02:48:13 19   experience in areas of HBV and HIV.  Right?

02:48:17 20   A.    Yes.

02:48:19 21   Q.    I want to show you quickly a demonstrative, DDX-501.

02:48:28 22   This is a demonstrative you helped prepare.  Is that right?

02:48:32 23   A.    Yes.

02:48:32 24   Q.    Can you tell us what we are looking at here?

02:48:36 25   A.    Sure.  So those are, on the left-hand side you see

02:48:39  1    the three commercially approved, FDA-approved products that

02:48:43  2    Gilead has on the market right now for Hepatitis B.  The

02:48:47  3    most recent was Vemlidy.  You see at the bottom, that was

02:48:52  4    actually just launched last month.

02:48:54  5            Viread right now is the market leader in HBV.

02:49:01  6            On the right-hand side you see the large number

02:49:03  7    of compounds we have launched in HIV and AIDS over the

02:49:05  8    years.  You see ten listed there.  We have got more on the

02:49:09  9    way.

02:49:11 10            At least five of those you see consist of just a

02:49:15 11    single pill that a patient would take once a day, and it's

02:49:19 12    been a big part of HIV going from a death sentence to a

02:49:22 13    chronic manageable disease in the United States.

02:49:25 14    Q.    So are we looking here on DDX-501, these are all

02:49:31 15    actual products that were approved, that are Gilead

02:49:36 16    products?

02:49:36 17    A.    Gilead approved -- approved products developed by

02:49:40 18    Gilead researchers.

02:49:41 19    Q.    How would you describe Gilead's sort of standing in

02:49:44 20    the market in Hepatitis B and HIV?  Are they a big player,

02:49:50 21    small player?  What?

02:49:52 22    A.    For the last ten years, nine out of every ten

02:49:54 23    patients who started therapy in HIV has started therapy on a

02:49:59 24    Gilead HIV product.  In HBV, it's not quite to that

02:50:03 25    magnitude.  But about six or seven out of ten.

Meyers - direct

02:50:07 1    Q.    And you were in both of these areas, meaning

02:50:10 2    Hepatitis B and HIV, before really getting into the HCV

02:50:15 3    area?

02:50:16 4    A.    Correct.

02:50:16 5    Q.    How was it that your experience in getting all these

02:50:20 6    drugs approved for other types of Hepatitis and virus, how

02:50:23 7    did that help you bring sofosbuvir to market more quickly?

02:50:27 8    A.    Well, on the HCV side, on the left, the very same

02:50:33 9    investigators who were evaluating and doing clinical trials

02:50:37 10   for Sovaldi and Harvoni, there is a tremendous degree of

02:50:41 11   overlap of those physicians with our Hepatitis B physicians.

02:50:45 12   So we were able to hit the ground running.

02:50:47 13         We didn't have to introduce ourselves.  We knew

02:50:50 14   who these people were.  That is a huge advantage.

02:50:54 15         Again, as I said, the division of the FDA that

02:50:57 16   approves your products for HEP C also approved your products

02:51:01 17   for HIV/AIDS and Hepatitis B.

02:51:04 18         So we just had a very high comfort level and

02:51:08 19   significant years of expertise with 13 products being

02:51:12 20   approved over a 15-year period that I think made us uniquely

02:51:16 21   able to get products to market more quickly than just about

02:51:20 22   anybody could have.

02:49:57 23   Q.    All right.  Let's turn to the second goal you

02:50:17 24   mentioned in this trying to get sofosbuvir to patients.  I

02:50:23 25   believe you said, trying to make it available to more

02:50:25 1    patients.  What do you mean by that?

02:50:28 2    A.    Well, you will recall I said that at the acquisition,

02:50:32 3    as promising sofosbuvir looked, it had only been studied in

02:50:35 4    genotype 2/3 type patients.  So if we went forward from

02:50:40 5    there, it would only have been benefitting a quarter of the

02:50:43 6    patients in the U.S. market, which wasn't good enough.  So

02:50:45 7    we immediately augmented the development program by quickly

02:50:50 8    moving into genotype 1 patients, which was the biggest group

02:50:54 9    of patients, but also doing something that had never been

02:50:57 10   done before in hepatitis C, which was study it in very

02:51:02 11   difficult to treat patient groups.

02:51:04 12          You know, no one had ever studied products in

02:51:08 13   Hep C and HIV/HCV coinfected or in pre-and-post transplant

02:51:14 14   patients.  You typically don't get good results in those

02:51:18 15   patients.  They're very, very sick patients.  And we wanted

02:51:21 16   to make sure, because of our conviction around this product,

02:51:23 17   that it would be available not at some point down the road

02:51:25 18   but from Day One for the patients who needed it most because

02:51:29 19   those were the patients that had not been able to use the

02:51:33 20   interferon and the other drugs from the prior years and who

02:51:36 21   needed to be treated right away.

02:51:37 22   Q.    Is there a relationship between Gilead trying the

02:51:42 23   drug for a broader class of patients in its trials on the

02:51:45 24   one hand and the actual data Gilead had got once the

02:51:49 25   products were marketed or released to the market on the

02:51:51 1 other hand?

02:51:52 2 A.    Yes.

02:51:52 3 Q.    What is that relationship?

02:51:53 4 A.    So one of the reasons you do study it broadly even

02:51:57 5 in difficult patients is you want to give physicians

02:52:00 6 information not only to know who to use it in but who not to

02:52:05 7 use it in because you don't want bad results.

02:52:08 8         And if we were going to tell physicians or if

02:52:11 9 physicians were going to want to use Sovaldi in transplant

02:52:16 10 patients, we needed to make sure that was safe.  And I have

02:52:20 11 to say that would even include products you saw in the

02:52:23 12 screen.  This has been one of the few, if only, times in

02:52:28 13 this industry I have seen such a correlation between

02:52:31 14 clinical trials and what as predicted in clinical reality.

02:52:35 15         You usually don't see that direct correlation

02:52:38 16 because real world patients are complex.  They have issues.

02:52:42 17 They are often excluded from clinical trials because of

02:52:46 18 those complexities and we didn't do that in our development

02:52:50 19 program.

02:52:50 20 Q.    So now let's go back or come forward I guess in time

02:52:55 21 to the actual launch.  So you launched Sovaldi and you told

02:52:59 22 us when that was.  Harvoni, when was Harvoni launched?

02:53:03 23 A.    October 2014.

02:53:07 24 Q.    And how was Harvoni received by doctors and patients?

02:53:09 25 A.    Extremely well.

02:53:10 1    Q.    What has happened in the marketplace?  What would

02:53:16 2    Gilead's share of the market be for Harvoni, for example?

02:53:19 3    A.    In every quarter since its launch, it has never been

02:53:22 4    less than 85 percent share of patients.

02:53:26 5    Q.    And what was, what were people taking before in the

02:53:31 6    market?  I think we just heard some of this

02:53:33 7    Dr. McHutchison, but what was the prior standard of care?

02:53:36 8    A.    Before Sovaldi?

02:53:37 9    Q.    Before Sovaldi, yes.

02:53:39 10   A.    So the prior standard of care at the time was either

02:53:43 11   Victrelis or Incivek, which were two protease inhibitors

02:53:48 12   combined with 24 to 48 weeks of the interferon injection you

02:53:52 13   heard about plus ribavirin.

02:53:54 14   Q.    So there were three pieces to the prior art standard

02:53:57 15   of care?

02:54:01 16   A.    Yes.

02:54:02 17   Q.    How many companies were selling all three pieces of

02:54:04 18   that prior standard of care?

02:54:05 19   A.    All three pieces?

02:54:07 20   Q.    Yes.  Selling all three.  Was there any company

02:54:10 21   selling all three of those pieces?

02:54:12 22   A.    There was one.

02:54:12 23   Q.    Which company was that?

02:54:13 24   A.    Merck.

02:54:14 25   Q.    And so which company suffered the most when Gilead's

Meyers - direct

02:54:20 1   Sovaldi and Harvoni came on the market and became very

02:54:22 2   successful?

02:54:23 3   A.        That would be Merck.

02:54:26 4   Q.        Setting aside the acquisition cost of Pharmasset,

02:54:31 5   which you told us were $11 billion, how much did Gilead

02:54:37 6   have to invest in addition to bring Sovaldi and Harvoni to

02:54:40 7   market?

02:54:40 8   A.        We estimated that to be an additional $4 billion.

02:54:44 9   Q.        So the total all in to actually acquire sofosbuvir,

02:54:48 10  fully develop it, bring it to market?

02:54:50 11  A.        Would be the $11 billion acquisition and the $4

02:54:55 12  billion.  So $15, roughly $15 billion.

02:54:59 13  Q.        All right.  Now, I want to transition and ask you

02:55:04 14  about a document that the jury has seen before relating to

02:55:08 15  Gilead's gross margins.

02:55:11 16            You were here during opening statements?

02:55:13 17  A.        Yes.

02:55:14 18  Q.        You have been here the whole trial?

02:55:16 19  A.        Yes.  The whole time.

02:55:20 20  Q.        You heard reference to this profit margin of

02:55:23 21  98.7 percent?

02:55:24 22  A.        I have.

02:55:24 23  Q.        Is that Gilead's actual profit margin?

02:55:27 24  A.        No.

02:55:28 25  Q.        All right.  Well, first of all, why not, at a high

02:55:32 1    level?

02:55:33 2    A.      That is our gross margin.

02:55:34 3    Q.      What do you mean by that?

02:55:37 4    A.      Gross margin is a very specific financial accounting

02:55:40 5    term that applies to just the cost of manufacturing the

02:55:44 6    product and the bottle.  Nothing more.

02:55:49 7                MR. FARRELL:  All right.  Can I have, Mr.

02:55:51 8    Sayres, PX-1722?

02:55:54 9                This is in evidence, Your Honor.

02:55:54 10   BY MR. FARRELL:

02:55:59 11   Q.      Mr. Meyers, do you recognize the document?

02:56:01 12   A.      I do.

02:56:02 13   Q.      Did you have any role in preparing this document?

02:56:06 14   A.      No.

02:56:08 15   Q.      Did your team have a role?

02:56:11 16   A.      No.

02:56:13 17   Q.      You have seen it before?

02:56:14 18   A.      I have.

02:56:14 19   Q.      Okay.  And you are familiar obviously with the

02:56:17 20   financial information of the company?

02:56:18 21   A.      Yes.

02:56:18 22   Q.      Okay.  Let's look at page 10 of the document.

02:56:24 23                And can we just blow up the chart maybe?  There

02:56:33 24   you go.

02:56:34 25                And you see, there is a line item here for gross

02:56:38 1  margin and there is 98.7 percent.  Right?

