1            **IN THE UNITED STATES DISTRICT COURT**

2             **IN AND FOR THE DISTRICT OF DELAWARE**

3                       **- - -**

4  **IDENIX PHARMACEUTICALS, INC., UNIVERSITA**   :    **CIVIL ACTION**
   **DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL**   :

5  **DE LA RECHERCHE SCIENTIFIQUE and**          :
   **L'UNIVERSITE MONTPELLIER II,**            :

6                           :
             **Plaintiffs,**            :

7  **v**                           :
                            :

8  **GILEAD SCIENCES, INC. and GILEAD**        :
   **PHARMASSET LLC,**                 :

9                           :
             **Defendants.**         :    **NO. 13-1987-LPS**

10 -----------------------------------------
   **IDENIX PHARMACEUTICALS, INC., UNIVERSITA**   :    **CIVIL ACTION**

11 **DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL**   :
   **DE LA RECHERCHE SCIENTIFIQUE and**        :

12 **L'UNIVERSITE MONTPELLIER II,**            :
                            :

13           **Plaintiffs,**            :
   **v**                           :

14                          :
   **GILEAD PHARMASSET LLC,**            :

15                          :
             **Defendant.**          :    **NO. 14-109-LPS**

16 -----------------------------------------
   **IDENIX PHARMACEUTICALS, INC.,**         :    **CIVIL ACTION**

17                          :
             **Plaintiff,**           :

18 **v**                           :
                            :

19 **GILEAD SCIENCES, INC.**            :
                            :

20           **Defendant.**          :    **NO. 14-846-LPS**
                        **- - -**

21

22               **Wilmington, Delaware**
              **Monday, December 12, 2016**

23             *Jury Trial - Volume F*

24                      **- - -**

25 **BEFORE:**   **HONORABLE LEONARD A. STARK, Chief Judge, and a jury**

                     **- - -**

1  **APPEARANCES:**

2

3      **ASHBY & GEDDES, P.A.**
    **BY: JOHN G. DAY, ESQ.**

4        **and**

5      **McCARTER & ENGLISH**
    **BY: MICHAEL P. KELLY, ESQ.**

6        **and**

7

8      **JONES DAY**
    **BY: CALVIN P. GRIFFITH, ESQ.,**
      **RYAN B. McCRUM, ESQ.,**

9        **MICHAEL S. WEINSTEIN, ESQ., and**
      **BRADLEY W. HARRISON, ESQ.**

10       **(Cleveland, Ohio)**

11       **and**

12     **JONES DAY**
    **BY: JENNIFER L. SWIZE, ESQ.**

13       **(Washington, District of Columbia)**

14       **and**

15     **JONES DAY**
    **BY: STEPHANIE E. PARKER, ESQ., and**

16       **JESIKA W. FRENCH, ESQ.**
      **(Atlanta, Georgia)**

17       **and**

18

19     **JONES DAY**
    **BY: JOHN D. KINTON, ESQ., and**
      **ANTHONY M. INSOGNA, ESQ.**

20       **(San Diego, California)**

21       **and**

22     **JONES DAY**
    **BY: JOHN M. MICHALIK, ESQ., and**

23       **LISA L. FURBY, ESQ.**
      **(Chicago, Illinois)**

24        **Counsel for Plaintiffs**

25

1 **APPEARANCES:  (Continued)**

2

3          FISH & RICHARDSON, P.C.
           BY:  MARTINA TYREUS HUFNAL, ESQ.,
                DOUGLAS E. McCANN, ESQ.,
4               JOSEPH B. WARDEN, ESQ.,
                SANTOSH COUTINHO, ESQ.,
5               ROBERT OAKES, ESQ., and
                KELLY ALLENSPACH DEL DOTTO, ESQ.

6
                and
7
           FISH & RICHARDSON, P.C.
8          BY:  FRANK SCHERKENBACH, ESQ., and
                JENNY SHMUEL, ESQ.
9               (Boston, Massachusetts)

10
                and
11
           FISH & RICHARDSON, P.C.
           BY:  JUANITA BROOKS, ESQ.,
12              W. CHAD SHEAR, ESQ.,
                CRAIG COUNTRYMAN, ESQ., and
13              JONATHAN E. SINGER, ESQ.
                (San Diego, California)
14
                and
15
           FISH & RICHARDSON, P.C.
16         BY:  MICHAEL R. HEADLEY, ESQ.,
                JOHN M. FARRELL, ESQ., and
17              DALIA KOTHARI, ESQ.
                (Redwood City, California)
18
                and
19
           FISH & RICHARDSON, P.C.
20         BY:  TASHA FRANCIS, ESQ.
                (Minneapolis, Minnesota)
21
                     Counsel for Defendants
22

23

24  Kevin Maurer                    Brian P. Gaffigan
    Official Court Reporter         Official Court Reporter
25

1                              - oOo -

2                    P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following trial was held

08:36:41  4  in open court, beginning at 8:41 a.m.)

08:37:54  5              THE COURT:  Good morning.

08:41:53  6              (The attorneys respond, "Good morning, Your

08:41:54  7  Honor.")

08:41:54  8              THE COURT:  I hope you had a nice weekend.

08:41:56  9              We will do the argument on jury instructions and

08:41:59 10  the verdict sheet this afternoon after the jury has left, so

08:42:03 11  it will probably be a very short break after we let the jury

08:42:06 12  go, and I'll have about an hour or so which I won't charge

08:42:09 13  anybody the time for, but we'll move through things fairly

08:42:13 14  quickly.

08:42:13 15              Are there any issues from the plaintiffs this

08:42:16 16  morning?

08:42:16 17              MS. PARKER:  Yes, Your Honor.  Thank you.

08:42:17 18              THE COURT:  Okay.

08:42:19 19              MR. HARRISON:  Good morning, Your Honor.

08:42:22 20              THE COURT:  Good morning.

08:42:23 21              MR. HARRISON:  I believe before I raise my

08:42:24 22  issues, defendants have an issue they want to raise with you

08:42:28 23  in line with their letter brief yesterday.

08:42:29 24              THE COURT:  Okay.  That's fine.

08:42:32 25              Good morning.

08:42:36 1         MR. WARDEN:  Good morning, Your Honor.

08:42:37 2         Just briefly, the objection that Idenix is going

08:42:39 3  to raise with respect to some of Gilead's demonstratives

08:42:42 4  touches on some third-party confidential information.  For

08:42:46 5  the reasons we put in the letter we sent yesterday, we ask

08:42:48 6  the courtroom be sealed before that argument goes forward.

08:42:51 7         THE COURT:  Okay.  And there will people in the

08:42:52 8  courtroom now that you would ask not be present for this

08:42:55 9  argument?

08:42:56 10         MR. WARDEN:  I think that is certainly the case.

08:42:58 11  I don't know everyone in the courtroom.

08:42:59 12         So just to be clear on who is permitted to be in

08:43:01 13  the courtroom, Your Honor, is the outside counsel for both

08:43:05 14  Idenix and Gilead, the damages experts, not the other

08:43:09 15  experts in the case but the two damages experts, and then,

08:43:13 16  of course, Gilead's in-house counsel because this is a

08:43:15 17  Gilead agreement that they're privy to the information in.

08:43:18 18         So we ask everyone else.

08:43:20 19         THE COURT:  And what is the plaintiffs' position

08:43:22 20  on this request?

08:43:24 21         MR. HARRISON:  At this time we have no

08:43:26 22  objection, Your Honor.

08:43:27 23         THE COURT:  All right.  Well, then for purposes

08:43:29 24  of this argument that we're about to have, I am closing the

08:43:32 25  courtroom.  So any who do not fall the into categories that

08:43:37 1  were just listed, I ask that you leave and we will reopen

08:43:41 2  the courtroom just as soon as we can.

08:43:41 3          (Following portion ordered sealed by the Court,

08:43:41 4  bound separately.)

08:43:41 5          *    *    *

09:07:24 6          (Courtroom reopened to public.)

09:07:24 7          THE COURT:  Okay.  Let's bring in the jury.

09:07:44 8          (Jury enters courtroom at 9:07 a.m.)

09:08:51 9          THE COURT:  Welcome back, everybody.  I hope you

09:08:55 10 enjoyed the weekend.  We are ready to proceed.  We will turn

09:08:58 11 to Gilead to call its next witness.

09:09:00 12         MR. SCHERKENBACH:  Thank you, Your Honor.

09:09:03 13         Good morning, ladies and gentlemen.

09:09:05 14         We are going to call as our first witness this

09:09:08 15 morning Dr. David Olsen, who is a scientist at Merck.  He

09:09:13 16 began working on Merck's hepatitis C program in 1998, and

09:09:18 17 was involved in a collaboration between Merck and Isis

09:09:22 18 regarding nucleosides for the treatment of hepatitis C.  He

09:09:24 19 will be talking of that program.

09:09:27 20         Your Honor, Gilead calls Dr. David Olsen.

09:09:52 21         ... DAVID OLSEN, having been duly sworn as a

09:09:52 22 witness, was examined and testified as follows ...

09:10:06 23         THE COURT:  Good morning, Dr. Olsen.  Welcome to

09:10:09 24 you.

09:10:10 25         THE WITNESS:  Good morning.

09:10:12 1        MS. BROOKS:  Thank you, Your Honor.  May I

09:10:14 2  approach with binders for the Court?

09:10:15 3        THE COURT:  Yes, you may.

09:10:36 4                DIRECT EXAMINATION

09:10:36 5  BY MS. BROOKS:

09:10:37 6  Q.    Good morning, Dr. Olsen.

09:10:39 7  A.    Good morning.

09:10:39 8  Q.    I have put in front of you two binders, one of which

09:10:42 9  has exhibits that I am going to be going over with you

09:10:45 10  today, and another one of which has some transcripts from

09:10:50 11  prior testimony of yours just in case we need it.

09:10:54 12  A.    Thank you.

09:10:54 13  Q.    Dr. Olsen, as my colleague mentioned, you are an

09:10:58 14  employee of Merck.  Is that right?

09:11:00 15  A.    That is correct.

09:11:00 16  Q.    And you have been with Merck I think for about 25

09:11:03 17  years.  Is that right?

09:11:04 18  A.    That is correct.

09:11:05 19  Q.    Now, you are not here today voluntarily, are you?

09:11:10 20  A.    No.  You subpoenaed me.

09:11:13 21  Q.    Yes, we did.  We issued a subpoena that commanded you

09:11:18 22  to appear here in United States District Court today at 9:00

09:11:23 23  a.m. in this courtroom.  Is that right?

09:11:26 24  A.    I assume it was this courtroom, yes.

09:11:27 25  Q.    But you have come to the right place?

09:11:30 1    A.     Yes.

09:11:31 2    Q.     Even though we subpoenaed you, you haven't spoken

09:11:37 3    with us before testifying today.  Is that right?

09:11:42 4    A.     That is correct.

09:11:42 5    Q.     In fact, you didn't even let us know when you got to

09:11:46 6    town.  Right?

09:11:48 7    A.     I did not personally let you know, correct.

09:11:50 8    Q.     How long have you been here, by the way?

09:11:53 9    A.     I came in on Saturday.

09:11:55 10    Q.     So you have been here all weekend?

09:11:59 11    A.     Yeah.

09:11:59 12    Q.     Working with the attorneys for Idenix.  Is that

09:12:02 13    right, sir?

09:12:04 14    A.     I have talked to counsel from Idenix, yes.

09:12:07 15    Q.     Now, you understand, Dr. Olsen, that one of Gilead's

09:12:14 16    defenses in this case is that the asserted claims of

09:12:17 17    Idenix's patent are invalid because Merck actually invented

09:12:22 18    the claimed invention first?  Do you understand that, sir?

09:12:30 19    A.     Can you ask it again?  It's a little bit of a long

09:12:32 20    question.

09:12:33 21    Q.     Sure.  Do you understand, sir, that one of Gilead's

09:12:37 22    defenses is that the asserted claims of Idenix's patent are

09:12:42 23    invalid because Merck actually invented the claimed

09:12:46 24    invention before Idenix did?  Do you understand that to be

09:12:49 25    the case, sir?

Olsen - direct

09:12:52 1  A.      I am not a lawyer, I am a scientist.  It's a little

09:12:56 2  bit of a complicated question for me.

09:12:59 3  Q.      That's fine.  If the answer is "I don't know," you

09:13:01 4  are welcome to say "I don't know."

09:13:03 5  A.      I am unsure.

09:13:04 6  Q.      Well, will you assume for me that all of the

09:13:08 7  questions I am going to be asking you today are going toward

09:13:13 8  establishing that defense?  Okay?

09:13:18 9  A.      I will take your word on it.

09:13:22 10  Q.      Now, the reason you had to be subpoenaed is even

09:13:27 11  though Idenix is technically the plaintiff, as an employee

09:13:32 12  of Merck you are really not a neutral witness in this case,

09:13:35 13  are you, sir?

09:13:40 14  A.      I don't know.  I am here -- my understanding is I am

09:13:44 15  here to talk about what we did at Merck in terms of the

09:13:48 16  discovery of certain compounds in certain time frames.

09:13:52 17  Q.      Thank you.  I appreciate that, sir.

09:13:55 18          Just so the ladies and gentlemen of the jury

09:13:57 19  understand where Merck sort of fits in, isn't it true, sir,

09:14:01 20  that in 2014, your company, Merck, actually acquired Idenix?

09:14:07 21  A.      That is my understanding.

09:14:08 22  Q.      So, really, even though we have been referring to the

09:14:12 23  plaintiff as Idenix and the plaintiff has been referring to

09:14:15 24  the plaintiff as Idenix, essentially, it's Merck sitting

09:14:19 25  over here on this side of the courtroom.  Is that fair?

09:14:24  1    A.      I will take your word on it.  I don't know the legal

09:14:28  2    ramifications of that question, sorry.

09:14:30  3    Q.      Well, as an employee and a stockholder of Merck, is

09:14:36  4    it fair to say that you actually have a personal stake in

09:14:40  5    the outcome of this litigation?

09:14:44  6    A.      I guess you could say that.

09:14:48  7    Q.      But as you said, Dr. Olsen, you are going to try, I

09:14:53  8    assume, to the best of your ability to just answer my

09:14:55  9    questions as truthfully and honestly as you can, putting

09:14:59 10    aside your personal stake in this litigation?

09:15:01 11    A.      I am a scientist.  I want to clear the record as to

09:15:05 12    what we did, when we did it.  That's what I feel I am here

09:15:10 13    to do.

09:15:11 14    Q.      If I ask you a question and the truthful answer is

09:15:14 15    yes, you will just say that for us.  Is that right, sir?

09:15:17 16    A.      If "yes" adequately depicts the correct answer, yes,

09:15:22 17    I will.

09:15:22 18    Q.      Let's start with the big question.  Dr. Olsen, isn't

09:15:26 19    it true that you believe that you and your fellow scientists

09:15:31 20    at Merck invented a 2'-methyl (up) class of compounds to

09:15:42 21    treat hepatitis C?

09:15:48 22    A.      We certainly discovered that class and we certainly

09:15:51 23    filed intellectual property around that discovery.

09:15:55 24    Q.      Thank you.  Then let's move to how that came to be.

09:16:11 25            Turn to your binder, if you would, Dr. Olsen.

09:16:13  1    What we are going to do is kind of work backward from the

09:16:16  2    time that you filed your patent application in this case,

09:16:21  3    all the way back to when the work that turned into it began.

09:16:26  4    Okay?

09:16:27  5    A.      Okay.

09:16:27  6    Q.      So we are going to kind of go backward in time.  Are

09:16:31  7    you with me?

09:16:32  8    A.      Sure.

09:16:30  9            MS. BROOKS:  Your Honor, we would move 2598 into

09:16:33 10    evidence.

09:16:33 11            MR. McCRUM:  No objection, Your Honor.

09:16:36 12            THE COURT:  It's admitted.

09:16:39 13            (DTX-2598 was admitted into evidence.)

09:16:39 14            MS. BROOKS:  If we can pull up the first page

09:16:40 15    and highlight the title of this application:  Nucleoside --

09:16:46 16    there we go.  No, down.  Nucleoside Derivatives.

09:16:50 17            So the title of this patent application is

09:16:53 18    Nucleoside Derivatives As Inhibitors of hepatitis C Virus

09:17:01 19    NS5B Polymerase.  Is that right, Dr. Olsen?

09:17:06 20    A.      Yes, that is the title.

09:17:07 21    Q.      Now, you filed this application because you believe

09:17:12 22    that you and your fellow scientists at Merck had discovered

09:17:16 23    an important class of molecules; correct?

09:17:20 24    A.      That is correct.

09:17:21 25    Q.      And at that point, when you had discovered this

09:17:28 1  important class of molecules and filed this patent

09:17:30 2  application, you had been doing years of work leading up to

09:17:37 3  this January 2001 filing; correct?

09:17:39 4  A.    I think it started in '98.  So, yes, it was a couple

09:17:46 5  years.

09:17:46 6  Q.    Okay.  Thank you.  Now, let's talk about what

09:17:49 7  invention you are referring to here.

09:17:51 8        You just testified that you and your fellow

09:17:55 9  scientists you believe invented a 2'-methyl up class of

09:18:01 10 compound to treat hepatitis C; correct?

09:18:03 11 A.    I said that we discovered those compounds, yes.

09:18:07 12 Q.    And one of the compounds in that class of 2'-methyl

09:18:14 13 up is a compound labeled 765; is that right?

09:18:19 14 A.    That was one of the key compounds from the

09:18:21 15 collaboration with, I just wanted to set the record

09:18:24 16 straight.  It is Isis Pharmaceuticals.  We didn't

09:18:27 17 collaborate with Isis who is more popular with the news

09:18:31 18 today.  So that is a small biotech company.

09:18:33 19        So in that collaboration with Isis

09:18:36 20 Pharmaceuticals, that was one of our key discoveries, thank

09:18:39 21 you.

09:18:39 22 Q.    Thank you.  And thank you for clearing that up.  I

09:18:42 23 meant to do that, too.

09:18:43 24 A.    Okay.

09:18:43 25 Q.    And actually Isis kind of picked their name before

09:18:46 1   the other Isis, and now they have actually changed their

09:18:49 2   name to Ionis; is that right?

09:18:51 3   A.     That is right.  But that name has not stuck in my

09:18:55 4   brain, so if we use Isis?

09:18:57 5   Q.     No problem.

09:18:58 6   A.     It's rare I ever beat you to the point on anything.

09:19:01 7   Q.     Well, Dr. Olsen, we will be seeing documents that

09:19:03 8   actually say Isis, so thank you for distinguishing.

09:19:08 9          Now, in September of 2000, the 765 compound that

09:19:14 10   we're going to be talking about, that was identified as a

09:19:19 11   potent hit on the replicon assay; correct?

09:19:25 12   A.     Yes.

09:19:25 13   Q.     As of September 2000, this methyl up class of

09:19:29 14   nucleosides we're talking about was really the unique

09:19:32 15   discovery from the replicon screening; is that right?

09:19:39 16   A.     Well, we discovered -- in the replicon screening, we

09:19:45 17   discovered 765, and we felt that that was a very important

09:19:48 18   compound for our collaboration.

09:19:50 19   Q.     And let's go back now to the provisional application

09:19:54 20   and turn, if you would, please to page 82.  Specifically,

09:20:05 21   Example 52.

09:20:08 22          What do we have here, Dr. Olsen?  Example 52.

09:20:14 23   Do you see that?  It's up on the screen, too, sir, to make

09:20:20 24   it easier on you.

09:20:21 25   A.     Oh, yes.  Thank you.

09:20:23  1   Q.      So Example 52 in this provisional patent application

09:20:26  2   is a nucleoside; correct?

09:20:28  3   A.      Yes.

09:20:28  4   Q.      And it is a nucleoside to be used in the treatment of

09:20:33  5   hepatitis C; correct?

09:20:34  6   A.      Yes, potentially.

09:20:37  7   Q.      And what is being referred to here is a

09:20:43  8   2'-C-methyladenosine; is that right?

09:20:46  9   A.      That is correct.  And the compound is showing

09:20:48 10   stereochemistry as well.

09:20:49 11   Q.      And if we look here at the compound where I'm

09:20:52 12   circling with the laser pointer, that is what would be

09:20:56 13   called the sugar ring; is that right, sir?

09:20:58 14   A.      Yes.

09:20:58 15   Q.      And on this sugar ring, at the 2' position, there is

09:21:03 16   a methyl up; correct?

09:21:04 17   A.      Yes.

09:21:05 18   Q.      And on the sugar ring at the 2' position, there is an

09:21:09 19   OH or what would also be known as a hydroxy down; is that

09:21:15 20   right?

09:21:15 21   A.      That is correct.  That was dictated by -- the way of

09:21:19 22   the compound is drawn by the chemist with the wedge and the

09:21:22 23   dash line.

09:21:22 24   Q.      Because the problem with drawing things on paper is

09:21:25 25   they're two-dimensional and you're really talking about

09:21:27 1   three-dimensional molecules as they exist in space?

09:21:31 2   A.   Yes.

09:21:33 3   Q.   Now, if we look at the top part here, there is two

09:21:36 4   rings.  Is that what is referred to as the base?

09:21:38 5   A.   Yes.

09:21:40 6   Q.   And in this particular case, this ring is called an

09:21:45 7   adenosine base; is that right, sir?

09:21:50 8   A.   Not technically as a scientist.  Maybe for the

09:21:53 9   courtroom, it is okay.  It's adenine base.

09:21:56 10  Q.   Did I mispronounce it?

09:21:57 11  A.   No, you pronounced adenosine perfectly, but adenosine

09:22:02 12  sort of refers to the whole process, and the base would be

09:22:05 13  adenine.

09:22:06 14  Q.   Adenine.  Another way to depict this, if we didn't

09:22:09 15  want to draw it is to have a line going up there and an A

09:22:12 16  there; would that be fair?

09:22:13 17  A.   That would be fair, yes.

09:22:16 18          MS. BROOKS:  Now, if we could, is there any way

09:22:18 19  to split the screen, Mr. Sayres, where we could keep that

09:22:22 20  compound, move it over and pull up the compound that was in

09:22:27 21  plaintiffs opening in PDX-21?

09:22:27 22  BY MS. BROOKS:

09:22:38 23  Q.   So are you, aware, Dr. Olsen, that Idenix has claimed

09:22:42 24  that this nucleoside with this adenine base, with a methyl

09:22:51 25  up at the 2' position and an OH down as claimed -- if we can

09:22:55 1  go back to the full slide now -- that that compound was

09:23:00 2  actually Idenix's pioneering invention?

09:23:03 3  A.    I'm sorry.  Was that a question?

09:23:08 4  Q.    Sure.  Are you aware, sir, that they have done that?

09:23:12 5  That's Idenix when they were still Idenix, not before they

09:23:15 6  were taken over by Merck.

09:23:16 7  A.    Yes.

09:23:16 8  Q.    But they're claiming that that compound that can be

09:23:19 9  found in your patent application that you described as a

09:23:24 10 breakthrough, they're claiming it was their invention.

09:23:28 11          MR. McCRUM:  Objection, Your Honor to the extent

09:23:29 12 it is mischaracterizing what we said in the document.

09:23:32 13          THE COURT:  To the extent it is?

09:23:33 14          MR. McCRUM:  It is, I'm sorry.  It is

09:23:35 15 mischaracterizing the prior representation, position of

09:23:38 16 Idenix in the document.

09:23:39 17          THE COURT:  Ms. Brooks.

09:23:41 18          MS. BROOKS:  Your Honor, it says "Idenix

09:23:43 19 pioneering invention" in the title.

09:23:45 20          MR. McCRUM:  It says use of 2'-methyl up.  She

09:23:49 21 is characterizing it as the compound is our invention.  Use

09:23:53 22 of the compound is.

09:23:54 23          THE COURT:  I will overrule the objection.  The

09:23:56 24 witness can answer, if he has an answer.

09:23:56 25 BY MS. BROOKS:

09:23:58 1  Q.      Are you aware, Dr. Olsen, that Idenix is claiming --

09:24:01 2  if you see this compound right here on this slide, the title

09:24:04 3  is Idenix's pioneering invention.  Do you see that, sir?

09:24:08 4  A.      I do, yes.

09:24:09 5  Q.      Were you aware that the very same compound that

09:24:12 6  appears at Example 52 in the January 2001 provisional is

09:24:18 7  being claimed by Idenix, the use of it as their pioneering

09:24:23 8  invention?  And if you don't know, you can say I didn't know

09:24:26 9  they were doing it.

09:24:28 10 A.      I knew, you know, when their patent published, I

09:24:32 11 looked at that patent.  I remember that they had 2'-methyl

09:24:39 12 up modified nucleoside.  I can't say I remembered

09:24:43 13 definitively this compound.  And I haven't really looked at

09:24:48 14 their patent in awhile.

09:24:49 15 Q.      Now, sticking with your invention then.

09:24:53 16         We can take that down.  Thank you.

09:24:55 17         Sticking with your invention here, sir, the

09:24:59 18 use of this compound to treat HCV.  Have you in fact

09:25:06 19 characterized this as a game changing discovery?

09:25:10 20 A.      I think that's fair.  I think when that was

09:25:13 21 discovered as a replicon hit in the September time frame of

09:25:18 22 2000, we certainly, as a team, felt that that was a game

09:25:22 23 changing discovery.  Yes.

09:25:23 24 Q.      And you told us earlier I believe that the work that

09:25:32 25 would eventually result in this began when Merck and ISIS

09:25:37 1  began collaborating in 1998; is that right?

09:25:43 2  A.    The work that went into the discovery of this

09:25:48 3  particular compound?  I mean that might be one way of

09:25:53 4  characterizing it.

09:25:56 5          We, you know, assembled the compound to screen

09:26:00 6  the replicon assay in the summer of 2000.

09:26:03 7  Q.    I'm talking about the beginning of the Merck/Isis

09:26:07 8  collaboration.  Am I correct, sir, that it began in 1998?

09:26:11 9  A.    Yes, we started collaborating with Isis in 1998.

09:26:14 10 Q.    And we're going to talk about that collaboration in a

09:26:16 11 movement, but just to finish this particular section.  Can

09:26:20 12 you turn, in your binder, to DX-997?

09:26:35 13 A.    (Witness complies.)

09:26:36 14 Q.    And, Dr. Olsen, as a result of filing patent

09:26:38 15 applications, you and your fellow inventors were issued

09:26:42 16 multiple United States patents; correct?

09:26:46 17 A.    Yes.

09:26:46 18 Q.    And this particular one at DX-997, this is a patent

09:26:52 19 referred to as the 7,105,499 patent; is that right, sir?

09:27:00 20 A.    Yes, I see that.

09:27:01 21         MS. BROOKS:  Your Honor, I would move DX-997

09:27:03 22 into evidence.

09:27:03 23         MR. McCRUM:  No objection, Your Honor.

09:27:04 24         THE COURT:  It is admitted.

09:27:05 25         (DX-997 was admitted into evidence.)

09:27:05 1  BY MS. BROOKS:

09:27:07 2  Q.    If we could turn just quickly on page 36, column 65.

09:27:15 3  And if we look at an Example 52.

09:27:19 4  A.    I don't see page numbers on mine.

09:27:22 5  Q.    That's okay.  Of course I'm on the clock so I'm going

09:27:25 6  to try to do this as expeditiously as possible.

09:27:28 7  A.    Okay.

09:27:28 8  Q.    Here we have that compound we were just looking at,

09:27:31 9  the 2'-methyladenosine; correct?

09:27:35 10  A.    That's correct.

09:27:36 11  Q.    So that appears in the various patents that you and

09:27:39 12  your fellow scientists at Merck were issued for work that

09:27:42 13  you did in the Merck/Isis collaboration; correct?

09:27:47 14  A.    Yes, this compound came out of that collaboration.

09:27:49 15  Q.    Now, actually, the compound itself had been made by

09:27:55 16  Merck in the past; isn't that right?

09:27:58 17  A.    That is correct.

09:27:58 18  Q.    That if you look in your binder at DX-2568, it's

09:28:03 19  already in evidence.

09:28:05 20        So if we could pull up, Mr. Sayres, page 3, and

09:28:10 21  blow up the top portion.

09:28:16 22        I'm sorry.  This is a very old copy.  Can you

09:28:20 23  make out that we have a 2'-C-methyladenosine right there,

09:28:26 24  and this paper, so we can orient the jury, is about

09:28:30 25  nucleosides and their antiviral properties.

09:28:33 1    Do you see right here, as early as 1968, Merck

09:28:37 2 again was working with this compound and testing it for

09:28:40 3 antiviral properties; is that right, Dr. Olsen?

09:28:43 4 A.    It would help me if in the paper, you could show me

09:28:47 5 the structure that they're referring to with that text

09:28:50 6 because when you say 2'-C-methyladenosine, it could mean

09:28:57 7 multiple things.  I know the text is almost identical what

09:29:00 8 is in our patent, but there could be big differences.

09:29:03 9 Q.    Let's look at on page 2, scheme 2.  Let's pull up all

09:29:07 10 those compound.

09:29:08 11    Does that help you at all, Dr. Olsen?

09:29:19 12 A.    Unfortunately not, because these are all single ring

09:29:22 13 base structures.

09:29:24 14 Q.    Well, let's see if there were any adenosine bases.

09:29:28 15 Let's go to the first page.  And we'll do this very quickly

09:29:30 16 and if you don't know, sir, that's fine.  Dr. Rachakonda has

09:29:33 17 already testified about this.

09:29:34 18 A.    Okay.

09:29:35 19    MS. BROOKS:  Mr. Sayres, if you could blow up

09:29:37 20 where my laser is.  Hopefully you can see it.  There we go.

09:29:42 21    And, again, I apologize for the bad printing,

09:29:44 22 but do you see where it says:  Biological testing indicates

09:29:48 23 that a 3'-C-methylcytidine as well as the previously

09:29:52 24 synthesized 2' and 3'-C-methyladenosines are effective

09:30:00 25 anti-vaccinia agents in mice.  And the date on this is 1968.

09:30:07  1        Is that right, sir?

09:30:08  2   A.    I see the text, yes.

09:30:10  3   Q.    Okay.  Thank you.  Now, let's talk briefly about your

09:30:17  4   collaboration, Merck's collaboration with Isis.

09:30:22  5        The reason Merck decided to collaborate with

09:30:25  6   Isis is because Isis had some really competent medicinal

09:30:31  7   chemists with expertise in nucleoside chemistry; is that

09:30:34  8   right, sir?

09:30:35  9   A.    That is one of the reasons, correct.

09:30:37 10   Q.    And as early as 1998, you and your colleagues

09:30:41 11   believed you could find nucleosides that would treat

09:30:46 12   hepatitis C; correct?

09:30:47 13   A.    We were certainly very hopeful that we could.

09:30:50 14   Q.    And now, if you would turn, sir, in your binder to

09:30:59 15   DX-2224.

09:31:03 16   A.    (Witness complies.)

09:31:11 17   Q.    And you have seen this document before, haven't you,

09:31:14 18   sir?

09:31:16 19   A.    I believe I have.

09:31:17 20   Q.    In fact, it was shown to you I believe at least once

09:31:22 21   at your deposition -- and this is from a Kevin Anderson of

09:31:26 22   Isis Pharmaceuticals -- I'm sorry -- to a Kevin Anderson of

09:31:31 23   Isis Pharmaceuticals from a Susan -- and how do you

09:31:34 24   pronounce her last name?

09:31:36 25   A.    Socher.

09:31:37 1    Q.      -- Socher at Merck; correct?

09:31:39 2    A.      Yes, that appears to be the case.

09:31:40 3    Q.      And this is sort of a kickoff letter memorializing

09:31:43 4    what is going to be the collaboration between Merck and

09:31:46 5    Isis, is that right?

09:31:55 6    A.      That appears to be the case.

09:31:57 7            MS. BROOKS:  Your Honor, we would move DX-2224

09:32:00 8    into evidence.

09:32:01 9            MR. McCRUM:  No objection, Your Honor.

09:32:02 10           THE COURT:  It's admitted.

09:32:04 11           (DX-2224 was admitted into evidence.)

09:32:04 12           MS. BROOKS:  If we can pull up the front page

09:32:07 13   just so we can orient ourselves on the date.

09:32:07 14   BY MS. BROOKS:

09:32:10 15   Q.      The date is June 25th, 1997; is that right?

09:32:13 16   A.      Yes.  That is correct.

09:32:16 17   Q.      And the second paragraph says:  Attached is a brief

09:32:19 18   summary of the research program and some issues that Merck

09:32:23 19   wishes to discuss.

09:32:24 20           Correct?

09:32:26 21   A.      I do see that.

09:32:27 22   Q.      Now, let's turn to page 6 in that letter, if we could.

09:32:36 23           And if we look at this, this is sort of

09:32:39 24   detailing -- when I say this, I'm talking about page 6,

09:32:43 25   and also you could look at the same time on page 7.  It's

09:32:47 1    basically detailing what Isis is going to do in the

09:32:50 2    collaboration and what Merck is going to do; is that right?

09:32:59 3    A.    So this is in 1997.  This is before?

09:33:03 4    Q.    Yes, what they're going to do going forward.

09:33:05 5    A.    Yes, but we didn't do some much these things.

09:33:09 6    Q.    But this is --

09:33:10 7    A.    This was a proposal for things that could, could

09:33:13 8    possibly be done in the collaboration.

09:33:15 9    Q.    Exactly.  And now if we could, sir, let's turn to

09:33:18 10   page, I believe it's page 8.  Yes, there are.

09:33:24 11           So this is again a proposal for how this

09:33:27 12   collaboration is going to work; is that right, sir?

09:33:31 13   A.    Again, I know that, well, from the stamp on the

09:33:35 14   front page of this, it looks like this was given to me in my

09:33:38 15   deposition at one point.  I can't say I have ever seen this,

09:33:42 16   this slide or the previous slide before, so if you just give

09:33:45 17   me a second to look at this.

09:34:59 18   Q.    Yes.  Take your time.  But I would like to remind

09:35:03 19   you, unfortunately, we are on the clock.

09:35:05 20   A.    I wish I could make my eyes and brain work faster.

09:35:10 21   Sorry.

09:35:10 22   Q.    Understood, sir.

09:35:10 23           (Pause.)

09:35:14 24   A.    I glanced it over.  Maybe if you have a question

09:35:17 25   related to it, we can address it.

09:35:20 1  Q.     Actually, I just asked it.  Does this appear to be,

09:35:24 2  where it show us how it's going to start, you are going to

09:35:27 3  have a compound design, nucleosides and substrate analogues,

09:35:31 4  triphosphates, and then sort of a decision tree, HCV

09:35:35 5  polymerase inhibition, if yes, move on to a pestivirus

09:35:41 6  antiviral activity, and from there, if it is yes, go on to

09:35:45 7  preclinical, and if it is not move on to the left.

09:35:49 8       I am just trying to sort of put out what looks

09:35:52 9  like it's going to be kind of a decision tree as far as the

09:35:55 10 collaboration is concerned.

09:35:59 11 A.     Again, as somebody who became the leader of the

09:36:02 12 program in 1998, this all looks like a reasonable proposal.

09:36:07 13 Certainly, if not, anything we used in the collaboration.

09:36:11 14 But it looks like a reasonable proposal.

09:36:13 15 Q.     If you would turn, please, Dr. Olsen, to page 20, as

09:36:19 16 far as what sort of nucleosides you were going to be looking

09:36:22 17 at, as early as 1997 now, in this proposal, one of the plans

09:36:28 18 was to evaluate the Beta-d -- I will not try to say it --

09:36:35 19 the nucleosides with substitutions at the 2' and 3'

09:36:40 20 positions.  Correct ?  Right there?

09:36:41 21 A.     Yes, again.  I don't think my eyes have ever seen

09:36:44 22 this particular slide before.

09:36:45 23 Q.     Dr. Olsen, you were shown this document at your

09:36:49 24 deposition, actually, you looked at this document to prepare

09:36:53 25 yourself for your deposition, where you were appearing as

09:36:57 1     what's called a 30(b)(6) witness, meaning a representative

09:37:01 2     speaking on behalf of Merck. Do you recall that, sir?

09:37:05 3     A.     No, I do not.

09:37:05 4     Q.     Let's go back then and see if I can refresh your

09:37:14 5     recollection. Will you accept my representation?

09:37:17 6     A.     I see the stamp on the front. It says it was put in

09:37:20 7     front of me. You know what happens in these depositions.

09:37:23 8     You turn to one specific page, you are asked questions on

09:37:27 9     it.

09:37:27 10        I don't ever remember seeing this slide before.

09:37:29 11     That's all I am trying to clarify for the jury.

09:37:32 12     Q.     From a scientist's perspective, can you tell me,

09:37:35 13     where it says alkyl now as one of the possible substitutions

09:37:39 14     at the 2' or 3' position, whether a methyl is part of an

09:37:42 15     alkyl group?

09:37:44 16     A.     Yes, that's fair.

09:37:45 17     Q.     Thank you.

09:37:50 18        Now. Let's move on to the actual collaboration

09:37:53 19     and the results of it.

09:37:56 20        Turn. If you would, please, to DX-2794 in your

09:38:01 21     binder. This is now a document from a Lawrence Kuo, who is

09:38:11 22     a Ph.D. researcher at Merck Research Laboratories, and it is

09:38:17 23     from Dan Cook, who is vice president of chemistry at Isis.

09:38:21 24     Correct, sir?

09:38:22 25     A.     Yes, that I recollect.

09:38:22 1   Q.      And the jury has actually already heard a brief

09:38:25 2   deposition clip from Dan Cook.  You are familiar with this

09:38:28 3   document.  Correct, sir?

09:38:32 4   A.      Yes.  I have seen this document before.

09:38:36 5              MS. BROOKS:  We will move DX-2794 into evidence,

09:38:39 6   Your Honor.

09:38:41 7              MR. McCRUM:  No objection, Your Honor.

09:38:45 8              THE COURT:  It's admitted.

09:38:45 9              (DX-2794 received in evidence.)

09:38:47 10  BY MS. BROOKS:

09:38:48 11  Q.      If we go to page 2, it says, heterocyclic polymerase

09:38:55 12  projects.  Do you see that, Dr. Olsen?

09:38:58 13  A.      Yes.

09:38:59 14  Q.      And the objective of this project is to design and

09:39:02 15  synthesize triphosphate mimics or nucleoside/enterocytes

09:39:07 16  that selectively inhibit HEP-C-pol.  Correct?

09:39:13 17  A.      I see the text there.  That did not become our

09:39:17 18  objective, though, when I joined the collaboration.

09:39:20 19  Q.      Did you not end up synthesizing nucleosides for use

09:39:24 20  in the treatment of hepatitis C?

09:39:27 21  A.      Yes.  That part is completely accurate.

09:39:29 22  Q.      Thank you.

09:39:31 23              Now, let's look, if we could, at page 30 of this

09:39:36 24  presentation, and there is an agenda.  This agenda is dated

09:39:43 25  November 19th, 1998.  Is that right?  It's right up there on

09:39:53 1  the screen, sir.  November 19th, 1998?

09:39:57 2  A.    Yes, I see that.

09:39:58 3  Q.    If we look down at the cc line, let's see if we can

09:40:02 4  find you on it, Doctor, you are D. Olsen.  Correct?

09:40:05 5  A.    Yes.

09:40:05 6  Q.    Now, specifically, let's just go through what the

09:40:09 7  agenda is talking about.

09:40:13 8        There is lunch and an introduction, then there

09:40:19 9  is a chemistry discussion by Dan Cook.  Do you see that?

09:40:24 10 A.    I do.

09:40:24 11 Q.    And then we also have a discussion of cell-based

09:40:28 12 assays by a Joanne Tomassini.  Do you see that?

09:40:32 13 A.    I do.

09:40:33 14 Q.    Now, an assay is what you are going to be testing the

09:40:38 15 nucleosides in to see whether or not they might have

09:40:43 16 activity against HCV virus.  Correct?

09:40:50 17 A.    Yes.  At this point we didn't have the HCV virus.  I

09:40:55 18 think we are all aware of that.  We had a surrogate virus,

09:40:58 19 BVDV.

09:41:00 20 Q.    I am getting there.  As of 1998, in other words, this

09:41:04 21 replicon assay we have heard about where you can test the

09:41:07 22 virus directly against the HCV virus in it replicon assay

09:41:12 23 didn't exist yet.  Correct?

09:41:13 24 A.    That's correct.  We didn't have the virus replication

09:41:17 25 assay in 2000, even.  It was a sub-genomic replication.

09:41:21 1 Just for the record.

09:41:23 2 Q.    But what you did have are what are called surrogate

09:41:27 3 viruses, they are surrogates for the hepatitis C.   Correct?

09:41:29 4 A.    Yes, that's very fair.

09:41:30 5 Q.    And one of the them is this BVDV, which we have heard

09:41:36 6 means bovine diarrhea virus?

09:41:40 7 A.    Bovine diarrheal virus.

09:41:42 8 Q.    And there is something called CRC and HCV-CRC.   Do

09:41:48 9 you see that, sir?

09:41:49 10 A.    I do.

09:41:49 11 Q.    Let's go from there to page, specifically, 133

09:41:55 12 through 134.

09:42:05 13       We are going to step through these, if we could.

09:42:09 14 I am going to try to do it as expeditiously as possible.

09:42:12 15       Are these showings test results -- when I say

09:42:16 16 "these," there is all these columns and there is compounds

09:42:19 17 here with numbers and there is structures and it shows BVDV,

09:42:23 18 HIV, influenza, adeno, et cetera.

09:42:28 19       Are these showing the testing of these various

09:42:32 20 compounds against these assays?

09:42:37 21 A.    Yes.   This is a summary table of the compounds and

09:42:39 22 the testing results.

09:42:40 23 Q.    Look.   Please, if you would, sir -- we will puts it

09:42:43 24 up on the screen -- at page 133?

09:42:48 25 A.    Yes, I have that.

09:42:49  1   Q.    If we go down to the very bottom compound on that

09:42:53  2   page, there is the one, 765, that we were talking about

09:43:00  3   earlier in your 2001 application, there it is, it's got the

09:43:05  4   two-ring base, it's got a methyl up in the 2' position and

09:43:11  5   an OH down.  Correct, sir?

09:43:14  6   A.    I see the structure.  But there is a little

09:43:16  7   difference between this and what we talked about earlier.

09:43:19  8         This depiction of the compound, which is what we

09:43:21  9   knew of the compound at the time, doesn't have any

09:43:24 10   stereochemistry.  So we don't know if it is methyl is up or

09:43:27 11   down on this compound at the time.

09:43:30 12   Q.    But you knew you were working with nucleosides.

09:43:32 13   Correct, sir?

09:43:33 14   A.    Yes.

09:43:34 15   Q.    That was the purpose of the project.  Correct?

09:43:36 16   A.    Yes.

09:43:37 17   Q.    And if we go up now, if we come up to the top again

09:43:41 18   to show the full screen, so this compound was screened

09:43:45 19   against BVDV.  Correct?

09:43:47 20   A.    Yes.

09:43:47 21   Q.    And HIV?

09:43:49 22   A.    Yes.

09:43:50 23   Q.    Influenza?

09:43:52 24   A.    Yes.

09:43:52 25   Q.    Adeno.  What's that, sir?

09:43:55 1    A.    It's another virus.

09:43:56 2    Q.    And what's this last one?

09:43:59 3    A.    It's an assay to look for inhibition of -- it's a

09:44:05 4    cell-based assay, to my understanding, I am not the best

09:44:07 5    expert on that, a cell-based assay for NSV protease, which

09:44:12 6    is another HCV target.  So we are targeting for polymerase.

09:44:15 7    That's what we are talking about here.  The protease is a

09:44:19 8    totally different target for HCV.

09:44:21 9    Q.    Let's drop down if we could.  Let's keep that up at

09:44:24 10   the top.  And let's blow up this compound and the results

09:44:27 11   just under BVDV.  Let's see how it did.  Do you see those

09:44:31 12   numbers 3, right there?

09:44:33 13   A.    Yes, I do.

09:44:34 14   Q.    And actually, the 3 should go under BVDV CPE rank,

09:44:42 15   because that's what it looks like on the screen.

09:44:45 16         Maybe blow up the whole sheet again so we can

09:44:47 17   show the jury exactly what we are talking about here.

09:44:50 18         We have got the BVDV CPE rank, there is the

09:44:54 19   compound number, and the results are 3 and 3.  Correct?

09:44:58 20   A.    Yes.

09:44:58 21   Q.    And if we go to the next page to look at what the

09:45:04 22   legend for 3 stands for, if we go to page 134, 3 means fully

09:45:12 23   protected.  Is that right?

09:45:13 24   A.    Yes.

09:45:14 25   Q.    So that's a pretty potent result right there?

09:45:17 1    A.      That would be considered a good thing, yes.  3 is

09:45:20 2    good and zero is not so good.

09:45:22 3    Q.      Exactly, basically no activity.

09:45:26 4    A.      Correct.

09:45:39 5    Q.      Let's go back to the page itself that we were on,

09:45:42 6    133, let's just keep it blown up, also, just like this.

09:45:46 7    Some of the compounds over here, it says "drop," do you see

09:45:49 8    that, "drop," "drop," "drop," "drop"?

09:45:52 9    A.      I do.

09:45:54 10   Q.      But for what would become 765, it's already numbered

09:45:59 11   the 765, there is a drop with a question mark.  Is that

09:46:02 12   right?

09:46:03 13   A.      For that particular compound, correct.

09:46:04 14   Q.      And, in fact, once you got the replicon assay, we

09:46:09 15   know, because you filed a patent application on it, this

09:46:14 16   compound was screened in replicon and in fact was found to

09:46:17 17   be groundbreaking and you filed a patent application on it.

09:46:21 18   Right?

09:46:22 19   A.      Well, that's fast-forwarding a couple of years.

09:46:27 20           The other thing, Ms. Brooks, if I can clarify,

09:46:30 21   you pointed out just the positive data for 765 with the BVDV

09:46:37 22   degree.  You didn't point out the next column.

09:46:40 23   Q.      Dr. Olsen, I am sorry to cut you off.  Remember our

09:46:42 24   deal at the beginning, if I asked you a question, and you

09:46:45 25   weren't going to be an advocate for Merck, if I asked you a

09:46:47 1    question, and the true answer was yes, you would just say

09:46:51 2    yes?

09:46:51 3    A.    I am sorry.

09:46:52 4    Q.    No problem.  They will have plenty of time to

09:46:55 5    question you on their clock.  Thanks.

09:46:59 6          You said we fast-forwarded.  In fact, let's go

09:47:02 7    from 1998 to talking about the continued work in the

09:47:06 8    Merck-Isis collaboration.  Is it true that Merck and Isis

09:47:10 9    continued to collaborate from 1998 all the way into the

09:47:16 10   early 2000s?

09:47:17 11   A.    It was a five-year collaboration.  So it ended in

09:47:21 12   2003, I believe.

09:47:22 13   Q.    For example, in 1999, Merck screened, along with

09:47:28 14   Isis, about 14,000 compounds in something called the NS5B

09:47:35 15   polymerase assay.  Is that right?

09:47:38 16   A.    Could you say the number again?

09:47:40 17   Q.    14,000?

09:47:41 18   A.    Yes.  So we did a high throughput screen against the

09:47:45 19   polymerase, the vast majority of those compounds would not

09:47:48 20   have been nucleosides.  So it was looking, just like I

09:47:52 21   talked about, NS5B polymerase on the top of this slide, it

09:47:58 22   was another target for the polymerase or nucleosides.

09:48:00 23   Q.    Let me try my question again.  Maybe you understood

09:48:03 24   it.  For example, in 1999 Merck screened about 214,000

09:48:09 25   compounds in the NS5B polymerase assay.  Correct?

09:48:13  1    A.      That is correct.

09:48:13  2    Q.      Merck also continued to develop what's called

09:48:18  3    structure-activity relationships or SAR.  Is that right?

09:48:22  4    A.      We relied heavily on SAR with this program, yes.

09:48:27  5    Q.      Now, turn, if you would, please, sir, to DX-447 in

09:48:33  6    your binder.

09:48:43  7            Now we have moved ahead in time.  We talked

09:48:45  8    about 1998 and talked about what you did in 1999.  Now we

09:48:50  9    are in 2000.  Let me know when you're there, DX-447?

09:48:55 10    A.      Yes.

09:48:55 11    Q.      This is anIsis-Merck joint review meeting held on

09:48:59 12    November 13, 2000.  Is that right?

09:49:00 13    A.      Yes.

09:49:01 14            MS. BROOKS:  Your Honor, we would move DX-447

09:49:04 15    into evidence.

09:49:05 16            MR. McCRUM:  No objection, Your Honor.

09:49:06 17            THE COURT:  It's admitted.

09:49:08 18            (DX-447 received in evidence.)

09:49:08 19    BY MS. BROOKS:

09:49:09 20    Q.      The title of it, it says it right there, Enzyme

09:49:12 21    Screen Results and Review of Most Important Leads.  Do you

09:49:15 22    see that?

09:49:16 23    A.      Yes, I do.

09:49:17 24    Q.      And if we go to page 10, here it says, "Nucleoside

09:49:27 25    Leads from the Cell-Based Replicon Assay.  So now you don't

09:49:31 1   have to do BVDV anymore, rely on that, or HIV or other

09:49:36 2   surrogate, you have actually got replicon in house at work.

09:49:40 3   Right, sir?

09:49:41 4   A.    Yes, and that is much more related to HCV.

09:49:44 5   Q.    In this particular case, there we find our compound

09:49:47 6   again. There is our 765. Right?

09:49:49 7   A.    Yes. And this is one of the first depictions of the

09:49:52 8   molecule in its full glory, so to speak, with the

09:49:56 9   stereochemistry highlighted.

09:49:58 10   Q.    Dr. Olsen, this number never changed from 1998, this

09:50:02 11   compound, they never, never changed from 1998 through 2000.

09:50:07 12   Right?

09:50:07 13   A.    The number did not change from '98 to 2000, that's

09:50:11 14   correct.

09:50:11 15   Q.    Thank you. Here is our compound with the methyl up

09:50:15 16   and an OH down and an adenine base?

09:50:20 17   A.    Yes.

09:50:21 18   Q.    So you called the whole thing a 2'-C-methyl

09:50:27 19   adenosine. Correct?

09:50:28 20   A.    That's correct.

09:50:28 21   Q.    Dr. Olsen, you are not trying to tell the ladies and

09:50:31 22   gentlemen of the jury, are you, that your work in 2000 was

09:50:34 23   unrelated to the work that you had done back in 1998 on

09:50:38 24   these compounds, are you?

09:50:42 25   A.    It was within the Isis-Merck collaboration. The

09:50:47 1    discovery of this compound in 2000, as far as I know, is

09:50:53 2    completely independent of what was done in 1998.

09:50:55 3    Q.    Really?  Because let's look at what it says on this

09:50:58 4    slide.

09:50:59 5          It is talking about the results in the replicon

09:51:02 6    assay.  And then right down here, what does it say?  "HIV

09:51:06 7    spread assay - Cytotoxicity evident at 2.5" -- is that

09:51:12 8    micromolars?

09:51:13 9    A.    Yes, it is.

09:51:13 10   Q.    "-- (1998 data.)"

09:51:21 11         Is that right, sir?

09:51:22 12   A.    That is correct.

09:51:22 13   Q.    In fact, in this document, you are referring to the

09:51:26 14   very testing that was done on this compound in 1998 in this

09:51:31 15   2000 document.  Correct, sir?

09:51:34 16   A.    After the compound came up as a hit for replicon

09:51:40 17   assay independent of what we did in 1998, we went back and

09:51:44 18   looked at what data was available on the compound.  And we

09:51:49 19   saw the 1998 data that had long been forgotten.

09:51:53 20   Q.    You didn't throw away the 1998 data, did you, sir?

09:51:57 21   A.    No, we didn't throw it away.  We put it in a database

09:51:59 22   so we could go and find it.

09:52:02 23   Q.    Just a couple more things and then we are done.

09:52:13 24         Let's turn to DX-2776 in your binder.  This is

09:52:17 25   an easy one, because it is to Dan Cook and you are cc'd on

09:52:24  1    it.  It's an e-mail.  Let me know when your there, sir.

09:52:28  2    DX-2776?

09:52:29  3    A.      Yes, I see this.

09:52:31  4    Q.      MS. BROOKS:  We would move DX-2776 into evidence,

09:52:37  5    Your Honor.

09:52:38  6              MR. McCRUM:  No objection, Your Honor.

09:52:39  7              THE COURT:  It is admitted.

09:52:40  8              (DX-2776 received in evidence.)

09:52:40  9    BY MS. BROOKS:

09:52:41 10    Q.      Let's see the contents of that e-mail.  If we can

09:52:43 11    blow up the "DNA, Enclosed."

09:52:47 12              We have already established, you are cc'd on it.

09:52:49 13    Is that right?

09:52:51 14    A.      I do see that, yes.

09:52:52 15    Q.      And in the e-mail, it says, "L-604765" -- that is the

09:53:00 16    compound we have been talking about -- "which is quite

09:53:03 17    potent in the replicon.  It is a close analog to," and then

09:53:07 18    it talks about another one.

09:53:08 19              "The one drawback to L-604765 is some

09:53:13 20    cytotoxicity in the HIV spread assay, but maybe this assay."

09:53:20 21              Do you see that?

09:53:20 22    A.      I do see that.

09:53:21 23    Q.      That assay that we were talking about was the 1998

09:53:25 24    one.  Correct?  We just saw that in other documents?

09:53:30 25    A.      I don't know that definitively.  I believe we input

09:53:34 1    compound multiple times into the HIV spread assay.  I am not

09:53:37 2    sure what this is referring to.

09:53:39 3    Q.     Let's move to DX-2851 in your binder.

09:53:52 4           It says, HCV Nucleoside Program.  It is an

09:53:57 5    updated dated June 21st, 2001.  Now we have gone from '98 to

09:54:02 6    '99, '99 to 2000, now we are moving to 2001.  Okay?

09:54:09 7    A.     Okay.

09:54:10 8           MS. BROOKS:  Your Honor, we would move DX-2851

09:54:13 9    into evidence.

09:54:13 10           MR. McCRUM:  No objection, Your Honor.

09:54:14 11           THE COURT:  It is admitted.

09:54:16 12        (DX-2851 received in evidence.)

09:54:16 13    BY MS. BROOKS:

09:54:17 14    Q.     If we could, please, let's go to page 3.

09:54:21 15           Now, here it says, Lead Compound.  And we have

09:54:27 16    two different compounds on here, one is the 765.  Do you see

09:54:32 17    that?

09:54:33 18    A.     Yes.

09:54:33 19    Q.     Now we have what looks like a very similar compound,

09:54:37 20    we will point out what the difference is in a moment, now

09:54:41 21    this has a number 884.  Do you see that?

09:54:43 22    A.     I do.

09:54:43 23    Q.     What has happened here, Dr. Olsen, is the 765

09:54:48 24    compound that's been with us since 1998 is now getting

09:54:53 25    modified at the 7-deaza.  Do you see that?

09:55:01 1   A.    Yes.

09:55:01 2   Q.    So the ladies and gentlemen of the jury can

09:55:02 3   understand what that means, if we look up here at this

09:55:07 4   two-ring base, right here where there is a double bond, do

09:55:09 5   you see those two lines later, sir?

09:55:12 6   A.    Yes.

09:55:12 7   Q.    In the 765 down there is an in.  Is that right?

09:55:15 8   A.    Yes, a nitrogen.

09:55:16 9   Q.    And now, at the 884 down, the N is gone.  Is that

09:55:21 10  correct?

09:55:22 11  A.    Absolutely, yes.

09:55:22 12  Q.    And I don't want to have to toggle back and forth, so

09:55:29 13  I will read it to you.  In that previous e-mail that I

09:55:32 14  showed you, it says, "The one drawback of L-604765 is some

09:55:38 15  cytotoxicity in the HIV spread assay but maybe this can be

09:55:43 16  decreased with structural modifications like 7-deaza, for

09:55:48 17  example."

09:55:49 18        By taking the nitrogen off here, is that what

09:55:53 19  would be considered a modification like 7-deaza?

09:56:00 20  A.    Yes.  That's very fair.

09:56:02 21  Q.    And so the hope was, in fact, that by doing that,

09:56:06 22  then 765, which was the lead compound, having the slight

09:57:12 23  modification, would have less toxicity?

09:57:12 24  A.    That was the hope, yes.

09:57:12 25  Q.    Am I correct, Dr. Olsen, that when you make a

09:57:12 1  modification to a compound, you then give it a different

09:57:12 2  number?

09:57:12 3  A.     Yes.  Every time.

09:57:12 4  Q.     Okay.

09:57:12 5         But we know 765, until it was modified right

09:57:12 6  here in 2001, was always the 765 from what we saw in 1998.

09:57:14 7  Correct, sir?

09:57:14 8  A.     Well, like I mentioned before, in '98 our view into

09:57:14 9  that compound didn't have stereochemistry.  We determined

09:57:14 10 that in the September-October time frame in 2000.

09:55:29 11 Q.     Dr. Olsen, that wasn't my question.  Let me try it

09:55:42 12 again.  Let me apologize.  I'm going very fast.

09:55:45 13        This compound 765 did not change from 1998 until

09:55:55 14 2001 when the nitrogen was removed from the base; correct?

09:56:05 15        And if you don't have an answer sir, you can

09:56:08 16 just say "I don't know."

09:56:10 17 A.     The way the question was worded is, to me, as a

09:56:13 18 scientist, didn't make sense.  I'm sorry.

09:56:16 19 Q.     That's fine?

09:56:16 20 A.     I don't want to insult you.

09:56:18 21 Q.     That's fine.  I'm not a scientist.

09:56:20 22 A.     Can you just ask me again.  Maybe I can get it.

09:56:22 23 Q.     Let me go back.  I think you already told me this.

09:56:25 24 A.     Okay.

09:56:25 25 Q.     When you modify a compound, you give it a different

09:56:27 1 number; correct, sir?

09:56:30 2 A.    Yes.

09:56:30 3 Q.    And this number here, 765, was given to this compound

09:56:35 4 in 1998 and it was still given to this compound in 2001;

09:56:40 5 correct, sir?

09:56:41 6 A.    That is fair.

09:56:42 7 Q.    Thank you.  Let's look, if we could, at page 3 of

09:56:50 8 2851.  I think we were just looking at page 3.  Let's move

09:57:02 9 to -- oop, I think I already made my point.  Never mind.

09:57:06 10 I'm ahead of myself.

09:57:07 11        Now, did eventually this compound where you have

09:57:10 12 your modification on the 7 deaza, did that eventually turned

09:57:15 13 into what would be called MK608?

09:57:19 14 A.    Yes, we refer to it as 0608.

09:57:23 15 Q.    0608?

09:57:25 16 A.    Yes.

09:57:25 17 Q.    Did that turn into the label indicated MK0608?

09:57:30 18 A.    Yes, that is that compound.

09:57:32 19 Q.    And that compound actually went into testing; right?

09:57:40 20 A.    All of these compounds were in testing.  Do you mean

09:57:45 21 human testing or --

09:57:46 22 Q.    In chimpanzees, sir?

09:57:49 23 A.    It did go into -- I think both of these compounds may

09:57:53 24 have gone into chimp.  884 or 0608 definitely did.

09:57:58 25 Q.    And isn't it true, sir, that you took MK0608 and

09:58:06 1    dosed chimpanzees with that and it resulted in what you have

09:58:12 2    characterized as the cure of one of the chimps of hepatitis

09:58:20 3    C and that that is the first, as far as you know,

09:58:22 4    demonstration of a cure of a mammal with these type of

09:58:26 5    molecules?

09:58:28 6    A.    That is fair.  That as far as I know, we're the first

09:58:36 7    -- so it wouldn't just 884 which is shown here which became

09:58:40 8    MK0608.  It was done in combination with another molecule

09:58:44 9    from Merck, a protease inhibitor, and we dosed one of the

09:58:48 10   chimps and one of the chimps we cured of its hepatitis C.

09:58:51 11   Q.    And as far as you know, you were the first; right?

09:58:55 12   A.    To cure a mammal of hepatitis C with direct acting

09:58:59 13   antivirals, yes.  There were other cures with interferon and

09:59:02 14   ribavirin.

09:59:03 15   Q.    Right.  But with what is called a DA, a direct acting

09:59:07 16   antiviral, Merck was the first.  That's your testimony under

09:59:10 17   oath before and it's your testimony under oath today; right?

09:59:13 18   A.    Well, to my knowledge, yes.  I mean I obviously can't

09:59:16 19   know what everybody else is doing.  But we published this

09:59:21 20   and I don't remember anybody saying that they did it before

09:59:23 21   us.

09:59:23 22   Q.    Well, actually, Idenix's counsel said it in opening

09:59:27 23   statement.  Are you aware, sir, that Idenix's counsel in

09:59:31 24   opening statement said for the next year or so, they,

09:59:35 25   referring to the scientists at Idenix, continued to work on

09:59:37 1     the invention?  A year later, they filed what is called a

09:59:41 2     non-provisional patent application and then the patent

09:59:44 3     actually published, meaning it became public, later on that

09:59:47 4     year.  Shortly after that, Idenix became the first company

09:59:52 5     that treated hepatitis C in animals.  The Idenix compound,

09:59:56 6     subject to this patent, successfully treated the human

10:00:00 7     hepatitis C in chimpanzees.

10:00:02 8         Did you know that that is what Idenix is

10:00:05 9     claiming in this trial, sir?

10:00:08 10     A.    I'm not aware of what they were saying in this

10:00:11 11     courtroom.  I didn't review any of that coming in today.

10:00:15 12     And it sort of goes to your definition of "successfully

10:00:18 13     treating."  I don't know what that means.

10:00:19 14     Q.    Thank you, Dr. Olsen.

10:00:22 15         MR. McCRUM:  Your Honor, can he finish his

10:00:25 16     answer?

10:00:25 17         THE COURT:  I thought he was.  Are you finished,

10:00:27 18     doctor?

10:00:27 19         THE WITNESS:  Well, I mean just to clarify for

10:00:30 20     the jury.  There is a very big difference between treating

10:00:32 21     an animal, a human, a chimp or a mouse with hepatitis C and

10:00:37 22     seeing it drop in viral load with a compound.  And I have no

10:00:42 23     idea what Idenix was referring to as the lawyers.  I wasn't

10:00:44 24     here.  I haven't read the transcripts.

10:00:46 25         What I was referring to with this MK0608

10:00:50 1    compound or 884, so when we combine that with a protease

10:00:55 2    inhibitor, we completely cured the virus from the

10:00:58 3    chimpanzee.  We looked in that chimp for months and months

10:01:02 4    and months after we stopped dosing and no virus came back.

10:01:06 5    So far as I know, we were the first ones to do that.  I

10:01:09 6    don't know how that relates to what Idenix was doing.  I

10:01:11 7    wasn't here.  I'm sorry.  I can't really comment on that.

10:01:15 8    Q.    And this subject didn't come in the two days of work

10:01:18 9    that you did with the Idenix lawyers preparing for your

10:01:21 10   testimony, sir; is that right?

10:01:21 11   A.    Which subject?

10:01:22 12   Q.    What we just talked about.

10:01:24 13   A.    No.  I mean --

10:01:26 14   Q.    Okay.  Thank you.

10:01:27 15   A.    -- the use of their compound in an animal to treat

10:01:32 16   HCV, no, that didn't come up at all.

10:01:35 17        MS. BROOKS:  Thank you.  No further questions.

10:01:36 18   Pass the witness.

10:01:37 19        THE COURT:  All right.  We will take a break

10:01:39 20   before we have the other examination.

10:01:41 21        Ladies and gentlemen of the jury, no talking

10:01:43 22   about the case.  We'll get you back here shortly.

10:01:45 23        (Jury left courtroom.)

10:01:46 24        THE COURT:  All right.  We will be in recess.

10:02:21 25        (Brief recess taken.)

10:02:21  1              *     *     *

10:16:59  2              (Proceedings reconvened after recess.)

10:16:59  3              THE COURT:  Bring the jury in.

10:19:21  4              THE WITNESS:  May I retake the seat?

10:19:25  5              THE COURT:  Well, you should stand until the

10:19:27  6      jury comes in.

10:19:31  7              (Jury returned.)

10:19:52  8              THE COURT:  We're ready to proceed.

10:20:46  9              Mr. McCrum.

10:20:47 10              MR. McCRUM:  Your Honor I have a few binders to

10:20:52 11      pass out.  May I approach?

10:20:54 12              THE COURT:  Yes, you may.

10:20:56 13              (Binders passed forward.)

10:21:13 14                      CROSS-EXAMINATION

10:21:13 15      BY MR. McCRUM:

10:21:13 16      Q.      Good morning, Dr. Olsen.  My name is Ryan McCrum.  I

10:21:18 17      represent Idenix in this case.

10:21:21 18              You may have already touched on this today, but

10:21:24 19      who was the leader of the Merck/Isis hepatitis C research

10:21:28 20      group from the fall of 1998 until 2003?

10:21:32 21      A.      I was.

10:21:33 22      Q.      And did your group ever discover a 2'-methyl up

10:21:41 23      nucleoside for treating hepatitis C prior to the fall of

10:21:44 24      2000?

10:21:44 25      A.      No.

10:21:46 1    Q.    Are you aware that the provisional application filed

10:21:50 2    for the Idenix patent in this case was filed in May of 2000?

10:22:00 3    A.    I'll take your word for it.

10:22:01 4    Q.    You will agree if in fact that was the case, that it

10:22:05 5    was filed in May of 2000, that is before your work in the

10:22:07 6    fall of 2000 on modified 2'-methyl up modified nucleosides?

10:22:15 7    A.    That would be, yes.

10:22:16 8    Q.    We're going to come back to that work, Dr. Olsen.

10:22:23 9    But we didn't get a chance to hear much about your personal

10:22:26 10   background, so I'd like to take a moment to do that.

10:22:29 11                Where do you live?

10:22:31 12   A.    I live a little north of Philadelphia in Lansdale,

10:22:35 13   Pennsylvania.

10:22:35 14   Q.    And you mentioned that you work for Merck.  How long,

10:22:39 15   if you could remind the jury?

10:22:40 16   A.    A little over 25 years now.

10:22:42 17   Q.    And what is your current position at Merck?

10:22:45 18   A.    I'm a distinguished scientist at Merck, and I have

10:22:51 19   really a terrific job.  I lead something called neglected

10:22:56 20   tropical disease discoveries for the company.

10:22:58 21                So neglected tropical diseases are things that

10:23:01 22   Merck wouldn't expect to profit from doing the work.  So

10:23:05 23   obviously I used to work on hepatitis C.  Now I have

10:23:08 24   transitioned into this not-for-profit space.  So my

10:23:12 25   collaborators are organizations like the Bill and Melinda

10:23:16 1  Gates Foundation, the Wellcome Trust, Drugs For Neglected

10:23:19 2  Diseases Initiative; and we work on things like TB, malaria,

10:23:27 3  Chagas' Disease.  Most of these diseases that I work on

10:23:31 4  affect the poor of the world.

10:23:33 5          More recently, I have worked on Ebola, and we

10:23:37 6  have some really interesting data on hits from some compound

10:23:41 7  from hepatitis C, not all of them nucleosides but some that

10:23:46 8  inhibit Zeka virus, which Zeka is in the same family as HCV.

10:23:52 9  So that we have some pretty exciting results there and we're

10:23:56 10 prosecuting that in my job.

10:23:58 11 Q.      Thank you.  Can you describe your educational

10:24:00 12 background, Dr. Olsen?

10:24:02 13 A.      Yes, I grew up in -- sorry -- north Jersey and went

10:24:07 14 to high school there.  Then I went to the middle of

10:24:09 15 Pennsylvania to a small school called Messiah College.

10:24:14 16         After Messiah, 1983, I graduated, went to the

10:24:19 17 University of Maryland, got a Ph.D. in biochemistry at the

10:24:23 18 University of Maryland.  And from there, I did something

10:24:24 19 called a post-doctoral study at the Max-Planck Institute For

10:24:29 20 Experimental Medicine.  I said that very slow because I know

10:24:32 21 he's got to type that somehow.

10:24:34 22         So I worked at the Max-Planck for about three

10:24:38 23 years until 1991, when I joined Merck.

10:24:42 24 Q.      And did you join a group at Merck when you joined in

10:24:45 25 1991?

A.     I joined an infectious disease, antiviral discovery

group in '91, yes.

Q.     Were you assigned to any project when you started at

Merck?

A.     Yes.  The first project I was assigned to was HIV

AIDS project.  It was a polymerase project, somewhat similar

to what we're doing, talking about here in HCV, but the

polymerase is more, the inhibitors of HIV are not DNA

directed and these are more RNA directed.

Q.     I want to go back, I mean kind of do it the opposite

way that counsel did.  I want to start at the beginning and

move forward.  I want to start in 1998 time frame.

       I guess my first question is at that point in

time, had Merck discovered a 2'-methyl up nucleoside for

treating hepatitis C?

A.     No.

Q.     At that time, what was the purpose of the Merck/Isis

collaboration?

A.     The purpose of the Merck/Isis collaboration was to

identify nucleoside inhibitors that could eventually treat

HCV infected people.

Q.     And the jury heard the term "assays."  What assays

did Merck use in its hepatitis C program at that time?

A.     Yes, there were two assays or tests that we had at

our availability.  So there is BVDV test that you heard

10:26:16 1   about.  So that is a cell-based test.  And then there was,

10:26:20 2   we also had the polymerase that was directly from HCV, that

10:26:27 3   is a biochemical test.  Both of these were run in test tubes

10:26:31 4   and we can test different compounds in those two different

10:26:34 5   assays.

10:26:35 6   Q.    Can you explain how the BVDV in hepatitis C

10:26:38 7   polymerase assays were being used at that time in 1998?

10:26:42 8   A.    Yes.  The typical protocol or procedure was to

10:26:48 9   identify an interesting nucleoside test, and it would go

10:26:53 10   into the BVDV assay and interesting hits in the BVDV assay

10:26:59 11   were then identified and the triphosphate was made.  And

10:27:04 12   then those would have been tested against the NS5B

10:27:08 13   polymerase in that polymerase assay.

10:27:10 14   Q.    Did Merck maintain business records that record this

10:27:13 15   kind of protocol that you described?

10:27:14 16   A.    Yes.

10:27:15 17   Q.    I think one of those was marked today already.  It's

10:27:19 18   DX-2794 which should be in your binder that counsel for

10:27:25 19   Gilead gave you.  Could you please refer to that for me?  It

10:27:30 20   should be November 13th, 1998.

10:27:34 21   A.    Yes, I do have that.

10:27:35 22   Q.    Can you just remind the jury, please, what that is

10:27:38 23   document is?

10:27:40 24   A.    Yes.  So this is a letter from Dan Cook to my boss at

10:27:45 25   the time, Lawrence Kuo.  Dan Cook is from our collaborator

10:27:50 1  organization called Isis Pharmaceuticals.

10:27:54 2  Q.    If I could have you turn to DX-005, please.

10:27:59 3  A.    Yes, I'm there.

10:28:00 4  Q.    Okay.  And can you describe what is reported here?

10:28:04 5  A.    Yes.  So this basically documents what I just said.

10:28:12 6  So the nucleosides would be screened in the BVDV assay.  And

10:28:17 7  then if you go down -- is it okay if I use this laser

10:28:22 8  pointer?

10:28:23 9          THE COURT:  Sure.

10:28:23 10  BY THE WITNESS:

10:28:24 11  A.    So that is the nucleosides screened in BVDV.

10:28:29 12          If you go down to this bullet here, it says that

10:28:34 13  the compounds of interesting activity -- boy, that works a

10:28:38 14  lot better in yellow -- would have been, triphosphates of

10:28:42 15  those would have been made and then tested against the

10:28:45 16  polymerase.

10:28:45 17  Q.    Okay.  So is it fair that you got the BVDV assay and

10:28:51 18  the polymerase assay, and if you find interesting results in

10:28:54 19  BVDV, you test the polymerase assay?

10:28:57 20  A.    That is pretty much what is outlined there, yes.

10:29:00 21  Q.    I will now go to later in this document.  I actually

10:29:06 22  don't have the DX number.  It's the chart, Mr. Farrell, that

10:29:11 23  is about four pages or five pages from the end of this

10:29:13 24  document.  It's got a Bates number MERCK56553.  Yes.  Thank

10:29:21 25  you very much.

10:29:21 1    All right.  You talked about this table earlier

10:29:23 2  in your testimony.  Do you recall that?

10:29:26 3  A.    Yes, I do.

10:29:27 4  Q.    Could you just remind the ladies and gentlemen of the

10:29:29 5  jury what is actually being shown here?

10:29:31 6  A.    So, again, from early on in the program, 1998 in this

10:29:36 7  particular case, some of the scientists are summarizing

10:29:40 8  their data.

10:29:40 9    In the left-hand column is the code number and

10:29:44 10 unique compound in the Merck collection.  It had a code

10:29:47 11 number.

10:29:48 12   The next column would have the structure

10:29:51 13 associated with the code number.

10:29:53 14   And then the following, I don't know how many,

10:29:56 15 six or seven or eight columns lists data associated with

10:30:02 16 those particular compounds.

10:30:03 17   And then the far right lists the status of that

10:30:07 18 particular compound, after those testing results were

10:30:10 19 obtained.

10:30:11 20 Q.    Okay.  We've talked some about this compound L-765.

10:30:17 21 That's the compound that is in the last row of this chart

10:30:20 22 that you see here; right?

10:30:22 23 A.    Yes.

10:30:23 24 Q.    Okay.  And what is recorded here for the status of

10:30:27 25 L-765, Dr. Olsen?

10:30:30 1   A.     It says, "drop" with a question mark.

10:30:33 2   Q.     What in fact did happen to L-765 after this data was

10:30:38 3   reported?

10:30:40 4   A.     It was dropped.

10:30:41 5   Q.     Let's talk a little bit more about that.

10:30:44 6         You testified earlier that this protocol about

10:30:47 7   testing BVDV first, and if you found an interesting hit,

10:30:54 8   there would be a triphosphate made and tested.

10:30:56 9         After the testing on L-765 in 1998, did Merck

10:31:01 10   make a triphosphate version of L-765?

10:31:04 11   A.     Years later.

10:31:06 12   Q.     So did you make one in 1998?

10:31:09 13   A.     No.

10:31:11 14   Q.     Not in 1999?

10:31:12 15   A.     No.

10:31:13 16   Q.     When was the triphosphate of L-765 first made by

10:31:18 17   Merck?

10:31:18 18   A.     January of 2001.

10:31:19 19   Q.     And how do you know that?

10:31:23 20   A.     I went back and looked it up.

10:31:24 21   Q.     Where would you find something like that at Merck?

10:31:28 22   You looked it up where?

10:31:29 23   A.     Yes.  Merck has an electronic database that contains

10:31:33 24   millions of compound.  Every time a new compound is used or

10:31:36 25   tested at Merck, it's given a unique L number which is

10:31:39 1    listed in that left-hand column.  And the associated data

10:31:45 2    with that compound is put in the structure and things like

10:31:49 3    that.

10:31:49 4    Q.    Are there any company documents that you are aware

10:31:54 5    of that show that the triphosphate of L-765 was not made

10:31:59 6    earlier than this January, this 2001 time frame you are

10:32:04 7    talking about?

10:32:05 8    A.    Yes.

10:32:07 9    Q.    Can I please have DX-2587?

10:32:10 10          It's Tab 2 in your white binder, Dr. Olsen.

10:32:14 11   Sorry we had to be switching back and forth.  Can you please

10:32:21 12   turn to that?

10:32:24 13   A.    Yes, I have it.

10:32:25 14   Q.    Is this one of the documents that you are referring

10:32:27 15   to about when the triphosphate of L-765 was made?

10:32:33 16   A.    Yes.

10:32:34 17   Q.    Before we publish this to the jury, can you just tell

10:32:39 18   what this is?  Tell us what this document is.

10:32:41 19   A.    Yes, this is an e-mail from me to a number of people

10:32:46 20   associated with the HCV program, including my boss and Dan

10:32:50 21   Cook at Isis Pharmaceuticals, a number of other people, and

10:32:55 22   it talks about 765.

10:32:58 23          MR. McCRUM:  Your Honor, I move the admission of

10:33:00 24   DX-2587.

10:33:04 25          MS. BROOKS:  No objection.

10:33:04 1                THE COURT:  It's admitted.

10:33:05 2                (DX-2587 was admitted into evidence.)

10:33:05 3     BY MR. McCRUM:

10:33:07 4     Q.     If you could turn to the second page of this

10:33:08 5     document, Dr. Olsen.

10:33:09 6                And if we could have the two columns highlighted

10:33:13 7     at the bottom of that, please?

10:33:15 8                Can you describe what is shown here?

10:33:16 9     A.     It's a short table of some key compounds, and the

10:33:22 10    last two rows which are highlighted contain information

10:33:26 11    about 604765.

10:33:29 12               And if you go over to the bottom right, I don't

10:33:32 13    know if that could be blown up or not.  But basically it

10:33:38 14    basically says there that the TP has never been made.  And

10:33:43 15    -- there you go.  That is great.  A TP has never been made.

10:33:47 16    And, again, this is dated in November of 2000.

10:35:06 17    Q.     How, if at all, does the fact that a triphosphate had

10:35:11 18    not been made as of November 2000 relate to this 1998 BVDV

10:35:18 19    test that they are talking about?

10:35:20 20    A.     Yes.  So what we just went through is if a compound

10:35:23 21    was tested in the BVDV assay and that compound was of

10:35:27 22    significant interest, it said it right in the memo, the

10:35:30 23    triphosphate would have been made.  If it was an interesting

10:35:33 24    compound, triphosphate would have been made.  We didn't make

10:35:36 25    it until years later, after it was tested in another assay.

10:35:39 1  Q.    Well, triphosphate was not made.  What additional

10:35:43 2  work was done on L-765 after this 1998 BVDV test?

10:35:52 3  A.    After the data in that 1998 table was generated, I

10:35:57 4  don't think any other testing was done on it until we

10:36:01 5  independently discovered it in 2000.

10:36:04 6  Q.    In the fall of 2000?

10:36:06 7  A.    In the fall of 2000.

10:36:07 8  Q.    So can you think of any work that was done on that

10:36:11 9  compound between late 1998 and the fall of 2000?

10:36:14 10  A.    Not that I can remember.

10:36:15 11  Q.    Who performed the 1998 BVDV testing of L-765?

10:36:21 12  A.    Dr. Wolanski.

10:36:22 13  Q.    What was his job in 1998?

10:36:27 14  A.    He ran cell-based assays for the HCV program.

10:36:31 15  Q.    Was he a chemist?

10:36:33 16  A.    No.  He was a biologist.

10:36:35 17  Q.    Did Dr. Wolanski ever report the results of testing

10:36:39 18  in group meetings as part of the hepatitis C research

10:36:43 19  project?

10:36:43 20  A.    Yes, he did.

10:36:44 21  Q.    And how were those results typically presented?

10:36:50 22  A.    My memory of that time when he presented results were

10:36:55 23  overheads, we didn't have nice electronic presenting things

10:37:00 24  like we have today, so it was an overhead projector.  So it

10:37:04 25  was using transparencies.  And they were lists of the L

10:37:09 1   numbers and the corresponding data.

10:37:12 2            Bob was a pretty hard-core biologist.  And

10:37:15 3   unlike myself, he wasn't that interested in the structures.

10:37:19 4            So I don't remember him presenting the data with

10:37:22 5   the structures on it.

10:37:22 6   Q.       I want to go back to DX-2794 in the black binder, Dr.

10:37:32 7   Olsen.  And I want to look at that table.  Can we blow up --

10:37:42 8   Thank you.

10:37:44 9            At the time that this 1998 BVDV test was done on

10:37:50 10  L-765, did your team know that the L-765 had methyl at the

10:37:55 11  2' up position?

10:37:59 12  A.       No.

10:38:00 13  Q.       Why not?

10:38:03 14  A.       The compound, as it's depicted here -- and this is

10:38:06 15  not the greatest visualization of it -- but the lines drawn

10:38:10 16  from the 2' carbon to the methyl group and the hydroxyl are

10:38:16 17  just straight lines.  They don't have the wedge, which is

10:38:20 18  that solid black triangular thing, or the dashed line, which

10:38:25 19  would tell us whether the methyl is up or down.

10:38:29 20           So at that point in time we would have known

10:38:31 21  that.

10:38:31 22  Q.       Did you bring a model of L-765 to explain to the

10:38:37 23  ladies and gentlemen of the jury what you are talking about?

10:38:40 24  A.       Yes.

10:38:40 25  Q.       Using that model, can you elaborate?

10:38:46 1    A.    Yeah.  These aren't the easiest things to handle.  If

10:38:50 2    it is okay with the jury, I am going to take the base off,

10:38:53 3    just to make it easier for me to hold.

10:38:56 4             So this is the ribose ring.  We typically like

10:38:59 5    to sort of put that flat when we are looking at something

10:39:02 6    like this.

10:39:04 7             This is with the methyl up and the hydroxyl down

10:39:07 8    at this important 2' position.  And so what we didn't know,

10:39:10 9    with the compound drawn in this manner, we didn't know that

10:39:14 10   that methyl was there.  We didn't know the hydroxyl was

10:39:18 11   there.  It just as easily could have been this, the

10:39:24 12   opposite.

10:39:25 13            So the way it's drawn it could have been one or

10:39:27 14   the other, but we didn't know which one it was at the time.

10:39:30 15   Q.    Did Merck ever determine for L-765 whether methyl was

10:39:36 16   up or down?

10:39:37 17   A.    Yes, we did.

10:39:38 18   Q.    And if you could just tell me what the time frame was

10:39:42 19   when this happened?

10:39:43 20   A.    That would have been late September-early October of

10:39:46 21   2000.

10:39:48 22   Q.    So prior to that date, would it have been possible

10:39:52 23   for someone at Merck to identify the proper stereochemistry

10:39:56 24   of L-765 using the Merck database?

10:40:00 25   A.    No.  If you went into the Merck database, this is

10:40:04 1    what you would see.

10:40:06 2    Q.    All right.  So we have talked about 1998 with respect

10:40:11 3    to L-765.  There wasn't much to talk about until 2000.  So I

10:40:16 4    want to talk about that now, Dr. Olsen.

10:40:24 5          If I could have PX-305 on the screen.  I think

10:40:30 6    it's Tab 3 of your binder.  Actually, let's not put it on

10:40:34 7    the screen yet.  Can you refer to Tab 3.  It's in the white

10:40:37 8    binder, Dr. Olsen.

10:40:44 9    A.    Okay.

10:40:45 10   Q.    Are you there?

10:40:46 11   A.    Yes.

10:40:46 12   Q.    What is this document?

10:40:50 13   A.    I have to go to the second page, because there is a

10:40:53 14   post-it that was on the first page.

10:40:55 15         It is from a Merck-Isis collaboration meeting in

10:40:59 16   West Point in May of 2000.

10:41:02 17   Q.    Did you attend that meeting?

10:41:04 18   A.    Yes.

10:41:04 19   Q.    Did you review the materials that you are looking at

10:41:08 20   around the time of this meeting?

10:41:10 21   A.    Yes.

10:41:11 22         MR. McCRUM:  I move for the admission of PX-305.

10:41:15 23         MS. BROOKS:  No objection, Your Honor.

10:41:16 24         THE COURT:  It is admitted.

10:41:17 25         (PX-305 received in evidence.)

10:41:17 1    **BY MR. McCRUM:**

10:41:18 2    **Q.    I ask that you turn to page 42, it is page**

10:41:22 3    **PX-305.0042.  If it is easier, Dr. Olsen, I will try to make**

10:41:33 4    **those visuals on the screen for you.  If you prefer hard**

10:41:37 5    **copies, by all means.**

10:41:39 6    **Describe what's shown -- first of all, what was**

10:41:41 7    **the date of this document?**

10:41:45 8    **A.    It's going back, the exact date is the 8th of May,**

10:41:49 9    **2000.**

10:41:49 10    **Q.    May 8, 2000.**

10:41:52 11    **Explain, if you could, to the jury what is being**

10:41:55 12    **shown here by Merck as of May 8th, 2000?**

10:42:01 13    **A.    This is a table, we talked a little bit earlier about**

10:42:05 14    **doing structure-activity relationships.  So that's when we**

10:42:09 15    **get a hit, we make specific modifications to the compound**

10:42:14 16    **and see how it affects the data, the potency in this**

10:42:17 17    **particular case.**

10:42:19 18    **So this is -- these are essentially a listing of**

10:42:23 19    **our key compounds from the May of 2000 time frame.**

10:42:28 20    **Q.    Were these the compounds you were most interested in**

10:42:30 21    **at the time?**

10:42:31 22    **A.    Yes.**

10:42:31 23    **Q.    Do any of the compounds on this table have a methyl**

10:42:35 24    **up group at the 2' position?**

10:42:38 25    **A.    No.**

10:42:39 1  Q.    Was L-765 included in this SAR study that is reported

10:42:46 2  as May 2000?

10:42:48 3  A.    No.  It wouldn't have been, because it was dropped in

10:42:52 4  '98.

10:42:52 5  Q.    You said that these were your top compounds, I think,

10:42:57 6  as of May 2000.  Did that change at some point?

10:43:00 7  A.    Very shortly after this.

10:43:02 8  Q.    And how did that change?

10:43:05 9  A.    Well, in 2000, it was the pivotal year for HCV drug

10:43:12 10  discovery, not just as Merck -- maybe later in other

10:43:15 11  companies.  But we got the replicon in HCV cell-based test

10:43:21 12  in at the company.

10:43:24 13          In preparation for running compounds through

10:43:26 14  that, I was working with some of my direct reports to

10:43:30 15  identify nucleosides for testing in the assay.

10:43:35 16          So we sort of cast a wide net, and tried to

10:43:41 17  identify as many nucleoside inhibitors or compounds --

10:43:44 18  hopefully they would be inhibitors -- to test in that new

10:43:48 19  replicon assay at Merck.

10:43:50 20  Q.    Could you describe how you went about identifying

10:43:57 21  compounds to test in this replicon?

10:44:02 22  A.    Yes.  So I think I mentioned to you earlier that

10:44:04 23  Merck has this electronic database.  So you can go in and

10:44:09 24  you can search for a compound based upon its L number, but

10:44:12 25  you can also do it based upon its structure, or even, to go

10:44:18  1    back to the models, even a substructure.

10:44:21  2            So you can basically go into the electronic

10:44:24  3    database and draw a structure like this, the adenine ring,

10:44:28  4    and pull up everything that has an adenine ring.  That's one

10:44:32  5    of the things that we did.

10:44:34  6            You can go and, you know, put a structure like

10:44:36  7    this into a search query and it would pull up everything

10:44:42  8    with a ribose.  That would include 765 with a methyl group

10:44:46  9    attached to it at the time.

10:44:48 10            So it was a very powerful tool electronically to

10:44:51 11    identify compounds.  We did that not only with the Merck

10:44:55 12    collection but we also did it -- you can do that same kind

10:44:58 13    of searching across the globe.  And there is big databases

10:45:03 14    of compounds that you can do these types of searches on,

10:45:06 15    then see which companies across the globe have those

10:45:10 16    molecules.

10:45:10 17            We identified compounds, you know, from

10:45:15 18    Scandinavia, from Russia.  All different or sorts of places.

10:45:19 19            We started to bring those compounds into the

10:45:22 20    company in anticipation of testing in the replicon assay.

10:45:25 21    Q.    Was that search in any way based off of the 1998 BVDV

10:45:32 22    test of L-765?

10:45:34 23    A.    No, it was not.

10:45:35 24    Q.    Did anyone assist you with that search that you just

10:45:40 25    described?

10:45:41 1    A.    Yes.  A few of my direct reports did.

10:45:43 2    Q.    Can you provide their names?

10:45:47 3    A.    Carrie Rickowski and Amy Himmelberger.

10:45:51 4    Q.    Did they report to you?

10:45:53 5    A.    Yes, they did.

10:45:54 6    Q.    Did they maintain laboratory notebooks in the

10:45:57 7    ordinary course of Merck's business?

10:45:58 8    A.    Absolutely.

10:45:58 9    Q.    Did you review those from time to time?

10:46:00 10   A.    Yes.

10:46:00 11   Q.    Can you take a look at PX-320 at Tab 4 of your

10:46:05 12   binder, please.

10:46:13 13           This would be in the white binder.

10:46:19 14   A.    Okay.  I do have it.

10:46:20 15   Q.    What is this document?

10:46:25 16   A.    This document comes from Amy Himmelberger's notebook.

10:46:31 17           MR. McCRUM:  Your Honor, I move the admission of

10:46:34 18   PX-320.

10:46:35 19           MS. BROOKS:  No objection.

10:46:35 20           THE COURT:  It is admitted.

10:46:35 21           (PX-320 received in evidence.)

10:46:37 22   BY MR. McCRUM:

10:46:37 23   Q.    If you could take a look at PX-320.004.

10:46:43 24   A.    Yes, I have that.

10:46:43 25   Q.    What is shown on this page?

Olsen - cross

10:46:46 1    A.      This is page 219 from Amy's notebook.  She is

10:46:50 2    describing the search for nucleoside analogues to test in

10:46:55 3    the replicon assay.

10:46:56 4    Q.      Is there a date on this notebook page?

10:46:59 5    A.      Yes.  This is from the 21st of June 2000.

10:47:03 6    Q.      Was the 2' methyl structure one of the search

10:47:07 7    criteria in this search?

10:47:09 8    A.      No.

10:47:10 9    Q.      Why not?

10:47:14 10   A.      It wouldn't have made sense to do that.  We weren't

10:47:20 11   interested in that at the time.  The way I instructed and

10:47:23 12   trained them to do these types of searches, they had never

10:47:25 13   done these types of searches before.  So it was actually

10:47:28 14   sort of fun to train them to do that.

10:47:31 15           We wanted to cast a wide net.  So we would do

10:47:35 16   much more vehicle searches to try to capture everything and

10:47:39 17   not, you know, look for very, very specific things.

10:47:43 18   Q.      Approximately how many compounds were identified by

10:47:46 19   these searches?

10:47:50 20   A.      At a high level, tens of thousands.

10:47:53 21   Q.      After the search was completed, what happened next?

10:47:57 22   A.      So the list of compounds was trimmed down to some

10:48:00 23   extent, and they were submitted for testing in the replicon

10:48:04 24   assay.

10:48:04 25   Q.      And what time are we talking about here now?

10:48:09 1    A.    This is in the summer of 2000, and replicon, I think

10:48:14 2    we started testing August-September.

10:48:19 3    Q.    What if anything did you discover from this testing

10:48:23 4    in the replicon from that fall of 2000 time frame?

10:48:27 5    A.    We identified L-765 as a very important inhibitor of

10:48:34 6    HCV replication in that cell-based assay.  It was a very

10:48:39 7    important discovery for us.

10:48:40 8    Q.    What was your reaction at that time?

10:48:41 9    A.    "Yee-ha."

10:48:44 10         Now, we were just very excited.  Very excited.

10:48:48 11   Q.    Are there company documents that memorialize the

10:48:52 12   results of this discovery?

10:48:54 13   A.    Yes, there are.

10:48:54 14   Q.    If I could -- if you could turn to PX-349.  It's Tab

10:48:59 15   5 in your binder, please.

10:49:08 16   A.    Yes, I have it.

10:49:09 17   Q.    What is this?

10:49:10 18   A.    This is an e-mail from Steve Carroll, who works very

10:49:16 19   closely with me at work, to Dan Cook, who was the head of

10:49:20 20   the Isis chemists in -- Isis Pharmaceuticals in California.

10:49:25 21   Q.    Is this an e-mail that would have been generated in

10:49:28 22   the ordinary course of Merck's business?

10:49:30 23   A.    Yes.

10:49:31 24         MR. McCRUM:  I move the admission of PX-349.

10:49:34 25         MS. BROOKS:  No objection, Your Honor.

10:49:35  1          THE COURT:  It is admitted.

10:49:35  2          (PX-349 received in evidence.)

10:49:37  3   BY MR. McCRUM:

10:49:37  4   Q.      Let's take a look at the e-mail.  If you could just

10:49:41  5   explain what you understand to be disclosed in this e-mail?

10:49:44  6   A.      Yes.  Thank you for blowing that up.

10:49:49  7          The interesting thing or the most interesting

10:49:52  8   thing is what is highlighted.  "There are a couple of

10:49:55  9   interesting new compounds from the Merck collection,

10:49:58 10   including 604765."

10:50:02 11   Q.      Let's turn to, if you could, DX-477, I am going to

10:50:08 12   switch you back to the black binder.  I believe this is a

10:50:14 13   document that is already into evidence.

10:50:21 14          Are you there?

10:50:23 15   A.      I am going to go from the screen, if that's okay.

10:50:26 16   Q.      That's perfectly fine.

10:50:27 17          Is this another document that memorializes the

10:50:30 18   discovery of L-765?

10:50:33 19   A.      Yes.

10:50:33 20   Q.      Can you described what this document is?

10:50:36 21   A.      This is from a Merck-Isis collaboration meeting from

10:50:40 22   November 13th of 2000.

10:50:42 23   Q.      If you could turn to page 447.0010.  Can you tell me

10:50:53 24   what's disclosed here, Dr. Olsen?

10:50:56 25   A.      Well, there is the structure of this lead compound,

10:51:00 1    765, that we have been referring to, and some corresponding

10:51:04 2    data associated with it.

10:51:06 3    Q.    If you could turn to the next page, can you explain

10:51:13 4    what is described on this slide?

10:51:15 5    A.    Yes.  So it was pretty clear that a flurry of

10:51:19 6    activity started to occur when we identified this molecule.

10:51:23 7    And this lists some of the things.  It lists, very

10:51:29 8    specifically it was, a top priority and it needed to be

10:51:32 9    resynthesized and we need to make the triphosphate.  It also

10:51:37 10   has analogues, the 7-deaza, the 8-bromo version, to study

10:51:42 11   the molecule further.

10:51:43 12   Q.    Just for non-chemists like me, what do you mean by

10:51:49 13   resynthesize?

10:51:52 14   A.    Yes.  So the compound was made a long time ago.  It

10:51:57 15   was made in the 1960s.  And it's always good, when you get a

10:52:01 16   screening hit in any sort of drug discovery program, to

10:52:06 17   remake the compound, and to confirm its activity.

10:52:12 18   Q.    Did you end up doing any of this follow-on work

10:52:15 19   that's described here?

10:52:18 20   A.    I think everything on this slide was done pretty

10:52:22 21   quickly after September, certainly initiated very quickly.

10:52:26 22   I am not sure when everything was delivered.  The

10:52:29 23   triphosphate, for example, it came in in January of 2001.

10:51:21 24   Q.    Okay.  And is that follow-on work described in

10:51:25 25   company record?

10:51:26 1    A.      Yes, it is.

10:51:26 2    Q.      Okay.  If I could take a look at PX-2299.  If you

10:51:32 3    could look at that for me in Tab 7 of your binder.

10:51:40 4    A.      (Witness complies.)

10:51:41 5    Q.      Is that one of the documents recording this follow-on

10:51:44 6    activity?

10:51:45 7    A.      Yes, it would be.

10:51:46 8    Q.      Can you tell us what that document is?

10:51:50 9    A.      Yes.  This comes from November.  November 13th of

10:51:55 10    2000 to be exact.  And it talks about structure activity

10:52:00 11    relationship plans around some of the hits from the replicon

10:52:05 12    assay, including 765.

10:52:07 13    Q.      And did you review this document at or around the

10:52:10 14    time it was?

10:52:11 15    A.      Yes.

10:52:11 16          MR. McCRUM:  I move for the admission of PX-2299

10:52:15 17    into admission.

10:52:16 18          MS. BROOKS:  No objection.

10:52:16 19          THE COURT:  It's admitted.

10:52:16 20         (PX-2299 was admitted into evidence.)

10:52:16 21    BY MR. McCRUM:

10:52:19 22    Q.      All right.  Let's take a look at pages PX-2299.002.

10:52:26 23         And can you explain what is shown on these

10:52:29 24    pages, Dr. Olsen?

10:52:30 25    A.      Yes.  I mentioned earlier that we like to do

10:52:33 1    structure activity relationship work.  This is not in a nice

10:52:37 2    grid that I showed you before, but essentially is the same

10:52:41 3    purpose is to take the lead compound, 765, which is in the

10:52:45 4    upper left-hand corner, and then to start tweaking the

10:52:49 5    molecule and making analogs.

10:52:52 6              There is a couple of other things I'd like to

10:52:54 7    point out on this slide.

10:52:55 8              No. 1 is circled actually and it says,

10:52:58 9    synthesize larger quantities.

10:53:00 10             And when you go and make 20 grams of a molecule

10:53:04 11   which is what is listed there, that definitely means you are

10:53:07 12   interested in the molecule because that is a big piece of

10:53:10 13   work to be able to do that.

10:53:12 14             Then No. 2 is to synthesize the triphosphate,

10:53:18 15   again, that was delivered a few months after this meeting.

10:53:21 16             So you can see structure activity relationship

10:53:25 17   initiated very quickly after HCV replicon.  It was

10:53:31 18   identified as HCV replicon hit in some of these other

10:53:36 19   activities.

10:53:36 20   Q.   Now, after some of this work that you have been

10:53:38 21   describing in this fall of 2000 time frame, did Merck file a

10:53:41 22   patent application?

10:53:42 23   A.   Yes, we started to gather the information in late

10:53:47 24   2000 and then the first patent application was submitted in

10:53:54 25   the end of January of 2001.

10:53:56  1   Q.      Okay.  If you could refer to DX-2598, I believe it

10:54:02  2   was marked as an exhibit in the black binder earlier today,

10:54:10  3   Dr. Olsen.

10:54:10  4          Is this the patent application you filed in

10:54:12  5   January of 2001?

10:54:15  6   A.      Yes.

10:54:15  7   Q.      And if you could turn to the next page -- actually,

10:54:20  8   right there is fine.

10:54:21  9          Are you listed as an inventor on this

10:54:23 10   application?

10:54:25 11   A.      Yes, I am.

10:54:28 12   Q.      Earlier we talked about who conducted the 1998 BVDV

10:54:34 13   test.  Do you remember talking about that?

10:54:35 14   A.      I do.

10:54:36 15   Q.      And remind, if you could, the ladies of the gentlemen

10:54:39 16   of the jury who that was?

10:54:40 17   A.      That was Dr. Wolanski.

10:54:42 18   Q.      Is Dr. Wolanski, the person who performed the 1998

10:54:47 19   BVDV test, listed as an inventor on this application?

10:54:51 20   A.      No, he is not.

10:54:52 21   Q.      Dr. Olsen, did you prepare a demonstrative that just

10:54:59 22   describes, summarizes the follow-on activities after the

10:55:03 23   replicon tests were reported in the fall of 2000?

10:55:06 24   A.      Yes, I did.

10:55:07 25   Q.      Can I please have that demonstrative on the screen?

10:55:11 1    Dr. Olsen, just generally tell us what is shown

10:55:15 2  here on this slide.

10:55:19 3  A.    Yes.  So this is the follow-on 765 hit in that HCV

10:55:24 4  cell-based assay.  And in 2000, September-ish time frame of

10:55:30 5  2000, and of going from left to right, actually the first

10:55:34 6  two columns there, remake the compound and determine the

10:55:37 7  structure, those were happening simultaneously.

10:55:42 8    We were also making the triphosphate.  We then

10:55:49 9  would test the triphosphate in a polymerase assay.  We would

10:55:54 10 conduct structure activity relationship analysis that was

10:55:57 11 making all those compounds, and then also preparing to file

10:56:00 12 the patent application, which we did in January of 2001.

10:56:03 13 Q.    All right.  So let's --

10:56:05 14 A.    It was a flurry of activity after the replicon assay.

10:56:10 15 Q.    And that replicon assay was the work done in the fall

10:56:13 16 of 2000?

10:56:14 17 A.    Yes.

10:56:14 18 Q.    Did I prepare a demonstrative that compares what

10:56:17 19 happened after the 1998 BVDV test that you talked about

10:56:21 20 earlier to what happened after the work we just discussed

10:56:25 21 with respect to the fall of 2000?

10:56:27 22 A.    Yes.

10:56:27 23 Q.    May I please have that demonstrative on the screen,

10:56:32 24 please?

10:56:32 25   How did the activities that you just describe at

10:56:37 1  length with respect to what happened after the replicon hit

10:56:43 2  in the fall of 2000, how did those activities compare to

10:56:46 3  what Merck did after the 1998 BVDV test of L-765?

10:56:51 4  A.    Yes.  The 1998 BVDV test, the compound was dropped

10:56:55 5  and essentially none of those activities occurred after

10:57:00 6  we -- after that testing.  The compound was dropped, so we

10:57:04 7  have X marks across the board to indicate that.

10:57:07 8  Q.    I think, I wanted to touch on some testimony that was

10:57:15 9  elicited during your direct examination.

10:57:17 10  Do you remember talking about Merck's treatment

10:57:19 11  of chimps with modified nucleoside?  Do you recall that

10:57:26 12  testimony.

10:57:26 13  A.    I do.

10:57:27 14  Q.    Do you know when -- if, and when, anybody else

10:57:35 15  might have tested chimps infected with hepatitis C using a

10:57:42 16  modified ribonucleoside?

10:57:50 17  Let me ask you this.

10:57:51 18  A.    So there has been -- well.

10:57:52 19  Q.    Let me ask you a different question.  Are you aware

10:57:55 20  of when, for example, Idenix may have first dosed chimps

10:58:00 21  with a modified ribonucleoside?

10:58:03 22  A.    Absolutely not.

10:58:05 23  Q.    Now, the jury has heard a lot about the 2'-methyl up

10:58:13 24  methyl compound that was made in the 1960s.  Are you

10:58:15 25  familiar with that work?

10:58:16 1    A.      Yes.

10:58:16 2    Q.      Did you prepare a demonstrative to describe how you

10:58:20 3    became familiar with that work?

10:58:21 4    A.      Yes.

10:58:23 5              MR. McCRUM:  May I please have that

10:58:25 6    demonstrative on the screen, please?

10:58:25 7    BY MR. McCRUM:

10:58:28 8    Q.      Tell us how you became, first became familiar with

10:58:32 9    the L-765 compound.

10:58:37 10   A.      So when it was pretty clear that this compound was an

10:58:44 11   interesting active for the program.  Some time in the 2001

10:58:49 12   time frame, I did some research back maybe even in 2000, the

10:58:54 13   end of 2000, did some research and saw where the compound

10:58:58 14   from.  Actually it is a pretty interesting story.

10:59:01 15              As it's been already testified to, this compound

10:59:04 16   was made first off in the 1960s, but I had no idea that it

10:59:10 17   was made by a woman chemist, African-American woman chemist

10:59:16 18   in the 1960s which I think had to be pretty rare.

10:59:19 19              And then the incredibly interesting part of

10:59:22 20   this story is when I looked in the Merck database, the

10:59:26 21   person appeared to still be there.  I sort of thought maybe

10:59:30 22   it has got to be someone else.  What is the chances that in

10:59:35 23   early 2000s, someone made an compound in the '60s and

10:59:36 24   they're still with the company, but sure enough they were.

10:59:39 25              So I picked up the phone and called Sue Jenkins,

who is pictured here, and had a really great conversation

with her about this discovery.

And I had to say she was really thrilled to be

told that a compound of her's from the '60s was having such

a huge impact on such an important discovery program and

potential impact on a disease as bad as hepatitis C.  So she

was just completely thrilled.  And she informed me that she

was retiring in a matter of weeks or maybe a couple of

months when I was on the phone with her.  So going out the

door, she was just really happy that she could walk out with

this.

Q.    Dr. Olsen, do you have an understanding as to whether

Ms. Jenkins or anyone else at Merck discovered using the

2'-methyl up nucleoside for treating hepatitis C in the

1960s?

A.    No, I mean HCV was discovered in the late 80s, so

that would have been impossible.

MR. McCRUM:  Thank you.  No further questions.

THE COURT:  All right.  Thank you.

Ms. Brooks.

MS. BROOKS:  Yes.  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. BROOKS:

Q.    Dr. Olsen, let's pick up where you left off.  And

that was No. 3.  Or I can put it on the Elmo if that is

11:00:57 1    quicker.

11:01:02 2              So, Dr. Olsen, did I hear you right that you

11:01:05 3    helped prepare this demonstrative?  Is that right?

11:01:07 4    A.    Yes, ma'am.

11:01:08 5    Q.    And this is from a paper from 1968; is that right?

11:01:13 6    A.    Yes.

11:01:13 7    Q.    And this is depicting the compound that we have been

11:01:16 8    referring to as 765; correct?

11:01:20 9    A.    This structure is, was drawn by me or one of my

11:01:23 10   colleagues.  The structure, as far as I know, does not come

11:01:28 11   from that publication.

11:01:29 12   Q.    That was going to be my question, sir, because we can

11:01:32 13   see very clearly her there is a methyl up at the 2'

11:01:37 14   position.  So you weren't trying to lead the jury to believe

11:01:39 15   that structure came from the paper, were you, sir?

11:01:41 16   A.    No, I wasn't trying to make that implication.

11:01:44 17   Q.    Okay.  Thank you.  Now let's go to DX-2587 that was

11:01:48 18   shown to you by counsel for Idenix.

11:01:50 19             And if we could pull up that, please.  And if we

11:01:55 20   could blow up the paragraph that says L604765.  There we go.

11:01:59 21             So this was shown to you by counsel from Idenix,

11:02:01 22   and he showed you a different part of it.  I'd like you to

11:02:05 23   show you this paragraph.

11:02:06 24             Dr. Olsen, is it true that in this exhibit,

11:02:09 25   which is an e-mail, it says, specifically, the L604765 is

11:02:15  1    one of our most potent replicon leads.  The negative data to

11:02:21  2    date consisted of 10 micromolar, and then it says whatever

11:02:24  3    it is, observed in a 1998 HCV spread assay.

11:02:30  4             Is that what this exhibit says, Dr. Olsen?

11:02:33  5    A.      Yes.

11:02:34  6    Q.      And you don't dispute, sir, do you, that in 1998,

11:02:39  7    at Merck, L-765 was tested as a nucleoside for potentially

11:02:48  8    treating hepatitis C against BVDV and HIV; correct?

11:02:54  9    A.      I don't dispute that.

11:02:55 10    Q.      And you don't dispute that that data was kept in the

11:02:58 11    database at Merck; correct?

11:03:01 12    A.      I don't dispute that that was in the database at

11:03:05 13    Merck.  We just didn't know the structure at that time.

11:03:07 14    Q.      Well, Dr. Olsen, you had to have known the structure

11:03:10 15    because the compound was actually made in 1966 by a chemist

11:03:18 16    at Merck; correct?

11:03:19 17    A.      That is correct.

11:03:20 18    Q.      And in order to make a compound, you have to know the

11:03:24 19    structure; correct?

11:03:28 20    A.      It's sort of an interesting story.

11:03:30 21    Q.      Doctor, if the answer is no, please tell me; if the

11:03:34 22    answer is yes, please tell me; or if the answer is I don't

11:03:38 23    know.

11:03:38 24             In order to make a compound, do you have to know

11:03:41 25    the structure?

A.      You might not know the exact structure when you go
and make a compound.  The stereochemistry is important, and
in this case it is extremely important.

Q.      And in making a compound, the stereochemistry is
important; correct?

A.      It is.

Q.      Thank you.  Now, counsel for Idenix asked you if
you realized that Idenix had filed a provisional patent
application in May of 2000.

        Could we have DDX-808 up, please?

        And counsel for Idenix asked you if you were
aware that Idenix had filed a provisional application in May
of 2000; and I can't remember if you said yes or no.

        Did you say yes or no, sir?

A.      Can we get that read back?

Q.      Well, let me ask it again, then.  Are you aware that
Idenix filed a provisional application in May of 2000?

A.      I would not swear to it.  I don't remember.  I have
-- I'm not 100 percent sure.

Q.      All right.  I can't remember what your answer was to
him, but, sir, are you aware that the May 2000 provisional
application at the time Idenix filed it, the only testing
they had done of their compounds was in yellow fever and
BVDV?

A.      Was that a question as to whether I was aware of

11:05:09 1    that?

11:05:09 2    Q.    Yes, sir.

11:05:11 3    A.    No, I was not aware of that.

11:05:12 4    Q.    Are you aware there is absolutely no data in that

11:05:15 5    May 2000 application?

11:05:16 6    A.    Ma'am, I'm aware of what we did at Merck.  I'm not

11:05:20 7    aware of what other companies did, and I remember looking at

11:05:26 8    this patent application when it published, but I definitely

11:05:29 9    don't have the memory of what data was in it.

11:05:33 10   Q.    And would you agree that in the fall of 2000, Merck

11:05:38 11   actually tested 765 against replicon; right?

11:05:42 12   A.    In the fall of 2000, Merck tested 765 in the

11:05:46 13   replicon, yes.

11:05:47 14   Q.    And filed in January of 2001 a patent application;

11:05:50 15   correct?

11:05:50 16   A.    Correct.

11:05:51 17   Q.    And are you aware that Idenix did not file their

11:05:53 18   utility application until May of 2001?

11:05:59 19   A.    I was -- well, I was not aware of that.  I probably

11:06:06 20   knew when it published, and I probably looked at it, but

11:06:11 21   when it was submitted and things, I wouldn't have remembered

11:06:14 22   that.

11:06:14 23   Q.    And you just told us that you really are only here to

11:06:17 24   talk about what Merck did and not what Idenix did; correct?

11:06:23 25   A.    I know the Merck work the best, for sure.

11:06:25 1    Q.    And, sir, the work at Merck that went on, that wasn't

11:06:30 2   based on anything that was going on at Idenix; correct?

11:06:34 3    A.    In what time frame, ma'am?

11:06:35 4    Q.    1998.

11:06:38 5    A.    No, I don't think we had any understanding what other

11:06:42 6   companies were doing for a good part of when we were working

11:06:47 7   on this program.

11:06:47 8    Q.    What about in 2000?

11:06:52 9    A.    Um.

11:06:52 10    Q.    Let me rephrase the question, sir.  Did your work

11:06:54 11   at Merck, was that because you copied what Idenix did?

11:06:59 12    A.    No.

11:07:00 13    Q.    Okay.  It was independent; right?

11:07:03 14    A.    In 2000?  Yes.

11:07:05 15    Q.    Yes.  And whatever your discoveries were, were

11:07:09 16   independent of whatever may have been going on at Idenix;

11:07:11 17   correct?

11:07:14 18    A.    I think that is a fair statement.

11:07:16 19           MS. BROOKS:  Thank you.

11:07:18 20           THE COURT:  Nothing further?

11:07:19 21           MS. BROOKS:  Nothing further.  Thank you, Your

11:07:21 22   Honor.

11:07:21 23           THE COURT:  All right.  Doctor, you may step

11:07:23 24   down.

11:07:28 25           (Witness excused.)

11:07:32  1        THE COURT:  Thank you.

11:07:36  2        Gilead may call its next witness.

11:07:45  3        MS. BROOKS:  Your Honor, while Mr. Scherkenbach

11:07:47  4  is introducing the next witness, may I collect the binders?

11:07:50  5        THE COURT:  Thank you.  Yes.  That would be

11:07:52  6  great.  Thank you.

11:07:54  7            (Binders taken from witness stand.)

11:07:56  8        MR. SCHERKENBACH:  Okay.  Ladies and gentlemen,

11:07:57  9  we're moving into the experts now.  Our next witness will be

11:08:03 10  Dr. Christoph Seeger who is an expert virologist for Gilead,

11:08:08 11  works at the Fox Chase Cancer Center.  He is going to talk

11:08:13 12  about the field of hepatitis C virals and biological testing

11:08:17 13  at the time of Idenix's patent applications in the 2000-2001

11:08:21 14  time frame.

11:08:21 15        So, Your Honor, Gilead calls Dr Christoph

11:08:26 16  Seeger.

11:08:26 17        THE COURT:  Okay.

11:08:36 18        ... CHRISTOPH SEEGER, having been first duly

11:08:45 19  sworn, was examined and testified as follows ...

11:08:51 20        THE COURT:  Good morning, Dr. Seeger.  Welcome.

11:09:04 21        MR. FARRELL:  May I approach?

11:09:06 22        THE COURT:  You may, yes.

11:09:16 23            (Binders passed forward.)

11:09:16 24        MR. FARRELL:  May I approach the witness?

11:09:43 25        THE COURT:  Yes.

11:09:44  1          (Binders passed forward.)

11:10:05  2          MR. FARRELL:  May it please the Court.

11:10:06  3                    DIRECT EXAMINATION

11:10:06  4  BY MR. FARRELL:

11:10:07  5  Q.       Dr. Seeger, what do you do for a living?

11:10:09  6  A.       I'm a professor of virology at the Fox Chase Cancer

11:10:15  7  Center in Philadelphia.

11:11:24  8  Q.       Virology.  What is that a study of?

11:11:28  9  A.       Virology is a study of viruses, understand how

11:11:32 10  viruses multiply, understanding how viruses cause disease.

11:11:36 11  I am also trying to understand how viruses can be fought or

11:11:41 12  conquered in terms of curing diseases.

11:11:44 13  Q.       What is the Fox Chase Cancer Center?

11:11:48 14  A.       The Fox Chase Cancer Center is a comprehensive cancer

11:11:51 15  center.

11:11:51 16  Q.       How long have you been at Fox Chase?

11:11:54 17  A.       Since 1990.

11:11:55 18  Q.       And during those 26 years, were you investigating

11:12:00 19  viruses?

11:12:01 20  A.       Yes, I did.

11:12:01 21  Q.       What viruses have you studied?

11:12:03 22  A.       The Hepatitis B virus.  The hepatitis C virus.  And

11:12:07 23  to some extent the VES69 virus.

11:12:11 24  Q.       Why you were you working on hepatitis C when you are

11:12:15 25  at a cancer center?

11:12:18  1    A.     Because hepatitis C virus like Hepatitis B causes

11:12:21  2    liver cancer.

11:12:21  3    Q.     Have we asked you to come to court today to give an

11:12:25  4    expert opinion about whether the asserted claims of the

11:12:30  5    Idenix '597 patent are invalid under we call Section 112 for

11:12:36  6    lack of enablement?

11:12:37  7    A.     Yes.

11:12:38  8    Q.     We also asked you to come to court to give an expert

11:12:41  9    opinion about whether Merck reduced to practice a 2'-methyl

11:12:47 10    (up) OH down nucleoside for the treatment of hepatitis C?

11:12:50 11    A.     Yes.

11:12:50 12    Q.     Before we get to those opinions, I have to go through

11:12:52 13    your education, training and experience that qualifies you

11:12:55 14    to give those opinions.   Okay?

11:12:57 15    A.     Okay.

11:12:57 16    Q.     I am calling you Dr. Seeger.   You have a Ph.D.?

11:13:02 17    A.     Yes.

11:13:02 18    Q.     What is your Ph.D. in?

11:13:05 19    A.     It is in virology.

11:13:06 20    Q.     Where and when did you receive your Ph.D.?

11:13:10 21    A.     In Basil, Switzerland, in 1982.

11:13:13 22    Q.     From the University of Basil?

11:13:16 23    A.     Correct.

11:13:16 24    Q.     After you received your Ph.D., where did you go to do

11:13:20 25    your postdoctoral fellowship?

11:13:22 1    A.      To the University of California in San Francisco.

11:13:24 2    Q.      In what department?

11:13:25 3    A.      The Department of Microbiology and Immunology.

11:13:28 4    Q.      After your post-doc fellowship, where did you go to

11:13:31 5    work?

11:13:31 6    A.      I became assistant professor at Cornell University in

11:13:35 7    Ithaca, New York.

11:13:36 8    Q.      After you were a professor at Cornell, where did you

11:13:40 9    go to work?

11:13:41 10   A.      Then I went to the Fox Chase Cancer Center.

11:13:45 11   Q.      And you have been there ever since?

11:13:47 12   A.      Yes.

11:13:47 13   Q.      You mentioned that you worked with hepatitis C.  When

11:13:49 14   did you work on hepatitis C?

11:13:52 15   A.      During the period of 1998 to about 2010.

11:13:56 16   Q.      Now, in 1998-1999 were you doing own your research

11:14:00 17   focusing on hepatitis C?

11:14:02 18   A.      We tried to grow the hepatitis C virus in cell

11:14:06 19   culture.

11:14:06 20   Q.      The jury has heard mention of this replicon assay

11:14:09 21   that I think Dr. Olsen called the pivotal event.  What was

11:14:14 22   your involvement in the developments of this hepatitis C

11:14:19 23   replicon assay?

11:14:19 24   A.      We were the second lab in the United States that

11:14:21 25   reproduced the system and we demonstrated that it could be

11:14:23 1   used for the study of antivirals and intervene.

11:14:27 2   Q.    When was HCV replicon assay invented or discovered?

11:14:33 3   A.    In 1999.

11:14:34 4   Q.    By whom?

11:14:35 5   A.    By my colleague, Ralph Bartenschlager, in Germany.

11:14:39 6   Q.    This was in July of 1999?

11:14:41 7   A.    Correct.

11:14:42 8   Q.    You mentioned you were the second lab in the United

11:14:46 9   States to develop the replicon assay.  Who was the first in

11:14:50 10  the United States?

11:14:51 11  A.    Dr. Charles Rice at the Rockefeller Institute.

11:14:53 12  Q.    In addition to developing cell lines for hepatitis C

11:14:59 13  research and your work with the replicon assay that has your

11:15:03 14  research involved the testing of compounds putting

11:15:06 15  nucleosides for activity?

11:15:08 16  A.    Yes, it has.

11:15:09 17  Q.    Has it also involved testing compounds in nucleosides

11:15:13 18  to determine toxicity?

11:15:14 19  A.    Yes, it has.

11:15:15 20  Q.    Consulting for pharmaceutical companies, have you

11:15:18 21  done that?

11:15:18 22  A.    Yes, I did.

11:15:19 23  Q.    Did you ever consult with Idenix?

11:15:22 24  A.    Yes, I did.

11:15:23 25  Q.    When?

11:15:24 1    A.    Around 2001, and the following years.

11:15:27 2    Q.    Big picture, what was your role as a consultant for

11:15:31 3    Idenix?

11:15:32 4    A.    In 2001, I was retained by Idenix.  My role was to go

11:15:36 5    the company, give a presentation, talk to the investigators,

11:15:40 6    and during that year have an open phone line in case

11:15:44 7    investigators of Idenix have questions.

11:15:46 8    Q.    And did they call you?

11:15:47 9    A.    They did.

11:15:48 10    Q.    And when you went to give these talks at Idenix, did

11:15:51 11    you meet with the science people, including Dr. Standring?

11:15:55 12    A.    I did.

11:15:55 13    Q.    What funding have you received from any government

11:15:58 14    agency when you were at Fox Chase?

11:16:00 15    A.    My lab has been funded by the National Institutes of

11:16:04 16    Health for the past 30 years.

11:16:06 17    Q.    In addition to your research and your consulting,

11:16:08 18    have you published articles?

11:16:09 19    A.    Yes, I did.

11:16:10 20    Q.    About how many?

11:16:11 21    A.    About 60.

11:16:12 22    Q.    And have you served on editorial boards of scientific

11:16:15 23    journals that deal with virology?

11:16:17 24    A.    Yes, I have.

11:16:17 25    Q.    And what organizations do you belong to that focus on

11:16:23 1    virology?

11:16:23 2    A.      The American Association of Virology and the American

11:16:27 3    Society for Microbiology.

11:16:29 4            MR. FARRELL:  Your Honor, we offer Dr. Seeger as

11:16:31 5    an expert in virology and the study of viruses, including

11:16:34 6    hepatitis C.

11:16:37 7            MR. McCRUM:  No objection, Your Honor.

11:16:38 8            THE COURT:  He is so recognized.

11:16:40 9    BY MR. FARRELL:

11:16:41 10   Q.      Dr. Seeger, do you have an expert opinion about

11:16:44 11   whether the asserted claims of the '597 patent are invalid

11:16:48 12   under Section 112 for lack of enablement?

11:16:51 13   A.      Yes, I do.

11:16:52 14   Q.      What is your opinion?

11:16:53 15   A.      They are invalid.

11:16:54 16   Q.      Do you have also have an opinion about whether

11:16:56 17   Merck's work on 2'prime-methyl up OH down nucleosides

11:17:01 18   anticipates certain claims of the '597 patent?

11:17:03 19   A.      Yes, I did.

11:17:04 20   Q.      What is your opinion on that?

11:17:05 21   A.      It does anticipate.

11:17:06 22   Q.      Now, have you prepared a demonstrative that further

11:17:09 23   outlines your opinions?

11:17:10 24   A.      Yes, I have --

11:17:15 25            MR. FARRELL:  With the Court's permission,

11:17:16 1  we will put up DDX-601.

11:17:16 2  BY MR. FARRELL:

11:17:22 3  Q.    Mr. Seeger, on whether the patent claims are enabled,

11:17:28 4  what is your present opinion there?

11:17:30 5  A.    The patent does not enable a person of ordinary skill

11:17:33 6  to make and use the claimed invention because he or she

11:17:36 7  would have to do undue experimentation to determine which

11:17:38 8  2'-methyl (up) ribofuranosyl nucleosides would be effective.

11:17:43 9  Q.    Now, with respect to this issue of Merck and the

11:17:47 10  reduction to practice before Idenix, what is your expert

11:17:50 11  opinion?

11:17:50 12  A.    So Merck used the 2' methyl OH for the treatment of

11:17:56 13  HCV before Idenix.  And Merck did not abandon, SUPPRESS or

11:18:00 14  conceal its work on 2'-methyl up nucleosides.

11:18:03 15  Q.    So let's focus first on your opinion the patent does

11:18:09 16  not enable the claims, the claims are not enabled.  Okay?

11:18:12 17  A.    Yes.

11:18:13 18           THE COURT:  Before we do that, I want to give

11:18:14 19  the jury a short break.  No talking about the case during

11:18:17 20  the break.  And we will be back shortly.

11:18:24 21           (Jury leaves courtroom at 11:17 a.m.)

11:18:24 22           THE COURT:  All right.  We will be in recess.

11:18:43 23           (Recess taken.)

11:32:06 24           THE COURT:  Bring the jury in.

11:32:19 25           (Jury enters courtroom at 11:31 a.m.)

11:33:19 1          THE COURT:  Welcome back.  You may proceed.

11:33:23 2          MR. FARRELL:  Thank you, Your Honor.

11:33:24 3  BY MR. FARRELL:

11:33:24 4  Q.      Dr. Seeger, we were going TO start on your opinion

11:33:27 5  that the claims of the Idenix patent are not enabled.  I

11:33:30 6  would like you, with the Court's permission, to pull up

11:33:35 7  PX-2525, which is already in evidence, Mr. Sayres.

11:33:44 8          PX- this is the '597 we are talking about.

11:33:49 9  Correct?

11:33:50 10 A.      That's correct.

11:33:50 11 Q.      What I would like to do, which I think is the first

11:33:53 12 time we have done it today, is look at the claim language.

11:33:55 13 Look at Claim 1, if we could.  I want to read the claim

11:33:59 14 language to you.  The claim reads:  "A method for the

11:34:02 15 treatment of a hepatitis C virus infection comprising

11:34:06 16 administering an effective amount of a purine or pyrimidine

11:34:10 17 beta-D-2'-methyl ribofuranosyl or a phosphate thereof, or a

11:34:19 18 pharmaceutically acceptable salt or ester thereof."

11:34:21 19         That's the claim we are talking about.  Correct?

11:34:23 20 A.      That's correct.

11:34:23 21 Q.      You are aware that the Court has construed the

11:34:25 22 language in these claims?

11:34:26 23 A.      Yes.

11:34:26 24 Q.      And did you prepare a demonstrative on Judge Stark's

11:34:30 25 construction so we can see what the definitions are?

11:34:33 1    A.    Yes, I did.

11:34:35 2    Q.    Would you pull up DDX-602.

11:34:38 3          On this slide we have at the top the language of

11:34:40 4    Claim 1 we just read.  Down below we have a chart that has

11:34:45 5    claim terms and then the Court's claim construction.

11:34:48 6    Correct?

11:34:48 7    A.    That's correct.

11:34:48 8    Q.    Did you apply all of Judge Stark's Claim

11:34:52 9    constructions in rendering your opinion?

11:34:54 10   A.    Yes, I did.

11:34:55 11   Q.    I want to focus on the one that is in red, where it

11:34:59 12   says it is reported that in an amount that is effective to

11:35:08 13   treat HCV.  The claim requires a nucleoside that is

11:35:10 14   effective, how do you know whether a nucleoside is effective

11:35:12 15   to treat a virus?

11:35:14 16   A.    You have to test it in an assay against a virus.

11:35:17 17   Q.    Is there any shortcut other than may go the

11:35:20 18   nucleoside and then testing it?

11:35:22 19   A.    There is no shortcut.

11:35:23 20   Q.    Why can't you just look at the structure of a

11:35:25 21   nucleotide and noting it will be effective?

11:35:28 22   A.    Because at the time nor today can one just look at

11:35:31 23   the structure and determine whether a compound is active

11:35:34 24   against a virus.

11:35:35 25   Q.    Why are nucleosides so unpredictable?

11:35:39 1    A.     Because nucleosides, because very small changes in a

11:35:46 2    nucleotides, just one to me, creates a new molecule and it's

11:35:50 3    impossible to predict whether that molecule is active or

11:35:55 4    not.

11:35:55 5    Q.     We have heard about assays.  How do you test the

11:35:59 6    nucleoside to know that it's effective, in what kind of

11:36:02 7    test?

11:36:02 8    A.     In an assay.

11:36:03 9    Q.     In an assay test, is this a single step or multi-step

11:36:08 10   process?

11:36:08 11   A.     A multi-step process.

11:36:10 12   Q.     Ballparking, how long does it take a biologist to run

11:36:14 13   this multiple step assay test?

11:36:16 14   A.     It can be anywhere from a week to ten, 15 days, ten,

11:36:20 15   14 days.

11:36:21 16   Q.     Now, without having antiviral activity, anti

11:36:26 17   hepatitis C activity data from an assay test, can you tell

11:36:30 18   if a nucleoside is going to be effective?

11:36:32 19   A.     I cannot.

11:36:34 20   Q.     So how much antiviral activity data is in this Idenix

11:36:41 21   patent, the '597 patent?

11:36:43 22   A.     There is none.

11:36:46 23   Q.     So now that we have talked about antiviral activity

11:36:52 24   data and that there is none in the patent, let's turn to the

11:36:55 25   legal standard you applied in reaching your opinion.  Okay?

11:36:58 1    Did you prepare a demonstrative that sets out

11:37:00 2    the legal standard you applied.

11:37:02 3    A.    Yes, I did.

11:37:03 4    Q.    Could you pull up DDX-608.

11:37:12 5        Dr. Seeger, here on DDX-608 did you apply this

11:37:17 6    standard, "A patent specification must enable persons having

11:37:21 7    ordinary skill in the art to make and use the claimed

11:37:25 8    invention at the time of original filing without having to

11:37:28 9    conduct undue experimentation."

11:37:32 10   A.    Yes, I did.

11:37:34 11   Q.    I want to focus on that phrase "Undue

11:37:38 12   experimentation."

11:37:39 13       Have you prepared a demonstrative that explains

11:37:41 14   how one decides if there is undue experimentation?

11:37:44 15   A.    Yes, I have.

11:37:45 16   Q.    Could you please, Mr. Sayres, pull up DDX-609.

11:37:49 17       Dr. Seeger, what is DDX-609 showing us?

11:37:53 18   A.    It shows us the seven criteria, factors for undue

11:37:57 19   experimentation.

11:37:57 20   Q.    Are these known in the law world as the WANDS

11:38:01 21   factors?

11:38:01 22   A.    Yes.

11:38:02 23   Q.    Did you apply the WANDS factors in reaching your

11:38:04 24   conclusion regarding undue experimentation?

11:38:06 25   A.    Yes, I did.

11:38:07 1    Q.    Now, at the bottom of DDX-609, it says, "ALL OF these

11:38:13 2    factors are judged as of May 2000 or May 2001 based on the

11:38:18 3    on application day."

11:38:20 4         Why did you assess and evaluate these factors as

11:38:22 5    of May 2000?

11:38:23 6    A.    Because those are the dates the patent falls back to.

11:38:26 7    Q.    Well, May 2000 was one of Idenix's filings?

11:38:30 8    A.    The provisional.

11:38:31 9    Q.    Did you also assess whether the patent was enabling

11:38:34 10   using these factors as of May 2001?

11:38:36 11   A.    Yes, I did.

11:38:37 12   Q.    And why did you consider that date as well, May 2001?

11:38:42 13   A.    Because that's where the patent falls back to, the

11:38:46 14   patent application.

11:38:40 15   Q.    Now, let's look at page 0059 of the May 2000 patent

11:38:48 16   application if we could.  0059.  The section entitled

11:38:56 17   Section IV.

11:38:57 18   A.    Yes.

11:38:58 19   Q.    There we go.

11:38:59 20        Focus in on this section.  It starts with

11:39:04 21   antihepatitis C activity.  Do you see that?

11:39:06 22   A.    I do.

11:39:06 23   Q.    How long is this section in total?

11:39:08 24   A.    There are three paragraphs.

11:39:10 25   Q.    Mr. Sayres, can you put all three paragraphs up on

11:39:13  1   the one slide?  It should fit there.

11:39:20  2               Okay.  So, we see -- just in the interest of

11:39:26  3   time, that's okay, Mr. Sayres -- we see the first paragraph

11:39:31  4   there on 57 and it ends right at the top at the middle part

11:39:34  5   of the paragraph on page 58; is that correct?

11:39:36  6   A.       That is correct.

11:39:37  7   Q.       In those three paragraphs, is there any data for any

11:39:42  8   nucleoside described in this patent application?

11:39:45  9   A.       No, there is not.

11:39:46 10   Q.       Well, is there any antiviral data, is there any data

11:39:52 11   of any sort in the entire May 2000 application?

11:39:55 12   A.       No, there is not.

11:39:56 13   Q.       Now, you understand you have to -- we can take it

11:40:01 14   down.  Thank you, Mr. Sayres.

11:40:02 15               Now, you understand you have to assess whether

11:40:04 16   this May 2000 application with no data was enabling from the

11:40:07 17   perspective of a person of ordinary skill in the art as of

11:40:10 18   May 2000?

11:40:11 19   A.       I understand.

11:40:12 20   Q.       And did you consider then this application from the

11:40:15 21   perspective of such a person?

11:40:17 22   A.       Yes, I did.

11:40:18 23   Q.       So let's go through what a person of ordinary skill

11:40:22 24   is here in this case.  Mr. Sayres, please put up DDX-605.

11:40:28 25               There is a lot of words there.  I want to read

11:40:32  1    through this and make sure we understand what a person of

11:40:34  2    ordinary skill is in the art that you applied in this case.

11:40:38  3              First, is this a team approach or an individual

11:40:40  4    approach?

11:40:41  5    A.      This is a team approach.

11:40:43  6    Q.      And the team is a medicinal chemist and a virologist;

11:40:47  7    is that correct?

11:40:47  8    A.      That is correct.

11:40:48  9    Q.      Now, the person of ordinary skill in this case you

11:40:50 10    found to be a Ph.D. in organic, synthetic, or medicinal

11:40:55 11    chemistry or pharmacology, with at least two years of drug

11:40:59 12    discovery or a lesser degree but four years of experience;

11:41:03 13    correct?

11:41:03 14    A.      Correct.

11:41:03 15    Q.      And they would have to be experienced with standard

11:41:06 16    laboratory techniques, experience in planning and experience

11:41:10 17    in synthesis of organic compounds and performing basic

11:41:11 18    interpretations of biological data; correct?

11:41:13 19    A.      That's right.

11:41:14 20    Q.      Now, the second person of the team you say is

11:41:17 21    ordinary skill is a Ph.D. in virology, microbiology or

11:41:22 22    molecular biology and two years of experience; correct?

11:41:25 23    A.      Yes.

11:41:25 24    Q.      Or of a lesser degree, they would have four years of

11:41:28 25    experience; correct?

11:41:29 1    A.    Correct.

11:41:29 2    Q.    And their experience would be in testing the compound

11:41:32 3    for biological activity and working with cell culture

11:41:36 4    systems, including assays; is that correct?

11:41:38 5    A.    That's correct.

11:41:38 6    Q.    Now, without putting you on the spot, you are a

11:41:41 7    person of extraordinary skill in the art based on your

11:41:45 8    experience; is that right?

11:41:46 9    A.    That is right.

11:41:46 10   Q.    So how are you able to view this patent not from your

11:41:50 11   perspective but from the perspective of someone of ordinary

11:41:53 12   skill in the art?

11:41:54 13   A.    Well, I have 30 years of laboratory experience, and I

11:41:57 14   am familiar with students, post-doctoral fellows and

11:42:01 15   technicians, so I think I have a good grasp what one can

11:42:04 16   expect from a person of ordinary skill.

11:42:07 17   Q.    In addition, were you actually working in the field

11:42:08 18   in 2000-2001?

11:42:09 19   A.    Oh, I was.

11:42:11 20   Q.    So now we have in mind the person of ordinary skill,

11:42:14 21   what does Idenix's May 2000 application teach a person of

11:42:18 22   ordinary skill in the art about what nucleosides would be

11:42:22 23   effective to treat hepatitis C?

11:42:24 24   A.    Nothing.

11:42:26 25   Q.    How can it teach them nothing?

11:42:28  1    A.      There is no antiviral data on this patent.

11:42:31  2    Q.      And why is that such a big problem?

11:42:33  3    A.      Because without antiviral data, the person of skill

11:42:37  4    does not know which compound, beta compounds are active or

11:42:43  5    not.

11:42:44  6    Q.      Well, I mean couldn't a person of ordinary skill just

11:42:47  7    take all the nucleosides described in the patent application

11:42:51  8    and just test them?

11:42:52  9    A.      No, the person of skill would first have to make

11:42:57 10    these billions of compounds.

11:43:00 11    Q.      Did they exist in 2000, these billions of compound?

11:43:03 12    A.      No, they did not exist.

11:43:05 13    Q.      Are there billions of compound even now on

11:43:09 14    nucleosides?

11:43:13 15    A.      No.

11:43:13 16    Q.      But the claim is limited to nucleosides that are

11:43:17 17    effective to treat hepatitis C.  Doesn't that change things?

11:43:19 18    A.      No, because I don't know which ones are effective.

11:43:21 19    Q.      Without first?

11:43:23 20    A.      Without first testing them.

11:43:24 21    Q.      So if I am limiting the claim to those that are

11:43:28 22    effective, I have to make and test them and then I can go

11:43:31 23    back and tell you they're good to make?

11:43:32 24    A.      That is essentially what you would have to do.

11:43:35 25    Q.      And how many nucleosides are actually described in

11:43:38 1  this May 2000 patent application?

11:43:40 2  A.      None.  Oh, billions.

11:43:42 3  Q.      Billions.  You are getting used to that none but now

11:43:46 4  we're going the other way.  All right?

11:43:49 5          Assume an unlimited supply of nucleosides.  I

11:43:51 6  know they don't exist, but assume they do.  How many

11:43:56 7  nucleosides could a person of ordinary skill in the art in

11:43:58 8  2000-2001 test per month?

11:44:00 9  A.      Maybe 30 to 50.

11:44:01 10  Q.      Okay.  And you were in court when the jury heard the

11:44:05 11  testimony of Ms. Tausek from Idenix who said up to 37 per

11:44:10 12  month?

11:44:10 13  A.      Yes, I was.

11:44:11 14  Q.      Does that sound reasonable to you?

11:44:12 15  A.      That sound reasonable.

11:44:13 16  Q.      So even assuming that billions of nucleosides

11:44:18 17  compounds exist, they have been made, conceptually how long

11:44:21 18  would it take to test them at a rate of 40 per month?

11:44:24 19  A.      It is unconceivable.  It would actually take forever.

11:44:28 20  Q.      Now, if we could put up DDX-609, which are the *Wands*

11:44:33 21  factors.

11:44:34 22          I want to focus on the factors of scope of the

11:44:37 23  claimed invention.  In terms of the number of compound

11:44:40 24  described in the patent application, how big is that scope?

11:44:44 25  A.      As we said, it is enormous because it includes those,

11:44:49 1    comprises those billions of compounds.

11:44:51 2    Q.    And even though the claim is limited to those that

11:44:54 3    are effective, how come that doesn't shrink the number?

11:44:58 4    A.    Because we don't know which ones.

11:44:59 5    Q.    Okay.  The other factor I want to highlight here is

11:45:02 6    the nature and predictability in the field.  How predictable

11:45:05 7    is nucleoside chemistry?

11:45:07 8    A.    There is no predictability.

11:45:09 9    Q.    Then we go to the time and cost of the necessary

11:45:13 10   experimentation, how routine it would be, the quantity of

11:45:17 11   experimentation.  How much would be involved here?

11:45:19 12   A.    Well, as I said, it is unconceivable.  It is

11:45:24 13   enormous.

11:45:24 14   Q.    So, in your opinion, does Idenix's May 2000

11:45:27 15   application enable a person of ordinary skill to make and

11:45:30 16   use the claimed inventions of claims 1, 2, 4 through 7, 9

11:45:35 17   and 10, 16, 19, 23, or 28 through 31 of the '597 patent?

11:45:42 18   A.    No, it does not.

11:45:43 19   Q.    What do all of those claims -- what is the common

11:45:46 20   problem of all of them?

11:45:47 21   A.    There is no data to support the claims.

11:45:50 22   Q.    Okay.  Well, let's turn now to the Idenix patent.

11:45:53 23   All right?

11:45:54 24         Can we have PX-1525, again, Mr. Sayres, in

11:45:58 25   evidence?

11:45:58 1      Now, we can see, there is a filing date there on

11:46:02 2 the cover.  It says June 20th, 2003; right?

11:46:06 3 A.    Yes.

11:46:07 4 Q.    Now, down below, though, it says is connected to a

11:46:10 5 filing on May 23rd, 2001.  Do you see that?

11:46:14 6 A.    Yes, I do.

11:46:15 7 Q.    And is that the May -- is that why you looked at

11:46:19 8 things from May 2001?

11:46:20 9 A.    That is correct.

11:46:21 10 Q.    All right.  Thank you.  Now, let's turn to page 0085

11:46:28 11 of the '597 patent.  And if we can see that paragraph there.

11:46:34 12 Now, it's antihepatitis C activity.

11:46:37 13      Do you see that?

11:46:38 14 A.    I do.

11:46:38 15 Q.    Okay.  Now, in this May 2001 application, Idenix has

11:46:43 16 added something, though; right?

11:46:44 17 A.    Yes, they have added.

11:46:46 18 Q.    What have they added?

11:46:47 19 A.    They have added the data.

11:46:49 20 Q.    They have added some data.

11:46:51 21 A.    Correct.

11:46:51 22 Q.    There are five tables of data?

11:46:54 23 A.    That's right.

11:46:55 24 Q.    That was, it was valuable data; correct?

11:46:57 25 A.    Yes.

Seeger - direct

Q.      How much antivirus, how much antihepatitis C activity did they have?

A.      Nothing.

Q.      Well, how much antiviral activity is there in this entire May 2001 application?

A.      There is no antiviral data on this application.

Q.      Rather than going through the five tables and the titles of them all and what they are, I want to focus on what is not there.

        Do any of those tables or the kinds of data that was added measure the activity of any nucleoside against any virus?

A.      No.

Q.      Okay.  Take that down.

        Now, you were here when Dr. Sommadossi testified?

A.      I was.

Q.      Okay.  Mr. Sayres, if we could put up demonstrative No. 17 from Dr. Sommadossi's testimony.

        Now, you recall Dr. Sommadossi told this jury that these four compounds, NM106, 107, 108, had activity when Idenix tested them.  Right?

A.      Yes, I was there.

Q.      And these are the nucleosides that were reported in the application in the patent; correct?

11:48:02 1    A.    That is correct.

11:48:02 2    Q.    Okay.  But even for these four compounds, is there

11:48:06 3    any antiviral activity in the claim?

11:48:09 4    A.    There is none.

11:48:13 5    Q.    What I want to do, though, is look if it's not in the

11:48:16 6    patent but it is in Idenix's internal records.  Okay?

11:48:20 7    A.    Okay.

11:48:20 8    Q.    I'd like you to turn in your binder to DX-338, which

11:48:24 9    is already in evidence.

11:48:32 10          All right.  Now, up on the screen we have it

11:48:36 11   here, we see Dr. Gilles Gosselin.  We heard his testimony

11:48:42 12   from tape.  He was the Idenix biologist doing this

11:48:45 13   evaluation; is that correct?

11:48:46 14   A.    That's correct.

11:48:47 15   Q.    Okay.  And I know it bears a date.  It says updated

11:48:51 16   August 24th, 2006?

11:48:53 17   A.    Yes.

11:48:54 18   Q.    Your understanding is this is a continually updating

11:48:57 19   log of compounds as Idenix tests them?

11:49:00 20   A.    I understand this.

11:49:01 21   Q.    By the way, all the information that is in this log,

11:49:05 22   as of 2006, that is how many years before the Patent Office

11:49:09 23   made its final decision as to whether to give Idenix a

11:49:13 24   patent?

11:49:13 25   A.    Three years.

11:49:14 1  Q.    Well, I want to find the four that made it into the

11:49:17 2  patent; all right?

11:49:18 3          So if we could go to page 007 of the document.

11:49:26 4  And it starts:  Biological results of NM compound.  All

11:49:29 5  right?

11:49:30 6          This is actually the very first.  This is the

11:49:32 7  order.  NM80 is the very first example on the list, right?

11:49:36 8  A.    Yes.

11:49:36 9  Q.    So NM80, that is in the patent; right?

11:49:40 10  A.    Yes.

11:49:40 11  Q.    Keep it up there, Mr. Sayres.  They don't need the

11:49:44 12  small part, just the big part.

11:49:46 13          All right.  Now, NM106 down there, the third

11:49:49 14  one, that is in?

11:49:50 15  A.    Yes.

11:49:50 16  Q.    Next page.

11:49:53 17          NM107, that is in?

11:49:57 18  A.    Correct.

11:49:58 19  Q.    Next page.

11:50:01 20          NM108.  All four of those are in the patent;

11:50:04 21  right.

11:50:05 22  A.    That is correct.

11:50:05 23  Q.    And all show activity in BVDV and yellow fever

11:50:10 24  viruses; correct?

11:50:11 25  A.    That is correct.

11:50:11  1    Q.    One got skipped, right?

11:50:13  2    A.    Yes.

11:50:14  3    Q.    Let's go back to NM105, one that got skipped.

11:50:21  4          NM105, is that active in BVDV and yellow fever

11:50:29  5    virus?

11:50:29  6    A.    No, it is not.

11:50:30  7    Q.    Did that make it into the patent?

11:50:32  8    A.    No, it did not.

11:50:33  9    Q.    Well, this Exhibit 338 has over 200 compounds,

11:50:43 10    compounds of nucleoside; is that right?

11:50:44 11    A.    That's correct.

11:50:46 12    Q.    Beside NM105, are there other compound listed there

11:50:49 13    that show no activity in BVDV or yellow fever virus?

11:50:53 14    A.    Yes, many others.

11:50:54 15    Q.    So in the interest of time, did you prepare a

11:50:57 16    demonstrative that illustrates inactive nucleoside compounds

11:51:00 17    contained in this Idenix report, DDX-338?

11:51:03 18    A.    Yes, I did.

11:51:04 19    Q.    Mr. Sayres, could you pull up DDX-607.

11:51:09 20          What are we looking at here?  What is all that?

11:51:20 21    A.    This is, these are the examples of compounds that

11:51:24 22    were not active.

11:51:25 23    Q.    All of them in this Idenix log; right?

11:51:31 24    A.    Correct.

11:51:31 25    Q.    How many of all of those that show no activity in

11:51:35 1  BVDV and yellow fever, how many made that into the patent?

11:51:40 2  A.    None.

11:51:40 3  Q.    Okay.

11:51:45 4          (Someone from courtroom gallery sneezes.)

11:51:49 5          MR. FARRELL:  Bless you.

11:51:49 6  BY MR. FARRELL:

11:51:50 7  Q.    So your analysis -- by the way, all these compounds,

11:51:53 8  they are all here?

11:51:54 9  A.    Yes.

11:51:55 10  Q.    They share something in common, don't they?

11:51:57 11  A.    They do.

11:51:57 12  Q.    They are all 2'-methyl up OH down compounds?

11:52:03 13          MR. McCRUM:  Your Honor, he is leading the

11:52:04 14  witness all over the place.

11:52:05 15          THE COURT:  Sustained.  Let's stop the leading.

11:52:05 16  BY MR. FARRELL:

11:52:07 17  Q.    Just what do they have in common?

11:52:09 18  A.    They have in common that they are 2'-methyl up OH

11:52:13 19  down compounds.

11:52:15 20  Q.    And how many of these 2'-methyl up OH down compounds

11:52:19 21  that show no activity in those two assays made it into the

11:52:22 22  patent?

11:52:23 23  A.    None.

11:52:23 24  Q.    All right.  And, by the way, this analysis of

11:52:31 25  DDX-338, how does that support your opinion that nucleosides

11:52:34 1 are unpredictable?

11:52:35 2 A.     It certainly supports it.

11:52:36 3 Q.     How?

11:52:37 4 A.     Because we cannot predict which ones of those were

11:52:39 5 active and which ones weren't active without testing them

11:52:43 6 first.

11:52:43 7 Q.     So, in your opinion, does the '597 patent enable

11:52:49 8 claims 1, 2, 4 through 7, 9, 10, 16, 19, 23, 28 to 31 of the

11:52:57 9 '597 patent?

11:52:59 10 A.     No, it does not.

11:53:00 11 Q.     And why not?

11:53:01 12 A.     Because there is no data about antivirals to be used

11:53:06 13 for.

11:53:07 14 Q.     If we could put up DDX-609 again, the *Wands* factors.

11:53:11 15        The ones we talked about before, the scope of

11:53:14 16 what's described, the nature and predictability of the

11:53:19 17 field, and the experimentation.  Are they still the same?

11:53:22 18 A.     Yes.

11:53:22 19 Q.     There is another one about working examples and

11:53:24 20 guidance throughout these four compound.  Does that change

11:53:29 21 anything for you?

11:53:30 22 A.     It doesn't change anything.

11:53:31 23 Q.     Why not?

11:53:31 24 A.     Because, again, I don't know which of the compounds

11:53:33 25 have any antiviral activity.  There is no viral data on the

11:53:37 1    patent.

11:53:37 2    Q.    Okay.  So let's turn to your opinion on the Merck

11:53:40 3    work, okay?  Do you have an opinion regarding Merck's work?

11:53:45 4    A.    Yes, I do.

11:53:46 5    Q.    Okay.  By the way, you can take that binder and put

11:53:49 6    it away; and the other binder is for this opinion, okay?

11:53:54 7          And did you prepare a demonstrative regarding

11:53:57 8    your opinion on Merck's work?

11:53:58 9    A.    Yes, I did.

11:53:59 10         MR. FARRELL:  With the Court's permission, I'd

11:54:02 11   like to show DDX-612.

11:54:02 12   BY MR. FARRELL:

11:54:05 13   Q.    Dr. Seeger, what is your opinion as to whether

11:54:08 14   Merck's work anticipates claims 1, 28, 30, and 31 of

11:54:13 15   Idenix's '597 patent?

11:54:15 16   A.    Merck made and tested the 2'-methyl OH for HCV first.

11:54:21 17         It reduced the 2'-methyl OH to practice claims

11:54:26 18   1, 28, 30, and 31 before Idenix.

11:54:28 19         And Merck did not abandon 2'-methyl OH for

11:54:33 20   hepatitis C.

11:54:34 21   Q.    Let's start with the legal standard you applied.

11:54:36 22         DDX-613, Mr. Sayres.

11:54:38 23         All right.  And, DDX-613, this shows the

11:54:42 24   standard you applied?

11:54:43 25   A.    It does.

11:54:44 1    Q.    Or anticipation?

11:54:45 2    A.    Yes.

11:55:53 3    Q.    For anticipation?

11:55:58 4    A.    Yes.

11:55:59 5          "Question:  The party was first to reduce the

11:56:01 6    invention to express and does not abandon, express or

11:56:04 7    conceal the invention is entitled to priority unless the

11:56:07 8    other party conceded the invention material and continued to

11:56:11 9    work with reasonable diligence to review it practice from

11:56:15 10   the time just before the parties first running the practice.

11:56:18 11   You nucleoside to show reduction to practice for only one

11:56:21 12   claimed compound."

11:56:23 13         Is that the standard you applied?

11:56:26 14   A.    Yes.

11:56:26 15   Q.    If we can go to DDX-614, recollection and to

11:56:31 16   practice, is this the standard you applied to show whether

11:56:36 17   Merck had reduction to practice?

11:56:37 18   A.    Yes, it does.

11:56:38 19   Q.    Reduction to practice occurs when the invention was

11:56:41 20   actually made and was shown to work as its intended purpose?

11:56:45 21         MR. McCRUM:  Your Honor, I am sorry.  Okay.  He

11:56:48 22   is reading the slide.

11:56:51 23   BY MR. FARRELL:

11:56:51 24   Q.    Can you tell us what standard you applied?

11:56:53 25   A.    Reduction to PRACTICE occurs when the invention was

11:56:56 1  made and was shown to work for its intended purpose.

11:57:01 2  Q.    I want to start with the 1998 testing by Merck.  If

11:57:08 3  you could turn in your binder to DX-439?

11:57:16 4  A.    Yes.

11:57:17 5  Q.    It's up here on the screen.  DX-439, which is already

11:57:21 6  in evidence, Your Honor.

11:57:23 7          Doctor Seeger, is DX-439 the whole notebook, a

11:57:27 8  document you reviewed to reach your opinion?

11:57:29 9  A.    Yes, it is.

11:57:29 10  Q.    The cover, it says BVDV/HCRFY.  What significance

11:57:36 11  does that for you?

11:57:36 12  A.    It says BVDV HEP C, it indicates to me this is the

11:57:40 13  BVDV.  Hepatitis C program, it is called.

11:57:45 14  Q.    Is it your understanding -- you heard Dr. Duffy's

11:57:49 15  testimony about Merck using an BVDV assay?

11:57:51 16  A.    Yes, I did.

11:57:52 17  Q.    What is your understanding of what Merck was using in

11:57:55 18  1998 to evaluate compounds so they could be effective to q.

11:57:55 19          Yes.

11:57:59 20          Treat HCV?

11:58:02 21  A.    They use the BVDV assay.

11:58:06 22  Q.    If we could turn to page DDX-832 of DDX-149, at the

11:58:12 23  top we see the date of September 10, 1998.

11:58:17 24  A.    Yes.

11:58:18 25  Q.    The first few lines, what generally is this page

11:58:21 1  describing?

11:58:22 2  A.    This page describes or describe the results from the

11:58:26 3  drug screen.

11:58:27 4  Q.    What kind of drug screen?

11:58:29 5  A.    The BVDV virus on different compounds.

11:58:33 6  Q.    If you could down to the bottom where it says

11:58:37 7  re-plates.  Look at the second line of the bottom, there is

11:58:43 8  a No. L 604-765.  Do you see that?

11:58:48 9  A.    I do.

11:58:48 10  Q.    There is a line above that says five compounds found

11:58:51 11  100 percent.  Do you see that?

11:58:53 12  A.    I do.

11:58:53 13  Q.    What does that line mean?

11:58:55 14  A.    That line means that there were five compounds that

11:59:00 15  at the specific concentration for micromolar protected the

11:59:04 16  cells from the BVDV virus 100 percent.

11:59:08 17  Q.    Now, I want to talk briefly about BVDV.  To be fair,

11:59:15 18  you don't believe that BVDV is a good predictor of anti-HCV

11:59:21 19  activity.  Correct?

11:59:23 20          MR. McCRUM:  Objection.  Leading.

11:59:24 21          THE COURT:  Sustained.  Stop with the leading,

11:59:26 22  please, counsel.

11:59:27 23  BY MR. FARRELL:

11:59:27 24  Q.    What is your personal opinion about the about the

11:59:31 25  BVDV assay?

11:59:31 1    A.     I didn't think it was a great predictor for HCV.

11:59:34 2    Q.     And before replicon -- after replicon, was invented

11:59:41 3   and used, what was your opinion after that 2000 and onwards

11:59:45 4   about BVDV as a test surrogate?

11:59:48 5    A.     After the replicon, which was a hallmark event, the

11:59:52 6   replicon assay became the state of the art.

11:59:57 7    Q.     Before replicon, people in the field were using, what

12:00:02 8   though?

12:00:03 9    A.     All the reps in the field used the BVDV assay as a

12:00:08 10   surrogate before replicon.

12:00:10 11    Q.     What was your personal opinion about BVDV even before

12:00:13 12   replicon came on?

12:00:15 13    A.     I never favored it.

12:00:18 14    Q.     Why didn't you favor it?

12:00:19 15    A.     Because I felt the risk of missing or finding a false

12:00:29 16   positive would outweigh the benefit.

12:00:35 17    Q.     While you were working on the field for replicon, who

12:00:39 18   were using BVDV assay to predict which something would be

12:00:44 19   effective to treat Hepatitis?

12:00:46 20    A.     For Idenix and Merck.

12:00:48 21    Q.     Was the testing we saw in September of 1998 the only

12:00:54 22   testing Merck did of this compound?

12:00:56 23    A.     No.

12:00:56 24    Q.     What other testing did you see in Merck documents

12:01:01 25   between 1September 998 and November of 1998?  What did you

12:01:06 1    see them doing?

12:01:07 2    A.    I saw them do the validated result, which we just

12:01:10 3    looked at, with the so-called titration assay to determine

12:01:14 4    the right concentration that would be necessary to protect

12:01:18 5    the cells from the BVDV virus.  I saw what we call

12:01:23 6    counter-assays, influenza, HIV, and I saw toxicity assays,

12:01:27 7    to determine that the drug would kill cells.

12:01:31 8    Q.    After those test data in 1998, what work did you see

12:01:40 9    looking to Merck documents between 1998 and the replicon

12:01:44 10   test we have talked about?  What work did you see on this

12:01:49 11   compound?

12:01:50 12   A.    Merck developed the replicon assay and tested the

12:01:54 13   compound in the BVDV replicon.

12:01:59 14   Q.    You told us already that the replicon assay was

12:02:02 15   invented in 1999?

12:02:04 16   A.    That's correct.

12:02:04 17   Q.    The lab gets the replicon assay, is it ready to go?

12:02:08 18   A.    No, it is not.

12:02:09 19   Q.    What do you have to do, big picture?

12:02:11 20   A.    You have to get the license.  You have to get the

12:02:14 21   materials.  And then you have to start to acquaint yourself

12:02:18 22   with that system and develop the SAR in a manner that is

12:02:21 23   robust enough to actually get useful results, especially

12:02:25 24   against antivirals.

12:02:28 25   Q.    In reviewing the Merck documents you saw, when did

12:02:37 1    you see that Merck got and had set up their replicon assay?

12:02:41 2    A.    The date we have is from mid-2000.

12:02:44 3    Q.    Let's turn back to Dr. Wolanski's lab notebook, which

12:02:51 4    is DX-439, and turn to page 393 of the document, that's

12:02:58 5    right there.

12:03:01 6            Dr. Seeger, when you look at pages 393 through

12:03:05 7    412 of DX-439, what do those pages tell you?

12:03:10 8    A.    Now, that those are the summaries of description off

12:03:15 9    the experiments they have done with the HCV replicon assay.

12:03:21 10   Q.    What compound was included in this replicon testing

12:03:26 11   that was done by Dr. Wolanski in August of 2000?

12:03:30 12   A.    Well, the methyl up OH.

12:03:36 13   Q.    Were you here when Dr. Olsen was testifying about

12:03:45 14   triphosphates?

12:03:46 15   A.    I was.

12:03:46 16   Q.    And the making of triphosphates?

12:03:48 17   A.    I was.

12:03:49 18   Q.    Do you know need to make a triphosphate to test a

12:03:54 19   nucleoside in replicon?

12:03:55 20   A.    No, you do not.

12:03:56 21   Q.    Now, to speed up, did you see Merck do a second

12:04:02 22   replicon testing later after August --

12:04:06 23   A.    Yes.

12:04:06 24   Q.    The basic time frame?

12:04:08 25   A.    A couple of months or so later.

12:04:10 1  Q.     Now, did you prepare a demonstrative that explains

12:04:14 2  how these tests relate to your opinions on reduction to

12:04:18 3  practice?

12:04:19 4  A.     Yes.

12:04:19 5  Q.     With the Court's permission, I will put up DDX-617.

12:04:25 6         Here we see the claim language.  What is in the

12:04:28 7  second box there, what is that?  What is that from?

12:04:33 8  A.     The box on the bottom right?

12:04:36 9  Q.     Yes:  What's that?

12:04:38 10 A.     That's the structure of the compound methyl up OH

12:04:44 11 down compound.

12:04:45 12 Q.     What are you illustrating by the middle box there

12:04:48 13 with the same numbers?

12:04:50 14 A.     Those are the results of the, the summary of the

12:04:53 15 replicon data.

12:04:54 16 Q.     In your opinion, in 2000, was Merck's testing of this

12:04:58 17 L-604765 in the replicon assay a reduction to practice of

12:05:04 18 Claim 1 of the '597 patent as it reads there?

12:05:07 19 A.     Yes, it was.

12:05:08 20 Q.     Why?

12:05:10 21 A.     Because they demonstrate antiviral activity with a

12:05:15 22 specific concentration in the replicon system.

12:05:18 23 Q.     When -- in 1998 was Merck's testing of this compound,

12:05:25 24 in 1998, was Merck's testifying of BVDV, compounds in BVDV,

12:05:32 25 was that a reduction to practice of Claim 1 of the '597

12:05:37 1  patent?

12:05:38 2          MR. McCRUM:  Objection, leading, Your Honor.

12:05:41 3          MR. FARRELL:  Foundation for his opinion.

12:05:43 4          THE COURT:  Overruled.

12:05:44 5          THE WITNESS:  Yes, it was.

12:05:45 6  BY MR. FARRELL:

12:05:45 7  Q.      Why?

12:05:46 8  A.      Because they DEMONSTRATED, there is a specific

12:05:49 9  concentration for MICROMOLAR, in fact, that they could

12:05:53 10 protect a hundred percent the cells from the BVDV virus.

12:05:57 11 Q.      So I want to talk about abandonment, though.

12:06:01 12         Do you understand the legal standard for

12:06:02 13 abandonment?

12:06:02 14 A.      Yes, I do.

12:06:03 15 Q.      Did you prepare a demonstrative on the standard you

12:06:06 16 applied?

12:06:07 17 A.      I have.

12:06:07 18 Q.      Court's permission, I would like to PUT up DDX-619.

12:06:12 19         Dr. Seeger, is this the standard you applied?

12:06:15 20 A.      It is.

12:06:15 21 Q.      What standard did you apply and Item whether Merck

12:06:18 22 abandoned its work?

12:06:21 23 A.      So a person is deemed to abandon, suppress, or

12:06:25 24 conceal an invention if the PERSON unreasonably delays in

12:06:28 25 making the invention available to the public.

12:06:30 1    Q.    In your expert opinion, did Merck abandon its work on

12:06:36 2    L-604765 between 1998 and 2000?

12:06:40 3              MR. McCRUM:  Objection Your Honor.  Lack of

12:06:43 4    foundation.  Calling for legal conclusion.  No personal

12:06:45 5    knowledge.

12:06:46 6              MR. FARRELL:  Your Honor, this is part of his

12:06:51 7    expert opinion on enablement.  There has to be not

12:06:54 8    abandonment.  This is what he is offered for.

12:06:57 9              MR. McCRUM:  He is testifying to facts.  He is

12:07:01 10   now talking about the law, Your Honor.  He is not an expert

12:07:04 11   on the law.

12:07:04 12             THE COURT:  Overruled.

12:07:06 13   BY MR. FARRELL:

12:07:06 14   Q.    In your opinion, did Merck abandon its work on

12:07:11 15   L-604765 between 1998 and 2000?

12:07:15 16   A.    Not at all.

12:07:15 17   Q.    Why do you say that?

12:07:16 18   A.    Because there is continuous activity from the period

12:07:21 19   of 1998 until they test the compound in the HCV replicon.

12:07:26 20   Q.    What is this evidence of continuous work?

12:07:28 21   A.    Well, obviously we have the facts in the notebook of

12:07:30 22   Dr. Wolanski.  There is other data.  And then we know that

12:07:34 23   the replicon system came back and they had to develop it,

12:07:37 24   and as soon as they had that, they would test the compound,

12:07:41 25   also by Dr. Wolanski.

12:07:43 1    Q.    You were here in court when the lawyers on both sides

12:07:47 2    had that document that said drop with a question mark?

12:07:50 3    A.    Yes, I was here.

12:07:51 4    Q.    Doesn't that document tell that you the compound was

12:07:54 5    abandoned, dropped?

12:07:56 6    A.    No, because it had has a question mark.

12:07:57 7    Q.    What did you see after that drop question mark at

12:08:00 8    Merck in the records?  What did you see happening at

12:08:03 9    Merck?

12:08:04 10   A.    Well, I saw, obviously, a continuation of activity

12:08:07 11   because they tested this compound in the replicon system.

12:08:11 12   Q.    If we could, let's turn to claims 28, 30 and 31 of

12:08:16 13   the '597.  Have you we prepared have you prepared a

12:08:22 14   demonstrative of those claims and how they relate to your

12:08:24 15   expert opinion?

12:08:26 16   A.    Yes.

12:08:26 17            MR. FARRELL:  With the Court's permission, I

12:08:29 18   would like to put up exhibit DDX-620.

12:08:32 19   BY MR. FARRELL:

12:08:33 20   Q.    Sir, each of these claims have certain language.  My

12:08:35 21   question will be first with 28.  Was Merck's replicon

12:08:39 22   testing about L-604765 a reduction to practice of Claim 1,

12:08:45 23   which requires being administered to a host?

12:08:47 24   A.    Yes, it was.

12:08:48 25   Q.    Why do you say that?

12:08:49  1  A.    Because they show it in cells which are considered

12:08:51  2  the host.

12:08:52  3  Q.    Was Merck's replicon testing of L-604765 a reduction

12:08:57  4  to practice of Claim 30, which requires contacting a

12:09:02  5  hepatitis C virus in the hose?

12:09:03  6  A.    Yes, it was.

12:09:04  7  Q.    Why do you say that?

12:09:06  8  A.    Because the drug was in the cells replicated replicon

12:09:12  9  and inhibited.

12:09:13 10  Q.    Lastly, Claim 31, was Merck's replicon testifying

12:09:18 11  about 604731 a reduction to practice of Claim 31 which

12:09:25 12  involved contacting a cell in the host infected with a

12:09:27 13  hepatitis C virus?

12:09:28 14  A.    Yes.

12:09:29 15  Q.    What.  Dr. Seeger, does the patent enable a person of

12:09:35 16  ordinary skill to practice the full scope of the claim with

12:09:38 17  undue experimentation?

12:09:39 18  A.    Yes.

12:09:39 19  Q.    And was Merck first?

12:09:42 20  A.    Merck was first.

12:09:44 21       MR. FARRELL:  No more questions.

12:09:46 22       THE COURT:  Okay.  Cross-examination.

12:09:59 23       MR. McCRUM:  If I can have a moment, I have to

12:10:01 24  get some notebooks passed out here

12:10:03 25       THE COURT:  Certainly.

**CROSS-EXAMINATION**

**BY MR. McCRUM:**

Q.      Good afternoon, Dr. Seeger.

A.      Good afternoon.

Q.      You may recall, we met at your deposition this year.
My name is Ryan McCrum.  I represent Idenix.

        I just wanted to pick up on something where you
left off, on this issue of abandonment.  You understand that
if L-765 was abandoned, it can't be invalidating prior art
against Idenix's patent.  Right?

A.      That's a legal question.  But I think I do
understand.

Q.      And that's why -- you said from 1998 to 2000 that
there was some work done during that time frame?

A.      That's correct.

Q.      But you didn't actually point to any documents
showing that work, did you?

A.      I saw the documents.

Q.      But in the testimonies that your counsel just led you
through, he didn't have you point to a single document to
point out this work that you referred to in 1998 to 2000?

A.      One document, yes, we looked at.  But other than that
we did not look at, correct.

Q.      There were others that he didn't take the time to
even talk about in court today.  Right?

12:12:30 1  A.      You could say that, yes.

12:12:32 2  Q.      They were important to show that if there was no

12:12:34 3  abandonment, don't you think he would have wanted to talk

12:12:39 4  about them to the ladies and gentlemen of the jury?

12:12:41 5  A.      You would have to ask him.

12:12:43 6          MR. FARRELL:  Objection.  Argument.

12:12:45 7          THE COURT:  Mr. McCrum.

12:12:46 8          MR. McCRUM:  It was a simple question, Your

12:12:48 9  Honor.  I don't think it was argumentative at all.

12:12:50 10         THE COURT:  Overruled.  I don't know if yu have

12:12:52 11 got an interest.

12:12:53 12         THE WITNESS:  I do not really -- I don't

12:12:59 13 interfere or make suggestions on the strategy of lawyers of

12:13:03 14 how to do a direct.  I am a scientist.

12:13:06 15 BY MR. McCRUM:

12:13:07 16 Q.      At best, you agree, you have identified at most one

12:13:12 17 document to support your evidence that there is no

12:13:15 18 abandonment during this time period?

12:13:17 19 A.      No, I identified many documents that I have seen

12:13:22 20 before I came here to testify.

12:13:23 21 Q.      Before you came here to testify today?

12:13:26 22 A.      Yes.

12:13:26 23 Q.      All right.  Let's talk about some issues I think we

12:13:34 24 can agree on.

12:13:36 25         You understand that one of the undisputed facts

12:13:38  1   in this case is that use of Sovaldi and Harvoni in

12:13:45  2   accordance with their labels results in methods defined by

12:13:47  3   the asserted claims of the '597 patent under this Court's

12:13:50  4   claim construction?

12:13:51  5   A.      Again, I am not a lawyer but I take your word for it,

12:13:55  6   yes.

12:13:55  7   Q.      You understand that is not being disputed in this

12:13:58  8   case.  Right?

12:13:59  9   A.      Okay.

12:13:59 10   Q.      You also understand infringement is not an issue the

12:14:01 11   jury is being asked to decide.  Right?

12:14:04 12   A.      Again, I take your word for it.

12:14:07 13   Q.      Your opinions, they go solely to the issue of

12:14:13 14   validity.  Correct?

12:14:15 15   A.      They are in reference to demonstratives that I have

12:14:19 16   shown you in the direct.

12:14:20 17   Q.      And you understand that issued patents are presumed

12:14:24 18   valid.  Right?

12:14:28 19   A.      Again, I am not a lawyer.  But I think that's

12:14:30 20   correct.

12:14:30 21   Q.      Just so we are clear, that's -- let me refresh your

12:14:35 22   recollection.  If we could get your expert report revised,

12:14:40 23   it's at Tab 1 in your binder.  Dr. Seeger, at page 6,

12:14:45 24   Paragraph 28, if we could have that on the screen, please.

12:14:54 25          This is your expert report, your opening expert

12:14:59 1    report that you submitted in this case.  Right?

12:15:01 2    A.    That's correct.

12:15:01 3    Q.    And in Paragraph 28, you said, "I understand that

12:15:06 4    issued patents are presumed valid, and that the valid" -- do

12:15:12 5    you see that?

12:15:12 6    A.    Yes.

12:15:13 7    Q.    And you went on to say "That the party challenging a

12:15:18 8    patent's validity bears the burden to prove that the patent

12:15:21 9    is invalid by clear and convincing evidence.

12:15:24 10          That is what is on the page here.  Right?

12:15:27 11   A.    Yes.

12:15:27 12   Q.    And that's what you wrote in your report?

12:15:29 13   A.    I did.

12:15:30 14   Q.    Idenix's '597 patent was issued by the United States

12:15:34 15   Patent Office.  Correct?

12:15:35 16   A.    Correct.

12:15:35 17   Q.    It's an issued patent.  Correct?

12:15:40 18   A.    Correct.

12:15:41 19   Q.    All right.  This case involves the discovery and

12:15:47 20   development of compounds for treating hepatitis C.  Right?

12:15:52 21   A.    Correct.

12:15:52 22   Q.    You have never actively participated in drug

12:15:56 23   development.  Right?

12:15:58 24   A.    I cannot agree with that.

12:16:03 25   Q.    You can't agree that you have not actively

12:16:06  1   participated in drug development?

12:16:08  2   A.      It would depend how you define participation.

12:16:11  3   Q.      Well, using your words and not mine, can we have Dr.

12:16:16  4   Seeger's deposition transcript from May 10, 2016, page 26,

12:16:25  5   lines 21 through 25.  Before we put that on the screen do

12:16:29  6   you remember giving your deposition in May of this year?

12:16:32  7   A.      Yes.

12:16:32  8   Q.      You were under oath during that deposition?

12:16:34  9   A.      I was.

12:16:35 10   Q.      And you told the truth.  Right?

12:16:38 11   A.      Sure.

12:16:38 12   Q.      If I could have that portion of Dr. Seeger's

12:16:41 13   deposition on the screen here.  Lines 21 through 25.  You

12:16:45 14   were asked:  You don't consider yourself an expert in drug

12:16:49 15   development, right?

12:16:52 16   A.      That's correct.

12:16:52 17   Q.      Your answer was, "I have not -- I have not actively

12:16:57 18   participated in drug development, that's correct."

12:17:00 19   A.      That's correct.  And it depends on the context.  Yes.

12:15:31 20   Q.      And you have never been employed by a company to

12:15:52 21   discover new drug compounds; right?

12:15:54 22   A.      That is true.

12:15:55 23   Q.      And you have never worked on a project where a

12:15:58 24   compound made it through clinical trials?

12:16:00 25   A.      That is correct.

12:16:01  1   Q.      And the flip side is true as well.  You never worked

12:16:06  2   on a project where a compound did not make it through

12:16:08  3   clinical trials; correct?

12:16:09  4   A.      That is correct, too.

12:16:11  5   Q.      Now, you have some opinions that you have offered

12:16:14  6   today regarding how easy or difficult it would be to screen

12:16:18  7   compounds; right?

12:16:21  8   A.      Not easy or difficult, I guess.  I don't know what

12:16:25  9   you are referring to.

12:16:26 10   Q.      Well, let me rephrase.  You have offered opinions

12:16:28 11   about screening compounds for activity in this case; right?

12:16:38 12   A.      I offered opinions about methods that can be used to

12:16:43 13   screen compounds.

12:16:43 14   Q.      Let me ask you this.  You have never been employed by

12:16:47 15   a company screening compound for the treatment of hepatitis

12:16:51 16   C; correct?

12:16:52 17   A.      That's correct.

12:16:53 18   Q.      And you have never been involved in high throughput

12:16:55 19   screening of compounds for treating hepatitis C?

12:16:58 20   A.      That is correct.

12:16:58 21   Q.      And you have never been involved in developing a high

12:17:02 22   throughput screening; correct?

12:17:03 23   A.      That is, I cannot agree with that statement.

12:17:06 24   Q.      Excuse me?

12:17:07 25   A.      I cannot agree with that statement.

12:17:09 1   Q.      You cannot agree with the statement that you have

12:17:11 2   never been involved with in high throughput screening of

12:17:14 3   compound for hepatitis C?

12:17:15 4   A.      For hepatitis C, that is correct.

12:17:17 5   Q.      Your lab is a basic science lab?

12:17:20 6   A.      Yes.

12:17:21 7   Q.      You have never done large scale drug screening in

12:17:25 8   your lab, right?

12:17:26 9   A.      No.

12:17:27 10  Q.      You have never even tested a single modified

12:17:29 11  nucleoside for hepatitis C activity prior to May of 2000?

12:17:37 12  A.      Prior to the replicon, that's correct.

12:17:39 13  Q.      And May of 2000 is an important date in this case; is

12:17:43 14  that correct?

12:17:43 15  A.      That is correct.

12:17:43 16  Q.      Because that is when Idenix filed its first patent

12:17:46 17  application covering the inventions of the '597 patent;

12:17:51 18  right?

12:17:52 19  A.      That is correct.

12:17:53 20  Q.      And in your entire career, you have only tested six

12:17:59 21  or seven modified nucleosides for activity against hepatitis

12:18:04 22  C?

12:18:04 23  A.      That is correct.

12:18:05 24  Q.      We've heard a lot about the BVDV assay.  You have

12:18:11 25  offered some opinions about that with respect to the Merck

12:18:14 1  work; right?

12:18:14 2  A.    I did.

12:18:15 3  Q.    You have never worked with that assay, have you?

12:18:17 4  A.    I have not used the BVDV assay.

12:18:21 5  Q.    Never made it in your lab?

12:18:22 6  A.    Never.

12:18:23 7  Q.    You talked about the hepatitis C polymerase assay as

12:18:26 8  well; right?

12:18:26 9  A.    Yes.

12:18:26 10  Q.    The in vitro?

12:18:29 11  A.    Yes.

12:18:29 12  Q.    You have never used that in your lab either, have

12:18:32 13  you?

12:18:32 14  A.    I have not.

12:18:33 15  Q.    Let's talk about your opinions regarding the Merck

12:18:45 16  work in L-765.  One of your opinions relates to this BVDV

12:18:52 17  test that was run by somebody by the name of Dr. Wolanski in

12:18:59 18  1998?

12:18:59 19  A.    That is correct.

12:19:02 20  Q.    Can I please have DX-2794?  It's a document that you

12:19:07 21  discussed today.  It should be in your notebook, your

12:19:16 22  counsel provided you.

12:19:18 23            THE COURT:  Are you going to put that on the

12:19:19 24  screen as well?

12:19:19 25            MR. McCRUM:  Yes, we can go ahead and put that

12:19:22 1    on the screen.

12:19:22 2    BY THE WITNESS:

12:19:25 3    A.    Okay.

12:19:25 4    Q.    This is a document you discussed today, right?

12:19:30 5    A.    I believe so, yes.

12:19:31 6    Q.    And it's dated November 13th, 1998?

12:19:35 7    A.    Give me a chance to open it up.

12:19:38 8    Q.    Oh, sure.  Take your time?

12:19:39 9    A.    2794.

12:19:41 10   Q.    I'm not sure what tab it is in the binder --

12:19:44 11   A.    I've got it.

12:19:45 12   Q.    -- that your lawyers gave you.  But it is on the

12:19:47 13   screen, Dr. Seeger, if that is sufficient?

12:19:49 14   A.    All right.  I got it.

12:19:51 15   Q.    This is a document you discussed today; right?

12:19:58 16   A.    I don't think I talked about the letter here.  The

12:20:03 17   letter was talked about previously today.

12:20:05 18   Q.    All right.  You have seen this document.  It is in

12:20:12 19   what you considered in providing your testimony?

12:20:15 20   A.    Yeah.  Yes.

12:20:15 21   Q.    And the document is dated November 13th, 1998?

12:20:19 22   A.    That is correct.

12:20:20 23   Q.    I want, if you could please refer to a table that you

12:20:25 24   heard testimony about from Dr. Olsen.  It is near the end of

12:20:30 25   this document, about four pages from the end of it.  I don't

12:20:35 1   have the specific pin cites for Gilead's numbers, but --

12:20:39 2   there it is.  It's on the screen, Dr. Seeger.

12:20:42 3          You have seen this table before, right?

12:20:44 4   A.    Oh, yeah.

12:20:45 5   Q.    And I want to look at the last row of the table.

12:20:49 6   That relates to the compound L-765, right?

12:20:52 7   A.    Yeah.

12:20:52 8   Q.    And that is the compound that is the subject of your

12:20:55 9   opinions; right?

12:20:57 10  A.    That is correct.

12:20:58 11  Q.    And you see the column all the way to the right

12:21:03 12  entitled, Status?

12:21:05 13  A.    I do.

12:21:06 14  Q.    Do you see that?  In the status column, as of

12:21:09 15  November 1998, the status for L-765 was "drop?"  Right?

12:21:18 16  A.    "Drop?" and distinct from "drop," correct.

12:21:22 17  Q.    Distinct from drop.  You are drawing a distinction

12:21:27 18  mark because of the question mark after drop?

12:21:29 19  A.    Obviously, yes.

12:21:30 20  Q.    And that was the status recorded by Merck for L-765

12:21:34 21  as of November 13th, 1998; right?

12:21:36 22  A.    That is correct.

12:21:37 23  Q.    Now, you understand that in order for the 1998 BVDV

12:21:44 24  test to be a prior invention, Gilead must establish that

12:21:47 25  it was a reduction to practice of a method for treating

12:21:52 1   hepatitis C; right?

12:21:52 2   A.      I believe so, yes.

12:21:53 3   Q.      A reduction to practice.  And so the jury

12:21:57 4   understands, that is kind of a legal term, what that means.

12:22:00 5   You understand that is where an embodiment of the invention

12:22:03 6   was actually made and it was determined that the embodiment

12:22:06 7   worked for its intended purpose; right?

12:22:09 8   A.      Okay.

12:22:09 9   Q.      That's what you had.  That is how you put it in your

12:22:13 10  expert report; right?

12:22:15 11  A.      I believe so.

12:22:15 12  Q.      So that is how you understand it has to be made and

12:22:18 13  determined to work for its intended purpose.  But you, as

12:22:25 14  Gilead's expert, you don't personally believe the 1998 BVDV

12:22:30 15  test that Dr. Wolanski ran was a reduction to practice of a

12:22:35 16  method for treating hepatitis C, do you?

12:22:37 17  A.      I clearly stated my opinion on that, and there is a

12:22:40 18  distinction between the person of skill, which I described

12:22:43 19  prior to the replicon, a person of skill recognizes there

12:22:47 20  is a surrogate model, and it's perfectly reasonable to use

12:22:50 21  it.  Some did use it, Merck and Idenix did.  And I stated a

12:22:56 22  personal opinion I have, and I can repeat it.

12:23:01 23          I was not favoring the BVDV, and that was my

12:23:05 24  personal opinion.

12:23:05 25  Q.      You are Gilead's expert, right?

12:23:06 1  A.     That is correct.

12:23:07 2  Q.     Your personal opinion is that this work in 1998 was

12:23:11 3  not a prior invention of the method for treating hepatitis

12:23:15 4  C; right?

12:23:15 5  A.     No, I can't agree with that statement.

12:23:18 6  Q.     Let's see what you said during your deposition.

12:23:21 7         Can I have -- first of all, you agree you gave a

12:23:25 8  deposition on November 4th of 2016; right?

12:23:28 9  A.     Oh, yes.  Yeah.

12:23:30 10 Q.     And, again, you were under oath?

12:23:31 11 A.     I was.

12:23:32 12 Q.     And you were telling the truth; right?

12:23:34 13 A.     I did.

12:23:34 14 Q.     So let me please have page 405 in that deposition,

12:23:40 15 lines 13 through 16.

12:23:43 16        Can I have that portion blown up?

12:23:51 17 A.     What is the line?

12:23:52 18 Q.     It's in, your deposition is in the second binder.

12:23:59 19 You had a few depositions so it will be toward the end.

12:24:03 20 It's one of the last two tabs.

12:24:10 21 A.     (Witness complies.)

12:24:12 22 Q.     So I'm going to read what you asked, Dr. Seeger.

12:24:16 23        "Question:  So you don't personally believe that

12:24:18 24 the 1998 BVDV test that Dr. Wolanski ran would be a

12:24:21 25 reduction to practice for HCV?

12:24:24 1    "Answer:  In that context, the answer is no."

12:24:26 2    And you can't -- that's okay.  So I want to move

12:24:31 3  on.  We talked about reduction to practice; right?

12:24:36 4  A.    Do you have a question or ...

12:24:37 5  Q.    I do.

12:24:38 6    In order to prove prior invention by someone at

12:24:43 7  Merck, you agree that Gilead also has to show that a prior

12:24:47 8  inventor at Merck was first to conceive of the invention;

12:24:52 9  right?

12:24:52 10 A.    Okay.

12:24:53 11 Q.    Do you agree with that?

12:24:54 12 A.    I do.

12:24:55 13 Q.    And by "conceive," that is another legal term.  You

12:24:58 14 understand that in order to prove conception, the inventor

12:25:02 15 had to have an idea that it was definite and permanent

12:25:06 16 enough that one skilled in the art could understand the

12:25:09 17 invention.  Do you understand that?

12:25:10 18 A.    I understand it.

12:25:11 19 Q.    So by "definite and permanent idea," you understand

12:25:15 20 there is a mental component to conception; right?

12:25:19 21 A.    Again, you are in the legal arena here.  I'm not

12:25:23 22 totally comfortable, but I take your word.

12:25:25 23 Q.    Okay.  Well, a definite and permanent idea anyway.

12:25:29 24 You agree with that?

12:25:30 25 A.    Again, same answer.

12:25:31  1    Q.    In forming your opinions, you never spoke with any

12:25:37  2    current or former Merck employee about what they thought

12:25:40  3    about the 1998 BVDV test; right?

12:25:43  4    A.    No, I never talked to them.

12:25:44  5    Q.    And you don't know what Dr. Wolanski thought about

12:25:47  6    the BVDV test in 1998 as it relates to the treatment of

12:25:51  7    hepatitis C, right?

12:25:53  8    A.    Except that he wrote that the drug 100 percent

12:25:59  9    protected against the, against the cells that were infected.

12:26:07 10    It was effective, so inferring from that, one would think he

12:26:11 11    thought that he had inactivity.

12:26:11 12    Q.    I don't want to talk about inferring from documents

12:26:13 13    and things that might be written down.

12:26:16 14    A.    Okay.

12:26:16 15    Q.    My question to you is you don't know what Dr.

12:26:18 16    Wolanski thought about the BVDV test in 1998 as it relates

12:26:23 17    to the treatment of hepatitis C?

12:26:25 18    A.    Okay.  Besides the documents I have seen, certainly I

12:26:29 19    do not know what he is thinking.

12:26:30 20    Q.    And using your words, you don't have magical

12:26:35 21    powers --

12:26:36 22    A.    You got it.

12:26:37 23    Q.    -- what was in Dr. Wolanski's mind in 1998; right?

12:26:40 24    A.    That's what I said.

12:26:41 25    Q.    You are not even sure whether Dr. Wolanski knew the

1  structure of L-765 in 1998; right?

2  A.    I can only testify to what I have seen in this

3  notebook.

4  Q.    Right.  So you don't know if he actually knew the

5  structure of that compound in 1998?

6  A.    Yeah, possibly.

7  Q.    You didn't talk to Dr. Wolanski and ask him if he had

8  a light bulb moment like the one that Dr. Sommadossi

9  described on the first day?

10  A.    I never met Dr. Wolanski.

11  Q.    So you don't know you have he had that light bulb

12  moment?

13  A.    No.

14  Q.    And it's not just Dr. Wolanski.  You have no internal

15  information from Merck that shows that anyone there

16  appreciated that L-765 could be used to treat hepatitis C;

17  right?

18  A.    That is correct.  I don't have internal information.

19  Q.    You understand that Merck did file a patent

20  application in January of 2001 relating to nucleosides for

21  treating HCV?

22  A.    That's correct.

23  Q.    Let's go look at Tab 5 in your binder that I gave.

24  That is PX-382.  I'm not sure if this is admitted yet.  It's

25  a copy of the application that Merck filed in January of

12:27:59 1  **2001, Tab 5.**

12:28:03 2  A.    **Okay.**

12:28:03 3  Q.    **Are you there?**

12:28:19 4  A.    **Yes.**

12:28:20 5  Q.    **This is a copy of the application that Merck filed in**

12:28:22 6  **January of 2001; right?**

12:28:26 7  A.    **Yes, I believe so.**

12:28:27 8  Q.    **And you considered this application when you rendered**

12:28:29 9  **your opinions in this case; right?**

12:28:34 10  A.    **I certainly knew of the application.**

12:28:38 11            **MR. McCRUM:  I move the admission of PX-382,**

12:28:41 12  **Your Honor.**

12:28:41 13            **MR. FARRELL:  No objection, Your Honor.**

12:28:42 14            **THE COURT:  It is admitted.**

12:28:42 15            **(PTX-382 was admitted into evidence.)**

12:28:43 16  **BY MR. McCRUM:**

12:28:43 17  Q.    **I want you to refer to the second page of this**

12:28:45 18  **document where it lists the inventors.**

12:28:48 19  A.    **Yes.**

12:28:49 20  Q.    **Are you there?**

12:28:51 21  A.    **(Nodding yes.)**

12:28:51 22  Q.    **Dr. Wolanski is not a named inventor, is he?**

12:28:54 23  A.    **He is not listed.**

12:28:56 24  Q.    **He is the one that conducted the 1998 BVDV test,**

12:28:59 25  **though; right?**

12:29:00 1   A.      That's correct.

12:29:00 2   Q.      Merck did not attribute his work to this invention,

12:29:05 3   did they?

12:29:05 4   A.      Based on that list, not.

12:29:09 5   Q.      The patent application that Merck filed describing

12:29:14 6   its invention here does not even mention the 1998 BVDV test

12:29:19 7   results, does it?

12:29:21 8   A.      I don't have the whole document in my head, but I

12:29:25 9   take your word for it.

12:29:26 10  Q.      All right.  Let's talk about, go back to where we

12:29:34 11  started.  You understand that Merck abandoned the 1998 BVDV

12:29:38 12  test.  It cannot be used to invalidate Idenix's '597 patent.

12:29:44 13  Right?

12:29:45 14  A.      I believe so.

12:29:45 15  Q.      And from December of 1998 through May of 2000, you're

12:29:55 16  not aware of a single test run by Merck where L-765 was

12:29:59 17  tested in an assay for hepatitis C activity and found to be

12:30:04 18  active; right?

12:30:05 19  A.      Correct.

12:30:11 20  Q.      Can I have -- can you refer to Tab 7 in your binder?

12:30:30 21  That is PX-347.

12:30:32 22          THE COURT:  You are not nearly completed.  You

12:30:44 23  have more than a few minutes; correct?

12:30:46 24          MR. McCRUM:  I do, Your Honor.

12:30:46 25          THE COURT:  All right.  Then I think it's a good

01:30:49 1   time to break for lunch.

12:30:50 2                   Ladies and gentlemen of the jury, I believe

12:30:51 3   lunch is here.  No talking about the case.  We'll get you

12:30:53 4   back here in a few minutes.

12:30:55 5                   (Jury left courtroom.)

12:31:16 6                   THE COURT:  We will be in recess.

12:31:30 7                   (Lunch recess taken.)

12:31:30 8                   *      *      *

01:15:13 9                   Afternoon Session, 1:10 p.m.

01:15:13 10                  MR. SCHERKENBACH:  Your Honor, before you bring

01:15:17 11  the jury in, can I ask a question?

01:15:18 12                  THE COURT:  Yes.

01:15:19 13                  MR. FARRELL:  Our next witness, Dr. Secrist will

01:15:25 14  be working with boards.  We're scheming where we can put

01:15:28 15  those.  We're thinking in the area of to the right,

01:15:31 16  immediate right of the witness stand at the end of the jury

01:15:33 17  box, if that is acceptable?  Because otherwise if it is

01:15:37 18  here, it will block.

01:15:38 19                  THE COURT:  Both sides are agreeable to that?

01:15:41 20                  MR. McCRUM:  Your Honor, while I'm up here,

01:15:43 21  either now or at the break, if we could talk.

01:15:46 22                  (Witness brushes against the microphone.)

01:15:46 23                  THE COURT:  Doctor, sorry.  The microphone.

01:15:50 24                  THE WITNESS:  Sorry.

01:15:50 25                  THE COURT:  Everybody does that.

01:15:51 1          MS. PARKER:  If we could talk about the schedule

01:15:55 2     for the rest of the afternoon to update Your Honor.

01:15:55 3          THE COURT:  Should we do that before the jury

01:15:59 4     comes in or can it wait until the break?

01:16:01 5          MR. SCHERKENBACH:  I think it can wait.  If we

01:16:03 6     could do it at the break before this an issue.

01:16:05 7          THE COURT:  We'll do that at the next break, and

01:16:07 8     boards are fine where you propose.  Just if the jury is in

01:16:10 9     and out, you will need to move them.

01:16:12 10         MR. SCHERKENBACH:  Right.

01:16:12 11         THE COURT:  All right.  Let's bring the jury in.

01:16:16 12         Mr. McCrum, you can come back to the podium.

01:16:19 13         (Jury returned.)

01:17:33 14         THE COURT:  Welcome back.

01:17:34 15         Mr. McCrum, you may proceed.

01:17:34 16    BY MR. McCRUM:

01:17:37 17    Q.     Good afternoon, Dr. Seeger.

01:17:39 18         Before the break, we were talking about the

01:17:42 19    issue of abandonment with respect to the compound L-765 that

01:17:47 20    we had been talking about today.  Do you remember that?

01:17:49 21    A.     I do.

01:17:49 22    Q.     And I had asked you right before the break to refer

01:17:52 23    to Tab 7 in your binder.  That's PX-347.  Do you still have

01:17:58 24    that open?

01:17:59 25    A.     I do.

01:17:59 1   Q.      And you considered this document in your supplemental

01:18:02 2   expert report in this case; correct?

01:18:04 3   A.      I did.

01:18:05 4               MR. McCRUM:  I move for the admission of PX-347.

01:18:09 5               MR. FARRELL:  No objection, Your Honor.

01:18:10 6               THE COURT:  It's admitted.

01:18:10 7               (PTX-347 was admitted into evidence.)

01:18:10 8   BY MR. McCRUM:

01:18:12 9   Q.      If you could turn to -- I'm sorry -- PX-347.  The

01:18:23 10  page has a Bates number MERCK0014296.  It's a timeline.

01:18:32 11              Are you there?

01:18:34 12  A.      Page, please?

01:18:34 13  Q.      It's got it at the bottom.  It has, it's on the

01:18:39 14  screen here, if it would be easier for you.

01:18:42 15  A.      Oh.

01:18:42 16  Q.      I think it is 80.  It is PX-347, page 80.

01:18:55 17              If we could, Mr. Farrell, if you could please

01:18:58 18  just blow up the timeline.

01:19:02 19              Thank you very much.

01:19:05 20  A.      Yes.

01:19:05 21  Q.      Okay.  This is the heading is Initial Timeline of

01:19:10 22  L-604765.

01:19:12 23              Do you see that?

01:19:14 24  A.      I do.

01:19:15 25  Q.      And the timeline indicates that L-765 was found in a

01:19:19 1  search of adenosine on June 21st, 2000.  Do you see that?

01:19:29 2  It's right in the first entry of the timeline, Dr. Seeger.

01:19:33 3  A.      Yes.  I don't -- okay.  Yes, I read what you

01:19:39 4  highlighted here.

01:19:40 5  Q.      That's what it says?

01:19:41 6  A.      June 21, 2000.  Correct.

01:19:44 7  Q.      And that was after Idenix filed its provisional

01:19:48 8  patent application in May of 2000; correct?

01:19:53 9  A.      Well, June is after May, that's correct.  Yes.

01:19:55 10  Q.      The timeline doesn't mention the 1998 BVDV test on

01:20:00 11  this compound; right?

01:20:04 12  A.      I don't see it on this page.

01:20:05 13  Q.      Okay.  It's true that you formed your opinions about

01:20:12 14  whether or not Merck abandoned L-765 in 1998 before you

01:20:17 15  heard Dr. Olsen's testimony today; correct?

01:20:20 16  A.      That is correct.  Yeah.

01:20:22 17  Q.      And you heard hem say today that L-765 was dropped

01:20:27 18  after the 1998 tests.  Do you remember that?

01:20:29 19  A.      I heard that.

01:20:30 20  Q.      And you agree that Dr. Olsen, as the leader of

01:20:36 21  Merck's HCV program from 1998 to 2003, is in a better

01:20:42 22  position to make that determination than you are; correct?

01:20:47 23  A.      My position is based on facts on notebook entries

01:20:53 24  that clearly demonstrated activity.

01:20:54 25  Q.      But that wasn't quite my question.  Is it your

01:20:57 1    testimony today under oath that you are in a better position

01:21:01 2    to determine whether L-765 was dropped after the 1998 BVDV

01:21:09 3    tests than Dr. Olsen?

01:21:13 4    A.    I cannot answer this question.

01:21:15 5    Q.    It's possible then you had more knowledge than the

01:21:18 6    leader of the HCV program upon what was going on during that

01:21:21 7    time period?  Is that what you are suggesting?

01:21:22 8    A.    Again, I go by the facts I see.  I cannot know what

01:21:26 9    was in his mind at the time.

01:21:27 10   Q.    In fact, you couldn't know what was in anyone's mind

01:21:32 11   in the group at that time; is that right?

01:21:35 12   A.    That's correct.

01:21:35 13   Q.    One more quick topic on this Merck work before we

01:21:41 14   move on.

01:21:42 15          Could I have Defendant's Demonstrative

01:21:44 16   Exhibit 161, please, on the screen?

01:21:54 17          You saw in this slide on Gilead's opening

01:21:56 18   statement before, right?

01:21:59 19   A.    I see the slide, yeah.

01:22:00 20   Q.    I just want to be clear.  You are not claiming that

01:22:05 21   once Merck made this compound in 1966 that they invented a

01:22:09 22   treatment for hepatitis C at that time; right?

01:22:13 23   A.    Consistent with Dr. Olsen's statement, there was

01:22:15 24   nothing known about HCV in 1966.

01:22:20 25   Q.    So they couldn't have invented it at that time;

01:22:22  1    right?

01:22:23  2    A.      Right.

01:22:25  3    Q.      And you understand that researchers developed new

01:22:30  4    uses for existing compounds; right?

01:22:31  5    A.      Say it again, please.

01:22:32  6    Q.      You understand that researchers have discovered new

01:22:35  7    uses for existing compounds; right?

01:22:37  8    A.      Yes.

01:22:38  9    Q.      All right.  I want to switch gears and talk about

01:22:44 10    enablement.  You understand the claims of the '597 patent

01:22:51 11    are limited to ribonucleosides that actually treat hepatitis

01:22:59 12    C; correct?

01:22:59 13    A.      I think I have correct that clearly explains the

01:23:04 14    construction of the Court.  I would have to see it again.

01:23:07 15    Q.      Well, let me just ask you this:  You agrees as of May

01:23:11 16    of 2000, it was known there weren't billions of compounds

01:23:14 17    that could treat hepatitis C; right?

01:23:22 18    A.      Can you say it again?  I don't understand your

01:23:24 19    question.

01:23:25 20    Q.      It was known as of May of 2000 that there were not

01:23:29 21    billions of compounds that could treat hepatitis C?

01:23:41 22    A.      That's question, it's a bizarre question because

01:23:48 23    nobody would expect that there are billions of compounds

01:23:52 24    that would be, you know, that would be effective treatments.

01:23:57 25    One wouldn't expect that.

01:23:58 1    Q.    Right.  And they would know that in May of 2000;

01:24:02 2    correct?

01:24:05 3    A.    I think it's known since the beginning of chemistry

01:24:08 4    that not billions of molecules can serve a specific function

01:24:15 5    you are looking for.  I don't understand the nature of your

01:24:19 6    question.  I mean I understand your question but it's, let's

01:24:24 7    put it that way.  Okay.  I think I answered it to the best

01:24:27 8    of my knowledge.

01:24:28 9    Q.    Okay.  Just so -- I'm not clear on your answer.  I

01:24:31 10   want to refer you to what you said during your deposition on

01:24:34 11   May 10th, 2016.

01:24:36 12   A.    All right.

01:24:36 13   Q.    We established you gave a deposition on that day and

01:24:39 14   you told the truth?

01:24:40 15   A.    Yes, I did.

01:24:42 16         MR. McCRUM:  Can I have page 294, lines 6

01:24:44 17   through 9 in that deposition on the screen, please.

01:24:46 18   BY MR. McCRUM:

01:24:46 19   Q.         You were asked:

01:24:52 20         "Question:  You agree that in 2000 and 2003,

01:24:54 21   there were not billions of nucleoside compound that could

01:24:57 22   treat HCV, right?

01:24:59 23         "Answer:  No, of course not."

01:25:05 24         Now, as of May 2000, it was known in the art

01:25:07 25   that only a very small number of compounds could be

01:25:10 1  effective against HCV; right?

01:25:13 2  A.    I think that is the expectation from the art of

01:25:20 3  identifying antivirals.  That's correct.

01:25:22 4  Q.    And that was the expectation even without testing

01:25:26 5  all of those compounds that existed in May of 2000; right?

01:25:31 6  A.    That a small number would be active.  That's the

01:25:34 7  expectation.  And as long as you don't test it, you don't

01:25:37 8  know which ones those are.

01:25:39 9  Q.    But without even conducting any of that testing, you

01:25:42 10  would know that it's only a small number; right?

01:25:46 11  A.    Your expectation is that only a small number will be

01:25:49 12  active.

01:25:50 13  Q.    And you agree that there were assays available in

01:25:55 14  2002 and 2001 to test compounds for activity against

01:25:59 15  hepatitis C; right?

01:26:00 16  A.    I do.

01:26:00 17  Q.    And one of those was the hepatitis C in vitro

01:26:04 18  polymerase assay?

01:26:05 19  A.    Yes.

01:26:08 20  Q.    And that was available at least by 1997; right?

01:26:13 21  A.    That was 1997, correct.

01:26:15 22  Q.    Before Idenix filed its 2002 provisional application;

01:26:19 23  correct?

01:26:21 24  A.    That's before that, yeah.

01:26:23 25  Q.    And skilled artisans could tests compound in 2000

01:26:29 1    using that assay to determine whether compounds have

01:26:33 2    activity against hepatitis C, right?

01:26:36 3    A.      They could test whether it has activity against the

01:26:40 4    polymerase of hepatitis C.

01:26:41 5    Q.      And we talked earlier about, you do agree there is

01:26:44 6    data in the '597 patent.  Right?

01:26:49 7    A.      There is no antiviral data.  But there is data.

01:26:51 8    Q.      I know you are drawing a distinction.  To be clear,

01:26:54 9    so the ladies and gentlemen of the jury understand, there is

01:26:56 10   data?

01:26:57 11   A.      There is data.

01:26:57 12   Q.      And there is data for a number of compounds there.

01:27:01 13   Right?

01:27:06 14   A.      A small number of compounds, yes.

01:27:10 15   Q.      And it would not have been undue experimentation to

01:27:13 16   test the triphosphates of those compounds reported in that

01:27:16 17   part of the '597 patent in the HCV polymerase assay at that

01:27:22 18   time.  Accurate?

01:27:23 19   A.      It could have been tested.

01:27:24 20   Q.      It could have been tested without undue

01:27:27 21   experimentation?

01:27:28 22   A.      For compounds, yes.

01:27:28 23   Q.      The answer to my question is yes?

01:27:30 24   A.      Yes.

01:27:34 25   Q.      The hepatitis C Polymerase assay, that was developed

01:27:38 1    by Dr. DeFrancesco?

01:27:41 2    A.    That's correct.

01:27:41 3    Q.    He is one of Idenix's experts in this case?

01:27:43 4    A.    Yes.

01:27:44 5    Q.    He is very well known for developing that.  Right?

01:27:49 6    A.    I know.

01:27:49 7    Q.    Okay.  So in addition to the hepatitis C polymerase

01:27:55 8    assay, in 2000 the HCV replicon assay was available.  Right?

01:28:01 9    A.    2000, yes, correct.

01:28:02 10   Q.    In fact, by that time frame everyone in the field

01:28:05 11   moved to that assay.  Right?

01:28:08 12   A.    That's right.

01:28:08 13   Q.    And you agree that you can use the replicon assay to

01:28:12 14   determine whether compounds are active against hepatitis C.

01:28:15 15   Right?

01:28:15 16   A.    Yes, I did.

01:28:16 17   Q.    We talked about the BVDV assay?

01:28:24 18   A.    We did.

01:28:25 19   Q.    That was also available by the year 2000.  Correct?

01:28:29 20   A.    It was available, yes.

01:28:30 21   Q.    And you agree that scientists were using that assay

01:28:34 22   prior to May of 2000 to determine whether compounds were

01:28:38 23   active against hepatitis C.  Correct?

01:28:41 24   A.    I agree.

01:28:48 25   Q.    Can I have the '597 on the screen, please, Mr.

01:28:56  1    Sayres.

01:28:59  2                Thank you.  I want to go to Column 13, lines 42

01:29:03  3    through 48.  Can we have that on the screen, please is.

01:29:39  4    Column 13, please.  Blow up lines 42 through 48 -- actually,

01:29:43  5    why don't you do 42 through 56, please.

01:29:50  6                Okay, do you see the sentence starting with

01:29:52  7    beta-D and beta-L nucleotides?

01:29:55  8    A.      I do.

01:29:56  9    Q.      The next sentence, it says, Nucleotides can be

01:29:59 10    screened for their ability to inhibit HCV polymerase in any

01:30:04 11    of the in-vitro assays according to screening methods set

01:30:07 12    forth more particularly herein.

01:30:10 13                Did I read that correctly?

01:30:12 14    A.      You did.

01:30:12 15    Q.      It goes on to say that one can readily determine the

01:30:16 16    spectrum of activity by evaluating the compound in the

01:30:18 17    assays described herein or with another confirmatory assay.

01:30:24 18    Do you see that?

01:30:25 19    A.      Yes, I do see it, sure.

01:30:28 20    Q.      And, just to round this out, in the next paragraph it

01:30:32 21    says in one embodiment, the efficacy of the anti-HCV

01:30:36 22    compound is measured according to the concentration of

01:30:39 23    compound necessary to reduce the plaque number of the virus

01:30:43 24    in-vitro assay, according to methods set forth more

01:30:47 25    particularly herein by 50 percent.

01:30:51  1          That's what the patent says.  Right?

01:30:53  2     A.     I see that.

01:30:54  3     Q.     And then, it gives preferred EC values at the end of

01:30:58  4     this patent.  Correct?

01:30:59  5     A.     Correct.

01:30:59  6     Q.     Can we go to DX-338, please.

01:31:19  7            This is a document you discussed in your direct

01:31:22  8     testimony.  Do you recall discussing this document?

01:31:38  9     A.     Yes, I did.

01:31:38 10     Q.     This is a compilation of 2'-methyl compounds that

01:31:42 11     were tested at Idenix.  Right?

01:31:44 12     A.     Correct.

01:31:44 13     Q.     I think you identified that there were a number of

01:31:47 14     them that you felt didn't show antiviral activity.  Right?

01:31:51 15     A.     I did, yes.

01:31:52 16     Q.     Did you count how many did have antiviral activity?

01:31:59 17     A.     I believe I directly referred to 4.

01:32:02 18     Q.     Did you create a slide like the one you showed that

01:32:06 19     didn't show activity?  Did you create a similar slide that

01:32:09 20     showed the ones that did have activity?

01:32:12 21     A.     No, I did not.

01:32:13 22     Q.     There was more than one compound in that slide

01:32:19 23     showing 2'-methyl nucleoside with activity.  Right?

01:32:22 24     A.     That's correct.

01:32:22 25     Q.     In fact, there was a lot more than one, wasn't it?

01:32:25 1   A.    I saw four.

01:32:26 2   Q.    You saw only four.  Did you look at the whole

01:32:29 3   document?

01:32:30 4   A.    I don't recall how many.  But there could be more,

01:32:33 5   that's correct.

01:32:33 6   Q.    But you didn't show that slide?

01:32:36 7   A.    I did not.

01:32:37 8   Q.    Prior to May of 2000, you are not aware of a single

01:32:43 9   '-methyl up compound that was reported in the literature

01:32:46 10  that showed activity against HCV, are you?

01:32:50 11  A.    I am not aware of it.

01:32:51 12  Q.    Not aware of one.  Right?

01:32:55 13  A.    I don't recall at this time.

01:32:56 14  Q.    And in your deposition, you testified that it would

01:32:59 15  have been miraculous to even find one.  Right?

01:33:03 16  A.    I don't recall what you are referring to.

01:33:05 17  Q.    It would have been a big deal in May of 2000 to find

01:33:08 18  one down against HCV.  You agree with that?

01:33:13 19  A.    In May 2000 it would be miraculous.  It's great to

01:33:21 20  find a compound that's a difficult process.  You can name it

01:33:24 21  miraculous.  It's certainly possible in 2000 to find a

01:33:28 22  compound.

01:33:28 23  Q.    In doing so, it would have been, in your words,

01:33:32 24  miraculous.  Right?

01:33:34 25  A.    I don't know if you are referring to my deposition.

01:33:37 1 If you did, that's what I said and I stand by that.

01:33:41 2 Q.    All right.  Let's switch gears.  I want to talk about

01:33:48 3 another patent application that you are familiar with.  Can

01:33:52 4 you please refer to PX-812, which is Tab 17 in your binder

01:34:14 5 are you there?

01:34:15 6 A.    Yes.

01:34:15 7 Q.    This is a copy of one of Pharmasset's patent

01:34:17 8 applications.  Right?

01:34:21 9 A.    Yes.

01:34:22 10 Q.    Pharmasset was ultimately purchased by Gilead.  You

01:34:26 11 know that, right?

01:34:27 12 A.    I do know that.

01:34:28 13 Q.    Gilead is the party that has retained you and is

01:34:32 14 paying for you in this case.  Right?

01:34:34 15 A.    That's correct, yes.

01:34:36 16         MR. McCRUM:  If it is not already admitted, Your

01:34:38 17 Honor, I would move PX-812 into evidence.

01:34:43 18         THE COURT:  DX or PX?

01:34:46 19         MR. McCRUM:  PX.

01:34:49 20         THE COURT:  Any objection?

01:34:50 21         MR. FARRELL:  No objection at this time.

01:34:51 22         THE COURT:  It's admitted.

01:34:52 23         (PX-812 received in evidence.)

01:34:53 24 BY MR. McCRUM:

01:34:54 25 Q.    Can you turn to page 15 of Pharmasset's '368 patent

01:35:03  1    application.  Are you there?

01:35:04  2    A.    I am here, yes.

01:35:06  3    Q.    Can you see, there is a Formula I shown there?

01:35:09  4    A.    Yes.

01:35:09  5    Q.    You agree that Formula I in Pharmasset's application

01:35:13  6    covers a substantial number of compounds.  Right?

01:35:15  7    A.    I have to tell you, for this event, I have not

01:35:19  8    reviewed this patent.  So I might have seen it in the past,

01:35:24  9    but just with the -- I just want to make you aware that I

01:35:31 10    have not prepared or reviewed this patent for this trial.  I

01:35:36 11    have seen it before, with that provision.  I can answer your

01:35:43 12    questions.

01:35:43 13    Q.    You haven't just seen it.  You have offered legal

01:35:46 14    opinions?

01:35:47 15    A.    I mean, yes, so you know, for this event, I have not

01:35:50 16    done that.

01:35:51 17    Q.    In this case, you have offered opinions on it.

01:35:54 18    Right?

01:35:54 19    A.    I have just not looked at it in the last couple of

01:35:57 20    days.

01:35:58 21    Q.    You agree that what's shown here in Formula I

01:36:02 22    disclosed a substantial number of compounds.  Right?

01:36:06 23          MR. FARRELL:  Your Honor, I have an objection

01:36:07 24    which might require a sidebar.

01:36:10 25          (The following took place at sidebar.)

01:45:36  1          THE COURT:  What's the objection?

01:45:36  2          MR. FARRELL:  There was a motion in limited

01:45:36  3  granted by the Court that you may not use one patent to

01:45:36  4  prove the patent validity of the other.  The question is,

01:45:36  5  this patent claims a lots of compounds and seems to be

01:45:36  6  violating that motion in limine.

01:45:36  7          I didn't know when to object to see where it is

01:45:36  8  going.  That is where I think this is heading.  That first

01:45:36  9  question saying from the patent claims a lot of compounds is

01:45:36 10  in violation the motion.

01:45:36 11          THE COURT:  Your response.

01:45:36 12          MR. McCRUM:  That motion, my understanding, that

01:45:36 13  motion in limine was not granted.  It was subject to that we

01:45:36 14  could object at trial if they felt we had the basis for

01:45:36 15  doing so.  But this is classic impeachment.  He is taking a

01:45:36 16  position that our patent discloses millions of compounds and

01:45:36 17  he can't figure out which ones actually work.

01:45:36 18          Now, when it comes to his client's patent,

01:45:36 19  Pharmasset, he agrees it discloses a lot of compounds with

01:45:36 20  data for only one, but says they all work.

01:45:36 21          THE COURT:  Your belief is that -- do you agree

01:45:36 22  there was a motion in limine on this question?

01:45:36 23          MR. McCRUM:  There was a motion as to this

01:45:36 24  question.

01:45:36 25          THE COURT:  Your belief is it was denied.

01:45:36 1       MR. McCRUM:  My belief is it was denied.

01:45:36 2       MR. GRIFFITH:  Let me comment.

01:45:36 3       This witness has testified that there is no way

01:45:36 4  that billions of compounds, many compounds could be

01:45:36 5  effective against any given disease, that you would have to

01:45:36 6  test data for each compound to have an idea whether there is

01:45:36 7  activity.

01:45:36 8       This questioning goes to state of the art.  This

01:45:36 9  is not a matter of, we are trying to say their patent is not

01:45:36 10 valid and therefore it is not enabled and therefore ours is.

01:45:36 11 It goes to the state of the art as well as this witness'

01:45:36 12 credibility and impeachment on some of the statements he has

01:45:36 13 made.

01:45:36 14      MR. McCRUM:  One more thing.  That motion in

01:45:36 15 limine, to the extent it was granted, it was sort of we

01:45:36 16 would not get up and say this is an issued patent.  It is

01:45:36 17 presumed valid.  Therefore, you should presume that our

01:45:36 18 patent is valid.  That's not what we are trying to

01:45:36 19 establish.

01:45:36 20      THE COURT:  Mr. Farrell.

01:45:36 21      MR. FARRELL:  We began with the motion in limine

01:45:36 22 wasn't granted.  Now there is no argument.

01:45:36 23      The Court:  Idenix is not going to be able to

01:45:36 24 present evidence or make the argument that there are

01:45:36 25 standard ways of patenting and that because other patents

1    have adequate written description or enablement and those

2    patents may resemble the patents in suit, therefore, the

3    patent in suit is enabled or had adequate written

4    description that would not be relevant to credibility.  So

5    that whole line of argument is not relevant.  If it were

6    relevant, there is undue confusion and unfair prejudice and

7    waste of time that would far outweigh this supposed

8    relevance.  This notion of state of the art and his

9    opinions, completely different disclosures, completely

10   different examples, completely repetitive.  We would have to

11   spend all day analyzing this patent.  This Court clearly

12   said not to do that.  What we started saying was this motion

13   was not granted.  It was.  Knowing they -- they have a new

14   argument with regard to state-of-the-art.  This is exactly

15   what they were going to say.  That was the first question

16   here.

17            THE COURT:  For the record, you were reading

18   from the pretrial conference.

19            I think -- I can take the time to go check.

20   It's consistent with my recollection that I said that, you

21   granted that motion in limine.  Do we agree with that?

22            MR. McCRUM:  I agree to a limited extent, Your

23   Honor.  If we were using it for a particular purpose, I

24   think --

25            THE COURT:  You did start with, essentially, I

01:45:37 1    think, trying to establish, this is where I see you were

01:45:37 2    headed, you acknowledge this had, this is your client's

01:45:37 3    patent and doesn't it appear to disclose billions of

01:45:37 4    compounds.

01:45:37 5              MR. McCRUM:  I don't dispute that.

01:45:37 6              THE COURT:  Are you still seeking to do that?

01:45:37 7              MR. McCRUM:  I am seeking to show that his

01:45:37 8    opinions are inconsistent when it comes to his client's

01:45:37 9    patent.

01:45:37 10             THE COURT:  That I have already ruled on.  That,

01:45:37 11   I am sticking to the motion in limine.  We are here on an

01:45:37 12   objection.  That objection is sustained.

01:45:37 13             Are you still trying to press this additional

01:45:37 14   state of the argument?

01:45:37 15             MR. GRIFFITH:  Yes, Your Honor.  I don't have

01:45:37 16   the rest of the transcript.  Just this one page.  It was

01:45:37 17   raised at the hearing, and, as well as impeaching of

01:45:37 18   witnesses.  Again, we are not arguing because if that patent

01:45:37 19   is enabled our patent must be, too.  It is going to this

01:45:37 20   witness' position that you can test billions of compounds

01:45:37 21   and there is no such thing as billions of compounds becoming

01:45:37 22   effective against a given disease.

01:45:37 23             Here we have a patent that does disclose

01:45:37 24   billions of compounds.  It doesn't matter that it's a

01:45:37 25   patent.  The point is that it's a reference in the field, in

01:45:37 1    this field, HCV treatments, is squarely the point, that is

01:45:37 2    addressing the effectiveness of a large class of compounds

01:45:37 3    and the amount of data that was added to understand the

01:45:37 4    effectiveness.

01:45:37 5            THE COURT:  Thank you.  Do you want to respond?

01:45:37 6            MR. FARRELL:  They are attempting to go to do

01:45:37 7    the exact same thing as in a different guise, the only

01:45:37 8    relevance would be, first you would have to lay the

01:45:37 9    groundwork for this, the same exact kind of specification,

01:45:37 10   the exact same representative examples, does it have data,

01:45:37 11   no data.  We would have to spend all day on this.  This is

01:45:37 12   why the Court said there is a 403 issue here where the

01:45:37 13   confusion and prejudice would outweigh.  It began with the

01:45:37 14   motion in limine wasn't granted.  Now we know it was.  Now

01:45:37 15   we know --

01:45:37 16           THE COURT:  Do you know what his opinion is as

01:45:37 17   to this patent and whether he believes it is valid or

01:45:37 18   invalid?

01:45:37 19           MR. FARRELL:  The is right, now you would have

01:45:37 20   to sit there, analyze the patent and go through all the

01:45:37 21   disclosures.

01:45:37 22           THE COURT:  Do you know if he is asked that what

01:45:37 23   will he say?

01:45:37 24           MR. FARRELL:  He is going to say it is a valid

01:45:37 25   issued patent.

01:45:37 1        THE COURT:  He did that analysis?

01:45:37 2        MR. FARRELL:  No.  He opinion in other cases.

01:45:37 3   What happened, they started to raise this patent, if your

01:45:37 4   patent is good, our patent is good.  That is what this is

01:45:37 5   all about, Your Honor.

01:45:37 6        MR. McCRUM:  Your Honor, last point.  I am not

01:45:37 7   planning to ask him that question.  That is not the purpose.

01:45:37 8   I am not going to ask him, is this a validly issued patent

01:45:37 9   or if he believes it's valid.  My point is to establish that

01:45:37 10  in this patent his opinion is that with respect to billions

01:45:37 11  of compounds and limited data, he, himself, believes that

01:45:37 12  the full extent of those components are useful and enabled.

01:45:37 13        I am not trying to establish that the patent is

01:45:37 14  valid or to say anything like that.

01:45:37 15        THE COURT:  If you have any basis to believe he

01:45:37 16  has done the analysis on this patent that you have been

01:45:37 17  showing him?

01:45:37 18        MR. GRIFFITH:  He is an expert in this case.

01:45:37 19  This was one of the patents involved in the case.  So we

01:45:37 20  have had these interferences and so forth.  He has studied

01:45:37 21  this extensively.

01:45:37 22        THE COURT:  He has opined this patent is valid.

01:45:37 23        MR. GRIFFITH:  That they are entitled to

01:45:37 24  priority.

01:45:37 25        MR. FARRELL:  This is an issue, in an

01:45:37 1   interference, this is exactly the prejudice and the

01:45:37 2   confusion.

01:45:37 3           THE COURT:  I believe in the 403 balance.  Here,

01:45:37 4   it does not favor allowing this line of cross-examination.

01:45:37 5   It is very close at least to what I already ruled on the

01:45:37 6   motion in limine is not going to be done.  I think it's

01:45:37 7   clear from the discussion that there is risk of confusion,

01:45:37 8   the amount of time it might take to put it into context.  We

01:45:37 9   might have to talk about an interference.  We might have to

01:45:37 10  talk about other proceedings.  I don't think that the

01:45:37 11  probative value is enough to allow that to occur.

01:45:37 12          I am sustaining the objection.

01:45:37 13          MR. FARRELL:  Can we have the question and

01:45:37 14  answer stricken?

01:45:37 15          THE COURT:  Was there an answer?  I don't recall

01:45:37 16          MR. FARRELL:  The answers was -- we can have the

01:45:37 17  question and if any answer was given stricken, because the

01:45:37 18  question is hanging.

01:45:37 19          THE COURT:  I don't think that is necessary.

01:54:39 20          (Sidebar conference ends.)

01:45:07 21          THE COURT:  You may proceed when you are ready,

01:45:09 22  Mr. McCrum.

01:45:09 23  BY MR. McCRUM:

01:45:13 24  Q.      All right.  Dr. Seeger, I want to talk about how

01:45:17 25  others skilled in the art viewed the '597, if we could.

01:45:22 1        In your opinions in this case, you have

01:45:26 2  addressed certain grant applications that were filed by

01:45:28 3  Pharmasset; correct?

01:45:29 4  A.    If you tell me so, yeah.

01:45:34 5        MR. McCRUM:  Can I please have PX-764?  That's

01:45:38 6  Tab 11 in your binder.  I believe this is already in

01:45:43 7  evidence.

01:45:43 8  BY MR. McCRUM:

01:46:05 9  Q.    Okay.  Are you there, Dr. Seeger?

01:46:07 10 A.    Yes, I am.

01:46:08 11 Q.    This is a grant application that was applied for by

01:46:12 12 Pharmasset; right?

01:46:13 13 A.    That's right.

01:46:14 14 Q.    And grant applications are requests made to the U.S.

01:46:18 15 Government for money to support research efforts; right?

01:46:20 16 A.    That's true.

01:46:21 17 Q.    And you have been involved in applying for grants,

01:46:23 18 right?

01:46:23 19 A.    I was, or I am.

01:46:25 20 Q.    And when you apply for government grants, you make

01:46:27 21 every effort not to misrepresent facts?

01:46:31 22 A.    Not misrepresenting facts, yes, that's correct.

01:46:35 23 Q.    You want to be truthful and accurate when you are

01:46:37 24 asking the government for money?

01:46:39 25 A.    As much as you can.

01:46:40 1    Q.    In fact, submitting false statements in a grant

01:46:43 2    application can subject the applicant to criminal and civil

01:46:47 3    penalties?

01:46:49 4    A.    I'm not aware that this has happened but I'm sure it

01:46:53 5    could happen.

01:46:54 6    Q.    Okay.  And are you aware that you can even go to jail

01:46:57 7    for giving false information to the government?

01:47:00 8    A.    If you tell me.

01:47:02 9    Q.    I want to refer you to the bottom of the first page

01:47:04 10   where it says:  Applicant Organization Certification and

01:47:08 11   Acceptance.

01:47:09 12           Do you see that?

01:47:10 13   A.    Yes.

01:47:10 14   Q.    The last sentence states that, quote:  I am aware

01:47:14 15   that false, fictitious, or fraudulent statements or claims

01:47:18 16   may subject me to criminal, civil, or administrative

01:47:21 17   penalties.

01:47:21 18           That is what it says; right?

01:47:23 19   A.    Yes.

01:47:23 20   Q.    Let's go to the second page, if we could.  Do you see

01:47:27 21   near the bottom is a list of key personnel?  Do you see

01:47:33 22   that?

01:47:34 23   A.    Yes.

01:47:34 24   Q.    And all of these individuals were from Pharmasset;

01:47:38 25   right?

01:47:38 1    A.      Correct.

01:47:38 2    Q.      And the jury has already heard from some of the

01:47:42 3    individuals listed here, Jeremy Clark and Lieven Stuyver;

01:47:42 4    correct?

01:47:50 5    A.      Correct.

01:47:50 6    Q.      I want to go to page 23 of this document.  And it is

01:47:58 7    PX-764.0023.

01:48:05 8            Are you there?

01:48:07 9    A.      I am.

01:48:07 10   Q.      And the third paragraph, the first sentence reads:

01:48:12 11   Several modified nucleoside analogs with potent inhibition

01:48:16 12   of the HCV NS5B polymerase have been published recently.

01:48:22 13           Do you see that?

01:48:23 14   A.      I do.

01:48:23 15   Q.      About four sentences down from that, it says:  They

01:48:27 16   can be divided into the following three classes.

01:48:31 17           Do you see that.

01:48:32 18   A.      I do.

01:48:32 19   Q.      And the first class is 2' modifications with methyl

01:48:38 20   or O methyl; correct?

01:48:41 21   A.      I see that.

01:48:43 22   Q.      And that sentence refers to footnotes 9 through 11.

01:48:48 23   Do you see that?

01:48:49 24   A.      I do.

01:48:49 25   Q.      Let's go to footnote 9, the first footnote listed

01:48:55 1   there.

01:48:55 2           And that is toward the back of this document.

01:48:59 3   Do you see it on the screen, Dr. Seeger?

01:49:01 4   A.     I do.

01:49:02 5   Q.     Footnote 9 cites to Dr. Sommadossi and Dr. La Colla's

01:49:06 6   patent application entitled Methods and Compositions For

01:49:10 7   Treating hepatitis C Virus.  Right?

01:49:13 8   A.     That is what it says.

01:49:14 9   Q.     That is what it says.  And this was a grant

01:49:17 10  application.  It was filed by Pharmasset with a U.S.

01:49:20 11  Government.  Correct?

01:49:22 12  A.     That's correct.

01:49:26 13  Q.     And let's go to -- by the way, this grant

01:49:31 14  application, this was filed by Pharmasset well before this

01:49:34 15  litigation ever began; right?

01:49:36 16  A.     Yes.

01:49:36 17  Q.     Okay.  Let's go to another one, PX-851.  It's Tab 12

01:49:46 18  in your binder.

01:49:52 19           Are you there?

01:49:55 20  A.     Not yet.

01:49:56 21  Q.     All right.

01:49:57 22  A.     Tab 5, yeah.

01:49:59 23  Q.     Tab 12.

01:50:00 24  A.     Oh, 12.  Sorry.

01:50:05 25           I'm here.

Seeger - cross

01:50:06 1    Q.    All right.  This is another grant application

01:50:08 2    submitted by Pharmasset; right?

01:50:15 3    A.    It looks -- yeah, it looks.  Yeah, I take your word

01:50:20 4    for it.

01:50:20 5    Q.    Okay.  And you addressed this grant application in

01:50:23 6    your expert report; right?

01:50:25 7    A.    Okay.  Yes.

01:50:26 8            MR. McCRUM:  I move the admission of PX-851.

01:50:28 9            MR. FARRELL:  No objection, Your Honor.

01:50:29 10            THE COURT:  It's admitted.

01:50:29 11            (PTX-851 was admitted into evidence.)

01:50:31 12    BY MR. McCRUM:

01:50:31 13    Q.    And just like the last grant application, you

01:50:33 14    understand that for this one, submitting false statements

01:50:37 15    can subject the applicants to criminal and civil penalties;

01:50:41 16    right?

01:50:42 17    A.    Correct.

01:50:42 18    Q.    All right.  If you could turn to page 20 of this

01:50:46 19    grant application.  I want to look at the third paragraph.

01:51:00 20            Are you with me?

01:51:01 21    A.    I am.

01:51:01 22    Q.    The second sentence there reads -- this was submitted

01:51:07 23    by Pharmasset; right?

01:51:08 24    A.    That's correct.

01:51:08 25    Q.    Well before this litigation?

01:51:09 1    A.      Correct.

01:51:10 2    Q.      All right.  And this is what Pharmasset said.  They

01:51:14 3    said:  The rationale for the presence of 2 prime beta up

01:51:18 4    methyl is because recent patents revealed that certain

01:51:20 5    nucleosides with 2'-dihydro, 2'-methyl-D-ribofuranose showed

01:51:28 6    a potent anti-HCV activity.

01:51:31 7          Did I read that correctly?

01:51:33 8    A.      You did.

01:51:33 9    Q.      And here again, Pharmasset is citing to two

01:51:38 10   footnotes, 34 and 35; right?

01:51:39 11   A.      Yes.

01:51:40 12   Q.      And if we go to the first footnote.  Pharmasset is

01:51:46 13   citing to and crediting Sommadossi and Dr. La Colla, right?

01:51:50 14   A.      Those are all the patents that are in question here;

01:51:54 15   correct?  Those are later patents.

01:51:56 16   Q.      Well, in fairness, have you read this patent

01:51:59 17   application from Dr. Sommadossi?

01:52:02 18   A.      I think, I believe I saw it, but I think the

01:52:06 19   nomenclature here suggests to me this is not the '594 patent

01:52:14 20   -- or the patents that we are talking in this litigation.

01:52:17 21   Is that correct?  Am I wrong?

01:52:19 22   Q.      In fairness to the jury, the application that is

01:52:23 23   referred to here is substantially the same as the '597

01:52:26 24   patent application.

01:52:27 25   A.      That, I don't know.

01:52:28 1   Q.    You have heard of someone by the name of Dr. Lieven

01:52:34 2  Stuyver; right?

01:52:35 3   A.    Yes.

01:52:35 4   Q.    He was the head of biology at Pharmasset in the early

01:52:39 5  2000s?

01:52:39 6   A.    I believe so yes.

01:52:41 7   Q.    I want to talk about an experience he had with the

01:52:43 8  Idenix patent.  If we could have PX-470 up on the screen,

01:52:48 9  please.

01:52:48 10        I want to get the first e-mail in the chain on

01:52:51 11  the screen, if I could.

01:52:55 12        You were here in opening statements when this

01:52:58 13  e-mail was showed?

01:52:59 14   A.    I was.

01:53:00 15   Q.    And Dr. Stuyver said he had, quote, "a cold shower in

01:53:04 16  Sherry's office when she disclosed in general terms (no

01:53:08 17  details) the basics of the Novirio patent."  That is what he

01:53:11 18  said, right?

01:53:12 19   A.    That is what he says, yes.

01:53:13 20   Q.    And he said this long before this litigation began?

01:53:17 21   A.    Yes.

01:53:17 22   Q.    Okay.  He also said:  For me, this means that almost

01:53:25 23  nothing is left of our inventions and list of compounds.

01:53:30 24        Do you see that?

01:53:31 25   A.    I see that, yeah.

01:53:32  1    Q.      And he goes on to say:  The way I see it now:  either

01:53:37  2    we need to take a license for Novirio in this case, we will

01:53:41  3    not have matter composition, nor use patents.

01:53:44  4              That is what he says, right?

01:53:46  5    A.      That is what he says.

01:53:47  6    Q.      Then finally, he questions -- let's see.  He says

01:53:53  7    here:  Besides that, what is your opinion about the chemists

01:53:58  8    doing work designing compounds that eventually might belong

01:54:01  9    to Novirio?

01:54:02 10              That is what he said; right?

01:54:04 11    A.      Yes.

01:54:04 12    Q.      And Dr. Stuyver was a person of ordinary skill in the

01:54:07 13    art?

01:54:08 14    A.      He was certainly.  He was a scientist, yes, or still

01:54:11 15    is.

01:54:11 16    Q.      So he was viewing this certainly from that position;

01:54:14 17    correct?

01:54:15 18    A.      He is not a lawyer or a patent specialist.  He is a

01:54:22 19    scientist and obviously he expresses and seeks some help.

01:54:25 20    That is my reading of this text.

01:54:27 21    Q.      That is your reading.  You talked to Dr. Stuyver

01:54:30 22    about that?

01:54:30 23    A.      No, but that is what is showing me.

01:54:32 24    Q.      So you are speculating?

01:54:33 25    A.      I'll just read it.  Yeah.  He is a scientist, I know

01:54:37 1  that.

01:54:39 2  Q.    We can agree he is a scientist.

01:54:45 3          Let's look at PX-678.  That's Tab 16 in your

01:54:53 4  binder.

01:54:58 5  A.    Yes.

01:55:12 6  Q.    These are Pharmasset chemistry meeting minutes from

01:55:14 7  January of 2003.  Right?

01:55:18 8  A.    Correct.

01:55:18 9  Q.    And again, long before this litigation.  Right?

01:55:22 10 A.    Yes.

01:55:22 11 Q.    These are the words of Pharmasset, written long

01:55:25 12 before this litigation.  Right?

01:55:28 13 A.    Yes.

01:55:28 14 Q.    If you could refer down to, I think it's Bullets

01:55:34 15 9-10.  Do you see those?

01:55:36 16 A.    Yes.

01:55:36 17 Q.    The first bullet says Jeremy -- you recognize that is

01:55:41 18 a reference to Jeremy Clark.  Right?

01:55:43 19 A.    It would.

01:55:43 20 Q.    Jeremy came up with the idea of making a 2'-fluoro

01:55:48 21 derivative of Idenix compound.

01:55:49 22          Do you see that?

01:55:50 23 A.    Yes.

01:55:50 24 Q.    And you understand that idea was PSI-6130.  Right?

01:55:58 25 A.    Eventually, that's what he synthesized.

01:56:01  1   Q.     And it's referred to here as a derivative of the

01:56:05  2   Idenix compound.  Do you see that?

01:56:06  3   A.     That's what it says, yes.

01:56:08  4   Q.     I want to switch gears for a moment.  You

01:56:12  5   understand -- were you here in the courtroom when Dr.

01:56:15  6   McHutchison was on the stand?

01:56:20  7   A.     I am not sure.  I don't think so.  Maybe only part of

01:56:23  8   it.

01:56:23  9   Q.     Well, let me see.  He was testifying about compounds

01:56:29 10   in clinical trials.  Some that made it and some that didn't

01:56:32 11   make it?

01:56:34 12   A.     I was not here during his testimony.

01:56:36 13   Q.     Well, let me ask you a couple of questions about

01:56:39 14   that.  You understand that no other country that develops a

01:56:41 15   drug during a drug discovery project results in an

01:56:46 16   FDA-approved drug.  Right?

01:56:49 17   A.     That seems reasonable.

01:56:50 18   Q.     But you don't measure the success of a drug discovery

01:56:54 19   project based on whether it resulted in FDA approval.

01:56:57 20   Right?

01:56:58 21   A.     I don't measure the success of drugs.  In general, I

01:57:01 22   am a virologist and I worry about other problems.

01:57:04 23   Q.     Let me ask you the question again because we talked

01:57:08 24   about this at your deposition.  You don't measure the

01:57:11 25   success of a drug discovery project based on whether it

01:57:14  1    resulted in an FDA-approved drug.  Right?

01:57:17  2    A.    Could you refer me to the line where I made the

01:57:20  3    comment on that?  I would like to see it.

01:57:22  4    Q.    Why don't we go to your May 10, 2016 deposition,

01:57:27  5    since the witness has asked for it, it is page 255, 21

01:57:33  6    through 4.      I asked you on that day:  Do you measure

01:57:39  7    the success of the drug discovery project based on whether

01:57:42  8    it resulted in an FDA-approved drug?

01:57:46  9          And the answer to that what was, "No."

01:57:51 10    A.    Okay.

01:57:51 11    Q.    Let's look at the '597 patent again.  If we could

01:58:02 12    have PX-1524.

01:58:11 13          I want to go to Columns, I think it's Columns --

01:58:15 14    starting at 139 where it discusses the data?

01:58:23 15    A.    Which tab is this?

01:58:24 16    Q.    Excuse me?

01:58:25 17    A.    What tab?

01:58:27 18    Q.    The '579 patent.

01:58:29 19    A.    All right.

01:58:29 20    Q.    I think we were in agreement that the '597 patent

01:58:35 21    does in fact disclose data.  Right?

01:58:38 22    A.    In the art.

01:58:38 23    Q.    Do you see the heading where it says Anti-hepatitis C

01:58:43 24    Activity?

01:58:43 25    A.    I do.

Seeger - cross

| | | |
|---|---|---|
| 01:58:43 | 1 | Q.      And underneath that there is Examples 4 through 7. |
| 01:58:47 | 2 | Right? |
| 01:58:50 | 3 | A.      Yes.  I don't see it well on the screen.  Oh, I can |
| 01:58:58 | 4 | this, yes. |
| 01:58:59 | 5 | Q.      These are the examples that disclose the data that we |
| 01:59:02 | 6 | have been talking about.  Right? |
| 01:59:04 | 7 | A.      That's correct. |
| 01:59:04 | 8 | Q.      For example, if you go to Example 4, if we can have |
| 01:59:08 | 9 | that blown up.  This is relating to phosphorylation data. |
| 01:59:13 | 10 | Correct? |
| 01:59:14 | 11 | A.      Yes. |
| 01:59:14 | 12 | Q.      And that kind of measures whether a compound |
| 01:59:20 | 13 | metabolizes.  Is that fair? |
| 01:59:22 | 14 | A.      That's fair. |
| 01:59:22 | 15 | Q.      And whether a compound metabolizes, that's important |
| 01:59:27 | 16 | to know, isn't it? |
| 01:59:29 | 17 | A.      That's a good thing to know, yes. |
| 01:59:30 | 18 | Q.      Let's go to the bioavailability data reported in |
| 01:59:35 | 19 | Example 5 at Column 140.  Bioavailability can tell you |
| 01:59:43 | 20 | whether a compound gets to the target site.  Right? |
| 01:59:46 | 21 | A.      Correct. |
| 01:59:47 | 22 | Q.      And whether a compound gets to the target site is a |
| 01:59:50 | 23 | major issue in drug development.  Right? |
| 01:59:53 | 24 | A.      That's a big issue. |
| 01:59:53 | 25 | Q.      And that's what this data here relates to, is |

Seeger - cross

01:59:58 1  bioavailability.  Right?

01:59:59 2  A.     That's just bioavailability, yes.

02:00:01 3  Q.     Let's move to the data reported at Example 6, in

02:00:06 4  Column 141.  It relates to bone marrow toxicity data.

02:00:11 5  Right?

02:00:11 6  A.     Right.

02:00:11 7  Q.     And this type of assay here that is reported here,

02:00:18 8  that is used to determine whether a given nucleoside will

02:00:21 9  inhibit bone growth.  Is that correct?

02:00:23 10 A.     That's right.  And this is also something skilled

02:00:27 11 artisans would like to know when you are developing a new

02:00:30 12 drug.

02:00:30 13 Q.     Let's move to the mitochondrial example.  In the next

02:00:36 14 example, mitochondrial toxicity assay is another assay to

02:00:40 15 test for toxicity.  Right?

02:00:42 16 A.     Correct.

02:00:42 17 Q.     And drug developers like it to have this data when

02:00:44 18 developing drugs for hepatitis C.  Isn't that right?

02:00:47 19 A.     Say that again?

02:00:49 20 Q.     Drug developers like to have this kind of data when

02:00:51 21 developing drugs for hepatitis C?

02:00:53 22 A.     That's correct.

02:00:53 23 Q.     And all of this data, we talked about, is in the '597

02:00:57 24 patent.  Right?

02:00:58 25 A.     Those data are in the '597 patent.

02:01:00  1    Q.    All right.  Now, we talked about -- let's go back to

02:01:23  2    the phosphorylation data.  Let's talk about the toxicity

02:01:27  3    data.  You agree that there would be no point in testing for

02:01:32  4    toxicity if you haven't already established that the

02:01:35  5    compounds have antiviral activity in hand.  Right?

02:01:41  6    A.    That is a difficult question.  You really don't know

02:01:44  7    what goes on in the mind of people who do that.  You

02:01:49  8    certainly would expect that they would show data, if they

02:01:55  9    had data, and it would make you suspicious in fact if they

02:01:58 10    wouldn't show it.  So it's really a -- it's difficult to

02:02:02 11    reach the minds, as we discussed before, of what happens in

02:02:08 12    situations like that.

02:02:09 13    Q.    Well, let's not speculate.  Let's talk about you.

02:02:14 14          You have never done a test where you found a

02:02:16 15    compound that was inactive and then decided to test it for

02:02:20 16    toxicity.  Right?

02:02:21 17    A.    Again, I am a lower scientist.  I will never be put

02:02:25 18    into that situation, fortunately.  With that, I don't think

02:02:31 19    I can answer for the biotechnology industry.

02:02:35 20    Q.    But the answer to my question is, you have never done

02:02:39 21    that, you have never tested an inactive compound for

02:02:42 22    toxicity.  Correct?

02:02:46 23    A.    No.  I wouldn't say that, because logic predicts that

02:02:52 24    what you do is what is done at the same time.  And if you

02:02:58 25    are, like in my case, able to take a compound, you will test

02:03:02 1    it against the hepatitis C virus, and in parallel we will

02:03:08 2    see whether it is toxic and that is very critical because of

02:03:15 3    course we know that the virus leads to cells.  The first

02:03:17 4    thing we need to know is that the activity of the compound

02:03:21 5    is not due to cell clinging effect.

02:03:24 6          So these two events are so extremely

02:03:27 7    interlinked.  It is hard to imagine that everything goes

02:03:31 8    according to what I would call protocol that you would

02:03:35 9    actually separate them.

02:03:36 10   Q.    Can I have Dr. Seeger's deposition from May 10, 2016,

02:03:44 11   page 247, lines 5 through 9.

02:03:48 12         You gave this deposition under oath.  This is

02:03:50 13   one we have been talking about.  Right, Dr. Seeger?

02:03:55 14         It reads, Have you ever done a test where you

02:03:57 15   analyzed a compound anti-viral activity -- I guess it should

02:04:03 16   say for antiviral activity -- found that it did not have

02:04:07 17   activity and then decided I'm going to test for toxicity

02:04:10 18   now?

02:04:11 19         "Answer:  I have not.

02:04:13 20   A.    Okay.

02:04:14 21   Q.    Dr. Seeger, I just have one final topic.  You have

02:04:22 22   been retained by Gilead to act as an expert in seven expert

02:04:27 23   legal proceedings.  Right?

02:04:29 24   A.    That's correct.

02:04:29 25   Q.    And for each of those proceedings were you retained

02:04:32 1  by Gilead, you have been paid $550 an hour?

02:04:37 2  A.      That is correct.

02:04:38 3  Q.      You have not been retained by any other party to act

02:04:42 4  as an expert in conjunction with any other legal proceeding.

02:04:46 5  Right?

02:04:48 6  A.      I cannot agree with that.

02:04:50 7  Q.      Let's go back to your deposition from May 10, 2016,

02:04:56 8  page 11, lines 4 through 8.  You were asked:  "And you have

02:05:02 9  not been retained by any other party to act as an expert

02:05:06 10 witness in connection with any other legal proceeding; is

02:05:09 11 that correct?"

02:05:09 12 A.      That's May 2016.  Now it's, I think, December.  And

02:05:14 13 things have changed.  That is why I gave that.

02:05:16 14 Q.      Thank you, Dr. Seeger.

02:05:19 15          THE COURT:  Thank you.  Redirect.

02:05:31 16                   REDIRECT EXAMINATION

02:05:32 17 BY MR. FARRELL:

02:05:37 18 Q.      I am going to cover some of the points.  Dr. Seeger,

02:05:41 19 you were asked about how you had never done a high

02:05:43 20 throughput screen.  Do you remember those questions on

02:05:46 21 cross?

02:05:46 22 A.      Yes.

02:05:46 23 Q.      Has a high throughput screen ever been an issue for

02:05:50 24 nucleotides?

02:05:50 25 A.      Not really.

02:05:51  1   Q.      Why not?

02:05:52  2   A.      Because there weren't enough nucleotides at the time

02:05:55  3   nor are there today that you would actually need a high

02:05:58  4   throughput assay.  That's with more molecules.

02:06:00  5   Q.      In terms of your experience, you were asked a lot

02:06:04  6   about that on cross, how many calls did you take from Idenix

02:06:08  7   scientists in the year 2001 when you were consulting for

02:06:11  8   them?

02:06:12  9   A.      I don't know how many.

02:06:13 10   Q.      But there were definitely several or many

02:06:16 11   interactions with Idenix during that time period before this

02:06:19 12   lawsuit, back in 2001, when you would go up, fly up to

02:06:24 13   Boston and meet with the Idenix people, what exactly did you

02:06:26 14   do there?

02:06:27 15   A.      I gave a seminar to the group.  And I talked to

02:06:30 16   individual scientists.

02:06:32 17   Q.      Now, by the way, when did Idenix finally get a

02:06:38 18   replicon assay?

02:06:40 19   A.      I believe it was in the time period 2004-05.

02:06:44 20   Q.      How do you know when they got their assay?

02:06:47 21   A.      Because I know they were interested and they licensed

02:06:49 22   it from Fox Chase Cancer Center.

02:06:53 23   Q.      From your lab.  Right?

02:06:54 24   A.      That's correct.

02:06:55 25   Q.      Now, you were asked a number of questions on cross

02:07:01  1    about the various data that's in the patent.

02:07:04  2    A.      Correct.

02:07:04  3    Q.      My first question is, how much data was in the May

02:07:08  4    2000 application, of any sort?

02:07:11  5    A.      None.

02:07:05  6    Q.      When was the data that was described to you added?

02:07:15  7    A.      2001.

02:07:20  8    Q.      And the data that was added, how much of it showed

02:07:23  9    antiviral activity?

02:07:24 10    A.      None.

02:07:26 11    Q.      You were asked on cross whether the various data that

02:07:29 12    was in there could be helpful or important.  What would a

02:07:32 13    person of skill in the art value of antiviral data?  How

02:07:37 14    would they value that?

02:07:40 15    A.      Essential.

02:07:41 16    Q.      Now, you were asked questions about how, whether you

02:07:45 17    would ever do antiviral, and then you talked about toxic

02:07:50 18    screening.  Do you remember that?

02:07:51 19    A.      Yes.

02:07:51 20    Q.      And the testimony the jury saw was you had never done

02:07:54 21    it, found it not active and then do it toxic.  I think you

02:07:59 22    also said you do it parallel.  So what is the difference

02:08:02 23    there?

02:08:02 24    A.      Well, the parallel assay happens as we do the -- as

02:08:07 25    we test for the virus, as I said.  In the other, in the

02:08:11  1    other case, it would be the follow-up, I guess, and do the

02:08:16  2    monkeys and other systems.

02:08:23  3    Q.      Now, about the patent; and there is some data, but

02:08:27  4    there is no antiviral data?

02:08:29  5    A.      That's correct.

02:08:29  6    Q.      And you were asked questions about, wouldn't a person

02:08:33  7    of skill kind of infer that there must have been some

02:08:37  8    antiviral testing since they're already getting toxic

02:08:42  9    screening in monkeys, et cetera.  Do you remember that

02:08:45 10    question?

02:08:45 11    A.      I do.

02:08:45 12    Q.      Leaving aside there is no data there, what would a

02:08:48 13    person of skill in the art, if they wanted to make an

02:08:50 14    inference about the lack of antiviral data, I think you said

02:08:55 15    it would be suspicious.  What would they be suspicious of?

02:08:58 16    A.      Again, that is what I said.  They would be suspicious

02:09:02 17    because lion's share of data end up in the patent.

02:09:05 18    Q.      And when you saw that log of compounds that showed a

02:09:08 19    number of inactive 2'-methyl up OH down compounds, how did

02:09:15 20    that affect the suspicion that you would have had?

02:09:17 21    A.      Well, that confirms it.

02:09:19 22    Q.      Now, you were asked about how you hadn't talked to

02:09:24 23    Dr. Wolanski at Merck and whether you knew what he was

02:09:28 24    thinking.  Do you remember those questions?

02:09:29 25    A.      Yeah, I remember.

02:09:30 1    Q.    I want to talk about what you do know about what they

02:09:33 2    did.  Okay?  Who did the BVDV assay testing at Merck?

02:09:37 3    A.    Dr. Wolanski.

02:09:38 4    Q.    Who did a counter screen of that compound we have

02:09:43 5    been talking about?

02:09:44 6    A.    Dr. Wolanski.

02:09:44 7    Q.    Who did the titration of that compound?

02:09:47 8    A.    Dr. Wolanski.

02:09:48 9    Q.    And who did the replicon assay in 2000, in August of

02:09:52 10   2000 on that?

02:09:52 11   A.    Again, Dr. Wolanski.

02:09:53 12   Q.    And where would you find all of that testing and what

02:09:56 13   single document would you find, did you find all that in?

02:09:58 14   A.    In his notebook.

02:10:00 15   Q.    DX-439?

02:10:04 16   A.    Exactly.

02:10:05 17   Q.    I think on cross you pointed out he wasn't a named

02:10:07 18   inventor on Merck's patent application in 2001?

02:10:11 19   A.    Yes.

02:10:11 20   Q.    That 2001 patent application by Merck, it had what

02:10:15 21   kind of data from what kind of assay replicon or BVDV?

02:10:20 22   A.    The 2001 replicon.

02:10:22 23   Q.    And who at Merck did that testing in that replicon

02:10:27 24   assay in August of 2000?

02:10:28 25   A.    Dr. Wolanski.

02:10:30 1   Q.      I want to talk about that Pharmasset grant

02:10:35 2   application you were shown on cross, PX-851.

02:10:38 3            Can we put that up on the screen?

02:10:41 4            And there was, I think there was also talk about

02:10:52 5   on opening statement but on cross it was, and you were shown

02:10:57 6   a footnote.

02:10:57 7   A.      Yes.

02:10:57 8   Q.      And the footnote cited to an Idenix document.  Hang

02:11:01 9   on one second.

02:11:11 10           I think this questioning began with the comment

02:11:13 11  that they were going to look at what others of skill thought

02:11:17 12  about the '597 patent.  Do you remember that?

02:11:19 13  A.      Yes.

02:11:20 14  Q.      One of things you were shown is this grant

02:11:22 15  application; and without going into it, again, you were

02:11:25 16  shown that footnote 34 and 35.  Do you remember that?

02:11:29 17  A.      Yes.

02:11:29 18  Q.      And then there was, citing to an Idenix source, a

02:11:32 19  patent application.  It had a number.  Do you remember that?

02:11:35 20  A.      Yes.

02:11:35 21  Q.      All right.  And that number was WO 0192282.  And you

02:11:44 22  were shown that in that little box, do you remember that, on

02:11:47 23  cross?

02:11:48 24  A.      Yes, I do.

02:11:48 25  Q.      And I think the jury was told, you were asked, well,

02:11:50  1    they are substantially the same.  Do you remember that?

02:11:53  2    A.    I do.

02:11:53  3    Q.    Okay.  I'd like to hand you, with the Court's

02:11:57  4    permission, DX-546 which is an Idenix filing with the number

02:12:03  5    WO 0192282.

02:12:11  6              THE COURT:  You may approach.

02:12:12  7              MR. FARRELL:  Thank you, Your Honor.

02:12:08  8              (Documents passed forward.)

02:12:08  9    BY MR. FARRELL:

02:12:23 10    Q.    Dr. Seeger, DX-546 is the actual Idenix document that

02:12:31 11    was actually cited in that footnote; correct?

02:12:33 12    A.    That's correct.

02:12:35 13              MR. FARRELL:  I move DX-546 into evidence.

02:12:37 14              THE COURT:  Is there any objection?

02:12:39 15              MR. McCRUM:  No objection, Your Honor.

02:12:39 16              THE COURT:  It's admitted.

02:12:39 17              (DX-546 was admitted into evidence.)

02:12:39 18    BY MR. FARRELL:

02:12:42 19    Q.    Dr. Seeger, if you just stay with me here.

02:12:46 20          The '597 patent is for the treatment of HCV; is

02:12:50 21    that correct?

02:12:50 22    A.    That's correct.

02:12:50 23    Q.    I want you to turn to the second page of DX-546.

02:12:57 24          What is the title of this filing?  And I think

02:13:01 25    you were told it was substantially the same as the '597.

02:13:04 1    A.       Methods and Compositions For Treating Flaviviruses

02:13:08 2    and Pestiviruses.

02:13:09 3    Q.       Do you see the word "hepatitis C" there, sir?

02:13:12 4    A.       I don't.

02:13:17 5                 MR. FARRELL:  You can take that down.  Thank

02:13:19 6    you.

02:13:19 7    BY MR. FARRELL:

02:13:30 8    Q.       You were also shown a document on cross, PX-347.  If

02:13:34 9    you could bring that up.

02:13:40 10               And what I would like to -- you were shown one

02:13:43 11   page, a certain page.  I'd like to go to a different page.

02:13:46 12               If you could go to page, I think it is 0008, if

02:13:49 13   my notes are right.

02:13:51 14               And if we could look up at the top of that, in

02:13:55 15   the very first line.

02:13:56 16   A.       Yes.

02:13:56 17   Q.       Were you shown this page on cross-examination?

02:14:00 18   A.       I don't believe so.

02:14:00 19   Q.       Well, let's look at it just briefly.  We got that

02:14:04 20   compound number L-604765; correct?

02:14:08 21   A.       Correct.

02:14:08 22   Q.       And we see it is being tested.  What does that mean

02:14:12 23   HIV spread?  What is happening here?

02:14:14 24   A.       Well, the target is -- well, HIV spread is an assay

02:14:18 25   to measure the activity of the AIDS virus, HIV.

02:14:23  1   Q.      And the test date?  When was this test done?

02:14:25  2   A.      It was done on 12th of October, '98.

02:14:29  3   Q.      And what is the target or point of this test in

02:14:33  4   October of 1998?

02:14:34  5   A.      It says HCV, hepatitis C virus.

02:14:40  6   Q.      You were asked, you were listening to Dr. Olsen's

02:14:45  7   testimony.  My question is this:  Did Dr. Olsen's testimony

02:14:49  8   change your opinion?

02:14:50  9   A.      No, it did not.

02:14:51 10   Q.      About abandonment or reduction?  And why not?

02:14:56 11   Fundamentally why not?

02:14:58 12   A.      It did not because I have seen the facts in the

02:15:00 13   notebooks and they speak for themselves, I believe.

02:15:05 14              MR. FARRELL:  One moment, Your Honor.

02:15:11 15              (Counsel confer.)

02:15:12 16              MR. FARRELL:  No more questions, Your Honor.

02:15:13 17   Thank you.

02:15:14 18              THE COURT:  Okay.  Thank you.

02:15:14 19              MR. McCRUM:  Your Honor, they introduced a new,

02:15:16 20   added a new exhibit.  Can I ask two questions about it since

02:15:19 21   this wasn't previously disclosed?

02:15:21 22              THE COURT:  Is there any objection to that?

02:15:26 23              MR. FARRELL:  (Shrugs shoulders.)

02:15:29 24              THE COURT:  I'm not seeing an objection.

02:15:31 25              MR. FARRELL:  I believe, I mean -- no objection

02:15:33 1    for those two questions.

02:15:34 2                THE COURT:  Then the answer is yes.

02:15:35 3                MR. McCRUM:  The other thing is I think they opened

02:15:38 4    the door on the patent that I had started questioning on.

02:15:40 5                THE COURT:  Well, ask these couple of questions,

02:15:42 6    and then we can talk about that further if you wish.

02:15:59 7                MR. FARRELL:  Can we have DX-546 back on the

02:16:01 8    screen, please?

02:16:12 9                THE COURT:  Do you have it?

02:16:14 10               MR. McCRUM:  Oh.

02:16:14 11               THE COURT:  To put on the screen.

02:16:16 12               MR. McCRUM:  I think --

02:16:18 13               THE COURT:  Otherwise, we can have them put it

02:16:19 14   up for you.

02:16:20 15               MR. McCRUM:  Can we have that put up on the

02:16:22 16   screen?

02:16:23 17               THE COURT:  Put it up, if you have it

02:16:24 18   electronically.

02:16:26 19               MR. McCRUM:  Okay.  Great.  Thank you.

02:16:26 20   BY MR. McCRUM:

02:16:29 21   Q.    Dr. Seeger, you were shown -- this is the patent that

02:16:32 22   was cited in the grant application for the proposition of

02:16:39 23   the 2'-methyl compounds, 2'-methyl up compounds were active

02:16:42 24   against HCV; right?

02:16:45 25   A.      Correct, yes.

02:16:46  1    Q.    And counsel for Gilead wanted to point out to you

02:16:49  2    that this had a different title than the '597 patent and may

02:16:57  3    have had some other differences.  Do you recall that?

02:17:00  4    A.    Yes.

02:17:02  5    Q.    Let's go to the second page of this document where

02:17:04  6    its says, methods and compositions for treating flaviviruses

02:17:08  7    and pestiviruses.  Do you see that?

02:17:11  8    A.    I do.

02:17:11  9    Q.    And the patent relates to flaviviridae.  Right?

02:17:20 10    A.    Flaviviruses and pestiviruses belong to the family of

02:17:25 11    flaviviridae.

02:17:26 12    Q.    And that relates -- and a type of flaviviridae is the

02:17:30 13    BVDV virus; correct?

02:17:34 14    A.    Yes, BVDV is a pestivirus.

02:17:38 15    Q.    So to Pharmasset, BVDV was predictive of activity

02:17:41 16    against HCV; right?

02:17:44 17    A.    Say that again.

02:17:45 18    Q.    To Pharmasset, BVDV was predictive of activity

02:17:50 19    against HCV?

02:17:51 20         MR. FARRELL:  Objection, beyond the scope what

02:17:53 21    was represented and my cross.

02:17:56 22         THE COURT:  I'll overrule that objection but

02:17:58 23    we're close to two questions, I think.

02:18:00 24         MR. McCRUM:  Okay.

02:18:00 25    BY MR. McCRUM:

02:18:01 1    Q.    I just want to see.  This is my final one.

02:18:04 2    Pharmasset BVDV was predictive of activity against HCV

02:18:08 3    since they cited this application and the grant and the

02:18:13 4    application where they said this shows potent HCV activity,

02:18:17 5    right?

02:18:17 6    A.    I have been a reviewer of grant applications for

02:18:21 7    30 years and I can tell you that even if you cite something,

02:18:28 8    it's possible it could, I don't -- it's possible -- it's

02:18:34 9    possible but to say what Pharmasset thought, that is a big

02:18:39 10    step.

02:18:42 11              MR. McCRUM:  Thank you, Dr. Seeger.

02:18:43 12              No further question.

02:18:44 13              THE COURT:  No furthers questions?  All right.

02:18:46 14              MR. McCRUM:  I did, yes.  If I could have a

02:18:48 15    sidebar.

02:18:48 16              THE COURT:  All right.  Well, fine.  Let's take

02:18:50 17    a break.

02:18:51 18              MR. McCRUM:  Take a break.

02:18:52 19              THE COURT:  Ladies and gentlemen of the jury,

02:18:53 20    we'll get you back in a little bit.  No talking about the

02:18:55 21    case when you are gone.

02:18:58 22              (Jury left courtroom.)

02:19:20 23              THE COURT:  All right.  Mr. McCrum, did you want

02:19:23 24    the witness -- are you concerned with him being present for

02:19:26 25    this discussion?

02:19:27 1          MR. McCRUM:  Yes.  I would actually prefer, Your

02:19:29 2  Honor, if he left.

02:19:30 3          THE COURT:  All right.  Doctor, we're going to

02:19:32 4  give you at least a short break.

02:19:34 5          THE WITNESS:  Okay.

02:19:34 6          THE COURT:  So you can step down and we'll ask

02:19:36 7  you to leave the courtroom for the next few minutes, please.

02:19:39 8          THE WITNESS:  All right.

02:19:39 9          THE COURT:  Thank you.

02:19:41 10          (Witness left courtroom.)

02:19:50 11          THE COURT:  Okay.

02:19:50 12          MR. McCRUM:  All right.  Your Honor, we're

02:19:51 13  starting to see unfold the prejudice to Idenix that is

02:19:57 14  resulting from our inability to use the patent from

02:20:00 15  Pharmasset upon which he formulated opinions.  And what

02:20:05 16  you heard elicited from Mr. Farrell was that he would be

02:20:13 17  suspicious that the data that we had in hand, and no one

02:20:17 18  disputes this, it wasn't reported in the application would

02:20:19 19  be bad.  That is what Dr. Seeger said.  He is leaving that

02:20:25 20  impression with the jury.

02:20:26 21          We're now not being entitled to ask him about

02:20:30 22  what he thought about the data that was left out of the

02:20:34 23  Pharmasset application.  There was only data for one

02:20:37 24  compound and he is not suspicious of that.

02:20:40 25          In fact, he is saying his opinion is that even

02:20:44 1    though there is only data for one compound, I believe that

02:20:47 2    it shows activity for the entire scope of what is disclosed

02:20:51 3    in there.

02:20:51 4            So it's just fundamentally unfair for him to be

02:20:54 5    able to tell the jury that he is suspicious of data that was

02:20:58 6    left out of our patent when he has disclosed in an expert

02:21:02 7    report with respect to data left out of a Pharmasset patent.

02:21:06 8            THE COURT:  Has the jury heard about the

02:21:07 9    Pharmasset patent from this witness?

02:21:10 10           MR. McCRUM:  I don't think we have got into

02:21:16 11   Pharmasset -- it is in evidence.  The jury has heard about

02:21:17 12   the Pharmasset '572 patent several times.  They're

02:21:22 13   introducing it when they want to.  And it just, again, it

02:21:25 14   seems fundamentally unfair that they can use that patent

02:21:29 15   when they want to use it to their benefit and we can't

02:21:32 16   cross-examine an expert who himself has formulated opinions

02:21:36 17   on it that are entirely inconsistent with what he is saying.

02:21:39 18           THE COURT:  All right.  Thank you.

02:21:40 19           Mr. Farrell.

02:21:41 20           MR. FARRELL:  Your Honor, his testimony was

02:21:46 21   responsive to the implication and inference being made on

02:21:50 22   the direct, on the cross-examination.  They first suggested

02:21:54 23   a person of ordinary skill would assume there was antiviral

02:21:57 24   data.

02:21:57 25           His response is that they assumed there was some

02:22:01 1    problem with it because who hides that of which they are

02:22:03 2    most proud?  If you had good data, you would have put it in.

02:22:07 3         What he also said that suspicion is confirmed by

02:22:11 4    the fact that I saw on the internal documents there were a

02:22:13 5    number of inactive compounds.

02:22:15 6         So, first of all, it is responding to that.

02:22:17 7         Second of all, Your Honor, the Idenix data and

02:22:20 8    lack of data has nothing to do with the PSI data and that

02:22:23 9    patent.  It's still the same issue we were addressing there.

02:22:26 10        We would have to analyze the different kind of

02:22:29 11   data that is in the Pharmasset patent which is serious

02:22:32 12   antiviral data.  For example, we would have a whole separate

02:22:35 13   trial.

02:22:36 14        We did not open this door, Your Honor.  He

02:22:38 15   simply responded.  But their implication is that a person of

02:22:41 16   skill in the art would assume there was good antiviral data;

02:22:44 17   and he said no, I would be suspicious because I think there

02:22:47 18   is something wrong maybe.  That is why he didn't put it in.

02:22:49 19   I think they're completely different issues, Your Honor.

02:22:51 20        And I might add, Your Honor, if there is

02:22:53 21   opening the door, we have to address the fact that they

02:22:57 22   cross-examined him on appearing in six different places and

02:23:02 23   $550 an hour after we have a motion in limine that says we

02:23:06 24   can't bring up the fact that in all of those places, all

02:23:10 25   those courts found for what he was saying.

02:23:12 1          THE COURT:  All right.  Mr. McCrum.

02:23:13 2          MR. McCRUM:  Again, Your Honor, I don't think

02:23:24 3    that changes things.  The data that Mr. Farrell is referring

02:23:28 4    to that Idenix has obtained is almost entirely data that was

02:23:36 5    generated after our application was filed.  So we're not,

02:23:39 6    you know, we're not withholding this data.

02:23:44 7          But the point remains, Your Honor, the

02:23:46 8    impression that was left on the jury was we were hiding data

02:23:48 9    and that it is somehow bad.  And we should be able to

02:23:53 10   cross-examine him on Pharmasset's patent where he didn't

02:23:55 11   have the opinion, he is not going to offer an opinion that

02:23:58 12   they were hiding data and it was bad.  And those two things

02:24:02 13   cannot be reconciled.

02:24:04 14         THE COURT:  All right.  Thank you.

02:24:06 15         I don't know what we want to call this

02:24:10 16   procedural posture, but the bottom line is that plaintiffs

02:24:14 17   seek to question the witness about at least a Pharmasset

02:24:19 18   patent on which he has given opinions and expert report but

02:24:22 19   not here in court in front of the jury, and I'm not going to

02:24:27 20   permit that.  I continue to see the 403 balance as one that

02:24:31 21   would disfavor doing that.

02:24:33 22         While certainly willing to grant there would be

02:24:36 23   some probative value to showing this witness, in front of

02:24:40 24   the jury, another patent on which, on some occasion but not

02:24:46 25   today in court, this witness said, in effect, he has no

02:24:52 1    suspicions about what is missing from that patent.  Isn't

02:24:57 2    that inconsistent with what you have said about the patent

02:24:59 3    in suit or which you do express opinions because don't they

02:25:02 4    look alike, and don't that they have these similarities and

02:25:06 5    those similarities.

02:25:07 6              Fine, there is some probative value to that and

02:25:11 7    there is some unfairness in not being able to undertake

02:25:15 8    cross-examination.  But I have to weigh at this point this

02:25:19 9    trial against all of the risk of confusion, the risk of how

02:25:23 10   much time it would take to put that in into whatever both

02:25:26 11   sides think is the proper context.  And I don't think that

02:25:30 12   balance favors allowing the plaintiffs to do what they're

02:25:33 13   seeking to do.  In fact, I think it strongly disfavors it.

02:25:36 14   So that request is denied.

02:25:38 15             I think that means we're done with the witness,

02:25:41 16   although he wasn't formally asked to step down from the

02:25:44 17   jury.  So I think after the break, just to be consistent,

02:25:47 18   we're going to need to have him on the stand and then I will

02:25:51 19   excuse him.

02:25:52 20             Separate from all of that, I believe plaintiffs

02:25:56 21   at least want to talk about the schedule.  Ms. Parker.

02:26:00 22             MS. PARKER:  Yes, Your Honor.  Just to bring

02:26:01 23   Your Honor up to date because you had asked me on Friday

02:26:03 24   afternoon where we were.  We had a chance to confer at lunch

02:26:06 25   so I think we're on the same page about this.

02:26:08 1        I expect they'll finish their case either today

02:26:12 2  or early tomorrow morning.  They have three more witnesses.

02:26:16 3  One is a very short deposition they're reading.  And then

02:26:18 4  there is a Dr. Secrist and a Dr. Putnam.  So that's it for

02:26:22 5  them.

02:26:23 6        And so we anticipate we'll start either first

02:26:27 7  thing tomorrow morning or right after they finish up

02:26:29 8  tomorrow morning.  And I know tomorrow is a short day, but

02:26:31 9  we could finish our case tomorrow, if not very early on

02:26:35 10  Wednesday morning.  So that's what we're looking at now

02:26:37 11  instead of Thursday like I told you on Friday.

02:26:41 12        THE COURT:  Okay.  Thank you.  That is very

02:26:41 13  helpful.

02:26:44 14        Mr. Scherkenbach, is there anything you want to

02:26:45 15  add to that?

02:26:46 16        MR. SCHERKENBACH:  I think the timing is

02:26:47 17  approximately right.  I think it will be some time during

02:26:49 18  the day Wednesday that all the evidence is in.  As you

02:26:52 19  remember, we have, we'll have a rebuttal shortly to their

02:26:55 20  case as soon as we have time.

02:26:57 21        THE COURT:  What it sounds like to me is while

02:27:01 22  there is at least some possibility that if I have the

02:27:04 23  instructions ready, we could be ready to instruct and

02:27:08 24  possibly even start closings on Wednesday.  Wednesday is

02:27:12 25  also a short day.

02:27:13 1          It seems to me perhaps we ought to decide now

02:27:18 2   closings will be on Thursday.  Would defendants be agreeable

02:27:21 3   to that?

02:27:21 4          MR. SCHERKENBACH:  We would prefer that, Your

02:27:22 5   Honor.  Yes.

02:27:22 6          THE COURT:  What do plaintiffs think?

02:27:23 7          MR. McCRUM:  That would be fine with us.

02:27:24 8          THE COURT:  Okay.  Well, let's leave open for

02:27:28 9   the moment whether I might instruct the jury at least in

02:27:31 10  part on Wednesday.  We can talk about that further tomorrow.

02:27:36 11  But we won't get to closings until Thursday morning at the

02:27:41 12  earliest, and probably at the latest as well.

02:27:44 13          Mr. Scherkenbach.

02:27:44 14          MR. SCHERKENBACH:  You didn't ask directly but

02:27:46 15  if there is time Wednesday and the jury instructions are

02:27:48 16  done, we have no objection to pre-instructing and it would

02:27:51 17  be a good use of the time, frankly.

02:27:53 18          THE COURT:  Thank you.  I don't know if

02:27:55 19  plaintiffs have a view with that.

02:27:56 20          MR. McCRUM:  That would be fine with us as well.

02:27:58 21  Thank you, Your Honor.

02:27:59 22          THE COURT:  All right.  Let's take a short

02:28:00 23  break.

02:28:45 24          (Brief recess taken.)

02:28:45 25          *     *     *

02:45:18 1            (Proceedings reconvened after recess.)

02:45:18 2            THE COURT:  Bring the jury back in.

02:45:39 3            (Jury enters courtroom at 2:47 p.m.)

02:46:39 4            THE COURT:  Ladies and gentlemen, welcome back.

02:46:41 5    Mr. Seeger, it turns out we have no more questions for you.

02:46:44 6    So you may step down.  Thank you very much.

02:46:44 7            (Witness excused.)

02:46:50 8            THE COURT:  Gilead may call its next witness.

02:46:54 9            MR. SCHERKENBACH:  Thank you, Your Honor.

02:46:55 10   Welcome back, ladies and gentlemen.  We are going to do our

02:46:58 11   last deposition read before a live witness.  It's very

02:47:03 12   short, 15 minutes or so.  Dr. David Standring, who was the

02:47:07 13   chief scientific officer at Idenix in the past, responsible

02:47:12 14   for biological aspects for drug research at Idenix.  He will

02:47:15 15   testify about some of Idenix's work on 2'-methyl nucleotides

02:47:19 16   and knowledge and awareness of Pharmasset's work.

02:47:24 17           And Mr. Countryman will do the reading and Ms.

02:47:27 18   Francis will play the witness.

02:47:29 19           We call Dr. David Standring.

02:47:32 20           THE COURT:  Thank you.

02:47:38 21           MR. COUNTRYMAN:  May we offer DX-1289, DX-1274,

02:47:45 22   and DX-2101.

02:47:50 23           MR. KINTON:  No objection, Your Honor.

02:47:51 24           (Above-referenced exhibits received in

02:47:51 25   evidence.)

02:47:52  1          "Question:  Good morning, Dr. Standring.

02:47:56  2          "Answer:  Good morning.

02:47:57  3          "Question:  And as I understand it, in 2000 you

02:48:00  4   left Schering-Plough and joined, was it Novirio at the time?

02:48:03  5          "Answer:  It was Novirio then, yes.

02:48:06  6          "Question:  And when in 2000 was it, do you

02:48:09  7   recall the month?

02:48:09  8          "Answer:  September, September the 10th, I

02:48:09  9   believe.

02:48:11 10          "Question:  That's good recall.

02:48:14 11          "Is there some event that sticks in your head

02:48:17 12   that you are able to nail down the date?

02:48:19 13          "Answer:  No.  I just -- I mean, it was an

02:48:21 14   important -- you know, it was the beginning of 13 years that

02:48:24 15   were pretty amazing.

02:48:25 16          "Question:  Okay.  At the time you joined

02:48:27 17   Novirio in November -- excuse me -- September of 2000, did

02:48:32 18   Novirio already have that compound?

02:48:33 19          "Answer:  Are we talking about LdT or are we

02:48:37 20   talking about 2'methyl here?

02:48:39 21          "Question:  2'-methyl-OH-compounds?

02:48:44 22          "Answer:  Yes we had 2'-methyl-OH compounds at

02:48:44 23   that time.

02:48:49 24          "Question:  Okay.  Let me ask it more broadly.

02:48:53 25   I believe you said that one of the reasons you were

02:48:54 1   interested in joining Novirio is they had a new set of HCV

02:48:58 2   compounds, right?

02:48:59 3           "Answer:  Yes.

02:49:00 4           "Question:  What would you include in that

02:49:01 5   so-called new set of HCV compounds in that sort of September

02:49:06 6   2000 time frame?

02:49:08 7           "Answer:  Basically compounds with 2'methyl,

02:49:11 8   yes.

02:49:11 9           "Question:  OH down?

02:49:12 10          "Answer:  Including OH down.

02:49:15 11          "Question:  Had you encountered any 2'-methyl

02:49:19 12  compounds prior to joining Novirio, ever hear of them, see

02:49:22 13  them in any contact?

02:49:24 14          "Answer:  I can't really say whether I had or

02:49:25 15  hadn't.  I mean, I think they were out there in the

02:49:28 16  literature.  But what I knew of them at the time, I don't

02:49:30 17  know.  I don't remember.

02:49:31 18          "Question:  And when you say they were out in

02:49:33 19  there in the literature, the compound per se was known going

02:49:36 20  back to the sixties, right, 2'methyl compounds?

02:49:39 21          "Answer:  The compound, yes.  Compounds with the

02:49:43 22  2'-methyl were known going back to something like the 60s, I

02:49:46 23  think that's correct, yes.

02:49:50 24          "Question:  So whether you want to call it

02:49:54 25  Idenix or Novirio, that's up to you, but when was it, to the

02:49:59 1   best of your recollection, that a 2'-methyl-fluoro compound

02:50:03 2   was first tested for biological activity?

02:50:09 3          "Answer:  2'-methyl fluoro compound you're

02:50:10 4   talking about?

02:50:13 5          "Question:  Fluoro, yes.

02:50:14 6          "Answer:  Early 2005, I believe.

02:50:16 7          "Question:  Your CV says as of March 2011 you

02:50:20 8   became chief scientific officer, correct?

02:50:23 9          "Answer:  I did.

02:50:24 10         "Question:  And is that the position you held

02:50:25 11  until leaving the company?

02:50:26 12         "Answer:  That's correct.

02:50:27 13         "Question:  So what were the circumstances of

02:50:29 14  you leaving the company in September of 2013?

02:50:33 15         "Answer:  I was asked to leave.

02:50:35 16         "Question:  By whom?

02:50:36 17         "Answer:  Ron Renaud.

02:50:37 18         "Question:  Did you have personal interactions

02:50:41 19  with Dr. Schinazi during your time at Idenix?

02:50:44 20         "Answer:  I did.

02:50:44 21         "Question:  Can you describe at a high level the

02:50:47 22  sort of circumstances of those interactions?

02:50:49 23         "Answer:  I met him at a number of scientific

02:50:51 24  meetings.  He was at a number of Idenix meetings in some

02:50:55 25  capacity or other.  He would basically push for information

02:50:58 1    about other compounds.  The meetings were generally or the

02:51:02 2    interactions were generally fairly uncomfortable and

02:51:05 3    one-sided from my point of view.

02:51:06 4            Question:  How so?  Because he was trying to get

02:51:10 5    information about your compounds?

02:51:12 6            "Answer:  Yes.

02:51:12 7            "Question:  Are you aware of what Dr. Schinazi's

02:51:14 8    relationship was to Novirio/Idenix?

02:51:18 9            "Answer:  He was one of the founders, is one of

02:51:18 10   the founders.

02:51:20 11           "Question:  Okay.

02:51:21 12           "Answer:  He was a close friend of Dr.

02:51:23 13   Sommadossi, in those days, and so he had information I

02:51:26 14   presume from -- well, he did have information from Dr.

02:51:29 15   Sommadossi and he would push the rest of us for information.

02:51:31 16   And in general, I mean, I felt uncomfortable about it.

02:51:34 17           "Question:  And you say he occasionally pressed

02:51:36 18   for information on Idenix compounds.  Which if any specific

02:51:40 19   compounds do you recall him being interested in?

02:51:43 20           "Answer:  I think he was interested in all of

02:51:45 21   our compounds.  I remember one particular instant with

02:51:48 22   IDX184, which kind of stuck in my memory.

02:51:52 23           "Question:  IDX184, that was a 2'methyl-OH

02:51:57 24   compound, right?

02:51:58 25           "Answer:  2'methyl-OH compound, yes.

02:52:01 1          "Question:  And so what is it about that

02:52:04 2     incident that sticks in your mind?

02:52:05 3          "Answer:  I had given a talk at a meeting in

02:52:12 4     Europe, I think it was in Milan, a meeting called 'EASL.'  I

02:52:18 5     don't remember the exact details of where it was.  But I had

02:52:21 6     not provided the structure of the compound.  And I was

02:52:24 7     cornered in a hotel somewhere by Dr. Schinazi who basically

02:52:24 8     wanted to know the structure of the compound.  And I felt

9     uncomfortable.  I wouldn't give it to him.  So he actually

10     said he was going straight to Montpelier and to ask other

11     people at Montpelier what the structure was.  I had to Call

12     Dr. Sommadossi and tell him about this and I believe he

13     actually called up Montpelier and told them not to talk to

14     Dr. Schinazi.

02:52:25 15          "Question.  Do you recall the time frame,

02:52:30 16     roughly, of this interaction?

02:52:31 17          "Answer:  I'd have to -- I had to look and see

02:52:35 18     what the meeting was and think about this.  Not off the top

02:52:37 19     of my head, no.

02:52:38 20          "Question:  Did it occur at a time when the

02:52:40 21     structure of IDX184 -- had not already been reported on or

02:52:45 22     presented on?

02:52:46 23          "Answer:  We had not reported the structure of

02:52:49 24     IDX184.

02:52:50 25          "Question:  Do you recall at this meeting in

02:52:52 1    December of 2001 who among the people present had this

02:52:56 2    opinion that the 2'-methyl was clearly important and appears

02:52:59 3    to make an essential contribution to activity?

02:53:02 4         "Answer:  I believe we collectively all thought

02:53:04 5    that.

02:53:05 6         "Question:  And is that a view you had

02:53:08 7    personally at the time, if you recall?

02:53:10 8         Yes.

02:53:10 9         "Question:  And what was the basis for your view

02:53:13 10   at the time in 2001 that 2'methyl was clearly important and

02:53:17 11   appears to make an essential contribution to activity?

02:53:20 12        "Answer:  Really, that was the only substituent

02:53:22 13   we had seen that allowed you to inhibit an RNA dependent RNA

02:53:26 14   polymerase driven virus, so that was the key to activity

02:53:30 15   against RNA plus-strand RNA viruses.

02:53:35 16        "Question:  And that was on the basis of the

02:53:38 17   compounds Idenix had made and tested as of that time?

02:53:42 18        "Answer:  Yes.

02:53:42 19        "Question:  Okay.  So the parenthetical after F

02:53:44 20   for fluorine says, 'although often toxic,' correct?

02:53:48 21        "Answer:  That's what it says, yes.

02:53:49 22        "Question:  Was that something that you recall

02:53:51 23   specifically being discussed at this meeting in December of

02:53:54 24   2001?

02:53:55 25        "Answer:  I do recall that being discussed.

02:53:56 1         "Question:  And what do you recall the

02:53:58 2  discussion being on that subject?

02:54:00 3         "Answer:  I think that some people, most of us,

02:54:01 4  actually, did not agree with that.  And I think Professor

02:54:05 5  Sommadossi or Dr. Sommadossi actually was quite annoyed at

02:54:07 6  statements like that because he did not believe in general

02:54:10 7  statements of that type.

02:54:11 8         "Question:  Do you recall anyone at the meeting

02:54:13 9  expressing the opinion that fluorine was often toxic?

02:54:16 10         "Answer:  I don't recall that.

02:54:17 11         "Question:  I believe you said your

02:54:19 12  understanding is Dick Storer created this document, DX-235;

02:54:25 13  is that right?

02:54:26 14         "Answer:  That's correct.

02:54:27 15         "Question:  So you don't recall Dr. Storer

02:54:29 16  expressing the opinion that fluorine was often toxic?

02:54:32 17         "Answer:  I don't believe this was his opinion

02:54:34 18         "Question:  Do you have any recollection of

02:54:36 19  anyone at the meeting expressing the opinion that fluorine

02:54:38 20  was often toxic?

02:54:40 21         "Answer:  I don't, no.

02:54:41 22         "Question:  So you, as a scientist, would feel

02:54:44 23  comfortable concluding that if you saw activity against

02:54:48 24  BVDV, that compound definitely had activity against HCV?

02:54:55 25         "Answer:  I think that's a pretty strange

02:54:57 1    hypothetical construction.  For this class of compounds with

02:55:00 2    the 2'-methyl, I think that really we could conclude that

02:55:04 3            "Question:  Talking about HCV compounds,

02:55:07 4    compounds with the treatment of HCV, Idenix did not take any

02:55:10 5    such compound either to the stage of animal testing or human

02:55:14 6    clinical testing without first having tested the compounds

02:55:17 7    in the HCV replicon assay?

02:55:20 8            "Answer:  That's absolutely untrue.

02:55:22 9            "Question:  Give me an example.

02:55:24 10           "Answer:  So we took NM283 forward without any

02:55:28 11   replicon testing.  We took that into the clinic, into

02:55:31 12   clinical trials.

02:55:32 13           "Question:  Based just on the surrogate assay

02:55:36 14   testing?

02:55:36 15           "Answer:  Yes.

02:55:38 16           "Question:  Okay.  And I think we talked about

02:55:40 17   this.  But at that time you didn't have -- you didn't have

02:55:43 18   the replicon yet at the time that NM283 had reached that

02:55:47 19   stage, right?

02:55:47 20           "Answer:  No, we didn't, that's correct.

02:55:49 21           "Question:  Once you had the HCV replicon, at

02:55:52 22   least by March of 2005, subsequent to that point, can you

02:55:55 23   think any of compound that was addressing HCV that Idenix

02:55:58 24   took either to animal or human clinical testing that was not

02:56:02 25   run through the replicon?

02:56:06 1    "Answer:  We had both sets of data in all IND

02:56:11 2    packages going forward, yeah.

02:56:13 3    "Question:  'Both sets' meaning BVDV testing and

02:56:17 4    HCV replicon testing?

02:56:17 5    "Answer:  Yes.

02:56:18 6    "Question.  And what, if anything, do you recall

02:56:20 7    about discussions with chemists in the January 2005 time

02:56:24 8    frame about the Pharmasset patent application?

02:56:27 9    "Answer:  I think the main focus would have been

02:56:29 10   on the biology results.

02:56:30 11   "Question:  Do you recall reviewing that portion

02:56:32 12   of the Pharmasset patent application reporting on the

02:56:34 13   biological results?

02:56:35 14   "Answer:  I believe I did, to the best of my

02:56:35 15   knowledge.

02:56:37 16   "Question:  And did you have any reaction

02:56:39 17   reviewing that portion of the patent application pertaining

02:56:41 18   to biological results?

02:56:42 19   "Answer:  I think we were pretty excited because

02:56:44 20   I think it was more proof that the 2'-methyl is important.

02:56:47 21   "Question:  Just before we leave, sorry, the

02:56:50 22   Pharmasset patent application, I believe you said there were

02:56:53 23   discussions with chemists when the application first came to

02:56:57 24   the attention of you and Index, right?

02:56:59 25   "Answer:  Yes.

02:56:59  1        "Question:  Do you recall anything specific

02:57:01  2  personally about the contents of those discussions involving

02:57:04  3  chemists?

02:57:05  4        "Answer:  I think my part of those discussions

02:57:07  5  would be the biology data, so think we looked at those.

02:57:17  6        "Question:  So are you aware of any 2'-methyl-OH

02:57:20  7  based drug that has been successfully brought to market to

02:57:24  8  treat HCV?

02:57:26  9        "Answer:  Not brought to market, no.

02:57:28 10        "Question:  I'm going to hand you what has been

02:57:30 11  marked DX-1289.  It's the December 2006 biology monthly

02:57:35 12  report, production numbers IDXDE00181410 through 422.

02:57:42 13        "And let me direct your attention to page --

02:57:45 14  well, it's the page ending in 417?

02:57:48 15        "Answer:  417.

02:57:49 16        "Question:  Is this another report that you

02:57:52 17  assembled based on input from your team?

02:57:55 18        "Answer:  To the best of my knowledge, anyway.

02:57:56 19        "Question:  So 417, there's our friend NB 66?

02:58:02 20        "Do you see that entry?

02:58:02 21        "Answer:  I do, yes.

02:58:03 22        "Question:  And that was an internal label used

02:58:05 23  to refer to --

02:58:07 24        "Question:  Yes.

02:58:08 25        "-- a 2'methyl-fluoro compound, right?

02:58:12  1                   "Answer:  Yes.

02:58:13  2                   "Question:  And underneath, it says IDX11763.

02:58:16  3                   "Do you see that?

02:58:16  4                   "Answer:  Yes.

02:58:20  5                   "Question:  And then actually underneath that it

02:58:20  6 says in parens 'IDX11763.'

02:58:26  7                   "Do you see that?

02:58:26  8                   "Answer:  Yes.

02:58:27  9                   "Question:  Do you know why that is there?

02:58:30 10                   "Answer:  I don't recall at this point.

02:58:33 11                   "Question:  Dr. Standring, I've marked as

02:58:38 12 DX-1274 an e-mail chain from the November 2009 time frame

02:58:40 13 involving yourself and some other people.  The production

02:58:42 14 number is IDXDE00154546 through 4548.

02:58:49 15           "So again, this being an e-mail chain, the story

02:58:53 16 begins at the back of the document and then that's the first

02:58:56 17 e-mail and then there are successive responses.  So if you

02:59:00 18 can turn to the page ending 47, there's an e-mail from you

02:59:04 19 dated November 5, 2009, to a number of folks, subject:  Nuc

02:59:11 20 data.

02:59:11 21                   "Do you see that?

02:59:13 22                   "Answer:  Yes, I do.

02:59:13 23                   "Question:  First of all, do you have any reason

02:59:15 24 to doubt that you sent and/or received the e-mails that are

02:59:18 25 contained in Exhibit 14 in the November 2009

02:59:22  1    timeframe?

02:59:23  2              "Answer:  No, I don't see any reason to doubt

02:59:25  3    it.

02:59:28  4              "Question:  In parens after NB 66 here, you say,

02:59:28  5    'This is the Pharmasset drug.'

02:59:28  6              "Do you see that?

02:59:28  7              "Answer:  I see that.

02:59:32  8              "Question:  Do you recall what you meant by that

02:59:34  9    at the time you wrote it in November of 2009?

02:59:35 10              "Answer:  I think simply that it was the drug in

02:59:35 11    the patent or the compound in the patent.

02:59:36 12              "Question:  The patent -- in you answer, the

02:59:36 13    patent being the Pharmasset patent?

02:59:36 14              "Answer:  Yes.

02:59:37 15              "Question:  First of all, you agree it was and

02:59:37 16    is common for competitors in the same drug discovery space

02:59:39 17    to keep tabs on what another were doing, true?

02:59:43 18              "Answer:  Yes.  We did try to keep tabs and

02:59:46 19    other companies did, too.

02:59:47 20              "Question:  And there were various ways to do

02:59:49 21    that by, for example, going to conferences, right, and

02:59:54 22    seeing what people were presenting on?

02:59:56 23              "Answer:  Correct.

02:59:56 24              "Question:  And monitoring one another's

02:59:56 25    published patents and patent applications, right?

02:59:56 1           "Answer:  Correct.

02:59:57 2           "Question:  It was common to do literature

02:59:57 3 searches to see what people were publishing on more broadly,

02:59:57 4 right?

03:00:01 5           "Answer:  Correct.

03:00:02 6           "Question:  And what would you describe as the

03:00:15 7 general purpose for that sort of activity, the efforts to

03:00:15 8 keep tabs on what your competitors were doing?

03:00:18 9           "Answer:  I mean, there were multiple reasons

03:00:19 10 for doing that, so it's kind of a complicated question.  I

03:00:21 11 think one of things was to see if we had a -- you know, a

03:00:24 12 space in which we could work that was, you know, something

03:00:27 13 that we could pursue.

03:00:28 14           "Question:  Meaning you didn't want to knowingly

03:00:31 15 duplicate what a competitor was doing?

03:00:34 16           "Answer:  We didn't want to knowing duplicate

03:00:36 17 necessarily.  We didn't want to fall way behind another

03:00:40 18 competitor, various things like that.

03:00:41 19           "Question:  And when you were with the company

03:00:43 20 Idenix, were there reasons for keeping tabs on competitors

03:00:47 21 that were specific to the biological side of things as

03:00:50 22 opposed to, say, the chemical synthesis side of things?

03:00:54 23           "Answer:  Yes, there were.

03:00:54 24           "Question:  And what were some of those reasons?

03:00:57 25           "Answer:  Want to know that we'd be doing

03:01:00  1    something that is at least, if possible, as good or better

03:01:04  2    as the competitors are doing, at least in the same ballpark,

03:01:07  3            "Question:  And in particular, on the biological

03:01:09  4    side, for example, you'd want to know that your compound was

03:01:12  5    as good or better at treating hepatitis C as the other guy's

03:01:16  6    compound, right?

03:01:17  7            "Answer:  That could be.

03:01:18  8            "Question:  So I'm marking as DX-2101 a

03:01:23  9    September 9, 2013 letter to you from Paul Fanning, senior

03:01:28 10    vice president of human resources for Idenix.

03:01:33 11            "Yes.  Two letters with production numbers

03:01:36 12    STANDRING104 through 112.  And just so the record is clear,

03:01:36 13    I may have said one letter dated September 29th.  The last

03:01:43 14    page of this exhibit is a second letter dated November 4, 2013.

03:01:46 15    Do you see that?

03:01:47 16            "Answer:  I see that.

03:01:47 17            "Question:  And in that November 4, 2013 letter,

03:01:52 18    I want to ask you about so Paragraph 2 indicates that you,

03:01:56 19    meaning you, Dr. Standring, have an aggregate of 625,000

03:02:00 20    options to purchase shares of Idenix's common stuck, par

03:02:05 21    value of .001 dollars per share.  Correct?

03:02:10 22            "Answer:  That's what it says.

03:02:10 23            "Question:  Do you still have those options

03:02:12 24    today?

03:02:13 25            "Answer:  No.

03:02:13  1          "Question:  You have exercised them?

03:02:15  2          "Answer:  They were all cashed out.

03:02:17  3          "Question:  As part of the severance?

03:02:18  4          "Answer:  No, as part of the buyout by Merck.

03:02:21  5          "Question:  And roughly what was that date?

03:02:24  6          "Answer:  Roughly August the something, 2014

03:02:27  7          "Question:  And what were the net proceeds to

03:02:29  8  you as a result of that buyout of those 625,000 options?

03:02:34  9          "Answer:  I don't recall an exact figure

03:02:36 10          "Question:  Ballpark?

03:02:37 11          "Answer:  Substantial.

03:02:38 12          "Question:  To the extent you recall, I'd like

03:02:41 13  to have it, please?

03:02:41 14          "Answer:  I think I got an Idenix paycheck that

03:02:45 15  was in excess of 8 million dollars.

03:02:47 16          "Question:  And do you, as you sit here today,

03:02:50 17  own either any shares in Merck or options to purchase shares

03:02:54 18  in Merck?

03:02:55 19          "Answer:  I have none.

03:02:56 20          "Question:  My question is whether this December

03:02:59 21  4, 2014 agreement is what you understand to be the operative

03:03:04 22  agreement for the consulting time you are spending in

03:03:08 23  connection with the litigations between formerly Idenix, now

03:03:11 24  Merck, and Gilead?

03:03:12 25          "Answer:  Yes.

03:03:13 1        "Question:  Okay?

03:03:14 2        "Answer:  It is.

03:03:15 3        "Question:  And so your rate went from 350 to

03:03:18 4  600.  Right?

03:03:19 5        "Answer:  Yes."

03:03:25 6        "Question:  Do you recall in any of your

03:03:26 7  interactions with Dr. Schinazi telling him anything about

03:03:29 8  the structure of Idenix's 2'-methyl-OH compounds prior to those

03:03:34 9  structures having been published or presented publicly?

03:03:38 10       "Answer:  I can't recall that he would tell me

03:03:39 11  that he knew the structures of our lead compounds and then

03:03:41 12  he would ask for additional information.

03:03:44 13       "Question:  Okay.  So my question is about

03:03:45 14  whether you recall, you personally, giving him any

03:03:48 15  information about the structure of Idenix 's 2'-methyl-OH

03:03:52 16  compounds?

03:03:53 17       "Answer:  I don't recall.

03:03:54 18       "Question:  Did anyone else in your presence, to

03:03:56 19  your knowledge, give Dr. Schinazi information on the

03:03:59 20  structure of Idenix's 2'-methyl OH compounds?

03:04:02 21       "Answer:  I can't be sure.

03:04:03 22       "Question:  All right.  Do you have any reason

03:04:06 23  to think that anything Dr. Schinazi learned from Idenix as

03:04:10 24  far as you know was misused by Dr. Schinazi for Pharmasset's

03:04:14 25  benefit?

03:04:14  1          "Answer:  No, I don't know.

03:04:17  2          "Question:  I want to talk to you about the ones

03:04:19  3  that you had with Dr. Schinazi.  I believe you testified

03:04:21  4  that Dr. Schinazi often attempted to obtain information from

03:04:26  5  Idenix.  Do you recall that?

03:04:27  6          "Answer:  I do.

03:04:28  7          "Question:  And I think you also testified that

03:04:30  8  such attempts by Dr. Schinazi, that made you feel

03:04:34  9  uncomfortable.  Is that correct?

03:04:36 10          "Answer:  That is correct.

03:04:36 11          "Question:  Idenix PX-880, which is the executed

03:04:41 12  letter of August 18th, 2003.  Had you ever seen that letter

03:04:45 13  prior to today?

03:04:47 14          "Answer:  Not to my knowledge.

03:04:48 15          "Question:  Is there any suggestion in this

03:04:50 16  letter of August 18th, 2003 by Ms. Corcoran that

03:04:55 17  Dr. Schinazi had done anything inappropriate, including

03:04:57 18  whether he had misappropriated any confidential information?

03:05:01 19          "Answer:  I don't see anything to say that.

03:05:03 20          "Question:  And to your knowledge, did Novirio

03:05:06 21  ever charge Dr. Schinazi in any way with breaching,

03:05:10 22  violating any aspect of the agreement marked as PX-204?

03:05:14 23          "Answer:  Not to my knowledge.

03:05:17 24          MR. COUNTRYMAN:  That conclude the designations.

03:05:19 25          THE COURT:  Okay.  Thank you.

03:05:28 1        MR. SCHERKENBACH:  All right.  Your Honor,

03:05:30 2    ladies and gentlemen, at this time we'll call our second

03:05:31 3    expert witness who is Dr. Jack Secrist.  He is a nucleoside

03:05:35 4    chemist and he is going to talk about nucleoside chemistry

03:05:39 5    and the state of the art at the time Idenix filed its patent

03:05:42 6    applications in 2000-2001.

03:05:46 7        THE COURT:  Thank you.

03:05:54 8         ... JOHN A. SECRIST, III, having been first

03:06:11 9    duly sworn, was examined and testified as follows ...

03:06:21 10        THE COURT:  Welcome, Dr. Secrist.  Good

03:06:23 11   afternoon.

03:06:26 12        You may proceed when you are ready.

03:06:29 13        MR. SINGER:  Good afternoon, Your Honor.  Ladies

03:06:30 14   and gentlemen of the jury.  My name is Jonathan Singer.  I

03:06:32 15   represent Gilead.

03:06:32 16                    DIRECT EXAMINATION

03:06:32 17   BY MR. SINGER:

03:06:35 18   Q.    Dr. Secrist, first things first.  Could you introduce

03:06:38 19   yourself to the ladies and gentlemen of the jury?

03:06:40 20   A.    Certainly.  Jack Secrist.  I go by Jack.  I'm trained

03:06:43 21   as a medicinal chemist.  I worked for many years at the

03:06:47 22   Southern Research Institute.  I'm a nucleoside chemist and I

03:06:50 23   was involved for a drug discovery over pretty much all those

03:06:54 24   years.

03:06:55 25   Q.    Are you the same Jack Secrist that we have heard

03:06:57 1  already a few witnesses talk about at this trial?

03:07:00 2  A.     I admit that.  I am him.

03:07:02 3  Q.     And have you been sitting here listening to the

03:07:05 4  evidence for most of the trial?

03:07:07 5  A.     I have.

03:07:08 6  Q.     Dr. Secrist, just cut to the chase.  Did you conduct

03:07:13 7  an analysis of the validity of the '597 patent under the

03:07:18 8  legal doctrines of enablement, written description, and

03:07:22 9  obviousness under the United States Patent Act?

03:07:25 10  A.     I did.

03:07:26 11  Q.     Did you conclude the patent was valid or invalid?

03:07:29 12  A.     I concluded there that it was invalid.

03:07:32 13  Q.     Just at a high level, why did you conclude the patent

03:07:35 14  was invalid?

03:07:35 15  A.     Well, the patent doesn't teach how to make and use

03:07:42 16  the claimed invention, and the patent doesn't demonstrate

03:07:46 17  that the inventors actually invented it.

03:07:48 18  Q.     Let's go over your qualifications to render these

03:07:52 19  opinions, sir, for the ladies and gentlemen of the jury.

03:07:55 20  All right?

03:07:55 21  A.     Certainly.

03:07:56 22  Q.     I think you talked about being a medicinal chemist.

03:07:58 23  About how long were you a medicinal chemist for?

03:08:01 24  A.     Well, I would say certainly since I've been at

03:08:08 25  Southern Research.  So that would be 35 years or so.

Secrist - direct

Q.      And you are presently retired; is that correct?

A.      I've been retired a couple of years.  Yes.

Q.      Just again for the jurors, what, in your experience, what is a medicinal chemist?

A.      Well, a medicinal chemist is an organic chemist but who cares about designing and making drugs that will be useful in treating human diseases.

Q.      Why did you become?  Why did you choose to become medicinal chemist?

A.      Well, I guess I will start.  When I was young, my father had a pharmacy degree.  So we talked about science around the house, and, you know, we weren't afraid to discuss it, so it was a common topic.  And I went to a technical high school, and one of the things I did during high school was take a course in organic chemistry.  It was fairly unusual for such a thing to be offered in high school but ours did.

Anyway, I took that course and decided that is what I wanted to do was be an organic chemist.  And then, gradually, I realized what I really wanted to do was make drugs that would help people.  So I sort of evolved into a medicinal chemist.

Q.      I think you mentioned to the jurors when you introduced yourself that you were at the Southern Research Institute, which we have heard about.  How long were you

03:09:26  1  there?

03:09:26  2  A.      I think probably 34 years.  Approximately 34 years.

03:09:33  3  Q.      What is the Southern Research Institute?

03:09:36  4  A.      Southern Research Institute is a not-for-profit

03:09:40  5  organization, 501(c)(3), that does work in life sciences

03:09:45  6  area like drug discovery and drug development, also in

03:09:49  7  engineering and environmental areas.  So all three of those,

03:09:54  8  we're very active in.

03:09:55  9  Q.      And at the time you retired, about how many

03:09:58 10  scientists, if you could tell the jurors, how many

03:10:02 11  scientists did Southern Research have?

03:10:06 12  A.      The total population of folks that work there was

03:10:09 13  about 500.  Maybe 400 of those were scientists or engineers.

03:10:13 14  Q.      How did Southern Research start?

03:10:15 15  A.      Well, back in the, actually in the 30s I would say,

03:10:19 16  early 40s, some visionary folks from the South thought there

03:10:23 17  ought to be a research institute to help industry and

03:10:26 18  agriculture, and one of those people spearheaded the

03:10:29 19  formation of Southern Research Institute which was chartered

03:10:33 20  in 1941.  So this is its 75th year.

03:10:36 21  Q.      Could you just briefly describe for the jurors some

03:10:39 22  of the more publicized work that Southern Research is

03:10:43 23  involved in?

03:10:43 24  A.      Well, over the years, in my area, Southern Research

03:10:49 25  has been responsible, has been an inventor of seven

03:10:54 1    different medicines that are used to treat cancer.  That is

03:10:57 2    an amazing accomplishment.

03:10:58 3             In the area of engineering, our folks have been

03:11:01 4    associated with the manned space flight program of NASA is a

03:11:06 5    since its beginning, and they still are.

03:11:08 6             They also do work for Department of Defense on

03:11:10 7    materials.

03:11:11 8             In the environmental area, our greatest

03:11:15 9    accomplishments relate to air equality.  We have done a lot

03:11:19 10   of work for the Department of Energy, Environmental

03:11:23 11   Protection Agency, and I will say the utility industry in

03:11:26 12   terms of improving air equality.

03:11:28 13   Q.    When you retired from there a few years ago, what was

03:11:31 14   your title?

03:11:31 15   A.    I was, for the last seven years, I was the President

03:11:34 16   and CEO of Southern Research.

03:11:36 17   Q.    In your retirement, Dr. Secrist, do you continue to

03:11:42 18   do any work with the institute?

03:11:43 19   A.    I do.

03:11:43 20   Q.    And what is that?

03:11:44 21   A.    Well, I do a couple of things.  The one that I'm most

03:11:48 22   I guess proud of recently is I edited a book for our 75th.

03:11:55 23   Remember, I wasn't there all 75 years, but I edited a book

03:11:58 24   for our 75th anniversary that talked about our accomplishments

03:12:02 25   over those years.  So it's lot of photographs, some words.

03:12:05 1    It's for the lay public.  It's a really nice document, and

03:12:09 2    it was fun to do.

03:12:10 3              I also am still writing manuscripts for

03:12:14 4    publication.

03:12:15 5              I'm on a committee of the American Chemistry

03:12:19 6    Society.

03:12:19 7              So I'm involved in various things that -- and I

03:12:22 8    also, of course, I edit a journal in the nucleoside area.  I

03:12:25 9    have since 1982, since the journal was started up, I have

03:12:31 10   been the executive journal of the journal in this area I'm

03:12:33 11   talking about.

03:12:33 12   Q.    All right.  Let's go back to the time you were at

03:12:36 13   Southern Research.  Why don't you tell the jurors very

03:12:38 14   briefly your education.

03:12:40 15   A.    Yes.  That was a long time ago.  I have a bachelor's

03:12:43 16   degree in chemistry from the University of Michigan.

03:12:46 17             I then, actually for the same reason Dr. Sofia

03:12:50 18   mentioned last week, I went to the University of Illinois to

03:12:53 19   get my Ph.D.  It was one of the top schools in the country.

03:12:56 20   I went there, got a Ph.D.

03:12:57 21             Then I went to Harvard for a post-doctoral time.

03:13:01 22   You have heard several people talk about that.  So I was at

03:13:05 23   Harvard working with a person who is a Nobel Laureate in

03:13:09 24   chemistry.

03:13:09 25   Q.    And after you were at Harvard, what did you do next?

03:13:13 1    A.    I took a position at the Ohio State University; and

03:13:16 2    it was from there that I moved to the Southern Research

03:13:20 3    Institute.

03:13:20 4    Q.    That is a lot of Big Ten schools and one in the

03:13:24 5    Northeast.  How did you end up in the south?

03:13:27 6    A.    Well, I discovered, because I had sizeable amount of

03:13:33 7    money in a certain area, working on nucleosides, that there

03:13:37 8    was a lot going on at the Southern Research Institute which

03:13:40 9    looked really good, and that these people understood how

03:13:43 10   to properly do drug discovery.  And since I wanted to do

03:13:46 11   something meaningful in this area, I thought, well, that is

03:13:49 12   the kind of place that I want to work.

03:13:51 13          And I can also, if I can get my own money, I can

03:13:53 14   do what I want, so I thought I'm going to give it a try.  My

03:13:57 15   wife grudgingly, went along down to Alabama.  We thought we

03:14:02 16   would stay a few years, and it turned into 34.

03:14:04 17   Q.    How did drug discovery and development work at

03:14:10 18   Southern Research?

03:14:11 19   A.    As you heard from others, it's a team operation.  You

03:14:14 20   have chemists, you have biologists, virologists.  It depends

03:14:19 21   on what you are doing, what kind of drugs you are working

03:14:21 22   on, but it's a team effort where you design compounds, you

03:14:24 23   make them, then you test them.  You look at the test

03:14:26 24   results, you go back, design other compounds, make them,

03:14:31 25   test them.  So it's a constantly iterative process where you

03:14:34 1   hope you improve the activity that you have and eventually

03:14:37 2   if things go well, maybe you have something that goes into a

03:14:40 3   clinical trial, maybe you don't.

03:14:42 4   Q.      Did you specialize in any particular type of drug

03:14:44 5   discovery at Southern Research?

03:14:46 6   A.      Well, I did a lot of work in anticancer drug

03:14:51 7   discovery, also in antiviral drug discovery, and in a couple

03:14:54 8   of other places, too.  But those were overwhelmingly the two

03:14:58 9   main ones.

03:14:59 10  Q.      What kinds of compounds were you working with in the

03:15:02 11  antiviral, anticancer area?

03:15:04 12  A.      In pretty much all cases, they were nucleosides.

03:15:07 13  Q.      As part of your job, did you ever see nucleoside

03:15:11 14  chemists making nucleosides at Southern Research Institute?

03:15:15 15  A.      Yes, I did.  Certainly.

03:15:17 16  Q.      Did you do that at the time of the patents in this

03:15:19 17  case, 2000-2001?

03:15:20 18  A.      Yes.  Yes.

03:15:21 19  Q.      Just give the jurors a flavor.  In a typical month,

03:15:25 20  how many nucleosides would a chemist synthesize at Southern

03:15:28 21  Research in that time frame?

03:15:30 22  A.      Well, I have thought about this over the years

03:15:32 23  actually as you decide how to evaluate people.  But anyway,

03:15:37 24  the answer is on average, it is about two to four

03:15:40 25  nucleosides a month from a chemist, and that sort of fits

03:15:42 1   from what we heard from others, too.

03:15:43 2   Q.      Is that a lot, in your expert view, or a little?

03:15:47 3   A.      As someone overseeing the work, it's a small number.

03:15:51 4   Q.      Why so few?

03:15:52 5   A.      It's just hard to do.  It's challenging when you are

03:15:55 6   making new compounds, and in the nucleoside area, though

03:15:59 7   some of them are easily accessible, a lot of them just are

03:16:03 8   not, and it just takes a long time to do.

03:16:04 9   Q.      All right.  You talked about I think cancer and

03:16:07 10  viral.  Obviously, we're here about hepatitis C.  Is that

03:16:10 11  one of the viruses you worked on at Southern Research?

03:16:13 12  A.      Yes, it is.

03:16:13 13  Q.      Were you involved with HCV research at the time again

03:16:17 14  of the patents in this case?

03:16:18 15  A.      I was very knowledgeable of it at the time, yes.

03:16:20 16  Q.      Could you just tell the jurors in an overall sense if

03:16:26 17  you had to sum up your career, what percent of your time did

03:16:29 18  you spend on nucleoside research?

03:16:32 19  A.      Certainly well over 90 percent.  I don't know, 90-95,

03:16:37 20  somewhere in there.

03:16:37 21  Q.      Dr. Secrist, have you invented any nucleoside drugs

03:16:42 22  that are approved by the FDA which are used by patients?

03:16:45 23  A.      I have been lucky enough to be an inventor on a drug

03:16:49 24  that is FDA approved.  Yes.

03:16:50 25  Q.      What is that drug?

03:16:51 1    A.       It's called clofarabine.  It's a nucleoside.

03:16:54 2    Q.       When was it approved?

03:16:56 3    A.       It was approved very late in 2004 for the treatment

03:17:00 4    of childhood leukemia.

03:17:02 5    Q.       Is it still used today?

03:17:03 6    A.       Yes, it is.

03:17:06 7            MR. SINGER:  Your Honor, we would tender

03:17:09 8    Dr. Jack Secrist as an expert to this jury in nucleoside

03:17:12 9    chemistry, nucleoside drug discovery, and the use of

03:17:14 10   nucleosides for the treatment of HCV.

03:17:19 11           MR. McCRUM:  No objection, Your Honor.

03:17:20 12           THE COURT:  Okay he is so recognized.

03:17:22 13           MR. SINGER:  Thank you, Your Honor.

03:17:22 14   BY MR. SINGER:

03:17:23 15   Q.       Dr. Secrist, did you help prepare a slide

03:17:25 16   presentation to help guide the jury through your invalidity

03:17:29 17   testimony today?

03:17:29 18   A.       I did.

03:17:29 19   Q.       All right.  Let's show the jury, if we could, under

03:17:33 20   the summary of your opinions.  There we go, DDX-702.

03:17:36 21           First off, just to make sure, did you analyze

03:17:39 22   all of the asserted claims of the '597 patent?  We have seen

03:17:43 23   claim 1 but did you analyze all the asserted claims?

03:17:45 24   A.       Yes, I did.

03:17:47 25   Q.       You have here, not enabled.  Can you tell the jurors

03:17:52 1  why the patent is not enabled?

03:17:53 2  A.    As it says here, the patent does not teach how to

03:17:55 3  make and use the invention without undue experimentation.

03:17:57 4  Q.    Is that your scientist understanding of the

03:18:00 5  enablement requirement of the patent laws of the United

03:18:02 6  States?

03:18:02 7  A.    Yes, it is.

03:18:03 8  Q.    No written description.  Why did you conclude that

03:18:06 9  the patent did not have written description?

03:18:08 10  A.    The patent shows that the inventors didn't possess

03:18:13 11  the invention at the time they filed the patent.

03:18:15 12  Q.    Same question.  Is that your understanding of the

03:18:18 13  legal requirement of written description?

03:18:19 14  A.    Yes, it is.

03:18:20 15  Q.    And then, finally, the opinion on obviousness.  Why

03:18:23 16  did you find the patent obvious over Merck's work?

03:18:26 17  A.    Well, as I looked over the materials, my opinion is

03:18:30 18  Merck invented the 2'-prime up, 2'-prime down OH compound

03:18:36 19  before Idenix did.

03:18:39 20  Q.    I'd like to, Dr. Secrist, begin with a little

03:18:42 21  background for your opinions.  We heard a lot about the

03:18:44 22  technology.  I'm hoping you can bring it together for all of

03:18:47 23  us in here --

03:18:48 24  A.    I'll do what I can.

03:18:50 25  Q.    -- so that we can understand your opinions maybe a

03:18:53 1  little bit better.  Can we do that?

03:18:54 2  A.    Certainly.

03:18:55 3  Q.    First off, did you analyze the patent for validity

03:18:59 4  based on what was known in 2000-2001 or do you use all the

03:19:03 5  knowledge that we have today in 2016?

03:19:05 6  A.    I put myself in the time frame that is relevant,

03:19:10 7  2000-2001.

03:19:11 8  Q.    All right.  Tell the jury one more time, where do

03:19:15 9  nucleosides primarily appear in nature?

03:19:17 10 A.    Okay.  We've heard this, you've heard this from

03:19:20 11 several folks.  They're the building blocks of life.

03:19:22 12 They're the building blocks that your body uses to make DNA

03:19:25 13 and RNA.

03:19:26 14       MR. SINGER:  All right.  If we could go to, Mr.

03:19:28 15 Sayres, the DDX-703.

03:19:28 16 BY MR. SINGER:

03:19:31 17 Q.    And what did you depict here with these DNA and RNA

03:19:37 18 as the blocks?

03:19:38 19       THE WITNESS:  Yes.  Your Honor, is it okay if I

03:19:40 20 use the laser pointer?

03:19:42 21       THE COURT:  You may.

03:19:42 22 BY THE WITNESS:

03:19:43 23 A.    On top, you can see DNA and down lower, RNA.  And

03:19:48 24 then these chains just depict the DNA chain or RNA chain.

03:19:55 25       The block is simply a nucleoside.  So we just

03:19:58 1   put N in there.  You heard CAUG.  Well, I'm just using N

03:20:03 2   here so it is easy.

03:20:04 3          The lines between them are the linkers that hold

03:20:07 4   these chains together.  And DNA typically exists as two

03:20:13 5   chains that are kind of stuck together.  RNA most often is a

03:20:17 6   single chain.  So there are different differences.

03:20:20 7   Q.      Do the letters D in DNA and R in RNA signify anything

03:20:27 8   to a chemist?

03:20:28 9   A.      Oh, yes, of course.

03:20:29 10  Q.      What is that?

03:20:30 11  A.      Well, DNA is 2'prime deoxyribonucleic acid, and RNA

03:20:36 12  is ribonucleic acid.  So the D is for 2'prime deoxyribo, the

03:20:39 13  R is just for ribo.

03:20:41 14          MR. SINGER:  All right.  If we go to the next

03:20:42 15  slide, Mr. Sayres.

03:20:42 16  BY MR. SINGER:

03:20:43 17  Q.      And we've depicted here one or you have depicted here

03:20:47 18  one nucleoside from each chain.  And you described

03:20:53 19  deoxyribo.  What is it you are showing all the jurors here

03:20:55 20  about the nucleoside in the DNA?

03:20:56 21  A.      Okay.  In the DNA, all the nucleosides that are put

03:21:01 22  into these chains are 2' deoxynucleosides.  This is an

03:21:07 23  example of one.  It's at the 2' position, it has H down, and

03:21:10 24  it has whatever the base is, so it's 2'-deoxyribonucleotide

03:21:16 25  acid.

03:21:17 1    In the RNA chain down here, at the 2' position,

03:21:21 2  it has an OH group, not an H group.  You heard this before.

03:21:24 3  So it is called ribonucleic acid.

03:21:28 4    And it is important that RNA have the 2' OH down

03:21:31 5  and the DNA have the 2' H down.

03:21:33 6  Q.    Do these two nucleosides different at the 2' up

03:21:36 7  position we've heard a lot about at this trial?

03:21:38 8  A.    No.

03:21:40 9  Q.    Is the difference between DNA and RNA at 2' down, so

03:21:45 10  OH in RNA, the H in DNA, is that important to a nucleoside

03:21:50 11  chemist in 2000-2001?

03:21:53 12  A.    Oh, yes.  It is a critical distinction, of course.

03:21:55 13    MR. SINGER:  Let's go to the next slide, Mr.

03:21:56 14  Sayres.

03:21:56 15  BY MR. SINGER:

03:21:57 16  Q.    Tell the jurors why that difference is important to

03:22:00 17  the nucleoside chemist in 2000-2001.

03:22:04 18  A.    Okay.  I can use my hands here again.

03:22:06 19    So in your body, all your cells have all of the

03:22:10 20  building blocks to make both DNA and RNA.  So they're all in

03:22:15 21  there.  Nucleosides they're called.

03:22:16 22    And the machinery in your cells to actually make

03:22:19 23  DNA uses the building blocks that have the 2' down H.  And

03:22:25 24  the machinery in your body to make RNA uses the building

03:22:28 25  blocks that have the OH down at the 2' position.  So they're

03:22:32 1   different.  They only accept certain things.

03:22:36 2            Therefore, just to say that in words, for DNA,

03:22:42 3   cellular machinery uses the 2' H down nucleotides and not

03:22:47 4   the 2' OH down nucleotides to make DNA.

03:22:51 5            RNA uses 2' OH down nucleotides and not 2' H

03:22:57 6   down; and that is pretty important to your well-being if

03:23:00 7   that is the case.

03:23:01 8   Q.    If you were to change, Dr. Secrist, either the H or

03:23:07 9   the OH in their respective nucleosides, would that have an

03:23:11 10  affect on someone's DNA and RNA?

03:23:14 11  A.    Certainly it could, yes.

03:23:15 12  Q.    Would you know ahead of time what that affect might

03:23:17 13  be?

03:23:17 14  A.    There would be no way to predict.

03:23:19 15  Q.    Now, let's take that into the area we're in this

03:23:24 16  case, HCV.  We've heard that HCV is an RNA virus.  What does

03:23:30 17  that mean for the nucleotides that make up the RNA of HCV.

03:23:35 18  A.    Well, it means those nucleotides all have a 2' OH

03:23:39 19  down.

03:23:40 20            MR. SINGER:  All right.  If we go to the next

03:23:41 21  slide, Mr. Sayres.

03:23:41 22  BY MR. SINGER:

03:23:42 23  Q.    And we depicted here a string of nucleosides with

03:23:45 24  an OH.  Just for the record, was this known that the

03:23:49 25  nucleotides for HCV RNA had an OH down at 2'?  Was that

03:23:55 1  known in 2000-2001?

03:23:57 2  A.     Oh, yes, of course.  We just use blue to show the

03:24:00 3  viral RNA rather than the green for your own cellular normal

03:24:08 4  RNA.

03:24:08 5  Q.     All right.  We have seen and heard depictions of the

03:24:11 6  modified nucleotide to stop the chain from growing.  You

03:24:14 7  heard about that?  You heard testimony about that here?

03:24:18 8  A.     Yes.

03:24:18 9  Q.     How does that work in reality?

03:24:22 10 A.     Well, you have to design a nucleoside that will be

03:24:29 11 acceptable to the machinery that makes the viral RNA, but

03:24:34 12 that will stop that viral RNA from growing longer.  It

03:24:39 13 sounds simple.

03:24:40 14        MR. SINGER:  If we go to the next slide, Mr.

03:24:41 15 Sayres.  DDX-707.

03:24:41 16 BY MR. SINGER:

03:24:44 17 Q.     And we depicted here, it says HCV RNA stops growing

03:24:48 18 with an effective HCV nucleoside treatment.  Is that what

03:24:51 19 you just described?

03:24:52 20 A.     Yes.  This is exactly what I said.  Instead of going

03:24:56 21 on and on like this, RNA chains aren't as long DNA chains

03:24:59 22 but they are pretty long.

03:25:00 23        When you get a modified nucleoside of the right

03:25:03 24 type, it will terminate the chain and obviously stop the

03:25:07 25 viral RNA from doing what it wants to do.

Secrist - direct

03:25:13 1    Q.    Now, you have depicted the treatment with an OH down

03:25:17 2    at 2'.  Is that correct?

03:25:19 3    A.    Yes.

03:25:19 4    Q.    Why did you do that?

03:25:20 5    A.    Well, it's -- number one, you would expect, when

03:25:24 6    you're making something -- this is in the 2001 time frame,

03:25:28 7    you would expect modified nucleotides to have that OH down

03:25:31 8    because you want to be accepted by the machinery that makes

03:25:35 9    that RNA virus.

03:25:37 10           So you want to have that 2- down.  And of course

03:25:40 11   you want something else in the molecule that by whatever

03:25:44 12   means stops it from continuing on.

03:25:45 13   Q.    Dr. Secrist, would any modified nucleoside with a

03:25:49 14   2'OH down stop HCV have any nucleoside replication?

03:25:53 15   A.    Heavens, no.

03:25:54 16   Q.    Most?  A few?

03:25:55 17   A.    Well, I wouldn't know how many.  But in general, my

03:25:58 18   experience in drug discovery is it's a few.

03:26:02 19   Q.    Would any molecule that stops this, that does what we

03:26:06 20   have depicted on DDX-707, would any of those be a fine

03:26:11 21   treatment for HCV?

03:26:12 22   A.    No, not at all.

03:26:14 23   Q.    Why not?

03:26:16 24   A.    Well, you have to not only be able to do what it

03:26:20 25   shows here, stop the HCV RNA from growing, but you don't

03:26:26 1  want this molecule to be incorporated into your normal RNA

03:26:29 2  of your body.

03:26:29 3  Q.     If we go to the next slide, DDX-078, what have we

03:26:35 4  depicted?

03:26:35 5  A.     It shows what I just said.  It is not a good thing if

03:26:38 6  the molecule you make also terminates your normal RNA from

03:26:42 7  growing to its normal length.

03:26:44 8          This would be a bad thing.  It's not selective

03:26:46 9  and it's not going to be a good drug.

03:26:49 10 Q.     Would this possibility of a modified nucleoside

03:26:54 11 stopping HCV RNA and human RNA, would that have been a known

03:27:00 12 danger in 2000-2001?

03:27:01 13 A.     Oh, yes, of course.

03:27:03 14 Q.     Tell the jurors, what were the goals in 2000-2001 for

03:27:07 15 people seeking to treat HCV with modified nucleotides?

03:27:11 16 A.     For HCV or anything else that deals with nucleic

03:27:16 17 acids, you certainly would want to stop this chain as one of

03:27:19 18 the ways you might go.  And you want nothing to happen here,

03:27:24 19 you want your normal RNA to grow just normally and not

03:27:27 20 incorporate any of this modified nucleoside.  That would be

03:27:30 21 the ideal.

03:27:31 22 Q.     And, again, you have depicted this nucleoside that

03:27:35 23 stops the growth and allows human RNA growth with the 2'-OH

03:27:41 24 down.  Is that correct?

03:27:42 25 A.     That's correct, in all cases we know the machinery

03:27:44 1    wants that two' OH down.

03:27:46 2    Q.    Now, is it just your opinion that in 2000-2001 OH was

03:27:53 3    desired at the two' down, or are you aware of literature

03:27:57 4    that talks about that?

03:27:58 5    A.    Oh, there's literature that talks about it.

03:28:01 6    Q.    If you could, Dr. Secrist, you have a binder, fairly

03:28:04 7    thin, up there.  Turn to DX.  Is this an article that you

03:28:19 8    rely on to form your expert opinion?

03:28:21 9    A.    Yes, it is.

03:28:23 10           MR. SINGER:  We move admission of DX-2637.

03:28:27 11           THE COURT:  Defendants, you mean.

03:28:29 12           MR. GRIFFITH:  No objection, Your Honor.

03:28:31 13           THE COURT:  It is admitted.

03:28:32 14           (DX-2367 received in evidence.)

03:28:32 15   BY MR. SINGER:

03:28:33 16   Q.    Without getting into too much detail, Dr. Secrist,

03:28:37 17   would you describe what this paper is about for the jury?

03:28:40 18   A.    I mentioned that the machinery that makes the HCV

03:28:44 19   viral RNA, this talks about characterization of a key enzyme

03:28:47 20   that's involved in that.  It's a polymerase enzyme that you

03:28:50 21   have heard a number of times during the week.

03:28:53 22   Q.    And when does it date from?

03:28:55 23   A.    This is 1998.

03:28:56 24   Q.    I see one of the authors is than Bartenschlager.

03:29:01 25   Have we have heard about Dr. Bartenschlager?

03:29:02 1    A.      Yes, he received the Lasker Award, along with Dr.

03:29:06 2    Sofia that we heard from last week.

03:29:08 3    Q.      If we could turn to be page 8 of the article.

03:29:19 4            We will focus on really the text here.  Thank

03:29:22 5    you.

03:29:22 6            Just if you could, the paragraph that says, "It

03:29:27 7    is well known, it bridges those two columns.  What is this

03:29:29 8    paragraph just generally talking about?

03:29:30 9    A.      Well, it's talking about what, what kind of a

03:29:35 10   summary, what they did in this article what.  What they did

03:29:37 11   is took some known nucleotides and looked at what happened

03:29:42 12   to them in the presence of this enzyme, in this polymerase.

03:29:45 13   Did they work, did they not work, how well did they work.

03:29:49 14   That sort of thing.  It is just a further characterization

03:29:51 15   of this enzyme at a relatively early stage.

03:29:54 16   Q.      If you look at the end of the paragraph, it concludes

03:29:58 17   with the statement that "These results indicate that the HCV

03:30:02 18   enzyme has a strict specificity for ribonucleoside 5'

03:30:08 19   triphosphates and requires the 2' and 3'-OH groups."

03:30:15 20           That is a mouthful for all of us.  What does

03:30:17 21   that mean with respect to this 2' position you and I have

03:30:20 22   just been talking about?

03:30:21 23   A.      Well, as I have always maintained, the entire

03:30:25 24   molecule, when you are making a drug, is absolutely

03:30:28 25   critical.  However, in the case of doing something for RNA,

03:30:34 1    then having this 2' prime, for the reasons I talked about

03:30:38 2    earlier, that's what the enzymes use, is really important.

03:30:41 3    The just sort of confirms that for this enzyme.

03:30:43 4    Q.    Let's turn to your opinions on enablement.  If we

03:30:49 5    could, go up to DDX-710, which is just your summary slide

03:30:55 6    again.  Let's talk about your analysis.

03:30:57 7              First off, I have to ask this question for the

03:31:01 8    record.  Did you analyze all the asserted claims of the '597

03:31:06 9    patent in your enablement analysis?

03:31:07 10   A.    Yes.

03:31:08 11   Q.    Let's take a look at Claim 1, which we have on

03:31:12 12   DDX-711.  Does your opinion differ between Claim 1 and the

03:31:16 13   remainder of the asserted claims?

03:31:18 14   A.    No.

03:31:18 15   Q.    Looking at this claim, do you consider Claim 1 to be

03:31:23 16   a broad claim that covers a lot of things or a narrow claim

03:31:27 17   that only covers a few things?

03:31:30 18   A.    Well, it's really hard to tell.

03:31:33 19   Q.    Why is it hard to tell?

03:31:35 20   A.    Well, the claim relates to a vast number of

03:31:47 21   nucleotides.  Just a vast number of nucleotides.  However,

03:31:51 22   it covers just those that are useful for the treatment of

03:31:55 23   hepatitis C virus.

03:31:57 24             So that's an unknown number at the time we are

03:32:00 25   talking about here.

03:32:02  1       So that's I say it's just it was hard to tell.

03:32:05  2   Q.      Are there particular parts of the claim that lead you

03:32:08  3   to that conclusion you just gave?

03:32:10  4   A.      Oh, yes.

03:32:10  5   Q.      If we go to the next slide.

03:32:11  6           We have highlighted two terms on here two terms

03:32:15  7   on here, "effective amount" and beta-D-2-prime methyl

03:32:24  8   ribofuranosyl nucleoside."

03:32:25  9           Why did you highlight that those terms on your

03:32:28 10   presentation?

03:32:29 11   A.      Those relate to what I was just talking about, that

03:32:33 12   it's hard to tell.

03:32:34 13   Q.      Now, when you looked at the claim, were you relying

03:32:38 14   on your view of the claim orthopedic you applying Judge

03:32:41 15   Stark's claim construction?

03:32:42 16   A.      Well, I certainly applied Judge Stark's claim

03:32:45 17   construction.

03:32:45 18   Q.      If we go to the next slide, we have highlighted the

03:32:52 19   term beta-D-2'-methyl ribofuranosyl nucleoside.

03:32:58 20           What is the Court's construction of that term?

03:33:00 21   A.      It is noted down here at the bottom right, it is a

03:33:04 22   Beta-D nucleoside that includes a five member sugar ring

03:33:06 23   with a methyl group at the 2' up position and non-hydrogen

03:33:10 24   substituents at that time 2' down and 3' down positions.

03:33:14 25   Q.      Is a chemist like yourself able to do one of these

03:33:18 1   drawings that we have seen of that construction by the

03:33:21 2   Court?

03:33:21 3   A.    Yes, sir.

03:33:21 4   Q.    If we can go to the next slide, DDX-714. What do you

03:33:27 5   see here? What did you have our artist draw for the jury,

03:33:27 6   Dr. Secrist?

03:33:32 7   A.    This describes what would be possible within that

03:33:36 8   claim. It talks about any purine or pyrimidine base which

03:33:40 9   is at the 1' up position, of course, you can have anything

03:33:44 10   at 1' down, no restrictions. At the 2' position you can

03:33:50 11   only have a methyl up, but you can have anything but an H

03:33:54 12   down, and anything but an H is a very large number of

03:33:57 13   different groups.

03:33:59 14       At the 3' position, up, you could have anything,

03:34:04 15   that's where the question mark is, down, you can anything

03:34:07 16   but H. Once again, a very large number of possibilities.

03:34:12 17       4' down, you can have whatever you would like.

03:34:15 18   Similarly, 5', the same.

03:34:17 19       So this is an extremely large number of

03:34:23 20   possibilities.

03:34:23 21   Q.    Can you estimate the number of compounds that meet

03:34:28 22   this definition that we are applying to the term in the

03:34:34 23   patent beta-D-2'prime methyl ribonucleoside?

03:34:40 24   A.    This is pretty much unlimited, I would say. It is

03:34:43 25   certainly billions and billions.

03:34:44  1    Q.      We highlighted another term.  Effective amount.  One

03:34:50  2    more question, if we go back.

03:34:55  3             Would you consider this, is this a structural

03:34:57  4    term?  Is that a fair characterization to a chemist like

03:35:01  5    you?

03:35:01  6    A.      Yes.

03:35:01  7    Q.      All right.  Now, had you highlighted the effective

03:35:05  8    amount.

03:35:07  9             What is the definition that you applied for the

03:35:10 10    effective amount term?

03:35:12 11    A.      Well, it's shown there.  An amount of the claimed

03:35:17 12    ribofuranosyl nucleoside that is effective to treat HCV.

03:35:19 13    Q.      Does this language, in your opinion, limit the

03:35:22 14    structure that we just described in some way?

03:35:25 15    A.      I am sure it does.  There would be some small number

03:35:28 16    of compounds that would be effective, unknown number, then

03:35:33 17    you have got this very large number that you are starting

03:35:35 18    with.  So somehow you have to get from here down to here.

03:35:39 19    Q.      As you understand the requirements for enablement,

03:35:42 20    under the Patent Act, does this structure of the claim, with

03:35:46 21    the broad term, structural term and the effective amount

03:35:50 22    term, does that create a problem, in your opinion?

03:35:53 23    A.      Oh, yes.

03:35:55 24    Q.      Why?

03:35:56 25    A.      Well, you have to figure out how to get from, as I

03:36:00 1    said, to get from the large number of compounds down to

03:36:03 2    those that are effective to treat HCV.

03:36:06 3    Q.    In your opinion, does the '597, the disclosure of

03:36:09 4    that patent, does it teach any of the chemists in 2000-2001

03:36:14 5    how to do that, how to get from that big structure downstair

03:36:17 6    to the ones that are effective?

03:36:19 7    A.    Considering the number of compounds in the claim and

03:36:21 8    so forth, absolutely not.

03:36:22 9    Q.    Dr. Secrist, I think we saw with Dr. Seeger some

03:36:28 10   legal factors for enablement.  Did you consider the same

03:36:30 11   factors?

03:36:31 12   A.    I did.

03:36:31 13   Q.    I actually have a board so the jurors can see them

03:36:34 14   while we go through your analysis.

03:36:35 15         MR. SINGER:  Permission to approach, Your Honor?

03:36:38 16         THE COURT:  Yes.

03:36:39 17   BY MR. SINGER:

03:36:39 18   Q.    Dr. Secrist, are these on here, and we will show them

03:37:01 19   to the jury in bright lights on the screen, are those the

03:37:04 20   factors that you considered in your enablement analysis?

03:37:07 21   A.    Yes, they are.

03:37:07 22   Q.    Did you consider each and every one of those factors?

03:37:10 23   A.    I certainly did.

03:37:11 24   Q.    Just for the record, so the record is clear, did you

03:37:15 25   apply them as of May 2000-2001?

03:37:18 1   A.    Yes.

03:37:18 2   Q.    Did you use hindsight or did you try to avoid using

03:37:21 3   hindsight in your analysis?

03:37:23 4   A.    I certainly tried to avoid it very hard.

03:37:25 5   Q.    As a scientist, looking at the first three factors,

03:37:28 6   the scope of the claimed invention, the level of skill in

03:37:32 7   the field, and the nature and predictability of the field,

03:37:35 8   just generally what do those relate to?

03:37:37 9   A.    They relate to the amount of teaching that would be

03:37:40 10  required in the patent, that you need to have in the patent.

03:37:43 11  Q.    Then the next two, it talks about the patent, whether

03:37:46 12  the patent has examples and whether it has guidance, what do

03:37:51 13  those just generally relate to as a scientist?

03:37:54 14  A.    Those would talk about the amount of teaching that is

03:37:56 15  actually in the patent.

03:37:57 16  Q.    Then the last two, the quantity of experimentation

03:38:00 17  necessary and how routine any experimentation is in the

03:38:03 18  field.  What do those relate to?

03:38:05 19  A.    They sort of relate to the burden of experimentation

03:38:09 20  that one would have relative to this patent.

03:38:12 21  Q.    Let's go through them.

03:38:15 22       The first factor, the scope of the claimed

03:38:18 23  invention, which I think you said was related to the amount

03:38:22 24  of information required or teaching required in the patent.

03:38:25 25  Is that correct?

Secrist - direct

03:38:26  1   A.      Amount of teaching required, yes.

03:38:28  2   Q.      Do you have a dry erase marker with you?

03:38:32  3   A.      Sure.

03:38:32  4   Q.      Why don't we write for the jurors.

03:39:08  5           Let the record reflect that Dr. Secrist has

03:39:15  6   written by the first three factors amount of teaching

03:39:19  7   required by the patent, and has underlined required.

03:39:23  8           The first factor, the scope of the claims, which

03:39:25  9   you and I talked about already, if we go to DDX-717, how did

03:39:30 10   you consider the scope of the claims in your enablement

03:39:34 11   analysis?

03:39:34 12   A.      Well, just looked at what's included in Claim 1.

03:39:40 13   Q.      And we have on here a large number of potential

03:39:43 14   nucleotides, but claims require nucleotides that are

03:39:45 15   effective to treat HCV.  Isn't that the structure of the

03:39:50 16   claim that we talked about earlier?

03:39:51 17   A.      Yes.

03:39:52 18   Q.      Now, this type of claim, in your expert opinion, does

03:39:56 19   that require more teaching or relatively speaking less in

03:40:01 20   the patent?

03:40:02 21   A.      It would require way more teaching in the patent.

03:40:06 22   Q.      Why do you say that?

03:40:06 23   A.      We have to understand how to do that, how to get from

03:40:12 24   one place to another, so the patent needs to be teaching us

03:40:15 25   how to do that.

03:40:16 1   Q.      Is it fair to say it has to teach how to get from the

03:40:19 2   large amount to the other amount?

03:40:22 3   A.      It is, as I said earlier.  That is exactly what you

03:40:24 4   need to be taught, is how to get from a large number to a

03:40:29 5   relatively speaking small number.

03:40:30 6   Q.      Factor 2, the level of ordinary skill in the field,

03:40:35 7   were you here during Dr. Seeger's examination?

03:40:38 8   A.      Yes, I was.

03:40:39 9   Q.      Did you apply the same definition of the person of

03:40:43 10  skill in the art that he did?

03:40:44 11  A.      Yes, I did.

03:40:44 12  Q.      We will not be reading that in.

03:40:47 13          We do have it for the jurors, they can see it

03:40:50 14  again on DDX-718.

03:40:52 15          I do have a couple questions, Dr. Secrist.  Did

03:40:55 16  you also review the definition provided defendants of what a

03:40:58 17  person of skill in the art is?

03:41:00 18  A.      Yes, I did.

03:41:01 19  Q.      Would your opinion change if the Court were to adopt

03:41:05 20  or the jury to find the Idenix's identification proper or

03:41:12 21  Gilead's definition proper?

03:41:13 22  A.      No, it would be the same either way.

03:41:14 23  Q.      And now, in considering this definition, how does it

03:41:18 24  impact your analysis of enablement?  Does it teach that more

03:41:23 25  teaching is required or do we end up with less teaching is

03:41:26 1   required relatively speaking?

03:41:28 2   A.      Well, in this field, a person of ordinary skill still

03:41:32 3   has a pretty decent amount of skill as we have seen.  I

03:41:38 4   would view it sort of neutral.  It wouldn't weigh in one way

03:41:40 5   or the other.

03:41:41 6   Q.      Why do you think it's neutral?

03:41:43 7   A.      You have people that know a fair amount and they can

03:41:46 8   learn what's going.  And they will absorb the teaching and

03:41:50 9   so forth.  I don't think it's something you would say is

03:41:54 10  high or low.

03:41:55 11  Q.      The last factor in first group, the nature and

03:41:59 12  predictability of the field, in 2000-2001, was the field we

03:42:05 13  are talking about, nucleotides for HCV, was it in its

03:42:09 14  infancy or was it mature, was it nearing maturation?  Where

03:42:13 15  do you put on the scale?

03:42:15 16  A.      You would put it as very young, clearly in its

03:42:19 17  infancy at the time.

03:42:20 18  Q.      At the time of the invention, how many nucleotides

03:42:22 19  were known to be effective to treat HCV?

03:42:26 20  A.      There was only one nucleoside approved by the FDA for

03:42:30 21  treating HCV.  One effective nucleoside.

03:42:34 22  Q.      What was that?

03:42:35 23  A.      That was Ribavirin.

03:42:36 24  Q.      If we go to 719, what are we looking at on DDX-719?

03:42:42 25  A.      This is just the structure of the Ribavirin.

03:42:45  1    Q.      Am I correct that the 2' down position is where I am

03:42:50  2    circling with the laser pointer?

03:42:52  3    A.      Yes.

03:42:52  4    Q.      What is at the 2' down position Ribavirin?

03:42:55  5    A.      It is a hydroxyl group.

03:42:57  6    Q.      That is a surprise to you?

03:42:59  7    A.      No, not at all, with an RNA virus, it makes sense,

03:43:03  8    although we don't know the mechanism of Ribavirin.

03:43:06  9    Q.      The fact that the field was in its infancy, I think

03:43:10 10    it's a straightforward question, does that require more

03:43:13 11    teaching in the patent or less?

03:43:15 12    A.      Of course, it would require much more teaching.

03:43:17 13    Q.      Predictability, let's talk about that.  We heard

03:43:21 14    about this from the witnesses.  Let's add your opinion to

03:43:24 15    it.  Is this a predictable or unpredictable art?

03:43:26 16    A.      Highly unpredictable.  It actually was then and in my

03:43:30 17    judgment it pretty much still is.  It's drug discovery.

03:43:34 18    That's what it is.

03:43:35 19    Q.      What is the main reason in your expert opinion why

03:43:38 20    this art or this field is so unpredictable?

03:43:41 21    A.      Well, I mentioned it briefly earlier.  But basically,

03:43:44 22    as a medicinal chemist, you design drugs, and each much them

03:43:48 23    is different.  What we have discovered, especially in the

03:43:50 24    nucleoside area, over many years of work, is that the

03:43:56 25    smallest change can have a dramatic effect not only on the

03:43:59 1  activity of that compound but on the toxicity of the

03:44:01 2  compound.

03:44:02 3        So nothing is predictable.

03:44:04 4  Q.    In 2000-2001, the time frame that you are required to

03:44:08 5  look at under the law, how did a nucleoside chemist

03:44:14 6  determine whether or a compound was effective to treatment

03:44:17 7  HCV?

03:44:17 8  A.    Well, it's pretty easy to talk about, anyway, you

03:44:20 9  have to make the compound and you have to test it.

03:44:23 10 Q.    Could you look at a structure of a nucleoside that

03:44:25 11 you could write out on paper and could you predict in

03:44:29 12 2000-2001 whether or not it was active against HCV?

03:44:33 13 A.    Absolutely not.

03:44:34 14 Q.    Now, this predictability, or unpredictability, again,

03:44:37 15 does that require more teaching, relatively speaking in the

03:44:41 16 patent, or less teaching?

03:44:42 17 A.    Well, once again, it would require a lot more

03:44:45 18 teaching.

03:44:45 19 Q.    All right.  So overall, considering the first three

03:44:48 20 factors, which you have talked about as amount of teaching

03:44:52 21 required, would you say that's a high amount of teaching

03:44:55 22 required in the patent or low?  How would you characterize

03:44:58 23 it, or medium?

03:44:59 24 A.    I would say it's a very high teaching that's

03:45:02 25 required.

03:45:03 1    Q.    Could you go right write on your board whatever you

03:45:07 2    believe.

03:45:19 3          Let the record reflect that doctor wrote "very

03:45:23 4    high" on the board for the amount of teaching required by

03:45:26 5    the patent.

03:45:27 6          Let's answer the question as to whether the

03:45:29 7    patent has that very high amount of teaching.  Okay, Dr.

03:45:33 8    Secrist?

03:45:33 9    A.    Okay.

03:45:33 10   Q.    We are going to go through Factors 4 and 5, am I

03:45:37 11   correct you characterized as the amount of teaching actually

03:45:40 12   in the patent?

03:45:41 13   A.    Yes.

03:45:42 14   Q.    Could you write that on the board to remind the

03:45:45 15   jurors.

03:46:13 16         Thank you, Dr. Secrist.

03:46:16 17         For the record, Dr. Secrist wrote "amount of

03:46:18 18   teaching actually in the patent," underlining "actually,"

03:46:22 19   "by/Factors 4 and 5.  Let's take them one by one like we did

03:46:26 20   Factors 1, 2 and 3 and we will go quickly.

03:46:30 21         Did you consider whether or not the patent

03:46:32 22   discloses as Factor 4 says specific working examples of the

03:46:37 23   claimed invention?  Did you consider that?

03:46:39 24   A.    Yes.

03:46:40 25   Q.    In this context, what do you consider a working

03:46:43 1    example to be?

03:46:43 2    A.    Well, it would be a situation where a compound was

03:46:46 3    made and it was tested.

03:46:48 4    Q.    With that definition, are there any of working

03:46:53 5    examples in the '597 patent?

03:46:56 6    A.    No, there are no specific working examples in the

03:46:58 7    '597 patent.

03:46:56 8    Q.    Is that true for both the May 2001 application and

03:47:05 9    the May 2000 application?

03:47:07 10   A.    Yes.

03:47:07 11   Q.    Why don't you think there are any working examples in

03:47:13 12   the patent?

03:47:13 13   A.    Welt, as Dr. Seeger said, there is no actual

03:47:20 14   antiviral data in the patent.  So first you have got to make

03:47:24 15   the compound, and then you have got to test it for its

03:47:28 16   antiviral activity; and that data just isn't there, for

03:47:31 17   whatever reason.

03:47:31 18   Q.    Now, we have also heard about the other data in the

03:47:34 19   patent.  Did you consider that other data?

03:47:36 20   A.    Oh, yes.

03:47:36 21   Q.    First off, again just for the record, when is your

03:47:41 22   understanding?  We have heard from others.  When is your

03:47:43 23   understanding as to when the data was added?

03:47:45 24   A.    Well, the May 2000 application doesn't have any data

03:47:51 25   of any sort.  May 2001 has the data that was discussed with

03:47:56 1    Dr. Seeger which isn't antiviral but which is relevant to

03:48:01 2    drug discovery.

03:48:02 3    Q.    How many compounds in total are there data in the

03:48:06 4    2001 application?

03:48:07 5    A.    Four compounds.

03:48:09 6          MR. SINGER:  Mr. Sayres, go to the next slide.

03:48:09 7    BY MR. SINGER:

03:48:11 8    Q.    Are these those four compounds?

03:48:13 9    A.    Yes, they are.

03:48:14 10   Q.    And what is, Dr. Seeger -- Secrist.  Excuse me.  I'm

03:48:14 11   Mr. Singer, you're Dr. Secrist.

03:48:20 12   A.    Thank you.  I'm not insulted.

03:48:22 13   Q.    Sometimes I do that, and I apologize.

03:48:25 14         What is at the 2' down position of each of these

03:48:31 15   nucleosides where there is some data in the patent?

03:48:34 16   A.    Yes.  My red marker, 2' down is a hydroxyl in each

03:48:39 17   one of these.  All four is a 2' down hydroxyl group.

03:48:43 18   Q.    In the patent, did you see, after reading it, any

03:48:49 19   data on any other nucleoside that had something different at

03:48:53 20   2' down than the OH known as hydroxyl?

03:48:59 21   A.    No.

03:49:00 22   Q.    What did these examples teach a skilled person to put

03:49:04 23   at the 2' down position in a nucleoside?

03:49:07 24   A.    Well, if you are thinking about effective treatment

03:49:12 25   of HCV, at best they teach that you would put an OH down at

03:49:16 1    the 2' along with a methyl up at the 2 prime, so that is

03:49:20 2    just one out of the large number of possibilities in the

03:49:24 3    claim at the 2' down position.  Just one of them.

03:49:27 4    Q.    And is that teaching, OH down at 2', is that

03:49:30 5    consistent or inconsistent with the conventional wisdom of

03:49:33 6    nucleoside chemists at the time?

03:49:35 7    A.    Well, speaking as a nucleoside chemist at the time, I

03:49:39 8    would have expected and certainly not been surprised by

03:49:43 9    compounds identified that had 2' down hydroxyls given what I

03:49:47 10   talked about in the initial discussion of RNA and DNA.

03:49:50 11   Q.    And these four compounds that we're looking at, is it

03:49:53 12   your understanding that Idenix invented any of them or were

03:49:58 13   they both --

03:49:59 14   A.    No, and I think that has been established.  These

03:50:01 15   compound were made back in the '60s by Merck scientists and

03:50:05 16   tested as antiviral drugs, but, of course, not against HCV

03:50:10 17   back at that time.

03:50:11 18   Q.    Okay.  Considering the scope of the claims, is this a

03:50:15 19   lot of teaching from these examples or a little or somewhere

03:50:17 20   in between?

03:50:17 21   A.    Well, considering the number of different molecules

03:50:20 22   possible in groups just at the 2' down position, this is

03:50:24 23   very, very little.

03:50:25 24   Q.    Now, is that just your opinion or have you seen

03:50:31 25   evidence that other people thought the same thing about the

03:50:34 1  Idenix patent at the relevant time?

03:50:36 2  A.    I have seen some other evidence, yes.

03:50:38 3  Q.    All right.  If you could go in your binder,

03:50:44 4  Dr. Secrist, to DX-922, if you would.

03:50:48 5        Let me know when you are there.

03:50:54 6  A.    Okay.

03:50:54 7  Q.    First off, formalities.  Is this a document you

03:51:00 8  considered in your expert analysis in this case?

03:51:02 9  A.    Yes, it is.

03:51:05 10       MR. SINGER:  Defendant moves the admission of

03:51:08 11  DX-922.

03:51:11 12       MR. GRIFFITH:  No objection, Your Honor.

03:51:12 13       THE COURT:  It's admitted.

03:51:12 14       (DX-922 was admitted into evidence.)

03:51:12 15  BY MR. SINGER:

03:51:15 16  Q.    Again, quickly for the jurors, Dr. Secrist.  Could

03:51:19 17  you describe just the general nature of this article for

03:51:24 18  them?

03:51:24 19  A.    Yes.  This is a review article.  So it is talking

03:51:26 20  about what these authors saw in the recent literature that

03:51:29 21  relates to this enzyme we have been talking about as a

03:51:32 22  target for HCV.  So it is just summarizing what is in the

03:51:36 23  literature as they see it.

03:51:37 24       MR. SINGER:  All right.  If we could go to page

03:51:39 25  5, Mr. Sayres.

03:51:39 1    BY MR. SINGER:

03:51:41 2    Q.    There is a section called nucleoside inhibitors.

03:51:45 3    Just generally, what is the review article talking about in

03:51:48 4    this section?

03:51:49 5    A.    Well, it's talking about compounds that had been

03:51:55 6    mentioned in the literature that might inhibit this enzyme,

03:52:01 7    nucleoside compounds that might inhibit the enzymes that

03:52:05 8    might -- and the chain terminates because they're talking

03:52:08 9    about this polymerase enzyme.

03:52:09 10    Q.    Is it talking about the modified nucleosides we have

03:52:12 11    been discussing in this case?

03:52:13 12    A.    Certainly.   They're talking about potential drugs, I

03:52:16 13    would say.

03:52:16 14    Q.    One formality I forgot to do.

03:52:18 15         Mr. Sayres, can we go to the front page so we

03:52:22 16    could show the date of the article?  And it is right there.

03:52:24 17    I'm going to point to it right there, Mr. Sayres.

03:52:27 18         Can you say when the article was from?

03:52:29 19    A.    It is from 2002.

03:52:31 20    Q.    Now, if you go to page 6, does the article talk about

03:52:35 21    Idenix's then existing work on nucleosides?

03:52:39 22    A.    Yes, it does.

03:52:40 23    Q.    And if we could highlight, Mr. Sayres, right up

03:52:44 24    there, where it says Novirio Pharmaceuticals.  And I will

03:52:48 25    read into the record.

03:52:49 1        "Novirio Pharmaceuticals (now Idenix

03:52:51 2   Pharmaceuticals Inc., Cambridge, MA, USA) has also disclosed

03:52:56 3   a broad series of nucleosides with extensive sugar

03:52:59 4   modification the (Figure 3c;[44]).  However, detailed

03:53:07 5   biological information is not yet available, making it

03:53:10 6   difficult to evaluate the mechanism of action of these

03:53:13 7   nucleosides."

03:53:13 8        Can you explain to the ladies and gentlemen of

03:53:15 9   the jury what this means to a person of skill, this last

03:53:19 10  sentence that I read that begins with "however"?

03:53:21 11  A.    Well, it means to me that the reference, in this

03:53:27 12  case No. 44, must not have information relating to this

03:53:36 13  polymerase enzyme and possibly not even anything that is

03:53:41 14  relevant to HCV.  That is what I would say from it.

03:53:44 15  Q.    All right.  Do you happen to know what the reference

03:53:47 16  44 is?

03:53:52 17  A.    It's the 2001 patent submission that we have been

03:53:57 18  talking about.

03:53:57 19  Q.    All right.  If we could show the ladies and gentlemen

03:54:00 20  of the jury that.

03:54:01 21        The Sommadossi, LaColla methods and compositions

03:54:05 22  for treating HCV; is that right?

03:54:08 23  A.    Yes, that's right.

03:54:09 24  Q.    All right.  Let's go to Factor 5, which is described

03:54:12 25  as the amount of guidance presented in the patent.  And

03:54:16 1   leave it to lawyers to come up with a so many factor test

03:54:18 2   that we have to go through, but we're on Factor 5.  Almost

03:54:22 3   there.

03:54:22 4           First off, as a person of skill, what categories

03:54:27 5   of information, of guidance are you looking for in this

03:54:31 6   field, nucleoside chemistry?  What types of information?

03:54:34 7   A.    Well, certainly, you would want to see guidance on

03:54:39 8   how to make the compounds that are in the claims.

03:54:42 9           No. 2, you would want to see data on the

03:54:45 10  compounds that are in the claims as you consider the claims

03:54:49 11  versus those that are effective against, for treating HCV.

03:54:52 12  Q.    On the making point we've heard, is that called a

03:54:56 13  synthetic scheme?

03:54:57 14  A.    Yes.  You would want to see how the patent proposes

03:55:03 15  to go about making compounds or how it goes about making

03:55:07 16  compounds that are in the claims.

03:55:09 17  Q.    All right.  Now, on the data point, is that the

03:55:14 18  antiviral data that you talked about earlier?

03:55:17 19  A.    Oh, yes.  Of course.

03:55:18 20  Q.    We talked about this, but so we dot our Is and cross

03:55:22 21  our Ts for the legal record, under Factor 5, is there any

03:55:26 22  antiviral data to guide the person of skill amongst the

03:55:30 23  possibilities covered by that 2'-Beta-D-methyl-ribofuranosyl

03:55:38 24  nucleoside?

03:55:38 25  A.    No.  We heard about it before but there is no

03:55:43 1    antiviral data in this patent application.

03:55:43 2    Q.    And even considering that other data, does that cover

03:55:45 3    a lot of compounds or only a few?

03:55:47 4    A.    Well, it only covers the four compounds and they all

03:55:50 5    have the 2' down OH only at this critical spot, 2' down.

03:55:57 6    Q.    Let's turn to the making of the compound.  What

03:55:59 7    kind of guidance does the patent provide and what kind of

03:56:02 8    compounds are actually -- or the patent teaches you can

03:56:05 9    actually make?

03:56:05 10   A.    Well, it gives, I'll say, standard literature ways to

03:56:11 11   make nucleosides that have 2' up methyl and a 2' or maybe

03:56:18 12   even a 2' up alkyl and a 2' down OH.

03:56:22 13   Q.    Let's go to the next slide, DDX-721.

03:56:25 14         What are we looking at here, Dr. Secrist, at

03:56:29 15   DDX-721, which excerpts the patent at column 48, lines 30 to

03:56:36 16   page 49, line 5?

03:56:38 17   A.    This is one of two general schemes that are in the

03:56:41 18   patent, and I won't go through it other than to note that

03:56:44 19   you take a starting material, that you go through a whole

03:56:47 20   series of steps, and you end up with a nucleoside with a

03:56:50 21   down OH.

03:56:52 22   Q.    Okay.  Now, since Scheme 3, I take it, there are

03:56:56 23   other schemes in the patent, synthetic schemes?

03:56:58 24   A.    There is one other general scheme and then one

03:57:01 25   scheme -- well, actually just one citation from the

03:57:05 1 literature on how to make one of the four compounds that is

03:57:09 2 mentioned in the patent.

03:57:10 3 Q.    I just want to make sure for the record, did you

03:57:11 4 consider all the synthetic schemes that were --

03:57:15 5 A.    Oh, yes.  Yes, of course.

03:57:14 6 Q.    -- listed in the patent?

03:57:16 7       We can only have one person talking about that

03:57:20 8 at a time for the court reporter, so let's try that again.

03:57:23 9       Did you consider all the schematic schemes in

03:57:25 10 the patent or only the Scheme 3?

03:57:27 11 A.    I considered all of them.

03:57:29 12 Q.    What compound does the patent show being made in

03:57:31 13 relation to the 2' position?

03:57:33 14 A.    Okay.  It shows only compounds that have a 2' down

03:57:39 15 hydroxyl group.

03:57:39 16 Q.    And a 2'-methyl up?

03:57:42 17 A.    A 2'-methyl, or as you can sigh in ours, it could be

03:57:47 18 another group up.

03:57:48 19 Q.    Are there any other synthetic schemes, any other

03:57:53 20 schemes in the patent that show something different at 2'

03:57:55 21 down?

03:57:55 22 A.    No, just OH.

03:57:56 23 Q.    Now, given the scope of the claims as you have

03:58:01 24 described them to the jury, is the manufacturing or

03:58:04 25 synthesis guidance, I'll use that word, is that a lot of

03:58:08 1  guidance, somewhere in the middle or only a little guidance

03:58:14 2  for a person of skill in the art who is trying to practice

03:58:17 3  the claims of these patents?

03:58:21 4  A.    I would say, once again, I go back to the claim has

03:58:25 5  the down position of 2', this large number of different

03:58:28 6  groups, large number of different groups.  The patent only

03:58:33 7  shows you how to make an OH down, so it shows you one out of

03:58:37 8  all of these groups.  So it is a very small amount of

03:58:40 9  guidance that is in there.

03:58:41 10  Q.    Now, does the patent also contain some formulas that

03:58:45 11  a chemist might consider making other compounds that don't

03:58:50 12  have an OH in them?

03:58:52 13  A.    It has formulas, yes.

03:58:54 14  Q.    Did you consider those formulas in your enablement

03:58:58 15  analysis?

03:58:59 16  A.    Yes, of course.

03:59:00 17  Q.    Let's go to one of them, DDX-722.

03:59:03 18        We are looking at here, for the record, formula

03:59:05 19  17 at column 29, line 26 to column 30, line 5.

03:59:10 20        Just remind the jurors one more time how these

03:59:15 21  formulas that chemists use work with these, these Rs and Xs

03:59:20 22  and the word base.  How do they work?

03:59:22 23  A.    Sure.  You have heard of it before, but I will say it

03:59:25 24  again quickly.

03:59:26 25        Certainly, base means purine or pyrimidine base,

03:59:31  1    single ring, double ring bases.

03:59:32  2          R, in this case it would be R6, R7, R9, R10 that

03:59:39  3    are at those various positions.

03:59:42  4          Those could be a large number of different

03:59:44  5    groups, and, of course, at the 5' up there on the upper

03:59:49  6    left.

03:59:49  7          Similarly, you can have a large number of groups

03:59:51  8    there.  So, thank you.

03:59:54  9    Q.    All right.  Putting it all together, is this a lot of

03:59:58 10    compounds or a few that are covered by this structure,

04:00:02 11    Formula 17, which is described as an eleventh principal

04:00:07 12    embodiment of the invention that we're talking about here?

04:00:09 13    A.    It is still a very large number of compounds.  An

04:00:13 14    amazingly large number of compounds.

04:00:15 15    Q.    Let's focus just at this 2' down position.  And what

04:00:19 16    R group is at 2' down?

04:00:21 17    A.    That is R7.

04:00:23 18    Q.    R7 right here that I'm pointing to with the laser

04:00:28 19    pointer?

04:00:29 20    A.    Yes.

04:00:29 21    Q.    How many possibilities in this formula are there in

04:00:34 22    R7?

04:00:36 23    A.    Well, just --

04:00:37 24          MR. SINGER:  Back that out, Mr. Sayres.  Thank

04:00:37 25    you.

04:00:40 1  **BY THE WITNESS:**

04:00:40 2  **A.     That one position, you can see on the right this list**

04:00:44 3  **in green and red.  It's a large, large number of compounds,**

04:00:50 4  **thousands of compounds that could just be at that one**

04:00:52 5  **position.**

04:00:52 6  **Q.     Is there any data on any of these possibilities**

04:00:56 7  **listed in Formula 17 other than in the patent?**

04:01:04 8  **A.     No, the only data that we said is on the 2' OH down**

04:01:06 9  **compounds.**

04:01:06 10  **Q.     Does the patent show any of these compounds being**

04:01:10 11  **made at R7 other than 2' OH down?**

04:01:13 12  **A.     No.  No.**

04:01:13 13  **Q.     Okay.  Now, does the patent, in your opinion, Dr.**

04:01:22 14  **Secrist, teach you that you can or cannot put a fluoro down**

04:01:27 15  **at the 2' down position?**

04:01:28 16  **A.     It doesn't teach that, no.**

04:01:31 17  **Q.     And why do you say that?**

04:01:33 18  **A.     Well, if you look on this list, R7, there are these**

04:01:41 19  **groups that are called, you heard this before but I don't**

04:01:44 20  **know if you remember halogens.  So halogens are chlorine and**

04:01:48 21  **bromine, iodine, and chlorine.  Those are the four that are**

04:01:52 22  **typically used in drug discovery.  Okay.  So those four.**

04:01:54 23  **And you see in R7 -- well, okay.  I'm sorry.  Go**

04:02:00 24  **ahead, Mr. Singer.**

04:02:01 25  **You see three of them under R7, chlorine,**

04:02:04 1 bromine, and iodine. However, if you go up to the groups at

04:02:08 2 the 2' up position, just right above that, you can see it

04:02:13 3 says, chloro, bromo, fluoro, and iodo. In other words, all

04:02:21 4 four of them are there for the 2' up position and only three

04:02:23 5 of them for the 2' down position. So it is clearly the

04:02:27 6 case, based on looking at this, that they purposely omitted

04:02:31 7 fluorine from the 2' down position.

04:02:32 8 Q.     Were you here when Dr. Otto testified?

04:02:35 9 A.     Yes, I was.

04:02:36 10 Q.     Did you hear him describe something similar?

04:02:38 11 A.     I did, exactly that. Yes.

04:02:39 12 Q.     Now, considering these formulas and considering the

04:02:42 13 scope of the claims, does this formula and the other ones

04:02:46 14 like this, do they provide a lot of guidance to a person

04:02:48 15 of skill in the art under Factor 5, a little guidance,

04:02:52 16 somewhere in between? What is your opinion?

04:02:54 17 A.     Well, it provides a very little amount of guidance.

04:02:59 18 Very little.

04:03:00 19 Q.     Now, considering those factors together, the amount

04:03:02 20 of teaching actually in the patent, Factors 4 and 5, what is

04:03:06 21 your opinion on how much teaching, relevant to the first

04:03:08 22 three categories, how much teaching is actually in this

04:03:12 23 patent?

04:03:13 24 A.     It is a very low amount of teaching for sure.

04:03:15 25 Q.     Can you fill in our board there and write that in?

04:03:18 1  A.      Sure.

04:03:18 2  Q.      All right.  Last two factors, Dr. Secrist.  And let

04:03:30 3  the record reflect that Dr. Secrist wrote "very low" by the

04:03:34 4  amount of teaching actually in the patent.

04:03:35 5          The quantity of experimentation necessary and

04:03:39 6  how routine any necessary experimentation is in the field,

04:03:43 7  and we'll try to take those together.

04:03:45 8          Just real quick, Dr. Secrist.  How much work

04:03:50 9  would it take, in your opinion, for the person of skill to

04:03:53 10 make and test some representative number of the compounds

04:03:59 11 described by this patent to look for the effective ones?

04:04:03 12 A.      Well, once between, just focusing on 2' down

04:04:06 13 position, which I view as critical -- though remember it's

04:04:10 14 the whole molecule that is important, but the 2' down in a

04:04:14 15 RNA situation is critical.  Just those shown as R7 in the,

04:04:21 16 on the slide, it would take a truly large amount of

04:04:27 17 experimentation to make them and then test them.  You

04:04:30 18 wouldn't know particularly where to begin.  You really

04:04:33 19 wouldn't know anything.  So I would say a very large amount

04:04:36 20 of experimentation.

04:04:11 21 Q.      You were here for Dr. Olsen, who testified this

04:04:40 22 morning?

04:04:41 23 A.      Yes.

04:04:41 24 Q.      Did you hear him describe the effort that Merck, then

04:04:45 25 called Isis Pharmaceuticals, undertook in their five-year

04:04:51 1    collaboration?

04:04:51 2    A.    He said a little something about it, I believe.

04:04:54 3    Q.    What did you take away from that testimony as it

04:04:56 4    relates to enablement?

04:04:57 5    A.    First of all, it was a very nice collaboration.  But

04:05:00 6    a lot of money was spent.  Millions of dollars.  And a lot

04:05:05 7    of chemists were involved in this to make nucleotides, and

04:05:10 8    in three to four years they made 2000 with a certain number

04:05:15 9    of chemists, they made about the same amount as I said, per

04:05:18 10   month, two to four nucleotides per months, the chemists.

04:05:23 11          It was a tremendous effort.  Very large amount

04:05:26 12   of effort.

04:05:26 13   Q.    Then the routine nature of this, that is the last

04:05:29 14   factor, how routine is this kind of work that you were doing

04:05:33 15   at Southern Research, that Merck and Isis were doing, that

04:05:36 16   Pharmasset was doing, that Idenix was doing.  What kind of

04:05:41 17   chemistry is this?

04:05:41 18   A.    Routine is not a word I think I would use in

04:05:44 19   connection with nucleoside chemistry.  It is hard to do.

04:05:48 20   Once you found out how to do something it makes it a little

04:05:52 21   easier.  Here we are talking about always making the

04:05:56 22   molecules.  Some are easier than others, some are more

04:05:59 23   challenging, some take a long, long time, some may be done

04:06:02 24   quickly.  It is just not routine.

04:06:03 25   Q.    Is it routine today, 16 or 15 years down the road,

04:06:08  1    what is your opinion as to whether it is routine today?

04:06:11  2    A.      Absolutely not today.

04:06:13  3    Q.      Is there a -- let me take that back.  Let's go on our

04:06:20  4    chart.  Then I want to ask you a couple questions about one

04:06:24  5    other topic.

04:06:25  6            You have described 6 and 7, if I may

04:06:28  7    characterize as the burden of experimentation?

04:06:30  8    A.      I believe that's what I said.

04:06:31  9    Q.      In connection with enablement, do you believe the

04:06:34 10    burden here of experimentation would be high, medium, low?

04:06:37 11    Where do you come out?

04:06:38 12    A.      It's very high, even just to deal with representative

04:06:42 13    compounds from among the claims.

04:06:44 14    Q.      If we could fill in our chart with what you believe?

04:07:14 15    Thank you, Dr. Secrist.  Let the record reflect that Dr.

04:07:18 16    Secrist has written next to Factors 6 and 7, described them

04:07:22 17    as the burden of experiments, that it is very high.

04:07:25 18            Now, in this trial, in your opinion, has there

04:07:29 19    been a good example that the jury has heard testimony about

04:07:34 20    the challenge in your view in making nucleotides?

04:07:38 21    A.      Oh, yes, there is.

04:07:39 22    Q.      What example would you like to cite for the ladies

04:07:44 23    and gentlemen of the jury?

04:07:44 24    A.      Well, the one I think we heard about is the one

04:07:49 25    trying to put a fluorine down at the 2' position.

04:07:53 1  Q.    And who was trying to put a fluorine down at the 2'

04:07:57 2  position at the nucleoside?

04:07:59 3  A.    That was Jean-Francois Griffon.

04:08:02 4  Q.    Who was Jean-Francois Griffon?

04:08:05 5  A.    He was and is a chemist working for Idenix.  He also

04:08:09 6  spent two years with me as a postdoctoral associate working

04:08:13 7  in our labs.  He worked on nucleotides with me.  He made

04:08:16 8  some hard compounds.  He did a great job and we published

04:08:20 9  his work.

04:08:20 10  Q.    Did you think he was a good chemist?

04:08:23 11  A.    I did, yes.

04:08:24 12  Q.    Did he have at least ordinary skill in the art?

04:08:26 13  A.    At least ordinary skill, for sure.

04:08:27 14  Q.    If we could go to the next slide, DDX-723, we are

04:08:33 15  looking at some testimony from Dr. Griffon that the jury has

04:08:36 16  heard, describing at least as of June 2004 where he stood on

04:08:40 17  this project.  Just as a general matter, what did you

04:08:44 18  conclude from hearing the testimony of all the Idenix

04:08:47 19  scientists about their effort to make 2'-methyl up fluoro

04:08:52 20  down as to whether making nucleotides is easy or hard?  What

04:08:57 21  did you conclude when you heard all that?

04:09:00 22  A.    Of course it's hard.  This is a pretty good example

04:09:02 23  of it.  They tried hard to make this compound and get the

04:09:06 24  final product in forms you might test it.  They couldn't

04:09:09 25  make an isolated compound.  It is very hard.  I know Jean so

04:09:15 1    I did see best.

04:09:16 2    Q.      To your recollection, how long did it take Idenix to

04:09:18 3    make this one compound?

04:09:21 4    A.      Well, they started -- I don't remember when they

04:09:27 5    started, but it took them, at least, three years, and they

04:09:31 6    really didn't do it until they had the Pharmasset specific

04:09:34 7    way to do it.  That's when they accomplished it, it was

04:09:38 8    after they saw what Pharmasset did.

04:09:39 9    Q.      Have we gone, a little laboriously, but all seven

04:09:46 10   factors that the law requires?

04:09:47 11   A.      Yes, we have.

04:09:48 12   Q.      What is your conclusion, Dr. Secrist, about whether

04:09:51 13   or not the claims -- the asserted claims of the '597 patent

04:09:56 14   require undue experimentation to practice their full scope?

04:10:00 15   A.      They clearly require undue experimentation.

04:10:02 16   Q.      If you want, you can write it on your slide or not.

04:10:05 17   It's up to you.  You are going to go ahead.  You are a

04:10:09 18   teacher.

04:10:27 19         Let the record reflect undue experimentation at

04:10:30 20   the bottom of the board.

04:10:32 21   A.      Difficult spell all the words right?  I'm pretty

04:10:35 22   sure.

04:10:38 23   Q.      I am not going vouch for you.

04:10:43 24         Let's talk about your other reasons that you

04:10:45 25   described to the jury, and those will go much quicker.

04:10:49  1          First let's turn to your opinions on written

04:10:52  2   description, if we could, Dr. Secrist.

04:10:54  3          Do I have your attention there?

04:10:56  4   A.      Yes.

04:10:57  5   Q.      Did you analyze the '597 patent for compliance with

04:11:02  6   the written description requirement of the United States

04:11:05  7   Patent Act?

04:11:06  8   A.      Yes, I did.

04:11:06  9   Q.      What did you conclude after finishing your analysis?

04:11:09 10   A.      That this patent just didn't meet the written

04:11:12 11   description requirements.

04:11:12 12   Q.      If we go to DDX-724, again, why did you conclude that

04:11:19 13   the patent does not meet the written description

04:11:22 14   requirement?

04:11:22 15   A.      Well, it doesn't show that the inventors possessed

04:11:24 16   the invention at the time they filed the patents, it says

04:11:27 17   here.          MR. SINGER:   Permission to approach, Your Honor?

04:11:31 18   We can get Claim 1 up?

04:11:33 19                  THE COURT:   Yes.

04:11:33 20   BY MR. SINGER:

04:11:51 21   Q.      Okay.  Dr. Secrist, we have placed on a board so we

04:11:58 22   can all see it, while we are talking about your opinion,

04:12:01 23   Claim 1 with the Court's construction of the two terms you

04:12:04 24   highlighted for the jurors.

04:12:05 25   A.      Yes.

04:12:06 1   Q.    You say on this slide that the patent does not show

04:12:09 2   the inventors possessed the invention at the time they filed

04:12:12 3   the patent, which I think you have testified is your

04:12:15 4   understanding of the legal requirement of the description?

04:12:19 5   A.    Yes.

04:12:19 6   Q.    What do you mean, just as a scientist, what do you

04:12:23 7   mean by the inventors didn't possess the invention?

04:12:26 8   A.    When I read the patent, it just doesn't show that

04:12:31 9   they invent what is claimed.

04:12:33 10  Q.    And why not?

04:12:34 11  A.    Well, for all the reasons we just talked about

04:12:38 12  relative to enablement.

04:12:39 13  Q.    Are there some additional reasons you would like to

04:12:42 14  highlight for the jurors that relate to written description?

04:12:44 15  A.    Yes, I'd say so.

04:12:46 16  Q.    First things first.

04:12:48 17        When you reviewed the '597 patent, did you see a

04:12:50 18  statement in there that the invention is a method for

04:12:57 19  treatment of hepatitis C virus infection that comprises

04:13:02 20  administering an effective amount of this beta-2'-methyl

04:13:08 21  /RAOEUB ribofuranosyl nucleoside as ultimately described by

04:13:12 22  the Court that has 2'-methyl (up), anything down but H,

04:13:16 23  those requirements that you described?  Did you see a patent

04:13:19 24  that said that?

04:13:20 25  A.    No, I didn't.

04:13:22 1   Q.     Did you see somewhere else in the patent a statement

04:13:25 2   as to what the invention was?

04:13:26 3   A.     Well, once we look at it, what we look at, I think,

04:13:31 4   is the summary of the invention.

04:13:32 5   Q.     If we pull up the summary of the invention, which is

04:13:36 6   at page 8 of the '597 patent, Column 5.  Is this the summary

04:13:45 7   of invention that you were talking about?

04:13:46 8   A.     Yes, it is.

04:13:46 9   Q.     And it describes compounds, methods, and compositions

04:13:52 10  for the treatment of hepatitis C infections are described

04:13:56 11  that include an effective hepatitis C treatment amount of a

04:13:59 12  beta-D beta-nucleoside of the Formulas I through XVIII or a

04:14:05 13  pharmaceutically acceptable salt or prodrug thereof.

04:14:10 14          Did I read that properly?

04:14:11 15  A.     Yes.

04:14:12 16  Q.     It's true, Dr. Secrist, these patents don't speak to

04:14:15 17  me and all the lawyers in the room and other people.  Are

04:14:19 18  they written for scientists?

04:14:21 19  A.     Well, I would say certainly among the folks that they

04:14:25 20  are written for would be scientists, because if you want to

04:14:29 21  do what's in the patent, they would be able to understand

04:14:31 22  it.

04:14:32 23  Q.     A scientist reading this, a person of skill, with

04:14:35 24  your definition of ordinary skill, after reading that, what

04:14:37 25  would they understand, in your opinion, the invention to be?

04:14:42 1    A.    Well, I would go to the formulas to see what they are

04:14:44 2    talking about.  I would go to formulas Roman Numerals I

04:14:49 3    through XVIII.

04:14:49 4    Q.    Did you do that when you analyzed the patent for

04:14:51 5    written description?

04:14:54 6    A.    Yes, I did.

04:14:55 7    Q.    Let's take a look at those.  We put them all on one

04:14:59 8    slide, which is DDX-7225, are these referred to in the

04:15:06 9    summary you just looked at?

04:15:09 10   A.    Yes.

04:15:09 11   Q.    Q did you get them right, or did you check this?

04:15:12 12   A.    I did check them, they are right.

04:15:13 13   Q.    Are any of these XVIII formulas in the patent limited

04:15:18 14   at the 2' up position to a 2'-methyl nucleoside?

04:15:23 15   A.    Yes, there are two of them that are.  It's numbers II

04:15:26 16   and V.

04:15:28 17   Q.    Let's look at II and V, which is DDX-726.

04:15:35 18         What do II and V allow for at the 2' position we

04:15:40 19   have highlighted in yellow here?

04:15:42 20   A.    Well, 2' down, they have an OR 3.  So in all cases

04:15:49 21   you would have to have an oxygen attached to the 2' carbon,

04:15:54 22   and then attached to that oxygen could be hydrogen.  It

04:15:57 23   could be a variety of things, actually a very, very large

04:16:00 24   number of possible things that are listed here.  You can see

04:16:02 25   the list.  I will not go through it.

Secrist - direct

04:16:05 1      All of them have a 2' oxygen down.

04:16:11 2  Q.      In connection with the Court's claim construction of

04:16:15 3  bait 2-D2' methyl ribofuranosyl, even though this is a large

04:16:23 4  number, is this broader than the Court's construction or

04:16:26 5  narrower than the Court's construction at 2' down position?

04:16:31 6  A.      Even given it is an oxygen down, it's still a very

04:16:34 7  large number of compounds.  But it is dramatically narrower

04:16:38 8  than the Court's construction of Claim 1.

04:16:41 9  Q.      Would this teach a person of ordinary skill, these

04:16:44 10 approximate two formulas, that the inventors were in

04:16:47 11 possession of, of the breadth of Claim 1 as you have

04:16:50 12 described it?

04:16:51 13 A.      No, no, it wouldn't even come close.

04:16:53 14 Q.      Are there other formulas of the 18 that you found

04:16:56 15 relevant to your written description analysis?

04:16:58 16 A.      Yes, there are.

04:16:59 17 Q.      What were those?

04:17:00 18 A.      Those were X, XI, XVI, XVII and XVIII.

04:17:03 19 Q.      If we go to DTX-727.  Why did you choose these five

04:17:07 20 formulas, Dr. Secrist?

04:17:09 21 A.      These five have an up substituent at the 2'

04:17:14 22 substituent that we have been talking about.  It's called

04:17:16 23 either R6 or R8 in these five.  And those all might include

04:17:22 24 a methyl up, which is of course what the claim says.

04:17:24 25 Q.      So that's the two methyl up specifically in these

04:17:28 1  FIVE, is it they allow for methyl up amongst the

04:17:32 2  possibilities?

04:17:33 3  A.      They allow for a large number of possibilities, one

04:17:35 4  OF which is methyl.

04:17:36 5  Q.      How about the other 11 formulas, do they allow for

04:17:39 6  2'methyl up?

04:17:41 7  A.      No, they don't.

04:17:42 8  Q.      Looking at these, how do you know as a scientist

04:17:48 9  reading this patent that the 2' position could possibly have

04:17:51 10  a methyl up?

04:17:54 11  A.      So.  As I noted, that are large number of things that

04:17:57 12  might be up in this -- where R6 is.  One of those is you can

04:18:03 13  see alkyl, including lower alkyl.  So that specific one is

04:18:08 14  the one that would allow for a 2' up methyl.  And for R8,

04:18:14 15  similarly you can see alkyl including lower alkyl.  So that

04:18:18 16  piece of this would allow methyl.

04:18:20 17  Q.      Is there actually a definition of alkyl in the

04:18:23 18  patent?

04:18:23 19  A.      Oh, yes, there is.

04:18:24 20  Q.      Let's go to DDX-728.  Is this the definition from the

04:18:31 21  patent at Column 37, lines 9 through 26 that you are talking

04:18:34 22  about?

04:18:37 23  A.      Yes.

04:18:38 24  Q.      How many alkyls, Dr. Secrist, does this definition

04:18:41 25  encompass in your expert opinion?

04:18:44 1  A.    It's got, I think, somewhere close to 19 -- it lists

04:18:50 2  specifically, but then it lists substituted and

04:18:53 3  unsubstituted alkyl groups and it lists what can be on

04:18:56 4  there.

04:18:57 5         This is just thousands and thousands of

04:18:59 6  possibilities that might be at the 2' up position.

04:19:03 7  Q.    In connection with the formula we looked at -- and we

04:19:09 8  can go back to the five formulas at '729, does that

04:19:14 9  definition of alkyl, within the context of these formulas,

04:19:19 10 signal to a person of skill in the art that 2'-methyl up is

04:19:23 11 of any significance at all?

04:19:24 12 A.    No, it doesn't points to it at all.  This is just

04:19:28 13 sort of a laundry list that you put up at this 2'-methyl

04:19:34 14 position.  One of them is alkyl and it doesn't single it out

04:19:37 15 in this group of alkyls.

04:19:39 16 Q.    Why not?  There is a lot of words here and pictures.

04:19:43 17 Why isn't that sufficient for the person of skill that they

04:19:48 18 possessed methyl up for all the structures allowed in Claim

04:19:51 19 1 for effective nucleotides?

04:19:52 20 A.    They don't give you any guidance as to how you would

04:19:58 21 get to a methyl up from this laundry list of structures that

04:20:03 22 are listed.

04:20:04 23        As a chemist, I wouldn't know what to go after

04:20:07 24 here.

04:20:08 25 Q.    Now, the definition of R6 and R8 at the up position

04:20:14  1   in these formulas, is that broader than the position allowed

04:20:17  2   by the claims or narrower?

04:20:20  3   A.      Oh, it's dramatically broader than the claims.

04:20:23  4   Q.      To be fair, the patent does boil these formulas down

04:20:27  5   a little bit down into something called preferred

04:20:30  6   embodiments.  Is that true?

04:20:31  7   A.      Absolutely, it does.

04:20:32  8   Q.      Can you explain, it is a term we haven't heard

04:20:35  9   before, can you explain to the jury what your understanding

04:20:37 10   of a preferred embodiment is?

04:20:39 11   A.      Well, you take -- I will do my best.  If you have

04:20:44 12   this many compounds that you are starting with, a preferred

04:20:46 13   embodiment would narrow it down by some means, usually by

04:20:52 14   looking at data, to this many, in a more preferred

04:20:55 15   embodiment similarly by some means, usually data would get

04:20:59 16   down to this number of compounds.  So you would go from here

04:21:02 17   to here with preferred embodiments, usually based on seeing

04:21:05 18   the data for compounds that are in these embodiments.

04:21:10 19   Q.      Did you look at the most preferred embodiments of,

04:21:13 20   for example, Figure 17 in your analysis?

04:21:16 21   A.      Yes, I did.

04:21:17 22   Q.      If we go to DDX-730.

04:21:22 23           What are we looking at here, Dr. Secrist, from

04:21:24 24   Column 32 of the patent, lines 42 to 59?

04:21:28 25   A.      On the right is the same structures, Roman Numeral

04:21:31 1    XVII that we have already seen.  Now we are looking at

04:21:36 2    what's up and what's down at the 2' position.  Of course,

04:21:39 3    this patent suggests that's an important position.  I have

04:21:43 4    suggested it is an important position.  It is.  What they

04:21:45 5    show is a methyl up, you can see it, R6 is methyl in all

04:21:50 6    cases and a hydroxyl down in all cases.

04:21:53 7            This ends up with a total of five compounds.

04:21:58 8    Q.    Now, do you believe that by pointing to these five

04:22:04 9    compounds as preferred embodiments, that that is written

04:22:09 10   description of the scope of the claim as construed by Judge

04:22:13 11   Stark?

04:22:13 12   A.    Oh, it's not even close.

04:22:15 13   Q.    Why aren't these representative of the full scope of

04:22:18 14   the claim?

04:22:19 15   A.    I have said it already, these just talk about a

04:22:22 16   HYDROXYL group down at the 2' position.  A claim has this

04:22:27 17   massive number of groups that might be at the 2' position

04:22:30 18   that aren't even remotely addressed in the patent.

04:22:33 19   Q.    In your opinion, Dr. Secrist, does this example or

04:22:35 20   the patent as a whole, does it teach the possession by the

04:22:41 21   inventors of anything new and novel at the 2' down position

04:22:46 22   to use with methyl up?

04:22:50 23   A.    Well, hydroxyl is the standard group that you would

04:22:53 24   put at that time 2' down position given what we have talked

04:22:56 25   about.  So not really, no.

04:22:58 1    Q.    Now, same question we had as for enablement.  Are

04:23:01 2    there substituents at 2' down that you believe the patent

04:23:06 3    directs the person of skill away from?

04:23:08 4    A.    Certainly.  One of them we have touched on.  Fluorine

04:23:11 5    is completely directed away from the 2' down position.

04:23:16 6    Q.    DDX-731, is that for the same reasons that you

04:23:20 7    described in enablement?

04:23:21 8    A.    Yes.  I won't go through it again.  You can see there

04:23:25 9    are only three halogens down but there are four up.  So

04:23:28 10   quite clearly whoever was putting together this patent

04:23:33 11   specifically excluded fluorine from down at the 2' position.

04:23:36 12   Q.    We have excerpted Formula XVII.  Is this exclusion

04:23:40 13   that we have described, a fluorine at R7 down, is that true

04:23:44 14   for the other formulas in the patent where it describes

04:23:49 15   fluorine, bromine, iodine?

04:23:51 16   A.    It is true in the other cases as well.

04:23:53 17   Q.    Based on all this, Dr. Secrist, what is your opinion

04:23:57 18   as to whether or not the patent shows possession of the

04:24:03 19   invention as construed by the Court of the asserted claims?

04:24:07 20   A.    As I have said before, it does not show possession.

04:24:13 21   Q.    Last little bit.  We are almost at the end of the

04:24:16 22   day.  Good timing.

04:24:17 23         Dr. Secrist, can we turn to the final ground of

04:24:20 24   invalidity, which I believe you testified was obviousness

04:24:23 25   over the Merck prior work?

Secrist - direct

A.      Yes.

            THE COURT:  Mr. Singer, do you really expect to
be like in the nature of five minutes?

            MR. SINGER:  I don't want to break any promises.
Perhaps it's better we break for the day.

            THE COURT:  I think that's probably right.

            Ladies and gentlemen of the jury, tomorrow, as
you may recall, will be at least a bit shorter than today.
We will be done by 3:15 tomorrow.  Same for Wednesday as
well.  But we will start at 9:00 tomorrow, so please be here
about 8:45 to order lunch.  While you are away from us, no
research or reading about the case.  No talking about the
case.  Stay there one second, we will ask Mr. Singer to come
and clear the way so you can get out.  We will do that now.
Take the jury out.  Have a good evening.

            (Jury leaves courtroom at 4:25 p.m.)

            THE COURT:  We are going recess for about five
minutes, then we will come back and do the argument.

            Ms. Parker.

            MS. PARKER:  For those of us not working on the
jury charges, may we be excused?

            THE COURT:  Whoever wants to go is free to go.
As long as there is one person here.  We will be in recess.

            (Brief recess taken.)

                  *      *      *

04:41:00 1          (Proceedings reconvened after recess.)

04:41:00 2          THE COURT: All right. Have a seat. You are

04:41:02 3 the lucky few.

04:41:03 4          All right. So our agenda, and I have up to an

04:41:06 5 hour, is to go through the jury instructions and the verdict

04:41:11 6 sheet, whatever you wish to argue.

04:41:14 7          I have seen that you submitted something I think

04:41:18 8 that was earlier today. That while it is hard for me to

04:41:24 9 know exactly what you changed from the ones that we worked

04:41:26 10 on over the weekend, I assume it moved the ball forward a

04:41:30 11 little bit.

04:41:31 12          So here is how we'll start: Let's go with the

04:41:37 13 General Instruction, Section 1. I'll hear from plaintiffs

04:41:39 14 first on any that are still in dispute, if any, and whatever

04:41:44 15 you want to touch on in that Section 1. So whoever is going

04:41:49 16 to address that from plaintiffs, please come to the podium.

04:41:51 17          MS. SWIZE: Thank you, Your Honor. May it

04:41:56 18 please the Court, good afternoon.

04:41:58 19          We did make a lot of progress, I believe, so we

04:42:00 20 have narrowed some disputes. I think we only have four

04:42:03 21 instructions in part 1, and I can touch on those pretty

04:42:07 22 quickly.

04:42:07 23          The first one is on 1.2, Jurors' Duties. Our

04:42:13 24 only issue there is that there is a duplicative sentiment.

04:42:18 25 The sentence that is remaining in dispute, the bolded

04:42:21 1    sentence, is captured in the final sentence of the

04:42:24 2    instruction.  And we just don't see the need to have the

04:42:26 3    jury instructed twice not to have their personal feelings

04:42:30 4    influence their decision.

04:42:31 5              THE COURT:  This is the final sentence of the

04:42:33 6    first paragraph now; correct?

04:42:36 7              MS. SWIZE:  Correct.

04:42:36 8              THE COURT:  And you believe it is duplicative?

04:42:39 9              MS. SWIZE:  Yes, of the final sentence of the

04:42:40 10   full instruction.

04:42:41 11             THE COURT:  All right.  Move on.

04:42:45 12             MS. SWIZE:  On 1.11, we just made a change by

04:42:51 13   adding another witness who testified in his capacity as a

04:42:54 14   30(b)(6), James Meyers.  I don't think there is any dispute

04:42:57 15   about that.  Just to let you know that was an update from

04:43:00 16   the last set you received.

04:43:01 17             THE COURT:  Thank you.

04:43:02 18             MS. SWIZE:  On 1.12.  The issue there, this is

04:43:05 19   exhibits and demonstratives.  We believe, if they haven't

04:43:09 20   already been admitted, that we will be entering into

04:43:11 21   evidence Federal Rule of Evidence 1006, Summaries.  And the

04:43:16 22   way the instruction would be worded under Gilead's wording,

04:43:19 23   it would sort of have this binary world that there is, there

04:43:24 24   are exhibits that are introduced into evidence, and there

04:43:26 25   are demonstratives that include charts and summaries.  And

04:43:28 1   our proposed language just makes clear that it is not quite

04:43:31 2   that binary.  That there are some charts and summaries that

04:43:35 3   can have evidentiary value under Rule 1006.

04:43:39 4           THE COURT:  All right.  We haven't seen those

04:43:41 5   yet, but those are coming?

04:43:42 6           MS. SWIZE:  Correct.  Yes, Your Honor.

04:43:43 7           And then probably the largest dispute, in 1.13

04:43:52 8   on burdens of proof.

04:43:53 9           We very much tried to follow prior instructions.

04:43:57 10  And let me point out one of the most particular disputes

04:44:03 11  here, which is evidence that the PTO did or did not

04:44:08 12  consider.  So we have contradictory statements in the sense

04:44:12 13  that some of the prior art or alleged prior work that Gilead

04:44:17 14  is asserting in its 102 and 103 arguments, the Merck work,

04:44:22 15  which is secret and not known, was not before the PTO, but

04:44:25 16  the other work, the Merck '224 patent, its predecessor

04:44:31 17  patent, the '395 patent, and the 1960 article are all in

04:44:36 18  fact cited on the face of the '597 patent, were considered

04:44:40 19  by the PTO.  The PTO issued our claims over that prior art.

04:44:47 20          And so we think the jury should be instructed

04:44:49 21  that that art was considered by the PTO and certainly should

04:44:52 22  not be instructed with the generic statement that Gilead has

04:44:58 23  that they have heard evidence that the PTO had no opportunity

04:45:01 24  to consider.  Gilead's statements doesn't limit it to any

04:45:05 25  evidence.  I think it would be very confusing to the jury if

04:45:08 1  they were misled to think that the entirety of this trial

04:45:10 2  was nothing that the PTO had before it.

04:45:13 3  THE COURT:  It also appeared that perhaps the

04:45:15 4  order of the instructions, and that sort of starts here on

04:45:21 5  burdens of proof, might be in dispute.

04:45:23 6  What is plaintiffs' position as to what order,

04:45:26 7  once I get to the substantive issues, I should do it in?

04:45:29 8  MS. SWIZE:  Yes.  Thank you for pointing that

04:45:31 9  out.  I do believe there is a dispute on that.

04:45:33 10  We followed the traditional order.  This was not

04:45:36 11  a bifurcated trial.  Ordinarily, infringement and willful

04:45:39 12  infringement would come first and then invalidity and damages.

04:45:43 13  In the preliminary instructions that the Court

04:45:45 14  granted, or issued to this jury, damages came first, so that

04:45:49 15  is why our verdict form has willful infringement and damages

04:45:52 16  first and then validity.  We were following that.

04:45:56 17  You know, we understand that normally damages

04:45:58 18  come last, but certainly willful infringement should not

04:46:01 19  come after invalidity, nor should willful infringement hinge

04:46:05 20  on invalidity.  It is the ordinary course that juries that

04:46:07 21  are deciding infringement decide infringement, willful

04:46:10 22  infringement and validity; and there is no caveat that they

04:46:14 23  don't reach willful infringement if the claims are found

04:46:16 24  invalid, nor that wilful infringement comes afterwards.

04:46:21 25  That is not how the order of proof came in this

04:46:23 1    case, since Idenix started first on its issues.  So we think

04:46:27 2    to avoid jury confusion, there is really no reason to.

04:46:30 3         THE COURT:  And what about on damages?  Would

04:46:32 4    the plaintiffs ask that we seek a verdict on damages even if

04:46:38 5    all the patent claims are found invalid?

04:46:41 6         MS. SWIZE:  I don't think that is normally done,

04:46:43 7    Your Honor.

04:46:43 8         THE COURT:  I don't think it is normally done.

04:46:45 9    But do plaintiffs request that we do that or not?

04:46:48 10        MS. SWIZE:  May I confer?

04:46:50 11        THE COURT:  Certainly.

04:46:52 12        (Counsel confer.)

04:47:24 13        MS. SWIZE:  Thank you, Your Honor.

04:47:27 14        No, we wouldn't ask that the jury reach damages

04:47:30 15   if they were to find all of the claims, of course, but it

04:47:33 16   would have to be every single one of the asserted claims

04:47:36 17   found invalid.

04:47:36 18        THE COURT:  All right.  I think that covers

04:47:38 19   everything in dispute on Section 1; correct?

04:47:40 20        MS. SWIZE:  Yes.

04:47:40 21        THE COURT:  All right.  Let me hear from Gilead,

04:47:43 22   please, on Section 1.

04:47:45 23        MR. SCHERKENBACH:  Your Honor, I'm going to

04:47:53 24   handle at least this section and leave the hard stuff for

04:47:56 25   Mr. Countryman.

04:47:57  1                    THE COURT:  He has been warned.

04:47:59  2                    MR. SCHERKENBACH:  Yes.  Repeatedly, I might

04:48:01  3    add.

04:48:01  4             I'll just go through the ones on my copy that I

04:48:04  5    think were originally disputed.

04:48:05  6             1.2, Jurors Duties.  We're fine with their

04:48:11  7    version of 1.2 to the extent it is still disputed.  I don't

04:48:14  8    think we need to fight about that one.

04:48:16  9                    THE COURT:  Okay.  It was your extra sentence

04:48:19 10    that they were troubled by.

04:48:21 11                    MR. SCHERKENBACH:  That's fine.  That's fine.

04:48:22 12             1.7, Credibility of Witnesses.  We're fine with

04:48:25 13    theirs, too.  It's not worth fighting about.

04:48:27 14                    THE COURT:  1.7?

04:48:29 15                    MR. SCHERKENBACH:  1.7.

04:48:31 16             1.11, I think we agree we can add Mr. Meyers'

04:48:36 17    name there as an additional 30(b)(6).

04:48:42 18             1.12, this one I think we need to just maybe

04:48:49 19    pass over for the moment.  Our issue -- well, actually there

04:48:53 20    are two things.  One is smaller than the other.

04:48:55 21             At the bottom of the first paragraph, at least

04:48:57 22    in my copy, there is a sentence that is repeated twice

04:49:00 23    verbatim.  Do you see the sentence, "Rather, it is the

04:49:04 24    underlying testimony of the witness that you heard."

04:49:08 25                    THE COURT:  Yes.  The second paragraph, at the

04:49:10 1    end of the second paragraph.

04:49:11 2           MR. SCHERKENBACH:  Okay.  I might be looking at

04:49:13 3    a different version.  Hold on a second.

04:49:15 4           THE COURT:  But to the extent it does appear

04:49:19 5    that that same sentence is there twice, I don't think

04:49:22 6    anybody is asking me to do that, and I see plaintiffs

04:49:25 7    agreeing.

04:49:26 8           MR. SCHERKENBACH:  Yes.  Okay.  I think I'm

04:49:27 9    looking at a copy that may have had a typo where it's

04:49:32 10   referred to the same thing twice.  So, okay, I think we're

04:49:35 11   done on that.

04:49:37 12          The last bit about charts and summaries, we're

04:49:43 13   fine with the instruction in general.  The issue is whether

04:49:46 14   the jury in this case will have seen any summaries.

04:49:50 15          They are going to try to use summaries at least

04:49:53 16   with Dr. Gosselin, and we're still discussing that issue.

04:49:58 17   We might agree to it, but for the moment we haven't yet.

04:50:01 18   And we just wanted to preserve our objection on that.  But

04:50:06 19   if you allow such a summary, then the instruction is fine.

04:50:09 20          THE COURT:  Okay.

04:50:11 21          MR. SCHERKENBACH:  Burdens of Proof.  You see we

04:50:14 22   have a somewhat significant difference of proof on sort of

04:50:18 23   just conceptually.  And let me try to, let me try to flag

04:50:22 24   the things that jumped out at me.

04:50:25 25          No. 1, they reiterate in their proposal, they

04:50:29 1   reiterate the instructions about infringement.  I lost count

04:50:35 2   of how many times they repeated them in the instructions but

04:50:38 3   it's a lot.

04:50:40 4           I don't know why on burdens of proof, they need

04:50:43 5   to tell the jury.

04:50:43 6           THE COURT:  Do you have a proposal as to how

04:50:46 7   many times is appropriate in an hour plus of instruction?

04:50:51 8           MR. SCHERKENBACH:  If he were to repeat it in

04:50:54 9   the final instructions, I think it would be more appropriate

04:50:56 10  to come where you are telling them what the issues are in

04:51:01 11  the case, to the extent you repeat an instruction about the

04:51:04 12  issues remaining in the case.  And it may make sense to

04:51:08 13  tell them, remember, infringement is not an issue you are

04:51:11 14  deciding.  That would be fine.  But I don't think it should

04:51:14 15  be sort of interspersed at a bunch of others places.

04:51:17 16          There are a bunch where they have done that.  I

04:51:20 17  don't have a list right now, but maybe as we go through,

04:51:22 18  maybe we can point out some of those to Your Honor.

04:51:25 19          So that is the first I guess comment.

04:51:27 20          The second is just, as you referred to this,

04:51:30 21  Your Honor, as sort of the overall order.

04:51:32 22          This is an example in this instruction where

04:51:34 23  they want to talk about the willfulness and damages pieces

04:51:37 24  before the liability pieces; and we think that sort of just

04:51:40 25  reversed both within the body of the instruction itself and

04:51:45 1    in the instructions overall.

04:51:47 2                   They have to decide liability first and then

04:51:50 3    decide whether there is willfulness and then whether there

04:51:53 4    is damages.

04:51:53 5                   THE COURT:  Well, let's talk about that.

04:51:55 6                   So I take it from the instructions, your

04:51:58 7    position is that I shouldn't be asking this jury to decide

04:52:01 8    willfulness or, of course, damages if they find that all

04:52:06 9    of the claims are invalid.  Do I understand your position

04:52:08 10   correctly?

04:52:09 11                  MR. SCHERKENBACH:  That is right.  Correct, yes.

04:52:12 12                  THE COURT:  So on damages, it is now clear to me

04:52:14 13   plaintiffs aren't asking me to ask the jury about damages if

04:52:17 14   all the claims are found invalid, so I'm agreeable to that.

04:52:21 15                  MR. SCHERKENBACH:  Okay.

04:52:21 16                  THE COURT:  So that is not an issue.  But on

04:52:23 17   willfulness, I think they are asking that I ask the jury,

04:52:27 18   and as you know, over your objection, infringement is, I

04:52:31 19   have told the jury this is assumed.

04:52:34 20                  Doesn't it follow and we have heard the

04:52:36 21   evidence, or at least most of it, shouldn't we have this

04:52:39 22   jury weigh in on whether they find willfulness regardless of

04:52:43 23   what they find on validity?

04:52:45 24                  MR. SCHERKENBACH:  Well, and, again, I would say

04:52:50 25   I acknowledge it can go either way, okay?  And, again, it is

04:52:53  1    discretionary; right?  So I'm not going to tell you there is

04:52:56  2    only one way you can do it.

04:52:58  3            But I think what is most commonly done, that

04:53:00  4    willfulness follows alongside with damages and not the other

04:53:04  5    way around, right?

04:53:05  6            So the jury decides, if infringement were in

04:53:08  7    the case, the forms I'm familiar with here would ask about

04:53:13  8    infringement, they would ask about validity, and then they

04:53:16  9    would ask if you get there about willfulness and damages.

04:53:20 10            I don't think it is always the case that

04:53:22 11    willfulness is always decided.

04:53:24 12            THE COURT:  No, I don't think -- I mean I think

04:53:26 13    you are right, it is discretionary, and I am sure we have

04:53:29 14    all seen different things.

04:53:30 15            MR. SCHERKENBACH:  Yes.

04:53:32 16            THE COURT:  We're going to have spent two weeks

04:53:34 17    together with this jury.  They're going to have heard

04:53:37 18    whatever presumably what anybody ever wanted to say about,

04:53:41 19    subject to my rulings, about willfulness.  Why shouldn't we

04:53:44 20    have this jury tell us what they think?

04:53:43 21            MR. SCHERKENBACH:  Well, like I say, it could go

04:53:51 22    either way.  The same could be true about damages.

04:53:55 23    Obviously, it's gotten a lot less focused in this trial.  We

04:54:00 24    do the same thing for damages.  Some trials are all about

04:54:02 25    damages.  They spent a lot of time on damages.  Yet I don't

04:54:06 1  think anybody is saying, including them, that we should go

04:54:08 2  ahead and have the jury repeat that if they find the patent

04:54:11 3  is invalid.  I guess that's the best I can say on that.

04:54:15 4          THE COURT:  If I am going ask the jury to deal

04:54:18 5  with willfulness, no matter what, I suppose, your preference

04:54:23 6  would be that I only instruct on willfulness after having

04:54:29 7  instructed on invalidity first.

04:54:31 8          MR. SCHERKENBACH:  Yes.  I think -- that is in

04:54:35 9  many ways sort of an independent issue.  They should be

04:54:39 10 talking about liability before they get to willfulness and

04:54:42 11 damages, even if you are going to have them find

04:54:47 12 willfulness, yes.

04:54:48 13         THE COURT:  Even though the way I allowed the

04:54:50 14 evidence to be presented was they heard the plaintiffs'

04:54:52 15 evidence first.

04:54:54 16         MR. SCHERKENBACH:  Right.  I do think that's

04:54:55 17 right.  Because again, the way -- willfulness is a damages

04:55:00 18 related issue, it's not a liability related issue.  Again, I

04:55:07 19 would also say, Your Honor, if the only principle that

04:55:13 20 mattered was instructed them in the order in which they

04:55:15 21 heard the evidence, they would be instructed on damages

04:55:19 22 before validity, because they heard from the plaintiff on

04:55:24 23 damages before they heard from us on validity.

04:55:26 24         It is never the case they can just follow

04:55:29 25 lockstep, I think, the order in which the trial evidence is

presented.  You do it in a way that makes the most sense for the jury and the comprehension of the jury.

THE COURT:  Anything else on this 1.13?

MR. SCHERKENBACH:  Two other very small things.

At the bottom of page -- there is no page numbers -- the one we filed before was 14.  In their version, they have this phrase, the third paragraph begins "Gilead also alleges that the asserted claims of the '597 patent are invalid" --

THE COURT:  I see that.

MR. SCHERKENBACH:  And they add, "and Idenix contests that allegation."  They just added that there about we don't see that anywhere else for any of the others issues.  Of course, it is contested.  It should be parallel.

Then the last comment is over the next page, we are okay with them having the sentence in this case you heard evidence that the U.S Patent and Trademark Office evaluated a prior patent that Gilead asserts for invalidity in this case.  I don't think it is essential, they can argue that.  It doesn't really need to be in the instruction.  It is not legally wrong.

But we do feel that, especially if they are going to get that sentence, that we should have the one in our proposal that says, In this case you heard evidence that the Patent Office had no opportunity to evaluate -- you have

04:57:02 1  heard evidence that the Patent Office basically didn't

04:57:04 2  evaluate before it granted the patent.

04:57:07 3          So it is parallel.  It's a parallel treatment.

04:57:10 4  Just so Your Honor is clear, the source of that instruction

04:57:13 5  is the *i4i* case.  That is an instruction that was given

04:57:20 6  before.

04:57:21 7          THE COURT:  Thank you.

04:57:26 8          Anything further from the plaintiffs on this

04:57:28 9  Section 1?

04:57:34 10          MS. SWIZE:  Your Honor, starting with the last

04:57:39 11  point, it would not be parallel treatment for the jury to

04:57:43 12  hear that the PTO did not consider the evidence that Gilead

04:57:49 13  is pointing to.  That is work that was done in a company --

04:57:53 14  it hasn't even been established that it was a prior

04:57:55 15  invention.  It certainly wasn't anything available to the

04:57:58 16  public.  That is not the kind of prior art that the PTO

04:58:00 17  would consider, such as the '224 patent, on the face of the

04:58:06 18  '597 patent.

04:58:07 19          THE COURT:  But it is true that the PTO didn't

04:58:10 20  consider it.  Whether it's prior art may be a dispute.  But

04:58:15 21  certainly the PTO didn't consider it.

04:58:16 22          MS. SWIZE:  It is true, but it wouldn't even

04:58:19 23  become relevant to the jury until the jury makes some

04:58:23 24  threshold determination that it does satisfy 102(g) as prior

04:58:27 25  art.  I think it would be highly misleading, particularly in

04:58:30 1    this point in the instructions, to let the jury think that

04:58:32 2    the PTO might have some way to consider it when the jury in

04:58:35 3    this case hasn't even determined that it would be prior art.

04:58:38 4    It wouldn't even be prior art for the POT to consider

04:58:43 5    because it was secret.

04:58:46 6           We would very much dispute instructing the jury

04:58:49 7    on that.

04:58:50 8           We do think it's appropriate to instruct the

04:58:52 9    jury that the PTO had before it both the Merck patent and

04:58:55 10    these 1960s articles, which, I am sorry, are not in our

04:59:00 11    proposal.  That would be also an accurate instruction to the

04:59:04 12    jury that the PTO had that where it --

04:59:07 13           THE COURT:  Accurate or inaccurate.

04:59:09 14           MS. SWIZE:  Accurate.

04:59:10 15           THE COURT:  Are you proposing some language now

04:59:12 16    that's not in what I have got?

04:59:14 17           MS. SWIZE:  Yes.  But I didn't want to confuse

04:59:16 18    things or overstep.  That's not appropriate.  I did want to

04:59:21 19    clarify that the PTO had before it the 1960s articles that

04:59:25 20    Gilead has been highlighting in the trial.  But certainly

04:59:29 21    what we have in the proposed instruction is accurate.  It

04:59:33 22    may not be complete from our view, but it's accurate.

04:59:37 23           THE COURT:  For now I am going to focus on the

04:59:39 24    two proposals that are in writing.  If I want more, I will

04:59:42 25    ask.

MS. SWIZE: ON THE order, we have made this argument before. I won't retread the ground. But we don't file like flipping the order of proof would be in any way fair to Idenix simply because we are in a situation where Gilead has conceded infringement. But I know you have heard argument on that before.

THE COURT: That's all on Section 1 for now.

MS. SWIZE: Yes.

THE COURT: Any last word on Section 1, Mr. Scherkenbach?

MR. SCHERKENBACH: It's a little bit more than a footnote. But the evidence the PTO has not heard that this jury has goes way beyond prior art. There is other evidence that is relevant to written description and enablement that the PTO didn't have that this jury does. It is a significant category of information.

THE COURT: But doesn't that cut towards maybe I shouldn't bother instructing on it, because unless the jury found it was prior art, while it might be nice for them to know the PTO didn't have it, that also there was no way for the PTO have it.

MR. SCHERKENBACH: My point is, even if that were correct as to the prior art information the PTO didn't have, there is another category of information having to do with what the state of the art was that Idenix knew and

didn't tell the PTO what testing they had done and not done

that they didn't tell the PTO.

It goes to Section 112 issues. That was my

point.

THE COURT: All right. Let's move on to Section

2. I don't think there is much in dispute here. What do

plaintiffs want to say on that?

MS. SWIZE: I am happy to note we did agree to

Section 2.1 on the parties, 2.2 on plaintiffs' contentions.

I think the only issue in Section 2 is the summary of the

patent issues in 2.4.

We do think it is appropriate for the jury to

have laid out for them in some clear fashion what the issues

are before them. That is what we attempted to do here.

I will note this is the first of several

disputed instructions where we have, in Paragraph 2,

attempted to identified exactly what Gilead's 102 and 103

assertions are compared to Gilead's very amorphous and vague

Merck work.

It doesn't identify for the jury what exactly

their invalidity contentions are. That is one area of

dispute. But we feel like it is something that the jury

should hear, so it has some guidance in what we are asking

it to do.

The Gilead proposal, in their Paragraph 1, is

05:02:18 1    where we object in particular to the phrase Merck's prior

05:02:22 2    work is too amorphous.  Again, I don't know that we need to

05:02:28 3    repeat the objection.  But they have the issues listed in

05:02:31 4    the wrong order with this caveat in No. 2 that the jury

05:02:34 5    would only reach willfulness if they were to find that each

05:02:37 6    and every one of the asserted claims is invalid.

05:02:40 7                THE COURT:  Okay.  Thank you.  Who is addressing

05:02:43 8    Section 2?

05:02:47 9                MR. HARRISON:  Thank you, Your Honor.

05:02:49 10               So on the order of the issues, I think it's the

05:02:52 11   same argument that we had before with respect to Section 1.

05:02:56 12   Again, we think the invalidity issue should be set up first

05:03:00 13   and only if the jury concludes that the patent is not

05:03:03 14   invalid would it have to reach either willfulness or

05:03:07 15   damages.

05:03:08 16               Then we would say, with respect to infringement

05:03:12 17   not being an issue the jury needs to decide, if the Court is

05:03:16 18   going instruct on that, we think this is the one and only

05:03:20 19   one place that the Court should do that.  So we have

05:03:23 20   included that in our proposal here.

05:03:25 21               The only other issue is with respect to the

05:03:29 22   description of the Merck defense.  This doesn't really

05:03:32 23   accurately characterize -- the proposal doesn't accurately

05:03:37 24   characterize Gilead's position.  Idenix throughout the

05:03:39 25   instructions has tried to break up the defense into these

05:03:43 1    different silos, the '98 work, the 2000 work.  The testimony

05:03:48 2    has been that the Merck-Isis collaboration was an ongoing

05:03:51 3    effort from 1998 to 2003.  It is all that work taken

05:03:55 4    together that the Gilead experts have said invalidates the

05:03:59 5    patents.

05:04:00 6              As a result, we think when that is described, it

05:04:05 7    shouldn't be broken up in this piecemeal fashion.  It should

05:04:09 8    be described.

05:04:10 9              THE COURT:  What about at least calling out at

05:04:12 10   this point anticipation and obviousness.

05:04:15 11             MR. COUNTRYMAN:  We would be happy to do that,

05:04:17 12   at the end of our proposal, you know, or based on

05:04:21 13   anticipation or obviousness due to Merck's work.  Something

05:04:25 14   like that would be acceptable.

05:04:27 15             THE COURT:  Anything else?

05:04:29 16             MR. COUNTRYMAN:  Nothing else.

05:04:31 17             THE COURT:  Any word or any thoughts, if I at

05:04:35 18   least were to add anticipation and obviousness to begin to

05:04:40 19   clue the jury in on what these Merck work defenses are.

05:04:44 20             MS. SWIZE:  I don't think we would have an issue

05:04:46 21   with anticipation.  We will get to the obviousness section.

05:04:50 22   We do have a dispute about that.  We do, separate and apart

05:04:54 23   from labeling the legal issues, we think the jury does need

05:04:59 24   to understand exactly what the asserted prior invention is.

05:05:03 25             I don't know how the jury would undertake its

05:05:06 1 task if it doesn't understand who the inventor is and what

05:05:12 2 the purported invention was, and who and what and when this

05:05:15 3 happened.

05:05:16 4    And to generalize this as "Merck work" doesn't

05:05:19 5 satisfy the requirement under Title 35 or what needs to be

05:05:23 6 shown for a prior invention.

05:05:25 7    THE COURT:  What about the alternative where I

05:05:28 8 don't reference Merck.  I just say anticipation or

05:05:28 9 obviousness.

05:05:33 10    MS. SWIZE:  Setting aside the issue of

05:05:35 11 obviousness, if the Court wanted to generalize, that would

05:05:38 12 be fine.  It will come up later where we do think somewhere

05:05:42 13 in the instructions, as normally happens in validity cases,

05:05:45 14 where instructions lay out exactly what asserted art is

05:05:50 15 being presented to the jury so it can then decide if that

05:05:53 16 asserted art anticipates or renders obvious the claims.  Not

05:05:58 17 some general amorphous description that doesn't have who or

05:06:02 18 what or when the assertion is.

05:06:04 19    As to the statements from the preliminary

05:06:06 20 instructions about infringement being assumed, it may be

05:06:10 21 here more than Your Honor would like.  We are not standing

05:06:13 22 on the number of times it is in there.  We did want to

05:06:17 23 respect the instruction and follow it.

05:06:20 24    Would you like me to turn to the next --

05:06:23 25    THE COURT:  Anything else on section.

05:06:24 1            MR. COUNTRYMAN:  Nothing.

05:06:25 2            THE COURT:  I believe Section 3 is just one

05:06:27 3   agreed-upon instruction at this point.  So I am hopeful

05:06:31 4   there is nothing to say on 3?

05:06:34 5            MS. SWIZE:  Correct, Your Honor.

05:06:35 6            THE COURT:  I think you can move on to Section

05:06:38 7   4, then.

05:06:41 8            Is there anything on Section 3?

05:06:44 9            MR. SCHERKENBACH:  No.

05:06:47 10           THE COURT:  I believe we can skip Section 4

05:06:49 11  because in the instructions submitted today the parties

05:06:52 12  agreed on 4.1 and 4.4.

05:06:57 13           Those are the only ones that were disputed in 4?

05:07:01 14           MS. SWIZE:  I believe so, Your Honor.

05:07:03 15           MR. COUNTRYMAN:  Your Honor on 4.2, we have

05:07:05 16  agreed to the instruction, on the construction of the

05:07:08 17  claims, just because that correctly states the Court's claim

05:07:11 18  construction order.  We do want to be clear that we are

05:07:14 19  preserving for appeal our objections to the underlying claim

05:07:17 20  constructions.  We are not waiving those by agreement.

05:07:19 21           THE COURT:  All right.  Then I guess we can move

05:07:21 22  on to Section 5.

05:07:23 23           MS. SWIZE:  There is only one instruction in

05:07:25 24  Section 5, which is Idenix's proposal that if infringement

05:07:30 25  had been in the case the jury would have been instructed on

05:07:34 1  exactly the types of infringement that Gilead would have

05:07:37 2  been alleged to have done.

05:07:38 3          So it is our view that it would be appropriate

05:07:41 4  in a short instruction one time to just lay out for them the

05:07:46 5  elements of induced and than contributory infringement.

05:07:49 6          THE COURT:  Why is that?  Why does this jury

05:07:51 7  need to hear that?

05:07:52 8          MS. SWIZE:  We think it would help put in

05:07:54 9  context the actions that Gilead was doing that were

05:07:57 10 infringing, since there are different types of infringement.

05:08:01 11         THE COURT:  All right.  Nothing else on that?

05:08:04 12         MS. SWIZE:  No.

05:08:05 13         THE COURT:  Do you want to respond, somebody?

05:08:07 14         MR. SCHERKENBACH:  I will deal with that.

05:08:09 15         I can't imagine why we are going to instruct on

05:08:11 16 infringement when it is not an issue in this case.  I think

05:08:14 17 the only purpose would be to prejudice Gilead.

05:08:17 18         They don't need to be told this.  They shouldn't

05:08:20 19 be told this.  We have 75 pages of instructions here.  That

05:08:27 20 is an additional reason why we should be paring back when.

05:08:31 21         They haven't heard any evidence, of course, on

05:08:34 22 this, and they are not deciding the issue.

05:08:37 23         THE COURT:  Anything else on Section 5?

05:08:41 24         MS. SWIZE:  No, Your Honor.

05:08:42 25         THE COURT:  We can move on to 6, which may also

consist of one instruction.

MS. SWIZE:  Yes, Your Honor.  This, particularly in light of some of the evidence and argument that was made in the trial, we feel like it is important for the jury to understand as a legal matter we could not have asserted infringement against Gilead until they made it a commercially approved product by the FDA.

This simply tracks Section 271(e)(1) of the statute.

THE COURT:  What is it you think the jury has heard either as evidence or argument that would make this pertinent?

MS. SWIZE:  We believe it was in opening statement and perhaps testimony that we had waited years. We had known about sofosbuvir and Gilead's efforts but we waited years before suing them in December 2013.

THE COURT:  Okay.  Anything else to say on that?

MS. SWIZE:  No, Your Honor.  Thank you.

MR. SCHERKENBACH:  Your Honor, Instruction 6 is another infringement instruction, an instruction that comes from 271 of the statute, which is infringement.  The jury is not deciding it.

So they haven't heard any evidence on this, and my comments and the evidence we have elicited had to do with whether Idenix had previously accused Pharmasset or

Recherche Scientifique of misappropriation, of misusing confidential information. It is very specific, in responding to their theft, betrayal, et cetera, et cetera, theme. It had nothing to do with they should have sued us for infringement sooner. We have never said that, and in fact, they could not have. We agree on that.

THE COURT: I can have your representation that if there is no instruction here you are not going to suddenly come up with an argument that they waited too long to suggest to you or suggest there was something wrong in suing you in 2001?

MR. SCHERKENBACH: Yes, you can have my representation that we are not going make that argument. We haven't, and we are not going to start now.

THE COURT: Ms. Swize, any response?

MS. SWIZE: Only that is not what I have heard. I would be concerned the jury heard it the same way I heard, that there was some sort of delay on our part that should be held against us because we do not sue until 2013, we feel it is an innocuous instruction. It would be helpful to find the transcript and submit that to the Court.

THE COURT: That is it on 6?

MS. SWIZE: Yes.

THE COURT: Mr. Scherkenbach.

MR. SCHERKENBACH: No, Your Honor.

05:11:19 1       THE COURT:  Let's move on to Section 7.

05:11:22 2       MS. SWIZE:  Section 7 is also a standalone

05:11:25 3  instruction.  This is the willful infringement instruction.

05:11:28 4  Ours very closely tracks the Federal Circuit Bar

05:11:32 5  Association's instruction.  I will point out a couple of

05:11:36 6  concerns we have with Gilead's proposal.

05:11:38 7       First, the beginning passage, where they have --

05:11:42 8  we discussed this before, "If you conclude that the '597

05:11:45 9  patent is not invalid then you must determine willfulness,"

05:11:49 10 we disagree with that caveat.

05:11:52 11      In the third paragraph, there is an assertion

05:11:55 12 that the jury may not consider any knowledge and actions of

05:12:00 13 Gilead or Pharmasset that were before December 6, 2013.

05:12:06 14 That not only is this contrary to the Court's ruling from

05:12:09 15 December 4th that recognized under *Halo* that pre-patent

05:12:16 16 issuance conduct can be relevant, but is contrary to *Halo*

05:12:20 17 and Federal Circuit case law.

05:12:23 18      We very much object to that, that the jury is

05:12:26 19 entitled to consider pre-patent conduct.  The cases Gilead

05:12:29 20 pointed you to in fact say that you can consider pre-patent

05:12:34 21 conduct, *Gustavson* and the *American Original* case.

05:12:38 22 Certainly the jury cannot consider pre-patent conduct for

05:12:42 23 liability.  But for willfulness and the totality of the

05:12:44 24 circumstances under *Halo*, it can be considered.  And we

05:12:47 25 believe Your Honor has already ruled on that.

05:12:49  1          THE COURT:  Okay.  Thank you.

05:12:52  2          Gilead.

05:12:53  3          MR. HARRISON:  Thank you, Your Honor.  Let me

05:12:58  4    start with Idenix's proposals.  There is a number of bullet

05:13:03  5    points in here we object to.  I will start with the last

05:13:06  6    one.

05:13:06  7          They are asking for an instruction that the jury

05:13:09  8    can consider Gilead's failure to obtain an opinion or rely

05:13:14  9    on the opinions of counsel that it was not infringing the

05:13:17 10    claims or the claims are invalid.  This statute bars

05:13:20 11    argument or any jury consideration of that.  35 U.S.C. 298

05:13:27 12    specifically says that the failure to obtain or rely upon an

05:13:30 13    opinion of counsel cannot be held against a defendant,

05:13:34 14          That was enacted as part of the AIA.  When it

05:13:38 15    was enacted there was some ambiguity about the effective

05:13:41 16    date.  Then Congress cleared that up in the Technical

05:13:45 17    corrections act, which we have cited in our authority,

05:13:48 18    Public Law No. 112274.  The Technical Corrections Act makes

05:13:54 19    clear that Section 298 applies to any suit that was

05:13:57 20    commenced on or after January 14 of 2013, which this suit

05:14:05 21    was.

05:14:06 22          And the *Carson Optical* case that we cite in our

05:14:10 23    authority makes clear that that is in fact the effective

05:14:13 24    state of the statute.

05:14:15 25          Given Section 298, we believe the last bullet

05:14:18 1   point is inappropriate.

05:14:21 2           And I should note that the cases that Idenix

05:14:25 3   cites for that bullet point, *Suprema* and *Visteon* were both

05:14:35 4   commenced before January 14th, 2013.  So they wouldn't apply

05:14:39 5   to the effective date issue here, the statute would control.

05:14:43 6   So for that reason, we object to that last bullet point in

05:14:48 7   Idenix's proposal.

05:14:50 8           Then the second to last bullet point.  I think

05:14:53 9   the problem here is, it says whether or not Gilead knew or

05:14:57 10  had reason to know it was infringing.

05:15:00 11          I think there is two problems with that.

05:15:03 12          First, the "had reason to know."  Really, the

05:15:06 13  standard is the Supreme Court I think has said is that the

05:15:08 14  conduct has to be willful, wanton, bad faith.  So you need

05:15:14 15  to have knowledge.  It's not enough to have reason to know.

05:15:17 16          And then the second thing is it leaves out.  It

05:15:19 17  should say it was infringing a valid patent, because if

05:15:26 18  Gilead believed that the patent was invalid, it wouldn't be

05:15:29 19  a willful infringer.

05:15:30 20          Moving up one more bullet point, whether or not

05:15:34 21  Gilead was woefully blind.

05:15:36 22          That is a concept that has been discussed in the

05:15:39 23  inducement case law in *Commil*, but we haven't seen it

05:15:40 24  discussed in the context of willful infringement, so we

05:15:44 25  don't believe it is an willful instruction.

05:15:47 1          Again, what it is doing is it is setting the bar

05:15:50 2   lower than the actual knowledge of bad faith conduct that

05:15:55 3   the Supreme Court has required.

05:15:56 4          Moving on to the earlier bullet point, whether

05:16:02 5   or not Gilead tried to cover up its infringement.

05:16:04 6          The problem with this is there is just no

05:16:06 7   evidence of that at all in this case.  There is no evidence

05:16:10 8   that Gilead did anything to cover up anything from December

05:16:15 9   6th, 2013 forward.

05:16:17 10          The only thing I can think about there were some

05:16:20 11   statements in opening where counsel referred to some of the

05:16:22 12   meeting minutes, the doctor meeting minutes allegedly that

05:16:27 13   Dr. Schinazi instructed on.

05:16:30 14          That happened ten years earlier.  It was before

05:16:33 15   issuance of the patent.  And whatever it was, it wasn't

05:16:37 16   covering up infringement because no infringement was

05:16:38 17   occurring during that period.

05:16:40 18          Moving up a couple more bullet points.  Idenix's

05:16:45 19   second bullet point, whether or not Gilead intentionally

05:16:49 20   copied a product of Idenix that was covered by the '597

05:16:54 21   patent.

05:16:54 22          So we object to that because there was no

05:16:57 23   evidence of that, one way or another.  There had been a

05:16:59 24   bunch of suggestions about copying 2-methyl up generally.

05:17:04 25   So the accused product there is the 2'-methyl-fluoro

nucleoside, and there is no evidence it was copied from
Idenix.  So we think that the first clause of that is
inappropriate.

Similarly, with the second clause, whether or
not Gilead had intentionally copied the '597 patent.  Again,
we have seen no evidence at all that anyone at Gilead took
the '597 patent and copied it.  In fact, the only evidence
is to the contrary, Dr. Otto's testimony that he and
Mr. Clark looked at the '597 patent and only proceeded with
2'-methyl-fluoro after confirming it wasn't in the patent.

So with both of those, we think the problem is
because there was no evidence, if they were included in the
jury instruction, it might suggest to the jury there was
some evidence of that when in fact there hasn't been.

And then finally --

THE COURT:  What about this timing point --

MR. COUNTRYMAN:  Sure.

THE COURT:  -- in your proposal?

MR. COUNTRYMAN:  Sure.  So on the timing point,
we think the *Halo* case supports that.

THE COURT:  Haven't I already ruled to the
contrary?

MR. COUNTRYMAN:  Yes.  So we understand your
prior ruling.  Part of our inclusion of this here is just
to preserve the issue for appeal, our respectful

05:18:09 1    disagreement.

05:18:10 2             I would say to the extent Your Honor doesn't

05:18:12 3    want to include a bright line rule, perhaps some language

05:18:16 4    saying that the jury can consider the connection or the

05:18:20 5    distance in time between the acts that are alleged to occur

05:18:23 6    in 2003 and the actual infringement period in 2013 would be

05:18:26 7    appropriate because it seems like even if the Court isn't

05:18:29 8    willing to accept a bright line there, it is at least a

05:18:33 9    factor the jury can consider, how connected those things

05:18:35 10   are.

05:18:35 11            THE COURT:  That is re not language you

05:18:37 12   proposed, though, is it?

05:18:38 13            MR. COUNTRYMAN:  It is not, Your Honor, because

05:18:39 14   we believe the correct instruction is what we have here.

05:18:43 15   But we think at a minimum, that type of language would be

05:18:46 16   appropriate.

05:18:46 17            THE COURT:  Okay.  Thank you.

05:18:47 18            MR. COUNTRYMAN:  Thank you.

05:18:47 19            THE COURT:  I'm starting to worry about time,

05:18:50 20   but any response on this willful instruction?

05:18:53 21            MS. SWIZE:  Yes, Your Honor.  I'll try to be

05:18:55 22   brief.

05:18:56 23            I think much of what Mr. Countryman noted are

05:19:01 24   fact issues for the jury to decide, and these are entirely

05:19:04 25   appropriate instructions.  They come almost directly from

05:19:07 1    the model instructions from the Federal Circuit Bar

05:19:10 2    Association as to whether or not infringement was occurring

05:19:13 3    and Gilead tried to cover it up.

05:19:16 4              Infringement, the patent issued in 2009.  We

05:19:18 5    were not allowed to sue under Section 271(e) because of that

05:19:23 6    statute.  But the patent was out.  We introduced evidence

05:19:27 7    that Gilead continued to willfully use our patent, so we

05:19:32 8    feel like that particular point is appropriate.

05:19:34 9              As for the other bullet points, part of the *Halo*

05:19:39 10   standard is recklessness, so we think that is adequately

05:19:42 11   captured.

05:19:42 12             Willful blindness, as the Supreme Court has

05:19:45 13   recognized, has a mental state element to it, and we think

05:19:49 14   that carries over to the willful context.

05:19:52 15             On the particular point about Section 298 and

05:19:55 16   whether our last bullet can be considered, we were following

05:19:59 17   Federal Circuit precedent.  It is an unpublished case, I

05:20:02 18   recognize, but it is the only Federal Circuit case, *Suprema*,

05:20:06 19   626 Fed.Appx 273, which does say that Section 298 only

05:20:12 20   applies to patents that are issued under the AIA, meaning

05:20:16 21   after the AIA was passed, which is not our patent which was

05:20:19 22   issued before.

05:20:20 23             THE COURT:  All right.  Thank you.

05:20:22 24             Is there anything in response on that?

05:20:24 25             MR. COUNTRYMAN:  Nothing else, Your Honor.  The

05:20:26  1    *Suprema* case commenced before January 14th, 2003, so it

05:20:30  2    doesn't speak to the effective date issue.

05:20:33  3              THE COURT:  Let's move on to Section 8 on

05:20:36  4    invalidity.  Let's start, we're going to have break these

05:20:38  5    up, but on the first three, 8.1, 8.2, 8.3, are there any

05:20:46  6    remaining disputes?

05:20:47  7              MS. SWIZE:  I believe so, Your Honor.  On 8.1,

05:20:52  8    we did try very much to follow the Court's instruction in

05:20:55  9    *Tarkus*.

05:20:56 10              We do believe, and this came up I believe at the

05:20:59 11    pretrial conference.  Somewhere or another, the jury should

05:21:02 12    be instructed that the patent is presumed valid because the

05:21:05 13    PTO has looked at it and that carries with it a presumption

05:21:08 14    of validity.  And this is one place where we included that

05:21:12 15    and followed the prior instruction.

05:21:14 16              THE COURT:  Okay.  And then 8.2, is that, I

05:21:18 17    guess Gilead objects to that?

05:21:22 18              MS. SWIZE:  Yes.  I believe there is no

05:21:23 19    counterproposal from Gilead.  This was an instruction that

05:21:26 20    was given in the California case that we have heard about,

05:21:28 21    and it does seem highly appropriate here where the jury has

05:21:31 22    heard about multiple patents.  So an instruction that they

05:21:35 23    understand more than one patent can cover a product or its

05:21:39 24    use is just as appropriate here as it was in the prior case

05:21:42 25    involving Gilead.

05:21:44 1                THE COURT:  Okay.

05:21:45 2                MS. SWIZE:  Then 8.3 actually has been agreed to

05:21:48 3    both as to the content and the location since the level of

05:21:52 4    ordinary skill goes to the invalidity issue.

05:21:56 5                THE COURT:  Let's stop there and hear what

05:21:58 6    defendants want to say on 8.1 or 8.2.

05:22:03 7                MR. COUNTRYMAN:  Sure.  So with respect to 8.1,

05:22:06 8    Your Honor, our main objection is just that Idenix's

05:22:09 9    proposed construction keeps repeating the presumption over

05:22:12 10   and over and over and over, I presume occurs at least four

05:22:17 11   types here over the course of two sentences.

05:22:19 12               Your Honor, if there is just a single sentence

05:22:22 13   that says it's presumed valid, that is fine, but it just

05:22:25 14   keeps repeating.  It starts to get argumentive.

05:22:28 15               And I think the part of our proposal should also

05:22:31 16   be adopted because, yes, the patent is presumed valid but

05:22:34 17   despite that, it is still the jury's duty to consider

05:22:38 18   whether the claims are invalid, and so that concept should

05:22:42 19   also be incorporated into the section as well for balance.

05:22:45 20               For Section 8.2, Your Honor, we just don't see

05:22:49 21   the need to give this instruction in this case.  I would

05:22:53 22   also add that I think the presence of other patents, some

05:22:56 23   Federal Circuit cases have held that that is relevant to

05:22:59 24   willfulness, and so to the extent -- it is an instruction

05:23:03 25   as a defense to willfulness, so to the extent this is an

05:23:07 1 instruction that is suggesting that the jury can't consider

05:23:09 2 those at all, that is inappropriate and the case here would

05:23:12 3 be different than in the *Merck* case where the jury there

05:23:15 4 didn't have to consider willful infringement while the jury

05:23:18 5 here does have that as an issue to consider.  So we would

05:23:22 6 continue to object to that instruction.

05:23:24 7          THE COURT:  Okay.  Thank you.

05:23:25 8          Let's move on to the written description

05:23:29 9 dispute, 8.4.  And I know there were new submissions today,

05:23:32 10 but I'm still having trouble where the disputes are, so I'm

05:23:36 11 hoping you can focus me.

05:23:37 12          MS. SWIZE:  Okay.  I will do my best, Your

05:23:39 13 Honor.

05:23:39 14          What we did in the latest submission was to try

05:23:41 15 to follow something that the Court has given before so that

05:23:45 16 we could try to streamline it.  So our proposal under 8.4,

05:23:53 17 it follows all the way until there might be a sentence or

05:23:57 18 two that we feel are important that I can call out, and then

05:24:00 19 the final paragraph, all of which is supported by case law.

05:24:05 20          In the third paragraph of our proposal, we do

05:24:12 21 have a reference to what blaze marks are, which, since the

05:24:15 22 jury I believe has already heard that, we feel like that

05:24:18 23 that is appropriate to include in an objective, neutral way,

05:24:22 24 instructing the jury what blaze marks are.  So we inserted

05:24:25 25 that description in the third paragraph of our proposal.

05:24:30 1        We feel in the fourth paragraph, these are

05:24:34 2 instructions starting in the "moreover" paragraph:

05:24:39 3 Moreover, the written description requirement does not

05:24:42 4 require the specification to have specifically disclosed the

05:24:44 5 accused technology of the product or method, written

05:24:47 6 description requirement.  Also does not require that the

05:24:51 7 description in the specification include every conceivable

05:24:54 8 future embodiment, including later embodiments.

05:24:57 9        That is taken directly from the *Masimo*

05:25:00 10 instruction and applies directly to this case, so we think

05:25:03 11 that should be included.

05:25:04 12        And that in our final paragraph, because these

05:25:08 13 are claims that cover genus, we feel like some instruction

05:25:11 14 on that would be helpful to the jury, and that's what our

05:25:13 15 final instruction paragraph proposes coming from the *Pfizer*

05:25:17 16 and *Ariad* cases cited in our sources.

05:25:23 17        One of the problems we have with Gilead's

05:25:24 18 proposal beside I think not quite tracking any model

05:25:28 19 instruction is that it repeatedly refers to the original

05:25:32 20 specification.

05:25:33 21        I think that would be confusing to the jury

05:25:36 22 because we have a patent that claims priority to the 2000

05:25:40 23 application, but then there is also the 2001 utility

05:25:44 24 application, so any instruction that only mentions the

05:25:47 25 original application would be inaccurate in this case.

05:25:50 1        Another issue we have with Gilead's instruction,

05:25:55 2  they insert a shorthand of the claim construction.  And it

05:25:59 3  appears in a few instructions.  The jury is uninstructed on

05:26:03 4  what the claims mean.  They have the patent with them.  We

05:26:06 5  don't see that it would be appropriate at all to try to

05:26:08 6  capture what the Court has ruled since the jury has that

05:26:12 7  itself.  And, in fact, the shorthand is not accurate and

05:26:14 8  does not restate something that the Court ruled the claims

05:26:19 9  mean.

05:26:19 10        And we would also call out the final sentence in

05:26:27 11  the penultimate paragraph of Gilead's instruction that says

05:26:31 12  that the claim covers technology that had not been invented

05:26:34 13  by the time the patent was filed.  The patentee -- the

05:26:37 14  patentee cannot show possession of that technology.

05:26:40 15        We believe that is directly contrary to *Hogan*

05:26:43 16  and *Kohler* would be to instruct the jury in that respect.

05:26:48 17        THE COURT:  Okay.  Thank you.

05:26:50 18        Let me hear from Gilead on this one.

05:26:54 19        MR. COUNTRYMAN:  Thank you, Your Honor.

05:26:57 20        So the first thing I would like to note, there is

05:27:00 21  not much agreement, but I would like to note a place where

05:27:02 22  the parties agree, which is that the written description and

05:27:05 23  enablement instructions should both say that a patent has to

05:27:09 24  describe and enable the full scope of the claims.

05:27:12 25        Here, because the patent needs to describe and

05:27:16 1    enable the full scope, the instruction about the patent

05:27:19 2    not needing to describe or enable the accused product is

05:27:24 3    incorrect as a matter of law.

05:27:27 4         I know that instruction was given in the *Masimo*

05:27:30 5    case, but the facts there were very different.  There, the

05:27:32 6    patent covered just a small component of a much more

05:27:35 7    complicated product.

05:27:36 8         So it was an absolutely correct statement of

05:27:40 9    the law to say that the patent would need to describe or

05:27:43 10   enable the entire product because it was just covering the

05:27:46 11   component, so it would just need to describe or enable the

05:27:49 12   component.

05:27:50 13        Here, what we have something very different.

05:27:51 14   And I would say the concern where that comes up in Federal

05:27:54 15   Circuit case law is the idea that you don't need to describe

05:27:56 16   or enable unclaimed features.  So when the Federal Circuit

05:28:01 17   uses that terminology, that is what it's talking about.

05:28:03 18        Here, we have claims that are directed to a

05:28:06 19   method of using a molecule that, in the case of Sovaldi, is

05:28:12 20   the molecule that is in the drug or, in the case of Harvoni,

05:28:13 21   is one of the two molecules.  So there is no concern here

05:28:17 22   about the jury thinking that the patent has to describe or

05:28:22 23   enable unclaimed features.

05:28:24 24        And, in fact, the patent does need to describe

05:28:27 25   or enable the 2'-methyl up fluoro down because the claims

05:28:34 1    squarely read on that.

05:28:36 2            So it would be erroneous to give the language

05:28:41 3    that the claim doesn't need to describe or enable the

05:28:46 4    accused product because it needs to describe and enable the

05:28:51 5    full scope of the invention.  So we object to that sentence

05:28:55 6    being given here.

05:28:56 7            With respect to blaze marks, I think, again,

05:28:59 8    both parties agree there should be a blaze marks

05:29:02 9    instruction.  I think in Idenix's proposal, it misstates the

05:29:05 10   law of blaze marks.  It adds to the generic instruction

05:29:10 11   about written description, you can look towards structures

05:29:14 12   and figures and say that these are often called blaze marks.

05:29:17 13           But the cases we cited in our instruction,

05:29:19 14   *Boston Scientific*, *Fujikawa*, et cetera, all say that you

05:29:27 15   need more for blaze marks.  What you really need is

05:29:31 16   something in the patent that directs the skilled artisan to

05:29:34 17   the claimed invention and distinguishes it from other

05:29:36 18   materials.  That is what the legal requirement we've tried

05:29:39 19   to reflect in that additional paragraph in our instruction,

05:29:42 20   and that is something that is absent from Idenix's

05:29:45 21   construction.  It is something that should be given to the

05:29:47 22   jury.

05:29:48 23           Just couple other points from Idenix's

05:29:51 24   instruction.  There are just some things in here that we

05:29:55 25   think are too argument for jury instructions.

05:29:58  1          For example, there is a reference to pioneering

05:30:03  2  invention receiving broad patent scope.

05:30:05  3          Obviously, that is hotly disputed here whether

05:30:09  4  Idenix's invention is pioneering.

05:30:12  5          Also, with respect to the Idenix paragraph about

05:30:15  6  describing genus claims, it talks about the way in which we

05:30:19  7  need to describe a genus claim.  I think many of their

05:30:24  8  statements from the case law are incomplete.  There are some

05:30:29  9  things they have taken out of *Ariad* but they omitted some

05:30:31 10  things that come earlier with *Ariad* and some things that

05:30:34 11  come later.

05:30:34 12          So to us, the more reasonable approach is to

05:30:37 13  just omit the whole paragraph and stick with something

05:30:40 14  closer to the model.  But to the extent that we are going to

05:30:43 15  include those types of things, the Court should include the

05:30:45 16  full context from *Ariad* and not just little snippets from

05:30:51 17  the case.

05:30:52 18          THE COURT:  The forest and the trees, is that

05:30:55 19  from the model?

05:30:57 20          MR. COUNTRYMAN:  It is not, Your Honor.  It is

05:30:58 21  from the Federal Circuit case law.  And, honestly, I think

05:31:02 22  it's just kind of a goose/gander situation.  To the extent

05:31:06 23  that plaintiffs propose argumentive language, we tried to

05:31:10 24  balance it.  I think we would be happier if the argument

05:31:13 25  language on both sides were instructive.

05:31:17  1                    THE COURT:  Thank you.

05:31:18  2                    MR. COUNTRYMAN:  Thank you.

05:31:18  3                    THE COURT:  Okay.  Is there anything further on

05:31:22  4    written description?

05:31:15  5                    THE COURT:  Okay.  Thank you.  Anything further

05:31:17  6    on written description?

05:31:19  7                    MS. SWIZE:  Just to reiterate, Your Honor, that

05:31:24  8    it would not be appropriate to instruct the jury that the

05:31:26  9    patent has to describe and enable later inventors.  That is

05:31:32 10    directly contrary to *Hogan* and *Kohler*.  We feel in deciding

05:31:36 11    exactly what the Masimo instructions say, everything before

05:31:39 12    our final paragraph, setting aside the Blaze Mark sentence

05:31:44 13    which I think is very objectively stated, obviously Gilead's

05:31:51 14    counsel agrees, then the pioneering statement, it is the

05:31:54 15    *Masimo* instruction.  We understand trying to find something

05:31:57 16    that has worked before, and everything didn't except the

05:32:03 17    final paragraph falls outside the *Masimo* instruction.

05:32:06 18                    THE COURT:  Mr. Countryman, anything further?

05:32:11 19                    MR. COUNTRYMAN:  Your Honor.  I neglected to

05:32:13 20    mention it the first time I was up there, this issue about

05:32:17 21    the later invented technology.

05:32:18 22                    So we think that's an incorrect statement of the

05:32:20 23    law.  We don't think that correctly describes the holdings

05:32:24 24    of Hogan and Kohler.

05:32:25 25                    We proposed a competing sentence in our

instruction that I think Idenix has objected to where we say if the claim covers technology that had not been invented by the time the patent was filed, the patent cannot show possession of that technology and the claim is invalid for lack of written description.

That is a statement of law directly out of the *Chiron* case that we have cited in our list of authority.

So we think that that is the correct version of the law there, not the language about later developed technology that Idenix has pointed to.

One last thing on the *Masimo* case, too. I would note that the parties have agreed ultimately on the written description and enablement instructions, there may be language in those instructions that gets in that isn't appropriate here where one party is objecting to it.

Thank you.

THE COURT: We truly are running out of time. Let's talk about enablement, hopefully quickly. 8.5.

MS. SWIZE: We were able to agree at least on the *Wands* factors. The second portion, I believe the principal disputes we have, Gilead's proposals is again the attempt to restate the claim construction, which we -- the claim construction, which doesn't belong in any instruction,

Then I would like to note in the final paragraph, it's agreed to on the how to use prong. But we

05:33:59 1    would like to know if there is a way to know -- I don't know

05:34:01 2    that utility is in the case anymore.  I would point that out

05:34:05 3    that may be an issue we bring to the Court.

05:34:07 4          Then the final sentence about a patent needing

05:34:10 5    to obtain FDA approval, that doesn't seem to be disputed.

05:34:13 6    Just as a reminder, at the July 26 hearing, there was a

05:34:18 7    conversation with Gilead's counsel that there would be an

05:34:23 8    objection to an instruction that a patent doesn't need FDA

05:34:28 9    approval and it didn't sound like Gilead's counsel would be

05:34:31 10   objecting to that.

05:34:32 11         THE COURT:  It doesn't appear to be objected to

05:34:34 12   in your version.

05:34:35 13         MS. SWIZE:  That's correct.

05:34:36 14         THE COURT:  Mr. Countryman.

05:34:39 15         MR. COUNTRYMAN:  Thank you, Your Honor.  So many

05:34:41 16   of the issues here overlap with what we have discussed

05:34:44 17   before.  The enablement -- the statement that enablement

05:34:48 18   doesn't require the specification to enable the accused

05:34:50 19   product or later invented products, we believe that is an

05:34:53 20   incorrect statement of the law.

05:34:55 21         Again, the specification has to enable the full

05:34:57 22   scope of the claims, which here include as construed by the

05:35:01 23   Court, 2'-methyl up 2'-fluoro down.

05:35:04 24         Therefore, there wouldn't be a showing that the

05:35:06 25   rest of embodiments are enabled by the patent.  So we object

05:35:10 1   to that sentence.

05:35:13 2          Likewise, the sentence about enablement not

05:35:15 3   requiring inventor to foresee every means in implementing

05:35:20 4   his invention, that strikes us argumentative, and not the

05:35:24 5   type of thing that should be included in a jury instruction.

05:35:27 6   I think, here, the problem is the patent doesn't enable any

05:35:33 7   means of making a 2'-methyl up 2'-fluoro down.  That is the

05:35:37 8   issue, not the sentence in the instruction.

05:35:42 9          The third point that I just note that is

05:35:44 10  included in our instruction is the sentence that if an

05:35:48 11  inventor attempts but fails to make an embodiment of the

05:35:52 12  patented invention, that is strong evidence that the patent

05:35:55 13  specification lacks enablement.  That is a statement of law

05:35:57 14  that comes from the *ALZA* case that is cited in our

05:36:02 15  authority.  It is also supported by the *Ormco* case.  And we

05:36:06 16  think it would be appropriate, given the evidence we have

05:36:09 17  seen of Idenix's failures to make a 2'-methyl up 2'-fluoro

05:36:13 18  down compound.  We think that additional instruction is

05:36:17 19  appropriate here.

05:36:19 20          THE COURT:  Okay.  Anything else on this one?

05:36:22 21          MS. SWIZE:  Only, Your Honor, that the *Ormco*

05:36:29 22  statement is from an entirely different situation.  In that

05:36:33 23  case, nobody could make this mouth device at all, neither

05:36:38 24  the plaintiff or the defendant.  That's not the situation we

05:36:40 25  have here.  We don't think that would be at all factually

05:36:44 1   analogous to include in this case. Sort of the goose-gander

05:36:47 2   rule, it starts to get argumentative. We did on enablement

05:36:50 3   try to follow the *Masimo* instructions that have been given

05:36:53 4   on that issue.

05:36:54 5         THE COURT: Anything you want to respond on to

05:36:55 6   that?

05:36:57 7         MR. COUNTRYMAN: No, Your Honor.

05:36:58 8         THE COURT: All right. Why don't you use a few

05:37:04 9   minutes on the rest of Section 8. We may not get much

05:37:08 10   further than that tonight. We still have quite a few in

05:37:18 11   dispute.

05:37:18 12         MS. SWIZE: They are essentially the bucket of

05:37:20 13   instructions on 101 and 102. So I would like to reiterate,

05:37:27 14   again, our position that at some point in the jury

05:37:32 15   instructions, and this would be an entirely appropriate

05:37:35 16   place in the anticipation contentions, that we have a

05:37:38 17   proposal for and Gilead does not. This is a standard way to

05:37:43 18   instruct the jury on what exactly the invalidity or

05:37:47 19   anticipation contentions are, and to identify what the

05:37:51 20   asserted prior art is.

05:37:53 21         It's particularly important in this case because

05:37:55 22   the asserted prior art setting aside, the '224 patent is a

05:38:01 23   prior invention which requires a mental state element of

05:38:06 24   recognition and appreciation, the conception and reduction

05:38:09 25   to practice requirements. It requires a person to have that

to believe they conceived an invention and bring steps to
bring it to the public without abandonment, expression or
concealment, and to identify exactly who that inventor
allegedly is when they did their work, and a general
description of their work, is entirely appropriate.  And
that is what we have done in setting forth the contentions.

We did not get any invalidity contentions on
these issues in the case.  So we didn't have any particular
model to follow from, but we certainly used the expert
reports that Gilead has relied on for these theories.

So as objectively as possible we went through
and identified the alleged inventor, when the alleged
invention happened, and tried to give the jury some
instructions as to which issues applied depending on our
priority date.

We do feel this follows a very standard
procedure of instructing a jury on what invalidity
contentions are under 102 and 103.  And again, because this
is 102(g), it is particularly important to have the jury
make a decision based upon a specific alleged inventor, and
turn to the others, unless you would like me to pause there.

THE COURT:  Tell me, on obviousness, what's the
objection to instructing on obviousness?

MS. SWIZE:  It relates to the point I just made
in the sense that this is a special kind invalidity case,

because the 103 issue came into this case only because of the Merck work, which came in because Gilead was seeking discovery and was waiting to see what was happening in the California case. So 103 was added on in the sense that if the asserted prior invention, Dr. Olsen in '98 or Dr. Olsen in 2000, didn't meet all of the claim limitation, then they were arguing 103, sort of to fill the gaps for some of the dependent claims.

There has never been a 103 issue in the case, certainly not in the sense of independent of the Merck work. We have had multiple briefing on this. Your Honor knows. It has been clearly represented that 103 is in the case only if there is 102(g) art. There is abundant Federal Circuit authority explaining this process of first having to find 102(g) art to become 103 prior art. Our position is the jury should clearly be instructed that if they do not find 102(g) art, there is no obviousness decision in the case. And it would be highly prejudicial to Idenix and erroneous to let the jury somehow think there is this amorphous 103 issue based broadly on the prior art unless the jury first finds, going through all of the steps for prior invention, that there is 102(g) art.

THE COURT: If we adopted all of your instructions on Section 8, would that accomplish what you have just described as the goal, in your understanding of

05:41:20 1    the law?

05:41:21 2              MS. SWIZE:  Yes, Your Honor.

05:41:25 3              What we have done in this section, we did try to

05:41:29 4    streamline, because they were entirely separate competing

05:41:33 5    proposals and we recognize that's not helpful.  So we took

05:41:36 6    Gilead's model of order in which they went through the

05:41:41 7    issues, but did insert, instead of saying Merck work, needed

05:41:45 8    to identify a particular anticipation theory that Gilead is

05:41:49 9    asserting, and again because 103 is in this case only

05:41:52 10   because of 102(g), the traditional instructions, five or six

05:41:57 11   of them on obviousness, are just not appropriate here.

05:42:00 12   There shouldn't be an instruction on the scope, the content

05:42:02 13   of the prior art.  It's sort of analysis of obviousness

05:42:07 14   because it only comes into play if there is 102(g) art then

05:42:12 15   they should be streamlined in the sense that we had proposed

05:42:15 16   in our obviousness instruction.

05:42:16 17             THE COURT:  And then in the new version we

05:42:19 18   received on 8.7 on priority date, agreed in part.  There is

05:42:24 19   still a dispute who has the burden with respect to the

05:42:27 20   priority date.  It's the first two disputed sentences.

05:42:31 21   Could you just speak to that.

05:42:33 22             MS. SWIZE:  Yes, Your Honor.  The *Tech Licensing*

05:42:35 23   case from the Federal Circuit which is cited from the

05:42:38 24   authorities, 545 F.3d 1366, I think that is a very nice job

05:42:45 25   of straightening out a very complicated issue.  There are

shifting burdens of production but never a shifting burden of persuasion.

This would be a strange instruction, to have the jury told that we have the burden of coming forward with evidence. We have done that. If it is going to the jury, we have done that. I don't think that is a typical instruction. They are instructed on what they are to decide, which is the burden of persuasion.

So we would object to Gilead's proposal that starts to inject this burden of production. It is ultimately Gilead's version on invalidity either to show it has some sort of anticipating prior art, which folds within it what our priority date is. That is straight out of the *Tech Licensing* case.

THE COURT: Okay. Thank you. Let me hear from defendant.

MR. COUNTRYMAN: So a couple of points. First, with respect to this instruction, 8.6, characterizing the different theories, we think that's inappropriate for jury instructions. Our proposals that we have laid out in Section 8.8 and 8.9 just the tell the jury all it needs to know. Gilead contends that certain claims are invalid based on Merck's work or based on Merck's prior patent. That is typically the level of detail we have seen in prior jury instructions. That is typically what we think is

05:44:10 1    appropriate.  The parties are free to argue their own

05:44:13 2    characterizations of the evidence in closing argument.

05:44:16 3              THE COURT:  Don't we at least need to know what

05:44:19 4    it is you are going to argue, what are your 102 and 103

05:44:23 5    contentions?

05:44:24 6              MR. COUNTRYMAN:  Right.  At this point, I think

05:44:27 7    it's at this point that Merck first reduced to practice the

05:44:31 8    claimed invention and didn't abandon, express or conceal it.

05:44:35 9    There are two reductions to practice that we have shown,

05:44:38 10   both in 1998 and in 2000, and the subsequent work continuing

05:44:44 11   shows that Merck didn't abandon it.  But we think that is

05:44:48 12   something the parties can lay out in their arguments.

05:44:50 13             THE COURT:  Is that 102 or 103?

05:44:53 14             MR. COUNTRYMAN:  That is 102(g).  But in the

05:44:55 15   alternative, to the extent the jury doesn't find it's

05:44:59 16   102(g), we also have an obviousness argument.  On that

05:45:02 17   point, I would say this was briefed in the summary judgment

05:45:05 18   briefing.  We explained our obviousness argument in the

05:45:07 19   context of that briefing.

05:45:10 20             Yes, we have a 102(g), we can establish that

05:45:15 21   many of the claims were anticipated under 102(g).  But there

05:45:17 22   is Federal Circuit case law that says that even if you don't

05:45:21 23   have a 102(g) reduction to practice, the evidence is still

05:45:27 24   relevant from obviousness to show, for example, the level of

05:45:29 25   ordinary skill in the art, things like that.

05:45:32 1          So we don't agree with the characterization of

05:45:34 2     law that there has to just be a 102(g) reduction to practice

05:45:38 3     before you even get to an obviousness analysis.

05:45:42 4          The Federal Circuit has held to the contrary.

05:45:46 5          So, again, we think that that's why, kind of

05:45:51 6     getting into all of this detail and all the possible

05:45:54 7     permutations in the jury instructions makes it unwieldy,

05:45:58 8     especially on this conception and reduction to practice,

05:46:00 9          Your Honor, there is a lot of different

05:46:02 10    iterations that can occur, depending on when the jury finds

05:46:06 11    that Merck conceived or Idenix conceived.  To try and spell

05:46:10 12    out all those possible permutations here we don't think is

05:46:14 13    helpful.

05:46:14 14         We think a general instruction that orients the

05:46:17 15    jury on all the issues is all that is needed and the parties

05:46:21 16    can argue base on the evidence the theories they think are

05:46:25 17    appropriate.

05:45:57 18         THE COURT:  Does the jury need to be told there

05:46:25 19    is not some sort of freewheeling obviousness defense?

05:46:29 20         MR. COUNTRYMAN:  I don't think so, Your Honor.

05:46:30 21    I mean we think that the law would actually suggest that the

05:46:35 22    jury can consider the scope and content of all of the prior

05:46:39 23    art that has been put forth at trial.  That is appropriate.

05:46:43 24         And in the context of obviousness, we're asking

05:46:46 25    for instructions on the *Graham* factors.  It is something

05:46:48  1   that happens in every case; and I think what Idenix is

05:46:51  2   asking for is something that we haven't seen done before and

05:46:55  3   is a departure from the practice, kind of limits the

05:46:58  4   obviousness analysis to a particular silo.  All we're asking

05:47:02  5   for on obviousness is an instruction based on the typical

05:47:06  6   *Graham* factors that are always given.

05:47:08  7            THE COURT:  Okay.

05:47:09  8            MR. COUNTRYMAN:  Thank you.

05:47:09  9            THE COURT:  Thank you.  Is there any response?

05:47:11 10            MS. SWIZE:  Yes, Your Honor.  What we just heard

05:47:15 11   is that all the jury needs to know is what they have.  I

05:47:19 12   don't know what the issues are.  If the assertion is that

05:47:23 13   Merck first created something, that should not go to the

05:47:26 14   jury because Merck can't be an inventor of anything.  There

05:47:30 15   needs to be a person at Merck that is identified, and that

05:47:33 16   is all we have in Gilead's instructions is a very amorphous

05:47:36 17   instruction that Merck did something first, not any

05:47:41 18   particular person.

05:47:41 19            We cannot have the jury under the impression

05:47:44 20   that what would be 102(g) art they don't find somehow can be

05:47:49 21   converted into a 103 case.  The Federal Circuit case has

05:47:53 22   been very clear that that is not an appropriate use of prior

05:47:57 23   background general knowledge.  The *Tyco* case, the

05:48:02 24   *Kimberly-Clarke* case.

05:48:02 25            It would be somehow inappropriate to let the

05:48:05 1   jury think that they can take general discussions of

05:48:09 2   privately done work that does not satisfy 102(g) and somehow

05:48:13 3   convert this into a 103 issue, which is a new issue, is not

05:48:17 4   the discovery that was conducted in this case.  It is a

05:48:20 5   moving target.  The jury as well as Idenix should understand

05:48:20 6   what it can consider invalidity assertions that are asserted

05:48:27 7   certainly at this point in the trial before the jury

05:48:29 8   deliberates.

05:48:30 9           THE COURT:  Okay.  Is there anything else on

05:48:32 10  that?

05:48:33 11          MR. COUNTRYMAN:  Just one thing, Your Honor.

05:48:34 12  And I neglected in my initial remarks to talk about the

05:48:37 13  burden of proof and production and priority dates.

05:48:40 14          So let me just say we think the cases cited

05:48:44 15  here, both the *PowerOasis and* the *Technology Licensing* case

05:48:48 16  does say the they have the burden of production and burden

05:48:53 17  of coming forward with evidence.

05:48:53 18          THE COURT:  The question is why the jury needs

05:48:54 19  to hear that.

05:48:55 20          MR. COUNTRYMAN:  Because I think it is our

05:48:56 21  position they haven't met that burden of production.

05:48:58 22          THE COURT:  If they haven't met that burden,

05:49:00 23  presumably you will make a motion and it will be granted.

05:49:04 24  Is it really an issue for the jury?

05:49:06 25          MR. COUNTRYMAN:  We think the jury should be

05:49:08  1    instructed on the totality of the burdens, both the burden

05:49:12  2    of production and burden of persuasion.  Otherwise, it would

05:49:15  3    be an incomplete statement of law.

05:49:17  4                THE COURT:  All right.  Well, I apologize.  I

05:49:19  5    actually do have somewhere I have to be so I have to leave.

05:49:21  6                I know we need to do argument on damages and

05:49:23  7    talk about the verdict sheet.  I won't be instructing the

05:49:26  8    jury before Wednesday, and I will certainly make time for

05:49:29  9    this and any other issues before then.  Something very

05:49:32 10    pressing?

05:49:33 11                MR. GRIFFITH:  Just a real quick question.

05:49:35 12                THE COURT:  Yes.

05:49:35 13                MR. GRIFFITH:  As I understand it, under the

05:49:37 14    pretrial order, directed verdict motions are not due until

05:49:40 15    all the evidence is in in the case, not after their

05:49:46 16    case-in-chief is complete.

05:49:47 17                THE COURT:  If that is what the order says.  I

05:49:49 18    don't recall offhand what the order says.

05:49:49 19                MR. GRIFFITH:  Okay.

05:49:50 20                THE COURT:  It varies case by case, at least in

05:49:54 21    my courtroom.

05:49:54 22                So, is there anything else pressing?  No?

05:49:57 23                MS. SWIZE:  No.

05:49:58 24                THE COURT:  Is there anything from defendants?

05:49:59 25                MR. COUNTRYMAN:  No.

05:49:59  1          THE COURT:  All right.  We'll see you tomorrow

05:50:00  2    morning.

05:51:47  3               (Proceedings adjourn at 5:50 p.m.)

          4

          5          I hereby certify the foregoing is a true and accurate
             transcript from my stenographic notes in the proceeding.
          6

          7                          /s/ Brian P. Gaffigan
                                    Official Court Reporter
          8                          U.S. District Court

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25