1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

4    IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
     DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
5    DE LA RECHERCHE SCIENTIFIQUE and          :
     L'UNIVERSITE MONTPELLIER II,              :
6                                              :
              Plaintiffs,                      :
7    v                                         :
                                               :
8    GILEAD SCIENCES, INC. and GILEAD          :
     PHARMASSET LLC,                           :
9                                              :
              Defendants.                      :  NO. 13-1987-LPS
10   -----------------------------------------
     IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
11   DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
     DE LA RECHERCHE SCIENTIFIQUE and          :
12   L'UNIVERSITE MONTPELLIER II,              :
                                               :
13            Plaintiffs,                      :
     v                                         :
14                                             :
     GILEAD PHARMASSET LLC,                    :
15                                             :
              Defendant.                       :  NO. 14-109-LPS
16   -----------------------------------------
     IDENIX PHARMACEUTICALS, INC.,             :  CIVIL ACTION
17                                             :
              Plaintiff,                       :
18   v                                         :
                                               :
19   GILEAD SCIENCES, INC.                     :
                                               :
20            Defendant.                       :  NO. 14-846-LPS
                                   - - -
21
                        Wilmington, Delaware
22                    Tuesday, December 13, 2016
                        *Jury Trial - Volume G*
23
                               - - -
24
     BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
25
                               - - -

1 **APPEARANCES:**

2

3        **ASHBY & GEDDES, P.A.**
       **BY:  JOHN G. DAY, ESQ.**

4            **and**

5        **McCARTER & ENGLISH**
       **BY:  MICHAEL P. KELLY, ESQ.**

6            **and**

7

8        **JONES DAY**
       **BY:  CALVIN P. GRIFFITH, ESQ.,**
           **RYAN B. McCRUM, ESQ.,**

9            **MICHAEL S. WEINSTEIN, ESQ., and**
           **BRADLEY W. HARRISON, ESQ.**

10            **(Cleveland, Ohio)**

11            **and**

12        **JONES DAY**
       **BY:  JENNIFER L. SWIZE, ESQ.**

13            **(Washington, District of Columbia)**

14            **and**

15        **JONES DAY**
       **BY:  STEPHANIE E. PARKER, ESQ., and**

16            **JESIKA W. FRENCH, ESQ.**
           **(Atlanta, Georgia)**

17            **and**

18

19        **JONES DAY**
       **BY:  JOHN D. KINTON, ESQ., and**
           **ANTHONY M. INSOGNA, ESQ.**

20            **(San Diego, California)**

21            **and**

22        **JONES DAY**
       **BY:  JOHN M. MICHALIK, ESQ., and**

23            **LISA L. FURBY, ESQ.**
           **(Chicago, Illinois)**

24                 **Counsel for Plaintiffs**

25

1    APPEARANCES:   (Continued)

2

3            FISH & RICHARDSON, P.C.
         BY:  MARTINA TYREUS HUFNAL, ESQ.,
              DOUGLAS E. McCANN, ESQ.,
4             JOSEPH B. WARDEN, ESQ.,
              SANTOSH COUTINHO, ESQ.,
5             ROBERT OAKES, ESQ., and
              KELLY ALLENSPACH DEL DOTTO, ESQ.

6

7            and

8            FISH & RICHARDSON, P.C.
         BY:  FRANK SCHERKENBACH, ESQ., and
              JENNY SHMUEL, ESQ.
9             (Boston, Massachusetts)

10

11           and

         FISH & RICHARDSON, P.C.
         BY:  JUANITA BROOKS, ESQ.,
12            W. CHAD SHEAR, ESQ.,
              CRAIG COUNTRYMAN, ESQ., and
13            JONATHAN E. SINGER, ESQ.
              (San Diego, California)

14

15           and

16           FISH & RICHARDSON, P.C.
         BY:  MICHAEL R. HEADLEY, ESQ.,
              JOHN M. FARRELL, ESQ., and
17            DALIA KOTHARI, ESQ.
              (Redwood City, California)

18

19           and

20           FISH & RICHARDSON, P.C.
         BY:  TASHA FRANCIS, ESQ.
              (Minneapolis, Minnesota)

21

                    Counsel for Defendants

22

23

24   Valerie Gunning                  Brian P. Gaffigan
     Official Court Reporter          Official Court Reporter

25

- oOo -

**P R O C E E D I N G S**

(REPORTER'S NOTE:  The following jury trial was held in open court, beginning at 8:34 a.m.)

THE COURT:  Good morning.

(The attorneys respond, "Good morning, Your Honor.")

THE COURT:  Are there issues from the plaintiffs this morning?

MS. PARKER:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. PARKER:  I think these are by agreement. Mr. Scherkenbach and Mr. Day and I talked this morning.  So I think we agree, if Your Honor does.  In preparing for closing, we just had a few issues to confirm.

If Your Honor would permit us, we would like, both sides would like to use the actual trial transcripts in closing to put them up on the screen.  We would like to use the actual video depositions that are in evidence up on the screen.  We would like to use the actual verdict form, put it up on the screen and fill that out however we want to fill that out.  And in terms of the time for closings, each side will have just whatever time we have left over out of the 22 hours that we have permitted for each side.

So that's what I think both of us agree, if that

08:35:18  1    meets with Your Honor's approval?

08:35:20  2            THE COURT:  With just one caveat.  If that is a

08:35:25  3    joint proposal, it's fine by me.

08:35:27  4            Mr. Scherkenbach.

08:35:28  5            MR. SCHERKENBACH:  It's agreed.

08:35:28  6            THE COURT:  Okay.  The only thing is with the

08:35:31  7    closings, if anyone is thinking of saving four or five or

08:35:37  8    six hours, then not agreeable.  But assuming you are

08:35:41  9    planning to save something on the order of two hours or

08:35:44 10    less, then that is fine.  That is what you intend?

08:35:47 11            MS. PARKER:  No more than two hours and probably

08:35:49 12    less.

08:35:49 13            THE COURT:  Mr. Scherkenbach?

08:35:50 14            MR. SCHERKENBACH:  I won't have two hours.

08:35:51 15            THE COURT:  Right.  Then all of that is fine.

08:35:56 16            MS. PARKER:  Thank you, Your Honor.

08:35:56 17            THE COURT:  Other things from the plaintiffs?

08:35:59 18    No?

08:35:59 19            (Ms. Parker sits down.)

08:36:00 20            THE COURT:  Is there anything else from

08:36:01 21    defendants?

08:36:05 22            Good morning.

08:36:06 23            MR. WARDEN:  Good morning, Your Honor.  Two

08:36:07 24    issues.

08:36:07 25            And, Your Honor, I think in fact the first issue

08:36:09 1    is an issue that needed to be raised by the plaintiffs.

08:36:13 2    They have informed us in the cross-examination of

08:36:16 3    Dr. Putnam, they intend to get into some information about

08:36:22 4    other litigation.

08:36:24 5        I won't go into specifics because of

08:36:27 6    confidentiality issues but it has to do with the

08:36:28 7    confidential third-party information that was discussed

08:36:30 8    yesterday morning.

08:36:31 9        Our view is under the Court's rulings at the

08:36:35 10   pretrial conference, they need to first seek leave to do

08:36:38 11   that and they haven't done that.  So at the most part, we

08:36:42 12   think this should be on their dime as far as the time

08:36:45 13   charged for it; and if they're going to actually seek leave,

08:36:47 14   we would need to close the courtroom to put on the record

08:36:50 15   our view on what should or should not be allowed.

08:36:52 16        THE COURT:  Okay.  Well, why don't you go on to

08:36:55 17   your next issue then.

08:36:56 18        MR. WARDEN:  The next issue is related, Your

08:36:58 19   Honor; and we would actually like to just clarify and

08:37:00 20   perhaps ask the Court to revisit part of its decision from

08:37:04 21   yesterday.  I'll be very brief on this, Your Honor.

08:37:06 22        If I may just hand up a couple of demonstratives

08:37:11 23   and highlighted portion of Dr. Putnam's transcript.  I've

08:37:15 24   got copies for plaintiff as well.

08:37:16 25        THE COURT:  Sure.

08:37:17  1                 (Documents passed out to opposing counsel.)

08:37:21  2                 MR. HARRISON:  Your Honor, I think in an

08:37:23  3    abundance of caution, given what I'm going to have to say

08:37:25  4    and given where we're going to go, this all relates to the

08:37:28  5    stuff that was sealed yesterday.  We're going to have to for

08:37:32  6    my argument.  We might as well do it and just be done with

08:37:34  7    it.

08:37:35  8                 THE COURT:  You would like to seal the

08:37:37  9    courtroom.

08:37:37 10                 MR. HARRISON:  We should seal the courtroom.  I

08:37:39 11    don't think we can discuss it without.  I don't want an

08:37:42 12    inadvertent slip up.

08:37:43 13                 THE COURT:  Mr. Warden, do you disagree?

08:37:45 14                 MR. WARDEN:  No, no problem.

08:37:46 15                 THE COURT:  We'll go ahead and close the

08:37:49 16    courtroom.  We'll ask anyone who is not permitted to be here

08:37:50 17    for the discussion of the confidential information to step

08:37:53 18    out.  You can pass those up while we're waiting.

08:37:56 19                 (Document passed forward.)

08:37:56 20                 (Following portion ordered sealed by the Court,

08:37:56 21    bound separately.)

08:53:28 22                 *     *     *

08:53:28 23                 (Courtroom opened.)

08:53:32 24                 MR. KINTON:  Good morning, Your Honor.  You may

08:53:34 25    recall that during Dr. Sofia's testimony, counsel for Gilead

asked Dr. Sofia and pointed to Dr. Standring and said, you
know, at any of the scientific meetings, did Dr. Standring
accuse Pharmasset of taking Idenix information?

And the purpose of the testimony is, first of
all, all of these exhibits are in evidence, and the purpose
is really to ask if Dr. Standring was aware of those
documents and that information before he sat in the
courtroom and saw them. So I think that on the basis that
he has seen them, you know, while sitting here in the
courtroom, and it's really to rebut the implication that was
drawn during Dr. Sofia's testimony.

THE COURT: Is he generally going to say he was
aware of them or unaware of them?

MR. KINTON: Unaware of them.

THE COURT: Thank you.

MR. McCANN: Your Honor, I think it's really
going to be an issue of question by question. If that's the
gist of the testimony, that's fine. If the witness is, you
know, going more into detail into something that he has no
personal knowledge of, I would object at that time. I do
think the documents themselves are things about which he has
no personal knowledge and the Court should not allow the use
of the documents, but rather only the recitation of what he
heard.

THE COURT: All right. Well, I'm going to

08:54:44 1    overrule the objection for now.  Based on the use I

08:54:51 2    understand as intended, it seems fair game to me.  If

08:54:53 3    anybody thinks that a particular question is objectionable,

08:54:55 4    you can object at the time.

08:54:57 5              Any other issues from defendants?

08:55:01 6              MR. HARRISON:  No, Your Honor.

08:55:04 7              MR. SCHERKENBACH:  No, Your Honor.

08:55:05 8              THE COURT:  We'll take a break in a moment and

08:55:06 9    hope that the jury is here.

08:55:09 10             I think the jury may be concerned as they often

08:55:11 11   are whether we're on track.  We know that we are on track.

08:55:16 12   My inclination is to tell them that we expect the evidence

08:55:20 13   to be completed tomorrow and that what happens after the

08:55:28 14   evidence is jury instructions and then closing arguments,

08:55:32 15   that we may begin the instructions as early as tomorrow and

08:55:36 16   that we fully anticipate having closing arguments Thursday

08:55:40 17   morning.

08:55:41 18             Is there any objection to me telling that much

08:55:43 19   to the jury?

08:55:43 20             MR. PARKER:  No.  Thank you, Your Honor.

08:55:45 21             MR. SCHERKENBACH:  No objection.

08:55:46 22             THE COURT:  All right.  Okay.  Then I will plan

08:55:47 23   to do that when we come back in with them.

08:56:35 24             (Brief recess taken.)

09:02:43 25             THE COURT:  The jurors are all here so we'll

09:02:47 1  bring them in.

09:02:48 2          We'll have the witness back on the stand.

09:02:59 3          Good morning.

09:02:59 4          THE WITNESS:  Good morning.

09:03:05 5          (Jury returned.)

09:04:20 6          THE COURT:  Good morning, members of the jury.

09:04:22 7  Welcome back.

09:04:24 8          I wanted to begin by just giving you an update

09:04:26 9  as to where we are.  I know if, as I have said before, it

09:04:30 10 often looks like maybe we're not moving as we think we

09:04:34 11 would, but we are.  I assure you we are moving at the pace

09:04:38 12 we anticipated.

09:04:40 13         And just to give you an idea as to what we

09:04:43 14 anticipate will happen next is we expect to finish the

09:04:47 15 evidence portion of the trial by some time tomorrow.

09:04:52 16         As you know, today is a relatively short day

09:04:55 17 until 3:15.  Tomorrow is a relatively short day, again until

09:04:59 18 3:15.  Nonetheless, we expect we will be done with the

09:05:02 19 evidence by tomorrow.

09:05:03 20         After we're done with the evidence, there are

09:05:06 21 some fairly lengthy instructions I need to share with you

09:05:10 22 and read to you.  We may begin that process as early as

09:05:14 23 tomorrow afternoon.  If not, then that will be Thursday

09:05:17 24 morning.

09:05:18 25         And either way, we'll have closing arguments on

09:05:21 1    Thursday morning.  Okay?  So that is kind of where we are.

09:05:24 2              With that, welcome, Dr. Secrist, back to the

09:05:28 3    stand.

09:05:28 4              THE WITNESS:  Thank you, Your Honor.

09:05:29 5              THE COURT:  I remind you that you remain under

09:05:31 6    oath.

09:05:32 7              THE WITNESS:  I understand.

03:05:54 8              ... JOHN A. SECRIST, III, having been previously

03:06:11 9    duly sworn, was examined and testified as follows ...

09:05:32 10             THE COURT:  Mr. Singer, you may proceed when

09:05:34 11   ready.

09:05:35 12             MR. SINGER:  Thank you, Your Honor.  Good

09:05:35 13   morning.

09:05:36 14             Good morning, ladies and gentlemen of the jury.

09:05:38 15             THE JURORS:  Good morning.

09:05:39 16             MR. SINGER:  When we broke yesterday, just to

09:05:42 17   remind everybody where we were, we had finished up written

09:05:45 18   description and were about to turn to obviousness.

09:05:45 19                 DIRECT EXAMINATION (Continued)

09:05:45 20   BY MR. SINGER:

09:05:47 21   Q.    My colleagues told me I forgot to ask one question,

09:05:50 22   Dr. Secrist, on written description for the record.

09:05:52 23             Your opinion that you gave on written

09:05:54 24   description yesterday that you and I went through, does it

09:05:57 25   apply to all the asserted claims of the '597 patent?

09:06:00 1   A.      Yes, it does.

09:06:17 2   Q.      All right.  Let's turn to the final round of

09:06:19 3   invalidity, Dr. Secrist, the Merck prior art.  And if we

09:06:24 4   could have DDX-732, Mr. Sayres.  And there we have your

09:06:27 5   summary slide again.  The invention is obvious based on

09:06:31 6   Merck's work.

09:06:32 7           We heard Dr. Seeger testify yesterday on

09:06:36 8   anticipation of claims 1, 28, 30 and 31.  Did you, Dr.

09:06:42 9   Secrist, conduct an analysis of whether the Merck prior art

09:06:47 10  renders obvious the remaining asserted claims of the '597

09:06:50 11  patent?

09:06:51 12  A.      Yes, I did.

09:06:51 13  Q.      And what did you conclude from your analysis?

09:06:53 14  A.      That they're obvious.

09:06:54 15  Q.      All right.

09:06:57 16          MR. SINGER:  With permission, I'd like to put

09:06:59 17  the board up with the asserted claims.

09:07:00 18          THE COURT:  You may approach and do so.

09:07:10 19          (Mr. Singer placed a board on the easel.)

09:07:17 20  BY MR. SINGER:

09:07:22 21  Q.      Dr. Secrist, looking at that board, are those the

09:07:25 22  claims that you analyzed?

09:07:26 23  A.      Yes, they are.

09:07:27 24  Q.      And we have not seen those before, so we'll go

09:07:30 25  through them in some detail, but not too much to try to get

09:07:35 1    through this.

09:07:35 2            First off, a little housekeeping.  Did you

09:07:39 3    assess whether or not that Merck L765 compound we've heard

09:07:44 4    about was in the structure in the claims, the Beta-D

09:07:49 5    2'-methyl ribofuranosyl nucleoside?  Did you make that

09:07:54 6    assessment?

09:07:54 7    A.       Yes, I did.

09:07:55 8    Q.       And what did you conclude?

09:07:56 9    A.       That it is.

09:07:57 10   Q.       All right.  If we could go to DDX-733 and we see the

09:08:01 11   structure there of L604765.  What is at the 2' position of

09:08:09 12   that nucleoside, Dr. Secrist?

09:08:10 13   A.       As we've seen before, that nucleoside has a methyl up

09:08:14 14   at the 2' position and a hydroxyl group down at the 2'

09:08:19 15   position right there.

09:08:23 16   Q.       All right.  Is that any surprise to you as an expert

09:08:25 17   that it has a 2' down hydroxyl?

09:08:28 18   A.       No, not at all.

09:08:29 19   Q.       Why not?

09:08:30 20   A.       For the reasons I enumerated yesterday when we talked

09:08:33 21   about RNA versus DNA.  2' down OH, when you are dealing with

09:08:37 22   RNA, is what one would expect.

09:08:39 23   Q.       All right.  Just like in enablement, we lawyers have

09:08:42 24   come up with a multi-factor test for obviousness.  Did you

09:08:45 25   apply those factors in your analysis?

09:08:51  1    A.      Yes.

09:08:51  2              MR. SINGER:  If we could go to DDX-734, Mr.

09:08:54  3    Sayres.  Thank you.

09:08:54  4    BY MR. SINGER:

09:08:56  5    Q.      Are these, Dr. Secrist, the factors you considered on

09:08:58  6    DDX-734?

09:08:59  7    A.      Yes.

09:09:00  8    Q.      And the first factor is the scope and content of the

09:09:04  9    prior art.  What is the prior art that you considered in

09:09:07 10    your analysis?

09:09:08 11    A.      Well, it's the Merck work as it has been explained by

09:09:13 12    Drs. Seeger and Olsen here at trial.

09:09:15 13    Q.      All right.  The second factor is the differences, if

09:09:18 14    any, between each asserted claim on our board and the prior

09:09:22 15    art.  Is it okay if we go through those after we go through

09:09:27 16    the other two factors?

09:09:28 17    A.      Certainly.

09:09:29 18    Q.      The third factor is a level of ordinary skill in the

09:09:32 19    art at the time the invention was made.  Did you consider

09:09:37 20    that factor?

09:09:37 21    A.      Oh, yes, of course.

09:09:39 22    Q.      And did you apply a different level of skill than you

09:09:42 23    did in your enablement analysis or the same?

09:09:45 24    A.      The same, the same level.

09:09:46 25    Q.      And, finally, the last factor is the objective

09:09:49 1   factors of nonobviousness.  What do you understand those

09:09:52 2   factors to be, Dr. Secrist?

09:09:54 3   A.     Well, I guess that would be real world evidence that

09:10:01 4   proves that the invention was not obvious.

09:10:04 5   Q.     All right.  In your review of the evidence in this

09:10:06 6   case, did you see any of those objective factors that you

09:10:09 7   found relevant to the obviousness analysis?

09:10:12 8   A.     No, I didn't.

09:10:13 9   Q.     I'd like to start, Dr. Secrist, with claims 4 through

09:10:17 10  7 on our board.  We'll come back to claim two.

09:10:21 11            What do claims 4 through 7 add?  And, you know,

09:10:26 12  let me ask one foundational question because I don't think

09:10:31 13  the jury has heard this.  Claims 4 through 7, are they what

09:10:34 14  is known as dependent claims?

09:10:36 15  A.     Yes.

09:10:37 16  Q.     And is claim 1 known as an independent claim?

09:10:40 17  A.     Yes.  Claim 1 is the independent claim or an

09:10:42 18  independent claim.

09:10:43 19  Q.     Could you explain to the jury the difference between

09:10:45 20  the dependent claims and an independent claim?

09:10:48 21  A.     Well, the dependent claims all depend on the

09:10:54 22  independent claim.

09:10:55 23  Q.     Is it your understanding, Dr. Secrist, that they

09:10:58 24  incorporate the limitations of the independent claim into

09:11:02 25  the dependent claim?

09:11:03  1    A.    Yes.

09:11:04  2    Q.    Are dependent claims narrower or broader than the

09:11:08  3    independent claim?

09:11:09  4    A.    No.  They are narrower.

09:11:10  5    Q.    All right.  With that just sort of foundational

09:11:13  6    explanation, what do claims 4 through 7 on our board add to

09:11:19  7    independent claim 1?

09:11:20  8    A.    Well, they all add something else to the material

09:11:28  9    that would be from the independent claim, so they add second

09:11:32 10    agents, one or more second agents to a drug that might be in

09:11:36 11    the dependent claim number one.

09:11:37 12    Q.    And by second agent, do you mean a second treatment

09:11:40 13    agent like interferon or ribavirin?

09:11:44 14    A.    Yes.  Typically, what happens here is you are going

09:11:47 15    to use whatever the -- for example, you're going to use

09:11:51 16    whatever the state of the art treatment is for someone and

09:11:53 17    add the new agent to it.  So putting together an additional

09:11:57 18    agent with what you are trying out would be pretty much

09:12:00 19    routine.  That's what would be done, what would actually be

09:12:03 20    required in that case.

09:12:04 21    Q.    In your opinion would it have been obvious or not

09:12:07 22    obvious to use the additional agents from claims 4 through 7

09:12:10 23    to the Merck L65 compound method of treatment at the time of

09:12:14 24    Idenix's --

09:12:16 25    A.    Oh, it would have been obvious.

09:12:17 1    Q.      Did you see any evidence in this case that the use of

09:12:19 2    one or more of these additional agents listed in claims 4

09:12:23 3    through 7 was known in the art at the time of Idenix's

09:12:27 4    invention?

09:12:27 5    A.      Yes.

09:12:28 6    Q.      What evidence did you find noteworthy?

09:12:30 7    A.      Well, you just need to look in the Merck patent

09:12:32 8    application.

09:12:33 9    Q.      Is that the Merck patent application that Dr. Olsen

09:12:35 10   described?

09:12:36 11   A.      Yes.

09:12:37 12   Q.      If we go to DDX-736, is this the Merck patent

09:12:43 13   application you are talking about, Dr. Secrist?

09:12:45 14   A.      Yes, it is.

09:12:46 15   Q.      All right.  And just for the record, we identify that

09:12:48 16   as DX-2598.

09:12:52 17           Why did you excerpt the text that we have on

09:12:58 18   DDX-736?

09:12:59 19   A.      Well, this actually talked about what we've just been

09:13:03 20   discussing with claims 4 through 7.  It talks about

09:13:07 21   therapeutically effective amount of a compound in

09:13:10 22   combination with therapeutically effective amount of another

09:13:13 23   agent, and they list, highlighted there are ribavirin,

09:13:17 24   interferon alpha, which, of course, are the two materials

09:13:20 25   that are approved for the treatment of HCV.

09:13:23  1    Q.    All right.  And just for the record, this is DX-2598

09:13:27  2    at page 34.

09:13:30  3                Let's move on, claims 9 and 10.  What do

09:13:36  4    claims 9 and 10 add to independent claim 1?

09:13:38  5    A.    Well, they talk about the dosage, the form of the

09:13:42  6    dosage and the amount of the dosage of a compound.

09:13:48  7    Q.    Same question:  Would it have been obvious or not

09:13:50  8    obvious to use the Merck L765 method of treatment prior art

09:13:54  9    in the dosage forms described or units by claims 9 through

09:13:59 10    10?

09:13:59 11    A.    It would have been obvious.

09:14:00 12    Q.    Did you see evidence in the Merck provisional about

09:14:03 13    that?

09:14:03 14    A.    Yes, I did.

09:14:04 15    Q.    If we could go to DDX-737, which excerpts DX-2598 at

09:14:10 16    page 37.

09:14:10 17                Why did you choose this excerpt, Dr.

09:14:14 18    Secrist, to show to the jury about these additional

09:14:15 19    limitations?

09:14:16 20    A.    Well, this paragraph actually focuses on what is

09:14:20 21    actually in those two claims.  You can see claim 10 talks

09:14:23 22    about tablet or capsule, and you can see highlighted in this

09:14:28 23    paragraph, tablets or capsules.

09:14:31 24                Claim 9 talks about the dosage units

09:14:34 25    between 50 and a thousand milligrams, and you can see that

09:14:37 1 the Merck paragraph certainly has 50 to a thousand, has some

09:14:43 2 other ones that are smaller as well, but it has the same

09:14:46 3 one.

09:14:47 4 Q.    All right.  Let's turn to claims 16 and 23.  What do

09:14:51 5 dependent claims 16 and 23 add to independent claim 1?

09:14:56 6 A.    Well, they talk about administering the nucleoside in

09:15:01 7 the form of a pharmaceutically acceptable ester or a

09:15:06 8 phosphate or a pharmaceutically acceptable salt thereof.

09:15:09 9 Q.    Are those additional limitations obvious over the

09:15:12 10 Merck prior work?

09:15:13 11 A.    Oh, yes, they are.

09:15:14 12 Q.    All right.  Again, did you see evidence in the Merck

09:15:16 13 patent application showing that this, these additional

09:15:19 14 limitations were routine or inventive at the time of

09:15:25 15 Idenix's invention?

09:15:26 16 A.    They were routine.

09:15:27 17 Q.    All right.  If we go to DDX-738.

09:15:34 18       If you could, Dr. Secrist, please describe for

09:15:37 19 the jury why you included these excerpts on DDX-738.

09:15:40 20 A.    Yes.  The top one relates to claim 16 where it's

09:15:45 21 talking about a pharmaceutically acceptable ester in the

09:15:48 22 asserted claims, and you can see and highlighted included

09:15:51 23 are those esters and acyl groups known in the art.

09:15:56 24       So this covers the same thing as we see in

09:16:00 25 the claims.  The lower paragraph talks about salts of,

09:16:05 1  phosphates and salts thereof.  Again, that's claim 23.  So

09:16:09 2  both of these claims are obvious based on the Merck

09:16:12 3  application.

09:16:13 4  Q.    All right.  Turning now to claim 209, Dr. Secrist,

09:16:18 5  which talks about the method being done in a human.

09:16:21 6      Would it have been obvious or non-obvious to try

09:16:24 7  to use the L765 method of treatment described in the Merck

09:16:31 8  prior work in a human at the time of Idenix's invention?

09:16:35 9  A.    It would have been obvious.

09:16:36 10 Q.    Okay.  Again, did you see evidence in the Merck

09:16:38 11 provisional that this was conventional at the time of

09:16:42 12 Idenix's invention?

09:16:43 13 A.    Yes, I did.

09:16:44 14 Q.    All right.  If we go to DDX-739, which excerpts

09:16:49 15 DX-2598 at page 36.

09:16:52 16     Why did you choose this passage to highlight for

09:16:54 17 the jury?

09:16:55 18 A.    Well, again, this paragraph notes humans the same as

09:17:01 19 the claim does, so it's in the Merck patent application.

09:17:04 20 Q.    All right.  And, finally, Dr. Secrist, the claim we

09:17:09 21 skipped 2 and then 19.

09:17:12 22     What do dependent claims 2 and 19 add to

09:17:16 23 claim 1?

09:17:17 24 A.    They both focus on pyrimidine nucleosides.

09:17:23 25 Q.    Now, claim 1 covers a pyrimidine or a purine?

09:17:27 1    A.    Yes.

09:17:27 2    Q.    Could you remind the jury what the difference between

09:17:29 3    the two is?

09:17:30 4    A.    Yes, using my demonstration tools here, pyrimidine

09:17:34 5    has just one ring in it.  Purine has two.

09:17:37 6    Q.    All right.  And which kind of base does the Merck

09:17:40 7    compound have?

09:17:41 8    A.    The Merck compound has two.

09:17:44 9    Q.    And is that a purine or a pyrimidine?

09:17:47 10   A.    That's a pyrimidine.

09:17:49 11   Q.    Now, would it have been obvious or not obvious to try

09:17:53 12   with the Merck L765 method of treatment the single ring

09:17:57 13   base?  The pyrimidine is the single ring?

09:18:02 14   A.    Yes.

09:18:02 15   Q.    Do I have that right?

09:18:03 16   A.    Yes.

09:17:47 17   Q.    Would it have been obvious to try the single ring

09:17:51 18   base of claims 2 through 19 with the Merck L-765 method of

09:17:55 19   treatment?

09:17:55 20   A.    Claims 2 and 19, yes.  When you have an active

09:17:59 21   compound, then, yes, it's obvious to try them all.  Once you

09:18:03 22   have an active compound, I'm sure you would want to try the

09:18:07 23   others?

09:18:07 24   Q.    Did you review testimony from Dr. La Colla in this

09:18:10 25   case that confirmed your opinion?

09:18:11 1    A.    Yes, I did.  He said the same thing.

09:18:13 2    Q.    Let's go to DDX-740.  This is the trial testimony of

09:18:19 3    Dr. La Colla.  Why did you choose to high light this for the

09:18:22 4    jury?

09:18:22 5    A.    It talks about what I just said.  Once you have

09:18:24 6    something that is active, you go to look at the other bases,

09:18:27 7    and you can see at the end, it is not highlighted.  It says:

09:18:33 8    So it is rather obvious.  It is something that is active.

09:18:36 9    That is actually in this case.

09:18:37 10    Q.    Oops, sorry.  Are you finished?

09:18:38 11    A.    Yes, I am.

09:18:39 12    Q.    Dr. Secrist, have we now gone over all the additional

09:18:43 13    asserted claims beyond the ones Dr. Seeger testified were

09:18:46 14    anticipated?

09:18:47 15    A.    Yes, we have.

09:18:48 16    Q.    What is your conclusion about each of these claims in

09:18:50 17    relation to the Merck prior work on L-765?

09:18:53 18    A.    They're all obvious based on the prior Merck work.

09:18:57 19    MR. SINGER:  No further questions at this time.

09:18:59 20    Pass the witness, Your Honor.

09:19:00 21    THE COURT:  Okay.  Cross-examination.

09:19:13 22    You can use the counter, sure.

09:19:33 23    Good morning.

09:19:33 24    MR. GRIFFITH:  Good morning, Your Honor.  I'll

09:19:34 25    get situated here and pass out some notebooks.

09:19:37 1          THE COURT:  Okay.

09:20:08 2          (Binders passed forward.)

09:20:13 3          MR. GRIFFITH:  Good morning, ladies and

09:20:14 4  gentlemen of the jury.

09:20:15 5          Good morning, Dr. Secrist.  I'm Cal Griffith and

09:20:18 6  I will be asking you some questions on behalf of Idenix.

09:20:21 7          THE WITNESS:  I understand.

09:20:27 8                    CROSS-EXAMINATION

09:20:27 9  BY MR. GRIFFITH:

09:20:28 10  Q.      Earlier in this case, in this trial -- Your Honor,

09:20:31 11  excuse me.  Let me start over again.

09:20:32 12          Earlier in this trial, Dr. Secrist, it was

09:20:34 13  mentioned by, your name came up with several witnesses.  Do

09:20:38 14  you recall that?

09:20:38 15  A.      I do.

09:20:40 16          MR. GRIFFITH:  And if we could have the slide.

09:20:42 17  BY MR. GRIFFITH:

09:20:43 18  Q.      And in that regard, you were in the courtroom when

09:20:46 19  Dr. Hassan testified by videotape; is that right?

09:20:51 20  A.      Yes, I was.

09:20:51 21  Q.      And you know Dr. Hassan; correct?

09:20:55 22  A.      Yes, I do.

09:20:55 23  Q.      He worked for you at the Southern Research Institute?

09:20:58 24  A.      Yes.

09:20:58 25  Q.      And then you helped Dr. Hassan get a job at

09:21:03 1    Pharmasset by contacting Dr. Schinazi; is that right?

09:21:07 2    A.    I did.

09:21:08 3    Q.    So you knew both Dr. Hassan and Dr. Schinazi back in

09:21:13 4    the early 2000s before this lawsuit ever came about; is that

09:21:17 5    right?

09:21:17 6    A.    Yes, I did.

09:21:17 7    Q.    Let me ask you some questions about the standards you

09:21:25 8    applied in doing your analysis in this case.

09:21:28 9          With respect to validity, I believe you

09:21:32 10   mentioned in one of your reports that the validity of the

09:21:41 11   '597 patent has to be analyzed by the clear and convincing

09:21:44 12   standard; is that right?

09:21:45 13   A.    Yes, I believe that is right.

09:21:48 14   Q.    Because the '597 patent was issued by the United

09:21:53 15   States Patent and Trademark Office; right?

09:21:54 16   A.    That's correct.

09:21:55 17   Q.    So you understand it enjoys a presumption of

09:21:58 18   validity, right?

09:21:58 19   A.    I do understand that.

09:21:59 20   Q.    And you are aware that the clear and convincing

09:22:02 21   standard is the highest burden of proof in a civil action;

09:22:07 22   is that right?

09:22:08 23   A.    Well I know it is a high burden.

09:22:09 24   Q.    Okay.  Now, there has been occasional discussion in

09:22:17 25   this trial of FDA approval under a variety of circumstances.

09:22:23 1    I just want to clear something up with respect to the

09:22:25 2    analysis that you did, Dr. Secrist.

09:22:27 3            In rendering your opinions here today, you

09:22:30 4    understood that the standards for FDA approval and the

09:22:34 5    standards of the Patent Office apply are different; correct?

09:22:39 6    A.    Yes, I understand that.

09:22:40 7    Q.    And you did not apply the FDA standards in doing your

09:22:43 8    analysis of patent validity; right?

09:22:47 9    A.    No.  No, no, I did not.

09:22:49 10   Q.    And you're a medicinal chemist; correct?

09:22:53 11   A.    Yes.

09:22:53 12   Q.    And is it correct that for medicinal chemist, your

09:23:02 13   success is in finding an active compound against a given

09:23:06 14   disease; is that right?

09:23:07 15   A.    There are successes defined in a lot of different

09:23:14 16   ways.  For a medicinal chemist such as me, Success, with a

09:23:18 17   capital S, is an FDA approved drug.

09:23:21 18            However, along the way to that, which doesn't

09:23:24 19   happen very often, there are plenty of other successes which

09:23:27 20   you might have, yes.

09:23:28 21   Q.    Fair point.  So in starting with the early part of

09:23:31 22   the process, discovery, you regard finding an active

09:23:37 23   compound as a success; right?

09:23:39 24   A.    That would be an early success, yes.

09:23:41 25   Q.    An early success.

09:23:43  1    A.    Yes.

09:23:43  2    Q.    And, likewise, getting an active compound to clinical

09:23:50  3    trial would also be a success; right?

09:23:52  4    A.    Yes.

09:23:52  5    Q.    And, of course, even more successful would be getting

09:23:56  6    it approved and on the market; fair?

09:23:58  7    A.    Absolutely.

09:23:58  8    Q.    Okay.  And finding that active compound in that early

09:24:05  9    part of the drug discovery and development process, that is

09:24:08 10    long before any FDA testing is done, typically; correct?

09:24:12 11    A.    Well, yes.  I'm not sure what you mean by FDA

09:24:16 12    testing, but it's a long way from the FDA, yes.

09:24:19 13    Q.    All right.  I want to switch topics and ask you some

09:24:24 14    questions about Pharmasset's reaction to the '597 patent

09:24:29 15    disclosure.

09:24:32 16          And the scientists at Pharmasset were skilled

09:24:36 17    artisans in the field, right?

09:24:39 18    A.    Yes, I would say so.  I don't know all of them.  I

09:24:42 19    didn't know all of them.  I just knew a couple.  Those that

09:24:45 20    I knew were, yes.

09:24:48 21    Q.    Dr.  Schinazi was a skilled artisan in the field;

09:24:50 22    right?

