08:07:22 1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    IDENIX PHARMACEUTICALS, INC., UNIVERSITA   :   CIVIL ACTION
     DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL   :
5    DE LA RECHERCHE SCIENTIFIQUE and           :
     L'UNIVERSITE MONTPELLIER II,               :
6                                               :
                  Plaintiffs,                   :
7    v                                          :
                                                :
8    GILEAD SCIENCES, INC. and GILEAD           :
     PHARMASSET LLC,                            :
9                                               :
                  Defendants.                   :   NO. 13-1987-LPS
10   -----------------------------------------
     IDENIX PHARMACEUTICALS, INC., UNIVERSITA   :   CIVIL ACTION
11   DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL   :
     DE LA RECHERCHE SCIENTIFIQUE and           :
12   L'UNIVERSITE MONTPELLIER II,               :
                                                :
13                Plaintiffs,                   :
     v                                          :
14                                              :
     GILEAD PHARMASSET LLC,                     :
15                                              :
                  Defendant.                    :   NO. 14-109-LPS
16   -----------------------------------------
     IDENIX PHARMACEUTICALS, INC.,              :   CIVIL ACTION
17                                              :
                  Plaintiff,                    :
18   v                                          :
                                                :
19   GILEAD SCIENCES, INC.                      :
                                                :
20                Defendant.                    :   NO. 14-846-LPS
                                    - - -
21
                         Wilmington, Delaware
22                    Wednesday, December 14, 2016
                         *Jury Trial - Volume H*
23
                                    - - -
24
     BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
25
                                    - - -

1  APPEARANCES:

2
          ASHBY & GEDDES, P.A.
3         BY:  JOHN G. DAY, ESQ.

4              and

5         McCARTER & ENGLISH
          BY:  MICHAEL P. KELLY, ESQ.
6
              and
7
          JONES DAY
8         BY:  CALVIN P. GRIFFITH, ESQ.,
               RYAN B. McCRUM, ESQ.,
9              MICHAEL S. WEINSTEIN, ESQ., and
               BRADLEY W. HARRISON, ESQ.
10             (Cleveland, Ohio)

11             and

12        JONES DAY
          BY:  JENNIFER L. SWIZE, ESQ.
13             (Washington, District of Columbia)

14             and

15        JONES DAY
          BY:  STEPHANIE E. PARKER, ESQ., and
16             JESIKA W. FRENCH, ESQ.
               (Atlanta, Georgia)
17
               and
18
          JONES DAY
19        BY:  JOHN D. KINTON, ESQ., and
               ANTHONY M. INSOGNA, ESQ.
20             (San Diego, California)

21             and

22        JONES DAY
          BY:  JOHN M. MICHALIK, ESQ., and
23             LISA L. FURBY, ESQ.
               (Chicago, Illinois)
24
                    Counsel for Plaintiffs
25

```
 1    APPEARANCES:   (Continued)

 2
                    FISH & RICHARDSON, P.C.
 3                  BY:  MARTINA TYREUS HUFNAL, ESQ.,
                         DOUGLAS E. McCANN, ESQ.,
 4                       JOSEPH B. WARDEN, ESQ.,
                         SANTOSH COUTINHO, ESQ.,
 5                       ROBERT OAKES, ESQ., and
                         KELLY ALLENSPACH DEL DOTTO, ESQ.
 6
                         and
 7
                    FISH & RICHARDSON, P.C.
 8                  BY:  FRANK SCHERKENBACH, ESQ., and
                         JENNY SHMUEL, ESQ.
 9                       (Boston, Massachusetts)

10                       and

11                  FISH & RICHARDSON, P.C.
                    BY:  JUANITA BROOKS, ESQ.,
12                       W. CHAD SHEAR, ESQ.,
                         CRAIG COUNTRYMAN, ESQ., and
13                       JONATHAN E. SINGER, ESQ.
                         (San Diego, California)
14
                         and
15
                    FISH & RICHARDSON, P.C.
16                  BY:  MICHAEL R. HEADLEY, ESQ.,
                         JOHN M. FARRELL, ESQ., and
17                       DALIA KOTHARI, ESQ.
                         (Redwood City, California)
18
                         and
19
                    FISH & RICHARDSON, P.C.
20                  BY:  TASHA FRANCIS, ESQ.
                         (Minneapolis, Minnesota)
21
                              Counsel for Defendants
22

23

24    Valerie Gunning                    Brian P. Gaffigan
      Official Court Reporter            Official Court Reporter
08:07:22 25
08:07:22
```

                              - oOo -

                        P R O C E E D I N G S

                (REPORTER'S NOTE:  The following hearing was
held in open court, beginning at 8:44 a.m.)

                THE COURT:  Good morning.

                I understand no issues from the plaintiffs this
morning other than talking about jury instructions and
verdict sheet; is that correct.

                MS. EVERETT:  That's correct.  Good morning,
Your Honor.

                THE COURT:  Good morning.  That is the same for
the defendants?

                MR. SCHERKENBACH:  It is, Your Honor.

                THE COURT:  All right.  Let's talk about jury
instructions and verdict sheet.  We'll start first with the
ones we didn't get to which I think were just damages ones
since I think the duty to deliberate et cetera is all agreed
to.  Ms. Swize.

                Good morning.

                MS. SWIZE:  Good morning.  May it please the
Court.

                I think that is right, Your Honor.  It's just
the damages, and I can take them in three sets.  The first
set are Instructions 9.1, 9.2 and 9.3, sort of general
instructions on calculating a royalty.

08:45:17 1          We had -- where we are now, we had changed our

08:45:21 2     proposals from the original set we filed, so when we refiled

08:45:25 3     them, I guess it was Monday before the charge conference, we

08:45:29 4     did that after talking about Gilead; and they suggested we

08:45:31 5     look at their model instructions that they had cited to see

08:45:35 6     if we could both try to be more objective and come up with

08:45:38 7     the same set.

08:45:38 8          So we did that and we looked at the Northern

08:45:41 9     District of California model instructions and thought we

08:45:43 10    could work with them.  So our 9.1, 9.2 and 9.3 almost

08:45:49 11    verbatim tracked those model instructions.

08:45:52 12         We sent them to Gilead and they said they were

08:45:54 13    going to maintain their proposal.  So we actually weren't

08:45:56 14    able to reach agreement on throws.

08:45:58 15         The ones that Gilead has proposed will not work.

08:46:02 16    One fundamental problem is that they selectively cut out the

08:46:08 17    passage that comes straight from 284 about damages being

08:46:12 18    adequate to compensate for the infringement, so I believe

08:46:14 19    they were following 9.1, Federal Circuit Bar Association.

08:46:18 20    There is, it's very clearly in that instruction that the

08:46:21 21    damages have to be adequate to compensate for infringement.

08:46:24 22    That is missing from their instruction.  It's in almost

08:46:28 23    all the instructions that I have seen and so it is in our

08:46:30 24    proposed 9.1.

08:46:33 25         Another concern we have with Gilead's

08:46:37 1   construction, 9.1, is that they repeat twice in the second

08:46:41 2   and third paragraphs the caveat that the jury doesn't need

08:46:44 3   to reach damages as we discussed on Monday.  We understand

08:46:47 4   it is going to be the caveat, but why it need to be repeated

08:46:51 5   twice in those paragraphs in a row, we don't see a need for

08:46:54 6   that.

08:46:55 7            Then just overall, because of Gilead's

08:46:59 8   modifications, their damages start with very specific

08:47:02 9   details about the accused products and then go to the

08:47:04 10  general whereas ours in following the model start and

08:47:09 11  generally go to more specifics, so that by the time the jury

08:47:12 12  gets to 9.3, that is when they're hearing about the accused

08:47:15 13  products.

08:47:15 14           Just a couple other specific points in those.

08:47:19 15           9.2, we have competing instructions on what to

08:47:23 16  do with post-hypothetical negotiation data.

08:47:27 17           As Your Honor knows, that is a point in dispute

08:47:30 18  in this case.  We do not think that Gilead's instruction,

08:47:35 19  the last paragraph of 9.2, should be given.  It would give

08:47:39 20  undue weight to their damages theory.  If any comment is

08:47:44 21  going to be made about the use of post-hypothetical

08:47:46 22  negotiation data, we would offer our proposal which is the

08:47:50 23  standard law that almost always the parties are looking at

08:47:55 24  information from the date of the hypothetical negotiation.

08:47:57 25           And then turning to the -- I think that covers

08:48:04 1  it for 9.1 through 9.3.  So the second bucket in damages is

08:48:09 2  the apportionment instruction, 9.6.  Gilead's proposal

08:48:16 3  really is about multicomponent products which is not at

08:48:19 4  issue in this case.  Our proposal comes from the *AstraZeneca*

08:48:24 5  case and does reflect this is a pharmaceutical product where

08:48:27 6  the accused product embodies that the claim, and there

08:48:31 7  really isn't any way to divide it up, and I don't think

08:48:33 8  there should be a dispute on that at the charge conference.

08:48:36 9  Gilead's counsel was in fact distinguishing a

08:48:39 10  multicomponent case and said, this is at page 39 of the

08:48:42 11  transcript:  Unlike the very different case where the patent

08:48:46 12  was just covering the component here, we have claims that

08:48:49 13  are directed to a method of using a molecule, and in the

08:48:53 14  case of Sovaldi is the molecule that is in the drug or in

08:48:57 15  the case of Harvoni is one of the two molecules.  So there

08:48:59 16  is no concern here about the jury thinking that the patent

08:49:01 17  has to describe or enable unclaimed features.

08:49:04 18  So I think that fully supports we're dealing

08:49:07 19  with the sort of situation that *AstraZeneca* had of an

08:49:12 20  dividable, a non-multicomponent product.

08:49:15 21  Then on the last one, 9.7, which is on

08:49:18 22  comparable licenses, the only dispute there is that final

08:49:22 23  sentence.  This is argumentive.  It takes this comment about

08:49:26 24  suggesting to the jury that settlements can be the most

08:49:29 25  probative evidence out of context from the *ResQNet* case

08:49:33 1    which, of course, recognizes that settlement licenses have

08:49:36 2    dubious value.  It would be error to give the jury that

08:49:41 3    final sentence as part in that instruction.

08:49:43 4              THE COURT:  Okay.  Thank you very much.  Let me

08:49:45 5    hear from Gilead, please.

08:49:48 6              MR. COUNTRYMAN:  Good morning, Your Honor.

08:49:50 7              THE COURT:  Good morning.

08:49:51 8              MR. COUNTRYMAN:  So let me see if I can

08:49:52 9    streamline some of the disputes on this.  I'll go

08:49:54 10   instruction by instruction.

08:49:55 11             So with respect to Instruction 9.1, obviously we

08:50:00 12   prefer our proposal.  I think what we would suggest, though,

08:50:02 13   is we could agree to the Idenix proposal except for one

08:50:06 14   sentence that is in ours that is not in theirs.  So at the

08:50:10 15   end of their first paragraph, they say if you find that any

08:50:13 16   claim of the '597 patent is invalid, you must determine the

08:50:17 17   amount of damages.

08:50:18 18             We would ask to add the sentence from ours that

08:50:22 19   says, you know, the other side of that, if you find that

08:50:26 20   all the asserted claims are all invalid, then Idenix is not

08:50:31 21   entitled to any damages.

08:50:32 22             So I think if we had parity between the two

08:50:35 23   sentences there, the beginning of the instruction, we would

08:50:40 24   otherwise be fine with their proposal on 9.1.

08:50:44 25             THE COURT:  Okay.

08:50:44 1      MR. COUNTRYMAN:  With respect to 9.2, the issue

08:50:45 2  is, the extent to which the Court instructs on information,

08:50:51 3  that comes after the hypothetical negotiation.  Our proposal

08:50:56 4  comes straight from the Federal Circuit Bar Association

08:50:58 5  model, the last paragraph of our instruction.

08:51:00 6      It's also very similar to something that this

08:51:03 7  Court previously gave from the *Helios* software case.  That

08:51:08 8  says if it is just easier in the interest of streamlining

08:51:11 9  things today, if the Court just wants to cut that paragraph

08:51:14 10  and not have to decide between the parties competing

08:51:17 11  proposal on that, we would be fine with that as well.

08:51:20 12      With respect to 9.3, there are two issues.  The

08:51:25 13  first is that, so it looks like the parties' proposals are

08:51:29 14  similar in many respects, so I'll kind of go from the Idenix

08:51:33 15  proposal.

08:51:34 16      The one thing that we would ask for in the

08:51:37 17  second paragraph, that Gilead contends that paragraph is to

08:51:41 18  insert the modifier which is in our proposal.  Gilead

08:51:46 19  contends that if you find the patent valid, and then go on

08:51:51 20  to say, instead of a percentage royalty, because, of course,

08:51:54 21  Gilead's contention is that no damages are necessary at all

08:51:57 22  because the patent is invalid.

08:51:59 23      And then the second thing is just the last

08:52:02 24  paragraph of Idenix's proposal, it says you are only being

08:52:06 25  asked to calculate damages to calculate for sales of Sovaldi

08:52:10 1    and Harvoni occurring up until August 6th, 16.  The Court

08:52:14 2    will determine damages for sales occurring after that.  That

08:52:17 3    is actually a dispute between the parties.

08:52:20 4            That would be true in the jury picks the running

08:52:22 5    royalty that Idenix is advocating, but it would not be true

08:52:26 6    if the jury picks the lump sum that Gilead is advocating

08:52:29 7    because the lump sum would be for the entire length of the

08:52:33 8    patent, so we think that last paragraph is inappropriate and

08:52:35 9    should be struck.

08:52:36 10           THE COURT:  Would you object to me just saying

08:52:39 11   the first sentence of that, that you are only being asked to

08:52:42 12   determine damages through August 2016?  I understand a lump

08:52:48 13   sum goes into the future, too, but they have only seen

08:52:50 14   numbers through August 2016.

08:52:53 15           MR. COUNTRYMAN:  I think we would, Your Honor,

08:52:54 16   because I think our theory of damages is that the lump sum

08:52:58 17   would cover the entire length of the patent.  And so that

08:53:01 18   would be the disputed point.

08:53:03 19           And I think it might be misleading to the jury

08:53:06 20   if they were kind of instructed on that because they might

08:53:10 21   pick a higher number based on thinking -- or low, a

08:53:13 22   different number based on having a misconception of the

08:53:16 23   period that it might apply to.

08:53:18 24           Finally, with respect to Section 9.6.  You know,

08:53:24 25   we think our proposal on apportionment correctly states the

law.  We think the *AstraZeneca* case is distinguishable and didn't set down a per se rule that in all pharmaceutical cases that the Entire Market Value Rule doesn't apply.  But this is one where I think we had initially proposed something on apportionment and the plaintiffs then come back with a counterproposal.  So as a compromise we would be fine with, just not giving either of these instructions.  I think it is a pretty hotly disputed point of law.

Finally, with respect to 9.7, the dispute is additional sentence on settlement agreements.  We think that does correctly state the law as articulated in *ResQNet* and we think it is appropriate here especially begin the questioning on cross-examination of Dr. Putnam where Idenix's counsel was trying to point out that because some of the licenses at issue that were settlements, trying to suggest that they would be an appropriate basis for damages.  *ResQNet* said settlement agreements are pertinent and can be the most reliable, so we think the jury can be instructed on that especially given the questioning on cross-examination.

THE COURT:  All right.  On the timing point, you all have agreed in, I guess I think it is 9.5 now, but that reasonable royalty timing.  The relevant date for the hypothetical reasonable royalty negotiation is December 6th, 2013.  What would be your position if we added to that something to the effect of if you award a running royalty as

08:54:57 1    Idenix seeks, it will be for the period through August 2016?

08:55:02 2    If you award a lump sum as Gilead seeks, it will be for the

08:55:05 3    entire life of the patent.

08:55:07 4              MR. COUNTRYMAN:  We would be fine with that.

08:55:09 5              THE COURT:  All right.  Thank you.  Is there

08:55:10 6    anything else?

08:55:10 7              MR. COUNTRYMAN:  Nothing else, Your Honor.

08:55:12 8              THE COURT:  Ms. Swize, just on that last point.

08:55:15 9    Would you all be agreeable to that?

08:55:17 10             MS. SWIZE:  One moment, Your Honor.

08:55:29 11             (Pause.)

08:55:42 12             MS. SWIZE:  Yes, Your Honor.

08:55:42 13             THE COURT:  You are agreeable to that?

08:55:45 14             MS. SWIZE:  Yes.

08:55:45 15             THE COURT:  Before we get to the verdict sheet,

08:55:48 16   the area that is giving us the greatest difficulty is the

08:55:54 17   whole prior invention, anticipation, obviousness, Merck

08:56:01 18   work.  The more I look through the different proposal, the

08:56:04 19   less I'm afraid I understand what Gilead is arguing and what

08:56:07 20   I need to tell the jury.  So let's see if we can make a

08:56:12 21   little bit of progress at least there before we bring the

08:56:14 22   jury in.

08:56:14 23             Let me hear from Gilead.  And if you could first

08:56:17 24   lay out for me what it is you think you have proven and that

08:56:20 25   I should be asking the jury to decide.

08:56:25 1          MR. COUNTRYMAN:  Certainly, Your Honor.  So

08:56:29 2  with respect to anticipation, we believe we have proven

08:56:33 3  anticipation of claim 1 of the '597 patent based on the 1998

08:56:39 4  Merck work, and anticipation of claims 1, 28, 30, and 31

08:56:45 5  based on the Merck August and September 2000 work.

08:56:50 6          And we also believe we have proven obviousness

08:56:52 7  of all the asserted claims based on either the 1998 or the

08:56:58 8  2000 work in combination with both the general knowledge in

08:57:03 9  the art as Dr. Secrist testified to particularly on his

08:57:07 10  redirect and more particularly in combination or using as

08:57:12 11  confirming evidence, I should say, that Merck 2001 patent

08:57:16 12  application which ultimately issued as the '499 patent.

08:57:22 13          THE COURT:  The Merck 2001 application.

08:57:24 14          MR. COUNTRYMAN:  Yes, which was --

08:57:25 15          THE COURT:  Has that been given a number in

08:57:27 16  front of the jury?

08:57:28 17          MR. COUNTRYMAN:  I'm not sure if it -- yes, I

08:57:30 18  think it's DX-2598.  It's the '313 patent application.

08:57:34 19          THE COURT:  Isn't there a Merck patent?  I think

08:57:39 20  the '224 patent?  Why does that fit in?

08:57:42 21          MR. COUNTRYMAN:  So that was one of the patents

08:57:44 22  that issued as a result or kind of claimed priority back to

08:57:49 23  that January 2001 application.  The '224 patent actually I

08:57:53 24  do not believe has come into evidence, but the Merck '499

08:57:55 25  patent has come into evidence.  So I think that would be the

08:57:59  1    appropriate patent number to note.

08:58:02  2              THE COURT:  All right.  Well, let's break this

08:58:04  3    down.

08:58:05  4              On anticipation, you believe claim 1.  You would

08:58:08  5    like to argue to the jury that claim 1 is invalid due to

08:58:13  6    anticipation by the 1998 Merck work?

08:58:16  7              MR. COUNTRYMAN:  Correct.

08:58:17  8              THE COURT:  Do you agree that I should explain

08:58:20  9    that it's Dr. Wolanski and that he would be the inventor?

08:58:27 10              MR. COUNTRYMAN:  We don't think that the Court

08:58:29 11    should instruct on a particular inventor.  We think

08:58:33 12    certainly Dr. Wolanski could be an inventor.  I think the

08:58:36 13    jury could conclude that Dr. Olsen reviewed the results at

08:58:40 14    the time and had a conception himself.

08:58:57 15              THE COURT:  They propose that I say a

08:58:59 16    corporation cannot be the inventor and that I need to -- do

08:59:03 17    you at least agree with that point?

08:59:05 18              MR. COUNTRYMAN:  I do agree.  You do need a

08:59:07 19    person.

08:59:08 20              THE COURT:  But you dispute me -- you would

08:59:11 21    object to me telling the jury that I must find it's Dr.

08:59:16 22    Wolanski?

08:59:16 23              MR. COUNTRYMAN:  Yes.

08:59:17 24              THE COURT:  Do you object to telling me your

08:59:19 25    list of people you would like to argue are the inventors?

08:59:25 1   Do you want me to tell the jury that?

08:59:27 2         MR. COUNTRYMAN:  I don't know if the Court needs

08:59:28 3   to tell the jury that.  I will represent it will be either

08:59:31 4   be Dr. Wolanski or Dr. Olsen.

08:59:34 5         THE COURT:  You've separately proven and would

08:59:36 6   like to argue that claims 1, 28, 30 and 31 were anticipated

08:59:41 7   by the 2000 work.  Is that correct?

08:59:44 8         MR. COUNTRYMAN:  Yes.

08:59:44 9         THE COURT:  That the inventor is Dr. Olsen.

08:59:46 10   Correct?

08:59:47 11         MR. COUNTRYMAN:  Correct.

08:59:47 12         THE COURT:  And only Dr. Olsen.  Correct?

08:59:49 13         MR. COUNTRYMAN:  Correct.

08:59:50 14         THE COURT:  All right.  And then you do want to

08:59:52 15   argue obviousness.

08:59:53 16         MR. COUNTRYMAN:  Yes.

08:59:54 17         THE COURT:  You believe you've shown that all of

08:59:56 18   the claims are invalid due to obviousness?

08:59:57 19         MR. COUNTRYMAN:  We do.

08:59:58 20         THE COURT:  And that is based on a combination

09:00:00 21   of the 1998 or the 2000 work.

09:00:05 22         MR. COUNTRYMAN:  Correct.

09:00:06 23         THE COURT:  Plus general knowledge of a person

09:00:08 24   of skill in the art.

09:00:10 25         MR. COUNTRYMAN:  Correct.

09:00:11 1          THE COURT:  Plus this Merck 2001 application,

09:00:17 2    the '313 application, which became the '499 patent.  Do I

09:00:21 3    understand that correctly?

09:00:26 4          MR. COUNTRYMAN:  Yes.

09:00:26 5          THE COURT:  And does Gilead object to me laying

09:00:29 6    this out for the jury in the instructions and then in the

09:00:33 7    verdict sheet?

09:00:33 8          MR. COUNTRYMAN:  Can I confer?

09:00:35 9          THE COURT:  Certainly.

09:00:36 10          (Pause while counsel conferred.)

09:00:49 11          MR. COUNTRYMAN:  Your Honor, I think we'd be

09:00:58 12    fine with giving that level of detail in the jury

09:01:00 13    instructions.  We would object, however, to breaking it out

09:01:02 14    in that manner on the verdict form because many of the other

09:01:05 15    defenses aren't broken out in that way on the verdict form,

09:01:07 16    and so all the constituent sub- elements, we think it would

09:01:11 17    be easier for the jury to just have a general question that

09:01:14 18    they could answer both on anticipation and on obviousness

09:01:18 19    and they would follow the Court's instructions in answering

09:01:20 20    that question, those questions.

09:01:21 21          THE COURT:  All right.  Now, there are disputes

09:01:24 22    over priority and certain contingencies.  Some of your

09:01:29 23    defenses I think you would acknowledge don't work depending

09:01:35 24    on what priority date the jury finds the '597 is entitled

09:01:39 25    to.  Is that correct?

MR. COUNTRYMAN: I think that's correct. There's a lot of different contingencies on priority. That's certainly true. So if the application gets the earlier -- if the Idenix application gets the May 2000 priority date, for example, there would be kind of a different combination of things that would have to be proven to show anticipation versus that the Idenix application got the May 2001 priority date.

THE COURT: So, for example, your second anticipation argument, the jury need not consider it if they believe the '597 gets the May 2000 priority. Is that fair?

MR. COUNTRYMAN: We disagree, your Honor, because the jury could find, even though the August reduction to practice is after the May 2000 application, the jury could find an earlier conception by Merck before the May 2000 and diligence by Merck from a period just before May 2000 through August 2000.

THE COURT: Without abandonment, suppression?

MR. COUNTRYMAN: Yes.

THE COURT: So at a high level, because the instructions you've given are very complicated, at what point in the instructions would you have me explain the complication to the jury, that here's our three anticipation/contingencies obviousness defenses, but in

09:03:05 1    order to resolve some of them, you need to figure out

09:03:08 2    priority issues.

09:03:09 3         MR. COUNTRYMAN:  We think it is covered by the

09:03:11 4    general instructions on conception reduction to practice,

09:03:13 5    abandonment, so I think there's part of the instructions

09:03:17 6    that says the party that is first to reduce to practice gets

09:03:21 7    priority if it doesn't abandon, suppress or conceal unless

09:03:25 8    the other party shows an earlier conception plus diligence.

09:03:29 9    And I think that covers both the situations.  It covers the

09:03:33 10   situations that Idenix is arguing for the May, you know, if

09:03:38 11   they get the May 2001 date, but then have an earlier

09:03:40 12   conception.  It would also cover the situation with Merck,

09:03:43 13   where Merck had an August 2000 reduction to practice and an

09:03:47 14   earlier conception.

09:03:48 15        So I think the Court can just give those general

09:03:51 16   instructions on the law, conception, reduction to practice,

09:03:55 17   diligence and abandonment, and doesn't need to kind of go

09:03:59 18   through with the jury each of the various permutations,

09:04:03 19   because they would all be covered by the general

09:04:06 20   instructions, and then the parties can argue as appropriate

09:04:09 21   in closing arguments, you know, their theories based on that

09:04:12 22   law.

09:04:12 23        THE COURT:  Now, if I only give them those

09:04:14 24   general instructions and only ask them generally are any of

09:04:22 25   the claims invalid due to, say, anticipation, we won't know

09:04:28 1    what the jury thought was anticipating or if they come back

09:04:33 2    with a verdict of anticipation, will we?

09:04:35 3         MR. COUNTRYMAN:  I think in that case you would

09:04:37 4    presume that the jury found all of the facts in favor of the

09:04:40 5    verdict winner, so if you have just a general verdict of

09:04:43 6    anticipation or obviousness, you would presume that the jury

09:04:46 7    found for the defendant on both theories, and likewise if

09:04:50 8    they found no anticipation or no obviousness, you would

09:04:53 9    assume that they found for the plaintiff on both theories.

09:04:56 10        THE COURT:  And after all of this trouble, you

09:04:58 11   guys don't want to know if it would say the 1998 or the

09:05:02 12   2000?

09:05:02 13        MR. COUNTRYMAN:  We don't think so.  The bottom

09:05:04 14   line is the same.  The patent would be either valid or

09:05:07 15   invalid, and that's really the question for the jury.

09:05:10 16        THE COURT:  And what if down the road this Court

09:05:12 17   or another Court though say one of those was sufficient and

09:05:17 18   one of them wasn't?

09:05:18 19        MR. COUNTRYMAN:  I mean, I think there would be,

09:05:20 20   you know, a question on appeal, but the Court of Appeals

09:05:22 21   could look at both, both bases and decide whether or not

09:05:26 22   they're supported by substantial evidence.

09:05:29 23        MR. SCHERKENBACH:  Could I add one observation

09:05:31 24   on this last point?

09:05:32 25        THE COURT:  Yes.

09:05:32 1          MR. SCHERKENBACH:  That's true in every case.

09:05:35 2     Forget about this complex priority dispute in this case.

09:05:38 3     Any case where there's anticipation based on more than one

09:05:41 4     prior art reference, for example, or obviousness based on

09:05:44 5     multiple combinations, it's the same issue.  Right?  And the

09:05:48 6     verdict form that I'm familiar with, we tend never to have

09:05:51 7     the detail in the verdict form and, indeed, often don't have

09:05:54 8     it in the jury instructions either, and the jury just

09:05:57 9     decides whether it's anticipated, yes or no.  Obviousness,

09:06:00 10    yes or no.  And it's reviewed on appeal accordingly.

09:06:03 11         So I don't think this is a special case in that

09:06:05 12    respect, your Honor, though we don't, as Mr. Countryman

09:06:08 13    said, we don't object to telling the jury in the

09:06:10 14    instructions what these three basic theories are.

09:06:13 15         THE COURT:  What about the risk of having to

09:06:15 16    re-do all of this?  Don't we reduce that by the clear

09:06:19 17    verdict form that lets us better know what the jury is

09:06:24 18    thinking?

09:06:25 19         MR. SCHERKENBACH:  Well, I think the answer to

09:06:25 20    that at some level is yes, but then I would say we should be

09:06:30 21    putting in all the detail about whatever their willfulness

09:06:33 22    theory is, which I still don't understand.

09:06:35 23         So are we going to put in the willfulness

09:06:37 24    instruction?  You know, what is it that happened in 2000 --

09:06:40 25         THE COURT:  I understand your point.

09:06:41 1          MR. SCHERKENBACH:  Okay.

09:06:42 2          THE COURT:  All right.  Let me hear from Idenix.

09:06:50 3  Good morning.

09:06:51 4          MR. KINTON:  Good morning, your Honor.  Your

09:06:52 5  Honor, there is a very serious problem with confusion,

09:06:59 6  potential confusion with their proposed verdict form and

09:07:02 7  with this whole Merck work defense.  It has taken them

09:07:07 8  forever to get to the point where they are willing to

09:07:09 9  identify individuals.  We should have been there all

09:07:12 10  along.

09:07:13 11          Now for the first time I'm hearing that on the

09:07:16 12  obviousness combination it's some evidence that came in on

09:07:19 13  redirect from an expert yesterday, not anything that was

09:07:23 14  ever in an expert report, not anything that ever got notice

09:07:28 15  of.  And the reason they did that is because this

09:07:34 16  provisional application, this Merck provisional application

09:07:37 17  on which until now their obviousness contention had been

09:07:41 18  based -- and your Honor heard Dr. Secrist say the

09:07:44 19  obviousness combination is L765 plus the provisional

09:07:48 20  application.

