08:07:22  1          IN THE UNITED STATES DISTRICT COURT

        2          IN AND FOR THE DISTRICT OF DELAWARE

        3                      - - -

        4   IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
            DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
        5   DE LA RECHERCHE SCIENTIFIQUE and          :
            L'UNIVERSITE MONTPELLIER II,              :
        6                                             :
                         Plaintiffs,                  :
        7   v                                         :
                                                      :
        8   GILEAD SCIENCES, INC. and GILEAD          :
            PHARMASSET LLC,                           :
        9                                             :
                         Defendants.                  :  NO. 13-1987-LPS
       10   ------------------------------------------
            IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
       11   DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
            DE LA RECHERCHE SCIENTIFIQUE and          :
       12   L'UNIVERSITE MONTPELLIER II,              :
                                                      :
       13                Plaintiffs,                  :
            v                                         :
       14                                             :
            GILEAD PHARMASSET LLC,                    :
       15                                             :
                         Defendant.                   :  NO. 14-109-LPS
       16   ------------------------------------------
            IDENIX PHARMACEUTICALS, INC.,             :  CIVIL ACTION
       17                                             :
                         Plaintiff,                   :
       18   v                                         :
                                                      :
       19   GILEAD SCIENCES, INC.                     :
                                                      :
       20                Defendant.                   :  NO. 14-846-LPS
                                      - - -
       21
                           Wilmington, Delaware
       22             Thursday, December 15, 2016
                         *Jury Trial - Volume I*
       23
                                  - - -
       24
            BEFORE:  HONORABLE LEONARD A. STARK, Chief Judge, and a jury
       25
                                  - - -

1    APPEARANCES:

2

              ASHBY & GEDDES, P.A.
3                  BY:  JOHN G. DAY, ESQ.

4                      and

5                  McCARTER & ENGLISH
              BY:  MICHAEL P. KELLY, ESQ.
6

7                      and

              JONES DAY
8                  BY:  CALVIN P. GRIFFITH, ESQ.,
                  RYAN B. McCRUM, ESQ.,
9                      MICHAEL S. WEINSTEIN, ESQ., and
                  BRADLEY W. HARRISON, ESQ.
10                     (Cleveland, Ohio)

11                     and

12                 JONES DAY
              BY:  JENNIFER L. SWIZE, ESQ.
13                     (Washington, District of Columbia)

14                     and

15                 JONES DAY
              BY:  STEPHANIE E. PARKER, ESQ., and
16                     JESIKA W. FRENCH, ESQ.
                  (Atlanta, Georgia)
17
                  and
18
              JONES DAY
19                 BY:  JOHN D. KINTON, ESQ., and
                  ANTHONY M. INSOGNA, ESQ.
20                     (San Diego, California)

21                     and

22                 JONES DAY
              BY:  JOHN M. MICHALIK, ESQ., and
23                     LISA L. FURBY, ESQ.
                  (Chicago, Illinois)
24
                      Counsel for Plaintiffs
25

```
 1    APPEARANCES:   (Continued)

 2
                    FISH & RICHARDSON, P.C.
 3                  BY:  MARTINA TYREUS HUFNAL, ESQ.,
                         DOUGLAS E. McCANN, ESQ.,
 4                       JOSEPH B. WARDEN, ESQ.,
                         SANTOSH COUTINHO, ESQ.,
 5                       ROBERT OAKES, ESQ., and
                         KELLY ALLENSPACH DEL DOTTO, ESQ.
 6
                         and
 7
                    FISH & RICHARDSON, P.C.
 8                  BY:  FRANK SCHERKENBACH, ESQ., and
                         JENNY SHMUEL, ESQ.
 9                       (Boston, Massachusetts)

10                       and

11                  FISH & RICHARDSON, P.C.
                    BY:  JUANITA BROOKS, ESQ.,
12                       W. CHAD SHEAR, ESQ.,
                         CRAIG COUNTRYMAN, ESQ., and
13                       JONATHAN E. SINGER, ESQ.
                         (San Diego, California)
14
                         and
15
                    FISH & RICHARDSON, P.C.
16                  BY:  MICHAEL R. HEADLEY, ESQ.,
                         JOHN M. FARRELL, ESQ., and
17                       DALIA KOTHARI, ESQ.
                         (Redwood City, California)
18
                         and
19
                    FISH & RICHARDSON, P.C.
20                  BY:  TASHA FRANCIS, ESQ.
                         (Minneapolis, Minnesota)
21
                             Counsel for Defendants
22

23

24    Kevin Maurer                    Brian P. Gaffigan
      Official Court Reporter         Official Court Reporter
25
```

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following trial was held in open court, beginning at 8:32 a.m.)

THE COURT:  Good morning.

(The attorneys respond, "Good morning, Your Honor.")

THE COURT:  So we received and I have read the letter this morning from Idenix asking that we strike the obviousness defense.  Do defendants want to respond to that?

MR. SCHERKENBACH:  Your Honor, the person who would do the argument is Mr. Countryman, and I didn't know we were arguing it this morning, so he isn't here at this moment.  We have a response.  I have not --

THE COURT:  How soon could he be here?

MR. SCHERKENBACH:  We'll get him ASAP.  I apologize.

THE COURT:  Do you need a break in order to reach him to give him that notice or can we continue?

MR. SCHERKENBACH:  We can do it in real-time.

THE COURT:  All right.  Well, let's do that.  Because if you wish to be heard before I make a decision, I need to hear.

MR. SCHERKENBACH:  We do.  Thank you.

THE COURT:  Okay.  Are there any other issues from plaintiffs this morning?

08:33:41 1          MR. GRIFFITH:  Just one, Your Honor.

08:33:42 2          THE COURT:  Okay.

08:33:42 3          MR. GRIFFITH:  Minor.  And last night -- excuse

08:33:47 4     me.  Good morning.

08:33:49 5          THE COURT:  Good morning.

08:33:49 6          MR. GRIFFITH:  Last night, we, after we sent

08:33:53 7     the verdict form in, we noticed in the text of the form it

08:33:59 8     just is:  Has Idenix proven?  And we think it would be

08:34:03 9     appropriate to say:  Have Idenix and the University proven?

08:34:07 10    in the questions.  And we asked Idenix's counsel.  So we

08:34:15 11    contacted them this morning.

08:34:17 12         As I understand it, they're agreeable to the

08:34:19 13    change and we would provide substitute copies for the Court.

08:34:25 14    I don't have 20 copies with me right now but we have many

08:34:29 15    copies made.  We just wanted to change that.  It is not a

08:34:32 16    substantive change to anything, and I know we wrangled

08:34:36 17    around on this.  I hated to do that, but that is the request

08:34:38 18    we have.

08:34:39 19         THE COURT:  Are you able to get us a change to

08:34:41 20    the version that I think it was Mr. Headley sent in last

08:34:43 21    night with the font and everything the way we wanted it or

08:34:48 22    do you need us to make that change in the document he sent

08:34:51 23    over?

08:34:54 24         The bottom line is I am hoping or was intending

08:34:57 25    to give the verdict sheet to the jury when I handed them the

08:35:00  1    instructions at 9:00 o'clock.  And we're happy to make that

08:35:04  2    change and make the copies, but it's just whatever is going

08:35:08  3    to be most quick.

08:35:09  4              (Counsel confer.)

08:35:11  5              MR. GRIFFITH:  So I believe that it is on that

08:35:14  6    font, so in other words, I believe that -- oh.  You have to

08:35:20  7    do it yourself?

08:35:21  8              THE COURT:  No, no.  I just need to have 20

08:35:23  9    copies at 9:00 o'clock.

08:35:26 10              MR. GRIFFITH:  I understand.  I believe it is

08:35:28 11    on that font because my partner made the change on their

08:35:31 12    document.

08:35:31 13              THE COURT:  That's what I'm asking.  So maybe if

08:35:34 14    you send us electronically that document, we can double

08:35:37 15    check and we can make the copies.

08:35:40 16              MR. GRIFFITH:  We will do that right away.

08:35:42 17              THE COURT:  Thank you.

08:35:42 18              MR. GRIFFITH:  Thank you.

08:35:43 19              THE COURT:  That's it from plaintiffs?

08:35:44 20              MR. GRIFFITH:  I'm sorry.  Yes, it is, Your Honor.

08:35:47 21              THE COURT:  Any issues from defendants?

08:35:49 22              MR. SCHERKENBACH:  No, Your Honor.  But

08:35:50 23    Mr. Countryman is in the security line.  He will be here in

08:35:54 24    two minutes.

08:35:54 25              THE COURT:  That's fine.  I'll just note for

08:35:56 1  the record, we received the final jury instructions as

08:36:01 2  requested, as required, and those are the ones that I will

08:36:06 3  be docketing and intend to read this morning.  It was the

08:36:10 4  one that came in around 7:00 o'clock last night.

08:36:13 5          And I have confirmed I have seen that both sides

08:36:17 6  now have filed a written motion for judgment as a matter of

08:36:20 7  law and, as of now, those motions are being taken under

08:36:25 8  advisement and I'm reserving decision.

08:36:27 9          But here is Mr. Countryman.

08:36:32 10          MR. COUNTRYMAN:  I apologize.

08:36:33 11          THE COURT:  As soon as he has a moment to come

08:36:35 12  forward and confer, if he wishes, with his co-counsel, we

08:36:38 13  will put him at the podium.

08:36:50 14          (Pause.)

08:36:58 15          MR. COUNTRYMAN:  Good morning.

08:37:03 16          THE COURT:  Good morning.  Hopefully, you have

08:37:05 17  been notified that you are the one who is responding to the

08:37:07 18  letter that we received from Idenix asking us to strike the

08:37:11 19  obviousness defense.

08:37:12 20          MR. COUNTRYMAN:  Yes, I am.  And I apologize for

08:37:15 21  keeping you waiting.

08:37:16 22          A few points.

08:37:17 23          First, we oppose the motion.  Idenix's letter is

08:37:22 24  really just rearguing the JMOL in many respects.  Idenix

08:37:26 25  never objected to the evidence as it came in through the

witnesses particularly during Dr. Secrist's examination but also during some of the other relevant witnesses, Dr. Sommadossi, Dr. McHutchison, and Dr. La Colla.

Idenix has also never offered any contrary opinion that the limitations of the dependent claims are not obvious; and I just note that a lot of limitations we're talking about are putting the active ingredient in the tablet, administering it with things that were state of the art at the time, interferon, ribavirin. So the limitations we're actually talking about are not things that Idenix ever said are inventive. In fact, Dr. Sommadossi said quite the opposite during his testimony.

To respond particularly to the point about where this was disclosed in our expert reports, I have a number of citations.

It was disclosed, for example, in paragraph 24 of our third supplemental reply expert report of Dr. Secrist where he talked about obviousness, went through all of the claims and talked about what was known in the state of the art.

Dr. Secrist also more particularly discussed the Merck '313 patent application in his first supplemental reply report, paragraphs 21 through 26, and 31 through 46. And then again he talked about just what was generally known in the state of the art in his first supplemental reply report at page 18, footnote 9, and also in his reply report

08:39:04 1    at page 84, footnote 24.

08:39:07 2              The other point I would just note is that there

08:39:12 3    was a distinction drawn between the '224 patent and the '499

08:39:15 4    patent.  Both of these patents descend from the January 2001

08:39:21 5    Merck application.  Both of them have materially the same

08:39:25 6    relevant disclosure.

08:39:27 7              We pointed in the expert reports to where it was

08:39:29 8    in the '313 application, because we were trying to show that

08:39:33 9    that is, you know, the disclosure was known to those of

08:39:36 10   skill in the art as least as of January 2001.  And, you

08:39:41 11   know, all of the materials were in the '224 patent.  I would

08:39:45 12   also note that they're in the '499 patent,

08:39:47 13             Which is in evidence as DX-997, at column 32,

08:39:54 14   lines 9 through 27 for the discussion of ribavirin and

08:39:58 15   interferon.

08:39:59 16             Column 35, line 48 through column 36, line 7 for

08:40:06 17   the discussion of tablets and dosages between 50 and 1,000

08:40:09 18   milligrams.

08:40:10 19             At column 30, lines 66 through column 31, line

08:40:15 20   34 for the discussion of esters of phosphates.

08:40:19 21             And at column 35, lines 39 to 47 for the

08:40:23 22   discussion of use in humans.

08:40:26 23             Also, Example 52 which was in Dr. Secrist's

08:40:30 24   expert report and in the '224 patent also appears in the

08:40:33 25   '499 patent.

08:40:34 1          So there is no surprise in terms of the

08:40:37 2    disclosure here or whether it is in the '224 or the '597.

08:40:44 3    I know that is a lot of information.  We would be happy to

08:40:46 4    respond further in writing, Your Honor, with citations.  I

08:40:50 5    have copies of expert reports, if it would be helpful for

08:40:53 6    the Court.

08:40:53 7          THE COURT:  Let me ask you a few questions.

08:40:58 8          MR. COUNTRYMAN:  Sure.

08:40:58 9          THE COURT:  The contention from Idenix is the

08:41:01 10   first time you articulated the specific theory that I

08:41:04 11   currently put in the jury instructions for obviousness,

08:41:08 12   which includes the '499 in light of what one of skill in the

08:41:13 13   art would have known -- and I'm just paraphrasing, I'm not

08:41:18 14   reading the actual instruction.

08:41:19 15          The first time it was articulated was yesterday.

08:41:21 16   Is that true or untrue?

08:41:23 17          MR. COUNTRYMAN:  It's untrue, Your Honor.

08:41:24 18          THE COURT:  Untrue.  So where will I find that

08:41:26 19   theory articulated previously?

08:41:28 20          MR. COUNTRYMAN:  I think it is in the expert

08:41:30 21   reports.  I would say the expert reports do not discuss the

08:41:37 22   '499 patent specifically.  They discuss the June 2001

08:41:40 23   application but they use the June 2001 application in

08:41:46 24   addition to being 102(e) art through the issuance of the

08:41:50 25   '224 patent.  They use it as indicative of general knowledge

08:41:54 1    in the art at the time.

08:41:55 2              THE COURT:  All right.  By saying that they

08:41:57 3    don't specifically mention the '499, isn't that another way

08:42:01 4    of saying we never articulated that theory before yesterday?

08:42:05 5              MR. COUNTRYMAN:  Actually, my colleague Mr.

08:42:11 6    Headley points out to me that the expert reports do mention

08:42:15 7    the '499 patent.

08:42:18 8              For example, Dr. Secrist's reply report, at

08:42:24 9    paragraph 179.

08:42:25 10             THE COURT:  His initial reply report?

08:42:29 11             MR. COUNTRYMAN:  His initial reply report, yes.

08:42:33 12             THE COURT:  And they articulate the theory as we

08:42:36 13   have articulated it to the jury?

08:42:52 14             MR. COUNTRYMAN:  I believe so, Your Honor.  I

08:42:56 15   mean the expert report, obviously he is an expert so he is

08:43:00 16   not a legal -- he is not a lawyer, but he articulated where

08:43:05 17   everything was in the '313 patent.  He cited the '499 patent,

08:43:09 18   and he cited all the relevant passages of the '313 patent

08:43:13 19   that were used in front of the jury to show knowledge, that

08:43:18 20   the '313 was indicative of knowledge, the level of a person

08:43:23 21   of ordinary skill at some of the previous citations we gave

08:43:28 22   to you.  So we believe all that is fair disclosure of the

08:43:31 23   defense.

08:43:31 24             THE COURT:  Theories based on the '499 patent,

08:43:36 25   and neither of his experts testified about the '499 patent

08:43:39 1  at trial.  True or untrue?

08:43:42 2          MR. COUNTRYMAN:  It's true that neither the

08:43:43 3  experts mentioned the '499 patent.  I think the invalidity

08:43:49 4  theory here is primarily based on the '313 application, and

08:43:54 5  the fact that it is indicative of the level and knowledge

08:43:57 6  of someone of skill in the art.  I think it is also fair to

08:44:02 7  point out that it issued as a number of patents including

08:44:04 8  the '499 patent, and I think that is really the purpose

08:44:09 9  we're using it for rather than using the '499 patent

08:44:13 10  specifically as a stand-alone reference.

08:44:19 11          THE COURT:  Idenix writes, "Had Gilead timely

08:44:23 12  disclosed its new defense based on the '499 patent, Idenix

08:44:27 13  would have at least cross-examined Dr. Secrist and Gilead's

08:44:30 14  other expert and fact witnesses on the fundamentally

08:44:34 15  inconsistent position taken in California and in this case."

08:44:37 16          That's correct, isn't it?

08:44:38 17          MR. COUNTRYMAN:  I don't agree with that, Your

08:44:41 18  Honor, because again, to show that the '313 disclosure, to

08:44:48 19  use it in an obviousness analysis, we are just using it as

08:44:52 20  general knowledge in the art.  We don't have to show that

08:44:54 21  the '313 patent enabled the claims in the '499 patent, which

08:44:58 22  I think is what Idenix is suggesting.

08:45:00 23          We are simply using the '313 application as

08:45:06 24  indicative of knowledge in the art.  These are very trivial

08:45:10 25  limitations in terms of administering other agents with

08:45:11 1    tablets in a very wide dosage range.

08:45:13 2            So I don't think it's the case they would have

08:45:15 3    cross-examined on this.  Their experts have never said that

08:45:19 4    these limitations weren't obvious.

08:45:22 5            I think really it's an 11th-hour attempt to try

08:45:25 6    to reargue their JMOL.  I don't think there is any surprise

08:45:28 7    or prejudice here.

08:45:29 8            THE COURT:  Why is it that we only first heard

08:45:32 9    about the '499 being the basis of your theory yesterday?

08:45:35 10   You all did not propose an instruction that mentioned any

08:45:39 11   patent number, if I recall correctly, with respect to

08:45:44 12   obviousness.  They did, trying to figure out what you were

08:45:46 13   going to argue.  And they used the '224.  And we had several

08:45:51 14   discussions, and at no point in those discussions, I

08:45:56 15   believe -- correct me if I am wrong -- yesterday did you

08:45:59 16   say, "No, Your Honor, it's not the '224.  It's the '499."

08:46:02 17           Isn't that what happened and aren't they right

08:46:04 18   that there is some unfair surprise here?

08:46:07 19           MR. COUNTRYMAN:  I don't think there is any

08:46:08 20   unfair surprise.  Honestly, it is just a consequence of how

08:46:12 21   the evidence came in.  It turned out when we examined Dr.

08:46:16 22   Olsen, we used the '499 patent instead of the '422 patent.

08:46:20 23   We didn't think there was a material differences because the

08:46:23 24   '499 has the same passage about Ribavirin tablets, esters,

08:46:28 25   that appeared in both the '224 patent and in the January

08:46:32 1    2001 application.  And because the '499 patent was in

08:46:36 2    evidence, that is just the patent we used throughout the

08:46:39 3    rest of the trial.

08:46:41 4         I don't think there is any prejudice, because,

08:46:44 5    again, the disclosures are materially the same across all

08:46:47 6    the patents and the '313 application.

08:46:50 7         THE COURT:  All right.  Thank you.

08:46:52 8         Any reply from Idenix?

08:46:55 9         MR. GRIFFITH:  Your Honor, I am not aware of

08:47:03 10   this passage that they are citing where the '499 patent is

08:47:08 11   supposedly mentioned in a report of Dr. Secrist.  If it was,

08:47:11 12   I am pretty sure it was not mentioned as an obviousness

08:47:15 13   combination on this point.  In fact, my memory of the way

08:47:19 14   this unfolded is, we pointed out -- Your Honor may recall,

08:47:26 15   at the end of September we filed an interrogatory response

08:47:31 16   where we said they failed to meet their burden of proof.

08:47:34 17   They haven't come forward on all these details and so forth.

08:47:38 18        So we did not know about this.  I believe

08:47:40 19   personally, I don't know, but I think it was a strategic

08:47:43 20   call, because to not have Dr. Secrist talk about the '499

08:47:47 21   because he did have inconsistent -- he couldn't have a more

08:47:52 22   inconsistent opinion than the one we set forth in our

08:47:56 23   letter.  It did catch us by surprise.  We would have

08:47:59 24   cross-examined him.  We lost that opportunity.  It is too

08:48:01 25   little, too late for them.

08:48:04 1          And it is more important than that.  It is truly

08:48:06 2   a prejudicial situation.  We stand by everything in our

08:48:09 3   letter.  I don't believe there is anything inaccurate in

08:48:13 4   that letter, Your Honor.

08:48:14 5          THE COURT:  Thank you.  We have already used up

08:48:16 6   ten minutes of Mr. Scherkenbach's closing time.

08:48:18 7          Mr. Countryman, do you want to say anything

08:48:20 8   further?

08:48:22 9          MR. COUNTRYMAN:  No, Your Honor.

08:48:24 10         THE COURT:  All right.  I will go think about

08:48:27 11  this for a moment.

08:48:29 12         We will be in recess.

08:48:31 13         (Recess taken.)

08:58:37 14         THE COURT:  So the issue that we were arguing I

08:58:40 15  view as let's just call it a motion to strike the

08:58:45 16  obviousness defense from going to the jury.  I am denying

08:58:51 17  the motion, but it is without prejudice to the plaintiffs

08:58:55 18  renewing that motion sometime after we have a verdict in

08:59:00 19  this case.

08:59:03 20         I have significant concerns, which I have

08:59:07 21  expressed in the discussion this morning.  I have not had

08:59:11 22  the occasion or the time, and I am not going to keep the

08:59:15 23  jury waiting while I review the expert reports that were

08:59:18 24  mentioned.  But I am concerned about the prejudice.  I am

08:59:22 25  concerned that this defense may not have been adequately and

08:59:25 1    timely disclosed.

08:59:27 2            But at this point, with the evidence all in,

08:59:30 3    with the jury ready, again, my decision is to deny the

08:59:35 4    motion without prejudice.

08:59:36 5            Anything else before we bring the jury in?

08:59:40 6            MS. PARKER:  Just briefly.  Logistically, will

08:59:43 7    Your Honor read the instructions and then will we take a

08:59:46 8    short break.

08:59:47 9            THE COURT:  My intent, subject to the

08:59:50 10   possibility of more breaks and other things occurring, is

08:59:55 11   that when I bring them in now, I will read Page 1 through

08:59:59 12   Page 48, so everything, all the substantive instructions.

09:00:04 13   And I would stop and save Section 8, Deliberation and

09:00:07 14   Verdict, to be the last thing that they hear before they go

09:00:10 15   in to deliberate.

09:00:12 16           My intent would be, if I read at roughly the

09:00:15 17   pace I anticipate, that I will give them a break after I

09:00:18 18   finish reading, encourage them to keep it to a short break,

09:00:22 19   then come back, hopefully get through all of your first

09:00:25 20   argument, before another short break, then depending on what

09:00:29 21   time it is, you know, I think they will need another break

09:00:33 22   at that point.  And whether that is a long break or not will

09:00:36 23   just depend on where we are.

09:00:38 24           Any thoughts?  Does that your question?

09:00:41 25           MS. PARKER:  It does answer my question.  Thank

09:00:43 1  you, Your Honor.  I haven't timed it, but I think I am

09:00:46 2  probably going to go about an hour and a half.  If that

09:00:49 3  helps.

09:00:49 4          THE COURT:  All right.  That does help.

09:00:52 5          So if that's the case, certainly, they will get

09:00:56 6  a break after that, and there is a possibility we will need

09:00:59 7  to take a break before the hour and a half is done.

09:01:03 8          Issues or questions, Mr. Scherkenbach?

09:01:05 9          MR. SCHERKENBACH:  For clarification, Your

09:01:07 10 Honor, I understand your ruling.  I had not intended to even

09:01:12 11 argue the '499 patent, 102(e) issue, so you won't see that

09:01:17 12 in my closing.  It wasn't there anywhere.

09:01:20 13         I want to inquire about timing.

09:01:22 14         It sounded like I lost ten minutes on that.  Is

09:01:27 15 there a motion?  I am trying to understand.

09:01:28 16         THE COURT:  That's correct.  Yes.  Ten minutes.

09:01:30 17 So you are down to, I believe, an hour and ten minutes.

09:01:34 18         MR. SCHERKENBACH:  I think I had 80, now I have

09:01:38 19 70.

09:01:39 20         THE COURT:  That's correct.

09:01:40 21         Let's bring the jury in.

09:01:42 22         (Jury enters courtroom at 9:03 a.m.)

09:03:10 23         THE COURT:  All right, ladies and gentlemen.

09:03:12 24 Welcome back.

09:03:14 25         Good morning.

09:03:17 1          So before he sits town, Mr. Looby will be

09:03:21 2     distributing some papers to you.  You will each receive two

09:03:24 3     documents.  The first and longer one is the final jury

09:03:27 4     instructions.  The second and shorter one is the verdict

09:03:31 5     form.  And over the course of today I am going to read these

09:03:46 6     documents to you.

09:03:47 7          The way this will proceed, you will see, as I

09:03:50 8     promised, the final jury instructions are fairly lengthy.  I

09:03:55 9     am going to read to you first thing the first seven

09:03:59 10    sections, so we will be reading Pages 1 through 48.  You

09:04:03 11    each have your own copy now.

09:04:08 12          Do we have enough?

09:04:10 13          Are you missing a second form?

09:04:14 14          There we go.  Great.

09:04:15 15          I will be reading Pages 1 through 47.  You can

09:04:19 16    follow along on your copy if you wish.  After that, we will

09:04:25 17    hear the closing arguments.  Once the closing arguments are

09:04:29 18    completed, I will read to you the remaining jury

09:04:33 19    instructions, then I will read the verdict form to you.  At

09:04:45 20    that point you will begin your deliberations.  And we will

09:04:47 21    take breaks as necessary.

09:04:49 22          Let me see if I can begin to read you the jury

09:04:52 23    instructions.  I am at Page 1.

09:04:58 24          Section 1 is called General Instructions, 1.1.

09:05:03 25    Introduction.

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding the case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain the rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law that you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

1.2, Jurors' Duties.

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is

your job, not mine, and nothing that I have said or done

during this trial was meant to influence your decision about

the facts in any way.  You are the sole judges of the facts.

Your second duty is to take the law that I give

you, apply it to the facts, and decide under the appropriate

burden of proof which party should prevail on any given

issue.  It is my job to instruct you about the law, and you

are bound by the oath you took at the beginning of the trial

to follow the instructions that I give you, even if you

personally disagree with them.  This includes the

instructions that I gave you before and during the trial,

and these instructions.  All of the instructions are

important, and you should consider them together as a whole.

Perform these duties fairly.  Do not let any

bias, sympathy, or prejudice you may feel toward one side or

the other influence your decision in any way.

1.3.  Evidence Defined.

You must make your decision based only on the

evidence that you saw and heard here in court.  Do not let

rumors, suspicions or anything else that you may have seen

or heard outside of Court influence your decision in any

way.

The evidence in this case includes only what the

witnesses said while they were testifying under oath

(including deposition transcript testimony that has been

played by video or read to you), the exhibits that I allowed into evidence, and the stipulations to which the lawyers agreed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. Any of my comments and questions are not evidence.

