08:46:48 1                    IN THE UNITED STATES DISTRICT COURT

        2                    IN AND FOR THE DISTRICT OF DELAWARE

        3                              - - -

        4  IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
           DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
        5  DE LA RECHERCHE SCIENTIFIQUE and          :
           L'UNIVERSITE MONTPELLIER II,              :
        6                                            :
                        Plaintiffs,                  :
        7  v                                         :
                                                     :
        8  GILEAD SCIENCES, INC. and GILEAD          :
           PHARMASSET LLC,                           :
        9                                            :
                        Defendants.                  :  NO. 13-1987-LPS
       10  -----------------------------------------
           IDENIX PHARMACEUTICALS, INC., UNIVERSITA  :  CIVIL ACTION
       11  DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL  :
           DE LA RECHERCHE SCIENTIFIQUE and          :
       12  L'UNIVERSITE MONTPELLIER II,              :
                                                     :
       13                  Plaintiffs,               :
           v                                         :
       14                                            :
           GILEAD PHARMASSET LLC,                    :
       15                                            :
                        Defendant.                   :  NO. 14-109-LPS
       16  -----------------------------------------
           IDENIX PHARMACEUTICALS, INC.,             :  CIVIL ACTION
       17                                            :
                        Plaintiff,                   :
       18  v                                         :
                                                     :
       19  GILEAD SCIENCES, INC.                     :
                                                     :
       20                  Defendant.                :  NO. 14-846-LPS
                                         - - -
       21
                             Wilmington, Delaware
       22                   Monday, October 19, 2015
                            *Claim Construction Hearing*
       23
                                      - - -
       24
           BEFORE:         HONORABLE **LEONARD A. STARK,** Chief Judge
       25
                                      - - -

1    APPEARANCES:

2

                ASHBY & GEDDES, P.A.
3               BY:  JOHN G. DAY, ESQ.

4                    and

5               JONES DAY
                BY:  CALVIN P. GRIFFITH, ESQ., and
6                    RYAN B. McCRUM, ESQ.
                     (Cleveland, Ohio)

7
                         Counsel for Plaintiffs

8

9               FISH & RICHARDSON, P.C.
                BY:  W. CHAD SHEAR, ESQ., and
10                   MARTINA TYREUS HUFNAL, ESQ.

11                   and

12              FISH & RICHARDSON, P.C.
                BY:  FRANK SCHERKENBACH, ESQ.
13                   (Boston, Massachusetts)

14                   and

15              FISH & RICHARDSON, P.C.
                BY:  TASHA M. FRANCIS, Ph.D., ESQ.
16                   (Minneapolis, Minnesota)

17                       Counsel for Defendants

18

19
                            Brian P. Gaffigan
20                          Registered Merit Reporter

21

22

23

24

25

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following claim construction hearing occurred in open court, beginning at 8:58 a.m.)

08:46:48  THE COURT:  Good morning, everyone.

08:46:48  (The attorneys respond, "Good morning, Your Honor.")

08:46:48  THE COURT:  I'll have you put your appearances on the record for us, please.

08:58:21  MR. DAY:  Good morning, Your Honor.

08:58:22  THE COURT:  Good morning.

08:58:23  MR. DAY:  On behalf of the plaintiffs this morning, John Day from Ashby & Geddes.  And with me from Jones Day in Cleveland, Cal Griffith and Ryan McCrum.

08:58:31  THE COURT:  Okay.  Welcome.

08:58:32  MR. GRIFFITH:  Good morning, Your Honor.

08:58:34  MR. McCRUM:  Good morning, Your Honor.

08:58:34  THE COURT:  Good morning.

08:58:37  MS. HUFNAL:  Good morning, Your Honor.

08:58:38  THE COURT:  Good morning.

08:58:38  MS. HUFNAL:  Martina Hufnal from Fish & Richardson.  Today I have with me Chad Shear.

08:58:42  MR. SHEAR:  Good morning.

08:58:43  MS. HUFNAL:  Frank Scherkenbach.

08:58:43 1          MR. SCHERKENBACH:  Good morning.

08:58:45 2          MS. HUFNAL:  And Tasha Francis.

08:58:45 3          MS. FRANCIS:  Good morning.

08:58:46 4          MS. HUFNAL:  All from Fish & Richardson.

08:58:48 5          And we also from have us with us two

08:58:50 6     representatives from Gilead Sciences, Jamie Lynch, who is

08:58:54 7     Associate General Counsel, and Andrea Hutchison, who is

08:58:57 8     Corporate Counsel Gilead Sciences.

08:58:59 9          THE COURT:  Welcome to all of you as well.

08:59:03 10         We're all here for the *Markman* hearing.  Have

08:59:06 11    you all talked about how you might like to the present

08:59:08 12    argument this morning?

08:59:08 13         MR. GRIFFITH:  Yes, Your Honor.  On behalf of

08:59:09 14    plaintiffs, our plan is to go term by term.  The plaintiff

08:59:13 15    will proceed first.  We're going to go through the order

08:59:17 16    that the terms were in the joint claim construction chart.

08:59:20 17    And so after I speak about the first term, "2$'$-C-branched

08:59:28 18    pyrimidine nucleotide," Gilead's counsel will go and provide

08:59:32 19    comments on that.  And once we finish with one term, we'll

08:59:34 20    go to the next term.  That's the plan.

08:59:36 21         THE COURT:  Is that agreeable to defendants?

08:59:38 22         MR. SHEAR:  Yes, Your Honor.

08:59:39 23         THE COURT:  All right.  I do allow rebuttal for

08:59:42 24    both sides before we move on to the next term, all subject

08:59:44 25    to your limit; and we'll start the clock now.

08:59:47 1     MR. GRIFFITH: Thank you, Your Honor.

09:00:02 2     Your Honor, Calvin Griffith on behalf of the

09:00:04 3 plaintiffs.

09:00:04 4     I'll sometimes refer to "Idenix" as the most

09:00:10 5 prominent, or first name, I should say, plaintiff. There

09:00:14 6 are actually four plaintiffs in the two lawsuits. So if I

09:00:17 7 omit mention of the other plaintiffs, it's just for

09:00:25 8 brevity's sake.

09:00:25 9     THE COURT: Okay.

09:00:26 10     MR. GRIFFITH: Your Honor, this case involves

09:00:27 11 methods of using modified nucleotides to treat hep. C which

09:00:33 12 is a devastating life threatening disease. It affects

09:00:36 13 millions of people. I think Gilead's tutorial and materials

09:00:39 14 have said it's over 170 million people worldwide who suffer

09:00:43 15 from this disease. It can lead to liver disease and death.

09:00:49 16 And the drug, the nucleotide drug as used in the patented

09:00:53 17 inventions at issue here are cures for that disease and not

09:00:58 18 mere treatments. These are truly amazing inventions.

09:01:02 19     There are three asserted patents in terms of

09:01:11 20 infringement claims in this case -- these cases. So there

09:01:15 21 is also, of course, the interference but we're not going to

09:01:19 22 be talking about those today.

09:01:22 23     And these patents relate to two families. So

09:01:26 24 the first two patents are the '054 patent and '597 patent.

09:01:31 25 And they were filed, the original application leading to

09:01:35 1    those was filed in 2000.  And they're going to take up the

09:01:39 2    bulk of our discussion today.  All of the terms that are

09:01:42 3    being argued today are in those patents.  In addition, one

09:01:47 4    term "administering" is also in the '600 patent, the other

09:01:53 5    patent-in-suit.

09:01:54 6         This first family of patents has never been

09:01:58 7    litigated, it's never been the subject of an interference.

09:02:01 8    It's never been the subject of any foreign decisions.  All

09:02:05 9    of the materials that Gilead cited in their briefs with

09:02:09 10   regard to interferences and foreign decisions did not apply

09:02:14 11   to these patents.  Those decisions do not get into these

09:02:18 12   patents.

09:02:18 13        THE COURT:  Put aside for the moment if there

09:02:20 14   is any relevance to it, but are they correct that you

09:02:23 15   have lost everywhere that those other patents have been

09:02:26 16   litigated?

09:02:27 17        MR. GRIFFITH:  That is correct, Your Honor.

09:02:28 18        THE COURT:  Do you think that is relevant?

09:02:30 19        MR. GRIFFITH:  With the '600 patent, has been

09:02:33 20   litigated.

09:02:34 21        So the first two patents, the '054 and the '597,

09:02:38 22   have not been litigated anywhere.

09:02:39 23        THE COURT:  Do you think there is any relevance

09:02:41 24   to your evident repeated defeats with respect to the '600?

09:02:43 25        MR. GRIFFITH:  Absolutely not.  So that is a

significant point of disagreement between us. But this
hearing today is not about enablement. So someday we will
get to that issue, I believe. And that is a defense that
they're asserting against all of these patents. But that
is not a defense that we should be getting into today. And
no witness -- by the way, no witness has opined that the
'054 and the '597 patents are invalid as not being enabled
or failing to meet the written description requirement or
that sort of thing.

THE COURT: Is enablement with respect to
flourine the basis on which you lost in those other
proceedings.

MR. GRIFFITH: Yes, Your Honor. Or in the
interferences, it was enablement. In the foreign decisions,
the doctrines are somewhat similar somewhat related but
there are differences in them so I can't say it is the
absolute equivalent to that but it is in that same ballpark.

THE COURT: Okay. Thank you.

MR. GRIFFITH: The irony I would note, Your
Honor, is that for the patent for which there have been
decisions or decisions relating to foreign counterparts is
one where everyone agrees that the claim covers 2'-methyl
up, 2'-fluoro down. There has been no dispute about that.
In the '600 patent, everyone agrees as a matter of claim
construction that is covered. So the fact that there is

09:04:19 1  enablement issues with respect to those, enablement defenses

09:04:22 2  that they have won on in the Patent Office doesn't change

09:04:26 3  that claim construction on '600 patent.  That is not in

09:04:30 4  dispute.  2'-fluoro down is covered even though they contend

09:04:33 5  they won in every jurisdiction that dealt with the issue of

09:04:37 6  enablement.

09:04:38 7          The first two patents, Your Honor, are broad

09:04:41 8  genus patents.  They cover a class of nucleotides for

09:04:47 9  covering HCV.  They feature a methyl group or a C branch at

09:04:52 10 the 2' position and specified that there is a nonhydrogen,

09:04:59 11 another nonhydrogen constituent at that position.

09:05:02 12         The '600 patent involves a later developed

09:05:07 13 species, the 2'-methyl up, 2'-fluoro down, so it is an

09:05:13 14 improvement patent.  It is a species within the genus.

09:05:23 15         Just to make sure we're all on the same page.

09:05:26 16 Throughout my presentation, I suspect that Gilead's counsel

09:05:30 17 will be doing the same.  I will be referring to the 2'

09:05:33 18 position, the 3' position, and the 5' position, those most

09:05:39 19 notably, so when I do that, it's these positions on the

09:05:43 20 sugar that I'm referring to.

09:05:45 21         Then I'll be, to some extent, talking about up

09:05:51 22 and down, and so up is relative to the plane of the sugar

09:05:58 23 ring.  And in this illustration, the methyl group is up at

09:06:02 24 the 2' position.  The fluoro group is down, the OH at the 3'

09:06:08 25 position is down.

09:06:12 1           And then ribonucleosides are going to be the

09:06:16 2  subject of one of the claim terms, two of the claim terms

09:06:19 3  actually, and those are nucleosides that have substituents

09:06:23 4  attached at the 2' and 3' down positions.

09:06:27 5           In nature, they are hydroxyl groups at those

09:06:30 6  positions.  And the issue that we're dealing with here is

09:06:33 7  whether these patents are about modified nucleosides and

09:06:37 8  about modified ribonucleosides.  I think pretty clearly they

09:06:41 9  are, and we're going to be discussing that.

09:06:45 10           So these are the disputed claim terms.  And the

09:06:48 11  order in which I'm going to go through them and Gilead's

09:06:55 12  counsel is going to go through them.  The first one we were

09:06:57 13  going to do is "ß-D-2'-C-branched pyrimidine nucleoside."

09:07:06 14           So this term is in claim 25 of the '054 patent.

09:07:13 15  And here are the parties' constructions of that term.  On

09:07:16 16  this particular term, our constructions are nearly identical

09:07:20 17  except for one important difference which is highlighted in

09:07:24 18  red on Gilead's proposed construction.

09:07:27 19           So everyone agrees that this term covers

09:07:32 20  nucleosides having two nonhydrogen substituents at the 2'

09:07:37 21  position, at least one of which connected at the 2 position

09:07:40 22  through a carbon-to-carbon bond.  So methyl would be an

09:07:44 23  example of one such substituent, and then there is one other

09:07:47 24  nonhydrogen substituent at that 2' position.

09:07:50 25           They agree with that, but they say, one

09:07:53 1  exception, it can't have fluorine down.  And they basically

09:07:59 2  take the position that there was a disclaimer of that.

09:08:03 3        I'm going to walk through this intrinsic record,

09:08:07 4  some of the evidence that we submitted and some of the case

09:08:09 5  law on this and demonstrate there is no disclaimer.  The

09:08:12 6  intrinsic record supports Idenix's proposed construction

09:08:17 7  which was in the prosecution history long before any claim

09:08:20 8  construction issues came up and it is clearly not litigation

09:08:25 9  driven as Gilead's counsel has asserted.

09:08:29 10       On the contrary, the tag line that you see there

09:08:31 11  the Gilead proposed construction, only arose in litigation.

09:08:35 12  It is not in the intrinsic record.

09:08:37 13       THE COURT:  Do you agree that the concept of an

09:08:39 14  implicit disclaimer has been recognized in binding Federal

09:08:43 15  Circuit law?

09:08:43 16       MR. GRIFFITH:  Yes, Your Honor.  It has.  And

09:08:48 17  the important thing about that is you don't just apply it

09:08:54 18  from the fact that an embodiment is not disclosed even

09:08:56 19  though other embodiments of that feature are disclosed.  And

09:09:01 20  you don't apply it from silence, and you don't limit the

09:09:04 21  claims to the embodiments disclosed.

09:09:06 22       THE COURT:  But --

09:09:07 23       MR. GRIFFITH:  I'm going to come to --

09:09:08 24       THE COURT:  But you don't need words of manifest

09:09:10 25  exclusion.

09:09:13  1          MR. GRIFFITH:  You don't have to have an express

09:09:15  2    term.  I agree, Your Honor.  You don't have to say this

09:09:18  3    patent excludes X for X to be excluded, but what you do find

09:09:23  4    in those cases, and we'll see this when we come to them, is

09:09:27  5    that for an exclusion to come up, you have a criticism of

09:09:31  6    the things that is excluded or for which there is found to

09:09:34  7    be a disclaimer or you distinguish over it in the prosecution.

09:09:39  8    You distinguish over the prior art over on the basis of

09:09:42  9    that.  You have disparagement of it or sometimes you have

09:09:44 10    cases where the patent owner will say the present invention

09:09:49 11    is X, and X does not include Y.  Well, then sometimes

09:09:58 12    they'll find that that is strong statement of what the

09:10:01 13    object of the invention is and tying it to specifically X

09:10:05 14    is limiting.

09:10:07 15          But we don't have any of that here.  And I want

09:10:09 16    to go through and show how that is absent, look at the cases

09:10:12 17    briefly, the featured cases that the parties discussed, and

09:10:16 18    explain why we believe there is no disclaimer.

09:10:20 19          Let's start with the claim.

09:10:29 20          There are no words of exclusion in the claim.

09:10:32 21    There is no -- the claim terms here talk about omitting

09:10:37 22    fluorine at the 2' down position.  So the proposed exclusion

09:10:41 23    is not in the claim.

09:10:42 24          Your Honor, just, there may be some confusion.

09:10:45 25    There was a certificate of correction that had to be applied

09:10:47  1    to claims 25 and 26.  So if you just look at claim 25, its

09:10:54  2    says "C-branded."  It's supposed to say "C-branched."  And

09:10:59  3    in claim 26, they had to correct "nucleoside" to

09:11:03  4    "ribonucleoside" in claim 26.

09:11:05  5         So Gilead doesn't dispute that the plain and

09:11:14  6    ordinary meaning of this phrase does not, by itself, exclude

09:11:20  7    flourine at the 2' down position.  So we start with in the

09:11:24  8    absence of any what I would say be criticizing remarks or

09:11:30  9    disparaging remarks or something that will rise to the level

09:11:33 10    of disclaimer, in the absence of that, the claim doesn't

09:11:36 11    prohibit flourine at the 2' down position.

09:11:40 12         So they have to establish that the intrinsic

09:11:43 13    record uses words or expressions of manifest exclusion or

09:11:47 14    restriction.  And Your Honor is correct, those can be

09:11:49 15    implied but they have to be implied from strong statements.

09:11:52 16         Now, the specification points out that the

09:12:00 17    embodiments disclosed are non-limiting, so they're quite

09:12:05 18    clear that they're giving examples but they're not intending

09:12:08 19    to limit the invention to the embodiments disclosed in

09:12:11 20    the specification.  This is pointed out at column 43 of

09:12:16 21    the specification.  And one of the major portions of the

09:12:22 22    specification Gilead relies on for their disclaimer

09:12:27 23    arguments is at column 47.  And this statement applied to

09:12:31 24    that.

09:12:31 25         There are other statements in the specification

to the effect of this invention is not limited to the
embodiments disclosed or herein.

THE COURT: Do you agree that there are
something on the order of 332 embodiments, none of which
list flourine at the 2' down position?

MR. GRIFFITH: I haven't counted them myself.
That is the number they have given, and I will take their
word for it. But two things about that, Your Honor.

What that shows is that this specification has
no general hostility to fluorine. There is no statement
in the specification that flourine is bad, flourine is
dangerous. Stay away from it. They just gave a lot of
examples in the specification, and this is one that there
wasn't an example of. But the law is clear that the claims
are not limited to the specific embodiments disclosed.

Second point on that, and kind of related to
that, is they said that and they said the specification
discloses billions of compounds. I don't agree with that
number. I think that their counting is way off. But it's
clear that the specification does disclose a large number of
embodiments. That augers in favor of a broad construction
of the claim. That shows that the applicants intended to
have much variation, modifications that were possible within
the scope of the invention.

So effectively with that argument about the 332

09:14:12 1  and about billions, what they're saying is the patent must

09:14:15 2  be limited only to the embodiments you disclose.  And that

09:14:19 3  is just wrong.  The complaint in effect is you disclosed a

09:14:26 4  billion but not a billion and one.  If you had a billion and

09:14:29 5  one, you could get this.

09:14:30 6       THE COURT:  But the fact that flourine is talked

09:14:37 7  about but never talked about in this position, doesn't that

09:14:41 8  at least begin to suggest something on the order of an

09:14:44 9  implicit disclaimer?

09:14:47 10      MR. GRIFFITH:  Not at all, Your Honor.  And

09:14:48 11  there is no case where such an inference was made from

09:14:54 12  repeated disclosure of embodiments that omit a particular

09:15:00 13  embodiment that a defendant argues in litigation is excluded

09:15:04 14  because it wasn't mentioned.

09:15:06 15      THE COURT:  The chemistry here, there is a

09:15:09 16  reference to I think a halogen group and a suggestion

09:15:13 17  that maybe all of the other halogen group elements are

09:15:18 18  specifically referenced as being embodiments at the 2'

09:15:22 19  position and only flourine is not.  Is that correct, first?

09:15:26 20      MR. GRIFFITH:  So at column 47, there are I

09:15:29 21  think three halogens that are called out as possibilities

09:15:33 22  for the 2' down position, and flourine is not mentioned

09:15:37 23  there.  And it is correct that flourine was not given as an

09:15:40 24  example of something in the other examples either, that you

09:15:44 25  could use at the 2' down position, but that does not rise to

09:15:50 1    the level of a disclaimer.

09:15:51 2              THE COURT:  How many other things as a matter

09:15:54 3    of chemical fact could have been listed there as other

09:15:59 4    halogens?  I'm aware of four, right?  The three that are

09:16:01 5    listed and fluorine.  So are there others?

09:16:04 6              MR. GRIFFITH:  Yes, I think there are six.

09:16:05 7              THE COURT:  So four out of six are listed --

09:16:07 8    three out of six are listed.

09:16:08 9              MR. GRIFFITH:  Right.

09:16:08 10             THE COURT:  And three out of six are not listed.

09:16:10 11             MR. GRIFFITH:  Correct, Your Honor.

09:16:11 12             THE COURT:  Do you think that fact has any

09:16:13 13   relevance to the claim construction dispute?