02:56:42 2  A.    I do.

02:56:42 3  Q.    Can you tell us, first of all, at a high level what

02:56:45 4  we're looking at on this chart?

02:56:47 5  A.    Yes.  So this would be a projected three year

02:56:51 6  forecast.  Again, we hadn't sold anything yet so it was just

02:56:55 7  a forecast.

02:56:56 8       The top line looks at what we projected with

02:56:58 9  revenue.  And we were projecting we would begin selling

02:57:02 10  Sovaldi in 2014.  That's the first time you see any mention

02:57:06 11  of revenue.  And that projected to be a little over $2

02:57:12 12  billion.

02:57:12 13       You can see the gross margin, the aforementioned

02:57:15 14  gross margin.  That was at 98.7 percent below that.

02:57:19 15       But then there is a number of other very, very

02:57:22 16  important things that come into play before you ever get to

02:57:25 17  profit margin, which is very different than gross margin.

02:57:29 18       The first of which would be research and

02:57:32 19  development costs.  You can see those were substantial.  In

02:57:36 20  fact, even as of fiscal year '14, still over $350 million.

02:57:48 21  Q.    Can I just stop you.  That's per year.  That is for

02:57:50 22  that year estimated?

02:57:51 23  A.    That's correct.

02:57:52 24  Q.    Okay.  Keep going.  What is next?

02:57:55 25  A.    The next is the category called sales, general, and

02:57:58 1  administrative.  That include a whole variety of things:

02:58:01 2  the cost of a sales force, the cost of medical education,

02:58:06 3  of programs that you provide to doctors, to educate other

02:58:13 4  physicians on Hep C.  That even includes things like patient

02:58:17 5  assistance programs or co-pay programs or free drug

02:58:20 6  programs.  So there is a whole litany of things that fall

02:58:23 7  into that category.

02:58:24 8  Q.      All right.  And so we get down to a line called

02:58:30 9  operating income.  Do you see that?  And operating margin?

02:58:34 10  A.      I do, yes.

02:58:34 11  Q.      What is that?

02:58:35 12  A.      That would be, that would be where you get to after

02:58:39 13  you subtract not only the cost of developing the product and

02:58:44 14  the bottle but all of the costs that go into research and

02:58:48 15  development, sales, general administration.  That gets you

02:58:51 16  down to operating income.

02:58:53 17  Q.      Now, this document we're looking at here, PX-1722,

02:59:00 18  this was a forecast analysis; is that right?

02:59:04 19  A.      That's correct.

02:59:04 20  Q.      At a high level, can you tell us how the actual net

02:59:11 21  operating margin has compared to, for example, the

02:59:16 22  63 percent represented here?

02:59:19 23  A.      You mean over time?

02:59:22 24  Q.      Over time.

02:59:23 25  A.      Yes.  I wouldn't say it exceeded that.  Certainly,

02:59:27 1    it's been less than that.  There has been a lot more

02:59:30 2    discounting on both discretionary and mandatory that has

02:59:35 3    occurred that has impacted every number that you see on

02:59:38 4    this slide.

02:59:39 5    Q.    Okay.  Thank you.

02:59:40 6              MR. FARRELL:  I have no further questions, Your

02:59:41 7    Honor.

02:59:41 8              THE COURT:  Okay.  Cross-examination.

02:59:45 9              MR. KINTON:  Your Honor, before I begin

02:59:47 10   cross-examination, we'd like to do a sidebar.

02:59:49 11             THE COURT:  We'll give the jury a break at this

02:59:51 12   point then.

02:59:52 13             Ladies and gentlemen, no talking about the case.

02:59:54 14   We'll get you back here when we can.

02:59:59 15             (Jury left courtroom.)

03:00:15 16             THE COURT:  Mr. Kinton, do you want the witness

03:00:20 17   -- well, I guess he has been in the courtroom throughout so

03:00:23 18   strike that.

03:00:24 19             Mr. Winston, do you want to come to the podium

03:00:26 20   and tell us what your concern is?  And everyone else can

03:00:29 21   leave.

03:00:30 22             MR. McCRUM:  Actually, I'd like to have my

03:00:31 23   partner, Jennifer Swize.

03:00:33 24             THE COURT:  That's fine.  Whoever you want to

03:00:35 25   have speak.

03:00:36 1          Mr. Meyers, if you want step down or sit, do as

03:00:39 2   wish.  You can go back to your seat.

03:00:41 3          Good afternoon.

03:00:43 4          MS. SWIZE:  Good afternoon, Your Honor.

03:00:43 5   Jennifer Swize for Idenix.

03:00:46 6          Your Honor, at this time, we would ask that you

03:00:49 7   consider our request to enter into evidence criticisms of

03:00:55 8   Gilead's pricing, its efforts to maximize its profits,

03:01:01 9   including the cost per pill that they have charged.

03:01:05 10          We do believe that in the latest testimony, they

03:01:08 11  have opened the door to that.  And I'm happy to walk Your

03:01:11 12  Honor through that.

03:01:11 13          THE COURT:  You are going to need to do that.

03:01:13 14  What did you hear that makes you think they opened the door

03:01:15 15  to it?

03:01:16 16          MS. SWIZE:  I will certainly address that.  If I

03:01:18 17  may, I was going to start from the beginning because we do

03:01:20 18  believe some of this is cumulative, but I can do it in the

03:01:23 19  order Your Honor would like.  So I can start with this

03:01:25 20  witness, if you would like.

03:01:26 21          THE COURT:  All right.  Well, I think you were

03:01:28 22  present this morning, in which Ms. Parker told me the door

03:01:31 23  had not yet been opened.

03:01:34 24          MS. SWIZE:  Yes.

03:01:34 25          THE COURT:  That is still your position; correct?

03:01:36 1        MS. SWIZE:  Yes, Your Honor.  I do think it is

03:01:37 2    important to put it in context, however.

03:01:39 3        THE COURT:  All right.  Well, go through it

03:01:41 4    however you like.

03:01:42 5        MS. SWIZE:  Okay.  So, of course, we all know

03:01:45 6    we're on the fifth day of trial.  And really from the

03:01:47 7    beginning of this case, starting with Gilead's opening and

03:01:51 8    at the start of their case with their first witness and then

03:01:54 9    through today, all of today, including the latest witness,

03:01:57 10   they have been weaving a story that has been portraying the

03:02:00 11   company to the jury.

03:02:04 12       They have been portraying Pharmasset as a small

03:02:07 13   company, really a family.  They posted a photo of it.  Their

03:02:11 14   first witness had very personal motivations for searching

03:02:16 15   for a cure for HCV.

03:02:18 16       This latest witness in particular identified

03:02:21 17   two specific goals that evidence of price gouging, pricing

03:02:26 18   criticism, profit maximizing is directly relevant to.

03:02:30 19       I heard Mr. Meyers mention they wanted to get

03:02:34 20   sofosbuvir to market as quickly as possible and they wanted

03:02:37 21   to reach as many patients as possible.

03:02:40 22       They were motivated by the courage of their

03:02:43 23   convictions.  Gilead's counsel repeated maybe once or twice

03:02:47 24   the conviction of Gilead.

03:02:50 25       They were interested in studying -- and I

Meyers - direct

1  believe again this is another quote -- to treat very hard to

2  treat patients and very sick patients.

3  We heard earlier from Dr. Sofia the many awards

4  he has received.

5  We heard that they are the only company ever to

6  make an antiviral cure.

7  This has been the story they have been painting.

8  I believe they used more than half of their trial time at

9  this point.  We have barely heard about invalidity and

10  damages, but this is what the jury has heard, and it is fair

11  for the jury to hear the other side of that story and that

12  is the evidence that we have.

13  THE COURT:  What is the other side of the story

14  that you would -- that you are asking leave to bring out?

15  MS. SWIZE:  It would not be very long, Your

16  Honor.  I know that was one of your concerns at the pretrial

17  conference, a waste of time.

18  We have a limited number of questions that we

19  would ask Dr. Meyers, and it would be based I believe

20  largely on the Senate Report.  The Senate Report was

21  conducted and issued in December of 2015.  It is a very

22  thorough report.  It has all of the indicia of reliability

23  for a business record or investigative report under federal

24  Rules of Evidence 803, 804, it was a bipartisan report,

25  very thorough, Gilead participated in it.  It includes

03:04:12 1    correspondence involving Mr. Meyers himself, so he would be

03:04:15 2    the most appropriate witness to address it.

03:04:17 3             And it would not be a long time.  But again it

03:04:20 4    would be important for the jury to hear there is another

03:04:24 5    side of the story than the altruistic story portrayal Gilead

03:04:28 6    has been making.

03:04:29 7             THE COURT:  I need some preview as to what that

03:04:32 8    story is.  What is the other side of the story?

03:04:34 9             MS. SWIZE:  The other side of the story is that

03:04:36 10   Gilead set its pricing not for the purposes that Mr. Meyers

03:04:41 11   just testified but really in order to maximize its profits.

03:04:44 12   It wasn't looking --

03:04:45 13            THE COURT:  Where did you hear Mr. Meyers talk

03:04:47 14   about how they set their prices?

03:04:49 15            MS. SWIZE:  I don't know that he used that.  I

03:04:54 16   think he was very careful to avoid that, but they have

03:04:56 17   painted a picture, and I think the jury would clearly infer

03:04:59 18   that they are motivated by altruistic concerns to try to

03:05:03 19   reach patients.  They are motivated by personal interests

03:05:07 20   and they haven't necessarily --

03:05:09 21            THE COURT:  Let me ask you this.  What more

03:05:12 22   would be accomplished by the Senate Report and whatever else

03:05:17 23   it is you are asking to do that wouldn't be accomplished by

03:05:21 24   simply establishing that they have a profit motive and that

03:05:25 25   they want to make as much money as they can, which would

03:05:28  1    seem to me you can do with a couple of straightforward

03:05:31  2    questions like that?

03:05:32  3             MS. SWIZE:  I think the questions would be

03:05:34  4    straightforward anyway but it would be helpful and relevant

03:05:38  5    to hear from a third party.  I don't think we should be

03:05:41  6    limited to Gilead's statements about themselves; and I'm not

03:05:44  7    sure that that would actually --

03:05:44  8             THE COURT:  I guess what I'm trying to

03:05:45  9    understand is what is it you are trying to establish other

03:05:48 10    than that they are profit-seeking entities and they set

03:05:53 11    prices and presumably do everything with an interest in

03:05:57 12    maximizing their profit?