09:24:51 23    A.    I would say he fits the definition for sure.

09:24:53 24    Q.    Dr. Stuyver was?

09:24:54 25    A.    Yes.

09:24:55  1    Q.      And Dr. Stuyver you may recall was the vice president

09:24:58  2    of Pharmasset in the early 2000s; right?

09:25:01  3    A.      I saw that.  I believe here at the time.

09:25:04  4    Q.      And let's take a look at what Dr. Stuyver said in an

09:25:08  5    e-mail to Dr. Schinazi back in the early 2000s.

09:25:13  6    A.      Okay.

09:25:13  7            MR. GRIFFITH:  Could we have PX-470 on the

09:25:16  8    screen?

09:25:17  9            And this is admitted into evidence, Your Honor.

09:25:17 10    BY MR. GRIFFITH:

09:25:20 11    Q.      And if we could get the first e-mail on the chain.

09:25:23 12            And do you recall that this is an e-mail from

09:25:28 13    Dr. Stuyver to Dr. Schinazi?

09:25:31 14    A.      Yes, I do.

09:25:32 15    Q.      And he explains his reaction to learning about the

09:25:40 16    '597 patent disclosure in around October 2001; right?

09:25:45 17    A.      I don't see the date on what you have shown me.

09:25:50 18            MR. GRIFFITH:  Could we go to the date.

09:25:51 19    A.      I don't doubt you.  I just feel like I ought to at

09:25:55 20    least confirm it.

09:25:55 21    Q.      Sure.  So you see at the very top?

09:26:00 22    A.      Yes.  Thank you.  October 15th.

09:26:02 23    Q.      October 15th?

09:26:03 24    A.      2001.

09:26:06 25            MR. GRIFFITH:  And if we could go back.

BY MR. GRIFFITH:

Q.    And so, Dr. Stuyver's reaction first is to say that he got a cold shower upon learning about the Pharmasset -- I'm sorry -- the Idenix patent, the '597 patent disclosure; right?

A.    I see that.

Q.    And he noted that it would be published in a couple of months; right?

A.    That is highlighted, yes.

Q.    And he went on to say that the way he sees it, Pharmasset would have to take a license from Idenix; right?

A.    He says that in this e-mail, yes.

Q.    And he questioned whether all the work of Pharmasset's chemists might belong to Idenix; right?

A.    Is that elsewhere?

Q.    Yes.

A.    Okay.  Yes.  Yes.

Q.    And before you reached your conclusions in this case, was this one of the documents that you considered?

A.    I considered an awful lot of documents.  I just don't specifically have a recollection whether I did or I didn't. But every relevant document, I must have looked at.

Q.    This e-mail was written by Dr. Stuyver well before this litigation began; right?

A.    Oh, yes.

09:27:24  1    Q.      And so it reports Dr. Stuyver's reaction to the

09:27:30  2    disclosure of the '597 patent in real-time before this

09:27:35  3    lawsuit was ever in anyone's mind; right?

09:27:38  4    A.      Yes, I would say so.

09:27:39  5    Q.      And so it's not in a litigation-driven setting; is

09:27:43  6    that fair to say?

09:27:44  7    A.      Right.

09:27:47  8            MR. GRIFFITH:  I'd like to go to PX-678, which

09:27:51  9    is also in evidence, Your Honor.

09:27:52  10   BY MR. GRIFFITH:

09:27:53  11   Q.      And this is a copy of January 17th, 2003 chemistry

09:28:00  12   meeting minutes.

09:28:02  13   A.      I see that.

09:28:02  14   Q.      And in this document, this reports Jeremy Clark's

09:28:12  15   work on what became the compound known as 6130.  Do you

09:28:17  16   recall that he was working on that back in January 2003?

09:28:21  17   A.      I do recall that, yes.

09:28:22  18   Q.      And in this document, it says:  With reference to

09:28:27  19   that compound that the 2'-fluoro down is derivative of

09:28:34  20   Idenix compound.

09:28:35  21            Do you see that?

09:28:35  22   A.      I see that.

09:28:36  23   Q.      So Pharmasset recognized that Clark's 2'-methyl

09:28:39  24   2'-fluoro was an Idenix derivative; right?

09:28:42  25   A.      I don't think I can say that, but I see what it says

09:28:45 1    here in the notes.

09:28:47 2    Q.      They were giving some credit to Idenix; right?

09:28:50 3    A.      They noted that Idenix has some kind of compound that

09:28:53 4    is related to it, yes.

09:28:55 5    Q.      All right.  Dr. Secrist, I'd like to direct your

09:29:02 6    attention to Tab 14 in the exhibit binder I handed you.

09:29:13 7    A.      Tab 14, you said?  14.

09:29:15 8    Q.      Tab 14.  And this is PX-1794A.

09:29:31 9            Do you recognize that document?

09:29:34 10   A.      It is a -- yes, I do.

09:29:37 11   Q.      And it is a copy of a U.S. patent on which you are a

09:29:39 12   named coinventor; is that right?

09:29:41 13   A.      That's correct.

09:29:41 14   Q.      And this patent relates to compounds that the patent

09:29:44 15   says are effective for inhibiting HCV; is that correct?

09:29:50 16   A.      That, I don't see that here but, yes, that is what it

09:29:53 17   was for.

09:29:54 18   Q.      Okay.

09:29:54 19   A.      I mean I know it is here somewhere.  I just don't see

09:29:57 20   it.

09:29:58 21           MR. GRIFFITH:  Your Honor, we would move for the

09:29:59 22   admission of PX-1794A into evidence.

09:30:05 23           MR. SINGER:  No objection to admitting that

09:30:07 24   document.

09:30:07 25           THE COURT:  It is admitted.

09:29:20  1        **(PX-1794A was admitted into evidence.)**

09:30:09  2              **MR. GRIFFITH:  If we could look, and if we could**

09:30:11  3  **go to the inventor identification in the upper left-hand**

09:30:15  4  **corner.**

09:30:15  5  **BY MR. GRIFFITH:**

09:30:17  6  **Q.      We can see, towards the bottom there, your name**

09:30:22  7  **listed, John A. Secrist; right?**

09:30:24  8  **A.      Yes, that is correct.  That is me.**

09:30:26  9  **Q.      No doubt not listed in order of importance, I**

09:30:30 10  **presume.**

09:30:30 11  **A.      They probably are.**

09:30:31 12  **Q.      All right.  Now if we could go to claim 13.  And --**

09:30:42 13  **A.      Excuse me.  Is there a page you can just?**

09:30:44 14  **Q.      I'm sorry.  Yes.  So it would be towards the very**

09:30:52 15  **back.**

09:30:55 16              **MR. GRIFFITH:  Could we enlarge to get the**

09:30:57 17  **column number on that?**

09:30:58 18              **MR. SINGER:  Your Honor, I'm going to object to**

09:31:00 19  **this line of questioning.  I wonder if you want to have a**

09:31:03 20  **sidebar.**

09:31:03 21              **THE COURT:  Let's get the page for the record,**

09:31:04 22  **then we'll have a sidebar.**

09:31:07 23              **Have you indicated yet what page it is?**

09:31:11 24              **MR. GRIFFITH:  It's page 69 of the PDF that is**

09:31:18 25  **electronically on the screen.**

09:31:19  1          THE WITNESS:  I found it.

09:31:20  2          THE COURT:  Then we'll ask for the jury's

09:31:22  3  patience while we have a sidebar.

09:41:40  4          (Sidebar conference ends.)

09:41:40  5          MR. SINGER:  There we go.

09:41:40  6          THE COURT:  All right.  You have to speak up so

09:41:40  7  we can hear you and, most importantly, the court reporter

09:41:40  8  can.  What is the concern here?

09:41:40  9          MR. SINGER:  I'm concerned again we're going

09:41:40 10  into the area where we're going to be comparing one patent

09:41:40 11  to another for purposes of bolstering the validity of this

09:41:41 12  patent.  We're talking about the patent of Dr. Secrist here

09:41:41 13  from 2013, for the validity of the patent that is 12 years

09:41:41 14  earlier.

09:41:41 15          THE COURT:  Is that where we're going,

09:41:41 16  Mr. Griffith?

09:41:41 17          MR. GRIFFITH:  We're going to a number of areas

09:41:41 18  on this.  One of them is that this patent discloses a class

09:41:41 19  of compounds that comprises billions of compounds.  And he

09:41:41 20  is the person, one of the people who invented that class and

09:41:41 21  believed that he was in possession of that large class of

09:41:41 22  compounds for treating antiviral diseases.  It is not to get

09:41:41 23  into whether the patent is valid or not.

09:41:41 24          He is a coinventor on the patent, so this is

09:41:41 25  something that we're using to get at state of the art and to

also challenge some of the comments that he has made about whether skilled artisans can deal with or manage or have an understanding of and work with large classes of compounds based on even whatever amount of information they may have.

And so the point of this is to get at that he felt that he was in possession of a large class of compounds and he felt comfortable with that in terms of it being able to treat HCV and other antiviral diseases.

So we've had considerable testimony in this case about these large classes are too large for skilled artisans to be able to work with and manage without undue experimentation, and this is simply being used here to get at skilled artisans were able to or they're used to dealing with large classes of compound.

I would note that this witness testified that in terms of predictability and so forth that the state of the art today is no different than it was back in 2000, so I don't think the timing of this, which is in the middle of this time period -- this application was actually filed in around 2007 -- I don't think that that really changes the analysis at all.

But this is one that he is a named inventor on. This is not something as distinguished from yesterday's discussion regarding the Clark patent that Dr. Seeger was not a named inventor on.

09:41:43  1          There are other statements in this patent as

09:41:43  2     well, Your Honor, that I wish to get into.  He admits in

09:41:43  3     this that NM283 is a useful compound.  He admits that IDX184

09:41:43  4     is a useful compound, advocates using it with his compound.

09:41:43  5     And those compounds, Your Honor may recall, have been

09:41:43  6     disparaged by their witnesses, Dr. McHutchinson most

09:41:43  7     notably.

09:41:43  8          So for those reasons, I'm getting into this

09:41:43  9     document.

09:41:43 10          THE COURT:  All right.  On those latter points,

09:41:43 11     is there an objection?

09:41:43 12          MR. SINGER:  There is no objection.

09:41:43 13          THE COURT:  Let's focus on the one you are

09:41:43 14     objecting to.

09:41:43 15          MR. GRIFFITH:  Your Honor, can I follow-up with

09:41:43 16     one thing?  And I apologize.

09:41:43 17          THE COURT:  Okay.

09:41:43 18          MR. GRIFFITH:  It was noted at that, at the

09:41:43 19     conference, and I can't remember right now which one it was,

09:41:43 20     that we discussed this.  Mr. Shear said so there are

09:41:43 21     certainly instances where cross-examination based on

09:41:43 22     someone's patent would be fair.  And he said if an expert

09:41:43 23     said in his or her report the sky was blue and the patent

09:41:43 24     said it was red, that would be fair.

09:41:43 25          But, I think this is a situation where these

09:41:43 1    witnesses are talking about a billion compound class is

09:41:43 2    something that is unmanageable by skilled artisans in this

09:41:43 3    field, and that is not what he is, in fact, saying in this

09:41:43 4    patent.

09:41:43 5            Again, I'm not getting into written description

09:41:43 6    standards with him or validity of claims, that sort of

09:41:44 7    thing.

09:41:44 8            THE COURT:  All right.  Do you still have an

09:41:44 9    objection?

09:41:44 10           MR. SINGER:  Yes, I do.  So, Your Honor, as to

09:41:44 11   state of the art, again, this is from many years later after

09:41:44 12   the patent in suit, and I don't think Dr. Secrist said it

09:41:44 13   was the same.  He said it was still unpredictable today.

09:41:44 14   The fact is there was a lot of advantages since the

09:41:44 15   2000-2001 time frame.

09:41:44 16           Also, I would note, Your Honor, this patent

09:41:44 17   doesn't even relate to nucleosides so we're not only outside

09:41:44 18   the time frame, we're outside the actual compounds that are

09:41:44 19   actually at issue in this case.  And if asked, that's what

09:41:44 20   he will testify.

09:41:44 21           So, again, what I see going on here is I think

09:41:44 22   counsel just said so, that they're trying to use the patent

09:41:44 23   from many years later when the field had advanced in a

09:41:44 24   different subject area, not nucleosides, yes, they're for

09:41:44 25   treatment of HCV, to bolster the ability under enablement

prong of managing these large classes of prongs.

I would just point out this is precisely one of the patents that we discussed in our motion in limine at the pretrial conference. We talked about the Clark patent. This was also one of the patents that we mentioned in our motion because it was discussed in the Merck trial, and it was used for the very purpose that counsel now says to use it, to bolster that patent-in-suit or trying to bolster his patents.

THE COURT: Well, he says he is going to stay away from the enablement standard or the written description standard or ask, surely you believe your patent is valid. He says he is not going to go there. He is just going to point out the objectionable part is there is billions of compound, and you seem comfortable with that.

Why shouldn't I let him do that? And you can then redirect on it's not nucleosides or the state of the art changed.

MR. SINGER: I can redirect him. I'm not saying I can't.

THE COURT: You can, but I mean why isn't that the right way?

MR. GRIFFITH: I object to that.

MR. SINGER: I think it is confusing for the jury, again, with the purpose being made the document is for

09:41:45 1    the jury to compare, right?, okay, here is an expert who is

09:41:45 2    an inventor on the patent who says that this patent is not

09:41:45 3    enabled because it's got too large of a class with too

09:41:45 4    little data or whatever his testimony, and the jury is being

09:41:45 5    asked to compare, oh, well, here is a patent from six years

09:41:45 6    later in a different class of compound where he, he signed

09:41:46 7    an oath and said that it was inventive to have a large class

09:41:46 8    of compounds based on what is in this, in a different

09:41:46 9    technical space with many years later, many years passing in

09:41:46 10   between.

09:41:46 11          I think it is going to be really confusing.  And

09:41:46 12   it is, again, as Your Honor said, I won't deny there is

09:41:46 13   some probative value, but it is enormously confusing and

09:41:46 14   prejudicial to compare one patent to another in this field.

09:41:46 15          MR. GRIFFITH:  Your Honor, it goes to weight not

09:41:46 16   admissibility.

09:41:46 17          THE COURT:  All right.  Give me a moment,

09:41:46 18   please.

09:41:46 19          (Court and law clerk confer.)

09:41:46 20          THE COURT:  All right.  It's your objection.

09:41:46 21   I'm going to overrule the objection.

09:41:46 22          I think while the 403 balance is close, it

09:41:46 23   doesn't favor preventing a plaintiff from doing what it

09:41:46 24   wants to do.  I'm motivated by the fact that it is this

09:41:46 25   witness's patent.  And while certainly we're going to hold

09:41:46 1   Mr. Griffith to his representation that we're not going to

09:41:46 2   ask anything along the lines of do you believe your patent

09:41:46 3   is valid?  You know, how can you possibly say that the '597

09:41:46 4   is invalid when it looks just like your own patent that you

09:41:47 5   are saying is valid.

09:41:47 6           But in terms of these issues about

09:41:47 7   predictability, and, you know, how many compounds one can

09:41:47 8   manage, I do think it is fair to cross-examine him with

09:41:47 9   his own patent, and to the extent there are ways to, two

09:41:47 10  different views of that, I'm sure we will hear both views,

09:41:47 11  and those all go to weight, not admissibility.  So the

09:41:47 12  objection is overruled.

09:41:47 13          Is there anything else while we're here?

09:41:47 14          MR. SINGER:  Not from me.

09:41:47 15          MR. GRIFFITH:  I don't think so.

09:41:47 16          THE COURT:  All right.  Thank you.

09:41:47 17          (Sidebar conference ends.)

09:41:39 18          THE COURT:  Thank you for your patience, ladies

09:41:41 19  and gentleman.

09:41:42 20          Mr. Griffith, when you are ready, you may

09:41:44 21  proceed.

09:41:55 22          MR. GRIFFITH:  Thank you, Your Honor.

09:41:58 23  BY MR. GRIFFITH:

09:41:58 24  Q.    And we were back at column 132, I believe it is, in

09:42:03 25  claim 13.  And, Dr. Secrist, this is also in your exhibit

09:42:08 1    binder.

09:42:09 2    A.    I see it, yes.

09:42:10 3    Q.    Okay.  And so the claim here is on a method for

09:42:16 4    treating a viral infection comprising administering to a

09:42:20 5    patient in need of such treatment a pharmaceutical

09:42:23 6    composition according to claim 1.

09:42:24 7              Do you see that?

09:42:25 8    A.    I do.

09:42:26 9    Q.    And do you recall, did the viral infection include

09:42:32 10   HCV?

09:42:33 11   A.    I presume that it does.

09:42:34 12   Q.    Okay.  Then if we could go to claim 1 -- what column

09:42:52 13   is that?  Here we go.  Column 103, Dr. Secrist.

09:43:10 14   A.    Yes.

09:43:10 15   Q.    And so claim 1 describes the compound, the class of

09:43:14 16   compounds that could be used in that method; is that

09:43:17 17   correct?

09:43:17 18   A.    Yes.

09:43:18 19   Q.    And it has this formula below.  If we could highlight

09:43:27 20   that.  It has R and R1 and R9 and R5 and so on.

09:43:35 21             Do you see that?

09:43:35 22   A.    I do.

09:43:36 23   Q.    And Z; right?

09:43:38 24   A.    Yes.

09:43:38 25   Q.    And so for each of those things, there's a number of

09:43:44  1    options; is that correct?

09:43:46  2    A.      Yes.

09:43:46  3    Q.      And then if we could pull back on this and look at

09:43:50  4    the whole page.

09:43:55  5            And so going down, for example, R has a list of

09:44:01  6    options, and that goes on for actually the rest of that

09:44:06  7    column; is that correct?

09:44:07  8    A.      Yes.

09:44:07  9    Q.      So all of those are options at the R1 position.  You

09:44:11 10    can switch those out; right?

09:44:13 11    A.      Well, at the R position.

09:44:15 12    Q.      I'm sorry.  At the R position?

09:44:16 13    A.      Yes.

09:44:17 14    Q.      And then if we go to the next column?

09:44:19 15    A.      Yes.

09:44:20 16    Q.      And then that gets into options for Z and R1 and R9.

09:44:31 17    Then it goes on.  R15, which is options within R1, I

09:44:35 18    believe; is that correct?

09:44:36 19    A.      It looks like within R1 and R10, R14, R15.

09:44:48 20    Q.      All right.

09:44:49 21    A.      And R11.  I see those.

09:44:51 22    Q.      Right.  And so these are all independent selections

09:44:55 23    that can be made; is that correct?

09:44:56 24    A.      Yes.

09:44:57 25    Q.      And this claim, in fact, describes it would include

09:45:04 1    maybe a billion compounds, something like that?

09:45:07 2    A.    Probably.

09:45:08 3    Q.    And you believed that, nevertheless, that you and

09:45:15 4    your co-inventors were in possession of this class of

09:45:18 5    compounds; is that right?

09:45:19 6    A.    Yes.

09:45:20 7    Q.    And in the chemical area, it's common for skilled

09:45:24 8    artisans to work with and think about classes that may be

09:45:28 9    very large, on the order of a billion or more compounds; is

09:45:32 10   that right?

09:45:32 11   A.    You could, you could -- so, I'm sorry.  Maybe you

09:45:37 12   should say that again.  It was -- something about it was

09:45:40 13   common?

09:45:41 14   Q.    Well, in the chemical area, it is common for skilled

09:45:44 15   artisans to work with and think about classes that may be on

09:45:49 16   the order of -- classes of compounds that may be on the

09:45:51 17   order of a billion compounds or a million compounds, but

09:45:55 18   large numbers; is that correct?

09:45:57 19   A.    Well, depending on how many substituents on the

09:46:02 20   compound and what's known about the situation from the prior

09:46:09 21   art, that could be very well true, yes.

09:46:12 22   Q.    Right.

09:46:12 23   A.    Mm-hmm.

09:46:13 24   Q.    Now, of course, needless to say, to actually

09:46:17 25   synthesize a billion compounds would take a lot of time;

09:46:21 1    right?

09:46:21 2    A.    Yes.

09:46:23 3    Q.    Maybe a lifetime; is that right?  It would be a lot

09:46:25 4    of time?

09:46:26 5    A.    And then some.

09:46:27 6    Q.    But to make a given compound in this class would take

09:46:34 7    a lifetime; is that right?

09:46:35 8    A.    No, it would not.

09:46:35 9    Q.    All right.  And to be clear, obviously, I think,

09:46:42 10   neither you nor your co-inventors actually made all of the

09:46:46 11   billion compounds that are within this class of compounds;

09:46:49 12   is that right?

09:46:49 13   A.    That's correct.

09:46:50 14   Q.    You would have made some small sampling of them;

09:46:53 15   right?

09:46:54 16   A.    A lot of compounds were made, but compared to a

09:46:56 17   billion, it was a small number.

09:46:57 18   Q.    And at the time that this application, this patent

09:47:01 19   was filed with the Patent Office, you had not obtained FDA

09:47:05 20   approval for the use of these compounds to treat a viral

09:47:08 21   disease; is that correct?

09:47:09 22   A.    That's correct.

09:47:10 23   Q.    Now, if we could -- so I want to move to a slightly

09:47:18 24   different topic --

09:47:20 25   A.    Okay.

09:47:20 1    Q.      -- within this patent.  If you could go to column 96

09:47:23 2    and lines 13 to 22.

09:47:31 3    A.      Okay.  I'm on 96.

09:47:33 4    Q.      And here you're talking about polymerase inhibitors,

09:47:40 5    HCV polymerase inhibitors that can be used with your class

09:47:45 6    of compounds; right?

09:47:46 7    A.      I see that's what this paragraph discusses, yes.

09:47:50 8    Q.      And you said -- this application was filed for in

09:47:55 9    2009; right?  The PCT application was filed in 2009?

09:47:59 10   A.      Can I look?

09:48:00 11   Q.      Sure.

09:48:02 12   A.      Yes, yes.  August of 2009.

09:48:05 13   Q.      And as of that point in time you viewed these

09:48:09 14   polymerase inhibitors as useful; is that correct?

09:48:11 15   A.      These polymerase inhibitors, you mean the ones in the

09:48:17 16   paragraph?

09:48:18 17   Q.      Yes.  The ones that you say can be used in the

09:48:22 18   present methods.  The present methods are the methods

09:48:25 19   invented by you and your colleagues; right?

09:48:27 20   A.      Yes.

09:48:28 21   Q.      And so one of the useful polymerase inhibitors that

09:48:31 22   you identified was NM283; right?

09:48:35 23   A.      I see that.

09:48:36 24   Q.      And that, of course, is an Idenix 2'-methyl up

09:48:42 25   ribonucleoside; is that correct?

09:48:44 1   A.     I'm pretty sure it is.  I don't remember the exact

09:48:48 2   structure of NM283, but it had 2' up methyl and 2' down

09:48:50 3   hydroxy.

09:48:50 4   Q.     And it's called a prodrug version; is that right?  If

09:48:54 5   you recall?

09:48:54 6   A.     Yes, yes.  It's a prodrug of that compound I just

09:48:57 7   mentioned.

09:48:58 8   Q.     Now, you're aware that that did not get out of the

09:49:01 9   clinic; right?  It was not approved by the FDA?

09:49:05 10  A.     I am aware.

09:49:06 11  Q.     But you nevertheless regarded it was a compound that

09:49:08 12  could be useful with your invention; right?

09:49:10 13  A.     Yes.

09:49:11 14  Q.     Then a little further down on the page, if we could

09:49:17 15  go to the next paragraph.  Oh, by the way, before we leave

09:49:21 16  that, this also identifies MK0608; right?

09:49:34 17  A.     I see that, yes.

09:49:35 18  Q.     And that again is a 2'-methyl up ribonucleoside ring?

09:49:42 19  A.     It's 2' up, methyl 2' down hydroxy ribonucleoside,

09:49:47 20  yes.

09:49:48 21  Q.     So that's again -- and it's a compound that didn't

09:49:55 22  make it out of the clinic; right?

09:49:57 23  A.     That's right.

09:49:58 24  Q.     But you felt it could be useful with your invention;

09:50:00 25  right?

09:50:00 1    A.    Yes.

09:50:01 2    Q.    Then if we could go to the next paragraph.

09:50:06 3    A.    By the way, may I add one more thing?  I don't know

09:50:09 4    when these compounds that you're asking me about actually

09:50:13 5    made it into the clinic or were dropped from clinical

09:50:17 6    trials, so that's sort of a caveat all along.

09:50:19 7    Q.    Okay.

09:50:19 8    A.    Thank you.

09:50:20 9    Q.    Then this again lists a number of HCV polymerase

09:50:25 10   inhibitors that can be used with your class of compounds,

09:50:29 11   that billion compound class; right?

09:50:31 12   A.    Yes.

09:50:35 13   Q.    And one of them, for example, is a polymerase

09:50:40 14   inhibitor, HCV polymerase inhibitor towards the middle

09:50:43 15   called R7128?

09:50:47 16   A.    I see that.

09:50:48 17   Q.    And next to it, it says Pharmasset/Roche?

09:50:53 18   A.    Yes.

09:50:53 19   Q.    And do you understand that to be the prodrug version

09:50:55 20   of 6130?

09:50:57 21   A.    I don't know.

09:50:58 22   Q.    All right.  Do you understand that that did not make

09:51:00 23   it out of the clinic?

09:51:01 24   A.    I don't know about that either.

09:51:04 25   Q.    But you did believe that this was an HCV polymerase

09:51:10 1   inhibitor that could be useful with your billion compound

09:51:14 2   class; right?

09:51:14 3   A.     At the time this was filed, yes. Again, as I said, I

09:51:19 4   don't know when things went into the clinic and were dropped

09:51:22 5   out, but, yes.

09:51:23 6   Q.     Now, if we could go to columns 85 to 92.

09:51:27 7   A.     Columns -- oh, earlier?

09:51:30 8   Q.     Yes.

09:51:31 9   A.     Okay. I see that.

09:51:32 10   Q.     And this, on 85, there starts Table 1.

09:51:37 11         Do you see that?

09:51:38 12   A.     Yes.

09:51:38 13   Q.     In Table 1, you set forth biological data for your

09:51:45 14   billion compound class; right?

09:51:46 15   A.     Yes.

09:51:47 16   Q.     And there are in that table 12 out of the billion

09:51:54 17   that were actually tested; is that correct?

09:51:56 18   A.     Well, it shows 12 compounds in the table, yes.

09:52:00 19   Q.     And not all of them were found to be active; is that

09:52:04 20   right?

09:52:05 21   A.     Well, I'm going to have to remind myself of what A,

09:52:12 22   B, C means. Let's see. Can you quickly point me to what A,

09:52:16 23   B and C are?

09:52:17 24   Q.     Dr. Secrist --

09:52:18 25   A.     I see --

09:52:19  1    Q.    -- it's not necessary.  That's a detail that we need

09:52:22  2    not get into.

09:52:22  3    A.    Okay.

09:52:23  4    Q.    The point is, there's --

09:52:24  5    A.    So I don't know.  There are 12 in the table.

09:52:26  6    Q.    Okay.  You had A, B and C to identify levels of

09:52:30  7    activity, I think; is that right?

09:52:31  8    A.    Yes.

09:52:32  9    Q.    Okay.  And so there were differing levels of activity

09:52:36  10   with these 12 compounds.  Fair?

09:52:38  11   A.    Yes.

09:52:38  12   Q.    All right.  But this is the data that you reported to

09:52:44  13   support that billion compound class of compounds; is that

09:52:47  14   right?

09:52:47  15   A.    Yes.

09:52:47  16   Q.    All right.  And when you were developing your own

09:52:58  17   billion compound class of compounds, you were comfortable

09:53:01  18   reporting that amount of data to support that class; is that

09:53:05  19   right?

09:53:05  20   A.    Yes.

09:53:06  21   Q.    All right.

09:53:14  22         MR. GRIFFITH:  Could we go to PX-851.  And that

09:53:26  23   is Tab 27.

09:53:27  24         THE WITNESS:  Tab 27.

09:53:31  25   BY MR. GRIFFITH:

09:53:32 1   Q.       Dr. Secrist --

09:53:33 2   A.       Thank you.

09:53:33 3   Q.       -- this is admitted into evidence.

09:53:42 4            MR. GRIFFITH:  Could we put that up on the

09:53:43 5   screen?

09:53:44 6   BY MR. GRIFFITH:

09:53:47 7   Q.       This is a copy of a Pharmasset grant application, and

09:53:53 8   the first few pages, for lack of a better word, Dr. Secrist,

09:53:57 9   are a bit odd.

09:54:00 10  A.       Are a bit odd?

09:54:01 11  Q.       Yes.  I would direct your attention, if you could

09:54:03 12  page into -- and I'm going to go with the number at the

09:54:06 13  bottom in the right-hand corner.

09:54:08 14  A.       Okay.

09:54:08 15  Q.       Page 007.

09:54:10 16  A.       Okay.  I see it.

09:54:16 17  Q.       And 006.  You can see this is one of the two grant

09:54:20 18  applications that Pharmasset filed that have been discussed

09:54:23 19  in this trial.

09:54:24 20  A.       Yes.

09:54:25 21  Q.       And so you've seen this before; is that right?

09:54:28 22  A.       I have seen this grant application before.  I have

09:54:32 23  not looked at it carefully.

09:54:33 24  Q.       Okay.  Let me direct your attention -- I want to ask

09:54:37 25  you some questions about this page 007 and the material in

09:54:41  1    the box.

09:54:42  2    A.      Certainly.

09:54:43  3    Q.      There.  Okay?

09:54:44  4    A.      Mm-hmm.

09:54:44  5    Q.      And I'm going to focus on the third paragraph.

09:54:47  6            MR. GRIFFITH:  If we could have that enlarged.

09:54:49  7    BY MR. GRIFFITH:

09:54:51  8    Q.      And it's talking in this paragraph about three

09:54:54  9    classes of nucleoside derivatives; is that right?

09:55:01 10    A.      Are we looking at the same thing?  Okay.  That

09:55:07 11    SAR-based.  I see.  By examination of three classes of

09:55:10 12    derivatives?

09:55:11 13    Q.      Yes.

09:55:11 14    A.      Yes.  I see it.

09:55:13 15    Q.      All right.  And I'm going to focus on the second

09:55:14 16    sentence there.

09:55:15 17    A.      Okay.

09:55:15 18    Q.      That sentence says -- again, this is Pharmasset

09:55:19 19    scientists who were talking to the U.S. Government; is that

09:55:24 20    right?

09:55:24 21    A.      Yes.

09:55:26 22    Q.      And trying to get a grant, and telling them about the

09:55:28 23    science involved in what they are doing to justify their

09:55:32 24    grant; right?

09:55:33 25    A.      They present what they want to do and then background

09:55:36 1    relating to it.

09:55:37 2    Q.    All right.  And they are trying to be honest here; is

09:55:39 3    that right?

09:55:40 4    A.    Yes.

09:55:40 5    Q.    You would have to be; right?

09:55:43 6    A.    Yes.

09:55:43 7    Q.    And they say in this application that, since certain

09:55:46 8    nucleosides with 2' dehydro, 2'-methyl-D ribofuranose showed

09:55:55 9    a potent anti-HCV activity, the lead compounds will be

09:56:00 10   substituted with the 2'-Beta up methyl group?

09:56:03 11                   Do you see that?

09:56:03 12   A.    Yes.

09:56:03 13   Q.    And dehydro means nonhydrogen substituent; is that

09:56:08 14   right?

09:56:08 15   A.    I believe it does in this context.  I believe it

09:56:10 16   does.

09:56:10 17   Q.    What they're talking about here is using a 2'-methyl

09:56:13 18   up, 2' dehydro nucleoside; is that right?

09:56:17 19   A.    Well, it says, certain nucleosides with 2' dehydro

09:56:24 20   2'-methyl.  I would have to, I would have to see more than

09:56:28 21   what it just shows.  This is just a description.  I would

09:56:30 22   have to go back and look at exactly what they mean because I

09:56:33 23   can't tell that for sure just from this paragraph.

09:56:35 24   Q.    Is it fair to say that scientists -- let me back up.

09:56:39 25   I apologize for starting with a bad question.

09:56:43  1    A.    That's all right.

09:56:43  2    Q.    Scientists in -- this application, grant application

09:56:48  3    was filed in 2002; is that right?

09:56:50  4    A.    Filed December of 2002, yes.

09:56:57  5    Q.    And in that time frame scientists were latching onto

09:57:04  6    the 2'-methyl up development; is that correct?

09:57:08  7    A.    Latching onto?

09:57:10  8    Q.    Well, you were starting to see more and more people

09:57:13  9    doing nucleoside research in the HCV area with 2'-methyl up

09:57:20 10    ribonucleosides; is that correct?

09:57:22 11    A.    Yes.

09:57:24 12    Q.    And Pharmasset scientists, as you know, had read the

09:57:28 13    specification for the '597 patent by the time they had filed

09:57:33 14    this grant application; is that right?

09:57:34 15    A.    Well, let me think about that.  Can you remind me of

09:57:39 16    when the --

09:57:40 17    Q.    Publication date?

09:57:41 18    A.    The publication date of the -- that you are talking

09:57:44 19    about?

09:57:45 20    Q.    November of 2001.

09:57:46 21    A.    Okay.  Yes.  So that -- that's -- it's before this

09:57:55 22    was filed, yes.

09:57:56 23    Q.    Okay.

09:57:56 24    A.    Not much before though.

09:57:58 25    Q.    All right.  And on the subject of 2'-methyl

09:58:08 1    ribonucleosides --

09:58:13 2    A.    Okay.  2'-methyl ribo --

09:58:15 3    Q.    Right.  The patent claim, claim 1 of the '597 patent

09:58:19 4    that we're talking about, is 2'-methyl ribofuranosyl

09:58:27 5    nucleosides?

09:58:28 6    A.    Yes, that's correct.

09:58:29 7    Q.    And that's 2'-methyl up; right?

09:58:31 8    A.    Yes.

09:58:32 9    Q.    And the patent and Figure 1 certainly give some

09:58:37 10   examples of 2'-methyl up ribonucleosides; is that right?

09:58:41 11   A.    The patent?

09:58:43 12   Q.    In Figure 1 --

09:58:45 13   A.    Of Figure 1 of --

09:58:46 14   Q.    -- of the '597 patent.

09:58:49 15   A.    Okay.

09:58:50 16   Q.    Let me make a more clear question for you.

09:58:52 17   A.    Thank you.  I need to see Figure 1.

09:58:54 18   Q.    Sure.  Let's put that up.

09:58:56 19   A.    Just ask the other question.

09:58:57 20   Q.    That's fine.  We'll put Figure 1 up.

09:59:00 21   A.    Thank you.  I appreciate that.

09:59:01 22          MR. GRIFFITH:  Can we put up Figure 1?

09:59:03 23   BY MR. GRIFFITH:

09:59:12 24   Q.    And the patent is in Tab 8 of your exhibit binder as

09:59:14 25   well.

09:59:15  1    A.      Tab 8 you said?

09:59:16  2    Q.      Yes.  So I think you pointed in your direct testimony

09:59:27  3    to the first four here.

09:59:30  4            Do you recall that?

09:59:31  5    A.      Yes, I do.

09:59:35  6    Q.      And all of those are 2'-Beta-D -- let me start

09:59:43  7    again.

09:59:43  8            All of those are Beta-D-2'-methyl

09:59:49  9    ribofuranosyl nucleosides; right?

09:59:51 10    A.      All of them have a 2' up methyl and a 2' down

09:59:54 11    hydroxyl, yes, and they are ribonucleoside.

09:59:58 12    Q.      And they're specifically called out as being

10:00:00 13    illustrative; is that right?

10:00:02 14    A.      Called out?

10:00:04 15    Q.      You see the title of Figure 1?

10:00:06 16    A.      Oh.

10:00:08 17    Q.      Chemical structure --

10:00:10 18    A.      Yes.

10:00:10 19    Q.      -- of illustrative?

10:00:12 20    A.      Yes.