09:07:50 21          I asked him if the provisional application

09:07:52 22  doesn't get the priority date, does your opinion on

09:07:55 23  obviousness go out the window?  And he said yes.  He doesn't

09:07:59 24  agree with the examiner that we get entitlement to the

09:08:03 25  priority, but he said if that does, that means that the

provisional application is gone as prior art and they heard

that, and the truth is, it goes out the window.

So now on redirect we supposedly have a

brand-new obviousness combination we had never heard before

coming in.  There's no notice here and it doesn't cut it

anyway.

So we really need to parse these things out

and this notion of it can just be obvious based on

whatever --

THE COURT:  Well, if I'm going to parse it out,

help me do that.  Do you agree that they -- that I should

instruct the jury that claim 1, that they need to find

whether claim 1 is anticipated by the 1998 invention by

Dr. -- you know, or purported invention by Dr. Wolanski or

Dr. Olsen?

MR. KINTON:  Yes, your Honor, with the caveat

that we will be making a JMOL motion on that.

THE COURT:  That's fine.  I'm not trying to

impact anybody's rights to make those.

MR. KINTON:  I understand.

THE COURT:  I'm just trying to get the

instructions done.

Okay.  And do you agree that I should instruct

the jury that they are to, you know, they have to decide

whether claims 1, 28, 30 and 31 are anticipated by the 2000

09:09:20 1   work, i.e., Dr. Olsen's purported invention?

09:09:25 2           MR. KINTON: Yes, your Honor. We believe that

09:09:26 3   that name should be mentioned so that they can tie it to a

09:09:29 4   human being for purposes of recognition, so forth.

09:09:33 5           THE COURT: All right. Now, on obviousness, I

09:09:35 6   understand you have an argument that it shouldn't go to the

09:09:37 7   jury, they didn't give you adequate notice. For the moment,

09:09:43 8   assume I'm going to instruct on it and give it to the jury

09:09:45 9   and have some sort of verdict question, because that's sort

09:09:48 10   of what I'm focused on right now.

09:09:50 11           Do you agree that the instruction should say in

09:09:54 12   essence, you need to decide whether all of the asserted

09:09:58 13   claims are obvious in light of that 1998 or 2000 invention

09:10:05 14   in combination with general knowledge of one of skill in the

09:10:08 15   art in combination with the Merck 2001 '313 application,

09:10:14 16   which becomes the '499 patent?

09:10:18 17           MR. KINTON: Absolutely not.

09:10:19 18           THE COURT: All right. So tell me why not.

09:10:20 19           MR. KINTON: Because, well, on the general

09:10:23 20   knowledge, that was not the theory that Dr. Secrist advanced

09:10:29 21   and the theory that we heard at any point in time up until

09:10:32 22   redirect. And even on redirect it's insufficient that

09:10:36 23   the -- the theory here of obviousness is -- and this was how

09:10:45 24   Dr. Secrist articulated it. It was claims 2 -- I apologize.

09:10:50 25   I'm going from memory. Claims 2 and another one were

09:10:54 1   obvious according to him based on Dr. La Colla's testimony,

09:11:00 2   okay, that that was general knowledge. And that's okay. So

09:11:03 3   they put in evidence of that. Whether or not it's JMOL

09:11:07 4   material or not, they put in evidence of that and that was

09:11:09 5   their theory. That was what Dr. Secrist articulated.

09:11:12 6         Bought on claims 4 to 7, and, again, I can't

09:11:15 7   remember the numbers specifically, but there was a group of

09:11:17 8   claims, and your Honor heard the testimony where if the

09:11:19 9   Merck provisional isn't prior art, that theory -- his

09:11:24 10   obviousness opinion goes out the window. He agreed.

09:11:29 11         And what they are trying to do is back-door this

09:11:31 12   with this nebulous notion of general knowledge, and that

09:11:35 13   should not go to the jury. That would be wrong. If it does

09:11:38 14   go to the jury, it needs to go to the jury solely on the

09:11:43 15   Merck '224 patent. And that -- I mean, it was the '224

09:11:49 16   patent that was identified as the patent that combined with

09:11:53 17   L765 created the alleged obviousness.

09:11:57 18         Now I just heard Mr. Countryman say, no, it's

09:12:00 19   not that. It's another Merck patent, the '499 patent.

09:12:04 20   That's new. That just came up today for the first time.

09:12:07 21         So if it goes to the jury on obviousness on

09:12:10 22   those claims, it needs to be put to them as the 1998 work of

09:12:16 23   Mr. Wolanski or Mr. Olsen or their alleged invention or the

09:12:20 24   2000 combined with the Merck '224 patent.

09:12:26 25         THE COURT: All right. And what about the whole

bit of figuring out priority?  Where would you have me in this sort of laying it out for the jury, tell them about priority issues and have it resolve them?

MR. KINTON:  That to me relates to the Merck 2000, so that's the David Olsen 2000 alleged invention.  And so if there is entitlement to priority, that becomes -- then they don't have to answer the question about David Olsen in 2000.  They only have to answer the question about David Olsen in 2000 if we are not entitled to priority.

THE COURT:  Now, they say, but he may -- a jury might be able to find Dr. Olsen conceived of it before you all did and then diligently reduced it to practice.  You say that's not something I should let them argue to the jury?

MR. KINTON:  Absolutely not.  Your Honor heard Dr. Olsen say that I conceived of this in the fall of 2000 and there's no evidence that he conceived of it earlier.  What's more, even if there were, even if they could concoct knowledge by Dr. Olsen out of 1998, and they can't, they did not put in evidence, proper evidence of diligence from a point in time before May 23rd, 2000, continuously up through the fall.  It was hand-waving.  It's general, oh, he did some stuff.  There was no testimony about continuously working on it or diligence.

THE COURT:  All right.  And what about this general idea, which is sort of a verdict sheet idea?  You

09:14:20 1   all suggest that I instruct clearly on this and make the

09:14:25 2   jury do the work of clearly sort of going through all of it,

09:14:29 3   but presumably you wouldn't want the same level of detail

09:14:33 4   on, say, your willfulness case where I lay out, here's the

09:14:36 5   five things they argue are willful and make a finding on

09:14:39 6   each of them.

09:14:17 7           MR. GRIFFITH:  Your Honor, I think our case on

09:14:26 8   willfulness has been pretty straightforward and clear all

09:14:29 9   along.  But aside from that, the jury has to know what the

09:14:34 10  alleged prior art is.  I mean that is so fundamental, and

09:14:37 11  this is tricky stuff, and they can easily go astray if we

09:14:42 12  don't give them any direction.  That is my fear and I think

09:14:47 13  it is a very serious problem.

09:14:51 14          And, Your Honor, I feel very strongly that at

09:14:57 15  least some, if not all, but at least some of this should go

09:15:01 16  by the wayside by JMOL, and I think that would be very, very

09:15:05 17  helpful on this whole complexity that we have.

09:15:09 18          And as I say, even if all of it doesn't go, and

09:15:13 19  I think all of it should go, but even if it didn't, all of

09:15:16 20  it didn't go and we pare back some of this, they will have a

09:15:20 21  shot at making this very amorphous, very general 102(g)

09:15:26 22  defense/103 that they have thrown up in a lot of different

09:15:29 23  ways, telling the jury throughout Merck work, never making

09:15:33 24  real clear to the jury who is involved and who isn't, and

09:15:38 25  did they have recognition, all of that.

09:15:41 1        I think our JMOL motions, Your Honor, are going

09:15:45 2    to be very serious, worthy of consideration, should be

09:15:49 3    granted.  And at a minimum, if there is some paring back, I

09:15:54 4    think it will be a lot easier for the jury to make sense out

09:15:56 5    of this defense.

09:15:57 6        THE COURT:  All right.  Thank you.

09:15:59 7        I know the jury is all here, and I want to bring

09:16:01 8    them in shortly, but I'll hear from each side briefly one

09:16:06 9    more time.

09:16:07 10        And from Gilead, you can respond to what you

09:16:11 11   have heard, but I'm also curious, we did get a new proposed

09:16:15 12   verdict sheet from Idenix overnight and, among other things,

09:16:21 13   it sets out perhaps an accurate but an extraordinarily

09:16:26 14   complicated math for the jury as to "if this, then that"

09:16:30 15   with respect to all the 102, 103s, even breaking it down by

09:16:35 16   claim.

09:16:36 17        I would like to know at least in general what

09:16:38 18   Gilead's position is and are you hopefully working on your

09:16:41 19   own math as to what the jury is going to have to decide and

09:16:46 20   know which questions they answer under which contingencies?

09:16:50 21        So if Gilead would come speak to that, any

09:16:52 22   response to what else you heard, and any other thoughts you

09:16:56 23   have on the verdict sheet.

09:16:57 24        MR. SCHERKENBACH:  Well, most of what we heard

09:16:59 25   was their JMOL argument on the Merck work, and if, and when,

they actually make that, Mr. Countryman will respond on the merits.

You know, they're asking you to assume their view of the evidence in constructing the verdict form and the jury instructions which, okay, with all due respect, the Court can't do.

On their amended verdict form, I do have some thoughts on that, which is why I -- and let me just say in terms of the 102 and 103 defenses based on Merck, no, we did not counter-propose a complicated contingent laden verdict form of the kind that they have.

If Your Honor says that that is the direction you deciding to, we can come up with something. But the sheer complexity of it is I think a pretty good reason not to do it and to leave it for the jury instructions.

We agree we can lay it out clearly in the jury instructions, but it's, there is so many contingencies and counter-contingencies here that it's very confusing to have this sort of a verdict form which, you know, I understand why they think that helps them, but I don't think it helps the jury.

As to the other issues on the verdict form, shall we talk about those?

THE COURT:  Yes, briefly.

MR. SCHERKENBACH:  Because I do think we made a

09:18:26 1    little bit of progress, frankly, on written description and

09:18:29 2    enablement so their written description that they filed.  I

09:18:32 3    think we can live with their formulations with a few small

09:18:36 4    changes.

09:18:37 5         Notably, for both written description and

09:18:40 6    enablement, they have taken out the list of all the

09:18:42 7    individual claims, which we think is correct and appropriate

09:18:45 8    because neither side has argued written description or

09:18:48 9    enablement on a claim by claim basis.  They rise or fall --

09:18:51 10        THE COURT:  Is it true you believe you have

09:18:53 11   proven invalidity of all asserted claims based on lack of

09:18:57 12   written description, lack of enablement?

09:18:59 13        MR. SCHERKENBACH:  Absolutely.  Absolutely.

09:19:01 14   Your Honor, conceptually, we haven't seen enough of the

09:19:03 15   claims in the case, but basically it's all about claim 1 and

09:19:06 16   every other claim is there directly dependent on or refers

09:19:10 17   to claim 1 so, yes, they all rise or fall together.  There

09:19:13 18   is no dispute about that.

09:19:14 19        What I would suggest on the language

09:19:16 20   specifically -- and I'll just take written description as an

09:19:18 21   example on their amended form.

09:19:21 22        We're okay with it if Your Honor would take out,

09:19:25 23   instead of say "each and every one of the claims," just say

09:19:29 24   "each of the asserted claims."  I think it's argumentive and

09:19:33 25   unnecessary to say "and every one."

And then in the next line, change "are invalid" to "is invalid."

And in the last line, "adequate written description of the asserted claims."

And then I would, enablement, you can make the same change and I think we're good. We have no problem with that.

The thing we have the biggest problem with, of course, is willfulness as we discussed before. If I could just say just a word about that.

There are sort of two related issues for the willfulness part of the form. One is the issue of where that question should be located. We talked about that a little bit on Monday. I won't repeat that. We think it should go with damages.

The related question, though, is should the answer to willfulness be contingent to the answer on validity? And on that, the answer we think is pretty clearly yes.

I don't see how we could be asking the jury to decide willfulness for a patent that might have been proved invalid. So if there is invalidity, there should be no willfulness particularly in this case.

I would note that their own, their own jury instruction 7 indicates, tells the jury that validity is a

factor for willfulness.

And what we're really concerned with is an inconsistent verdict and this is maybe really where the rubber meets the road.

Suppose the jury says, yes, the claims are invalidity but willfully infringed.

Is that inconsistent? On this record is that inconsistent? There may be an argument that it is, and I'm sure Idenix would make that argument. So at a minimum, I think if Your Honor is not going to make willfulness contingent on validity, the validity finding, I think we need to get a representation on the record from Idenix that they're not going to be arguing there is going to be some inconsistent verdict in the event the jury answers the questions in a way that is not supported by the record.

I think just the last thing on damages. On the damages question, this is a relatively small point but an important one. On the Idenix form, it implies the jury should find, should enter a damages number, find damages regardless of anything else they have done. There is no contingent language there, and there needs to be something that says don't answer this if you already found the patent invalid, for example.

THE COURT: Let me hear briefly from Idenix, please.

09:22:10 1    And let's start on what I think was the most
09:22:14 2 important point there, because I'm definitely inclined to
09:22:17 3 ask this jury to make a finding on willfulness.  They sat
09:22:21 4 through the evidence.  And so I'm inclined to keep it as the
09:22:25 5 first thing as you suggest, but are you reserving the right
09:22:30 6 to argue that there is an inconsistent verdict if the jury
09:22:34 7 does as I instruct them to do and makes a finding on
09:22:37 8 willfulness?
09:22:38 9    I'm not instructing them to do this in your
09:22:41 10 favor, this is a hypothetical, but if I tell them no matter
09:22:45 11 what you need to make a finding of willfulness, and no
09:22:47 12 matter what you have to make a finding on invalidity, and
09:22:50 13 let's just say hypothetically everything is invalid.  Am I
09:22:53 14 going to be hit with a motion that this is inconsistent and
09:22:55 15 we have to start all over?
09:22:57 16    MR. GRIFFITH:  I don't believe so, Your Honor.
09:22:58 17 Put another way, I don't believe it is inherently
09:23:00 18 inconsistent to find a patent willfully infringed and also
09:23:04 19 find it invalid any more that it is not inconsistent to find
09:23:07 20 a patent infringed and invalid.
09:23:11 21    In other words, we do this all the time, right?
09:23:13 22 We have infringement first and then validity second, and
09:23:15 23 they can answer "yes" to infringement and then they can
09:23:18 24 answer "yes" to invalidity, and that doesn't create a per se
09:23:23 25 or inherent inconsistency, and I think the same is true on

09:23:27  1    willful infringement.

09:23:29  2              THE COURT:  Okay.

09:23:30  3              MR. GRIFFITH:  I mean I'm not promising that

09:23:32  4    some verdict that they come back with doesn't have an

09:23:34  5    inconsistency in it, but we've got -- with other questions

09:23:40  6    we have, but I don't think there is any inherent

09:23:42  7    inconsistency in that.

09:23:43  8              THE COURT:  Okay.  What else do you want to say?

09:23:45  9              MR. GRIFFITH:  Then the changes that Mr.

09:23:49 10    Scherkenbach proposed to written description and enablement

09:23:51 11    are fine with us.

09:23:52 12              THE COURT:  Okay.

09:23:52 13              MR. GRIFFITH:  I thought that was acceptable.

09:23:58 14              I don't think there is any need to alter the

09:24:01 15    damages question, Your Honor.  The lead-ins up to it are

09:24:07 16    all, you know, first off, they're going to be going through

09:24:10 17    this, and each time it says if you find, then you can skip

09:24:15 18    to that.

09:24:15 19              THE COURT:  But we established this earlier in

09:24:19 20    the week.  You don't want a damages decision if they find

09:24:22 21    that all of the claims are invalid; correct?

09:24:26 22              MR. GRIFFITH:  Correct.

09:24:26 23              THE COURT:  All right.  That's it.

09:24:28 24              MR. GRIFFITH:  Yes.

09:24:29 25              THE COURT:  All right.  Thank you.  We'll take a

09:24:31  1    recess and we'll be back shortly.

09:25:09  2                    (Brief recess taken.)

09:25:09  3                    *    *    *

09:43:41  4                    (Proceedings reconvened after recess.)

09:43:41  5                    THE COURT:  All right.  The jury is all here.

09:43:43  6    The witness is here; correct?

09:43:45  7                    MR. GRIFFITH:  Yes, Your Honor.

09:43:45  8                    THE COURT:  He can come back to the witness

09:43:47  9    stand.  And we'll go get the jury.

09:43:51 10                    (Jury returned.)

09:45:30 11                    THE COURT:  Good morning, ladies and gentlemen.

09:45:32 12                    THE JURORS:  Good morning.

09:45:32 13                    THE COURT:  I apologize for the late start.  I

09:45:34 14    had some matters to deal with, but I assure you we will have

09:45:38 15    you out of here at 3:15 today.

09:45:40 16                    I believe we are ready to proceed.  Dr. Meier,

09:45:44 17    welcome back.  I remind you that you remain under oath.

09:45:47 18                    THE WITNESS:  Yes.

02:23:10 19                    ... CHRIS MEIER, having been previously duly

02:23:24 20    sworn, was examined and testified as follows ...

09:45:48 21                    THE COURT:  Mr. Griffith, you may resume your

09:45:50 22    examination.

09:45:51 23                    MR. GRIFFITH:  Thank you, Your Honor.

09:45:53 24                    DIRECT EXAMINATION (Continued)

09:45:53 25    BY MR. GRIFFITH:

09:45:53 1   Q.    Good morning.

09:45:56 2   A.    Good morning.

09:45:56 3   Q.    Dr. Meier, when we adjourned yesterday, I was asking

09:46:05 4   you about evidence that you had seen about reactions from

09:46:12 5   other skilled artisans in the field to the specification of

09:46:18 6   the '597 patent.  And so if we could go back to that topic,

09:46:23 7   that is where I'm going to start off today.

09:46:25 8        What evidence have you seen of reactions by

09:46:31 9   skilled artisans to the PCT publication that had the same

09:46:38 10  specifications as the '597 patent?

09:46:42 11  A.    So I have seen a couple of publications addressing

09:46:46 12  the issues of the '597 patent.  For example, one was from

09:46:52 13  Pharmasset scientists, which is a grant application, and

09:46:57 14  another paper was from Charles Rice and Raffaele De

09:47:05 15  Francesco which is a reference article on the status of HCV

09:47:09 16  research.

09:47:10 17  Q.    And I believe we have some slides regarding both of

09:47:14 18  those.  And if we could turn to the grant application first,

09:47:20 19  and go to slide 24.

09:47:25 20  A.    Yes.

09:47:25 21  Q.    Can you tell the jury what this is?

09:47:26 22  A.    Yes.  So this is the title page of this grant

09:47:30 23  application that has been submitted by scientists from

09:47:34 24  Pharmasset.  And the title of this grant application is 2'

09:47:41 25  And/Or 4'-C-Modified Nucleosides As Anti-HCV Agents.  And

09:47:46  1    this has been submitted in 2003.

09:47:50  2              MR. GRIFFITH:  And could we go to the next

09:47:52  3    slide, slide 25.

09:47:54  4    BY MR. GRIFFITH:

09:47:55  5    Q.      And Dr. Meier, could you describe what the Pharmasset

09:47:58  6    scientists are saying on this page as you understand it?

09:48:02  7    A.      Yes.  So this is, I copied that from the grant

09:48:07  8    application from the Pharmasset scientists.  And the first

09:48:13  9    highlighted sentence, just at the beginning, states:

09:48:16 10    Several modified nucleoside analogs with potent inhibition

09:48:19 11    of the HCV NS5B polymerase -- which is the enzyme which

09:48:25 12    replicates HCV -- has been published recently.

09:48:30 13              So they summarized on work that has been

09:48:33 14    published recently.

09:48:34 15              And then, a little bit lower, it says:  Several

09:48:38 16    classes of sugar modified nucleosides were recently

09:48:41 17    disclosed.  They can be divided into the following three

09:48:44 18    classes of compounds.  And the first one that is mentioned

09:48:49 19    is 2' modifications, and then in parentheses, it says methyl

09:48:56 20    or O-methyl, and then after the parenthesis, there are three

09:48:59 21    references given, 9 to 11.  And No. 9, the reference number

09:49:06 22    9, I copied in the bottom part of this slide, and that's the

09:49:12 23    international patent application, 121, which is authored by,

09:49:22 24    Sommadossi and La Colla.  And this is essentially saying the

09:49:24 25    patent, the '597 patent, and it has the same title as the

09:49:29 1    '597 patent.

09:49:30 2            And among the compounds that the Pharmasset

09:49:33 3    scientists identified from that international patent

09:49:36 4    application, it says:  Among them, 2' C methylcytidine are

09:49:45 5    representatives of these three classes of modified

09:49:48 6    nucleoside with potent anti-HCV activity.

09:49:51 7            Which pointed out that the scientists at

09:49:53 8    Pharmasset, by reading the international patent application,

09:49:57 9    recognized that the key invention in this patent application

09:50:02 10   is the methyl up modification.

09:50:05 11   Q.    And to be clear, Dr. Meier, would the 2'

09:50:12 12   methylcytidine be representative of all three classes or one

09:50:17 13   of the particular classes?

09:50:18 14   A.    No, it is just one particular class and this is the

09:50:22 15   first 2' modification and then the methyl modification.

09:50:25 16   Q.    And then you also mentioned a paper that you

09:50:28 17   reviewed.

09:50:28 18           Do you have a slide regarding that?

09:50:30 19   A.    Yes, I have.

09:50:31 20           MR. GRIFFITH:  Let's go to the next slide.

09:50:34 21           Let me back up, Your Honor.  Can we take that

09:50:37 22   down.

09:50:37 23   BY MR. GRIFFITH:

09:50:42 24   Q.    Let me ask you to turn to Tab 5 in your binder.  I

09:50:46 25   don't believe this is in evidence yet.

09:50:53  1    A.    I'm there.

09:50:53  2    Q.    And that is a copy of Plaintiffs' Exhibit 702; is

09:50:57  3    that correct?

09:50:57  4    A.    That's correct.

09:50:58  5    Q.    Could you identify that?

09:50:59  6    A.    Yes, that is the paper that I reviewed.

09:51:02  7    Q.    And who are the authors on that?

09:51:05  8    A.    So the two authors mentioned here is Raffaele De

09:51:11  9    Francesco and Charles Rice.

09:51:12 10          MR. GRIFFITH:  We move to admit Plaintiffs'

09:51:14 11    Exhibit 702 into evidence.

09:51:17 12          MR. COUNTRYMAN:  No objection, Your Honor.

09:51:18 13          THE COURT:  It's admitted.

09:51:19 14          (PX-702 was admitted into evidence.)

09:51:20 15          MR. GRIFFITH:  With that, can we put slide 26 up?

09:51:20 16    BY MR. GRIFFITH:

09:51:25 17    Q.    And, first, who is Dr. De Francesco?

09:51:33 18    A.    Raffaele De Francesco is an expert in the field of

09:51:38 19    hepatitis C at that time and nowadays as well, and he will

09:51:41 20    take my place maybe in another half hours.

09:51:45 21    Q.    So he will be testifying this morning?

09:51:47 22    A.    Yes.

09:51:48 23    Q.    And then Dr. Rice, have we seen this picture at all

09:51:52 24    during this case?

09:51:53 25    A.    Yes.

09:51:53  1   Q.      And who was he mentioned by?

09:51:56  2   A.      By Dr. Sofia.

09:51:59  3   Q.      Okay.  Could you describe for the jury how this

09:52:08  4   document related to your analysis?

09:52:09  5   A.      Yes, I can, of course.

09:52:12  6           So this is a publication a scientific

09:52:16  7   publication which has been published in Clinics in Liver

09:52:19  8   Disease which is a renowned journal in that field, and that

09:52:24  9   the title of this publication is New Therapies on the

09:52:28 10   Horizon of Hepatitis C:  Are We Close?

09:52:33 11           And the two authors are already mentioned.

09:52:35 12   They are experts in the field, and sometimes experts in the

09:52:38 13   field are asked by editors of journals to summarize the

09:52:42 14   status of the research in a particular field.  And due to

09:52:46 15   the scientific quality of these two scientists, obviously

09:52:49 16   they were asked to summarize on the status of hepatitis C

09:52:55 17   virus development.

09:52:58 18           And there is a section in this, in this review

09:53:02 19   paper, and the title is, or the subtitle is nucleoside

09:53:06 20   analogs, and this is the section that I copied.

09:53:08 21           And it says in the yellow highlighting:  Novel

09:53:12 22   series of nucleosides that are candidates for the treatment

09:53:15 23   of HCV are being developed, and some have been described in

09:53:20 24   the recent patent literature.

09:53:22 25           And then again, three references are given in

09:53:27 1  brackets.

09:53:28 2          And the last one, 133, is copied below on this

09:53:34 3  demonstrative.  And it refers to the same international

09:53:37 4  patent application as the Pharmasset scientists did in their

09:53:41 5  grant application.  So it's also the Sommadossi, La Colla

09:53:48 6  patent application.

09:53:29 7  Q.      All right.  Could we go to the next slide, slide 28.

09:54:12 8  Sorry.  Slide 27.  Slide 27.

09:54:19 9              Okay.  Well, let me just ask.  Dr. Meier,

09:54:22 10  can you summarize your opinion on written description for

09:54:26 11  the jury?

09:54:27 12  A.      Yes.  It is my opinion that the -- that the written

09:54:31 13  description requirement is satisfied by the '597 patent

09:54:37 14  because it mentions the method of, for treatment of

09:54:46 15  hepatitis C virus infection.  It clearly identifies the

09:54:48 16  target of the inhibitor that may be used to do the job.  And

09:54:55 17  the patent discloses and describes a class of compounds

09:54:59 18  which is B-D-2 methyl ribofuranosyl nucleoside or a

09:55:06 19  phosphate thereof.

09:55:07 20  Q.      I want to switch topics slightly, but it's a related

09:55:11 21  topic, and I want to talk about the '585 provisional

09:55:14 22  application.  That application that was filed in May of

09:55:16 23  2000.

09:55:16 24  A.      All right.

09:55:17 25  Q.      And could you explain your opinion as to why and how

09:55:23 1  the '597 patent meets the written description requirement.

09:55:26 2  Do you have an opinion as to whether the provisional

09:55:28 3  application also meets the written description requirement?

09:55:31 4  A.    Yes, I do.  I have an opinion.

09:55:34 5  Q.    And your opinion is what, Dr. Meier?

09:55:36 6  A.    It also satisfies the written description

09:55:38 7  requirement.

09:55:38 8  Q.    Why?  Why do you say that?

09:55:40 9  A.    So because when you compare or when you read the '585

09:55:46 10  provisional application, you find the same wordings and you

09:55:52 11  find the same method which is described there, so it's a

09:55:56 12  method to treat hepatitis C.

09:55:58 13        It mentions also the same targets and it

09:56:00 14  identifies the target that should be inhibited by the class

09:56:04 15  of compounds that are disclosed in this provisional

09:56:07 16  application, and it also names the class of compounds that

09:56:12 17  should be used for this task.

09:56:14 18  Q.    All right.  Do you have slides that illustrate some

09:56:19 19  of the disclosures in the provisional application that you

09:56:22 20  found to be pertinent?

09:56:23 21  A.    Yes, I have.

09:56:24 22  Q.    All right.  Let's go to slide 29.  And can you

09:56:33 23  explain how this was relevant to your analysis?

09:56:35 24  A.    Yes.  The title page of the provisional application

09:56:41 25  '585, and this reads also highlighted there, the title of

09:56:46 1    the provisional application, and the title and the wording

09:56:49 2    is absolutely identical to that of the '597 patent.

09:56:53 3    Q.    And could we go to slide 30.  And could you explain

09:56:58 4    for the jury what this slide shows?

09:57:00 5    A.    Yes.  That's this -- it's the section, feed of the

09:57:07 6    invention from the '585 provisional application.  And,

09:57:10 7    again, the first sentence is:  This invention is in the area

09:57:13 8    of pharmaceutical chemistry, and is in particular, is a

09:57:16 9    method and composition for the treatment of hepatitis C.

09:57:20 10   You can see again the same wording as the title and the same

09:57:24 11   wording as the '597 patent.

09:57:27 12   Q.    All right.  Let's go to slide 31.  And is this

09:57:33 13   another portion from the provisional application?

09:57:35 14   A.    That's true.

09:57:36 15   Q.    Could you explain how this portion from the

09:57:39 16   provisional application related to your analysis?

09:57:41 17   A.    Yes.  So this is now the portion that identifies the

09:57:44 18   target enzyme for the compounds that are disclosed for the

09:57:49 19   method of treating hepatitis C.  And this reads on the first

09:57:54 20   line highlighted in yellow, the B-D and B-L nucleosides of

09:58:00 21   this invention belong to a class of anti-HCV agents that

09:58:03 22   inhibit HCV polymerase.  So again it's more or less the same

09:58:09 23   wording and it identifies the target enzyme as being the

09:58:12 24   polymerase of the virus.

09:58:15 25          And on the same page, a little bit, a few lines

09:58:18 1    down, it says, in preferred embodiments the compound

09:58:23 2    exhibited an EC50 of less than 15 or 10 micromolar when

09:58:27 3    measured according to the polymerase assay.  And, again,

09:58:31 4    this is an indication which enzyme is inhibited, how to do

09:58:34 5    this analysis, and the '585 provisional then lists the same

09:58:42 6    four publications as the '597, which describe the assay that

09:58:47 7    can be used for evaluating these compounds for the antiviral

09:58:52 8    activity.

09:58:52 9    Q.    And for the record, this is from page 45 of the

09:58:55 10   provisional application; is that correct?

09:58:57 11   A.    That's correct, yes.

09:58:58 12   Q.    Then if we could go to slide 32.  And if you could

09:59:03 13   describe for the jury how this information from the

09:59:06 14   provisional application related to your analysis, please do

09:59:09 15   so.