During the trial I may not have let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see, and sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

1.4.  Direct and Circumstantial Evidence.

You may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the

testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give with the whatever weight you believe it deserves.

1.5.  Consideration of Evidence.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

1.6.  Statements of Counsel.

09:10:05 1    A further word about statements of counsel and

09:10:07 2 arguments of counsel.  The attorneys' statements and

09:10:11 3 arguments are not evidence.  Instead, their statements and

09:10:14 4 arguments are untended to help you review the evidence

09:10:17 5 presented.  If you remember the evidence differently from

09:10:19 6 the attorneys, you should rely on your own recollection.

09:10:26 7    1.7.  Credibility of Witnesses.

09:10:29 8    You are the sole judges of each witness's

09:10:33 9 credibility.  You may believe everything a witness says, or

09:10:37 10 part of it, or none of it.  You should consider each

09:10:40 11 witness's means of knowledge; strength of memory;

09:10:44 12 opportunity to observe; how reasonable or unreasonable the

09:10:47 13 testimony is; whether it is consistent or inconsistent;

09:10:51 14 whether it has been contradicted; the witness's biases,

09:10:55 15 prejudices, or interests; the witness's manner or demeanor

09:11:00 16 on the witness stand; and all circumstances, that according

09:11:04 17 to the evidence, could affect the credibility of the

09:11:06 18 testimony.

09:11:06 19    In determining the weight to give to the

09:11:09 20 testimony of a witness, you should ask yourself whether

09:11:12 21 there is evidence tending to prove that the witness

09:11:15 22 testified falsely about some important fact, or whether

09:11:19 23 there was evidence that at some other time the witness said

09:11:24 24 or did something, or failed to say or do something, that was

09:11:27 25 different from the testimony he or she gave at the trial in

person or by deposition testimony played by video or read to you. You have the right to distrust such witness's testimony and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

1.8. Number of Witnesses.

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

1.9. Expert Witnesses.

Expert testimony is testimony from a person who has a special skill or knowledge in some science,

profession, or business.  This skill or knowledge is not
common to the average person but has been acquired by the
expert through special study or experience.

In weighing expert testimony, you may consider
the expert's qualifications, reasons for the expert's
opinions and the reliability of the information supporting
expert's opinions, as well as the factors I have previously
mentioned for weighing testimony of any other witness.
Expert testimony should receive whatever weight and credit
you think appropriate, given all of the other evidence in
the case.  You are free to accept or reject the testimony of
experts, just as with any other witness.

1.10.  Deposition Testimony.

During the trial, certain testimony was
presented to you by the reading of a deposition transcript
or the playing of video excerpts from a deposition.  If
played by video, the deposition testimony may have been
edited or cut to exclude irrelevant testimony.  You should
not attribute any significance to the fact that deposition
videos may appear to have been edited.

Deposition testimony is entitled to the same
consideration you would give it had the witness testified in
person here in the courtroom.

1.11.  Rule 30(b)(6) Deposition Testimony.

In this trial, there were certain witnesses

identified as "Rule 30(b)(6) witnesses" for the parties.
These Rule 30(b)(6) witnesses were designated to speak on
certain topics on behalf of the entities which designated as
Rule 30(b)(6) witnesses.  These witnesses include
Dr. Michael Otto (designated by Gilead), Joseph Duffy
(designated by Merck), and James Meyers (designated by
Gilead).  Rule 30(b)(6) witnesses are required to testify
about information known or reasonably available to the
designating entity related to those particular topics.  For
answers within the designated topics, the entity is bound by
the answers provided by its Rule 30(b)(6) witness.

12.12.  Demonstrative Exhibits.

During the course of the trial, you have seen
many exhibits.  Many of these exhibits were admitted as
evidence.  Some of these exhibits constitute charts and
summaries.  You may use these charts and summaries as
evidence, even though the underlying documents and records
are not here.  You should give them only such weight as you
think they deserve.  You will have these admitted exhibits
in the juryroom for your deliberations.

The remainder of the exhibits (including other
charts and animations) were offered to help illustrate the
testimony of the various witnesses.  These illustrative
exhibits, called "demonstrative exhibits," have not been
admitted, and are not evidence, and should not be considered

09:15:50 1   as evidence.  Rather, it is the underlying testimony of the

09:15:53 2   witness that you heard when you saw the demonstrative

09:15:55 3   exhibits that is in the evidence in this case.

09:16:01 4          1.13.   Burdens of Proof.

09:16:04 5          In any legal action, facts must be proven by a

09:16:08 6   required weight of the evidence, known as the "burden of

09:16:11 7   proof."  In a patent case such as this one, there are two

09:16:15 8   different burdens of proof that you will apply.  The first

09:16:19 9   is called "preponderance of the evidence."  The second is

09:16:23 10  called "clear and convincing evidence."

09:16:25 11         Infringement of the '597 patent is not an issue

09:16:28 12  you are deciding in this case, and Idenix is not required

09:16:30 13  to prove infringement at this trial.  Instead, you are to

09:16:34 14  assume that Gilead infringes the '597 patent.  You must

09:16:38 15  decide whether Idenix has proven that Gilead's infringement

09:16:41 16  of any valid claim of the '597 patent was willful by what is

09:16:46 17  called a preponderance of the evidence.  That means Idenix

09:16:50 18  must produce evidence that, considered in the light of all

09:16:54 19  the facts, leads you to believe that what Idenix alleges is

09:16:57 20  more likely true than not true.  To put it differently, if

09:17:02 21  you were to put the evidence of Idenix and Gilead concerning

09:17:05 22  willful infringement on opposite sides of a scale, the

09:17:10 23  evidence supporting Idenix's allegations would have to make

09:17:13 24  the scale tip somewhat toward Idenix's side for you to

09:17:17 25  issue a verdict in favor of Idenix on the issue of willful

infringement. If the scale should remain equally balanced or tip in favor of Gilead, your verdict must be for Gilead on the issue of willful infringement.

Gilead also alleges that the asserted claims of the '597 patent are invalid. A patent is presumed to be valid under the U.S. patent laws. Accordingly, Gilead has the burden of proving by clear and convincing evidence that each asserted claim is invalid. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

Those of you familiar with criminal cases will have heard of "proof beyond a reasonable doubt." That burden is higher than those that apply in this case, and it does not apply in a civil case like this one. Therefore, you should put it out of your mind in considering whether or not either party has met its burden of proof.

Idenix must also prove by a preponderance of the amount of damages that is adequate to compensate Idenix for Gilead's infringement. I will give you more detailed instructions on damages later.

1.14. Use of Notes.

You may use notes taken during trial to assist your memory. However, as I instructed you at the beginning

09:18:47 1    of the case, you should use caution in consulting your

09:18:50 2    notes.  There is generally a tendency I think to attach

09:18:53 3    undue importance to matters which one has written down.

09:18:56 4    Some testimony which is considered unimportant at the time

09:18:59 5    presented, and thus not written down, takes on greater

09:19:03 6    importance later in the trial in light of all the evidence

09:19:06 7    presented.  Therefore, your notes are only a tool to aid

09:19:09 8    your own individual memory, and you should not compare

09:19:13 9    notes with other jurors in determining the content of any

09:19:16 10   testimony or in evaluating the importance of any evidence.

09:19:20 11   Your notes are not evidence, and are by no means a complete

09:19:24 12   outline of the proceedings or a list of the highlights of

09:19:27 13   the trial.

09:19:27 14          Above all, your memory should be your greatest

09:19:31 15   asset when it comes time to deliberate and render a decision

09:19:34 16   in this case.

09:19:38 17          We're now up to Section 2, at page 16.  The

09:19:42 18   Parties and Their Contentions.

09:19:43 19          2.1.  The Parties.

09:19:45 20          I will now review for you the parties in this

09:19:47 21   action, and the positions of the parties that you will have

09:19:50 22   to consider in reaching your verdict.

09:19:51 23          As I previously told you, the plaintiffs in this

09:19:55 24   case are Idenix Pharmaceuticals LLC and Universita Degli

09:20:02 25   Studi di Cagliari.  I will refer to the plaintiffs

collective as "Idenix."  The defendant in this case is Gilead Sciences Inc., which I will refer to as "Gilead."

2.2.  Plaintiffs' Contentions.

The Idenix patent in this case is U.S. Patent No. 7,608,597, often referred to by the lawyers and the witnesses as the '597 patent.  The patent has also been referred to as the "asserted patent" or the "patent-in-suit."  The asserted claims are claims 1, 2, 4 through 7, 9 through 10, 16, 19, 23, and 28 through 31 of the '597 patent.  The inventors of the '597 patent are Dr. Jean-Pierre Sommadossi and Dr. Paolo La Colla.  Dr. Sommadossi assigned his patent rights to Idenix, and Dr. La Colla assigned his rights to the University.

You are to assume that Gilead infringes the '597 patent.  Idenix is not required to prove infringement. Idenix alleges that Gilead's infringement of claims 1, 2, 4 through 7, 9 through 10, 16, 19, 23, and 28 through 31 of the '597 patent has been and continues to be willful. Idenix also contend that Gilead owes Idenix damages to compensate for Gilead's infringement in the form of a reasonable royalty.

I will explain further each of these contentions in a few moments.

2.3.  Defendant's Contentions.

Gilead contends that the asserted claims of the

'597 patent are invalid.  Gilead also denies that its conduct is willful.

I will explain further these contentions in a few moments.

2.4.  Summary of the Patent Issues.

I will now summarize the patent issues that you must decide and for which you will provide instructions to guide your deliberations.

Infringement of the '597 patent is not an issue you are deciding in this case.  Instead, you are to assume that Gilead infringes the '597 patent under the Court's claim construction.

Here are the issues you must decide:

1.  Whether Idenix has proven by a preponderance of the evidence that Gilead's assumed infringement has been and is willful.

2.  Whether Gilead has proven by clear and convincing evidence that one or more of the asserted claims of the '597 patent are invalid due to lack of written description, lack of enablement, or anticipation or obviousness.

3.  If you do not find each and every one of the asserted claims invalid by clear and convincing evidence, then you must determine the amount of money damages to be awarded to Idenix.  Idenix has the burden to establish the

09:22:59 1    amount of its damages by a preponderance of the evidence.

09:23:03 2              I will provide more detailed instructions on

09:23:06 3    each of the issues you must decide throughout elsewhere in

09:23:11 4    these jury instructions.

09:23:15 5              Section 3.  Patent Laws.

09:23:17 6              At the beginning of the trial, I gave you some

09:23:19 7    general information about patents and the patent system and

09:23:22 8    a brief overview of the patent laws relevant to this case.

09:23:24 9    I will now give you more detailed instruction about the

09:23:27 10   patent laws that specifically relate to this case.

09:23:35 11             4.  The patent claims.

09:23:39 12             4.1.  Generally.

09:23:40 13             Before you can decide many of the issues in

09:23:42 14   this case, you will need to understand the role of patent

09:23:45 15   "claims."

09:23:46 16             Patent claims are the numbered paragraphs at the

09:23:48 17   end of each patent.  The claims are important because it is

09:23:51 18   the words of the claims that define what a patent covers.

09:23:54 19   The claims are intended to define, in words, the boundaries

09:23:58 20   of the invention that constitute the patent owner's property

09:24:02 21   rights.  The figures and text in the rest of the patent

09:24:05 22   provide a description and/or examples of the invention and

09:24:08 23   provide a context for the claims, but it is the claims that

09:24:12 24   define the breadth of the patent's coverage.  Each of the

09:24:15 25   asserted claims must be considered individually.

Each claim of a patent effectively acts as if it were a separate patent, and each claim may cover more or less than another claim.

4.2.   Construction of the Claims.

It is the Court's duty under the law to define what the patent claims mean.  As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning of claim terms.  You must apply the meaning that I give in each patent claim to decide if the claim is invalid.  You must accept my definitions of these words in the claims as being correct. You must ignore any different definitions used by the witnesses or the attorneys.

It may be helpful to refer to the copy of the '597 patent that you have been given as I discuss the claims at issue here.  The claims of the patent are toward the end of the patent.

You are advised that the following definitions for the following terms must be applied:

The claim term "Method for the treatment of a Hepatitis C virus infection" has the construction plain and ordinary meaning.

The claim term "Administering" has the construction "Making available."

The claim term "effective amount" has the

construction "An amount [of the claimed ribofuranosyl nucleoside] that is effective to treat HCV."

The claim term "Nucleoside" has the meaning "A compound comprising a base linked to a sugar."

And the claim term "Beta-D-2'-ribofuranosyl nucleoside" has the meaning "A Beta-D-nucleoside that includes a five member sugar ring with a methyl group in the 2' up position and non-hydrogen substituents at 2' down and 3' down positions."

For any words in the claim for which I have not provided you with a definition, you should apply the plain and ordinary meaning to a person of ordinary skill in the art.

4.3.  Independent and Dependent Claims.

There are two types of claims in the patent. The first type is called an "independent claim."  An independent claim does not refer to any other claim of the patent.  An independent claim is read separately to determine its scope.

On the other hand, a "dependent claim" refers to and depends upon at least one other claim in the patent and thus incorporates whatever the other claim says. Accordingly, to determine what a dependent claim covers, you must read both the dependent claim and the claim or claims to which it refers.  For example, Claim 1 of the '597 patent

is an independent claim. You know this because it mentions no other claims. Accordingly, the words of Claim 1 of the '597 are read by themselves in order to determine what Claim 1 covers. Claim 2 of the '597 patent, on the other hand, is a dependent claim. You know this because it refers to Independent Claim 1. Accordingly, the words of Claims 1 and 2 are read together in order to determine what Claim 2 of the '597 patent covers.

4.4: "Open-Ended or "Comprising Claims."

The asserted claims all include the word "comprising." The word comprising means includes the following but not excluding others. A claim that uses the word comprising is not limited to products or methods having only the elements that are recited in the claims, but also covers products and methods that have additional elements.

Section 5. Willful Infringement.

Idenix alleges that Gilead act willfully. To prove willful infringement, Idenix must prove by a preponderance of the evidence that Gilead had knowledge of the '597 patent, but mere knowledge of the '597 patent is not sufficient.

Instead, to prove willful infringement, Idenix must also prove, by a preponderance of the evidence, that Gilead's conduct was reckless, willful, wanton, malicious, committed in bad faith, deliberate, consciously wrongful,

09:28:51 1    flagrant or -- it may be described -- characteristic of a

09:28:56 2    pirate.  To determine whether Gilead acted willfully,

09:28:59 3    consider all of the facts.

09:29:01 4         If you do decide that there was willful

09:29:03 5    infringement, that decision should not affect any damage

09:29:06 6    award you give in this case.

09:29:15 7         Section 6, Page 26, Invalidity.

09:29:18 8         6.1.  Generally.

09:29:21 9         The granting of a patent by the United States

09:29:23 10    Patent and Trademark Office carries with it the presumption

09:29:26 11    that the patent is valid.  The law presumes that the Patent

09:29:30 12    and Trademark Office acted correctly in issuing the patent.

09:29:32 13    Each of the asserted claims is presumed valid, independently

09:29:38 14    of the validity of each other claim.  This presumption puts

09:29:41 15    the burden on Gilead of proving invalidity by clear and

09:29:44 16    convincing evidence on a claim-by-claim basis; that is, you

09:29:48 17    must be left with an abiding conviction that the asserted

09:29:51 18    claims of the '597 patent are invalid.  This burden always

09:29:55 19    remains with Gilead and never shifts to Idenix.

09:29:59 20         Even though the Patent Office examiner allowed

09:30:01 21    the claims of a patent, you have the ultimate responsibility

09:30:04 22    for deciding whether the claims of the patent are proven to

09:30:08 23    be invalid.

09:30:10 24         For a patent to be valid, the subject matter

09:30:12 25    claimed in the individual claims of the patent must be new,

nonobviousness, and the specification of the patent must contain a sufficient written description of the claimed invention and must enable people to make the invention. A patent cannot take away from the right of anyone who wants to use what was already known or used by others, or what would have been obvious to those of skill in the art at the time the invention was made.

### 6.2.  Other Patents.

In this case you have heard testimony and saw evidence about patents other than Idenix's '597 patent that may cover Gilead's Sovaldi and Harvoni products.  More than one patent by the same or different owners can cover a product or its use.  Often, multiple patents cover the same product or its use.  The fact that Gilead has patents that may cover its Sovaldi and Harvoni products or their use does not mean that that any of the asserted claims of the '597 patent are invalid.

### 6.3.  Level of Ordinary Skill.

Patent invalidity defenses are evaluated from the perspective of a "hypothetical person of ordinary skill in the art."  The hypothetical person of ordinary skill in the art is presumed to be aware of all the prior art at the time of the invention.

You are to determine the level of ordinary skill in the art to which the claimed invention pertains at the

time the claimed invention was made.  In deciding what the level of ordinary skill in the relevant field is, you should consider all the evidence introduced at trial, including but not limited to:  the levels of education and experience of other persons actively working in the field.

6.4.  Written Description.

Gilead contends that the asserted claims of the '597 are invalid for lack of an adequate written description.  Gilead has the burden of proving lack of adequate written description for each asserted claim by clear and convincing evidence.

The patent law requires that a patent application contain an adequate written description of the invention to ensure that the inventor was in possession of the invention at the time the patent application was filed.

The written description requirement is satisfied if a person having ordinary skill reading the patent application would have recognized that the application describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the relevant application.

In the patent application process, the applicant may keep the originally filed claims, or expand, narrow or change the claims between the time the patent application is

first filed and the time that a patent is issued.  An

applicant may amend the claims or add new claims.  The

written description requirement ensures that the issued

claims correspond to the scope of the written description

that was provided in an application.

In deciding whether a specification satisfies

this written description requirement, you must consider the

description from the viewpoint of a person having ordinary

skill in the field of technology of the patent when the

application was filed.  The written description requirement

may be satisfied by any combination of words, structures,

figures diagrams, formulas, experiments, data, etc.,

contained in the patent application.  These are often called

"blaze marks."  Blaze marks guide a reader through the

specification's "forest" towards the claims.  The full scope

of a claim or any particular requirement in a claim need not

be expressly disclosed in the original patent application if

a person having ordinary skill in the field of technology of

the patent at the time of filing would have understood that

the full scope or missing requirement is in the written

description in the patent application.

6.5.  Enablement.

Gilead contends that the asserted claims of the

'597 patent are invalid because the specification lacked an

enabling disclosure.  Gilead has the burden of proving

nonenablement for each asserted claim by clear and
convincing evidence.

A patent specification must contain a
sufficiently full and clear description of how to make and
use the full scope of the claimed invention.  This is known
as the "enablement" requirement, and it is designed to
prevent inadequate disclosure of an invention and overbroad
claiming that might otherwise attempt to cover more than was
actually invented.  The purpose of this requirement is to
ensure that the public, in exchange for the patent rights
given to the inventor, obtains from the inventor a
sufficient disclosure of how to carry out the claimed
invention.

In order to be enabling, the patent must permit
persons having ordinary skill in the field of technology of
the patent to make and use the full scope of the claimed
invention at the time of the original filing without having
to conduct undue experimentation.  Some amount of
experimentation to make and use the invention is allowable.

In deciding whether a person having ordinary
skill would have to experiment unduly in order to make and
use the invention, you may consider several factors:

(1) the quantity of experimentation necessary;

(2) how routine any necessary experimentation is
in the relevant field;

09:35:59 1          (3) whether the patent discloses specific

09:36:01 2  working examples of the claimed invention;

09:36:04 3          (4) the amount of guidance presented in the

09:36:06 4  patent;

09:36:08 5          (5) the nature and predictability of the field;

09:36:10 6          (6) the level of ordinary skill; and.

09:36:15 7          (7) the scope of the claimed invention.

09:36:22 8          No one of these factors is alone dispositive.

09:36:25 9  Rather, you must make your decision as to whether the degree

09:36:28 10  of experimentation required is undue based upon all of the

09:36:31 11  evidence presented to you with regard to all of the factors

09:36:34 12  above.  You should weigh these factors and determine whether

09:36:37 13  or not, in the context of this invention and the state of

09:36:40 14  the art at the time of the relevant application, a person

09:36:43 15  having ordinary skill would need to experiment unduly to

09:36:48 16  make and use the full scope of the claimed invention.

09:36:55 17          6.6.  Gilead's Prior Invention Contentions.

09:36:59 18          A patent claim is invalid if the claimed

09:37:02 19  invention is not new and nonobviousness.

09:37:06 20          In this case, Gilead contends that claims of --

09:37:11 21  let me start over.

09:37:12 22          In this case, Gilead contends that claims of

09:37:14 23  Idenix's '597 patent are invalid as not new and as not

09:37:21 24  nonobviousness.  These the defenses are sometimes called

09:37:24 25  anticipation and obviousness.  Gilead has the burden of

proving anticipation and obviousness by clear and convincing evidence.

Gilead's contentions can be summarized as follows:

1.   Gilead contends that there was an alleged prior invention by Merck's Bohdan Wolanski or David Olsen in 1998 that invalidates Claim 1 of the '597 patent due to anticipation.

2.   Gilead contends there is anticipation of Claims 1, 28, 30, and 31 of the '597 patent by an alleged prior invention by Merck's David Olsen in 1998 or 2000.

3.   Gilead contends that even if none of these Merck related purported inventions anticipate any of the claims of the '597 patent, all of the asserted claims of the '597 patent are invalid as obvious due to the combination of (a) either the work described above, with (b) Merck's 2001 '313 patent application, which resulted in Merck's '499 patent, and/or (c) the general knowledge of a person of skill in the art at the pertinent time.

I will provide instructions to guide your consideration of each of these contentions further below.

6.7.   Anticipation - Prior Invention.

Gilead contends that certain claims of the '597 patent are invalid because the invention defined in the claims was invented by another person, either Bohdan

Wolanski or David Olsen in 1998, or David Olsen in 2000, before Dr. Sommadossi and Dr. La Colla did so.

If Merck made or invented the subject matter covered by those claims of the '597 patent before Idenix did, then these claims were anticipated by the other invention and are invalid. Gilead must prove anticipation by clear and convincing evidence.

Only a person may be an inventor. A corporation cannot be an inventor.

An invention requires conception and reduction to practice. It also requires that there be no abandonment, suppression, or concealment.

Conception occurs when the inventor has a specific, settled idea; a particular solution to the problem at hand. The date of conception is the date the inventor first appreciated the fact of what he or she made.

Reduction to practice occurs either as of the filing of a patent application that adequately enables and describes the claimed invention (which is a "constructive" reduction to practice) or when the invention was actually made and was shown to work for its intended purpose ("actual" reduction to practice.)

An invention loses its status as an invention if it was abandoned, expressed or concealed. This occurs when an inventor unreasonably delays in making the invention

publicly known.  Mere delay is not sufficient to establish
suppression or concealment.

If Person A conceived of the claimed invention
first, but reduced it to practice second (that is, after
Person B), then Person A is the inventor permitted to obtain
a valid patent only if Person A(1) began to reduce the
claimed invention to practice before Person B conceived of
it and (2) continued to work with reasonable diligence to
reduce it to practice just before Persons B's conception.

Due diligence means that the inventor worked
reasonably continuously on reducing the invention to
practice.  Interruptions caused by the everyday problems and
obligations of the inventor or others working with him or
her do not prevent a finding of reasonable diligence.

In this case, Idenix's earliest reduction to
practice date is the same as the date you determine to be
the priority date to be for the '597 patent.

6.8.  Obviousness - Generally.

Even though an invention may not have been
identically disclosed or described before it was made by an
inventor, in order to be patentable, an invention must not
have been obvious to a person of ordinary skill in the art
at the time the invention was made.

Gilead contends that if all of the elements of
the asserted claims of the '597 patent are not found in Dr.

Wolanski's 1998 alleged invention, or Dr. Olsen's alleged invention, then you should consider whether that work renders the claims obvious when considered with the general knowledge in the field at the time and/or Merck's '313 patent application, which issued as Merck's '499 patent. Gilead bears the burden of proving obviousness by clear and convincing evidence.

In order to be patentable an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made.  The issue is not whether the claimed invention would be obvious today to you, as a layperson, to me as a Judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made.

In determining obviousness or nonobviousness of the subject matter of each of the asserted claims, you should take the following steps:

1.  Determine the scope and content of the prior art practice;

2.  Identify the differences, if any, between each asserted claim and the prior art;

3.  Determine the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

4.  Consider objective factors of

nonobviousness.

In addition, you may consider whether there was an apparent reason to combine or modify the prior art references in the fashion claimed by the patent at issue, but in doing so, you must guard against slipping into the use of hindsight.

I will explain each of these factors in more detail in a moment. Against this background, you will then decide whether the subject matter of each asserted claim would have been obvious or nonobvious to a person of ordinary skill in the pertinent art.

6.9. Scope and Content of the Prior Art.

As I just instructed you, in deciding whether or not the claimed invention is obvious to one of ordinary skill in the art, you must first determine the scope and content of the prior art.

This means that you must determine what prior art is reasonably pertinent to the particular problem with which the inventor was faced. Prior art is reasonably pertinent if it is in the same field as the claimed invention or is from another field that a person of ordinary skill would look to in trying to solve the problem the named inventor was trying to solve. Prior art can include the following:

Prior patents that issued before the critical

date for a particular patent;

Prior publications having a publication date before the critical date for a particular patent;

U.S. patents that have a filing date prior to the critical date for a patent;

Anything in public use or on sale in the United States before the critical date for a particular patent;

Anything that was publicly known or used by others in this country before the date of the invention of a particular patent;

Any of Merck's work (as evidenced by testimony, documents, publications, or patents) that you have found was a prior invention or that you find to be indicative of the level of ordinary skill in the art.

6.10. Level of Ordinary Skill in the Art.

Next you are to determine the level of ordinary skill in the art to which the claimed inventions were made. I have already given you instructions on the "Level of Ordinary Skill" at Instruction 6.3. That same instruction applies here.

6.11. Obviousness - Objective Criteria.

Lastly, in making a determination as to the obviousness or nonobviousness of the claimed inventions, you must consider the following objective criteria (sometimes called "secondary consideration"), which may shed light on

the obviousness or not of the claimed invention:

       1.  Whether the invention was commercially successful as a result of the merits of the claimed invention;

       2.  Whether the invention satisfied a long-felt need;

       3.  Whether others had tried and failed to make the invention;

       4.  Whether others invented the invention at roughly the same time;

       5.  Whether others copied the invention;

       6.  Whether there were changes or related technologies or market needs contemporaneous with the invention;

       7.  Whether the invention achieved unexpected results;

       8.  Whether others in the field praised the invention;

       9.  Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

       10.  Whether others sought or obtained rights to the patent from the patent holder; and

       11.  Whether the inventor proceeded contrary to accepted wisdom in the field.

09:47:05 1      There must be a connection (i.e., a nexus)

09:47:09 2 between the evidence showing any of these factors and the

09:47:12 3 claim invention if this evidence is to be given weight by

09:47:15 4 you in arriving at your conclusion on the obviousness issue.