09:16:15 14             MR. GRIFFITH:  I don't, Your Honor.  And now, I

09:16:18 15   mean they assert, vehemently, that it does, and this is an

09:16:22 16   absolute point of major disagreement between us.  And the

09:16:28 17   there is a case that is particularly on point with respect

09:16:31 18   to this issue of does repeated disclosure -- let me see if I

09:16:41 19   can go straight to it because it goes directly to the point

09:16:50 20   to the questions that Your Honor is asking.

09:16:57 21             So this is the *Thorner* case, a fairly recent

09:17:00 22   decision of the Federal Circuit.  Basically the defendant in

09:17:04 23   *Thorner* was making the same argument that Gilead is making

09:17:08 24   here.  The issue is whether "attached" encompasses either an

09:17:14 25   external or internal attachment.  The court said we must

decide whether the patentee has redefined this term to mean only attachment to an external surface.

Well, as Sony argues, the defendant, the specification repeatedly uses the term "attached" in reference to embodiments where the actuators are attached to an outer side. In fact, the specification never uses the word "attached" when referring to an actuator located on the interior of the controller. This does not rise to the level of either lexicography or disavowal.

So the Federal Circuit has addressed this. Whether repeated description of embodiments that fall into one category and never mentioning the fourth possible embodiment, the other possible embodiment that the defendant is using, that doesn't count as a special definition. That doesn't count as disavowal. The court said we do not read limitations from the specification into claims. We do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer.

And so what we see are cases like *Chicago Board of Options* where there are derogatory statements that are made about embodiments. We don't have that. As I said, there is never any statement that said flourine has got a problem, guys. Watch out. Or, we're trying to overcome the fluorine problem. That is what you find in cases like

09:19:06 1   *Scimed*, this case, and many of the cases that they cite.

09:19:13 2          *In Re:  Abbott Diabetes* is one such case that

09:19:18 3   they cited with some prominence.  Those cases deal -- when

09:19:21 4   you have disparagement, that would be different.  If we had

09:19:25 5   disparagement of flourine here, you would have a different

09:19:27 6   argument, but we don't have that.

09:19:29 7          And then also, if you use words I was discussing

09:19:32 8   this earlier, to the effect of the present invention is X.

09:19:35 9   So that was something that came up in the *Absolute Software*

09:19:39 10  case.  The repeated reference to a certain limitation or

09:19:43 11  preferred embodiment as this invention, that can be construed

09:19:46 12  as limiting.  But there is no case that found on facts like

09:19:51 13  this to be a disclaimer or a lexicographer situation.

09:19:57 14         If I could go back, Your Honor, to I think some

09:20:06 15  important parts of the intrinsic record here.

09:20:08 16         We have a situation where the patentee did

09:20:15 17  make this amendment, and there was a rejection pending at

09:20:19 18  the time.  And the patentee characterized, the patent

09:20:23 19  applicant characterized the core of the invention as this:

09:20:31 20  di-substituted in the 2' position with two nonhydrogen

09:20:34 21  substituents.

09:20:35 22         No mention again of avoiding flourine as being

09:20:40 23  the core of the invention or according to the invention.

09:20:43 24  And what is more, the use of flourine is consistent with

09:20:49 25  this description of the core of the invention.  It is not

09:20:52 1    contrary to that.

09:20:53 2              There is more here, though.  They actually faced

09:21:01 3    a rejection based on a reference that had flourine at the 2'

09:21:06 4    position.  And they could have said, look, we're not talking

09:21:10 5    about having flourine at that position.  That is not what

09:21:12 6    this invention is about.  They didn't do that.

09:21:16 7              What they argued was their invention differed

09:21:19 8    from that in that that invention, that earlier piece of

09:21:24 9    prior art involved flourine at just one position.  I'm

09:21:32 10   sorry.  Flourine was not di-substituted so it had a hydrogen

09:21:37 11   group at the other position.  And it also had, it also had

09:21:42 12   precursors in there with flourine and an alkyl group, I

09:21:48 13   think, at the 2' position, but those were precursors.  They

09:21:51 14   were not used in that patent to treat HCV.  So they were

09:21:56 15   used to make the compound.  They were not used to treat HCV.

09:22:01 16   That was the basis on which this was distinguished.  They

09:22:04 17   didn't say, hey, look, we're not talking about having

09:22:07 18   flourine at the 2' position.

09:22:09 19             So what they have is the argument that they

09:22:20 20   kind of repeat throughout their brief that flourine is

09:22:24 21   absent.  They spin it different ways.  The specification

09:22:27 22   excludes flourine at the 2' down position, they say.  The

09:22:31 23   specification doesn't say flourine is excluded, just to be

09:22:34 24   clear.  It just doesn't say use flourine at the 2' position.

09:22:40 25   It doesn't have an example of doing that.

09:22:42 1        THE COURT:  And is there anything in the record

09:22:44 2  or do you even have any argument as to why that is?  Why

09:22:48 3  wouldn't they mention flourine?

09:22:51 4        MR. GRIFFITH:  Your Honor, there is nothing in

09:22:53 5  the record on that point.  And it wouldn't matter.  In other

09:22:59 6  words, the private -- and for claim construction, you don't

09:23:02 7  go back and talk about what the inventors privately intended

09:23:06 8  to say, what the patent attorney intended to say.  They

09:23:09 9  don't have any cases.  They argue in their brief that we

09:23:13 10  never explain why, but they don't have any case that says

09:23:16 11  the reason why something is omitted is relevant.  And it's

09:23:20 12  not.

09:23:20 13        THE COURT:  Okay.  It may not be relevant, but

09:23:23 14  I'm still curious about it.  If there is only six halogens,

09:23:27 15  why is all the talk about three and now this case is

09:23:30 16  evidently about a fourth?  Why has that happened?

09:23:34 17        MR. GRIFFITH:  My personal opinion, Your Honor?

09:23:35 18        THE COURT:  If that is all we've got, sure.

09:23:37 19        MR. GRIFFITH:  Because we could always snipe at

09:23:39 20  the patent attorney in hindsight.  We could always say you

09:23:45 21  left that out.

09:23:45 22        As I said, their argument is you put in billions

09:23:48 23  of compounds.  They exaggerate, but leaving that aside,

09:23:51 24  there is no question that the patent attorney here put in

09:23:53 25  many examples of embodiments and now we're faulting that

09:23:56 1  patent for not putting in enough.  It's a hindsight

09:24:00 2  criticism.

09:24:00 3          THE COURT:  Let's put it this way.  How would

09:24:03 4  one of skill in the art looking at the patent here and the

09:24:05 5  intrinsic evidence, how would they know that flourine is

09:24:09 6  possible at the 2' down position?

09:24:12 7          MR. GRIFFITH:  Because the intrinsic record

09:24:14 8  tells them that.  It talks about, when you go to that

09:24:19 9  prosecution history statement, it talks about the core of

09:24:23 10 this invention is di-substitution at the 2' position, one of

09:24:29 11 which an alkyl group; in the case of the '597 patent, a

09:24:36 12 methyl group.

09:24:36 13         And there is no debate, Your Honor, that there

09:24:40 14 are other things that are not mentioned as options at the 2'

09:24:43 15 position.  And no specific example given of -- well, Your

09:24:50 16 Honor mentioned the other halogens, but there are other

09:24:55 17 things that were not specifically exemplified in this

09:24:59 18 application as possible options at the 2' position.  Their

09:25:04 19 construction doesn't exclude those.  So their construction

09:25:09 20 only excludes flourine, which was arbitrarily picked to get,

09:25:15 21 no surprise here, their molecule has flourine at the 2' down

09:25:21 22 position.

09:25:21 23         But what they didn't do -- so they had an expert

09:25:24 24 that they retained to come in and look at this.  And they

09:25:27 25 spoon fed that expert their positions.  I mean they gave

09:25:31 1  them the claim constructions.  They gave them their

09:25:36 2  position.  They gave them their molecule.  What they

09:25:38 3  didn't do was ask that expert, listen, you looked at the

09:25:44 4  specification.  You let us know.  Is there a clear and

09:25:46 5  unmistakable disclaimer of something in here?  And if so,

09:25:49 6  what is it?  They could have done it.  If it was so clear

09:25:52 7  and unmistakable, he ought to notice it.  But that didn't

09:25:56 8  happen in this case.  Instead, they led him along, they

09:26:00 9  wrote his expert report, and he came out with an opinion

09:26:03 10  that 2' flourine is excluded at the down position.

09:26:06 11          That is not terribly credible or useful evidence

09:26:10 12  on this record.  The intrinsic record is much more relevant

09:26:14 13  and much more reliable than that expert evidence that they

09:26:20 14  submitted on this point.

09:26:21 15          In fact, Your Honor, their opening report

09:26:26 16  submitted relied extensively on Dr. Micklefield.  It had a

09:26:31 17  lot of cites to the Micklefield testimony and in their

09:26:35 18  response brief after we took her deposition, there was just

09:26:40 19  one cite.  They stayed away from the intrinsic record in

09:26:42 20  their opening brief.  They had to resort to it in the

09:26:45 21  response brief because this intrinsic record does not have a

09:26:47 22  clear and unmistakable disclaimer.

09:26:49 23          THE COURT:  One of the pieces of the intrinsic

09:26:52 24  record I think they rely on in their answering brief is a

09:26:55 25  portion of the prosecution history.  It regards I think

09:26:59 1    claim 44 of the '868 patent.

09:27:02 2                MR. GRIFFITH:  Yes, Your Honor.

09:27:03 3                THE COURT:  Can you address that?

09:27:04 4                MR. GRIFFITH:  I can, and I'm glad Your Honor

09:27:06 5    mentioned that.  And fortunately I might have forgotten it

09:27:11 6    if you hadn't.  And in that regard --

09:27:17 7                Your Honor, did I hand up a copy of our

09:27:19 8    presentation?

09:27:21 9                THE COURT:  I have your slides, yes.

09:27:30 10               MR. GRIFFITH:  If I may hand up a copy of the

09:27:33 11   case, *Integra Life Sciences v Merck*.

09:27:35 12               THE COURT:  Okay.

09:27:41 13               (Documents passed forward.)

09:27:45 14               MR. GRIFFITH:  So this was a case in which, like

09:27:48 15   Gilead here, the defendant argued that the earlier patent,

09:27:55 16   the patent-in-suit, the plaintiff said was a genus patent

09:27:59 17   and it covered certain types of peptides, they said it did

09:28:05 18   not encompass cyclic peptides, only linear peptides, and

09:28:12 19   only linear peptides were disclosed in the specification.

09:28:15 20               And further, there was a later application, not

09:28:22 21   related, not a continuation, like the '600 patent here.

09:28:27 22   That is not a continuation of these other two patents.  It's

09:28:29 23   not a part of the intrinsic record for the '054 or '597

09:28:34 24   patents.

09:28:36 25               But like the situation here, the defendant

09:28:41 1    argued, well, you filed a later patent on using cyclic

09:28:49 2    peptides for that.  That must mean that you intended to

09:28:53 3    exclude cyclic peptides from the earlier application.  And

09:28:58 4    like here, in that later case, they faced in a prosecution a

09:29:03 5    rejection based on the earlier case.  And they argued, the

09:29:09 6    applicants in the later case said, well, that earlier case

09:29:14 7    does not disclose cyclic peptides.

09:29:20 8            That is like Idenix here.  Idenix said the '054

09:29:24 9    and '597 patents don't disclose flourine at the 2' down

09:29:28 10   position.

09:29:29 11           They didn't say it doesn't claim them.  They

09:29:32 12   didn't say it's not within the scope of those claims.  And

09:29:34 13   that is an important distinction.

09:29:37 14           And that was the case in this *Integra* case.  So

09:29:42 15   the Court in *Integra* -- and this is a Federal Circuit case,

09:29:45 16   331 F.3d 860, at page 869 -- the Court goes through this

09:29:53 17   analysis in detail.  And it concludes that the earlier

09:29:59 18   patent, the '525 patent is a genus patent.  Such a genus

09:30:04 19   patent do not estop the applicant from later filing an

09:30:09 20   improvement patent such as the '517 patent.

09:30:12 21           This is on page 8, Your Honor, of what I handed

09:30:15 22   up, the top left-hand corner.

09:30:18 23           It does not estop the applicant from later

09:30:21 24   filing an improvement patent such as the '517 to claim

09:30:25 25   species with particularly useful properties.

09:30:27 1          So that is the situation we have here.  The fact

09:30:31 2     that they pointed out that the '054 and '597 patents don't

09:30:37 3     disclose flourine at the 2' down position doesn't -- and the

09:30:41 4     specification is, it's true.  I mean this was the whole

09:30:45 5     point of Your Honor's questions to me earlier is was there

09:30:48 6     an example, is there an embodiment with fluorene at the 2'

09:30:51 7     down position?

09:30:54 8          But genus species situations are routine in

09:30:57 9     the patent law.  There is so many examples of it.  The

09:31:02 10    automobile, the original internal combustion engine.  There

09:31:07 11    are many improvement patents on that.  That doesn't mean the

09:31:09 12    original patent on that didn't cover, dominate, if you will,

09:31:14 13    subsequent improvements on the internal combustion engine.

09:31:17 14         THE COURT:  Let me make sure I understand.  Then

09:31:20 15    in your view, the patents I have in front of me today, the

09:31:24 16    '054 and the '597, they're the genus patents.  Correct?

09:31:28 17         MR. GRIFFITH:  That's correct, Your Honor.

09:31:30 18         THE COURT:  And the '868 that the defendants

09:31:32 19    have pointed me to in their answering brief is a species

09:31:35 20    patent?

09:31:36 21         MR. GRIFFITH:  That is correct, Your Honor.

09:31:36 22         THE COURT:  And the '868 is a subsequent species

09:31:39 23    improvement patent; correct?

09:31:41 24         MR. GRIFFITH:  That's right.

09:31:41 25         THE COURT:  And you don't dispute that if I go

09:31:45 1  study the prosecution history of the '868, it will very

09:31:48 2  clearly have your client saying we never disclosed flourine

09:31:53 3  at the 2' down position in our earlier '054 and '597.  Right?

09:31:59 4          MR. GRIFFITH:  That's correct, Your Honor.

09:32:00 5          THE COURT:  But your contention is I won't

09:32:03 6  find anywhere in the prosecution history of the '868 an

09:32:08 7  indication that you failed to claim flourine at the 2' down

09:32:13 8  position on the earlier genus patents?

09:32:16 9          MR. GRIFFITH:  That's correct, Your Honor.

09:32:17 10         THE COURT:  Now, is it your contention further

09:32:20 11 that it is absolutely irrelevant what your client said in

09:32:23 12 connection with the '868 about the very patents-in-suit in

09:32:27 13 front of me?

09:32:28 14         MR. GRIFFITH:  Well, I don't think it is very

09:32:32 15 relevant.  So, certainly, since the whole point of their

09:32:38 16 disclaimer argument is that there is no embodiment of

09:32:42 17 flourine disclosed at the 2' down position, that's the whole

09:32:46 18 basis really for their argument.  So it's relevant.

09:32:49 19         THE COURT:  Maybe I can short-circuit that.  I

09:32:51 20 guess you agree with that.  Right?

09:32:52 21         MR. GRIFFITH:  I do agree with that.

09:32:54 22         THE COURT:  You would make a distinction between

09:32:56 23 disclosure and claiming, so it is not really in dispute.

09:32:59 24 You agree you failed to disclose flourine at the 2' down

09:33:04 25 position in the patents-in-suit in front of me.  Correct?

09:33:07 1      MR. GRIFFITH:  Yes.  I wouldn't call it a

09:33:09 2  failing but, yes, it's not disclosed.  And I mean I think

09:33:13 3  that this patent attorney did a robust job of disclosing

09:33:18 4  embodiments.  And as I said at the outset, the disclosure of

09:33:22 5  many compounds and many modifications supports the notion

09:33:27 6  that this is a broad invention, not a very narrow specific

09:33:33 7  invention on only having a very precise narrow group of

09:33:39 8  substituents or maybe only two at that 2' position.

09:33:44 9      Your Honor, if I may.  I don't want to -- I have

09:33:50 10 been up here awhile, so I think I have hit the major points.

09:33:53 11     I do think it is important to note -- and this

09:33:58 12 is on page 30 of our slides -- that the arguments about

09:34:03 13 enablement and written description truly are irrelevant to

09:34:06 14 claim construction.  As I said, no witness has said that the

09:34:10 15 '054 and '597 patents are invalid for lack of enablement.

09:34:16 16 So they argue that, and that is attorney argument, and that

09:34:20 17 certainly will be the subject of expert discovery in this

09:34:22 18 case, but that is where that is properly located.

09:34:27 19     THE COURT:  As a matter of case management, why

09:34:30 20 shouldn't we get to the bottom of that fairly soon, whether

09:34:34 21 or not you can show what you need to show on enablement,

09:34:37 22 written description?

09:34:38 23     MR. GRIFFITH:  Well, I think we are going to,

09:34:40 24 Your Honor.  I think that that is on the agenda for starting

09:34:44 25 in January, we're going to be doing expert reports, and it's

been not a real long period of time we have for that expert

discovery.  That is on the horizon, and that is what we're

going to be doing.  And then there is a summary judgment

process at the end of that.  And so if they feel that as a

matter of law these claims are not enabled, then I expect

that we'll see something from them in the way of a summary

judgment motion on that, but that is the time for that.

Your Honor, sum and substance, this intrinsic

record supports a broad concept of di-substituted at the 2'

position, one of which is a C branch.  And it does not

support a prohibition on flourine at the 2' down.  That is

an undisclosed embodiment but it is nothing more than that.

And the case law does not go so far as to find a

disclaimer on this record.  There are no cases that go that

far.  And, indeed, the *Thorner* case quite clearly takes a

position that that would be going too far.

THE COURT:  Can you prevail on infringement if

they're right that flourine at the 2' down position is not

within the scope of your claims?

MR. GRIFFITH:  So not on literal infringement.

Then it would become a question of Doctrine of Equivalents,

and we would have to do that analysis.

THE COURT:  All right.  Is there anything else?

MR. GRIFFITH:  That's all for now, Your Honor.

THE COURT:  Okay.  We'll give you a chance on

09:36:23 1   rebuttal, but we'll hear first from defendants.

09:36:26 2            MR. SHEAR:  Good morning, Your Honor.  Chad

09:36:40 3   Shear from Fish & Richardson.

09:36:43 4            THE COURT:  Good morning.

09:36:43 5            MR. SHEAR:  If I can begin with --

09:36:49 6            (Elmo settings adjusted.)

09:36:46 7            MR. SHEAR:  Thank you, Ms. Hufnal.

09:36:53 8            If I could begin where opposing counsel began.

09:36:56 9   He noted at the outset of his presentation that this was a

09:37:00 10  breakthrough invention.  That it is a cure for hepatitis C

09:37:04 11  where no cure previously existed.

09:37:06 12            And all of those things are true with the

09:37:08 13  exception of the idea of the invention because the invention

09:37:10 14  is ours.  We have our own patents that cover the product.

09:37:13 15            The plaintiffs in this case, they don't have a

09:37:17 16  product, they don't have a product market, they don't have

09:37:20 17  a cure of their own, and these patents are directed at

09:37:23 18  something else.  This was a product that had development at

09:37:26 19  the time and that ultimately failed alternative clinical

09:37:28 20  trials.

09:37:28 21            So with that understanding in mind, let me jump

09:37:32 22  right into the terms.

09:37:33 23            THE COURT:  I could have that understanding in

09:37:35 24  mind, but you don't contend it is relevant to the issues in

09:37:38 25  front of me?

09:37:39 1          MR. SHEAR:  I don't, Your Honor.

09:37:44 2          So one point that I'd like to address at the

09:37:49 3    outset that Idenix makes much of in their briefs is the

09:37:53 4    idea that these patents are directed to modified nucleosides

09:37:57 5    and therefore any discussion of natural nucleosides is

09:38:00 6    irrelevant.

09:38:01 7          We fully agree the patents are about modified

09:38:04 8    nucleosides, but you have to modify something, and what

09:38:07 9    one of skill understands is that you are modifying natural

09:38:11 10   nucleosides.  That is what these patents are all about:

09:38:15 11   modifying natural nucleosides in very specific, very

09:38:18 12   disclosed ways.