03:06:00 13             MS. SWIZE:  I think it is also fair to, again,

03:06:02 14    because we heard so much about Gilead and this story that

03:06:06 15    has been weaving, there is a third party that has conducted

03:06:11 16    a very thorough investigation and came out a different way

03:06:15 17    or had some concerns.  I don't think we should be limited to

03:06:18 18    just questions that are much more strictly financial and

03:06:22 19    mathematical, but there has been an emotional portrayal to

03:06:27 20    Gilead.

03:06:30 21             If I could confer with my colleague for a

03:06:32 22    moment?

03:06:33 23             THE COURT:  Certainly.

03:06:34 24             (Counsel confer.)

03:07:07 25             MS. SWIZE:  Your Honor, I have been handed some

03:07:12 1    questions that perhaps we could, if you let us pursue this,

03:07:15 2    we could ask some initial questions and, depending on the

03:07:19 3    answers, that might lead us in one direction or another, of

03:07:23 4    course, with your permission.  But if we were to simply ask

03:07:26 5    the straightforward question if Gilead had a profit motive

03:07:30 6    and if they had an interest in making as much money as they

03:07:34 7    can.  Depending on those answers, that might be all we need

03:07:37 8    or we might advance, or no, and then we would ask to present

03:07:42 9    this contrary evidence.

03:07:44 10          THE COURT:  But if the answer to both of those

03:07:46 11    questions, do you want to make money and make as much as you

03:07:51 12    can, if the answers to both of those are yes, then you are

03:07:54 13    not seeking leave to do anything beyond that?

03:07:56 14          MS. SWIZE:  I think that is right, but let me

03:07:58 15    confer.

03:07:59 16          THE COURT:  Sure.

03:08:01 17          (Counsel confer.)

03:08:15 18          MS. SWIZE:  Thank you, Your Honor.  We would

03:08:18 19    want to ask one more specific question in response to

03:08:20 20    Mr. Meyers' testimony where he said they were seeking to

03:08:25 21    make their drug available at Day One to patients that need

03:08:28 22    it most.

03:08:31 23          The report from the Senate has contrary

03:08:34 24    information that they were setting their prices and resulted

03:08:38 25    in limited access, so we would like to follow-up with

03:08:41 1    Mr. Meyers about that.

03:08:43 2         THE COURT:  About the report's finding, if it is

03:08:48 3    a finding, that they set the prices in a way not intended to

03:08:53 4    reach a maximum number of patients?

03:08:57 5         MS. SWIZE:  Correct, and from the beginning.

03:08:58 6         THE COURT:  Okay.  Thank you.  I might have more

03:09:01 7    questions, but I would like to hear from Gilead at this

03:09:04 8    point.

03:09:05 9         MR. SCHERKENBACH:  Thank you, Your Honor.

03:09:10 10        I mean it seems apparent they just have been

03:09:13 11   waiting for their opportunity to argue this with a bunch of

03:09:17 12   material that has nothing to do with Mr. Meyers.  I mean as

03:09:21 13   they acknowledged before Mr. Meyers took the stand, there

03:09:24 14   was no basis on which to go into this information.

03:09:27 15        I stayed a mile away with it with Mr. Meyers.

03:09:30 16   We have been very careful to do that for obvious reasons.

03:09:33 17        Just to fast forward.  The Senate Report stuff

03:09:36 18   is the most prejudicial material they could possibly use to

03:09:41 19   get into this area.  It's a bunch of stuff written by two

03:09:47 20   staffers for two senators who were all fired up.

03:09:51 21        And to put it in, it is extremely prejudicial,

03:09:55 22   the statements they initially made; and there was a very

03:09:58 23   long drawn out process that ensued, involving interviews and

03:10:04 24   massive data submission, and what was said to whom, and what

03:10:09 25   was the follow-up.  It would be an enormous distraction in

03:10:15 1    addition to the prejudice it would cause.  This played out

03:10:18 2    over a long period of time.

03:10:19 3         And at the end of the day, there was never a

03:10:22 4    hearing; and there was never any consequences to Gilead.  So

03:10:26 5    it doesn't ultimately lead anywhere.

03:10:28 6         THE COURT:  Is there any finding as a result of

03:10:32 7    this Senate process?

03:10:34 8         MR. SCHERKENBACH:  I don't believe so.  They

03:10:35 9    didn't show you a specific finding.

03:10:37 10        THE COURT:  What you understand them to be

03:10:40 11   asking for is some, to you, some Senate Report which was in

03:10:44 12   your view the beginning of a process?

03:10:47 13        MR. SCHERKENBACH:  Right.  The Senate Finance

03:10:51 14   Committee sent a request for information to Gilead and said,

03:10:55 15   you know, we're concerned about X.  Send us information on X.

03:10:59 16   Gilead did that.  And then there were substantial follow-up

03:11:03 17   discussions.  And the committee then did subsequently issue

03:11:08 18   a report that has some information in it that they like and

03:11:13 19   that they want to elicit.

03:11:15 20        We certainly don't characterize those as

03:11:17 21   findings because there was no hearing.  There was no full

03:11:20 22   process here that ended in a formal Senate Report, which is

03:11:27 23   itself part of the problem.

03:11:30 24        But more to the point, there is nothing that

03:11:32 25   this witness said that had anything to do with pricing, or I

03:11:37  1    think even fairly touching on that.

03:12:46  2         And the last suggestion I heard was, well, they

03:12:49  3    wanted to ask a couple of more innocuous sounding questions,

03:12:53  4    and then, depending on the answer, maybe then they can go to

03:12:57  5    the Senate Report.  I don't think that's fair.  They can't

03:12:59  6    open the door for themselves.

03:13:02  7         We stayed away from this for this very reason.

03:13:05  8         THE COURT:  Do you have an objection to them

03:13:07  9    asking, in essence, does Gilead seek to make profit and seek

03:13:13 10    to maximize its profit?

03:13:16 11         MR. SCHERKENBACH:  I don't object to them asking

03:13:17 12    those questions if -- again, presuming that that is not

03:13:23 13    going to lead to them being allowed to open the door or

03:13:26 14    argue the door has been opened for them to get in this

03:13:29 15    evidence.  It's no secret -- every company in this room is

03:13:34 16    seeking to make profit, yes, sure.  Ask the question.

03:13:38 17         I mean, I don't think there is a problem with

03:13:42 18    that.

03:13:42 19         THE COURT:  All right.  What about the argument

03:13:48 20    that he testified to the effect that they wanted to get the

03:13:55 21    drug into as many as they can and yet somebody in the Senate

03:14:02 22    at least had reason to think that maybe that wasn't true and

03:14:08 23    that the pricing wasn't actually set with the main intent or

03:14:12 24    at least the primary -- the sole intent, perhaps, of getting

03:14:17 25    it into as many people's hands as they could but for the

03:14:20  1    profit motive?

03:14:22  2            MR. SCHERKENBACH:  So the context of the

03:14:24  3    questions that Mr. Meyers was asked, and his answers, was to

03:14:28  4    characterize the added value that Gilead brought to these

03:14:33  5    products, I guess for damages purposes.

03:14:36  6            They have a patent, which we are assuming covers

03:14:39  7    the ingredient, the active ingredient in one of the

03:14:44  8    products, one of the two active ingredients in the other

03:14:47  9    product.  And a damages issue is what else did Gilead bring

03:14:50 10    to the table.

03:14:52 11            That was the point of Mr. Meyers' testimony,

03:14:55 12    what we brought to the table was our ability to get the

03:14:59 13    product to market quickly, and to have as many patients

03:15:03 14    treated as possible because that made the enterprise more

03:15:09 15    valuable.  And that's fine, that's fair game.

03:15:11 16            But he didn't say anything about pricing, which

03:15:14 17    is a different issue.  How the price got set and why it got

03:15:18 18    set is a very different inquiry.  He didn't touch that.

03:15:23 19            THE COURT:  And what about the argument that

03:15:27 20    while true as of this morning, Idenix didn't think the door

03:15:32 21    had been opened, they also didn't say I don't think that

03:15:36 22    everything that happened before didn't get them anywhere

03:15:39 23    near meeting their burden of proving and opened the door, so

03:15:45 24    when you take everything we had this morning and everything

03:15:48 25    that happened today, they do get over whatever burden there

03:15:51 1  is?

03:15:51 2          MR. SCHERKENBACH:  The only two things I

03:15:52 3  heard -- the answer is, I guess maybe, but I don't think on

03:15:56 4  these facts it helps.

03:16:00 5          We described Pharmasset truthfully as a small

03:16:03 6  company and showed a photo.  That has nothing to do with

03:16:09 7  this issue.  That's all about personalizing the people who

03:16:13 8  are alleged to have stolen something from Idenix.

03:16:17 9          I don't even see how you can connect that to

03:16:19 10 Gilead.  By the way, that allegedly happened in 2000, these

03:16:24 11 allegations of misappropriation.

03:16:26 12         We are talking about now 13 years later

03:16:29 13 launching the product and how the price got set.

03:16:31 14         I don't see that at all.

03:16:33 15         The only other thing that was mentioned was Dr.

03:16:36 16 Sofia got awards for his development of sofosbuvir.  His

03:16:42 17 development work happened long before the product was ever,

03:16:45 18 you know, launched.  He was presenting the drug in 2009.

03:16:50 19 And then it went through the clinical trial.

03:16:53 20         He didn't talk about, you know --

03:16:56 21         THE COURT:  What about the personal testimony

03:16:57 22 from Dr. Rachakonda, and the picture of Mr. Wilson, I think

03:17:03 23 it was, the very personalized stories of particular patients

03:17:09 24 who either benefited from sofosbuvir or sadly did not?

03:17:13 25         MR. SCHERKENBACH:  Well, what I would say to

03:17:15  1    that, again, that testimony bears on the benefits that the

03:17:20  2    drugs have brought in general to patients over the prior

03:17:23  3    standard of care.  And it's a damages issue.  When --

03:17:28  4    because, of course, Idenix never brought such a drug to

03:17:32  5    market, notwithstanding they had the patent and

03:17:34  6    notwithstanding they developed compounds covered by the

03:17:36  7    patent.

03:17:37  8              The question is, what else did Gilead bring to

03:17:40  9    the party and how much impact and value did that have in the

03:17:43 10    real world.

03:17:45 11              Dr. Rachakonda in particular, you know, she was

03:17:48 12    never a Gilead employee.  She is testifying about her

03:17:52 13    experience in Pharmasset in developing what led to these

03:17:55 14    drugs.  But she wasn't speaking certainly on behalf of

03:17:58 15    Gilead.  And it's not like we put somebody from Gilead on

03:18:01 16    the stand to talk about how, you know, their primary

03:18:04 17    motivation for, you know, the way they priced these drugs

03:18:10 18    was really just to get it into as many patients as possible.

03:18:14 19    There hasn't been anything like that.