10:00:12 21    Q.      So they are representative nucleosides; is that

10:00:15 22    correct?

10:00:15 23    A.      They're examples.

10:00:17 24    Q.      Yes.  Representative examples; right?

10:00:19 25    A.      I say they're examples.  I don't know what a

10:00:25 1    representative example would be, but they are examples for

10:00:27 2    sure.

10:00:28 3    Q.    And you don't know what a representative example

10:00:29 4    would be?

10:00:30 5    A.    No, I don't think I do.

10:00:32 6    Q.    All right.  Now, with respect to the compounds that

10:00:42 7    you would regard as effective, would be effective in

10:00:46 8    treating HCV within the class described in claim 1, I think

10:00:51 9    you testified that the tabs for the skilled artisan is

10:00:56 10   winnowing down at relatively smaller number of

10:01:02 11   ribonucleosides that will be effective from the larger class

10:01:07 12   that potentially could be.  Is that fair?

10:01:09 13   A.    That's what I said, yes.

10:01:11 14   Q.    And you agree that the skilled artisan in doing that

10:01:18 15   task, in winnowing down to those that would be effective,

10:01:23 16   would not deliberately select options that are highly

10:01:26 17   unlikely to work?

10:01:31 18   A.    Would -- I guess I would say that the skilled artisan

10:01:36 19   would look at what the options were that were given in the

10:01:40 20   patent and focus on those.

10:01:42 21   Q.    And they would not choose options that are highly

10:01:46 22   unlikely to work.  Is that fair?

10:01:48 23   A.    I disagree.

10:01:51 24   Q.    Well, let me put it this way.  They wouldn't choose

10:01:55 25   plutonium with 2' down, would they?

10:01:57 1   A.      No.

10:01:59 2   Q.      And in your chart, you said the claim means 2' up,

10:02:05 3   anything but hydrogen down; is that right?

10:02:07 4   A.      That's what the Court's construction was, yes.

10:02:09 5   Q.      But no skilled artisan in their right mind is going

10:02:12 6   to choose plutonium for 2' down; is that correct?

10:02:15 7   A.      I agree.

10:02:16 8   Q.      Nor mercury; is that correct?

10:02:17 9   A.      I agree.

10:02:18 10  Q.      So it's not really infinite what you can use at 2'

10:02:21 11  down, is it?

10:02:22 12  A.      It pretty much is.

10:02:24 13  Q.      So they're not going to choose a 100 carbon chain

10:02:28 14  alkyl either, are they?

10:02:29 15  A.      I don't know what any given person would choose.  You

10:02:37 16  would have to look and decide what you were going to do.  I

10:02:41 17  don't know any more than that.

10:02:42 18  Q.      A skilled artisan doesn't check their common sense at

10:02:45 19  the door when they read a patent, do they?

10:02:47 20  A.      I wouldn't think so, no.

10:02:49 21  Q.      All right.  And if you, for example -- if you, for

10:02:53 22  example, are reading instructions on how to build a suitcase

10:02:58 23  with wheels on it, all right, and the instruction said put

10:03:04 24  wheels on it, you wouldn't put -- you wouldn't choose

10:03:08 25  tractor tires, would you?

10:03:09 1   A.      I wouldn't, no.

10:03:11 2   Q.      Right.  So the skilled artisan in making their

10:03:16 3   choices as to what they are going to choose for the various

10:03:18 4   options at positions on molecule are going to use -- are

10:03:24 5   going to bring their common sense to the table in making

10:03:27 6   those decisions.  Is that fair to say?

10:03:29 7   A.      They are going to bring their knowledge and they're

10:03:30 8   going to look at what's in the patent, which doesn't include

10:03:33 9   a hundred carbon chain.

10:03:36 10  Q.      All right.  Now I'm going to switch topics and talk

10:03:44 11  about some more focus enablement questions related to

10:03:50 12  synthesis.

10:03:51 13          Do you recall testifying about that?

10:03:52 14  A.      Yes, I do.

10:03:32 15  Q.      And, in fact, the ordinary skilled artisan.

10:03:46 16  A.      Are we finished for now with the grant application?

10:03:50 17  Q.      We are.

10:03:51 18  A.      Okay.  Thank you.

10:03:51 19  Q.      Put that away.

10:03:52 20  A.      I appreciate that.

10:03:53 21  Q.      Pushing back to synthesis.

10:03:59 22  A.      I'm with you.

10:04:01 23  Q.      Synthesizing, excuse me, compound Beta-D-2'-methyl

10:04:08 24  ribofuranosyl nucleosides.

10:04:11 25  A.      Yes.

10:04:11  1   Q.      The skilled artisan, reading the '597, could have

10:04:16  2   synthesized, for example, 2'-methyl guanosine without undue

10:04:19  3   experimentation back in 2000-2001; right?

10:04:22  4   A.      There was literature to do that actually from Merck

10:04:26  5   to put in a 2'-methyl up and 2' hydroxyl, so yes.

10:04:34  6   Q.      So they could have switched in adenosine; right?

10:04:37  7   A.      Yes.  They could have made an adenine instead of a

10:04:40  8   guanine.

10:04:41  9   Q.      And they could have switched in cytosine?

10:04:44 10   A.      Yes.

10:04:44 11   Q.      They could have switched in Uracel?

10:04:47 12   A.      Yes.

10:04:47 13   Q.      They have put phosphates on it; right?

10:04:50 14   A.      You are talking about on the oxygen of the sugar?

10:04:55 15   Q.      You could have put phosphate on the 5' end?

10:04:58 16   A.      Yes.

10:04:58 17   Q.      You could have put phosphates at the 3' position?

10:05:01 18   A.      Yes.

10:05:01 19   Q.      None of that could have been undue experimentation.

10:05:04 20   That would not beyond the ordinary skill, the artisans level

10:05:08 21   of skill; right?

10:05:09 22   A.      No.  At that time, the literature showed you how to

10:05:12 23   make a 2'-methyl up and 2' down hydroxyl, and certainly

10:05:17 24   there was literature to put phosphates on as well, yes.

10:05:18 25   Q.      And certainly those sorts of things are all

10:05:21  1   characterized as illustrative examples in the '597 patent?

10:05:25  2   A.      I don't remember whether it talks about how you would

10:05:28  3   put a phosphate, details of how you put a phosphate in.  As

10:05:32  4   I said I think in my testimony yesterday, there are two

10:05:39  5   schemes to make compounds with an R group up at the 2' and

10:05:44  6   OH group down at the 2'.  That is what is in there.

10:05:48  7   Q.      But I think you agree that even if those schemes in

10:05:53  8   the patent don't specifically describe how to put as

10:05:56  9   phosphates on, for example, the 5' end, the skilled artisan,

10:06:02 10   that would have been within his skill, his or her skill to

10:06:05 11   do that; right?

10:06:06 12   A.      Well, you would go to the literature and look for a

10:06:08 13   way to do it, to see if you could apply it to a given

10:06:10 14   compound.  That is not always the case that you can.

10:06:13 15   Q.      Are you telling the jury that putting ing a phosphate

10:06:15 16   at the 5' end would have been beyond the level of skill of

10:06:18 17   the ordinary skilled artisan back in 2000?

10:06:20 18   A.      I'm just saying exactly what I said.  That the

10:06:22 19   literature was there to do that.

10:06:24 20   Q.      Okay.

10:06:25 21   A.      But it doesn't work every single time.

10:06:27 22   Q.      I think we're in agreement that putting a phosphate

10:06:30 23   on the 5' end wouldn't have been too much work for the

10:06:33 24   ordinary skilled artisan; right?

10:06:36 25   A.      That's right.

10:06:36 1   Q.      Same for the 3' position; right?

10:06:40 2   A.      Certainly doable.

10:06:40 3   Q.      Putting in a diphosphate would have been doable;

10:06:44 4   right?

10:06:44 5   A.      I would say yes.

10:06:45 6   Q.      Triphosphate would have been doable; right?

10:06:48 7   A.      Yes.  That they get progressively harder, but I would

10:06:52 8   say yes.

10:06:52 9   Q.      Now, in fact -- and so making these illustrative

10:07:01 10  compounds would have been within the ordinary skill of the

10:07:06 11  ordinary artisan in this field back in 2000-2001; right?

10:07:10 12  A.      They come from the Merck papers and patents from the

10:07:14 13  late 60s, so, absolutely, they would.

10:07:17 14  Q.      Well, you raise a good point I would like to explore.

10:07:21 15  And that is I think you testified that this field was in its

10:07:25 16  infancy in 2000-2001.  Do I have that right?

10:07:30 17  A.      Yes.

10:07:31 18  Q.      But nucleoside synthesis was not in its infancy, was

10:07:38 19  it?

10:07:38 20  A.      Oh, no.  Of course not.

10:07:39 21  Q.      You had been doing it for years; right?

10:07:42 22  A.      More years than I would like to remember.

10:07:43 23  Q.      And so it was, nucleoside synthesis was a well

10:07:49 24  developed science by the time of 2000-2001; fair?

10:07:54 25  A.      Certainly, there was a lot of information that could

10:07:58  1    be brought to bear on making nucleosides, but each one is a

10:08:02  2    challenge in itself.

10:08:03  3    Q.    And, by the way, sometimes you wouldn't even

10:08:06  4    necessarily have to synthesize it anew, right?  Sometimes

10:08:09  5    you can find compounds in an existing library with it

10:08:12  6    already available; right?

10:08:15  7    A.    In an existing library, you mean buy it from

10:08:19  8    somebody?

10:08:19  9    Q.    Buy it from somebody or maybe if you are a large

10:08:22 10    company, you have it in your library of compounds.

10:08:26 11    A.    Any company that worked on nucleosides would

10:08:28 12    presumably have some.  They don't last forever, but they

10:08:32 13    would and they're all different, but it is a pretty small

10:08:34 14    number.  Very small number, I would say.

10:08:36 15    Q.    So the newer -- when you talked about the field being

10:08:41 16    in its infancy --

10:08:43 17    A.    Yes.

10:08:43 18    Q.    -- the newer aspect of the HCV field was screening

10:08:49 19    and assaying for activity, right?

10:08:54 20    A.    The newer aspect would be trying to figure out how to

10:08:57 21    get an active compound versus HCV.  I guess that is more or

10:09:02 22    less what you said.

10:09:02 23    Q.    Okay.  And, Dr. Secrist, that is more in the

10:09:08 24    wheelhouse, if you will, of Dr. Seeger and Dr. DeFrancesco,

10:09:14 25    correct?, is screening and assaying for active compounds?

10:09:19 1    A.    The development of the screens and the testing of

10:09:25 2    compounds for sure would be what they would do, not what

10:09:28 3    someone like me would do.

10:09:30 4    Q.    Right.

10:09:33 5          MR. GRIFFITH:  Your Honor, I have got more

10:09:34 6    questions.  I don't have a lot to go but I don't have five

10:09:37 7    minutes to go.  So ...

10:09:38 8          THE COURT:  Well, we might as well given the

10:09:40 9    jury a break.

10:09:42 10          No talking about the case, and we'll get you

10:09:44 11    back here in a little bit.

10:09:47 12          (Jury left courtroom.)

10:10:07 13          THE COURT:  We will be in recess.

10:10:48 14          (Brief recess taken.)

10:10:48 15          *    *    *

10:29:20 16          (Proceedings reconvened after recess.)

10:29:20 17          THE COURT:  Bring the jury back in.

10:29:52 18          (Jury returned.)

10:30:35 19          THE COURT:  All right.  We are ready to proceed.

10:30:38 20          Mr. Griffith.

10:30:38 21    BY MR. GRIFFITH:

10:30:43 22    Q.    Dr. Secrist, I'd like to go back to the topic that

10:30:47 23    you mentioned briefly on your direct, and that was so-called

10:30:52 24    objective factors of nonobviousness.

10:30:56 25    A.    Okay.

10:30:56 1    Q.    Do you recall that?

10:30:58 2    A.    I do.

10:30:58 3    Q.    And I believe you testified that you didn't see any

10:31:01 4    such factors?

10:31:03 5    A.    That's what I said, yes.

10:31:05 6    Q.    And do you understand that objective factors of

10:31:10 7    nonobviousness include things like commercial success,

10:31:14 8    long-felt need in the art, unexpected results, that sort of

10:31:20 9    thing?

10:31:21 10    A.    I do.

10:31:21 11    Q.    Okay.  And with respect to commercial success, do you

10:31:32 12    understand that sofosbuvir, the use of sofosbuvir is covered

10:31:39 13    by the claims of the '597 patent?

10:31:41 14    A.    Sofosbuvir is included in those claims.  Yes, I do

10:31:46 15    understand that.

10:31:46 16    Q.    And it's been a tremendous commercial success;

10:31:46 17    correct?

10:31:51 18    A.    I believe so, yes.

10:31:51 19    Q.    And do you agree that in the 2000 and 2001 time

10:32:02 20    frame, there was a long felt need for a direct acting

10:32:07 21    anti-HCV nucleoside?

10:32:12 22    A.    Well, no.

10:32:15 23    Q.    Let me ask you this.  Do you agree there was a need

10:32:18 24    in the 2000 to 2001 time frame for a more effective

10:32:23 25    treatment of HCV?

10:32:24  1    A.    Yes.

10:32:27  2    Q.    And as far as the 2'-methyl up ribonucleosides

10:32:41  3    described in Figure 1 of the '597 patent --

10:32:48  4    A.    Yes.

10:32:49  5    Q.    -- you understand those to be active against HCV;

10:32:52  6    correct?

10:32:57  7    A.    At least some of them are active.  I'm not sure that

10:32:59  8    they all are.

10:33:00  9    Q.    Okay.  And do you agree that before their activity

10:33:11 10    was discovered, that would not have been expected, the

10:33:15 11    activity of those 2'-methyl up ribonucleosides?

10:33:19 12    A.    Yes.

10:33:22 13    Q.    Now, let me ask you some questions about Mr. Clark

10:33:30 14    and the 2'-methyl up, 2'-fluoro down he made back in early

10:33:40 15    2003 or so.

10:33:41 16    A.    Okay.  Yes.

10:33:42 17    Q.    On your direct, you testified about a Dr. Griffon who

10:33:48 18    works for Idenix; right?

10:33:50 19    A.    Yes.

10:33:50 20    Q.    And you're also familiar with Mr. Clark's work on

10:33:56 21    synthesizing a 2'-methyl, 2'-fluoro ribonucleoside; correct?

10:34:02 22    A.    I have seen the reports and, yes, I'm reasonably

10:34:08 23    familiar with it.

10:34:08 24    Q.    And you heard him testify, correct?, by videotape.

10:34:12 25    A.    I did.

Secrist - cross

10:34:13 1    Q.    And that compound that he made is sometimes called

10:34:18 2    6130.  We refer to it as 6130 for short.

10:34:23 3    A.    The first one he made was 6130.

10:34:26 4    Q.    Right.  Did you know that when Mr. Clark first

10:34:34 5    reported that idea to Mr. Otto, he was in possession of the

10:34:42 6    specification for the '597 patent?

10:34:44 7    A.    Okay.  So let me -- please ask it again.  Two parts.

10:34:55 8    Q.    Sure.

10:34:57 9    A.    Thank you.

10:34:57 10   Q.    Do you recall when he went into Dr. Otto's office to

10:35:01 11   report on his idea of this methyl up, fluoro down compound,

10:35:07 12   he was in possession of the specification for the '597

10:35:11 13   patent?

10:35:11 14   A.    Yes, I believe it had recently published and he took

10:35:15 15   that and had gone into Dr. Otto's office.  That is what I

10:35:18 16   heard, yes.

10:35:19 17   Q.    So he had that before he started doing his synthesis

10:35:22 18   work; right?

10:35:24 19   A.    I don't know the answer to that question.

10:35:25 20   Q.    And did you know that within a few weeks of first

10:35:37 21   writing down the structure of that compound, methyl up,

10:35:41 22   fluoro down, within a few weeks of that, he came up with the

10:35:45 23   synthesis route and synthesized it with protected groups?

10:35:50 24   A.    I don't know the timing of those things or how long

10:35:54 25   it took.

10:35:54 1    Q.    So that is not something you factored into your

10:35:57 2    opinions in this case?

10:35:57 3    A.    Well, I looked at his documents, so I had to have

10:36:01 4    seen it, but I don't remember now what the dates were.  We

10:36:05 5    can look at them if you wish.  I just say I don't remember

10:36:08 6    the dates.  You said a few weeks.  I don't know about that.

10:36:11 7    Q.    And do you know that Mr. Clark did not have a Ph.D.?

10:36:15 8    A.    Yes, I knew that.

10:36:16 9    Q.    And so as we defined the level of skill in this case

10:36:25 10   -- I'm sorry.  As I defined the level of skill in this case,

10:36:27 11   he was actually below the level of ordinary skill; correct?

10:36:31 12   A.    Oh, absolutely not.

10:36:32 13   Q.    Well, he did not have a Ph.D.?

10:36:35 14   A.    That's correct.

10:36:35 15   Q.    And he did not have four years of experience in drug

10:36:39 16   development; right?

10:36:41 17   A.    I'm not sure about that.  But looking at him, I would

10:36:45 18   say that he meets the qualifications.

10:36:47 19   Q.    All right.  I want to switch topics.  You gave some

10:36:55 20   testimony about Merck work and a Merck patent application?

10:37:00 21   A.    Yes.

10:37:01 22   Q.    I want to talk about that.

10:37:02 23   A.    Okay.

10:37:02 24   Q.    And in connection with that testimony, you relied

10:37:12 25   extensively on a Merck patent application that was filed in

10:37:16 1    January of 2001; correct?

10:37:19 2    A.    Yes.

10:37:19 3    Q.    And I believe you testified that in view of that

10:37:25 4    application, filed in January 2001, the claims 4 to 7, 9 to

10:37:32 5    10, 16, 23, and 29 are obvious.

10:37:38 6    A.    Yes.

10:37:38 7    Q.    So you used that January 2001 application for your

10:37:45 8    obviousness opinions; right?

10:37:47 9    A.    Yes.

10:37:47 10   Q.    Okay.  And if that Merck patent application is not

10:37:54 11   prior art, so if it's not before the Idenix work, that

10:38:00 12   obviousness opinion goes out the window; right?

10:38:04 13   A.    I presume it would have to be prior art.

10:38:06 14   Q.    All right.  You presume that the Merck patent would

10:38:09 15   have to be prior art for your obviousness opinion on those

10:38:12 16   claims that I just enumerated to be relevant; right?

10:38:16 17   A.    I'm not an attorney, so I can't say for sure, but I

10:38:23 18   would say yes.

10:38:24 19   Q.    And I understand you are not, but it seems it has to

10:38:29 20   be prior for it to be prior art; right?

10:38:32 21   A.    Yes.

10:38:32 22   Q.    Now, the Merck January 2001 application that you

10:38:37 23   relied on is after the May 2000 provisional for the '597

10:38:47 24   patent, right?

10:38:49 25   A.    Right.

10:38:49 1  Q.    So that Idenix filing actually came eight months

10:38:53 2  earlier than the Merck provisional filing; right?

10:38:58 3  A.    Approximately, yes.

10:38:58 4  Q.    And did you know that in the prosecution of the '597

10:39:07 5  patent -- so when it was being reviewed in the Patent

10:39:11 6  Office, the '597 patent -- the U.S. Patent Examiner actually

10:39:16 7  cited a Merck patent against the claims of the '597 patent?

10:39:27 8  A.    The filing prosecution is something I don't have a

10:39:30 9  clear recollection of what was in it, so I can't tell you

10:39:36 10  that I know that right now, just to say it.  But if you want

10:39:40 11  to look at it, I can remind myself of that.  I'd be happy to

10:39:46 12  do that.

10:39:46 13  Q.    Let's do that.  Let's take a look at it.  All right.

10:39:52 14  So if you could turn to Tab 17 of the exhibit binder.

10:39:56 15  A.    Sure.

10:39:56 16  Q.    And you will see PX-3001 there.

10:40:03 17  A.    Yes.

10:40:10 18  Q.    And that is a copy of an Office Action in connection

10:40:15 19  with the patent application for the '597 patent; correct?

10:40:29 20  A.    Well, the front page says an office communication

10:40:32 21  concerning this application.  Is that what you --

10:40:34 22  Q.    Yes.

10:40:35 23  A.    Um-hmm.  I see that.

10:40:36 24  Q.    And if you need to check, I would represent to you

10:40:39 25  that it is the Patent Application No. 10 -- can you see that

10:40:44  1    the patent application number for that is 10-602691?

10:40:49  2    A.    I see that.

10:40:50  3    Q.    That is the same as the patent application for the

10:40:53  4    '597 patent as reported on the cover of the '597?

10:40:59  5    A.    I see that.

10:41:00  6           MR. GRIFFITH:  We move for admission of

10:41:02  7    Plaintiff's Exhibit 3001.

10:41:03  8           THE COURT:  Is there any objection?

10:41:07  9           MR. SINGER:  No objection, Your Honor.

10:41:08 10           THE COURT:  It's admitted.

10:41:08 11           (PTX-3001 was admitted into evidence.)

10:41:26 12    BY MR. GRIFFITH:

10:41:26 13    Q.    Now, let's take a look at the office action, and if

10:41:32 14    we could go -- so the office action, if you go up to the

10:41:35 15    date of it towards the top.

10:41:39 16           So is actually date mailed as November 2005; is

10:41:45 17    that right?

10:41:45 18    A.    I see that.  November 7th, 2005.

10:41:48 19    Q.    And then if we could go to the next page, third page

10:41:56 20    of it.

10:41:56 21           So looking at the numbers on the bottom

10:41:58 22    right-hand corner, it's 003.  In the bottom half you'll see

10:42:06 23    at that time examiner says, issues a rejection based on a

10:42:13 24    Bhat, B-h-a-t patent.

10:42:16 25           Do you see that?

10:42:17 1  A.    Yes, I do.

10:42:17 2  Q.    And that's a Merck patent.

10:42:19 3              Do you understand that?

10:42:19 4  A.    Well, Bhat was one of the people on the Merck Isis

10:42:24 5  team, so I presume that's the case, yes.

10:42:28 6  Q.    And so what the examiner is saying here is, hey,

10:42:34 7  Idenix, this Merck patent is before you, they're before you,

10:42:40 8  so you can't get a patent.

10:42:41 9              That's basically what the examiner is

10:42:43 10  saying here; is that right?  Section 102 rejection; is that

10:42:52 11  right?  102(e)?

10:42:55 12  A.    Again, these numbers, as you might imagine, a

10:42:59 13  scientist wouldn't know those, but I see that it says

10:43:02 14  certain number of the claims are rejected based on -- being

10:43:07 15  anticipated by that patent application.

10:43:09 16  Q.    Okay.  So let's go to then Tab 18.

10:43:20 17  A.    Okay.  I have it.

10:43:21 18  Q.    And this is Idenix's response to the Patent Examiner;

10:43:25 19  is that correct?  Do you see the amendment response?

10:43:34 20  A.    I see it, yes.  That's correct.

10:43:36 21  Q.    And we would move for admission -- and that document

10:43:41 22  is Plaintiffs' Exhibit 3002; is that correct?

10:43:46 23  A.    That's the page I'm on, yes.

10:43:49 24              MR. GRIFFITH:  So we move for admission of

10:43:52 25  Plaintiffs' Exhibit 3002.

10:43:54  1      MR. SINGER:  I object on foundation, Your Honor.

10:43:56  2      THE COURT:  You are objecting to that?

10:43:57  3      MR. SINGER:  Yes.

10:43:59  4      THE COURT:  Mr. Griffith?

10:44:00  5      MR. GRIFFITH:  It's a self-authenticating

10:44:02  6  document.  He is an expert.  He can testify to documents he

10:44:04  7  hasn't seen before and he doesn't have personal knowledge

10:44:06  8  of.

10:44:06  9      THE COURT:  Do you want to respond?

10:44:07 10      MR. SINGER:  If that's a sufficient basis for

10:44:09 11  the Court, I would object.  The witness hasn't seen it

10:44:12 12  before.

10:44:13 13      THE COURT:  I'm going to overrule the objection

10:44:14 14  and admit the document.

10:44:16 15      (PX-3002 was admitted into evidence.)

10:44:19 16  BY MR. GRIFFITH:

10:44:20 17  Q.    So this is Idenix's response to the examiner saying,

10:44:23 18  hey, Merck is first; right?  This is the -- this follows

10:44:28 19  that office action we just looked at.  So it says, you see

10:44:33 20  the first line in response to the office action mailed on

10:44:36 21  November 7, 2005.

10:44:37 22  A.    I see it.

10:44:38 23  Q.    That's the thing we just looked at; is that right?

10:44:40 24  A.    Yes.

10:44:40 25  Q.    Now, if we could go to page 5 of this.

10:44:50 1    A.      Now, are you talking about which 5?  The 0005?

10:44:55 2    Q.      Yes.  Let's do that.  This happens to coincide

10:44:58 3    nicely.

10:44:58 4    A.      They're the same.

10:44:59 5    Q.      It doesn't usually happen.

10:45:00 6    A.      Sorry.  If I had seen that, I wouldn't have asked.

10:45:03 7    Okay.  I've got it.

10:45:04 8    Q.      And if we could blow up the second -- there we go.

10:45:09 9    Rejections under 35 U.S.C., 102.  So 102 is called

10:45:14 10   anticipation; right?  You referred to Dr. Seeger talking

10:45:18 11   about anticipation?

10:45:19 12   A.      Yes.

10:45:19 13   Q.      Right?  And so Idenix says, the United States Patent

10:45:25 14   Office Examiner says, you've rejected these claims as being

10:45:29 15   anticipated by the Bhat patent.  And so they then go --

10:45:34 16   let's go to the next paragraph.

10:45:35 17   A.      Okay.

10:45:36 18   Q.      And so that's where Idenix is just saying what the

10:45:38 19   Patent Office has already done.

10:45:40 20   A.      Correct.

10:45:42 21   Q.      All right.  And then Idenix says, let me explain the

10:45:46 22   dates for the Bhat patent.  Okay?

10:45:49 23   A.      Okay.

10:45:49 24   Q.      And you'll see, he goes through it as a family

10:45:53 25   lineage, so to speak, that if you will note, goes back to

10:45:57 1   January 22, 2001.  And the provisional application No.

10:46:09 2   60/263,313.

10:46:09 3          Do you see that?

10:46:10 4   A.    Okay.  Just give me a second to read it.

10:46:12 5          (Pause while witness reviewed exhibit.)

10:46:20 6          THE WITNESS:  Yes, I see it.

10:46:23 7   BY MR. GRIFFITH:

10:46:23 8   Q.    Okay.  So that January 22nd, 2001 application is the

10:46:28 9   provisional application that you testified about?  Do you

10:46:32 10  understand that?

10:46:33 11  A.    I believe it is, yes.

10:46:34 12  Q.    Okay.  And then let's look further at what Idenix

10:46:38 13  says to the United States Patent Office.

10:46:40 14         They say, the present application claims

10:46:42 15  earliest priority to U.S. provisional application No.

10:46:50 16  60/206,585, filed on May 23, 2000, predating the early

10:46:55 17  earliest priority document of Bhat by eight months.

10:46:59 18  A.    I see it, yes.

10:47:01 19  Q.    So they explained, the Examiner, you thought that

10:47:05 20  Bhat was earlier, but, in fact, our filing date is earlier?

10:47:09 21  A.    Yes.

10:47:10 22  Q.    That's what they are saying?

10:47:11 23  A.    That's what they are saying, exactly.

10:47:14 24  Q.    So let's go to what the Patent Office does.  If you

10:47:19 25  could go to tab 19.  And that is a copy of Plaintiffs'

10:47:28 1     Exhibit 3005; is that correct?

10:47:29 2     A.     Yes.

10:47:30 3     Q.     And it's the office action that responds to what

10:47:33 4     Idenix just filed; right?  It's dated May 30th, 2006.

10:47:48 5     A.     I see that.  I was -- I'm sure what you say is true.

10:47:51 6     I'm just looking for where it says that it's responding to

10:47:54 7     it.

10:47:54 8     Q.     Well, first, I move for the admission of Plaintiffs'

10:48:00 9     Exhibit 3005.

10:48:01 10          MR. SINGER:  No objection, Your Honor.

10:48:02 11          THE COURT:  It's admitted.

10:48:03 12          (PX-3005 was admitted into evidence.)

10:48:05 13    BY MR. GRIFFITH:

10:48:06 14    Q.     And if we could go to page 3 of the office action.

10:48:10 15          And in the middle of the page there, the United

10:48:14 16    States Patent Examiner says -- if we could include the bit

10:48:21 17    right above that.  Let me back up a second.  There we go.

10:48:26 18          The United States Patent Office Examiner says,

10:48:29 19    the amendment filed March 10, 2006 has been received and

10:48:34 20    carefully considered; right?

10:48:35 21    A.     I see it.

10:48:37 22    Q.     And then the Examiner says at the bottom, 102(e)

10:48:44 23    rejection, which has been overcome by the applicant's

10:48:49 24    arguments?

10:48:49 25    A.     I see it.

Q.     103(a) rejection overcome by the applicant's
arguments?

A.     Yes.

Q.     So the United States Patent Examiner is saying you're
first.  You, Idenix, are first.  You're entitled to priority
to your May 2000 provisional application; is that correct?

A.     Well, I don't know the details of what the Patent
Examiner would specifically say, but I do see that the
Patent Examiner lists the rejections as having been
withdrawn.

Q.     And you didn't know about this before you formed your
opinions about the Merck work and those anticipation and 103
opinions; right?

A.     Oh, I'm not sure I can say that.  I looked at so many
things along the way, I couldn't say that for sure.

Q.     But you certainly didn't mention this in your direct
testimony; right?

A.     No, I did not.

Q.     And the Patent Examiner, the United States Patent
Examiner is looking at the very same question that you're
talking to the jury about in this case?

A.     Yes.

Q.     Who's first; right?

A.     Yes.

Q.     And the United States Patent Examiner came out

10:49:59 1  opposite from the way you're coming out; is that correct?

10:50:01 2  A.      That's correct.

10:50:02 3  Q.      And the United States Patent Examiner is an object of

10:50:05 4  unbiased party.

10:50:06 5                    Do you agree?

10:50:07 6  A.      I can't comment on their objectivity.  I will say

10:50:14 7  that they try to look at all the information they have

10:50:16 8  available to them.

10:50:17 9  Q.      You have no reason to believe that the United States

10:50:20 10 Patent Examiner was biased in any way, do you?

10:50:23 11 A.      No, I don't.

10:50:24 12 Q.      Okay.

10:50:24 13 A.      No, not at all.

10:50:26 14 Q.      And if the United States Patent Examiner is correct,

10:50:31 15 your opinion on obviousness of claims 4 to 7, 9 to 10, 16,

10:50:37 16 23 and 29 goes out the window; is that correct?

10:50:40 17 A.      If the Patent Examiner is correct.  I don't accept

10:50:44 18 that the Patent Examiner is correct.

10:50:48 19                MR. GRIFFITH:  Okay.  Thank you, Dr. Secrist.

10:50:50 20                THE COURT:  Redirect?

10:50:51 21                    REDIRECT EXAMINATION

10:50:52 22 BY MR. SINGER:

10:51:02 23 Q.      Let me begin where counsel for Idenix left off.

10:51:08 24                Dr. Secrist, are you aware, was the patent

10:51:12 25 examiner told any examination about the 1998 BVDV testing

10:51:17 1   that Merck undertook?

10:51:18 2   A.     Well, I would say, no, the Patent Examiner wouldn't

10:51:24 3   have known that.

10:51:24 4   Q.     Was the Patent Examiner told about the 2000 Merck

10:51:28 5   replicon testing?

10:51:29 6   A.     I don't believe so, no.

10:51:31 7   Q.     Was the Patent Examiner told about Griffon's, Dr.

10:51:36 8   Griffon's failures to be able to make the 2'-Beta fluoro

10:51:39 9   during examination?

10:51:40 10   A.     I wouldn't think so, no.

10:51:41 11   Q.     Was the Patent Examiner told about the inactivity of

10:51:44 12   the 2'-Beta compounds we saw in Dr. Gosselin's document

10:51:50 13   yesterday?

10:51:50 14   A.     I don't believe so.

10:51:51 15   Q.     All right.  With respect to the Merck reference that

10:51:56 16   you relied on, were you relying on that as an obviousness

10:52:02 17   reference or simply to try to simply show the jury what the

10:52:07 18   what the state of the art was?

10:52:09 19            MR. GRIFFITH:  Objection.  Leading.

10:52:10 20            THE COURT:  Sustained.

10:52:11 21            MR. SINGER:  I will ask a different question,

10:52:13 22   Your Honor.

10:52:13 23   Q.     Dr. Secrist, in your opinion, was the use of

10:52:16 24   ribavirin as an additional agent known in May of 2000?

10:52:19 25   A.     Yes.

10:52:20  1    Q.      Was the use of interferon known as an additional HCV

10:52:24  2    treatment agent known in 2000?

10:52:25  3    A.      Certainly.

10:52:26  4    Q.      And was the use of phosphates and salts and esters

10:52:29  5    with nucleosides for treatment of diseases known in May of

10:52:35  6    2000?

10:52:36  7              MR. GRIFFITH:  Objection.  Leading.

10:52:37  8              THE COURT:  Overruled.

10:52:39  9              THE WITNESS:  Oh, yes.  We used it for one of

10:52:43 10    our approved ANDA drugs.

10:52:45 11    BY MR. SINGER:

10:52:45 12    Q.      Did people use capsules in May of 2000?

10:52:48 13    A.      Yes.

10:52:49 14    Q.      Did people use dosage units between 50 and 1,000

10:52:54 15    milligrams in May of 2,000?

10:52:56 16    A.      Oh, yes, of course.

10:52:57 17    Q.      And did people try to treat diseases in humans with

10:53:00 18    nucleosides in May of 2000?

10:53:02 19    A.      Yes.

10:53:03 20    Q.      All right.  You were shown some communications from

10:53:07 21    the file history of the patent-in-suit.  I'd like to just

10:53:11 22    look at the one where Idenix described why they should be

10:53:21 23    considered to be before Merck, and that was PX-3002.

10:53:26 24              MR. SINGER:  I don't know if we have that, Mr.

10:53:27 25    Sayres, or if we don't.

Secrist - redirect

                    THE COURT:  I will ask Idenix to display it for

you.

                    THE WITNESS:  I have the first page here.

BY MR. SINGER:

Q.     I'm going to ask you to go to page 5.  It will

probably be faster if we just use -- thank you kindly.

                    If we go to the middle, counsel for Idenix

showed you the paragraph under rejections where it says, the

priority documents are.  It's the third paragraph down.

A.     I see it.

Q.     Okay.  And then he didn't show you the next

paragraph, did he?

A.     I don't believe so, no.

Q.     All right.  Actually, that's the one I wanted to look

at.  It was the paragraph before, I believe, that counsel

showed you.

                    It says, support for the pending claims can

be found throughout provisional application 60/206,585, a

copy of which is attached.  Specifically, the compound with

Formula VI on page 23 discloses a Beta-D-2'- methyl

ribofuranosyl nucleoside, wherein base is a purine or

pyrimidine base.  R4 may be alkyl and R prime may be H.

                    Were you shown Figure -- excuse me, Formula 6 on

your cross-examination?

A.     No, I was not.

10:54:52  1    Q.    Could we go to page 30 of PX-3002.

10:54:56  2    A.    Are you talking about 0030?

10:54:59  3    Q.    Yes.

10:54:59  4    A.    Okay.

10:54:59  5    Q.    So it's page 23, Dr. Secrist, of the document?

10:55:02  6    A.    Okay.

10:55:02  7    Q.    Page 30 is stamped by counsel for Idenix.

10:55:06  8    A.    Okay.  Page 23.  I have it.

10:55:08  9    Q.    All right.  And if we could show that on the screen

10:55:10 10    for the jury, please.

10:55:12 11            And if you could, highlight Figure 6, which is

10:55:16 12    the top figure.  What is the 2' down of that figure?

10:55:23 13    A.    Again, it's a hydroxyl group down at the 2' position.