09:59:10 16   A.    Yes.  I mentioned yesterday for the '597 already that

09:59:15 17   the chemical structures or the structural formula important

09:59:20 18   formula is important for chemists when they read the patent.

09:59:23 19   This is a structural formula again which is typical for a

09:59:26 20   nucleoside analog.  You can see the base.  You have the

09:59:29 21   five-membered ring where there's an X in the ring, so this

09:59:32 22   is an oxygen.  Then you have the ribose ring, and you have

09:59:37 23   different modifications that are possible to this structure.

09:59:42 24   For example, there are 5', substitute in 5'.  And there are

09:59:46 25   a couple of moieties listed there, and 3' is in OH.  And 2',

09:59:57 1    there are two substitutes in the up orientation that are

09:59:59 2    formed, residue, and the down is R6.

10:00:01 3           And on the right-hand next to the

10:00:05 4    structural formula, there's a list of specifications given

10:00:09 5    in this provisional application and these are preferred

10:00:13 6    embodiments of the '585, and they list all as the R4

10:00:21 7    substitute can be made an alkyl.

10:00:24 8    Q.    Can we go to the next slide.  And this is slide 33,

10:00:34 9    Dr. Meier.  What is this describing?

10:00:35 10   A.    These are two further structural formulas given in

10:00:39 11   the same specification as '585.  This is structural Formula

10:00:46 12   6 and 13.  One can see again, it's the typical structure of

10:00:50 13   the nucleoside structure with a base and a sugar.  And here

10:00:56 14   in structure six, it is just our four in the, in the 2' up

10:01:01 15   position, and however structural formula, there are more

10:01:06 16   variables present and allowed for -- at the structure, but

10:01:11 17   still falls in the 2' up.  And you can see below the

10:01:14 18   structure 13, there's also given R4, should be alkyl.

10:01:21 19   Q.    And is methyl an alkyl?

10:01:23 20   A.    Yes, it is.  Of course.  As I mentioned yesterday,

10:01:26 21   methyl is the smallest possible alkyl residue.

10:01:30 22   Q.    You could have other alkyls; is that correct?

10:01:33 23   A.    That's correct.

10:01:33 24   Q.    But the smallest one is methyl; is that correct?

10:01:36 25   A.    The simplest one is methyl, the C 1 group.

10:01:43 1    Q.    Could we go to Demonstrative Exhibit 34, Plaintiffs'

10:01:47 2    Demonstrative Exhibit 34.  And is this also from the

10:01:51 3    provisional application, Dr. Meier?

10:01:52 4    A.    Yes, that's true.

10:01:53 5    Q.    And could you explain what this is showing?

10:01:55 6    A.    Yes.  There's a section that follows structural

10:01:59 7    formula 13.  And as you can see the first line, in even more

10:02:04 8    preferred sub-embodiments, a compound of formula 13, so it

10:02:08 9    refers to the structure just discussed on the other side.

10:02:12 10         And here are given six examples now with

10:02:15 11    specific residues that are attached to the structure.  And

10:02:21 12    when you go from -- I can use a laser pointer?

10:02:25 13         THE COURT:  You may.

10:02:26 14         THE WITNESS:  Okay.  So if you start here with

10:02:28 15    the first one, second and so on, there are six compounds

10:02:32 16    listed, and the specific residues are given for the

10:02:35 17    modifications at the structure.

10:02:38 18         And what you can see here, that in all cases,

10:02:41 19    the R4 substitute here is a methyl group.  You can see it

10:02:45 20    here on over.  And the only difference in this description

10:02:48 21    here or the specification is that the base differs from

10:02:53 22    purine to pyrimidine base.

10:02:55 23         So the only difference are the substitutes in

10:02:59 24    the structure essentially identical?  And if you compare

10:03:02 25    this wording or the listing in words with the structures

10:03:05  1    that were shown in Figure 1 of the '597 patent that I showed

10:03:12  2    you yesterday, these structures are essentially included in

10:03:14  3    the '597 patent as a chemical formula; not in this written

10:03:18  4    version, but as chemical formula.  So it's absolutely

10:03:22  5    identical.

10:03:23  6    Q.    And, Dr. Meier, Gilead has argued that a lack of data

10:03:28  7    in the '585 provisional application means that it cannot

10:03:33  8    provide written description support for the claim.

10:03:38  9          Do you agree with that?

10:03:39 10    A.    No, I don't.  I disagree.

10:03:41 11    Q.    Can you summarize your opinion on whether the

10:03:46 12    provisional application supports claim 1 of the '597

10:03:52 13    patent?

10:03:53 14    A.    Yes.  So just as a summary, the '585 provisional

10:03:58 15    describes the same method for the treatment of hepatitis C.

10:04:02 16    It identifies the same target enzyme as being the HCV

10:04:08 17    polymerase, and it identifies the same class of compounds

10:04:12 18    being 2' up methyl ribonucleoside.

10:04:18 19    Q.    All right.  Thank you.

10:04:20 20          I would like to move to a slightly

10:04:22 21    different topic and ask you some questions about testimony

10:04:26 22    that we've heard from Gilead's side that the '597 patent

10:04:31 23    discloses billions of compounds and suggested that the

10:04:36 24    inventors could not possibly have been in possession of the

10:04:39 25    claimed invention because of that.

10:04:41 1        First, let me ask:  Do you agree with that

10:04:44 2  view?

10:04:44 3  A.    No, I don't.  I disagree with that.

10:04:46 4  Q.    Why?

10:04:47 5  A.    Because it is my opinion that the number is much too

10:04:52 6  large.

10:04:53 7  Q.    And why is that?

10:04:54 8  A.    Because this is the -- of course, if you take the

10:05:00 9  theoretical approach to discuss all the structures that are

10:05:05 10  mentioned in the '597 patent, also in the '585, then there

10:05:14 11  are very -- a lot of compounds.  However, the scientists or

10:05:19 12  the skilled in the art would not approach a patent like

10:05:23 13  that, so it would take into account the patent as a whole

10:05:28 14  and the description of the patent and what is mentioned in

10:05:31 15  the patent, so the key invention or the key structures are

10:05:35 16  2'-methyl up, and it should be an inhibitor of the NS5B

10:05:41 17  polymerase.  And taken all of these pieces into

10:05:43 18  consideration, it is my opinion that the number is

10:05:50 19  significant, significantly smaller.

10:05:51 20  Q.    You have said on a number of occasions that the '597

10:06:04 21  patent discloses representative examples of 2'-methyl up

10:06:10 22  ribonucleosides.

10:06:12 23          Does it disclose every possible 2' up methyl

10:06:17 24  ribonucleoside?

10:06:18 25  A.    No.

10:06:19  1    Q.      And would skilled artisans be able to recognize the

10:06:26  2    2'-methyl up ribonucleoside class of compounds without

10:06:31  3    having every member specifically listed?

10:06:34  4    A.      Yes.  Definitely.

10:06:35  5    Q.      Okay.  All right.  Now I want to switch topics again

10:06:39  6    and move on to discussion of the enablement question that

10:06:43  7    has been raised in this case.

10:06:45  8            Do you believe that the '597 patent enables -- I

10:06:50  9    want to back up one second to complete the written

10:06:53 10    description argument and I apologize for getting ahead of

10:06:56 11    myself.

10:06:57 12            We have been focusing in our questions on claim

10:07:01 13    1 of the '597 patent.  Do your opinions with regard to

10:07:06 14    written description support apply to the dependent claims as

10:07:11 15    well?

10:07:12 16    A.      Yes, it does.

10:07:15 17    Q.      And is that with respect to the provisional

10:07:17 18    application as well?

10:07:18 19    A.      Yes, it is.

10:07:19 20    Q.      All right.  Now moving on to enablement, do you

10:07:24 21    believe that the '597 patent enables the skilled artisan to

10:07:28 22    use the method of claim 1 without undo experimentation?

10:07:32 23    A.      Yes.

10:07:32 24    Q.      And before we get to your specific opinions, I'd like

10:07:37 25    to discuss some of the assumptions that you applied or rules

10:07:42 1    that you applied in doing your analysis:  In that regard,

10:07:49 2    can we put up slide 37.

10:07:50 3        And could you explain how this -- what's

10:07:55 4    described on this slide and how it affected your

10:07:58 5    analysis?

10:07:58 6    A.    Yes.  So this is an assumption that I took into

10:08:02 7    consideration for the question of enablement, and it

10:08:05 8    says, as of its filing date, the patent must contain a

10:08:09 9    disclosure that enables a person of ordinary skill in the

10:08:12 10    art to make and use the claimed invention without undue

10:08:14 11    experimentation.

10:08:19 12    Q.    All right.  And could we also go to slide 37.  And

10:08:35 13    can you explain for the jury what this slide is showing?

10:08:37 14    A.    So this is a section from my -- from my expert

10:08:42 15    report.  It's paragraph 38.  And this shows a number of

10:08:49 16    criteria that have been shown here already.  These are the

10:08:56 17    factors that we already heard in the testimony from Dr.

10:08:58 18    Secrist.

10:08:59 19    Q.    Okay.  And did you apply, use these factors in doing

10:09:03 20    your analysis?

10:09:03 21    A.    Yes, I did.

10:09:04 22    Q.    All right.  Now, getting back to your opinion on

10:09:09 23    enablement, why do you believe that the ordinary skilled

10:09:11 24    artisan would have been able to get the compounds in claim 1

10:09:15 25    without undue experimentation?

A.      Okay.  So let me first start with a more general

comment on that.

So we have heard here a lot about

nucleoside chemistry, and nucleoside chemistry is -- was at

that time and also this is also the case today, of course,

it was a very developed science in natural compound

synthesis and it's a part of organic chemistry as I

mentioned yesterday.      So in the sixties there were a

lot of nucleoside analogs synthesized with the aim to get

anti-cancer drugs.  And then in the 17th, this shifted a

little bit to the antivirals.  For example, infections like

acyclovir is one compound that has been developed at that

time.  And the field then even and the chemistry related to

that explodes in the eighties by the discovery of the HIV

and then the AIDS pandemic.

And this then, because it was quite

successful to use nucleoside analogs as antivirals against

HIV, this principle then was also used for other viral

infections.  For example, hepatitis B in the nineties and

then, of course, it starts at the beginning of the 2000s

also in the field of HCV, to be used in the field of HCV.

In all of these cases, the compounds that

are used are modified, are structurally modified

nucleosides, which relates to the natural nucleosides that

are normally used by the machinery in order to replicate or

10:10:54 1    to synthesize RNA or DNA.

10:10:56 2         So there are a lot of synthesis procedures

10:11:00 3    and methods known at that time that the skilled artisan has

10:11:04 4    in mind or can remember or even go to the literature and

10:11:10 5    take it out and use it.  So there was really a lot of

10:11:15 6    information present at that time.

10:11:17 7         And the main, main synthetic approaches to

10:11:21 8    synthesized modified nucleosides are two.  The first one is

10:11:26 9    the so-called sugar route.  So this is starting from the

10:11:32 10   sugar part of the molecule, of the nucleoside, modified at

10:11:35 11   the sugar part and then introduce the base to that.

10:11:38 12        At the second approach or the general approach

10:11:41 13   is starting from an intact nucleoside that you can buy

10:11:46 14   because there are suppliers that offer you these compounds,

10:11:49 15   and then you start doing chemistry on this intact nucleoside

10:11:53 16   and modify the nucleoside structure in the sugar part or

10:11:57 17   even the base part.

10:11:58 18   Q.   All right.  So let's start with that sugar route.

10:12:03 19   And do you have a slide that relates to what the '597 patent

10:12:08 20   says about that?

10:12:09 21   A.   Yes.  I have prepared a slide for that.

10:12:11 22   Q.   If I could put slide 41 up, and if you could explain

10:12:16 23   what this slide is showing, that would be helpful.

10:12:18 24   A.   Yes.  So this slide is also taken from the '597

10:12:25 25   patent, and this is Scheme 3.  And this essentially

10:12:31 1    summarizes what I just explained.

10:12:33 2              So when you go here on the top structure,

10:12:35 3    here you can see a ribose sugar moiety, and this has hydroxy

10:12:42 4    groups at the 5', 3', 2', and here's a leaving group, a

10:12:48 5    leaving group.  This is needed to later introduce the base,

10:12:52 6    so I do not want to talk about that at the moment.

10:12:55 7              But then you use what is given here, an

10:12:58 8    oxidation that should be done, and this oxidation plays at

10:13:04 9    this position here in order to give this keto sugar.

10:13:07 10   This is called a keto sugar.

10:13:09 11             And from there this keto sugar is used as a

10:13:12 12   starting material to introduce the, in this case it's R6M,

10:13:18 13   and R6M means an organometallic reagent.  This is a common

10:13:23 14   reagent.  Reagents that were used for a long time before --

10:13:28 15   before the 2000s not only in nucleoside chemistry, but in

10:13:32 16   organic chemistry in general.

10:13:34 17             And by using these organometallic reagents, you

10:13:38 18   can run a reaction here, this C 2' or this C2 carbon atom in

10:13:45 19   order to introduce here the moiety R6.  And after you have

10:13:50 20   done that and you have reached to this material, then you

10:13:53 21   can use the leave-in group that's already attached.  And

10:13:56 22   then here it says coupling, and coupling means the coupling

10:14:01 23   between the sugar part and the base.  And this was also very

10:14:05 24   well developed technology or chemical reaction, which is

10:14:09 25   called also the verboten coupling, and this can be applied

10:14:14 1  to all the bases that -- maybe not to all the bases, but to

10:14:19 2  really a large number of bases, particularly for the natural

10:14:22 3  ones.

10:14:08 4  And by that, you get then to the nucleoside here

10:14:11 5  with the base attached to the sugar.

10:14:13 6  Q.    All right.  And you also mentioned a nucleoside route

10:14:17 7  for synthesis.  Does the patent contain a similar disclosure

10:14:21 8  with respect to that?

10:14:22 9  A.    Yes, that is true.

10:14:23 10  MR. GRIFFITH:  Can we put up slide 44?

10:14:23 11  BY MR. GRIFFITH:

10:14:36 12  Q.    And can you describe what this slide shows?

10:14:38 13  A.    Yes.  So this is essentially the second pass where I

10:14:43 14  just described in general.  So that here you start with

10:14:48 15  intact nucleosides.  You can see here the sugar part and the

10:14:52 16  base is attached to the 1 prime position, and then you run

10:14:56 17  actually the same reactions as I mentioned before, you

10:14:59 18  oxidize here in this position.  Chemically, this alcohol

10:15:04 19  to a keto nucleoside now can use the same kind of

10:15:09 20  organometallic agents as before in order to modify the sugar

10:15:13 21  at that part here and put the R6 group on what is also

10:15:17 22  mentioned here, this is, they are protecting groups.

10:15:22 23  And this, organic chemists are doing regularly

10:15:25 24  in order to select or selectively modify in one of the

10:15:28 25  positions at the sugar structure.  And at the end, you have

10:15:33 1  to cleave the protecting groups in order to get the modified

10:15:38 2  nucleoside and in this case, it is a 5' OH, 3' OH, and 2'

10:15:45 3  OH.  And this is routine chemistry.

10:15:48 4  Q.    Dr. Meier, do these same disclosures appear in the

10:15:52 5  provisional application filed in May of 2000?

10:15:55 6  A.    Yes.

10:15:56 7  Q.    All right.  So could you summarize your opinions

10:15:58 8  regarding enablement, the enablement issue with respect to

10:16:05 9  the '597 patent and the provisional application as concerns

10:16:08 10  the asserted claims in this case?

10:16:10 11  A.    Yes.  It is my opinion that the '597 as well as the

10:16:15 12  '585 provisional application satisfies the enablement

10:16:20 13  requirement for this class of compounds.

10:16:24 14         MR. GRIFFITH:  That's all I have, Your Honor.

10:16:26 15         THE COURT:  Okay.  Cross-examination.

10:16:29 16         MR. SINGER:  Permission to approach, Your Honor,

10:16:40 17  with binders?

10:16:41 18         THE COURT:  You may.

10:16:59 19         (Documents passed forward.)

10:17:06 20              CROSS-EXAMINATION

10:17:06 21  BY MR. SINGER:

10:17:07 22  Q.    Good morning, Dr. Meier.  We have not met before.  My

10:17:09 23  name is Jonathan Singer.  I represent Gilead.

10:17:11 24  A.    Good morning.

10:17:11 25  Q.    Good morning.  I want to start with just talking

10:17:14 1 about the difference between 2000 and 2001, the two time

10:17:18 2 dates that you talked about on your direct examination.

10:17:20 3 Okay?

10:17:21 4 A.     Okay.

10:17:21 5 Q.     You showed the jury some slides when you were talking

10:17:24 6 about written description of the '597 patent.

10:17:27 7           MR. SINGER:  And I want to call up, if we could,

10:17:30 8 Mr. Sayres, PDX-17.

10:17:30 9 BY MR. SINGER:

10:17:34 10 Q.     And just to be clear, this example that you relied on

10:17:37 11 for written description of the '597 patent, that first

10:17:41 12 appeared in the patent in the 2001 application; is that

10:17:44 13 true?

10:17:44 14 A.     That is correct.

10:17:45 15 Q.     And then you also showed the jury PDX-20, again,

10:17:52 16 Example 5.

10:17:53 17           That also first appeared in the May 2001

10:17:55 18 application?

10:17:56 19 A.     That is correct.

10:17:56 20 Q.     And then you also showed the jury PDX-21, which has

10:18:01 21 Example 6.

10:18:03 22           Again, that also appeared first in May 2001?

10:18:06 23 A.     That is correct.

10:18:06 24 Q.     And then you also showed the jury PDX-22, which has

10:18:11 25 Example 7.

10:18:12 1     Again, that also appeared first in the May 2001

10:18:17 2 application; is that correct?

10:18:18 3 A.     That is correct.

10:18:19 4 Q.     And you relied on those for written description of

10:18:21 5 the '597 patent; is that correct?

10:18:23 6 A.     In addition to other things, yes.

10:18:25 7 Q.     Okay.  Fair enough.  Now, I want to talk about the

10:18:28 8 difference between 2000 and today, okay?  2016.

10:18:33 9     When you analyzed the patent for validity, you

10:18:37 10 did so with the knowledge of the person of skill for 2001;

10:18:37 11 correct?

10:18:41 12 A.     Yes.

10:18:41 13 Q.     And you didn't use hindsight, looking back today what

10:18:44 14 you might know?

10:18:45 15 A.     No.

10:18:46 16 Q.     And the reason we need to do that in validity is that

10:18:48 17 since 2000-2001, the science of nucleoside treatments for

10:18:54 18 HCV has advanced; right?

10:18:56 19 A.     Yes, that is correct.

10:18:56 20 Q.     We heard I think from a variety of witnesses about

10:19:01 21 what has happened over the last 15 years; is that fair?

10:19:04 22 A.     Yeah, that's fair.

10:19:05 23 Q.     All right.  Now, at the time of the patent, this

10:19:10 24 distinction I'm making is important because the field was in

10:19:13 25 its infancy in 2000-2001; fair?

10:19:17 1    A.      With respect to what in its infancy?

10:19:19 2    Q.      The modified nucleosides activity for HCV.

10:19:24 3    A.      Yes.

10:19:24 4    Q.      Right.

10:19:24 5    A.      The activity, yes.

10:19:26 6    Q.      All right.  And you heard Dr. Secrist testify that he

10:19:29 7    was actually involved with the study of HCV in this time

10:19:33 8    frame, 2000-2001; true?

10:19:37 9    A.      I know that.

10:19:39 10   Q.      And you were not; correct?

10:19:40 11   A.      That is correct.

10:19:41 12   Q.      And we talked to you at your deposition.  You didn't

10:19:44 13   begin studying HCV until 2012; is that correct?

10:19:46 14   A.      That is correct.

10:19:47 15   Q.      Which I think you described in your deposition was

10:19:49 16   very late in the ballgame; fair?

10:19:51 17   A.      Yeah.

10:19:52 18   Q.      And now it's also true that you have only done a

10:19:55 19   little bit of work on HCV; is that true?

10:19:57 20   A.      Yes, we have done a little -- we have done some work

10:20:02 21   on HCV as well.

10:20:02 22   Q.      But when you started working in 2012, you learned how

10:20:06 23   unpredictable the field of nucleosides for HCV is; true?

10:20:11 24   A.      How unpredictable it is?

10:20:14 25   Q.      Yes, how unpredictable to make a compound and

10:20:18 1   determine whether or not it is active. You learned how

10:20:21 2   unpredictable it can be.

10:20:22 3   A.     Yes. But during the time, I followed that research

10:20:25 4   on the science and by attending meetings, and there was a

10:20:31 5   lot of things going on, particularly with the 2'-methyl

10:20:34 6   compound. There was surprisingly high number of 2'-methyl

10:20:39 7   up nucleosides that show activity against HCV.

10:20:42 8   Q.     Well, I was talking about the 2012. When you started

10:20:44 9   working on it, you learned how unpredictable it could be,

10:20:48 10   didn't you?

10:20:48 11   A.     Yes, of course.

10:20:50 12   Q.     I think you told us at your deposition that you,

10:20:53 13   since 2012, you have sent out roughly 40 compounds for

10:20:59 14   testing?

10:20:59 15   A.     Yes, that is true. But they were not nucleoside

10:21:01 16   based. They are nonnucleoside compounds.

10:21:04 17   Q.     But the ones you sent out for testing, 90 percent

10:21:07 18   came back as inactive?

10:21:09 19   A.     Yes, that is true.

10:21:10 20   Q.     It is also true you haven't published on HCV?

10:21:13 21   A.     No, not yet.

10:21:14 22   Q.     And I think you told us in your deposition, in

10:21:17 23   forming your opinions in this case, the only people you

10:21:20 24   spoke to were the lawyers for Idenix; isn't that true?

10:21:24 25   A.     Yes, that is true.

10:21:25 1    Q.    Dr. Meier, you showed the jury PDX-23 -- if we could

10:21:32 2    have that, Mr. Sayres -- in your written description.

10:21:36 3            This is Formula 11 of the '597 patent, true?

10:21:44 4    A.    That is correct.

10:21:44 5    Q.    I'm using the laser pointer.  Now, just to be clear,

10:21:48 6    methyl is a possible alkyl but it doesn't list specifically

10:21:51 7    methyl in this depiction you have on PDX-23; correct?

10:21:55 8    A.    Yeah, but it says lower alkyl.  And as I mentioned

10:22:00 9    several times now, that lower alkyl or the smallest alkyl is

10:22:05 10   methyl.

10:22:05 11   Q.    I think we can agree on that.  It doesn't say methyl?

10:22:09 12   A.    Yes.

10:22:09 13   Q.    And methyl is one of many possible alkyls listed in

10:22:13 14   the patent; true?

10:22:15 15   A.    From the specification, yes.  But if you take the

10:22:17 16   patent as a whole and take the examples in Figure 1 and

10:22:23 17   the biological data that are given, then the key is the

10:22:28 18   2'-methyl.  This is included here in this structure.

10:22:31 19   Q.    Your counsel will get a chance to ask you questions

10:22:33 20   on --

10:22:33 21   A.    Okay.

10:22:34 22   Q.    -- on redirect.  I'm on a clock.  I just want to know

10:22:37 23   if methyl is listed as one of many options in the alkyl

10:22:40 24   definition in the patent; true?

10:22:42 25   A.    Yes.

10:22:42 1   Q.      Okay.  Now, I think the Figure 1 you relied on in

10:22:49 2   your direct testimony, that was also added in 2001; true?

10:22:54 3   A.      The figure, yes, but not the description of this

10:22:56 4   compound.  As I pointed out just this morning, that in the

10:23:01 5   '585, they are given in words.  They are the same

10:23:05 6   structures.

10:23:05 7   Q.      But the pictures.

10:23:06 8   A.      The pictures in the '597, that's correct.

10:23:09 9   Q.      Okay.  Thank you.  Now, I think you also testified

10:23:11 10  yesterday that R7 had hydroxy which we talked about with

10:23:17 11  Dr. Secrist which is OH and some other things down.  Does

10:23:19 12  that sound about what you said yesterday?

10:23:21 13  A.      Yeah.

10:23:22 14  Q.      And one of the things that is not listed down,

10:23:25 15  though, is fluoro; true?  Do you agree with that?

10:23:28 16  A.      Yes, it's not on the list.  Yeah.

10:23:30 17  Q.      But it is listed as a possibility at the R6 position

10:23:33 18  up; true?

10:23:34 19  A.      That is correct.

10:23:35 20  Q.      And we saw that with Dr. Secrist when I went through

10:23:39 21  those formulas with him; correct?

10:23:41 22  A.      Yeah.

10:23:43 23  Q.      Now, I want to understand your testimony.  You relied

10:23:46 24  on some preferred embodiments when you talked about the '585

10:23:49 25  provisional.  Do you recall that?

10:23:50  1    A.      Yeah.

10:23:51  2    Q.      We just went through that?

10:23:52  3    A.      That is correct.

10:23:52  4    Q.      But you also reviewed those for the '597 patent

10:23:58  5    itself; true?

10:23:59  6    A.      Yeah.

10:23:59  7    Q.      And this formula has a preferred embodiment; true?

10:24:02  8    A.      Yeah.

10:24:03  9    Q.      And just so the jury can hear it one more time and

10:24:09 10    understand, the preferred embodiment kind of narrows down

10:24:13 11    the formulas.

10:24:14 12    A.      That is correct.

10:24:15 13    Q.      So if we go to the most preferred or more

10:24:18 14    preferred -- there is lots of language like that in the

10:24:20 15    patent -- of this formula, Formula 11, at column 23, at

10:24:23 16    lines 8 to 36, we can see what that is.

10:24:27 17            Thank you, Mr. Sayres.

10:24:29 18            And that actually has a methyl up at the 2'

10:24:34 19    position, true?

10:24:34 20    A.      That is correct, yes.

10:24:35 21    Q.      And the X in the middle has become an oxygen; is that

10:24:39 22    right?

10:24:39 23    A.      Yeah.

10:24:40 24    Q.      And 2' down is what, Dr. Meier?

10:24:42 25    A.      In that, this is in hydrogen.

10:24:47 1   Q.      It is a hydrogen.  Now, I noticed that during your

10:24:50 2   testimony, you didn't show the Court's claim construction

10:24:54 3   that I had on the board with Dr. Secrist.  Do you remember

10:24:57 4   that?

10:24:58 5   A.      Yeah.

10:24:58 6   Q.      And I could show it again if you need it, but what

10:25:02 7   is the one thing that is not permitted at 2' down by the

10:25:07 8   Court's claim construction?

10:25:08 9   A.      The hydrogen.

10:25:09 10  Q.      So this most preferred embodiment of the formula you

10:25:12 11  showed is not covered by the claims of the patent that we're

10:25:16 12  talking about; true?

10:25:17 13  A.      According to the claim construction, it is not

10:25:21 14  included.

10:25:22 15  Q.      All right.  Now, Dr. Meier, you showed the jury the

10:25:28 16  slide with the grant application -- which is PDX-25, Mr.

10:25:32 17  Sayres.  And I noticed you did mention that there are three

10:25:39 18  footnotes here, or endnotes, I don't know if they're -- I

10:25:43 19  think they're endnotes.

10:25:44 20  A.      We call it references, but anyway.

10:25:47 21  Q.      Okay.

10:25:47 22  A.      Endnotes is also okay.  I understand what you mean.

10:25:51 23  Q.      I'm on the clock so I'll just say it's got references

10:25:53 24  9, 10, and 11.  True?

10:25:56 25  A.      That is correct.

10:25:57 1   Q.      And you showed the jury the reference for 9; correct?

10:26:01 2   A.      Yes.

10:26:01 3   Q.      Now, you didn't highlight references 10 and 11; true?

10:26:04 4   A.      That is correct.

10:26:05 5   Q.      Now, if we got to the grant application, which is

10:26:09 6   PX-764 at page 38, we can see those other references, what

10:26:13 7   their names are.

10:26:15 8           Can you bridge up the page, Mr. Sayres?  I think

10:26:19 9   you are going to need to do two pages, unfortunately, 10 and

10:26:23 10  11.  Thank you.  Those two that bridge the page.  And it is

10:26:28 11  continued.  Thank you.

10:26:29 12          Now, let me start with 11.

10:26:32 13          This is the Walker paper.  Do you recall me

10:26:35 14  going through that with Dr. Secrist?

10:26:37 15  A.      Yes, I recall that.

10:26:38 16  Q.      And the paper sort of criticizes the biological data

10:26:44 17  in the Idenix paper.  Do you remember that?

10:26:46 18  A.      Yes, that is true.

10:26:46 19  Q.      And in reference 10, this is a paper we haven't seen

10:26:50 20  before.  This is from Merck.  Do you understand that?  If

10:26:57 21  you look, you see there is Dr. Olsen?

10:27:00 22  A.      (Inaudible.)

10:27:00 23          THE COURT:  Well, hold on.  You can only speak

10:27:02 24  one at a time, but let counsel finish the question.

10:27:05 25          THE WITNESS:  Okay.

BY MR. SINGER:

Q.     Do you see there is Dr. Olsen and Dr. Wolanski?

A.     That is true.

Q.     Now, if you look in your binder, Dr. Meier, you will see we marked this article as DX-482.

A.     Yes, I have it here.

         MR. SINGER:  Defendant moves into evidence DX-482.

         MR. GRIFFITH:  No objection, Your Honor.

         THE COURT:  It's admitted.

         (DX-482 was admitted into evidence.)

BY MR. SINGER:

Q.     If we go, right at the top, right here.  Right here (indicating).  We can see there is a replicon data in this article; is that correct, Dr. Meier?

A.     It says it is inhibitory potency in the replicon assay, yes.

Q.     And that is the 2'-C-methyladenosine compound; correct?

A.     That is correct.

Q.     And the Idenix patent has no replicon data; correct?

A.     That is correct.

Q.     So when Pharmasset was citing articles to the government, they cited one article with replicon data; correct?

10:28:08  1    A.    Yes, obviously.