09:47:22 5      We're now at page 41.  Section 7.  Patent Damages.

09:47:29 6      7.1.  Patent Damages Generally.

09:47:32 7      I will now instruct you about the measure of

09:47:34 8 damages.  If you find that any claim of the '597 patent is

09:47:38 9 not invalid, you must then determine the amount of money

09:47:42 10 damages to be awarded to Idenix to compensate it for the

09:47:45 11 infringement.  If you find that all of the asserted claims

09:47:49 12 are invalid, then Idenix is not entitled to any damages.

09:47:52 13      By instructing you on damages, I am not

09:47:56 14 suggesting which party should win this case, on any issue.

09:47:59 15      The amount of damages you award must be adequate

09:48:02 16 to compensate for Idenix -- compensate Idenix for the

09:48:07 17 assumed infringement of its '597 patent.  A damages award

09:48:11 18 should put Idenix in approximately the same financial

09:48:14 19 position that it would have been in had the infringement not

09:48:17 20 occurred, but in no event may the damages award be less than

09:48:21 21 a reasonable royalty.  You should keep in mind that the

09:48:24 22 damages you award are meant to compensate the patent holder

09:48:28 23 and not to punish an infringer.

09:48:30 24      Idenix has the burden to persuade you of the

09:48:33 25 amount of its damages by a preponderance of the evidence.

You should award only those damages that Idenix more likely than not suffered.  While Idenix is not entitled to damages that are remote or speculative, Idenix is not required to prove its damages with mathematical precision.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

Again, the fact that I am instructing you on damages does not mean that the Court believes that one party or the other should win this case.  My instructions about damages are for your guidance in the event you find in favor of Idenix.

7.2.  Patent Damages - Reasonable Royalty.

In this case, Idenix seeks a reasonable royalty based upon Gilead's sales of Sovaldi and Harvoni.  A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  That right is called a "license."  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began.  In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement.  You must also assume that both parties believed the patent was valid and infringed.  Your

role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. Although evidence of the actual profits of an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

7.3. Patent Damages - Running Royalty Or Lump Sum.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard.

Idenix contends that you should calculate the reasonable royalty based on what is called a "running royalty." To calculate a running royalty, you must determine what the "base" is. The base is the products on which the infringer is to pay, here that is Sovaldi and Harvoni. You must also determine the "rate." The rate is

the percentage Idenix and Gilead would have agreed Gilead would pay Idenix as a result of the hypothetical negotiation. You then need to multiply the revenue that Gilead obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation.

Gilead contends that (if you find any of the claims of the '597 patent are not invalid), instead of a percentage royalty, you should decide that the appropriate royalty that would have resulted from a hypothetical negotiation is a one-time lump sum payment that Gilead would have paid at the time of the hypothetical negotiation for a license covering all sales of Sovaldi and Harvoni, both past and future. This differs from payment of a running royalty because, with a running royalty, the licensee pays based on the revenue of actual licensed products it sells. When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

7.4. Factors For Determining Reasonable Royalty.

In determining the reasonable royalty, you should consider all the facts known or available to the

parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

1.  The royalty received by Idenix for the licensing of the '597 patent, proving or tending to prove an established royalty.

2.  The rates paid by Gilead for the use of other patents comparable to the '597 patent.

3.  The nature and scope of the license, as exclusive or nonexclusive; or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

4.  Idenix's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

5.  The commercial relationship between Idenix and Gilead at the time of the hypothetical negotiation, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6.  The effect of selling the patented product in promoting sales of other products of Gilead; the existing value of the invention to Idenix as a generator of sales of

its non-patented items; and the extent of such derivative or
convoyed sales.

          7.   The remaining life of the '597 patent and
the term of the license.

          8.   The established profitability of the product
made under the infringed '597 patent, its commercial
success, and its current popularity.

          9.   The utility and advantages of the patented
property over the old modes or devices, if any, that had
been used for working out similar results.

          10.   The nature of the patented invention; the
character of the commercial embodiment of it as owned and
produced by Idenix at the time of the hypothetical
negotiation; and the benefits to those who have used the
invention.

          11.   The extent to which Gilead has made use of
the invention; and any evidence probative of the value of
that use.

          12.   The portion of the profit or of the selling
price that may be customary in a particular business or in
comparable businesses to allow for the use of the invention
or analogous inventions.

          13.   The portion of the realizable profit that
should be credited to the invention as distinguished from
non-patented elements, the manufacturing process, business

risks or significant features or improvements added by Gilead.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as Idenix) and a licensee (such as Gilead) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular product embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Gilead would have been willing to pay and Idenix would have been willing to accept, acting as normally prude business people.

7.5. Reasonable Royalty - Timing.

The relevant date for the hypothetical reasonable royalty negotiation is at the time infringement began. In this case, that date would be December 6, 2013,

when Gilead received approval to begin selling Sovaldi.

If you award a running royalty, as Idenix seeks, it will be for the period through August 2016. If you award a lump sum, as Gilead seeks, it will be for the entire life of the '597 patent.

And finally, for now, 7.6. Damages - Comparable Licenses.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patent in question, or for rights to similar technologies. A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Idenix and Gilead in order for you to consider it. However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between Idenix and Gilead, in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

So that concludes the portion of the instructions I'm going to read to you now.

Before we begin with the closing arguments, we'll give you a short break. You still are not to discuss the case. I'm hoping to keep this break shorter than our

```
09:58:19  1    typical break but we'll check in with you in a few minutes.
09:58:21  2              We will be in recess.
09:58:47  3              (Jury left courtroom.)
09:58:48  4              THE COURT:  We will be in recess.
09:59:40  5              (Brief recess taken.)
09:59:40  6              *    *    *
10:09:08  7              (Proceedings reconvened after recess.)
10:09:08  8              THE COURT:  Are there any issues before we bring
10:09:09  9    the jury in?
10:09:10 10              MS. PARKER:  Not from me.
10:09:10 11              THE COURT:  Any issues?
10:09:11 12              MR. SCHERKENBACH:  No, Your Honor.
10:09:12 13              THE COURT:  All right.  Let's bring the jury in.
10:09:39 14              (Jury returned.)
10:10:34 15              THE COURT:  All right.  Ladies and gentlemen, we
10:10:35 16    have reached the time now for closing arguments.  We'll hear
10:10:39 17    first from Idenix.
10:10:40 18              Ms. Parker.
10:10:42 19              MS. PARKER:  May it please the Court, counsel,
10:10:51 20    and Chris Meyers.  Good morning, ladies and gentlemen.
10:10:53 21              THE JURORS:  Good morning.
10:10:54 22              MS. PARKER:  I get to talk to you again.
10:10:57 23              I wart to start by saying thank you for your
10:10:59 24    service.  I'm sure I am speaking on behalf of everyone in
10:11:01 25    the courtroom to say we appreciate the sacrifice you made.
```

Other than military service, there is really not more you
can do in our country to support our democracy.  So we all
appreciate the time you spent with us for almost two weeks
now, so thank you.

          And that is on behalf of both of my clients.
Remember, I represent both Idenix and the University.  But
Judge Stark told you at the very beginning of the case, we
have been referring to them together as "Idenix."

          Now, this case is about this patent.  Here it
is.  And you are going to have a copy of this back in your
juryroom as you are deliberating.  And it says right there,
on the first page, you have seen this before.  This patent
is for methods and compositions for treating the hepatitis C
virus.

          Now, how did we get this patent?

          Well, once they filed their application,
remember that video that you all saw the first day you
came for jury selection?  And we showed you the video.

          The Patent Office assigns someone who is
knowledgeable in this area to look at our application.  And
they went through a very rigorous analysis and evaluation of
what we submitted.  They looked through thousands of pages,
they studied the literature.  They sent letters back and
forth with Idenix to get more information.  And after a
number of years, the Patent Office, after this very rigorous

2095

study of our application, they granted this application.

And because the Patent Office did that, this patent is presumed to be valid.

When you go back to start deliberating, the first thing that you all need to say is this is presumed to be valid because our Federal Government has approved it after years of study, pursuant to the policy and the procedures that they follow.

Now, this is not like a lot of patent cases because we have not had to bring evidence in court to prove that Gilead infringed on the patent. You heard from the very beginning of the case, Judge Stark gave you some instructions that they are assumed to have infringed. That is something we didn't have to prove. They're assumed to have infringed.

And so in our case, what we have tried to do is to spend our time bringing you the evidence about the other issues in the case that you do have to decide: willfulness, what they did was willful, and to give you the evidence to justify our request for damages in this case.

Now, there are three key points of evidence that you heard, and these three key points are going to answer the questions on the verdict form for you.

So let me go over though three points. And then what I'm going to do is spend my time talking to you this

morning about what we proved at trial.  What the evidence

was at trial about these points.  Okay?

So, first of all, our invention was first.  We

were first.  And that is why the Patent Office issued this

patent to us.

Second, they, Gilead, they willfully, they

willfully took our invention.  And they still use it today.

They are still using it today without our permission,

without paying us anything.

And then, third, Gilead makes billions of

dollars in profits on these drugs, but they refuse to pay

Idenix and the university our fair and reasonable share.

So let me go over those three points in more

detail.  I'll start with the first one.

Remember, again, that video you saw on Day One

from the Patent Office to talk about that.  The patent is

property.  This is property, as you saw in the video.  Just

like real estate is property, just like your automobile is

property, this is a piece of property that we own.

The investors.  If we'll put that picture up.

I'm sorry.  The inventors, there they are.  It is Dr.

Sommadossi, and Dr. La Colla.  Remember them.  And you heard

both of them testify in this case.

Now, there are different types of patents.  You

remember you heard some patents are called compound or

composition patents?  And that is where you have a patent
on a particular brand new compound that you invented.

But there is a different type of patent, and
that is what we have.  That is when you have a patent on a
brand new use of an existing compound.  That is what we
discovered.  We discovered this brand new use for these
compound that had been used previously to treat other
diseases.

Here is what we invented.

And the critical component of that is what you
see in green.  We have tried to show it in the same color
green throughout the trial.  This is that 2'-methyl up.
That is the class of drugs that is involved in this case.
And our invention was to use this class of compounds to
treat hepatitis C.

And that H3C there, 2'-methyl up.

Again, remember, these compounds had been used
previously to treat cancer and some other diseases.  But
this is brand-new use of those compounds to treat Hepatitis
C.

So let's go over the timeline of the evidence
that you saw at trial about something.

Remember, they didn't even identify the virus
that causes Hepatitis C until 1989.  There is no dispute
about that.

After they identified the virus, then the race
was on to try to find a cure and a lot of different people
started working on it to see what they could do to treat
that virus.

The company, Idenix, that was Dr. Sommadossi's
company, it was formed a few years later.  It was formed in
1998.  And right after that, in early 2000, that is when Dr.
Sommadossi came up with this new breakthrough idea to use
this class of compounds to treat Hepatitis C.

Remember, you heard Dr. Sommadossi, when he took
the stand, he came and took the stand, he was our first
witness, remember he told you that before he started Idenix,
he worked at the National Cancer Institute.  He worked doing
cancer research.  And because of that he knew about this
class of compounds, and he knew that there was this class of
compounds that treated this particular enzyme in cancer.
Then he realized that same enzyme was in this virus that had
just been identified that causes Hepatitis C.

He realized it was the same enzyme in cancer as
in Hepatitis C.  And so he is the one who came up with that
idea of using those drugs that treated that enzyme in cancer
to use the same drugs to treat that same enzyme in
Hepatitis C.

That's when the light bulb went off.

He understood, before anybody else, that those

drugs would work against that same enzyme with Hepatitis C.
Nobody had heard about it before.  That was the flash of
genius in this case.

Let me show you the patent title again.  Again,
this is the Methods and Compositions For Treating Hepatitis
C.

But Gilead says Dr. Sommadossi and Dr. La Colla
did not deserve this invention.  That's where they are
coming to court saying.  They are saying that this patent,
that recognizes their work from the United States
Government, that they don't deserve it.

Now, after he came up with the invention, they
started testing this.  That brings us to March of 2000.
That's when they are able to confirm and in Dr. La Colla's
laboratory in Italy that that compound, 2'methyl up has
activity, which means it works.

So remember, they did the testing on the Yellow
Fever virus.  Remember you heard, there was this family of
viruses.  And the family of viruses includes Hepatitis C and
it included Yellow Fever and some others.  So they did this
testing on the Yellow Fever virus, and here is their lab
notebook, which we showed you at trial.

Remember, Dr. La Colla had the translator to
translate what he was saying.  This is what he showed you.
Remember, it has the date there in the European way, March

14 of 2000.  MD1, that's the 2' methyl up, has activity for
YF, Yellow Fever.

I am going to show you a little clip now of what
you heard at trial from Dr. La Colla himself.

"In early 2000 did you consider Yellow Fever to
be asserted for anti-HCV activity.

A surrogate for anti-HCV activity?

For predictive?

For predictive, yes, yes.

That breakthrough idea from Dr. Sommadossi was
confirmed by Dr. La Colla in his lab and this testing
confirmed is this key 2'-methyl up.  2'-methyl up is the key
to this activity that is used to treat Hepatitis C.

Now, there can be all sorts of variations of the
drug, so there come be different configurations and all.
But the key is, it has to have 2'-methyl up in it to work.
If it doesn't have 2'-methyl in it, it is not effective.
That is the key and that is the invention.  And that is what
is covered by this patent.

The next thing that happened is, May 23rd of
2000 -- that's why I have got that board up there.  I am
going to leave that board up the whole time I am talking to
you.  This is the key date.  That's when Dr. Sommadossi
filed that patent application.

That's when their invention becomes protected by

federal law.

That is the key.

After they filed that initial patent application, they continued on working on it.  A year later they filed an additional application, something called a non-provisional patent application, you all remember that.  And then in November of that year it published.  That is the first time it became public.

So from May 23rd of 2000, when they filed it, up until November of 2001 when it was published, they owned it.  They were protected.  But it's still confidential.  It doesn't become public until the patent publishes.

Then remember on our timeline, you heard that Idenix was the first company to treat Hepatitis C in animals, and they successfully treated human Hepatitis C in chimpanzees.

I am going stop for a minute and tell you, remember when Dr. Olsen was on the stand, I think Dr. Stranding talked about it as well, there was some testimony about, Wait a minute, what about Merck?  Did Merck treat animals first?  What was that about?

Remember, Dr. Standring explained to you the difference.  Remember when Idenix was doing its research, because the chimpanzees were so strong, remember how he talked about even though the weight was like 140 to 150

10:23:39 1   pounds, they had such strength, they could only give them

10:23:43 2   the medicine if they anesthetized them?  Right?  So they

10:23:47 3   couldn't give them the treatment for a long period of time

10:23:50 4   because of the animal ethics regulations at the time.

10:23:53 5          But Idenix was the first to treat human

10:23:57 6   Hepatitis C in animals.  But later on, Merck invented the

10:24:01 7   way -- used the way of putting that medicine in fruit juice,

10:24:06 8   and the chimpanzees would drink the fruit juice so they

10:24:11 9   didn't have to be anesthetized.  But using the fruit juice

10:24:16 10  they were able to take it for a long period of time so they

10:24:21 11  were actually cured.  So there is being treated and being

10:24:25 12  cured.  That is what that evidence was about.

10:24:27 13         Then in December of that year, Idenix was the

10:24:30 14  first company that went to human clinical trials to treat

10:24:34 15  Hepatitis C using these 2'-methyl up compounds.

10:24:39 16         From that point forward, Idenix has continued

10:24:42 17  its work.

10:24:44 18         Now, this patent, if we could put this up, I am

10:24:48 19  going to show you all because you will have this in the

10:24:52 20  deliberation room, this patent lists what are called claims.

10:24:56 21  You will see this, in the pages of the patent when you get

10:24:59 22  it back there, those are the claims that Dr. Sommadossi and

10:25:04 23  Dr. La Colla made.  They are claims about what they

10:25:07 24  invented.  And these are the claims that the Patent Office

10:25:11 25  granted.

10:25:12 1          So these are the claims that the Patent Office
10:25:14 2  said, yes, you are first, you are protected.
10:25:21 3          That's what Gilead wants to take away from us.
10:25:23 4  Not only do they not want to pay us damages for using our
10:25:27 5  invention, but now they are coming to court and they are
10:25:31 6  trying to punish us by taking our patent away.  They are
10:25:33 7  asking you to declare our patent invalid, on top of not
10:25:40 8  paying us for using it.
10:25:44 9          We were first.  That is the most important
10:25:46 10 thing.  All of the Gilead work comes after ours.  Our patent
10:25:51 11 was first, and the Gilead story starts years later.
10:25:56 12         Let me show you their timeline.  This is the
10:25:59 13 timeline that Gilead has used throughout the trial, with a
10:26:04 14 number of different witnesses.  They put this timeline up,
10:26:06 15 and they would say different questions to different
10:26:09 16 witnesses.
10:26:09 17         I want you to look very carefully, their
10:26:12 18 timeline starts in 2001.  That's after our work.
10:26:24 19         We are there first.  All of this work we did in
10:26:29 20 filing our patent application that caused us to have this
10:26:33 21 protection and this priority was first.  They are standing
10:26:40 22 on our work, on our shoulders.  Before there was the drug
10:26:49 23 Sovaldi, before there was Harvoni, before there was
10:26:52 24 sofosbuvir, before there was Jeremy Clark, before there was
10:26:55 25 Pharmasset, before there was Gilead, before there was any of

that, there was Dr. Sommadossi and Dr. La Colla working together to come up with this invention.

And our work, which came first, is the foundation for everything that followed.

You know, I want to stop for a minute, I want you to think about this.

We have not criticized in this trial any of the scientific work that Gilead did to get this invention to the market. You haven't heard any of our witnesses criticize them for that good work that they did to get these drugs to the market. You haven't heard me say a thing negative in my opening statement -- I am not going to say anything negative about that.

I said in my opening we congratulate them for the additional work that they did. But we get credit, too. We get credit for the work we did in the beginning that's the foundation for what they did later on. They took the great invention that we came up with, and they made it better. But the key is, they took our invention, and they refused to pay us for using it.

That brings us to the evidence on the second key fact, the second key point that you heard about during the trial. Gilead willfully took our invention, and they still use it today without our permission.

Now, when somebody uses your patent, that's like

taking your property, the same as if somebody took your automobile or somebody took your real estate. That's what's called infringement. That is what Judge Stark has already told you to assume happened here.

We do not have to prove at this trial that Gilead's drugs infringe, because Judge Stark has already instructed you, infringement of the '597 patent -- that's the number for our patent, '597 -- is not an issue you are deciding in this case. And Idenix is not required to prove infringement at this trial.

He also told you, you are to assume that Gilead infringes the '597 patent.

Gilead knew what they were doing. They did it willfully, they did it intentionally. And then they tried to cover it up. They tried to cover it up, including deleting data, and changing their official company records.

Before our patent application became public, after it was filed but before November of 2001 when it became public, they used our confidential idea. And even after it became public, they continued to use it. They continued to use it willfully and intentionally, knowing that it was ours.

Now, all of this evidence about what they did is not my words. Everything that we brought you at trial is from their own documents and from their own witnesses. All

10:30:18  1    this that we showed you about what they knew and what they

10:30:22  2    did came from their own internal secret company documents

10:30:26  3    that we weren't able to even get our hands on until they had

10:30:31  4    to turn them over to us in this lawsuit.

10:30:34  5            They had to give us those internal company

10:30:38  6    documents, and we were able to look at them and see what

10:30:41  7    they had done.

10:30:43  8            So our evidence in this case, again, is not what

10:30:48  9    I am saying.  It's what they are saying back at the time

10:30:53 10    before they had a lawsuit, back at the time when they were

10:30:55 11    writing down what they were really thinking and they were

10:30:58 12    really doing, that is the truth that you all need to look at

10:31:02 13    when you go back to deliberate in the jury room.

10:31:10 14            Now, when I gave my opening statement to you

10:31:14 15    last Monday, I told you what I thought the evidence was

10:31:18 16    going to be.  And I went over some of these documents.  And

10:31:21 17    that's exactly what the evidence was at the trial.  The

10:31:25 18    documents that I went over with you is what we introduced

10:31:27 19    into evidence and what you are going to have with you back

10:31:31 20    in the jury room.  So I am going to go over that with you

10:31:35 21    again.

10:31:36 22            Remember, Dr. Sommadossi and Dr. Schinazi were

10:31:39 23    best friends.  There is no dispute about that.  Nobody has

10:31:43 24    disputed that.  And Dr. Schinazi served on the Idenix

10:31:47 25    scientific advisory board.  No dispute about that.  He was

also a paid consultant, and we brought you those documents so you could see for yourself, he had a consulting agreement in writing with Idenix, where he was paid for his work to be a consultant. That started back in 1998. No dispute about that.

He also acknowledged in writing that he was an insider at Idenix. Remember this document that you saw. He was an insider. He had inside information. And Dr. Sommadossi trusted his best friend. He trusted Dr. Schinazi.

In the pharmaceutical industry, the rule is "trust but verify." And so that's why Idenix required Dr. Schinazi to sign in writing that he had confidential information and he could not share it.

Let's put that up.

He agrees, this is really important, he agrees not to make use of such confidential information except on the company -- and that's Idenix's -- behalf.

You haven't heard anything different in this trial.

Then, that's what leads us up to 2000. And the year 2000, after Dr. Sommadossi comes up with this great invention, and after he files the patent application, but it's still confidential, Dr. Sommadossi tells Dr. Schinazi, who is on the scientific advisory board, a paid consultant

10:33:48 1   at his company, his best friend, he tells him, Hey, I came

10:33:53 2   up with this great idea.  Dr. La Colla and I have been

10:33:56 3   working on it, we came up with this great breakthrough idea.

10:34:00 4   Let me tell you about it.  He told Dr. Schinazi about that.

10:34:04 5   And Dr. Schinazi has admitted under oath in his deposition

10:34:06 6   in this case that until Dr. Sommadossi told him about it, he

10:34:13 7   did not know that this class of compounds could be used to

10:34:17 8   treat Hepatitis C.

10:34:20 9         He admitted, he did not know this information

10:34:23 10   until Dr. Sommadossi told him about it.

10:34:30 11         Then, Dr. Schinazi turns around and tells people

10:34:35 12   in his own company about it.  That's what happened.

10:34:40 13         Dr. Schinazi did not honor those commitments

10:34:44 14   that he made in his written confidentiality agreements to

10:34:49 15   keep the information confidential within Idenix and not to

10:34:53 16   use it except for Idenix.

10:34:59 17         That brings us to why we are in this courtroom

10:35:02 18   today.  Let's play this clips from the video so you can hear

10:35:06 19   again what Dr. Schinazi admitted.

10:35:08 20         "Question:  You agree that you pointed

10:35:10 21   Pharmasset to the fact that 2'-methyl nucleosides were

10:35:14 22   important.  Is that right?

10:35:17 23         "Answer:  /STPWHR-FRPBLGTS whatever.

10:35:19 24         "Question:  And this was before Idenix's

10:35:22 25   development work on these 2'-methyl compounds had been

1    publicly available.  Right?

2                "Answer:  That is correct.

3                "Question:  At the time you told Dr. Watanabe

4    about Idenix's confidential work on 2'-methyl nucleosides,

5    you did not understand how a specific 2'-methyl nucleoside

6    was effective against HCV.  Right?

7                "Answer:  That is correct.

8                And then we brought you the e-mail that Dr.

9    Schinazi wrote, back at the time, back before there was a

10   lawsuit, he never thought you all would see it, he wrote an

11   e-mail that laid it all out.

12               Now, we are going to put that up.

13               Let me stop for a minute and talk to you about

14   this document and how they have used it during trial.

15               This entire document is in evidence.  We are the

16   ones who brought it to you and put it into evidence.  It's

17   Plaintiffs' Exhibit 677.

18               We brought you the entire document.

19               What they have been saying during trial is, wait

20   a minute, counsel for Idenix -- that's me -- they have been

21   pulling out this part or that part and they haven't been

22   showing you the entire document.  Just remember, if they say

23   it again, we brought you the entire e-mail.

24               You are going to have the entire e-mail back

25   there and you can see the entire e-mail for yourselves.

10:36:55 1               Here is what Dr. Schinazi says in there.

10:36:59 2               He talks about giving -- he says, for the

10:37:03 3  record, "Here are the facts."

10:37:06 4               He talks about giving this confidential

10:37:08 5  information to Dr. Watanabe in his own company, and then he

10:37:15 6  says, Dr. Watanabe must have told Dr. Hassan to make the

10:37:20 7  compound.

10:37:22 8               Well, what happens next?

10:37:23 9               Let's play the video clip from the vice

10:37:28 10  president there.  This is the vice president at

10:37:31 11  Dr. Schinazi's company.  What did he say?

10:37:35 12               "Question:  Are you aware that in 2000 and 2001,

10:37:38 13  Dr. Schinazi was in regular communication with Idenix?

10:37:44 14               "Answer:  I think he has communications with

10:37:47 15  Idenix and some others all the time.

10:37:48 16               "Question:  So it's possible, if not likely,

10:37:50 17  that Dr. Schinazi told Hassan to make the 2'-methyl up

10:37:56 18  nucleoside; is that right?

10:38:00 19               "Answer:  So it's possible that Schinazi told

10:38:04 20  Hassan to make that compound.  It's likely, yes."

10:38:09 21               Then what did Dr. Hassan say?  Well, I'm going

10:38:12 22  to play this clip in just a minute.

10:38:14 23               Listen to what he says.  He says that Dr.

10:38:18 24  Watanabe encouraged him.  That he told him to, quote, "do

10:38:22 25  it."  That's what he says.  He says "do it."  And that is

1    what he does.  He turns around and uses our confidential

2    information to make this compound.

3              Let's play that video clip.

4              "Question:  When you presented your idea to

5    make 2'-methyl modification, what was the reaction of Dr.

6    Watanabe?

7              "Answer:  Dr. Watanabe is very encouraging

8    person.  He said do it."

9              He said do it.  And we know that Dr. Watanabe

10   and Dr. Hassan here discussed target compounds, that's what

11   they are calling them, potential target compounds.  In fact,

12   you are going to hear on this next clip that Dr. Hassan

13   said he discussed those with Dr. Watanabe almost on a daily

14   basis.

15             Let's play that.

16             "Question:  So you discussed potential target

17   compounds with Dr. Watanabe?

18             "Answer:  I was.  Almost daily basis."

19             Almost on a daily basis.

20             So what happened is that Dr. Sommadossi, once he

21   has this invention, once he filed the confidential patent

22   information, he tells Dr. Schinazi.  Dr. Schinazi is an

23   insider at his company, bound by confidentiality agreement

24   not to use it.  But Dr. Schinazi admits he tells a scientist

25   at his company named Dr. Watanabe, and Dr. Watanabe in turn

10:39:57 1  tells Dr. Hassan, and they make it.

10:39:59 2  Now, what are they trying to say here?  Well,

10:40:03 3  they're trying to distance themselves from Dr. Schinazi.