09:38:22 13         Now, the term at issue, "ß-D-2'-C-branched

09:38:32 14   pyrimidine nucleoside," which admittedly is a mouthful,

09:38:36 15   follows a very systemic and methodical approach naming

09:38:40 16   nucleosides.  And we'll get into this in much more detail

09:38:43 17   when we talk about the terms where the issues are actually

09:38:47 18   in dispute.  But if I can spend a brief moment talking about

09:38:51 19   how this works in the context of this term because I think

09:38:54 20   we're going to see it throughout the morning.  And it is

09:38:56 21   consistent.

09:38:57 22         The "ß-D," that just talks about the base which

09:39:01 23   in this case is the pyrimidine at the end.  That just tells

09:39:05 24   one of skill in the art where the base is relative to the

09:39:08 25   sugar.

09:39:09 1    The "2'-C-branched," that is talking about where

09:39:12 2 the modification to the natural nucleoside is taking place.

09:39:18 3 In this case, at the 2' position.

09:39:18 4    And then the "C-branched" is just talking

09:39:24 5 about what that modification is.  And in this case, it is a

09:39:30 6 carbon-to-carbon bond.  That is what the branching implies.

09:39:33 7    And all of that is agreed between the parties

09:39:36 8 because in this context, it follows.  This is a very

09:39:38 9 systemic methodical approach to naming nucleosides that I

09:39:42 10 just mentioned.

09:39:44 11    There is another thing that we agreed on back

09:39:46 12 before any of the briefing took place, and that is the idea

09:39:49 13 that the claim has two nonhydrogen substituents at the 2'

09:39:55 14 position based upon the prosecution disclaimer that counsel

09:39:58 15 mentioned several times and is repeated throughout their

09:40:03 16 brief.

09:40:03 17    But, and we'll get to this in more detail in a few

09:40:05 18 moments, that concept does not mean that they're entitled to

09:40:09 19 have flourine at 2' down.  Because as I mentioned, the patents

09:40:14 20 are about modifications to natural nucleosides that are done

09:40:19 21 in a very precise way.

09:40:20 22    THE COURT:  You do agree, though, that flourine

09:40:22 23 would be within the plain and ordinary meaning of the term?

09:40:25 24    MR. SHEAR:  I do, Your Honor.

09:40:27 25    Now, there are two patent families at issue, as

09:40:30 1  counsel mentioned.  What is very important to reference is

09:40:34 2  that the time points are different but importantly the

09:40:36 3  specifications are different.  They disclose very different

09:40:39 4  things.  Both of them are directed to modifications of

09:40:43 5  nucleosides.  I disagree with the idea that the '054 and

09:40:48 6  '597 patents are about genus patents and the '600 is the

09:40:51 7  species.  We can get into that more when we talk about some

09:40:54 8  of the specific issues.

09:40:55 9          We'll actually come back to Dr. Micklefield at

09:41:02 10  the end.

09:41:03 11          But as Your Honor pointed out, it is our

09:41:06 12  position that this patent contemplates billions of

09:41:10 13  compounds.  And it does contemplate billions of compound.

09:41:15 14          THE COURT:  How do you calculate to billions

09:41:17 15  since that is evidently in dispute?

09:41:19 16          MR. SHEAR:  Sure.  So if you look at column 47

09:41:21 17  of their patent, there is just one example.  And, in fact,

09:41:25 18  I'll go to that slide.

09:41:26 19          So you can see a basic compound.  And if you go

09:41:31 20  through their patent, there is a whole bunch of different

09:41:34 21  compound.  I think there may be as many as 20 different sort

09:41:37 22  of basic models with the various Rs that can be done out.

09:41:40 23          So when you start going through the permutations

09:41:45 24  of what they disclose, any R can be anything that is listed

09:41:49 25  below.  Now, this is just an excerpt in the patent.  It's

09:41:52 1    not the whole thing.

09:41:53 2              Specifically, though, there are a lot of these

09:41:56 3    terms.  Your Honor before mentioned halogen.  And we noted

09:42:01 4    halogen, there are only five halogens, not six, but halogens

09:42:04 5    is one of the catchall terms that encompasses multiple

09:42:08 6    things.

09:42:08 7              So if you look at the definition here of $R^7$ and

09:42:11 8    $R^9$, $R^7$ is in the red box there and you start going down this

09:42:15 9    list.  Independently hydrogen, $OR^2$, and $R^2$ is previously

09:42:20 10   defined so it could be that, hydroxy, alkyl.  Alkyl, again,

09:42:24 11   is one of those catchall things which basically means a

09:42:27 12   compound that has a carbon in it.  So your mind can start

09:42:31 13   running methyl, ethyl, propyl, isopropyl.  You can go on and

09:42:35 14   on and on for alkyls.

09:42:38 15             And that keeps on going down as you go down this

09:42:41 16   list.  Each of these are catchall:  cyano, alkenyl, alkynyl.

09:42:46 17   This is sort of, I apologize, it's hard core chemistry

09:42:49 18   speak.  It's not the easiest thing to get out in the

09:42:52 19   morning.  But that is how we get to billions, because by the

09:42:56 20   time you go through these permutations and you mix and match

09:43:00 21   and you plug and play, you get an incredible number of

09:43:01 22   compounds.

09:43:02 23             THE COURT:  And not a single one that is

09:43:03 24   disclosed has flourine at the 2' down position.

09:43:08 25             MR. SHEAR:  Absolutely correct.  Not a single

one.  And, notably, I haven't heard any dispute of that.

They say maybe one of skill would reed it that way, but as

far as the actual disclosure of the specification, nowhere

is there a flourine at 2' down.

And, notably, if we stay on this slide for a

moment, the silence on this point is deafening to one of

skill in the art, and that is because of the way that

chemists view the world.  They have the periodic table of

elements.  And as we already talked about, we have the

halogens.  The periodic table is divided into columns, each

column lists elements that are in families, and the way it

is done that way, they have similar reactivities, they have

similar electron density structures.  So they are grouped

intentionally.

So one of skill in the art, seeing all of the

other halogens listed, for example, at $R^9$ which is 2' up, or

6, it's hard to read on this slide, which is 2' up, that is

what they would expect to see, all of the halogens listed.

So the fact that it's absent from 2' down speaks volumes to

one of skill in the art.

THE COURT:  What are the halogens?

MR. SHEAR:  Chlorine, bromine, flourine, iodine,

and astatine.  Please don't ask me to spell the last one.

THE COURT:  I won't.  And which are the three

that are called out and disclosed as being at the 2' down

09:44:39 1  position?

09:44:40 2          MR. SHEAR:  So it's chloro -- I'm sorry --

09:44:44 3  chlorine, bromine, iodine.

09:44:48 4          THE COURT:  And what is your view as to whether

09:44:50 5  astanine --

09:44:52 6          MR. SHEAR:  Astatine.

09:44:53 7          THE COURT:  Astatine -- don't ask me to

09:44:58 8  pronounce it.  That fifth halogen, is that within the scope

09:45:00 9  of their claim at the 2' down position or not?

09:45:03 10          MR. SHEAR:  It probably wouldn't be, Your Honor.

09:45:05 11  Or not probably, it wouldn't be.  We didn't focus on it

09:45:08 12  because it really isn't an issue between the parties.  They

09:45:11 13  make a big deal of the fact we're focusing on flourine.

09:45:16 14  We're trying to focus on the issues that matter in the case.

09:45:17 15          THE COURT:  But every bit of your analysis would

09:45:19 16  actually indicate this last fifth one that probably begins

09:45:22 17  with a A.  Is that fair?

09:45:23 18          MR. SHEAR:  Yes, fair enough.

09:45:24 19          THE COURT:  One that begins with an A would also

09:45:26 20  be disclaimed in your view?

09:45:28 21          MR. SHEAR:  Yes, Your Honor.  Excuse me.  And

09:45:30 22  astatine is a fairly rare halogen.  People generally refer

09:45:36 23  to the four common ones, which are the chlorine, bromide,

09:45:39 24  iodine, fluorine.  Those are the four main ones.  It's you

09:45:43 25  just don't see astatine that often.

09:45:45 1    And as we just pointed out, this exclusion runs

09:46:03 2  rampant throughout their specification.  So it doesn't

09:46:08 3  matter which compound you pick, which embodiment you pick.

09:46:15 4  There is no fluorene ever listed.  This is not a preferred

09:46:19 5  embodiment case, the family of cases that Idenix relies on,

09:46:22 6  because all of the embodiments in this context don't have

09:46:25 7  flourine.  The 2' down.

09:46:27 8    THE COURT:  And you just caught yourself.  And

09:46:29 9  I'm troubled by the use of the word "exclusion" in this

09:46:32 10 context, and your briefing frequently says they excluded

09:46:36 11 flourine.  The specification could not be clearer.

09:46:39 12    MR. SHEAR:  Yes.

09:46:39 13    THE COURT:  Those are not accurate statements,

09:46:41 14 are they?

09:46:41 15    MR. SHEAR:  That the specification couldn't be

09:46:43 16 clearer that they didn't include fluorine.

09:46:45 17    THE COURT:  Or that it is excluded.  It is

09:46:49 18 nowhere excluded, is it?

09:46:49 19    MR. SHEAR:  I think if you are looking for the

09:46:51 20 phrase "we exclude flourine," that is true, you are not

09:46:53 21 going to find it.  But I think, importantly, in the context

09:46:56 22 of this, to one of skill in the art, it is absolutely

09:47:00 23 excluded.  The only -- and, by the way, the only evidence

09:47:04 24 that we have on how one of skill in the art would read the

09:47:07 25 specification and look at these claims is the declaration

09:47:11 1    that Dr. Micklefield submitted.

09:47:12 2         Now, I disagree with all of the comments that

09:47:16 3    counsel made about how the process was done and what

09:47:19 4    Dr. Micklefield did, and to that extent, Your Honor, I

09:47:23 5    should address all of them.  But if you actually look at

09:47:25 6    what he testified to in his deposition, none of that is

09:47:27 7    supported by what he actually said, and what he actually

09:47:31 8    did.

09:47:32 9         What also sort of speaks volumes in this record,

09:47:36 10   Your Honor, is the fact that Idenix didn't bring their own

09:47:39 11   chemist to submit a declaration to review Dr. Micklefield.

09:47:44 12   His opinions stand uncontested and literately unrefuted by

09:47:50 13   anything other than attorney argument.  That is telling

09:47:52 14   because in this context, that is, as counsel has mentioned

09:47:55 15   and as Your Honor yourself picked up on earlier on, we have

09:48:00 16   been having this dispute globally.  This has been an ongoing

09:48:03 17   fight for years.

09:48:06 18        Idenix has had seven different chemists testify

09:48:08 19   on their behalf in various courts around the world.  They

09:48:12 20   didn't ask a single one of them to submit declaration to

09:48:14 21   support their construction, presumably because they wouldn't

09:48:17 22   agree with the constructions they're putting out.  I don't

09:48:19 23   know the reason they didn't ask them, but they certainly

09:48:22 24   have a stable of chemists they could have drawn upon.

09:48:24 25        THE COURT:  Can you prevail in your disclaimer

09:48:28  1    argument without me considering any extrinsic evidence?

09:48:30  2         MR. SHEAR:  Yes, I believe we can.  I believe

09:48:32  3    looking at the specification just based on the intrinsic

09:48:35  4    fact that flourine was mentioned 332 times but never at 2'

09:48:41  5    down is dispositive.

09:48:50  6         And as we, as I just noted, flourine is never

09:48:58  7    listed at the 2' down.  Idenix is hoping to achieve through

09:49:03  8    claim construction a modification that they never disclosed,

09:49:05  9    that they never claimed, and, in fact, one that was never

09:49:09 10    considered by the Examiner or the PTO and that specific

09:49:12 11    modification which is the subject of their later

09:49:16 12    application, the '600 patent.

09:49:18 13         I'm going to come to that in a second, but I do

09:49:20 14    want to make sure that I do comment on their argument that

09:49:23 15    the core of the invention is two nonhydrogen substituents at

09:49:29 16    the 2' position.  We agree that is what they said at the

09:49:34 17    Patent Office.  We agree that that is a limitation of the

09:49:36 18    term.  We agree to include it in the term that was given to

09:49:40 19    Your Honor.

09:49:41 20         What we don't agree with is the idea that just

09:49:44 21    because they said that, it then opens up the possibility

09:49:49 22    that anything could be at 2'.  We actually don't think our

09:49:53 23    construction is inconsistent with this in any way.  It says,

09:49:57 24    two nonhydrogen substituents.  The specification makes it

09:50:00 25    clear one of those is flourine.  They could have a bunch of

09:50:03 1  other things that aren't hydrogen.  But, actually, our

09:50:06 2  view is our construction is entirely consistent with this

09:50:09 3  disclosure they made during prosecution.

09:50:11 4       THE COURT:  But flourine is a nonhydrogen

09:50:14 5  substituent; correct?

09:50:15 6       MR. SHEAR:  It is.  It is.  That is why when you

09:50:18 7  asked me before if I agreed that normally flourine would be

09:50:21 8  within the plain and ordinary meaning of this term as it is

09:50:25 9  laid out, I agree that that would be true.  But based upon

09:50:30 10 this specification, it's not part of that universe of

09:50:35 11 potential modification.

09:50:36 12      THE COURT:  But there is nothing about this

09:50:37 13 portion that we're looking at that disclaims flourine from

09:50:44 14 the plain and ordinary meaning.  That is, flourine is a

09:50:47 15 nonhydrogen substituent; correct?

09:50:50 16      MR. SHEAR:  That is exactly right.

09:51:07 17      I did want to comment, Your Honor.  You asked at

09:51:09 18 the outset if there was relevance to the fact that we had

09:51:13 19 won everywhere around the world with respect to the '600

09:51:18 20 patent and specifically with respect to whether or not

09:51:21 21 Idenix has been able to make a 2'-fluoro or specifically

09:51:26 22 whether or not the specifications of those patents taught

09:51:28 23 those of skill how to make a 2'-methyl fluoro.  And the

09:51:32 24 courts that have all looked at the merits have all agreed,

09:51:37 25 they have all come out the same way.

What is important, because you asked what this is relevant to, it's relevant to a myriad of things.

One, it is relevant to the idea that they didn't possess the invention that they now claim is part of the '054 and '597 patents.

Two, it actually shows or makes it more likely, rather, that they really did mean to disclaim the 2'-fluoro aspect for the '054 patent.

One thing, if Your Honor should ever take the time to look at these decisions, one thing you will see throughout is that there is something unique about flourine at this 2' position when you have a methyl at the up position. It is incredibly difficult to make. And that is the fundamental underlying basis between all of these decisions, making a 2'-fluoro methyl compound is incredibly difficult to do. And, in fact, Idenix tried for years and wasn't able to. So that has been the basis of all of these decisions, and we contend that actually makes it far more likely that they intended to exclude fluorine from the '054 and '597.

But it also goes to one other thing which is their motive for seeking the construction that they're seeking. Because the '600 patent, which everyone acknowledges discloses or at least lists as a possibility flourine at the 2' down position, because that patent has been repeatedly invalidated, they're stretching the '054 and '597 beyond the scope that

09:53:08 1  those patents were intended to cover in an effort to have a

09:53:12 2  claim against us.

09:53:15 3          THE COURT:  Now, all of that is extrinsic

09:53:17 4  evidence.

09:53:18 5          MR. SHEAR:  It is all extrinsic evidence, Your

09:53:19 6  Honor.  That is exactly right.

09:53:21 7          THE COURT:  So your view is you don't need it

09:53:23 8  for claim construction today.

09:53:24 9          MR. SHEAR:  We don't need it but, generally

09:53:26 10 speaking, we think it is informative.

09:53:27 11         THE COURT:  What about the plaintiff cites the

09:53:33 12 case, I think *Hill-Rom*, suggesting that enablement, written

09:53:38 13 description issues are not relevant to claim construction.

09:53:43 14         MR. SHEAR:  Generally speaking, that is correct.

09:53:45 15 There are portions that you are generally supposed to

09:53:47 16 construe claims in a way that preserves their validity.  And

09:53:50 17 we, of course, will get to enablement and written

09:53:53 18 description later.

09:53:54 19         My response would be if you look at the *Wang*

09:53:57 20 case that we rely on.  One of the reasons that the Court

09:53:59 21 construed the term that the way it did was because the Wang

09:54:06 22 inventors didn't have possession of the alternative

09:54:07 23 embodiment that was being discussed.  It was graphic-based

09:54:12 24 protocol versus bit-map protocol, and the inventors couldn't

09:54:15 25 make the bit map side of it, so the Court limited it to

graphic-based protocol.

THE COURT: And that extrinsic evidence was in front of the court at the *Markman*.

MR. SHEAR: It was, apparently. It was in the decision so I'm guessing it must have been.

I do want to spend a moment, Your Honor, on what we think is fairly compelling evidence of Idenix's view of what the '054 patent covered before this litigation happened outside of the context of this dispute.

Counsel mentioned the '868 application which is in the same family as the '600 patent and I think actually is before Your Honor as part of one of the appeals that is coming up from the interference route. It is not subject to hearing today.

During prosecution, Idenix had presented claim 44. And claim 44 listed the halogens: flourine, chlorine, bromide, iodine specifically at the 2' down position.

The Examiner rejected claim 44 as anticipated by the '054 patent. And what is telling is the response. They say claim 44 stands rejected under 102(e) as allegedly anticipated by the '054 patent. The Office Action alleges that 2' bromo substituted compound -- in other words, bromo is the modification we're talking about -- disclosed a site and falls within the scope of the above-listed claims of this application. And then they say: Importantly, this

09:55:53 1   rejection is now moot. $R^{7'}$ which is $2'$ down, has been

09:55:58 2   amended to recite flourine.

09:55:59 3          In other words, to avoid the prior art, the

09:56:02 4   '054 patent, they made $2'$ down flourine. Had fluorene been

09:56:09 5   disclosed in the '054 application, this amendment wouldn't

09:56:12 6   have changed anything. It would not have rendered the later

09:56:16 7   application of the patent.

09:56:21 8          THE COURT: Now that it is conceded that

09:56:24 9   flourine at the $2'$ down is not disclosed in the '054 patent,

09:56:29 10   this is just further evidence of that, but that is now an

09:56:31 11   undisputed fact in front of me. Correct?

09:56:34 12          MR. SHEAR: I think it is undisputed. Yes, it

09:56:36 13   is an undisputed fact in front of you. I would agree with

09:56:39 14   that. And I think this is further evidence of that. But I

09:56:42 15   think it is also further evidence of the fact that one of

09:56:44 16   skill in the art would not read the '054 specification and

09:56:48 17   think flourine was there.

09:56:50 18          THE COURT: Would one of skill in the art be

09:56:52 19   expected to understand the legal distinction between

09:56:54 20   disclosure and claiming?

09:56:56 21          MR. SHEAR: I don't think so. I think one

09:56:59 22   of skill in the art would be understood to understand the

09:57:03 23   scientific teachings and not necessarily the difference

09:57:06 24   between the two concepts.

09:57:08 25          THE COURT: What do you say to the argument that

09:57:09 1  plaintiff is now making, that, yes, fair enough.  We didn't

09:57:13 2  disclose flourine but we did claim it.  What do you say to

09:57:22 3  that?

09:57:22 4       MR. SHEAR:  I think you have to provide

09:57:27 5  adequate support for that which you claim.  You have to have

09:57:30 6  possession of it.  You have to enable it.  You have to be

09:57:33 7  written description, all of the 112 requirements that are

09:57:36 8  there.

09:57:37 9       The claims cannot be broader in scope than the

09:57:39 10  specification as read by one of skill in the art.  If one

09:57:42 11  of skill in the art reads the '054 patent to not include

09:57:46 12  flourine, then the claim shouldn't be allowed to include it

09:57:49 13  by way of using broader language.

09:57:58 14       Oh, I did want to mention, Your Honor, counsel

09:58:03 15  pointed to, handed up the *Integra* case on this point to

09:58:09 16  argue that it isn't relevant.  And I would just direct Your

09:58:13 17  Honor to page 869.  So it's 331 F.3d 869.

09:58:20 18       Specifically at the top of what would be 869

09:58:26 19  is a quote from what the applicant actually said during

09:58:34 20  prosecution.  And specifically what they said is that:  "As

09:58:38 21  a result, one of skill in the art would not immediately

09:58:41 22  envision the claimed peptide because of the very large

09:58:43 23  number of peptides encompassed by the generic teaching of

09:58:47 24  this reference."