03:18:15 20              THE COURT:  Anything else?

03:18:16 21              MR. SCHERKENBACH:  I don't think so, Your Honor.

03:18:18 22              THE COURT:  Any reply from the plaintiffs?

03:18:25 23              MS. SWIZE:  Respectfully, Your Honor, I just

03:18:28 24    don't see the line that Gilead is drawing.  They have

03:18:32 25    portrayed themselves throughout the entire case in a very

03:18:38 1  personal and empathetic way.  The Senate Report we are

03:18:43 2  talking about has 624 footnotes.  The leadership changed.

03:18:47 3  It has all the indicia -- and I can cite two cases, there is

03:18:50 4  a Third Circuit case, *Coleman v. Home Depot*, 306 F.3d 1333,

03:18:57 5  and a District of Columbia Court case, *Barry v. Trustees of*

03:19:03 6  *Ireland Pension Plan*, 467 F.Supp.2d 91, that walked through

03:19:09 7  the kind of indicia that show a reliable -- it is a very

03:19:15 8  thorough, more than a hundred-page report.

03:19:17 9       There are conclusions in the report, Section 7,

03:19:22 10 conclusions and questions, after more than a hundred pages

03:19:25 11 of analysis, that includes at least 50 references to the

03:19:30 12 witness in question, Mr. Meyers.

03:19:33 13      And I will just quote briefly, they say that

03:19:38 14 "During the investigation, Gilead has asserted that its

03:19:41 15 primary concern in developing and marketing Sovaldi was to

03:19:45 16 treat the largest number of HCV patients as possible," very

03:19:51 17 similar to the testimony we just heard.  In reality, the

03:19:53 18 committee found Gilead's marketing, pricing and contracting

03:19:53 19 strategy for pricing the product and maximizing profits was

03:19:57 20 focused on revenue.

03:19:59 21      That is what we are talking about.

03:20:02 22      I don't see how this can just be limited to

03:20:04 23 damages.  Mr. Meyers is not a damages expert.

03:20:07 24      I am also surprised to hear this is the most

03:20:10 25 prejudicial.  Certainly, it is, again, given the

03:20:13  1   thoroughness and the seriousness in which it was taken, I

03:20:15  2   don't see that -- the particular exhibit that was mentioned

03:20:19  3   this morning was the Massachusetts Attorney General letter,

03:20:23  4   which we are not intending to use.

03:20:25  5           We are certainly willing to compromise and

03:20:29  6   follow the Court's order, which is why we offered the

03:20:31  7   questions.  But we do think the report is relevant.

03:20:34  8           THE COURT:  Just to be clear, you are not

03:20:35  9   seeking leave to use anything beyond the Senate Report.

03:20:39 10   Correct?

03:20:41 11           MS. SWIZE:  That's correct.

03:20:42 12           THE COURT:  I am going take a recess.

03:20:45 13           This is plaintiffs' issue.  And we have

03:20:47 14   basically passed to cross-examination.  So all of this

03:20:49 15   argument time is charged to the plaintiffs, as well as

03:20:52 16   whatever time it takes me when I come back to articulate a

03:20:56 17   ruling, which I will do after a break.

03:20:57 18           I am not going to charge anyone for the time it

03:21:00 19   takes me to go back to chambers and think about it, which I

03:21:05 20   will do now.

03:21:06 21           We will be in recess.

03:21:07 22           (Recess taken.)

03:42:14 23           THE COURT:  You can have a seat.

03:42:19 24           So this time, like the argument time, is all

03:42:21 25   charged to the plaintiffs.  It's their issue.

Meyers - direct

03:42:23 1          The issue is the plaintiffs' Idenix's request

03:42:27 2   for leave to examine Mr. Meyers using a Senate Report and to

03:42:32 3   ask him questions about allegations or even findings that

03:42:36 4   prices for sofosbuvir products are set in a way that does

03:42:41 5   not maximize patient access.

03:42:44 6          This request is denied except to the limited

03:42:47 7   extent that I will explain.

03:42:55 8          Here is what I will permit Idenix to do.

03:42:57 9          It can ask if Gilead seeks to make money and

03:43:01 10  maximize profits.  They can ask if Gilead in selling

03:43:07 11  sofosbuvir products seeks to make money and maximize

03:43:10 12  profits.

03:43:10 13         And they can ask if these motivations, that is,

03:43:13 14  to seek to make money and to seek to maximize profits, apply

03:43:17 15  to Gilead's decisions how to set prices of those products

03:43:22 16  containing sofosbuvir, whether they apply to how quickly

03:43:27 17  Gilead sought FDA approval of those products, and whether

03:43:31 18  they applied to how broad of a label Gilead sought for FDA

03:43:39 19  approval with respect to those products.

03:43:41 20         So FDA approval of the label.

03:43:44 21         But no questioning in this area beyond that.

03:43:46 22  And no use of the Senate Report.

03:43:49 23         With respect to the Senate Report, the Rule 403

03:43:52 24  balance clearly disfavors inclusion of this evidence.  The

03:43:57 25  probative value is at best minimal.  And given the questions

that I am going to permit, the incremental probative value

of the Senate Report, I think, is probably nonexistent.

Certainly plaintiffs have not articulated any probative

value of use of the report beyond the probative value of

what they can get from asking the questions that I am

permitting.

On the other hand, on the 403 balance, the risk

of unfair prejudice of saying a Senate committee looked into

this and certain criticisms were leveled by some Senators or

even a whole committee, the risk of confusion of the jury,

the waste of time, all of that, very substantially outweighs

any even arguable probative value of the use of the report.

I don't feel I can say that no matter what the

answers are there will be no followup permitted, but I think

it's extremely unlikely that the plaintiffs, if they ask for

leave to ask more questions in this area beyond what I have

now approved, it's very unlikely that I am going to grant

such leave.  But until we hear the answers, you know, I

can't say there is no way the door will be opened.

But certainly the obligation to seek such leave

continues.  And you have my views on where we are now.

I do want to say, in reaching these decisions, I

have carefully considered all of the evidence, all of the

statements that have been made to this point.  I am not

solely looking at what Mr. Meyers said on direct.  Though,

03:45:52 1    mind you, I listened extremely carefully to Mr. Meyers'

03:45:56 2    direct, and I agree with Mr. Scherkenbach that he stayed, if

03:45:59 3    not a mile away from the areas that the plaintiffs said they

03:46:03 4    were concerned about, at least close to a mile away.

03:46:07 5         I have also looked back just now at what I said

03:46:10 6    in the pretrial conference and what plaintiffs said their

03:46:13 7    concerns were at the time of the pretrial conference.  And I

03:46:18 8    have in my mind sort of thought of, there is essentially a

03:46:23 9    burden on the plaintiffs in order to say the door has been

03:46:25 10   opened and obtain leave.  And in reaching that decision,

03:46:29 11   again, I have considered the cumulative impact of everything

03:46:33 12   that the defendants have offered as evidence.

03:46:37 13        My decision is not based just on what we heard

03:46:40 14   on the direct but on everything.  While it is true that

03:46:45 15   Gilead has presented some evidence that you might broadly

03:46:48 16   describe as emotional, including testimony about at least

03:46:52 17   two specific individuals who were inflicted with HCV, I

03:46:58 18   don't see that as opening the door to what the plaintiffs

03:47:00 19   are trying to do here.

03:47:02 20        Instead, I view that as a fair response to what

03:47:06 21   might equally be broadly characterized as an emotional set

03:47:10 22   of allegations that the plaintiffs have made against the

03:47:13 23   defendants, references to betrayal and stealing and theft.

03:47:21 24        So, again, I have considered all of that, but I

03:47:24 25   don't think it gets the plaintiffs anywhere near meeting the

03:47:26 1  burden of showing that the balance here favors allowing them

03:47:31 2  to do what they want.

03:47:32 3          In the end, it just seems to me that what Idenix

03:47:35 4  is asking now is to allow evidence or examination going to

03:47:40 5  Gilead's corporate motivations.  That's not what you are

03:47:44 6  doing.  You are not really asking to attack Gilead's

03:47:47 7  corporate motivations.

03:47:48 8          What you are really asking to do is to admit

03:47:50 9  evidence and examination on a third-party governmental

03:47:55 10 entity's criticisms of Gilead's practices.  And I just don't

03:47:58 11 see any basis to permit Idenix to do that at this point in

03:48:01 12 the trial.

03:48:02 13         Any questions about that before we bring the

03:48:05 14 jury back?  Ms. Parker.  You may come to the podium.

03:48:08 15         MS. PARKER:  Thank you, Your Honor.

03:48:09 16         Would it be possible to ask the court reporter

03:48:12 17 to read the questions back, just to make sure -- we tried to

03:48:16 18 take notes.

03:48:17 19         THE COURT:  Certainly.  We will do that.  But

03:48:18 20 any other questions?

03:48:21 21         MS. PARKER:  No, Your Honor.

03:48:22 22         THE COURT:  Mr. Scherkenbach, any questions?

03:48:24 23         MR. SCHERKENBACH:  No, Your Honor.

03:48:28 24         MR. KINTON:  Your Honor, I just want to clarify,

03:48:35 25 if we don't get into the motivations for pricing and

03:48:38 1    revenue, are we permitted to examine Mr. Meyers on the

03:48:41 2    documents, for example, that Mr. Carter testified regarding

03:48:45 3    revenue and costs as opposed to setting prices, which I

03:48:51 4    think is fair game because it goes to the margin?

03:48:56 5              THE COURT:  If you want to cross-examine on what

03:48:58 6    actually is the margin for this company, I don't think we

03:49:01 7    have been talking about any of that, so it sounds like

03:49:05 8    that's fair.  At least it seems to have nothing to do with

03:49:08 9    what we are talking about right now.

03:49:10 10             MR. KINTON:  I see it the same way.  But I want

03:49:13 11   to make sure I am not overstepping any bounds.

03:49:15 12             THE COURT:  I don't think you are.  We will see.

03:49:18 13   If you get any objections, then I will rule at that time.

03:49:21 14             MR. KINTON:  Thank you, Your Honor.

03:49:22 15             THE COURT:  Anything else before we read those

03:49:24 16   questions back?

03:49:27 17             Okay, if we could try to read back the questions

03:49:30 18   that I said would be permitted.

03:51:01 19             (Reporter read back requested information.)

03:51:03 20             THE COURT:  Thank you.  Any further questions?

03:51:05 21   Were you able to get that?

03:51:07 22             MS. PARKER:  May we ask for the third one to be

03:51:11 23   read again?

03:51:11 24             THE COURT:  Let's read the third one again, please.

03:51:14 25             MR. KINTON:  Your Honor, the question was

03:51:32 1   motivation.