10:55:27 14    Q.    Is that any surprise to a person of skill in the art

10:55:29 15    at that time?

10:55:30 16    A.    Certainly not.

10:55:30 17    Q.    And why is that?

10:55:32 18    A.    Well, as I've said repeatedly, in the situation where

10:55:37 19    you're dealing with an RNA virus, the machinery wants to

10:55:41 20    have a 2' down hydroxyl, so it makes sense that that would

10:55:45 21    be where you would go.

10:55:46 22    Q.    All right.  You were asked some questions --

10:55:49 23            MR. SINGER:  You can take that down.  Thank you.

10:55:51 24    BY MR. SINGER:

10:55:52 25    Q.    You were asked some questions about sofosbuvir's

| | |
|---|---|
| 10:55:56 1 | commercial success. |
| 10:55:57 2 | Do you recall that? |
| 10:55:57 3 | A. Yes. |
| 10:55:57 4 | Q. You were asked whether sofosbuvir was encompassed |
| 10:56:01 5 | within the scope of the asserted claims. |
| 10:56:02 6 | Do you recall that? |
| 10:56:03 7 | A. Yes. |
| 10:56:04 8 | Q. Do the claims also cover Idenix compound 184? |
| 10:56:07 9 | A. Yes. |
| 10:56:08 10 | Q. As you understand it? |
| 10:56:09 11 | A. Of course, they do. |
| 10:56:10 12 | Q. Do they cover NM283? |
| 10:56:13 13 | A. Yes. |
| 10:56:13 14 | Q. Were those -- were those compounds commercially |
| 10:56:18 15 | successful? |
| 10:56:18 16 | A. No, they were not. |
| 10:56:19 17 | Q. Do you believe there's a nexus between the commercial |
| 10:56:22 18 | success of sofosbuvir and the claimed invention? |
| 10:56:26 19 | MR. GRIFFITH: Objection. Leading. |
| 10:56:28 20 | MR. SINGER: It's not a leading question, Your |
| 10:56:30 21 | Honor. |
| 10:56:30 22 | THE COURT: Overruled. |
| 10:56:31 23 | THE WITNESS: So a connection? No. No, I do |
| 10:56:35 24 | not. |
| 10:56:35 25 | BY MR. SINGER: |

10:56:36 1    Q.      And why not?

10:56:37 2    A.      Well, there are all of thinks different things.

10:56:40 3    There's absolutely no connection between that and the Idenix

10:56:46 4    application or patent.

10:56:47 5    Q.      All right.  Thank you.

10:56:49 6            If we could, you were asked some questions about

10:56:53 7    a couple -- excuse me.  Actually, I will go over here.

10:56:59 8            You were asked about a patent of yours on

10:57:01 9    cross-examination.

10:57:02 10           Do you recall that?

10:57:03 11   A.      I do.

10:57:04 12   Q.      And do you remember, Dr. Secrist, that was -- if I

10:57:10 13   have the number right, PX-1794 A?

10:57:13 14           MR. SINGER:  Do we have that, Mr. Sayres?

10:57:15 15   BY MR. SINGER:

10:57:17 16   Q.      And when does that patent actually date from, Dr.

10:57:20 17   Secrist?

10:57:20 18   A.      When does it actually date from?

10:57:22 19   Q.      Yes.  When was it filed?

10:57:23 20   A.      August 19th of 2009 is what it says there.

10:57:28 21   Q.      Had the field of treatments for HCV, is that a more

10:57:37 22   advanced state -- strike that.

10:57:39 23           Was there greater or lesser knowledge about

10:57:41 24   treatments for HCV in 2009 than the dates we're talking

10:57:45 25   about in this case?

10:57:46 1  A.      Well, I believe there were no additional approved

10:57:53 2  drugs, but the knowledge in the field has certainly advanced

10:57:58 3  significantly during those years.

10:57:59 4  Q.      Now, you were shown some replicon data, I think, for

10:58:03 5  the compounds in your class; is that correct?  Do you

10:58:06 6  remember that on your cross-examination?

10:58:07 7  A.      The data -- yes, I do remember.  I'm sorry.  Yes.

10:58:16 8  Q.      And --

10:58:17 9  A.      The table with 12 compounds in it.

10:58:19 10  Q.      Exactly.  And that's in column 86, if we can go to

10:58:22 11  that real quick, Mr. Sayres.

10:58:24 12          Is there any replicon data like this in the

10:58:31 13  Idenix patent that you analyzed?

10:58:33 14  A.      No, no.

10:58:34 15  Q.      Is it your -- what is your opinion as to whether

10:58:37 16  there's any antiviral data in that patent at all?

10:58:41 17  A.      There is no antiviral data in that patent.

10:58:44 18  Q.      These compounds, do these act like nucleosides?

10:58:47 19  Are these similar to nucleosides or different than

10:58:49 20  nucleosides?

10:58:50 21  A.      These -- this particular series of compounds

10:58:53 22  absolutely does not act like nucleosides and they have no

10:58:56 23  effect on this polymerase enzyme that we've been talking

10:58:59 24  about for all these days.  They do something completely

10:59:01 25  different.

10:59:02 1    Q.    Is that related to the field that we're in in this

10:59:04 2    case or different than the field we're in in this case?

10:59:06 3    A.    Well, it relates to treatment of HCV, but it doesn't

10:59:09 4    relate to nucleosides for the treatment of HCV.

10:59:12 5    Q.    Thank you.

10:59:13 6          A few more questions, Dr. Secrist.  You were

10:59:16 7    asked about an e-mail from Dr. Schinazi to a Dr. Stuyver.

10:59:23 8    It was PX-478.

10:59:24 9          MR. SINGER:  I just want to focus on the very

10:59:26 10   top part of that, Mr. Sayres, if we could have that.  All

10:59:32 11   right.

10:59:32 12   BY MR. SINGER:

10:59:33 13   Q.    What is that e-mail date from, Dr. Secrist?

10:59:36 14   A.    The date is October 15th of 2001.

10:59:40 15   Q.    When you here when Mr. Clark's testimony was played?

10:59:42 16   A.    I was.

10:59:43 17   Q.    Is this date before or after Mr. Clark came up with

10:59:46 18   his invention of the 2'-Beta fluoro compound?

10:59:50 19   A.    It's before.

10:59:51 20   Q.    And do you know about how much before?

10:59:54 21   A.    Well, based on what we talked about with

10:59:59 22   Mr. Griffith, the publication of the patent application was

11:00:07 23   sometime in November, so it would have been after the

11:00:09 24   November publication.

11:00:10 25   Q.    I was asking about Mr. Clark's invention.

11:00:12 1    A.    Oh.

11:00:13 2    Q.    Was Mr. Clark's --

11:00:14 3    A.    I'm sorry.

11:00:15 4    Q.    -- invention before or after this date?

11:00:17 5    A.    Oh, it was after.

11:00:18 6    Q.    All right.  And how much after?  That's what I was

11:00:20 7    asking.

11:00:20 8    A.    Quite a bit after.  It was pre-2003.  I'm sorry.

11:00:24 9    Q.    You'll see Dr. Schinazi is talking about, we will

11:00:26 10   defend our invention.  Do you see that?

11:00:28 11              To your understanding, is he talking about

11:00:31 12   Mr. Clark's invention or could he be talking about

11:00:33 13   Mr. Clark's invention?

11:00:35 14   A.    He's certainly not.

11:00:36 15   Q.    That would be impossible?

11:00:37 16   A.    Certainly not.

11:00:38 17   Q.    All right.  Thank you.

11:00:39 18              You were also shown a document we've seen,

11:00:44 19   PX-678, about Idenix derivatives.  Do you recall that on

11:00:48 20   your cross-examination?  I can show you it again if you need

11:00:55 21   to.

11:00:55 22   A.    Very quickly, I'd like to see it, please.

11:00:57 23   Q.    It's PX-678.  It's in the binder counsel for Idenix

11:01:01 24   gave you?

11:01:03 25   A.    I don't know which tab that would be.

11:01:05 1  Q.      Maybe we can put it on the screen.  Mr. Sayres has

11:01:08 2  put it on the screen, Dr. Secrist.

11:01:10 3  A.      Okay.  Great.  Thank you.

11:01:11 4  Q.      And all I really wanted to ask you was:  Were you

11:01:14 5  here when Dr. Rachakonda testified, Dr. Secrist?

11:01:17 6  A.      Oh, yes, I was.

11:01:18 7  Q.      Were you here when she talked about -- strike that.

11:01:23 8          Do you understand that she authored these

11:01:24 9  minutes or someone else did?

11:01:26 10 A.      My understanding is that she did.

11:01:30 11 Q.      Did you hear her explain about the chemical

11:01:33 12 definition of derivative is different than how we might use

11:01:38 13 it in ordinary conversation?

11:01:40 14 A.      Oh, yes.  Mm-hmm.

11:01:41 15 Q.      And do you agree with that concept?

11:01:44 16 A.      I do, yes.

11:01:45 17 Q.      What does it mean for the jurors when someone says

11:01:48 18 something is a derivative chemically versus how we might use

11:01:52 19 it in regular conversation?

11:01:54 20 A.      Well, a derivative might be a prodrug.  It might be

11:01:58 21 something you would take a structure and you would make some

11:02:02 22 addition to it or change to it so that it directly came from

11:02:06 23 that molecule.

11:01:42 24 Q.      Is it more fair to call it a structural analog?

11:01:55 25          MR. GRIFFITH:  Objection, leading.

11:01:56 1          THE COURT:  Sustained.

11:01:57 2          MR. SINGER:  I'll strike that.

11:01:57 3   BY MR. SINGER:

11:01:58 4   Q.     Did you agree with Dr. Rachakonda when she called it

11:02:00 5   a structural analog?

11:02:02 6          MR. GRIFFITH:  Objection, leading.

11:02:03 7          THE COURT:  Sustained.

11:02:04 8          MR. SINGER:  I'll move on.

11:02:04 9   BY MR. SINGER:

11:02:05 10  Q.     Finally, Dr. Secrist, you were shown a figure from

11:02:10 11  the patent, Figure 1, which is at, I believe -- thank you.

11:02:16 12  And it described chemical structure of illustrative

11:02:20 13  nucleosides.

11:02:21 14         Whoops.  That's a really small part of one.

11:02:26 15         If we could look, I think you were shown -- I

11:02:32 16  don't recall which one, but I wanted to ask you, what is at

11:02:36 17  the 2' down position of each of those nucleosides that are

11:02:41 18  described as illustrative?

11:02:43 19  A.     Well, in every single case, that is 3, 6, 8, 10

11:02:50 20  compounds, there is an OH down at the 2' position.

11:02:53 21         So just, there, there, there, and so on, down to

11:02:59 22  ribavirin.  OH down for all of them.

11:03:03 23  Q.     Just for clarification, the FIAU does that have a 2'

11:03:07 24  down?

11:03:08 25  A.     I'm sorry.  All but one.  FIAU does not.

11:03:12 1   Q.      And is that a prior art compound?

11:03:15 2   A.      Yes.

11:03:16 3   Q.      Now, at the time of the invention -- and it uses the

11:03:18 4   term riba, do you see that, Dr. Secrist?  Maybe I can point

11:03:24 5   it out.

11:03:26 6           It uses the term ribo.  Do you see that?

11:03:29 7   A.      Yes.

11:03:30 8   Q.      At the time of the invention, what did a person of

11:03:32 9   skill believe was at the 2' position, in your opinion, of a

11:03:37 10  ribonucleoside?

11:03:38 11  A.      Well, as a scientist, I would say a 2' OH down.

11:03:44 12  Q.      All right.  And then, finally, Dr. Secrist, in your

11:03:47 13  opinion, does the patent, the '597 patent show anything new

11:03:55 14  or novel being made or tested for HCV at the 2' down

11:04:02 15  position over what was known in the prior art?

11:04:05 16  A.      No, certainly not.

11:04:09 17          MR. SINGER:  I have nothing further, Your Honor.

11:04:10 18          THE COURT:  All right.  Thank you very much.

11:04:11 19  You can step down.

11:04:13 20          THE WITNESS:  Thank you, Your Honor.

11:04:14 21          (Witness excused.)

11:04:21 22          THE COURT:  Mr. Singer, will you remove the

11:04:24 23  binders.

11:04:24 24          MR. SINGER:  I will.  And I will remove ...

11:04:27 25          THE COURT:  Remove the board.

11:04:52 1          (Witness stand area cleared.)

11:04:52 2                  THE COURT:  Gilead may call its next witness.

11:04:55 3                  MR. SCHERKENBACH:  Thank you, Your Honor.

11:04:59 4          Good morning, ladies and gentlemen.

11:05:01 5          Our next and last witness is Dr. John Putnam who

11:05:07 6   is Gilead's expert in patent valuation.  We call

11:05:12 7   Dr. Jonathan Putnam.

11:05:13 8                  THE COURT:  Thank you.

11:05:19 9              ...  JONATHAN PUTNAM, having been first duly

11:05:35 10  sworn, was examined and testified as follows ...

11:05:45 11                 THE COURT:  Welcome, Dr. Putnam.  Good morning

11:05:47 12  to you.

11:05:48 13                 THE WITNESS:  Good morning.

11:05:52 14                 MR. WARDEN:  Your Honor, I have some binders.

11:05:55 15          (Documents passed forward.)

11:06:17 16                 DIRECT EXAMINATION

11:06:17 17  BY MR. WARDEN:

11:06:18 18  Q.     Good morning, Dr. Putnam.

11:06:19 19  A.     Good morning.

11:06:20 20  Q.     Could you please introduce yourself to the jury?

11:06:22 21  A.     Sure.  My name is Jonathan Putnam.  I work at

11:06:26 22  Competition Dynamics, and I'm an economist who specializes

11:06:29 23  in the analysis of intellectual property like patents.

11:06:31 24  Q.     Why are you here, Dr. Putnam?

11:06:33 25  A.     I was retained by Gilead to address Idenix's damages

11:06:38 1    claim in this case and to help the jury understand

11:06:41 2    Mr. Carter's opinions.

11:06:42 3    Q.    Do you agree with Mr. Carter's opinions?

11:06:44 4    A.    Not at all.

11:06:45 5    Q.    Why not?

11:06:46 6    A.    Well, I think Mr. Carter makes three fundamental

11:06:49 7    mistakes.  First of all, he ignores the real world evidence

11:06:52 8    in this case.

11:06:54 9              Secondly, he relies on the wrong licenses.

11:06:58 10             And third, when he analyzes the licenses, he

11:07:01 11   analyzes them incorrectly.

11:07:03 12   Q.    All right.  Before we get into the specifics of your

11:07:06 13   disagreement, I want you to tell the jury a little bit about

11:07:08 14   your background.

11:07:09 15             First, can you tell the jury about your

11:07:10 16   education?

11:07:10 17   A.    Sure.  I have a bachelor's degree and master's degree

11:07:14 18   and a Ph.D. agree all in economics and all from Yale

11:07:18 19   University.

11:07:18 20   Q.    And other than your Ph.D., did you receive any other

11:07:21 21   graduate training?

11:07:22 22   A.    Yes.  I studied intellectual property law and

11:07:27 23   competition law at Yale Law School and Columbia Law School.

11:07:32 24   Q.    Have you ever taught anywhere?

11:07:34 25   A.    Yes.  Actually, I was a chair in the law and

11:07:36 1    economics of intellectual property at the University of

11:07:39 2    Toronto where I taught patent law and the regulation of high

11:07:42 3    technology industries.

11:07:43 4    Q.    At the beginning of your testimony up mentioned you

11:07:46 5    work at Competition Dynamics.  What is that?

11:07:49 6    A.    That is a firm that I founded.  We specialize in the

11:07:52 7    economic analysis of intellectual property and R&D based

11:07:56 8    competition.

11:07:56 9    Q.    And have you served as an expert in other patent

11:07:59 10   cases?

11:07:59 11   A.    Yes.  Over 100 times.

11:08:01 12   Q.    Have you served specifically as an expert on patent

11:08:04 13   cases involving pharmaceuticals?

11:08:05 14   A.    Yes, many times.

11:08:07 15         MR. WARDEN:  Your Honor, we offer Dr. Putnam as

11:08:09 16   an expert in patent valuation an assessing patent damages.

11:08:12 17         MS. PARKER:  No objection, Your Honor.

11:08:14 18         THE COURT:  He is so recognized.

11:08:14 19   BY MR. WARDEN:

11:08:16 20   Q.    Dr. Putnam, are you being compensated for your time?

11:08:18 21   A.    Yes, at my regular rate.

11:08:20 22   Q.    Is your compensation dependent on the outcome of this

11:08:22 23   case?

11:08:22 24   A.    No.

11:08:25 25   Q.    As part of your analysis, what assumptions do you

11:08:28 1  make about Idenix's '597 patent?

11:08:30 2  A.     I assume, as we always do, that the patent is valid.

11:08:34 3  Q.     Are you offering an opinion about the validity of the

11:08:37 4  '597 patent?

11:08:38 5  A.     No, I have no opinion one way or the other.

11:08:41 6  Q.     And if the jury finds that the '597 patent is not

11:08:45 7  valid, what are the damages?

11:08:46 8  A.     If the patent is invalid, then the damages are zero.

11:08:49 9  Q.     And at that point, does the jury need to consider the

11:08:52 10  analysis that you have given or that Mr. Carter has given?

11:08:55 11  A.     Nope.

11:08:56 12  Q.     All right.  Let's talk about your criticisms of

11:08:58 13  Mr. Carter.  The first thing you said is that you think

11:09:01 14  Mr. Carter is ignoring the real world evidence?

11:09:04 15  A.     Yes.

11:09:04 16  Q.     What is the real world evidence that Mr. Carter is

11:09:08 17  ignoring?

11:09:09 18  A.     The most important real world evidence is something

11:09:11 19  called the Merck Purchase Price Allocation or PPA.

11:09:14 20        The PPA establishes that Idenix could not have

11:09:18 21  placed a value of $2.54 billion on its claim against Gilead.

11:09:23 22        MR. WARDEN:  Let's take a look at the PPA.  And,

11:09:25 23  Mr. Sayres, can you put up DX-2461 which is already in

11:09:30 24  evidence.

11:09:30 25  BY MR. WARDEN:

11:09:31  1    Q.      Now remind the jury what the PPA is.

11:09:34  2    A.      So, in 2014, Merck bought Idenix.  When a public

11:09:40  3    company acquires another company, you have to do an

11:09:42  4    inventory of the assets that you purchased.  You have got

11:09:45  5    to divide up the value of the company to make sure that you

11:09:48  6    know what you purchased, and so one of the assets that Merck

11:09:52  7    purchased from Idenix was the value of this claim in this

11:09:57  8    litigation.

11:09:58  9    Q.      And why is the value that Merck placed on this claim

11:10:01 10    and this litigation relevant if this PPA came after the time

11:10:06 11    of the hypothetical negotiation?

11:10:07 12    A.      Well, that is a good question.  This is an inventory,

11:10:12 13    so you are trying to look at what Merck actually bought from

11:10:14 14    Idenix.  The question is are the economic circumstances at

11:10:17 15    the time of this valuation the same as they would be at the

11:10:19 16    time of the hypothetical negotiation?  And for most of the

11:10:22 17    assets in that inventory, the answer is yes.  And so it's

11:10:26 18    legitimate to look at that inventory then.

11:10:29 19              MR. WARDEN:  Let's take a look at page 7.  If we

11:10:34 20    blow up the table here.

11:10:34 21    BY MR. WARDEN:

11:10:36 22    Q.      What is shown on page 7?

11:10:39 23    A.      On page 7 is just a list of this, of the assets in

11:10:43 24    this inventory.  They are grouped into five categories.

11:10:46 25    Q.      Where within this list would we find Idenix's claim

11:10:50 1    against Gilead?

11:10:51 2    A.    Well, you can see the largest item is the value of

11:10:56 3    the compound that Merck wanted to acquire from Idenix, but

11:11:00 4    then the answer to your question is Merck's claim would be

11:11:04 5    found in something called goodwill, assembled workforce and

11:11:07 6    residual goodwill, which is the fourth category.

11:11:10 7         That is sort of a catchall category where

11:11:13 8    everything else that isn't given a specific value is placed.

11:11:16 9    Q.    And how do you know that the claim is included

11:11:19 10   anywhere at all in these assets?

11:11:22 11   A.    Well, it has to be included somewhere because they

11:11:24 12   purchased all of the assets and so if it's not specified

11:11:27 13   specifically somewhere else, it has to fall into the

11:11:30 14   catchall category.

11:11:31 15   Q.    So looking at this catchall category, the value put

11:11:35 16   on goodwill is $1.55 billion.  Does that mean that Merck

11:11:40 17   could have valued Idenix's claim as high as $1.55 billion?

11:11:44 18   A.    No, because if you look at the notices here, with

11:11:47 19   this category, it says that most of that amount, a little

11:11:50 20   over $1.1 billion is actually related to something called

11:11:54 21   deferred tax liabilities, which is the next item down, about

11:11:59 22   $1.17 billion.

11:12:01 23   Q.    What happens when you account for the $1.17 billion

11:12:04 24   that is the deferred tax liabilities?

11:12:06 25   A.    If you subtract the $1.17 billion from the

11:12:09 1    $1.55 billion, you are left with $380 million, and that is

11:12:14 2    the true value of all the other assets that Merck acquired

11:12:18 3    from Idenix, including the claim in this case.

11:12:21 4    Q.    So is it your opinion that the $380 million is the

11:12:25 5    value that Merck placed on Idenix's claim against Gilead?

11:12:29 6              MS. PARKER:  Objection, leading.

11:12:30 7              THE COURT:  Sustained.

11:12:31 8    BY MR. WARDEN:

11:12:31 9    Q.    What is your opinion about what the $380 million

11:12:35 10   represents?

11:12:35 11   A.    The $380 million is just the maximum value of all the

11:12:39 12   other assets, everything in that category, so it includes

11:12:42 13   the scientists, it include the dozens of patents that Merck

11:12:46 14   purchased from Idenix, everything else, and it also includes

11:12:50 15   the claims.  So the claim itself must be less than that.

11:12:52 16   Q.    Dr. Putnam, are there any differences in the value

11:12:56 17   that Merck placed on Idenix's claim when it did this

11:13:00 18   mid-2014 PPA and the value that you believe Idenix and

11:13:05 19   Gilead would have placed on that claim at a hypothetical

11:13:08 20   negotiation in December of 2013?

11:13:10 21   A.    Yes, there is a few differences.

11:13:13 22            The most important of them is that in the

11:13:15 23   hypothetical negotiation, Idenix and Gilead would be

11:13:19 24   bargaining over the U.S. sales of sofosbuvir.  But Merck was

11:13:25 25   valuing the worldwide sales of sofosbuvir.  And so in a

11:13:30 1  hypothetical negotiation, the valuation would be less than

11:13:33 2  Merck placed on it.

11:13:34 3  Q.     How much less?

11:13:35 4  A.     Well, based on the hundreds of financial analyst

11:13:40 5  reports that I read, the U.S. sales were forecast to be

11:13:43 6  one-half of the worldwide sales, so the claim would be

11:13:46 7  roughly one-half of the value that Merck placed on it.

11:13:48 8  Q.     Now, you said there were some other differences.

11:13:51 9  What other differences are there between the value Merck put

11:13:54 10 on the claim and the value that would have been put on it at

11:13:56 11 a hypothetical negotiation?

11:13:57 12 A.     Well, again, in the hypothetical negotiation, the

11:14:01 13 patent is assumed to be valid.  When Merck was buying the

11:14:05 14 patent claim from Idenix, it didn't know the patent was

11:14:09 15 valid, and so in the hypothetical negotiation, a valid claim

11:14:12 16 would be worth more than Merck paid for it.

11:14:15 17 Q.     And what would be the difference in that value?

11:14:18 18 A.     When Merck was buying the claim, Merck would say to

11:14:21 19 Idenix, we don't know if you are going to win at trial or

11:14:24 20 not.  You might lose.  So we would look at the likelihood

11:14:27 21 that you are going to win or lose, and we would discount the

11:14:33 22 claim based on the probability that you could lose this

11:14:36 23 case.

11:14:37 24        I estimate that probability to be about

11:14:39 25 58 percent based on a widely cited empirical study of the

11:14:44  1    likelihood that patentee win their cases at trial.

11:14:47  2    Q.      When you account for those differences that you

11:14:50  3    discussed, what does that do to the $380 million goodwill

11:14:54  4    value that you testified about?

11:14:55  5    A.      When you combine these two effects, the U.S. sales

11:14:59  6    versus the adjustment for the validity of the patent, you

11:15:01  7    end up with a number that is substantially less than

11:15:04  8    $380 million.

11:15:05  9    Q.      And how does the value that Merck placed on Idenix's

11:15:09 10    claim have anything to do with the value that Idenix would

11:15:12 11    negotiate for at a hypothetical negotiation?

11:15:15 12    A.      Well, the point is that Idenix was willing to sell

11:15:17 13    its claim for substantially less than $380 million to Merck

11:15:22 14    in June of 2014.

11:15:23 15            So in the hypothetical negotiation, Idenix would

11:15:27 16    have been willing to license its patent for substantially

11:15:30 17    less than $380 million to Gilead.

11:15:35 18    Q.      All right.  Dr. Putnam, I want to move on to the

11:15:37 19    second disagreement you said you had with Mr. Carter which

11:15:41 20    is he relies on the wrong licenses.  Is that right?

11:15:43 21    A.      Yes.

11:15:44 22    Q.      In your opinion, what is the correct way to determine

11:15:46 23    what the right licenses are?

11:15:48 24    A.      Well, you have to look at the circumstances of a

11:15:51 25    hypothetical negotiation and try to find license agreements

11:15:54 1  that are as similar as possible to those circumstances.

11:15:57 2  Q.    Did you prepare a demonstrative to show the kind of

11:16:00 3  circumstances you would be looking at?

11:16:02 4  A.    Yes.

11:16:03 5          MR. WARDEN:  Mr. Sayres, could we please have

11:16:05 6  DDX-902.

11:16:05 7  BY MR. WARDEN:

11:16:07 8  Q.    Dr. Putnam, tell the jury what is shown on DDX-902.

11:16:10 9  A.    Well, here I have listed several principle criteria

11:16:13 10 you would look to to decide whether a license was similar or

11:16:16 11 dissimilar to the economic circumstances of the hypothetical

11:16:19 12 negotiation.

11:16:20 13 Q.    And I see the first category you have up here is

11:16:24 14 parties and products.  What does that mean?

11:16:26 15 A.    Yes.  So the first and most important question is if

11:16:28 16 you are looking at a negotiation between Idenix and Gilead,

11:16:32 17 then what you would like to know is, is the license

11:16:35 18 agreement that you are looking at entered into by either

11:16:40 19 Idenix or Gilead?  Was it something that one of these two

11:16:43 20 parties actually did?

11:16:43 21 Q.    And for the two licenses that Mr. Carter testified

11:16:46 22 about, were either of those entered into by either Idenix or

11:16:50 23 Gilead?

11:16:50 24 A.    No.  The first one was an agreement between Merck and

11:16:54 25 Roche and the second was an agreement between Pharmasset and

11:16:56 1    Roche.  Neither one of them is Idenix or Gilead.

11:17:00 2    Q.     The next is licensed sofosbuvir products.  What do

11:17:02 3    you mean by that?

11:17:03 4    A.     Well, again, what you would like to have is to get a

11:17:05 5    license as close as possible, and ideally to the same

11:17:08 6    product that has been accused of infringement in this case

11:17:10 7    which is sofosbuvir.

11:17:11 8    Q.     And how does that compare to Mr. Carter's licenses?

11:17:15 9    A.     Again, in the case of the Merck/Roche and

11:17:18 10   Pharmasset/Roche agreements, those licenses are not for

11:17:20 11   sofosbuvir, they're for other products that ultimately were

11:17:23 12   commercial failures.

11:17:24 13   Q.     The next group you have is under the title of timing

11:17:27 14   and approval.  What do you mean by this group of items?

11:17:29 15   A.     Well, again, what you would like to get is a license

11:17:32 16   ideally that is as close as possible in time to the time of

11:17:36 17   the hypothetical negotiation so it is under similar economic

11:17:39 18   circumstances as possible.

11:17:41 19          The hypothetical negotiation is in December of

11:17:43 20   2013 whereas the Merck/Roche license is about two and-a-half

11:17:49 21   years earlier, in 2011, and the Pharmasset/Roche license is

11:17:53 22   about nine years earlier, in 2004.

11:17:56 23   Q.     And what about these items, FDA approval and years to

11:17:59 24   product launch?

11:17:59 25   A.     The reason why this matters is because prior to the

11:18:03  1    launch of the product, there is -- we already heard this

11:18:05  2    many times, there is enormous risk involved in developing a

11:18:09  3    drug and bringing it to market.  It is likely to fail most

11:18:12  4    of the time.

11:18:13  5            And so in the case of sofosbuvir, at the time of

11:18:16  6    the hypothetical negotiation, it had received FDA approval.

11:18:19  7    It was, there was no more risk.  It wasn't going to fail

11:18:23  8    whereas in the case of Mr. Carter's agreements, neither of

11:18:26  9    those drugs had received FDA approval.  They were either

11:18:29 10    four years or more than eight years away from launch, if

11:18:33 11    they were ever going to launch, which they never did.

11:18:35 12    Q.    And, finally, you have a group of items here that

11:18:38 13    says nonpatent terms.  What do you mean by that?

11:18:41 14    A.    That is sort of the whole point is that in the

11:18:43 15    hypothetical negotiation, Idenix and Gilead are just

11:18:46 16    bargaining for the right to use the '597 patent.  That is

11:18:49 17    all they care about.  But in Mr. Carter's licenses, these

11:18:53 18    are not just bare patent licenses.  These are actually

11:18:57 19    research collaborations where the parties are getting

11:19:00 20    together and trying to develop a drug together.  They're

11:19:02 21    transferring know-how to each other, they're giving each

11:19:05 22    other access to future products.  They're having to pay

11:19:07 23    for these things in the course of the agreement.  So the

11:19:10 24    agreement isn't structured anything like a bare patent

11:19:12 25    license.  They're not comparable.

11:19:16  1          MR. WARDEN:  Your Honor, Dr. Putnam up coming

11:19:18  2   testimony is going to get into some third-party confidential

11:19:21  3   information so we would ask the court be sealed.

11:19:22  4          THE COURT:  All right.  I don't believe there is

11:19:24  5   any objection to that; correct?

11:19:25  6          MS. PARKER:  That's correct.

11:19:26  7          THE COURT:  So for this limited portion of the

11:19:27  8   at the time, we're going to seal the courtroom.  Anyone who

11:19:29  9   is not permitted to be in here will step out now.

11:19:29 10          (Following portion ordered sealed by the Court,

11:19:33 11   bound separately.)

11:19:33 12                *    *    *

11:30:26 13          THE COURT:  For the record, the courtroom is now

11:30:28 14   open.  You may continue.

11:30:31 15   BY MR. WARDEN:

11:30:32 16   Q.    Are you aware of any evidence of what either Merck or

11:30:34 17   Pharmasset expected the value of their licenses to be?

11:30:38 18   A.    Yes.  Merck did a study of the value of its patent in

11:30:44 19   various licensing scenarios shortly before it entered into

11:30:47 20   its agreement with Roche.

11:30:50 21   Q.    And can I have you take a look at PTX-1588 in your

11:30:55 22   binder?

11:31:03 23   A.    I have it.

11:31:03 24   Q.    And is PTX-1588 a study you were referring to?

11:31:07 25   A.    Yes.

11:31:08  1          MR. WARDEN:  Your Honor, we move for the

11:31:10  2     admission of PTX-1588.

11:31:12  3          MR. PARKER:  No objection.

11:31:12  4          THE COURT:  It's admitted.

11:31:13  5          (PTX-1588 was admitted into evidence.)

11:31:14  6     BY MR. WARDEN:

11:31:14  7     Q.     Let's put that up on the screen.  This was in

11:31:16  8     February of 2011; is that correct?

11:31:18  9     A.     Yes.  About three months before the Roche merger

11:31:21 10     agreement.

11:31:22 11     Q.     Turn to page 16 of PTX-1588?

11:31:24 12     A.     Yes, I have it.

11:31:25 13     Q.     Tell the jury what we see on page 16.

11:31:28 14     A.     On page 16 you can see Merck is considering various

11:31:31 15     scenarios for licensing a compound called RG -- Roche's

11:31:35 16     compound.  Licensing its patents for use with RG7128, and

11:31:41 17     it's considering, as you can see at the bottom, a ten

11:31:43 18     percent royalty, which is the rate that it eventually agreed

11:31:46 19     to as part of this license.

11:31:49 20          The first of these scenarios is simply a patent

11:31:52 21     license.  Now, what turned out, it was a much more complex

11:31:56 22     agreement, but they were considering just a patent license,

11:31:58 23     and so they asked themselves, if we were to receive

11:32:01 24     royalties for this patent over its entire lifetime, what

11:32:05 25     would the present value of those royalties be?  And the

11:32:08 1    answer is:  73, which means $73 million.

11:32:12 2    Q.    And how is that $73 million value relevant to the

11:32:17 3    hypothetical negotiation?

11:32:18 4    A.    Well, this is -- this is the value that if you were

11:32:22 5    converting the Merck-Roche agreement to a lump sum, you

11:32:25 6    would say, and you only were writing a single check -- now,

11:32:30 7    remember, that's not what they did.  They said it was a ten

11:32:33 8    percent royalty of sales.  But if you were converting it to

11:32:35 9    a lump sum, you would compare that to the lump sum that

11:32:38 10   Gilead would pay and it's obviously much less, 73 million.

11:32:41 11   Q.    Let's move on now to the third criticism you said you

11:32:45 12   have of Mr. Carter, which is I believe you said he did the

11:32:48 13   wrong analysis; is that right?

11:32:49 14   A.    Yes.

11:32:49 15   Q.    What do you mean by that?

11:32:50 16   A.    Well, I have a couple of slides that compare mine

11:32:53 17   with his.

11:32:54 18            MR. WARDEN:  Can we put DDX-910 up.

11:32:54 19   BY MR. WARDEN:

11:32:58 20   Q.    What is DDX-109?

11:33:00 21   A.    Well, you remember that Mr. Carter said that he

11:33:03 22   believed the royalty ought to be ten percent and so if you

11:33:05 23   are looking at Gilead's sales as being a pie, then he said

11:33:10 24   Gilead would get 90 percent.  They would get to keep that,

11:33:14 25   and then Idenix would get ten percent.

11:33:16  1   Q.    Do you agree with that?

11:33:18  2   A.    No.

11:33:18  3   Q.    Let's go on to slide 911.  Does this slide explain

11:33:22  4   your disagreement with Mr. Carter?

11:33:24  5   A.    Yes.

11:33:24  6   Q.    Can you tell the jury what we're seeing here?

11:33:26  7   A.    Well, I've taken the same pie, but I've said, here's

11:33:30  8   what actually happened in the real world.  Okay?  Mr. Carter

11:33:33  9   said the only cost that Gilead would have was the cost of

11:33:36 10   manufacturing.  That was the 1.3 percent.  That was the cost

11:33:40 11   of actually making the bottle of the drug.  But what

11:33:43 12   Mr. Carter left out was all of Gilead's other costs.  If you

11:33:47 13   are going to explain Gilead's profits, you have to subtract

11:33:50 14   all of the cost.  The overhead, the taxes, the capital cost,

11:33:55 15   the R&D.  He left out all of those things.

11:33:58 16   Q.    And what --

11:33:59 17   A.    I'm sorry.

11:34:00 18   Q.    I say, what is this Pharmasset item?  What does that

11:34:04 19   mean?

11:34:04 20   A.    That's the most important thing.  Remember that when

11:34:06 21   Gilead brought the drug to market, in order to do that, they

11:34:10 22   had to buy Pharmasset.  Pharmasset cost them $11 billion,

11:34:14 23   and then Mr. Myers said, and we spent $4 billion on top of

11:34:18 24   that to develop the drug and actually figure this out.  All

11:34:21 25   of that money has to get paid back out of the profit that

11:34:24 1    you are making, and so the profit that Gilead made is not

11:34:28 2    98.7 percent.  It's something much, much less, less than

11:34:31 3    50 percent.