10:28:08  2    Q.    And then the other two articles -- or, excuse me, the

10:28:11  3    Idenix patent application, No. 9?

10:28:14  4    A.    Yes.

10:28:15  5    Q.    And then the Walker article criticizing the Idenix

10:28:19  6    patent application; true?

10:28:20  7    A.    The first one doesn't criticize the Idenix patent,

10:28:25  8    the Sommadossi and La Colla.  The first one refers to this

10:28:28  9    class of compounds as interesting, and potent anti-HCV

10:28:35 10    inhibitors.

10:28:36 11    Q.    I was talking about the Walker article.

10:28:38 12    A.    You have to show me the Walker actually.

10:28:40 13    Q.    We'll move on in the interest of time.

10:28:42 14          Now, finally, Dr. Meier, I couldn't tell from

10:28:47 15    your testimony.  Do you agree that the field of nucleoside

10:28:51 16    chemistry was challenging in 2000-2001 or not?

10:28:56 17    A.    What do you understand by "challenging?"

10:28:58 18    Q.    Do you believe it was routine experimentation to make

10:29:01 19    nucleosides?

10:29:02 20    A.    A lot of things were routine, yes.

10:29:04 21    Q.    Now, one of the things a nucleoside chemist would

10:29:09 22    want to make, and I think you described this in 2000-2001,

10:29:13 23    to study how they behave is this nucleoside tri -- (clearing

10:29:16 24    throat) triphosphate; true?  A nucleoside triphosphate;

10:29:16 25    true?

10:29:22 1    A.      If you can repeat, please, the complete question?

10:29:25 2    Maybe I didn't.

10:29:26 3    Q.      Sorry I got, my throat got a little try.  One of the

10:29:30 4    things a nucleoside chemist would want to make to study a

10:29:15 5    nucleoside is a nucleoside triphosphate?

10:29:37 6    A.      That's correct.

10:29:38 7    Q.      You talked about those on your direct because that

10:29:40 8    polymerase assay, to work, requires the nucleoside

10:29:46 9    triphosphate?

10:29:46 10   A.      That is correct.

10:29:47 11   Q.      And the nucleoside itself won't work in that assay;

10:29:50 12   true?

10:29:50 13   A.      Yes, that is true.

10:29:52 14   Q.      And I think, we don't have to look at it but I think

10:29:55 15   the triphosphates are covered by claim 1 which describes

10:29:58 16   phosphates thereof; right?

10:30:00 17   A.      Yeah, that is true.

10:30:01 18   Q.      And phosphates, the triphosphates play an essential

10:30:05 19   role in biological systems; true?

10:30:07 20   A.      In connection with polymerases, yes.  And also in

10:30:12 21   energy.

10:30:12 22   Q.      And just so our jurors understand, the triphosphate,

10:30:17 23   that is ultimately the active compound that would cure HCV

10:30:22 24   in the body, the nucleoside might be converted to the

10:30:25 25   triphosphate in the liver and then would treat the virus;

10:30:28 1  true?

10:30:29 2  A.      Yes.  By blocking the replication cited, yes.

10:30:32 3  Q.      It will kill the virus hopefully but not kill the

10:30:35 4  patient?

10:30:36 5  A.      Hopefully, yes.

10:30:37 6  Q.      Now, and you know that making these triphosphate

10:30:40 7  compounds is not, was not routine experimentation in

10:30:44 8  2000-2001; isn't that true, Dr. Meier?

10:30:46 9  A.      There were a lot of methods known and even at that

10:30:50 10 time how to make nucleoside triphosphates.

10:30:53 11 Q.      Well, let me ask this.  Do you agree there are many

10:30:56 12 challenges in the chemical synthesis of nucleoside

10:30:59 13 triphosphates even today?

10:31:01 14 A.      No, I don't think so.

10:31:06 15 Q.      Okay.  If you could look in your binder, Dr. Meier.

10:31:11 16 There is a document tabbed DX-2853.  And let me know when

10:31:16 17 you get there.

10:31:19 18 A.      Yes.

10:31:19 19 Q.      And is that a book chapter that you wrote, Chemical

10:31:22 20 Synthesis of Nucleoside Triphosphates?

10:31:25 21 A.      I contributed to that monograph, yes.

10:31:28 22 Q.      And it is authored by a Lina Weinschenk and Chris

10:31:33 23 Meier; correct?

10:31:33 24 A.      Yes.

10:31:34 25 Q.      And I bought the book.  That is how I got the

10:31:36 1  chapter.  And this book was published in 2013?

10:31:39 2  A.      Yes, I think so.

10:31:41 3          MR. SINGER:  Defendant moves in the admission of

10:31:43 4  DX-2853.

10:31:45 5          THE COURT:  Is there any objection.

10:31:47 6          MR. GRIFFITH:  No objection, Your Honor.

10:31:48 7          THE COURT:  It's admitted.

10:31:48 8          (DX-2853 was admitted into evidence.)

10:31:50 9          MR. SINGER:  And if we could put that up on the

10:31:52 10 screen.

10:31:54 11         If you would, if we could go to page 209 which

10:31:57 12 is the second page.

10:31:57 13 BY MR. SINGER:

10:32:00 14 Q.      In the first full paragraph, and there the jury can

10:32:01 15 see your name, Chris Meier, it says:  Modified NTPs have

10:32:11 16 important diagnostics applications; the corresponding

10:32:14 17 nucleoside analogs are used clinically, for example, in

10:32:17 18 antiviral therapy.  There, triphosphates is the ultimate

10:32:21 19 active form that acts as a chain termination agent.  Thus,

10:32:26 20 syntheses of these nucleoside triphosphates are needed for

10:32:32 21 biochemical and pharmacological studies.

10:32:35 22         That is what you wrote?

10:32:36 23 A.      Yes.

10:32:36 24 Q.      And then you go on to say, in the next paragraph, and

10:32:39 25 this is 2013, which is over a decade after the patent in

10:32:44 1    suit:  There are many challenges in the chemical synthesis

10:32:47 2    of NTPs:  (1), demanding reaction conditions, (2),

10:32:52 3    sensitivity of reactions against water, (3) lability of the

10:32:57 4    target molecules toward hydrolysis and (4), problematic

10:33:02 5    isolation and purification.

10:33:04 6            And that is what you wrote in 2013, is that

10:33:06 7    correct?

10:33:07 8    A.    Yes.

10:33:07 9    Q.    And if you go on, there is a conclusion.  If we go to

10:33:11 10   the concluding remarks in the monograph, as you called it,

10:33:14 11   which is at page 224, Dr. Meier, if you want to follow long

10:33:18 12   with me, which should be page -- next page -- thank you --

10:33:25 13   if you could, Mr. Sayres.

10:33:28 14           And you have some concluding remarks and you

10:33:30 15   talk about the history of triphosphates, how they were

10:33:33 16   discovered, and then you say:  Just in the last decade --

10:33:37 17   after the patents in suit is just for timing wise -- many

10:33:41 18   new approaches in this field were published.  Some of the

10:33:44 19   procedures have short reaction times, are easy to handle

10:33:48 20   and give satisfying yields for some nucleosides, but there

10:33:51 21   is no universal method for all of them.

10:33:54 22           Is that what you wrote?

10:33:55 23   A.    Obviously.

10:34:09 24   Q.    And then you said, that is, of course, a problem for

10:34:12 25   biochemical and medicinal use, where a fast and

10:34:15 1  non-complicated access to the triphosphate is required.

10:34:21 2          Now, that was in your concluding section in

10:34:23 3  this paragraph from your chapter from 2013; is that correct?

10:34:27 4  A.      It is.

10:34:27 5  Q.      And that's the field in this case, isn't it, Dr.

10:34:30 6  Meier?  Medicinal use of these nucleoside triphosphate;

10:34:34 7  true?

10:34:35 8  A.      Medicinal use.  So let me comment on that.

10:34:40 9  Q.      Dr. Meier, I'm on the clock.  My question was --

10:34:43 10         MR. KINTON:  Could the witness please complete

10:34:46 11 his answer?

10:34:46 12         THE COURT:  Let's allow the witness to answer

10:34:48 13 the question.

10:34:48 14         MR. SINGER:  Fair enough.

10:34:50 15         THE WITNESS:  So even in 2000, you need the

10:34:52 16 triphosphate to study the activity of the triphosphate in

10:34:56 17 order to block or inhibit the polymerase.  There were -- at

10:35:01 18 that time there were a lot of methods known that are maybe

10:35:04 19 not usable for all the nucleoside analogs that were present,

10:35:08 20 but there were several methods that could be used to make

10:35:12 21 triphosphate, and there were a lot of publications around

10:35:15 22 that described that, and we heard during this trial here

10:35:20 23 that Isis and Merck were able to make a lot of triphosphate

10:35:26 24 at that time.

10:35:27 25         So chemistry is always developing.  So

10:35:31 1    chemistry, of course, you can improve methods, and in the

10:35:36 2    last ten years even my group, we published on new synthesis

10:35:41 3    of triphosphate that are really working well now, and this

10:35:46 4    is -- this now in the broader sense is applicable to make

10:35:51 5    triphosphate.

10:35:52 6              And the medical use, this is a little bit

10:35:54 7    different.  Medical use means that you start with a

10:35:57 8    nucleoside.  You give it to patient and the cell synthesizes

10:36:02 9    the triphosphate.  It's not chemically made.  It's the cell

10:36:07 10   that's phosphorylated from the nucleoside to the mono to the

10:36:12 11   di to the triphosphate, and that is needed for application

10:36:15 12   of this compound in the medical sense.

10:36:17 13             If you study it in biochemistry, you have to

10:36:21 14   chemically make it.  And that's all what I would like to

10:36:23 15   add.

10:36:24 16   Q.    All I was asking was whether the field that we're

10:36:27 17   talking about in this case is medicinal use of nucleoside

10:36:30 18   triphosphate.  That is what we're talking about in this

10:36:33 19   case?

10:36:33 20   A.    I made the differentiation between using it as a drug

10:36:36 21   or using it in biochemical assay.

10:36:40 22             MR. SINGER:  I have no further questions, your

10:36:41 23   Honor.

10:36:41 24             THE COURT:  All right.  Redirect?

10:36:42 25             MR. KINTON:  Your Honor, I have no questions.

10:36:45  1          THE COURT:  All right, Doctor.  You may step

10:36:46  2   down.  Thank you.

10:36:47  3               (Witness excused.)

10:36:50  4          THE COURT:  What is going to be next?

10:36:56  5          MR. PARKER:  Your Honor, good morning.  Our next

10:37:02  6   witness is by deposition.  It's Professor Gilles Gosselin.

10:37:06  7          THE COURT:  All right.  Roughly how long is

10:37:08  8   that?

10:37:08  9          MS. PARKER:  About 40 minutes.

10:37:09 10          THE COURT:  Video?

10:37:10 11          MS. PARKER:  Yes, your Honor.

10:37:11 12          THE COURT:  All right.  I think we'll give the

10:37:13 13   jury a break before we do that.  No talking about the case.

10:37:16 14   We'll meet you back here shortly.

10:37:18 15               (The jury was excused for a short recess.)

10:37:42 16          THE COURT:  All right.  We'll be in recess.

10:37:44 17               (Short recess taken.)

10:54:27 18          THE COURT:  Let's bring the jury in.

10:54:28 19               (The jury entered the courtroom.)

10:55:56 20          THE COURT:  All right.  I think we are ready for

10:55:58 21   the deposition.

10:55:59 22          Ms. Parker?

10:56:00 23          MS. PARKER:  Your Honor, I believe I need at

10:56:02 24   this point to read the exhibits in that go with it, if I

10:56:04 25   may.

10:56:04  1          THE COURT:  You may.

10:56:05  2          MS. PARKER:  It's Plaintiffs' Exhibit 274, 303,

10:56:10  3   307, 330, 338, 346, 366, 369, 397, 421, 430, 446, 1022, and

10:56:28  4   2263.

10:56:29  5          And then, your Honor, the date of the deposition

10:56:31  6   was about a month ago on November 18th of 2016, and it took

10:56:36  7   place in French.

10:56:37  8          THE COURT:  Okay.

10:56:38  9          MS. PARKER:  Thank you.

10:56:38 10          THE COURT:  Thank you.

10:56:40 11          On the exhibits, any objection?

10:56:41 12          MR. HEADLEY:  No objection, your Honor.

10:56:43 13          THE COURT:  Okay.  Those are all admitted.

10:56:45 14   (PX-274, 303, 307, 330, 338, 346, 366, 369, 397, 421, 430,

10:56:23 15   446, 1022, and 2263 were admitted into evidence.)

10:56:45 16          MR. HEADLEY:  And we move DX-2841 with respect

10:56:49 17   to this deposition.

10:56:49 18          THE COURT:  All right.  Any objection to that?

10:56:51 19          MS. PARKER:  No, your Honor.

10:56:52 20          THE COURT:  All right.  That one is admitted as

10:56:53 21   well.

10:56:54 22          (DX-2841 was admitted into evidence.)

10:56:54 23          MR. HEADLEY:  And the deposition was taken in

10:56:56 24   New York, your Honor.

10:56:58 25          MS. PARKER:  It's in French.  There's a

10:57:01 1    translator.

10:57:02 2              THE COURT:  It's in French, but it occurred in

10:57:04 3    New York.

10:57:05 4              MR. HEADLEY:  Yes, your Honor.

10:57:06 5              THE COURT:  Thank you for that.  We'll turn the

10:57:08 6    lights down.  And you may proceed.

10:57:14 7              (The videotaped deposition of Gilles Gosselin

10:57:11 8    was played as follows.)

10:57:13 9              "Question:  Is nucleoside chemistry particularly

10:57:26 10   hard?

10:57:26 11             "Answer:  Yes.  Yes.

10:57:28 12             "Question:  Dr. Gosselin, Exhibit 3, this is the

10:57:31 13   Merck article by Dr. Walton that you were thinking about

10:57:34 14   before; correct?

10:57:35 15             "Answer:  Yes.  I did make a mistake.  This is

10:57:37 16   it.

10:57:45 17             "Question:  If I compare formula one of the

10:57:49 18   circled diagram that you have in Exhibit 3 with NM80, which

10:57:54 19   is shown on paragraph 41 of your declaration, which is

10:57:57 20   Exhibit 1, those are the same thing.  Right?

10:57:59 21             "Answer:  Yes.  That's the same compound.

10:58:01 22             "Question:  If I want to be precise when I look

10:58:03 23   at these compounds that are in your declaration, I would say

10:58:06 24   they are 2'-methyl up OH-down.  Correct?

10:58:10 25             "Answer:  For the compound described in my

10:58:12  1    declaration, yes.

10:58:13  2            "Question:  And in your declaration, you say

10:58:15  3    this work was done at your direction.  Correct?

10:58:18  4            "Answer:  Exactly.

10:58:18  5            "Question:  So did Dr. Sommadossi direct any of

10:58:23  6    this work?

10:58:24  7            "Answer:  No, not in this part of -- not for

10:58:28  8    this part.

10:58:28  9            "Question:  You need to screen the compound

10:58:31 10    before you can tell if it's active; right?

10:58:31 11            "Answer:  Yes.

10:59:33 12            "Question:  Good afternoon, Professor Gosselin.

10:59:37 13            "Answer:  Thank you.

10:59:38 14            "Question:  Would you please introduce yourself

10:59:40 15    for us?

10:59:41 16            "Answer:  Yes.  My name is Gilles Gosselin.  I

10:59:48 17    am 67 years old.  I retired one-and-a-half years ago, and

10:59:51 18    before that I was a research director for the CNRS at the

10:59:57 19    University of Montpellier in the South of France.

11:00:02 20            "Question:  What is your native language?

11:00:03 21            "Answer.  French.

11:00:12 22            "Question:  What is your understanding of the

11:00:14 23    topic of your testimony today?

11:00:16 24            "Answer:  Yes.  I am doing a deposition, and we

11:00:18 25    are discussing about the cooperative laboratory, and

11:00:21 1  regarding hepatitis C, the work we were doing from August

11:00:24 2  2000 until May 2001.

11:00:26 3           "Question:  And what was your role at that work?

11:00:29 4           "Answer:  As the director of the Cooperative

11:00:32 5  Laboratory, I was supervising the totality of the research

11:00:34 6  that was performed in that lab.

11:00:36 7           "Question:  Can you tell us what the Cooperative

11:00:39 8  Lab was?

11:00:40 9           "Answer:  Yes.  It was a laboratory with three

11:00:42 10 parties.  One of it was business related with Idenix and

11:00:47 11 Novirio.  There were two academic parts.  One was CNRS and

11:00:56 12 the University of Montpellier.

11:00:58 13          "Question:  You mentioned you were supervising

11:01:04 14 the totality of the research that was performed in the

11:01:06 15 Cooperative Lab.  Who was conducting that research?

11:01:09 16          "Answer:  Who was conducting?

11:01:10 17          "Question:  Yes.

11:01:11 18          "Answer:  Well, I was making propositions and I

11:01:15 19 was supervising.

11:01:16 20          "Question:  And who were you supervising?

11:01:19 21          "Answer:  Some Ph.D.s, some technicians, and one

11:01:22 22 Ph.D. student.

11:01:24 23          "Question:  Can you describe, at a high level,

11:01:27 24 what the Ph.D. chemists, chemistry technicians and the Ph.D.

11:01:40 25 students were working on in the Cooperative Lab between

11:01:46 1    August 2000 and May 2001?

11:01:49 2              "Answer:  All these people were working on HCV.

11:01:51 3              "Question:  And why were they working on HCV?

11:01:54 4              "Answer:  Because I had requested them.

11:01:55 5              "Question:  And why did you request them to do

11:01:58 6    work on HCV?

11:02:00 7              "Answer:  Because Jean-Pierre Sommadossi

11:02:05 8    had asked me to make them work on this series of compounds.

11:02:08 9              "Question:  And what series of compounds was

11:02:10 10   that?

11:02:11 11             "Answer:  2'-methyl branched ribonucleosides.

11:02:17 12             "Question:  During that time from August 2000 to

11:02:20 13   May 2001, did the Ph.D. chemists, their chemistry

11:02:23 14   technicians and the Ph.D. student keep records of the work

11:02:27 15   that they did?

11:02:28 16             "Answer:  Yes.  That was a rule.  Any Ph.D.

11:02:30 17   worker or chemist worker in the lab had, as a duty, to write

11:02:35 18   a lab notebook describing the work that they were planning

11:03:47 19   to do, doing or were going to do.

11:06:03 20             "Question:  As director of the Cooperative Lab,

11:06:06 21   did you have opportunity to review the lab notebooks and

11:06:09 22   reports between August 2000 and May 2001?

11:06:14 23             "Answer:  Very little regarding the lab

11:06:15 24   notebooks, but for the reports, yes.

11:06:17 25             "Question:  When did you look at the lab

11:06:18 1  notebooks between August 2000 and 2001?  Can you describe

11:06:23 2  that for us?

11:06:24 3          "Answer:  Rarely.  We did that rarely, but we

11:06:26 4  did when there were discussions regarding the reactions and

11:06:29 5  when they had finished filling their notebook and it had to

11:06:33 6  be sent to Cambridge.

11:06:35 7          "Question:  Do you know how the notebooks

11:06:38 8  related to the work conducted by the Ph.D. chemists, their

11:06:43 9  chemistry technicians and the Ph.D. student between August

11:06:46 10 2000 and May 2001 were maintained?

11:06:49 11         "Answer:  As long as the notebooks were not

11:06:51 12 completely full, we would keep them in a safe deposit box.

11:06:55 13 And once they were finished, then we would send a copy to

11:06:58 14 Cambridge.

11:06:59 15         "Question:  You mentioned work on 2'-methyl

11:07:03 16 branched ribonucleosides.  Do you know what happened to the

11:07:13 17 2' branched ribonucleosides after they were made in the

11:07:18 18 Cooperative Lab?

11:07:20 19         "Answer:  Once those components were finalized

11:07:27 20 and -- finalized and characterized, the Ph.D.s would send

11:07:31 21 two samples, and one batch would go to Paolo La Colla at

11:07:40 22 Cagliari.  The other ones, AV activities, anticellular,

11:07:48 23 anticellular culture experiments and a BVDV test would be

11:07:55 24 mimic and surrogate would be sent to --

11:07:59 25         "THE INTERPRETER:  Sorry.  Could you repeat?

11:08:26 1    **"Answer:  Once the compound was finished,**

11:08:28 2    **then the Ph.D. would have two samples from the same batch,**

11:08:33 3    **and one would be sent to Cagliari, to Mr. La Colla for**

11:08:38 4    **assessments and for the CVR cultures, including BVDV as a**

11:08:45 5    **mimic of HCV.**

11:08:50 6    **"The other sample I would send to Cambridge to**

11:08:52 7    **increment the compounds and to complement the library and --**

11:09:00 8    **so they would be in a safe place to use for additional**

11:09:03 9    **experiments.**

11:09:05 10   **"Question:  Professor Gosselin, I am going to**

11:09:07 11   **hand you a series of documents.**

11:09:13 12   **"Professor Gosselin, I have handed you a series**

11:09:24 13   **of documents marked as PX-274, PX-303, PX-307, PX-330,**

11:09:33 14   **PX-338, PX-346, PX-366, PX-369, PX-397, PX-421, PX-430,**

11:09:45 15   **PX-446 and PX-1022.**

11:09:47 16   **"My simple question to you is:  Do you recognize**

11:09:50 17   **those documents?  Can you take a look at them really quick**

11:09:53 18   **to determine whether you recognize them or not.**

11:09:57 19   **"(So marked for identification as Plaintiffs'**

11:10:00 20   **Deposition Exhibit PX-274 as of this date.)**

11:10:04 21   **"(So marked for identification as Plaintiffs'**

11:10:08 22   **Deposition Exhibit PX-303 as of this date.)**

11:10:21 23   **"(So marked for identification as Plaintiffs'**

11:10:24 24   **Deposition Exhibit PX-307 as of this date.)**

11:10:28 25   **"(So marked for identification as Plaintiffs'**

11:10:31 1    Deposition Exhibit PX-330 as of this date.)

11:10:34 2              "(So marked for identification as Plaintiffs'

11:10:37 3    Deposition Exhibit PX-338 as of this date.)

11:10:40 4              "(So marked for identification as Plaintiffs'

11:10:43 5    Deposition Exhibit PX-346 as of this date.)

11:10:47 6              "(So marked for identification as Plaintiffs'

11:10:50 7    Deposition Exhibit PX-366 as of this date.)

11:10:54 8              "(So marked for identification as Plaintiffs'

11:10:56 9    Deposition Exhibit PX-369 as of this date.)

11:11:00 10             "(So marked for identification as Plaintiffs'

11:11:03 11   Deposition Exhibit PX-397 as of this date.)

11:11:06 12             "(So marked for identification as Plaintiffs'

11:11:08 13   Deposition Exhibit PX-421 as of this date.)

11:11:11 14             "(So marked for identification as Plaintiffs'

11:11:13 15   Deposition Exhibit PX-430 as of this date.)

11:11:16 16             "(So marked for identification as Plaintiffs'

11:11:19 17   Deposition Exhibit PX-446 as of this date.)

11:11:23 18             "(So marked for identification as Plaintiffs'

11:11:25 19   Deposition Exhibit PX-1022 as of this date.)

11:11:34 20             "Answer:  Absolutely.  These are the lab

11:11:36 21   notebooks.  The first one is from Samira Benzaria.  The

11:11:44 22   other one is from Jerome Peyronnet, notebook number three.

11:11:49 23   Should I look at them?

11:11:51 24             "Question:  Please.  Just for the purpose of

11:12:11 25   whether you recognize them.

11:12:19 1          "Answer:  Agnes Amador.  I think it is notebook

11:12:26 2     number 1, I believe -- no.  Number 2.

11:12:31 3          "Claire Pierra, P-i-e-r-r-a.

11:12:54 4          "Tony Bouisset.

11:13:02 5          "Dorothee Bardiot, the student.

11:13:10 6          "Abdesslem Faraj.

11:13:17 7          "Samira Benzaria, notebook 2.

11:13:25 8          "The first one was number 1.

11:13:29 9          Jerome Peyronnet, his number 4 notebook.

11:13:36 10          Aurore Gelin, notebook 1.

11:13:43 11          Claire Pierra, number 4.

11:13:51 12          Tony Bouisset, number 2.

11:13:58 13          And the last one is David Dukhan, notebook 3.

11:14:08 14          "Question:  Thank you.  You can set those aside.

11:14:10 15          "Are you generally familiar with the content of

11:14:12 16     those notebooks?

11:14:14 17          "Answer:  Well, yes.

11:14:15 18          "Question:  How are you familiar with the

11:14:17 19     contents of those notebooks?

11:14:19 20          "Answer:  Well, as I explained, I reviewed them

11:14:21 21     while they were not completely finished.  And then I had to

11:14:24 22     send them to Cambridge, so I had to prepare my declaration

11:14:27 23     and review them.  And that is how I did.

11:14:29 24          "Question:  At a high level, what is your

11:14:31 25     understanding of what those notebooks contain?

"Answer:  It was all the research that I had
requested from the Ph.D. and the technicians.  It is a
report of -- a daily report of what was being done.

"Question:  And you mentioned earlier there was
a policy with regard to recording information in the
notebooks.  What was your understanding of what that policy
was?

"Answer:  So the policy was to give a maximum of
detail and not to leave a blank page and to take -- once it
was done, to put a line to show that it was at the end, to
show that it was over.  And then to take a person as a
witness.  And there were two people signing.  There was the
writer, and whether it was a researcher or technician, and
then a witness to confirm that it had been written by that
person.

"Question:  Professor Gosselin, I will hand you
what has been marked PX-2263.

(So marked for identification as Plaintiffs'
Deposition Exhibit PX 2263 at of this date.)

"Question:  Do you recognize PX-2263?

"Answer:  Yes, I have.

"Question:  Did you -- what is it?

"Answer:  It is a summary, including some
tables, of what I had reported in my declaration, and it is
under more condensed form, with comments.  And it is in

11:15:58  1   order to clarify what I had said in my declaration.

11:16:01  2          "Question:  What is it a summary of?

11:16:03  3          "Answer:  Well, what I had written in my

11:16:05  4   declaration, and that included what was in the notebooks.

11:16:08  5          "Question:  Did you help create PX-2263?

11:16:11  6          "Answer:  Yes.  Not only did I read it, but I

11:16:21  7   also added some comments in the last column.

11:16:24  8          "Question:  Can you describe -- what I would

11:16:26  9   like to do now is walk you through what the columns are on

11:16:32 10   the exhibit.  The first part of the exhibit shows a table of

11:16:35 11   six columns.  The first column says, 'date.'

11:16:42 12          "What is reflected in the date column?

11:16:45 13          "Answer:  The date in the first column

11:16:47 14   corresponds to the date that was written in the notebook

11:16:50 15   regarding the reaction, because in the notebooks it was

11:16:54 16   necessary absolutely to put the date.

11:16:57 17          "Question:  Professor Gosselin, the next column

11:17:00 18   is headed 'NB.'  What does that mean?

11:17:04 19          "Answer:  Well, each code corresponded to each

11:17:06 20   person.  For example, if you look at SB, it is for Samira

11:17:14 21   Benzaria.  And SB 1 means Samira Benzaria notebook number 1.

11:17:28 22   It correspond to the first page with the details of -- and

11:17:33 23   if you want to, that is in the first page for Samira

11:17:16 24   Benzaria.  If you want to know the details about the codes,

11:17:45 25   you can look into page 99 as a recap, where it corresponds

11:17:49 1 to the various people in numbers.

11:17:51 2    "Question:  The third column.  What is contained

11:17:53 3 in the third column?

11:17:55 4    "Answer:  It's the page of the notebook that

11:17:57 5 corresponds to the reactions written on the line.

11:18:00 6    "Question:  Thank you.  The next column is

11:18:03 7 headed 'calendar entry.'  Do you see that?

11:18:10 8    "Answer:  Yes.

11:18:10 9    "Question:  What does that mean?

11:18:14 10    "Answer:  In fact, it is a kind of merge of the

11:18:17 11 two former columns.  It is a summary of the notebook made by

11:18:21 12 the technician or the researcher with a page in order to be

11:18:24 13 able to place it in a calendar for the period that is a

11:18:29 14 frame starting from August 2000, to be able to return to the

11:18:34 15 -- to go back to the declaration by month, by each day, to

11:18:38 16 see what was done on the topic of synthesis of 2' branched

11:18:45 17 ribonucleoside as far as HCV is concerned.

11:18:49 18    "Question:  You said return to the declaration.

11:18:51 19 Did you mean return to the table at the first part of the

11:18:55 20 exhibit?

11:18:55 21    "Answer:  Yes.  From page 89 to page 98.

11:19:00 22    "Question:  The next column in the table at the

11:19:02 23 beginning of the first part of Exhibit PX-2263 is headed

11:19:08 24 'task.'

11:19:10 25    "Do you see that?

11:19:11  1          "Answer:  Yes.

11:19:12  2          "Question:  What does that mean?

11:19:14  3          "Answer:  It is the scheme mark on top of each

11:19:17  4    page during the beginning of the reaction of the work done

11:19:20  5    by Ph.D.s or technicians and for the work that is being done

11:19:25  6    or that has been done.  And it is a cut-and-paste of what

11:19:29  7    is, what corresponds to the page and the notebook number

11:19:34  8    that is in front of me.

11:19:36  9          "Question:  The last column in the first part of

11:19:38 10    PX-2263 is headed, 'comments.'  What does that mean?

11:19:45 11          "Answer:  The last column is what has been done.

11:19:48 12    It corresponds to each line and it is to summarize in the

11:19:51 13    briefest way, in the most succinct way what was done as a

11:19:56 14    matter of work.