10:40:07 4  But Dr. Schinazi was in charge.  Here is what the evidence

10:40:11 5  was about that.

10:40:15 6  "Question:  So prior to 2005, did you hold any

10:40:18 7  other positions at Pharmasset?

10:40:21 8  "Answer:  Executive director.

10:40:23 9  "Question:  Executive director.  What is an

10:40:26 10  executive director at Pharmasset?

10:40:28 11  "Answer:  I sign the checks.

10:40:29 12  "Question:  You sign the checks.  Is there

10:40:30 13  anything else?

10:40:31 14  "Answer:  That's it.  I was helping with the

10:40:34 15  chemistry as well.

10:40:35 16  *    *    *

10:40:38 17  "Answer:  Well, he was chairman in the board but

10:40:40 18  in reality he also acted as the CEO.

10:40:43 19  "Question:  So he ran the company?

10:40:44 20  "Answer:  He ran the company, yes.

10:40:47 21  *    *    *

10:40:48 22  "Answer:  Since he founded the company, it was

10:40:49 23  his baby, if you will.  And so took a very close look at the

10:40:53 24  financials, that kind of thing.

10:40:56 25  *    *    *

"Question:  But he was the guy at the top?

"Answer:  He was the guy making the decisions.

"Question:  All right.

"Answer:  In my view, Schinazi was controlling what is -- was instrumental to making sure it is made with, he had a wealth of knowledge on the chemistry, on the synthesis on the methyl up.  But what, the work was rarely done by Schinazi.

"Question:  So Schinazi directed what was to be made at Pharmasset?

"Answer:  Yeah.

Then recall the testimony Dr. Hassan wasn't even hired until after, wasn't hired by Dr. Schinazi until after we told him about this compound that he said he didn't know about, about how to use it for hepatitis C.  Dr. Hassan was not hired until after we filed our patent application.

And remember how Dr. Hassan and Dr. Schinazi came together, from their expert witness in this case.  Do you remember Dr. Secrist?  That is the gentleman that they paid to come to court and take the stand and talk to you about his opinions.

He admitted he is the one who put Dr. Hassan and Dr. Schinazi together to begin with.  Dr. Hassan had worked with him and Dr. Schinazi and Dr. Secrist had a conversation.  And you heard Dr. Secrist admit that he told

Dr. Schinazi, hey, you should hire Hassan.  You should hire Dr. Hassan.

And what happens when he goes to work there, when Dr. Hassan goes to work at Dr. Schinazi's company?

One of the first things he did was to put in his notebook that he had prepared a 2'-methyl up compound.

But it was not a new one.  It was the exact compound -- this MD1 that I showed you with Dr. La Colla's notebook, it was the exact compound that Dr. Sommadossi and Dr. La Colla had been using to come up with their invention that was covered by the patent.  Let's look at that.

On the left-hand side is the Idenix drawing.  That is the Idenix 2'-methyl up.  That is what is covered by this patent application that was filed May 23rd of 2000.

On the right, this is Dr. Hassan's own rendering of the same thing.

This is why Dr. Schinazi hired Dr. Hassan.

Now, ladies and gentlemen, do you believe that just, whoosh, just out of thin air that Dr. Hassan shows up on the scene and on his own, even though Dr. Schinazi has this confidential information, Dr. Schinazi has admitted that he gave it to the top, Dr. Watanabe, the top scientist, even though you heard Dr. Stuyver, the vice president there, said they use that to make the compound, they're asking you to believe, nope.  Dr. Hassan, on his own, was hired by Dr.

10:44:20 1    Schinazi this exact period of time and he just miraculously

10:44:25 2    came up with it on his own.  No coincidence.  That is what

10:44:28 3    they want you to believe.

10:44:32 4            But whether Dr. Hassan made it for himself or

10:44:37 5    whether he made it using our information, the key is

10:44:41 6    Pharmasset knew, they knew that we had a patent that covered

10:44:47 7    this compound used to treat hepatitis C.  They knew that we

10:44:54 8    were protected by this patent as of May 23rd of 2000.

10:45:00 9            Even before the patent becomes public, when it

10:45:05 10   is published by the Patent Office, they knew it was ours.

10:45:10 11           Let's see what Dr. Schinazi said.

10:45:14 12           "Question:  Just to be clear, Idenix's 2'-methyl

10:45:20 13   nucleosides were not public knowledge at the time you told

10:45:21 14   Dr. Watanabe?

10:45:22 15           "Answer:  Correct.  But I believe they had filed

10:45:26 16   the patent.

10:45:27 17           "Question:  Okay.

10:45:29 18           "Answer:  So they were covered.

10:45:30 19           "Question:  But their patent hadn't published

10:45:34 20   yet?

10:45:35 21           "Answer:  Yeah, but it was covered.

10:45:36 22           "Question:  It was covered but not published?

10:45:38 23           "Answer:  Correct."

10:45:40 24           That's willful.  That is willful, that is

10:45:42 25   intentional, that is deliberate.

10:45:44  1                    But that is not everything.  Remember the

10:45:47  2   document you saw that talked the cold shower?

10:45:51  3                    Again, this is one of the documents they created

10:45:54  4   back before there was a lawsuit.  This is a document they

10:45:57  5   created when they were running the company at the time.

10:46:02  6   They have no idea we were going to be talking about it today

10:46:04  7   in this courtroom.

10:46:05  8                    Let's look at, this is really important.  This

10:46:08  9   is from Dr. Stuyver.  Remember you saw him on the video

10:46:13 10   earlier.  Dr. Stuyver was the vice president.  Remember

10:46:18 11   Dr. Stuyver found out for himself that Idenix had this

10:46:21 12   discovery and that it is covered by a patent.

10:46:23 13                    And what does he do?  He writes an e-mail.  He

10:46:29 14   writes an e-mail to Raymond Schinazi.  He says I found out

10:46:34 15   about this.

10:46:35 16                    He knew what they were working on.  He is the

10:46:37 17   vice president.  He said I found out about this.  And he

10:46:40 18   said when I found out about it, I had to get a cold shower.

10:46:44 19                    He said there is nothing left of our work.

10:46:47 20                    He said we need to take a license.  He knew that

10:46:50 21   they needed to get a license from Novirio, which is Idenix

10:46:53 22   now.  He knew they needed to get a license.  He knew they

10:46:57 23   needed to pay us for what they were doing.

10:46:59 24                    And he says I consider all of my efforts

10:47:01 25   redundant.

10:47:03 1         And then he says to Dr. Schinazi, well, what is

10:47:05 2  your opinion?  What is your opinion about doing all this

10:47:08 3  work designing compounds that eventually might belong to

10:47:14 4  Novirio?  To Idenix?

10:47:17 5         And how does Dr. Schinazi respond?  This is

10:47:20 6  really important.  You know, if somebody wrote you -- just

10:47:24 7  think about this.  Let's think about this now.  If somebody

10:47:27 8  wrote you an e-mail and said I just found out about this.  I

10:47:29 9  had to take a cold shower.  What are we going to do?

10:47:33 10         If you think that you have an independent, on

10:47:37 11  your own, compound and invention, don't you write back to

10:47:41 12  them and say, oh, you are wrong.  I'm sorry.  You are wrong.

10:47:45 13  You have a misunderstanding.  Let me fix this.

10:47:47 14         No, Dr. Schinazi replies back and in his e-mail

10:47:52 15  that we have, he does not dispute, he does not dispute that

10:47:57 16  they are using the Idenix work.  Instead, he says, leave it.

10:48:03 17  That is Dr. Stuyver.  He says relax.  He said I already

10:48:07 18  worked out a plan.  Sleep well.  Be happy.

10:48:12 19         Dr. Stuyver knows better.  Dr. Stuyver replies

10:48:18 20  back.  Another secret confidential e-mail that we got

10:48:22 21  because of this lawsuit.

10:48:23 22         And Dr. Stuyver says:  I'm sorry, I am not

10:48:27 23  relaxed.  I did not sleep well.  I am not happy.

10:48:31 24         He says:  The moment of truth is coming closer.

10:48:36 25  The moment when that patent is published and the whole world

will know.

          This trial is that moment of truth.  And
Dr. Stuyver says once he finds out that the work they had
been doing is covered by the Idenix patent, he said our
world is collapsing.

          Let's play that video clip.

          "Answer:  Okay.  So now it starts making more
sense for me.  Because everything in the patent had detected
or synthesized the 2'-methyl up ribo, and maybe I discovered
that was in their patent portfolio from Idenix.  Then this
world is collapsing.

          "Question:  What do you mean?

          "Answer:  Well, then if it came up independently
at Pharmasset, then it belongs to, and it was filed already
in Idenix application in 2000, then that makes more sense,
yes.

          "Question:  Can you tell me a little more.  When
you say the world is collapsing, what do you mean by that?
How that make you feel?

          "Answer:  Suppose that the whole, the 2'-methyl
up hydroxy down, that that was independently conceived at
Pharmasset.  And we worked through the summer with this
compound as our positive control.  Then I must have lived at
that time with the idea that this is a compound that belongs
to us.  But I have -- notes and there they call the cold

shower, yeah, you can work on it but it is not yours.

And then I'm asking myself, what am I doing here?  And then I write to Raymond Schinazi."

He says I was working on it but it wasn't ours because it was covered by this patent application.

Dr. Stuyver's prediction was right.  The next thing that happened is that patent did publish by the United States Patent Office.  And that is when it became public.  And that was November of 2001.

So now the whole world knows about our patent application.  We're protected from May 23rd of 2000 when we first filed it but it is confidential up until it publishes in November of 2001.

They're using, Pharmasset, now Gilead was using our invention before the patent application became public and they continued using it after it became public, and they continued to intentionally and deliberately use our invention.

Here is some -- here is another internal secret company document that we got in this litigation.  This is from January, and these are meeting minutes.  Remember how you heard about at trial that when they had a meeting of the chemistry department, all the chemists?  Someone would take notes and they would type them up and they are the minutes of the meeting.  So here are the official company documents,

10:52:10  1  the official company meeting minutes.

10:52:12  2          You can see there on the screen.  And they're

10:52:14  3  talking about, it says Dr. Watanabe gave an overview of the

10:52:18  4  research work.  And he talks about how the focus is on new

10:52:24  5  leads from Idenix.

10:52:26  6          Their own documents, at the time, before there

10:52:31  7  is litigation, documents they're working on the Idenix

10:52:35  8  compound.

10:52:36  9          And it is all over the place in their minutes.

10:52:39 10  This isn't the only one.  We showed you a bunch of them at

10:52:42 11  trial.

10:52:43 12          Now, this brings us up to Jeremy Clark.

10:52:46 13  Remember him?  He testified by video deposition, and he

10:52:50 14  developed that compound called 6130.  And that is the

10:52:55 15  Pharmasset compound that led to sofosbuvir which is in

10:53:04 16  these two drugs, Sovaldi and Harvoni.

10:53:06 17          Let's see what the meeting minutes say about

10:53:09 18  Jeremy Clark.

10:53:10 19          It says right there, Jeremy came up with this

10:53:12 20  idea, and that it was a derivative of the Idenix compound.

10:53:19 21          Now, you already heard Dr. Schinazi say how he

10:53:23 22  contributed to this work.  He got the information.  He got

10:53:26 23  the information from Idenix.  He turned it over to his top

10:53:30 24  scientist, Dr. Watanabe.  Dr. Watanabe passes it on.

10:53:35 25          Jeremy Clark testified under oath in his

10:53:40 1    deposition, -- I'm going to play you this clip -- that

10:53:43 2    Dr. Schinazi instructed the Pharmasset scientist to work

10:53:48 3    on the Idenix compound.  Watch this.

10:53:52 4            "Question:  At that point in time, in the

10:53:54 5    fall of 2002, had Dr. Schinazi, to your knowledge, issued a

10:54:00 6    directive or prohibition on research on nucleosides for

10:54:07 7    anti-HCV of a particular type or in a particular area?

10:54:13 8            "Answer:  It's odd because he, from my

10:54:14 9    understanding, he had people working on the Idenix compound

10:54:20 10   in the fall, at some point in time.  You know, it could

10:54:24 11   have been December, it could have been September.  I'm not

10:54:26 12   exactly sure when that came about.  But there were people

10:54:29 13   during that time frame that were working on, you know,

10:54:33 14   Novirio, the Idenix compound, and I believe that to be at

10:54:38 15   the instruction of Raymond Schinazi."

10:54:39 16           And then Jeremy Clark also testified that Dr.

10:54:44 17   Schinazi was conveying information to them about the Idenix

10:54:49 18   work.

10:54:50 19           If we could pull that up.

10:54:52 20           "Answer:  I don't recall at this point in time,

10:54:54 21   but there was certainly conveyance of information about

10:54:58 22   Idenix's stuff.

10:55:02 23           "Question:  By Dr. Schinazi?

10:55:05 24           "Answer:  Sure, absolutely."

10:55:09 25           And then Jeremy Clark testified in this trial

2122

in that video deposition that he understood the importance
of the 2'-methyl up.  And that it influenced the way that he
made 6130.

Let's play that.

"Question:  Before you came up with the idea
for 2'-methyl, 2'-fluoro for a nucleoside, was it your
understanding that in 2'-methylcytidine, that methyl at
the up position conferred activity on the compound and
was tolerated?

"Answer:  Absolutely.  Yes.  No question of that
now.

"Question:  All right.  And that influenced you
in your interest in using methyl up at the 2' position in
your nucleoside?

"Answer:  Yes.  Correct."

Right there he admitted that information
influenced him.

Now, the next thing that happened is Jeremy
Clark goes into his boss's office.  He goes to Dr. Otto in
his office.  He goes into his office and Dr. Otto admitted
in his video deposition, that Jeremy Clark went into his
office to tell him about this 6130 compound and he took with
him the Idenix application for this patent.

Do we have that?  Yes.

"Question:  When Mr. Clark came to you with the

idea for 6130 and conducted a literature search you told him
to conduct, did he present you with any literature that
guided him to 6130?

"Answer:  Well, he didn't say what necessarily
guided him to that idea, but he did bring with him to my
office copies or portions of copies of a Merck application
and a Novirio application."

MS. PARKER:  That is what he testified to under
oath in his deposition taken before the case.  And we played
this for you.

But they brought Dr. Otto live.  They called him
as a live witness, and he took the stand, and Dr. Otto tried
to explain that away.  He tried to say, well, what he was,
what we were really talking about is we were looking at the
Idenix application and he was just walking me through it.

Oh, it has nothing to do what Jeremy Clark
invented, we just happened to be talking about the Idenix
patent application at the same time.

Remember, Dr. Dr. Otto made, he admitted,
between 16 and 17 million dollars when Gilead bought
Pharmasset.

Here is the key.  All of this is drawn out in
their own laboratory notebooks, their own internal documents
at the time, not when somebody is coming into Court later
trying to excuse something.

10:58:12 1          But at the time we know exactly how the Idenix

10:58:15 2   compound worked with Jeremy Clark's 6130, which is what led

10:58:21 3   to sofosbuvir, which is what led to these two drugs.

10:58:25 4          This is their own company document, from the

10:58:29 5   time.  This is their own company document from their vice

10:58:35 6   president.  And as you will see on the right-hand side, that

10:58:38 7   is the Idenix compound, that's the use of that to treat

10:58:43 8   Hepatitis C is what's covered in our patent as of May 23rd.

10:58:48 9          And he drew an arrow.  He drew an arrow.  And

10:58:53 10  what you see on the left-hand side, you see at the bottom,

10:58:58 11  6130.  There is your proof.  It doesn't matter what they say

10:59:02 12  when they come to Court after they have been paid all this

10:59:07 13  money.  There it is.

10:59:09 14         Here is what is credible.  They keep talking in

10:59:12 15  their internal documents about the Idenix compound.  They

10:59:16 16  keep saying in their internal documents, because they never

10:59:19 17  think we are going to see them, they never think we are

10:59:22 18  going to be in court looking at these documents, so that

10:59:25 19  they wrote back in the early 2000s.  They continued to say

10:59:28 20  what they were really doing, which is using our Idenix

10:59:31 21  compound.

10:59:32 22         Let's look at another one of those.

10:59:34 23         This is February meeting minutes.  Talks about

10:59:38 24  Idenix sugar.

10:59:42 25         Then that's when this, this period of time is

when Dr. Schinazi starts getting nervous, it's when he

starts getting worried because he knows what they are doing

and he knows it's protected.

He gets nervous that their company documents

keep saying what they are really doing.

So he wrote, there is an e-mail, he wrote to Dr.

Otto, again, Dr. Otto is the one who got paid 16 to 17

million dollars when Gilead bought him, who came on the

stand, who came on the stand, he is the one that said, Oh, I

can explain this.

Well, Dr. Schinazi sends an e-mail to Dr. Otto

back at that time.  He says, I am not sure we should show

the Idenix compound.  He says, I would prefer it if you

deleted any data on that compound.

Then he says, you have inside information.  He

admits it.

And it's signed RFS, Raymond F. Schinazi.  It

says, you have information and I think we ought to start

deleting references to Idenix's compound.  We should delete

Idenix's compound.

That's not all.

So let's go to the meeting minutes again.  This

is May 2nd.  They have, again, a meeting of the whole

chemistry department.  It says who all is there.  You will

see all the different names up there.  Dr. Schinazi is

there.  Dr. Otto is there.  Jeremy Clark is there.  They are
still talking about the Idenix compound.

But he does not want them to do that.

This is the original document that says "Idenix"
all over it.  Remember, he wrote that e-mail to Ann, his
assistant there, who was the person who wrote these minutes.
He said, "Ann:  Avoid using the word Idenix sugar."

He says, Instead call it by the chemical name.

Lo and behold, they revised the minutes.  They
take out the reference to Idenix, and they put this in
there.

Let's go back and look again at that.  Here is
the original, here is how they changed it.

Now, if everybody in the company thinks that
Idenix sugar and Idenix compound is really not what they are
working on, which is the story they have tried to tell in
this courtroom, that doesn't mean what it says, it means
something else, if that were true, why are they going to all
these lengths to delete data and change their documents?

Why are they even bothering?  If it is innocent,
why are they changing their documents?  Why are they
deleting data?

Gilead wrongfully took our patented invention
that's covered by this patent as of May 23rd of 2000 and
they used it.  They used it for their own purposes.  Then

they tried to cover it up.

That brings us to these two drugs that are at issue in this case, Sovaldi and Harvoni.

Here is a drawing of sofosbuvir.  Right there. That is the 2'-methyl up right there.  That is the same 2'-methyl up that's in our patent.

In 2009, after years of this rigorous evaluation and study, the Patent Office issues our patent.  And afterwards, Gilead continues to use it, even after it is issued, they are using our invention while it's confidential, they are using it after it was published, and they continue using it after the patent has issued.

From the time Dr. Sommadossi told Dr. Schinazi about it, way back at the beginning, because Dr. Schinazi was a paid consultant covered by a confidentiality agreement, and Dr. Schinazi turned around and gave the information to his own company, they have been using it, deliberately, intentionally, and willfully.

Now, in 2011 -- that's when Gilead buys Pharmasset.  And they pay 11.4 billion dollars for the company.

What did Dr. Schinazi say about that?  Let's play that clip:

"Question:  Dr. Schinazi, first of all, Pharmasset, the company that you were the principal founder

```
11:04:54  1    of, was ultimately sold to Gilead.  Correct?
11:04:59  2              "Answer:  Yes.
11:05:00  3              "Question:  And I don't recall exactly how much
11:05:03  4    that was for.  Was it 12 billion dollars?
11:05:06  5              "Answer:  Yes, plus .4.
11:05:08  6              "Question:  12.4 billion dollars.
11:05:12  7              "How much money did you personally mark on that
11:05:15  8    sale?
11:05:16  9              "Answer:  Well, I had trusts, trusts for my
11:05:18 10    daughter, my grandchildren, I also had a divorce that was
11:05:23 11    almost completed, settled on the facts.
11:05:27 12              So between us, all the family, everything, there
11:05:33 13    was approximately 400 dollars out of costs, before the tax,
11:05:38 14    before the divorce.
11:05:41 15              "Question:  So it was approximately 400 million,
11:05:44 16    you said?
11:05:47 17              "Answer:  Less at least 50, 60 million in taxes,
11:05:50 18    plus another some to cough up that money.  So I was left
11:05:55 19    with maybe 200 or so, which was quite nice.
11:06:00 20              "Question:  Do you currently own stock in
11:06:03 21    Gilead?
11:06:03 22              "Answer:  Yes, I do.
11:06:04 23              "Question:  And approximately how many shares do
11:06:07 24    you own?
11:06:08 25              "Answer:  I don't recall.
```

       "Question:  Do you have an idea of the approximate value of the shares that you own in Gilead?

       "Answer:  I don't know.  I trust my bankers."

       When Gilead bought Pharmasset, they bought the good, the bad, and the ugly.  They bought the whole thing.

       Remember, Dr. McHutchison, remember, he is the doctor who was from Australia that they called from their company who took the stand and testified, he said he knew that Dr. Schinazi knew he had a bad reputation.  But they bought his company anyhow.

       Dr. Schinazi is Gilead.  He is a shareholder. And to this day, he is a consultant to Gilead at $800 an hour.  You heard that at trial.

       Here is the pathway.  Dr. Sommadossi gave the confidential information to Dr. Schinazi.  That was appropriate.  That was covered by the confidentiality agreement.  That was because Dr. Schinazi was a paid consultant.  And Dr. Schinazi tells Dr. Watanabe, who tells Dr. Hassan, who uses it to make a compound that Jeremy Clark, you saw the drawing with the arrow, Jeremy Clark relied on, Jeremy Clark's work was relied on by Dr. Sofia, that's what led to those two drugs.

       Sofosbuvir was not an accident.  It was deliberate.  All of their company witnesses admitted, sofosbuvir is based on Jeremy Clark's 6130 and it has

2'-methyl up in it.

Dr. Rachakonda:

"You would agree, sofosbuvir is based on PSI-6130?

Let me start at the top: "Sofosbuvir has 2'-methyl up?

"Answer: Yes.

Dr. Otto:

"Sofosbuvir, like 1630, has 2'-methyl up?

"Answer: Yes.

"Question: Was that a deliberate choice? Was that intentional?

"Answer: Yes."

Dr. Sofia:

"Dr. Sofia, it has 2'-methyl?

"Answer: Yes."

Dr. McHutchison, even Dr. McHutchison had agreed:

"Doesn't sofosbuvir have 2'-methyl up?

"Yes."

Gilead launches these two drugs, these two products, despite knowing about the history of the design and the work from Idenix.

Sovaldi is the first one that goes to market. It goes to market in 2013. Harvoni goes to market a year

11:08:48 1    later in 2014.

11:08:50 2            We are talking about that, so let me stop and

11:08:53 3    tell you what the evidence is -- about a question that they

11:08:55 4    asked several of our witnesses.  Do you remember they asked

11:08:58 5    several of our witnesses, well, why didn't you say something

11:09:01 6    to them beforehand?  Why didn't you do something about this

11:09:04 7    before now?

11:09:05 8            Well, you heard the evidence in this courtroom

11:09:08 9    that the earliest we can file this lawsuit is when the

11:09:13 10   infringement happened, when the drugs hit the market.

11:09:17 11           That's when Gilead started to wrongfully profit.

11:09:21 12   They started to wrongfully profit when the drugs hit the

11:09:24 13   market.  That's why the damages in this case start from

11:09:28 14   2013, when the drugs start being sold.

11:09:30 15           And we filed this lawsuit in 2013 right when

11:09:35 16   Sovaldi first started being sold.

11:09:39 17           Remember, Judge Stark has instructed you, the

11:09:43 18   use of those two drugs in accordance with their labels

11:09:49 19   results in the use of the methods defined by our patent, by

11:09:58 20   the '597 patent.  And he told you that infringement of the

11:10:03 21   '597 patent is not an issue that you are deciding in this

11:10:10 22   case.  And we are not required to prove infringement at this

11:10:13 23   trial.

11:10:15 24           And he told you you are to assume that Gilead

11:10:20 25   infringes our patent.

11:10:24 1          That brings us to the third key point of

11:10:26 2   evidence that you heard, which is Gilead has made billions

11:10:31 3   on this.  But they refuse to pay Idenix and the university.

11:10:37 4   Sovaldi and Harvoni are blockbuster drugs, no question about

11:10:41 5   it.  They made over 42 billion dollars worldwide.  This is

11:10:49 6   just since they went on the market.  They made 28 billion

11:10:54 7   dollars in the United States.  And Gilead recognized the

11:10:59 8   potential for this blockbuster because they went out and

11:11:02 9   they paid Pharmasset, they paid 11.4 billion dollars to buy

11:11:09 10  Pharmasset.

11:11:10 11          All we are asking for in this case is our fair

11:11:14 12  and reasonable share, which we have said, based on the

11:11:18 13  evidence, is ten percent, because Idenix was the first

11:11:24 14  patent the first company use of these compounds to treat

11:11:27 15  Hepatitis C, because it was our invention, because we are

11:11:30 16  the foundation that led to all this other work.  But Gilead

11:11:37 17  doesn't want to pay us anything.  Instead, they want to

11:11:41 18  punish us.  They want you to declare that the Patent Office

11:11:45 19  was wrong.  They want you to declare our patent invalid.

11:11:51 20          They are treating us the way they treated Jeremy

11:11:54 21  Clark.  Remember, Jeremy Clark said, he was asked, did they

11:11:58 22  pay you for your work on 6130?  Did you get anything for it?

11:12:02 23  He said no.

11:12:05 24          Ten percent is fair, ten percent is reasonable.

11:12:09 25  And remember, the damages go to both Idenix and to the

11:12:14 1  university, because Dr. Sommadossi was at Idenix and Dr. La

11:12:18 2  Colla was at the university.

11:12:21 3      Now, I want to emphasize again, there is no

11:12:25 4  question whatsoever that these are fabulous drugs, these are

11:12:30 5  fantastic drugs and they have been very helpful to a lot of

11:12:33 6  people who have Hepatitis C.  We don't dispute that.  We

11:12:37 7  haven't disputed that at all in this case.

11:12:38 8      And we join with everyone else to congratulate

11:12:43 9  them for the additional work they did to get it out to the

11:12:46 10  market actually for patients.

11:12:48 11      But it's based on our work.  It's based on our

11:12:52 12  work.  And they should give us credit for what we did as

11:12:55 13  well.

11:12:56 14      Let's go over their witnesses and what their

11:12:59 15  witnesses said.

11:13:01 16      I am going to start with Dr. Rachakonda.  You

11:13:04 17  know, she seemed like she was a nice lady.  I think every

11:13:09 18  one of us were very sorry to hear the story she told about

11:13:12 19  her mother being sick with Hepatitis C and her mother passed

11:13:16 20  away.

11:13:18 21      But she was just not in the loop.  She was not

11:13:21 22  in the Schinazi circle.

11:13:24 23      She came to court and she denied that the

11:13:27 24  scientists she worked with at Pharmasset had any

11:13:30 25  confidential information.  We know that's just not Dr.