09:58:47 25       In other words, the prior art was a generic

09:58:49 1   teaching.  The '054 patent and 597 patents, they're not

09:58:53 2   generic teachings.  They are very precise teachings of how

09:58:56 3   you can modify nucleosides.  This is not a genus species

09:59:02 4   world.  The specification is both the '600 and the '054

09:59:09 5   encompass billions of compounds, billions of potential

09:59:10 6   modifications that can be made to nucleosides.  One is not a

09:59:15 7   genus versus the species.  Therefore, I don't think that, it

09:59:16 8   is argued that mercury in *Integra* is not applicable.

09:59:26 9          And then, Your Honor, if I could just go to

09:59:40 10  Dr. Micklefield to conclude.

09:59:44 11         Dr. Micklefield, the only person of skill to

09:59:48 12  offer any evidence in this case, specifically testified that

09:59:52 13  skilled artisans reviewing the specification of the '054

09:59:56 14  patent would conclude that "2'-C-branched pyrimidine

10:00:03 15  nucleoside" excludes flourine at the 2' down position.  It

10:00:03 16  just simply isn't there.

10:00:04 17         And you can see from the left-hand side, when

10:00:07 18  he was deposed on this, those are the cites to where he was

10:00:10 19  deposed in his deposition.  They spent a lot of time on this

10:00:14 20  point, they knew they had no contrary evidence, and they

10:00:17 21  were unable to move him off of his position at all.

10:00:23 22         Idenix provide no contrary evidence, they don't

10:00:26 23  contest the substance of his testimony, and they don't have

10:00:30 24  an expert of their own either.

10:00:32 25         Unless Your Honor had any specific questions.

THE COURT:  I do have some more questions.

MR. SHEAR:  Okay.

THE COURT:  When I look at his deposition transcript, will I find that in terms of process, the process essentially was you all told him the conclusion as opposed to handing him the intrinsic evidence and saying tell me what your conclusion is?

MR. SHEAR:  No.  What will you find when you read his deposition is that Dr. Micklefield testified that he read each of the patents-in-suit four or five times over. He looked at the prosecution histories.  He met with myself, he met with Ms. Francis multiple times, told us what his conclusions were, and then asked Ms. Francis to do a first draft of his report, which he then edited extensively.  That is all in the deposition record.

There are, if you look at the section, probably 20 questions back and forth to finally get Dr. Micklefield to get a clean one word answer where they said:  Isn't it true Fish did the first draft?  He said -- finally he just says "yes," after having repeated the process over and over, and explained how it was done.

So this is not a situation where we spoon fed him anything.  These are his opinions after his own review of the intrinsic record and the extrinsic record.

THE COURT:  So I think you have already agreed

10:01:49  1    this is not an express disclaimer case.  Correct?

10:01:53  2              MR. SHEAR:  I would agree with that, although I

10:01:55  3    would say this comes close.

10:01:56  4              THE COURT:  Do you agree that even an implicit

10:01:59  5    disclaimer has to be clear and unmistakable?

10:02:07  6              MR. SHEAR:  That is an interesting question

10:02:08  7    because usually that language is tied to explicit statements.

10:02:11  8    So I think it is fair to say that -- I think it would be fair

10:02:15  9    to say that an implicit disclaimer would have to be clear

10:02:18 10    and unmistakable to one of skill in the art reading the

10:02:21 11    specification.  They would have to see it.  They would have

10:02:23 12    to know it is there.

10:02:25 13              THE COURT:  Do you agree that the law does not

10:02:27 14    require disclosure of every specific embodiment?

10:02:31 15              MR. SHEAR:  I agree with certain inventions that

10:02:34 16    that is absolutely the case.  You wouldn't need to disclose

10:02:36 17    every specific embodiment.

10:02:38 18              In this context, when we're talking about

10:02:41 19    modified nucleosides and the invention is the modification

10:02:45 20    of natural nucleosides, I think you have to disclose the

10:02:48 21    modifications that you intending to make.

10:02:50 22              Now, with the caveat that remember when we were

10:02:53 23    talking before how we got to the billions of numbers?  There

10:02:57 24    are ways that patent prosecutors typically use chemistry

10:03:01 25    braises to encompass what is specifically there.  So they

1  will say alkyl, for example, that will include dozens and

2  dozens and dozens of compounds that maybe aren't explicitly

3  disclosed but are there because they fall into the broad

4  family.  So that would be the way in which one would modify

5  a nucleoside.

6          THE COURT:  So here, had the patent prosecutor

7  said halogen --

8          MR. SHEAR:  Yes, exactly right.

9          THE COURT:  -- that would include all five

10 halogens.

11         MR. SHEAR:  That is exactly right.

12         THE COURT:  But you say there is nowhere

13 disclosed all five halogens or even just the phrase halogen

14 group for the 2' down position.

15         MR. SHEAR:  Exactly.  And, notably, they do say

16 halogens in the patent, just never, they don't say halogens

17 in reference to the 2' down.

18         THE COURT:  Just like they say flourine

19 elsewhere.

20         MR. SHEAR:  Right.  Precisely right.

21         THE COURT:  And, finally, on the prosecution

22 history point, you may have responded to the plaintiffs'

23 argument, but if so, I want to make sure I understand it.

24 Do you agree they had an opportunity at a certain point in

25 the prosecution to very simply overcome I think it was a

10:04:06 1  rejection by saying flourine is not within the scope of our

10:04:09 2  claims, and they passed on that?

10:04:11 3  MR. SHEAR:  A qualified yes.  Qualified, and

10:04:16 4  I think the portion Your Honor is referring to is the

10:04:19 5  rejection over the Schinazi application where they didn't

10:04:24 6  distinguish based on fluoro.

10:04:24 7  That application, if I'm remembering it

10:04:27 8  correctly, is 2'-fluoro up, not 2'-fluoro down, and my team

10:04:27 9  will tell me if I have got it wrong.  And they are all

10:04:36 10  shaking their heads, so I've got it right.  So Schinazi is

10:04:37 11  2'-fluoro up.

10:04:38 12  So, of course, they wouldn't have said, well,

10:04:41 13  we're different because we have 2'-fluoro down because that

10:04:41 14  literally wasn't the subject at issue.  The difference was

10:04:43 15  the methyl versus the fluoro at the 2' up position.

10:04:47 16  THE COURT:  Okay.  That answers my questions.

10:04:49 17  Thank you.

10:04:49 18  MR. SHEAR:  Thank you, Your Honor.

10:04:49 19  THE COURT:  You will have a chance on rebuttal,

10:04:51 20  if you wish.  We'll go back to the plaintiff.

10:05:06 21  MR. GRIFFITH:  I'll try to keep my points, Your

10:05:11 22  Honor, to a minimum.

10:05:12 23  First, on one of your last questions, one of

10:05:15 24  Your Honor's last questions, you asked whether implied

10:05:20 25  disclaimers must be clear and unmistakable like an express

disclaimer?

The answer is yes.  The answer is in *Thorner*.
In *Thorner*, they said:  But the implied redefinition must be
so clear that equates to an explicit one.

So that's -- I'm not going to have a pin cite --
at page 1368 of *Thorner*.

It would seem to be illogical to require "clear
and unmistakable" for express but not for implicit.  It
would seem, if anything, implicit should have to be stronger
because it is not explicit.

Listening to Mr. Shear's presentation, I guess I
couldn't help but think under what circumstances would they
say that the claim is, in this case, not limited to the
disclosed embodiments?  And, in fact, Your Honor asked are
you limiting the claims to, or, you know, do you agree that
claims can't cover more than disclosed embodiments?  And
Mr. Shear's answer was in some circumstances.

Well, in most circumstances, that is usually the
case.  There are circumstances where you have a disclaimer
or a lexicographer situation, but the ordinary situation is
the claims are not limited to the disclosed embodiments.

THE COURT:  But why should that ordinary case
apply here?  We're talking about these complex modifications
of nucleosides.  Shouldn't you have to tell us where the
modifications are, what the modifications are, how you are

going to do it?

MR. GRIFFITH: No. That's the point of this invention. And they said what the core of the invention was, was to have this di-substituted 2' position. That has real value. So, for example, you put a methyl at that 2' position and another non-hydrogen substituent there. That is what they do.

They found out about that C-branch, that methyl group that 2' position from Idenix. They actually found out about it before it was public information, and they used that confidential information to their benefit way back when.

We showed the Schinazi patent, and that just had one substituent, flourine, at the 2' position, it didn't have two. It wasn't di-substituted. They got that idea from Idenix. That idea has real value. It is a powerful idea.

Mr. Shear said we failed; and we have done anything but failed. True, Idenix is behind them in the FDA process so our drugs have not been approved yet.

They, like us, had an OH down version of a drug. That ran into approval problems not because of our clinical trials in which lives were saved, and those people will not call this invention a failure, but because of another company that had issues with a drug that had OH down at that position.

There are other compounds that are C-branched

10:08:36 1  and non-hydrogen substituted at the 2' position that are in

10:08:40 2  the works, both companies.  They're great drugs.  They're

10:08:43 3  coming along.  They will save lives.  It's a powerful

10:08:47 4  invention.

10:08:48 5          They took that idea from Idenix.  And that is

10:08:51 6  what these patents, the '597 and '054, are claiming in no

10:08:57 7  uncertain terms.  That is what they told the Examiner.

10:08:59 8          Your Honor asked if that Schinazi patent

10:09:03 9  encompassed flourine down at the 2' position.  Answer:  Yes.

10:09:05 10 It was up or down.  It was express about that.

10:09:11 11         Quickly on Dr. Micklefield.  Look, expert evidence

10:09:16 12 isn't the most powerful evidence on claim construction.  The

10:09:19 13 primary thing is the intrinsic record, and the intrinsic

10:09:23 14 record here is quite clear.

10:09:25 15         And I wrote this down.  Gilead's counsel said on

10:09:30 16 this flourine down, the silence was deafening.

10:09:33 17         Well, then why did you tell Dr. Micklefield

10:09:37 18 about that silence, that allegedly deafening silence before

10:09:42 19 he could see it himself?

10:09:44 20         And in his testimony:  Before you came up with

10:09:49 21 your opinion, were you given a list of claim terms?  Were

10:09:52 22 you given a list of constructions?

10:09:53 23         Yes, proposed constructions.

10:09:56 24         So he is sitting there with their construction

10:09:58 25 saying, excludes flourine.  He knew.  That was before he did

10:10:02 1  any of his opinions.  They spoon fed him those things.  They

10:10:07 2  wrote his declaration.

10:10:08 3          Look, I'm not saying they don't --

10:10:09 4          THE COURT:  Hold on.

10:10:10 5          MR. GRIFFITH:  -- one can help but --

10:10:12 6          THE COURT:  Hold on.  You have got to let me

10:10:14 7  talk.

10:10:14 8          Regardless of how weak Dr. Micklefield may be,

10:10:17 9  I don't have any contrary expert testimony in front of me;

10:10:20 10 correct?

10:10:21 11         MR. GRIFFITH:  That's correct, Your Honor.  I

10:10:23 12 mean, yes, that's correct.

10:10:23 13         THE COURT:  So --

10:10:24 14         MR. GRIFFITH:  That's correct.  We didn't --

10:10:25 15         THE COURT:  Yes, you are going to have to stop

10:10:27 16 when I speak.  I'll give you plenty of time.

10:10:31 17         So here I'm being asked -- I'm not one of

10:10:33 18 ordinary skill in the art.  I am being asked to look at

10:10:36 19 these formulas and this complex patent, a patent that 332

10:10:42 20 times mentioned flourine but never once by your own

10:10:45 21 concession discloses using flourine at the 2' down position.

10:10:49 22 I'm being asked to make a decision what one of ordinary

10:10:52 23 skill in the art would read looking at that.  I only have

10:10:56 24 one person of ordinary skill in the art in the record and he

10:10:58 25 says, weak or not, he says one of ordinary skill in the art

10:11:04 1  would not think that flourine is in the 2' down position.

10:11:09 2          Why isn't that the end of the story in this case?

10:11:12 3          MR. GRIFFITH:  Because *Phillips* tells us and the

10:11:14 4  Federal Circuit has repeatedly told us, not just in *Phillips*

10:11:18 5  but in many other cases, that the extrinsic evidence is

10:11:22 6  far less important than the intrinsic record and expert

10:11:24 7  testimony is particularly down on the list.  It's not that --

10:11:29 8          THE COURT:  And that is all generally true, of

10:11:34 9  course, but this is a patent that has, by your own admission,

10:11:37 10 no disclosure of the embodiment that you're asking me to read

10:11:42 11 into your claims.  Correct?

10:11:43 12         MR. GRIFFITH:  Correct.  That is to say, it

10:11:49 13 doesn't disclose flourine at the 2' down position.  And,

10:11:53 14 look, that is always the case with the patent.  That there

10:12:00 15 are undisclosed embodiments.  There is never a case where

10:12:03 16 that isn't happening.  There are limits to the capabilities

10:12:09 17 of a patent draftsman or draftswoman, and you just can't

10:12:14 18 disclose every possible embodiment that there is.  And all

10:12:16 19 these disclaimer cases, that was never enough, the mere fact

10:12:21 20 that's an embodiment.  The *Thorner* case, I didn't hear any

10:12:25 21 distinction of the *Thorner* case.  It was repeatedly, a

10:12:29 22 particular way of doing something was repeatedly disclosed,

10:12:32 23 various embodiments with that same way of doing it.  It was

10:12:36 24 never disclosed the other way.  And yet the Court said,

10:12:38 25 look, just because you say "repeatedly," that doesn't rise

10:12:41 1  to a level of a disclaimer.

10:12:42 2  So you don't get there by just having an expert

10:12:47 3  saying, okay, I'll endorse it now, and that makes it a

10:12:53 4  disclaimer. We just don't have the fact pattern here that

10:12:58 5  fits into any one of these disclaimer cases. They always

10:13:03 6  involve criticism, or possibly a characterization of a

10:13:07 7  particular embodiment as the invention. We don't have that.

10:13:11 8  So, instead, they had to get Dr. Micklefield to come in and

10:13:17 9  say I find it. Well, the intrinsic record trumps in that

10:13:21 10 our view, Your Honor.

10:13:21 11 THE COURT: I don't imagine that the motivation

10:13:23 12 for either side is relevant, but it has been suggested that

10:13:27 13 you have retained experts around the world, and any one of

10:13:31 14 them could easily have been asked to opine in this matter

10:13:36 15 whether flourine is within the scope of what one of ordinary

10:13:39 16 skill in the art would think was present at the 2' down

10:13:44 17 position, and you didn't do that.

10:13:46 18 Do you want to respond to the suggestion that

10:13:48 19 none of them would have helped you?

10:13:50 20 MR. GRIFFITH: Yes. Your Honor. I think the

10:13:52 21 intrinsic record is more important. It is as simple as that.

10:13:57 22 I have argued in this court and in others constructions of

10:14:00 23 claim terms and foregone expert testimony when the other side

10:14:04 24 used it. And I just don't think, just because they went out

10:14:08 25 and got expert testimony, we needed to do that.

10:14:11 1          Could we have done it?  Sure, we could have

10:14:16 2     done it.  But under *Phillips*, it has minimal value.  I just

10:14:19 3     don't see on this record that they get to the level of a

10:14:22 4     disclaimer.  And I don't think a battle of the experts is

10:14:25 5     going to change that.

10:14:27 6          I mean they haven't agreed with anything our

10:14:34 7     experts have said worldwide, and now they're hypothesizing

10:14:40 8     no expert would possibly agree with this position.  I just

10:14:44 9     don't think that is the case.  I don't think that the

10:14:46 10    inference could be drawn, that they asked this Court to

10:14:51 11    draw, particularly when you look at how Dr. Micklefield's

10:14:54 12    declaration itself was prepared.  They kept his hands tied

10:14:59 13    and didn't give him free rein.

10:15:02 14         Look, Gilead's counsel mentioned any number of

10:15:07 15    times their motive is to cover the accused product.  This

10:15:12 16    the debate we have here is whether the claim covers the

10:15:16 17    accused product.

10:15:17 18         They want the claim not to cover the accused

10:15:20 19    product.  So I'm not surprised that their making the

10:15:24 20    arguments they're making, but I don't think the fact that

10:15:29 21    our view is that the claim covers the accused product

10:15:31 22    somehow impeaches.  Particularly when you look at our

10:15:40 23    construction, you look at that prosecution history, we're

10:15:43 24    tracking that prosecution history.  The addendum here is

10:15:47 25    something that did not occur, was not said in the intrinsic

10:15:50 1    record.

10:15:50 2         On this '868 patent in the *Integra* case, I

10:15:58 3    didn't hear any distinction of that.  The later patent had a

10:16:02 4    species within the scope of the earlier genus.  We have

10:16:05 5    never said in the prosecution that the claims of the '054

10:16:11 6    patent don't cover that.  It is simply -- and we didn't even

10:16:15 7    say the flourine is not disclosed at the 2' down position.

10:16:21 8    It could be inferred from what we did, I acknowledge that,

10:16:24 9    and, look, we have said here that there is no example

10:16:29 10    with flourine at the 2' down position.  That is a totally

10:16:33 11    different question from whether the claim covers it.  That

10:16:36 12    was not at issue here.

10:16:37 13         And, Your Honor, it was a pure 102 issue, not a

10:16:41 14    103 issue.  In other words, obviousness was not analyzed

10:16:48 15    there because of the ownership of the applications that did

10:16:52 16    not have to be considered.  It was purely this specific

10:16:58 17    species actually disclosed in that specification.  Not is it

10:17:03 18    covered by the claims, not would it be obvious from, not is

10:17:07 19    it encompassed by the concepts there.  None of those latter

10:17:10 20    issues were at issue in that discussion.

10:17:12 21         Finally, Your Honor, on enablement.  I repeat,

10:17:18 22    and I didn't hear any contradiction of this, no witness has

10:17:21 23    ever said that the '054 and '597 patents are invalid for

10:17:26 24    lack of enablement.  They're saying that all the stuff about

10:17:29 25    the '600 patent applies to these things and is wrong.  You

10:17:33 1    have to analyze these patents on their specifications on

10:17:37 2    their claims and are they enabled for the breadth of their

10:17:42 3    claims at the time of filing of these things.  That is the

10:17:45 4    issue.  Nobody has analyzed that.  It is just not in this

10:17:50 5    record.  Dr. Micklefield didn't do that.  That is all

10:17:53 6    attorney argument.

10:17:53 7            So enablement is, as I said earlier, that is for

10:17:57 8    another day.  That is not for today.

10:18:03 9            THE COURT:  I take as true that the halogen

10:18:05 10   group is five and not six?

10:18:08 11           MR. GRIFFITH:  I had it down as six, Your Honor.

10:18:13 12   But ...

10:18:14 13           THE COURT:  Do you know if there is any evidence

10:18:16 14   in the record on that point?

10:18:18 15           MR. GRIFFITH:  I think the periodic chart is in

10:18:20 16   there, is in the record.  So ...

10:18:24 17           THE COURT:  Does it help, or respond now to the

10:18:30 18   defendants saying, in their view, this fifth halogen is also

10:18:38 19   excluded.  You would attack them for being so focused on

10:18:41 20   flourine.  They now say of course the fifth one is excluded

10:18:46 21   as well.  They just don't care.

10:18:48 22           MR. GRIFFITH:  Yes.  So I mean what is coming

10:18:51 23   out, Your Honor, is that their view is if there is no

10:18:55 24   specific embodiment disclosed in the spec, it's not covered.

10:18:58 25   They are simply saying these claims are limited to what is

disclosed in the spec.  And that illustrates that their

assertion on that, I mean just on the spot, illustrates that

they're just saying if that specific embodiment is not

disclosed in the spec, it's not covered.  That is not

consistent with *GE Lighting* and the other cases we cited.

And, Your Honor, I go to their definition in this

regard:  The ß-D-pyrimidine nucleoside with two nonhydrogen

substituents at the 2' position, at least one which is

connected at the 2' position through a carbon-to-carbon bond,

and no flourine at the 2' down position.

Well, now what we're finding out is what they

actually -- the way they actually construe it is not only

no flourine at the 2' down position but not any other

nonhydrogen substituent that wasn't specifically mentioned

as being at the 2' down position.

THE COURT:  Well, at least not any halogen that

wasn't disclosed.

MR. GRIFFITH:  I can't find a principal basis on

which they would say any other undisclosed example is within

the scope of the claim.  I mean I just can't see any

principal basis for that.

THE COURT:  Is there anything else?

MR. GRIFFITH:  That's all, Your Honor.

THE COURT:  Thank you.  Is there any rebuttal

from defendants?

10:20:29 1          MR. SHEAR:  Two very quick points, Your Honor.