03:51:33 2          THE COURT:  That last set with respect to

03:51:35 3   motivations.

03:51:01 4          (Reporter read back requested information.)

03:52:37 5          THE COURT:  Thank you very much.

03:52:39 6          Mr. Kinton, did you get it?

03:52:40 7          MR. KINTON:  I think, Your Honor.

03:52:42 8          THE COURT:  Anything else?

03:52:43 9          Let's bring the jury in, please.

03:52:18 10         (Jury returned.)

03:53:12 11         THE COURT:  Welcome back, ladies and gentlemen.

03:53:13 12  I hope you didn't mind the long break.  I had some matters

03:53:17 13  to attend to.  I promise you that the weekend will begin at

03:53:20 14  or around 4:30.  I'm not going to keep you beyond 4:30, and

03:53:24 15  so we're now up to cross.  Mr. Kinton.

03:53:27 16         MR. KINTON:  Thank you, Your Honor.  May it

03:53:28 17  please the Court.

03:53:30 18                      CROSS-EXAMINATION

03:53:30 19  BY MR. KINTON:

03:53:30 20  Q.     Good afternoon, Mr. Meyers.

03:53:31 21  A.     Good afternoon.

03:53:32 22  Q.     We met before at your deposition?

03:53:33 23  A.     Yes.

03:53:34 24         MR. KINTON:  I have some exhibit binders.  May I

03:53:36 25  approach?

03:53:36  1          THE COURT:  Yes.

03:53:45  2              (Binders passed forward.)

03:54:06  3     By MR. KINTON:

03:54:06  4     Q.     Mr. Meyers, you have testified regarding the revenue

03:54:24  5     that Gilead has made from Sovaldi and Harvoni?

03:54:30  6     A.     Yes.

03:54:32  7              MR. KINTON:  Can we have PX-2251 up on the

03:54:35  8     screen?

03:54:35  9     BY MR. KINTON:

03:54:40 10     Q.     And that should be behind Tab No. 1 of your binder.

03:54:52 11     A.     Yes.

03:54:52 12     Q.     Do you have that?

03:54:53 13     A.     Yes.

03:54:53 14     Q.     What is PX-2251?

03:54:57 15     A.     So this is a look-at for both Sovaldi and Harvoni

03:55:06 16     units or bottles sold by quarter on one particular slide.

03:55:13 17     On the next slide, it is by month and then also by revenue.

03:55:16 18     Q.     Okay.  So it shows the number of bottles Sovaldi and

03:55:21 19     Harvoni that Gilead sold and the net revenues that Gilead

03:55:26 20     booked for those sales from when the products launched

03:55:29 21     through August of 2016; is that right?

03:55:31 22     A.     Yes.

03:55:37 23     Q.     And the units are bottles?

03:55:39 24     A.     Correct.

03:55:43 25              MR. KINTON:  Actually, can we use the exhibit

03:55:44 1    rather than the demonstrative, please?

03:55:44 2    BY MR. KINTON:

03:55:51 3    Q.      How many pills are in each bottle?

03:55:53 4    A.      28.

03:55:55 5    Q.      And underneath the units, it says net revenues; is

03:55:59 6    that right?

03:55:59 7    A.      Correct.

03:55:59 8    Q.      And that is in millions of dollars?

03:56:02 9    A.      Yes.

03:56:04 10   Q.      And net revenue is the money Gilead makes for selling

03:56:07 11   those pills, pill bottles minus expenses like cost of

03:56:11 12   distribution and discounts; is that right?

03:56:15 13   A.      Yes.  Mainly after discounts, returns, cost of

03:56:19 14   distribution.

03:56:20 15   Q.      Okay.  So Gilead sold 583,101 bottles of Sovaldi from

03:56:28 16   the December 2013 launch through August of 2016; is that

03:56:34 17   right?

03:56:34 18   A.      Yes.

03:56:35 19   Q.      And the net revenue that is listed there from launch

03:56:39 20   through August of 2016, it says 12,755.  And that is in

03:56:45 21   millions of dollars; right?

03:56:47 22   A.      Correct.

03:56:47 23   Q.      So it's $12,755 -- $12,755 million?

03:56:56 24   A.      Yes.

03:56:57 25   Q.      And the net revenue on Gilead's sales -- I'm sorry.

03:57:07 1    So to figure out the average revenue per bottle, you would

03:57:11 2    divide that number of $12,755 million by the 583,101; is

03:57:21 3    that right?

03:57:21 4    A.    Yes.

03:57:21 5    Q.    Okay.  I have a calculator here.  I can do the math.

03:57:26 6    I have it on the demonstrative.  Which would you prefer?

03:57:29 7    A.    Whatever you would prefer.

03:57:29 8    Q.    Why don't we go throw up the demonstrative.

03:57:33 9          So you make, the revenue is $21,874.43 per

03:57:43 10   bottle; is that right?

03:57:44 11   A.    Cumulatively over that period of time, yes.

03:57:46 12   Q.    From launch and through August 2016?

03:57:50 13   A.    Yes.

03:57:50 14   Q.    That's the revenue per bottle?

03:57:51 15   A.    It was higher in the early months, and the discounts

03:57:55 16   have gotten greater and greater and the payer mixes have

03:57:58 17   shifted to more Medicaid and deeply discounted it.  It would

03:58:01 18   be lower now, but that is the average over the period of time.

03:58:04 19   Q.    Average over the period of time.  So the net revenue

03:58:07 20   on Gilead's sales of Harvoni from its October 2014 launch

03:58:12 21   through August 2016, the chart says 15,741.  Is that right?

03:58:17 22   A.    Yes.

03:58:17 23   Q.    And like Sovaldi, that numbers is in millions as

03:58:21 24   well; right?

03:58:22 25   A.    It is.

03:58:22 1   Q.    So that is $15,741 million; right?

03:58:27 2   A.    Correct.

03:58:27 3   Q.    And to figure out the revenue per bottle, you would

03:58:32 4   divide it by the 1,036,908 bottles?

03:58:41 5   A.    Yes.

03:58:41 6   Q.    So the average revenue per bottle -- so doing the

03:58:44 7   math, similar to what we did before -- we can go to the next

03:58:49 8   demonstrative -- you would divide the $15,741 million by the

03:58:55 9   1,036,908 bottles; right?

03:58:59 10   A.    Yes.

03:58:59 11   Q.    That would give you the $15,180.71 per bottle; right?

03:59:07 12   A.    Correct.

03:59:07 13   Q.    So how much does a bottle of Sovaldi cost to make?

03:59:12 14   A.    As a patient?

03:59:13 15   Q.    How much does a bottle of Sovaldi cost to make?

03:59:17 16   A.    Oh, to make.  The bottle itself, I mean it was

03:59:22 17   98.7 percent, so it is very -- I don't have the exact number

03:59:26 18   on me, but the cost for the bottle and the pills are a

03:59:30 19   relatively small portion of what we ultimately have to pay

03:59:35 20   and have to spend to get a product to market.

03:59:40 21   Q.    Do you recall having your deposition taken in this

03:59:56 22   case?

03:59:56 23   A.    I do.

03:59:58 24   Q.    Actually, let me just ask this question.  Does $125 a

04:00:02 25   bottle sound right for the cost?

04:00:04 1   A.       I think it does for Sovaldi.

04:00:05 2   Q.       For Sovaldi?

04:00:06 3   A.       Yes.

04:00:06 4   Q.       And for the Harvoni bottles, how much does it cost

04:00:10 5   Gilead to make?

04:00:11 6   A.       It might have been a little over $150.

04:00:14 7   Q.       Does $156 sound about right?  $156?

04:00:17 8   A.       Yes.

04:00:17 9   Q.       So Gilead's gross profit margin on its products is

04:00:25 10  about 99 percent, isn't it?

04:00:28 11  A.       No.  Our gross margin is, not gross profit margin.

04:00:32 12  That is a very big distinction.

04:00:34 13  Q.       So the gross margin is 99 percent?

04:00:40 14  A.       Yes.

04:00:40 15  Q.       So you talked about how much Gilead spent in its

04:00:46 16  investment to acquire Pharmasset?

04:00:48 17  A.       I did, yes.

04:00:49 18  Q.       And you talked also about how much they spent in

04:00:52 19  additional research and development?

04:00:54 20  A.       Yes.

04:00:54 21  Q.       And that was $15 billion?

04:00:57 22  A.       $11 billion for the acquisition, and $4 billion

04:01:01 23  and counting for the expenses related to development and

04:01:08 24  commercialization, patient assistance programs, and so

04:01:11 25  forth.

04:01:12  1    Q.    So that represents, the $15 billion represents the

04:01:18  2    total amount that Gilead invested to bring Sovaldi and

04:01:22  3    Harvoni to market; is that right?

04:01:24  4    A.    Up until that time, yes.

04:01:25  5    Q.    Okay.  But that is not just the U.S. market, is it?

04:01:30  6    A.    A large percentage of it is.  I don't have the exact

04:01:37  7    breakdown of the Ex-U.S. versus U.S., but, again, most of

04:01:41  8    the trials were conducted in the U.S.; and, you know, the

04:01:47  9    larger sales teams, the bigger markets.  So most, the

04:01:50 10    overwhelming percentage of those expenses would have been

04:01:53 11    U.S.

04:01:53 12    Q.    But those expenses, the $15 billion allowed Gilead

04:01:59 13    to market Sovaldi and Harvoni worldwide, not just the U.S.;

04:02:04 14    right?

04:02:04 15    A.    The $11 billion acquisition, yes.

04:02:06 16    Q.    You talked today about the most common genotype in

04:02:14 17    the U.S. is genotype 1?

04:02:16 18    A.    Correct.

04:02:16 19    Q.    And you said in the U.S., 20 to 25 percent of the

04:02:19 20    patients are genotype 2/3; is that right?

04:02:23 21    A.    Yes.

04:02:23 22    Q.    Do you know what percentage of the patients are

04:02:26 23    genotype 2/3 in the rest of the world?

04:02:28 24    A.    It depends on the country.  In some countries, in

04:02:31 25    Europe it is identical to the U.S.  In other countries, you

04:02:35  1    have a higher skew of genotype 2; in some, you have genotype

04:02:39  2    3.  It's on average.  If you did it in aggregate, it would

04:02:43  3    be more of an equal balance than it would be in the U.S.

04:02:46  4    where it's heavily weighted toward genotype 1.

04:02:49  5    Q.      So what is the most common genotype worldwide?

04:02:53  6    A.      Genotype 1.

04:02:55  7    Q.      I'd like you to look at PX-2155 behind Tab 2 in your

04:03:05  8    binder.