11:34:31 4    Q.    Now, let's go back to the first, the slide of

11:34:34 5    Mr. Carter's, DDX-910.  And do you recall Mr. Carter saying

11:34:38 6    that he thought it was appropriate to use as the royalty

11:34:41 7    base the whole pie, as he put it?

11:34:43 8    A.    Yes.

11:34:43 9    Q.    And do you recall Mr. Carter saying that this is

11:34:46 10   because the Idenix patent provides a basis for customer

11:34:50 11   demand of sofosbuvir?

11:34:52 12   A.    Yes.

11:34:53 13   Q.    Do you agree with that?

11:34:54 14   A.    No.

11:34:55 15   Q.    Why not?

11:34:55 16   A.    Well, customers, if you are suffering from hepatitis

11:34:59 17   C, that's a life-threatening disease, you want to be cured.

11:35:01 18   He said, customers want to be cured.  We all know that.

11:35:04 19   That's right.

11:35:04 20        But the Idenix patent doesn't teach you how to

11:35:07 21   cure HCV.  Okay?  The thing that customers want is not the

11:35:11 22   thing that the Idenix patent gives.  The Idenix patent gives

11:35:15 23   you a whole group of compounds and then Gilead and

11:35:20 24   Pharmasset have to go out and actually figure out which one

11:35:23 25   of those compounds actually does cure HCV.  Customers don't

11:35:28  1    want the group of compounds.  They want the one that's going

11:35:30  2    to cure them.

11:35:31  3    Q.    In your opinion, are the Idenix patents the reasons

11:35:34  4    patients use sofosbuvir?

11:35:37  5            MR. PARKER:  Objection.  Leading.

11:35:39  6            MR. WARDEN:  I'm simply asking for his opinion.

11:35:40  7            THE COURT:  Overruled.

11:35:41  8            THE WITNESS:  No.

11:35:41  9    BY MR. WARDEN:

11:35:43 10    Q.    Dr. Putnam, overall, what is your opinion about Mr.

11:35:46 11    Carter's analysis in this case?

11:35:47 12    A.    Well, basically, I said this.  He has got the wrong

11:35:51 13    structure of the license agreement.  It's not a running

11:35:54 14    royalty agreement.  He ignored the two Gilead agreements

11:35:58 15    that actually show you the structure that they would enter

11:36:00 16    into, which is a one-time lump sum license for a fully

11:36:04 17    paid up right to use the patent.

11:36:06 18    Q.    And what is the second disagreement, or the second

11:36:09 19    conclusion?

11:36:10 20    A.    Well, he also ignored the real-world evidence.  The

11:36:14 21    Merck PPA says the maximum value to be placed on this claim

11:36:17 22    is $380 million.  When you actually do the math, it's

11:36:21 23    substantially less than that, and it's nowhere near

11:36:23 24    two-and-a-half billion.

11:36:24 25    Q.    And your final conclusion?

11:36:25  1   A.     Well, he also ignored all of Gilead's costs.  He said

11:36:30  2   it's the cost of manufacturing.  He disregarded the, all of

11:36:34  3   Gilead's costs in bringing a product to market.  And also he

11:36:37  4   disregarded Gilead's contributions in bringing that drug to

11:36:41  5   market.  If you were going to look at the value of a single

11:36:43  6   patent, the best thing to look at is the Merck-Roche

11:36:47  7   valuation of the Merck-Roche license, which he said was the

11:36:50  8   most comparable, and that value is 73 million.

11:36:54  9           MR. WARDEN:  No more questions, Your Honor.

11:36:56 10           THE COURT:  Thank you.  Cross-examination, and

11:36:57 11   then if you need to close the courtroom at a certain point,

11:37:01 12   please let us know.

11:37:16 13           MR. PARKER:  Your Honor, may I approach?

11:37:18 14           THE COURT:  You may.

11:37:20 15           MS.  PARKER:  Thank you.

11:37:22 16           (Binders handed to the Court and the witness.)

11:37:48 17                   CROSS-EXAMINATION

11:37:50 18   BY MR. PARKER:

11:37:55 19   Q.     Good morning, Dr. Putnam.

11:37:56 20   A.     Good morning.

11:37:57 21   Q.     We have not met before, but my name is Stephanie

11:38:00 22   Parker, and I represent Idenix and I have some questions for

11:38:03 23   you.

11:38:03 24   A.     Nice to meet you.

11:38:04 25   Q.     Thank you.

11:38:05 1          Now, you talked about the hypothetical

11:38:08 2  negotiation when you were being asked questions.  I want to

11:38:11 3  follow up on that.

11:38:14 4          Now, you assumed in connection with your

11:38:16 5  hypothetical negotiation that the Idenix patent is valid.

11:38:19 6  You said that; is that correct?

11:38:20 7  A.    Yes.

11:38:21 8  Q.    And you also assumed for your hypothetical

11:38:24 9  negotiation that the two drugs, Sovaldi and Harvoni,

11:38:29 10 infringe the Idenix patents.  You said that also; is that

11:38:33 11 correct?

11:38:33 12 A.    Yes.

11:38:33 13 Q.    And you agree that the hypothetical negotiation would

11:38:38 14 have taken place right before the launch of the first drug,

11:38:43 15 Sovaldi; is that correct?

11:38:44 16 A.    That's right.

11:38:45 17 Q.    And the date of the launch of Sovaldi was December in

11:38:49 18 2013?

11:38:50 19 A.    December 6th, I believe, yes.

11:38:53 20 Q.    All right.  And as you wrote in your report in the

11:38:57 21 case, you understand that infringement dots not occur until

11:39:01 22 the eve of the sales launch; is that correct?

11:39:04 23 A.    Well, I think infringement occurs actually at the

11:39:09 24 launch.

11:39:09 25 Q.    Okay.

11:39:10  1   A.      First of all, I'm not a lawyer, so I don't want to

11:39:13  2   say exactly.  My understanding is you begin infringing when

11:39:16  3   you begin selling.

11:39:17  4   Q.      And so here the assumed infringement didn't occur

11:39:21  5   until that sales launch; is that correct?

11:39:23  6   A.      Yes.

11:39:23  7   Q.      Now, you talked about how Gilead purchased Pharmasset

11:39:30  8   back in 2012?

11:39:32  9   A.      I think it's 2011, but, yes.

11:39:35 10   Q.      And Gilead acquired Pharmasset for $11.4 billion; is

11:39:41 11   that correct?

11:39:41 12   A.      That's right.

11:39:42 13   Q.      And you wrote in your report that when Gilead

11:39:47 14   purchased Pharmasset, Gilead stated that it acquired

11:39:52 15   intangible assets primarily comprised of the sofosbuvir and

11:40:00 16   process and reason and development compound?

11:40:04 17   A.      Yes.

11:40:05 18   Q.      That had an estimated fair market value of

11:40:07 19   10.72 billion as of the date of the acquisition, according

11:40:11 20   to your report; is that correct?

11:40:13 21   A.      That's right.

11:40:14 22   Q.      Now, you're aware that as a result of that

11:40:17 23   transaction, Dr. Raymond Schinazi received approximately

11:40:22 24   $400 million; is that correct?

11:40:25 25           MR. WARDEN:  Objection, Your Honor.  Lack of

11:40:27 1    personal knowledge and beyond the scope of his report.

11:40:30 2                    THE COURT:  Ms. Parker?

11:40:31 3                    MS. Parker:  I'm happy to lay a foundation.

11:40:33 4                    THE COURT:  All right.  Let's do that.

11:40:34 5    BY MS. Parker:

11:40:35 6    Q.    Dr. Putnam, when you reviewed all of these materials

11:40:37 7    that you told the jury about, did you see how much Dr.

11:40:41 8    Raymond Schinazi received as a result of Gilead's purchase

11:40:45 9    of Pharmasset?

11:40:46 10   A.    It wasn't something I was interested in.  I might

11:40:51 11   have seen it.  I heard it in court, but I don't recall

11:40:53 12   seeing it when I was reviewing the materials.

11:40:55 13   Q.    Okay.  Fair enough.

11:40:56 14         Now, you told the jury you were being paid your

11:40:58 15   regular rate?

11:41:00 16   A.    Yes.

11:41:00 17   Q.    What is your regular rate?

11:41:01 18   A.    $750 an hour.

11:40:49 19   Q.    Does that include your testimony here today?

11:40:52 20   A.    That's right.

11:40:52 21   Q.    And does that include your time sitting in court?

11:40:56 22   A.    Yes, ma'am.

11:40:56 23   Q.    Now, I want to go through some other things that you

11:41:03 24   mention in your report, I want to follow-up.  If you could

11:41:06 25   look at the notebook I gave you, the white notebook under

11:41:09 1   Tab No. 1, please, sir.

11:41:11 2            And that is your report?

11:41:12 3   A.    Yes.

11:41:12 4   Q.    That is actually the initial report that you

11:41:18 5   prepared; correct?

11:41:18 6   A.    That's right.

11:41:19 7   Q.    If you could turn to page 73, please.

11:41:27 8   A.    Yes, I have it.

11:41:27 9   Q.    All right.  If we could look down at paragraph 136.

11:41:32 10   A.    Yes.

11:41:32 11   Q.    Do you see that?

11:41:34 12   A.    Yes.

11:41:34 13   Q.    I just want to read this to you.  It says:  Parties

11:41:37 14   often invoke the so-called "book of wisdom" to justify their

11:41:41 15   reference to later facts that the hypothetically bargaining

11:41:45 16   parties would have considered.

11:41:46 17             Do you see that?

11:41:47 18   A.    Yes.

11:41:47 19   Q.    Did I read that correctly?

11:41:49 20   A.    Yes.

11:41:49 21   Q.    Okay.  And I'm going to ask you to turn to the next

11:41:52 22   page, to page 74.

11:41:54 23         MR. WARDEN:  Objection, Your Honor.  If she has

11:41:56 24   questions about his opinion, she can ask them, but the

11:41:58 25   report is not in evidence and this isn't impeachment.

11:42:02 1          THE COURT:  Why do you need the report?

11:42:03 2          MS. PARKER:  I'm read leading up to.  I'm

11:42:05 3   setting the background for what I'm asking.

11:42:07 4          THE COURT:  I'll overrule it for now.  I'll give

11:42:10 5   you a little bit of leeway.

11:42:10 6   BY MS. PARKER:

11:42:11 7   Q.      So on page 74.  Do you see that?  Are you there?

11:42:15 8   A.      74, yes.

11:42:16 9   Q.      Okay.  Paragraph 137.

11:42:18 10  A.      Yes.

11:42:19 11  Q.      And you say there:  When evaluating whether or not

11:42:22 12  a given fact would have been known or ought to be imputed

11:42:26 13  to the parties, the benchmark date is the hypothetical

11:42:30 14  negotiation which is generally taken to occur on the eve of

11:42:33 15  infringement.

11:42:34 16          Do you see that?

11:42:35 17  A.      Yes.

11:42:35 18  Q.      And, again, the date of the hypothetical negotiation

11:42:39 19  would have been December of 2013.

11:42:41 20  A.      Yes, that's right.

11:42:42 21  Q.      Okay.  And you would agree that from an economic

11:42:47 22  point of view, the most accurate measure of compensation

11:42:51 23  derives from expectations borne from the information

11:42:54 24  available at the time of the negotiation; correct?

11:42:58 25  A.      Yes.

11:42:59 1  Q.      That is actually your words; right?

11:43:01 2  A.      Those are my words.  That is what I believe, that's

11:43:04 3  right.

11:43:04 4  Q.      And you also believe that to endow one party with

11:43:09 5  later or, quote, "better" information is invariably to tilt

11:43:14 6  the playing field in that party's favor.  Correct?

11:43:16 7  A.      Well, if you are telling them something they wouldn't

11:43:19 8  have known, then that is obviously unfair.  But if you are

11:43:22 9  just asking them is what you thought in April similar to

11:43:25 10  what you thought in December, then, of course, it's fair.

11:43:28 11  Q.      Now, you talked about the Merck acquisition of

11:43:32 12  Idenix.  And I want to follow-up about that.  So Merck

11:43:35 13  acquired Idenix for $3.9 billion; correct?

11:43:40 14  A.      Yes.

11:43:40 15  Q.      That amount.  And the acquisition was completed in

11:43:44 16  August of 2014?

11:43:44 17  A.      That's right.

11:43:45 18  Q.      And you talked about what you called the PPA,

11:43:49 19  purchase price allocation.  Remember, you were asked some

11:43:53 20  questions about that?

11:43:53 21  A.      Yes.

11:43:54 22  Q.      And the date on that PPA is October 15th of 2014;

11:44:00 23  correct?

11:44:00 24  A.      Relative valuation as of August 5th when the deal

11:44:04 25  closed, but, yes, that's right.

11:44:05  1    Q.      That was the date, August 15th, 2014?

11:44:09  2    A.      I think it's the 5th, but anyway, August.

11:44:13  3    Q.      August.  Okay.  And the allocations in that PPA were

11:44:17  4    prepared by Merck; correct?

11:44:18  5    A.      By Merck's accountant actually.  Yes, that's right.

11:44:21  6    Q.      Not by Idenix?

11:44:23  7    A.      Well, at that point, Idenix was part of Merck, so

11:44:27  8    who within the new Merck which includes Idenix did the

11:44:33  9    valuation is something I don't know.

11:44:34 10    Q.      It was not the Idenix that was the separate company

11:44:38 11    that prepared that PPA; correct?

11:44:40 12    A.      Because it was no longer a separate company.  It was

11:44:43 13    part of Merck.  That's right.

11:44:44 14    Q.      The PPA was made after the fact?

11:44:48 15    A.      The fact being it was?

11:44:51 16    Q.      The PPA was not prepared at the time of the

11:44:54 17    acquisition?

11:44:56 18    A.      No, it was supposed to reflect the value on the date

11:44:58 19    of the acquisition.

11:44:59 20    Q.      And it was prepared later, looking back; correct?

11:45:03 21    A.      Of course.

11:45:03 22    Q.      So you would agree that the PPA is not a

11:45:08 23    contemporaneous valuation; is that correct?

11:45:11 24    A.      No, I disagree.  It says explicitly it is supposed to

11:45:15 25    reflect the value of the company on the date the transaction

11:45:18 1    closed.  They're not supposed to be using later information.

11:45:21 2    They're supposed to be using information as it existed on

11:45:23 3    the date of the deal closed.

11:45:24 4    Q.    So just to be clear, you agree that the PPA is not a

11:45:28 5    contemporaneous valuation?

11:45:30 6    A.    No, I think to be clear, I disagree.  It is a

11:45:32 7    contemporaneous valuation of Idenix as of the date the deal

11:45:37 8    closed.

11:45:38 9    Q.    Let me ask you then to look at your report at

11:45:41 10   paragraph 312.

11:45:55 11                 Are you there?

11:45:56 12   A.    Yes.

11:45:57 13   Q.    I'm just going to read the first sentence there.  It

11:45:59 14   says:  Because a PPA is made after the fact, it is not a

11:46:02 15   contemporaneous valuation.

11:46:05 16                 Is that what you wrote?

11:46:06 17   A.    Well, in relation to.  Okay.  So, sure, "after the

11:46:10 18   fact" meaning after the hypothetical negotiation.  It

11:46:13 19   certainly is after the hypothetical negotiation.  Of course,

11:46:16 20   it is not contemporaneous with that date, which is why you

11:46:18 21   have to make the adjustments that I described.

11:46:21 22   Q.    Okay.  Now, I want to ask you some questions about

11:46:25 23   this Merck/Roche agreement that you mentioned when you were

11:46:29 24   being asked questions.

11:46:30 25   A.    Sure.

11:46:31 1    Q.       If you could turn to Tab 6, please, of your binder.

11:46:39 2    A.       (Witness complies.)

11:46:41 3    Q.       Are you there?

11:46:41 4    A.       Yes.

11:46:42 5    Q.       And that is Plaintiffs' Exhibit 1603.  Do you see

11:46:45 6    that?

11:46:46 7    A.       Yes.

11:46:46 8    Q.       And that is an e-mail exchange from Roche to Merck

11:46:50 9    back in May of 2011 relating to these agreements; correct?

11:46:53 10   A.       That is what it looks like, yes.

11:46:55 11             MS. PARKER:  Your Honor, I move for the

11:46:57 12   admission of Plaintiffs' Exhibit 1603.

11:46:59 13             MR. WARDEN:  No objection.

11:47:00 14             THE COURT:  It's admitted.

11:47:00 15             (PX-1603 was admitted into evidence.)

11:47:01 16             MS. PARKER:  If we could pull that up, please.

11:47:07 17             If we could pull up the first e-mail.

11:47:07 18   BY MS. PARKER:

11:47:13 19   Q.       Can you see on the screen where I have highlighted?

11:47:16 20   A.       Yes.

11:47:16 21   Q.       It says:  We would however like to be able to discuss

11:47:20 22   the other agreements in general broad-brush terms so they

11:47:25 23   realize that the royalty rate reflects other considerations

11:47:29 24   and would have been substantially higher in the absence of

11:47:32 25   the other agreements.

11:47:33 1      Did I read that correctly?

11:47:35 2 A.      Yes.

11:47:35 3 Q.      And then if we can look at the second paragraph

11:47:39 4 there.

11:47:39 5      It says:  So far, all we told Pharmasset was

11:47:43 6 that we are seeking a license under the '499 patent series

11:47:47 7 and that the anticipated royalty rate is 10 to 12 percent.

11:47:52 8      Did I read that correctly?

11:47:53 9 A.      Yes.

11:47:54 10      MS. PARKER:  Your Honor, I believe we're getting

11:47:55 11 to the point where there is some confidential information.

11:47:58 12      THE COURT:  Okay.  All right.  Then we're going

11:48:01 13 to have to close the courtroom again temporarily.

11:48:01 14      (Following portion ordered sealed by the Court,

11:48:01 15 bound separately.)

11:52:38 16      *    *    *

11:52:38 17      (Courtroom unsealed.)

11:52:38 18 BY MS. PARKER:

11:52:40 19 Q.      Now, I want to change gears and ask you questions

11:52:44 20 about the sales of the two drugs, Sovaldi and Harvoni.  Okay?

11:52:48 21      Now, when Gilead bought Pharmasset, Gilead

11:52:51 22 bought the right to sell the sofosbuvir-containing products

11:52:56 23 worldwide; correct?

11:53:00 24 A.      Well, it bought all of Pharmasset's assets, and so

11:53:03 25 insofar as that right was contained in those assets, then

11:53:06 1   yes.

11:53:06 2   Q.    Now, if we could pull up the demonstrative that was

11:53:10 3   used with Mr. Meyers who was -- were you in the courtroom

11:53:13 4   when Mr. Meyers testified?

11:53:15 5   A.    Yes, I was.

11:53:17 6         MS. PARKER:  Let's pull up the demonstrative

11:53:18 7   there.

11:53:18 8   BY MS. PARKER:

11:53:20 9   Q.    Okay.  This is the total worldwide sales of Sovaldi

11:53:24 10  and Harvoni to date.  Do you agree with that number?

11:53:28 11  A.    If Mr. Meyers says so, then it's got to be right.

11:53:31 12  Q.    Okay.  And that is $42,590 million; correct?

11:53:37 13  A.    Yes.

11:53:37 14  Q.    Now, that is worldwide; right?

11:53:40 15  A.    Yes.

11:53:42 16        MS. PARKER:  If we could pull up the next

11:53:45 17  demonstrative and talk about the sales in the United States.

11:53:45 18  BY MS. PARKER:

11:53:48 19  Q.    So the United States sales are $28,496 million.  You

11:53:55 20  agree with that number?

11:53:57 21  A.    Yes.

11:53:57 22  Q.    Now, if you could turn to your report again.  And

11:54:08 23  this is under Tab 1.

11:54:12 24  A.    Okay.

11:54:12 25  Q.    And if you could turn to page 113.

11:54:21 1    A.    (Witness complies.)

11:54:23 2    Q.    Are you there?

11:54:23 3    A.    Yes.

11:54:24 4    Q.    And paragraph 224.  Do you see it?

11:54:30 5    A.    Yes.

11:54:30 6    Q.    You agree that sofosbuvir, whether it is sold as

11:54:34 7    Sovaldi or whether it is sold as Harvoni is, quote, "highly

11:54:38 8    profitable;" correct?

11:54:40 9    A.    Yes.

11:54:41 10           MS. PARKER:  Your Honor, I have no further

11:54:42 11    questions.

11:54:43 12           THE COURT:  Okay.  Thank you.

11:54:44 13           MS. PARKER:  Thank you.

11:54:45 14           THE COURT:  Redirect.

11:54:46 15           MR. WARDEN:  No redirect, Your Honor.

11:54:47 16           THE COURT:  All right.  Thank you, Doctor.  You

11:54:50 17    may step down.

11:54:51 18           (Witness excused.)

11:54:52 19           THE COURT:  What is next from Gilead?

11:55:01 20           MR. SCHERKENBACH:  As I had indicated, Your

11:55:08 21    Honor, Dr. Putnam was our last witness; so at this point,

11:55:11 22    Gilead rests its case.

11:55:13 23           THE COURT:  Okay.  Thank you.

11:55:14 24           Back to Idenix.

11:55:15 25           MS. PARKER:  Thank you, Your Honor.

11:55:20 1        Our first witness in this phase of the trial is

11:55:23 2  Dr. David Standring who has been in the courtroom as our

11:55:26 3  corporate representative.  He is the former chief scientific

11:55:30 4  officer at Idenix.

11:55:30 5        THE COURT:  All right.  Bear with me one second.

11:55:34 6        (Court and deputy clerk confer.)

11:55:36 7        THE COURT:  All right.  I have been advised

11:55:37 8  lunch is here.  So, Dr. Standring, if you don't mind waiting

11:55:41 9  a little bit, we will now take our lunch break.

11:55:43 10        Ladies and gentlemen of the jury, no talking

11:55:44 11  about the case during the lunch break.  I'll get you back

11:55:47 12  here in a bit.

11:55:48 13        (Jury left courtroom.)

11:55:48 14        THE COURT:  All right.  We're going to be in

11:56:10 15  recess.

11:56:37 16        (Brief recess taken.)

11:56:37 17        *     *     *

12:43:52 18        Afternoon Session, 12:49 p.m.

12:47:14 19        THE COURT:  All right.  We'll bring the jury in.

12:49:58 20        (Jury returned.)

12:52:13 21        THE COURT:  Welcome back, ladies and gentlemen.

12:52:14 22  We are ready to proceed.

12:52:17 23        Idenix may call its witness.

12:52:19 24        MR. KINTON:  As we did before the break, Idenix

12:52:27 25  calls Dr. David Standring.

| | |
|---|---|
| 12:52:30 1 | THE COURT: Okay. |
| 12:52:41 2 | ... DAVID NIGEL STANDRING, having been first |
| 12:52:52 3 | duly sworn, was exam blind and testified as follows ... |
| 12:53:02 4 | THE COURT: Good afternoon, Dr. Standring. |
| 12:53:04 5 | THE WITNESS: Good afternoon, Your Honor. |
| 12:53:05 6 | THE COURT: Welcome. |
| 12:53:07 7 | You may proceed. |
| 12:53:08 8 | MR. KINTON: Your Honor, I have some binders to |
| 12:53:09 9 | pass out. May I do that? |
| 12:53:13 10 | THE COURT: You may. |
| 12:53:15 11 | (Documents passed forward.) |
| 12:53:34 12 | DIRECT EXAMINATION |
| 12:53:34 13 | BY MR. KINTON: |
| 12:53:36 14 | Q. Good afternoon, Dr. Standring. |
| 12:53:36 15 | A. Good afternoon. |
| 12:53:37 16 | Q. Everybody has seen you, and your name has been |
| 12:53:39 17 | mentioned several times throughout the case. Now that you |
| 12:53:42 18 | have an opportunity, can you introduce yourself to the jury? |
| 12:53:45 19 | A. So I'm David Standring. I was born in England, the |
| 12:53:49 20 | north of England in Manchester actually. I grew up in |
| 12:53:52 21 | Harrogate in North Yorkshire; and in my early 20s, I came to |
| 12:53:56 22 | the U.S. and I guess I must have liked it because I stayed |
| 12:54:00 23 | here ever since. |
| 12:54:02 24 | I live now just South of Boston with my family, |
| 12:54:06 25 | and our daughter and grandkids live just around the corner. |

12:54:12  1          And for 13 years, basically I was at Idenix and

12:54:16  2   left Idenix as the CSO, the chief scientific officer at the

12:54:20  3   company.

12:54:20  4   Q.     Thank you.  I refer you to as Dr. Standring.  Do you

12:54:25  5   have a Ph.D.?

12:54:26  6   A.     I have a Ph.D. in bio-organic chemistry.

12:54:29  7   Q.     Where did you get your pH?

12:54:30  8   A.     Harvard University.

12:54:31  9   Q.     Okay.  What got you interested in science?

12:54:35 10   A.     Well, that really comes down to my father.  He was

12:54:39 11   a very, very bright man, loved science.  And when he

12:54:45 12   finished grammar school, which is the sort of upper school

12:54:48 13   in England, he really wanted to go to University but there

12:54:52 14   was no chance for him to do that because there was no money

12:54:54 15   in the family.  My father's father, my grandfather died when

12:54:59 16   my dad was four years old.  So he had to go to work and he

12:55:04 17   went do work in a company called ICI, Imperial Chemical

12:55:09 18   Industries which is a big chemical company in the U.K., And

12:55:12 19   he was a lab assistant there.

12:55:14 20          So the next thing, the war comes along and he

12:55:18 21   enlists as an RAF pilot, Royal Air Force pilot, and he

12:55:23 22   served out the war.  And then two years after the war, when

12:55:27 23   he is finally demobilized, he gets a tremendous break

12:55:33 24   because the U.K. government gives him a chance to go to

12:55:36 25   college.

12:55:36 1     So he went to Manchester University and got his

12:55:39 2 bachelor's, and he became a chemical engineer at ICI.

12:55:43 3     Now, his chemistry books were left lying around

12:55:45 4 the house, so I would pick them up off the shelf and I would

12:55:49 5 read the chemistry books, and I really enjoyed it.  I loved

12:55:52 6 it.

12:56:05 7 Q.     Can I have Dr. Standring's first demonstrative on the

12:56:11 8 screen?

12:56:12 9     So, Dr. Standring, what's shown here?

12:56:14 10 A.     Well, this is me when I was about 14 or 15.  This is

12:56:19 11 in my bedroom.  Okay?  This, what you see there, the cabinet

12:56:25 12 that you see is actually my mother's kitchen cabinet from

12:56:29 13 downstairs.  We had these free-standing, pretty horrible

12:56:33 14 kitchen cabinets, and this one has finally given up the

12:56:36 15 ghost I think and so my mother replaced it.

12:56:38 16     I removed this up to my bedroom, disassembled

12:56:42 17 it, put it back together again, and that became my

12:56:45 18 laboratory.  You can see it's filled with chemicals and

12:56:47 19 everything.  I'm there in my lab coat doing natural

12:56:51 20 experiments, and really I have a fully operational

12:56:54 21 laboratory.  Of course, there's no fume hood in there

12:56:59 22 to take away the toxic fumes and there's absolutely no

12:57:02 23 safety precautions or equipment at all, but, hey, I'm

12:57:05 24 still here.

12:57:06 25 Q.     So let's talk about how you -- your educational

12:57:11 1  background that led you from doing science experiments in

12:57:15 2  your bedroom to your Ph.D. at Harvard.  So can you give the

12:57:18 3  jury a little bit of background?

12:57:20 4  A.     Yes.  So in the system in the United Kingdom, it's

12:57:29 5  quite different from what we see in America, and actually

12:57:32 6  education was very rigid for some ways from a very early

12:57:36 7  time.  Believe it or not, I was specializing towards science

12:57:39 8  from the age of 11 on.  It's crazy.  Who makes choices

12:57:44 9  like that at 11?  But it was easy for me because I love

12:57:47 10 science.

12:57:48 11        And as I went through 11-plus exams, all

12:57:54 12 levels, series of exams, and I did well in those exams, and

12:57:57 13 my favorite subject was chemistry.  And my -- I had a very

12:58:02 14 good mentor in chemistry, very, very wonderful man called

12:58:06 15 Henry Hall and he was the one who sort of said when it came

12:58:09 16 time to apply for college, he said, you should think about

12:58:12 17 going to Oxford.  I was like, Oxford?  Okay.

12:58:14 18        And he had gone to St. John's College himself

12:58:18 19 and he suggested that I went there.  So I applied to Oxford

12:58:22 20 and I got in.

12:58:24 21        And in Oxford I got a Bachelor's in science and

12:58:29 22 then a Master's in science.  In Oxford they call them a

12:58:32 23 Bachelor of Arts in science and a Master of Arts in science.

12:58:38 24 They like to be different.

12:58:38 25 Q.     And so what did you do after your earned your

**Master's?**

A.     **Well, after my Master's I got the opportunity to come to the U.S., and all my colleagues in Oxford, they went off and they went to London.  They worked in the financial business, but I wanted to come over and do science, so I came.  I managed to get to Harvard and I did my graduate studies there.**

Q.     **So what did you do after you earned your Ph.D. at Harvard?**

A.     **Well, after that I went and did a post-doctoral fellowship at the University of California at San Francisco, and I worked for a man, William J. Rudder, who became something of a legend in the biotechnology business.  He was actually a full professor and pretty much the founder of the department of biochemistry and biophysics at UCSF, which was quite a famous institute itself, but he also founded Chiron Corporation, a big biotechnology company, and today I think he runs about eight different companies and he's 90 years old.  So an amazing man.**

**Anyway, there I did a number of different scientific projects.  I worked on -- that was the time of the revolution in genetics, DNA sequencing, and things like that.  I worked on things like gene splicing, gene expression, but towards that, the end of that time I actually started to work on viruses, and especially my main**

01:00:11 1    focus was on hepatitis B virus, which you've heard about

01:00:14 2    here.  But I also worked on HIV and certain amount of work

01:00:20 3    with Chiron on HCV, and I even did a bit of work on the

01:00:26 4    polio virus as well.

01:00:27 5    Q.    Now, was that all during your post-doctorate or did

01:00:31 6    you stay on at UCSF for a little while?

01:00:33 7    A.    No.  I stayed on.  I started off as a post-doctoral

01:00:36 8    fellow, but I became a faculty member, and I think I was

01:00:40 9    there for a total of almost 14 years basically.  During the

01:00:42 10   end of that time I had my own lab and focused on a number of

01:00:45 11   viral projects, especially the work I was best known for, I

01:00:48 12   think, was viral assembly.

01:00:50 13   Q.    So what did you do after you left the University of

01:00:53 14   California, San Francisco?

01:00:55 15   A.    So I decided that I really wanted to move from

01:00:58 16   studying viruses to actually doing something about them.

01:01:01 17   And, you know, providing drugs for unmet medical needs.  And

01:01:05 18   so I went to Bristol-Myers Squibb, and at Bristol-Myers

01:01:10 19   Squibb, I ran groups which looked into hepatitis B virus and

01:01:15 20   also HCV, two different targets in hepatitis C.  One is the

01:01:20 21   protease and one is the polymerase.  You've heard about

01:01:27 22   them.

01:01:27 23        Now, I was very fortunate at Bristol-Myers

01:01:30 24   Squibb, because almost the day I walked into Bristol-Myers

01:01:33 25   Squibb, we discovered a compound that became the precursor

01:01:38 1   to a drug that is marketed today, a drug called Entecavir

01:01:43 2   which is marketed in man, and it has been probably, I assume

01:01:46 3   at this point, in millions of patients worldwide, and it's a

01:01:51 4   very successful drug. I didn't really realize at that time

01:01:53 5   how lucky I was, but when I was leaving, you know, people

01:01:56 6   told me, hey, I've been here for 19 years and I never

01:02:00 7   touched a drug in my hole time at Bristol-Myers, so I was

01:02:03 8   very fortunate.

01:02:04 9   Q.    Well, how long were you at Bristol-Myers?

01:02:06 10   A.    Four years.

01:02:06 11   Q.    What did you do after that?

01:02:08 12   A.    So after that I went to Schering-Plough in New

01:02:11 13   Jersey, and I worked there, worked on the HCV protease

01:02:16 14   program that was there. Again, I headed a group that did

01:02:19 15   that effort, and that also led to the identification this

01:02:25 16   time, by the time I left, of another drug that became

01:02:29 17   successful and was marketed for a while.

01:02:34 18   Q.    And so how long were you at Schering?

01:02:36 19   A.    Two years.

01:02:37 20   Q.    And what did you do after Schering?

01:02:38 21   A.    So after Schering I came to Idenix, and one day I got

01:02:43 22   a phone call from doctor John Pierre Sommadossi, and he's

01:02:49 23   quite excitable. Hey, we have some good compounds. I need

01:02:52 24   a virologist.

01:02:53 25         He persuaded me to come and interview and I did.

01:02:58  1    So I flew down.  I spent one day in Boston, talked to all

01:03:02  2    the people there, very exciting environment, and they had

01:03:06  3    really good new compounds.  They told me.  And, you know, it

01:03:10  4    sounded to be true basically.

01:03:12  5            So I was excited.  I flew back to New

01:03:15  6    Jersey.  I got an offer for a job in the mail the next day

01:03:19  7    and I got another offer from another company, too, but I

01:03:24  8    decided I just had to go to Idenix.  In those days, it was

01:03:27  9    called Novirio, as you know.

01:03:29 10    Q.    So can you give us a brief overview of what you did

01:03:32 11    when you were at Idenix during your time frame there?

01:03:34 12    A.    Yes.  So what I was brought in to do by Dr.

01:03:41 13    Sommadossi was really to do the more detail oriented

01:03:44 14    virology work, and I will explain that in a moment.  But

01:03:47 15    when I arrived there, the virology was being done in Italy

01:03:53 16    by professor Paolo          La Colla, whom you've heard

01:03:56 17    of here.

01:03:57 18            So he did a lot of broad screening, but

01:03:59 19    Idenix in Cambridge, Massachusetts at that point had no real

01:04:04 20    virology capability, and we needed to do a lot of more

01:04:09 21    detailed work, especially to make the sort of package that

01:04:12 22    you've heard of from the FDA called an IND.

01:04:16 23            So I came in and we had no lab, no facility or

01:04:20 24    anything.  This was September of 2000.  So we set up a lab.

01:04:26 25    I found a space, leased it, dilapidated building a little

01:04:31 1  ways away from our luxurious headquarters, and we set up the

01:04:36 2  lab there.

01:04:36 3          I went around and got equipment basically

01:04:39 4  bought from companies that were going out of business at the

01:04:42 5  cheapest price possible, hired a whole laboratory of people,

01:04:46 6  you know, a team to work on our product, and by January we

01:04:51 7  had started and we were doing real science there.

01:04:54 8          And the deal was that we wanted to do science to

01:04:57 9  do additional antiviral testing, to deepen our understanding

01:05:02 10 of how our drugs worked.  We wanted to do some in vitro

01:05:08 11 toxicity testing, that sort of thing, cytotoxicity,

01:05:13 12 mitochondrial testing and everything, the sort of things

01:05:16 13 you've heard about here.

01:05:17 14         And then we also did studies to look at the

01:05:20 15 availability, bioavailability of the compound in animals.

01:05:23 16 We did some safety studies, and we actually even in the end

01:05:27 17 did some testing in chimpanzees as well, HCV-infected

01:05:31 18 chimpanzees that we had access to.

01:05:33 19 Q.      So what was Dr. Sommadossi's role at Idenix during

01:05:40 20 that time frame?

01:05:42 21 A.      He was very active.  Aside from hiring me, I mean, he

01:05:46 22 really looked at all of the aspects of the programs.  He and

01:05:48 23 I talked and, you know, decided a lot of the program content

01:05:53 24 and how we should shift direction and everything all the

01:05:56 25 time.

01:05:57 1    Q.      And so how long were you at Idenix?

01:06:00 2    A.      Thirteen years.

01:06:01 3    Q.      And what are you doing now?