11:20:02 15          "Check Interpreter:  'That column corresponds to

11:20:07 16    my own comments,' just in the beginning.

11:20:11 17          "The Interpreter:  Correction by the

11:20:15 18    interpreter.  'That column corresponds to my own comments.'

11:20:19 19    Yes.

11:20:20 20          "Question:  Professor Gosselin, you mentioned a

11:20:24 21    calendar, and pages 88 to 98 appear to have a calendar from

11:20:28 22    August 2000 to May 2001.  What do those pages show?

11:20:33 23          "Answer:  I tried to show the work that was done

11:20:35 24    according to what was requested regarding the 2' branched

11:20:40 25    ribonucleoside, to mention all the things that were in the

11:20:43 1   notebooks and in my declaration.

11:20:46 2         "Question:  Professor Gosselin, what is the

11:20:49 3   source of the information that is contained in PX-2263?

11:20:53 4         "Answer:  The source?  Well, it is the

11:20:55 5   declaration and the notebooks of each researcher and each

11:20:59 6   technician.

11:21:00 7         "Question:  Professor Gosselin, from August 2000

11:21:03 8   through May 23, 2001, what was the focus of the Idenix

11:21:07 9   scientists working for you in the cooperative lab?

11:21:11 10         "Answer:  It was the synthesis of 2'-methyl

11:21:17 11   branch ribonucleoside within the work against the hepatitis C.

11:21:24 12         "Question:  And during that time frame, did the

11:21:26 13   Idenix scientists working for you in the cooperative lab

11:21:37 14   ever stop their efforts in synthesizing 2'-methyl branched

11:21:42 15   ribonucleosides for Idenix's hepatitis C program?

11:21:47 16         "Answer:  No, never.  Quite the opposite.  They

11:21:51 17   really increased their efforts toward that.

11:21:59 18         "Question:  So how would you characterize the

11:22:01 19   efforts of the Idenix scientists in that project during the

11:22:04 20   time frame of August 2000 to May 23, 2001?

11:22:09 21         "Answer:  Their efforts were intense and

11:22:11 22   continuous until they succeeded in conducting the synthesis.

11:22:16 23         "Question:  Thank you, Professor Gosselin.

11:22:19 24         "I have no further questions at this time.

11:22:21 25         (Designations end.)

11:34:00 1      THE COURT:  That's it.  All right.  We'll turn

11:34:02 2  the lights back on.  And you may call your next witness.

11:34:07 3      MS. PARKER:  Thank you, your Honor.  Our next

11:34:09 4  witness is Dr. Raffaele De Francesco, who is from Milan,

11:34:14 5  Italy.  He's a virologist.  He's one of the world's leading

11:34:17 6  experts in hepatitis C and he's here in the courtroom.

11:34:20 7      THE COURT:  All right.  He may come forward.

11:34:36 8      RAFFAELE DE FRANCESCO, having been duly

11:34:52 9  sworn as a witness, was examined and testified as follows.

11:35:03 10      THE COURT:  Good morning, Dr. De Francesco.

11:35:05 11  Welcome.

11:35:07 12      MR. McCRUM:  Your Honor, good morning.  May I

11:35:10 13  approach to hand out some notebooks?

11:35:13 14      THE COURT:  Yes.

11:35:15 15      (Mr. McCrum handed notebooks to the Court and to

11:35:22 16  the witness.)

11:35:30 17              DIRECT EXAMINATION

11:35:48 18  BY MR. McCRUM:

11:35:49 19  Q.      Good morning, ladies and gentlemen of the jury.  Good

11:35:51 20  morning, Dr. De Francesco.

11:35:53 21      Could you please introduce yourself to the jury

11:35:56 22  and tell us where you are from.

11:35:58 23  A.      Yes.  My name is Raffaele De Francesco, and I am from

11:36:02 24  Italy, Milan, where I work and live.

11:36:05 25  Q.      And what are you here to talk about today, Dr.

11:36:08 1    De Francesco?

11:36:08 2    A.    I'm here to talk about my opinions concerning the

11:36:14 3    validity of the '597 Idenix patent.

11:36:17 4    Q.    Before we get into those opinions, Dr. De Francesco,

11:36:22 5    I'd like to talk a little bit about your background.

11:36:25 6          Can you tell us what you do for a living?

11:36:27 7    A.    Yes.  I am a virologist and I work at the National

11:36:33 8    Institute For Molecular Genetics in Milan, Italy.

11:36:35 9    Q.    And what do you do as a virologist?

11:36:38 10   A.    Well, as a virologist I obviously do research on

11:36:42 11   viruses, and that -- there are three primary components in

11:36:48 12   it, but we have already heard about this trial.

11:36:50 13         But to summarize, we studied how viruses,

11:36:54 14   in fact, multiply in cells in human cells.  We studied how

11:37:01 15   that infection causes disease to human cells, human body.

11:37:05 16   And we also, we are interested in finding strategies to

11:37:09 17   actually fight that infection, to stop viral replication and

11:37:15 18   multiplication in order to stop the disease from

11:37:17 19   progressing.

11:37:18 20   Q.    And have you focused on any particular virus in your

11:37:21 21   research?

11:37:22 22   A.    Yes.  In the course of my career, as a virologist, I

11:37:29 23   published on hepatitis C and related viruses.

11:37:34 24   Q.    And how long have you been working, doing work

11:37:38 25   relating to the hepatitis C virus?

11:37:40 1  A.     I've been working on the hepatitis C virus and

11:37:44 2  related viruses since 1991, so that's about 25 years.

11:37:47 3  Q.     And how did you get interested in work relating to

11:37:51 4  hepatitis C?

11:37:52 5  A.     Well, at that time as I mentioned, 1991, I was

11:37:57 6  joining a drug discovery research institute, and shortly

11:38:02 7  before that time, in the late eighties, actually, I think

11:38:07 8  '89, sorry, 1989, sorry, the HCV virus was absolutely

11:38:16 9  isolated and discovered.

11:38:17 10          And at that time it was known -- at that

11:38:19 11  time the virus was known as a known A, known B, and it was

11:38:23 12  known actually to code viral hepatitis, chronic viral

11:38:26 13  hepatitis, chronic disease in very many patients.  So we

11:38:31 14  knew at the time that that virus was covered by -- very few

11:38:38 15  medical needs.  So there was a very strong medical need to

11:38:41 16  find strategies to actually stop that infection.  And

11:38:46 17  because of my background in biology and enzymology I will

11:38:51 18  discuss later, I decided that, you know, I could actually

11:38:54 19  start working with a mission of finding new antivirals, so

11:39:00 20  new strategies to fight infection.

11:39:02 21  Q.     And can you tell the jury about your educational

11:39:06 22  background?

11:39:07 23  A.     Yes.  My scientific education started very early

11:39:12 24  because in Italy, like I also heard is the case in the U.K.,

11:39:15 25  we start specializing very early.  So I went to what we call

11:39:21 1 high school and I went for many years university studies at

11:39:26 2 the University of Milan and I got my doctoral degree in

11:39:29 3 biology from the University of Milan, focusing on the

11:39:37 4 characterization of bacterial enzymes.

11:39:38 5 Q.     Okay.  And did you do any post-doctoral work?

11:39:43 6 A.     Yes.  I did first post-doctoral fellowship in a plant

11:39:51 7 at Georgia.  I was there for three years and I kept working

11:39:54 8 at the time on bacterial enzymes, so as an enzymologist.

11:40:00 9         After that I moved back to Europe.  I went to

11:40:03 10 the EMBL, that's European Molecular Biology Laboratory, very

11:40:10 11 prestigious.  Our laboratory in Heidelberg, Germany, and

11:40:14 12 there I started to develop an interest in the biology of the

11:40:17 13 liver and, you know, to try a mechanism of how the cells

11:40:24 14 became liver cells and how the organ was developed in the

11:40:28 15 human body.

11:40:29 16 Q.     And what did you do after completion of your

11:40:32 17 post-doctoral studies?

11:40:33 18 A.     After that, I think I mentioned this already.  I

11:40:38 19 moved to a newly born drug discovery dispute and that was

11:40:44 20 back in Italy.  I moved to Rome, and the name of the

11:40:48 21 institute was Institute of Research in Molecular Biology.

11:40:54 22 And there I, shortly after I joined the institute, I started

11:40:59 23 working on the hepatitis C virus with the mission, with the

11:41:06 24 ultimate mission of discoveries of a new antiviral drug.

11:41:10 25         So my work was focusing primarily -- the

11:41:13  1   virus that had been discovered, so nothing much is known

11:41:17  2   about it.  So my work was really -- would really be related

11:41:22  3   to identification of potential targets for the development

11:41:24  4   of new drugs, and, you know, so that would be a large part

11:41:29  5   of the work, especially in the early years.  And then once

11:41:32  6   we identified the target to develop assays that we could use

11:41:36  7   in the laboratory to screen many compounds, looking for

11:41:39  8   inhibitors.

11:41:41  9           Most of these targets are enzymes.  In fact,

11:41:44 10   what I referred to when I said my background was in

11:41:47 11   enzymology, so I thought that was a nice treat.

11:41:50 12           And so eventually we ended up discovering

11:41:52 13   targets, making assays with these targets to go through many

11:41:56 14   compounds, and then as a chemist, we optimized those

11:42:02 15   compounds and eventually took some of them to trial.

11:42:04 16   Q.      Have you published any papers on hepatitis C?

11:42:08 17   A.      Yes.  I published many papers.  I think I published

11:42:14 18   throughout my career about 140 papers overall, and more than

11:42:18 19   100 of those are, in fact, on hepatitis C.

11:42:21 20   Q.      And did you create a demonstrative summarizing some

11:42:24 21   of your publications?

11:42:25 22   A.      Yes.

11:42:26 23           MR. McCRUM:  Can I please have the first PDX.

11:42:29 24   BY MR. McCRUM:

11:42:29 25   Q.      Can you describe, Dr. De Francesco, what is shown

11:42:32 1    **here?**

11:42:32 2    **A.    Yes.  This is a lead.  Can I use my pointer?**

11:42:37 3    **Q.    Sure.**

11:42:37 4    **A.    So as -- the title of the paragraph says there, these**

11:42:40 5    **are papers.  I'm senior author.  Senior author means I'm the**

11:42:51 6    **principal author on these paper.  That's dialogue with the**

11:42:56 7    **journal in order to get the paper excited and published.**

11:43:00 8    **So this is at least ten of my moat cited senior**

11:43:06 9    **author papers.  The first of the leads is actually a paper**

11:43:09 10    **where we reported for the first time on the discovery of an**

11:43:13 11    **HCV polymerase and the polymerase assay that we learned a**

11:43:17 12    **lot about.  That paper received by the time when I made this**

11:43:22 13    **life about 762 citations.  Now it's about 800.  I just**

11:43:27 14    **checked this morning.**

11:43:27 15    **Q.    And just on these ten articles alone, a rough**

11:43:32 16    **estimate.  How many times have they been cited by others?**

11:43:35 17    **A.    Yes.  In considering all my publications, I received**

11:43:40 18    **around 14,000 citations, and these papers alone account for**

11:43:46 19    **over 3,000.**

11:43:47 20    **Q.    Now, you mentioned the hepatitis C polymerase assay.**

11:43:52 21    **The ladies and gentlemen of the jury have heard a lot about**

11:43:55 22    **that.  But just to be clear, who developed that assay?**

11:43:58 23    **A.    It was me and my group who developed the assay in our**

11:44:01 24    **lab in the early nineties.**

11:44:03 25    **Q.    And if you could just describe generally that work.**

11:44:07 1    A.    Right.  So as I said, when I joined the IRBM

11:44:12 2    laboratories and I started to work on hepatitis C, the goal

11:44:17 3    as actually to identify targets that could be exploited for

11:44:22 4    development of antiviral drugs.  This virus was a very new

11:44:27 5    entity and it was our work task to actually demonstrate that

11:44:32 6    there was a viral, independent RNA polymerase.  That is the

11:44:38 7    full name for that polymerase, and to actually show that it

11:44:41 8    would be possible to measure the activity of these enzymes

11:44:46 9    in vitro, in a test tube in the laboratory, and that's what

11:44:50 10   we did.

11:44:50 11           And thanks to our work, we laid the

11:44:52 12   foundation not only of the two components, the

11:44:55 13   identification of the target.  And second was the

11:44:58 14   development of an assay that could lay the foundation for

11:45:02 15   ways of testing many, many, many compounds in the

11:45:06 16   laboratory.

11:45:06 17   Q.    The jury has also heard about the hepatitis C

11:45:12 18   replicon assay.  Have you ever used that assay?

11:45:16 19   A.    Yes, I have.

11:45:17 20   Q.    And they've also heard about the BVDV assay.  Have

11:45:23 21   you ever used that assay?

11:45:24 22   A.    Yes.  We use both assays in the laboratory.  BVDV in

11:45:30 23   the '97-98, we started using it in '97-98 time frame, and

11:45:36 24   roughly an assay shortly after it was published, so from

11:45:41 25   1999 onward.  And we used it in -- both assays in the lab to

11:45:46  1    screen many hundreds or many thousands of compounds.

11:45:51  2    Q.      Okay.  And we'll talk about some of that a little

11:45:54  3    later, but for now, your Honor, we would offer Dr.

11:45:58  4    De Francesco as an expert in the field of virology as

11:46:00  5    applied to nucleosides for treating hepatitis C.

11:46:05  6              MR. SHEAR:  No objection, your Honor.

11:46:07  7              THE COURT:  All right.  He's so recognized.

11:46:10  8    BY MR. McCRUM:

11:46:10  9    Q.      Dr. De Francesco, did you create a demonstrative

11:46:13 10    summarizing the opinions that you plan to discuss today?

11:46:15 11    A.      Yes.

11:46:16 12              MR. McCRUM:  Could I have PDX-3, please.

11:46:22 13    BY MR. McCRUM:

11:46:23 14    Q.      Can you briefly describe the opinions that you plan

11:46:26 15    to offer today?

11:46:27 16    A.      Yes.  This is a highlight of some of my opinions

11:46:29 17    and these are that undue experimentation would not have

11:46:33 18    been required to practice the asserted claims of the '597

11:46:36 19    patent.  And undue experimentation would not have been

11:46:42 20    required to practice the asserted claims of the '597 patent

11:46:45 21    based on the disclosure of the '585 provisional application

11:46:48 22    filed May 23, 2000.

11:46:54 23    Q.      And did you form these opinions from the perspective

11:46:58 24    of a person of ordinary skill in the art?

11:47:00 25    A.      That is what I did.

11:46:42 1  Q.    Can I have the next demonstrative, please, PDX-5,

11:46:51 2  actually?

11:46:51 3  BY MR. McCRUM:

11:46:54 4  Q.    And can you describe the person of ordinary skill in

11:46:58 5  the art as you applied it?

11:46:59 6  A.    Yes.  Sorry.  This is a bit of a long text, which is

11:47:03 7  copy pasted by my expert report.

11:47:06 8         So a person skilled in the art, as I used that

11:47:11 9  phrase in forming my opinion, refers to person or persons

11:47:15 10  skilled in the field of flaviviridae viruses.  These are all

11:47:21 11  the viruses that are related to hepatitis C.  This person or

11:47:23 12  persons would have a Ph.D. or M.D. or another advanced

11:47:29 13  equivalent degree with years of experience in molecular

11:47:34 14  virology and biology of the flaviviridae.  That include

11:47:40 15  familiarity with viruses, but could be used to evaluate

11:47:44 16  whether a compound has antiviral activity and also some

11:47:49 17  basic understanding of the structure and function of

11:47:51 18  nucleosides that could be used for antiviral therapy or

11:47:54 19  during the process of drug discovery.

11:48:00 20        Another important component is that actually

11:48:02 21  this person would work together in a team with possibly

11:48:09 22  personal of lower skills, we call them laboratory technician,

11:48:13 23  would run the assay in the laboratory, but also with high

11:48:18 24  skills person, including, for example, organic and medicinal

11:48:23 25  chemist.

11:48:24 1    Q.    Overall, how would you describe the degree of skill

11:48:30 2    for your person of ordinary skill in the art?

11:48:35 3    A.    Very --

11:48:35 4    Q.    Is it -- Sorry.  Go ahead.

11:48:36 5    A.    Very, very high skill.  We're talking about very high

11:48:41 6    skill here.

11:48:42 7    Q.    Now, Dr. Seeger, you were here when he testified?

11:48:46 8    A.    Yes.

11:48:46 9    Q.    And he offered a slightly different definition for a

11:48:49 10   person of skill in the art.  Does his definition change any

11:48:52 11   of your opinions?

11:48:53 12   A.    No.  It wasn't overall different but very similar

11:49:00 13   definition.  And that would not change my opinion.

11:49:03 14   Q.    Okay.  We are going to get to your opinions.  I just

11:49:06 15   want to talk about some legal assumptions that you made in

11:49:10 16   rendering your opinions.

11:49:11 17              Can we have the next slide, please?

11:49:18 18              Can you tell us what is shown here?

11:49:20 19   A.    This is a list of the legal principles that I was

11:49:26 20   given and I used in judging an issue of enablement.  And

11:49:32 21   these are:

11:49:32 22              That patents are presumed valid.

11:49:36 23              Patents can be found invalid for lack of

11:49:38 24   enablement only by clear and convincing evidence.

11:49:42 25              As of its filing date, patent must contain a

11:49:47 1    disclosure that enables a person of ordinary skill in the

11:49:50 2    art to make and use the claimed invention without undue

11:49:54 3    experimentation.

11:49:55 4            The patent does not need to enable future

11:49:58 5    improvements or commercially viable embodiments.

11:50:02 6            And, therefore, the patent disclosure does not

11:50:05 7    need to enable FDA approval, which is approval to the

11:50:08 8    market.

11:50:10 9    Q.    All right.  Let's get to your opinions now.

11:50:14 10           Do you understand that pursuant to this

11:50:19 11   Court's claim construction that the claims are limited to

11:50:22 12   ribonucleosides having methyl at the 2' up position?

11:50:25 13   A.    Yes.

11:50:26 14   Q.    And as of May, 2000, were there billions of

11:50:32 15   22'-methyl up ribonucleosides that could treat hepatitis C?

11:50:36 16   A.    No.

11:50:37 17   Q.    And would skilled artisans have known that as of

11:50:40 18   May 2000?

11:50:41 19   A.    Yes, that is what I believe.

11:50:43 20   Q.    All right.  What is your opinion as to whether it

11:50:46 21   would have been undue experimentation as of May 2000 to

11:50:50 22   screen 2'-methyl up compound for activity against hepatitis

11:50:55 23   C in view of the '597 patent disclosure?

11:51:00 24   A.    My opinion is that in view of the '597 patent

11:51:03 25   disclosure, it would not have been undue experimentation

11:51:09 1  for a person of skill in the art to screen 2'-methyl up

11:51:18 2  nucleosides against hepatitis C virus.

11:51:20 3  Q.      And is your opinion the same with respect to the '585

11:51:24 4  provisional application?

11:51:26 5  A.      My opinion would be the same also in light of the

11:51:29 6  '585 provisional application.

11:51:31 7  Q.      Does the '597 patent in that May 2000 provisional

11:51:38 8  application say anything about screening the compound for

11:51:42 9  activity against hepatitis C?

11:51:45 10  A.      Yes, there is mention of screening, and the patent is

11:51:50 11  also pointing to screening assays.

11:51:53 12  Q.      All right.  Let's go to the patent at PX-1525.

11:51:57 13          Dr. De Francesco, if you want to look at it in

11:51:59 14  your binder, it's Tab 2.

11:52:01 15  A.      Okay.  I'll follow it on the screen.

11:52:04 16          MR. McCRUM:  Okay.  Can we get column 13 at

11:52:07 17  lines 43 through 49?

11:52:11 18          THE WITNESS:  No, actually I don't --

11:52:13 19          MR. McCRUM:  We'll blow this up for you.

11:52:16 20          THE WITNESS:  Okay.

11:52:18 21  BY MR. McCRUM:

11:52:18 22  Q.      What does this say in the patent at this column and

11:52:23 23  line number?

11:52:23 24  A.      Well, this paragraph says that the nucleosides of

11:52:27 25  invention may inhibit HCV polymerase activity.  And the

11:52:33 1    nucleosides can be screened for ability to inhibit HCV

11:52:37 2    polymerase activity in vitro according to screening methods

11:52:41 3    that are described in the patent.

11:52:42 4            And one can readily determine the spectrum of

11:52:45 5    activity by evaluating the compound in the assays described

11:52:50 6    in the patent or with confirmatory assays.

11:52:54 7    Q.    And there is a reference in here to "screen."  Can

11:52:57 8    you describe this concept of screening?

11:53:00 9    A.    Yes.  Screening is referring to a methodology that we

11:53:04 10   use in the drug discovery business.  And that refers to

11:53:08 11   actually methodology that you can adopt to actually go

11:53:13 12   through many, many different compounds.  It could be even

11:53:18 13   hundreds of thousands of compounds in a relatively short

11:53:22 14   time.

11:53:23 15           So the concept of the screen is the concept of a

11:53:27 16   filter, so actually filtering out all the known active

11:53:31 17   compound in order to focus on the most interesting compounds

11:53:35 18   which are the active compounds.

11:53:36 19           We use the screening because that is a way you

11:53:41 20   actually cut down the number of compounds, by removing all

11:53:45 21   inactive ones to a few interesting ones.  So screening means

11:53:51 22   being able to go through many compounds simultaneously or

11:53:55 23   almost simultaneously but in a short time, and there is

11:54:00 24   technology to do that, and in order to put all your

11:54:04 25   resources on the active ones essentially.

11:54:07  1          THE COURT:  All right.  Mr. McCrum, I'm going to

11:54:09  2     stop you there.  I'm advised lunch is here.  We're going to

11:54:12  3     given the jury their lunch break.

11:54:13  4          Ladies and gentlemen, I expect this lunch break

11:54:15  5     may take a little longer than normal so figure you have

11:54:19  6     about an hour or so to eat.  Of course, no talking about the

11:54:23  7     case while you are away from us, and we'll see you shortly

11:54:26  8     or in about an hour.

11:54:28  9          (Jury left courtroom.)

11:54:49 10          THE COURT:  Doctor, you may step down.

11:54:51 11          You all can have a seat.  Let me tell you where

11:54:54 12     we are.

11:54:55 13          I think in about the next 15 minutes or so, I

11:55:01 14     will have what I'm going to call a draft final jury

11:55:05 15     instructions.  And we'll send in a few copies for each side,

11:55:09 16     so leave someone in the courtroom please so that we can give

11:55:13 17     you copies of those.

11:55:14 18          We'll then, before I read the instructions to

11:55:17 19     the jury, give both sides a chance to state any new

11:55:20 20     objections you may have; and also if you see something that

11:55:25 21     you believe is both important and pretty clearly wrong in

11:55:29 22     there, you can ask for reconsideration.  We've had to do a

11:55:34 23     lot of work very quickly on a lot of issues, and so I do

11:55:37 24     want to give you that opportunity if you see something in

11:55:41 25     there that you think we should reconsider before we share it

11:55:44  1   with the jury.

11:55:44  2          And in that regard, I would ask that you

11:55:47  3   probably focus first in the limited time I'm going to be

11:55:51  4   able to give you on the invalidity section because that is

11:55:53  5   where we've done the most work and we've had, in my view,

11:55:56  6   the most challenge.

11:55:58  7          I do still intend to read the bulk of these

11:56:01  8   instructions to the jury today, if things move along at the

11:56:04  9   pace you all had anticipated.

11:56:07 10          Just a few quick questions.  They're very small,

11:56:10 11   I believe.  Any additional 30(b)(6) witnesses that I should

11:56:14 12   add to what we had discussed previously?  And these charts

11:56:18 13   and summaries, I don't recall seeing them introduced.  Can I

11:56:22 14   assume they're not going to be introduced?  So first to the

11:56:25 15   plaintiffs.

11:56:31 16          MR. GRIFFITH:  Your Honor, no more 30(b)(6)

11:56:33 17   witnesses as far as we know.

11:56:37 18          As far as charts and things that have been put

11:56:39 19   up on the screen as demonstrative exhibits, I'm assuming

11:56:44 20   those are not coming into evidence, but the chart, the

11:56:49 21   summary that the two fact witnesses for us, Dr. Standring

11:56:55 22   and Dr. Gosselin, put in, the 1006 summaries do come in.

11:57:01 23   They are in evidence, without objection.

11:57:04 24          So I point that out because that is sort of a

11:57:08 25   term of art.  They're 1006 summaries.

11:57:10 1     THE COURT: When we last talked, it was unclear
11:57:12 2 if those were coming in. Your view is they have now come
11:57:15 3 in.
11:57:16 4     MR. GRIFFITH: They're in.
11:57:16 5     THE COURT: All right. Do defendants agree on
11:57:19 6 both of those points?
11:57:20 7     MR. SCHERKENBACH: We agree the two summaries
11:57:22 8 can come in, so I think that paragraph we talked about is
11:57:25 9 fine.
11:57:26 10     As the 30(b)(6), I believe the draft that I saw
11:57:31 11 last did not have Mr. Meyers name.
11:57:34 12     THE COURT: All right.
11:57:35 13     MR. SCHERKENBACH: Going from memory.
11:57:36 14     THE COURT: Right. Here is the most recent
11:57:39 15 draft has Dr. Michael Otto, designated by Gilead; Joseph
11:57:44 16 Duffy, designated by Merck; and James Meyers, designated by
11:57:48 17 Gilead.
11:57:49 18     MR. SCHERKENBACH: Then that is correct from our
11:57:50 19 perspective.
11:57:51 20     THE COURT: And you agree with that?
11:57:53 21     MR. GRIFFITH: We do, Your Honor.
11:57:53 22     THE COURT: All right. Now, in terms of the
11:57:57 23 verdict sheet, I'm not going to be sharing the verdict sheet
11:58:01 24 with the jury today, so that gives us all a little bit more
11:58:04 25 time.

11:58:05 1          And in particular, I will now direct that the

11:58:10 2    parties meet and confer and give me a submission by 7:00

11:58:13 3    p.m. tonight with perhaps an agreed upon verdict sheet, but

11:58:19 4    if not, your competing versions.  And you will have the jury

11:58:24 5    instructions, of course, in advance of that so that should

11:58:28 6    help inform what your positions are on the verdict sheet.

11:58:33 7          But, in addition, I have already decided the

11:58:36 8    verdict sheet Question 1 will be willful infringement, and

11:58:40 9    it will be as stated in the version we got overnight from

11:58:44 10   Idenix, which my recollection is the language there is not

11:58:51 11   disputed.

11:58:51 12         In terms of, well, Question 2 will be validity,

11:58:56 13   and A will be written description and B will be enablement.

11:59:00 14   Again, consistent with Idenix proposed overnight with the

11:59:03 15   edits that were proposed this morning by defendants and were

11:59:07 16   not objected to.

11:59:11 17         I have not made a decision yet how to deal with

11:59:14 18   anticipation and obviousness.  You will see what we have in

11:59:18 19   the instructions, but that is where you all are going to

11:59:21 20   need to do some work and give me your proposals.

11:59:24 21         The very last question will be about damages.  I

11:59:28 22   do agree that it need to have some sort of contingent

11:59:31 23   introduction to make clear that if the jury finds at least

11:59:35 24   one of the asserted claims not invalid, then they need to

11:59:40 25   answer this question.  However, if they find that all of the

11:59:44 1   asserted claims are invalid, they do not have to answer the

11:59:47 2   question.

11:59:49 3          And it also needs to be made clear that the jury

11:59:55 4   is to either fill in the blank or blanks for the running

12:00:01 5   royalty or alternatively fill in the blank or blanks for a

12:00:05 6   lump sum.

12:00:07 7          Beyond that, you all are free to figure out what

12:00:10 8   the best way to comply with all of that is.

12:00:13 9          So any questions about any of that before we

12:00:15 10  break?

12:00:16 11          MR. GRIFFITH:  No questions, Your Honor.

12:00:17 12          THE COURT:  Any questions?

12:00:18 13          MR. SCHERKENBACH:  Your Honor, we maybe do this

12:00:20 14  in the meet and confer, but we're going to ask to swap the

12:00:23 15  order of enablement to written description, unless you are

12:00:26 16  ordering that right now, in which case we won't.

12:00:29 17          THE COURT:  I'm not ordering that.  If you come

12:00:30 18  to agreement, fine.  If you don't, then I'll have to make a

12:00:33 19  decision.

12:00:34 20          MR. SCHERKENBACH:  All right.  Thank you.

12:00:34 21          THE COURT:  Stand by for the draft.

12:01:46 22          (Lunch recess taken.)

12:01:46 23          *       *       *

12:57:42 24          Afternoon Session, 12:57 p.m.

12:57:42 25          THE COURT:  Have a seat for a moment.

12:57:46 1        Just for the record -- you can't hear me, can

12:57:49 2    you?

12:57:50 3        MR. SCHERKENBACH:  We can, but the mike is not

12:57:52 4    on.

12:57:53 5        THE COURT:  We'll get that fixed.  Just for the

12:57:55 6    record, yes, about probably 40 minutes ago we sent in two

12:58:01 7    copies of these draft final instructions for each side to

12:58:04 8    look at.

12:58:05 9        As I said, you will have a chance to talk to me

12:58:07 10   about them before I read them, and I think we should

12:58:11 11   probably get started with the jury pretty soon, but is there

12:58:15 12   anything you want anything you want to say at this point,

12:58:18 13   plaintiffs?

12:58:20 14       MS. SWIZE:  Your Honor, if I may.  Briefly.

12:58:22 15       THE COURT:  Briefly, sure.

12:58:25 16       MS. SWIZE:  Just for the record, Your Honor, to

12:58:30 17   preserve our objections to the instructions that were not

12:58:33 18   given.  I have two very quick points.