Rachakonda.  Dr. Schinazi has admitted it.  All these other

people admitted it.  She just didn't know.

            She testified at trial that Dr. Hassan said,

well, he didn't rely on Idenix, and that he came up with it

on his own.  She didn't know.  She just didn't know what

else was going on.

            But, remember, we played you this video clip

before trial, before she came to court, we asked her:

            What about Dr. Hassan?  Did Dr. Hassan rely on

Idenix?  Did Dr. Hassan do it himself?  And she said she

didn't know.  Then she came to court and said, no, he

didn't.  Let's play this.

            "Question:  Do you have an understanding as to

why Dr. Hassan was synthesizing 2'-methyl-2'-hydroxy

nucleosides?

                "Answer:  No.

                "Question:  Do you have an understanding as to

whether someone instructed Dr. Hassan to make 2'-methyl-2'

hydroxy nucleosides?

                "Answer:  No, I don't know that.

                "Question:  Do you know whether Dr. Hassan came

up with the idea to make his 2'-methyl-2'-hydroxy

nucleosides on his own?

                "Answer:  I don't know that, either."

                So before court, she said under oath she didn't

11:14:55 1   know.  And then she came to court and said, he didn't.

11:14:59 2              Just keep that in mind.

11:15:01 3              But, regardless, whatever it was that she did,

11:15:04 4   her contributions, let's move her to the 90 percent we are

11:15:11 5   not asking for.  Remember, in this pie chart, let's put her

11:15:15 6   as part of the 90 percent of the work that we agree stays

11:15:19 7   with Gilead.

11:15:21 8              Then Dr. Hassan, another one of their witnesses,

11:15:25 9   remember, he was hired by Dr. Schinazi in 2001, and the very

11:15:31 10   first thing he worked on at the company is this 2'-methyl.

11:15:37 11   He said he had a lot of discussions with Dr. Watanabe.  We

11:15:40 12   know Dr. Watanabe had the confidential Idenix information.

11:15:43 13   He said Dr. Watanabe suggested targets to him and Dr.

11:15:48 14   Watanabe told him to do it.

11:15:50 15              Let's put Dr. Hassan in that 90 percent with

11:15:54 16   Gilead.

11:15:56 17              Then Jeremy Clark.  Jeremy Clark did do some

11:15:59 18   work that advanced getting these drugs on the market.  He is

11:16:02 19   the one who did the work for 6130.  But it was based -- he

11:16:08 20   was influenced by Idenix.

11:16:10 21              He knew what Dr. Hassan was doing.  And,

11:16:13 22   remember, he took the Idenix patent application to his boss.

11:16:17 23   And he said, Dr. Schinazi was the reason I did it the way I

11:16:23 24   did it.

11:16:24 25              Let's put Jeremy Clark in that 90 percent.  And

then Dr. Sofia, Dr. Sofia I think is a good doctor, a good
scientist.  And he definitely did work to advance getting
those drugs to the market.

But he wasn't in the loop.  He didn't even come
until 2005.

And he cited Idenix, he cited Dr. Sommadossi and
Dr. La Colla in his own research papers.  And he admitted
that his work was based on Jeremy Clark's 6130.  And then,
remember that Gilead, even today, he testified even today,
Gilead pays him $15,000 a month to do things like testify
and to give speeches.

Let's put him in that 90 percent.

Then they brought Dr. Hutchison, remember, he is
the doctor from Australia.  He didn't join Gilead until
2010.  He admitted that sofosbuvir uses 2'-methyl up.  So
put him in the 90 percent also.

Then Dr. Otto, they brought Dr. Otto.  At trial,
he said no one at Pharmasset knew about the patent before
November of 2001.  We know that's not true.  Dr. Schinazi
has admitted that.  Dr. Stuyver has admitted that.  Both of
them admitted that under oath, what he told you is just not
correct.

And remember the documents where he was, he
talked even earlier about being concerned about the patent
implications.

11:18:02 1          He was paid 16 to $17 million when Gilead bought

11:18:06 2     the company.  But the regardless, whatever he may have done

11:18:09 3     to help, put him in the 90 percent also.

11:18:14 4          Then Dr. Stuyver.  Dr. Stuyver, remember, was

11:18:18 5     the vice president of biology.  He was the one who wrote the

11:18:22 6     cold shower and the world collapsed.  Whatever he did, put

11:18:25 7     it in the 90 percent also.

11:18:26 8          And the same thing with Dr. Schinazi.  Put him

11:18:29 9     in the 90 percent.

11:18:32 10         We're not asking for that.  We're not asking for

11:18:35 11    the work that they did.  We're asking for our share, which

11:18:41 12    the evidence is, is 10 percent.  We only want our fair and

11:18:46 13    reasonable share.

11:18:50 14         Over $42 billion worth of sales worldwide.  Now,

11:18:55 15    you may be tempted to use that number when you are

11:18:57 16    calculating damages, but don't.  That is not the right

11:19:00 17    number.  It is not worldwide.  You have to limit it to the

11:19:02 18    United States sales.

11:19:04 19         And the United States sales were over

11:19:06 20    $28 billion, but for some various accounting reasons, we

11:19:09 21    adjusted it down to $25.4.

11:19:13 22         Everybody in this case, there is no dispute

11:19:16 23    about it, everybody in this case has agreed these are highly

11:19:19 24    profitable drugs.  Highly profitable to Gilead.  But we have

11:19:24 25    never been paid for our part.

11:19:28  1          Now, ladies and gentlemen, that all brings us to

11:19:30  2      the verdict form that you are going to fill out when you go

11:19:33  3      back.

11:19:34  4          These facts that I have been going over are

11:19:36  5      the facts that you can use to answer the questions on the

11:19:41  6      verdict form.  There is not going to be a question on the

11:19:46  7      verdict form about infringement because that is something we

11:19:49  8      do not have to prove.

11:19:53  9          Let's go over the very first question on the

11:19:55 10      verdict form.  That is the first one that you have.

11:19:58 11          And that is the one that asks about was the

11:20:01 12      infringement willful?  You will see it right there.

11:20:04 13          And the answer to that question is yes.  For all

11:20:10 14      these reasons I have been going over, it was willful.

11:20:15 15          So that is the first question.

11:20:17 16          The next, I think it is four questions, all

11:20:20 17      relate to this issue about whether our patent is valid.

11:20:24 18      Okay?  The next four questions, they have the burden on.

11:20:27 19      Okay?

11:20:28 20          They want you to disregard years of work by our

11:20:34 21      Federal Government, by the U.S. Patent Office and instead

11:20:38 22      they want you to rely on a couple of hours of testimony from

11:20:42 23      paid witnesses that they brought to court to tell you that

11:20:46 24      the patent is invalid.

11:20:47 25          Now, you heard from Judge Stark, their burden

11:20:53  1    is a particularly high one.  As a matter of fact, it is

11:20:56  2    the highest burden.  The burden of proof they have is the

11:20:59  3    highest burden they have in any civil case.  That is because

11:21:02  4    what they are asking you to do is so extraordinary.  They

11:21:05  5    have this extraordinarily high burden.  They've got to prove

11:21:08  6    to you by something called clear and convincing evidence.

11:21:11  7            That is not the burden we have.  So when we have

11:21:15  8    to prove willfulness, that burden does not apply to us.

11:21:18  9    When we have to prove to you our damages, that burden does

11:21:21 10    not have to apply to us.

11:21:23 11            This high burden only applies to them because

11:21:26 12    they're asking you to disregard what the Patent Office did.

11:21:35 13    That is the instruction that you have that Judge Stark read

11:21:39 14    to you:  Clear and convincing evidence.  You have to have

11:21:47 15    been left with an abiding conviction that what they're

11:21:51 16    trying to prove is true before you can throw out our patent.

11:22:00 17            So let me go over those questions, these

11:22:03 18    questions that relate to their claim that our patent is not

11:22:07 19    valid.

11:22:07 20            And I think this is clear, but let me just say

11:22:11 21    it.  So they're trying to say our patent is not valid, so

11:22:14 22    they won't have to pay us.  Okay?  That is what this is

11:22:18 23    about.  If our patent is not valid, they don't have to pay

11:22:21 24    us.  So that is why they're coming to court to say, hey, we

11:22:24 25    don't have to pay you because we think your patent is not

11:22:27 1    valid.  So that is what is going on here.

11:22:29 2              So here is the first question.  And this is

11:22:37 3    titled Enablement.  You see that.

11:22:40 4              But the evidence here is that the disclosure is

11:22:44 5    enabling.  The evidence is in our favor on this point.

11:22:48 6              You will see that we disclose multiple ways to

11:22:51 7    make this claimed class of compound.  There is no undue

11:22:55 8    experimentation that is required.

11:22:57 9              A person skilled in the art could test these

11:23:01 10   compounds.

11:23:02 11             And the Patent Office looked at this issue and

11:23:06 12   they granted the patent.

11:23:09 13             That is why we brought you Dr. Meier who

11:23:12 14   testified earlier this week.  Remember, Dr. Meier took the

11:23:17 15   stand, and he explained that this issue of nucleoside

11:23:21 16   synthesis is a well developed science.  He told you that

11:23:24 17   synthetic approaches to making modified nucleosides are

11:23:28 18   described and well known.  And he told you that there are a

11:23:32 19   lot of different methods for making the nucleosides.

11:23:35 20             And then we also brought you Dr. De Francesco.

11:23:40 21   Dr. De Francesco also said there is no undue experimentation

11:23:44 22   to screen 2'-methyl up for activity against hepatitis C.

11:23:49 23             So we put our evidence in like the Patent Office

11:23:54 24   reviewed.

11:23:54 25             Our patent discloses multiple ways to make and

11:23:58 1   use these compounds.  They did it back in 2000 in that very

11:24:03 2   first patent application, May 23rd of 2000.  And that is all

11:24:06 3   that is required.

11:24:08 4          They have not met their very high burden on this

11:24:14 5   question.

11:24:15 6          Instead, who did they bring you?  They brought

11:24:17 7   you Dr. Seeger.  Remember him?

11:24:20 8          He took the stand but he admitted on cross-

11:24:24 9   examination that he was not an expert in drug development.

11:24:26 10         He had never been employed by a company to

11:24:29 11  discover new compounds.

11:24:30 12         He had never used a BVDV assay or a hepatitis C

11:24:35 13  polymerase assay.

11:24:36 14         Even he, though, had to admit that before

11:24:42 15  May 23rd, 2000, no one had reported a 2'-methyl up compound

11:24:50 16  that showed HCV activity.  That is their expert.  Okay?

11:24:56 17  Their expert admitted that.

11:24:57 18         He also admitted that it does not take undue

11:25:00 19  experimentation to test compounds using this hepatitis C

11:25:04 20  polymerase.  And he said that this HCV replicon assay and

11:25:10 21  the BVDV assay were also available.

11:25:17 22         The point of all this is their own expert

11:25:21 23  undercut the argument they're making to you that the patent

11:25:25 24  should be invalid so they won't have to pay us money.

11:25:29 25         Now, they spent a lot of time at the trial

11:25:32  1    talking about something called 2'-fluoro down.  And I don't

11:25:35  2    know what counsel for Gilead is going to say when they talk

11:25:39  3    to you, but I bet you they're going to spend a lot of time

11:25:43  4    talking about it again.

11:25:43  5              Here is what you need to know.  What is

11:25:46  6    important is the patent in this case is a method of using

11:25:52  7    2'-methyl up as a way to treat hepatitis C.  And this

11:25:59  8    2'-fluoro down that they keep talking about is paired with

11:26:04  9    our 2'-methyl up.  It is not something separate.  It is

11:26:09 10    paired with 2'-methyl up.  And that is us, and that is what

11:26:13 11    is covered.

11:26:14 12              And, again, you have already heard from Judge

11:26:18 13    Stark you are to assume that their two drugs infringe.  You

11:26:23 14    are to assume that those two drugs use the patent.

11:26:28 15              And there is really no better evidence about

11:26:30 16    that than Jeremy Clark.  Okay?  Jeremy Clark said after he

11:26:35 17    got our patent, after he got our patent and looked at it, he

11:26:39 18    said it took him 15 minutes to make it.

11:26:41 19              Remember, that is why they kept saying, well, he

11:26:44 20    is not even a Ph.D.  He has a master's degree, and it only

11:26:47 21    took him 15 minutes after he figured out the patent to make

11:26:53 22    the compound.

11:26:54 23              Now they want you to think that the Idenix

11:26:56 24    patent is invalid because the compound listed in the patent

11:26:59 25    contain references to something called R.  Remember you kept

seeing, you kept hearing during the trial about these Rs?

What does that mean?  Well, it is another argument they're making to try to get you to throw our patent out so they don't have to pay money.

What they're arguing is that it would take undue experimentation to determine which one of these supposedly large number of compounds, large number of nucleosides would be effective.

But Dr. Sofia, their witness, Dr. Secrist, their witness, themselves follow the same approach in their own work.  And that shows that scientists in the field can handle large classes of compound, something that they do regularly.

And, again, all of this has been before the Patent Office.  And the Patent Office heard it and they agreed with us.  The Patent Office agreed with us.

And so you will see, if you can pull up the jury charge, that is why they have the burden.  Gilead has the burden of proving nonenablement for each claim by clear and convincing evidence.

So when you get to that question on the verdict form, just remember our patent is presumed valid.  All of this has been looked at by the Patent Office and they granted our patent.

And the answer to that is no.

So the next question on the verdict form that is

2144

part of their claim, their claim that the patent is invalid, that question is Question No. 3 on the verdict form.

If we could pull that up.

Okay.  And there is a jury instruction that was read to you by Judge Stark, and that is what he read to you earlier.

It says:  The written description requirement may be satisfied by any combination of words, structures, figures, diagrams, formulas, experiments, data, et cetera, contained in the patent application.  These are often called "blaze marks."

You will see when you go back and you look at it, there are drawings all throughout.  There are figures. There is information.  This is what they're talking about. Okay?  And you will see this for yourself back in the juryroom.

Our invention is described properly.  Gilead knew from the start what Idenix invented.  Gilead described our invention to the government.  Leaders in the field were able to do the same thing.  And the Patent Office agreed with us.

Remember Dr. Stuyver.  Remember he told you before the patent ever issued.  Remember he understood what it was.  He knew.  He understood it.  That is why he said, hey, this is what we're doing.  It is covered by this application.

11:29:59 1              Let's hear what he had to say on this issue.

11:30:04 2             "Question:  Okay.  Now you said in your e-mail

11:30:07 3  you got a cold shower.  What did you mean by that?

11:30:13 4             "Answer:  I don't exactly recall it is the cold

11:30:16 5  shower.  But most likely, I went in there with a whole lot

11:30:20 6  of interesting stuff to tell her that, look, this is their,

11:30:25 7  the new things that we found in our screening, initial

11:30:29 8  go-round and start filing maybe, something like that.  And

11:30:33 9  then she, she most likely told me, well, I count five for

11:30:38 10  you on this type of compounds because it's already in the

11:30:45 11  Idenix filings.

11:30:46 12             "Question:  Was it your impression that the

11:30:49 13  Pharmasset work up to October 2001 developed a compound

11:30:55 14  might eventually belong to Idenix at that time.

11:30:57 15             "Answer:  The way that -- if I read this now,

11:30:59 16  the way that I see it, that throughout all our screenings,

11:31:06 17  everything that we discovered must have been part of what

11:31:13 18  was discovered already in Idenix applications, yes.

11:31:16 19             "Question:  Okay.  When you say 'we discovered,'

11:31:18 20  you meant Pharmasset?

11:31:19 21             "Answer:  We at Pharmasset, yes.

11:31:23 22             That shows way back in the beginning, Gilead,

11:31:26 23  Dr. Stuyver, understood our patent.  They knew.

11:31:31 24             Now, they may come and say, well, Jeremy Clark

11:31:35 25  invented something new.  6130 is something new.

11:31:38  1          Just remember that picture that we showed you

11:31:41  2   before where it is Idenix's work and the arrow going up to

11:31:45  3   6130.  And, remember, 6130 has 2'-methyl in it.  He didn't

11:31:52  4   remove it.  He added to it.  It has 6130 in his drawings, no

11:31:56  5   question about that.

11:31:57  6          And then this is where those grant applications

11:31:59  7   that you saw during trial, this is where they come in and

11:32:03  8   why they are important.

11:32:04  9          Remember, we showed you those grant applications

11:32:07 10   where, back in the time, Gilead, Pharmasset signed under

11:32:13 11   oath -- let's pull that up.  Remember, with criminal

11:32:17 12   penalties.  They signed under oath these requests to the

11:32:21 13   Federal Government to get money, to do research.  All right?

11:32:25 14          And you can see in their own grant applications

11:32:29 15   back at the time -- this is 2003 -- they're citing us right

11:32:36 16   there.  Their footnote goes to Dr. Sommadossi and Dr. La

11:32:41 17   Colla.

11:32:41 18          That shows right there they understood our

11:32:46 19   patent.  They understood what was in the patent.  Idenix's

11:32:52 20   disclosures were so clear that Pharmasset knew early on what

11:32:58 21   Idenix -- what information Idenix had.

11:33:01 22          And it's not just them.  Others in the field

11:33:04 23   knew it also.  That is why we brought you these articles

11:33:07 24   that we showed you this week.

11:33:09 25          Remember, we showed you this article from 2002.

11:33:13 1    And this is one written by Dr. De Francesco.  That is why we

11:33:16 2    brought him to court.  Dr. De Francesco wrote this article

11:33:21 3    way before there is any litigation, way before he had any

11:33:23 4    relationship with us or said he would come to court or

11:33:26 5    anything.  He wrote an article back in 2002 and he talked

11:33:30 6    about the same thing.

11:33:31 7            And then he and a Dr. Rice wrote another article

11:33:35 8    back in 2003.  And Dr. Rice you may remember from trial, he

11:33:39 9    is a very famous scientist who got the same award that

11:33:42 10   Dr. Sofia told you that he got, that Lasker Award that they

11:33:47 11   were talking about.  They both, both of those articles

11:33:50 12   report about the Idenix invention.

11:33:54 13           And then we brought you Dr. Meier who also

11:33:58 14   testified that every scientist who read the patent at the

11:34:03 15   time recognized the importance of it.  They recognized the

11:34:08 16   importance of this patent to use the 2'-methyl up compound

11:34:11 17   to treat hepatitis C.

11:34:14 18           And then the Patent Office gave us our patent.

11:34:18 19   The Patent Office found that our descriptions were

11:34:21 20   sufficient, that our drawings and our figures and all the

11:34:26 21   blaze marks are sufficient.

11:34:27 22           So when you get to that question in the verdict

11:34:29 23   form, we also ask that you answer that no.  They have not

11:34:34 24   met their burden of proof to declare our patent invalid.

11:34:39 25           Now, the last two questions on this part of the

11:34:42 1    verdict form which also relate to their claim, again, under

11:34:46 2    this clear and convincing standard, where they're trying to

11:34:50 3    declare our patent invalid, those are Questions 4 and 5 on

11:34:54 4    the verdict form.

11:34:55 5            If we could pull those up.

11:34:57 6            I'm going to deal with those together.  Okay?

11:35:00 7    And this involves their claim that Idenix was not first.  Okay?

11:35:09 8            So what was the evidence on that?

11:35:11 9            Their experts tried to tell you that a Bob

11:35:15 10   Wolanski, who was a scientist at Merck, and Dr. David Olsen,

11:35:19 11   who testified in court, another scientist at Merck, were the

11:35:22 12   first to invent this 2'-methyl up.

11:35:25 13           Well, what was the evidence?

11:35:27 14           The evidence was that Idenix was before Merck.

11:35:30 15   Merck didn't even know that they had this 2'-methyl up

11:35:33 16   compound in 1998.  And then they abandoned the work they

11:35:36 17   were doing.

11:35:37 18           Merck discovered it after, after this key date

11:35:42 19   of May 23rd of 2000.  And the Patent Office agreed.

11:35:48 20           Remember, you heard Dr. Olsen testify.  He came

11:35:52 21   to court, he was the top scientist at Merck in charge of

11:35:55 22   the whole program about hepatitis C.  He is the person.  If

11:36:00 23   anybody would know, it was him.  He was in charge the whole

11:36:03 24   program.

11:36:03 25           And he said that in 1998, they did not know that

that compound they were working on, they didn't even know it
had 2'-methyl up and they dropped it.  Okay?

          But Gilead is trying to tell you that Dr.
Olsen's work, there is that "drop?"  Remember we showed that
to you?

          Gilead is trying to tell you that Dr. Olsen's
work back in 2000, that that just wasn't the case.

          But remember Dr. Olsen told you that when he
found out about all of this, he picked up the phone and
he called that young chemist who had been doing the work
initially.

          Remember we showed you there, Susan Jenkins.
Remember he told you that he looked up her name, that her
name was the one that was listed there from the prior work,
and he called her on the phone and he said he was so
surprised she still worked at Merck.  She was about to
retire.  But he was able to talk to her about it and tell
her.

          In the 1960s, when she did her work, Merck did
not use that compound to treat hepatitis C.  Hepatitis C
wasn't even identified.  That virus wasn't even identified
until 1989.

          Why are these facts important?  These facts are
important because it shows Idenix came first.

          Both of these questions on the verdict form can

be answered very simply by you just remembering what the

evidence was from the Patent Office.

Okay. Remember, there was that first letter

from the Patent Office to Idenix. And this talked about a

2001 reference. They rejected our patent application.

Remember that? Then Idenix wrote back and gave them the

additional information. You saw that at trial. And the

Patent Office responded and said, Idenix has overcome the

issues and the Patent Office said they withdrew that

concern. They withdrew that issue.

So the Patent Office looked at this whole thing,

they sorted it out for themselves, and they said, Idenix was

first and issued the patent.

Really, ladies and gentlemen of the jury, that

is the beginning and end of that whole issue. When you get

to the verdict form, on these two questions, Question 4 and

Question 5. Also, every one of those, the question is

divided up for each one of the claims, answer each one of

them as no. They have not met their burden of proof here.

They have not met that clear and convincing evidence. They

have not met it, because of Dr. Olsen's testimony, and

because the Patent Office looked at all these issues

themselves, asked for more information from Idenix, Idenix

sent it to them. And they withdrew that concern.

So those are all the questions on the verdict

form that relate to their claim that the patent is not

valid, because they are trying to avoid paying us money.

Their final insult to us is, they say, despite

what all you did, despite our taking it and using it, you

get nothing.  You get nothing.  That brings us to the

verdict form on damages.  And that is Question 6.

Our position is, we are only asking for what is

called a reasonable royalty.  You heard that, you heard

Judge Stark talk about that.

We brought you -- we can pull up that jury

charge also, right there.  This is what Judge Stark read to

you this morning:  "In no event may a damages award be less

than a reasonable royalty."

That is all we are asking for, a reasonable

royalty.

That is why we gave you -- we brought into

evidence the other licenses that are similar, so you would

have an idea about what would be an appropriate percentage.

We brought you, also, some internal documents from Gilead

that showed they also used comparable licenses and looked at

royalty rates.

So the evidence that you have from these other

licenses, the percentages of those other licenses go all the

way up to 18 percent.  And you may think, after hearing all

the evidence of wrongdoing in this case, that 18 percent is

the right number, but that's not what we are asking for.  We
are trying to be fair and reasonable.

That is why we are only asking for ten percent.

Without our work, without our breakthrough, none
of those profits would have been available to them.  They
would not have made any of that money, any of those profits,
if it had not been for our work to begin with.

So ten percent of what, though?  When you are
calculating it, ten percent of what?  That's when you go
back and you look at not the worldwide sales but the U.S.
sales, adjusted downward for the accounting.  That is how
you come up with this number, 25.4 billion is the base.
That is their U.S. sales adjusted downward for these
accounting reasons.

So let's go back to that pie chart, that's the
whole pie, once you know that, and once you decide on your
percentage, then you just have to do the math.  And all of
this is on the verdict form.  So when you do the math there,
you will see ten percent is 2.54 billion dollars.

Ladies and gentlemen, that's a lot of money.
But they have made a staggering amount of money off of our
work.  We are only asking for ten percent.  If they made
$100, we would be getting ten percent of $100.  Whatever it
is that they have made, we are asking for ten percent of it,
which we think is fair and reasonable.

11:42:12  1      Gilead's position, what is their position?

11:42:13  2 Their position is, we get zero.  Their position is, they

11:42:17  3 want you to say our patent is worthless and we get zero.

11:42:22  4      They are treating us just like they treated

11:42:25  5 Jeremy Clark.  Let's play that video from him.

11:42:29  6      "Question:  Let me ask you this:  How much did

11:42:34  7 Pharmasset and Gilead ever pay you for your 6130 invention

11:42:40  8 other than what you earned orderly by way of a salary?

11:42:48  9      "Answer:  Nothing."

11:42:49 10      Then remember he said, would you go to work,

11:42:52 11 would you want to work for a company like that?  That's who

11:42:55 12 we are dealing with here.

11:42:57 13      Let's get back to the verdict form.  The verdict

11:42:59 14 form, you will see, the question there, (a), that talks

11:43:07 15 about the running royalty, which is what we are asking for,

11:43:11 16 then it asks for the rate, we want you to put ten percent

11:43:15 17 there, then it asks for the base, so we want you to use only

11:43:19 18 the U.S. number, adjusted for the accounting reasons, so

11:43:23 19 that royalty base is 25.4 billion, then you just do the

11:43:29 20 math.  That's what we are asking for.  That is fair, and

11:43:35 21 that is reasonable.

11:43:38 22      Ladies and gentlemen, there is only one other

11:43:40 23 thing I want to talk to you about.  Then I am going to sit

11:43:44 24 down.  Counsel for Gilead will have a chance to talk to you,

11:43:47 25 then I get to talk to you one more time at the end.

11:43:51 1        You know, this is America.  In America, we value
11:43:56 2   people like Dr. Sommadossi and Dr. La Colla.  We value
11:44:00 3   people who come up with ideas and use those ideas to help
11:44:04 4   other people, to treat other people.  We value, we value
11:44:09 5   this work.  Don't devalue it.  Don't let your verdict speak
11:44:13 6   to all those people out there -- remember we saw the picture
11:44:17 7   of Dr. Standring in his lab coat when he was 14 years old.
11:44:21 8   Don't send a message to people like that that their work has
11:44:25 9   no value and that their patents should be thrown out.
11:44:28 10       Let your verdict speak about the importance of
11:44:33 11  innovation and new ideas, that we should share in these
11:44:38 12  profits that Gilead has made, wrongfully using our patent.
11:44:44 13       So thank you very much for listening to me this
11:44:47 14  morning.  I look forward to talking to you again after the
11:44:51 15  lawyer for Gilead finishes.
11:44:53 16       Your Honor, that completes the first part of my
11:44:55 17  closing.  Thank you.
11:44:56 18       THE COURT:  Thank you very much.
11:44:57 19       Ladies and gentlemen, we are going to give you a
11:44:59 20  break.  I believe your lunch is here, so we will let you
11:45:04 21  have your lunch.  There is still no talking about the case
11:45:07 22  yet.  We still have a couple more arguments.  I have a few
11:45:11 23  more instructions to give you.  We will give you as much
11:45:14 24  time as you need to eat, but I think we will check in with
11:45:18 25  you in about 20 minutes and see if you are ready to come

11:45:22  1    back in.  If not, we will give you more time.  But we will

11:45:25  2    check in with you, see if you are ready.  We will be in a

11:45:28  3    recess.