10:20:37 2          On the last point, whether halogen is five or

10:20:41 3   six halogens, it's actually rather easily solved by the

10:20:46 4   patent.  It's a defined term.

10:20:48 5          So at column 37, line 51.  It says:  The term

10:20:52 6   halo as used herein includes fluoro, bromo, iodo, and

10:20:58 7   fluoro.  So that is one, two, three, four.  And it excludes

10:21:02 8   the astatine, the one I said was the rare halogen that has

10:21:09 9   often been cited to.  And on slide 11 of our technology is

10:21:14 10  the periodic table that has the halogens highlighted.

10:21:17 11         The last point is not one of claim construction

10:21:19 12  but I didn't want Your Honor to leave thinking it was not

10:21:23 13  contested.

10:21:24 14         Mr. Griffith started his rebuttal by saying that

10:21:27 15  we took the 2'-methyl up from that.  That obviously is hotly

10:21:33 16  contested, should this make it to trial.  That will be hotly

10:21:38 17  contested, should they make that argument.

10:21:39 18         THE COURT:  Going back to the claim construction

10:21:42 19  point.

10:21:42 20         MR. SHEAR:  Yes.

10:21:42 21         THE COURT:  They are correct, aren't they, that

10:21:49 22  you are excluding any of these nonhydrogen substituents

10:21:56 23  other than the three halo group that are specifically called

10:22:00 24  out at the 2' down position?

10:22:03 25         MR. SHEAR:  I think --

10:22:04 1                THE COURT: You don't care about any of them but

10:22:07 2  fluorine, fair enough.

10:22:08 3                MR. SHEAR: Fair enough.

10:22:10 4                THE COURT: But if we had reason to care and I

10:22:11 5  pushed you, you would say they're all excluded; correct?

10:22:14 6                MR. SHEAR: Unfortunately, I should say I

10:22:16 7  probably would. I think it would depend on the context

10:22:20 8  on what wasn't listed and what, how one of skill would

10:22:23 9  interpret it.

10:22:24 10             This is a pretty blatant situation because we're

10:22:28 11  talking about a very small family life of well recognized

10:22:30 12  elements that are always listed together, and this one time

10:22:33 13  it's not.

10:22:34 14             So I think the answer to your question

10:22:37 15  unfortunately is probably yes. It would just depend on what

10:22:40 16  the element is that we were talking about.

10:22:41 17                THE COURT: Okay.

10:22:43 18                MR. SHEAR: Thank you, Your Honor.

10:22:44 19                THE COURT: Thank you. Let's move on to the

10:22:46 20  next one.

10:22:53 21             MR. GRIFFITH: Your Honor, in connection with

10:23:08 22  this next term, I have an exhibit to hand up to the Court.

10:23:11 23  And I alerted opposing counsel to this last week.

10:23:15 24                THE COURT: Okay.

10:23:18 25             MR. GRIFFITH: It's a confidential document.

10:23:19 1   It's from Gilead's files, and they have designated it as a

10:23:23 2   confidential.  I don't intend to describe any of the details

10:23:26 3   of any molecules disclosed here, but it is a confidential

10:23:30 4   document.  So I would ask that it be treated as such because

10:23:35 5   that is the way they designated it.  It would be Exhibit 26.

10:23:38 6          THE COURT:  Okay.  Thank you.  Is there any

10:23:40 7   objection?

10:23:40 8          MR. SHEAR:  No, Your Honor.  Based upon who I

10:23:43 9   see in the courtroom, I don't any problem if Mr. Griffith

10:23:45 10  wants to go into details of the document.

10:23:48 11         MR. GRIFFITH:  Thank you.

10:23:48 12         MR. SHEAR:  I certainly intend to.

10:23:50 13         THE COURT:  Okay.  Fine.  Thank you.

10:23:57 14         MR. GRIFFITH:  So, Your Honor, the next term is

10:23:59 15  "ß-D-2-C-branched pyrimidine ribonucleoside."

10:24:04 16         So we were making progress.  We are getting four

10:24:07 17  more letters done.

10:24:10 18         Let's start with the parties' constructions.

10:24:20 19         They don't match up quite as nicely as they did

10:24:23 20  on the last one, but I think nonetheless that substantively

10:24:28 21  the real difference that we're talking about here is whether

10:24:32 22  the claim requires that the nonhydrogen substituents at the

10:24:39 23  2' position and the 3' position -- or let me rephrase that --

10:24:44 24  whether the claim requires hydroxyl groups at those

10:24:48 25  positions or does it more broadly encompass any nonhydrogen

10:24:53 1    substituents at those two positions.

10:24:55 2            Gilead says they have to be hydroxyl groups, OH

10:24:58 3    groups; and to the extent the Court disagrees, in any event,

10:25:03 4    it excludes fluorine down.  I believe the argument on

10:25:08 5    flourine down, we covered that.  It's all the same for

10:25:08 6    this, so I'm not going to talk about that aspect in this

10:25:11 7    presentation.

10:25:12 8            And as I said, Idenix contends that the claim

10:25:17 9    covers any nonhydrogen substituents at the 2' and 3' down

10:25:22 10   positions.

10:25:25 11           So starting with the intrinsic record, and

10:25:33 12   specifically starting with the claims, we see that when the

10:25:35 13   applicant wanted to limit a compound to OH at the 2' and 3'

10:25:40 14   down positions, they knew how to do so and they did that.

10:25:43 15           So this is in claim 1 of the '054 patent.  And

10:25:49 16   claims 1 through 24 all specifically state having an OH

10:25:54 17   at the 2' and 3' down.  So the fact that claims 1 to 24

10:25:59 18   expressly require OH at those positions and claim 26 does

10:26:04 19   not is strong evidence that claim 26 is not so limited.  And

10:26:09 20   this ribonucleotide is in claim 26.

10:26:20 21           Sticking with the specification and the

10:26:22 22   intrinsic record, there are lots and lots of examples of a

10:26:27 23   specification having substituents other than OH at the 2'

10:26:33 24   and 3' down position.

10:26:37 25           Column 47 is one particularly notable one these

other ones apply to.  But in column 47, we see that when the

specification uses the almost identical term in dispute,

2'-C-branched nucleosides, it does so without limiting that

term to OH at the 2' and 3' down positions.

So going back to our position, "ribonucleoside"

means modified ribonucleoside in these patents.  The

abstract refers to the invention being directed to modified

nucleosides, and it's understood that you are going to have

modifications to the substituents.  That's the whole point.

This broad term, "ribonucleoside," this shows

when they say ribonucleosides, they don't necessarily mean

to limit it to OH at 2' and 3' down.  That is column 47.

There are other examples of that in the briefs

that we cited to.  I don't think we need to go through those

separately.

I'm not going dwell on the prosecution history,

Your Honor, but I would note that again the characterization

of the core of the invention as being di-substitution at

the 2' position expresses no intent to limit the 2' and 3'

positions to OH.  And this argument, this point was made at

the time that the amendment adding claim 26 was submitted to

the Patent Office.  Elsewhere in the prosecution history, we

see the same thing.

And this, here is the point here is that when

claim 26 was added, support for that amendment was at column

47.  They cited to column 47 for support for that.  So that shows that they were again thinking broadly in terms of the substitutions that you could have at 2' and 3' down.

Your Honor, I'd like to point out that Gilead's own, or Gilead's plain and ordinary meaning they assert in this case is consistent with their own term "ribonucleoside" and this document we handed up as Exhibit 26.

This document is from April of 2000, so the priority document for these patents was I believe found in May of 2000.  It was right around the relevant time frame.  And on page 1, you can see that the document refers to the selection of ribonucleosides from here our existing compound library.  It talks about the design and synthesis of new ribonucleosides.

And then on page -- and there are lots of pages that could be looked at to illustrate this point, but I think a particularly useful one is page 955734.  So it begins at 734, the Bates number.

The heading on this page states Ribonucleoside Candidates For HCV Studies.  And it has got a formula there, and it sets out a lot of options that you can have at R and Y, which are the 2' and 3' down positions, not limited to OH.  And notably, at that 2' position, there is no di-substitution, I would point out there.  That is something that they came on to later.

10:30:31 1    But this shows that the term "ribonucleoside"

10:30:35 2  is used by folks working in this field, persons of skill in

10:30:40 3  the art working in this field.  When they're working on

10:30:43 4  modified ribonucleoside, they use the word "ribonucleoside"

10:30:51 5  to encompass that.  So we see that same usage in the

10:30:53 6  specification of the '054 patent.

10:30:57 7    And we also see that -- this is our Plaintiff's

10:31:07 8  Exhibit 10 -- a patent application filed on 2'-methyl,

10:31:13 9  2'-fluoro ribonucleoside with the flourine in the down

10:31:19 10  position.

10:31:19 11    Ribonucleosides is plural.  So in that

10:31:24 12  application and in their issued patent that relates to this,

10:31:27 13  they talk about you can have other substitutions at the 3'

10:31:31 14  position.  It wasn't limited to OH.

10:31:34 15    Gilead pointed to Figure 1 of their patent

10:31:47 16  and they said that shows ribonucleosides.  It calls ribo

10:31:55 17  nucleosides a bunch of compounds that have OH at the 2'

10:31:59 18  and 3' positions down.  And it's true, and it is true they

10:32:03 19  are ribonucleosides.  That the heading of that page says

10:32:06 20  Illustrative Nucleoside, so it clearly was intended to be

10:32:11 21  illustrative and not definitional.

10:32:13 22    Now, I think the crux of the dispute here

10:32:20 23  is that their definitions and their focus is on natural

10:32:25 24  ribonucleosides, but the '054 patent is not directed to,

10:32:30 25  it's not about using natural ribonucleosides.  If you used

10:32:37 1  natural ribonucleosides, they would not be effective in

10:32:39 2  treating viruses, so the whole point is to use modified

10:32:43 3  nucleosides and ribonucleosides.

10:32:46 4          Gilead's expert acknowledged this, grudgingly:

10:32:51 5          Do you agree that the patents-in-suit are

10:32:53 6  directed to modified nucleosides?

10:32:56 7          That's what it says.

10:32:57 8          Well, it says that, but you agree that that is

10:32:59 9  the --

10:33:01 10          Yes.  Yes.

10:33:02 11          Now, Gilead nonetheless says, look, ribo, look

10:33:10 12  it up in a textbook.  Ribonucleoside means you have got OH

10:33:15 13  down and 2' and 3'.  They said claim 26 has to be limited to

10:33:22 14  that.

10:33:22 15          But those same definitions don't say anything

10:33:24 16  about having a C branch at the 2' position.  So those

10:33:29 17  definitions, if those are intended to be limiting, then they

10:33:35 18  would exclude and be inherently inconsistent with the

10:33:39 19  claimed invention.  Claim 26 specifically requires a C

10:33:45 20  branch at the 2' position.  So the reliance on definitions

10:33:50 21  of "natural nucleosides" really doesn't advance the ball

10:33:54 22  with this case.

10:33:55 23          And here is kind of an oddity I think in the

10:34:03 24  positions they're taking.  They say with this claim 26 with

10:34:07 25  ribonucleosides, it's got to be limited to OH at 2' and 3'

10:34:13 1   down.  I think that they would say "unless you specify

10:34:20 2   otherwise."  So that is the default position.  And that is

10:34:22 3   because of nature.  All right?

10:34:24 4           But on the definition of "nucleoside," they

10:34:27 5   were quite clear in their definitions that it could have

10:34:32 6   any nonhydrogen substituent, except for flourine they said,

10:34:37 7   but any nonhydrogen substituent at the 3', I'm sorry, at the

10:34:42 8   2' position, and they don't put any limits on what you would

10:34:45 9   have at the 3' either.

10:34:47 10          So the claim, claim 25 on nucleoside doesn't

10:34:53 11  have any more restrictions on that 2' position than claim

10:35:00 12  26 does.  And yet for claim 25, nature is not the default.

10:35:08 13  It's recognized to not be the default.  You can have other

10:35:11 14  alternatives at 2' and 3' but for claim 26, nature is the

10:35:16 15  default.  It's not consistent.

10:35:22 16          On, Your Honor, the other --  do you want to do

10:35:28 17  those together, Chad?

10:35:29 18          MR. SHEAR:  Sure, it's easier.

10:35:32 19          MR. GRIFFITH:  I think that these terms are, I

10:35:34 20  don't think the parties advance any difference in meaning

10:35:39 21  with respect to these terms:  "ß-D-2-methyl ribofuranosyl

10:35:39 22  nucleoside" and "ß-D- 2'-C-branched pyrimidine

10:35:47 23  ribonucleoside."

10:35:47 24          That might not be appearing because the

10:35:54 25  definitions don't match up word for word, but when I read

what their expert did with this term and what they're brief

says about this term, as far as I can tell, it's saying

the same thing in substance that they said about 2' ribo,

2'-C-branched ribo. And we believe that the two claim

limitations are two different ways of saying the same thing.

In their definition, they put in the methyl

group. This is the '597. I'm sorry, Your Honor. I

apologize. I switched patents. This is claim 1 of the

'597 patent.

They put in that methyl is at the 2' up

position. And we caucused about that and during the claim

construction process and we agreed not to challenge that.

And I would say our non-challenge would apply equally to

claim 25 on that point.

I don't think that the 2' position is, the C

branch or the methyl group is required to be ethyl. We have

no intention of taking them on on that point, and I don't

think that there is any need to address that in the context

of this case and the issues we are facing.

I guess the additional argument that they have

here is they say that when this term "ribofuranosyl" was added

to the claims during the prosecution of the '597 patent, the

applicant supported to the support for that amendment a

priority document so the priority date was at issue. And they

said support could by found throughout the document, and

10:37:56 1  specifically they gave a cite to a particular area, a

10:38:00 2  particular compound and that compound was OH at the 2', 3'

10:38:05 3  down positions.  But the citation that was given during that

10:38:11 4  amendment was quite explicit that support could be found

10:38:16 5  throughout the document.  The remainder of the application,

10:38:17 6  which was expressly relied on by the applicants, since there

10:38:21 7  were numerous compounds, they were not limited to OH of those

10:38:25 8  positions.  So they picked that for support, but they pointed

10:38:30 9  out that the entire application supports and the entire

10:38:35 10  application has ample examples of nonhydrogen substituents at

10:38:45 11  that position.

10:38:45 12          And their expert agreed that the portion of the

10:38:49 13  prosecution cited by Gilead, at least to a skilled artisan,

10:38:54 14  was not intended to limit support for this claim term to

10:38:57 15  one exemplary ribofuranosyl nucleoside.  And that is this

10:39:04 16  testimony here:

10:39:05 17          Support for the pending claims could be found

10:39:08 18  throughout.  Do you agree with that?

10:39:09 19              That's what it says.

10:39:10 20          So they were clear that the support for those

10:39:12 21  claim terms was not simply limited to compound 7.  Correct?

10:39:17 22              He meant to say compound 6.

10:39:19 23          That's the impression that they're conveying.

10:39:21 24  That's what they're saying about that.  That's what I

10:39:23 25  believe they're trying to say.

10:39:24 1          So that was an example of support.  It certainly

10:39:28 2   is an ribonucleoside, but it wasn't intended to be limiting

10:39:32 3   on ribofuranosyl nucleoside.

10:39:35 4          And the same specification supports, at column

10:39:40 5   47, the use of the word ribonucleoside to describe lots of

10:39:46 6   things that have modifications at the 2' and 3' positions

10:39:51 7   that are not OH applies equally to this claim.

10:39:58 8          THE COURT:  So the bottom line on the

10:40:00 9   ribofuranosyl claim term is it is that same dispute as to

10:40:07 10  whether the 2' and 3' are limited to being an OH.  Correct?

10:40:13 11         MR. GRIFFITH:  That's the way I see it, Your

10:40:15 12  Honor.

10:40:15 13         THE COURT:  And the specification for either of

10:40:18 14  the two patents that you just discussed, do they anywhere

10:40:20 15  talk about natural ribonucleosides?  So they use the word

10:40:29 16  "natural?"

10:40:29 17         MR. GRIFFITH:  No, Your Honor.  I can't promise

10:40:31 18  you that.  That's what they said, and I haven't gone to look

10:40:34 19  to see the word.  I didn't do a text search.

10:40:36 20         THE COURT:  You don't point to anywhere?

10:40:37 21         MR. GRIFFITH:  We did not point to anything,

10:40:40 22  Your Honor.  I read that, and I thought, well, that is the

10:40:42 23  point.  I mean these are modified ribonucleosides, not

10:40:48 24  natural nucleosides or ribonucleosides.

10:40:52 25         THE COURT:  So is it your reading of the

10:40:53 1   specifications that every time they're talking about

10:40:56 2   ribonucleosides, they're talking about modified?  They're

10:41:00 3   never talking about natural.

10:41:01 4               MR. GRIFFITH:  Yes.

10:41:02 5               THE COURT:  Okay.

10:41:03 6               MR. GRIFFITH:  Yes.  And, again, I can't

10:41:05 7   promise.  It wouldn't surprise me if there is someplace

10:41:07 8   where they refer to a natural ribo as a ribonucleoside.

10:41:11 9   That would not be what they're claiming as the invention.

10:41:15 10              THE COURT:  All right.  Because that is a no.

10:41:17 11  You said yes to my question, but now I think you may be

10:41:22 12  saying no.  That is what I wonder.  If I sit down and read

10:41:25 13  from front to end of the specification, not being one of

10:41:28 14  ordinary skill in the art, mind you, will there occasionally

10:41:33 15  be a reference to ribonucleoside that is meant to be natural

10:41:40 16  as opposed to modified as you are say there may be?

10:41:43 17              MR. GRIFFITH:  I can't personally vouch that

10:41:45 18  there is not.  For all of the relevant portions that we have

10:41:48 19  looked at, that are describing embodiments of the invention,

10:41:53 20  they're talking about modified ribonucleosides, every single

10:42:00 21  one.

10:42:00 22              THE COURT:  Wouldn't this be important, given

10:42:00 23  the law, which, of course, I have to deal with, is terms

10:42:05 24  are generally used to have the same meaning throughout the

10:42:07 25  same patent.  So wouldn't it be important to know if

10:42:11 1  ribonucleoside is always used in your view to mean modified

10:42:15 2  as opposed to occasionally it means natural?

10:42:18 3          MR. GRIFFITH:  Well, Your Honor, you asked me if

10:42:21 4  we have a cite for where natural nucleoside was used.  And

10:42:28 5  I don't have one.  So what we looked at were portions of the

10:42:32 6  spec they referred to, for example, column 47, that said

10:42:37 7  ribonucleosides of the following types.  And then they list

10:42:42 8  lots of things that don't have OH at the 2' and 3' down

10:42:46 9  positions.

10:42:47 10         All I meant, Your Honor, and I apologize for

10:42:49 11 getting off on this tangent, is this is a patent about

10:42:53 12 nucleosides.  So is there somewhere in there that they

10:42:56 13 mentioned natural nucleosides?  I'm just trying to tell you

10:43:01 14 I didn't do a line by line check of that.

10:43:04 15         THE COURT:  All right.

10:43:09 16         MR. GRIFFITH:  I have just been handed a note.

10:43:15 17         So every ribo, a reference to ribonucleoside

10:43:19 18 for treating HCV, which is what this claim is about, is a

10:43:25 19 modified ribonucleoside, bar none.

10:43:26 20         THE COURT:  Okay.  Thank you.  Let me hear from

10:43:29 21 defendants.

10:43:37 22         (Elmo settings are adjusted.)

10:43:58 23         MR. SHEAR:  Sorry.  I want to make sure you are

10:44:02 24 ready.

10:44:02 25         THE COURT:  Yes.

MR. SHEAR: On "ß-D-2-C-branched pyrimidine ribonucleoside," I'll try to handle this all at the same time.

THE COURT: You agree it is the same dispute; right?

MR. SHEAR: Yes, it is.

So what is really important, and I want to take some time to walk through this slowly, is the fact that chemists are very methodical, systematic people, and they're that way so they can communicate with one another, so they methodically named these compounds. And once you understand the key how they do it, you can decipher any compound that is placed in front of you.

It begins with the presumption that the plain and ordinary meaning flows from naturally occurring nucleosides, and we'll see that as we walk through.

Modifications are then made, as I said at the outset, to the naturally occurring nucleosides. And unless that modification is actually called out, one of skill in the art assumes you have the same substituents that you had in the natural nucleoside. And Dr. Micklefield explained this both in his deposition and in his declaration.

So, importantly, and we can just walk through an example. And we'll actually begin with the ribofuranosyl, and you will see it's the same issue across both terms.