04:03:12  9    A.      I'm sorry.  Say that again.  PX?

04:03:14 10    Q.      2155, behind Tab 2 of your binder.

04:03:18 11    A.      Okay.

04:03:18 12    Q.      Do you recognize that document?

04:03:23 13    A.      Yes, it appears to be a 10-K.

04:03:26 14    Q.      So that is Gilead's 10-K filing with the Securities

04:03:30 15    and Exchange Commission for the fiscal year ending December

04:03:32 16    2015; is that right?

04:03:37 17    A.      I don't see the date, but I'm not sure.  Can you

04:03:42 18    point to the date?

04:03:43 19    Q.      Sure.  If you would look, right below where it says

04:03:46 20    form 10-K, it says annual report pursuant to Section ...?

04:03:49 21    A.      Yes.

04:03:49 22    Q.      Then the next line says:  For the fiscal year ending

04:03:52 23    December 31, 2015.

04:03:54 24    A.      Yes, I see that.

04:03:55 25            MR. KINTON:  I move for the admission of

04:03:56 1    Plaintiffs' Exhibit 2155.

04:03:59 2              MR. SCHERKENBACH:  No objection.

04:04:00 3              THE COURT:  It's admitted.

04:04:00 4              (PX-2155 was admitted into evidence.)

04:04:00 5    BY MR. KINTON:

04:04:03 6    Q.    Can you please turn to page 101 of Plaintiffs'

04:04:06 7    Exhibit 2155?

04:04:20 8              I'm sorry.  It's page 100.  It's 101 in the

04:04:28 9    pedia.

04:04:28 10   A.    Okay.

04:04:29 11   Q.    Do you see there is a heading that says Product Sales

04:04:33 12   on the top left?

04:04:34 13   A.    I think I'm on the wrong --

04:04:36 14   Q.    So the bottom right number is PX-2155.0102?

04:04:42 15   A.    It is page 101 actually.

04:04:45 16   Q.    Whoops.  Sorry.

04:04:45 17   A.    Got it.

04:04:46 18   Q.    If you look at that chart, the first two rows show

04:04:53 19   the sales of Sovaldi and Harvoni for 2013, 2014, and 2015;

04:05:00 20   is that right?

04:05:00 21   A.    Yes.

04:05:01 22   Q.    And that's the worldwide sales for Sovaldi and

04:05:13 23   Harvoni from launch through 2015; is that correct?  You said

04:05:19 24   it includes 2013?

04:05:21 25   A.    Yes.  I'm just trying to confirm it is worldwide.

04:05:24 1  I'm assuming it is because it looks larger than the U.S.

04:05:27 2  alone, so yes.

04:05:28 3  Q.      I'd like you to look at Plaintiffs' Exhibit 3003.

04:05:34 4  Oh, and those numbers are also in millions?

04:05:36 5  A.      Yes.

04:05:36 6  Q.      I'd like you to look at Plaintiffs' Exhibit 3003

04:05:40 7  behind Tab 3 in your binder.

04:05:46 8          Do you recognize this as Gilead's 10-Q for the

04:05:49 9  quarterly period that ended September of 2016?

04:05:53 10 A.      I do.

04:05:55 11         MR. KINTON:  I move for the admission of

04:05:57 12 Plaintiffs' Exhibit 3003.

04:05:59 13         MR. SCHERKENBACH:  No objection.

04:05:59 14         THE COURT:  It's admitted.

04:05:59 15         (PX-3003 was admitted into evidence.)

04:05:59 16 BY MR. KINTON:

04:06:02 17 Q.      Can you please turn to page 25 on the internal

04:06:05 18 document number?

04:06:07 19 A.      Yes.

04:06:19 20 Q.      And there is a heading, Segment Information; is that

04:06:22 21 right?

04:06:22 22 A.      Yes.

04:06:23 23 Q.      And below that is antiviral products.  Do you see

04:06:26 24 that?

04:06:26 25 A.      I do.

04:06:27 1  Q.      And there is two rows.  The first row is Harvoni and

04:06:30 2  the second row is Sovaldi; is that right?

04:06:33 3  A.      I think Truvada is in between.

04:06:35 4  Q.      I'm sorry.  The third row?

04:06:36 5  A.      Yes.

04:06:37 6  Q.      I apologize.  So if you look at the third column from

04:06:43 7  the left, it's nine months ended September 30, 2016.  That

04:06:47 8  gives you the sales of Harvoni and the sales of Sovaldi for

04:06:55 9  2016 through September.  January 1st, 2016 through September

04:06:59 10 30th of 2016; is that right?

04:07:02 11 A.      Yes.  Can someone just adjust?  Oh, it's the yellow.

04:07:06 12 Okay.

04:07:07 13         So you are saying the 7,441, and the 3,460?

04:07:12 14 Q.      Yes.

04:07:13 15 A.      Yes.

04:07:13 16 Q.      And that is worldwide sales?

04:07:16 17 A.      Yes.

04:07:16 18 Q.      So using the numbers in the two exhibits that we just

04:07:21 19 talked about, 3003 and 2251, I prepared a demonstrative that

04:07:29 20 summarizes that data.

04:07:30 21         Can we have that demonstrative up on the screen?

04:07:35 22         So is this an accurate reputation of the sales

04:07:39 23 of Sovaldi and Harvoni worldwide from launch through

04:07:43 24 September 30th of 2016?

04:07:46 25 A.      It looks accurate.  I assume if it's from our 10-K

04:07:55 1   it's accurate, so ...

04:07:56 2   Q.     So that 42,590.  Again, that is in millions like the

04:08:04 3   10-K?

04:08:04 4   A.     Yes.

04:08:05 5   Q.     So that is 42,590 million.  Right?

04:08:10 6   A.     Yes.

04:08:11 7   Q.     And you were here when Mr. Carter showed the amount

04:08:13 8   of U.S. revenue at issue in this case; right?

04:08:18 9   A.     Yes.

04:08:18 10  Q.     And he put up a pie chart showing the revenue and the

04:08:22 11  royalty percentage that Idenix is asking for in this case?

04:08:25 12  A.     Yes.

04:08:26 13  Q.     And that 10 percent royalty that Idenix is asking for

04:08:29 14  is only on the U.S. revenue.  Do you understand that?

04:08:34 15  A.     That's my understanding, yes.

04:08:36 16  Q.     So you would agree that Gilead seeks to make money

04:08:54 17  and maximize its profits; right?

04:08:58 18  A.     As a for profit company, yes.

04:09:00 19  Q.     And you would agree that Gilead, in selling

04:09:03 20  sofosbuvir containing products such as Sovaldi and Harvoni,

04:09:07 21  seeks to maximize money and make profits; right?

04:09:11 22  A.     Yes.

04:10:17 23  Q.     And the motivation that Gilead, in setting the prices

04:10:21 24  for those products, applied to -- those motivations applied

04:10:25 25  to Gilead's decision in setting the prices for those

04:10:28 1    products.  Is that right?

04:10:32 2    A.      That's one of many factors.  But it plays a role,

04:10:35 3    yes.

04:10:35 4    Q.      Do you agree that Gilead is legally responsible for

04:10:48 5    all of the actions of Pharmasset?

04:10:51 6              MR. SCHERKENBACH:  Objection, Your Honor.  Calls

04:10:52 7    for a legal conclusion.

04:10:55 8              MR. KINTON:  I am asking his understanding, as

04:10:57 9    the representative of Gilead.

04:10:59 10              MR. SCHERKENBACH:  He is not Gilead's

04:11:02 11   representative on legal questions and legal answers.

04:11:07 12              THE COURT:  I will overrule the objection.

04:11:09 13              You can answer.

04:11:13 14              THE WITNESS:  You know, I know from the time of

04:11:14 15   the deposition and even as a corporate witness I was

04:11:18 16   designated to know and speak to certain topics but not to

04:11:22 17   all topics.  That is a topic I have no knowledge on.

04:11:27 18              MR. KINTON:  Thank you, Mr. Meyers.

04:11:29 19              I have no further questions.

04:11:30 20              THE COURT:  Redirect.

04:11:31 21              MR. SCHERKENBACH:  No redirect, Your Honor.

04:11:32 22              THE COURT:  You can step down, Mr. Meyers.

04:11:34 23   Thank you.

04:11:34 24              (Witness excused.)

04:11:45 25              THE COURT:  You may call your next witness.

04:11:47  1          MR. SCHERKENBACH:  Thank you.

04:11:50  2          We are going to try to finish up just a few more

04:11:54  3   short deposition reads.  It should take us to just about the

04:11:58  4   end of the day.

04:12:00  5          The next deposition is of a Dr. Gilles Gosselin

04:12:06  6   from his November 3, 2015 deposition.  We heard his name

04:12:11  7   before.  He was in charge of medicinal chemistry efforts at

04:12:14  8   the Montpelier location of Idenix.  This is only about two

04:12:19  9   minutes long.  Mr. Countryman again will read the questions

04:12:22 10   and Mr. Coutinho will play the witness.

04:12:35 11          MR. COUNTRYMAN:  We have one exhibit with this

04:12:36 12   designation, Your Honor.  DX-338 we move into evidence.

04:12:40 13          THE COURT:  Any, objection?

04:12:44 14          MR. KINTON:  No, Your Honor.

04:12:46 15          THE COURT:  Okay.  Admitted.

04:12:48 16          (No. DX-338 received in evidence.)

04:12:51 17          (Deposition read as follows:)

04:12:54 18          "Question:  Dr. Gosselin, you mentioned a few

04:12:57 19   moments ago that in 1998 you became affiliated with Idenix.

04:13:02 20   Can you describe how it is that you became affiliated with

04:13:05 21   them in the first instance?

04:13:07 22          "Answer:  It started before the creation of

04:13:09 23   Idenix.

04:13:10 24          "Question:  Which individuals were you involved

04:13:12 25   with?

04:13:14  1      "Answer:  Jean-Pierre Sommadossi, John-Louis

04:13:19  2  Imbach, who was the head of my laboratory at that time,

04:13:22  3  Paolo La Colla for biology, and myself.

04:13:25  4      "Question:  What was your title at Idenix?

04:13:27  5      "Answer:  Director of the Co-operative lab.

04:13:29  6      "Question:  Okay.  And, Dr. Gosselin, I'm

04:13:33  7  correct that you don't know whether or not a nucleoside will

04:13:38  8  have activity against HCV until you make it and test it; is

04:13:43  9  that correct?

04:13:43 10      "Answer:  Yes.

04:13:49 11      "Question:  Dr. Gosselin, the court reporter has

04:13:52 12  handed you what's been marked as DX-338, a document bearing

04:13:57 13  Bates label IDXDE00232887 through 948.  Do you have that?