01:06:03 4    A.      Now I'm a consultant.  I'm not working full-time at

01:06:09 5    this time.  I'm part-time.  I'm doing some, you know,

01:06:12 6    enjoying life more after working very hard for a long time.

01:06:16 7    And I'm still looking at other opportunities and everything

01:06:18 8    as well.

01:06:19 9    Q.      I will let you take your sip of water.  I can see you

01:06:23 10   reach for it.

01:06:27 11           Doctor, now I'd like to talk about some of the

01:06:31 12   compounds that Idenix developed as clinical candidates.

01:06:35 13   Okay?

01:06:35 14   A.      Yes.

01:06:36 15   Q.      Did you help prepare a slide that shows some of the

01:06:38 16   clinical candidates Idenix has?

01:06:40 17   A.      I did.

01:06:44 18           MR. KINTON:  Can we have slide 2 up on the

01:06:46 19   screen.

01:06:47 20   BY MR. KINTON:

01:06:48 21   Q.      And the first compound that's listed on slide 2 is

01:06:51 22   NM283.

01:06:52 23           Do you see that?

01:06:53 24   A.      I see that, yes.

01:06:54 25   Q.      What is NM283?

01:06:56 1    A.      So this is -- we talked a lot in this room about

01:07:01 2    NM107, and this is actually a valine prodrug.  I don't know

01:07:06 3    if I have a laser pointer somewhere.

01:07:09 4              But over --

01:07:12 5              THE COURT:  One may be coming, Doctor.

01:07:21 6              MR. KINTON:  Your Honor, I may approach?

01:07:23 7              THE COURT:  You may.

01:07:24 8              THE WITNESS:  Sorry.  I should have asked for

01:07:25 9    one.

01:07:26 10             (Mr. Kinton handed a laser pointer to the

01:07:29 11   witness.)

01:07:30 12             THE WITNESS:  Thank you.

01:07:33 13             So NM283 is over here, and here you see the base

01:07:38 14   C that you are familiar with.  Here you have the sugar.  In

01:07:42 15   green here you see the methyl up.  And over at what we call

01:07:46 16   the 3' position is the molecule known as valine.  So this is

01:07:51 17   a valine prodrug of NM107.  And the purpose of the valine is

01:07:54 18   to improve oral bioavailability.

01:07:57 19   BY MR. KINTON:

01:07:57 20   Q.      So before NM283 went into the clinic, did Idenix

01:08:04 21   conduct any pre-clinical testing on it?

01:08:06 22   A.      Very extensive.  All of the types of things that I

01:08:09 23   just discussed that we did and to get any drug into man, you

01:08:16 24   have to do a very extensive packaging of testing.  Again,

01:08:22 25   the toxicity testing, safety testing, bioavailability, all

01:08:26 1    of those kind of things.

01:08:27 2                And we also tested this drug -- after we

01:08:32 3    had done all the BVDV work, which is the model that we like

01:08:35 4    to use to really profile this compound, we also did an

01:08:39 5    experiment in HCV infected chimps to look at the efficacy

01:08:43 6    there.

01:08:43 7    Q.    So before -- we've heard the test called the

01:08:49 8    hepatitis C virus replicon or HCV replicon test.  Did Idenix

01:08:55 9    run NM283 and HCV replicon before it went into the clinic?

01:09:01 10   A.    No, we did not.

01:09:02 11   Q.    And you mentioned that did some testing in HCV

01:09:07 12   infected chimpanzees.  Are you aware of anyone else that

01:09:11 13   used the 2'-Beta up nucleoside to treat chimpanzees before

01:09:17 14   Idenix did?

01:09:18 15   A.    No.  I should add that we actually saw antiviral

01:09:22 16   reductions.  We took two different concentrations of our

01:09:26 17   compounds in the chips, two different doses, and we actually

01:09:29 18   saw significant load reduction, and this was the first time

01:09:33 19   that would be done.

01:09:33 20               By the way, these chimpanzees had been

01:09:35 21   infected with human hep C years before we ever were doing

01:09:42 22   any work.  This was stuff that was done in the NIH many,

01:09:45 23   many years ago.

01:09:46 24   Q.    Now, Dr. Olsen testified that he understood that his

01:09:51 25   group was the first to cure chimpanzees of hepatitis C.  Can

01:09:56 1  you explain the difference between what he did and what you

01:09:58 2  did?

01:09:58 3  A.    Yes.  So he did a pretty remarkable experiment in

01:10:03 4  some ways.  It's very interesting.

01:10:05 5        Chimpanzees are, they weigh something like 140

01:10:10 6  to 150 pounds.  They are ten times stronger than we are.

01:10:15 7  They could literally tear any one of us apart.  So working

01:10:19 8  with chimpanzees is not trivial.  And to dose them, you

01:10:23 9  actually have to basically anesthetize them because you

01:10:27 10 can't go close to them.

01:10:29 11       So for most studies it's very difficult to do

01:10:32 12 that, and we could only treat the animals for a week with

01:10:37 13 our drug because we couldn't do that.  As an animal ethics

01:10:44 14 committee, we couldn't do any more than that.

01:10:46 15       Dr. Olsen I think did a very different time of

01:10:51 16 experiment.  He managed to do a long-term treatment with two

01:10:53 17 direct acting antiviral, nucleoside inhibitor and the

01:10:57 18 protease inhibitor.  And he did that because he was able to

01:11:00 19 get those into some sort of flavorful fruit drink that the

01:11:04 20 chimpanzees would just drink by themselves, and so it's a

01:11:07 21 very different kind of study and one that we could never

01:11:10 22 manage to do.

01:10:37 23 Q.    Okay.  How did you feel about the milestone of

01:11:00 24 completing the preclinical trials for NM283?

01:11:04 25 A.    It was a great moment.  I think for us, that is what

01:11:08 1    we call a proof of concept.  It was the first time that

01:11:11 2    really one of these drugs lad been advanced on the 2'-methyl

01:11:15 3    series, and I think the whole company was ecstatic.

01:11:19 4    Q.    So can you describe how -- NM283 did end up going

01:11:23 5    into clinical trials; right?

01:11:25 6    A.    It did end up going into the clinic.  And, you know,

01:11:28 7    for a while, it did pretty well but, ultimately, there was

01:11:33 8    some gastrointestinal effects and some GI, some stomach

01:11:39 9    effects basically.

01:11:40 10            And, finally, after it had gone in to a lot of

01:11:42 11   patients and had pretty good antiviral, pretty reasonable

01:11:46 12   antiviral activity, we actually, we stopped.  We discontinued

01:11:51 13   it.

01:11:51 14   Q.    Now, Dr. McHutchison has said he conducted a clinical

01:11:57 15   trial with NM283.  He said the cure rate was zero.  Do you

01:12:01 16   agree with that characterization?

01:12:02 17   A.    It was surprising.  When we first put that compound

01:12:06 18   into the clinic, all kinds of investigators were dying to

01:12:09 19   get into that, to do that study because this was really a

01:12:12 20   first of its kind molecule and really something of a

01:12:16 21   breakthrough in the field.  So he was in the team.  I don't

01:12:20 22   know what study he was referring to because we really, you

01:12:23 23   know, we just had, we just had the words.  We didn't see any

01:12:27 24   results or anything.

01:12:29 25            But, you know, I'm not a clinical person, but

01:12:31 1   from what I remember of the results, certainly we saw

01:12:34 2   effective treatment of HCV as shown by a reduction in the

01:12:39 3   amount of virus circulating in patients who took it.  And,

01:12:44 4   you know, as far as I'm aware, there was talk at the time

01:12:47 5   that there were actually cures; and I believe that to be the

01:12:50 6   case.

01:12:51 7          There were also, you might recall, in a

01:12:54 8   background, this was an add-on therapy.  In those days, we

01:12:59 9   had 48 week trials, 24 more weeks before you could read out

01:13:04 10  a cure.  And those trials were in the presence of pegylated

01:13:09 11  interferon and ribavirin and you added our drug on top of

01:13:12 12  that.

01:13:13 13         So the background regime alone actually gives

01:13:17 14  you a cure, so I'm pretty confident that we did get cures.

01:13:22 15  Q.      Now, are you aware of any other 2'-methyl up

01:13:26 16  nucleosides that treated hepatitis C in human patients

01:13:29 17  before NM283?

01:13:31 18  A.      No, I am not.  I believe we were the first.

01:13:33 19  Q.      Okay.  You heard that Dr. Secrist refer to getting

01:13:46 20  into clinical trials as a success earlier today, didn't you?

01:13:51 21  Did you hear that?

01:13:52 22  A.      I heard that.  Yes.

01:13:54 23         THE COURT:  I'm sorry.  Doctor, would you mind

01:13:56 24  pulling a microphone closer to you so we can be you sure to

01:14:00 25  hear you.

01:14:01 1          THE WITNESS:  Sorry.

01:14:01 2          THE COURT:  Thank you.

01:14:01 3   BY MR. KINTON:

01:14:04 4   Q.     Did you hear Dr. Secrist refer to getting a drug in

01:14:05 5   the clinical trials as a success?

01:14:07 6   A.     I did.  I heard that, yes.

01:14:08 7   Q.     Do you agree with that with respect to NM283?

01:14:11 8   A.     Oh, yes.  We certainly always thought that, yes.

01:14:16 9   Q.     Let's look back at your slide, the next compound

01:14:19 10  there is IDX184.

01:14:22 11         Can you describe that compound for us?

01:14:24 12  A.     So this again is the 2'-methyl class of compound.

01:14:28 13  And now you are looking over here at the base, the G base.

01:14:34 14  And over on this side, you have a different prodrug of a

01:14:37 15  type that we called sate prodrug, and this actually is a

01:14:44 16  liver-targeted technology which you heard about from

01:14:47 17  Dr. Sofia earlier in this trial.

01:14:50 18  Q.     Do you know whether IDX went into humans before or

01:14:55 19  after sofosbuvir?

01:14:56 20  A.     We went, in 2008, sofosbuvir went into the clinic in

01:15:01 21  2010, so we were two years in front of that technology.

01:15:05 22  Q.     Had Idenix done any preclinical testing of this

01:15:08 23  compound before it entered clinical trials?

01:15:11 24  A.     Yes, absolutely.  We did the same package of

01:15:13 25  preclinical testing, perhaps even more than for NM283.

01:15:18 1  Everything required to satisfy the FDA.

01:15:20 2  Q.      And how did IDX184 perform in clinical trials?

01:15:24 3  A.      Well, we were in there and we were seeing effective

01:15:27 4  treatment of patients in the clinic, and all was actually

01:15:34 5  going along pretty well and, all of a sudden, from out of

01:15:38 6  the blue, there was a problem with a competitive drug, the

01:15:41 7  compound that Bristol-Myers Squibb was developing that we

01:15:45 8  call BMS094.  And that problem, that compound actually gave

01:15:49 9  problems in the clinic and the FDA became very nervous

01:15:52 10  about nucleosides.  The BMS compound was a nucleoside with

01:15:57 11  a guanosine base and potentially we could share a common

01:16:01 12  metabolite with this compound.  So the FDA was very

01:16:05 13  concerned and they stopped all testing on this class of

01:16:09 14  compounds.

01:16:09 15  Q.      Okay.  The next compound on your slide is IDX21437.

01:16:15 16  Do you see that?

01:16:16 17  A.      Yes, I do.

01:16:17 18  Q.      Can you describe that compound for us?

01:16:19 19  A.      So now this is again the 2'-methyl compound, it was

01:16:26 20  has a uradine base.  It's a U.  And it has a prodrug on the

01:16:31 21  5' end over there.  That is the 5' end that is essentially a

01:16:34 22  modified McGuigan prodrug.  The Pharmasset sofosbuvir

01:16:43 23  prodrug is a straightforward McGuigan.  This is a modified

01:16:46 24  one.

01:16:46 25  Q.      What is at the 2' down on this one?

01:16:48 1    A.    There is a chlorine there instead of an OH or a

01:16:52 2    flourine.

01:16:53 3    Q.    Okay.  And did IDX21437 show antihepatitis C

01:16:59 4    activity?

01:16:59 5    A.    Yes, it's currently showing very good hepatitis C

01:17:03 6    activity.

01:17:03 7    Q.    And did it go into clinical trials?

01:17:05 8    A.    Yes.

01:17:06 9    Q.    Now, under IDX21437, there is a designation MK3682.

01:17:14 10   Do you see that?

01:17:15 11   A.    Yes, I do.

01:17:15 12   Q.    Do you have an understanding as to what that means?

01:17:18 13   A.    So, as you heard here, Merck acquired Idenix and they

01:17:24 14   renumbered this compound, and this is now 3682 is the Merck

01:17:28 15   numbering.

01:17:29 16   Q.    So during your time at Idenix, did Idenix develop a

01:17:34 17   number of lead compounds for treating hepatitis C?

01:17:37 18   A.    I should add actually that this compound is doing

01:17:40 19   very well in clinical trials.  It is still in clinical

01:17:43 20   trials and is moving along very well.

01:17:46 21         Again, this compound in particular has cured

01:17:50 22   patients, but between them, all of these compounds have

01:17:53 23   cured patients.

01:17:54 24   Q.    Thank you.  So Idenix has developed a number of

01:17:57 25   compounds, ribonucleosides for treating hepatitis C; is that

01:18:03 1     right?

01:18:03 2     A.     We have yes.

01:18:03 3     Q.     Was there anything in common with those compounds?

01:18:06 4     A.     Really, the only thing in common with the compounds

01:18:09 5     is the 2'-methyl up.

01:18:11 6     Q.     Do you agree with -- or actually do you consider your

01:18:17 7     work at Idenix to be a success even though the compounds

01:18:21 8     that you worked on have not made it out of clinical trials?

01:18:26 9     A.     Well, yes, I do.  This is, in my opinion, the basis

01:18:30 10    for the nucleoside therapy that is happening at the moment.

01:18:34 11    And really this is a key molecule.

01:18:38 12    Q.     And so you think that the patients that are cured by

01:18:44 13    Idenix's 2'-methyl up nucleosides are failures?

01:18:47 14    A.     I should think they are thrilled.  I don't think they

01:18:49 15    are failures.

01:18:50 16    Q.     Okay.  So I'd like to step back in time from the work

01:18:54 17    that Idenix -- or the clinical trials to the work that

01:18:57 18    Idenix was doing on 2'-methyl up class of compounds between

01:19:05 19    May 2000 and May 2001, the filing of the provisional and the

01:19:10 20    filing of the utility application.  Okay?

01:19:12 21    A.     Okay.

01:19:12 22    Q.     You mentioned you were responsible for setting up the

01:19:15 23    biology lab at Idenix; is that right?

01:19:18 24    A.     That's right, yes.

01:19:19 25    Q.     Between January of 2001 and May 2000, who worked on

01:19:23 1    the lab on Idenix's hepatitis C program?

01:19:25 2    A.    So we had a variety of scientists.  Some of the ones

01:19:30 3    who are most connected with this particular work were

01:19:34 4    Meredith Fisher, for instance, Julia Lee, Lin Qu, they were

01:19:39 5    associates.  And we had a couple of post-doctoral fellows as

01:19:44 6    well, Xin Ru Pan-Zhou and Erika Cretton-Scott.  I apologize

01:19:50 7    to the Clerk of the Court.  I'm sure that is tough.

01:19:54 8    Q.    Did you oversee their work?

01:19:58 9    A.    I did, yes.

01:19:59 10    Q.    Can you describe at a high level what they were

01:20:01 11    working on during that time frame?

01:20:02 12    A.    So we, having just set up a lab basically, we started

01:20:09 13    to grow the cells, do the cytotoxicity assays that we needed

01:20:14 14    to evaluate the compound, brought in BVDV and set up all the

01:20:19 15    BVDV assays, and did all of those kind of things basically,

01:20:22 16    everything we needed, and we really started to profile the

01:20:24 17    compound seriously.

01:20:26 18    Q.    And did you have any consultations with Dr.

01:20:31 19    Sommadossi regarding the work they were doing?

01:20:33 20    A.    All the time.  He was -- we discussed everything in

01:20:36 21    a lot of detail.  You know, we chose the lead compounds

01:20:40 22    together.  We took data that La Colla, Professor La Colla

01:20:47 23    sent from Italy, and we looked at that and decided which

01:20:50 24    compounds to move forward.  He was always very directly

01:20:53 25    involved with the work in the lab, very informative about

01:20:56 1    what was going on.

01:20:57 2    Q.      Now, you mentioned Dr. LaColla.  What was his role at

01:21:01 3    that time?

01:21:01 4    A.      So he, obviously he was over in Cagliari in Italy, so

01:21:09 5    a little further in terms of communication.  But he worked

01:21:11 6    with a group in France, which was Dr. Gilles Gosselin and

01:21:16 7    his group, and they screened the compounds, and then we

01:21:19 8    selected the ones we wanted to move forward is what we call

01:21:22 9    leads, compounds that we might want to move forward to

01:21:26 10   clinical development.  So he was always involved as well.

01:21:29 11   Q.      Now, you mentioned screening the compounds.  Can you

01:21:32 12   describe what you meant by that?

01:21:34 13   A.      Well, screening the compounds for -- his was not an

01:21:39 14   industry sort of lab, so he did fairly laborious

01:21:42 15   experiments.  He really titrated the compound in many cases.

01:21:46 16   In other cases, he just did a single determination of the

01:21:49 17   activity of the compound at, say, the concentration of

01:21:54 18   something like 100 micromolar, which is often used in the

01:21:57 19   industry.  So he did the first pass and he looked in a

01:22:00 20   number of different viruses.

01:22:04 21           You heard here about yellow virus fever first,

01:22:07 22   BVDV virus.  By the time I came on board, there was also

01:22:11 23   West Nile virus, even polio virus as far as away as

01:22:17 24   coxsackie virus.  A number of viruses.

01:22:19 25   Q.      During that time, did the scientists in your lab keep

01:22:23 1    record of their work?

01:22:24 2    A.      They did, yes.

01:22:24 3    Q.      And what did they use to keep their record in?

01:22:28 4    A.      They had notebooks, assigned by Idenix.

01:22:35 5    Q.      Do you know how the notebooks relating to the work

01:22:37 6    conducted in your lab were kept by the biologists?

01:22:42 7    A.      While they were working, the notebooks were kept in

01:22:45 8    the lab, and then they were stored in special facilities.

01:22:48 9    Q.      Dr. Standring, you have a binder in front of you.

01:22:51 10   I'd like you to look at Tabs 1 through 5, which are

01:22:55 11   identified as Plaintiffs' Exhibit 380, 383, 391, 393, and

01:23:04 12   400, and let me know if you recognize those exhibits.

01:23:15 13   A.      Yes, I do.

01:23:16 14   Q.      When I say the past few questions when I have said

01:23:20 15   in this time frame, you understand I'm referring to between

01:23:25 16   May 2000 and May 2001?

01:23:27 17   A.      I do understand that, yes.

01:23:29 18   Q.      Okay.  Great.  You said you recognized those

01:23:33 19   notebooks -- or those exhibits?

01:23:35 20   A.      I do.

01:23:36 21   Q.      And what are they?

01:23:37 22   A.      They are laboratory notebooks belonging to specific

01:23:40 23   people.

01:23:41 24           MR. KINTON:  I move for the admission of

01:23:43 25   Plaintiffs' Exhibits 380, 383, 391, 393 and 400.

01:23:49  1          MR. McCANN:  No objection, Your Honor.

01:23:50  2          THE COURT:  Those are admitted.

01:23:51  3          (PX-380, PX-383, PX-391, PX-393, PX-400 were

01:23:51  4  admitted into evidence.)

01:23:51  5  BY MR. KINTON:

01:23:56  6  Q.     Dr. Standring, are you familiar generally with the

01:23:58  7  contents of those notebooks?

01:24:00  8  A.     Yes, I am.

01:24:00  9  Q.     So I'd like you to look at the next document in your

01:24:07 10  notebook which is at Tab 6.

01:24:14 11  A.     (Witness complies.)

01:24:15 12  Q.     And it is marked as Plaintiffs' Exhibit 2264.  Do you

01:24:24 13  see that?

01:24:25 14  A.     Yes.

01:24:25 15  Q.     Do you recognize that document?

01:24:27 16  A.     I do.

01:24:27 17  Q.     And what is it?

01:24:28 18  A.     So here, I pulled together a summary of the work done

01:24:33 19  by the various people in the lab, along with dates and a lot

01:24:38 20  of information about what kind of work that is done.  It's a

01:24:40 21  table summary.  At the end, there is also a calendar of

01:24:44 22  events.

01:24:46 23          MR. KINTON:  I move for the admission of

01:24:49 24  Plaintiffs' Exhibit 2264.

01:24:50 25          MR. McCANN:  No objection, Your Honor.

01:24:50 1    THE COURT:  It's admitted.

01:24:51 2    (PX-2264 was admitted into evidence.)

01:24:51 3    MR. KINTON:  Can we have the first page of

01:24:54 4 Plaintiffs' Exhibit 2264 up on the screen?

01:24:54 5 BY MR. KINTON:

01:24:58 6 Q.    Dr. Standring, you mentioned the first part of the

01:25:00 7 exhibit shows a table.  Can you tell us what this table

01:25:03 8 shows?

01:25:04 9 A.    Yes.  So this, the summary here you see over in this

01:25:09 10 side, on the left-hand side, you see a date.  That is the

01:25:12 11 date that the experiment was recorded.  In some places,

01:25:16 12 there is obviously a range of dates because many experiments

01:25:19 13 lasted over a period of time.

01:25:21 14    In the second column, there is the identifier

01:25:25 15 for the notebook.  In this case, you can see that this is

01:25:29 16 notebook MF, which stand for Meredith Fisher, and it is

01:25:34 17 Notebook No. 6.

01:25:35 18 Q.    Is there a key for the notebook column somewhere in

01:25:39 19 the exhibit?

01:25:40 20 A.    There is actually.

01:25:42 21    MR. KINTON:  Can we go to the last page of the

01:25:44 22 exhibit?  It should be on page 16.

01:26:06 23 BY MR. KINTON:

01:26:06 24 Q.    So is that the key down at the bottom?

01:26:08 25 A.    It is the key.  So it starts with Dr. Erika

01:26:12 1   Cretton-Scott, for instance, in Notebook No. 9, Julia Lee

01:26:16 2   and other people in the lab in Notebook 5, Lin Qu, Meredith

01:26:21 3   Fisher, and Xin Ru Pan-Zhou.

01:26:24 4        MR. KINTON:  Let's go back to the table on the

01:26:25 5   first page.

01:26:25 6   BY MR. KINTON:

01:26:32 7   Q.   And can you explain what the rest of the table is

01:26:35 8   showing?

01:26:35 9   A.   Okay.  So the page column here, the third column

01:26:39 10  over, that is pretty obvious.  This is a page number where

01:26:42 11  that work can be found.

01:26:43 12       And then this is a calendar entry.  So you will

01:26:48 13  see in a little while a calendar, and Meredith Fisher's

01:26:55 14  Notebook No. 6, page 1, is indicated by this kind of

01:27:00 15  marking.  And you will see that in the calendar.

01:27:02 16       Then we have a column which describes the task

01:27:06 17  that was being performed.  That one is a little bit hard to

01:27:10 18  read, but these are taken from the notebooks or from notes

01:27:14 19  in the -- or from the indices of the books or whatever.  And

01:27:19 20  in some cases, there are continuations of work, and so this

01:27:23 21  then reflects us back to Meredith Fisher No. 1 -- Meredith

01:27:32 22  Fisher No. 6 at 1.

01:27:33 23       Then there are comments which are either my or

01:27:37 24  their interpretation of what work was actually being done.

01:27:40 25  Q.   And so you mentioned a calendar.  Let's go to page 12

01:27:44 1    of Plaintiffs' Exhibit 2264, and the next few pages show a

01:27:50 2    calendar.  What is this summarizing or showing?

01:27:53 3    A.    So this is a calendar.  It attempts to capture the

01:27:58 4    totality of the work that we were doing on this project and

01:28:02 5    you will see the lab was only set up in January.  We only

01:28:06 6    hired most of the people at the beginning of January.  And

01:28:08 7    by January the 24th, we were already working, we were doing

01:28:14 8    experiments towards looking at our 2'-methyl compound.  And

01:28:19 9    what you will see, as we go along, is an increasing amount

01:28:21 10   of work and a continuous amount of work over time.

01:28:24 11              MR. KINTON:  Can we see the next page of the

01:28:26 12   exhibit?

01:28:26 13   BY MR. KINTON:

01:28:29 14   Q.    And let's quickly go through the next few pages up to

01:28:34 15   May.

01:28:37 16   A.    You can see by now that the lab is getting more and

01:28:39 17   more set up, and we're getting busier and busier, doing more

01:28:44 18   and more experiments.

01:28:45 19   Q.    Okay.

01:28:45 20   A.    Remember, that the lab was only set up.  We only

01:28:48 21   moved into the, even into the company in September, so this

01:28:52 22   is already pretty quick.

01:28:54 23   Q.    So what is the source of the data that is included in

01:28:59 24   Plaintiffs' Exhibit 2264?

01:29:00 25   A.    The data is all taken from the notebooks.

01:29:03 1    Q.      Right.  So from January of 2001 through May 23rd,

01:29:07 2    2003, what was the focus of your group at Idenix?

01:29:11 3    A.      The focus was really profiling, characterizing the

01:29:16 4    2'-methyl series of compounds.  We were focused much more on

01:29:19 5    the lead series of compounds than anything else.

01:29:21 6    Q.      And during that time frame, did Idenix stop work on

01:29:24 7    those compounds?

01:29:25 8    A.      We did not, no.

01:29:26 9    Q.      So how would you characterize the efforts of the

01:29:29 10   Idenix folks at your lab during that time?

01:29:31 11   A.      A very robust effort and very persistent continuous

01:29:34 12   effort.

01:29:34 13   Q.      Okay.  So I'd like to move away from Idenix's early

01:29:40 14   work between the filing of the provisional and the filing of

01:29:46 15   the application and ask you some questions about your

01:29:48 16   interactions with Pharmasset and Dr. Schinazi.  Okay?

01:29:51 17   A.      Okay.

01:29:51 18   Q.      While you were at Idenix, you were aware of

01:29:56 19   Pharmasset?

01:29:57 20   A.      I was, yes.

01:29:58 21   Q.      Did you have any interactions with Dr. Schinazi while

01:30:00 22   you were there?

01:30:01 23   A.      I had a few over the years, yes.

01:30:03 24   Q.      And can you describe some of those interactions for

01:30:06 25   us?

01:30:06  1   A.    Well, I would characterize them as generally pretty

01:30:10  2   uncomfortable, I think as being, as you have seen I think

01:30:15  3   in some of the transcripts here.  He was always pushing for

01:30:19  4   information, and he was pushing various different people,

01:30:25  5   has a definite way of, you know, getting into your space and

01:30:29  6   demanding information.

01:30:31  7          And I was uncomfortable because I have never

01:30:34  8   quite seen that kind of information before and didn't

01:30:37  9   really know, you know, the right of Dr. Schinazi to have

01:30:41 10   information that we would not give to anyone else.  The

01:30:46 11   pharmaceutical business is competitive and we don't just

01:30:49 12   give people information very easily.

01:30:50 13          There were many specific examples as well.

01:31:09 14   Q.    What were some of the specific examples you recall?

01:31:12 15   A.    So certainly one of the ones that was most memorable

01:31:17 16   to me was I had given a talk, one of the first talks on the

01:31:22 17   frequent clinical profile of a compound IDX184, and that was

01:31:26 18   a meeting in Europe, I believe it was Milan, but I didn't

01:31:30 19   research that or look at it properly.  But I had just given

01:31:34 20   the talk and I did not show the structure of the compound

01:31:37 21   because we did not show the structure of clinical compounds

01:31:40 22   until they're fairly well along the pathway.

01:31:44 23          So I was in a hotel at one point meeting some

01:31:47 24   people and Dr. Schinazi was there and he came right up to me

01:31:50 25   and he demanded to know the structure of the particular

01:31:53 1    prodrug that we were using.  He did not know that.

01:31:57 2            So I refused to give it to him.  He was kind of

01:32:00 3    yelling at me and he basically said that he would go off and

01:32:05 4    go visit the lab in Montpellier.  He knew the people there

01:32:09 5    and he would get the structure from Dr. Gosselin.

01:32:13 6            So I had to call up Dr. Sommadossi at that

01:32:16 7    point, our CEO, tell him about this interaction, and he

01:32:20 8    actually called up the lab in Montpellier and told them not

01:32:24 9    to talk to Dr. Schinazi.

01:32:25 10   Q.    Okay.  Let's just shift gears a little bit.

01:32:32 11           MR. KINTON:  Can we have Exhibit 1274, which is

01:32:35 12   behind Tab 7 of your notebook.  And I believe we've seen

01:32:41 13   this before.  This is an e-mail that was put up.  It's in

01:32:46 14   evidence, where you used the term, the Pharmasset drug for

01:32:59 15   NB66.

01:33:00 16           Do you recall testimony about this or discussion

01:33:02 17   of this?

01:33:02 18   A.    Oh, yes.  I didn't see it for a moment.

01:33:06 19   Q.    What year was this e-mail drafted?

01:33:12 20   A.    This e-mail was drafted November 5th, 2009.

01:33:14 21   Q.    And do you know when the Pharmasset patent

01:33:17 22   application was published?

01:33:18 23   A.    I believe it was 2005.

01:33:21 24   Q.    And did you get information on the structure of the

01:33:24 25   Pharmasset compound from Dr. Schinazi before the Pharmasset

01:33:27 1    patent published?

01:33:28 2    A.    No.

01:33:29 3    Q.    Okay.  Now, counsel for Gilead asked you some

01:33:34 4    questions, or asked Dr. Sofia some questions during his

01:33:37 5    testimony.

01:33:38 6                Do you recall that?

01:33:38 7    A.    Yes.  I was surprised at those.

01:33:41 8    Q.    Counsel for Gilead asked Dr. Sofia if you ever

01:33:44 9    accused Pharmasset of taking anything from Idenix at

01:33:47 10   scientific meetings.

01:33:49 11               Do you recall that?

01:33:49 12   A.    I recalled that, yes.

01:33:51 13   Q.    Why didn't you accuse Pharmasset of taking anything

01:33:54 14   from Idenix at scientific meetings?

01:33:56 15   A.    Well, I didn't know a lot of the information that I,

01:34:01 16   you know, had learned at this trial, and besides, that would

01:34:06 17   be something I would not accuse someone myself.  I would

01:34:08 18   take that back to the company, to a CEO and lawyers, I

01:34:13 19   guess.

01:34:13 20   Q.    Okay.  Now, you mentioned you didn't know some of the

01:34:16 21   information seen at this trial.

01:34:18 22               MR. KINTON:  Can we have Plaintiffs'

01:34:21 23   Exhibit 470, which has been previously admitted, up on the

01:34:24 24   screen.

01:34:24 25   BY MR. KINTON:

01:34:25 1  Q.    And this is the -- I will refer to it as the cold

01:34:32 2  shower e-mail.

01:34:32 3        Had you seen Plaintiffs' Exhibit 470 before you

01:34:38 4  sat through this trial?

01:34:39 5  A.    I had not, no.

01:34:41 6  Q.    The next tab in your binder is Tab 9, and that's

01:34:46 7  Plaintiffs' Exhibit 677, which also has been previously

01:34:53 8  admitted.

01:34:54 9  A.    I see it.

01:34:55 10 Q.    Dr. Standring, before you sat in this courtroom, had

01:34:58 11 you seen this exhibit where Dr. Schinazi told Dr. Otto that

01:35:01 12 he gave Idenix's confidential information to Dr. Watanabe?

01:35:07 13 A.    I had not seen this.

01:35:10 14        MR. KINTON:  Can we have Plaintiffs' Exhibit 691

01:35:12 15 up on the screen.

01:35:13 16 BY MR. KINTON:

01:35:14 17 Q.    This is some meeting minutes from January 31st, 2003.

01:35:18 18 Were you in the courtroom when this was discussed with Dr.

01:35:26 19 Rachakonda?

01:35:26 20 A.    Yes, I was.

01:35:27 21 Q.    And were you here when it was pointed out that in

01:35:30 22 January of 2003, Dr. Schinazi told Jeremy Clark to start

01:35:34 23 with the cytosine or C base?

01:35:37 24 A.    Yes, I was.

01:35:42 25 Q.    Before you sat in this courtroom during that

01:35:44  1   testimony, did you know about this?

01:35:45  2   A.      I did not, no.

01:35:50  3              MR. KINTON:  Can we have Plaintiffs'

01:35:52  4   Exhibit 720, which is Tab 11, up on the screen.

01:35:54  5   BY MR. KINTON:

01:35:57  6   Q.      Dr. Schinazi, had you seen this -- I'm sorry.  You're

01:36:00  7   not Dr. -- please forgive me.  You're definitely not Dr.

01:36:04  8   Schinazi.

01:36:04  9              Dr. Standring, had you seen Plaintiffs'

01:36:10 10   Exhibit 720 before you sat in the courtroom?

01:36:12 11   A.      No, I had not.

01:36:16 12   Q.      Were you aware that Dr. Schinazi instructed Dr. Otto

01:36:19 13   to delete data that showed Idenix's compound used C, the

01:36:24 14   cytosine base, because it was inside information?

01:36:27 15   A.      I was not aware of that, no.

01:36:29 16   Q.      Were you aware that Dr. Schinazi did this less than a

01:36:32 17   month after he told Jeremy Clark to use cytosine as a base

01:36:37 18   for PSI-6130?

01:36:39 19   A.      I did not know that, no.

01:36:41 20              MR. KINTON:  Thank you, Dr. Standring.  I have

01:36:43 21   no further questions at this time.  Pass the witness.

01:36:46 22              THE COURT:  Cross-examination.

01:37:00 23              MR. McCANN:  May I approach the witness, Your

01:37:02 24   Honor?

01:37:02 25              THE COURT:  You may.

01:37:03 1    (Mr. McCann handed a binder to the Court and to

01:37:07 2 the witness.)

01:37:11 3    MR. McCANN:  Dug may I proceed, Your Honor?

01:37:27 4    THE COURT:  You may.

01:37:28 5    CROSS-EXAMINATION

01:37:31 6 BY MR. McCANN:

01:37:32 7 Q.    Dr. Standring, my name is Douglas McCann.  You told

01:37:36 8 us that you spent 13 years at Idenix?

01:37:38 9 A.    I did, yes.

01:37:39 10 Q.    And in the 13 years that you were at Idenix, Idenix

01:37:44 11 has not received FDA approval for an HCV drug; is that

01:37:50 12 correct?

01:37:50 13 A.    That's correct.

01:37:51 14 Q.    And in September of 2013, you were then the chief

01:37:55 15 scientific officer of Idenix?

01:37:56 16 A.    I was, yes.

01:37:57 17 Q.    And in September of 2013, the CEO called you into his

01:38:01 18 office and told you he was letting you go.  That's correct?

01:38:07 19 A.    That's correct.

01:38:08 20 Q.    Now, you told us that since leaving Idenix, that you

01:38:10 21 had taken up work as a consultant; is that correct?

01:38:13 22 A.    Correct.

01:38:14 23 Q.    But you did not tell us in your direct testimony what

01:38:16 24 kind of consultant you were; is that correct?

01:38:18 25 A.    That's correct.

01:38:19  1    Q.      And on the -- in the same letter where your

01:38:25  2    employment with Idenix was terminated, you agreed to serve

01:38:28  3    as a consultant with Idenix going forward; is that correct?

01:38:31  4    A.      I did, yes.

01:38:32  5    Q.      In your materials, but I'm just going to use the Elmo

01:38:36  6    to save some time -- in your materials is DTX-2011 already

01:38:42  7    in evidence, and I'm just going to show you page 4.  And

01:38:45  8    this is your September 2013 consulting arrangement; is that

01:38:49  9    correct?

01:38:49 10    A.      Correct.

01:38:50 11    Q.      And so the record is clear, the yellow highlighting

01:38:54 12    is mine and the red pen is mine.