12:58:35 19       There was an agreement or seemed to be an

12:58:37 20   agreement earlier that the jury could be instructed on FDA

12:58:41 21   approval not being required for the patents, and we didn't

12:58:43 22   see that in here.

12:58:44 23       And in 6.3 on the damages instruction, it seems

12:58:49 24   a little bit unclear that whether the jury would have to

12:58:52 25   find all of the claims are not invalid before awarding

12:58:57  1    damages.  We would ask in the third paragraph, it say:  If

12:59:00  2    you find any of the claims are not invalid ...

12:59:02  3            And then Mr. Griffith is going to address some

12:59:08  4    of the other sections.

12:59:08  5            THE COURT:  Sorry.  In the third paragraph, page

12:59:11  6    43.

12:59:12  7            MS. SWIZE:  Sorry.  Page 43 begins:  Gilead

12:59:18  8    contends, and then in the parenthetical, instead of

12:59:23  9    saying "if you find the claims of the '597 patent are not

12:59:25 10    invalid," then it would say "if you find any of the claims

12:59:29 11    ..."

12:59:29 12            THE COURT:  All right.  Thank you for that.

12:59:33 13            Mr. Griffith.

12:59:33 14            MR. GRIFFITH:  Your Honor, does the Court wish

12:59:37 15    to address these now or should we continue with the jury and

12:59:40 16    then after the jury address objections?

12:59:42 17            THE COURT:  If it is anything similar to what I

12:59:44 18    just heard from Ms. Swize, fine.  If it's more substantive,

12:59:47 19    we should probably put it off.

12:59:49 20            MR. GRIFFITH:  Mine are more substantive.

12:59:51 21            THE COURT:  Fine.  Then let me get Gilead's

12:59:53 22    position on just whether they add back that FDA approval.

12:59:57 23    And do you have any concerns about me adding of in that

01:00:01 24    parenthetical, page 43?

01:00:03 25            MR. COUNTRYMAN:  "Any of" is fine.  We're also

01:00:09 1    fine with the FDA.

01:00:10 2             THE COURT:  We'll make those two changes.

01:00:12 3             Do you have anything of a similar nature, not

01:00:14 4    too substantive?

01:00:15 5             MR. COUNTRYMAN:  Not terribly substantive, but

01:00:18 6    with respect to obviousness and our contentions.  There was

01:00:21 7    a couple places we wanted to tweak the wording, so I don't

01:00:23 8    know if you would prefer to address that now or bring the

01:00:26 9    jury in.

01:00:26 10            THE COURT:  I think we'll probably wait to get

01:00:28 11   to that.

01:00:29 12            MR. GRIFFITH:  I will warn Your Honor that some

01:00:30 13   of my substantive objections go to that, and wording as well

01:00:34 14   but I think there is also substance.

01:00:35 15            THE COURT:  Okay.  Let's deal with that at the

01:00:37 16   next break then.  If there is nothing else for now, then

01:00:41 17   we'll bring the jury in.

01:00:43 18            All right.  Sorry.  Hold on.

01:00:47 19            Ms. Parker.

01:00:48 20            MS. PARKER:  Shall we get the witness back on

01:00:51 21   the stand?

01:00:53 22            THE COURT:  Yes.  We'll get the witness back on

01:00:56 23   the stand.  Thank you.

01:01:27 24            (Jury returned.)

12:59:48 25            THE COURT:  All right.  I hope you had an

01:02:55 1  enjoyable lunch, ladies and gentlemen.  We are ready to get

01:02:58 2  started again.

01:02:58 3          Mr. McCrum?

01:02:59 4          MR. McCRUM:  Thank you, your Honor.

01:03:00 5  BY MR. McCRUM:

01:03:01 6  Q.    Dr. De Francesco, just to orient everyone where we

01:03:04 7  were before the break, we were talking about the disclosure

01:03:09 8  in the '597 patent.  In particular, screening compounds, so

01:03:14 9  I want to pick up where we left off.

01:03:16 10          And if I could have on the screen the

01:03:18 11  portion of the '597 patent that we were looking at last,

01:03:22 12  column 13, lines 13 through 49.

01:03:30 13          And while we're waiting on that, Dr. De

01:03:32 14  Francesco, I think we had just wrapped up the concept of

01:03:35 15  screening compounds.  Can you just, to put us where you were

01:03:40 16  at before, remind everyone?

01:03:42 17  A.    I will go through the definition, explanation of what

01:03:46 18  a screening means in our business.  And that relates to

01:03:53 19  methodology, to filter out a majority of the inactive

01:03:58 20  compounds in order to get rapidly to the active and more

01:04:02 21  interesting ones.

01:04:04 22  Q.    Thank you.

01:04:05 23          This portion of the '597 patent that is on the

01:04:08 24  screen, is there a similar passage in the May 23rd, 2000

01:04:15 25  provisional patent application?

01:04:17  1   A.      It seems to be correct, yes.

01:04:19  2   Q.      Does the '597 patent and the '585 provisional

01:04:26  3   application disclose assays that can be used to screen

01:04:30  4   2'-methyl up nucleosides for treating hepatitis C?

01:04:34  5   A.      Yes.

01:04:35  6   Q.      Okay.  If we could go to line -- column 139, lines 29

01:04:42  7   through 50 in the '597 patent, please.

01:04:46  8          Can you explain what is disclosed here, Dr. De

01:04:50  9   Francesco?

01:04:50 10   A.      Yes.  Here under the heading anti-hepatitis C

01:04:54 11   activity, a number of assays that can be used to measure

01:05:02 12   anti-hepatitis C activity are pointed to.  It says,

01:05:05 13   compounds can exhibit an anti-hepatitis C activity by

01:05:11 14   inhibiting HCV polymerase and a number of assays have been

01:05:15 15   published to assess those activities.  And what follows is a

01:05:20 16   list of bibliographic references or references to published

01:05:23 17   articles, and all of those published articles are about the

01:05:26 18   polymerase assay, so methodology to carry out this assay

01:05:31 19   improvement over original assay that we developed.

01:05:36 20          Then there's a reference '97 application,

01:05:41 21   where also it describes an HCV polymerase assay that can be

01:05:50 22   used to evaluate the activity of the compounds described

01:05:54 23   herein.  Another HCV polymerase assay has been reported by,

01:05:59 24   this is an Australian researcher, that includes actually

01:06:03 25   using cloned HCV non-structural proteins.

01:06:06 1        So in summary, there is a list of references to

01:06:10 2  publication, reported methodology to evaluate compounds for

01:06:16 3  antihepatitis C activity and polymerase assays.

01:06:20 4  Q.    And these assays that you just discussed here, were

01:06:25 5  they also disclosed in the May 23rd, 2000 provisional patent

01:06:28 6  application?

01:06:29 7  A.    Yes.

01:06:31 8  Q.    All right.

01:06:34 9        MR. McCRUM:  Can we get column 13, lines -- I'm

01:06:37 10 sorry, column 36, actually, lines 54 through 57 of the '597

01:06:44 11 patent, please.

01:06:51 12       Actually, I would like to go to column 36, if I

01:06:58 13 could.  Thank you.  And if I could please have, I think it's

01:07:14 14 lines 54 through 57.  Okay.

01:07:20 15 BY MR. McCRUM:

01:07:20 16 Q.    Dr. De Francesco, can you please explain what is

01:07:22 17 being described here in the '597 patent?

01:07:24 18 A.    Yes.  So this patch states that in preferred

01:07:28 19 embodiments of the patent, the compounds of the invention

01:07:33 20 exhibiting EC50 of less than 15 or 10 micromolar, when

01:07:37 21 measured according to the polymerase assay described in

01:07:41 22 Ferrari et al.  So the references are essentially the same

01:07:45 23 that I described before.  So all of these papers refer to

01:07:49 24 methodology, published methodology for measuring the

01:07:53 25 polymerase assay.

01:07:54  1    And here the inventors point to values of EC50,

01:08:00  2    so this is a factor EC50, which is another way to say

01:08:05  3    inhibitory concentration 50.  So the concentration had

01:08:09  4    reached the compounds were obtained 50 percent of the

01:08:13  5    maximum effect.  That is the standard way to measure

01:08:17  6    potency, inhibitory potency of compounds.  And there are

01:08:20  7    actually a number, less than 15 or 10 micromolar, that

01:08:26  8    would have made the person skilled in the art that actually

01:08:37  9    had this other data on the compound invention.

01:08:38 10    Q.    And is there a similar disclosure as you see here, is

01:08:42 11    there a similar disclosure as this in the May 23rd, 2001

01:08:46 12    provisional patent application?

01:08:48 13    A.    Yes.

01:08:49 14    Q.    And in addition to the assays that were disclosed in

01:08:52 15    the '597 patent, the five provisional application, were

01:08:58 16    other assays known in the art for screening purposes for

01:09:02 17    antiviral activity?

01:09:04 18    A.    Yes.  There were a number of assays.

01:08:52 19         MR. McCRUM:  Can I please have demonstrative, I

01:08:55 20    think it's 9, PDX-9 on the screen please.

01:08:55 21    BY MR. McCRUM:

01:08:59 22    Q.    Can you tell us what is shown here, Dr. De Francesco?

01:09:01 23    A.    Yes, this is a slide I made that summarizes the assay

01:09:06 24    used prior to May 2000 for determining activity against

01:09:11 25    hepatitis C, so there are three major classes of assays

01:09:14  1    shown here.

01:09:14  2            As shown here, one is hepatitis C polymerase

01:09:18  3    assay.  I'm going to describe this as a very high level.

01:09:20  4            Actually, hepatitis C or HCV polymerase assay.

01:09:25  5    This is the assay that was first developed and invented in

01:09:28  6    my own group and we described already.

01:09:30  7            There were surrogate assays.  Surrogate assays,

01:09:35  8    the word "surrogate" refers to the fact that in these

01:09:38  9    assays, if a hepatitis C virus was not used, because at

01:09:43 10    the time actually it was not known how to actually to

01:09:47 11    have entire virus in a cell culture in a laboratory.  So

01:09:49 12    researcher use viruses that were very closely relative of

01:09:55 13    HCV, within the same family, and that were recognized to

01:09:58 14    have predictive value.  And we have heard a lot about these.

01:10:01 15    And these are, for example, the BVDV virus that could about

01:10:05 16    used in cell protection assays as well as other activity

01:10:09 17    assays.

01:10:10 18            Also, we make -- actually we do, we have heard

01:10:13 19    about the plaque assay.  Professor La Colla indeed referred

01:10:18 20    to this plaque assay using yellow fever virus which is a

01:10:24 21    relative close virus of BVDV and HCV.

01:10:28 22            Finally, there is this hepatitis C replicon

01:10:32 23    assay which became known some time in the year 1999.  It's

01:10:36 24    a very potent assay because it is actually a simpler assay

01:10:40 25    compared to the surrogate assays, but it also, it is in

01:10:44 1    cells as opposed to polymerase assay which is in a

01:10:48 2    test-tube, so it is a very potent assay and it was rapidly

01:10:52 3    adopted when it got published in 1999.

01:10:55 4    Q.    Okay.  At a high level, how are these assays here

01:10:59 5    relevant to the opinions that you are offering today?

01:11:01 6    A.    Well, all of these assays are relevant to my opinion

01:11:04 7    because, at the time, it would have been possible and within

01:11:14 8    familiarity of a person skilled in the art to use this assay

01:11:17 9    to screen compounds and specifically 2'-methyl up

01:11:23 10   ribonucleosides.

01:11:24 11   Q.    Now, Gilead has suggested through the testimony of

01:11:27 12   Ms. Tausek and Dr. Seeger that in the 2000 time frame, only

01:11:34 13   30 to 40 nucleosides per month could be screened for activity.

01:11:38 14         What is your reaction to that?

01:11:40 15   A.    Well, that does not match with my experience of what

01:11:48 16   a member of skill, a person of ordinary skill at the time

01:11:51 17   would have thought.  That is, essentially with any of this

01:11:56 18   assays, it was possible to screen thousands or even tens of

01:12:02 19   thousands of compounds in a relatively short time frame, and

01:12:07 20   without any undue experimentation.  So because these were

01:12:13 21   all very well established assays and they were in the

01:12:17 22   toolbox of a virologist at the time.

01:12:21 23   Q.    All right.  I'm going to go through each of these.

01:12:23 24   Hopefully, we'll be able to do that quickly.

01:12:25 25         Let's start with the hepatitis C polymerase

01:12:28 1  assay.  How difficult was that assay to use in the 2000-2001

01:12:32 2  time frame?

01:12:33 3  A.     Yes.  As I mention earlier, this assay we described

01:12:35 4  first in 1996.  So by the year 2000, a number of papers

01:12:40 5  that came out that are referred to offered improvement of

01:12:47 6  original methodology.  So at that time, it was a very quite

01:12:50 7  straightforward assay, no particular difficult in

01:12:55 8  implementing it and to using it to screen many compounds.

01:13:00 9          So actually in our laboratory at that time, we

01:13:03 10 had to use it to screen certainly over 100,000 compounds.

01:13:09 11 Q.     When you say at that time, you used it to screen over

01:13:12 12 100,000 compounds, what time frame are you talking about?

01:13:15 13 A.     Before May 2000.

01:13:16 14 Q.     And, in your opinion, would it have required undue

01:13:20 15 experimentation to screen 2'-methyl up compounds in the

01:13:25 16 2000-2001 time frame using the hepatitis C polymerase assay?

01:13:29 17 A.     No, it would not require undue experimentation to

01:13:32 18 screen 2'-methyl up nucleosides on the polymerase assay in

01:13:38 19 the 2000-2001 time frame.

01:13:39 20 Q.     Okay.  The next method that you mentioned for

01:13:43 21 determining activity against hepatitis C was the surrogate

01:13:46 22 assays.

01:13:48 23 A.     Yes.

01:13:48 24 Q.     Remind us, if you could, what types of viruses we're

01:13:55 25 talking about.

01:13:55 1    A.    We are talking about viruses that are close relatives

01:14:02 2    of the hepatitis C virus.  In our specifically language, we

01:14:06 3    say they are genetically related because they share genes,

01:14:10 4    the genetic structure is similar, and the sequence of the

01:14:13 5    actual gene is similar especially about the active site of

01:14:19 6    the enzymes.  So since nucleosides target the active sites

01:14:23 7    of the polymerase, it was known at the time that these

01:14:26 8    related viruses had a very similar active site, so they were

01:14:30 9    accepted in the art as surrogates for predicting activity

01:14:34 10    against hepatitis C.

01:14:35 11          As I said, these assays are inactivity assays so

01:14:41 12    they rely on cells cultivated in the lab being infected with

01:14:45 13    the viruses.  And then you have, typically but not

01:14:49 14    necessarily, ways of measuring, in particular example, of

01:14:56 15    this BVDV assay that I mention here or for counting the

01:15:01 16    assay, the virus within the cell.  So an antiviral agent

01:15:04 17    would prevent the cells from dying.  So that methodology

01:15:08 18    was actually used in the laboratory to measure activity of

01:15:11 19    antiviral, so compounds that we would kill or slow down the

01:15:15 20    infection without killing the cells.

01:15:17 21    Q.    And as of 2000-2001 time frame, could skilled

01:15:22 22    artisans have screen 2'-methyl up nucleosides using the

01:15:26 23    surrogate assays you discussed?

01:15:28 24    A.    Yes.  It is my opinion that in 2000-2001 time frame,

01:15:34 25    a person skilled in the art could have used surrogate, one

01:15:39 1   of the surrogate assays that was just described to screen

01:15:43 2   2'-methyl up nucleosides without undue experimentation.

01:15:46 3   Q.      And how do you know that?  Have you ever personally

01:15:49 4   used one of these assays?

01:15:51 5   A.      We have made systematic use of the BVDV assay in the

01:15:58 6   late 90s, I would say, to actually screen for nucleosides as

01:16:06 7   well as other compounds, yes.

01:16:07 8   Q.      And when you say "we," are you doing this with your

01:16:10 9   own hands or are you supervising it or how does that work?

01:16:14 10  A.      Well, at that time, actually, I was not doing work at

01:16:18 11  the bench myself anymore, so I was supervising people with

01:16:23 12  virologist skills that I just described in the laboratory

01:16:27 13  doing the assay, or I would provide technicians running the

01:16:34 14  assays.

01:16:34 15  Q.      All right.  The next method that you mentioned for

01:16:37 16  determining activity against hepatitis C was the replicon

01:16:42 17  system?

01:16:42 18  A.      Yes.

01:16:42 19  Q.      And when was this assay first reported in the

01:16:45 20  literature?

01:16:46 21  A.      The assay was first reported in 1999.  And I remember

01:16:51 22  July 1999.  That was a very important paper that was

01:16:55 23  published by Dr. Ralf Bartenschlager in Germany.

01:17:01 24          So this was, as I said before, to that point we

01:17:06 25  were not able to actually grow hepatitis C in cells in the

01:17:12  1    laboratory.  So if I had that need for infection, but not

01:17:18  2    able to reproduce, by actually putting in the cell just

01:17:22  3    one piece of the -- so not entire RNA of a virus, but just

01:17:28  4    one piece of it, and the piece of RNA was actually capable

01:17:31  5    of sustaining its own multiplication and replication, and

01:17:35  6    that recapitulated almost all of the natural viral

01:17:41  7    lifecycle, and especially it did depend on the presence of a

01:17:46  8    virus polymerase because viral RNA was getting multiplied by

01:17:50  9    the viral polymerase.

01:17:52 10            So it became immediately obvious to all of those

01:17:55 11    working on drug discovery in HCV biology in a general way

01:18:03 12    that this was an important assay to have in the toolbox, so

01:18:06 13    we set it up in our laboratory.

01:18:09 14    Q.      So as of the 2000-2001 time frame, could the replicon

01:18:13 15    assay be used to screen 2'-methyl up nucleoside for activity

01:18:16 16    against hepatitis C?

01:18:17 17    A.      Yes.

01:18:17 18    Q.      And could they do that without undue experimentation?

01:18:22 19    A.      I think it was possible to do that without undue

01:18:25 20    experimentation.

01:18:25 21    Q.      And how do you know that, Dr. De Francesco?  How --

01:18:25 22    A.      That --

01:18:30 23    Q.      Sorry to interrupt you.  I want to make sure I'm done

01:18:32 24    with my question before you answer for the benefit of the

01:18:35 25    court reporter.  But have you ever used that assay to screen

01:18:39 1    compounds?

01:18:40 2    A.    Yes.  Actually, I have used that assay together with

01:18:44 3    my group.  As I said, we rapidly implemented the assay in

01:18:49 4    the lab after the paper was published; and in early year

01:18:53 5    2000, we use that assay to screen between 18 and 20,000

01:18:58 6    compounds.

01:18:59 7    Q.    Over what period of time did you screen these 18 or,

01:19:03 8    I'm sorry, did you say 20,000 compounds?

01:19:04 9    A.    Between 18 and 20,000.

01:19:08 10   Q.    What period of time are you talking about?

01:19:10 11   A.    That was in about three months.

01:19:13 12   Q.    So on average, 6,000 compounds a month?

01:19:17 13   A.    Yeah.  On average, yes.

01:19:20 14   Q.    So what is your opinion regarding whether it would

01:19:24 15   have been undue experimentation to screen 2'-methyl up

01:19:29 16   compounds using the replicon assay in the 2000-2001 time

01:19:33 17   frame?

01:19:33 18   A.    No, my opinion is it would not be undue

01:19:36 19   experimentation to screen 2'-methyl up nucleosides using the

01:19:43 20   replicon assay in 2000-2001.

01:19:44 21   Q.    Okay.  I'm going to switch gears for a moment and ask

01:19:49 22   you whether you have an opinion about the importance of the

01:19:51 23   inventions disclosed in the '597 patent.

01:19:55 24   A.    Yes.

01:19:55 25   Q.    And what is that?

01:19:59 1   A.     Well, when the discovery of a 2'-methyl nucleosides

01:20:08 2   was first reported, it did receive a lot of attention. It

01:20:13 3   was certainly seen as a very important pioneering discovery

01:20:18 4   and as a result, it did receive a lot of attention on this

01:20:24 5   part, a lot of attention and focus on that class of

01:20:31 6   compounds, a 2'-methyl up nucleosides.

01:20:35 7       So I would say that when Novirio, at the time

01:20:40 8   Idenix was called Novirio, patent application in question,

01:20:45 9   the one we are discussing about, published, it got

01:20:48 10   immediately recognized, and the utility of that invention

01:20:56 11   got recognized by the workers in the field, by scientific

01:21:00 12   community in a general way, and actually many companies

01:21:04 13   started focusing their effort on that class of compounds,

01:21:07 14   so nucleosides with this key feature of a 2'-methyl up

01:21:13 15   substitution that would confer activity to those compounds.

01:21:17 16   So that was a very big deal.

01:21:18 17   Q.     I think you mentioned that there is some publications

01:21:21 18   that support this view; is that right?

01:21:24 19   A.     Correct.

01:21:24 20   Q.     Okay. Can we please -- if you could please refer to

01:21:28 21   DX-664, which is Tab 8 in your binder. I can't display it

01:21:36 22   quite yet on the screen, Dr. De Francesco.

01:21:38 23   A.     Will you repeat the number?

01:21:40 24   Q.     Sure. It's Tab 8, I believe.

01:21:45 25   A.     Yes.

01:21:45 1   Q.      Is this one of the articles that you were referring

01:21:49 2   to?

01:21:49 3   A.      Yes.  This is one of the articles that I am referring

01:21:53 4   to.  And, in particular, this is an article that I wrote

01:21:57 5   with my collaborators, some of my collaborators at IRBM at

01:22:04 6   the time.

01:22:04 7   Q.      And what is the date of this article?

01:22:06 8   A.      It was published some time in 2003, but if you read

01:22:13 9   under the title and the list of publication, it says it was

01:22:18 10   received by the Journal on September -- November 27th, 2002.

01:22:25 11          MR. McCRUM:  Your Honor, I move the admission of

01:22:28 12   PX-664.

01:22:29 13          MR. SHEAR:  No objection.

01:22:29 14          THE COURT:  It's admitted.

01:22:28 15          (PX-664 was admitted into evidence.)

01:22:28 16   BY MR. McCRUM:

01:22:33 17   Q.      If you could refer to page, if we could have page 11

01:22:37 18   on this screen, please.  And I would like you to -- thank

01:22:46 19   you.

01:22:46 20          Dr. De Francesco, could you read this part of

01:22:49 21   your article.

01:22:50 22   A.      Yes.  It says:  Notably, the discovery of a novel

01:22:55 23   series of oral, once-daily nucleosides, potentially useful

01:22:59 24   for the treatment of all HCV genotypes, was recently

01:23:03 25   reported (reference to Sommadossi and La Colla, 2001).

01:23:09 1    Among these, Beta-D-2'-methyl-ribofuranosyl-guanosine.

01:23:18 2    Figure 5A, Compound 11, is phosphorylated in cultured

01:23:22 3    uninfected cells and orally bioavailable in primates.

01:23:26 4    Q.    This is something you wrote in 2002?

01:23:28 5    A.    Yes.  I wrote it, yes.  And I may add, it is very

01:23:32 6    similar to the work was actually discussed by the earlier

01:23:36 7    witness, Dr. Meier.

01:23:37 8    Q.    What is this reference to Sommadossi and La Colla,

01:23:41 9    2001?

01:23:44 10    A.    Sommadossi and La Colla 2001 refers to information

01:23:50 11    of international patent application relative to the '597

01:23:53 12    patent.  So it has the same specifications as the '597 patent.

01:23:57 13    Q.    And when you wrote this article, what were you

01:24:01 14    referring to when you referenced, quote, "a novel series of

01:24:05 15    oral, once-daily nucleosides?"

01:24:09 16    A.    I was referring to this new class of compounds that

01:24:12 17    was actually disclosed in this invention and this class of

01:24:16 18    compounds, 2'-methyl up ribonucleosides, as shown by these

01:24:25 19    compounds here, 2'-methyl-up-ribofuranosyl-guanosine which I

01:24:35 20    indicated was representative the class.

01:24:37 21    Q.    Can you describe generally what happened in the field

01:24:40 22    of hepatitis C after Idenix's PCT application of the '597

01:24:47 23    published in November of 2001?

01:24:48 24    A.    Yes.  As I said, this was something very new.

01:24:52 25    Essentially, there was no -- at that time, there was no

01:24:58 1  class of activities known to have activity against hepatitis

01:25:01 2  C, so this is what we call a breakthrough discovery or a

01:25:06 3  game changer.  I have heard that word as well.  So that

01:25:09 4  applies here.

01:25:11 5          Because now there was an avenue that was opened

01:25:15 6  up by this discovery to actually develop nucleoside

01:25:19 7  inhibitors of HCV polymerase.  And this invention describe a

01:25:24 8  key feature of the molecules that was at 2'-methyl up

01:25:30 9  substitution.

01:25:30 10         So many companies started to work in this area.

01:25:34 11  And eventually in the following years, that led to a number

01:25:37 12  of compounds with 2'-methyl up substitution being developed

01:25:44 13  and in clinical trials, and some of them actually are on the

01:25:47 14  market today, as we speak.

01:25:51 15             MR. McCRUM:  Thank you, Dr. De Francesco.

01:25:52 16             Your Honor, I pass the witness.

01:25:54 17             THE COURT:  Okay.  Cross-examination.

01:26:03 18             MR. SHEAR:  Your Honor, may I approach with some

01:26:04 19  binders?

01:26:06 20             THE COURT:  You may.

01:26:24 21             (Binders passed out.)

01:26:52 22             MR. SHEAR:  Your Honor?

01:26:59 23             THE COURT:  You may.

01:26:59 24                    CROSS-EXAMINATION

01:27:00 25  BY MR. SHEAR:

01:27:00 1  Q.    Dr. De Francesco, my name is Chad Shear.  We've

01:27:03 2  actually never met before.  Good afternoon.

01:27:05 3          With counsel on direct you spoke about column 13

01:27:10 4  of the patent.  Do you remember the phrase beginning with,

01:27:12 5  Beta-D, Beta-D nucleosides of this invention?

01:27:17 6  A.    Yes.

01:27:17 7  Q.    All right.  I wold like to talk about that for a

01:27:20 8  second.

01:27:21 9          Now, you were in court yesterday when Dr.

01:27:30 10 Secrist walked the jury through the formulas at issue in

01:27:34 11 this patent.

01:27:35 12         Do you remember that?  Sorry.  It's not on the

01:27:37 13 screen right now.

01:27:38 14 A.    Okay.

01:27:38 15 Q.    I'm just asking.

01:27:39 16 A.    Yes, I was here.

01:27:40 17 Q.    Okay.  And you heard Dr. Secrist's opinion yesterday

01:27:44 18 that there are billions of compounds described in this

01:27:46 19 patent?

01:27:48 20 A.    That's correct.

01:27:49 21 Q.    Okay.  Now, Dr. De Francesco, you're not a chemist;

01:27:53 22 right?

01:27:53 23 A.    Right.

01:27:54 24 Q.    And for the purposes of determining the number of

01:28:00 25 compounds that are at issue or fall within the scope of the

01:28:02 1    claims, you were relying on Dr. Meier's opinion; is that

01:28:06 2    correct?

01:28:07 3    A.      That's correct.

01:28:07 4    Q.      All right.  So you relied on Dr. Meier's assessment

01:28:10 5    of the scope of the claims for the purposes of your opinion?

01:28:14 6    A.      Yes.

01:28:15 7    Q.      And you didn't do any independent analysis of the

01:28:20 8    compounds that would fall within the scope of the '597

01:28:23 9    patent; is that correct?

01:28:24 10   A.      We didn't do an independent analysis.

01:28:29 11   Q.      You didn't do an independent analysis of the number

01:28:31 12   of compounds that would fall within the scope of the claim?

01:28:34 13   A.      I did not do, no, no independent analysis.

01:28:37 14   Q.      Okay.  You relied on Dr. Meier for that?

01:28:40 15   A.      Yes.

01:28:41 16   Q.      Now, counsel just ended talking with you about your

01:28:50 17   2003 paper, PX-664.

01:28:56 18              And, Mr. Sayres, if we could have that.

01:28:58 19   And you should I think still have it.  You can follow on the

01:29:01 20   screen.  You may have it in your binder.

01:29:02 21   A.      Can I look in the original binder?

01:29:05 22   Q.      You can.  We're going to look at the exact same

01:29:07 23   paragraph you looked at before.

01:29:08 24   A.      Let me find that.

01:29:12 25   Q.      So you can follow on the screen?

01:29:13 1   A.      Sure.

01:29:13 2   Q.      And, Dr. De Francesco, what I'd like to talk to you

01:29:16 3   about is specifically the compound that you are referencing

01:29:18 4   here, Beta-D 2' methyl ribofuranosyl guanosine.

01:29:25 5           Do you see that?

01:29:25 6   A.      Yes.

01:29:26 7   Q.      It says here Figure 5A, compound 11.

01:29:28 8           Do you see that?

01:29:29 9   A.      Yes.

01:29:29 10  Q.      Now, if we look, we can still see Figure 5A.  It's up

01:29:33 11  on the screen.  We see compound 11.

01:29:35 12          Do you have that?

01:29:36 13  A.      Yes.

01:29:37 14  Q.      And what's shown on the screen here, this compound

01:29:40 15  number 11, that's the compound you're referencing below; is

01:29:44 16  that right?

01:29:44 17  A.      Yes, I think so.

01:29:46 18  Q.      And I would like to understand for a moment what you

01:29:49 19  meant when you wrote Beta-D 2 'methyl ribofuranosyl

01:29:55 20  guanosine.

01:29:57 21          So looking at the compound, Beta-D 2'

01:30:00 22  methyl, that tells us that the methyl is in the 2' up

01:30:03 23  position; is that correct?