11:45:48  4              (Jury leaves courtroom at 11:45 a.m.)

11:45:48  5              THE COURT:  We will be in recess.

11:45:50  6              (Luncheon recess taken.)

12:18:49  7              THE COURT:  The jury is done with lunch.  So we

12:18:51  8    will bring them in in a moment.

12:18:53  9              Mr. Scherkenbach, I wonder if you have a view --

12:18:56 10    you have an hour and ten minutes.  I assume you intend to

12:18:59 11    use most of it.  I don't think we can get through an hour

12:19:04 12    and ten minutes of your closing plus however much the

12:19:08 13    plaintiffs are going use plus the 20 or so minutes of

12:19:13 14    reading I have to do without giving the jury a break.  It

12:19:16 15    seems to me I could either interrupt you at 55, 60 minutes

12:19:23 16    into things and then give you your last bit after a short

12:19:27 17    break, or I could wait until you are finished and take a

12:19:31 18    break.

12:19:32 19              Do you have a preference?

12:19:34 20              MR. SCHERKENBACH:  I think I would rather go all

12:19:36 21    the way through, if that's okay with the Court.

12:19:38 22              THE COURT:  Certainly.  That's fine.

12:19:41 23              Anything else before we bring the jury in?

12:19:45 24              MS. PARKER:  One quick question.  How does it

12:19:51 25    work?  Will you give us a note when we are close?  I asked

12:19:55  1    Neal this morning, he thought like a ten-minute notice?  How

12:19:59  2    does that work?

12:19:59  3                THE COURT:  I am hopeful I won't have to do this

12:20:01  4    with you.  But you have an hour an five minutes left, I see.

12:20:08  5                You get to ten minutes left, I will let you know

12:20:12  6    that, and we will let you know with two minutes, and then we

12:20:16  7    will stop you.

12:20:16  8                Anything else?

12:20:18  9                Let's bring the jury in.

12:20:20 10                (Jury enters courtroom at 12:20 p.m.)

12:21:49 11                THE COURT:  Welcome back, ladies and gentlemen.

12:21:50 12    I hope you enjoyed lunch.  We are ready to hear Gilead's

12:21:55 13    closing.

12:21:55 14                Mr. Scherkenbach.

12:21:56 15                MR. SCHERKENBACH:  Thank you, Your Honor.

12:21:58 16                Ladies and gentlemen, good afternoon.  I was

12:22:01 17    hoping to say good morning, but it was not meant to be.

12:22:05 18                I will be, to give you some comfort up front,

12:22:09 19    substantially briefer than this morning's argument.

12:22:13 20                Obviously, we are very grateful you are here and

12:22:19 21    that you are willing to listen to what is an extremely

12:22:25 22    complicated and hard-fought dispute.

12:22:27 23                What I want to do is not so much tell you what I

12:22:31 24    think.  In fact, I don't want to tell you what I think at

12:22:34 25    all.  I want to show you the evidence that would allow you

to decide what you think as you are in the jury room and
answering the questions on that form.

I want to begin where the case began. That is
with something not that I told you, but with something that
Idenix's counsel told you, because often in these cases, the
thing that you might find the most useful in sorting through
the evidence and deciding who to believe and what to believe
are things that you know from your own personal experience,
common sense -- it's something I am going to come back to --
and trust, as counsel said in her opening, trust. Trust is
important. It is really important.

And it's not just important because this is a
pharmaceutical case. And it's not just important because
this case involves a lot of money.

It's important because you can't look at every
single document fully yourself. You can't read every single
deposition transcript fully yourself.

You can't remember perfectly everything the
witnesses said when they took the oath and took the stand.

So at some level you have to trust what's being
represented to you.

It's important to be able to trust
representations that are made to you.

Now, there are a few documents, in particular,
that we started the case with, that we saw throughout the

12:24:19 1   case, and that we saw again here today.

12:24:24 2         They are documents that -- actually, they are

12:24:27 3   ones that I do hope you take the time to look at and make up

12:24:31 4   your own mind what they actually say and what they actually

12:24:34 5   mean.

12:24:34 6         This one is PX-677.  What I am showing you here

12:24:40 7   is a slide from Idenix's opening, where they represented to

12:24:45 8   you the content of this document.  And that is not the

12:24:47 9   content of the document.  And they did it again today.

12:24:56 10         Yellow is what they want you to look at.  Green

12:25:00 11   is sort of the rest of the story.  Some of you may remember,

12:25:04 12   there actually was a radio personality back in the seventies

12:25:07 13   and eighties and his show was called "The Rest of the

12:25:11 14   Story."  What were you not necessarily being shown?  What

12:25:13 15   were you not necessarily being told?

12:25:17 16         I don't go through this exercise to tell you

12:25:21 17   that you should agree with my view of the evidence or our

12:25:24 18   view of the evidence.  The point is that you need to form

12:25:28 19   your own view of the evidence when you look at all of it,

12:25:31 20   not just pieces that are spoon-fed to you, not video clips

12:25:37 21   that are taken out of context and truncated and put together

12:25:40 22   in a way that they never were delivered.

12:25:54 23         This document, because they keep coming back to

12:25:56 24   it, back and forth, back to it over and over again, is one

12:26:00 25   we actually asked the witnesses about.  We asked Dr. Otto:

What was going on here in this exchange, Dr. Otto?

The "Mike" is Dr. Otto. This is an exchange between him and Dr. Schinazi.

What are we talking about here? Who said what to whom? What actually happened?

So we brought Dr. Otto. We brought witnesses. And we said, we asked him about this, and noted, as I noted, well, gee, they cut off actually the most important part, which was Dr. Schinazi saying, We don't want to do what Idenix is doing. And I thought that's what he was basically stating, we don't want to be working in an area where somebody else is already working. Why would you want to do that?

Then there is a statement that Dr. Schinazi made. And he made the statement, gee, Hassan must have told -- he must have told Hassan, Dr. Watanabe must have told Hassan something.

Now, Dr. Schinazi has no idea what if anything Dr. Schinazi told Dr. Hassan. In fact, I am going to show you in a minute that Dr. Schinazi was asked about that in deposition, and he said, yeah, you are right. I don't really know.

But Dr. Otto knows. And he came here and took the stand and he told you what he knows. And what he knows is Dr. Hassan -- and I am going show you the evidence on

12:27:44 1    this -- had been working on 2'-methyl compounds before he

12:27:49 2    came to Pharmasset.

12:27:53 3          These compounds were well known and many people

12:27:57 4    had worked on them in many labs around the world.  Remember,

12:28:01 5    these are the compounds that Merck invented in the 1960s.

12:28:05 6          So it's not surprising that Dr. Hassan knew

12:28:10 7    about these compounds.

12:28:13 8          Dr. Schinazi admitted, this is what I just said,

12:28:16 9    I don't know what knowledge they had.  Yeah, I said that in

12:28:20 10   the e-mail, but I don't really know, which is again why we

12:28:23 11   brought you the people who actually know.

12:28:28 12         One thing there Schinazi did say is I didn't

12:28:31 13   tell Dr. Hassan anything.  That's for sure.

12:28:37 14         Now, so much of their case has been about Dr.

12:28:41 15   Schinazi, so much of it has.

12:28:44 16         It should be clear by now, I hope it's clear by

12:28:47 17   now that Idenix is the party relying on Dr. Schinazi,

12:28:56 18   fundamentally, for the core theme of their case.  It's all

12:29:00 19   about Dr. Schinazi.  They brought him into the courtroom

12:29:06 20   through video.  They subjected you to 95 minutes of his

12:29:12 21   video.  Then they spent the rest of the case tearing him

12:29:16 22   down and implying to you you can't trust him as far as you

12:29:21 23   can throw him.

12:29:23 24         You know, that's for you to decide.  Maybe he

12:29:28 25   said some things that weren't reliable or weren't accurate.

12:29:33 1   Maybe he said some things that were.

12:29:37 2          But he is not our -- we are not running away

12:29:40 3   from him, but he is not our witness.  They brought him in.

12:29:44 4   He says some things they like, and they want you to believe

12:29:47 5   those things.  But when Dr. Schinazi says something like I

12:29:53 6   never told Hassan anything, they don't want you to believe

12:29:55 7   that.

12:29:59 8          Two last points on Dr. Schinazi.  Nothing he has

12:30:03 9   to say is relevant to any issue you are actually going to

12:30:07 10  decide, ladies and gentlemen.  I will show you why.

12:30:12 11         You are not going to have a question on the

12:30:13 12  verdict form that says, Do I like this guy?  Do I want to do

12:30:18 13  business with this guy?  Do I think he was a

12:30:24 14  straight-shooter with everyone whose path he crossed?

12:30:29 15         Maybe not.  But that hardly makes Gilead a

12:30:35 16  willful infringer, and it certainly doesn't say anything

12:30:38 17  about whether Idenix's patents are valid.

12:30:35 18         Then we have the cold shower e-mail.  This is

12:30:51 19  without doubt the document that has gotten the most airplay

12:30:58 20  time in this trial.

12:30:59 21         It was highlighted in the beginning.  It was a

12:31:01 22  really important document by Idenix.  Watch for this one,

12:31:04 23  and it was used in cross-examination with many of our

12:31:07 24  witnesses and here it is again today.

12:31:10 25         And another one.  I invite you, it's PX-470.  I

really do invite you to read the document.  Okay?  PX-470.

Is it really important?  Does it actually have
anything to do with what this case is about?

And I suggest to you the answer to that question
is no.

The date is October 15th, 2001.  That is roughly
a year before Jeremy Clark ever had the idea to make what
became 6130, before he ever had the idea to make a 2'-methyl
compound.

So how can it be, just on its face, how can it
be this e-mail from a year earlier is talking about the
2'-methyl-fluoro work that was done at Pharmasset?  How can
it be commenting on that?  How can it have anything to do at
all with that?  It doesn't.

And, in fact, you see a reference here to the
moment of truth.  The moment of truth being October 18th.
You remember they made a big deal of that in the opening.
The moment of truth, right?

Boy, that sounds sinister.  That was the
deadline for the filing of a patent application.

Well, here is Dr. Otto.  Could it possibly be
talking about 6130?

No.

The moment of truth, October 18th, 2001, it was
the deadline for Dr. Stuyver and Dr. Watanabe to file a

patent application on something that is completely unrelated
to what is going on in this case.

Dr. Stuyver was asked about it in the
deposition.  The filing date, October 18th, 2001.

So what Dr. Stuyver is talking about.  Let me
just go back to the dreaded cold shower e-mail, is that what
he was trying to get a patent on with Dr. Watanabe, he was
worried about whether he could still get his patent because
of what Sherry Knowles told him was in an Idenix patent
application.

Okay.  It actually turns out they did file the
patent, so it didn't even -- even the implication that it
ended up being a problem isn't supported by the evidence.
But one thing is for sure.  It has nothing to do with
anything in this case other than the words sound bad.  They
sound sinister.  It sound like maybe something nefarious is
going on.

All right.  Here is another one that is not
document based but it is also really important.  Unlike, I
suggest to you, the cold shower e-mail, this one is really
important.  Because it pertains to a representation about
what the evidence would be from a key witness in the case.
This is the Merck defense:

"You were promised in opening that you were
going to hear from the scientist at Merck who was head of

the whole hepatitis C research program."

And here is the key part:  "You are going to hear him say, no, Idenix was first, they were first, we were not."

You did not hear that.  You didn't hear it from anybody other than Idenix's lawyers.  Dr. Olsen said no such thing.  And, in fact, he said the opposite.

Here is the actual evidence:

Dr. Olsen, isn't it true that you believe that you and your fellow scientists at Merck invented a 2'-methyl up class of compounds to treat hepatitis C?  You and your fellow scientists invented that class of compounds.  Isn't it true you believe that?

Answer:  We certainly discovered that class.  And we certainly filled intellectual property around that discovery.

Now, does that sound like Dr. Olsen telling you that Idenix was first?

I don't think so.

And, in fact, he was asked further about the Idenix patent application.  What do you know about that?  What do you know about Idenix's work?

He said:  I'm not aware of what other companies did.  I'm not aware.

Yes, I looked at their application some time

2165

after it came out.  I don't really remember it.  I'm not
aware of what they did.  I know the Merck work the best.

So nobody from Merck came in here and told you
Idenix was first.

All right.  Now, what happened at Pharmasset?

This was about half of the time spent, actually
it was two-thirds of the time spent in opening by Idenix.
It is another half of the time spent here.

So we have to respond to it, even though I think
you will find at the end of the day it has nothing to do
with any issue in this case.

But we are happy to meet it on the merits and
review with you the evidence of what actually happened.

In opening, it's a betrayal.  This great story
of betrayal.  There are more than four times it was said.  I
thought four was enough.

Theft, copying, caught with their hand in the
cookie jar.  It's outrageous what happened in this case,
isn't it?

And here we are, in a case that was first filed
in 2013, based on outrageous conduct in 2000, and no one
from Idenix said a word in 13 years.

You may have wondered why we were asking the
Idenix witnesses about that.  Why did we ask Dr. Sommadossi,
hey, isn't it true you never accused Dr. Schinazi of

12:37:36 1     anything wrong?  You never accused Pharmasset of doing

12:37:39 2     anything wrong.  You never alleged breach the contract.  You

12:37:44 3     never came to Gilead and said Gilead is using your invention.

12:37:47 4             Dr. Standring.  How about Dr. Standring, when he

12:37:52 5     took the stand?  Same thing.

12:37:53 6             And what is their excuse?  Oh, we didn't see

12:37:56 7     your confidential documents so we didn't know.

12:38:00 8             Now, think about that for a minute.  You know

12:38:05 9     that they knew the instant our patent application was filed.

12:38:10 10             Exactly what Pharmasset had done because they

12:38:14 11     copied the patent application.

12:38:17 12             That was the only way they could figure out how

12:38:20 13     to make 2'-methyl-fluoro.  I'm going to show you that

12:38:23 14     evidence.

12:38:24 15             They knew from 2005 for sure, and, in fact, they

12:38:27 16     knew earlier.  And then sofosbuvir gets, there is a big

12:38:32 17     presentation by Dr. Sofia.  Dr. Standring is there.  He gets

12:38:36 18     the handouts.  He takes the handouts back to Idenix, 2009.

12:38:41 19             Soup to nuts.  Here is what sofosbuvir is all

12:38:44 20     about.

12:38:45 21             Did they need our confidential internal

12:38:47 22     information to decide whether these horrendous things had

12:38:52 23     happened?  Betrayal, theft, copying.

12:38:56 24             Those are serious charges and you better have

12:39:01 25     serious evidence to back them up.

Now, as I said, we brought the witnesses. Not snippets of documents, people.

And, in fact, that is one of the reasons my closing is going to be shorter. Because we spent a lot of time putting evidence on through witnesses.

And I'm not telling you. This is the classic jury role. Okay? You decide who to believe. Don't let the lawyers tell you who to believe. But I will say I think for you to buy this conspiracy theory, theft, betrayal, whatever you want to call it, for you to buy that story, you are going to disbelieve an awful lot of people.

And, in fact, I think we have now added Dr. Secrist to the list. If I understand the closing correctly, somehow he was involved in putting together the people who were responsible for all this. So now he is tagged.

I told you we would present the witnesses. We presented the witnesses.

Now let's run through, and I'm going to do it relatively quickly. There are a lot of issues to cover, what they actually said.

This is what was represented about Dr. Hassan, by Idenix. Remember that name. That is a name you are going to hear.

You are going to hear Gilead claim Dr. Hassan came up with this idea all on his own.

Actually, what you heard was Dr. Hassan claim he came up with it all on his own.

That is a somewhat important difference.

He came from a lab in Japan that was famous for its work on nucleosides, including its work at the 2' position and making modifications at the 2' position.

That is a fact. That is not disputed. So years later, when he comes to Pharmasset, did he get something illicit about 2' modifications from Idenix?

Then he went to Southern Research Institute. That is Dr. Secrist's organization that he runs.

Dr. Hassan worked on the 2' position there. Nothing to do with Idenix.

Then he comes to Pharmasset, and in his job interview -- you may remember Dr. Rachakonda talked about this. Pharmasset had a very rigorous interview program. The chemists had to give a scientific presentation as part of their interview.

You want a job here? You know, we only have 15 or so people. We're serious about our science. We're serious about our chemistry. Show us what you have got. Present some chemistry to us.

And he presented on modifications at the 2' position for his job interview.

Now, did he like go talk to Idenix first to get

12:42:33 1    that information?  I don't think so.

12:42:38 2            Dr. Rachakonda was at the interview.  She was

12:42:42 3    part of the interview.  Yes, that is what he presented on.

12:42:47 4            Then Dr. Hassan gets a job.  And he comes to

12:42:55 5    Pharmasset.

12:42:56 6            And what is the first thing he thinks to try in

12:43:01 7    this hepatitis C program?  The whole reason he came to

12:43:04 8    Pharmasset was to work on hepatitis C.

12:43:08 9            Hey, let's try these 2' modified nucleosides.

12:43:12 10   I've been working on those for years.  Let's see if they

12:43:15 11   work.

12:43:17 12           And he did.  And it is in his notebook.

12:43:26 13           March of 2001, May of 2001.

12:43:30 14           Now, we had a new spin on this today in closing.

12:43:36 15   I don't know if you caught it.

12:43:40 16           The new story is, aha, look at this compound at

12:43:47 17   the upper left.  By now, you all are experts.  That is

12:43:53 18   2'-methyl adenosine.  Right?

12:43:57 19           The double ring base, the adenosine, there is

12:44:00 20   your methyl, there is your OH.  And the argument is that is

12:44:04 21   exactly the same as the Idenix MD1 compound.  It's the same

12:44:11 22   structure.  Oh, my gosh.

12:44:19 23           Can we go to slide 1105?

12:44:31 24           Oh, my gosh.  It's the Merck compound.

12:44:37 25           Merck made that compound in 1968.  They remade

it in the '90s as part of their hepatitis C program and
tested it long before Idenix ever thought to do it.

Yes, Dr. Hassan made that same compound in 2001.
It was a well known compound. People knew it had antiviral
properties. And that is where Idenix got it from. They
didn't make that compound initially either.

If we go back to slide 1028.

So that is the 2'-methyl modification branch, if
you will, of Pharmasset's work.

What about the fluorine? Was Pharmasset working
on the fluorine? Yes. In fact, Dr. Rachakonda herself
personally was working on 2' modifications, putting a
flourine both down and up. She testified to that. There is
no dispute about that.

Now, let me just pause on Dr. Rachakonda for a
moment because there were some implications about her here
in closing.

She came to this trial, as she said, because she
wanted to be heard. She took a week off work, flew here
from Cleveland, and waited around to take that witness
stand. So she could tell you to tell the truth: I was
accused, and she didn't do anything wrong. Nor did her
colleagues.

Now, you can disbelieve her, but don't do it on

the basis of pieces of documents represented to you by lawyers.

Dr. Rachakonda obviously knew about Dr. Hassan's work. She had interviewed him where he did his presentation. So she knew Pharmasset had information and knowledge about 2' modified nucleosides.

The cover up. So there is a betrayal, there was a theft, then there is a cover up. It's like a bad television show. They doctored the minutes. What started as a betrayal has turned into a cover up. It sounds like the lead into a TV show.

Dr. Rachakonda, is that true?

No.

We corrected one set of the minutes. Did they change the minutes? Yes, they did.

Dr. Rachakonda, why did you change the minutes?

Because in the minutes, if I use Idenix's compound in that set of minutes, they couldn't tell what the base was or what substituent was at 2' up. Someone had to know what Idenix compound meant.

And so we put in 2'-C-methyl-cytidine which tells you the methyl is up and the base is cytidine.

That is her explanation.

You may not believe it but one thing you might have to ask yourself, this would be the most inept cover up

in history to change one document and leave the references

to Idenix compound and Idenix sugar in all the other

documents. Who would do that if you were trying to cover

something up that was wrong, that you felt bad about?

And Dr. Rachakonda explained this labeling.

There is nothing nefarious about it.

Idenix had published a patent in which it was

working on 2'-methyl-up-OH-down-cytidine.

And so, yes, the label Idenix compound was used

as a shorthand often for that structure.

Dr. Hassan had been working on many different

2'methyl up modified nucleosides, this one has an NH2 down

with cytidine. That was labeled Hassan's compound.

Here is the really important one, for obvious

reasons. Right? Jeremy Clark. 2'methyl up fluorine down

cytidine.

Those are different compounds. They have vastly

different properties. And as you know, only one ultimately

led to the cure to Hepatitis C.

It may not look like it, but it's quite a

difference in the real world.

Jeremy Clark. Let's go on to Jeremy Clark.

Here is what was represented about him.

Jeremy Clark's work was based on this Idenix

breakthrough invention. And we know that. We know that

12:50:37 1    because they have admitted it.

12:50:41 2              No, they haven't.

12:50:43 3              We asked Dr. Otto directly, and he said:  No, we

12:50:49 4    don't admit that.

12:50:51 5              And we presented Jeremy Clark's testimony, and

12:50:56 6    you watched his video, about who he was, what made him tick,

12:51:01 7    where did he come from, who is this guy?  Is he the kind of

12:51:05 8    guy who would steal something from someone else?

12:51:09 9              And he told you, you know, the whole reason I

12:51:12 10   came to Pharmasset was because I wanted to do my own stuff.

12:51:17 11   He was at a big company where every time I said, hey, I want

12:51:20 12   to make this, they were like, you don't know what you are

12:51:25 13   talking about, we are not going to make that.  You are only

12:51:28 14   a Master's degree.  What do you know?

12:51:30 15             So he had all these ideas in his head and he

12:51:34 16   wanted to make them.  He was, in fact -- "I would rather ask

12:51:38 17   to be excused later than for permission first.  I just

12:51:42 18   wanted to make things I thought would be interesting."

12:51:48 19             Why did he think this was interesting?  Well, he

12:51:51 20   was aware that Merck had done -- this is Jeremy's testimony.

12:51:57 21   He knew about Pharmasset's work on 2' compounds, he knew

12:52:01 22   about Merck's work on 2' compounds.

12:52:05 23             There he is saying, yeah, I knew Hassan had

12:52:07 24   worked on those, of course, 15 people, through 15 people in

12:52:12 25   the company.

There is his idea. Put them together. Who would ever think -- the evidence in the trial, in the trial is clear on this, I don't have it on the slide, but Dr. Hassan made these 2'-methyl up OH down compounds. They were active, but they were toxic.

Dr. Rachakonda made 2'-fluoro down compounds. They were active, and they were toxic.

Jeremy, who didn't know any better, said, What a great idea. Let's take a toxic compound and another toxic compound and put them together and see what happens. So a methyl up and a fluoro down. Yeah, that will work. His colleagues told him he was nuts. A, you can't make it. B, if you make it it will be toxic. Go ahead. He did. And here's his "I told you so."

"That which some call impossible is simply what they have not seen.

"Who would have thought a redneck from Alabama could think of something that would lead to the cure of Hepatitis C?" "I told you so, you Ph.D. chemists, you."

So he has his idea. He wants to make it. But he had to get approval from the boss. Mike Otto to was his boss. Mike Otto -- sorry, this is what was represented to you in opening as to what Mike Otto was going to say. Jeremy took that application, he took the application for this patent from Idenix. He took it to his boss, and said,

12:54:08 1    this is what I'm working on.

12:54:13 2            Think about that for a minute.  You are a

12:54:16 3    scientist working in a company, a drug discovery company,

12:54:19 4    trying to come up with new drugs, and you are going to take

12:54:23 5    a sheet of paper with your idea, and you are going to take

12:54:28 6    your competitor's patent application in your other hand and

12:54:34 7    you in your boss's office and you are going to say, Here's

12:54:37 8    my idea.  Here's their patent.  This is what I am working

12:54:40 9    on.  It is in their patent.  That's what I want to do.

12:54:43 10           Common sense, ladies and gentlemen.  Common

12:54:47 11   sense.  Would anybody do that?

12:54:50 12           That's what was represented to you in opening.

12:54:53 13           Dr. Otto comes here and we say, Did that happen?

12:54:58 14           Absolutely not.

12:55:03 15           Did Jeremy come to your office?

12:55:05 16           Sure did.

12:55:06 17           Did he bring his papers with his ideas?

12:55:11 18           Sure did.

12:55:12 19           Did he bring a couple of patent applications?

12:55:14 20           That's the next slide.

12:55:16 21           What did he tell you?

12:55:18 22           He told me he thought his ideas were novel.

12:55:22 23           Did he tell you he got it from Idenix?

12:55:25 24           No.

12:55:26 25           But he did bring patent applications, didn't he?

He did bring them in there?

Yes, he did, he brought the Idenix publication, he brought a Merck application.  And he proceeded to show me where he thought his idea, why he thought his idea was novel.  And he pointed out that it was not in the Idenix patent.

And based on that, Dr. Otto said, go ahead.  You want to -- you know, it's your idea.  You have showed me no one else has done it.

This is the very formula that Dr. Otto testified Jeremy showed him, Formula XI.  This is from the published Idenix patent application.  It is in the Idenix patent.  It is one of many you will see where Idenix has a formula where at 2' up you can have all these various classes of compounds, including chloro, bromo, fluoro, and iodine.

Remember, those are the halogens.  They are all related.  They are near one another on the Periodic Table.

You can put a fluoro up at 2' up, sure.  2' down, chlorine, bromine -- oops, no fluorine.  And this is all over their patent.

You will have the patent, and you can find many other formulas like this, where you can put fluorine at various locations on that molecule according to them, never at 2' down.

That was the conclusion in November of 2002,

12:57:16 1    before these ships got launched.

12:57:18 2              And that is exactly what Dr. Secrist took the

12:57:22 3    stand and told you is the fundamental reason their patent is

12:57:26 4    invalid for lack of written description.  It's just the

12:57:30 5    same, because you can't get a claim on something you didn't

12:57:36 6    describe and disclose in your patent.  It's just not there.

12:57:42 7    You didn't hear a single witness in this trial on our side,

12:57:46 8    on their side, tell you or show you where a 2'methyl up

12:57:50 9    fluoro down nucleoside is disclosed in the Idenix patent.

12:57:56 10   That is an undisputed fact on this record.  It is not there.

12:58:00 11   So they can't claim it.

12:58:04 12             We are going talk about how it got there.

12:58:07 13             One last thing on sort of the story, the

12:58:10 14   willfulness story.

12:58:12 15             This is a page from Dr. Stuyver's notebook,

12:58:16 16   where it was represented to you, you can see it right there

12:58:19 17   on the screen, they admit way back, before there is any

12:58:23 18   lawsuit, in their official company records, they are using

12:58:27 19   our information, right there with that arrow.