10:45:27 1          So: "ß-D-2'-methyl ribofuranosyl nucleoside."
10:45:33 2   Sorry, it's a mouthful.  Everything there has a meaning.
10:45:36 3   Everything there tells one of skill in the art what this
10:45:38 4   nucleoside is.
10:45:39 5          So we talked earlier about the ß-D and how that
10:45:42 6   is where the base is.
10:45:44 7          The 2' explains where the modification is made.
10:45:49 8          The ribofuranosyl, that is a very specific
10:45:53 9   compound.  The parties agree furanosyl is a five-member
10:45:56 10  sugar ring.
10:45:57 11         The parties also agree in the context of a
10:45:59 12  naturally occurring nucleoside, specifically a naturally
10:46:02 13  occurring ribonucleoside, importantly, you have hydroxyls,
10:46:06 14  OH groups at the 2' position and the 3' position both down.
10:46:12 15  That is undisputed.  This is actually from Idenix's
10:46:15 16  technology tutorial at slide 28 of their tech tutorial.
10:46:20 17         Now, what the 2'-methyl tells one of skill in
10:46:28 18  the art is that the modification is being made at the 2'
10:46:32 19  position.
10:46:33 20         Now, counsel had said before that they weren't
10:46:36 21  going to take us to task for the fact that we cited 2'-methyl
10:46:40 22  is up.  2'-methyl is up for a very specific reason.  2'-methyl
10:46:46 23  is up because the use of the term "ribo," just like in the
10:46:48 24  naturally occurring nucleoside, means there are hydroxyl
10:46:51 25  groups are pointing down at the 2' and 3'.  So to one of skill

in the art, they would know there is a methyl modification at 2'' that there is OH groups at the 2' and 3' position based on the use of the term "ribo," and that forces the 2'-methyl into the up position.

Now, this specific approach, this -- I shouldn't call it approach.  It's the nomenclature how nucleosides are named.  Every single term in dispute follows this same approach.  And the specifications don't support any other type of approach.  So that is why, when Your Honor asked me in reference to the last one, did I concede that the plain and ordinary meaning of 2' nucleoside -- 2'-C-branched pyrimidine nucleoside, whether the plain and ordinary mean- ing encompassed 2'-fluoro down, the reason I agreed to that is there wouldn't be anything at 2' down per that lineage.  It was nucleoside versus ribonucleoside.  Specifically, it's the use of the term "ribo" that puts OH in the 2' down and 3' down positions.

Dr. Micklefield explained this.  That the plain and ordinary meaning of natural nucleosides is relevant because it's how the modified nucleosides are made.

And Idenix essentially concedes that his views are correct.  They're all based on his experience and textbooks.  They offer no contrary evidence and they really can't contest them on the substance of how these terms were named.

10:48:47 1          Now, fortunately, if we go back to the first

10:48:50 2    term that was discussed by counsel:  "ß-D-2-C-branched

10:48:55 3    pyrimidine ribonucleoside."

10:48:57 4          We can pick it apart just like we have every

10:48:59 5    other term.

10:49:00 6          The ß-D talks about where the base, the

10:49:03 7    pyrimidine is.

10:49:04 8          The 2'-C-branched talks about where the

10:49:09 9    modification is.

10:49:09 10          And the fact it is a ribo means 2', 3' OH down.

10:49:13 11          And really that is the dispute.  What does

10:49:19 12    "ribonucleoside" mean?

10:49:20 13          They want it to be basically anything other than

10:49:23 14    hydrogen, and that is obviously not our view.

10:49:30 15          Now, we already walked through how we get to ribo.

10:49:34 16    And this is a standard textbook that was relied on that also

10:49:40 17    explains that with ribo, you have hydroxyls in the 2' and 3'

10:49:44 18    down.  And, notably, throughout their specification, they

10:49:50 19    consistently use this exact same approach when they are naming

10:49:53 20    nucleosides.

10:49:53 21          So if you look at Figure 1 as just an example,

10:49:57 22    every single compound in Figure 1 is labeled as a riboC or

10:50:01 23    riboG.  The C and the G are the base that is up there.

10:50:04 24          The ß-D-2'-CH$_3$ or methyl, ribo.

10:50:09 25          And they're all OH down in the 2' and 3'

10:50:12 1    position, each and every time.

10:50:17 2         And, importantly, that's not the only place

10:50:20 3    that they go through it.  So they say, at column 48 of the

10:50:26 4    specification, in a particular embodiment, the 2'-C-branched

10:50:29 5    ribonucleoside is desired.  The synthesis of a ribonucleoside

10:50:33 6    is shown in scheme 3.  So here is where they make the

10:50:38 7    ribonucleoside with the lower right hand corner circled in

10:50:41 8    yellow, the 2' and 3' OH.

10:50:44 9         And then they go on to make an alternatively a

10:50:48 10   deoxyribonucleoside.  I highlighted this for a specific

10:50:54 11   reason.  This also follows the exact same nomenclature

10:50:56 12   approach we talked about.  Deoxyribo.  Deoxy means no

10:51:03 13   oxygen, no OH group.  So they're signalling to one of skill

10:51:06 14   in the art that in the context of this final product down

10:51:09 15   here that there is no oxygen at the 2' position.  And that

10:51:12 16   is just how these things are named.  That is how chemists

10:51:14 17   talk about them.

10:51:26 18        At the conclusion of the last segment regarding

10:51:28 19   the previous term, Mr. Griffith made the comment we wouldn't

10:51:33 20   agree with what his expert would have to say anyway.

10:51:36 21        That is not true.  This is their expert

10:51:37 22   explaining what a ribonucleoside is.  Now, of course, they

10:51:41 23   would say this is a natural nucleoside or a natural

10:51:45 24   ribonucleoside as opposed to a ribonucleoside, but in the

10:51:49 25   context of nomenclature, we contend it is one and the same

unless you explain what the modification is otherwise.

One very important point that I do want to point out.  Their construction of the term "ribo" essentially makes the term meaningless.

So they say that their invention is two nonhydrogen substituents at the 2' down position.  That is what they told the Patent Office.

Tellingly, all of those statements are about what is going on at the 2' position.  They never say what is happening at the 3' position, to the Patent Office or otherwise.

In their specification, they explicitly disclose hydrogen being the 3' position.  So the idea that all of a sudden we're going to conjure up a construction that says, yes, at the Patent Office we told 2', never hydrogen, now we're going to say that means the same thing for the 3'.  There is no support whatsoever for that in the intrinsic or extrinsic record.

Now, consistent with this nomenclature approach we have been talking about, it also explains the extrinsic evidence that Idenix relies on.

So, specifically, they pointed to three Gilead or Pharmasset patents -- Pharmasset was later acquired by Gilead -- where we talked about ribonucleosides that have things other than OH at the 2' down position.

10:53:32  1          Well, that is exactly what you would expect

10:53:34  2   because that is exactly how these are named.  2'-methyl,

10:53:39  3   2'-fluoro ribonucleoside.  One of skill in the art knows

10:53:42  4   that nucleoside is OH down, 2', 3', except here they're

10:53:47  5   explicitly told we're making a modification with methyl and

10:53:51  6   with fluoride.  And that follows repeatedly each and every

10:53:54  7   time when you look at the examples.

10:53:57  8          And to the extent that Your Honor would like me

10:54:01  9   to address the exhibit you were shown this morning, the

10:54:04 10   document that you were shown, so, yes, on the first page it

10:54:07 11   uses the word "ribonucleosides."  But if you start paging

10:54:13 12   through almost every example after that, it's a series of

10:54:17 13   compounds, explicitly shown and explicitly named.  And every

10:54:26 14   single one of them follows the exact approach we have been

10:54:30 15   discussing.  So we can pick page, I'm going pick the page

10:54:32 16   that ends in 30, at Bates No. 730.  It's four pages in.

10:54:43 17          And first compound is a 4-ß-D ribofuranosyl-5,

10:54:50 18   and then it goes on to explain the other modifications that

10:54:53 19   are made to the base.  But telling, it's a ß-D ribofuranosyl

10:54:58 20   five-member ring, OH at 2' and 3' down, just like you would

10:55:03 21   expect from the use of the word "ribo."  And that is

10:55:05 22   literally consistent.  Every single compound is named

10:55:10 23   consistently with that approach.  And you can just literally

10:55:16 24   walk through and look at example after example.

10:55:17 25          Now, what counsel directed you to was I believe

10:55:22 1  page 8.

10:55:23 2           THE COURT:  The one that ends in 34.

10:55:25 3           MR. SHEAR:  Yes.  Thank you.  And said what

10:55:28 4  this disclosure is, is the idea that, well, ribonucleosides,

10:55:32 5  they're just talked generally in the field.  That when

10:55:36 6  someone says ribonucleosides, it doesn't have any specific

10:55:39 7  meaning.  It just means lots of potential compounds.

10:55:41 8           That is not what this stands for.  What this

10:55:43 9  stands for is we're making ribonucleosides.  They could be

10:55:48 10  modified.  And if we're going to modify them and we're going

10:55:51 11  to name them, because at some point you are going to have to

10:55:53 12  name them, we'll use the approach we've been talking about.

10:55:57 13  This is just the general catchall.  That is all this is.

10:56:01 14  And, importantly, that is all their compounds are in the

10:56:04 15  specification as well.

10:56:05 16           So they pointed to, I think it was column 47

10:56:09 17  had a compound.  And it used the "ribofuranosyl" language

10:56:16 18  or "ribonucleoside" language that is very similar to the

10:56:22 19  claim language and then it showed a bunch of potential

10:56:26 20  modifications that could be made.

10:56:30 21           They're right.  It shows a lot of modifications

10:56:32 22  that could be made.  It doesn't make them all ribonucleosides

10:56:36 23  when it comes time to name them or, importantly, when it comes

10:56:39 24  time to claim then them.  Their position is essentially that

10:56:43 25  our construction reads out the preferred embodiment because

10:56:48 1    they view the preferred embodiment is all that that discloses.

10:56:51 2    I don't think that is what we're doing at all.

10:56:53 3         What we're doing is we're saying, look, you are

10:56:57 4    claiming a specific thing here.  There is no body of law

10:57:00 5    that says each claim has to encompass all embodiments in

10:57:04 6    the patent.  In fact, that is contrary to what claims do.

10:57:06 7    Claims claim specific pieces of patent specifications.

10:57:13 8         When they wrote the claims that they did, they

10:57:17 9    wrote very precise nucleosides or ribonucleosides.  If they

10:57:25 10   wanted to claim more broadly, they certainly were entitled

10:57:26 11   to.  In certain places, they certainly did.  But it doesn't

10:57:30 12   change the fundamental fact that the plain and ordinary

10:57:36 13   meaning of the phrase "ribonucleoside" means you have OH at

10:57:41 14   2' and 3' down.

10:57:42 15        THE COURT:  But going back to this handout that

10:57:45 16   they gave me.

10:57:46 17        MR. SHEAR:  Sure.

10:57:47 18        THE COURT:  At page 34, you are agreeing that

10:57:51 19   your own client, when contemplating modifications they might

10:57:57 20   consider as candidates for 2' and 3', specifically for HCV,

10:58:04 21   they didn't limit themselves going to OH.  They were

10:58:08 22   contemplating at this point in time a whole range of things

10:58:13 23   listed at R and Y; correct?

10:58:16 24        MR. SHEAR:  Sure.  But if they were going to

10:58:18 25   claim the compounds, they would have actually said what the

10:58:20 1    modifications were.

10:58:21 2              THE COURT:  And then they would have given a

10:58:23 3    name consistent with the nomenclature you are saying.

10:58:26 4              MR. SHEAR:  Exactly.  So we have up here, I

10:58:28 5    think one of these examples is actually from -- no.  One of

10:58:32 6    the examples is fortunately not from a claim, but if you

10:58:34 7    pull any of our applications that they have cited and look

10:58:39 8    at the actual way the claims are written, they will be

10:58:42 9    written in -- I need the laser pointer -- in this format

10:58:49 10   (indicating), precisely explaining to one of ordinary skill

10:58:51 11   in the art what has been modified, precisely pointing out,

10:58:55 12   distinctly claiming what the modification has been.

10:59:01 13             And, notably, Idenix has tried to do just that.

10:59:05 14   They have nucleoside in one term, they have ribonucleoside

10:59:09 15   in the other.  Ribo has to have meaning.

10:59:12 16             And I should note, Mr. Griffith made a claim

10:59:16 17   differentiation argument between claim 26 and claim 1 and

10:59:22 18   showed that claim 1 was specifically drawn and had a

10:59:25 19   specific formula and was saying that it's our position that

10:59:28 20   those two things are one and the same.  It is not our

10:59:31 21   position that those two things are one and the same.  We

10:59:34 22   agree that both of those things are 2', 3' OH down, but claim

10:59:40 23   26 we would say is broader than claim 1.  It just says

10:59:43 24   pyrimidine is meant to encompass modifications to that base

10:59:47 25   that claim 1 with a very specific base doesn't contemplate,

10:59:54 1    so there is a difference in scope between those two claims.

10:59:55 2    We don't concede they are the same in scope.

10:59:58 3            THE COURT:  Should I be trying to construe the

11:00:00 4    word "ribonucleoside" just full stop?

11:00:06 5            MR. SHEAR:  You certainly could.  I don't think

11:00:08 6    that you need to given the context of the claims and the

11:00:11 7    context that it has been presented to Your Honor, but

11:00:15 8    "ribonucleoside" does have a specific meaning.

11:00:18 9            THE COURT:  And to you, in the context of this

11:00:22 10   patent, it means "natural ribonucleoside."

11:00:26 11           MR. SHEAR:  I would say that the substituents --

11:00:30 12   I wouldn't say it like that.  I would say the substituents

11:00:33 13   would be the same as that found in a natural ribonucleoside

11:00:37 14   before we know what the modifications are.

11:00:39 15           THE COURT:  The term that you all had proposed

11:00:43 16   to me is never just "ribonucleoside."

11:00:46 17           MR. SHEAR:  It's not.

11:00:46 18           THE COURT:  It is prefaced by this other

11:00:48 19   chemical language; correct?

11:00:50 20           MR. SHEAR:  That is correct.

11:00:51 21           THE COURT:  And your view, if I'm following you,

11:00:52 22   is that you really have to understand what that preceding

11:00:57 23   chemical language is to then know whether "ribonucleoside" is

11:01:02 24   being used to reference "natural" or some other modification

11:01:08 25   of a ribonucleoside.  Is that fair?

11:01:10 1        MR. SHEAR: Very, very close. The only thing I

11:01:14 2 guess I would say, and perhaps we're saying the exact same

11:01:18 3 thing, is that what I would say is that in the context of

11:01:21 4 this term, this entire phrase has meaning, and each piece of

11:01:24 5 that phrase is explaining to a person of skill in the art

11:01:27 6 what the nucleoside looks like.

11:01:34 7        So ribonucleoside is the same as its natural

11:01:37 8 context, the substituents. You start from the idea, you

11:01:40 9 just see ribonucleosides. You start with the idea that it's

11:01:42 10 $2'$, $3'$ OH, and that is because the nucleoside is made from a

11:01:46 11 ribose sugar. That is where this comes from.

11:01:49 12        So you start with $2'$ $3'$ OH. But then you have to

11:01:53 13 look at the rest of the term, which is why I hesitated when

11:01:56 14 you said should I be construing it in isolation. You have

11:01:59 15 to look at the rest of the term because the rest of the term

11:02:02 16 explains to you the modifications that are made to the base

11:02:06 17 ribonucleoside.

11:02:19 18        Your Honor, do you still have the exhibit that

11:02:33 19 was handed up in front of you?

11:02:36 20        THE COURT: The one that plaintiffs handed up?

11:02:38 21        MR. SHEAR: Yes.

11:02:39 22        THE COURT: Yes.

11:02:40 23        MR. SHEAR: Thank you. So there is one specific

11:02:41 24 page they thought would illustrate the point we're making.

11:02:44 25 And it is the third page in, page 729.

11:02:46  1         THE COURT:  Okay.

11:02:51  2         MR. SHEAR:  If you just look at the first

11:02:52  3  example.

11:02:55  4         MR. GRIFFITH:  I'm sorry.  What page?

11:02:57  5         MR. SHEAR:  729.

11:02:59  6         MR. GRIFFITH:  Okay.

11:03:01  7         MR. SHEAR:  I think it is the third page.

11:03:01  8         (Elmo settings adjusted.)

11:03:21  9         MR. SHEAR:  So if we look at the first example,

11:03:23 10  and I apologize, that is my scribble on the side there.  You

11:03:26 11  can just ignore my scribble.  If we look at that, this

11:03:30 12  precisely follows the naming convention we're talking about.

11:03:34 13  It even takes it one step further.

11:03:35 14         So you have got a 1-D-bromo -- I'm sorry --

11:03:45 15  1-2-bromo.

11:03:46 16         Oh, I'm pointing to the wrong one.  Sorry.  I

11:03:48 17  got corrected by the group.  Thank you.

11:03:50 18         2-bromo-2-deoxy-ß-D-ribofuranosyl.  That whole

11:03:57 19  phrase has specific meaning.

11:03:57 20         If you start at the back end, the ribofuranosyl

11:04:00 21  tells you it's a five-member ring with normally what you

11:04:03 22  would expect, a OH at the 3', and you would expect an OH at

11:04:08 23  the 2' as well, but then you have to read the front part of

11:04:10 24  it which explains what is happening at the 2' position.

11:04:13 25         So the 2' deoxy means there is no OH group there

1    that you would normally expect from a ribofuranosyl.

2         And the 2 bromo means that that is in place of

3    where the OH would go.

4         So this is, yes, it is sort of another example

5    of a very precise, very systemic nomenclature that all of

6    those of skill in the art routinely follow.

7         THE COURT:  And by the way, OH and HO, same

8    thing?

9         MR. SHEAR:  Yes, they are.  Yes.  What is

10   important there is where it shows it being connected.  So

11   what is key is where the bond is coming in, the bond is

12   always coming into the oxygen, but that is what.  Either way

13   is the same, it's the same thing.

14         (Elmo settings adjusted.)

15         MR. SHEAR:  So, Your Honor, I'm going to jump

16   ahead to address the specific points in the "ribopyranosyl"

17   specific term.  So if you are following along on the slides,

18   I think I'm going to jump to page 43.

19         So this is another example in the specification

20   itself of this nomenclature approach we have been discussing.

21   Specifically, the idea of ribofuranosyl nucleoside.

22         And in the specification, they talk about a drug

23   that is well known, Ribavirin.  It's used for a whole bunch

24   of things, including HCV and HIV.  So Ribavirin is the trade

25   name, if you will.

11:06:08 1        When they say what Ribavirin is and they name

11:06:16 2   the nucleoside, they follow the exact same convention that

11:06:18 3   we have been discussing: ß-D, ribofuranosyl, five-member

11:06:26 4   ring, OH at 2' and 3' down.

11:06:27 5        So the specification is entirely consistent with

11:06:34 6   our proposed construction of the term.  And, notably, so is

11:06:41 7   the prosecution history.

11:06:41 8        Specifically, when they set forth new claims,

11:06:46 9   they have to identify where those claims found support.

11:06:50 10  And, notably, that for the compound that one of the claims

11:06:55 11  they say specifically, the compound with Formula VI on page

11:07:00 12  23 discloses a ß-D-2'-methyl-ribopyranosyl nucleoside.

11:07:08 13       This is Compound VI from page 23.  Again,

11:07:14 14  following the exact same discussion we've had.  And,

11:07:18 15  notably, there are two potential modifications of Formula

11:07:21 16  VI:  $R^4$ and R'.

11:07:25 17       They say $R^4$ may be alkyl, which is methyl,

11:07:30 18  because they have to, they tell the Patent Office they have

11:07:33 19  support for it.  That is methyl.  And then R' is H, and that

11:07:37 20  is why it is a nucleoside, ribopyranosyl nucleotide.  That

11:07:41 21  is the compound.

11:07:43 22       Now, I think their response to this is that,

11:07:45 23  well, during Dr. Micklefield's deposition, they acknowledged

11:07:52 24  there is more support than just this in the specification.

11:07:55 25  And they're right.  There is more support for a claim like

this in the specification than just the spot they pointed
to. There are lots of compounds where if you made the right
choices you could get to this compound. That is all he was
agreeing to. That there are other places that disclose this
compound. And there are. There are many. But, notably,
they told the Patent Office what a methyl ribopyranosyl is,
and it completely follows the construction that we have
proposed.