04:14:05 14      "Answer:  Yes.

04:14:06 15      "Question:  Have you seen this document before?

04:14:09 16      "Answer:  I had the original, yes.

04:14:11 17      "Question:  Okay.  So this is a copy of your

04:14:13 18  original document?

04:14:14 19      "Answer:  I think, yes.  I think so.

04:14:17 20      "Question:  So DX-338 is a smaller set, if you

04:14:22 21  will, of a larger document, and DX-338 is just the

04:14:27 22  biological activity of 2'-methyl up compounds that Idenix

04:14:32 23  made and tested; is that correct?

04:14:35 24      "Answer:  Yes and no.  Yes and no but only the

04:14:39 25  results, the biological results that I had in my

04:14:42 1    possession."

04:14:49 2            MR. COUNTRYMAN:  That completes the designations.

04:14:52 3            MR. SCHERKENBACH:  We will have the same -- the

04:14:55 4    next two depositions pertain to a slightly different topic,

04:14:58 5    which is Merck's prior work on 2'-methyl nucleosides.  So

04:15:02 6    the first witness on that issue is Dr. Dan Cook, who was a

04:15:10 7    chemist at Isis, a company that collaborated with Merck in

04:15:13 8    the late 90s and early 2000.  His testimony is about four

04:15:18 9    minutes long.

04:15:20 10           THE COURT:  Thank you.

04:15:21 11           MR. COUNTRYMAN:  We have just two exhibits with

04:15:26 12   Mr. Cook:  DX-2579 and DX-2802.  We move admission.

04:15:33 13           THE COURT:  Any objection?

04:15:36 14           MR. KINTON:  No, Your Honor.

04:15:36 15           THE COURT:  Those are admitted.

04:15:39 16           (Exhibit Nos. DX-2579 and DX-2802 received in

04:15:39 17   evidence.)

04:15:40 18           (Deposition read as follows:)

04:15:42 19           "Question:  Now, you mentioned that there was a

04:15:45 20   collaboration between Isis and Merck?

04:15:48 21           "Answer:  Yes.

04:15:48 22           "Question:  Were you involved in that

04:15:49 23   collaboration?

04:15:50 24           "Answer:  Absolutely.

04:15:51 25           "Question:  Did you get that collaboration

04:15:52 1  started?

04:15:53 2          "Answer:  Yes.  With key people from Merck.

04:15:55 3          "Question:  You also mentioned that you had a

04:15:57 4  compound library or just a collection of compounds with just

04:16:01 5  2' modifications in general?

04:16:04 6          "Answer:  Yes.

04:16:05 7          "Question:  So these 2' modifications are

04:16:08 8  modifying the hydroxyl in the down position to something

04:16:12 9  else?

04:16:13 10         "Answer:  It's replacing the hydroxyl in the

04:16:15 11 down position.

04:16:16 12         "Question:  And leaving the hydrogen in the 2'

04:16:19 13 up position?

04:16:20 14         "Answer:  For -- yeah, for the most part, yeah.

04:16:22 15         "Question:  What do you mean 'For the most

04:16:27 16 part'?

04:16:28 17         "Answer:  Well, we were initially looking at --

04:16:30 18 earlier in the game we were looking at just the 2'

04:16:33 19 modifications.  Later on, as I'm sure you'll get to, we

04:16:37 20 began to look at -- we were the first, actually, as far as

04:16:40 21 I'm concerned, to discover the 2'-C-methyls.

04:16:44 22         "Question:  What do you mean 2'-C-methyls?

04:16:48 23         "Answer:  Meaning the nucleosides with the

04:16:50 24 methyl group up on the 2' position.

04:16:59 25         "Question:  -- your collaboration with Merck was

04:17:02 1    intended to develop a nucleotide NS5B inhibitor?

04:17:07 2            "Answer:  Yes.

04:17:07 3            "Question:  Is kind of a blank slate starting

04:17:10 4    with --

04:17:12 5            "Answer:  Absolutely.

04:17:12 6            "Question:  -- NS5B inhibitors?

04:17:16 7            "Answer:  Yes, absolutely.  And we were the

04:17:18 8    first major collaboration.  The first collaboration,

04:17:20 9    probably, period, that had decided to tackle Hepatitis C.

04:17:24 10            "Question:  So is it your understanding that

04:17:26 11    Merck was also kind of starting from a blank slate in terms

04:17:30 12    of getting the assays up and running for your calculation?

04:17:34 13            "Answer:  Yeah, I think so.  But I think they

04:17:36 14    were really good.  They knew how to -- they had good

04:17:39 15    biologists.  They knew how to put this together, so.

04:17:44 16            "Question:  So this is a letter with enclosure

04:17:47 17    dated April 20th, 1999 that you sent to Dr. Kuo?

04:17:55 18            "Answer:  Yeah.  Yeah, I think it's a letter,

04:17:58 19    right.

04:17:58 20            "Question:  So we're just shy of a year into the

04:18:01 21    collaboration at this point?

04:18:03 22            "Answer:  Yes.

04:18:07 23            "Question:  So there's at this point 325

04:18:10 24    nucleoside triphosphates entered into the Isis database?

04:18:14 25            "Answer:  Yes.

04:18:14  1          "Question:  You've got 160 triphosphates that

04:18:18  2   you have data being screened on by Merck?

04:18:21  3          "Answer:  Yeah.

04:18:21  4          "Question:  About what amount of effort did it

04:18:24  5   take to create all those compounds?

04:18:27  6          "Answer:  Well, I don't know precisely.  But if

04:18:30  7   you look at -- if you look at how many -- we had about nine

04:18:36  8   or ten full-time equivalents, you know.  But you see here,

04:18:40  9   there's a lot of full-time equivalents.  There's a lot of --

04:18:44 10   so there's people working on the project right here.  We'd

04:18:48 11   have to add those up.

04:18:49 12          "Question:  This is another e-mail from Lawrence

04:18:52 13   Kuo to yourself.  This one is dated June 3rd, 1999; right?

04:19:00 14          "Answer:  Yes.

04:19:01 15          "Question:  In this paragraph Dr. Kuo is

04:19:03 16   referring to the potential for 'A lot of synthetic effort

04:19:08 17   required for even minor modifications of compounds you have

04:19:11 18   already made.'

04:19:14 19          "Do you see that?

04:19:15 20          "Answer:  Yes."

04:19:20 21          MR. COUNTRYMAN:  That ends the designations for

04:19:21 22   that one.

04:19:29 23          MR. SCHERKENBACH:  The last one is from Dr.

04:19:37 24   Joseph Duffy.  His deposition is dated April 15, 2016.  He

04:19:42 25   is the executive director of discovery chemistry at Merck.

04:19:47  1    He was testifying as a corporate representative of Merck

04:19:50  2    regarding Merck's conception.

04:19:51  3              Mr. Countryman again will be doing the

04:20:01  4    questions.  Ms. Shmuel will play the role of the witness.

04:20:07  5    This is eight minutes.

04:20:08  6              THE COURT:  Thank you.

04:20:13  7              MR. COUNTRYMAN:  I have four exhibits for this

04:20:15  8    witness, Your Honor:  DX-610, DX-611, DX-612, DX-439.

04:20:22  9              We move all of those into evidence.

04:20:25 10              MR. KINTON:  No objection, Your Honor.

04:20:26 11              THE COURT:  Those are all admitted.

04:20:26 12              (Above-referenced exhibits received in evidence.)

04:20:29 13              (Deposition read as follows:)

04:20:32 14              "Question:  What is your complete understanding

04:20:34 15    of the collaboration between Merck and Isis?

04:20:37 16              "Answer:  My understanding is that the

04:20:39 17    collaboration was to identify compounds with activity

04:20:43 18    against HCV.

04:20:44 19              "Question:  Is it correct that you had no

04:20:47 20    involvement with the Merck/Isis collaboration?

04:20:51 21              "Answer:  That is correct.

04:20:52 22              "Question:  You mentioned that in September

04:20:54 23    1998, that there were results from a BVDV assay; is that

04:20:59 24    correct?

04:21:00 25              "Answer:  That is correct.

04:21:00 1           "Question:  So the L-765 compound is a

04:21:04 2  nucleoside with a methyl up, hydroxy down at the 2' position

04:21:15 3  and an OH down at the 3' position, right?

04:21:19 4           "Answer:  That's a fair characterization of

04:21:22 5  L-765.

04:21:23 6           "Question:  Okay.  By September 1998, Merck had

04:21:27 7  results from a BVDV assay on the L-765 compound, correct?

04:21:33 8           "Answer:  Yes, that is correct.

04:21:35 9           "Dr. Duffy, Exhibit 2, that contains information

04:21:39 10  obtained from a Merck database, right?

04:21:42 11           "Answer:  That is correct.

04:21:43 12           "Question:  And is that database kept in the

04:21:45 13  ordinary course of business at Merck?

04:21:47 14           "Answer:  Yes, it is.

04:21:48 15           "Question:  And does Merck rely on that database

04:21:51 16  to be accurate in Merck's ordinary course of business?

04:21:54 17           "Answer:  We do rely on that database to be

04:21:56 18  accurate.

04:21:57 19           "Question:  Okay.  For Exhibit 1, Exhibit 1 is

04:22:00 20  also a -- also contains information obtained from a Merck

04:22:03 21  database, correct?

04:22:05 22           "Answer:  That is correct.

04:22:12 23           "Question:  Is the MCIDB database kept in the

04:22:18 24  ordinary course of business?

04:22:21 25           "Answer:  Yes, it is.

04:22:22 1       "Question:  And does Merck rely on the accuracy

04:22:23 2  of the MCIDB database in its daily business?

04:22:27 3       "Answer:  Yes, it does.

04:22:29 4       "Question:  You've been handed DX-612.  DX-612

04:22:34 5  reflects the assays that are contained in DX-611?

04:22:38 6       "Answer:  Yes, they do.

04:22:39 7       "Question:  What were Merck's conclusions on the

04:22:42 8  results from the BVDV assay on compound L-00604765 in 1998?

04:22:52 9       "Answer:  I can't speak to the conclusions of

04:22:55 10  Merck; I can speak to the data and subsequent followup on

04:22:59 11  that work.  I don't know what was in the scientists' minds

04:23:02 12  in 1998.

04:23:05 13       "Question:  Tell me about the data and

04:23:06 14  subsequent followup work.