01:38:56 13            And in your agreement you agreed to the full

01:38:58 14    extent permitted by law that you would cooperate with the

01:39:02 15    company in the prosecution of any claim; is that correct?

01:39:06 16    A.      Correct.

01:39:06 17    Q.      A little bit further down, it's actually called the

01:39:11 18    Litigation Assistant Services.

01:39:13 19    A.      Correct.

01:39:13 20    Q.      And do you see that?  Yes?  Litigation Assistant

01:39:21 21    Services?

01:39:23 22    A.      Yes.

01:39:24 23    Q.      All right.

01:39:25 24    A.      I see that.

01:39:26 25    Q.      And you indicated that among the service that you

01:39:28 1  would provide, you agreed, you contractually bound yourself

01:39:32 2  to serve as a witness; correct?

01:39:34 3  A.    Yes.  I have not seen that I'm actually coerced to do

01:39:44 4  that, but, yes, I did agree to help the company.

01:39:48 5  Q.    I'd be happy to take away the -- and you agreed to

01:39:52 6  act as a witness?

01:39:52 7  A.    Yes.

01:39:53 8  Q.    In the original agreement, they indicated they would

01:39:55 9  pay you a hundred dollars per hour?

01:39:56 10  A.    Yes.

01:39:56 11  Q.    And that's your yours initials making it $350 per

01:40:01 12  hour?

01:40:01 13  A.    Yes.

01:40:01 14  Q.    And am I correct that you've since raised your rates?

01:40:04 15  A.    Yes.

01:40:05 16  Q.    And what are they today?

01:40:06 17  A.    600 an hour.

01:40:07 18  Q.    Including your time preparing for and testifying in

01:40:09 19  this case?

01:40:09 20  A.    Including my time, yes.  Yes.

01:40:13 21  Q.    In your direct examination you testified to some

01:40:22 22  things that you did not know before you came to trial in

01:40:27 23  this case; is that correct?

01:40:27 24  A.    Examples?

01:40:34 25  Q.    I could be more clear, sure.

01:40:36  1    A.      Yes.

01:40:36  2    Q.      Counsel asked you whether you had ever said anything

01:40:39  3    to Michael Sofia about the inventorship of sofosbuvir.

01:40:47  4                    Do you recall that?

01:40:47  5    A.      I recall that.

01:40:48  6    Q.      And you said that, well, one of the reasons why I

01:40:51  7    didn't say anything, because Dr. Sofia was -- there were

01:40:54  8    some things that I did not then know; is that correct?

01:40:56  9    A.      That's correct, yes.

01:40:57 10    Q.      Things that you've learned here at this trial; is

01:40:59 11    that correct?

01:40:59 12    A.      That's correct.

01:41:00 13    Q.      And you could not have known some of the things that

01:41:02 14    were happening at Pharmasset in the early 2000s because, of

01:41:06 15    course, you were not an employee of Pharmasset; is that

01:41:08 16    correct?

01:41:09 17    A.      That's correct.  Yes.

01:41:09 18    Q.      So at this trial you've heard from some of the

01:41:13 19    Pharmasset witnesses.  Yes?

01:41:14 20    A.      I have.

01:41:15 21    Q.      And so before this trial you could not have known

01:41:19 22    that as Dr. Hassan testified, he first learned of the idea

01:41:26 23    of 2'-methyl on a nucleoside from his prior employer at a

01:41:29 24    lab in Japan.

01:41:31 25                    Do you recall that?

01:41:32  1    A.      I recall that.

01:41:34  2    Q.      And you could not have known if Dr. Rachakonda

01:41:36  3    testified that she actually recalled Dr. Hassan bringing up

01:41:40  4    the idea of 2' methyls at his job interview; is that

01:41:43  5    correct?

01:41:43  6    A.      Correct.

01:41:44  7    Q.      You were not in the room when Jeremy Clark came to

01:41:51  8    speak of Mike Otto about his idea?

01:41:54  9    A.      That's correct.

01:41:55  10   Q.      And you could not have known what occurred in that

01:41:58  11   room until you heard the testimony in this trial?

01:41:59  12   A.      Correct.

01:42:00  13   Q.      And you heard Dr. Otto say that Jeremy Clark walked

01:42:07  14   in with a sheet of paper?

01:42:08  15   A.      I did.

01:42:09  16   Q.      And on that paper was a sugar ring of a nucleoside?

01:42:13  17   A.      I don't recall what was on that paper.

01:42:16  18   Q.      You don't recall if he said that he had drawn a sugar

01:42:19  19   ring with a methyl up and a fluorine down?

01:42:24  20   A.      I recall the patent at this point, but I believe

01:42:27  21   you're correct.

01:42:27  22   Q.      Okay.  You just said you recall the patent.  You

01:42:29  23   recall Dr. Otto said he asked Jeremy Clark, is anybody else

01:42:34  24   doing this, and Clark said no.

01:42:35  25                   Do you recall that testimony?

01:42:36  1    A.    I don't recall those specific words, no.

01:42:38  2    Q.    Do you recall that Clark showed Dr. Otto a page from

01:42:45  3    Novirio, Idenix's patent publication?

01:42:48  4    A.    I believe so, yes.

01:42:49  5    Q.    And it was this page, PX-491B, at page 14.

01:42:54  6          Do you recall that?

01:42:55  7    A.    I don't recall the specific page at this point.

01:43:01  8    Q.    You were here when Dr. Otto testified; is that

01:43:04  9    correct?

01:43:04 10    A.    There has been a lot of testimony.  I don't remember

01:43:07 11    every page.

01:43:08 12    Q.    Do you remember Dr. Otto?

01:43:10 13    A.    If you are telling me that's what I saw, yes.

01:43:12 14    Q.    And do you recall Dr. Otto pointed to Figure 11 and

01:43:14 15    said Clark showed him that figure?

01:43:16 16    A.    I don't recall that specific piece.

01:43:19 17    Q.    Do you recall that Dr. Otto said that he and Clark

01:43:23 18    looked at the R6 up and the R7 down, the 2' position?

01:43:28 19    A.    I will take your word for it.

01:43:29 20    Q.    Do you recall that Dr. Otto said at the 2' down

01:43:34 21    position, which is R7, he saw chlorine, bromine, iodine, but

01:43:39 22    not fluorine?

01:43:40 23          Do you recall that?

01:43:41 24    A.    I do recall that, yes.

01:43:41 25    Q.    Okay.  And he then gave Clark the green light.

01:43:46  1    Do you recall that?

01:43:46  2    A.    I don't recall that specifically, but I will take

01:43:49  3    your word for it.

01:43:50  4    Q.    Now, that was some things that were happening at

01:43:54  5    Pharmasset in 2000 and 2001.  I want to talk a little bit

01:44:00  6    about Idenix, all right, along the same lines.

01:44:03  7         Now, on this document, PX-491B at page 14, you

01:44:10  8    would agree with me that R6 includes alkyl.  Yes?

01:44:20  9    A.    I'm not a patent expert, but it appears to, yes.

01:44:23 10    Q.    And a methyl group is a kind of an alkyl; is that

01:44:27 11    correct?

01:44:27 12    A.    That's correct.

01:44:28 13    Q.    And just so we're clear, this is Idenix's patent

01:44:31 14    application.  Yes?

01:44:32 15    A.    Yes.

01:44:33 16    Q.    This is the work of Dr. Sommadossi and his

01:44:36 17    colleagues.  Yes?

01:44:36 18    A.    Yes.

01:44:37 19    Q.    Okay.  And then at R7 down, one of the possibilities

01:44:42 20    is hydroxy; is that correct?

01:44:43 21    A.    That's correct.

01:44:45 22    Q.    And another is chlorine.  Yes?

01:44:47 23    A.    Correct.

01:44:48 24    Q.    And a moment ago on direct, you showed us some of the

01:44:55 25    work that Idenix was doing on this demonstrative.

01:45:04  1           Do you recall that?

01:45:05  2   A.      I do.

01:45:05  3   Q.      Now, NM283, the sugar ring of this molecule has a

01:45:13  4   methyl up and a hydroxy down.  Yes?

01:45:15  5   A.      Yes, it does.

01:45:16  6   Q.      And we just saw in the Idenix patent application, it

01:45:19  7   specifically, where I'm showing you, allowed you for an OH

01:45:24  8   down, hydroxy down.  Correct?

01:45:25  9   A.      Correct.

01:45:26 10   Q.      But you agree that's not a fluorine?

01:45:28 11   A.      I agree.

01:45:29 12   Q.      And then looking at, this is demonstrative number 2,

01:45:32 13   just to make sure the record is clear.  And actually, NM283,

01:45:35 14   that compound did not become an approved drug; is that

01:45:39 15   correct?

01:45:39 16   A.      It did not, no.

01:45:40 17   Q.      It did have some issues with toxicity?

01:45:42 18   A.      It did.

01:45:42 19   Q.      And Idenix chose not to continue its development.

01:45:45 20   Yes?

01:45:45 21   A.      That's correct.

01:45:46 22   Q.      IDX184, this compound has a methyl up at the 2' and a

01:45:53 23   hydroxy down; is that correct?

01:45:54 24   A.      It does.

01:45:55 25   Q.      And that also is the same kind of sugar ring that we

01:45:59 1    just looked in Idenix's patent application as something

01:46:02 2    specifically called out; is that correct?

01:46:04 3    A.      Correct.

01:46:04 4    Q.      But it's not a fluorine.  You agree with that?

01:46:07 5    A.      I agree.

01:46:09 6    Q.      Now, this compound, I think you told us, had some

01:46:12 7    similarities with a Bristol-Myers Squibb compound?

01:46:16 8    A.      It did, yes.

01:46:17 9    Q.      Bristol-Myers Squibb, that's a separate

01:46:20 10   pharmaceutical company?

01:46:21 11   A.      Yes.

01:46:21 12   Q.      And they were also trying to develop a hepatitis C

01:46:24 13   drug?

01:46:24 14   A.      They were, yes.

01:46:26 15   Q.      And their hepatitis C drug had some similarities to

01:46:31 16   your hepatitis C drug?

01:46:33 17   A.      Yes, it did.

01:46:34 18   Q.      And you said that theirs gave some problems in the

01:46:36 19   clinic.  That's what I wrote down from your direct.

01:46:38 20   A.      Mm-hmm.

01:46:39 21   Q.      And, in fact, someone died from the administration of

01:46:42 22   that drug?

01:46:42 23   A.      Yes.  One person died.  Others were injured.

01:46:45 24   Q.      As serious a problem as you might expect in clinical

01:46:50 25   trial; is that correct?

01:46:50 1    A.      True.

01:46:50 2    Q.      And because of that, this methyl up, hydroxy down

01:46:54 3    compound, Idenix and the FDA agreed it should no longer

01:46:59 4    continue in development; is that correct?

01:47:00 5    A.      Yes.  I have to point out we had never seen any

01:47:05 6    effects in the clinic or anything, but the FDA was simply

01:47:08 7    uncomfortable with this class of compound.

01:47:10 8    Q.      They were uncomfortable following the death of

01:47:12 9    someone in the Bristol-Myers Squibb trial with a compound

01:47:16 10   that they thought was structurally similar to this one,

01:47:20 11   IDX184?

01:47:21 12   A.      They didn't know it was the metabolite, but that was

01:47:24 13   the concern.  So very difficult for us to address.

01:47:26 14   Q.      The final compound, IDX21437, that's currently in

01:47:31 15   clinical trials?

01:47:32 16   A.      It is, yes.

01:47:33 17   Q.      Not yet an FDA approved drug?

01:47:35 18   A.      Not yet an FDA approved drug.

01:47:38 19   Q.      Also not a fluorine down; is that correct?

01:47:40 20   A.      That one is not a fluorine down.

01:47:42 21   Q.      It does have chlorine, which was expressly described

01:47:45 22   in the Idenix patent; is that correct?

01:47:46 23   A.      That's correct.

01:47:47 24   Q.      But not fluorine.  Yes?

01:47:50 25   A.      That's correct.  Yes.

01:47:52 1   Q.     Sir, you know that from the testimony in this case,

01:48:03 2   actually, you know from outside this case that Jeremy Clark

01:48:08 3   ultimately published some articles on his compound 6130?

01:48:14 4   A.     I do.

01:48:14 5   Q.     And those articles first published in 2005?

01:48:18 6   A.     Yes.  I believe so.

01:48:20 7   Q.     And you and Idenix were aware of those articles some

01:48:23 8   time after they published; is that correct?

01:48:25 9   A.     We were.

01:48:26 10  Q.     And he showed the structure of 6130?

01:48:28 11  A.     I believe so.  Yes.

01:48:32 12  Q.     And he showed some activity data for 6130.  Do you

01:48:35 13  recall that?

01:48:36 14  A.     I do, yes.

01:48:37 15  Q.     You also know that Jeremy Clark got a patent?

01:48:40 16  A.     Yes.

01:48:40 17  Q.     And that is not something you just learned in this

01:48:43 18  trial; is that correct?

01:48:44 19  A.     That's correct.

01:48:45 20  Q.     And in that patent, again, Jeremy Clark showed the

01:48:48 21  structure of 6130, the methyl up and the fluorine down.

01:48:52 22  Yes?

01:48:52 23  A.     That's correct.

01:48:53 24  Q.     And also some activity data for it; is that correct?

01:48:57 25  A.     I believe so.

01:48:58 1  Q.    And he also in this patent published a synthesis

01:49:04 2  scheme; isn't that correct?

01:49:04 3  A.    Yes, that's correct.

01:49:05 4  Q.    And when I say synthesis scheme, I mean he described

01:49:09 5  in the patent to the public a way to make 6130; is that

01:49:13 6  correct?

01:49:13 7  A.    He described a way to make it, yes.

01:49:17 8  Q.    And Idenix synthesized 6130 in-house; is that

01:49:25 9  correct?

01:49:25 10 A.    We did, yes.

01:49:26 11 Q.    And you called that, I think it was NB66?

01:49:29 12 A.    NB66.

01:49:31 13 Q.    And NB66 was first made in Idenix, at Idenix after

01:49:37 14 Mr. Clark published his patent; is that correct?

01:49:40 15 A.    That molecule was made afterwards, yes.

01:49:44 16 Q.    After Mr. Clark published his patent; is that

01:49:46 17 correct?

01:49:46 18 A.    Yes.

01:49:47 19 Q.    And it was first tested in 2005 at Idenix after

01:49:52 20 Mr. Clark published his patent; is that correct?

01:49:54 21 A.    It was, yes.

01:49:59 22 Q.    You were present in court when testimony from Jenny

01:50:04 23 Wang was read into evidence?

01:50:07 24 A.    Jingyang Wang.

01:50:09 25 Q.    Yes.  W-a-n-g?

01:50:11 1   A.     W-a-n-g, I believe.

01:50:13 2   Q.     Yes.

01:50:14 3   A.     Yes.

01:50:14 4   Q.     And this was an employee of Idenix?

01:50:19 5   A.     It was.

01:50:20 6   Q.     She is a chemist?

01:50:22 7   A.     She is, yes.

01:50:23 8   Q.     And she testified with respect to the synthesis of

01:50:31 9   NB66. And just so we're clear again, NB66 is Idenix making

01:50:39 10   Jeremy Clark's 6130 in-house at Idenix; correct?

01:50:42 11   A.     It is, yes.

01:50:43 12   Q.     She testified, and this is at page 1198, line 2:

01:50:56 13         "Question: You don't recall. But in any event,

01:51:06 14   you agree that the first time that compound NB66 was tested

01:51:09 15   for activity was some time in March of 2005. Right?

01:51:16 16         "Answer: From -- yes, from here, yes.

01:51:17 17         "Question: And that -- I think you already said

01:51:20 18   this -- that ended up being successful and you were able to

01:51:23 19   make NB66 following the Pharmasset synthetic route. True?

01:51:27 20         "Answer: Yes."

01:51:28 21         You recall that testimony; correct, sir?

01:51:30 22   A.     I do, yes.

01:51:30 23   Q.     And she is testifying about the Pharmasset route

01:51:33 24   described by Jeremy Clark in his patent application;

01:51:36 25   correct?

01:51:38  1   A.       Yes, that is correct.

01:51:39  2   Q.       She was not testifying that she made Jeremy Clark's

01:51:42  3   compound using any scheme or any instructions from Idenix's

01:51:46  4   patent; isn't that true?

01:51:48  5   A.       I haven't actually looked at the routes.  I don't

01:51:51  6   know if it is exactly the same but basically that is

01:51:53  7   correct.

01:51:53  8   Q.       So at least as of 2005, you and your colleagues at

01:52:03  9   Idenix were aware of the structure of 6130; correct?

01:52:07 10   A.       We were.

01:52:08 11   Q.       You were aware of its activity data; correct?

01:52:11 12   A.       We were.

01:52:12 13   Q.       You believed that you at Idenix had discovered the

01:52:19 14   use of methyl up to treat HCV?

01:52:25 15                MR. KINTON:  Objection, calls for a legal

01:52:26 16   conclusion.

01:52:27 17                MR. McCANN:  I think he testified they believed

01:52:28 18   that, Your Honor.

01:52:29 19                THE COURT:  Again, you believe?  What was the

01:52:31 20   question?  You believe you did what?

01:52:33 21   BY MR. McCANN:

01:52:34 22   Q.       You believe that your colleagues at Idenix were the

01:52:39 23   ones who discovered the use of a nucleoside with a 2'-methyl

01:52:44 24   substitution in the up position to treat hepatitis C;

01:52:48 25   correct?

01:52:49  1    A.      I am not a legal expert, obviously.  But we did

01:52:52  2    believe that basically.

01:52:53  3    Q.      And you were aware from Pharmasset's public work, not

01:52:56  4    anything you learned in this courtroom, that Pharmasset was

01:52:59  5    using a nucleoside with a methyl up at the 2' position and

01:53:05  6    the fluorine down at the 2' position; correct?

01:53:08  7    A.      That is correct.

01:53:09  8    Q.      And you do agree that you knew also not just the

01:53:13  9    structure of Clark's compound 6130 but the structure of

01:53:17 10    sofosbuvir; correct?

01:53:21 11    A.      In what time frame?

01:53:21 12    Q.      2009.

01:53:23 13    A.      2009, yes.

01:53:24 14    Q.      And sofosbuvir also has a sugar ring with a methyl up

01:53:30 15    at the 2' position and a flourine down at the 2' position;

01:53:34 16    correct?

01:53:34 17    A.      Yes, it does.

01:53:35 18    Q.      And it is your testimony that you never said to

01:53:40 19    Michael Sofia, that is Idenix's invention; correct?

01:53:45 20    A.      I never said that to him, no.

01:53:49 21            MR. McCANN:  May I just have a moment, Your

01:53:50 22    Honor?

01:53:52 23            (Counsel confer.)

01:53:55 24            MR. McCANN:  Your Honor, I have no further

01:53:56 25    questions.

01:53:56 1          THE COURT:  Okay.  Redirect.

01:53:59 2                  REDIRECT EXAMINATION

01:54:08 3  BY MR. KINTON:

01:54:08 4  Q.     Dr. Standring, counsel for Gilead asked you about

01:54:14 5  Jeremy Clark.  Before this trial, had you heard that

01:54:18 6  Dr. Schinazi got, gave Idenix confidential information to

01:54:21 7  people at Pharmasset?

01:54:23 8  A.     I did not, no.

01:54:24 9  Q.     Do you have an understanding as to when a patent

01:54:28 10 lawsuit such as this one can be brought in the

01:54:30 11 pharmaceutical context?

01:54:32 12 A.     Again, I am not a lawyer.

01:54:35 13         MR. McCANN:  Objection to foundation.

01:54:36 14         THE COURT:  There is an objection.  Yes?

01:54:37 15         MR. McCANN:  I object to the foundation.

01:54:38 16         THE COURT:  All right.  Sustained.

01:54:40 17         You can try to lay a foundation.

01:54:40 18 BY MR. KINTON:

01:54:43 19 Q.     Dr. Standring, do you have an understanding regarding

01:54:47 20 the safe harbor rules for pharmaceutical lawsuits?

01:54:51 21 A.     I have some understanding of it, yes.

01:54:53 22 Q.     What is your understanding?

01:54:54 23 A.     So basically it's, as I understand it, it is very

01:54:58 24 hard to sue a pharmaceutical company while they're in

01:55:01 25 clinical trials.  So this is something that you really

01:55:05  1    can't do.  So litigation is only at or after the point of

01:55:09  2    commercialization.

01:55:10  3    Q.      And that would be after approval by the FDA?

01:55:13  4    A.      After approval by the FDA, yes.

01:55:15  5             MR. McCANN:  Thank you.

01:55:16  6             MR. KINTON:  Thank you.  I have no further

01:55:17  7    questions.

01:55:18  8             THE COURT:  Thank you, Doctor.  Stay there for a

01:55:20  9    moment.  We're going to give the jury a break.

01:55:22 10             No talking about the case during the break.  And

01:55:24 11    we'll get you back in.

01:55:27 12             (Jury left courtroom.)

01:55:48 13             THE COURT:  You may step down during the recess.

01:55:50 14    We're going to take a recess.

01:56:22 15             (Brief recess taken.)

01:56:22 16             *      *      *

02:21:26 17             (Proceedings reconvened after recess.)

02:21:26 18             THE COURT:  Bring the jury back in.

02:22:17 19             (Jury returned.)

02:22:38 20             THE COURT:  All right.  We're ready to continue.

02:22:40 21    What is next?

02:22:43 22             MS. PARKER:  Thank you, Your Honor.  Our next

02:22:45 23    witness is Professor Chris Meier.  Professor Meier is a

02:22:48 24    Professor of Chemistry At the University of Hamburg in

02:22:52 25    Germany.  He is a world renowned expert on nucleoside

02:22:55 1    chemistry, and he is going to talk about the validity of our

02:22:59 2    patent.

02:22:59 3                    THE COURT:  Okay.

02:23:00 4                    MS. PARKER:  Thank you.

02:23:10 5                    ... CHRIS MEIER, having been first duly sworn,

02:23:24 6    was examined and testified as follows ...

02:23:33 7                    THE COURT:  Good afternoon, Professor Meier.

02:23:34 8    Welcome.

02:23:35 9                    THE WITNESS:  Good afternoon.

02:23:35 10                   THE COURT:  Mr. Griffith.

02:23:37 11                   MR. GRIFFITH:  Your Honor, may I approach the

02:23:38 12   witness?

02:23:38 13                   THE COURT:  You may.

02:24:08 14                        DIRECT EXAMINATION

02:24:08 15   BY MR. GRIFFITH:

02:24:08 16   Q.       Good afternoon, Dr. Meier.

02:24:10 17   A.       Good afternoon.

02:24:10 18   Q.       Would you please introduce yourself to the ladies and

02:24:13 19   gentlemen of the jury.

02:24:15 20   A.       Yes.  My name is Chris Meier.

02:24:17 21   Q.       What do you do for a living?

02:24:19 22   A.       I am a professor for organic chemistry at the

02:24:23 23   University of Hamburg in Germany.

02:24:26 24   Q.       What are you here to talk about today?

02:24:30 25   A.       I'm here today to talk about the issue of validity of

02:24:35 1    the '597 patent; and I was asked to give an opinion about

02:24:41 2    the FDA, whether the '597 patent satisfies the written

02:24:49 3    description and enablement requirement.

02:24:53 4    Q.    Did you reach an opinion on those issues?

02:24:55 5    A.    Yes, I did.

02:24:56 6    Q.    Briefly, what is your opinion?

02:24:59 7    A.    So my opinion is that the '597 patent satisfies the

02:25:05 8    written description and enablement requirements.

02:25:07 9    Q.    Dr. Meier, were you retained by Idenix as an expert

02:25:13 10   in this case?

02:25:14 11   A.    Yes.

02:25:14 12   Q.    And have you been paid your hourly rate for your work

02:25:16 13   in the case?

02:25:17 14   A.    Yes.

02:25:18 15   Q.    And does that depend in any way on the substance of

02:25:22 16   your testimony or the outcome of this litigation?

02:25:25 17   A.    No.

02:25:29 18   Q.    All right.  We're going to come back to your opinions

02:25:31 19   on the issue of validity.  But first I would like to ask you

02:25:35 20   some questions about your education and work experience.

02:25:38 21         Could you tell the jury where you come from?

02:25:40 22   A.    Yes.  I was born in 1962 in West Berlin.  It was at

02:25:48 23   the time when Berlin was separate in two parts, and so it

02:25:52 24   was more or less surrounded by Russians.  And my parents

02:25:55 25   then decided that it's not best place to raise a family and

02:25:59 1   we left Berlin then after two years and moved to a small

02:26:03 2   town close to Hamburg in the northern part of Germany.  From

02:26:08 3   there, I moved around within Germany quite a bit.

02:26:11 4   Q.      How did you get interested in chemistry, Dr. Meier?

02:26:15 5   A.      So when I, at the age of high school, when I was in

02:26:19 6   high school, my father was appointed by the German

02:26:24 7   government as a teacher for German language, mathematics,

02:26:28 8   and arts and at the German school in Canary Islands in

02:26:34 9   Spain.

02:26:34 10          So we moved there and lived there for four

02:26:37 11  years; and in high school, I attended classes in chemistry,

02:26:41 12  and my teacher actually was a biologist and he always

02:26:45 13  combines organic chemistry with questions coming from

02:26:49 14  biochemistry.  And this was so fascinating for me that I

02:26:52 15  decided to join or get training in organic chemistry and

02:26:56 16  biochemistry after my high school degree.

02:26:35 17  Q.      Did you have some slides prepared that summarize your

02:27:20 18  educational background?

02:27:21 19  A.      Yes, I do.

02:27:23 20          MR. KINTON:  Can we put those up?  Slide one,

02:27:26 21  please.

02:27:26 22  BY MR. KINTON:

02:27:28 23  Q.      With this aid, Dr. Meier, could you tell the jury

02:27:32 24  about your educational background?

02:27:34 25  A.      Yes, of course.  So when I finished my high school, I

02:27:38 1    moved back to Germany and joined the University of Marburg

02:27:47 2    and I got a Master's degree and pH degree in chemistry from

02:27:50 3    that university.

02:27:51 4    Q.    And what did you do after you got your Ph.D.?

02:27:55 5    A.    After my Ph.D., I moved to France, to the Pasteur

02:28:04 6    Institute in France as a post-doc.

02:28:07 7              Maybe you know Louis Pasteur, who is the

02:28:10 8    inventor of the pasteurization process for milk products.

02:28:15 9    He founded actually 130 years ago a research institute,

02:28:18 10   which is located within Paris, and I joined the organic

02:28:22 11   chemistry unit at that time at that institute, which is

02:28:27 12   one of the most prestigious research centers within Europe.

02:28:31 13   Q.    At the time you were at Pasteur Institute, was there

02:28:34 14   a research focus at that institute?

02:28:36 15   A.    Yes.  There was a time when Montpellier was still

02:28:40 16   actively working at Pasteur, and he's the discoverer of the

02:28:45 17   HIV virus.  And he was working there and, of course, the

02:28:50 18   whole institute there was then dedicated in HIV research,

02:28:55 19   and also the chemistry unit where I was working was

02:29:00 20   interested in finding chemotherapeutics to combat HIV

02:29:09 21   infections, and one strategy to combat HIV is using

02:29:13 22   nucleoside analogs of prodrugs in order to inhibit the viral

02:29:18 23   infection, and I was working there at the school, working on

02:29:21 24   nucleosides and prodrugs of nucleosides.

02:29:24 25   Q.    Then after the Pasteur Institute, what then did you

02:29:28 1  do next in the way of education and further research in

02:29:33 2  work?

02:29:36 3  A.      Okay.  So I decided then after my post-doc to stay at

02:29:40 4  the university and become a university professor, and so I

02:29:44 5  moved back to Germany and joined first the University of

02:29:48 6  Frankfurt as an assistant professor, and then I was

02:29:50 7  appointed as an associate professor in Wurzburg, in Bavaria

02:30:00 8  in Germany.  Finally, I landed 1999 in hamburg.

02:30:04 9  Q.      And during the 1990s, did you develop a research

02:30:09 10 focus?

02:30:09 11 A.      Yes, I did.  I started building up a research term,

02:30:12 12 and within our -- my group we are working on nucleoside

02:30:15 13 chemistry and pro nucleoside chemistry actually, which

02:30:21 14 involves the synthesis of nucleoside monophosphate prodrugs.

02:30:26 15 Q.      And you said in '99 you went to the University of

02:30:28 16 Hamburg.

02:30:29 17             Do I have that right?

02:30:30 18 A.      That's correct.

02:30:30 19 Q.      And that's where you are now; is that right?

02:30:32 20 A.      That's correct.

02:30:33 21 Q.      And what do you do as a full professor at the

02:30:37 22 University of Hamburg?

02:30:38 23 A.      So what I'm doing -- so, first of all, we have

02:30:42 24 teaching duties, of course, and we have also administrative

02:30:46 25 duties to do for the university, and at the same time, I'm

02:30:50  1    running a research team there, which is more or less 60

02:30:55  2    persons in the group.

02:30:57  3    Q.    All right.  I'm going to come back to your research

02:30:59  4    in a few moments, but just in terms of teaching, can you

02:31:01  5    tell the jury what sorts of things you teach and to whom you

02:31:05  6    teach?

02:31:05  7    A.    Okay.  So I'm teaching undergraduate students as well

02:31:10  8    as graduate students, and doing the academic training at

02:31:15  9    Hamburg University, we teach organic chemistry, and starting

02:31:20 10    from the very first year, which includes then functioning

02:31:27 11    group chemistry, basic organic chemistry, later then

02:31:31 12    stereochemistry and then natural compound synthesis in

02:31:36 13    natural compounds as well as medicinal chemistry.

02:31:39 14    Q.    And what is medicinal chemistry?

02:31:42 15    A.    Yes.  Medicinal chemistry, if you want, particularly

02:31:48 16    a section within organic chemistry which is devoted to the

02:31:51 17    synthesis of bioactive compounds and the development of

02:31:54 18    bioactive compounds, for example, against HIV or viral

02:31:59 19    infections or even cancer.

02:32:01 20    Q.    All right.  And, Dr. Meier, at the university, have

02:32:12 21    you held any positions besides full professor?

02:32:14 22    A.    Yes, I did.  From 2005 to 2010 I was the head of the

02:32:18 23    chemistry department, and from 2010 to '15 I was the vice

02:32:24 24    dean for research of the faculty of sciences.  And later I

02:32:28 25    was -- I got the offer to be a vice president of the

02:32:31 1 University in Hamburg which I refused, because otherwise I

02:32:35 2 would nerve come back to the lab again, the lab research. I

02:32:41 3 decided not to do that.

02:32:43 4 Q.    All right. Are you a member of any scientific

02:32:47 5 organizations?

02:32:47 6 A.    Yes, I am.

02:32:48 7 Q.    And do you have a slide that identifies some of those

02:32:51 8 that you're on?

02:32:52 9 A.    Yes.

02:32:56 10         MR. KINTON:  Could we pull that up, please.

02:32:58 11 BY MR. KINTON:

02:32:59 12 Q.    Could you tell the jury what these organizations are,

02:33:02 13 Dr. Meier?

02:33:02 14 A.    So these are the two main societies that I'm involved

02:33:05 15 in.  So the first one is the international society on

02:33:07 16 nucleosides, nucleotides and nucleic acids, abbreviated

02:33:12 17 ISN3A.

02:33:16 18         And the second society that I'm involved in or a

02:33:18 19 member of is the International Society of Antiviral

02:33:21 20 Research, which is abbreviated ISAR.

02:33:23 21 Q.    And what is ISN3A, this International Society of

02:33:33 22 Nucleosides, and so on?

02:33:34 23 A.    So that is a society that is dedicated mainly on

02:33:39 24 chemistry and the chemistry of nucleosides, nucleotides and

02:33:45 25 oligonucleotides as well as their study and their properties

02:33:47 1  and their possible application, while the second

02:33:51 2  organization, or the second society is more directed to the

02:33:56 3  application of drugs, to different viral infection, and

02:34:04 4  including nucleosides and prodrugs of nucleosides.

02:34:10 5  Q.    And worldwide, how many members are there in the

02:34:12 6  ISN3A?

02:34:13 7  A.    In the ISN3A there are about 450 members, and I would

02:34:19 8  say that in my opinion, this is the most important society,

02:34:24 9  which is dealing with the, or dedicated to the chemistry of

02:34:28 10 nucleosides, nucleotides and oligonucleotides.

02:34:32 11 Q.    Did you have any roles or positions in that

02:34:35 12 organization?

02:34:35 13 A.    Yes.

02:34:35 14 Q.    If so, would you tell the jury what they are?

02:34:38 15 A.    Yes.  In both of these societies I served in

02:34:40 16 different roles.  For example, in both societies organizing

02:34:46 17 the national meetings, and during the international meetings

02:34:52 18 or even for the preparation of these meetings, I'm serving

02:34:56 19 on the program committee, and during the meetings as poster

02:35:01 20 award committee and site selection committees were various

02:35:03 21 things that I'm involved in.

02:35:04 22          And as you can see on the slide, in 2015 I

02:35:08 23 was elected as Vice President of the International Society

02:35:13 24 of Nucleosides, nucleotides and nucleic acids.  And from the

02:35:17 25 first of January, actually in three weeks, I will be

02:35:20 1    President Elect of the society.

02:35:22 2    Q.    Dr. Meier, have you presented at any conferences

02:35:28 3    around the world, presented research?

02:35:30 4    A.    Yes.  For example, on the occasion of these meetings,

02:35:36 5    organized by these societies, I presented our research in

02:35:40 6    the form of oral communications or poster communications,

02:35:44 7    and I tried obviously to get my students involved and bring

02:35:47 8    them to the meetings so that they are also present their own

02:35:50 9    stuff during the meetings.

02:35:52 10            MR. KINTON:  And can we have the next slide,

02:35:55 11   please.

02:35:55 12   BY MR. KINTON:

02:35:56 13   Q.    And this is titled conference Presentations.

02:35:59 14   A.    Right.

02:36:00 15   Q.    Could you tell the jury what that's all about?

02:36:02 16   A.    Yes.  So the first two I mentioned already.  This is

02:36:05 17   the -- the first one is the bi-annual meeting of ISN3A,

02:36:15 18   which is moving around in the world.  Every second year

02:36:18 19   there will be an international meeting, and I presented

02:36:21 20   there, as I mentioned, in oral communications or in poster

02:36:29 21   contributions.

02:36:29 22            And the second one is the International

02:36:32 23   Conference on Antiviral Research, which is the annual ISAR

02:36:35 24   meeting, ISAR meeting.  And also on that occasion I present

02:36:40 25   regularly our research.  I am -- I attended these two

02:36:45 1    conferences regularly, so since about 20 years.

02:36:48 2            And then there's a third one mentioned on this

02:36:52 3    demonstrative and this is the Gordon Research Conference,

02:36:56 4    which is a little bit different, because this is a private

02:36:58 5    organization that organizes conferences, international

02:37:03 6    conferences on different topics, and one conference that is

02:37:06 7    organized by this Gordon Research Conference is also dealing

02:37:12 8    with nucleosides, nucleotides and nucleic acids.  And I was

02:37:16 9    also attending that meeting also regularly and I was also

02:37:20 10   giving talks at that meeting.

02:37:29 11   Q.    Dr. Meier, let me get back to some questions on your

02:37:33 12   research.  Have you published on work that you've done in

02:37:39 13   the laboratory?

02:37:40 14   A.    Yes, of course.  We are published quite a bit.  I

02:37:44 15   have about 200 scientific publications at the moment.

02:37:47 16   Q.    In what field?

02:37:49 17   A.    Mainly in the field of, more or less -- it's not

02:37:54 18   exclusively, but really mainly in nucleoside chemistry and

02:37:58 19   prodrug development.  We also have some papers in

02:38:00 20   carbohydrate chemistry and small molecules.

02:38:04 21   Q.    Have your publications been cited by others in the

02:38:06 22   field?

02:38:06 23   A.    Yes.  About 2800 times already.

02:38:09 24   Q.    Could we go to the next slide, please.

02:38:16 25            Dr. Meier, this sets forth some, it's

02:38:19 1    titled fellowships and awards.  Could you tell the jury what

02:38:22 2    you have set forth in this slide?