01:30:04 24  A.      That's incorrect.

01:30:04 25  Q.      And the guanosine on the end, that tells us what the

01:30:07 1   base is; is that correct?

01:30:09 2   A.      Correct.

01:30:10 3   Q.      That's the double ring base up there on the

01:30:12 4   right-hand side?

01:30:12 5   A.      Yes.

01:30:13 6   Q.      And then the ribofuranosyl, that tells us that

01:30:16 7   there's a 2' OH down and a 3' OH down; is that right?

01:30:21 8   A.      Yes.

01:30:22 9   Q.      Okay.  And just to close the loop, so Beta-D --

01:30:28 10          THE COURT:  I'm sorry, counsel.  Do we need a

01:30:31 11  quick break?

01:30:32 12          A JUROR:  Yes.

01:30:33 13          THE COURT:  The jury needs a short break.

01:30:35 14          MR. SHEAR:  Sure.

01:30:36 15          THE COURT:  No talking about the case.  We'll

01:30:37 16  get you back as soon as we can.

01:30:39 17          (The jury was excused for a short recess.)

01:31:05 18          THE COURT:  Doctor, if you want to step down,

01:31:06 19  you may.

01:31:07 20          I'm sorry to interrupt, but the juror was

01:31:09 21  indicating he needed a break.  While we have a few moments,

01:31:13 22  why don't we talk about jury instructions.  The clock is

01:31:16 23  off.

01:31:16 24          Mr. Griffith, do you want to start us off?

01:31:19 25          MR. GRIFFITH:  Sure.  Your Honor, I've got a

01:31:47 1   series of issues.  Hopefully, it's not too many, but let me

01:31:52 2   start with the enablement instruction, which is 5.5.

01:31:59 3          As an aside, I noticed that the willfulness

01:32:02 4   instruction I think was labeled number five and it was left

01:32:08 5   out of the table of contents.  And I think that the validity

01:32:12 6   will then -- I think all of the instructions will be

01:32:14 7   increased by one after that.

01:32:16 8          THE COURT:  Thank you.

01:32:17 9          MR. GRIFFITH:  So this will become 6.5.

01:32:20 10          And your Honor may recall that we had a proposal

01:32:26 11   to include a sentence that said, enablement does not require

01:32:30 12   that the specification enable the accused product or later

01:32:35 13   invented products.

01:32:36 14          And that was based on *Masimo* and an instruction

01:32:43 15   from there as well as from *Hogan*.  The instruction from

01:32:46 16   *Masimo* referred to accused product but not later invented.

01:32:53 17   *Hogan*, on the other hand, is a case that specifically deals

01:32:56 18   with the idea of later invented embodiments need not be

01:33:03 19   enabled by the earlier, an earlier filed patent.

01:33:07 20          And I can understand not wanting to have both

01:33:13 21   here.  Maybe that would be too strong.  And in particular,

01:33:19 22   maybe by saying accused product, you know, that might -- I

01:33:25 23   think that's appropriate.  I think it would be proper under

01:33:28 24   *Masimo*, but I think that Gilead would argue that is loading

01:33:33 25   the deck in our favor.  But I think that this is important

01:33:36 1  because the issue is in play by the evidence and the

01:33:39 2  arguments in the way the trial has been presented to the

01:33:43 3  jury.

01:33:44 4          THE COURT:  All right.  So you're asking for

01:33:46 5  reconsideration that we add back your sentence about you

01:33:48 6  need not enable later embodiment?

01:33:53 7          MR. GRIFFITH:  I am.

01:33:54 8          THE COURT:  All right.  Doctor, you're welcome

01:33:56 9  to sit there if you would like, but you don't have to.

01:33:58 10         THE WITNESS:  Okay.

01:34:04 11         THE COURT:  It's fine.  Do you have anything

01:34:06 12 else on enablement?

01:34:07 13         MR. GRIFFITH:  I do not.

01:34:08 14         THE COURT:  The agreement before about adding

01:34:10 15 the FDA language back in, that was to the end of this

01:34:14 16 instruction on enablement, I believe.  Is that right?

01:34:16 17         MR. GRIFFITH:  Honestly, I do not recall.

01:34:18 18         THE COURT:  Okay.

01:34:18 19         MR. GRIFFITH:  I thought it was a separate

01:34:20 20 instruction.

01:34:21 21         THE COURT:  I think that's agreeable.  And there

01:34:22 22 was a whole paragraph that mentioned utility as well.

01:34:26 23         Is it just the FDA sentence that you are

01:34:28 24 proposing we add back?

01:34:29 25         MS. SWIZE:  Yes, your Honor.

01:34:30 1          THE COURT:  Okay.  Thank you.  Let me give -- I

01:34:34 2   don't know how much time we have.

01:34:35 3          Let me hear from Gilead about what we talked

01:34:37 4   about so far.  And can you confirm that the agreement is to

01:34:40 5   add just the FDA sentence and it should go at the end of

01:34:43 6   enablement?

01:34:45 7          MR. COUNTRYMAN:  Yes, your Honor.

01:34:45 8          THE COURT:  All right.  And if you want to

01:34:46 9   respond to Mr. Griffith?

01:34:48 10          MR. COUNTRYMAN:  Sure.  So I think the Court was

01:34:50 11   correct in taking out both the reference to enabling the

01:34:53 12   accused product and enabling the later invented things.

01:34:57 13          On the accused product, I discussed that during

01:34:59 14   my remarks previously that *Masimo* is a totally different

01:35:03 15   case.  You're dealing with multi-component products, et

01:35:06 16   cetera.  I don't feel the need to explain myself again

01:35:08 17   unless the Court has questions on that.

01:35:09 18          With respect to the later invented products, I

01:35:12 19   would say that Idenix's view of the law, *Hogan* and Culler is

01:35:18 20   incorrect.  Those cases dealt with situations where you had

01:35:22 21   claims that, where there were multiple different ways of

01:35:25 22   making something, and later it was developed, additional

01:35:29 23   ways of making a product were developed later on in time.

01:35:32 24   And as a result, the Courts there held that you just needed

01:35:36 25   to enable the way of making it that were known at the time.

01:35:40 1    That's different than this case.

01:35:41 2              Here, you've got to enable the full scope of the

01:35:45 3    claim, as the instruction says. And we're saying that, no

01:35:50 4    way of making some of the embodiments of the claim was

01:35:52 5    enabled as of the time of the filing date. For example, the

01:35:57 6    2' methyl fluoro. So those cases don't apply here. We

01:36:00 7    think it would be an error of law to add that to the

01:36:03 8    instruction.

01:36:04 9              THE COURT: Okay. I'm going to keep it the way

01:36:06 10   I have it. And I'm told that the juror who needed a break

01:36:09 11   is okay now, so let's get the jury back and we'll talk about

01:36:12 12   the rest of them at the next break.

01:36:59 13             (The jury entered the courtroom.)

01:38:19 14             THE COURT: Welcome back. Thank you. You're

01:38:22 15   all okay? We'll proceed.

01:38:24 16             Go ahead.

01:38:25 17             MR. SHEAR: Thank you, your Honor.

01:38:25 18   BY MR. SHEAR:

01:38:27 19   Q.    So Dr. De Francesco, we were just talking about your

01:38:30 20   2003 paper. We were talking about the phrase -- sorry. I'm

01:38:34 21   shooting the Elmo here. Beta-D 2' methyl ribofuranosyl

01:38:39 22   guanosine, and I think where we left off was that you were

01:38:42 23   confirming that that phrasing describes the structure that's

01:38:44 24   depicted in Figure 11; is that correct?

01:38:47 25   A.    That's correct.

01:38:47 1    Q.     And that's a methyl up at the 2' position, OH or

01:38:51 2    hydroxy down at the 2' and 3' position?

01:38:53 3    A.     Right.  Correct.

01:38:54 4    Q.     I'd actually like to shift gears now away from your

01:38:57 5    paper for a moment.  You can take that down, Mr. Sayres.

01:39:01 6            Dr. De Francesco, you would agree with me that

01:39:07 7    the '597 patent does not have any antiviral activity data in

01:39:11 8    it; is that correct?

01:39:12 9    A.     It has data, but not antiviral data.

01:39:16 10   Q.     And you were here in court when Professor Meier said

01:39:19 11   that the '597 patent doesn't have any antiviral activity

01:39:23 12   data in it?

01:39:25 13   A.     I was here, yes.

01:39:26 14   Q.     And you were here the other day when Dr. Seeger said

01:39:29 15   the same thing, that the '597 patent doesn't have any

01:39:32 16   antiviral activity data in it; is that right?

01:39:34 17   A.     I heard that, too, yes.

01:39:36 18   Q.     So you, Professor Meier and Dr. Seeger, all agree

01:39:39 19   that the '597 patent doesn't have any antiviral activity

01:39:42 20   data in it?

01:39:43 21   A.     He referred to the compound being active as

01:39:48 22   antiviral, but it does not show any data.

01:39:51 23           MR. SHEAR:  Okay.  Thank you.  No further

01:39:52 24   questions, your Honor.

01:39:53 25           THE COURT:  Thank you.

01:39:53 1          Redirect?

01:40:08 2          MR. McCRUM:  Can we have the '597 patent

01:40:11 3   starting at column 139?

01:40:13 4                 REDIRECT EXAMINATION

01:40:13 5   BY MR. McCRUM:

01:40:14 6   Q.     Dr. De Francesco, I'd like to just briefly pick up

01:40:18 7   where counsel for Gilead left off, and there's a section

01:40:25 8   here that I want to focus on, anti-hepatitis C activity.

01:40:34 9   Okay.

01:40:34 10         Are you familiar with this section of the '597

01:40:36 11  patent, Dr. De Francesco?

01:40:38 12  A.     Yes.  I think we have gone over this section earlier,

01:40:44 13  or a similar section.

01:40:45 14  Q.     And are you familiar with the examples that are

01:40:47 15  disclosed underneath this section?

01:40:50 16  A.     Yes.  There are a number of examples disclosed,

01:40:55 17  yes.

01:40:55 18  Q.     And those examples, do they report data?

01:40:59 19  A.     Yes.  They report data.  As I mentioned, as I think I

01:41:03 20  mentioned in my reply as well, was cross-examined, there is

01:41:07 21  data, although there is no specific number, antiviral data,

01:41:17 22  example in the tables.

01:41:18 23  Q.     Okay.

01:41:18 24  A.     There is a lot of data in the patent.

01:41:20 25  Q.     And what, if anything, does that data tell a skilled

01:41:26 1    artisan about whether Dr. Sommadossi and Dr. La Colla were,

01:41:31 2    in fact, in possession of antiviral data?

01:41:33 3    A.    Let me just summarize at a very high level what the

01:41:37 4    data is.

01:41:38 5           So there is data about phosphorylation of

01:41:41 6    the compound in lever cells, so that would be the ability to

01:41:45 7    make actual active compounds.  This is in lever cells.  And

01:41:50 8    it was shown that 2'-methyl up nucleoside were

01:41:55 9    phosphorylated.  So that compound was being made.

01:41:58 10           They are aware of toxicity data, different type

01:42:01 11    of toxicity data.  These are the type of data that you

01:42:04 12    generate, that a skilled person in the lab would generate

01:42:08 13    when there is activity because you want to know about

01:42:11 14    toxicity of compounds or if you have active compounds.  You

01:42:16 15    don't care about the toxicity of inactive compounds.

01:42:19 16           And there are pharmacokinetic data, a bit of

01:42:25 17    complicated work.  Pharmacokinetic data revealed what

01:42:31 18    percentage of compound is picking up when you take the

01:42:33 19    compound orally, so how much compound, how much of that goes

01:42:41 20    into the bloodstream.  If I remember, 19 percent, and that

01:42:44 21    was in monkeys.

01:42:45 22           So that's a very laborious, time-consuming

01:42:49 23    resource intensive experiment with ethical implications, so

01:42:53 24    you don't do that on an inventive compound.  And actually

01:42:59 25    for the description of the experiment, it is specifically

01:43:02  1   vague.  The inventor said that the compound in question was

01:43:05  2   active.

01:43:05  3   Q.      Okay.  So real briefly, on Example 5 relates to

01:43:10  4   phosphorylation data.

01:43:11  5   A.      Yes.

01:43:12  6   Q.      Would skilled artisans in your opinion perform

01:43:15  7   phosphorylation testing on compounds that don't have

01:43:18  8   antiviral activity?

01:43:20  9   A.      No.

01:43:21  10  Q.      How about bioavailability data in monkeys?  I won't

01:43:28  11  even attempt to pronounce that.

01:43:29  12          Would skilled artisans do bioavailability

01:43:34  13  testing on monkeys for compounds that are not antivirally

01:43:40  14  active?

01:43:40  15  A.      As I said, even less so, because this is very

01:43:43  16  difficult, expensive, and there are issues.  Again, the

01:43:48  17  compounds affected here is referred to as an active

01:43:51  18  compound.

01:43:51  19  Q.      And how about bone marrow toxicity assays?  Would

01:43:56  20  skilled artisans be doing that assay using compounds that

01:44:00  21  are not antivirally active?

01:44:03  22  A.      I wouldn't see any reason, so my opinion is that a

01:44:05  23  person skilled in the art of virology would have read

01:44:10  24  these examples as something done after activity was

01:44:15  25  established.

01:44:16  1    Q.    And in these examples that we've been talking about,

01:44:19  2    do you know whether it actually refers to these compounds as

01:44:23  3    active?

01:44:25  4    A.    Yes.   There is at least one place where the compound

01:44:28  5    in question, it's referred to as active, and that's in

01:44:35  6    pharmacokinetic experiment.   Actually, I'm not sure if

01:44:38  7    I remember the number of examples, but the monkey

01:44:42  8    experiment.   I think it was six.   I'm not sure.   I've seen

01:44:50  9    many numbers.

01:45:00 10    Q.    Well, let's look at Example 5.

01:45:02 11    A.    Five.   Sorry.

01:45:03 12    Q.    Column 140 at about line 49.   And if you could just

01:45:20 13    -- if you could expand that so we can actually put the whole

01:45:23 14    thing into context.   I'm sorry.

01:45:31 15              Starting at about line 47 --

01:45:35 16    A.    Correct.

01:45:35 17    Q.    -- can you read that sentence?

01:45:37 18    A.    Yes.   It says, each monkey (six total), received

01:45:42 19    approximately 250 uCi reactivity, radioactive compound, with

01:45:52 20    each dose of active compound.   Namely, Beta-D-2' methyl ribo

01:45:59 21    G at a level of ten mg per kilo, and so on and so forth.

01:46:07 22              So essentially here it is specified that

01:46:09 23    each monkey received ten milligrams per kilo of the active

01:46:15 24    compound Beta-D'-2'-C methyl up ribo G, active meeting

01:46:23 25    acting as an antiviral.

01:46:25  1          MR. McCRUM:  Thank you, Dr. De Francesco.  I

01:46:27  2   have no further questions.

01:46:28  3          THE COURT:  All right.  Thank you.  You may step

01:46:29  4   down, Doctor.

01:46:30  5              (Witness excused.)

01:46:31  6          THE COURT:  What is next?

01:46:32  7          MS. PARKER:  Your Honor, that completes our

01:46:34  8   case.  Thank you.

01:46:34  9          THE COURT:  Okay.  Thank you.

01:46:36 10          Back to Gilead.

01:46:39 11          MR. SCHERKENBACH:  No witnesses, your Honor.

01:46:40 12          THE COURT:  Okay.  All right.  Anything further,

01:46:43 13   Ms. Parker?

01:46:43 14          MS. PARKER:  No, your Honor.  Thank you.

01:46:45 15          THE COURT:  Okay.  Mr. Scherkenbach, anything

01:46:47 16   further?

01:46:47 17          MR. SCHERKENBACH:  No.  Thank you.

01:46:48 18          THE COURT:  All right.  So, ladies and

01:46:50 19   gentlemen, as you may have gathered, that completes the

01:46:52 20   evidentiary portion of the trial.  What remains is for me to

01:46:56 21   read you those final instructions I mentioned as well as the

01:47:01 22   verdict sheet and for you to hear closing arguments.

01:47:03 23          I need a little bit of time to finish up some of

01:47:06 24   those materials, so I'm going to give you a break now.  As I

01:47:11 25   said, you will be out of here by 3:15 today, but I expect

01:47:14  1   you will be back in here at some point between now and 3:15.

01:47:17  2   I can't tell you exactly what time it is, but for now we'll

01:47:21  3   give you a break.  No talking about the case, and we will

01:47:25  4   see you again in a bit.

01:47:27  5        (The jury was excused for a short recess.)

01:47:54  6        THE COURT:  All right.  Have a seat.

01:47:55  7        So the clock is off.  Let's get back to the jury

01:47:58  8   instructions and try to finish those up.

01:48:01  9        Mr. Griffith?

01:48:08 10        THE COURT:  Sure.

01:48:12 11        MR. GRIFFITH:  Your Honor, the second one that I

01:48:30 12   wanted to discuss was the written description instruction.

01:48:35 13   And we had two sets in our instruction that we think are

01:48:40 14   pertinent to the evidence as it has come in.  We think

01:48:43 15   they're rather bland statements of the law, but they will

01:48:50 16   be of great assistance to the jury in sorting through their

01:48:53 17   duties.

01:48:53 18        And the first sentence is:  For genus or class

01:48:57 19   of compound claims, every species or specific example of the

01:49:02 20   class in a claimed genus need not be described to satisfy

01:49:06 21   the written description requirement.

01:49:09 22        And the second sentence is:  The specification

01:49:13 23   may provide a representative number of species falling

01:49:19 24   within the scope of the genus or structural features common

01:49:22 25   to the members of the genus so that one of skill in the art

01:49:25 1   can visualize or recognize the members of the genus.

01:49:27 2          And, of course, the witnesses have testified,

01:49:30 3   some witnesses have testified to if they're being

01:49:34 4   representative numbers of the species and members of the

01:49:39 5   class and that that would tell the ordinary skilled artisan

01:49:45 6   of the nature of this class.  They would recognize the class

01:49:48 7   from the members of the genus.

01:49:50 8          And those, as I said, those instructions are

01:49:54 9   supported by *Masimo*, *Ariad*, other cases.  They're really not

01:50:00 10  too controversial, I didn't think.

01:50:02 11         THE COURT:  All right.  Is there anything else

01:50:04 12  on written description?

01:50:05 13         MR. GRIFFITH:  No.

01:50:05 14         THE COURT:  Okay.  Let me get the response on that.

01:50:09 15         MR. COUNTRYMAN:  We object to both of those

01:50:17 16  sentences, Your Honor.

01:50:17 17         With respect to the test, we think it is an

01:50:19 18  incorrect statement of the law.  The patent needs to

01:50:23 19  describe the full scope of what is claimed, and that

01:50:25 20  includes inadequate written description of every species.

01:50:28 21         With respect to the second sentence, about the

01:50:31 22  specification providing representative examples, we object

01:50:33 23  to that as well.  We objected previously because it's just

01:50:36 24  one sentence of a much longer passage in the *Ariad* case and

01:50:40 25  we think it would be error to give just that sentence in

01:50:44 1  isolation without giving the full context of that case.  So

01:50:47 2  we agree with what the Court did in just taking out this

01:50:50 3  language.  We think the rest of the instruction correctly

01:50:52 4  states the law, and that is the way to go here.

01:50:54 5          THE COURT:  All right.  I'm going to adhere to

01:50:57 6  what I have.  I'm concerned about whether in context what

01:51:05 7  the plaintiffs ask would be a correct statement of the law,

01:51:08 8  but in addition, it also seemed to me to come too close to

01:51:14 9  having me weigh in on argument that I think plaintiffs may

01:51:18 10 make.  And for the most part, we tried to take out things

01:51:22 11 that could appear to be commenting on the evidence or trying

01:51:27 12 to make one side's case or the other for them.  So I'm

01:51:30 13 adhering to what I have.

01:51:33 14          What is next?

01:51:34 15          MR. GRIFFITH:  And, Your Honor, I think the

01:51:39 16 directive is clear, but our objections are noted for the

01:51:41 17 record.

01:51:41 18          THE COURT:  Yes.

01:51:42 19          MR. GRIFFITH:  Then on reduction to practice.

01:51:48 20 We have had included -- and I'm going to have to find my

01:52:00 21 copy of it.

01:52:01 22          THE COURT:  I think it's in 5.7 now.

01:52:06 23          MR. GRIFFITH:  I've got it, yes, in 5.7.  And

01:52:13 24 we have had a recognition requirement in there, and,

01:52:18 25 unfortunately, I'm not finding my copy.

01:52:20 1          THE COURT:  Is it some language you wanted to

01:52:34 2    propose to add back?

01:52:39 3          MR. GRIFFITH:  It is.  I apologize, Your Honor.

01:52:41 4    I'm having a hard time locating it.

01:52:43 5          THE COURT:  Just give me the general idea.  And

01:52:45 6    if you need to track down the language, we can.

01:52:47 7          MR. GRIFFITH:  It was a requirement that

01:52:51 8    accidental or unappreciated reduction to practice isn't a

01:52:57 9    reduction to practice.  That was the gist of the phrase.  It

01:53:01 10   didn't use the phrase "reduction to practice" twice in the

01:53:03 11   sentence but that was the nature of the sentence.

01:53:06 12         THE COURT:  That even -- I'm sorry.  That

01:53:09 13   unappreciated reduction to practice is not reduction to

01:53:12 14   practice?

01:53:13 15         MR. GRIFFITH:  Yes.  As I said, it did

01:53:15 16   repeat the phrase twice, but if you -- an accidental or

01:53:19 17   unappreciated conducting of a particular activity or

01:53:22 18   creation of a product, doesn't constitute reduction to

01:53:24 19   practice.

01:53:25 20         THE COURT:  I see.  And you would ask to add

01:53:26 21   that back to what we say about reduction to practice?

01:53:30 22         MR. GRIFFITH:  We would, Your Honor.

01:53:31 23         THE COURT:  What is the defendants' view?

01:53:36 24         MR. COUNTRYMAN:  We would object to that, Your

01:53:39 25   Honor.  We think especially when you are talking about

01:53:42 1     accidental reduction to practice, it seems a little

01:53:46 2     argumentative to us.  So we would object to it.

01:53:48 3            THE COURT:  All right.  Well, I'm going to

01:53:51 4     adhere to what I have.

01:53:53 5            What is next from the plaintiffs?

01:54:00 6            MR. GRIFFITH:  The last point, Your Honor, is in

01:54:15 7     the Gilead's prior invention contentions.  So this is 5.6,

01:54:22 8     page 33.  I don't know if this is the last one.

01:54:27 9            It says, in 3, item B, on Merck's 2001 patent,

01:54:37 10     '313 patent application, in light of the general knowledge

01:54:41 11     of a person of skill in the art.

01:54:43 12            Their contention was based on 102(e) on the '224

01:54:48 13     patent that claims priority to this '313 patent provisional

01:54:53 14     patent application.

01:54:55 15            But the provisional patent application is not

01:54:59 16     prior art, and the '224 patent is not in evidence.  And, in

01:55:06 17     fact, their expert, in his expert report, simply assumed

01:55:10 18     that it was prior art and did not take a position that it in

01:55:14 19     fact was.

01:55:16 20            For it to be prior art, they have to prove

01:55:21 21     that at least one claim in the '224 patent is entitled to

01:55:27 22     priority to that provisional application, which, of course,

01:55:30 23     they haven't done.  It was because it is not in evidence,

01:55:35 24     but even if it had been in evidence, there was no attempt by

01:55:39 25     anyone to explain how a claim and that patent was entitled

01:55:42 1   to provisional application.

01:55:46 2                And that, Your Honor, is the *Dynamic Drinkware*

01:55:54 3   case, 800 F.3d 1375 (1381).

01:56:01 4                THE COURT:  All right.  So what would your

01:56:03 5   proposal be then?

01:56:05 6                MR. GRIFFITH:  Well, it's two-part proposal,

01:56:07 7   Your Honor.  It would have to say '224 patent.  So it would

01:56:11 8   be have to be Merck's '224 patent, period.  But we would

01:56:18 9   move for JMOL on this because -- and this goes back to my

01:56:23 10  comments earlier today.

01:56:25 11               THE COURT:  We'll come to the JMOL motions, if

01:56:28 12  we're going to do it, because that I will have to turn the

01:56:31 13  clock back on for.

01:56:32 14               MR. GRIFFITH:  Okay.

01:56:32 15               THE COURT:  All right.  Thank you.  What is the

01:56:34 16  response on this one, please?

01:56:39 17               MR. COUNTRYMAN:  So on this point, we disagree.

01:56:45 18  Essentially, Idenix is arguing the JMOL here.  The '313

01:56:49 19  patent ultimately resulted in a number of Merck patent

01:56:52 20  applications, including Merck's '499 patent which is in

01:56:56 21  evidence, and so the jury can certainly conclude based on

01:56:59 22  that.

01:57:00 23               THE COURT:  '499 is a patent, right?

01:57:03 24               MR. COUNTRYMAN:  Yes, and it is a Merck patent

01:57:05 25  that is in evidence; and the jury can certainly conclude

01:57:07 1  from that that the '313 application and its disclosure is

01:57:12 2  available as prior art.

01:57:13 3      So what we would, one thing we were thinking

01:57:18 4  about suggesting for this sentence would be to just note

01:57:21 5  under B that it's Merck's 2001 '313 patent application and

01:57:27 6  then add a comma and say, "which resulted in Merck's '499

01:57:32 7  patent," just to make clear there is a patent associated

01:57:35 8  there.

01:57:36 9      THE COURT:  And, again, the '499 is in evidence?

01:57:39 10      MR. COUNTRYMAN:  It is in evidence, Your Honor.

01:57:40 11      THE COURT:  All right.  And would you propose to

01:57:42 12  keep the "in light of" language as well?

01:57:45 13      MR. COUNTRYMAN:  So with respect to that, we

01:57:47 14  would propose to modify it slightly because our contention

01:57:50 15  is it's not, the general knowledge is kind of a separate

01:57:55 16  alternative basis, so what we would suggest would be to

01:57:59 17  strike "in light of," and say "the '313 patent application

01:58:03 18  or, C, the general knowledge" -- and I think it should say

01:58:11 19  "of" -- general knowledge of a person of skill in the art at

01:58:16 20  the pertinent time.

01:58:17 21      Because Dr. Secrist did testify that the general

01:58:20 22  knowledge plus Merck's work would render the claims obvious,

01:58:23 23  and he was using the '313 patent in part to confirm the

01:58:26 24  general knowledge of the art at the time.

01:58:28 25      THE COURT:  So just to understand your proposal,

01:58:31 1    B would read Merck's 2001 patent, I'm sorry, 2001 '313

01:58:40 2    patent application which resulted in Merck's '499 patent

01:58:45 3    and, then it would be comma, or C?  And C?

01:58:51 4              MR. COUNTRYMAN:  Or C.

01:58:52 5              THE COURT:  Or C, general knowledge, or the

01:58:55 6    general knowledge of a person of skill in the art.

01:59:00 7              MR. COUNTRYMAN:  Yes.

01:59:01 8              THE COURT:  At the pertinent time.

01:59:03 9              MR. COUNTRYMAN:  Yes.  One other thing.  There

01:59:05 10   is currently an "and" before the B here.  We would propose

01:59:09 11   striking the "and" because if we could make it a

01:59:12 12   disjunctive.

01:59:14 13             THE COURT:  So the argument is that you can

01:59:19 14   invalidate a patent claim for obviousness under 103 through

01:59:25 15   the combination of A, B, and C, C being the general

01:59:32 16   knowledge.

01:59:36 17             MR. COUNTRYMAN:  I guess the point would be you

01:59:38 18   could take A with either B and/or C.  You know, it could be

01:59:43 19   either Merck's work and either the Merck patent application,

01:59:48 20   you know, and/or the general knowledge.

01:59:50 21             THE COURT:  All right.  So you would have it

01:59:55 22   read, A, with B, and/or C?

02:00:01 23             MR. COUNTRYMAN:  Yes, that would be fine.

02:00:03 24             THE COURT:  Okay.  Thank you.

02:00:05 25             Mr. Griffith.

02:00:06 1          MR. COUNTRYMAN:  I'm sorry.  But one other issue

02:00:09 2     we had on this instruction was just paragraph 1, it just

02:00:12 3     mentions Dr. Wolanski for 1998.  We're also contending that

02:00:16 4     Dr. Olsen is a potential inventor in 1998 as well so we

02:00:21 5     would ask to have him added there in 1998.

02:00:25 6          THE COURT:  Right.

02:00:26 7          MR. COUNTRYMAN:  Thank you.

02:00:28 8          THE COURT:  That I will do.  I intended to do

02:00:30 9     that.

02:00:31 10          MR. COUNTRYMAN:  Thank you.

02:00:32 11          THE COURT:  Mr. Griffith, do you want to respond

02:00:34 12     to the proposed revision of 3?

02:00:37 13          MR. GRIFFITH:  Yes, Your Honor.  We were never

02:00:39 14     given any notice prior to today that the '499 patent is

02:00:44 15     being asserted in this obviousness combination.  Their

02:00:47 16     expert never said so.  No interrogatory answer ever said so.

02:00:51 17     This is the first time we're hearing it.  It's not the same

02:00:54 18     specification as the '224 patent.  It's highly prejudicial

02:00:58 19     for us to now have a new patent asserted for the basis for

02:01:05 20     obviousness.

02:01:05 21          Same for general knowledge.  We never heard

02:01:08 22     general knowledge being the basis for the obviousness

02:01:11 23     combination, so our experts, our witnesses never had an

02:01:15 24     opportunity to testify on either of those issues.  There are

02:01:18 25     substantive issues that go into establishing whether that is

02:01:21 1    proper, including entitlement to the priority date.  So we

02:01:26 2    object on these bases.