12:58:30 20             First of all, that is their arrow.  But put that

12:58:33 21   to one side.  Right there -- it is a little hard to see from

12:58:37 22   where you are -- this text at the top, it says PSI-6130 --

12:58:45 23   in Dr. Stuyver's writing -- is a modification of the

12:58:49 24   PSI-5817 analog and from PSI-0262.

12:59:00 25             The PSI-5817 is straight out of Dr. Hassan's

notebook.  The other compound, again, I apologize, that's
too small, that is a fluorine down at 2', that is straight
out of Dr. Rachakonda's notebook.  This doesn't show use of
anything from Idenix.  It's what Dr. Rachakonda was working
on.  It's what Dr. Hassan was working on.  And it was Jeremy
Clark's idea to put the two together.

All right.  Which brings me to this question:
Why have are we spent 70 percent of this trial or so on this
issue, these issues, this conspiracy theory?  Why?

Maybe we don't want to talk about the patent.
They would say it's to prove willfulness.  It does not prove
willfulness, ladies and gentlemen.

Here is the jury instruction on willfulness,
which requires, among other things, that Gilead had
knowledge of the patent, the patent issued in 2009.  All of
these documents they have been showing you pertain to the
time period of 2000 to 2003.  So now, apparently, there is a
time machine involved in their story.  There was no patent
back in 2009.  That actually is the point.  They didn't
apply for the patent, apply for it, until they saw what
Pharmasset was doing.  It issued in 2009.

So whatever happened back then, and we have put
on our side of that story, it can't have anything to do with
willfully infringing a patent that didn't exist years.

And the other piece of this is they have to

prove, you know, outrageous conduct, essentially

characteristics of a pirate.  Did somebody actually take

Idenix's invention?  And that in many ways is the

fundamental issue in the case.  Is 2'-methyl up fluoro down,

which is nowhere in their patent, and which they could not

make for years until they saw Pharmasset's patent, whose is

it?  Is it Pharmasset's or is it really Idenix's?

I am going move on in the interests of time.

Enablement.  So there is three core patent

issues.  Enablement.  The language that I would ask you to

focus on, it's actually true for written description too, so

maybe I can kill two birds with one stone.  Full scope.

The patent itself has to enable somebody to make

and use the full scope of the invention.  Not a part of it.

All of it.

They have been going on and on about how their

invention is 2'-methyl up nucleosides used to treat HCV.

All of them, not just some of them, all of them that are

effective to treat HCV.

So they have to describe and enable all of them.

They can't point to four examples in their patent that were

added in 2001, by the way, and say, see, good enough.

If 2'-methyl-fluoro is covered, and they did get

a claim that covers it, they have to show -- they have to

show that they described it and that they enabled somebody

01:03:06 1    to make and use it, in their patent.

01:03:08 2            All right.  This I am going to go through very

01:03:12 3    quickly.  It shows, as I have said to you and we put all

01:03:16 4    this evidence in the record, they couldn't make it.  This is

01:03:18 5    an internal Idenix document, DX-2178.  How to get this key

01:03:26 6    molecule, methyl up fluoro down.

01:03:29 7            How are we going to get this there?

01:03:34 8            Dr. Storer is saying a lot of things that look

01:03:37 9    simple on paper, And related systems have been tried and

01:03:41 10   don't work in this series.

01:03:45 11           The punch line is they first thought of trying

01:03:49 12   in late '01.  They started to try in early '02.  And it took

01:03:55 13   them three years, until early 2005, to figure out how to

01:04:02 14   make a 2'-methyl fluoro.  And the only way they can is after

01:04:07 15   they saw Jeremy Clark's patent publish, which told them how

01:04:12 16   to make it.

01:04:15 17           Dr. Griffon was in charge of the effort.  And we

01:04:20 18   actually read in quite a bit of Dr. Griffon's deposition

01:04:25 19   testimony and the documents that came in with it.

01:04:29 20           He was charged with making it in March of 2002.

01:04:32 21   And he would issue periodic progress reports.  And in every

01:04:37 22   one of these reports, the story is the same.  You see these

01:04:41 23   proposed reactions, with X's through the arrows, meaning it

01:04:46 24   didn't work, he couldn't make it.

01:04:49 25           The text here at the bottom, I am going to hop

01:04:53 1  ahead, it says all the strategies that were attempted to

01:05:00 2  introduce the methyl group at the 2' up position and the

01:05:04 3  fluorine atom at the 2' down position starting from

01:05:09 4  different uridine derivatives failed.  All strategies

01:05:13 5  failed.  In fact, they got so bad, in late 2003, they were

01:05:18 6  abandoning the project.  They were giving up.

01:05:23 7          But it gets reinitiated in early 2004.  Why did

01:05:28 8  it get reinitiated in early 2004?

01:05:33 9          Doctor Dr. Sommadossi wanted to try it, the

01:05:37 10 2'-fluoro-2'-methyl analog, which he heard from Schinazi was

01:05:43 11 good?  Now again, here is Dr. Schinazi, you don't have to

01:05:51 12 believe this, but it certainly suggests the information is

01:05:56 13 going both ways.  He is telling Dr. Sommadossi about

01:06:00 14 2'-methyl-fluoro.  So Dr. Sommadossi wants to reinitiate the

01:06:05 15 effort.  Doctor Griffon remembers this e-mail.  He remembers

01:06:07 16 the project being abandoned.  He remembers it being

01:06:11 17 reinitiated.  And he remembers the reason it was reinitiated

01:06:15 18 was that Dr. Sommadossi had heard from Pharmasset that the

01:06:22 19 2'-fluoro-2'-methyl analog was good.

01:06:29 20         Dr. Storer had heard the same thing earlier in

01:06:31 21 2003.  We read into the record some of Dr. Storer's

01:06:35 22 testimony.  He was a senior chemist at Idenix.  Pharmasset

01:06:44 23 drug looks good.  No tox, potent, et cetera.

01:06:50 24         They knew very well what Pharmasset was working

01:06:52 25 on.  They knew it was good.  And they were trying to

01:06:55 1    duplicate it in house.  And there is nothing wrong with

01:06:58 2    that.  They can make a 2'-methyl-fluoro if they want and use

01:07:02 3    it as a control to compare it against their own compounds.

01:07:09 4    Fine.  They couldn't make it.  Dr. Standring, years later in

01:07:13 5    2009, after they did see the Pharmasset patent, after they

01:07:18 6    were able to make it, they gave it their own name, NB66.

01:07:22 7    You see the structure there, 2'-methyl-fluoro, "This is the

01:07:25 8    Pharmasset drug."

01:07:27 9            Pharmasset.  They knew exactly what Pharmasset

01:07:31 10   was doing.  They gave credit to Pharmasset for it before

01:07:35 11   this lawsuit.  But they couldn't make it.

01:07:41 12           Here is a report all the way through the middle

01:07:44 13   of 2004 of all the strategies that were attempted to

01:07:48 14   introduce a methyl group at the 2' up and a fluorine atom at

01:07:52 15   the 2 down failed.

01:07:55 16           "Yes, that's my conclusion."

01:07:57 17           Then Jeremy Clark's patent publishes in January

01:08:01 18   of 2005.

01:08:04 19           And that changed everything.  The patent gets

01:08:10 20   widely circulated inside Idenix.  They study this e-mail at

01:08:17 21   the bottom, which says please study the experimentals and

01:08:20 22   data.

01:08:23 23           Idenix, really, all the people who were involved

01:08:27 24   in trying to make it, read the patent, they follow the

01:08:31 25   synthesis in the patent, and lo and behold -- I apologize, I

01:08:37 1   didn't mean to do that -- they were able to make the

01:08:41 2   compound.

01:08:42 3           This is Dr. Alistair Stewart.  So Dr. Griffon

01:08:46 4   had been unsuccessful.  Dr. Stewart had been unsuccessful

01:08:50 5   until he followed the patent route.

01:08:48 6           This is Dr.  Stewart saying before he saw the

01:08:54 7   patent, before he saw the patent, you attempted to use 11

01:09:00 8   different schemes to synthesize a 2'-methyl nucleoside in

01:09:05 9   the time November 2004 through April of 2005?

01:09:08 10          Answer:  Yes.

01:09:09 11          11 different schemes he tried.

01:09:12 12          "Question:  The only scheme you tried where you

01:09:14 13  were able to conclude that you had actually synthesized a

01:09:18 14  2'-methyl fluoro nucleoside was Scheme H.  Correct?

01:09:22 15          "Answer:  Yes.

01:09:22 16          "Question:  And that was the scheme that was

01:09:23 17  based on the Pharmasset patent; right?

01:09:25 18          "Answer:  Yes.

01:09:30 19          Ms. Wang couldn't make it until March of 2005.

01:09:36 20  She also followed the Pharmasset patent.

01:09:40 21          And just one last point on synthesis and how

01:09:43 22  hard this compound was to make.

01:09:45 23          I think you heard from counsel in her remarks

01:09:47 24  that Jeremy Clark made this thing in 15 minutes, like that.

01:09:53 25  Easy as pie.

01:09:56 1          Well, actually his testimony was to the

01:09:58 2   contrary.  He tried three different routes:  Took me many,

01:10:07 3   many times of going back and doing the same steps over and

01:10:09 4   over.  It was an extremely messy reaction.

01:10:13 5          He did eventually succeed, and a lot of people

01:10:20 6   are lucky that he did, but it was not easy.

01:10:27 7          All right.  Just quickly on -- so that is the

01:10:32 8   core of our enablement case.  Okay?

01:10:37 9          2'-methyl fluoro is covered by the claims they

01:10:40 10  later got?

01:10:40 11         Yes, but you can't get a valid claim if your

01:10:45 12  patent doesn't enable somebody to make and use the full

01:10:48 13  scope of your claim.  The full scope.  That includes

01:10:54 14  2'-methyl fluoro.

01:10:56 15         There is nothing in their patent about how to

01:10:58 16  make it.  They couldn't make it, Pharmasset did.

01:11:03 17         Now, let me just skip forward in the interest of

01:11:06 18  time to the Patent Office issue.  Okay?

01:11:10 19         Because there was a lot of air time given to the

01:11:14 20  presumption of validity, and the Patent Examiner did this,

01:11:17 21  and the Patent Examiner did that, and the Patent Examiner

01:11:23 22  studied this.

01:11:23 23         We don't have any problem with what the Patent

01:11:26 24  Office did in this case.  Now, that may sound strange

01:11:29 25  because the Patent Office issued a patent that we say is

01:11:32 1    invalid.

01:11:34 2          The Patent Office has limited information.  They

01:11:37 3    do the best job they can.  They do a good job with the

01:11:43 4    information they have.  Okay?  What information did they not

01:11:48 5    have that you have?

01:11:51 6          And this is why, ladies and gentlemen, on the

01:11:52 7    verdict form, you were instructed -- this is why we have

01:11:57 8    trials, okay?  We're not all here for you to say, oh, the

01:12:00 9    Patent Office issued the patent.  Let's call it a day.

01:12:03 10   Let's just go home.

01:12:05 11         Even though the Patent Office Examiner

01:12:08 12   allowed the claims of the patent, you have the ultimate

01:12:11 13   responsibility for deciding whether the claims of the

01:12:14 14   patent are proven to be invalid.  You do.

01:12:18 15         And, please, by all means, consider what the

01:12:20 16   Patent Office did.  That is part of the puzzle.  But consider

01:12:24 17   information they didn't have.

01:12:27 18         The Patent Office didn't know that Idenix didn't

01:12:30 19   even think of trying a 2'-methyl fluoro until after they

01:12:35 20   filed both of the applications that are at issue in this

01:12:37 21   case.  They hadn't even thought of it, okay?

01:12:42 22         Did Idenix tell the Patent Office they tried

01:12:44 23   for three years to make a 2'-methyl fluoro and failed and

01:12:49 24   couldn't do it?

01:12:50 25         No, they didn't tell the Patent Office that.

01:12:52 1          Did Idenix tell the Patent Office that they only

01:12:56 2   could succeed after they looked at how Pharmasset made it?

01:13:01 3          No.

01:13:03 4          Did Idenix tell the Patent Office that they had

01:13:08 5   antiviral data, but a lot of it showed that the 2'-methyl

01:13:12 6   compound -- I'm coming to this now in the context of written

01:13:15 7   description in particular -- they have all this data for

01:13:18 8   2'-methyl compound showing that most of them don't work?

01:13:24 9          So let me go to written description.  All right?

01:13:26 10  That is enablement.  Written description.

01:13:30 11         The issue here is you can't claim what you

01:13:36 12  didn't actually invent.  You actually have to invent it.

01:13:41 13         If it's in your specification, then you can

01:13:45 14  claim it.  It may still not be new based on other people but

01:13:52 15  at least it is in your specification.  At least it is

01:13:54 16  described to a person of skill in the art reading your

01:13:57 17  specification.

01:13:57 18         Here is that full scope language again, and it

01:13:59 19  is the same language it was for enablement.

01:14:02 20         You have to describe the full scope of your

01:14:04 21  claim, not part of it.  The full scope, okay?

01:14:11 22         Because you can only claim as much as you

01:14:13 23  actually invented, not more, not somebody else's invention.

01:14:17 24  Only yours.

01:14:21 25         And in a case like this where Idenix is saying,

well, everybody reading the specification would have known

that 2'-methyl up is where it is at, that is what matters,

that is what the invention is, well, the specification has

to basically tell you that. There have to be blaze marks to

guide a reader through the forest of the specification

toward the claims. It can't be, you know, here it is, here

is a disclosure of every possible nucleoside on the planet.

Have at it. Go see if you can figure it out.

And I suggest to you, ladies and gentlemen, when

you look at this actual patent that that is what you are

going to see.

These formulas in the patent cover billions of

compounds. The question is which ones are effective. The

Court's construction requires that the compound be effective.

Which ones are effective? Does the specification direct you

to which ones are effective?

You have seen some of these before. Dr.

Secrist walked you through this, so I'm going to be very,

very brief on this.

11 of the 18 formulas in the patent don't even

allow for a 2'-methyl. You can't even have it. Okay? Yet

Idenix is telling you the patent is all about 2-methyl.

The five formulas that allow for a 2'-methyl

don't -- two of them specify it, but the others, it's among

hundreds or thousands of compounds. It is not singled out.

There is no attention paid to it. There is no direction given to focus on 2'-methyl up nucleosides that are effective for HCV.

Now, effective. I wanted to talk about that for a minute. Dr. Sommadossi was here. He is an inventor. He took the stand. And he told you every single 2'-methyl nucleoside was active in the surrogate assay. Every single one was active.

What is the evidence on that? Here is another document that I recommend to you, DX-338.

This is Dr. Gosselin, one of Dr. Gosselin's compilations of Idenix's own testing of 2'-methyl OH nucleosides. It's a pretty thick document, okay? It's a 2006 time frame.

And if you look in the document, and if you look at the actual testing, in this document, there are 257 2'-methyl OH nucleosides. 201 of them are inactive. Inactive, okay?

Dr. Sommadossi says every single one is active. Dr. Gosselin says not quite. 251 (sic) are not.

Is 2'-methyl the key? Is 2'-methyl the be all and end all of curing hepatitis C? Is that all you need?

The Patent Office didn't have this either.

Dr. Meier I really already covered. Because Dr. Meier, his evidence was all about a few examples of

2'-methyl OH.  And he came in and he pointed to the patent

and he said, hey, there is some evidence, there is some

data in here about these four compounds.  Look.  There is

compounds, there is information on how to make a couple of

methyl OH compounds.

And there is.  Four of them.  That is not the

full scope of the claims, ladies and gentlemen.

All right.  I am going to move on to the last

module which is about Merck.

Now, so far, I've been focused on 2'-methyl

fluoro mostly, but there is still the question, because

Idenix, they have honest to God information in their patents

on 2'-methyl OH nucleosides for treating HCV, okay?  Not

what Pharmasset did but what Idenix actually thought it

invented, and that is what you are going to see when you

look at their patent.

But the question is, did Idenix invent that

first or did Merck?

I have already showed you Dr. Olsen's testimony.

He says Merck.

Oop.  Excuse me.

This may have been lost in the shuffle, you

know, this blizzard of depositions you got subjected to.

This man, though, this is an important one I

think.  Dr. Cook.  Remember, Merck had this big hepatitis C

01:20:02 1   program where they partnered with Isis Pharmaceuticals.

01:20:06 2   Merck and Isis. Isis were the nucleoside experts. Dr. Cook

01:20:10 3   was the head of the Isis piece of the collaboration.

01:20:14 4        And his deposition was taken and he said: "We

01:20:18 5   were the first, actually, as far as I'm concerned to

01:20:20 6   discover the 2' C methyls.

01:20:23 7        "Question: What do you mean?

01:20:24 8        "Answer: Meaning the nucleoside with the methyl

01:20:27 9   group on the 2 up on the 2' position.

01:20:29 10        So the person from Isis Pharmaceuticals says

01:20:32 11   that the Merck/Isis collaboration, they were first.

01:20:36 12   Dr. Olsen says Merck was first.

01:20:39 13        The only people telling you that Merck was not

01:20:42 14   first are Idenix's lawyers.

01:20:45 15        And there is two bodies of work here that we

01:20:48 16   have presented to you and that we have asked you to consider

01:20:53 17   two pieces to Merck's work:

01:20:55 18        The 1998 work where they tested 2'-methyl

01:21:02 19   adenosine against the BVDV assay, found that it was active,

01:21:06 20   found that it was fully protective. This was Dr. Wolanski's

01:21:12 21   work and he supervised by Dr. Olsen. We put in deposition

01:21:15 22   testimony. We showed you the notebook pages. Years before

01:21:18 23   Idenix did its very first work.

01:21:20 24        And then there is a second piece of work in the

01:21:25 25   fall of 2000 where Merck and primarily Dr. Olsen tested a

01:21:31 1  large number of compounds in the hepatitis C replicon assay.

01:21:38 2  Okay?

01:21:39 3          And in between time, there was testimony about

01:21:41 4  what was going on.  Dr. Seeger talked about it, and we

01:21:45 5  showed you documents where Merck licensed the replicon assay

01:21:53 6  in '99, replicon assay was published.  Merck licensed it,

01:21:57 7  set it up in early 2000 and basically started testing

01:22:01 8  compounds.

01:22:01 9          THE COURT:  Mr. Scherkenbach, you have

01:22:03 10  10 minutes left.

01:22:04 11          MR. SCHERKENBACH:  Thank you, Your Honor.  I

01:22:05 12  will make it.

01:22:07 13          And so what is the evidence, some of the

01:22:09 14  evidence you saw on that?

01:22:11 15          We showed you the actual test results.  This was

01:22:14 16  in '98 for the 2'-methyl up adenosine.

01:22:19 17          Dr. Olsen agrees that the results were good.

01:22:23 18          And, again, it's two years before Idenix did its

01:22:29 19  first work.

01:22:31 20          And I'll come back to this but their primary

01:22:35 21  argument is abandonment, and I'm going to get to that.

01:22:37 22  Okay?

01:22:37 23          The 2000 work, there is our friend, 2'-methyl

01:22:42 24  adenosine.

01:22:44 25          In the replicon assay, very potent, no

cytotoxicity. And here is one thing I wanted you to notice, and I will show you some documents. The 2000, because there was the question, was the '98 work completely buried, put on the shelf, forgotten? That is Idenix's theory; right? Abandoned, suppressed, concealed. And so it doesn't count.

Many of the documents in 2000, where they retested in replicon, refer back to the '98 testing and actually rely on the data. Here is one of them, relying on cytotoxicity data from 1998.

Obviously, we know that Merck thought the world of the 2000 work. Game changing. Discovered an important class of compounds. They filed, Merck filed for a patent application on it in January of 2001. That is the '313 patent.

There is the 2'-methyl adenosine. It is Example 52 in the patent. It is the same compound they tested in '98. They retested it in 2000. They put it in their patent application. Idenix didn't file their utility application until May of 2001. Okay?

Now, one other high level point on Merck's defense. And, again, it's up to you to make of it what you will.

The only experts in the case to address the Merck work and analyze it were Dr. Seeger and Dr. Secrist, our experts.

Idenix does not have any expert testimony on the

01:24:46  1    Merck work or the analysis of the Merck work.

01:24:51  2             Now, let me get to what is I think Idenix's

01:24:57  3    fundamental argument as to why it doesn't matter what work

01:25:04  4    Merck did.  Because Idenix says, hey, we conceived first and

01:25:07  5    we're diligent in reducing to practice.

01:25:11  6             You have to focus on full scope again.  Okay?

01:25:19  7             The question is did Idenix conceive the claimed

01:25:25  8    invention in 2000 before Merck?

01:25:30  9             Not a piece of the invention.  It's not enough

01:25:33 10    for Idenix to say, well, we thought a part of it.  They have

01:25:37 11    to have conceived the invention as claimed.

01:25:40 12             The invention as claimed includes 2'-methyl

01:25:44 13    fluoro.  And Idenix admits they didn't even think of trying

01:25:50 14    that until late in 2001.  Okay?

01:25:55 15             So they can't say something that they admit

01:25:57 16    they didn't have in 2001 they sure didn't conceive in 2000.

01:26:02 17             And so the fact that they had, in 2000, tested

01:26:08 18    one 2'-methyl OH compound, that is not enough.  That doesn't

01:26:13 19    allow them to get behind everything Merck did.  Because the

01:26:17 20    claim Idenix is seeking is to the whole universe.  It's to

01:26:22 21    every 2'-methyl compound that is effective against HCV

01:26:27 22    including 2'-methyl fluoro, and that doesn't work.

01:26:33 23             All right.  Abandonment, quickly.

01:26:39 24             The issue here is whether there was an

01:26:42 25    unreasonable delay for you to decide.  Dr. Olsen did come

here and say they abandoned.  That is true.  And you have to

decide whether you believe him in view of what the evidence

actually showed, the documents actually showed.  But their

fundamental argument -- oh, I said there is all these

documents in 2000 that refer back to '98.  So that is one

thing you can consider on abandonment.

The fact that in 2000, they're pointing back

repeatedly to '98 data.  Here is an October 2000 document

pointing back to '98.  November 2000, pointing back to '98.

Dr. Seeger is of the view that Merck did not

abandon.  And he testified on anticipation.

And let me just skip ahead to Dr. Secrist.

1123, on obviousness.

There are two pieces to the Merck work.  Some of

the Merck work Dr. Seeger analyzed is, our contention is

exactly the same as certain of the patent claims.  Some of

the other patent claims are slightly different.  That is

where obviousness comes in.  It is not exactly the same as

what -- Dr. Secrist walked through all of those, and they're

things like using ribavirin together with using the

compound, using interferon together with the compound, using

phosphates versions of the compound, putting it into the

form of a capsule, using a certain dosage, all things

the evidence showed were well, well, well known in the art,

and, in fact, the Merck patent application itself filed in

01:28:41 1    early 2001 discloses all of these things, and that is, in

01:28:45 2    Dr. Secrist's view, evidence of what was known in the art.

01:28:49 3         So all the other claims as sort of bells and

01:28:52 4    whistles, no one is really arguing about those.  In fact,

01:28:55 5    Idenix has no opinion from any expert saying that those

01:28:58 6    claims are not obvious.  Okay?

01:29:00 7         All right.  So that is the Merck work.  And with

01:29:07 8    that, let me just wrap up in my two minutes or whatever I

01:29:11 9    have left here.

01:29:17 10        So this is Dr. Sofia who you heard and who is

01:29:21 11   widely credited as the inventor of sofosbuvir.  Okay?

01:29:26 12   Jeremy Clark made this foundational discovery.  Dr. Sofia

01:29:31 13   took it and made it the cure for hepatitis C.  And he is

01:29:36 14   talking about what an amazing accomplishment it is, and no

01:29:40 15   one doubts that it is.

01:29:46 16        But it's actually one of the great ironies of

01:29:49 17   this case, I suggest to you, that if -- if -- 2'-methyl-

01:29:54 18   fluoro, which is in sofosbuvir, and which was Jeremy Clark's

01:29:58 19   compound that led to sofosbuvir, if 2'-methyl-fluoro had

01:30:03 20   been in Idenix's patent -- it's not there -- if it had been

01:30:07 21   there, what would history look like?

01:30:10 22             THE COURT:  Now you have two minutes.

01:30:12 23             MR. SCHERKENBACH:  Thank you.  I am glad I have

01:30:14 24   two minutes.

01:30:16 25        What would history look like?  What if Jeremy

01:30:19 1  Clark had walked into Dr. Otto's office and 2'-methyl-fluoro

01:30:24 2  had been in Idenix's patent?  It was Dr. Otto's testimony

01:30:28 3  that, well, if that had been the case, I would have said, no

01:30:32 4  dice.  You are not making that.  They already have it in

01:30:34 5  their patent.  Forget about it.  We are a small company.

01:30:38 6          We are not going to be wasting our time making

01:30:40 7  other people's compounds.  It was the very fact it was not

01:30:45 8  in Idenix's patent that got these ships launched.

01:30:50 9          Why does that matter?  That matters because

01:30:53 10 Idenix couldn't make it.  Idenix couldn't make that compound

01:30:59 11 without copying Pharmasset.  Would they ever have made it?

01:31:05 12 Would they ever have made 2'-methyl-fluoro?  Would we have

01:31:09 13 cured Hepatitis C if Jeremy Clark hadn't been done what he

01:31:17 14 did and if Dr. Otto hadn't done what he did and verified

01:31:23 15 that it was okay to make this compound?

01:31:28 16          I will leave you with that.

01:31:30 17          THE COURT:  Thank you very much.

01:31:32 18          Ladies and gentlemen of the jury, we are going

01:31:33 19 to give you a short break.  Still no talking about the case,

01:31:38 20 which, and we will get back with you in a few minutes.

01:31:50 21          (Jury leaves courtroom at 1:31 p.m.)

01:32:03 22          THE COURT:  We will be in recess.

01:32:05 23          (Recess taken.)

01:39:55 24          THE COURT:  All right.  We will bring the jury

01:39:58 25 in.

01:41:41 1                    (Jury enters courtroom at 1:42 p.m.)

01:41:41 2                    THE COURT:  Ladies and gentlemen, we are ready

01:41:43 3       to proceed.  We will hear again from Idenix.

01:42:00 4                    MS. PARKER:  Just a little bit more.  This is a

01:42:02 5       patent case, appeared we were first.

01:42:05 6                    Let's go back to that timeline.

01:42:08 7                    That is what this comes down to.

01:42:10 8                    THE COURT:  Ms. Parker, could you speak up?  I

01:42:13 9       want to make sure I can hear you.

01:42:15 10                   MS. PARKER:  Sure.

01:42:16 11                   That's what this case comes down to.  This is a

01:42:19 12      patent case, and we were first.