Absent any questions, Your Honor, I don't have
any more.

THE COURT: Just one more. If I'm focused,
and maybe I shouldn't be, but if I'm focused on just what
does the word "ribopyranosyl nucleoside" mean in the
patent specification, do you take the view that it is used
consistently throughout or is it used inconsistently,
sometimes talking about "natural" and sometimes talking
about "modified?"

MR. SHEAR: I think the answer is it is used
consistently. Whether it is natural or modified, they
essentially mean, they're one and the same. It's just where
the modifications are taking place is the only difference.

So if you walk up to someone of skill in the art
and say what does ribonucleoside mean, they're going to
uniformly tell you 2' 3' OH. That is what it means. That is
what the term means.

11:09:19 1    Now, of course the patent is about modifying

11:09:23 2 them, and you can modify them. You just have to explain how

11:09:26 3 you are modifying them.

11:09:27 4    Thank you for asking the question, because it

11:09:29 5 did remind me of one last point I want to make sure I

11:09:32 6 mention. Counsel likes column 47 has the word

11:09:37 7 "ß-D-2'-C-branched ribonucleosides" and has the list of all

11:09:38 8 possible structures.

11:09:39 9    Notably, one thing that you are not hearing

11:09:41 10 from them is that they acted as their own lexicographer and

11:09:45 11 defined that term. That was an argument they could have

11:09:50 12 made. They could have said we define this term to mean all

11:09:52 13 these things.

11:09:52 14    The reason you are not hearing that argument is

11:09:56 15 flourine is excluded from that example. So if they had come

11:10:00 16 in and said this term means that, then by definition, by

11:10:03 17 their own definition, then flourine could never be at 2'

11:10:06 18 down because it would not be in the compound as they would

11:10:09 19 have defined it.

11:10:10 20    THE COURT: Okay. Thank you.

11:10:12 21    MR. SHEAR: Thank you.

11:10:13 22    THE COURT: Rebuttal.

11:10:16 23    (Elmo settings adjusted.)

11:10:36 24    THE COURT: Do you have any rebuttal?

11:10:38 25    MR. GRIFFITH: I do, Your Honor. I'm sorry.

11:10:39 1                    THE COURT:  Okay.  Because after I hear

11:10:41 2     rebuttal, we'll take a short break.

11:10:42 3                    MR. GRIFFITH:  Okay.  I want to go to the column

11:10:49 4     47 point.

11:10:53 5                    So the term "ribonucleoside," when used by

11:11:03 6     itself, or 2'-C branched nucleosides here, is used is to

11:11:11 7     refer to a genus of compounds that have modifications at

11:11:16 8     the 2' position.

11:11:19 9                    THE COURT:  Let me stop you.  There, I want to

11:11:21 10    make sure I understand.  When ribonucleoside is used all by

11:11:26 11    itself --

11:11:27 12                   MR. GRIFFITH:  Yes.

11:11:28 13                   THE COURT:  -- is it your contention that that

11:11:29 14    already means there is a modification?

11:11:31 15                   MR. GRIFFITH:  Yes, Your Honor.

11:11:32 16                   THE COURT:  The modification at 2' and 3'?

11:11:36 17                   MR. GRIFFITH:  Modification at 2'' and could be

11:11:42 18    modified, need not be modified at 3'.

11:11:45 19                   THE COURT:  And I guess to be more precise, when

11:11:47 20    I'm told by defendants that everyone of ordinary skill in

11:11:51 21    the art, if all you said to them was ribonucleoside, nothing

11:11:55 22    else, you just say ribonucleoside, every one of skill in the

11:11:59 23    art would agree it is OH at the 2' and 3'.  Do you disagree

11:12:03 24    with that?

11:12:03 25                   MR. GRIFFITH:  I disagree with that.  So we saw

11:12:07 1 that in the Gilead document.  So they explained how you can

11:12:11 2 write the formulas real precisely, and you can.  You can

11:12:16 3 write them precisely so you are specifying exactly what

11:12:20 4 type of ribonucleoside you mean.

11:12:24 5 But that document that they have, where they

11:12:27 6 write out the formulas, they refer to all of them as

11:12:32 7 ribonucleosides.  That is our point.  So when you say

11:12:36 8 ribonucleosides, you are talking about this collection of

11:12:42 9 possible formulas that you can have that is going to have a

11:12:46 10 nonhydrogen substituent at the $2'$ and $3'$ down positions.  It

11:12:50 11 may be substituted, it might not be.

11:12:54 12 There is a substitution, though, in every

11:12:59 13 single one of those, in every single one.  And that is the

11:13:02 14 point.  That is what skilled artisans are doing with these

11:13:06 15 ribonucleosides.  That was the point of our invention.

11:13:14 16 And this is column 47.  I'm sorry.  I got to go

11:13:18 17 back one.

11:13:19 18 $2'$-C-branched ribonucleoside of the following

11:13:27 19 structure.  And then for $R^7$ and $R^9$, the $2'$ and $3'$ down

11:13:33 20 positions, there are any number of non-hydroxy, non-OH

11:13:41 21 groups that are options at those positions.

11:13:44 22 So that is the class of ribonucleosides.  When

11:13:53 23 the patent uses the term "ribonucleosides," it's using it

11:13:56 24 to refer to this class of compounds that have non-hydrogen

11:14:03 25 groups -- non-hydroxyl groups.  I'm sorry.  I apologize.

92

Nonhydrogen groups at the 2' and 3' down.  And these are
examples of substitution can be made.  These are not the
only substitutions that can be made at those positions.
There are others that are disclosed in the patent.  So it
uses the term "ribonucleoside" broadly.

          Yes, you can write a specific formula like is
written in claims 1 through 24.  Claim 26 is a genus claim.
It's a genus claim.  It was deliberate that it was not
written to specify OH at 2', 3' down.

          They said, well, that -- and this is
inconsistent with our construction.  They didn't say this
was consistent with their construction.  What they said --
and it is not consistent with their construction.  And that
is a problem because this is the intrinsic evidence.  So
they're trying to contradict the intrinsic evidence in the
use of this term in the patent.

          They say, Idenix has got a problem with this one
because it calls for the possibility of hydrogen at the 3'
down position.  And it does.  At the 2' position, as we
all agree, hydrogen was disclaimed, so they say this is
inconsistent with our construction.

          First, by far the majority of what they're
talking about here are nonhydrogen substituents at the 3'
position.  That said, that said, you could argue that
possibly, the only argument you could make to disagree with

11:15:52 1  our construction based on this is that it should be read to

11:15:57 2  include hydrogen at the 3' position.

11:16:00 3  We didn't do that. I think arguably you could

11:16:04 4  go that far. But we didn't do that because we see ordinary

11:16:12 5  skilled artisans looking at the substitutions for OH at

11:16:17 6  those positions as mimicking ribonucleosides. But there is

11:16:21 7  no question, absolutely no question on this intrinsic record

11:16:24 8  that ribonucleosides encompasses things that don't have OH

11:16:30 9  at either of those two positions. To so hold would be

11:16:36 10 contrary to this intrinsic record.

11:16:39 11 Now, I want to go to slide 47, Your Honor. Oop.

11:16:49 12 That is the wrong one. Okay. That's this one.

11:16:54 13 So claim 25 is 2'-C-branched nucleoside and

11:17:07 14 pyrimidine nucleoside. And they agree that a 2', there is

11:17:14 15 nothing specified in the claim as to what is at 2' position.

11:17:20 16 Hydrogen was disclaimed. You can't put hydrogen there. And

11:17:24 17 they agree that that claim encompasses any nonhydrogen

11:17:29 18 substituent at the 2' down position.

11:17:33 19 Maybe they would say it has to have been

11:17:36 20 disclosed as a specific example in the spec. Possibly. I

11:17:39 21 can't tell for sure. But in any event, that claim doesn't

11:17:46 22 follow, on 25, doesn't follow this nomenclature rule that

11:17:52 23 they have created and really out of hole cloth for claim 26.

11:17:59 24 Claim 25 does not follow this mandatory nomenclature process

11:18:03 25 where you have to specify, I guess using a Markush group or

11:18:07 1 a formula or something, what precisely is this substitute.

11:18:12 2 This is a rule that only applies to ribonucleoside, it

11:18:16 3 doesn't apply to nucleoside. That makes no sense. There is

11:18:20 4 no principal basis for that distinction.

11:18:28 5 Gilead's slide in that regard, slide 22, they said

11:18:38 6 modifications must be explicitly called out. There is no law

11:18:42 7 that says that. And this is a genus claim. And I think it

11:18:46 8 is real clear that these are genus claims. So claims 1 to 24

11:18:50 9 had formulas in them with very precise substituents in those

11:18:54 10 positions. And we saw in the prosecution history that they

11:18:59 11 award these claims trying to describe the invention more

11:19:03 12 broadly, consistent with the specification.

11:19:05 13 THE COURT: Looking at their slide 22, I read

11:19:07 14 it to mean they are citing Dr. Micklefield saying one of

11:19:13 15 ordinary skill in the art would understand this chemistry

11:19:15 16 nomenclature, and in that regard modifications must be

11:19:19 17 explicitly called out. He wasn't making a legal conclusion,

11:19:23 18 he was just telling me what one of ordinary skill in the

11:19:26 19 art would require. You disagree with that.

11:19:29 20 MR. GRIFFITH: But the problem with that, Your

11:19:30 21 Honor, it is contradicted by the intrinsic record. And the

11:19:32 22 case law is clear, *Vitronics* and other cases we cited in our

11:19:38 23 briefs, the expert can't contradict the intrinsic record,

11:19:42 24 and that is what he is doing here.

11:19:44 25 THE COURT: What do I have in the intrinsic

record that would allow me to conclude that one of ordinary

skill in the art doesn't follow the type of mandatory

nomenclature that defendants' expert has explained to me?

MR. GRIFFITH: Column 47 is one. It says that

these are all ribonucleosides. And,

Second, you have claim 25. And claim 25 is what

everyone agrees is a genus claim. It doesn't call out all

the possible modifications you can have at the 2' position.

There was never articulated anywhere in this record, nor by

Dr. Micklefield, that there is this nomenclature rule about

having to expressly call out what are the embodiments, what

are the specific substituents at the 2' and 3' positions.

Their construction and our construction are

agnostic on that. That is because they were deliberately

attempting not to limit that claim to some particular

substituent that you might see, for example, in claim 1.

And claim 26 is doing the same thing, but as I

said, we viewed claim 26 as accomplishing the concept of a

non-hydrogen substituent at the 3' position, not just two

at the 2'.

But if column 47 can't be ignored, it can't

be ignored. It is part of the intrinsic record. And so

whether it is Dr. Micklefield or Gilead in its arguments

contradicting that, that is improper. That is not following

the Federal Circuit's guidelines on how to construe the

11:21:36 1    claims.

11:21:36 2              Now, on --

11:21:41 3              THE COURT:  You only have about ten minutes

11:21:43 4    left.  I want to make sure you have time for the other

11:21:46 5    terms.

11:21:46 6              MR. GRIFFITH:  Okay.

11:21:46 7              THE COURT:  You can keep going, but just fair

11:21:49 8    warning.

11:21:49 9              MR. GRIFFITH:  Then, Your Honor, I think I will

11:21:51 10   quit.

11:21:51 11             THE COURT:  Okay.

11:21:51 12             MR. GRIFFITH:  Because we do need some time for

11:21:54 13   the other terms.

11:21:55 14             My closing point I guess would be on

11:22:00 15   "ribofuranosyl."  Column 47 applies to that, too.  In other

11:22:06 16   words, there is no substantive difference in meaning to that.

11:22:09 17   Yes, there are formulas in the spec where ribopyranosyl is

11:22:15 18   used, and they're calling out a lot of details about where

11:22:18 19   everything is, but not using that in a genus fashion like is

11:22:22 20   present in claim 1 of the '597 patent.  And,

11:22:28 21             Finally, on the Clark patent which is, it was

11:22:31 22   a patent application, it was Plaintiff's Exhibit 10.  They

11:22:39 23   said, Clark used the phrase:  The present invention

11:22:42 24   specifically discloses the potent anti-HCV activity of the

11:22:46 25   2'-methyl-2'-fluoro nucleoside with the fluorine in the down,

11:22:54 1  ribo position.

11:22:54 2          But that was talking about a genus of compounds

11:22:56 3  that is described, in fact, at page 7 which is not limited

11:23:01 4  to OH at the 3' down position.  They have an R at the, it's

11:23:06 5  OH at the 3' down position.  And it can be all sorts of

11:23:12 6  different options there.

11:23:12 7          So when they use that, they use that phrase in

11:23:15 8  the same genus fashion that claim 26 does, in the same way

11:23:20 9  you see it in their own document to refer to any other of a

11:23:23 10  variety of specific compounds that are within that genus.

11:23:27 11  That is our point.

11:23:27 12          THE COURT:  Okay.  Thank you.  Is there any

11:23:30 13  rebuttal on these two terms?

11:23:32 14          MR. SHEAR:  Very, very brief.  Just three quick

11:23:38 15  points.

11:23:38 16          The first is we don't agree that claim 26 is a

11:23:42 17  genus claim.  We think it only depicts in words what you

11:23:47 18  could depict in pictures, like the other claims.

11:23:51 19          Claim 25.

11:23:53 20          (Elmo settings adjusted.)

11:23:56 21          MR. SHEAR:  Counsel said it doesn't follow the

11:23:57 22  approach that we have been walking through.  It follows the

11:23:59 23  approach we walked through precisely.  ß-D-2-C-branched

11:24:04 24  tells you where the modification is.  Pyrimidine, the base,

11:24:08 25  nucleoside.  So it follows everything we have been talking

11:24:11 1    about.  It just doesn't involve the word "ribo," so we

11:24:15 2    didn't talk about it being the 2' or 3'.

11:24:18 3            Finally, on column 47.  I guess two more points.

11:24:22 4    On column 47, it says 2'-C-branched nucleosides.  It's

11:24:30 5    telling the world we're going to be making modifications to

11:24:33 6    the ribonucleosides.  Here are the potential modifications.

11:24:36 7    When it comes time to name them, you have to actually say

11:24:39 8    what it is that you are doing.

11:24:40 9            And then the very last point, Your Honor, is I

11:24:46 10    think Mr. Griffith said in response to a question that you

11:24:48 11    led with, if someone just said ribonucleoside, what would it

11:24:54 12    mean?  He said a modified version.

11:24:57 13            That is contrary to -- I apologize, this slide

11:25:01 14    is not numbered -- but this slide in their tech tutorial

11:25:04 15    where they acknowledge -- we had it up on one of their

11:25:07 16    slides as well -- where they acknowledged natural

11:25:09 17    ribonucleosides are a 2' 3' OH down.

11:25:12 18            THE COURT:  Well, I think he told me he would

11:25:13 19    not agree with your contention that every person of ordinary

11:25:17 20    skill in the art, when asked what is a ribonucleoside,

11:25:20 21    without any further context or nomenclature, you say they

11:25:26 22    would all agree that it is an OH at the 2' and 3' down.

11:25:31 23    Correct?

11:25:31 24            MR. SHEAR:  Yes, that is right.

11:25:32 25            THE COURT:  And he disagrees with that.

11:25:34 1               MR. SHEAR: Fair enough.

11:25:36 2               THE COURT: And you are saying I can find

11:25:37 3 support in their tutorial for your position.

11:25:40 4               MR. SHEAR: Yes.

11:25:40 5               THE COURT: And that is one of the slides in

11:25:42 6 their tutorial?

11:25:43 7               MR. SHEAR: Yes.

11:25:45 8               (Elmo settings adjusted.)

11:25:53 9               MR. SHEAR: I don't know if you can see this or

11:25:55 10 not. So this is from their tutorial, and it's the same one

11:26:02 11 we have. We excerpted a different slide in our presentation

11:26:08 12 today from the tutorial. It says the same thing, but ...

11:26:13 13               Our slide 23, Your Honor, has the same point

11:26:15 14 from their tech tutorial. They have it multiple places.

11:26:18 15               But at the bottom, you can see that they explain

11:26:22 16 a natural ribonucleoside is 2' 3' OH down.

11:26:26 17               The dispute is whether or not, I take it, that

11:26:29 18 in the context of modified, does it always mean it is

11:26:32 19 something other than OH down. And that is our view it is

11:26:35 20 not the case.

11:26:36 21               THE COURT: All right. Let's take a short

11:26:39 22 recess.

11:31:21 23               (Brief recess taken.)

11:31:21 24          *     *     *

11:38:43 25               (Proceedings reconvened after recess.)

11:38:43 1                THE COURT:  All right.  So plaintiffs I believe

11:38:45 2      have eight minutes left, and we'll turn to you as to

11:38:51 3      nucleotide.

11:38:53 4                MR. GRIFFITH:  Your Honor, I will be brief.

11:38:56 5                So the big issue on nucleoside is whether it

11:39:00 6      requires a hydroxyl group OH at the 5' position.  They say

11:39:05 7      it does, we say it doesn't.

11:39:07 8                And the specification uses the term "nucleoside"

11:39:14 9      to refer broadly to compound that have things that are not

11:39:17 10     OH at the 5' position.  So this is another case where the

11:39:22 11     usage of the term in the specification encompasses things

11:39:26 12     that are not as limited as the construction for it.

11:39:31 13               And in the tables, usually the tables, people

11:39:35 14     don't read those necessarily as much, but they're headed,

11:39:40 15     you know, the following nucleosides, and then it has lists

11:39:44 16     of nucleosides, and those include things that are not OH

11:39:47 17     and 5' position.  There are plenty of nucleosides disclosed

11:39:54 18     that are not limited to OH and 5' position.

11:39:57 19               And the prosecution, a claim was submitted that

11:40:01 20     said a nucleoside of the formula, and then it had an R[1] that

11:40:07 21     could be a variety of substituents not limited to OH.  So

11:40:11 22     you use the word nucleoside to refer to that group of

11:40:15 23     compounds.

11:40:15 24               Now, their expert came in and said I don't

11:40:25 25     agree.  He said the usage of the term "nucleoside" in those

11:40:29 1   tables and in the specification is, I disagree with.  It

11:40:34 2   is contrary to the way I construe the term but he doesn't

11:40:37 3   get to simply change the meaning of the term based on his

11:40:41 4   disagreement with it.  And he just didn't understand how

11:40:45 5   *Phillips* works and how the law works with regard to

11:40:48 6   construing patents.

11:40:49 7        So I originally might have spent more time more

11:40:57 8   leisurely going through the intrinsic record, but the big

11:41:00 9   issue here, Your Honor, I believe is that this nucleoside

11:41:04 10   term is in two patents at issue, the '054 and the '597.  And

11:41:12 11   '597 uses the phrase "nucleoside or a phosphate thereof" or

11:41:19 12   "a salt ester thereof."

11:41:22 13        So because of that usage in, and in claim 25 --

11:41:28 14   and the '054 patent doesn't saw that.  It just says

11:41:31 15   "nucleoside."  So because of that longer phrase, they said

11:41:37 16   "nucleoside" must not be as broad as we say.  It must mean

11:41:42 17   OH at the 5' position and you can have "or a phosphate

11:41:50 18   thereof" specifically called out.

11:41:52 19        And they say, if you say "a phosphate thereof,"

11:41:55 20   you are talking about a nucleotide, not a nucleoside.

11:41:59 21        This is the fundamental disagreement between us.

11:42:01 22   We say that a nucleotide is a subset of nucleosides, and all

11:42:06 23   the definitions and constructions we believe are consistent

11:42:09 24   with that.

11:42:10 25        They say, for example, a nucleotide is a

phosphorylated nucleoside.  They don't say it's not a
nucleoside, it's a phosphorylated nucleoside.

It can be phosphorylated at the 3' or the 5'
position.  It doesn't have to be phosphorylated to be a
nucleotide.  It doesn't have to be phosphorylated at 5'.  So
this argument that nucleotide means phosphorylated at 5' and
nucleoside means OH at 5' are, it's contrary to their own
definitions, and their expert agreed with that.

So I think the crux of the argument here is
whether this longer phrase of the '597 patent trumps
everything.

And we construe the phrase "nucleoside or
phosphate thereof" to mean it's including the phosphate of
that.  It is calling it out specifically.  Perhaps the
lawyer didn't have to use as many words as she used in
claiming that, but it was not intended to make the meaning
of "nucleoside" more narrow.