04:23:07 15       "Answer:  The data in 1998 from the Isis report

04:23:12 16  I referred to previously included the term 'Drop question

04:23:17 17  mark' next to L-765, the compound we're referring to as

04:23:21 18  L-765.  Following 1998, there was no further followup on the

04:23:24 19  compound for the HCV project until it was tested in the

04:23:28 20  replicon assay in David Olsen's laboratory in September to

04:23:32 21  October time frame of 2000:

04:23:38 22       "Question:  Okay, so is 2'-C-methyl adenosine

04:23:42 23  the compound that Merck generated the BVDV test results, at

04:23:46 24  least as of September 1998?

04:23:48 25       "Answer:  I'll use the more specific compound

04:23:51 1    identifier, L-604765, because 2'-C-methyl adenosine could be

04:23:58 2    vague.  In 1998, the BVDV assay data was generated on this

04:24:03 3    compound, L-604765.

04:24:07 4         "Question:  Between 1998 and 2000, was Merck and

04:24:13 5    Idenix continuing with their collaboration to investigate

04:24:16 6    nucleosides for the potential treatment of HCV?"

04:24:20 7         MR. GRIFFITH:  Your Honor, I think that question

04:24:22 8    needs to be re-read.  He misspoke.

04:24:25 9         MR. COUNTRYMAN:  I apologize.

04:24:30 10        "Question:  Between 1998 and 2000, was Merck and

04:24:33 11   Isis continuing with their collaboration to investigate

04:24:38 12   nucleosides for the potential treatment of HCV?

04:24:41 13        "Answer:  I believe that is correct.  I cannot

04:24:43 14   independently verify the dates of the Isis collaboration.

04:24:46 15        "Question:  Actually, let me -- the results from

04:24:48 16   the BVDV assay for L-765, what did Dr. Olsen tell you about

04:24:55 17   those results?

04:24:56 18        "Answer:  Dr. Olsen told me that those results

04:24:59 19   were presented in summary form.  And from those results,

04:25:04 20   L-765 was not distinguished as a compound of interest in the

04:25:08 21   BVDV assay screen in 1998.

04:25:11 22        "Question:  Did Dr. Olsen indicate whether or

04:25:14 23   not he thought the L-765 compound at that point in time

04:25:19 24   could be useful against HCV?

04:25:20 25        "Answer:  Dr. Olsen indicated that he had no

04:25:27 1    thoughts about the compound at the time because it did not

04:25:30 2    distinguish itself as a compound of interest, from his view

04:25:32 3    of the data.

04:25:33 4         "Question:  Was the L-765 compound determined to

04:25:37 5    be worthy of active followup following its results in the

04:25:40 6    BVDV assay?

04:25:42 7         "Answer:  I don't know how the result was

04:25:45 8    judged.  I do know there was no active followup following

04:25:48 9    the result in the BVDV assay of 1998.

04:25:52 10        "Question:  As of April 1999, before doing the

04:25:55 11   screening of 214,000 compounds, had Merck determined which

04:26:02 12   nucleosides might be active against HCV?

04:26:05 13        "Answer:  Prior to 1999, Merck had tested

04:26:08 14   compounds in the BVDV assay pursuant to identifying

04:26:12 15   compounds that would be active against HCV.  The results of

04:26:16 16   that BVDV testing would inform possibility of activity

04:26:19 17   against HCV.

04:26:21 18        "Question:  And you've been handed DX-439,

04:26:28 19   bearing production numbers Merck 0030673 through 0031135,

04:26:36 20   which appears to be a lab notebook to a Mr. Wolanski.  Do

04:26:40 21   you see that, Dr. Duffy?

04:26:41 22        "Answer:  Yes, I do.

04:26:42 23        "Question:  And is this one of the documents

04:26:44 24   that you looked at in preparation for the 30(b)(6)

04:26:46 25   deposition?

04:26:47 1          "Answer:  Yes, it is.

04:25:43 2          "Question:  Do you see, there is a paragraph at

04:25:50 3   the bottom, starts with, 'On September 11, 1998'?

04:25:54 4          "Do you see that nomenclature?

04:25:56 5          "Answer:  Yes, I do.

04:25:57 6          "Question:  It goes on to say, 'B. Wolanski

04:26:00 7   concluded that five compounds provided 100 percent

04:26:03 8   protection at 4 micromolar.

04:26:07 9          "Do you see that?

04:26:09 10         "Answer:  Yes, I do.

04:26:09 11         "Question:  And it lists the five compounds, one

04:26:12 12  of which is the 604765 compound, correct?

04:26:16 13         "Answer:  Yes, that is correct.

04:26:17 14         "Question:  And that's a compound with the

04:26:21 15  2'-methyl up hydroxy down group?

04:26:26 16         "Answer:  Yes, that's the compound we've been

04:26:28 17  referring to.

04:26:29 18         "Question:  Just to make sure, and that testing

04:26:31 19  was conducted in the BVDV assay, correct?

04:26:35 20         "Answer:  Yes, that is correct.

04:26:36 21         "Question:  Did he tell you anything about

04:26:39 22  whether, had he been aware that it was -- that L-765 was in

04:26:45 23  fact a nucleoside, if that would have changed his interest

04:26:49 24  in L-765 as a compound of interest for the treatment of HCV?

04:26:54 25         "Answer:  Yes, he did.

"Question:  Okay.  Can you tell me what he talked to you about in that regard?

"Answer:  Yes.  Dr. Olsen said specifically, if he had recognized at the time that L-765 was a nucleoside, he would have been very interested in following up on the compound for the potential treatment of HCV.

MR. COUNTRYMAN:  That concludes the designations.

THE COURT:  Thank you very much.  I assume what would be next would be more than two minutes.

MR. SCHERKENBACH:  We can talk fast but not that fast.  Yes, our next witness is a live witness.  One of our expert witnesses actually.

THE COURT:  All right.  Well then, ladies and gentlemen, just a few remarks and then I will let you go for the weekend.

First off, I want you to know we are on track. You may have heard me say, in the preliminary instructions, this is a timed trial, which means I have given each side a certain amount of time to present their cases and understanding that allows me to be confident that we are on track.  I know at times it can seem like we're maybe not on track but we are.  So please understand that.

Next week, Monday, we expect will be a full day. So we need you back here about 8:45 so we can order lunch and get started at 9:00 and we'll go at 4:30 on Monday.

04:28:19  1          You may recall Tuesday and Wednesday, while

04:28:22  2    we'll start at the same time so we'll start at 9:00 a.m.,

04:28:25  3    we'll let you go a little bit early.  Both of those days,

04:28:28  4    you will be done here by 3:15 on both Tuesday and Wednesday

04:28:33  5    of next week.

04:28:34  6          So while you are away from us, no talking about

04:28:38  7    the case to anyone, no research or looking at anything about

04:28:41  8    the case.  It is the weekend the next two days so don't come

04:28:47  9    here tomorrow or Sunday, but we will see you on Monday.  I

04:28:51 10    hope you all have a nice weekend.  Thank you very much.

04:28:54 11          (Jury left courtroom.)

04:29:18 12          THE COURT:  All right.  Can I get an update on

04:29:22 13    where we are, what we anticipate happening on Monday?

04:29:24 14          MR. SCHERKENBACH:  Yes, Your Honor.  I believe

04:29:28 15    first thing Monday, we will be calling Dr. Olsen live as an

04:29:33 16    adverse witness.  I know I said expert.  I was thinking we

04:29:37 17    were still going today.  Dr. Olsen is a Merck witness on

04:29:41 18    their 2-methyl-OH work.

04:29:44 19          And then we would be presenting our two

04:29:48 20    technical experts, Dr. Seeger, Dr. Secrist, and then

04:29:56 21    probably our last witness is Dr. Putnam, our damages expert.

04:30:01 22          The only footnote there is we had put on the

04:30:04 23    record an agreement.  I don't think it will be an issue

04:30:08 24    timing wise, but they want to call Mr. Renaud, and we did

04:30:12 25    agree to accommodate that so that he could be done before

04:30:16 1    noon on Tuesday.

04:30:18 2           But I actually think that is not going to be an

04:30:20 3    issue.  I think we will be able to finish our case, and then

04:30:23 4    they can start with Mr. Renaud.

04:30:25 5           THE COURT:  And still be done with him before

04:30:27 6    noon Tuesday is your current expectation?

04:30:30 7           MR. SCHERKENBACH:  That is my current

04:30:31 8    expectation.  I obviously don't control how long their cross

04:30:34 9    exams are, but I would think that is reasonable.

04:30:36 10           THE COURT:  Any update from the plaintiffs, if

04:30:38 11    you have anything to add to that?

04:30:40 12           MS. PARKER:  No, Your Honor.  We'll be ready to

04:30:45 13    go as soon as they rest.

04:30:46 14           THE COURT:  Right.  Okay.  And any preliminary

04:30:50 15    nonbinding sense as to how much evidence you may have?  Just

04:30:55 16    I'm trying to think about the rest of Tuesday and Wednesday

04:30:58 17    and as you know, I'll be starting another trial in the

04:31:01 18    afternoon on Tuesday.

04:31:04 19           MS. PARKER:  I think this is just from me.

04:31:06 20           THE COURT:  And I'm not holding you to this.

04:31:09 21           MS. PARKER:  I think we'll probably be ready for

04:31:11 22    closings on Thursday.

04:31:12 23           THE COURT:  Probably Thursday.  Okay.  Thank

04:31:14 24    you.

04:31:16 25           So we have your jury instructions submission.

04:31:20 1   We'll be looking at those more carefully over the coming

04:31:24 2   days.  I tentatively plan to how many you to have argument

04:31:27 3   on those if you wish probably on Monday and probably at the

04:31:31 4   end of the time with the jury on Monday.  I can't fully

04:31:35 5   commit to that but that is my current expectation.

04:31:38 6               Any other issues?  Anything from plaintiffs?

04:31:43 7               MS. PARKER:  No, Your Honor.  Thank you I hope

04:31:45 8   everybody has a good weekend.

04:31:46 9               THE COURT:  I hope so, too.  Thank you.  Any

04:31:48 10  issues from defendant.

04:31:49 11              MR. SCHERKENBACH:  Just to clarify the argument

04:31:51 12  Monday, would that include the verdict form as well?

04:31:53 13              THE COURT:  Yes, it would include the verdict

04:31:54 14  form and it will not cost anybody any time.  We'll turn the

04:32:00 15  clock off for when we get to.

04:32:02 16              MR. SCHERKENBACH:  Very good.  No further

04:32:03 17  issues.

04:32:03 18              THE COURT:  Very good.  I hope you all have a

04:32:06 19  little bit of a weekend.  We'll see you Monday.

04:36:32 20              (Proceedings adjourn at 4:36 p.m.)

21

22          I hereby certify the foregoing is a true and accurate
            transcript from my stenographic notes in the proceeding.
23

24                          /s/ Brian P. Gaffigan
                            Official Court Reporter
25                            U.S. District Court