02:38:24 3    A.    Yes.  On this slide I summarized a few fellowships

02:38:30 4    and awards that I obtained during my career so far.  And I

02:38:36 5    would just focus on the last one maybe, because I think

02:38:40 6    it's the most prestigious one, and this is the so-called

02:38:43 7    William Prusoff award, which is given by the International

02:38:48 8    Society For Antiviral Research, and I was awarded with this

02:38:55 9    prize in 2007 and it's given particularly for young

02:38:58 10    investigators.

02:39:02 11    Q.    Have you been asked to serve as a reviewer for

02:39:05 12    publications and for peer-reviewed journals?

02:39:08 13    A.    Oh, yes, all the time.  For example, since I'm here

02:39:11 14    in Wilmington, last ten days I got five requests for

02:39:16 15    reviewing papers.

02:39:17 16        Also, for example, from the Journal of

02:39:21 17    Medicinal Chemistry, which I was -- I think is the most

02:39:23 18    prestigious journal in that field, in the field of medicinal

02:39:28 19    chemistry.

02:39:30 20        MR. KINTON:  Your Honor, with that, we would

02:39:31 21    offer Dr. Meier as an expert in medicinal chemistry as

02:39:34 22    applied to antiviral nucleoside compounds.

02:39:40 23        MR. SINGER:  No objection, Your Honor.

02:39:41 24        THE COURT:  All right.  He's so recognized.

02:39:42 25    BY MR. KINTON:

Q.    Dr. Meier, getting back to the opinions you alluded
to earlier, what is your opinion regarding Gilead's
contention that the asserted claims of the '597 patent are
invalid for lack of written description and enablement?

A.    I disagree with that.

Q.    And for the '585 provisional application, that's the
application that was filed in May of 2000, what is your
opinion regarding the contention that the asserted claims
are not entitled to claim priority to that provisional
application?

A.    I disagree as well.

Q.    All right.  Could we go to the next slide?

      Dr. Meier, did you have assumptions that you
made and understandings that you used in terms of written
description law that you applied in doing your analysis in
this case?  Could you tell the jury about that?

A.    Yes, I did.  I put them here on the slide.  The
assumption of the first one is for a class claim, it is
sufficient to describe a representative number of members of
the class if the skilled artisan can recognize members of
the genus from that description.

      And the second point that I took into account is
mentioned also there, and it reads, take account of the
entire disclosure, including the words used in the
specification, the structures, formulas, chemical drawings,

02:41:23  1    figures, data, experiments and text.

02:41:28  2    Q.     So are these rules that you followed in doing your

02:41:32  3    analysis?

02:41:32  4    A.     That's true.

02:41:33  5    Q.     All right.  Next I'd like to discuss, going step by

02:41:36  6    step here, your approach to analyzing written description,

02:41:42  7    and let me ask you:  Did you approach your analysis from the

02:41:46  8    level of ordinary skill in the field?

02:41:48  9    A.     Yes, I did.

02:41:50 10    Q.     And did you have a slide prepared that helps

02:41:53 11    illustrate your opinion on the level of ordinary skill in

02:41:56 12    the field?

02:41:56 13    A.     Yes, I did.

02:41:58 14    Q.     Okay.

02:41:59 15           MR. KINTON:  And could we pull that slide up,

02:42:01 16    slide 7.

02:42:01 17    BY MR. KINTON:

02:42:03 18    Q.     And is this a summary of what you regarded as the

02:42:07 19    level of ordinary skill?

02:42:08 20    A.     Yes, it is.  This is a section from my expert report

02:42:14 21    that I copied, the passage from the expert report.  But to

02:42:18 22    summarize it in a few words, I think it's a relatively high

02:42:24 23    level of skill that I -- that -- which is the background for

02:42:29 24    this, for these persons, and they have training in organic

02:42:34 25    chemistry or in synthesis of molecules.  They should have a

02:42:38 1    Ph.D. degree and at least two years of experimental

02:42:43 2    experience afterwards.

02:42:45 3              And I think due to the similarity of the

02:42:51 4    patent application that we are talking about, I think the

02:42:56 5    person of skill in the art would be a member of a team

02:43:00 6    comprising an organic chemist or medicinal chemist or

02:43:07 7    virologist, for example, which have also the same level of

02:43:10 8    skill as the chemist.

02:43:12 9    Q.    Now, were you present in court when Dr. Secrist

02:43:16 10   testified?

02:43:16 11   A.    Yes, I was.

02:43:02 12   Q.    And did you hear him describe his opinion as to the

02:43:05 13   level of ordinary skill in the art?

02:43:08 14   A.    Yes.

02:43:08 15   Q.    And could you describe whether your opinions would

02:43:16 16   change or how they might differ depending on whether your

02:43:21 17   opinion as to the level of ordinary skill or that which we

02:43:24 18   heard from Dr. Secrist applies?

02:43:26 19   A.    So, my opinion would not change because it's my

02:43:31 20   opinion that his description was more or less identical.  It

02:43:38 21   was a little bit but not dramatically, so there was no

02:43:40 22   reason, or there would be no reason to come to another

02:43:44 23   conclusion, a different conclusion.

02:43:50 24              MR. GRIFFITH:  Now, can we go to slide 9.

02:43:50 25   BY MR. GRIFFITH:

Meier - direct

02:43:52 1   Q.    And this is a copy of claim 1 of the '597 patent.  Do

02:43:57 2   you see that?

02:43:58 3   A.    Yes, I see that.

02:43:59 4   Q.    Is it your opinion that the invention of claim 1 is

02:44:01 5   described in the specification of the '597 patent?

02:44:05 6   A.    Yes, I do.

02:44:07 7   Q.    Can you summarize why?

02:44:09 8   A.    So, the claim 1 reads on two essential points.  And

02:44:14 9   the first one is that it reads here, a method for treatment

02:44:18 10   of a hepatitis C virus infection.  And the second point is

02:44:23 11   that it should be achieved by using a class of compound,

02:44:27 12   compound that is described here as purine or pyrimidine

02:44:32 13   Beta-D-2'-methyl ribonucleosides.

02:44:41 14   Q.    All right.  Let's start with the term "method for the

02:44:45 15   treatment of hepatitis C virus infection."

02:44:50 16        Where is that described in the specification?

02:44:54 17   A.    Well, you can find it in several places throughout

02:44:57 18   the specification of the '597 patent.

02:44:59 19   Q.    Okay.  And have you had some slides prepared that

02:45:02 20   illustrate some portions where that is disclosed?

02:45:05 21   A.    Yes.

02:45:06 22        MR. GRIFFITH:  Could we go to slide 10.

02:45:06 23   BY MR. GRIFFITH:

02:45:12 24   Q.    And could you explain how this relates to your

02:45:14 25   opinion, Dr. Meier?

02:45:15 1    A.       Yes, of course, I can.

02:45:18 2              So this is taken from the title page of the '597

02:45:22 3    patent.  And in line 54, I highlighted the title of the

02:45:29 4    patent, and this reads Methods and Composition for Treating

02:45:34 5    Hepatitis C Virus.  So which is essentially the wording is

02:45:37 6    identical to that what I just read on the previous slide on

02:45:42 7    claim 1.

02:45:43 8              MR. GRIFFITH:  And could we go to the next

02:45:45 9    slide.

02:45:45 10   BY MR. GRIFFITH:

02:45:47 11   Q.       Can you explain how this relates to your opinion

02:45:52 12   concerning written description?

02:45:54 13   A.       Yes.  I took this section or this slide from the

02:45:58 14   section, field of the invention of the '597 patent.  And I

02:46:04 15   highlighted again the first sentence which reads:  This

02:46:07 16   invention is in the area of pharmaceutical chemistry, and in

02:46:11 17   particular, is a compound, method and composition for the

02:46:14 18   treatment of hepatitis C virus.

02:46:16 19             So, again, identical wording as in the other two

02:46:19 20   cases.

02:46:21 21             MR. GRIFFITH:  All right.  Let's go to the next

02:46:23 22   slide, please.

02:46:28 23   BY MR. GRIFFITH:

02:46:28 24   Q.       And could you explain how this -- this is PDX-12.

02:46:33 25   Can you explain how this relates to your opinion concerning

02:46:36 1   written description?

02:46:37 2   A.    Now, this is taken from the section called detailed

02:46:42 3   description of the invention.

02:46:43 4          And it read again:  The invention as disclosed

02:46:46 5   herein is a compound, method and composition for the

02:46:49 6   treatment of hepatitis C.

02:46:52 7          So, again, the same wording as in the other

02:46:54 8   three cases now.

02:46:56 9   Q.    And does the patent talk about the purpose being to

02:47:02 10  administer active compounds or a metabolite of active

02:47:09 11  compounds to treat HCV?

02:47:11 12  A.    Yes, definitely.

02:47:12 13  Q.    Did you find that in the specification and have a

02:47:14 14  slide prepared regarding an example of where you found that

02:47:17 15  one?

02:47:17 16  A.    Yes.

02:47:19 17          MR. GRIFFITH:  If we can go to the next slide,

02:47:20 18  please.

02:47:20 19  BY MR. GRIFFITH:

02:47:21 20  Q.    So would you tell the jury what this portion of the

02:47:23 21  specification is talking about?

02:47:25 22  A.    So this is, the heading here is:  Pharmaceutical

02:47:30 23  Compositions.

02:47:31 24          And this describes in the specification that

02:47:35 25  a host which is infected with HCV can be treated by

02:47:41 1   administering to that infected patient an effective amount

02:47:46 2   of the active compound or a pharmaceutically acceptable

02:47:49 3   prodrug thereafter.

02:47:52 4   Q.     All right.  So let me ask you somewhat related

02:48:01 5   question, but slightly different.  And that is, does the

02:48:05 6   specification indicate how the 2'-methyl up compounds work?

02:48:13 7   A.     Yes, it does.

02:48:13 8   Q.     And in that regard, what would the skilled artisan

02:48:20 9   understand about how the invention works?

02:48:24 10  A.     From the patent?

02:48:25 11  Q.     Yes.

02:48:26 12  A.     Yes.  So you can, in several places throughout the

02:48:31 13  '597 patent, there is clear indication which target should

02:48:36 14  be addressed in order to achieve this antiviral effect or

02:48:42 15  the inhibition of the HCV infection.  And this is the viral

02:48:48 16  enzyme which is called HCV polymerase or others known as

02:48:54 17  NS5B polymerase.

02:48:57 18  Q.     Did you prepare a slide where you found examples of

02:49:00 19  teaching in regard to that?

02:49:01 20  A.     Yes, I brought that slide.

02:49:04 21         MR. GRIFFITH:  Can we go to the next slide,

02:49:05 22  please.

02:49:05 23  BY MR. GRIFFITH:

02:49:07 24  Q.     And would you explain for the jury what this slide

02:49:09 25  shows?

02:49:09  1    A.      Yes.   This is from column 13 from the '597 patent,

02:49:14  2    the section that I copied here.

02:49:17  3          And I highlighted the first two sentences and

02:49:21  4    this reads:  Beta-D and Beta-L nucleosides of this invention

02:49:26  5    may inhibit HCV polymerase activity.   Nucleosides can be

02:49:31  6    screened for their ability to inhibit HCV polymerase

02:49:35  7    activity in vitro according to screening methods set forth

02:49:39  8    more particularly herein.

02:49:41  9          So which is a clear indication which enzyme is

02:49:47  10   involved in the replication of this virus, it should be

02:49:50  11   addressed by these compounds.   And within or in this text,

02:49:54  12   it is also mentioned that within the patent, there are

02:49:59  13   screening methods described or included to test the

02:50:04  14   compounds for the activity.

02:50:10  15         MR. GRIFFITH:   Could we go to the next slide.

02:50:10  16   BY MR. GRIFFITH:

02:50:15  17   Q.      And this appears to be a continuation of the earlier

02:50:18  18   one.   Could you explain why what you wanted to point out

02:50:21  19   about this passage in the specification?

02:50:24  20   A.      Okay.   This is also taken from the '597 patent, from

02:50:27  21   column 36, but the first part I do not read it again because

02:50:32  22   this is essentially identical to the section that I had just

02:50:35  23   shown you in the previous slide.

02:50:36  24         But a little bit lower, a few lines lower,

02:50:40  25   the second highlighted block describes:  In preferred

02:50:45 1    embodiments the compound exhibits an EC50 of less than 15

02:50:51 2    or 10 micromolar, when measured according to the polymerase

02:50:56 3    assay described in, and then there are following four

02:51:01 4    references, literature references in which the detailed

02:51:06 5    experiment conditions are described, how to run such a

02:51:13 6    polymerase assay.

02:51:15 7    Q.      What type of polymerase assay do those articles refer

02:51:18 8    to, describe?

02:51:19 9    A.      It is the HCV polymerase assay or NS5B polymerase

02:51:25 10   assay.

02:51:26 11           Maybe I should explain to the jury that this is

02:51:28 12   a quite common thing that happens in patent applications.

02:51:32 13   That if the patent refers to previous data or experiments,

02:51:38 14   that you put just the reference in the patent without

02:51:42 15   repeating all the experimental details that are disclosed in

02:51:48 16   this or described in this reference.

02:51:50 17   Q.      And, Dr. Meier, did you find in the '597 patent that

02:51:57 18   there was a portion that talked about phosphorylation data?

02:52:02 19   A.      Yes, I found some.

02:52:05 20           MR. GRIFFITH:  Why don't we put the next slide up.

02:52:07 21   BY MR. GRIFFITH:

02:52:07 22   Q.      And is this something you found that related to

02:52:11 23   phosphorylation data, Dr. Meier?

02:52:15 24   A.      Yes.  This is Example 4 which appears at the end of

02:52:19 25   the '597 patent.  And Example 4 describes phosphorylation

02:52:26  1   assay of nucleosides to active triphosphates.

02:52:32  2          And so this is, this is essentially the

02:52:35  3   assay that we are talking about.  The polymerase of the

02:52:41  4   virus regularly or normally uses natural ribonucleoside

02:52:47  5   triphosphates as substrates in order to build up the viral

02:52:53  6   RNA.

02:52:53  7          So in order to inhibit or interact with this

02:52:57  8   enzyme, also nucleoside analogs have to be in the form of

02:53:01  9   triphosphate in order to interact with this enzyme, so it is

02:53:06 10   bound to the enzyme and inhibits the enzyme.  So, therefore,

02:53:10 11   there is a prerequisite that compound with the nucleoside

02:53:15 12   analogs that are used are indeed phosphorylated to the

02:53:18 13   triphosphate.  Otherwise, it could not exert the biological

02:53:21 14   activity.

02:53:22 15          So, therefore, this experiment here, which is

02:53:24 16   described in this Example 4, is quite important for the

02:53:29 17   understanding of this patent.  And they used, they used what

02:53:33 18   is in the text on the right, highlighted in yellow.  They

02:53:39 19   used active compound, and then they incubated them in liver

02:53:45 20   cells.  After a certain time of incubation, they destroyed

02:53:49 21   the cells and analyzed the metabolites that have been formed

02:53:53 22   from the active nucleoside from intracellularly.

02:53:59 23          This is summarized in the table, which is Table 1.

02:54:02 24   And as you can see, there are four different nucleoside

02:54:05 25   analogs that were used in this assay.  And they are all

02:54:10 1    Beta-2'-methyl-ribonucleosides.  And as can be seen here from

02:54:16 2    the table, which is time dependent compliant, all of these

02:54:23 3    compounds are transformed from the active nucleoside to the

02:54:26 4    triphosphate and not in the same extent, so a different

02:54:31 5    extent, but they are all activated to the triphosphate and,

02:54:35 6    thus, they can, in principle, interact with the polymerase,

02:54:39 7    enzyme B.

02:54:40 8    Q.    Can you summarize what this information would mean to

02:54:43 9    the skilled artisan, these references to the HCV polymerase

02:54:48 10   assay in this phosphorylation data?

02:54:50 11   A.    So actually the compounds that are described and are

02:54:53 12   used in this method to treat hepatitis C can be activated to

02:54:58 13   the triphosphate.  And this is, as I mentioned, the starting

02:55:03 14   point that they can interact with the polymerase.

02:55:05 15   Q.    And what, if anything, would the skilled artisan

02:55:09 16   understand to be the focus of inhibition?

02:55:12 17   A.    The focus of inhibition is clearly the inhibition of

02:55:16 18   the NS5B polymerase.

02:55:19 19   Q.    All right.  You also said that the specification

02:55:25 20   describes using 2'-methyl-ribonucleoside for treatment of

02:55:33 21   hepatitis C.  Where are those compounds described in the

02:55:37 22   patent?

02:55:39 23   A.    They are described at several points in this, in the

02:55:42 24   application.

02:55:42 25   Q.    Okay.  And I think --

02:55:44  1    A.      On the patent.

02:55:44  2    Q.      -- you had some slides prepared, and I think maybe

02:55:47  3    we'll go to those to set forth things where you found that.

02:55:52  4    A.      Okay.

02:55:53  5              MR. GRIFFITH:  Can we put the next slide up,

02:55:55  6    please.

02:55:55  7    BY MR. GRIFFITH:

02:55:56  8    Q.      All right.  So with slide PDX-19, could you describe

02:56:03  9    for the jury what this is all about?

02:56:05 10    A.      So this is also taken from the '597 patent and this

02:56:08 11    is Figure 1.  And the title of this figure is Chemical

02:56:13 12    Structure of Illustrative Nucleosides.  And what I have

02:56:17 13    put here, we have seen this Figure 1 in a longer version

02:56:22 14    already during this trial.  I put up a selection of these

02:56:27 15    nucleosides that are depicted in Figure 1, and I selected

02:56:31 16    those that have bases that are present in RNA.  So, for

02:56:37 17    example, the first two compounds that are shown here, the

02:56:41 18    pyrimidine base or the single ring nucleosides and the last

02:56:46 19    two ones are the other ring, purine nucleosides.

02:56:51 20              And the common feature of all these, although

02:56:54 21    they differ in their base, the common feature of these

02:56:59 22    nucleosides here is the modification at the 2' up position

02:57:05 23    by a $CH_3$ group, which is a methyl group, and I highlighted

02:57:09 24    that in green on this slide.

02:57:11 25    Q.      Now, this figure, all of the compounds have hydroxide

02:57:21 1   at the 2' down position; is that correct?

02:57:23 2   A.    That is correct.

02:57:23 3   Q.    Is the disclosure of the patent limited to having

02:57:25 4   hydroxide at the 2' down position?

02:57:28 5   A.    No, it is not.  It is examples of the compound, of

02:57:35 6   the class of compounds.

02:57:39 7   Q.    And what type of virus is the hepatitis C virus?

02:57:44 8   A.    So hepatitis C is an RNA virus, so the genome of the

02:57:50 9   virus is a single stranded RNA molecule.  And in order to

02:57:55 10  replicate, this RNA strand has to be multiplied, several

02:58:02 11  copies are synthesized by the help or by the action of this

02:58:07 12  HCV polymerase which is also called NS5B polymerase.

02:58:13 13          MR. GRIFFITH:  All right.  Let's go to the next

02:58:14 14  slide.

02:58:15 15  BY MR. GRIFFITH:

02:58:15 16  Q.    And this has Example 5 from the patent; is that

02:58:20 17  correct?

02:58:20 18  A.    That is correct, yes.

02:58:21 19  Q.    Could you tell the jury how this related to your

02:58:27 20  opinions, how this impacted your opinions in this case about

02:58:30 21  written description?

02:58:31 22  A.    Okay.  So what is summarized here in the section of

02:58:35 23  the '597 patent is an animal assay and they used monkeys for

02:58:40 24  this assay.  Essentially, they used six monkeys and these

02:58:45 25  monkeys were treated with a regulated compound, regulated

02:58:51  1    version of one of these Beta-D-2'-methyl riboG nucleosides.

02:58:59  2    And the monkeys were treated intravenously with a compound

02:59:02  3    and orally with a compound.

02:59:04  4            And from the tables on the right side, it

02:59:07  5    becomes clear that the compound are up-taken into the body

02:59:11  6    of these monkeys, and it is distributed throughout the body

02:59:16  7    of the monkeys, which is a quite important information,

02:59:20  8    piece of information in terms of instructive element.

02:59:25  9            If the element is not up-taken by a monkey, for

02:59:28 10    example, or by an animal or by a human being, of course,

02:59:32 11    then it would never exert antiviral activity, so that is why

02:59:37 12    this experiment is quite important.

02:59:38 13    Q.      And, Dr. Meier, what compound was used in this

02:59:41 14    example, in this testing?

02:59:43 15    A.      Yes.  It says here in the highlighted section, it is

02:59:48 16    one of the examples, the active compound, namely, Beta-D-2'

02:59:55 17    riboG.

02:59:56 18    Q.      So that is a 2'-methyl up compound?

03:00:01 19    A.      That is correct.

03:00:01 20    Q.      So this passage refers to it as an active compound.

03:00:06 21    Did you see that?

03:00:06 22    A.      Yes.

03:00:06 23    Q.      What did you understand that to mean?  Let me

03:00:09 24    rephrase that.  What would the ordinary skilled artisan

03:00:13 25    understand that to mean?

03:00:14 1    A.    Okay.   The ordinary skill in the art would understand

03:00:17 2    that this compound has antiviral activity because otherwise

03:00:21 3    he would never run an in vivo assay in a monkey.   If this

03:00:26 4    compound would not be active, it doesn't make sense to treat

03:00:30 5    animals.

03:00:31 6            You have heard already that animal assays are

03:00:34 7    expensive assays to run and, of course, there are ethical

03:00:38 8    reasons that you never would treat an animal with an

03:00:43 9    inactive compound, so it just doesn't make sense to do that.

03:00:47 10           MR. GRIFFITH:   All right.   Let's go to slide 21.

03:00:47 11   BY MR. GRIFFITH:

03:00:52 12   Q.    And this has information related to Example 6 from

03:00:55 13   the patent; is that right?

03:00:56 14   A.    That is correct.   Yes.

03:00:57 15   Q.    And how does this relate to your opinions on written

03:01:00 16   description?

03:01:01 17   A.    So this is a toxicity assay, a particular toxicity

03:01:06 18   assay that is described here on this, in the '597 patent.

03:01:10 19   And this is a toxicity assay in bone marrow cells.   Bone

03:01:16 20   marrow cells are involved in the production of the red and

03:01:19 21   white blood cells.   This is involved in the functioning of

03:01:24 22   the immune system.   And it is known from previous work in

03:01:28 23   the field also at that time that sometimes nucleoside

03:01:32 24   analogs may be toxic in bone nature marrow cells and this

03:01:38 25   often leads to a hold in the development of these compounds.

03:01:44 1    So if there is some toxicity issues related to the

03:01:48 2    nucleoside analogs, then that is not a good sign.

03:01:51 3            So the inventors here run this assay, this bone

03:01:58 4    marrow toxicity assay; and in the Table 4 on the right, you

03:02:03 5    can see again the four nucleosides, the examples of the

03:02:06 6    class of compounds that is used here for, as a method for

03:02:10 7    treatment of hepatitis C are summarized and they are, the

03:02:16 8    data that are depicted here in this was compiled in this

03:02:20 9    table shows that the compounds are not toxic to bone marrow

03:02:25 10   cells.

03:02:25 11   Q.     And are the compounds that were tested in this assay,

03:02:31 12   are they, were they 2'-methyl up compounds?

03:02:36 13   A.     That is correct.  That is essentially the four

03:02:38 14   compounds that I have put on the slide a few slides ago,

03:02:43 15   with the four natural bases, methyl up, hydroxy down.

03:02:52 16            MR. GRIFFITH:  Let's go to the next slide.

03:02:52 17   BY MR. GRIFFITH:

03:02:54 18   Q.     And this is Example 7, entitled Mitochondria Toxicity

03:02:59 19   Assay.  Do you see that?

03:03:00 20   A.     I see that.

03:03:01 21   Q.     How does that relate to your opinions in this case?

03:03:03 22   A.     So this is a second toxicity assay that is presented

03:03:07 23   here in this '597 patent and this is toxicity mitochondria.

03:03:13 24   Mitochondria are a part of cells, and mitochondria are

03:03:18 25   present in every cell.  For example, they used here liver

03:03:23 1    cells, the HepG2 cells that are mentioned in the slide are

03:03:28 2    liver cells, and the mitochondria are the energy plant of

03:03:32 3    every cell.

03:03:33 4          And the mitochondria have a particular DNA

03:03:37 5    polymerase.  And this has also been shown in previous work

03:03:41 6    that sometimes nucleoside analogs or their triphosphates of

03:03:45 7    nucleoside analogs may inhibit the so-called DNA polymerase

03:03:51 8    gamma which is present in this mitochondria and this cause

03:03:55 9    severe problems, toxicity problems.

03:03:58 10          And so the inventors here run this assay using

03:04:03 11    one of the examples that I have shown you in this slide

03:04:08 12    where I have shown all the four ones.  This is one, this is

03:04:13 13    Beta-D-2'-methyl riboC.

03:04:17 14          And as you can see here from the numbers in the

03:04:19 15    table, although they varied the amount that they treat, that

03:04:24 16    they treat the cells, they found no toxicity in mitochondria.

03:04:30 17          This is also an important piece of information

03:04:33 18    in terms of drug development and the suitability of

03:04:37 19    compounds to act as a drug.

03:04:43 20          MR. GRIFFITH:  All right.  Could we go to the

03:04:44 21    next slide?

03:04:46 22    BY MR. GRIFFITH:

03:04:46 23    Q.    And by now, the jury has I think is getting used to

03:04:50 24    seeing chemical drawings and so forth.  But with this slide,

03:04:56 25    could you tell the jury how this formula on this part of the

03:04:59 1   patent related to your opinions on written description?

03:05:03 2   A.      Yes, you asked me before.  That the four compounds

03:05:06 3   that I have shown on the slides all have OH group and the

03:05:10 4   question was if it is restricted to OH in the 2' down

03:05:15 5   position?

03:05:15 6           And I answered that question with, no, it is

03:05:17 7   not restricted.  And you can see here the chemist normally

03:05:21 8   reads chemical structures.  Often, chemists read chemical

03:05:25 9   structures faster than text.  And so the whole patent is

03:05:30 10  full of chemical structures, and this is a typical structure

03:05:35 11  here shown on the slide and this is Compound or Chemical

03:05:40 12  Structure 11 from the '597 patent.  And this shows the base

03:05:45 13  and it shows the five-membered ring which is the sugar part

03:05:48 14  with an X group, it is a variable in this ring where oxygen

03:05:52 15  is the ribose.  And you have this moiety attached to the 4',

03:05:56 16  3', and 2' position.

03:05:58 17          And what is shown here in the 2' position, there

03:06:03 18  is an up orientation, the variable R6 which are highlighted

03:06:08 19  in green, which is the same position as the methyl group

03:06:11 20  which was shown on the other slide.

03:06:13 21          And on the right, you can see that the

03:06:16 22  description which follows Structure Formula 11 allows that

03:06:22 23  R6 can be alkyl, and in parentheses, this is included using

03:06:28 24  lower alkyl.

03:06:29 25          And our methyl group is the lowest of the

03:06:32 1    smallest alkyl that exists, so it is just a CH3 group.  This

03:06:37 2    is the smallest alkyl group that you can imagine.

03:06:41 3           And then there is the down position is R7, and

03:06:46 4    R7 is also listed on the right.  And there are a couple of

03:06:50 5    substituents including OH but also prodrugs and phosphates

03:06:56 6    and so on and so forth.

03:06:57 7    Q.    All right.  Dr. Meier, Gilead has contended that the

03:07:04 8    skilled artisan reading the '597 patent would not be able to

03:07:09 9    recognize 2'-methyl ribonucleosides as the key compounds in

03:07:16 10   the '597 patent.  Do you agree with that?

03:07:19 11   A.    No, I don't.

03:07:21 12   Q.    And we saw a slide from Dr. Secrist showing a lot of

03:07:30 13   formulas disclosed in the patent.  And what is your response

03:07:37 14   to the notion or contention that a skilled artisan would not

03:07:45 15   be able, in that bunch of formulas, be able to discern a

03:07:51 16   class of 2'-methyl ribonucleosides?

03:07:56 17   A.    Yes.  So for me, I take.  Or I would think that

03:08:02 18   there, a person of skill in the art would take the patent

03:08:05 19   as a whole, which includes the text of the specifications or

03:08:13 20   the drawings, also the experiments and the figures.  And we

03:08:16 21   ran through all this, this issues already.

03:08:19 22          And it is my opinion that the key of this

03:08:24 23   invention is the nucleosides that have a methyl group in the

03:08:29 24   up orientation.  And this is based on the examples that I

03:08:34 25   have given.  And we discussed it right now, whether you put

03:08:37 1    it with the toxicity assays and also with the animal assay

03:08:41 2    that were performed with the compounds that have the methyl

03:08:44 3    group in the up orientation.  And just at the beginning of

03:08:48 4    the patent, it's also the section that I have shown you

03:08:51 5    from Figure 1 where explicitly illustrative examples of the

03:08:58 6    compounds as a method for treating hepatitis C are shown.

03:09:02 7    And these compounds all have methyl group in the up

03:09:06 8    orientation.

03:09:06 9         So taking all these pieces together, the

03:09:09 10   structures, Figure 1, the examples at the end, it is my

03:09:14 11   opinion that the key of these compounds is the methyl group

03:09:17 12   in the 2' position, up.

03:09:20 13   Q.    All right.  Thank you.  Now, I want to switch topics

03:09:25 14   a little bit and go to something that has been discussed by

03:09:30 15   some of the experts and that is antiviral data.

03:09:33 16        And Gilead has argued that there is a lack of

03:09:37 17   specific antiviral data in the specification and that that

03:09:41 18   would indicate lack of possession of the invention.  Do you

03:09:45 19   agree with that?

03:09:46 20   A.    No, I don't.  Not at all.

03:09:48 21   Q.    Why do you disagree?

03:09:50 22   A.    It is true that the '597 patent does not report on

03:09:56 23   antiviral data.  However, the '597 patent shows a different.

03:10:06 24   -- different sections point to the, and I showed you that on

03:10:12 25   the slides that they are talking about, active nucleosides

03:10:16  1    that were used in the biological assays.

03:10:19  2            They are biological assays.  They are not

03:10:22  3    antiviral assays but they are biological assays, and they

03:10:27  4    were all done with active nucleoside analogs of this class

03:10:29  5    of compounds, 2'-methyl ribonucleosides.

03:10:34  6            So all these assays would not have been done if

03:10:37  7    these compounds were not active.  Otherwise, you do not run

03:10:41  8    an animal assay, you do not run this extensive toxicity

03:10:45  9    assays that are reported in this patent.  So I am really

03:10:51 10    convinced that the inventors were in possession of these

03:10:53 11    compounds.

03:10:54 12    Q.    All right.  Now, we've heard some of your views on

03:10:58 13    this subject.  Have you identified any evidence that others

03:11:03 14    in the field read and understood the Idenix patent the same

03:11:07 15    way you have described today?

03:11:08 16    A.    Yes, I did.

03:11:10 17    Q.    Could you describe some of that evidence?

03:11:12 18    A.    Yes.  I reviewed at least two publications where

03:11:19 19    the authors of this publications refer to this, this new

03:11:24 20    class of 2'-methyl up ribonucleoside for the treatment of

03:11:31 21    hepatitis C, and they referred to the international patent

03:11:36 22    application of this, of this '597 patent.

03:11:40 23            THE COURT:  Mr. Griffith, I think we'll going to

03:11:44 24    have to wait to see that until tomorrow.  As you know, we're

03:11:47 25    letting the jury go a little bit early today.

03:11:49 1          So, ladies and gentlemen of the jury, we are

03:11:50 2  nearly at the end of our time with you today.

03:11:53 3          Tomorrow, again, be here in time to get started

03:11:56 4  again at 9:00.  We'll be done by 3:15 tomorrow.  And while

03:12:00 5  you are away from us, no research or reading about the case

03:12:03 6  or talking about the case, and we'll see you tomorrow.

03:12:06 7          (Jury left courtroom.)

03:12:29 8          THE COURT:  Doctor, you may step down, if you

03:12:31 9  would like.

03:12:32 10          Counsel, I just wanted to get an update or where

03:12:35 11  you think we are.

03:12:36 12          MS. PARKER:  Timing wise?

03:12:38 13          THE COURT:  In terms of what to expect tomorrow.

03:12:40 14  How much of the day do you think you will need to finish up

03:12:43 15  the evidence?

03:12:44 16          MS. PARKER:  I think we probably have about I

03:12:48 17  would say roughly 30 minutes with this witness.

03:12:51 18          MR. GRIFFITH:  That sounds about right.

03:12:52 19          MS. PARKER:  And then we have a video.  So, of

03:12:56 20  course, the cross.  Then we have a video witness that is 40,

03:13:00 21  four-oh, minutes.  That is for both sides.  And then we have

03:13:04 22  another, a live witness, a live expert after that, which

03:13:07 23  would be maybe an hour.

03:13:11 24          MR. GRIFFITH:  At most.

03:13:12 25          MS. PARKER:  At most an hour on direct.

03:13:14  1                    THE COURT:  Okay.

03:13:15  2                    MS. PARKER:  And then we'll be finished.

03:13:16  3                    THE COURT:  Right.  Okay.

03:13:17  4              And how does it look from Gilead's side?

03:13:20  5                    MR. SCHERKENBACH:  Our present intention would

03:13:24  6    be to call Dr. Secrist back briefly.  He may be our only

03:13:29  7    rebuttal witness, I'm not sure.  But at this moment, I think

03:13:32  8    it is likely we call him back.

03:13:33  9                    THE COURT:  And any non-binding estimate as to

03:13:37 10    how long the crosses might be of the two live witnesses

03:13:39 11    tomorrow, just roughly only?

03:13:41 12                    MR. SCHERKENBACH:  Well, Dr. Meier, 15 to

03:13:44 13    20 minutes probably.  Dr. DeFrancesco, I assume that is the

03:13:49 14    individual that will be roughly an hour, their expert.

03:13:51 15                    MS. PARKER:  Yes.

03:13:52 16                    MR. SCHERKENBACH:  About the same, 15 to

03:13:54 17    20 minutes.

03:13:55 18              Our time calculations have us, you know,

03:13:58 19    finishing the evidence tomorrow maybe by midday-ish,

03:14:03 20    something like that.

03:14:03 21                    THE COURT:  Okay.  Well, thank you.  That is

03:14:05 22    very helpful.

03:14:06 23              As you know, I'm starting another trial and I

03:14:09 24    will be very curious as to what time I will be with them

03:14:11 25    tomorrow.  I will remain hopeful that we may be able to

03:14:15 1  start the instructions with the jury tomorrow.

03:14:20 2          I know we need to hear argument on the damages,

03:14:24 3  I think it was, and the verdict sheet.  Be prepared to

03:14:27 4  present that argument at 8:30 tomorrow morning.

03:14:29 5          Provided we can pull things together and there

03:14:34 6  is time before 3:15, we may start instructing tomorrow.

03:14:37 7          Any issues before we break today?

03:14:40 8          MS. PARKER:  No, Your Honor.  Thank you.

03:14:41 9          THE COURT:  Thank you.  From defendants?

03:14:43 10         MR. SCHERKENBACH:  Nothing more.

03:14:43 11         THE COURT:  Okay.  Let me just note, there have

03:14:46 12  been portions of the transcript that are sealed or

03:14:50 13  discussions we've had with the courtroom closed.  And if I

03:14:54 14  haven't always been careful about noting that those portions

03:14:57 15  of the transcript are sealed until further Order of the

03:15:00 16  Court, I hereby order all of those are sealed and trust all

03:15:04 17  of you are treating those as sealed portions of the transcript.

03:15:07 18         We will be in recess.  We'll see you in the morning.

03:15:25 19         (Proceedings adjourn at 3:15 p.m.)

20

21          I hereby certify the foregoing is a true and accurate
transcript from my stenographic notes in the proceeding.

22

23                  /s/ Brian P. Gaffigan
                Official Court Reporter
24                 U.S. District Court

25