02:01:29 3              THE COURT:  All right.  Thank you.

02:01:30 4              Mr. Countryman, can you give me an idea as to

02:01:34 5    when plaintiffs would have had notice of those A with B

02:01:38 6    and/or C combination, if it was before today?

02:01:42 7              MR. COUNTRYMAN:  Sure.  So the general knowledge

02:01:44 8    stuff was certainly discussed in Dr. Secrist's third

02:01:47 9    supplemental expert report, which is one of the reports that

02:01:51 10   was considered before the previous motions to strike.

02:01:53 11             With respect to the '313 patent application, and

02:01:56 12   whether it is the '244, the '224 or the 449, these patents

02:02:02 13   are both the same -- or they both have, I should say, the

02:02:07 14   same relevant disclosures of the January 2001 application.

02:02:16 15             In particular, they both have the example of

02:02:22 16   2'-methyl adenosine.  So we don't think there is any

02:02:25 17   prejudice here.

02:02:26 18             THE COURT:  All right.  Thank you.

02:02:28 19             I'm going to go with the defendants' newly

02:02:33 20   revised combination for obviousness here, but this is

02:02:38 21   without prejudice to the plaintiffs filing a motion

02:02:44 22   indicating that this is unfair, prejudicial surprise.  But I

02:02:50 23   am not in a position to determine who is right or wrong

02:02:52 24   about that at this point, so my plan is to instruct the jury

02:02:55 25   as I have indicated, and that will be subject to further

02:03:00  1    motions practice.

02:03:01  2            Mr. Griffith, what is next?

02:03:03  3            MR. GRIFFITH:  In 5.6, in Item 2, I would have

02:03:08  4    thought that David Olsen would have been specified for the

02:03:15  5    year 2000, but if they are going to go with 1998, I think it

02:03:19  6    should say 1998 or 2000 since those are the two options with

02:03:23  7    him.  He testified he did not conceive of it in 1998, so

02:03:26  8    that is a JMOL topic I understand.

02:03:29  9            THE COURT:  Right.  Well, we made it this based

02:03:32 10    on what they argued earlier today, that they think they

02:03:36 11    have adduced evidence that Olsen may have conceived of it

02:03:40 12    in 1998, and so that is why I took the date out.  But I

02:03:46 13    certainly understand your position.  You would propose that

02:03:49 14    we add 1998 or 2000, that phrase?

02:03:52 15            MR. GRIFFITH:  Yes, with objecting.  Subject to

02:03:55 16    our JMOLs.

02:03:56 17            THE COURT:  Of course.  All right.  Do you want

02:03:58 18    to respond to that?

02:04:00 19            MR. COUNTRYMAN:  We would be fine with that

02:04:02 20    addition.

02:04:02 21            THE COURT:  Then I will add it, the phrase "an

02:04:06 22    alleged prior invention by Merck's David Olsen in 1998 or

02:04:10 23    2000."

02:04:13 24            All right.  Is there anything else, Mr. Griffith?

02:04:16 25            MR. GRIFFITH:  Then on 5.8 to 5.11, we have

02:04:21 1  items in the nature of JMOL objections, so I think that, you

02:04:28 2  know, I guess I'm alerting the Court that I think there is a

02:04:32 3  lot in there that shouldn't be in there, but it's not a per

02:04:37 4  se jury instruction issue, even though it is.

02:04:39 5           THE COURT:  Okay.

02:04:40 6           MR. GRIFFITH:  Then one final thing.  2.4

02:04:42 7  referred to Merck work, I understand.  And it's --

02:04:46 8           (Counsel confer.)

02:04:48 9           MR. GRIFFITH:  And that seems to be too general.

02:04:50 10 It seems maybe I should find some way to reference to Bohdan

02:04:56 11 Wolanski or David Olsen.

02:04:57 12          THE COURT:  I see that at page 19.  I think what

02:04:59 13 would be better in light of the other changes is just to be

02:05:02 14 to cross out, due to Merck's prior work.  So "with

02:05:10 15 anticipation, or obviousness" is how it would end.  No

02:05:12 16 objection from the plaintiffs to that?

02:05:13 17          MR. GRIFFITH:  No objection.

02:05:14 18          THE COURT:  No objection by defendants to that?

02:05:17 19          MR. COUNTRYMAN:  No objection.

02:05:18 20          THE COURT:  Other than JMOL will issue, issues

02:05:21 21 about the jury instructions from the defendants?

02:05:22 22          MR. COUNTRYMAN:  Just a couple more minor

02:05:25 23 changes relating to the obviousness combination.

02:05:29 24          So in 5.7, just where it refers to Dr. Wolanski.

02:05:36 25 And in the first sentence where it refers to Dr. Wolanski in

02:05:39 1  1998, we proposed to add Dr. Olsen as well, David Olsen,

02:05:44 2  consistent with what the Court ruled on 5.6.

02:05:48 3          THE COURT:  So in page 34 of your draft, it

02:05:50 4  should read either Bohdan Wolanski, or David Olsen, in 1998,

02:05:58 5  and then it should read, or David Olsen in 1998 -- I'm

02:06:06 6  sorry.  It can say "or David Olsen in 2000."  That would be

02:06:09 7  consistent with what you are asking for; correct?

02:06:12 8          MR. COUNTRYMAN:  Yes.

02:06:13 9          THE COURT:  Mr. Griffith, any concerns about me

02:06:15 10 adding David Olsen, or Ms. Swize, earlier in that sentence?

02:06:19 11          MR. GRIFFITH:  No, subject to our JMOL.

02:06:22 12          THE COURT:  Subject to all of your objections

02:06:24 13 you made before.  Okay.  Mr. Countryman.

02:06:28 14          MR. COUNTRYMAN:  The next one is on instruction

02:06:30 15 5.8 on page 36.  The second paragraph, first sentence.  It's

02:06:36 16 just the kind of issue with the '313 patent again and the

02:06:40 17 "or"s.  So perhaps I could just read what it says.

02:06:44 18          So it says, Gilead contends that if all the

02:06:46 19 elements of the asserted claims of the '597 patent are not

02:06:50 20 found in Dr. Wolanski's 1998 alleged invention -- and we

02:06:57 21 would add an "or" there -- or Dr. Olsen's alleged

02:07:02 22 invention -- and then we would say, when combined with the

02:07:12 23 general knowledge in the field at the time and/or Merck's

02:07:20 24 '313 patent application, which issued as Merck's '499

02:07:27 25 patent, comma.

02:07:32 1       And then we continue with what is here.

02:07:49 2       MR. COUNTRYMAN: Then you should continue

02:07:50 3 whether that work, and then we would delete or the patent

02:07:57 4 altogether, and then the rest of the sentence can stay,

02:07:59 5 renders the claim obvious.

02:08:04 6       THE COURT: Okay. So here's what I got. All

02:08:09 7 right. Gilead contends that if all of the elements of the

02:08:12 8 asserted claims of the '597 patent are not found in Dr.

02:08:17 9 Wolanski's 1998 alleged invention or Dr. Olsen's alleged

02:08:20 10 invention when combined with the general knowledge in the

02:08:24 11 field at the time and/or Merck '313 patent application,

02:08:32 12 which issued as Merck's '499 patent, then you should

02:08:37 13 consider whether that work renders the claims obvious.

02:08:40 14       Is that what you are proposing?

02:08:43 15       MR. COUNTRYMAN: I'm sorry, your Honor.

02:08:44 16       THE COURT: Okay.

02:08:45 17       MR. COUNTRYMAN: I think I should have added

02:08:46 18 that last clause at the end of the sentence. Sorry. The

02:08:52 19 sentence should read, Gilead contends that if all the

02:08:55 20 elements of the asserted claims of the '597 patent are not

02:08:58 21 found in Dr. Wolanski's alleged invention, 1998 alleged

02:09:02 22 invention, or Dr. Olsen's alleged invention, and then delete

02:09:07 23 the or, the Merck '224 patent.

02:09:10 24       And then it can continue: Then you should

02:09:12 25 consider whether that work, delete or patent altogether.

02:09:19 1   When you consider -- you should consider whether that work

02:09:22 2   renders the claims obvious, and then you should add that

02:09:26 3   clause I proposed, when combined with the general knowledge

02:09:30 4   in the field at the time and/or Merck's '313 patent

02:09:35 5   application, which issued as Merck's '499 patent.

02:09:40 6              THE COURT:  Okay.

02:09:42 7              MR. COUNTRYMAN:  Sorry about that.

02:09:43 8              THE COURT:  I got that.  Mr. Griffith, if you

02:09:45 9   got that and subject to all of your objections, just in

02:09:48 10  terms of language, do you object to that language?

02:09:50 11             MR. GRIFFITH:  I thought it should be phrased --

02:09:54 12  can I see what you have written down?

02:09:57 13             MR. COUNTRYMAN:  Yes.

02:09:57 14             (Pause while counsel conferred.)

02:10:14 15             MR. GRIFFITH:  I think that phase is fine

02:10:15 16  subject to our objection to all of it.

02:10:17 17             THE COURT:  All right.  Then I will make those

02:10:18 18  changes.

02:10:19 19             Something else in 5.8?

02:10:21 20             MR. COUNTRYMAN:  Nothing else there, your Honor.

02:10:22 21             THE COURT:  Okay.  What's next?

02:10:23 22             MR. COUNTRYMAN:  And just one other issue.  A

02:10:27 23  substantive issue in 5.11 in page 40, the instruction on

02:10:33 24  objective criteria.  We noted that the Court had removed the

02:10:37 25  paragraph we proposed to the end about there having to be a

02:10:42 1  nexus between each of these and the -- each particular

02:10:47 2  objective indicia.  I did see that the Court added some

02:10:51 3  nexus language at the end of section, or part one here about

02:10:55 4  commercial success.

02:10:56 5          We think the law is pretty clear, there has to

02:10:59 6  be a nexus with respect to any of the indicia and the

02:11:04 7  claimed invention, and so we would just propose adding a

02:11:07 8  sentence at the end of this that would say that there has to

02:11:10 9  be a nexus for any of the factors above and the claimed

02:11:14 10 invention.

02:11:16 11         THE COURT:  The nexus between any of the factors

02:11:20 12 above and the claimed invention?

02:11:23 13         MR. COUNTRYMAN:  Yes.

02:11:23 14         THE COURT:  All right.  Mr. Griffith, what is

02:11:25 15 your view?

02:11:26 16         MR. GRIFFITH:  We would leave it as is, your

02:11:28 17 Honor.  I don't think that's necessary and I didn't hear

02:11:32 18 any witnesses talking about -- I didn't hear Mr. Secrist

02:11:35 19 talking about nexus.  But I think that the language as is is

02:11:41 20 fine.  On the commercial success, I agree, there has to be a

02:11:44 21 nexus.

02:11:44 22         THE COURT:  Right.  Do you disagree there needs

02:11:46 23 to be a nexus for any objective --

02:11:49 24         MR. GRIFFITH:  Yes.  I don't think that applies

02:11:51 25 to these other elements.  Long-felt need for the invention

02:11:54 1  is -- you know, you don't usually think in terms of a nexus

02:11:59 2  for that.  That's what comes up with, you know, is the, you

02:12:01 3  know, the sale -- in this case, is the sale of sofosbuvir

02:12:06 4  due in part to the claimed invention.  But I don't think

02:12:10 5  that applies, for example, to long felt but unmet need,

02:12:13 6  things like that.  Whether others tried and failed to make

02:12:16 7  the invention, I don't think -- the concept of a nexus does

02:12:19 8  not really make sense there.  I see it with commercial

02:12:23 9  success.  I don't see it with the others.

02:12:25 10        THE COURT:  Okay.  My understanding is you need

02:12:27 11  to show a nexus for any secondary consideration in order to

02:12:32 12  be relevant, and so that was inadvertent on my part to limit

02:12:35 13  it only to commercial success.  So I will add a sentence

02:12:38 14  that makes it clear that, my understanding of the law, that

02:12:44 15  you need a nexus for all of them.  And I think I will

02:12:47 16  probably then cross out the parenthetical at commercial

02:12:50 17  success because it's not in any different status.

02:12:52 18        Anything else from defendants?

02:12:55 19        MR. COUNTRYMAN:  Nothing else from us, your

02:12:56 20  Honor.

02:12:56 21        THE COURT:  All right.  So I know you reserved

02:13:01 22  an opportunity to argue JMOL motions after the close of all

02:13:04 23  evidence.  We're at that point.  I can tell you most likely,

02:13:09 24  I'm going to just reserve ruling on them and it is going to

02:13:13 25  take time away from your argument tomorrow, and, more

02:13:17 1   importantly, it's going to make it hard for me to get to the

02:13:19 2   jury instructions.

02:13:21 3           But, you know, if you think you are going to

02:13:23 4   maybe persuade me that I should take some of these issues

02:13:26 5   away from the jury, I would like to be persuaded on that

02:13:29 6   before I start instructing them.

02:13:31 7           So I look to you for some thoughts as to how you

02:13:34 8   would like to proceed.

02:13:35 9           Mr. Griffith?

02:13:36 10          MR. GRIFFITH:  Candidly, I am getting a sense

02:13:48 11  that I'm probably not going to persuade your Honor.

02:13:48 12          THE COURT:  I tried to give you that sense, but

02:13:48 13  my mind is open.

02:13:53 14          MR. GRIFFITH:  I don't want to waive, so if

02:13:54 15  there were some abbreviated way for me to make the motions

02:13:58 16  so that we don't waive and preserve our rights post-trial

02:14:05 17  and on to appeal, that's what I would like to do.  And

02:14:07 18  so is there a way I could do that and not take up much

02:14:11 19  time?

02:14:12 20          THE COURT:  Yes.  Why don't you do your best to

02:14:14 21  list for us the bases on which you would move while

02:14:18 22  reserving argument and that way, certainly, as far as I'm

02:14:21 23  concerned, you've clearly not waived anything.

02:14:24 24          MR. GRIFFITH:  Okay.

02:14:25 25          THE COURT:  And if I think I need to hear

02:14:27 1    argument before instructing the jury, I will let you know

02:14:29 2    that.

02:14:29 3              MR. GRIFFITH:  And perhaps, your Honor, if we

02:14:31 4    could file also something later today as an extension of the

02:14:39 5    motion we're making now, that would also be a nice way to

02:14:42 6    handle that.

02:14:43 7              THE COURT:  All right.  You may do so and we'll

02:14:45 8    start the clock now.

02:14:46 9              MR. GRIFFITH:  Okay.  We move for judgment as a

02:14:48 10   matter of law that Gilead has failed to present legally

02:14:51 11   sufficient evidence to establish lack of written description

02:14:55 12   with respect to any and all of the asserted claims because

02:14:59 13   persons of ordinary skill in the art, the evidence shows

02:15:02 14   that no reasonable jury could find otherwise that the '597

02:15:06 15   inventors had possession of the claimed invention.  And

02:15:11 16   Idenix has presented evidence of a representative number of

02:15:13 17   species, has presented evidence of the key of the invention,

02:15:20 18   and other evidence against which Gilead's evidence we

02:15:23 19   believe as a matter of law fails.

02:15:26 20             Second, on enablement, Gilead has also failed to

02:15:30 21   establish lack of enablement as a matter of law.  Idenix has

02:15:35 22   presented evidence of explicit disclosures in the patent on

02:15:38 23   how to make and use compounds within the scope of the

02:15:42 24   claims.

02:15:42 25             Gilead has merely attempted to address one

02:15:44 1    particular embodiment, but the evidence shows that

02:15:48 2    Mr. Clark, who arguably has less than the ordinary level of

02:15:52 3    skill, made it with our patent in hand.  Moreover, that work

02:15:56 4    is legally irrelevant as well as the work of Griffon, et al

02:16:01 5    they have cited because that occurs at a later point in time

02:16:06 6    and involves a later admitted technology.  Therefore, in re

02:16:11 7    *Hogan* and other case law is not relevant.

02:16:14 8         On utility, Gilead has conceded utility, has not

02:16:20 9    presented evidence on lack of utility, and therefore we move

02:16:23 10   for JMOL on that.

02:16:24 11        Then, finally, on anticipation and obviousness,

02:16:29 12   we would move for judgment as a matter of law because Gilead

02:16:32 13   as to the 1998 work has failed to establish a reduction to

02:16:37 14   practice the BVDV assay, and running of it was not within

02:16:40 15   the scope of any of the claims of the patent.  And as a

02:16:43 16   matter of law, the evidence shows an absence of recognition,

02:16:48 17   and certainly they have not met their burden of proving by

02:16:51 18   clear and convincing evidence that there was recognition,

02:16:55 19   that there was a reduction to practice.

02:16:58 20        Further, as a matter of law, they have not met

02:17:00 21   their burden of proving by clear and convincing evidence

02:17:04 22   that the 1998 BVDV test, the work on L765 at that time was

02:17:10 23   not abandoned, suppressed or concealed.  The evidence is

02:17:13 24   uniform in showing that that sat on the shelf and was -- and

02:17:20 25   nothing was done with it.

And then, further, as to the 2000 work, as a matter of law, Gilead has failed to prove a lack of diligence on Idenix's part from a date prior to the alleged 2000 work, which is in either August or September of 2000. And we put in evidence of diligence from a point in time prior to that through the filing date of our patent application in May of 2001. Gilead bears the burden of showing absence of diligence. They have not punched any holes in that evidence. There are no fact issues there that would prevent that from going to the jury.

Finally, or not finally, but penultimately, on obviousness, Gilead's sole obviousness combination rests on asserted prior art that is not prior art. The general knowledge that they cite to and the testimony that came in for the first time on redirect, never previously cited before by them. Only says it occurred in May 2001. As a matter of law, without being more specific, that leaves it at May 31st, 2000. I'm sorry. I said 2001. They said in. May 2000 as a matter of law, that makes it May 31st 2000. That's too late.

And Dr. La Colla's testimony is legally irrelevant because one should not go about determining obviousness under Section 103 by inquiring into what patentees, i.e. inventors, would have known or would have likely have done. *Standard Oil v American Cyanamid Oil v*

02:19:10 1    *American Cyanamid.*

02:19:11 2            Then finally, on damages, no reasonable jury

02:19:13 3    could accept Dr. Putnam's damages theory.  It's based on

02:19:18 4    legally insufficient data and assumptions, post-hypothetical

02:19:21 5    negotiation data, data not tied to the facts of the case.

02:19:25 6    He failed to assume invalidity and infringement and he used

02:19:29 7    incomparable licenses.  Those are our JMOL motions.

02:19:16 8            THE COURT:  Okay.  Thank you.  I am going to

02:19:18 9    reserve judgment on all of them.  If Gilead wishes to

02:19:24 10   respond now or in writing, you are free to do so.

02:19:27 11           MR. SCHERKENBACH:  We prefer to respond in

02:19:28 12   writing later.

02:19:29 13           THE COURT:  That's fine.

02:19:30 14           MR. SCHERKENBACH:  As to ours, we actual filed a

02:19:32 15   brief paper about an hour ago, so we wouldn't take any time

02:19:36 16   on the record, but just to preserve our position.  We

02:19:39 17   understand you will reserve.

02:19:41 18           THE COURT:  Provided we see it on the docket,

02:19:42 19   which I assume we will once we look at the docket.

02:19:45 20           MR. SCHERKENBACH:  I'm advised it's there.  It

02:19:48 21   should be.

02:19:48 22           THE COURT:  I'm sure you have been advised

02:19:50 23   correctly.  All right.  We'll go ahead and finish up the

02:19:53 24   jury instructions.  We will be in recess.

02:46:01 25           (Brief recess taken.)

02:46:01 1                *    *    *

02:48:25 2                (Proceedings reconvened after recess.)

02:48:25 3                THE COURT:  All right.  So it has gotten late in

02:48:28 4    the day.  We're going to bring the jury in and let them go.

02:48:30 5    Then we can talk about any remaining issues we have.

02:48:48 6                (Jury returned.)

02:49:44 7                THE COURT:  All right.  Ladies and gentlemen, I

02:49:46 8    hope you have enjoyed your break, and I have what I hope you

02:49:49 9    will agree is further good news, which is I need to work on

02:49:52 10   the instructions just a little bit more, so I'm going to

02:49:56 11   wait until tomorrow morning to go read those to you, which

02:49:58 12   means I'm basically done with you for today.

02:50:01 13               Tomorrow, however, please be here in time to

02:50:05 14   start at 9:00 o'clock.  I expect to begin by reading you the

02:50:08 15   instructions.  And I warn you if I haven't already, they're

02:50:11 16   a lot longer than the preliminary instructions.  And then

02:50:14 17   we'll hear closing arguments.  We do expect to be here a

02:50:18 18   full day tomorrow.

02:50:20 19               No talking about the case while you are away

02:50:23 20   from us, no research or reading anything about the case, and

02:50:25 21   we'll see you tomorrow morning.

02:50:27 22               (Jury left courtroom.)

02:50:47 23               THE COURT:  All right.  Have a seat.

02:50:48 24               Let me just note for the record, since I was

02:50:51 25   last in here, I sent my law clerk in to show you the FDA

02:50:56 1   sentence we had added by agreement to enablement, and my

02:51:01 2   understanding is there was, after seeing that, an agreement

02:51:04 3   to take it back out.  Is that correct?

02:51:06 4              MR. GRIFFITH:  That is correct, Your Honor.

02:51:07 5              THE COURT:  Is that correct?

02:51:08 6              MR. SCHERKENBACH:  That is correct, Your Honor.

02:51:09 7              THE COURT:  So that has been removed.

02:51:11 8         So the instructions are substantively done,

02:51:16 9   consistent with our discussion.  We were having various

02:51:19 10  formatting problems.  As you all may know, we work in

02:51:23 11  WordPerfect mostly and these are in Word, so what we're

02:51:27 12  going to do is very shortly, once I'm sure all the changes

02:51:30 13  have been made, we're going to e-mail them back to you guys

02:51:34 14  and ask you to put your experts on fixing the table of

02:51:38 15  contents and you will see a few other numbering and spacing

02:51:41 16  things.

02:51:41 17             I'm trusting you all not to make any substantive

02:51:44 18  changes, just to make it look as pretty as possible for the

02:51:48 19  jury.  And we'll have you e-mail that back to us hopefully

02:51:51 20  by 7:00 p.m. tonight, when you submit the verdict sheet.

02:51:55 21             Any questions about that?

02:51:57 22             MR. GRIFFITH:  No, Your Honor.  That's fine.

02:51:58 23             THE COURT:  Okay.  Any questions about that?

02:51:59 24             MR. SCHERKENBACH:  No questions, Your Honor.

02:52:00 25             THE COURT:  All right.  Now, I understand there

02:52:02  1    may be an issue about closing arguments or something else.

02:52:08  2    Mr. Scherkenbach.

02:52:09  3              MR. SCHERKENBACH:  Yes, Your Honor.  I had

02:52:12  4    assumed, and I think consistent with past practice, that the

02:52:17  5    closings would follow the burdens, so they go, we go, they

02:52:22  6    go, we go.  In other words, that we get a rebuttal on

02:52:26  7    validity, particularly since it is fundamentally a validity

02:52:30  8    case.

02:52:30  9              They seem to think that we don't get a validity

02:52:34 10    rebuttal but they do get a rebuttal on their issue, so I

02:52:38 11    don't think that is either fair or appropriate particularly

02:52:40 12    in this case which is a validity case.

02:52:42 13              THE COURT:  And remind me, has that come up

02:52:44 14    before in this case?  Have we talked about it?

02:52:46 15              MR. SCHERKENBACH:  Well, we talked about, not

02:52:48 16    specifically in the context of closing, I don't believe.

02:52:51 17    The pretrial order addresses the order of proof at trial and

02:52:55 18    provides for, provided for those four phases.  It is on page

02:53:01 19    8 of the joint pretrial order.  And we have obviously

02:53:04 20    proceeded in that fashion during the trial.

02:53:05 21              THE COURT:  Okay.

02:53:07 22              Mr. Day.

02:53:08 23              MR. DAY:  Thank you, Your Honor.  Just a couple

02:53:12 24    points.

02:53:12 25              As Mr. Scherkenbach said, the pretrial order

02:53:17 1    speaks to the presentation of evidence in terms of following

02:53:21 2    the burdens of proof not to closings.

02:53:24 3         We don't see any reason to allow them to have a

02:53:27 4    rebuttal on validity in closing, particularly since they

02:53:30 5    didn't present a rebuttal case during the evidentiary phase.

02:53:35 6         More specifically, in previous cases that I

02:53:38 7    have been in with Your Honor, the closings have always gone

02:53:43 8    plaintiff, defendant, plaintiff.

02:53:45 9         And to refresh Mr. Scherkenbach's recollection,

02:53:47 10   that was even the case in the 2008 Fairchild case.  When

02:53:51 11   they were the plaintiffs, Fairchild had its own patents that

02:53:55 12   we were asserting.  We sought to have a final rebuttal since

02:53:58 13   we had our own set of patents.

02:54:00 14        He opposed it, Your Honor, with your standard

02:54:03 15   plaintiff, defendant, plaintiff.  And so we talked a lot

02:54:07 16   about sauce for the goose, sauce for the gander.  While this

02:54:11 17   is a different case, I think we should follow that same

02:54:14 18   practice here.

02:54:15 19        THE COURT:  Thank you.  Mr. Scherkenbach, is

02:54:18 20   there anything else?

02:54:18 21        MR. SCHERKENBACH:  Only that I do think this is

02:54:20 22   a different situation because they don't have a burden on

02:54:23 23   infringement.  This is a validity case.  It is really for

02:54:25 24   all intents and purposes we're the plaintiff, proving an

02:54:30 25   invalidity claim.  I think it is only fair that we be

02:54:32  1    allowed to have a rebuttal.

02:54:34  2          As to the fact we didn't put a rebuttal case on

02:54:38  3    in the evidence, that simply is a time issue.  We ran out of

02:54:41  4    time.  We needed to save time for closing.  In fact, part of

02:54:45  5    the reason I saved more time for closing was assuming I

02:54:47  6    would have a little bit in the any way of rebuttal.

02:54:49  7          THE COURT:  All right.  Well, I think it's

02:54:52  8    totally discretionary call.  Obviously, all else being

02:54:56  9    equal, it would have been better had the issue been raised

02:54:59 10    earlier, potentially in the pretrial order or at the

02:55:02 11    pretrial conference.

02:55:03 12          As it wasn't, and my recollection, I have done

02:55:07 13    it in both different ways that have been suggested.  I think

02:55:11 14    probably as an empirical matter, Mr. Day is right, I have

02:55:16 15    more often done it just three arguments, so two for the

02:55:19 16    plaintiff, one for the defendant.

02:55:20 17          Here, under the circumstances, that is what

02:55:23 18    I'm going to do.  It will be just one argument for the

02:55:27 19    defendants.  There will be two for the plaintiff.  They are

02:55:30 20    the plaintiff.  For all intents and purposes, they're the

02:55:33 21    plaintiff and they are in fact the plaintiff.

02:55:37 22          The fact that the defendant chose not to contest

02:55:40 23    infringement in this trial for reasons that are well

02:55:43 24    established is fine, but it doesn't alter in my view in

02:55:47 25    this case what is more often the practice at least in my

02:55:53 1    courtroom.  So the plaintiffs will have a chance to give an

02:55:56 2    opening as well as a rebuttal, and the defendants will have

02:56:00 3    a chance to be heard once.

02:56:01 4              Any other issues we should discuss?

02:56:04 5              MS. PARKER:  Yes, Your Honor.  If I may.

02:56:06 6              I'm not in any way rushing the Court by asking

02:56:10 7    this question, but just because we're going to use it in our

02:56:12 8    openings tomorrow, do you have any idea when we might get

02:56:15 9    the verdict form?  We're sending it to you at 7:00.  Would

02:56:19 10   it be tomorrow morning or how does --

02:56:23 11             THE COURT:  First off, if you are both in

02:56:25 12   agreement on what it is, then you can be pretty sure that is

02:56:27 13   what I will use.  But if you are not, it may not be until

02:56:31 14   the morning, but I'm going to be reading to them for quite a

02:56:35 15   bit before you make your presentation, and so you should be

02:56:43 16   able to have it in hand.

02:56:44 17             MS. PARKER:  That should work just fine.  Is it

02:56:48 18   all right if our tech people work to scan that all in while

02:56:52 19   Your Honor is instructing the jury?

02:56:53 20             THE COURT:  That is entirely fine.

02:56:55 21             MS. PARKER:  Thank you so much.

02:56:57 22             THE COURT:  Anything else from plaintiffs?

02:56:58 23             MS. PARKER:  No, Your Honor.  Thank you.

02:56:59 24             THE COURT:  Any issues from defendants?

02:57:01 25             MR. SCHERKENBACH:  No, Your Honor.

02:57:03 1          THE COURT:  All right.  I've been taking fairly

02:57:08 2     frequent breaks with this jury.  We're just going to have to

02:57:14 3     see how it goes tomorrow, but I think given the amount of

02:57:17 4     time you have for closings, the length of the instructions,

02:57:22 5     I'm doubtful that we're going to get through both sides

02:57:25 6     saying everything they want to say and me reading all the

02:57:27 7     instructions before it is time to give them a lunch break,

02:57:30 8     so I may have to interrupt one or both sides in order to

02:57:34 9     give the jury several breaks before we can finish up.  So

02:57:38 10    we'll just see how that goes.

02:57:40 11          All right.  We'll look for your filings by 7:00

02:57:43 12    tonight.  Thank you.

02:57:56 13          (Proceedings adjourn at 2:57 p.m.)

14

15          I hereby certify the foregoing is a true and accurate
        transcript from my stenographic notes in the proceeding.
16

17                       /s/ Brian P. Gaffigan
                         Official Court Reporter
18                        U.S. District Court

19

20

21

22

23

24

25