01:42:21 13                   Now, you heard Judge Stark say that what the

01:42:25 14      lawyers are saying is not evidence.  The lawyer for Gilead

01:42:32 15      spent a lot of time talking about me.  He spent a lot of

01:42:36 16      time talking about different things I said.  First I

01:42:40 17      thought, was that a personal attack on me?  But I don't

01:42:43 18      think it is.  I think it's just another effort to distracts

01:42:46 19      you from to come go on what happened in this case.

01:42:55 20                   He keeps saying they only showed you part of the

01:42:57 21      documents.  You will see for yourselves, when you go back in

01:43:00 22      the jury room, these internal documents have PX on there.  P

01:43:04 23      is the plaintiff.  X means exhibit.  Plaintiff's exhibit, we

01:43:08 24      brought you the whole document.

01:43:10 25                   So don't worry about, oh, well she only showed

01:43:13 1  you this or she showed you that.  I brought you the whole

01:43:18 2  document.

01:43:20 3          How many times did he tell you that Gilead's

01:43:25 4  trusted consultant, Dr. Schinazi, admitted that he took

01:43:30 5  confidential information?  Not once.

01:43:33 6          But that is undisputed in this case.  How many

01:43:37 7  times did he deny that Dr. Schinazi, their trusted

01:43:42 8  consultant, took this confidential information from Idenix?

01:43:49 9  None.  Or the way he put it in his opening statements, Not

01:43:54 10 once.

01:43:55 11         All of those words and all of those actions, and

01:43:58 12 I won't go over all of it, but you know what I am about,

01:44:01 13 where Dr. Schinazi got the information, passed it along,

01:44:05 14 they put it under oath to the federal government from the

01:44:08 15 grant applications, all of that tells you all you need to

01:44:15 16 know about whether this patent was valid.  They all thought

01:44:18 17 it was valid.  They all understood it.  They knew exactly

01:44:21 18 what it was about, until this lawsuit, when they are now

01:44:25 19 claiming it's invalid.

01:44:26 20         From those e-mails, they knew that we claimed

01:44:29 21 that this 2'-methyl up was in our -- was our invention and

01:44:35 22 it was in our patent.  All those e-mails show it.  All those

01:44:38 23 e-mails show they knew exactly what was in our patent, what

01:44:42 24 we had invented.  They didn't show you a single e-mail that

01:44:45 25 says, hey, look, look what Idenix's has invented.  You know

01:44:52 1    what?  That's invalid.

01:44:54 2           They didn't show you a single e-mail or document

01:44:57 3    that said that.

01:44:58 4           They didn't show you a single e-mail that said,

01:45:00 5    oh, gosh, you know what?  This is not enabled or there is no

01:45:05 6    written description or any of that that they are talking

01:45:08 7    about now.

01:45:09 8           All the e-mails back at the time before there

01:45:13 9    was this lawsuit explained, laid out very clearly that

01:45:18 10    Pharmasset and Gilead knew exactly what he had invented and

01:45:23 11    it was covered by the patent application.

01:45:25 12           But now they have been caught with their hand in

01:45:28 13    the cookie jar.

01:45:30 14           I am going to spend a few minutes just reviewing

01:45:33 15    what counsel for Gilead said.

01:45:37 16           He tried to distance Gilead from Dr. Schinazi,

01:45:40 17    that was one of the first things he said when he stood up.

01:45:43 18    But remember that when Gilead bought Pharmasset, it bought

01:45:46 19    the whole company.  They bought the good, the bad, and the

01:45:51 20    ugly.  And remember, Dr. Schinazi, today, is a paid

01:45:55 21    consultant to Gilead at $800 an hour.  And he is a

01:46:00 22    shareholder.

01:46:01 23           You heard them say, the videos that we showed

01:46:05 24    you, Pharmasset was his baby, and he was in charge of

01:46:09 25    everything.  Gilead is just trying to escape responsibility

for that ten percent.

        Then he said that Gilead shouldn't be found
liable because we waited too long to sue.  He said, they
didn't say anything about it, they didn't say anything about
all these problems.

        That is an odd excuse for doing wrong.  It's an
odd excuse to do wrong if you say, well, you didn't say
anything about it earlier.  Idenix, we could not sue until
those products went on the market.  That's when the damages
began.  That's when the infringement, assumed infringement
began.

        It wasn't until those products were on the
market.  That was in 2013, that is exactly when we filed our
lawsuit.  Again, it's another effort to avoid paying that
ten percent.

        Then, he kept talking about Merck, and he said,
well, the scientists at Merck came up with this invention
before Idenix did.  Let stop again here and explain to you,
this will straighten the whole thing out, I think.  There is
a difference between a compound and a use of a compound.  We
said from the beginning, Dr. Sommadossi said when he took
the stand, those compounds themselves were not what were
invented.  Those compounds were older.  The compounds had
been used to treat other diseases like cancer .

        What we invented was using those compounds to

treat Hepatitis C.  That was the invention.  That is what is
on the first page of the patent.  That is what we have done.

So I hope that clears it up.

But the most important thing is, the Patent
Office looked at all of this.  Remember, they sent a letter
to Idenix and said, we think there is a problem.  We think
you may not be first.  And Idenix sent ought all this
information.  And the Patent Office sorted it out and they
said they are withdrawing their concern and they issued the
patent.

He said that our patent is too broad and it
doesn't give enough information.  But again, it was not too
broad and it was not confusing to all those scientists at
Pharmasset like Dr. Schinazi and Dr. Stuyver.  They knew
exactly what it meant.  That's why they were concerned that
the world is collapsing.  He had to take a cold shower,
because they knew exactly what it meant.

He said that the Patent Office did not have all
the information.  Well, look at this patent when you go
back, look at it for yourself, there is a tremendous amount
of information in here.

In addition, there is evidence that the Patent
Office over this multi-year -- they investigated this, they
went through this rigorous analysis for eight or nine years
before they issue the patent.  It is in evidence that the

01:49:05 1  Patent Office wrote letters to Idenix for more information

01:49:09 2  and Idenix had to respond.

01:49:11 3  Again, it is another effort to avoid paying that

01:49:13 4  ten percent.

01:49:15 5  Then he said that Dr. Hassan came up with a

01:49:18 6  compound on his own.

01:49:20 7  Then why did they change the company records?

01:49:25 8  Why did they have a company record that said we

01:49:28 9  need to delete data?  Why do they have all these company

01:49:34 10  records that talk about they are working on the Idenix

01:49:37 11  compound and Idenix sugar if they weren't doing that?

01:49:40 12  Again, it's another effort to avoid paying that

01:49:46 13  ten percent.  And what really matters in any event is we

01:49:49 14  were first.  We were first regardless of what they were

01:49:52 15  doing, regardless of whether he came up with it on his own

01:49:56 16  or not.  It was ours.  It was protected by this patent -- my

01:50:01 17  board is down, but as of that date in 2000, May 23, 2000.

01:50:10 18  Then he said, well, we lose because we didn't

01:50:12 19  make a product that got to market first.  That is not a

01:50:16 20  defense.  Their product did get to the market first.  There

01:50:19 21  is no question about it.  Just think.  If that were a

01:50:22 22  defense, we wouldn't be here.  We wouldn't have a trial.

01:50:24 23  There wouldn't be anything for you all to decide.  It's not

01:50:27 24  a defense.

01:50:32 25  The issue is, their product that did get to

market did it use his or Idenix's idea of our invention of
2'-methyl.  And they do not deny that.

He said while our patent does not include
fluoro.  Well, the issue is their drugs do contain 2'-methyl
up.  The issue is their drugs do contain the compound that
we have patented to use to treat hepatitis C.

That is what we're claiming in this case.  That
is what the patent says.  That is what the Patent Office
said.

Fluoro is paired with 2'-methyl up.  It doesn't
matter about fluoro.  The issue is 2'-methyl up used to
tread hepatitis C is in their drugs.  And they don't dispute
that.

Again, another effort to avoid that 10 percent.

He said, well, Jeremy Clark got his own patent,
and that is true.  We don't dispute that.

But as you heard throughout this trial, a
product can have more than one patent, just like your
cellphone.  Your cellphone has a lot of different patents on
it.  Again, it is no defense.  It is just another effort to
try to avoid that 10 percent.

At the end of the day, all those people he
talked about, Dr. Rachakonda, Jeremy Clark, Dr.  Sofia, all
of them, give them credit for whatever they did.

If you could put that up.

01:51:52  1          That is why I said all along, give them credit

01:51:55  2   for what they did.  We're not complaining about the

01:51:57  3   additional work that they did.  But we should be included as

01:52:00  4   well.  We should receive a fair and reasonable damages for

01:52:06  5   the part we contributed, which was the foundation.  Our work

01:52:09  6   was the foundation.

01:52:10  7          And there is no dispute here.  You have been

01:52:13  8   told by Judge Stark to assume that their patent -- that

01:52:17  9   their drugs infringe our patent.

01:52:19 10          Finally, here is what you did not hear.  You did

01:52:29 11   not hear him deny that those two drugs use 2'-methyl up.

01:52:36 12          You did not hear him deny that Dr. Schinazi, the

01:52:40 13   boss, this company, you know, his baby, took confidential

01:52:44 14   information from Idenix.  You did not hear hmm deny that

01:52:50 15   Dr. Schinazi took that confidential information from Idenix

01:52:54 16   and gave it to Dr. Watanabe, the scientist at his company.

01:53:01 17          You did not hear hmm deny that Pharmasset went

01:53:05 18   back and change their company records to remove a reference

01:53:09 19   to Idenix.

01:53:11 20          And you didn't hear him deny that since these

01:53:14 21   two drugs went on the market, they have made -- it's been

01:53:19 22   highly profitable for them, and they have made over $24

01:53:24 23   billion.

01:53:26 24          Now, one more, just one more thing I want to

01:53:36 25   show you.

01:53:37 1          You spent a lot of time talking about Dr. Olsen.

01:53:40 2     Let's pull that up.  I understand our team has it.  Let's

01:53:43 3     pull up exactly what he said.

01:53:50 4          Starting down at the bottom.

01:53:52 5          Okay.  And this is when, what is it, Ryan McCrum

01:53:57 6     on our team, remember, he asked questions of Dr. Olsen.  He

01:54:01 7     starts by introducing himself and he said:  You may have

01:54:05 8     already touched on this today, but who was the leader this

01:54:08 9     research program?

01:54:08 10         And Dr. Olsen said:  I was.

01:54:10 11         And then he says:  Did your group ever discover

01:54:13 12    a 2'-methyl up nucleoside for treating hepatitis C prior to

01:54:17 13    the fall of 2000?

01:54:18 14         He says:  No.

01:54:19 15         Again, that is the difference between the

01:54:21 16    compound that was older, that had been used previously,

01:54:25 17    versus using it to treat hepatitis C.  He says no.

01:54:32 18         So then he says:  Are you aware that this

01:54:36 19    application, that is the Idenix application that was filed

01:54:39 20    back on May 23rd -- it says May of 2000.

01:54:45 21         He says:  I'll take your word for it.

01:54:48 22         Then Mr. McCrum says:  You will agree if in fact

01:54:52 23    that was the date, that it was filed in May of 2000, that is

01:54:55 24    before your work in the fall of 2000 on this modified

01:54:59 25    2'-methyl up modified nucleosides?

2206

He says:  Yes.

Again, we were first.  That is what this case is about.

So I just want to leave you with one final thought.  The Patent Office of the United States spent eight or nine years looking at this issue.  They have looked at all of these issues that have heard about today and they determined that the patent, that this was a very good invention, that the patent ought to issue and they issued it.  And this patent has a presumption of validity because of that.

Thank you again so much for listening to me this afternoon.  We've enjoyed the privilege of presenting our case to you and thank you so much.

Thank you, Your Honor.

THE COURT:  Thank you again, Ms. Parker.

Ladies and gentlemen of the jury what remains is for me to read the last few instructions as well as the verdict sheet.  So I am picking up where I left off, it was this morning I believe at page 49 of the instructions.

Feel free fo follow along, if you wish.

Section 8.  Deliberation and verdict.

8.1.  Introduction.

I have concluded the part of my instructions explaining the rules for considering some of the testimony

and evidence.  Now let me finish up by explaining some things about your deliberations in the juryroom and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.  Any questions or messages normally should be sent through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages.  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4 to 4 or 6 to 2 or whatever your vote happens to be.  That should stay secret until you are finished.

8.2.  Unanimous Verdict.

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an

01:57:32  1    agreement, if you can do so without violence to your

01:57:35  2    individual judgment.  Each of you must decide the case for

01:57:39  3    yourself, but do so only after an impartial consideration of

01:57:43  4    the evidence with your fellow jurors.  In the course of your

01:57:46  5    deliberations, do not hesitate to reexamine your own views

01:57:50  6    and change your opinion, if you become convinced it is

01:57:53  7    erroneous.  But do not surrender your honest conviction as

01:57:57  8    to the weight or effect of evidence solely because of the

01:58:00  9    opinion of your fellow jurors, or for the purpose of

01:58:03 10    returning a verdict.  Remember at all times that you are not

01:58:08 11    partisans.  You are judges -- judges of the facts.  Your

01:58:11 12    sell interest is to seek the truth from the evidence in the

01:58:14 13    case.

01:58:14 14         A form of verdict has been prepared for you, and

01:58:18 15    you have been provided a copy.  I will review it with you in

01:58:20 16    a moment.  You will take this form to the juryroom and when

01:58:23 17    you have reached unanimous agreement as to your verdict, you

01:58:27 18    will have your foreperson fill in, date and sign the form.

01:58:30 19    You will then return to the courtroom and your foreperson

01:58:33 20    will give your verdict to my deputy who will read aloud your

01:58:37 21    verdict.

01:58:37 22         It is proper to add the caution that nothing

01:58:40 23    said in these instructions and nothing in the form of the

01:58:42 24    verdict is meant to suggest or convey in any way or manner

01:58:46 25    any intimation as to what verdict I think you should find.

01:58:50 1 What the verdict shall be is the sole and exclusive duty and

01:58:53 2 responsibility of the jury.

01:58:57 3         8.3.   Duty to Deliberate.

01:59:00 4         Now that all the evidence is in and the

01:59:03 5 arguments are completed, you are free to talk about the case

01:59:06 6 in the juryroom.  In fact, it is your duty to talk with each

01:59:09 7 other about the evidence, and to make every reasonable

01:59:13 8 effort you can to reach unanimous agreement.  Talk with each

01:59:16 9 other, listen carefully and respectfully to each other's

01:59:20 10 views and keep an open mind as you listen to what your

01:59:23 11 fellow jurors have to say.  Try your best to work out your

01:59:27 12 differences.  Do not hesitate to change your mind if you are

01:59:32 13 convinced that other jurors are right and that your original

01:59:35 14 position was wrong.  But do not ever change your mind just

01:59:38 15 because other jurors see things differently, or just to get

01:59:41 16 the case over with.  In the end, your vote must be exactly

01:59:45 17 that - your own vote.  It is important for you to reach the

01:59:49 18 unanimous agreement, but only if you can do so honestly and

01:59:53 19 in good conscience.

01:59:54 20         No one will be allowed to hear your discussions

01:59:56 21 in the juryroom, and no record will be made of what you say.

02:00:00 22 So you should all feel free to speak your minds.

02:00:02 23         Listen carefully to what the other jurors have

02:00:05 24 to say, and then decide for yourself.

02:00:11 25         8.4.   Social Media.

During your deliberations, you must not
communicate with or provide any information to anyone by any
means about this case.  You may not use any electronic
device or media, such as the telephone, cellphone,
smartphone, tablet or computer, the Internet, any Internet
service, any text or instant messaging service, any Internet
chatroom, blog, or website such as Facebook, MySpace,
LinkedIn, YouTube, or Twitter, to communicate to anyone any
information about this case or to conduct any research about
this case, until after I accept your verdict.

In other words, you cannot talk to anyone on the
phone, correspond with anyone, or electronically communicate
with anyone about this case.  You can only discuss the case
in the juryroom with your fellow jurors during
deliberations.

Finally, 8.5.  Court Has No Opinion.

Let me finish by repeating something I said to
you earlier.  Nothing that I have said or done during this
trial was meant to influence your decision in any way.
You must decide the case yourself based on the evidence
presented.

With that, let me turn your attention to the
verdict form.  That is the shorter of the documents we
handed you this morning.  I want to go over that with you
now.

At page 1, it says at the top, we, the jury unanimously find as follows.

Then Section I is entitled Willful Infringement.

Question 1 you need to answer is: Have Idenix and the University proven by a preponderance of the evidence that Gilead's infringement of the asserted claims of the '597 patent was willful?

There is a little further instruction there "yes" is a finding for Idenix and the University. "No" is a finding for Gilead. And there is a space there for you to mark either yes or no.

Section II is called Invalidity.

Subsection A. Enablement.

Question 2 asks you: Has Gilead proven by clear and convincing evidence that each of the asserted claims of the '597 patent is invalid because the specification of the '597 patent does not enable the asserted claims?

There is a further instruction, "yes" is a finding for Gilead. "No" is a finding for Idenix and the University. And, again, a spot for you to mark yes or no.

B. Written Description.

Question 3 is: Has Gilead proven by clear and convincing evidence that each of the asserted claims of the '597 patent is invalid because the specification of the '597 patent does not contain an adequate written description of

02:02:50  1   the asserted claims?

02:02:52  2          "Yes" is a finding for Gilead.  "No" is a

02:02:54  3   finding for Idenix and the University.  You mark either yes

02:02:58  4   or no.

02:02:59  5          C.  Anticipation.

02:03:01  6          Question 4.  Has Gilead proven by clear and

02:03:04  7   convincing evidence that any of the following claims of the

02:03:07  8   '597 patent is invalid for anticipation based on prior

02:03:11  9   invention?

02:03:13 10          "Yes" is a finding for Gilead, "no" is a finding

02:03:16 11   for Idenix and the University.

02:03:20 12          It lists there, claims 1, 28, 30, and 31.  And

02:03:24 13   there is a space for you to mark yes or no for each of those

02:03:28 14   claims.

02:03:29 15          Section D.  Obviousness.

02:03:32 16          Question 5 asks:  Has Gilead proven by clear and

02:03:35 17   convincing evidence that any of the following claims of the

02:03:38 18   '597 patent is invalid because the claimed subject matter

02:03:40 19   would have been obvious to a person of ordinary skill in the

02:03:43 20   art at the time of the claimed invention?

02:03:46 21          "Yes" is a finding for Gilead.  "No" is a

02:03:48 22   finding for Idenix and the University.

02:03:51 23          And you are to mark yes or no with respect to

02:03:54 24   each claim.  Specifically, claims 1, 2, 4, 5, 6, 7, 9, 10,

02:04:00 25   16, 19, 23, 28, 29, 30, and 31.

02:04:09  1          Then finally, Section III.

02:04:12  2          Damages (If Applicable.)

02:04:16  3          There is an instruction if you find any of

02:04:18  4   the asserted claims are valid, then you should answer this

02:04:20  5   question.  If you find that all of the asserted claims are

02:04:23  6   invalid, then you should not answer this question.

02:04:25  7          Question 6 is:  What is the reasonable

02:04:28  8   royalty that Idenix and the University have proven by a

02:04:31  9   preponderance of the evidence that they are entitled to?

02:04:35 10          And if you reach this question, the further

02:04:37 11   instruction is (Fill out only (a) or (b).)

02:04:42 12          a says:  If you are awarding damages based on a

02:04:46 13   running royalty, answer these questions.

02:04:47 14          It says Royalty Rate, and there is a space for

02:04:51 15   percentage.

02:04:51 16          Royalty Base, there is a place to enter the

02:04:54 17   dollar figure.  And the parentheses underneath that is, it

02:04:59 18   says (total dollar value of U.S. sales of Sovaldi and

02:05:02 19   adjusted sales of Harvoni through August 2016).

02:05:05 20          And then it says below that, Total Amount

02:05:08 21   Through August 2016.  There is a place to write in a dollar

02:05:12 22   amount.  And it says in the parenthetical underneath there

02:05:14 23   that that is the royalty rate percentage multiplied by the

02:05:18 24   royalty base.

02:05:19 25          That was all 6a.

6b says:  If you are awarded damages based on
a lump sum, what is the lump sum payment Idenix and the
University are entitled to?

And there is a blank there to write in a dollar
figure.

And then at the very end, it says you have now
reached the end of your verdict form, and you should review
it to ensure it accurately reflects your unanimous
determinations.  You must each sign the verdict form in the
spaces below and notify the jury officer that you have
reached a verdict.

And at that point, your foreperson will also
enter the date and let us know that you have reached a
verdict.

With that, we'll ask our court security officer
to please come forward.

Mr. Looby will administer the oath.

(Court security officer placed under oath to
watch over the jury.)

THE COURT:  All right.  Please take the jury
out.

(Jury left courtroom.)

THE COURT:  All right.  I'll ask that you all
make sure that my deputies know how to reach you.  We may
need to reach you on short notice.  Is there anything we

| | | |
|---|---|---|
| 02:07:03 | 1 | need to discuss from the plaintiffs? |
| 02:07:04 | 2 | MS. PARKER: No. Thank you, Your Honor. |
| 02:07:05 | 3 | THE COURT: From the defendants? |
| 02:07:06 | 4 | MR. SCHERKENBACH: No, Your Honor. |
| 02:07:06 | 5 | THE COURT: All right. We will be in recess. |
| 02:07:16 | 6 | (Recess taken while jury deliberates.) |
| 02:07:16 | 7 | *    *    * |
| 04:18:39 | 8 | (Proceedings reconvene.) |
| 04:18:39 | 9 | THE COURT: All right. Welcome back. |
| 04:18:42 | 10 | I have been advised that the jury has reached a |
| 04:18:44 | 11 | verdict. Is there anything to discuss before we bring them |
| 04:18:47 | 12 | in to take the verdict, Ms. Parker? |
| 04:18:49 | 13 | MS. PARKER: Not that I know of. |
| 04:18:50 | 14 | THE COURT: And Mr. Scherkenbach? |
| 04:18:51 | 15 | MR. SCHERKENBACH: No, Your Honor. |
| 04:18:52 | 16 | THE COURT: All right. Let's bring the jury in. |
| 04:18:55 | 17 | (Jury returned.) |
| 04:20:26 | 18 | THE COURT: Good afternoon, ladies and gentlemen |
| 04:20:28 | 19 | of the jury. It is my understanding that you have reached a |
| 04:20:30 | 20 | verdict. Madam Foreperson, is that correct? |
| 04:20:33 | 21 | THE FOREPERSON: We have, Your Honor. |
| 04:20:34 | 22 | THE COURT: I'll ask you to please hand the |
| 04:20:37 | 23 | verdict form to Mr. Looby. |
| 04:20:39 | 24 | (Mr. Looby hands it to the Court to review with |
| 04:20:44 | 25 | law clerk.) |

04:20:46  1                    THE COURT:  Give me a moment, please.

04:20:49  2                    (Pause.)

04:21:18  3                    THE COURT:  I'm going to have Mr. Looby read the

04:21:25  4      verdict, please.

04:21:27  5                    THE DEPUTY CLERK:  Question 1.  Have Idenix and

04:21:31  6      the University proven by a preponderance of the evidence

04:21:33  7      that Gilead's infringement of the asserted claims of the

04:21:36  8      '597 patent was willful?

04:21:39  9                    Answer:  Yes.

04:21:40 10                    Question 2.  Has Gilead proven by clear and

04:21:46 11      convincing evidence that each of the asserted claims of the

04:21:48 12      '597 patent is invalid because the specification of the '597

04:21:53 13      patent does not enable the asserted claims?

04:21:57 14                    Answer:  No.

04:21:58 15                    Question 3.  Has Gilead proven by clear and

04:22:03 16      convincing evidence that each of the asserted claims of the

04:22:06 17      '597 patent is invalid because the specification of the '597

04:22:11 18      patent does not contain an adequate written description of

04:22:15 19      the asserted claims?

04:22:17 20                    Answer:  No.

04:22:18 21                    Question 4.  Has Gilead proven by clear and

04:22:23 22      convincing evidence that any of the following claims of the

04:22:26 23      '597 patent is invalid for anticipation based on prior

04:22:28 24      invention?

04:22:33 25                    Claim 1:  No.

```
04:22:34  1              Claim 28:  No.

04:22:36  2              Claim 30:  No.

04:22:38  3              Claim 31:  No.

04:22:40  4              Question 5.  Has Gilead proven by clear and

04:22:47  5    convincing evidence that any of the following claims of the

04:22:49  6    5697 patent is invalid because the claimed subject matter

04:22:54  7    would have been obvious to a person of ordinary skill in the

04:22:57  8    art at the time of the claimed invention?

04:23:01  9              As to claims 1, 2, 4, 5, 6, 7, 9, 10, 16, 19,

04:23:10 10    23, 28, 29, 30, and 31, answer no.

04:23:20 11              Question 6.  What is the reasonable royalty that

04:23:24 12    Idenix and the University have proven by a preponderance of

04:23:27 13    the evidence that they are entitled to?

04:23:31 14              Royalty rate:  10 percent.

04:23:33 15              Royalty base:  $25.4 billion.

04:23:40 16              Total amount through August 2016, $2.54 billion.

04:23:48 17              Signed and dated by the eight jurors.

04:23:51 18         THE COURT:  Thank you, Mr. Looby.

04:23:53 19         Ms. Parker, do you wish to have the jury polled?

04:23:55 20         MS. PARKER:  No.  Thank you, Your Honor.

04:23:56 21         THE COURT:  Mr. Scherkenbach, do you wish to

04:23:58 22    have the jury polled?

04:23:58 23         MR. SCHERKENBACH:  No, Your Honor.

04:23:59 24         THE COURT:  All right.  Thank you, ladies and

04:24:01 25    gentlemen.  Thank you very much for your service.  It is
```

04:24:04 1  almost complete.  Mr. Looby I think has some paperwork for

04:24:08 2  you, and I do want to have a chance to thank you personally

04:24:10 3  back in the juryroom.  So I will take you back there now and

04:24:15 4  I will meet with you very shortly.  Thank you very much.

04:24:34 5             (Jury left courtroom.)

04:24:38 6           THE COURT:  All right.  I am going meet briefly

04:24:40 7  with the jury and then get back to my other trial.  I do

04:24:44 8  want to have a joint status report from the parties a week

04:24:46 9  from today advising me as to where you think we are and how

04:24:51 10  you think we should proceed from here.

04:24:52 11           Is there anything else before we break, Ms. Parker?

04:24:55 12           MS. PARKER:  No.  Thank you, Your Honor.

04:24:56 13           THE COURT:  Mr. Scherkenbach?

04:24:57 14           MR. SCHERKENBACH:  No, Your Honor.

04:24:57 15           THE COURT:  All right.  Well, I thank all of you

04:25:00 16  for a well tried case, and Happy Holidays.  And I'm sure we

04:25:04 17  will see you at some point.

04:25:06 18           We will be in recess.

04:29:19 19           (Jury trial concludes.)

20

21     I hereby certify the foregoing is a true and accurate

transcript from my stenographic notes in the proceeding.

22

23              /s/ Brian P. Gaffigan
              Official Court Reporter

24              U.S. District Court

25