Your Honor, I think the other key thing on this
point is the '597 phrase could be construed as a whole, and
they argue that nucleoside there means OH at 5'.  And you
could construe that phrase which has a lot more words in it
to be different in scope from claim 25 of the '054 patent,
and that is not inconsistent.  That is not -- courts have
done that.  We cited the cases in our brief that point out
that if you are talking about the use of a same term within

a larger context, that may have a different meaning than absent that context.

So at most, we would say that in the '597 patent, at most, that is limited to 5' OH.  But that doesn't change the genus aspect of claim 25 which I think was clear from the prosecution history.

I don't need to go into those slides all over again.

In a nutshell, and as about as brief as I think I can probably make it, those are our points on that.

THE COURT:  Okay.  Thank you very much.

(Elmo settings adjusted.)

MR. SHEAR:  Your Honor, on "nucleoside," it follows the same approach we have been talking about this whole day, this nomenclature approach.  To one of skill in the art, the term has meaning.  If you are going to modify it just as their patent contemplates in certain circumstance, you are welcome to modify it, but you have to explain to one of skill how you are doing that.

So we put forth the plain and ordinary meaning of a nucleoside that is well understood to those of skill in the art.  Nucleoside means that at the 5' position, you have an OH.

Now, that is most notably to differentiate it from nucleotides which, in the body, the OH can be taken off

11:45:42 1  or chemically outside the body, frankly.  At some place, the
11:45:45 2  OH can be taken off, phosphorylated, adding this phosphorus
11:45:50 3  group right here, and that changes it from a nucleoside to a
11:45:53 4  nucleotide.  And the distinction is important because
11:46:02 5  they're different things.
11:46:03 6      Now, Idenix took us to task for our use of the
11:46:07 7  term "moieties."  We use the term "moieties" because that is
11:46:10 8  what they used when they explained to the Court in England
11:46:14 9  what a nucleoside was.  A compound comprising base and sugar
11:46:18 10  moieties with hydroxyl groups at the 3' and 5' positions is a
11:46:22 11  nucleoside, and a nucleoside with one or more phosphates at
11:46:26 12  the 5' position is a nucleotide.  It's just a conventional
11:46:30 13  approach that everyone uses.
11:46:31 14      Nucleoside is 5' OH.  Does that patent
11:46:37 15  contemplate modifying a nucleoside?  Absolutely.  Of course
11:46:39 16  it does.  But if they have to make modifications, they have
11:46:42 17  to explain the modifications that they are making.
11:46:44 18      They made a similar statement in Germany.  It
11:46:48 19  is in our brief.  I don't need to belabor the point.  But
11:46:51 20  their specification, when they're specifically again naming
11:46:55 21  compounds, follows the same convention.  Figure 1 is a
11:46:59 22  good example.  Chemical structure of illustrative
11:47:03 23  nucleosides.  Every single one of them is 5' OH.  Again,
11:47:07 24  following the same convention.
11:47:08 25      And Your Honor might remember before the break

11:47:11 1   we were talking about Ribavirin.  This is the construction

11:47:14 2   here of Ribavirin.  And in the construction where

11:47:17 3   specification where it describes what the name of Ribavirin

11:47:19 4   is, the chemical name, it calls it a ribonucleoside.  A

11:47:28 5   nucleoside as opposed to -tide because there is a 5' OH.

11:47:30 6          Another example from the spec where they made

11:47:33 7   clear that a nucleoside is a 5' OH.  It says:  Lipophilic

11:47:41 8   substituents that can be covalently incorporated into the

11:47:44 9   nucleoside, preferably at the 5' OH position of the

11:47:50 10  nucleoside.

11:47:50 11         MR. SHEAR:  This is actually great evidence

11:47:58 12  that the specification meant to follow the typical naming

11:48:00 13  convention that is used with nucleosides.  Specifically,

11:48:03 14  they are pointing out the 5'-OH position of the nucleoside,

11:48:08 15  that is where in this disclosure they're talking about

11:48:11 16  making the modification.

11:48:12 17         And, again, where we were talking about before,

11:48:22 18  the same point still applies.  Idenix did not redefine

11:48:27 19  nucleosides to include anything that has been disclosed.

11:48:31 20  They aren't making a lexicography argument.  If they do make

11:48:36 21  a lexicography argument, then that is argument suffers from

11:48:41 22  the same thing as the last one, which is if the Court were

11:48:42 23  to hold the 2'-C-branched nucleoside is now a defined term,

11:48:46 24  I think as Idenix may even be pushing for now, if the Court

11:48:50 25  were to go that far, if you look at the example, $R^7$ is

11:48:55 1  not fluorine, because, again, there is never a disclosure of

11:48:58 2  the fluorine at 2' down.

11:49:04 3          Okay.  One quick point on the claim

11:49:07 4  differentiation, because I think this is actually

11:49:10 5  illustrative of what has happened.

11:49:13 6          Nucleosides, Mr. Griffith just argued that nucleo-

11:49:17 7  sides is some broader set of compounds that nucleotides would

11:49:20 8  be a subset of, and it's not disputed that a nucleotide is

11:49:25 9  simply a phosphorylated version of a nucleoside.  That is just

11:49:28 10 what it is.

11:49:29 11         If that were right, if nucleoside were construed

11:49:32 12 so broadly as to encompass both, then "for a phosphate

11:49:38 13 thereof" has absolutely no meaning in claim 1 of the '597

11:49:42 14 patent.  It doesn't need to be there at all because under

11:49:44 15 Idenix's definition, you could have a phosphate just by the

11:49:48 16 use of the term "nucleoside."  So that can't be the direct

11:49:52 17 construction, one where it renders superfluous one, two,

11:49:58 18 three, four words in a claim.

11:50:03 19         And absent any questions, Your Honor, I think

11:50:11 20 that is it on nucleoside.

11:50:12 21         THE COURT:  Okay.

11:50:14 22         MR. SHEAR:  Thanks.

11:50:15 23         THE COURT:  Thank you.  Do you want any more

11:50:17 24 time on nucleosides or do you want to go on to the last

11:50:20 25 term?

11:50:20 1          MR. GRIFFITH:  Your Honor, I won't use any more

11:50:22 2     time.  My only comment would be the word "nucleoside," much

11:50:26 3     like the word "baffle" in *Phillips*, is used in a non-limiting

11:50:29 4     fashion.  Obviously, you can refer to specific nucleosides

11:50:35 5     that have precise formula, but the term by itself is used in a

11:50:38 6     broad fashion to describe that entire class of compounds.

11:50:42 7          THE COURT:  All right.

11:50:43 8          MR. GRIFFITH:  My colleague --

11:50:44 9          THE COURT:  I'm sorry.

11:50:45 10         MR. GRIFFITH:  My colleague is going to argue

11:50:47 11    the next term.

11:50:47 12         THE COURT:  Is there anything further only

11:50:48 13    "nucleoside?"

11:50:49 14         MR. SHEAR:  Not unless it raised a question in

11:50:51 15    Your Honor's mind.

11:50:52 16         THE COURT:  It did not.  Thank you.

11:50:53 17         You have got "administering;" correct?

11:50:58 18         MR. McCRUM:  I've got a minute?

11:50:59 19         THE COURT:  No, I said you have the term

11:51:00 20    "administering."

11:51:01 21         MR. McCRUM:  Sorry.  I'm just thinking about

11:51:03 22    60 seconds.

11:51:04 23         THE COURT:  Yes.

11:51:05 24         MR. McCRUM:  Yes, Your Honor.

11:51:06 25         THE COURT:  I'm going to give --

11:51:07 1          MR. McCRUM:  My partner so kindly left me

11:51:09 2  90 seconds to argue.

11:51:10 3          THE COURT:  I'll double it.  I am going to give

11:51:12 4  you three minutes.  Take your time.

11:51:17 5          (Laughter.)

11:51:18 6          MR. McCRUM:  All right.  I'll try not to sound

11:51:19 7  like an auctioneer today.

11:51:21 8          All right.  So "administering," we'll try to

11:51:24 9  make this brief.

11:51:25 10          Your Honor, by the way, Ryan McCrum on behalf of

11:51:29 11  plaintiffs.

11:51:29 12          The dispute here is Idenix's is proposing a

11:51:34 13  construction of "making available."

11:51:36 14          Gilead is proposing a construction of "providing

11:51:40 15  externally."

11:51:41 16          The reality, Your Honor, is we're perfectly

11:51:44 17  satisfied with Gilead's construction minus the word

11:51:47 18  "externally."

11:51:48 19          The terms "making available," "providing,"

11:51:51 20  "delivering," you pick the synonym.  We think they all are

11:51:55 21  the same as the term "administering."  The real dispute is

11:51:58 22  whether it should be qualified by the term "externally."  We

11:52:01 23  don't believe it should.

11:52:03 24          We believe that the strongest evidence of this

11:52:08 25  may be conclusive.  You may not need to look further unless

11:52:11 1  Your Honor is looking at the claim language itself.

11:52:13 2  This is claim 1 of the '600 patent.  It refers

11:52:16 3  to when administered in vivo.  That is what the claim

11:52:21 4  language says, Your Honor.  It expressly contemplates in

11:52:26 5  vivo administration, which is what Gilead contends should

11:52:30 6  be excluded.

11:52:31 7  I'm not --

11:52:32 8  THE COURT:  Also, I'm sure you will come to it,

11:52:36 9  the spec contemplates administration by professionals, does

11:52:38 10  it not?

11:52:39 11  MR. McCRUM:  It does, Your Honor.  And we

11:52:41 12  don't dispute that the term "administration" covers both

11:52:44 13  administration by professionals but it also covers

11:52:48 14  administration through in vivo transformation as well.  We

11:52:53 15  contend it covers both, and there is ample support both for

11:52:57 16  the intrinsic record, starting primarily here with the claim

11:53:00 17  language.

11:53:00 18  If you move on to -- sticking with the claim

11:53:06 19  language, I think it is important to note that it talks

11:53:08 20  about administering to a host, Your Honor.

11:53:10 21  "A host" is a defined term in the specification

11:53:13 22  to mean infected cells, cells transfected with all or part

11:53:18 23  of the HCV genome.

11:53:21 24  The only way you can administer to a host and

11:53:24 25  whether -- or the only way administering to a host makes

11:53:27 1    sense is if you construe that to include in vivo

11:53:31 2    transformation.  In other words, you can't administer

11:53:35 3    externally to infected cells located internally.  So

11:53:40 4    Gilead's construction doesn't make a whole lot of sense.

11:53:42 5            They say a host can refer to a petri dish or a

11:53:48 6    flask, Your Honor.  We're not buying that.  Gilead's own

11:53:50 7    expert wasn't buying it.  He testified:

11:53:53 8            You agree that infected cells are located inside

11:53:56 9    a patient or animal?

11:53:58 10           And he said:  Yes, correct.

11:54:00 11           He actually went a little further and actually,

11:54:03 12   based on this notion of the host, he said:

11:54:08 13           Based on that definition, he was asked, the host

11:54:12 14   specifically refers to infected cells, correct?

11:54:14 15           Correct.

11:54:14 16           So the specifications are not simply referring

11:54:16 17   to providing externally to patients and animals; right?

11:54:20 18           That's what the specification says.

11:54:22 19           THE COURT:  I'm afraid we are going to have to

11:54:24 20   cut you off.

11:54:24 21           MR. McCRUM:  I appreciate that, Your Honor.  I

11:54:26 22   think that that is sufficient for now.  I appreciate the

11:54:30 23   extra 90 seconds.

11:54:32 24           THE COURT:  Okay.  Thank you.  We'll hear from

11:54:43 25   defendants.

11:54:45 1          MR. SHEAR:  And Your Honor may have gathered

11:54:54 2   from that discussion, the real dispute is apparently the

11:54:57 3   word "externally" and what it conveys, meaning are these

11:55:00 4   patents about providing a compound to someone or are they

11:55:02 5   about providing a compound to someone and then a bunch of

11:55:05 6   stuff happens later that may or may not treat the disease.

11:55:10 7          So, in other words, can a metabolite that has to

11:55:12 8   go through multiple phases and functions within the body be

11:55:14 9   administered.

11:55:15 10         And, of course, it is our position that in the

11:55:18 11  context of this patent, that simply isn't what administer

11:55:25 12  means.  Administer has a plain and ordinary meaning.  It

11:55:30 13  means to give a tablet, give some eyedrops, inject someone

11:55:35 14  with something, but it is you are administering a compound.

11:55:37 15         That is entirely consistent with the intrinsic

11:55:40 16  record, as Your Honor noted.  It talks about professionals

11:55:44 17  administering or supervising the administration of the

11:55:48 18  composition.

11:55:48 19         There is a specific reason, by the way, that

11:55:51 20  this is phrased the way that it is.  The specification

11:55:57 21  contemplates not only specific nucleosides, which, by the

11:56:03 22  way, can be administered in their own right.  There is no

11:56:04 23  reason as counsel suggested that you couldn't give someone a

11:56:07 24  tablet and then that tablet makes its way through the body

11:56:11 25  and get to an infected cell without some sort of

11:56:13 1  transformation.  That can certainly happen.  It is not what

11:56:16 2  happens in the accused product, which is why they're arguing

11:56:19 3  for the construction they're arguing for.

11:56:21 4       But the patent also specifically contemplates

11:56:24 5  prodrugs.  And prodrugs are nothing more than a compound

11:56:27 6  that has been modified in some way so that when you take it,

11:56:32 7  the modification falls off.  Usually it is because you can't

11:56:36 8  get it into the blood.  You can't get it into a cell.  You

11:56:40 9  modify it some way.  So prodrugs can be administered, and

11:56:43 10  our product is a prodrug.

11:56:44 11       And it's a later metabolite that is ultimately

11:56:48 12  active.  So that is the reason for the dispute.  But that is

11:56:52 13  also the reason that their patent contemplates what it does.

11:56:56 14       Now, counsel pointed to the term "host."

11:57:02 15       I missed it.  There it is.

11:57:08 16       "Host" is a defined term in the specification.

11:57:10 17  We agree with that.  What we disagree with is counsel's

11:57:14 18  focus on the words "infected cells."  And he is right.  Our

11:57:16 19  expert said what our expert said because everything that

11:57:18 20  he said was right.  What he said doesn't contradict the

11:57:23 21  proposed construction in any way, shape or form.

11:57:24 22       "Host" is defined more broadly than a person

11:57:27 23  that is infected with HCV.  Host is also defined as cells

11:57:33 24  transfected with all or part of the HCV genome.  Those are

11:57:38 25  petri dishes.  Those are assays that one of skill in the art

11:57:40 1  would use in an in vitro assay to determine as a preliminary

11:57:44 2  matter before you get to clinical trials and all of that.

11:57:48 3      As a preliminary matter, that is how you would

11:57:51 4  determine whether or not there is activity, whether or not

11:57:54 5  you progress further.  That is what cells transfected with

11:57:57 6  all or part of the HCV genome are used for.

11:58:01 7      So when you talk about administering to a host,

11:58:04 8  we're not just talking about giving it to a human or giving

11:58:06 9  it to someone with transfected cells, we're also talking

11:58:10 10  about it in this context because of the way they define the

11:58:12 11  term.

11:58:13 12      THE COURT:  But isn't the entire context of the

11:58:14 13  patent to treat a human who is infected with HCV?

11:58:21 14      MR. SHEAR:  It is.  I don't disagree with that.

11:58:22 15  But the way that they defined "host" because the claim says

11:58:26 16  "administered to a host," "host" is a defined term which for

11:58:30 17  reasons I don't understand that they chose to do this, they

11:58:34 18  chose to include cells transfected with all or part of the

11:58:38 19  HCV genome in their definition of "host."

11:58:41 20      THE COURT:  But you are saying one of skill

11:58:46 21  in the art reading this patent would not think that you

11:58:49 22  were treating a host when you were treating infected cells

11:58:53 23  through a metabolite of the product that is being claimed.

11:58:59 24      MR. SHEAR:  If you substitute the word

11:59:01 25  "treating" with "administering," I would agree with what you

1    said.

2            So one of skill in the art would not think that

3    you are, when you say administering to a host one of skill

4    in the art, would not think you are delivering a metabolite.

5    That by just giving whatever the compound is, you are

6    administering it to that person or you are administering to

7    the host, you are testing the compound to see if it would

8    work.

9            THE COURT:  And that's just a result of how they

10   drafted this definition?

11           MR. SHEAR:  It is a result of how they drafted

12   the definition, exactly.  It is unusual to see the "phrase

13   administering to a host" and have "host" defined in this

14   manner.

15           THE COURT:  So if their answering brief, they

16   said your construction would "defeat the entire purpose of

17   the asserted patent and asserted claims which is to deliver

18   compound internally to be effective in treating HCV."  You

19   say that is correct.

20           MR. SHEAR:  No, I disagree with that contention.

21   So the only way that contention works is if you assume

22   that the only way you can treat someone is by giving them a

23   prodrug version of the compound.  I disagree with that.

24           THE COURT:  But certainly your construction

25   would take outside the scope of the claims the use of a

12:00:11 1    prodrug version.

12:00:12 2                MR. SHEAR:  Right.  And by the way, they claimed

12:00:14 3    prodrugs.  If you look at claim 8 of the '054.  It is not

12:00:17 4    asserted because it has the wrong compound.  You can't

12:00:19 5    assert if you don't infringe it, but claim 8 specifically

12:00:22 6    sets forth prodrugs.

12:00:23 7                THE COURT:  Because we're not talking about the

12:00:25 8    '600, right?

12:00:26 9                MR. SHEAR:  It's all three.  I'm sorry.  This

12:00:30 10   term covers all three.

12:00:30 11               So the '600 patent has a different twist.  That

12:00:33 12   why don't we get to it right now since counsel focused on

12:00:37 13   it.

12:00:41 14               This is it.  Okay.  So Idenix makes a primary

12:00:46 15   argument that our version, our view of the world of the term

12:00:51 16   "administering" is improper based upon this phrase when

12:00:56 17   administered in vivo provides.  They say that is inconsistent

12:01:00 18   with what the idea of administering up here is as it is used

12:01:03 19   in the claim.

12:01:04 20               It's actually entirely consistent with our view

12:01:07 21   of the world.  So the term is "administering," meaning

12:01:10 22   "giving," present tense, "giving to someone."

12:01:13 23               Notably, down here when it says when

12:01:16 24   administered.  It's past tense.  So, in other words, after

12:01:19 25   you give the drug to the host, stuff happens in vivo.

12:01:25 1     But that is actually entirely consistent with
12:01:28 2   our definition because this is talking about what happens
12:01:30 3   after administration.  Not the step of administration.
12:01:37 4     So the '600 patent is actually consistent with
12:01:41 5   our view of the world.  That administering is "providing
12:01:44 6   externally" and that doesn't include metabolites.
12:01:47 7     THE COURT:  Are prodrugs disclosed in the
12:01:52 8   specification of any of these three patents?
12:01:55 9     MR. SHEAR:  They are.  Not the prodrug we are
12:01:57 10  using, but, yes, they are.  Prodrugs absolutely are.  In
12:02:01 11  fact, claim 1 of the '600 patent contemplates prodrugs.  It
12:02:03 12  says, "provides pharmaceutically acceptable leaving group,"
12:02:09 13  which is, which they're alleging is a prodrug.  That is
12:02:14 14  where they're infringement contention is that that is our
12:02:16 15  prodrug.
12:02:20 16    Absent any other questions, Your Honor, I'll be
12:02:26 17  seated.
12:02:27 18    THE COURT:  No, I think that is it.
12:02:28 19    MR. SHEAR:  Okay.
12:02:29 20    THE COURT:  Plaintiffs are out of time, so I
12:02:32 21  think that covers all of the terms.  It certainly takes all
12:02:35 22  the time that we had.
12:02:37 23    Separate from claim construction is there
12:02:41 24  anything else we should talk about while we're together,
12:02:44 25  from plaintiffs?

12:02:44  1          MR. GRIFFITH:  Nothing from plaintiffs, Your

12:02:45  2   Honor.

12:02:45  3               THE COURT:  Defendants?

12:02:46  4               MR. SHEAR:  Nothing, Your Honor.

12:02:46  5               THE COURT:  Thank you all for very, very helpful

12:02:49  6   argument.  We'll take it under advisement.  And we will be

12:02:51  7   in recess.

12:03:11  8               (Claim construction hearing ends at 12:03 p.m.)

12:03:17  9

12:03:17 10       I hereby certify the foregoing is a true and accurate
              transcript from my stenographic notes in the proceeding.

         11

         12                          /s/ Brian P. Gaffigan
                                     Official Court Reporter
         13                           U.S. District Court

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25